# EXHIBIT 76



Dealers | About | Contact | Shop

SEARCH ▶

| Riflescopes | Lasers | Binoculars | Spotting Scopes | Telescopes | Microscopes | Tripods | Biometric Safes |

| Trail Cameras | Metal Detectors | Monoculars | Mounts / Rings | Flashlights | Grips / Bipods | Rifle Cleaning Kit |

**Browse by Category**
Biometric Safe

Riflescopes
Binoculars
Spotting Scopes
Laser Sights
Telescopes
Microscopes
Tripods
Rifle Scope Rings Mounts
Red Dot Scopes
Monoculars
Flashlights
Sports Watch
AR 15 Scopes
Metal Detectors
Trail Camera
Back

Home
**Products**
Search
Dealers
Distributors
About Us
Contact Us
Product Reg.
Optics Guide
Binoculars with Monopod
Product Manuals

◆ Biometric Safe



**AX11620 - Compact Biometric Gun Safe by Barska**

The smaller dimensions of the safe mean that it can be kept in little spaces out of reach of everyone but still accessible to the owner. No combinations to remember or carry a key because your fingerprint is the key that opens the safe door! Up to 30 users, Store anything you want to keep hidden, Pre-drilled holes allow the safe to be mounted into a wall, onto a shelf or counter top.

New Silent Access Feature
Allows you to mute beeping notification

2 solid steel locking bolts
Operates on 4-AA batteries (included)
CA DOJ Approved
Includes protective floor mat ensuring that items are not scratched, set of emergency back-up keys and mounting hardware
Dimensions: 12" x 8" x 7.75"
Inner Dimensions: 11.5" x 7.5" x 5.75"
Weight: 12 lbs

**BUY NOW ▶**





 rate this product

 Tell a Friend

Phone Orders Call: 1-888-666-6769 Ext: 141
Mon - Fri 9AM - 5PM PST

BARSKA®
VALUE. QUALITY. NEW TECHNOLOGY.

BARSKA®
A Trusted Brand
Since 1994

Manufacture &
Supply Contact

★ MILITARY    AST    OEM

Additional Info    Comments    Product Specs

The smaller dimensions of the safe mean that it can be kept in little spaces out of reach of everyone but still accessible to the owner. When the contents must be accessed, the state of the art locking mechanism is opened through the high-tech art of fingerprint recognition. The owner of the biometric gun safe can record up to 30 fingerprints that open the lock immediately after the safe is purchased. Some owners want to have one or more other people who can open the safe in case a need arises in their absence, Important documents, valuables, and firearms are placed inside the safe for secure keeping and the safe is stored in an obscure location. Only the person or persons who have recorded a fingerprint in the safe will be successful in opening it. Valuable contents are protected from thieves who are completely unable to access the interior of the safe. If the contents

must be accessed quickly, the touch of a finger in the correct position against the locking mechanism will open the lock and provide immediate access. Having a biometric gun safe in the house means that the weapon is kept out of the reach of small hands. No more need for finding the right key or remembering a complex numeric combination under duress. Most biometric safes include a key for traditional access in the event access to the fingerprint is not available, and the safe must be opened.

## Related Products & Accessories - You may also be interested in these Barska Products



Biometric Safe with Fingerprint Lock



Top Opening Biometric Drawer Safe by Barska



Digital Keypad Safe by Barska



Compact Biometric Gun Safe by Barska



Quick Access Biometric Rifle Safe by Barska

**Barska Products**
- Rifle Scopes
- Rifle Scope Rings
- Rifle Scope Mounts
- Binoculars
- Zoom Binoculars
- Digital Binoculars
- Binocular Telescopes
- Opera Glasses
- Monoculars
- Spotting Scopes
- Telescopes
- Brass Telescopes
- Microscopes
- Digital Microscopes

- Biometric Safes
- Biometric Rifle Safes
- Biometric Gun Safes
- Tactical Flashlights
- Laser Sights
- Metal Detectors
- Tripods
- Heart Rate Monitor Watch
- Gun Cleaning Kits
- Rifle Bipods
- Rifle Grips
- Muzzle Breaks
- Bore Sighters

**Information**
- Product Manuals
- Barska Catalog
- Barska News
- Military Bids
- School Bids - Government Bids
- ASI OEM & Promotional Sales
- Authorized Dealers
- Dealer Setup
- Shop Barska

**Customer Service**
Toll Free: 1-888-666-6769

**Hours Of Operation**
9AM - 5:30PM PST Mon-Fri

**Sat - Sun Contact**
Contact Form

**Location Of Barska®**
1721 Wright Ave
La Verne CA, 91750 USA



Copyright © Barska. All Rights Reserved.

EXHIBIT 77

# Targeting Guns

*Firearms and Their Control*

**Gary Kleck**



**AldineTransaction**

*A Division of Transaction Publishers*

New Brunswick (U.S.A.) and London (U.K.)



Second printing 2006
Copyright © 1997 by Transaction Publishers, New Brunswick, New Jersey.

All rights reserved under International and Pan-American Copyright Conventions. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without prior permission in writing from the publisher. All inquiries should be addressed to AldineTransaction, A Division of Transaction Publishers, Rutgers—The State University, 35 Berrue Circle, Piscataway, New Jersey 08854-8042. www.transactionpub.com

This book is printed on acid-free paper that meets the American National Standard for Permanence of Paper for Printed Library Materials.

Library of Congress Catalog Number: 97-35884
ISBN: 0-202-30569-4
Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Kleck, Gary, 195.-
    Targeting guns : firearms and their control / Gary Kleck.
        p. cm.--(Social institutions and social change)
    Includes bibliographical references (p.   ) and index.
    ISBN 0-202-30569-4 (pbk. : alk. paper)
        1. Gun control—United States.  I. Title.  II. Series.

HV7436.K54   1997                                    97-35884
363.3'3'0973—dc21                                    CIP

# 3

## The Ownership and Acquisition
## of Guns

This book is primarily concerned with the relationships among guns, violence, and gun control. However, to understand these issues it is necessary to first appreciate how common gun ownership is, who owns guns, why they own them, how they get them, and what they use them for. How easily and cheaply guns can be regulated depends to a great extent on how numerous they are and what kinds of people own them. How easily people can be dissuaded from getting, having, keeping, carrying, or using guns depends heavily on why they own them and what they use them for. And how one interprets the relationships between gun availability and crime will depend on how well one understands the impact of crime on gun ownership, in addition to the impact of guns on crime.

### SIZE OF THE CIVILIAN GUN STOCK

Although a few nations may have shares of their households with guns rivaling those of the United States, this country almost certainly has more firearms in civilian hands than any other nation in the world. There are two major ways to measure the size of the civilian gun stock, i.e., the number of guns in the possession of private persons, other than the on-duty arms of the police or military. First, one can cumulate the number of guns manufactured for the civilian market in the past, subtract guns exported out of the country, and add guns imported into the country. Second, one can survey a representative sample of the population and ask whether they own guns, and how many they own. Table 3.1 shows the figures resulting from the first procedure. The data indicate that this cumulated total (hereafter the "production-based estimate" for short), for

all gun types, probably passed the 235 million mark some time around 1994. The handgun total is over 80 million. If one makes the simple assumption that uncounted additions to the gun stock have equaled uncounted losses, the figures imply that for every 100 Americans there are 90 guns of all types, including 31 handguns. There are, however, numerous flaws in these data, discussed at length in *Point Blank* (Appendix 1).

Several major points can be noted about the figures in Table 3.1. First, the existing private stock of guns in the United States is enormous. Even if it were conservatively (and unrealistically) assumed that no gun survived past its fortieth birthday, all older guns being lost, confiscated, worn out, or corroded, and it were assumed that there were no uncounted additions to the stock, there would still have been nearly 170 million guns, nearly 69 million of them handguns, in the civilian stock as of 1994, based solely on guns produced since 1954.

Second, about 63% of the gun stock has been produced since 1965, and thus most guns are still relatively new and not likely to wear out or corrode soon. This is especially true of handguns. Third, among recent additions to the firearms stock, handguns have claimed an increasingly large share. As recently as 1962 only 29% of annual additions were handguns, but by 1994 this had risen to 54%. Fourth, the increasing annual additions of guns was not solely due to population increases, since the per capita rates in the last two columns also show large increases. The rates of increase in per capita ownership turned sharply upward right around 1963, also a watershed year for crime rate increases. From 1964 to 1994, the handgun ownership rate increased by 188%, and the rate for all guns increased by 100%. Thus the biggest increases occurred among the type of guns most frequently owned and used for self-defense and for committing crimes. Fifth, of the 236 million guns in the cumulated stock as of 1994, 36% were handguns and the rest were long guns. Despite the increases in handguns, long guns are still far more common.

The other major way of measuring the size of the gun stock, as well as the prevalence of gun ownership in the population, is through surveys of representative samples of the nation's population. Table 3.2 displays the results of eighty-four national surveys conducted between 1959 and 1996. There were no national surveys asking a gun ownership question before 1959. All of the surveys asked whether there was a gun of some kind in the respondent's (R) household, and some asked more specifically whether there was a handgun in the household. With one minor exception, only since 1980 have any national surveys asked whether the R individually owned any of the household guns. The surveys indicate that since at least 1959 about 46%, plus or minus 6%, of U.S. households report owning a gun. They show no consistent evidence of an increase in household gun ownership in the United States from 1959 to 1995. On the other hand, they

show an sharp increase in household ownership of handguns from about 16% in 1972 to about 26% in 1982. Taking into account sampling error, there is no consistent evidence of any trend in handgun prevalence either before 1972 or after 1982.

The survey-based estimates have all the widely discussed deficiencies of survey data (e.g., see Deming [1944] 1978 for a classic enumeration). Rs can forget, not be aware of, or lie about guns in their households. They may be especially reluctant to report gun ownership if they believe they can be identified. For example, the General Social Surveys (GSS) done by the National Opinion Research Center are among the few national surveys done face-to-face in the Rs' homes, a format where Rs necessarily are identifiable. Since 1990, the GSS has yielded gun prevalence estimates three to 6 percentage points lower than other surveys done at the same time, a difference that cannot be entirely attributed to sampling error (Table 3.2).

Rs can also misunderstand what the question means, failing to understand that air guns should not be reported, or that guns kept in a vehicle, garage, or barn, or at a business should be reported along with those in their house or apartment. Some Rs may not know about the gun ownership of other household members, others may forget about guns long gathering dust in an attic or basement, and some may no longer think of an antique family heirloom as a firearm. These problems with the survey estimates, and others, are discussed in detail in *Point Blank* (Appendix 2).

A failure of Rs to report guns on business premises is probably fairly unimportant. In a 1968 national survey, 18% of all businesses and 26% of retail businesses reported keeping a gun on the premises (U.S. Small Business Administration 1969:117). In 1992, there were 6,318,000 business establishments of all types and 1,564,000 retail establishments (U.S. Bureau of the Census 1995:550). If one gun was kept on each gun-owning premise, these figures would imply only about 1.1 million guns on business premises, about 400,000 of them in retail businesses.

On the other hand, a 1993 national survey estimated that 12.4 million adults carry guns in their vehicles in a given year (Table 6.2). Since some of these might be kept only, or usually, in a vehicle, some Rs could fail to report them when asked about guns in their "home or garage." Thus, up to 12 million guns might be missed in surveys for this reason. Surveys in future should therefore ask about guns kept in vehicles and in places of business.

There is a major gap between most estimates of the gun stock based on surveys and those based on production and import/export figures. Perhaps the most conspicuous seeming discrepancy is that survey results indicate no increases in gun ownership prevalence since 1959, while the production-import estimates indicate enormous growth in the size of the

total gun stock, especially from about 1965 to 1994. Even the handgun prevalence figures from surveys indicate no increase after 1982. One possible reason for the apparent discrepancy would be an increasing tendency of Rs to fail to report guns that they did in fact possess. Another possible explanation is that gun ownership increased among segments of the population largely excluded from survey samples, including young adult minority males, illegal immigrants, transients, and criminals. Maybe these groups, though a relatively small share of the entire population, absorbed a disproportionately large share of the guns, especially handguns produced in recent decades. Evidence concerning gun possession trends in some of these groups will be presented later.

There is strong evidence indicating that the discrepancy between survey-based estimates of the gun stock and production-based estimates is partly due to survey Rs failing to report guns in their households. First, the measured growth in the survey-estimated handgun stock is not nearly large enough to gibe with the additions to the handgun stock indicated by production figures. From 1968 to 1993, there were a net 53.3 million handguns added to the civilian stock (Table 3.1, cumulated handgun stock for the end of 1993 minus that for the end of 1968). On the other hand, comparison of survey results from the 1993 LH Research (1993b) survey with the 1968 Harris survey (PB:54) indicates a growth of survey-reported handguns of only 39.3 million, 14.0 million short of the number actually added to the handgun stock. Thus, the survey-reported growth in the stock of handguns is missing 26% of the 1968–1993 growth as directly measured by production/importation figures. Contrary to speculations by Cook and Moore (1994:268–69, and note 1, p. 566), the discrepancy between production and survey figures cannot be accounted for simply by growth in the total number of U.S. households and increases in the number of guns owned per gun-owning household, since these are both taken into account in these computations. Underreporting by survey Rs very likely continues to be part of the explanation for the discrepancy, with some newly handgun-owning households failing to accurately report their handgun ownership to survey researchers.

Further, in an Illinois survey, there was direct evidence of Rs wrongly denying gun ownership because they had a gun owner's license, but claimed, without any plausible alternative reason, not to own any guns (PB:455–57). Likewise, surveys of registered gun owners indicate that as many as 12.7% fail to report guns (Kellermann et al. 1990; Rafferty, Thrush, Smith, and McGee 1995).

Finally, underreporting of gun ownership can be inferred from the differing percentages of married men and women who report household gun ownership. Within the population of members of married couples, the percentage of women who report household gun ownership should

be identical to the percentage of men who do so, since the population of households being covered is identical for both sets of Rs, excluding the small number of households with residents who are married but living apart. In surveys, however, the share of married women reporting a household gun is considerably smaller than the share of married men doing so. For example, in the 1993 National Self-Defense Survey (Kleck and Gertz 1995), 50.1% of married men reported a household gun, but only 37.4% of married women did. Further, a national survey in Canada found that 38.5% of married men reported a household gun, but only 22.8% of married women did so (H. Taylor Buckner, letter to the author, February 9, 1995). Finally, fourteen consecutive General Social Surveys found married women to report household guns at lower levels than married men (Table 3.3).

Rs may feel that while it is their prerogative to report their own guns, it is not their place to "inform on" other household members, so to speak. Since it is most commonly a male who owns the household guns, it would most often be women Rs who would be in the position of reporting about some other household member's guns. It is also possible that some married women are simply not aware of their husband's gun ownership. Given that married women make up around 31% of the usual adult survey samples (Davis and Smith 1994), for them to underreport household ownership by about 12 percentage points would imply that this response bias alone could produce underreporting of household gun ownership of 4 percentage points.

There is reason to believe that underreporting of gun ownership increased after 1987. Table 3.3 shows trends in the discrepancy between husbands' and wives' reports of household gun ownership in married couple households from 1973 to 1993. Prior to 1988 (or perhaps 1985), there was only about a 2–3 percentage point gap between husbands and wives, but the discrepancy was consistently double or triple this size thereafter, around 7 percentage points. The push for federal gun controls, especially the Brady Act and the assault weapons ban, may have intensified a sense among gun owners that their ownership of guns was increasingly being defined as illegitimate, thereby strengthening the motivation to conceal that ownership.

Another indication of increasing problems with survey measures of gun ownership prevalence is the increasingly erratic estimates after 1989, and especially after 1993. Table 3.2 shows three national surveys indicating 37 or 38% of households reporting a gun, and two surveys indicating 51 and 53% figures, all in the 1993–1996 period. Taken at face value, the figures indicate that household gun prevalence increased from 42% in June 1993 to 51% just four months later, before plummeting to 37% a year later. These wild swings are far larger than random sampling error (typ-

ically plus or minus 3 percentage points for any one survey) could ac-
count for. It is also highly unlikely that actual trends in gun ownership
were really this erratic. The volatility of estimates may instead be attribut-
able to an increased sensitivity of the gun-owning population to gun-
related political events and corresponding swings in news coverage of
those events.

Underreporting is likely to be greatest among—though not limited
to—those who possess guns illegally or for criminal purposes. Thus, tests
of the validity of responses to gun ownership questions that use samples
of persons who have lawfully registered their guns or obtained hunting
licenses (e.g., Kellermann et al. 1990; Rafferty et al. 1995) are likely to miss
most of the underreporting because they are artificially confined to the
minority of gun owners who have already, in effect, publicly declared
their willingness to let their gun ownership be known to strangers, i.e.,
the legal authorities. Nevertheless, even within these biased samples of
registered gun owners, as many as 12.7% may have falsely denied gun
ownership (Rafferty et al. 1995:284).

It may also be relevant to note that when a 1994 national survey con-
ducted for *U.S. News and World Report* asked whether anyone in the R's
household had owned a gun in the previous five years, 52% were willing
to report gun ownership (DIALOG 1995), even though only 41–45% re-
ported *present* household gun ownership in two national surveys con-
ducted within two months of the first survey (compare with the January
1994 *Los Angeles Times* poll and the spring 1994 NORC poll, Table 3.2).
While some of the discrepancy could be due to sampling error and to a
few gun owners getting rid of their guns, some may also be due to gun
owners feeling safe reporting past ownership without acknowledging
current ownership.

In sum, there is strong evidence that a significant minority of gun
owners incorrectly deny gun ownership in surveys. However, while we
can detect some of the underreporting, some response errors very likely
remain undetected. Therefore, we cannot be sure how much surveys
understate U.S. household gun prevalence, though 5 to 10 percentage
points would seem a reasonable minimum estimate.

By international standards the fraction of U.S. households with guns is
extraordinarily high. The nearest known competitor is Norway, where
32% of households report guns (Killias 1993b:292). Nevertheless, house-
hold prevalence in the United States may actually be lower today than it
was in earlier periods, when the country was predominantly rural. For
example, per capita domestic gun production in the early 1890s was
higher than for typical recent years [compare Kennett and Anderson
(1975:101) with Table 3.1].

Earlier evidence (*PB*:Table 2.3) provided estimates of the size of the

Case: 1:10-cv-04184 Document #: 180-7 Filed: 04/27/12 Page 13 of 101 PageID #:8173

U.S. gun stock, based on national surveys that asked Rs how many guns
they owned. These estimates all supported the view that there is a huge
number of guns in private hands. All but one of the estimates, however,
were substantially lower than production-based estimates for the same
years (Table 3.1). Some of the discrepancy is due to used guns in the
hands of dealers and to new guns produced or imported but still in the
hands of manufacturers, importers, wholesalers, and dealers, and some is
due to survey underreporting. Other flaws in the survey estimates and
reasons for the discrepancy are discussed in *Point Blank* (Appendix 2).

Most households with guns have long guns (85%), and most (56%)
own only long guns, whereas only one-seventh of owning households
have only handguns (analysis of GSS data; Davis and Smith 1994). How-
ever, it is the handgun-only type of household that will be of special
interest later because it may be the type most likely to have guns for
crime-related reasons (Bordua et al. 1979). Conversely, two-thirds of
households with handguns also have long guns. This fact is significant
because it suggests that when handguns are used in crimes or for defense
(at least when in the home), the use is often the result of a choice between
different types of guns, rather than the fact that only handguns were
available. This would support the view that there is something about
handguns that gun users regard as especially suitable for defensive and
criminal purposes. An even more important implication is that if hand-
guns were restricted, most current handgun owners would not even have
to acquire new guns in order to have substitute firearms to use. The
implications of this substitution possibility will be discussed in Chapter 4.

It is useful to obtain estimates of the number of guns owned per owner.
If it is assumed that the true fraction of households and individuals
owning guns is 10% higher than survey figures indicate, to adjust for the
underreporting previously discussed, combining 1993 GSS figures with
the production cumulation figures in Table 3.1 yields rough estimates of
the numbers of guns owned per owner. Among households owning guns,
an average of over five guns are owned, considerably higher than most
survey data suggest. The distribution, however, is undoubtedly skewed
to the right, with a few households owning very large numbers of guns,
and most households owning a few (*PB*:54). Among households with a
handgun, the average number of handguns owned is about 2.8. Among
individuals age eighteen or over who own guns, the average number of
all guns owned is about 3.4, and among individuals with handguns, the
average is about 2.0 handguns. Both these data and survey data support
the conclusion that although gun ownership is widespread in the United
States, a large share of the guns may also be in relatively few hands (see
also Cook 1983:78–79).

Regardless of the major source on which one relies, it is clear that the

number of guns currently in private hands in the United States is very large, whether or not the number is 236 million. One straightforward policy implication is that policies that seek to reduce gun violence by reducing the overall supply of guns, as distinct from reducing the number possessed by high-risk subsets of the population, face an enormous obstacle in this huge existing stock. Even if further additions to the stock could somehow be totally and immediately stopped, the size of the stock and the durability of guns imply that, in the absence of mass confiscations or unlikely voluntary surrenders of guns, it could be decades before any significant reduction in the number of working guns became apparent.

## WHO OWNS GUNS?

In a nation where at least half of the households have a gun, it would be difficult to regard gun ownership as an unusual or deviant status. Nevertheless, gun owners do differ from nonowners in some respects, as the data in Table 3.4 demonstrate. These figures were computed from the combined 1990, 1991, and 1993 GSS conducted by the National Opinion Research Center (for details of the surveys, see Davis and Smith 1994). For descriptive purposes, the following material discusses bivariate relationships between gun ownership and other variables. The reader is strongly cautioned against drawing causal inferences before the results of multivariate analyses are discussed.

Males are far more likely to personally own guns than females, although many women live in households with guns that belong to a male in the household. Whites are much more likely to own guns or handguns than blacks, although the difference is much smaller for handguns. Most of this racial difference is due to the fact that most blacks live in big cities, where gun ownership is lower. Black households in rural areas are just as likely to have a gun as white households in those areas, and racial differences in other kinds of places are small (Stinchcombe, Adams, Heimer, Scheppele, Smith, and Taylor 1980:107). Guns are more common among whites in those ethnic groups that immigrated earlier to the United States than in more recently arrived white ethnic groups (ibid.). Gun ownership is higher among middle-aged people than in other age groups, perhaps reflecting higher income levels and the sheer accumulation of property over time. Married people are significantly more likely to own guns than unmarried persons. Protestants are more likely, and Jews far less likely than others to have guns (Table 3.4). Middle- and upper-income people are significantly more likely to own than lower-income people, but co

sistent with the stereotype of gun ownership as a working-class attribute, persons with manual jobs are more likely to own guns (contrast with Wright and Marston 1975). Gun ownership is somewhat lower among better educated persons.

Along with the sex difference, perhaps the strongest differences in gun ownership are by size of place: rural people are far more likely than urban residents to own guns, including handguns. By region, gun ownership is highest in the South followed by the Rocky Mountain states, the Midwest, then the Pacific states. Finally, it is the Middle Atlantic states, and, even more so, New England, that stand out as the oddities, showing far lower levels of gun ownership than the rest of the nation.

Political conservatives are more likely to own guns than liberals. Not surprisingly, hunters are far more likely to own guns than nonhunters. Finally, contrary to what might be common expectation, persons afraid to walk in their neighborhoods or afraid in their homes at night are significantly less likely to own guns or handguns, and those burglarized or robbed in the year prior to the interview are less likely to own guns. Alternatively, gun owners are less likely to be victimized or fearful.

Perhaps what is most striking about this entire set of relationships is the absence of consistent indications of a link between gun ownership and criminal or violent behavior by owners. It is true that both gun ownership and violence are more frequent among males and southerners. On the other hand, gun ownership is also higher among whites than among blacks, higher among middle-aged people than among young people, higher among married than unmarried people, higher among richer people than poor, and higher in rural areas and small towns than urban areas, patterns that are all the reverse of the way in which violent criminal behavior is distributed. In short, gun ownership is not consistently higher in groups where violence is higher.

For the most part, there has been very little change in recent decades in the patterns of gun ownership, or changes in who owns guns. The major patterns of gun ownership in the 1990s (Table 3.4) were also evident in survey data from 1959 (Wright et al. 1983:87, 89) and throughout the period from 1973 through 1987 (U.S. Bureau of Justice Statistics 1988:167, 169). Further, when Wright and his associates combined data from a 1959 survey and a 1976 survey, they found that the predictors of gun ownership did not interact with the year of the survey, indicating that the effects of the variables had not changed over time (1983:92).

The press gave considerable attention to claims that gun ownership increased sharply among women in the 1980s. Beyond a pair of surveys sponsored by a gun manufacturer, cited endlessly by the NRA in propaganda aimed at women, there was little evidence for the asser-

tion, and national surveys indicated little change (PB:23–24). The percentage of women reporting that they personally owned a gun in the GSS was 11.3% in 1980, and 9.6% in 1991 and 14.0% in 1993 (computed from Davis and Smith 1994). Given that these estimates all had a margin of error due to random sampling error of about 2 percentage points, they do not support a claim of increasing gun ownership among U.S. women from 1980 to 1993 (see also Sheley, Brody, and Wright 1994; Smith and Smith 1995).

There was, however, one important shift in the social distribution of gun ownership in recent decades. During the period of the nation's fastest increases in violent crime rates, from 1964 to 1974, gun ownership apparently increased more among criminals than it did among noncriminals. The most direct evidence of such a trend is survey data comparing persons with and without a criminal arrest or conviction. Although the GSS asked both gun ownership and arrest questions, these surveys began only in 1973, too late to indicate trends over the entire period of interest, and the GSS ceased asking the arrest question in 1984. Pre-1973 ownership surveys did not ask any criminal record questions. GSS data point to a possible continuation of this trend into the 1973–1984 period. Gun and handgun ownership among persons without arrest records remained fairly stable over this period, whereas household ownership of guns in general, but especially of handguns, increased more for arrestees than for nonarrestees (PB:59).

## THE BLUMSTEIN SPECULATION ABOUT DIFFUSION OF GUNS AND YOUTH HOMICIDE INCREASES IN 1985–1991

In contrast, survey data do not indicate that gun ownership increased among high-risk subsets of the population after 1984. When gun homicide increased sharply among young urban blacks in the period from 1985 to 1991, some observers assumed that the increase must have been at least partly due to increased gun ownership among young urban blacks. For example, after accurately noting the close connection between these trends and the increased involvement of black youth in cocaine-selling during the same period, Blumstein speculated that gun increases may have initially been confined to drug dealers and street gang members, but eventually caused a wider "diffusion of guns from drug markets through the larger community of juveniles" (1995:31). It would be illegitimate to engage in the circular reasoning of attributing a gun homicide increase to gun increases, and to then cite gun homicide increases as one's only evidence of the gun increase. Yet, Blumstein offered no other evidence of

the gun "diffusion" that he speculated was partly responsible for increases in gun homicide.

Table 3.2 indicated that there was no increase in the national prevalence of either guns in general or of handguns during the 1985–1991 period, when this sharp increase in gun homicide occurred among young urban blacks. Thus, it would seem that Blumstein's speculation was baseless. One might, however, save the Blumstein thesis by speculating that increases occurred just among blacks, or just young blacks, or urban blacks, or some other high-homicide subset of the population. Table 3.5 displays data on trends in gun ownership in these and related subsets of the population, as measured in the GSS. Unfortunately, these survey data (and other national surveys of the period) do not cover juveniles. Nevertheless, the same forces driving a hypothesized increase in gun possession among juveniles aged 13–17 ought to have also produced increases among those just slightly older, aged 18–24. Note that sample sizes in these surveys are too small to yield stable estimates for small subsets of the population such as low-income urban black males aged 18–24, so we must make do with data on the somewhat larger subpopulations of which this group is a subset. To minimize the instability attributable to small sample sizes for any one survey, three-year averages were computed. Note that these data are used only to judge trends in gun ownership, not absolute levels. Therefore, it is not necessary to assume complete reporting of gun ownership. Rather, it is sufficient to assume that completeness levels, however high or low, were relatively stable over the period around 1985–1991.

Between the beginning of the period in question, ca. 1984–1987, to the end of the period, ca. 1990–1993, there was no significant increase in the prevalence of either guns or handguns among males, blacks, black males, persons aged 18–24, low-income people, or people living in big cities. Indeed, in most of these groups the evidence indicates that gun prevalence declined. The only seeming exception was a nonsignificant 1.8 percentage point increase in handgun prevalence among young adults (of all races and income levels), but even this was entirely a product of a large jump between 1991 and 1993, after the youth homicide rate had already leveled off. One might speculate that the aforementioned possible increases in survey underestimation of gun ownership might be masking increases in gun prevalence within these groups but, absent such selective speculation, the data indicate no increase in gun prevalence in these groups, and none that would go very far in accounting for a doubling of the youth homicide rate.

In sum, no support is found for the Blumstein thesis. Excluding speculation and circular reasoning, there is no empirical basis for believing that increases in gun possession or a "diffusion" of guns into the larger community of inner-city youth was responsible for the gun homicide

increases in the 1985–1991 period. Alternative explanations of violence increases in this period are offered in Chapter 7.

## WHY PEOPLE OWN GUNS

### Stated Reasons

There are two ways one can answer the question, Why do people own guns? The simplest way is to report the reasons people give when they are asked the question. These reasons tend to be utilitarian, reflecting the uses to which gun owners put or anticipate putting their guns. When the questions refer to all guns, without differentiating them by type, the most frequently given main reasons for owning guns are, in descending order: hunting, protection, sport or target practice, and gun collecting. Cook claimed that only a "small fraction of guns are acquired for self-defense purposes" (1991:44), but this assertion is clearly wrong. A December 1989 national survey found that 27% of all owners have a gun *mainly* for protection, and that 62% have a gun at least partly for protection (Quinley 1990). In a 1994 national survey, 60% of all gun owners reported that the *main* reason they owned guns was for sports/hunting, but another 22% mentioned protection as their main reason. Including people's secondary and tertiary reasons for owning guns, 68% owned them at least partially for sports/hunting reasons, and 45% for "self-protection" (*U.S. News and World Report* survey of 16–18 May 1994, DIALOG search of public opinion file).

When the question pertains just to handguns, the leading reason for ownership is clearly protection. About half of handgun owners report that defense or protection is *their main* reason for having a handgun, leaving half who own them mainly for other, mostly recreational reasons. In a 1978 national survey, 45% of handgun owners stated that protection at home or work was their most important reason for owning, with another 8% owning for a law enforcement or security job, arguably also defensive reasons for owning. The next most common reasons were target shooting, cited by just 17%; gun collecting, cited by 14%; and hunting, cited by 9% [Decision-Making-Information (DMI) 1979:40]. In a 1996 national survey, 66% of adult handgun owners in urban areas said that "protection from criminals" was their main reason for owning the gun, while the share was 39% even among nonurban handgun owners (U.S. Bureau of Justice Statistics 1996a:197). Further, among persons in a 1977 Illinois survey who owned *only* handguns, 67% reported that protection was their primary reason for owning the guns, with 73% citing protection

as a primary or secondary reason (Kleck 1984a:105). No other reason for owning handguns rivals protection.

Owners of long guns are most likely to own them primarily for hunting or target shooting, although in the 1977 Illinois survey, even among persons in households with only long guns, 11.4% owned them at least partly for protection (Bordua et al. 1979:231). It should be stressed, however, that in all these surveys "protection" could have been understood by Rs to refer to protection from dangerous animals as well as defense against humans. The most important conclusions to be derived from these data are that most owners of guns in general, and long guns in particular, own them primarily for recreational reasons unrelated to crime, but about half of handgun owners, and some long gun owners as well, own guns mainly for protection. It may be the protection subset of owners that is most relevant to understanding the relationship between levels of gun ownership and violence.

## Modeling Gun Ownership

Another way to explain why people own guns is to develop and test a statistical model predicting gun ownership. Prior research of this type will be reviewed. Interest will first focus on the possible effects of criminal victimization and fear of crime on gun ownership, since these links will be important later in interpreting aggregate-level relationships between gun ownership levels and rates of crime and violence. These can be regarded as situational determinants of gun ownership, because it is assumed that when crime levels change or people relocate into areas with a different crime level, the motivation to get a gun for defensive reasons changes as the situation changes.

Situational determinants can be contrasted with cultural determinants, which are likely to be more lasting mental attributes that people retain over time and carry with them as they move from place to place, to some degree independent of situation. Thus, persons raised to believe in rural values or a southern regional culture conducive to gun ownership are likely to retain these cultural attributes for a time, even after they leave the social settings where they were socialized and where these cultures flourish, carrying their culture with them even when they move into settings less conducive to keeping firearms.

## Fear, Victimization, and Gun Ownership

Some scholars have expressed doubt that fear of crime and prior criminal victimizations motivate gun ownership (Wright et al. 1983). Neverthe-

less, the weight of the best available evidence supports the idea that crime affects handgun ownership, although interpretation of the evidence is clouded by the fact that associations may simultaneously reflect both the effects of fear or victimization on gun owning and the effects of gun ownership on fear and victimization.

Evidence on these issues has been very mixed. Williams and McGrath (1976), Lizotte and Bordua (1980), Lizotte, Bordua, and White (1981), McClain (1983), Hill, Howell, and Driver (1985), Young (1986), Smith and Uchida (1988), and Ellison (1991) all found support for the idea that fear, prior victimization, or perception of high or increasing crime rates motivates gun acquisition, at least for some people, while Wright and Marston (1975), DeFronzo (1979), Stinchcombe et al. (1980), Young (1985), and Sheley et al. (1994) generally failed to detect significant positive associations. Generally the supportive studies were methodologically more satisfactory, but all were seriously flawed.

The best studies of gun ownership done to date are those of Lizotte and Bordua (1980; Lizotte et al. 1981). Though the studies covered only Illinois, the researchers avoided most of the problems affecting research in this area. They used data generated by surveys designed specifically to research gun ownership, measured respondent as well as household gun ownership, could directly identify Rs who owned guns for protection, specified multivariate models of gun ownership, estimated their models with logistic regression methods, and used a three-item measure of fear of crime and a five-item measure of prior victimization. In addition, they explored the possible causal paths through which actual crime levels, perceived crime levels, prior victimization, and fear of crime might affect gun ownership. They found that county crime rates positively affected Rs' perceived level of crime, which in turn positively and significantly affected fear of crime. Both fear and prior victimization were significantly and positively associated with gun ownership for protection.

Some ancillary findings from the Illinois surveys are important to note. Bordua and his associates asked Rs why they owned guns and thus could distinguish those who owned only for protective reasons, mainly for protection, secondarily for protection, or not at all for protection. They found that though women were far less likely to own guns than men, they were more likely to own solely for protection. Likewise, though blacks were generally less likely than whites to own guns, they were more likely than whites to own solely for protection. In particular, 9.8% of all Illinois black female Rs owned a gun solely for protection, compared to only 2.4% of white males, who otherwise were most likely to own guns. These findings are significant in light of the symbolic imagery used by gun control advocates to justify disarming defensive gun owners. Bordua has noted that these advocates paint a picture that stresses the "obstructionist

refusal of 'rednecks' to join the twentieth century" but downplays "disarming frightened black women whose frontier is now." He further suggested that "The common stereotype held among gun control proponents of a Daniel Boone lingering on from yesterday should perhaps give way to that of a black nurse hoping to make it to tomorrow" (Bordua 1988:37, 42).

Although the Lizotte-Bordua studies are the most authoritative to date, both they and their predecessors share important flaws. First, there is the knotty problem of causal order. Whereas fear of crime and criminal victimization might affect gun ownership, gun ownership could also influence the level of fear and the likelihood of victimization. If people buy guns to provide themselves with some security against crime, then gun ownership could well have the intended effect of reducing fear of crime (DeFronzo 1979; Hill et al. 1985). Clearly this is what gun owners believe they experience. As will be discussed in Chapter 5, results from a number of national surveys have all indicated that most protection gun owners feel safer because they have a gun in their home, whereas almost none feel less safe. If these assessments are accurate, the net effect of home gun possession on gun owners is to reduce fear of crime. In surveys done at a single point in time, it is impossible to disentangle the possible negative "reassuring" effects of gun ownership on fear, and deterrent effects on victimization, from the positive "motivating" effects of fear and victimization on gun ownership. The results of prior survey studies may reflect an undifferentiated combination of both effects. Since the effects are of opposite sign, almost any observed association is compatible with the hypothesis that fear and victimization motivate defensive gun acquisition. For example, even a net negative association could be interpreted as indicating a strong fear-reducing effect of gun ownership, in combination with a weaker positive motivating effect of fear on gun acquisition. Likewise, the absence of any relationship significantly different from zero could simply be interpreted as an indication of the two opposite-sign effects canceling each other out, the "reassuring" effects of gun ownership being roughly equal in size to the motivating effects of fear on gun acquisition (a point noted by Wright et al. 1983:129).

Indeed, if one had to interpret existing survey results as bearing on one causal link or the other, one would have to say that the surveys bear more on the effects of gun ownership on victimization and fear of crime than on the effect of victimization and fear on gun ownership. The R's fear has always been measured as of the time of the survey, and victimization measured for the period (usually a year) just prior to the interview. In contrast, gun ownership is a continuing status resulting from a gun acquisition that occurred at some time in the past, usually the rather remote past—in one national survey the median span of gun ownership was

twenty-three years (Quinley 1990). Thus gun acquisition is usually temporally prior to victimization and fear of crime as measured in these surveys. A present-time emotion cannot cause a behavior in the past. Further, current fear is unlikely to be a good proxy for fear prior to gun acquisition in the past, especially twenty-three years in the past. Perhaps the best way to interpret the results of the best survey studies is to conclude that the net relationship between fear and gun ownership is positive, suggesting that the positive motivating effect of victimization and fear on gun ownership may be greater, on average, than the fear-reducing effects of gun ownership. Whether there is actually any effect of fear on gun acquisition cannot be definitively established until research uses a panel design or asks about future intentions to acquire a gun, among nonowners, to assess this temporal/causal sequence.

The second major problem characterizing most of these studies is the conceptual error of thinking that the only way gun ownership can be a response to crime is through the emotional experience of fear. Instead, gun acquisition, even for protective reasons, may be a fairly unemotional act of prudence and planning for the future. Persons acquiring guns may get them not because they are afraid but simply because they recognize the possibility of becoming a crime victim in the future and wish to give themselves another option for dealing with such a situation should it arise. Under this rational decision-making model, some people in effect make rough predictions of the likelihood of their future victimization and the probability that it will occur in circumstances where their possession of a gun might help. If this model is correct, gun ownership is indeed a response to crime, but the effect does not have to be mediated by either fear of crime or even experience with criminal victimization.

Two prior studies related gun ownership to actual (as distinct from perceived) crime rates in surrounding areas. Lizotte et al. (1981:501) found a weak indirect connection between reported crime rates in the R's county of residence and owning a gun for protection—actual county crime rates affected R's perception of how high their county's crime rates were relative to other counties, which in turn affected fear of crime, which influenced the likelihood of protective gun ownership. Smith and Uchida (1988:100–1) found that reported crime rates indirectly affected the likelihood of buying a weapon for protection by increasing household victimization and the perceived likelihood of burglary or robbery victimization in the future.

The rational decision-making explanation ties together all of the existing survey research results just reviewed, the fact that large numbers of gun owners, especially handgun owners, say they own guns for protection, and also the results of aggregate studies that indicate that increases in crime rates can drive up gun ownership rates (discussed in a later

section). However, it should be stressed that this perspective does not preclude the possibility of some individuals acquiring guns in response to fear. There can be multiple paths to protective gun ownership.

## Confidence in the Criminal Justice System

There is another way in which protective gun ownership may be a response to crime. People may acquire guns not merely because they perceive high or rising crime risks, but also because they believe the police and the rest of the criminal justice system cannot adequately protect them from these risks, leading them to the conclusion that they must rely at least partly on their own resources, including gun ownership, for security. In a 1970 national survey, Rs were asked, "Do you think that people like yourself have to be prepared to defend their homes against crime and violence, or can the police take care of that?" (Feagin 1970:805). Among Rs who believed they had to defend their homes and could not leave it to the police, 60% of whites and 33% of blacks reported a gun in their household, whereas among those who felt they could rely on the police, only 35% of whites and 27% of blacks reported a gun.

Lizotte and his colleagues found that a perception of the police as ineffective indirectly affected ownership of a gun for protection by increasing fear of crime, which in turn increased the likelihood of protective gun ownership (1981:501). Later research by Young (1985; see also Young et al. 1987), using more limited data from the Detroit area, also indicated that gun ownership was higher among persons with less confidence in the ability of the police to provide adequate protection. Smith and Uchida found that defensive weapon ownership was higher among persons less satisfied with the "quality of police services in their neighborhood" (1988:97). On the other hand, Whitehead and Langworthy's (1989:274) analysis of a 1982 national survey indicated no net effect of confidence in the police on household gun ownership. This anomalous finding may be due to the failures to measure the R's personal gun ownership or to distinguish defensive or handgun ownership from less crime-related types of gun ownership.

## Aggregate-Level Studies of the Effect of Crime Rates on Gun Ownership Rates

Another way to assess the effects of crime on gun ownership is to use information on aggregates such as states or cities to measure the association between levels of gun ownership and levels of crime, civil disorder,

and other sources of insecurity. In two national time-series studies, Kleck (1979, 1984a) found that rates of total gun ownership, handgun ownership, and even long gun ownership were positively and significantly affected by homicide rates. Because of the high correlation between homicide and robbery rates, the effects of these two crime rates on gun ownership could not be separated, but either variable included in the handgun equation by itself showed a positive and significant effect. These studies are superior to others because they utilized models that allowed for reciprocal causation between gun ownership and crime rates, i.e., crime rates could affect gun ownership levels, and gun ownership rates could affect crime rates. Further, production-based data were used to measure gun ownership levels, thereby counting both legal and illegal gun ownership. Using Kleck's data and a somewhat different estimation technique, Magaddino and Medoff (1984) also concluded that the homicide rate increased handgun ownership levels.

Bordua and Lizotte (1979) examined the relationship between rates of licensed gun ownership and crime rates in Illinois counties. They concluded that crime rates had no effect on rates of legal ownership among men but did have significant positive effects on women's ownership. However, the authors acknowledged that they could not separate ownership of handguns from long guns, noting that the latter are far more common than the former. It may be for these reasons, and because much protective gun ownership is illegal, that the authors found no effect of crime rates on legal ownership among men. Further, they did not model the reciprocal relationship between gun levels and crime rates.

Clotfelter (1981) found no significant relationship between the murder rate or the rate of other violent crimes and the rate of legal handgun acquisitions when a time trend variable was included in his regression equations, but acquisitions were positively and significantly related to nonmurder violent-crime rates when the trend variable was omitted. Handgun acquisitions were also related to frequency of riots in the United States as a whole, though not to riot frequency within the states. Finally, in a sophisticated time series analysis of the issuance of permits to purchase handguns in Detroit, McDowall and Loftin (1983) modeled the reciprocal relationship between gun ownership and crime. They found that the violent crime rate had a significant positive effect on handgun permits issued, and also that permit issuance was higher when police strength was low. As with the previous two studies, the generalizability of these findings to unlawful gun acquisitions is unknown.

If findings of the more sophisticated studies are weighted more heavily, the entire set of results from aggregate-level studies indicates that crime rates positively affect gun ownership rates. This conclusion thus accords with the admittedly ambiguous findings of the best individual-

level survey studies, supporting the claim that gun ownership, especially handgun ownership, is often a response to the threat of a crime.

## Gun Ownership as Pathology

Some researchers have claimed that gun ownership, especially protective ownership, is caused by pathological or abnormal factors. Some have proposed that gun ownership is a result of racial prejudice, or punitiveness or aggressiveness toward criminals (Young 1985). Others have suggested that gun ownership may be the result of psychological abnormalities such as paranoia, violence-proneness, inability to control aggressive impulses, an unusual need for power, or felt sexual inadequacies (e.g., Bakal 1966; Sherrill 1973; Diener and Kerber 1979).

Stinchcombe and his associates argued that gun ownership is caused by "punitiveness" toward criminals, finding that whites who favored capital punishment and harsher criminal courts were 5 or 6 percentage points more likely to own guns, though this small association could easily have been spurious (*PB*:35). Young asserted that among white males in Detroit interviewed in 1979, racial prejudice toward blacks caused "aggressive attitudes towards criminals" (1985:473), which in turn caused nonhunting household gun ownership. The link, however, was a weak and indirect one (*PB*:35–36). Lizotte et al. found that "racist attitudes did not predict owning a gun for protection" (1981:503). Instead, the perception of blacks in the R's neighborhood was associated with a higher probability of crime victimization and higher perceived crime rates in the R's county, and these in turn increased the fear of crime and the likelihood of owning a gun for protection. In short, the perceived presence of blacks in the neighborhood may have served as an indicator of high crime levels, elevating the perception of crime risk and thereby indirectly increasing protective gun ownership. This interpretation is supported by the findings of Smith and Uchida (1988:100–1), which indicated that the size of the nonwhite share of an R's neighborhood population had a positive effect on the purchase of protective weapons, but that all of this effect was mediated by household victimization experiences and the R's perceived risk of future victimization.

Although scholars have occasionally argued that gun owners are more racist or punitive than other people, it has mostly been nonscholars who have asserted or implied that gun owners are somehow psychologically abnormal (e.g., Bakal 1966; Sherrill 1973). Bruce-Briggs commented on one variant of this theme:

A common assertion in the dispute is that gun owners are somehow mentally disturbed. The weapon is said to be a phallic symbol substituting for real

masculinity, for "machismo." The historian Arthur Schlesinger, Jr. has writ-
ten of the "psychotic suspicion that men doubtful of their own virility cling
to the gun as a symbolic phallus and unconsciously fear gun control as the
equivalent of castration." When queried about the source of this suspicion,
he responded that he thought it was a "cliché." Such statements never cite
sources because there are no sources. Every mention of the phallic-narcissist
theory assumes it is well known, but there is no study or even credible
psychoanalytic theory making the point. (1976:59)

Although there may be no scientific basis for this notion of gun owner-
ship as compensation for felt sexual or penile inadequacies, there has
been scholarly discussion of the related idea that a gun can bestow "feel-
ings of power and virility" on its owner (Diener and Kerber 1979:227).
That a gun, or any other tool, does in fact bestow power is obvious; on the
other hand, whether people acquire guns as compensation for an unusual
lack, or perceived lack, of other sources of power is a very different
matter. There is only one small-scale scholarly study of any value on
personality attributes of gun owners (Diener and Kerber 1979). The au-
thors concluded that

> there was no evidence in the present study that the average gun-owner
> exhibits atypical personality characteristics. The gun owners did not differ
> appreciably from a normative sample of college students on the CPI sub-
> scales, nor did the gun-owners show an unusual profile compared with the
> nonowner matched sample. (ibid.:236)

However, they also noted findings indicating that "gun-owners tended to
be more open-minded and tended to have a higher need for power" and
were less affiliative and sociable than nonowners (ibid.:234), though their
scores on the pertinent scales were not significantly different from nation-
al norms. Because the authors stated that "no evidence emerged that gun
owners were more personally insecure than nonowners" (ibid.:237), it is
unclear what the "need for power" might denote. The authors cautioned
that it may simply reflect a greater desire of gun owners to control their
environments, and that "this motivation for gun ownership should thus
be viewed skeptically" (ibid.:236). At this point, there is no research-
based foundation for attributing gun ownership to psychological
abnormalities.

## Cultural Determinants of Gun Ownership

As the term will be used here, culture refers to mental attributes such
as norms and values that are shared by the members of social groups, and
that are learned in interaction with other members. They may also be

transmitted from one generation to the next. In contrast to situational determinants of gun ownership, such as residence in a high crime area or the perception of a high risk of personal victimization, cultural determinants would tend to be more persistent and probably also more difficult to change. Consequently, to the degree that gun ownership is due to cultural causes, it might be more difficult to deliberately reduce through gun control laws.

Many authors have suggested that gun ownership results from membership in subcultural groupings and the acceptance of subcultural norms and values. Bruce-Briggs contrasted "two alternative views of what America is and ought to be" (1976:61), views that sociologists would identify as elements of two distinct subcultures:

> On the one side are those who take bourgeois Europe as a model of a civilized society: a society just, equitable, and democratic; but well ordered, with the lines of responsibility and authority clearly drawn, and with decisions made rationally and correctly by intelligent men for the entire nation. (ibid.)

On the other side are persons whose

> model is that of the independent frontiersman who takes care of himself and his family with no interference from the state. They are 'conservative' in the sense that they cling to America's unique pre-modern tradition—a non-feudal society with a sort of medieval liberty writ large for everyman. (ibid.)

In the gun-hunting subculture of rural and small-town America, a boy's introduction to guns and hunting is an important rite of passage—Bruce-Briggs called the first gun at puberty the "bar mitzvah of the rural WASP" (ibid.:41). Stinchcombe and his associates (1980) portrayed much gun ownership as resulting from membership in a rural hunting culture originating in the early settlement of the American frontier. They argued that the culture is found today primarily in rural areas and small towns and among ethnic and religious groups whose ancestors came to the United States early in its preindustrial history. Persons with a family tradition of hunting, and an exposure, especially in the South and West, to regional values and norms encouraging hunting are more likely to own guns. The authors showed that contemporary gun ownership was in fact higher in these social locations.

Lizotte and his colleagues (1981) developed evidence directly supporting a subcultural explanation of ownership of guns for sporting purposes. Independent of the fact that gun owners were themselves more likely to hunt, they were also more likely to have friends who hunt, and were more likely to reside in counties in which there were many other hunters

nd in which many residents subscribed to magazines devoted to hunting nd other outdoor sports, indicating ample opportunities for association vith others interested in gun-related recreation. Sport owners were also nore likely to have parents who owned guns, to have obtained their first gun at an early age, and to have been trained in gun use, suggesting ocialization into a sporting gun culture. Concerning a possible protective gun subculture, the authors found that although persons who owned guns for protection were more likely to have friends who also owned for the same reason, there was no evidence of socialization into a gun-owning subculture. Protective gun owners commonly obtained their first guns as adults, without training in gun use, and without any family background in gun ownership. Finally, the authors found no evidence that gun ownership was part of a subculture of violence. Neither provi-olent attitudes nor racially prejudiced views predicted either sport or protection gun ownership.

Other authors have focused on region-based subcultures of gun own-ership, stressing especially the higher rates of gun ownership in the South. Note, however, that gun ownership is also high in the Rocky Mountain states and in the Midwest (Table 3.4). Consequently, the exclu-sive regional focus on the South may be unduly narrow. Many studies of national survey data have found that southerners are more likely than average to own guns, yet most could not separate cultural from situation-al effects because they did not distinguish where people were raised from where they currently resided (e.g., Newton and Zimring 1969; Wright and Marston 1975; Williams and McGrath 1976; Stinchcombe et al. 1980; Hill et al. 1985). For example, it is possible that people in the South are more likely to own guns because more of the region's population was reared in rural areas where hunting was common, rather than because they were socialized into a regional subculture. Dixon and Lizotte (1987) found that household gun ownership was higher among males both raised and currently residing in the South than among those either reared outside the South or currently residing outside the South. The results were thus consistent with the existence of a southern subculture of gun ownership. The authors also concluded that this regional effect on gun ownership was not mediated by a regional subculture of violence, finding no links between region and violent attitudes or between violent attitudes and gun ownership. They did, however, report evidence that those both raised and currently residing in the South are more likely to have "defen-sive" attitudes, and that such attitudes in turn positively predict house-hold gun ownership.

On the other hand, Ellison (1991) concluded from national survey data that approval of defensive violence has little relationship with hand-gun ownership, and none with overall personal gun ownership. He ac-

counted for the higher levels of southern gun ownership by demographic factors such as rural residence and cultural factors such as greater political conservatism. He also argued that racial prejudice plays a small role, but his results (esp. his Table 2, models IV-V and VIII-X) show only weak and marginally significant associations between prejudice and gun ownership.

The pattern of evidence as a whole is fully compatible with the thesis that gun ownership is a product of socialization into a rural hunting culture. The findings support a simple explanation of the high level of gun ownership in the United States. Unlike European nations with a feudal past, the United States has had both widespread ownership of farmland and millions of acres of public lands available for hunting. Rather than being limited to a small land-owning aristocracy, hunting has been accessible to the majority of ordinary Americans. Having the income and leisure to take advantage of these resources, millions of Americans have hunted for recreation, long after it ceased to be essential to survival for any but an impoverished few. Rather than high gun ownership being the result of a lack of strict gun control laws, it is more likely that high gun ownership discouraged the enactment of restrictive gun laws, and that the prevalence of guns was mostly a product of the prevalence of hunting, though, beginning in the late 1960s, concerns about crime began to drive handgun acquisition.

One final category of causes of gun ownership would be gun control laws themselves. Gun laws could either discourage gun ownership, as many of them are intended to do, or in some cases inadvertently encourage gun acquisition. Some laws, although probably having little long-term impact on gun ownership, may encourage people, during the period the laws are being considered, to buy guns in a soon-to-be-prohibited category, e.g., when sales of semiautomatic firearms increased sharply after 1989 as state and federal "assault weapons" bans were being debated (Chapter 4). The impact of gun laws on gun levels will be addressed in Chapter 11.

## USES OF GUNS

The uses to which people put guns are to some extent implied by owners' stated reasons for having guns. People use guns primarily for outdoor recreational activities such as hunting and target and sport shooting, for protection against threats both human and animal, and in connection with a variety of miscellaneous pursuits such as gun collecting

[see Olmstead (1988) for an account of gun collecting as "morally contro-versial leisure"].

Just as the most common reasons for owning guns are recreational, so the most common uses of guns are recreational. According to data from the 1991 National Survey of Fishing, Hunting, and Wildlife-Associate Recreation (U.S. Fish and Wildlife Service 1993), among U.S. residents age 16 or older, 14 million persons hunted, each for an average of 17 days per year, 5 hours per hunting day, for a total of 236 million hunting days. These survey results are supported by hunting license data, which indi-cate there were 16 million hunting license holders in the United States in 1992 (U.S. Bureau of the Census 1994:255).

The other major category of recreational use of guns is sport shooting, which can cover more formal target shooting such as trap or skeet shoot-ing and the shooting of paper targets, or less formal "plinking"—shooting of tin cans, natural inanimate targets found in the woods, and so forth. Target shooting accounted for 149 million days of participation, by 10.4 million participants age 16 or over in 1975; plinking accounted for 84 million days of participation by 5.7 million participants (U.S. Fish and Wildlife Service 1977:54, 55, 64, 85). By comparison, guns are used for defensive purposes about 2.5 million times a year, with about 2 million of the uses involving handguns (Chapter 5) and for criminal purposes per-haps 0.6 million times. In 1992, about 3.8 billion shots were fired, based on the number of rounds of ammunition produced by manufacturers report-ing to the Sporting Arms and Ammunition Manufacturers Institute (Smith 1993:176), almost all of them in connection with some variety of shooting linked with recreation.

## HOW ARE GUNS ACQUIRED?

The ways in which people obtain guns are of obvious relevance to their regulation. Much gun law is concerned largely with regulating the sale and purchase of guns (the two are legally distinct in that different parties to the transaction are regulated) and these regulations mostly cover trans-actions involving licensed gun dealers (U.S. BATF 1994c; Blose and Cook 1980). Every person in the United States in the regular business of selling guns is required to have a federal firearms dealer's license, and many must have a state or municipal license as well.

The limitation of this regulatory focus is that many guns are acquired through other, largely unregulated, channels. Even among members of the general, largely noncriminal population, about 33–36% of guns were acquired by their present owners from private parties, most commonly as

a gift (Cook and Ludwig 1997:25; DMI 1979:71). Although nominally regulated in some jurisdictions, these transactions are largely invisible to legal authorities under existing law, and they are, as will be seen, even more common routes to gun possession among criminals. Ignoring the atypical years of 1992 and 1993, the data in Table 3.1 imply that there were about 4.5 million new guns sold at retail per year in the preceding decade. Since there is about one used gun acquired for each new gun (Newton and Zimring 1969:13–14), this implies that there are about 9 million total nontheft gun acquisitions each year, 3.2 million (36%) of them involving nondealer sources, and the remaining 5.8 million involving guns, both new and used, acquired from licensed dealers.

The best work on criminal acquisition of guns was done by Wright and Rossi (1986), who surveyed over 1800 imprisoned felons in ten states about their guns. Among 943 felon handgun owners, 44% had acquired their most recently acquired handgun through a purchase, usually from a source other than a dealer, 32% had stolen the gun, 9% rented or borrowed it, 8% each obtained it in trade or as a gift. Only 16% of the total had obtained their handgun by a purchase from a conventional retail source (ibid.:185). Only 2.9% mentioned a "black market source" and only 4.7% got the gun from a fence. Consequently, the focus of some scholars (e.g., Moore 1981; Kennedy et al. 1996) on black market enterprises as sources of criminal guns appears to be misdirected. While criminals do get their guns from unlicensed sources, they rarely get them from black market dealers regularly in the business of selling illegal guns. Most of the felons' guns were obtained outside licensed, easily regulated channels, yet not from persons in the business of illegal gun selling. Supporting these views, the 1991 Survey of State Prison Inmates, a survey of a large nationally representative sample of state prison inmates, indicated that 27% of felons owning a handgun had obtained their most recent handgun by purchasing it from a retail outlet, while 31% got it from family or friends, 9% stole it themselves, and another 28% had obtained it from a drug dealer, fence, or other "black market source" (U.S. Bureau of Justice Statistics 1993b:19).

It is important to stress the chief limitation of the Wright-Rossi prison survey, which the authors acknowledged, as well as the Survey of State Prison Inmates. The felons answering questions must be regarded as an especially serious, criminally active, and strongly motivated set of criminals. First-time criminals, and infrequent or petty offenders do not often get sent to prison. Yet much of the rationale for gun control is based on the belief that relatively weakly motivated, infrequent offenders can be disarmed or prevented from acquiring guns through firearms regulations. Consequently, the subset of the criminal population that is arguably most relevant to gun control was necessarily heavily underrepresented in these and other prison surveys. Among less "hard-core" criminals, gun

transactions probably resemble those in the general public more than those typical among the inmates, with more purchases from licensed dealers and fewer thefts and illegal purchases.

These studies indicate that 16–27% of handgun acquisitions by serious felons were purchases from licensed dealers. This is not a negligible fraction, and indicates some potential impact from regulation of such transfers. Whether this potential translates into actual impact depends on how large a share of criminals getting guns this way could have obtained them *only* in this way. Future surveys of prisoners should ask felons whether they had other ways of obtaining guns besides the one they actually used in their most recent acquisition. The Wright-Rossi survey also confirmed an important fact first noted by Burr (1977): the main reason criminals acquire handguns is not to commit crimes, but rather for self-protection. When the felon gun owners were asked the reasons why their most recent guns were obtained, 58% cited protection as a "very important" reason for getting their most recent handguns, with another 26% citing protection as "somewhat important." This was far and away the most frequently cited reason, with only 28% citing "to use in crimes" as "very important" and 20% citing this reason as "somewhat important" (Wright and Rossi 1986:137). Criminals live among and routinely associate with other criminals, much more so than do members of the general public, and they are crime victims as well as victimizers. Consequently, their motivation to acquire guns for self-protection may be even stronger than it is among noncriminals.


## INTERSTATE GUNRUNNING


Considerable attention in recent years has been focused on interstate "gunrunning," i.e., illicit movement of guns across state lines by persons in the business of illegal gun sales, typically moving guns from states with less strict laws to states with more strict laws. Such activity could be significant to gun control efforts because, to the extent it occurs, it could reduce the effectiveness of state-level controls. Persons ineligible to acquire or possess guns under the laws of their state could evade those laws by buying guns from persons illegally moving guns across state lines.

The federal agency charged with enforcing the federal laws that prohibit these interstate transfers, the Bureau of Alcohol, Tobacco and Firearms (BATF), devotes a significant share of its resources to suppressing this activity. BATF has been the primary source of information used to support the claim that gunrunning is a significant source of criminal guns. Using records of gun manufacturers and sellers, applied to samples of

guns seized from criminals by local police departments, BATF has shown that, in some locations, a large share of such guns were first sold at retail in some other state. That is, somewhere between first retail sale and their use in a crime, the guns had been moved across state lines. This is true of a large share of crime handguns in areas with strict controls, such as New York City, Boston, and Washington, D.C., and in some cities located on or near state borders, such as Detroit or Kansas City, while it is typically true of ess than a quarter of crime handguns elsewhere (U.S. BATF 1976a:27; 1992). For example, BATF agent Julius Wachtel (1996) reported that only 19% of guns recovered by police in Southern California and traced by BATF in 1988–1995 had first been purchased outside California. Gunrunning may be largely superfluous to supplying criminals with guns in any but the most strictly controlled locations.

There is, however, a logical problem in interpreting data showing out-of-state origins for crime guns as demonstrating the impact of gunrunning. From 1985 to 1990, 9.4% of the U.S. population moved its residence across state lines (U.S. Bureau of the Census 1994b:19). Since they move their possessions with them, it is reasonable to assume that about 9.4% of the nation's gun stock (approximately 236 million by 1994), or 22 million guns, were moved across state lines during that period, simply as a result of the mobility of their owners. Over a period of many years, many more guns would be moved as a by-product of owner relocation.

For example, in 1980, at least 42% of the Boston population had lived out-of-state, since this many had been born out-of state (U.S. Bureau of the Census 1983); still others were born in Massachusetts, but had resided elsewhere in the interim. Most of these persons who had owned a gun while living in another state would presumably have brought it with them when they moved to Massachusetts. A BATF report (1994b:13) found that "a majority" of guns recovered by Boston police had been first sold out-of-state, and BATF clearly attributed the presence in Boston of a significant share of these guns to "illegal firearms trafficking into . . . Boston" (ibid.:2). However, an obvious alternative explanation is that the out-of-state origins of so many guns are a simple by-product of the out-of-state origins of so large a share of Boston's residents. Any gun that ended up in a criminal's hands as a result of a residential burglary or other theft involving a gun owner who had lived in another state would be correctly classified by BATF as an out-of-state gun, but there would be no justification for interpreting this information as evidence of interstate gunrunning.

Beyond these ambiguous data, the main evidence for such claims is weak anecdotal references to occasional investigations that turn up genuine, relatively large-scale, interstate gun traffickers, who were linked with a few dozen or few hundred illegal gun transfers (e.g., U.S. BATF 1991, 1995b), but the numbers involved do not sum to more than a minuscule

share of the estimated 9 million U.S. gun transfers each year or the esti-
mated 0.6–1.4 million annual gun thefts that put guns into criminal hands
(see next section). For example, even in one of the largest BATF field
divisions, covering Southern California, Wachtel could identify only 17
BATF cases involving 100 or more guns sold by corrupt licensed dealers
over a four-year period, or about four "big" illicit dealers caught per year
(1996:Table 7). Large-scale illicit gun dealing, whether interstate or intra-
state, would seem to be fairly rare.

While there may be some local areas where gunrunning is, at least for a
time, a significant source of criminal guns, there is little solid evidence for
its more widespread significance. From the administrative standpoint of
BATF, concentrating scarce investigative resources on a relatively small
number of fairly large-scale gunrunners undoubtedly makes more sense
than dispersing those resources over the far larger number of illicit gun
sellers who rarely sell more than a gun or two a month. Nevertheless, the
strategy can have only modest effects if most illicit gun transfers involve
occasional sales of stolen guns by thieves and their friends and associates.

Criminals do sell guns for profit, but these mostly seem to be stolen guns,
and the activity is mostly a low-volume business done as a by-product of
other criminal activities, such as burglary, drug-dealing, or trafficking in
stolen property in general. The Wright-Rossi survey of prison inmates
indicated that 47% of the felons had stolen guns during their lives, but most
had stolen less than ten in their lives and only 11% had stolen over a
hundred (Wright and Rossi 1986:194). Thus many criminals steal guns but
few steal enough to make a living from just the gun thefts, and even fewer
are gun-dealing specialists who make a living from large numbers of illegal
gun sales, either within or across state lines. More commonly, criminals in
possession of stolen property of all sorts (usually because they stole it
themselves) will sell guns along with the rest of the loot, while those
involved in drug selling will occasionally accept guns as payment for drugs,
and later sell them at a profit (Wright and Rossi 1986:202–4). Put another
way, the "illicit gun dealers" that some authors recommend for increased
law enforcement attention (Kennedy 1994) turn out to be extremely numer-
ous, but with each one dealing in so few guns that arresting them could have
little or no impact on the availability of guns to criminals.


## GUN THEFTS


Guns are manufactured or imported into the United States, sold by
manufacturers and importers to wholesale dealers, who then sell them to

licensed retail dealers. These retail dealers then sell the guns to their first private owners, who are probably almost all noncriminals. Many of these guns are transferred later to other noncriminal owners in transactions between private parties as well as between private parties and legal dealers buying used guns or taking them in trades. However, a significant share of this moving stock is also diverted to criminals through theft.

Thefts are significant to the control of guns because they are probably the primary way that guns are transferred from the less criminal segments of the population to the more criminal segments. In the Wright-Rossi prison survey, 47% of the felons had stolen guns in their lives, and 32% of the felons who possessed handguns when sent to prison had personally obtained their most recently acquired handgun by stealing it. This, however, understates the share whose handguns had been stolen at some time in the past. Among the handguns most recently acquired by the felons, 46% were regarded by their owners as "definitely stolen" and another 24% were "probably stolen" (Wright and Rossi 1986:196). Sheley and Wright (1993) arrived at similar conclusions from a survey of juvenile inmates: 50% had stolen at least one gun in their lives, and 24% had stolen their most recently obtained handgun. On the other hand, in the Survey of State Prison Inmates, only 9% of inmates who had ever possessed a handgun admitted to having stolen their most recently owned one (U.S. Bureau of Justice Statistics 1993b:19). Nevertheless, the majority of handguns in the possession of criminals, and presumably most of those used in gun crimes, may have been stolen at some time in the past, though not necessarily by their current criminal owner. Further, few criminals are gun theft specialists and few set out to commit burglaries and other thefts specifically to obtain guns. Instead, guns are just part of the property that thieves come across in the routine course of their criminal activities (Wright and Rossi 1986:194).

Estimates of the volume of gun thefts are rough at best. In 1993, according to the FBI's *Uniform Crime Reports*, $113,969,000 worth of stolen firearms were reported to the police (U.S. FBI 1994:205). In the 1987 Census of Manufactures, the average net selling value at the factory was $186.11 per gun. Doubling this to reflect retail markup, a ball-park estimate of the average retail value of a gun sold ca. 1987 was $372.23, an estimate consistent with the 1996 retail prices of new guns stated in the 1997 *Gun Digest* (Warner 1996), a fairly comprehensive catalog of guns currently sold at retail to the civilian market. If victims typically report the retail value of their guns to the police, the FBI value of guns reported stolen would imply 306,179 guns reported stolen to the police. Or, if the stolen guns tended generally to be the cheaper models more common among low-income crime victims, and one assumed an average reported value of $200, the figures would imply 569,845 guns stolen. Only about half of U.S.

burglaries are reported to the police (U.S. Bureau of Justice Statistics 1994a), so if this fraction were applied to gun thefts in general it would imply about 0.6–1.14 million total guns stolen annually, reported or unreported. A BATF study of 300 crime guns found that, among those which had been stolen, only 21% had been reported to the police (U.S. BATF 1976b:1). This would imply at least 1.46 million annual gun thefts (306,179/0.21). Therefore, it may be conservative to assume that 50% of gun thefts are reported to the police and to only double the police-recorded theft estimates.

This rough-and-ready estimate is consistent with information from an independent source. The National Crime Victimization Survey (NCVS) counts both reported and unreported thefts, and its findings indicated an estimated 341,000 "incidents of firearm theft" per year, 1987–1992 (U.S. Bureau of Justice Statistics 1994b), based on victim survey reports. This source does not establish how many guns were stolen per incident. Since there are about 5.15 guns per gun-owning household, the 341,000 theft incidents could have involved anywhere from 341,000 to 1.76 million guns. Conservatively assuming only half of the guns available to be stolen are actually taken would imply about 2.6 stolen per theft, or 880,000 guns stolen. Data from approximately two dozen gun theft cases reported in a national survey implied about 2.2 guns per incident of household gun theft (Cook and Ludwig 1997:30), an estimate that does not reflect the presumably much larger average in thefts from stores.] In sum, the number of guns stolen each year could be from 0.57 to 1.82 million.

It is worth reflecting on the implications of such a level of gun theft. All of these gun transfers are both involuntary and completely unlawful. In every case, the immediate recipient of the gun is, by definition, a criminal. There is thus a flow of 0.6–1.8 million guns from largely noncriminal hands to exclusively criminal hands each year. If, as was estimated earlier, criminals commit around 540,000 crimes with guns each year, then even if we implausibly assumed that each gun crime involved a different gun, thereby spreading the gun crime around to the maximum number of different guns, it would mean that, at most, only about half a million different guns each year are used to commit gun crimes. More likely, active criminals, especially robbers, make repeated use of guns and far fewer guns are used. For example, if the average crime-involved gun were used in three violent gun crimes per year, it would mean only 180,000 different guns are used to commit such crimes each year.

Thus, even if one could completely eliminate all voluntary transfers of guns to criminals, including either lawful or unlawful transfers, involving either licensed dealers or private citizens, and even if police could completely confiscate all firearms from all criminals each year, a single year's worth of gun theft alone would be more than sufficient to rearm all gun

criminals and easily supply the entire set of guns needed to commit the current number of gun crimes. This is especially so given that a single gun acquired early in a criminal career could, given the durability of firearms, easily meet that owner's criminal needs for a lifetime.

The fact that there are enough stolen guns in total to supply all persons who will commit a gun crime in a given year does not necessarily mean that the 0.6–1.8 million stolen guns will in fact reach these gun criminals. Criminal buyers and sellers will not always be able to link up in an inefficient illegal market, where open advertising is usually impossible. Some prospective criminal gun users, such as occasional impulsive offenders, do not know in advance that they are going to need a gun, and will not have made the necessary arrangements before the occasion for using one arises. Others do not know anyone willing and able to sell one to them, are unwilling to expend the search time needed to find such a seller, or cannot pay the asking price. Controls over gun acquisition such as background checks close off the easiest, cheapest, least risky route to a gun, i.e., purchase from a licensed gun dealer, increase the search time needed for a prospective criminal gun buyer to locate a willing seller, and thereby make it marginally less likely a given criminal will be able to get a gun. The stolen gun estimates merely imply that there are probably enough firearms stolen each year such that they *could* meet the entire criminal demand, not that the demand *actually* is, or in future would be, completely met by stolen guns. Even where gun thefts are common, the purchase of a gun from a store remains the easiest, least risky way to acquire a gun, where no legal controls prevent a purchase.

These estimates do, however, imply serious limits on the results one can realistically expect from controls applied only to voluntary (nontheft) transfers such as gun sales. One cannot substantially reduce the flow of water through a sieve by blocking just a few of the holes, especially if one cannot block the largest ones. Effective controls cannot focus solely on blocking acquisition of guns by prospective criminals, since even totally effective controls over voluntary transfers would still leave open a channel of guns large enough to meet all criminal demand for guns.

The gun theft figures imply that, to be significantly effective, gun controls may have to somehow succeed in decreasing possession and use of guns by prospective aggressors, above and beyond efforts to prevent such persons from acquiring guns in the first place. For example, carry license laws are intended to reduce unlicensed possession of guns in public places without necessarily preventing anyone from acquiring a gun or keeping it in their home. Bans on possession of guns by convicted criminals could deter some criminals from possessing guns anywhere, without directly blocking their initial acquisitions. Likewise, laws enhancing penalties for committing violent crimes if they are committed with

firearms could conceivably reduce the *use* of guns in crimes without necessarily preventing any criminals from acquiring guns.


## CONCLUSIONS


There were probably over 235 million guns in private hands in the United States at the end of 1994, about 36% of them handguns. The size of the U.S. gun stock increased enormously from the 1960s through the 1990s, especially the handgun stock, though the prevalence of gun ownership in U.S. households showed little or no change. Some of the increase was due to the formation of new households and to income increases enabling those who already owned guns to acquire still more; however, some of the increase was also a response, among people who previously did not own guns, to rising crime rates. Most handguns are owned for defensive reasons. Therefore, part of the positive association sometimes observed between gun ownership levels and crime rates is due to the effect of crime on gun ownership, rather than the reverse. Nevertheless, most guns, especially long guns, are owned primarily for recreational reasons unconnected with crime.

Gun owners are not, as a group, psychologically abnormal, nor are they more racist, sexist, or violence-prone than nonowners. Most gun ownership is culturally patterned, linked with a rural hunting subculture. The culture is transmitted across generations, with gun owners being socialized by their parents into gun ownership and use from childhood. Defensive handgun owners, on the other hand, are more likely to be disconnected from any gun subcultural roots, and their gun ownership is less likely to be accompanied by association with other gun owners in connection with gun-related activities or by training in the safe handling of guns. Defensive ownership is more likely to be an individualistic response to life circumstances perceived as dangerous. This response to dangers, however, is not necessarily mediated by the emotion of fear, but rather may be part of a less emotional preparation for the possibility of future victimization.

Probably fewer than 2% of handguns and well under 1% of all guns will ever be involved in even a single violent crime. Thus, the problem of criminal gun violence is concentrated within a very small subset of guns and gun owners. These criminal gun users most commonly get their guns by buying them from friends and other nondealer sources. Gun theft is common enough that it alone could meet the criminal demand for guns. Therefore, if gun regulation is to succeed in controlling gun violence, it

will have to effectively restrict nondealer acquisitions and, independent of controls over acquisition of guns, deter possession and use of guns by the small high-risk subset of owners most likely to use guns for criminal purposes.

## NOTE

1. Marginals for question 60 list specific sources of the most recently acquired gun for 90% of gun-owning Rs, and 32% of all gun owners cited a private source (DMI 1979:71). The rest are cited sources that would generally be holders of dealer licenses—a gun shop, sporting goods, or department store, pawnshop, or a seller at a gun show. Therefore among Rs identifying a specific sources, 35.6% (32/90 = 0.356) indicated a private, nondealer source.

*Table 3.1.* Size of the U.S. Civilian Gun Stock, 1945–1994

| Year | Net Additions to Stock[a] | | | Cumulated Stock[b] | | Guns/1000 pop[c] | |
|------|----------|-----------|-----------|----------|-----------|----------|--------|
| | Handguns | Long Guns | Total | Handguns | Total | Handguns | Total |
| 1899–1945 | 12,657,618 | 34,251,565 | 46,909,183 | 12,657,618 | 46,909,183 | 94.9 | 351.6 |
| 1946 | 176,745 | 1,356,620 | 1,533,365 | 12,834,363 | 48,442,548 | 91.2 | 344.3 |
| 1947 | 264,256 | 1,836,669 | 2,100,925 | 13,098,619 | 50,543,473 | 91.3 | 350.8 |
| 1948 | 444,034 | 2,215,524 | 2,659,558 | 13,542,653 | 53,203,031 | 92.7 | 362.6 |
| 1949 | 262,504 | 1,940,925 | 2,203,429 | 13,805,157 | 55,406,460 | 92.9 | 371.1 |
| 1950 | 278,038 | 2,217,583 | 2,495,621 | 14,083,195 | 57,902,081 | 93.5 | 381.3 |
| 1951 | 348,373 | 1,738,210 | 2,086,583 | 14,431,568 | 59,988,664 | 94.1 | 389.6 |
| 1952 | 454,229 | 1,503,422 | 1,957,651 | 14,885,797 | 61,946,315 | 95.6 | 396.1 |
| 1953 | 415,857 | 1,583,063 | 1,998,920 | 15,301,654 | 63,945,235 | 96.7 | 402.3 |
| 1954 | 376,455 | 1,236,362 | 1,612,817 | 15,678,109 | 65,558,052 | 97.3 | 405.0 |
| 1955 | 429,237 | 1,399,846 | 1,829,083 | 16,107,346 | 67,387,135 | 98.0 | 408.2 |
| 1956 | 534,964 | 1,513,834 | 2,048,798 | 16,642,310 | 69,435,933 | 99.5 | 413.1 |
| 1957 | 538,032 | 1,442,544 | 1,980,576 | 17,180,342 | 71,416,509 | 100.8 | 417.2 |
| 1958 | 519,362 | 1,227,579 | 1,746,941 | 17,699,704 | 73,163,450 | 102.1 | 420.1 |
| 1959 | 648,672 | 1,526,066 | 2,174,738 | 18,348,376 | 75,338,188 | 103.9 | 425.3 |
| 1960 | 602,843 | 1,560,034 | 2,162,877 | 18,951,219 | 77,501,065 | 105.4 | 430.6 |
| 1961 | 561,742 | 1,473,809 | 2,035,551 | 19,512,961 | 79,536,616 | 106.6 | 434.6 |
| 1962 | 598,649 | 1,467,719 | 2,066,368 | 20,111,610 | 81,602,984 | 108.3 | 439.3 |
| 1963 | 676,062 | 1,555,762 | 2,231,824 | 20,787,672 | 83,834,808 | 110.3 | 444.8 |
| 1964 | 744,273 | 1,778,620 | 2,522,893 | 21,531,945 | 86,357,701 | 112.6 | 451.8 |
| 1965 | 1,013,300 | 2,107,921 | 3,121,221 | 22,545,245 | 89,478,922 | 116.5 | 462.4 |
| 1966 | 1,212,817 | 2,309,250 | 3,522,067 | 23,758,062 | 93,000,989 | 121.5 | 475.5 |
| 1967 | 1,673,417 | 2,413,345 | 4,086,762 | 25,431,479 | 97,087,751 | 128.8 | 491.7 |
| 1968 | 2,414,724 | 2,799,776 | 5,214,500 | 27,846,203 | 102,302,251 | 139.7 | 513.1 |
| 1969 | 1,725,383 | 3,084,186 | 4,809,569 | 29,571,586 | 107,111,820 | 146.8 | 532.0 |
| 1970 | 1,673,227 | 3,132,686 | 4,805,913 | 31,244,813 | 111,917,733 | 153.2 | 548.7 |
| 1971 | 1,777,862 | 3,233,186 | 5,011,048 | 33,022,675 | 116,928,781 | 160.1 | 567.3 |
| 1972 | 2,106,883 | 3,269,316 | 5,376,199 | 35,129,558 | 122,304,980 | 168.7 | 587.7 |

| Year | | | | | | | |
|------|------|------|------|------|------|------|------|
| 1973 | 1,781,261 | 3,930,432 | 5,711,693 | 36,910,819 | 128,016,673 | 175.9 | 610.3 |
| 1974 | 2,175,818 | 4,394,790 | 6,570,608 | 39,086,637 | 134,587,281 | 184.9 | 627.0 |
| 1975 | 1,995,077 | 3,332,767 | 5,327,844 | 41,081,714 | 139,915,125 | 192.8 | 657.1 |
| 1976 | 2,026,689 | 3,708,975 | 5,735,664 | 43,108,403 | 145,650,789 | 200.8 | 678.5 |
| 1977 | 1,914,050 | 3,183,161 | 5,097,211 | 45,022,453 | 150,748,000 | 208.1 | 696.7 |
| 1978 | 1,972,498 | 3,444,020 | 5,416,518 | 46,994,951 | 156,164,518 | 215.3 | 715.6 |
| 1979 | 2,231,088 | 3,493,255 | 5,724,343 | 49,226,039 | 161,888,861 | 219.2 | 720.9 |
| 1980 | 2,481,230 | 3,311,496 | 5,792,726 | 51,707,269 | 167,681,587 | 227.5 | 737.9 |
| 1981 | 2,712,200 | 2,868,968 | 5,581,168 | 54,419,469 | 173,262,755 | 237.2 | 755.1 |
| 1982 | 2,469,671 | 2,486,464 | 4,956,135 | 56,889,140 | 178,218,890 | 245.6 | 769.3 |
| 1983 | 1,943,069 | 2,111,304 | 4,054,373 | 58,832,209 | 182,273,263 | 251.6 | 779.6 |
| 1984 | 1,904,029 | 2,506,575 | 4,410,604 | 60,736,238 | 186,683,867 | 257.5 | 791.6 |
| 1985 | 1,684,754 | 2,289,515 | 3,974,269 | 62,420,992 | 190,658,136 | 262.4 | 801.3 |
| 1986 | 1,538,080 | 1,985,856 | 3,523,936 | 63,959,072 | 194,182,072 | 266.3 | 808.6 |
| 1987 | 1,842,145 | 2,502,291 | 4,344,436 | 65,801,217 | 198,526,508 | 271.6 | 819.4 |
| 1988 | 2,235,483 | 2,604,830 | 4,840,313 | 68,036,700 | 203,306,821 | 278.3 | 831.5 |
| 1989 | 2,353,087 | 2,769,701 | 5,122,788 | 70,389,787 | 208,489,609 | 285.2 | 844.7 |
| 1990 | 2,109,394 | 2,224,544 | 4,333,938 | 72,499,181 | 212,823,547 | 290.7 | 853.3 |
| 1991 | 1,941,977 | 1,930,422 | 3,872,399 | 74,441,158 | 216,695,946 | 295.2 | 859.4 |
| 1992 | 2,803,330 | 2,568,067 | 5,371,397 | 77,244,488 | 222,067,343 | 302.9 | 870.7 |
| 1993 | 3,668,945 | 2,924,678 | 6,593,623 | 80,913,433 | 228,660,966 | 313.9 | 887.0 |
| 1994 | 3,752,257 | 3,190,778 | 6,943,035 | 84,665,690 | 235,604,001 | 325.2 | 905.0 |

[a] Domestically manufactured guns, minus exported guns, plus imported guns, within each gun type category.

[b] As of the end of the calendar year.

[c] Based on resident population as of July 1.

*Notes*: Shipments to the military are excluded. 1982–1991 import figures for the federal fiscal year were used for corresponding calendar years (e.g., federal fiscal year 1985 was 1 October 1984 to 30 September 1985 and was used for calendar year 1985). See *PB*:17–18, 451–54 for further details and limitations of the data.

*Sources*: Number of guns: 1945–1968: Newton and Zimring (1969:174); 1969–1972: Zimring (1975:168–69, Table 4, ATF column; Table 5); U.S. Bureau of the Census (1976:156); U.S. BATF (1975–1984); 1973–1981: U.S. BATF (1975–1984); 1982–1983: BATF figures reported in Howe (1987); U.S. BATF (1989); 1984–1991: U.S. BATF (1994); 1992–1994: Smith (1993); Thurman (1994, 1996).

Population estimates, all years: U.S. Bureau of the Census (1993:8; 1995:8).

The Ownership and Acquisition of Guns

*Table 3.2.* National Survey Estimates of Gun Ownership, 1959–1996

| Survey Dates | Households Owning (%) | | Respondents (%) | Survey Organization |
|---|---|---|---|---|
| | Any Gun | Handgun | Any Gun | |
| 7/23–28/59 | 49 | 16 | — | Gallup |
| 1/7–12/65 | 48 | 16 | — | Gallup |
| 1966 | 48 | — | — | Gallup[a] |
| 4/?/68 | 51 | — | — | Harris |
| 5/22 to 6/16/68 | 44 | — | 33 | CBS News[b] |
| 1968 | 50 | 17 | — | Gallup[c] |
| 10/?/68 | 49 | 20 | — | Harris[d] |
| 1/?/71 | 51 | — | — | Harris |
| 5/26–29/72 | 43 | 16 | — | Gallup |
| 3–4/?/73 | 47 | 20 | — | NORC |
| 3–4/?/74 | 45 | 20 | — | NORC |
| 3/7–10,28–31/75 | 44 | 18 | — | Gallup |
| 10/3–6/75 | 47 | 19 | — | Gallup |
| 10/?/75 | 47 | — | — | Harris |
| 9/29 to 10/8/75 | 41 | 21 | — | DMI[e] |
| 3–4/?/76 | 47 | 21 | — | NORC |
| 3–4/?/77 | 50 | 21 | — | NORC |
| 1/?/78 | 51 | — | — | CBS News |
| 4/20 to 5/15/78 | 44 | 24 | — | Cambridge[f] |
| 5/19 to 6/9/78 | 47 | 24 | — | DMI[g] |
| 12/9–12/78 | 48 | 20 | — | DMI[g] |
| 2/?/80 | 45 | — | — | Gallup |
| 3–4/?/80 | 48 | 23 | 29 | NORC[h] |
| 1/13–22/81 | 43 | 23 | — | L.A. Times |
| 4/12–16/81 | 44 | 21 | — | L.A. Times |
| 4/?/81 | 44 | 23 | — | NBC News |
| 1981 | 47 | 27 | — | ABC News[h] |
| 3–4/?/82 | 45 | 21 | 29 | NORC[h] |
| 1982 | 47 | 26 | — | ABC News[h] |
| 5/20–23/83 | 40 | 18 | — | Gallup[i] |
| 3–4/?/84 | 45 | 22 | 26 | NORC[h] |
| 1/11–16/85 | 42 | 24 | — | ABC News[h] |
| 3–4/?/85 | 44 | 23 | 29 | NORC[h] |
| 6/?/85 | 44 | 22 | — | Gallup[h] |
| 4/11–14/86 | 42 | 20 | — | Gallup[i] |
| 3–4/?/87 | 46 | 25 | 28 | NORC[k] |
| 2–4/?/88 | 41 | 23 | 26 | NORC[i] |
| "Early 1989" | 49 | 29 | — | ?[l] |
| 2/?/89 | 49 | — | — | YCS[m] |
| 2/?/89 | — | 24 | — | Decima[i] |
| 2/28 to 3/2/89 | 47 | 25 | — | Gallup[n] |
| 2–4/89 | 46 | 25 | 31 | NORC[i] |
| 3/15/89 | 52 | — | — | CBS/N.Y. Times[i] |
| 3/23–29/89 | 45 | 27 | — | Harris[i] |
| 2–4/90 | 43 | 24 | 28 | NORC[i] |

*(continued)*

*Table 3.2.* (*Continued*)

| Survey Dates | Households Owning (%) | | Respondents (%) Any Gun | Survey Organization |
|---|---|---|---|---|
| | Any Gun | Handgun | | |
| 3/20 to 4/10/90 | 46 | 27 | — | CSUR[c] |
| 9/10–11/90 | 47 | — | — | Gallup[f] |
| 12/8–12/90 | 43 | — | — | L.A. Times[f] |
| 2–4/91 | 40 | 21 | 26 | NORC[f] |
| 2/21–24/91 | 42 | — | — | Princeton[f] |
| 3/21–24/91 | 46 | 25 | — | Gallup[f] |
| 5/7–8/91 | 49 | — | — | CBS/N.Y. Times[f] |
| 5/16–19/91 | 46 | 22 | — | Gallup[f] |
| 11/7–10/91 | 48 | — | — | Gallup[f] |
| 1/22–25/92 | 49 | — | — | CBS/N.Y. Times[f] |
| 2–5 to 4–26/93 | 42 | 24 | 29 | NORC[f] |
| 3/12–14/93 | 48 | — | — | Gallup[f] |
| 3/18/93 | 45 | — | — | Yankelovich[f] |
| 4/3–12/93 | 42 | 26 | — | LH Research[f] |
| 2–4/93 | 38 | 26 | — | Research Network[f] |
| 6/1–16/93 | 42 | — | — | Princeton[f] |
| 6/17–20/93 | — | 28 | — | ABC News[f] |
| 10/13–18/93 | 51 | — | 32 | Gallup[f] |
| 12/2/93 | 48 | — | — | Yankelovich[f] |
| 12/2–5/93 | 45 | — | — | Princeton[f] |
| 12/5–7/93 | 49 | 26 | — | CBS News[f] |
| 12/17–19/93 | 49 | 28 | 31 | Gallup[f] |
| 1/15–17/94 | 53 | — | — | CBS/N.Y. Times[f] |
| 1/15–19/94 | 45 | 29 | — | L.A. Times[f] |
| 1/27 to 5/31/94 | 41 | 24 | 28 | NORC[f] |
| 4/28 to 9/18/94 | 34 | — | — | ICARIS[f] |
| 11-12/ /94 | 35 | — | 25 | Chilton[c] |
| 1994 | 37 | — | — | NCHS[f] |
| 3/15–19/95 | 41 | — | — | L.A. Times[f] |
| 4/25/95 | 45 | — | — | CBS News[f] |
| 4/26–27/95 | 39 | — | — | L.A. Times[f] |
| 5/11–14/95 | — | — | 35 | Gallup[f] |
| 10/27–30/95 | 45 | — | — | L.A. Times[f] |
| 10/31 to 11/6/95 | 44 | — | 30 | Yankelovich[f] |
| 6/2–6/96 | 36 | — | — | Hart/Teeter[f] |
| 7/15–21/96 | 40 | — | — | Harris[f] |
| 7/26–28/96 | 38 | — | — | Gallup[f] |
| 9/7–10/96 | 37 | — | — | L.A. Times[f] |
| 10/24–27/96 | 39 | — | — | L.A. Times[f] |
| 11/21–24/96 | 42 | — | — | Gallup[f] |

[a] Computed from Stinchcombe et al. (1980:111, Table 34).

[b] Computed from separate black-white percentages in Erskine (1972:459), assuming sample was 90% white, 10% black.

(continued)

*Table 3.2.   (Continued)*

<sup>c</sup> Gallup (1984:119).
<sup>d</sup> Newton and Zimring (1969:10).
<sup>e</sup> U.S. Congress (1975a).
<sup>f</sup> Cambridge Reports (1978).
<sup>g</sup> DMI (1979).
<sup>h</sup> U.S. Bureau of Justice Statistics (1987b:169–70).
<sup>i</sup> Gallup (1984:118).
<sup>j</sup> Computer search of DIALOG databank's Public Opinion file.
<sup>k</sup> U.S. Bureau of Justice Statistics (1988:167–69).
<sup>l</sup> Killias (1990).
<sup>m</sup> Yankelovich Clancy Shulman (Quinley 1990:17).
<sup>n</sup> Gallup (1990:88–89).
<sup>o</sup> Center for Social and Urban Research, University of Pittsburgh (Mauser and Margolis 1990:17).
<sup>p</sup> Gallup Poll Monthly, various issues.
<sup>q</sup> Kleck and Gertz (1995:187).
<sup>r</sup> U.S. Dept. of Health and Human Services, "Injury control and risk survey (ICARIS)" 1996.
<sup>s</sup> Cook and Ludwig (1997).
<sup>t</sup> U.S., National Center for Health Statistics, telephone conversation with Deborah Rose, 20 February 1997, re the 1994 National Health Interview Survey.
All pre-1982 surveys without a superscript on the survey organization's name are from Crocker (1982:255).
*Notes:* All surveys cover the noninstitutionalized resident population, age 18 or over, of the lower 48 states, except the DMI surveys, which covered registered voters. NORC: National Opinion Research Center, producer of the General Social Surveys.

*Table 3.3.*   Trends in Survey Underreporting of Gun Ownership, U.S. 1973–1993

| Year | Reporting Household Guns, Among Married Couples (%) | | Husband-Wife Discrepancy |
| | Husbands | Wives | |
| --- | --- | --- | --- |
| 1973 | 55.5 | 54.2 | 1.3 |
| 1974 | 56.3 | 52.6 | 0.7 |
| 1976 | 57.1 | 55.1 | 2.0 |
| 1977 | 60.8 | 57.1 | 3.7 |
| 1980 | 60.5 | 56.8 | 3.7 |
| 1982 | 57.6 | 54.2 | 3.4 |
| 1984 | 54.8 | 55.9 | 1.1 |
| 1985 | 58.7 | 53.0 | 5.7 |
| 1987 | 59.3 | 58.0 | 1.3 |
| 1988 | 58.8 | 51.6 | 7.2 |
| 1989 | 61.1 | 54.5 | 6.6 |
| 1990 | 57.2 | 50.6 | 6.6 |
| 1991 | 59.0 | 49.8 | 9.2 |
| 1993 | 55.2 | 49.8 | 5.4 |

*Source:*   GSS (Davis and Smith 1994).

*Table 3.4.* Who Owns Guns?

| Respondent/Household Characteristic | Respondents Owning (%) | | Households Owning (%) | |
|---|---|---|---|---|
| | Gun | Handgun | Gun | Handgun |
| Total Population | 27.8 | 16.2 | 41.8 | 22.7 |
| **Sex** | | | | |
| Male | 49.1 | 26.9 | 52.3 | 28.4 |
| Female | 11.5 | 8.1 | 33.7 | 18.4 |
| **Race** | | | | |
| White | 29.4 | 17.2 | 44.4 | 23.9 |
| Elack | 20.6 | 12.7 | 29.0 | 17.6 |
| Other | 17.3 | 7.9 | 25.2 | 12.6 |
| Elack Males 18–39 | 26.3 | 15.5 | 34.5 | 22.4 |
| Urban Black Males 18–39 | 19.0 | 9.1 | 22.7 | 9.1 |
| Urban Black Males 18–39, income < $10,000 | 15.4 | 0.0 | 15.4 | 0.0 |
| **Ethnic Group** | | | | |
| Hispanic | 19.6 | 14.0 | 28.7 | 19.6 |
| **Age Category** | | | | |
| 18–24 | 19.1 | 10.0 | 35.7 | 17.1 |
| 25–29 | 25.5 | 13.4 | 37.1 | 19.1 |
| 30–39 | 28.4 | 16.3 | 41.5 | 23.2 |
| 40–64 | 30.0 | 19.6 | 47.3 | 27.1 |
| 65 and over | 28.9 | 14.7 | 37.6 | 18.9 |
| **Marital Status** | | | | |
| Married | 34.1 | 19.4 | 53.5 | 28.5 |
| Widowed | 20.5 | 12.7 | 26.3 | 14.5 |
| Divorced | 25.7 | 17.0 | 32.1 | 19.4 |
| Separated | 16.5 | 10.1 | 24.1 | 13.9 |
| Never Married | 19.0 | 10.6 | 29.5 | 16.2 |
| **Religion** | | | | |
| Frotestant | 30.8 | 18.0 | 47.1 | 25.8 |
| Catholic | 23.0 | 13.0 | 34.3 | 17.3 |
| Jewish | 6.5 | 3.2 | 8.1 | 4.8 |
| Other | 18.1 | 13.9 | 25.0 | 19.4 |
| None | 25.9 | 15.8 | 34.7 | 19.8 |
| **Family Income** | | | | |
| Under $10,000 | 18.9 | 9.5 | 26.3 | 12.9 |
| $10,000–$19,999 | 25.6 | 11.4 | 37.6 | 15.9 |
| $20,000–$24,999 | 36.8 | 21.1 | 47.0 | 27.1 |
| $25,000 or more | 30.3 | 19.5 | 48.0 | 27.9 |
| **Occupation** | | | | |
| Frofessional, technical | 21.8 | 12.9 | 33.5 | 18.2 |
| Manager, administrator, sales workers | 32.4 | 21.8 | 42.5 | 26.8 |
| Clerical | 13.2 | 10.7 | 37.5 | 21.3 |
| Craftsmen, operatives | 46.5 | 23.0 | 57.6 | 26.3 |
| Farmers, farm laborers | 66.7 | 44.4 | 83.3 | 44.4 |
| Service workers | 17.0 | 12.4 | 36.3 | 23.9 |

*(continued)*

102                                      The Ownership and Acquisition of Guns

*Table 3.4.    (Continued)*

| Respondent/Household Characteristic | Respondents Owning (%) | | Households Owning (%) | |
|---|---|---|---|---|
| | Gun | Handgun | Gun | Handgun |
| Education (last grade completed) | | | | |
| 0–7 | 36.4 | 16.1 | 44.9 | 18.6 |
| 8–11 | 30.1 | 14.6 | 43.0 | 20.3 |
| 12 | 31.0 | 18.2 | 48.2 | 25.9 |
| 1–3 years of college | 27.4 | 18.2 | 41.5 | 24.5 |
| 4 years of college | 18.9 | 12.7 | 31.5 | 20.5 |
| Over 4 years of college | 22.9 | 13.0 | 32.4 | 17.1 |
| Size of place of residence | | | | |
| Under 5,000 population | 40.8 | 21.1 | 60.4 | 29.4 |
| 5,000–49,999 | 27.8 | 16.7 | 42.4 | 22.9 |
| 50,000–249,000 | 22.8 | 14.7 | 32.9 | 19.7 |
| 250,000–999,999 | 15.2 | 10.8 | 28.3 | 17.2 |
| 1,000,000 or more | 9.1 | 6.5 | 11.5 | 7.7 |
| Region | | | | |
| New England | 17.3 | 9.4 | 27.6 | 14.2 |
| Middle Atlantic | 17.8 | 7.9 | 28.9 | 13.1 |
| East North Central | 24.7 | 14.6 | 40.1 | 20.6 |
| West North Central | 35.1 | 12.8 | 49.8 | 17.2 |
| South Atlantic | 30.0 | 18.3 | 46.0 | 27.1 |
| East South Central | 41.0 | 24.6 | 60.6 | 33.7 |
| West South Central | 39.2 | 26.9 | 54.2 | 35.4 |
| Mountain | 31.0 | 23.8 | 43.7 | 28.6 |
| Pacific | 23.2 | 14.7 | 34.2 | 18.4 |
| Political Views | | | | |
| Liberal | 22.0 | 13.0 | 33.5 | 18.6 |
| Moderate | 28.4 | 16.4 | 43.1 | 23.0 |
| Conservative | 32.2 | 19.0 | 47.6 | 26.4 |
| Hunter | | | | |
| Yes | 78.3 | 43.1 | 82.7 | 45.4 |
| No | 19.1 | 11.5 | 30.6 | 16.8 |
| Afraid to walk in own area | | | | |
| Yes | 17.0 | 11.2 | 33.1 | 18.9 |
| No | 36.0 | 20.1 | 48.5 | 25.7 |
| Burglarized in past year | | | | |
| Yes | 26.1 | 18.6 | 38.1 | 23.2 |
| No | 28.0 | 16.1 | 42.0 | 22.7 |
| Robbed in past year | | | | |
| Yes | 21.1 | 15.8 | 25.9 | 19.0 |
| No | 28.0 | 16.3 | 42.1 | 22.8 |

*Source:*   Analysis of 1990, 1991 and 1993 GSS, combined (Davis and Smith 1994).
*Note:*   "No answer," "don't know," and other missing responses have been excluded before calculating percentages.



*Table 3.5.* Trends in Gun Ownership among High-Violence Subsets of the Population, 1973–1993

| | Households (%) with | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *Any gun* | | | | | | *Handgun* | | | | | |
| *Year* | *Males* | *Blacks* | *Black Males* | *Age 18–24* | *Income <$10,000* | *Big Cities* | *Males* | *Blacks* | *Black Males* | *Age 18–24* | *Income <$10,000* | *Big Cities* |
| 1973 | 53.3 | 39.9 | 44.4 | 42.7 | 39.4 | 20.3 | 23.1 | 19.6 | 17.3 | 13.1 | 15.9 | 11.9 |
| 1974 | 51.8 | 32.5 | 34.8 | 42.5 | 41.0 | 19.4 | 25.2 | 16.4 | 25.7 | 14.5 | 14.4 | 11.0 |
| 1976 | 52.2 | 37.5 | 44.4 | 40.5 | 38.7 | 17.1 | 26.1 | 20.6 | 22.2 | 15.5 | 16.7 | 9.5 |
| 1977 | 55.3 | 34.3 | 39.7 | 51.6 | 42.4 | 22.7 | 22.5 | 20.0 | 23.5 | 16.1 | 18.8 | 16.5 |
| 1980 | 55.9 | 29.5 | 35.6 | 46.9 | 34.7 | 14.2 | 29.4 | 17.1 | 24.4 | 19.1 | 14.5 | 7.7 |
| 1982 | 55.0 | 34.7 | 46.6 | 40.7 | 31.9 | 20.1 | 26.3 | 20.5 | 26.0 | 14.7 | 14.7 | 12.4 |
| 1984 | 53.6 | 26.9 | 34.0 | 36.9 | 31.8 | 20.4 | 28.7 | 17.4 | 22.6 | 14.0 | 11.5 | 14.0 |
| 1985 | 54.7 | 29.3 | 45.5 | 37.6 | 28.8 | 21.9 | 29.3 | 18.0 | 28.8 | 14.0 | 13.6 | 14.6 |
| 1987 | 51.0 | 28.8 | 43.2 | 36.8 | 32.5 | 21.6 | 29.6 | 18.7 | 28.4 | 18.9 | 15.7 | 14.7 |
| 1988 | 50.5 | 25.0 | 34.1 | 30.7 | 25.6 | 14.5 | 28.2 | 17.2 | 27.3 | 14.9 | 11.1 | 7.3 |
| 1989 | 54.9 | 25.5 | 37.9 | 37.7 | 27.0 | 16.1 | 33.5 | 14.7 | 20.7 | 22.8 | 12.1 | 16.1 |
| 1990 | 53.2 | 24.7 | 23.5 | 36.4 | 20.0 | 7.3 | 29.4 | 16.5 | 17.6 | 18.2 | 12.1 | 5.5 |
| 1991 | 50.9 | 33.3 | 48.9 | 29.4 | 30.3 | 17.9 | 27.3 | 17.6 | 23.9 | 11.1 | 12.1 | 11.9 |
| 1993 | 52.8 | 28.0 | 44.2 | 42.4 | 28.2 | 5.9 | 28.6 | 18.4 | 30.8 | 22.8 | 12.1 | 2.9 |
| Avg. *n* per year | 593 | 150 | 58 | 164 | 355 | 91 | 592 | 151 | 58 | 164 | 354 | 91 |
| Avg., 1984–1987 | 53.1 | 28.3 | 40.9 | 37.1 | 31.0 | 20.8 | 29.2 | 18.0 | 26.6 | 15.6 | 13.6 | 14.4 |
| Avg., 1990–1993 | 52.3 | 28.7 | 38.9 | 36.1 | 26.2 | 10.4 | 28.4 | 17.5 | 24.1 | 17.4 | 12.9 | 6.8 |
| Change (%) | −1.5 | 1.2 | −5.0 | −2.8 | −15.7 | −50.2 | −2.6 | −3.0 | −9.4 | 11.1 | −4.9 | −53.1 |

*Source:* GSS (Davis and Smith 1994).

# EXHIBIT 78

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No: 10-CV-4184 Judge Edmond E. Chang |
| v. | ) ) | |
| THE CITY OF CHICAGO, ET AL., | ) ) | |
| Defendants. | ) | |

**<u>DECLARATION OF WHITNEY O'DANIEL</u>**

I, Whitney O'Daniel, make the following declaration pursuant to 28 U.S.C. § 1746:

1.      I am a resident of Illinois and a citizen of the United States.  I am over eighteen years of age.  My statements herein are based upon personal knowledge and experience.

2.      I am the Executive Director of the Illinois Association of Firearms Retailers ("ILAFR"), a not-for-profit corporation organized under the laws of Illinois.  ILAFR is a membership organization, and I am responsible for its day-to-day management.

3.      ILAFR's purpose is to promote the interests of the firearm retail industry in Illinois and the Second Amendment rights of its members and their customers.  In particular, ILAFR seeks to expand the marketplace of its members and all Illinois firearm retailers by reducing burdensome restrictions on the retail sale of firearms and ammunition at both the state and local levels. Additionally, ILAFR represents Illinois firearms retailers at the national level as a member of the National Association of Firearms Retailers.

1

4.      Membership in ILAFR is open to anyone who seeks to expand the commercial marketplace of the firearms retail industry.  Voting membership, however, is restricted to federally licensed firearms dealers based in Illinois.

5.      Success in striking down Chicago's ban on firearms sales would vindicate Second Amendment rights and open up a market of millions of people to ILAFR members and other firearms retailers in Illinois.

6.      ILAFR has members who desire to sell firearms within the City of Chicago, and who would do so but for Chicago's prohibition of firearms sales.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

Executed on April 24, 2012

Whitney O'Daniel

# EXHIBIT 79

WHITNEY O'DANIEL                                    March 22, 2011

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


ILLINOIS ASSOCIATION OF FIREARMS)

RETAILERS, KENNETH PACHOLSKI,    )

KATHRYN TYLER, and MICHAEL HALL,)

          Plaintiffs,            )

          vs.                    ) Case No. 10 CV 4184

THE CITY OF CHICAGO and          )Judge Edmond E. Chang

RICHARD M. DALEY, Mayor of the   )Mag. Judge Geraldine

City of Chicago,                 )   Soat Brown

          Defendants.            )


          The 30(b)(6) deposition of ILAFR by

WHITNEY O'DANIEL, called for examination, taken pursuant

to the Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking of

depositions, taken before LAURA KIENLEN, CSR No.

84-4153, a Notary Public within and for the County of

Cook, State of Illinois, and a Certified Shorthand

Reporter of said state, at Suite 1240, 30 North LaSalle

Street, Chicago, Illinois, on the 22nd day of March,

A.D. 2011, at 9:30 a.m.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

20

1       Q.    So aside from the four people, the three

2   directors and yourself, that's it?

3       A.    That's correct.

4       Q.    Do you receive any compensation for your

5   duties on behalf of the ILAFR?

6       A.    No.  I wish.

7       Q.    How much of your time would you say you've

8   devoted to your ILAFR duties since its inception in 2008

9   up through the present?

10      A.    Oh, I would say 15 percent of my time every

11  year is allocated to them, trying to get them to be a

12  more stronger organization.

13      Q.    Can you run me through your educational

14  background?

15      A.    Yeah.  I went to, obviously, elementary

16  school, high school and all that in Carbondale,

17  Illinois.  Then I went to SIU Carbondale and then

18  finished there and just went out, and that was it.

19      Q.    Did you receive a degree from SIU?

20      A.    No.

21      Q.    Did you have a field of focus while --

22      A.    Political science.

23      Q.    Again, if you could just let me finish the

24  question.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

21

```
 1      A.     Oh, sorry.
 2      Q.     And when did you leave SIU?
 3      A.     1996.
 4      Q.     Have you ever operated as a firearms' dealer
 5   or a retailer?
 6      A.     No, never.
 7      Q.     Do you have any experience in the retail side
 8   of the firearms' business?
 9      A.     No.
10      Q.     You never worked in a gun store or anything
11   like that?
12      A.     No.
13      Q.     Could you describe for me in your own words
14   what the ILAFR is?
15      A.     Yeah.  The Illinois Association of Firearms
16   Retailers is an organization designed and structured to
17   represent fire -- all the firearm retailers in the state
18   of Illinois, to allow them to have representation as
19   necessary so that their markets for retail sales can go
20   forward without too much hassle, basically.  You know,
21   obviously represent them in Springfield in a lobby
22   scenario, and make sure that the markets continue to be
23   open for them, and where there needs to be new --
24   pursue -- there are obstacles to existing markets
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                          March 22, 2011

22

1    possibly and to try and work to open those markets up as

2    well.  And that's the sole thing that the Association is

3    supposed to do.

4        Q.    Are the activities of the Association limited

5    to what I would call legislative/lobbying/advocacy

6    efforts in Springfield before perhaps either the

7    legislature or government agencies for the State of

8    Illinois, or do you, in addition to those sorts of

9    things, also do what I'll refer to as, you know,

10   business advocacy in terms of working with manufacturers

11   or distributors or banks to get financing for members of

12   the Association to open up new branches, that sort of

13   thing, or is it limited simply to advocating before

14   governmental authorities?

15            MR. PATTERSON:  Object to that question as

16   vague and compound.

17                But you can answer if you understand.

18            THE WITNESS:  Maybe refine it to this

19   statement:  That strictly working through legislative

20   and regulatory issues on the state and federal levels,

21   that's what the Association has done and continues to

22   do.  We don't go outside of that.  So if that helps

23   answer that for you, that we don't -- you know, we are

24   members of the National Association of Firearm



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1   Retailers, so that's a national organization that

2   obviously works to reduce burdens on a national level

3   from the Alcohol, Tobacco, and Firearms, and also from

4   Congress, okay, which is the sole regulation of firearms

5   in the United States, authorized regulation, to that

6   degree of retail sales.  So that's what we do.  Outside

7   of that, we don't do anything like that.

8   BY MR. WORSECK:

9       Q.    So the only things that ILAFR does is lobby or

10  advocate to or in front of governmental decision-makers,

11  whether they be legislators or regulators or other

12  executive officials; is that fair to say?

13      A.    To the degree that we do, it would also go

14  down to like the agency level and work with, you know,

15  Department of Natural Resources, maybe the Attorney

16  General -- well, see, she's executive.  Illinois State

17  Police, you know, that kind of thing.  So even, you

18  know, to that level, lower, yes, so regulatory --

19      Q.    Right.

20      A.    -- where that comes into play.

21      Q.    But nothing beyond legislative or state

22  regulatory bodies?

23      A.    Well, federal.  You would have federal through

24  the National Association -- we are a member of the NAFR,



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

73

1    obstacle to someone to sell it legally, because, you

2    know, a firearm is a legally, federally-mandated device

3    or product, whatever it is, to the degree that ATF says,

4    you know, and is constitutionally protected.  So then

5    you're -- so the City of Chicago is saying basically,

6    you know, we don't care, we don't want them so we're

7    going to ordinance them out of business and by

8    prohibiting the retail sales and then obviously the

9    other obstacles which are the individual ownership

10   problems, where they can keep it and do whatever they

11   want to do with it.

12       Q.    Does the ILAFR believe that the Second

13   Amendment protects the right to sell firearms?

14           MR. PATTERSON:  Object for calling for a legal

15   conclusion.

16           THE WITNESS:  Yeah, I don't know.

17   BY MR. WORSECK:

18       Q.    Just based on your understanding of what the

19   Second Amendment says and what it protects.

20       A.    Well, I mean you certainly could understand

21   that it would be because if you can't sell one, how are

22   you going to own one.  You know, not everybody can make

23   one.  And under federal law, which is what you guys --

24   the City of Chicago is dealing with is -- you know, the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                    March 22, 2011

1    federal law says, you know, provided that you do this,

2    this, and this, we'll give you a license to own one.  As

3    far as a retail store, manufacturing store,

4    manufacturing location, you know, X, Y, Z, and what the

5    City of Chicago does is putting a prohibition on what

6    federal law says that can happen, you know.  And

7    obviously, you know, you could have some zoning where

8    you don't want one in a residential area.  We understand

9    that.  But when you have a business district, and

10   there's no zoning for those, that's kind of a problem.

11   So hopefully I answered your question.

12        Q.    Yeah.  It was a long answer, and I appreciate

13   that, but I just want to be clear on this, whether the

14   ILAFR believes that the Second Amendment protects the

15   right to sell guns.

16        A.    Yes.

17        Q.    And its members share that belief?

18        A.    Yes.  Because obviously you can't have one

19   unless you sell one.  You can't own one without having

20   it being sold.  It has to have a transaction.  Federal

21   law requires a transaction, either a private or a public

22   transaction.

23        Q.    Well, the residents of Chicago are free to go

24   outside of Chicago and buy a weapon and thereby possess



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                    March 22, 2011

75

1    a weapon and exercise their Second Amendment rights.

2        A.    Sure.

3        Q.    Is that your understanding?

4        A.    Yeah, they certainly could do that.  But, I

5    mean, you're talking about a burden.  It's a burden for

6    them to leave the city.  I mean what if they don't have

7    public transportation?  There's public transportation

8    that's not always that efficient, much less sufficient,

9    plus the requirements that are on the individual as

10   well.  If you have one around the corner, and someone

11   could walk down there, sure, it's a little easier.  If

12   you've got to travel out to DuPage County or to Lake

13   County or to Will County or whatever, it's a little

14   tougher.

15       Q.    So even though Chicago residents can go just

16   across the city line and buy firearms and thereby

17   acquire firearms and thereby exercise their Second

18   Amendment rights, ILAFR still believes that it has a

19   Second Amendment right to sell guns in Chicago?

20       A.    Yes.

21       Q.    Or that there is a Second Amendment right to

22   sell guns in Chicago?

23       A.    Yes.  I mean you got car dealers in the city.

24   Why can't they go out to DuPage County and buy a car?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                      March 22, 2011

1    They got Home Depot in the city, go out by Home Depot,

2    you know, out in the sticks.  You know, the only thing

3    you're prohibiting is Wal-Mart and -- because, you know,

4    Wal-Mart has its own problems.  Eventually it probably

5    will get resolved.  But, you know, that's the other

6    company that is being prohibited from having a presence

7    in the city of Chicago.  And I think both of them are

8    based on two different ideas; one is Second Amendment

9    right, the other one is an ability for a retail store to

10   do as it chooses without interference on labor issues, I

11   think, you know.

12       Q.    You mentioned this idea of burden; you know,

13   Chicago residents are burdened by having to go outside

14   to the suburbs to get their guns.

15       A.    Uh-huh.

16       Q.    How many stores would there need to be in

17   Chicago in order for there to be no burden to Chicago

18   residents?

19       A.    I can't answer that exactly, but if you --

20   let's just take the city itself, and you stuck it in --

21   because it's kind of an upside down L, you know, because

22   you got to go out to O'Hare.  You know, let's put -- I

23   don't know -- six, eight, ten, 15, 20, 30, 40, 100.

24   Does it matter?  You know, the thing is free enterprise


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                    March 22, 2011

                                                              82

1   But it's his deposition.

2            THE WITNESS:  No.  No.  I've got you, but I

3   mean --

4            MR. PATTERSON:  He could waste his time asking

5   whatever irrelevant questions he wants.

6            THE WITNESS:  You know, my collection, I have

7   no idea what that number is to be honest with you, but

8   I'm not answering it because I don't know.  Okay?  It's

9   irrelevant to Chicago because of the residents here in

10  the state of -- the city of Chicago.

11  BY MR. WORSECK:

12      Q.    Well, I'm trying to understand the basis for

13  your position --

14      A.    Sure.  Our basis --

15      Q.    -- that it's burdensome for Chicago residents

16  to travel outside of Chicago to get their guns, and you

17  have volunteered that based on your own personal

18  circumstances, you experience a burden even in Southern

19  Illinois.  So you brought that in, and I'm trying to get

20  to the foundation, you know, get behind the reasons why

21  you said that, and so that's why I'm asking these

22  questions, and I think an answer is appropriate.

23      A.    Well, I understand that, but I can't tell you

24  exactly how many guns there are.  I don't know.  That's



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                    March 22, 2011

83

1    just me.  I have no idea.  I have not done a count.

2              The question becomes is, you know, how

3    many are too many.  I don't know, you know.  It's a

4    personal choice.  Okay?  Just as it is a personal choice

5    for someone to be able to go down the street in the city

6    of Chicago and buy a firearm from a federally-licensed

7    dealer.  That is their choice.  If they choose not to,

8    and they choose to go to DuPage County, that's fine, but

9    to prohibit them from having the choice is the problem.

10   That is the key.  And it becomes an enterprise issue of

11   does the person who has a desire to open up a store, if

12   the burdens are removed, can they open up a store, and

13   if the burdens are removed, which are the ordinances,

14   then, yes, there should be people that will open up a

15   retail store in the city of Chicago.

16        Q.    How many members of the ILAFR have been

17   injured by the Chicago ban on gun stores?

18        A.    I can't tell you, but -- I can't tell you

19   exactly, but I'm going to guess probably two or three.

20   If you did not have the burdens in place, the current

21   burdens with the new ordinances and zoning, I think you

22   have two or three from around this area that would

23   probably try and open a store in the city, at least.

24        Q.    I won't ask you for their names, but --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                     March 22, 2011

1      A.    Yeah.   Yeah.

2      Q.    -- are there specific members that you've had

3   talks with regarding their desire or intention to open

4   up a store in Chicago if they could?

5      A.    In the past, yeah.   In the past I have, yeah.

6   Not like last week, but yeah.   You know, they all see

7   the opportunity that's there, yeah.

8      Q.    Well, in the time following the enactment of

9   the new Chicago ordinance in July of last year, have you

10  had any communications with any ILAFR members about them

11  wanting to open up a business in Chicago?

12     A.    Yes.

13     Q.    How many members have you had such

14  conversations with?

15     A.    One to three.   It just depends.

16     Q.    And how many of those conversations have there

17  been?

18     A.    Oh, one or two, yeah.

19     Q.    One or two total or one or two with each of

20  the --

21     A.    One or two with each of them, depending, yeah.

22  Yeah.

23     Q.    And what have they said?

24     A.    You know, if you had these burdens removed,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

85

1     would you be able to do something retail related in

2     Chicago?  Yes, I would.  So that's all it was.  It

3     wasn't anything specific about, you know, are you going

4     to open this, are you going to open this, are you going

5     to do this, you know, how much is your inventory.  No.

6     We have a long way to go, I think, before those

7     individuals could even think about something like that.

8         Q.    So these were conversations that you initiated

9     with the members?

10        A.    I had a couple conversations with them, yeah.

11        Q.    Did you initiate them?

12        A.    They were part of -- they were part of a

13    general discussion, so we had discussions about it, so,

14    yeah, I did talk to them about it.  They didn't come to

15    me about it or they didn't come to us; I went to them.

16        Q.    So you went to them and said, hey, would you

17    be interested in opening up a business in Chicago if

18    this ban was struck down?

19        A.    Uh-huh.

20        Q.    And they said yes?

21        A.    Uh-huh.

22        Q.    And it didn't go any further than that?

23        A.    No.  No.

24        Q.    Nothing about any specifics or details?



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

86

1       A.      Not anything specific, no.  Just because

2   they -- you know, it's a long way to go.

3       Q.      What do you mean by that?

4       A.      Just between the -- because certainly between

5   now and this court case and if there's any ability

6   before the -- you know, two things.  The court case

7   might have to take its time to get through the system

8   and a final judgment rendered.  Okay?  Or the city

9   council and the mayor decides that they're going to open

10  one.  You know, there's two ways to do this, you know,

11  so either way would take a long time.  You know, and

12  obviously the outcome of both are independent of each

13  other, and they still may not be suitable for the

14  environment for retail.

15      Q.      Would they still be unsuitable for the

16  environment for retail?

17      A.      Well, it depends on the judgment, what the

18  judge says could happen or what the city council would

19  do.  You know, maybe they're just still too hard to do

20  something, you know, and I can't tell you what they

21  would be because I'd be speculating on what ordinances

22  or what federal -- a judge's federal ruling would be.

23  You know, I can't tell you what that would be, you know.

24          MR. PATTERSON:  Could I ask to go off the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                        March 22, 2011

87

1    record?

2                      (WHEREUPON, a discussion was had off the

3                      record.)

4                      (WHEREUPON, a recess was had.)

5    BY MR. WORSECK:

6        Q.    Mr. O'Daniel, is the ILAFR pressing the

7    right -- pressing only the right to open gun stores in

8    Chicago or also the right to operate shooting ranges in

9    Chicago?

10       A.    Well, they're kind of both because they're --

11   one is of the other, if that makes sense.  You have a

12   shooting range that is complementary to a retail

13   operation or a shooting range that is vice versa.  So

14   for both opportunities, they kind of go hand in hand, so

15   in the sense that we are supporting both.

16       Q.    So you are taking issue with both the ban on

17   gun stores and the ban on shooting ranges?

18       A.    Yes.

19       Q.    And before you mentioned that there were two

20   or three members who indicated they would be interested

21   in moving into Chicago if the ban on stores were

22   invalidated.  Would those members also be interested in

23   operating a shooting range in Chicago as well?

24       A.    I don't know that.  All I know is that a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

114

1    wanted to do training, and I knew that he wanted an FFL

2    and a shooting range, so to me that was a store.  So

3    specifically brick and mortar, I mean other than a

4    shooting range, which has to be brick and mortar

5    obviously, I can't really say, you know.

6         Q.    So he wanted to open a range in Chicago?

7         A.    Uh-huh.

8         Q.    But beyond that, you don't know?

9         A.    I don't know.  And I -- but to me that means

10   FFL, so he's going to have -- you know, I would assume

11   he would be a retailer as well, but that's just my

12   perception.  That may not have been what the end game

13   was.

14        Q.    Did he ever say anything to you indicating

15   what his plan was or what his desire was in terms of

16   doing anything in Chicago?

17        A.    As I just said, the shooting range, I think,

18   and training and to -- and that's as much as I can

19   remember at this point.  I think -- I do think he -- he

20   had to have an FFL.  I don't think there's any way

21   around it.  So I believe he was going to be a dealer as

22   well, a retailer.

23        Q.    And that's based on things he said to you?

24        A.    Right.  Right.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                    March 22, 2011

1      Q.    Did Mr. Campion ever say anything to you about

2    his plans or his desires for opening some sort of

3    firearms' business in Chicago?

4      A.    I think that what he wanted was obviously to

5    open up -- to have -- to be able to have transactions in

6    the city.  How he was going to do that, I don't know

7    specifically.  So I don't know if it was an FFL

8    scenario, if it was a gun show scenario.  I don't know

9    exactly what he had, but he had desires to do it.

10     Q.    But beyond expressing his desire, you don't

11   know anything about the specific plan that he was

12   looking to pursue?

13     A.    True.  True.

14     Q.    And did Mr. Norton ever say anything to you

15   about his plans or desires regarding opening a business

16   in Chicago or doing business in Chicago?

17     A.    As far as I remember, his desires were simply

18   to have retail operations in the city.  I don't know if

19   that was individually or if it was collectively with

20   someone else, but I know he wanted to do a transaction

21   within the city.  So that means he had to have an FFL

22   location here in the town.

23     Q.    Did he say anything else?

24     A.    Not that I know of.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

116

1       Q.      And Tony Kole, have you ever had a

2   conversation with him?

3       A.      No.

4       Q.      Do you know anything about his plans or

5   desires for opening a business or doing a business in

6   Chicago?

7       A.      No.

8       Q.      Do you know who out there might know what his

9   plans are?

10      A.      No, I don't.

11      Q.      Did you have any -- or let me ask it this

12  way:  Were there any members who were asked to disclose

13  their membership as part of this lawsuit and who

14  rejected that request?

15      A.      When I have said to a few members, you know,

16  hey, there is a potential you might have to have -- this

17  might get released, and they said if it is released, we

18  quit, and I was like, oh, okay.  So they certainly

19  valued the confidentiality of the membership.  And that,

20  to me, was a startling scenario, that it's not something

21  I really want to go down the road with because that

22  could snowball.  And they felt that this was a private

23  entity, so, you know --

24      Q.      Aside from the four individuals who were



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                    March 22, 2011

                                                              156

1    STATE OF ILLINOIS   )

2                        ) SS:

3    COUNTY OF C O O K   )

4              I, LAURA KIENLEN, a Notary Public within

5    and for the County of Cook, State of Illinois, and a

6    Certified Shorthand Reporter of said state, do hereby

7    certify:

8              That previous to the commencement of the

9    examination of the witness, the witness was duly sworn

10   to testify to the whole truth concerning the matters

11   herein;

12             That the foregoing deposition transcript was

13   reported stenographically by me, was thereafter reduced

14   to typewriting under my personal direction and

15   constitutes a true record of the testimony given and the

16   proceedings had;

17             That the said deposition was taken before

18   me at the time and place specified;

19             That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of such

21   attorney or counsel for any of the parties hereto, nor

22   interested directly or indirectly in the outcome of this

23   action.

24             IN WITNESS WHEREOF, I do hereunto set my



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                    March 22, 2011

157

1   hand of office at Chicago, Illinois, this 26th day of

2   March, 2011.

3

4

5

6                              Notary Public

7                         Cook County, Illinois

8                    My commission expires 10/05/11.

9

10

11

12

13

14

15  CSR Certificate No. 84-4153.

16

17

18

19

20

21

22

23

24



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

# EXHIBIT 80

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL., | ) ) | |
| | ) | |
| Plaintiffs, | ) ) | Case No: 10-CV-4184 Judge Edmond E. Chang |
| v. | ) ) | |
| THE CITY OF CHICAGO, ET AL., | ) ) | |
| Defendants. | ) | |

**<u>DECLARATION OF WILLIAM CAMPION</u>**

I, William Campion, make the following declaration pursuant to 28 U.S.C. § 1746:

1.      I am a resident of Steward, Illinois and a citizen of the United States.  I am over eighteen years of age.  My statements herein are based upon personal knowledge and experience.

2.      I am a member of the Illinois Association of Firearms Retailers.

3.      I was a police officer with the City of Chicago Police Department for 31 years.  I currently am the holder of a Federal Firearms License ("FFL"), and I own and operate a gun store from a building on my property in Steward, Camco Sales & Service.  I have exhibited firearms at gun shows in the past.

4.      I currently cannot sell firearms in Chicago because the City's firearms ordinance bans the transfer of firearms with minor, irrelevant exceptions.  If this ban is struck down, I intend to sell firearms, ammunition, and accessories at sporting goods shows and/or gun shows in Chicago. The firearms I would sell would be strictly limited to those covered by my FFL.  Generally, these are shotguns, rifles, and handguns.

1

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

Executed on April 20, 2012

William Campion

2

# EXHIBIT 81

**Certified Copy**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRETT BENSON, et al.

       Plaintiff(s),

    vs.                                 No. 10 CV-4184

CITY OF CHICAGO, et al.

       Defendant(s).

DEPOSITION OF

WILLIAM CAMPION

March 10, 2011
10:08 a.m.

30 North LaSalle Street, Suite 1230
Chicago, Illinois

MARY C. LaCORCIA, CSR No. 84-1497



Telephone:  312.782.8087
Toll Free:  800.708.8087
Facsimile:  312.704.4950

311 Monroe Street
Suite 1200
Chicago, IL 60606

William Campion                                          March 10, 2011

                                                                    18

1         A.      You really have to be more specific.

2         Q.      Were you involved in the day-to-day

3    operations of the farm during that time period?

4         A.      Not completely.

5         Q.      You have people that work for you; is

6    that a fair statement?

7         A.      I was on a lease basis with a farmer who

8    raised corn and beans on off years, so it was -- he

9    leased the property and managed and farmed the

10   property until I moved out there.

11        Q.      Understood.

12                So before you took it over, it wasn't a

13   farm for hay and breeding Clydesdales?

14        A.      Beans and corn.

15        Q.      Before you went into farming about two

16   years ago, were you employed at that point?

17        MR. AMBLER:  Are you asking him immediately

18   before two years ago, or at any time?

19   BY MR. AGUIAR:

20        Q.      Before you went into farming, did you

21   have a profession?

22        A.      Yes.

23        Q.      What was that?

24        A.      I was a police officer.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                    March 10, 2011

1      Q.     Who were you a police officer for?

2      A.     City of Chicago.

3      Q.     How long were you a police officer with

4   the City of Chicago?

5      A.     31 years.

6      Q.     Can you describe for me what your

7   employment with the police department was, starting

8   from when you began in the police department?

9           I know from working with other police

10  officers, people tend to move around.  Can you give

11  me a sampling of what your experience was with the

12  Chicago Police Department as best you can recall?

13     A.     Where should I start?

14     Q.     Immediately before you went into

15  farming.  What was your position when you left the

16  police department?

17     A.     I was injured and had to retire.

18     Q.     Injured on the job?

19     A.     Yes -- no, not on duty.

20     Q.     At the time that you retired, what was

21  your position with the police department?

22     A.     I was working on the Area 3 Command

23  Staff for the Duty Chief Guerrero.

24     Q.     What were your responsibilities working



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                    March 10, 2011

20

1    in the Area 3 Command Staff?

2        A.    I was in charge of the Rapid Response

3    Team for Area 3 as far as secretarial work,

4    statistics, recruitment, training and maintenance

5    of equipment and supplies, acquisition of equipment

6    and supplies.

7        Q.    How long did you do that job for?

8        A.    Approximately six years.

9        Q.    Before you became -- working for Area 3

10   Command Staff, what did you do for the Chicago

11   Police Department?

12       A.    Immediately before, I was assigned to a

13   tactical unit on the North Side.

14       Q.    What was the responsibility of the TAC

15   Team that you were assigned to?

16       A.    Drug enforcement, gang suppression,

17   street robbery suppression and investigation.  I

18   was responsible for responding to in-progress calls

19   as back-up units or primarily, depending on who got

20   there first.

21       Q.    For how long did you do this TAC Team

22   assignment?

23       A.    I was on TAC Teams approximately four

24   years.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

21

1      Q.     Those were all on the North Side?

2      A.     Yes.

3      Q.     Before you worked on this TAC Team, what

4   did you do for the Chicago Police Department?

5      A.     I was in general patrol for several

6   years in different districts.

7             I worked at the Gang Crimes North, which

8   was previously known as Special Operations Group 6,

9   and then it became Special Operations Group 3 when

10  they realigned the areas.

11            And I worked on the -- what was called

12  the War Wagon, 60 Edward, which was the Hostage

13  Barricade Team Special Response Vehicle as a relief

14  sniper.

15     Q.     How long were you doing general patrol

16  in all of these different capacities?  How long a

17  period of time was that?

18     A.     Probably over a 12-year period.

19     Q.     Do you recall what you did before that

20  for the Chicago Police Department?

21     A.     I was a communications dispatcher for a

22  year.  I taught at the Academy for a little over a

23  year, probably a year-and-a-half.

24            I worked foot in Cabrini Green for six



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                    March 10, 2011

1   months or a year.

2           And then I was on one of the project

3   cars, on midnights, in Cabrini Green from '73 to

4   '77.

5       Q.      You said you taught at the Academy.

6   What subjects did you teach?

7       A.      I was on the range staff.

8       Q.      What did that involve?

9       A.      I taught in-service firearms' programs.

10  I taught recruit firearms' programs.  I taught

11  drill and ceremony, gas masks procedures and

12  deployment.

13          I requalified the HBT teams on rifles.

14  I taught firearms' qualifications programs for the

15  City for people that were already on the job.  I'm

16  sure I missed something, but that is it.

17      Q.      Are you a licensed firearms instructor

18  in Illinois?

19      A.      I'm no longer a firearms' instructor in

20  Illinois.

21      Q.      But were you at one time a licensed

22  firearms' instructor?

23      A.      Yes.

24      Q.      When were you first licensed as a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

23

1    firearms' instructor, if you recall?

2         A.    When I was in the Academy, which was

3    '81, I think.  I had to have certifications for the

4    various regiments I taught.

5         Q.    Who did you obtain the certifications

6    from?

7         A.    The National Rifle Association worked in

8    conjunction with the police department.  The FBI

9    worked in conjunction with the police department.

10   I believe the Illinois State Police worked with the

11   police department.  And then I attended seminars

12   with various gun manufacturers and special

13   operations companies.

14        Q.    Would these gun manufacturers certify

15   you to train other people with their firearms?

16        A.    Yes, it was teach-the-teacher programs.

17        Q.    When did you stop being a licensed

18   firearms' instructor?

19        A.    I think my last certification ran out

20   about 1987 or '88.

21        Q.    You haven't instructed since then?

22        A.    I have not.

23        Q.    Before joining the police department,

24   did you have another profession or career?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

31

1    weapons had to demonstrate they had a knowledge of

2    the weapon before they were actually allowed to use

3    the range.   That was done on the range, in the

4    booth to whoever was checking them in to use the

5    range.

6          Q.    How many employees did Illinois Gun --

7    did Illinois Gun Works have any employees?

8          A.    Yes.

9          Q.    How many employees do you recall were

10   working there?

11         A.    At the time I was there, there were

12   three employees.

13         Q.    Those would have been in addition to the

14   three owners?

15         A.    No.

16         Q.    So it was the three owners who were the

17   employees?

18         A.    Yes.

19         Q.    Did you have -- have you ever owned any

20   other gun store or gun range besides Illinois Gun

21   Works?

22         A.    No gun stores or ranges.

23         Q.    No ownership in any gun store or ranges?

24         A.    Correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                    March 10, 2011

1       MR. AGUIAR:  One moment, please.

2               (WHEREUPON, a discussion was had off

3               the record.)

4    BY MR. AGUIAR:

5       Q.    Back on the record.  Let's shift gears

6    and talk about Camco.

7               You formed Camco about two-and-a-half

8    years ago you said; is that correct?

9       A.    Correct.

10      Q.    What is Camco's business address?

11      A.    1769 Paw Paw Road, Steward, Illinois

12   60553.

13      Q.    Is that the same as your residence?

14      A.    The same address.

15      Q.    So do you run Camco out of your home?

16      A.    No.

17      Q.    You don't.  It is the same address,

18   though?

19      A.    Yes.

20      Q.    Where do you run Camco out of?

21      A.    Out of my office.

22      Q.    Is that in your home?

23      A.    No.

24      Q.    Where is it?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                          March 10, 2011

                                                                    33

1        A.    It's in a separate building.

2        Q.    On the farm, correct?

3        A.    Yes.

4        Q.    How many buildings are on your farm?

5        A.    Five, at this time.

6        Q.    One of them is your office?

7        A.    Office and store, yes.

8        Q.    You say "store"; what kind of store?

9        A.    Gun shop.

10       Q.    Does the gun shop have a name?

11       A.    Camco Sales.

12       Q.    Do you keep any firearms at the gun

13  shop?

14       A.    No.

15       Q.    Why don't you store any guns at the

16  shop?

17       A.    Mostly a safety issue.

18       Q.    Why is it a safety issue?

19       A.    I'm out in the middle of nowhere.  The

20  response time is typically 45 minutes for any kind

21  of police presence.  So I don't keep an inventory.

22  I take orders for firearms and procure them for the

23  customers.

24       Q.    So you think it is a safety concern of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                        March 10, 2011

34

1    keeping the firearms in your store, on the farm?

2        A.      I keep them in a safe.

3        Q.      Why is it a safety concern?

4        A.      I don't have the safe in the store.

5        Q.      Where is the safe?

6        A.      Located in an adjacent building.

7        Q.      What do you store in the safe?

8        A.      Firearms.

9        MR. AMBLER:  Let me just object to the

10   relevance of these questions to the extent that

11   they go to proprietary issues and safety issues

12   that Mr. Campion has expressed.  Given those

13   concerns, I don't think these questions about the

14   specifics of where on his property he keeps various

15   materials -- the relevance of that information, the

16   irrelevance of it, I don't think the questions are

17   proper.

18   BY MR. AGUIAR:

19       Q.      Okay.  We were talking a second ago that

20   your safe is in a different building, and that is

21   where you store the firearms, correct?

22       A.      Yes.

23       Q.      And those are firearms that you have

24   procured for your customers?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                    March 10, 2011

38

1       A.      98 percent.

2       Q.      You said you had inventory stored in

3   your safe.  What kind of inventory is that if

4   people are coming wanting a specific firearm.  Do

5   you keep an inventory of guns that you allow them

6   to try out before they actually purchase a weapon?

7       A.      No.

8       Q.      Is this a personal inventory of

9   firearms?

10      A.      No.

11      Q.      Do you sell these weapons -- the

12  inventory, do you sell them, the ones stored in

13  your safe?

14      A.      No.

15      Q.      It is just your own personal firearms?

16      A.      No.

17      Q.      Explain to me the inventory.  How did

18  they come to be in your possession?

19      A.      I have to -- I have to have a little bit

20  of back stock on some items that are repetitious

21  for various sales.  So an officer may come in and

22  say, "I want a Springfield," whatever.  Or he may

23  want a Remington, whatever.  And I have begun to

24  keep one or two of the most popular items



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                      March 10, 2011

1    available, so that an officer coming in with a

2    letter of purchase from his department may procure

3    the weapon and walk out the door with it.

4         Q.    You said a letter of purchase from the

5    department.  Do you require that for a law

6    enforcement officer to purchase from you?

7         A.    No.

8         Q.    Why do they come with a letter, then, do

9    you know?

10        A.    There are two ways an officer or anyone

11   can procure a firearm.  They either have to wait

12   the time period specified by state and federal law

13   if they don't have a purchase permit from the

14   department, or if they have the purchase permit

15   from the department, federal and state laws are

16   waived and they may procure the weapon immediately.

17        They must, of course, fill out a 4473

18   Form and pass the background checks from the

19   Illinois State Police through Brady, whatever it

20   is.

21        Q.    Do you have a federal firearms' license?

22        A.    Yes.

23        Q.    How long have you had that for?

24        A.    Approximately two-and-a-half years.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

40

1      Q.      Have you held it continuously ever
2   since?
3      A.      Yes.
4      Q.      Do you recall what you have to do to
5   obtain your FFL, or what you did to obtain your
6   FFL?
7      A.      Yes.
8      Q.      What did you do?
9      A.      There is a form set, a kit, that comes
10  from the Alcohol, Tobacco & Firearms, explosive
11  branch of the Department of Justice that has an
12  application, has fingerprint cards that must be
13  filled out at a local law enforcement agency.
14          And then the forms and print card are
15  submitted to ATF for background checks with the
16  FBI.
17          And then you have to get your local
18  chief law enforcement officer to sign off on it.
19     Q.      Does the FFL that you received limit the
20  type of firearms that you can sell?
21     A.      Yes.
22     Q.      How so?
23     A.      The classification of general firearms
24  is limited to pistols, rifles and shotguns.  It is



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

41

1    considered a nondestructive device license.

2          Q.    Does it come with any other limitations,

3    such as a geographic area that you can sell?

4          A.    No.

5          Q.    Does your FFL allow you to sell

6    ammunition?

7          A.    Yes.

8          Q.    Any limits on the ammunition that you

9    can sell?

10         A.    Yes.

11         Q.    What are those limits?

12         A.    Ammunition can only be obtained in

13   Illinois from someone who has a FOID card.  And

14   specifically, handgun ammunition can only be

15   purchased -- ammunition designed specifically for

16   handguns can only be purchased by someone 21 years

17   of age.

18         Q.    Are there any limitations on your

19   ability to sell ammunition?

20         MR. AMBLER:  Let me just object to the extent

21   it calls for a legal conclusion.

22         MR. AGUIAR:  I'm asking if he knows.

23         MR. AMBLER:  Subject to that objection, he can

24   answer.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                    March 10, 2011

42

1    BY THE WITNESS:

2        A.    There are specific rules and regulations

3    that you have to follow in order to maintain a good

4    license.

5    BY MR. AGUIAR:

6        Q.    Do you know whether your FFL allows you

7    to sell firearm accessories?

8        A.    It would be a does not apply.

9        Q.    Does not apply?

10       A.    No.

11       Q.    Does Camco advertise or do any marketing

12   of its services?

13       A.    I do.

14       Q.    How do you advertise or market?

15       A.    Word of mouth and business cards.

16       Q.    Do you do any advertising in newspapers?

17       A.    No.

18       Q.    Do you have a web page?

19       A.    No.

20       Q.    When you say "word of mouth," how do you

21   go about spreading the word of your business?

22       A.    When I meet police officers, I tell them

23   I'm a federally-licensed dealer, and if I can

24   assist them in the purchase of anything that they



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                    March 10, 2011

49

1      Q.      Do you currently service what you sell?

2      A.      I do not.

3      ·Q.      Is there any particular training that

4    you would need to get to be able to service

5    firearms?

6      A.      Yes.

7      Q.      What is that training?

8      A.      Recertified as an armorer.

9      Q.      What is an armorer?

10      A.      An armorer is a plumber.  He replaces

11    parts, tunes up, and makes sure it is operating

12    properly versus gunsmith, who is highly skilled,

13    highly trained and has done an internship or

14    slaveship in some other shop.

15      Q.      How long does it take to obtain a

16    certification as an armorer, if you know?

17      A.      The classes that I have been to

18    generally take from three to five days, and are

19    offered by the manufacturers themselves.

20      Q.      So you would be certified on a specific

21    firearm?

22      A.      Yes.

23      Q.      You would only be able to service those

24    particular firearms?


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                         March 10, 2011

50

1         A.      It is a bad question in that, no, it
2    doesn't limit me to only servicing that firearm.
3                 As an armorer, in order to obtain
4    warranty service for a firearm, you would only work
5    on that firearm.
6                 But as an armorer, you get trained in a
7    multitude of different firearms.  And basically, a
8    wrench is a wrench, and you are working on the same
9    type of systems over and over again.  The only
10   thing that changes is the parts.
11        Q.      You said you were certified once before?
12        A.      Yes.
13        Q.      When was that?
14        A.      When I was with the department, they
15   sent me to school.
16        Q.      How long did that school last for?
17        A.      As I said, anywhere from three to five
18   days, generally.  You are only working on one thing
19   at a time, so it is over and over and over to make
20   sure you get it right.
21        Q.      Are you currently a member of the
22   Illinois Association of Firearms' Retailers?
23        A.      I am.
24        Q.      When did you first become a member of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                51

1    ILAFR?

2         A.     It was the end of last summer.

3         Q.     Have you been a member continuously

4    since then?

5         A.     Yes.

6         Q.     Do you know of any member of ILAFR that

7    intends to open a gun shop or range in Chicago?

8         A.     I do not, no.

9         MR. AGUIAR:  Mark this as 3.

10               (WHEREUPON, a certain document was

11               marked Campion Deposition Exhibit

12               No. 3, for identification, as of

13               03/10/2011.)

14   BY MR. AGUIAR:

15        Q.     I'm handing you what has been marked as

16   Exhibit 3.  This is Plaintiffs' Second Amended

17   Complaint for Declaratory Judgment and Injunctive

18   Relief filed in this case.  Have you seen it

19   before?

20        A.     I have not.

21        Q.     I would ask that you turn to Page 10 of

22   this document, and direct your attention to

23   Paragraph 40.  And I will read aloud the first part

24   of that.  The Plaintiffs have said in their



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    complaint, "Plaintiff ILAFR has members that desire

2    to sell firearms and operate shooting ranges inside

3    Chicago city limits for patronage by law-abiding

4    residents and would do so, but for the ordinance."

5            As a member of ILAFR, do you have any

6    intention to operate a shooting range or gallery

7    within the City of Chicago?

8        A.    I do not.

9        Q.    Do you have any intention or interest in

10   selling firearms within the City of Chicago?

11       A.    I do.

12       Q.    Is it your intention to establish a

13   traditional brick and mortar store in the City of

14   Chicago?

15       MR. AMBLER:  You are talking about but for the

16   ordinance?

17       MR. AGUIAR:  All of my questions are but for

18   the ordinance, yes.

19   BY THE WITNESS:

20       A.    No.

21   BY MR. AGUIAR:

22       Q.    You don't intend to open up something

23   like Illinois Gun Works in the City of Chicago?

24       A.    No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                    March 10, 2011

1              (WHEREUPON, a certain document was
2              marked Campion Deposition Exhibit
3              No. 4, for identification, as of
4              03/10/2011.)
5      BY MR. AGUIAR:
6          Q.    Mr. Campion, the court reporter has
7      handed you what has been marked as Exhibit No. 4.
8      This is Plaintiffs' Objections and Responses to
9      Defendants' Third Set of Requests For Production
10     and Third Set of Interrogatories.  Have you seen
11     this document before?
12         A.    I have not.
13         Q.    I'm going to ask that you turn to Page 7
14     and 8.  Let's start on Page 7.  On Page 7, the
15     plaintiffs are responding to certain
16     interrogatories which we posed to them.  And I
17     would like to direct your attention to the bottom
18     of Page 7.  I'm going to read this aloud.
19             "Subject to and without waiving these
20     objections, plaintiffs state that ILAFR member,
21     William Campion, intends to sell firearms,
22     ammunition and accessories at sporting goods shows
23     and/or gun shows in Chicago if the ordinance at
24     issue in this lawsuit is found unconstitutional.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                    March 10, 2011

54

1   He will arrange for the delivery of firearms

2   through local federally licensed firearm dealers

3   after all of the buyer's required qualifications

4   are confirmed.  The firearms he would sell would be

5   strictly limited to those covered by his Class I

6   Federal Firearms' License.  Generally, these are

7   shotguns, rifles and handguns.  Prices would be

8   determined based on market conditions at the time

9   of the sale."

10          Does this accurately state your

11  intention to sell firearms within the City of

12  Chicago if the ordinance is found invalid?

13      A.    Yes.

14      Q.    I want to talk about what is said there

15  and go into some detail about that.

16          Have you ever sold firearms at a gun

17  show before?

18      A.    Yes.

19      Q.    When was that?

20      A.    I would say approximately ten years ago.

21      Q.    Do you recall where the gun show was

22  located?

23      A.    I'm sorry, the time frame is wrong.  It

24  has got to be 16 or 17 years ago.  And I believe it



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                    March 10, 2011

55

1    was the St. Charles Gun Show at the fairgrounds in

2    St. Charles, which is -- I can't remember the

3    county's name, but it is the St. Charles

4    Fairgrounds.

5         Q.    Did you sell this firearm individually,

6    meaning you, or was -- did you sell it on behalf of

7    a company?

8         A.    Individually.

9         Q.    Did you sell a firearm that was your own

10   firearm?

11        A.    Yes.

12        Q.    Had you arranged to have a booth or

13   table at this gun show?

14        A.    Yes.

15        Q.    How many firearms did you sell that day,

16   if you recall?

17        A.    I think it was just one.

18        Q.    Was the gun show just for a day?

19        A.    Those are two-day shows, there.

20        Q.    So you sold one gun over two days?

21        A.    Yes.

22        Q.    At that time, did you have an FFL?

23        A.    No.

24        Q.    How did you go about making the sale?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

77

1   STATE OF ILLINOIS    )

2                        )  SS:

3   COUNTY OF C O O K    )

4           I, MARY C. LaCORCIA, CSR No. 84-1497, a

5   Notary Public within and for the County of Cook,

6   State of Illinois, and a Certified Shorthand

7   Reporter of said state, do hereby certify:

8           That previous to the commencement of the

9   examination of the witness, the witness was duly

10  sworn to testify the whole truth concerning the

11  matters herein;

12          That the foregoing deposition transcript

13  was reported stenographically by me, was thereafter

14  reduced to typewriting under my personal direction

15  and constitutes a true record of the testimony

16  given and the proceedings had;

17          That the said deposition was taken

18  before me at the time and place specified;

19          That I am not a relative or employee or

20  attorney or counsel, nor a relative or employee of

21  such attorney or counsel for any of the parties

22  hereto, nor interested directly or indirectly in

23  the outcome of this action.

24          IN WITNESS WHEREOF, I do hereunto set my



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                      March 10, 2011

78

1   hand and affix my seal of office at Chicago,

2   Illinois, this 16th day of March, 2011.

3

4

5

6

7              Notary Public, Cook County, Illinois.

8              My commission expires 12/16/13.

9

10  MARY C. LaCORCIA, CSR No. 84-1497

11                          OFFICIAL SEAL
                            MARY CATHERINE LACORCIA
12                          Notary Public - State of Illinois
                            My Commission Expires Dec 16, 2013

13

14

15

16

17

18

19

20

21

22

23

24



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com