# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 4.2
### Eastern Division

Kenneth Pacholski, et al.

                              Plaintiff,

v.                                                    Case No.: 1:10−cv−04184
                                                      Honorable Edmond E. Chang

The City of Chicago, et al.

                              Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, February 13, 2012:

     MINUTE entry before Honorable Edmond E. Chang: Defendant's unopposed
motion to adjust briefing schedule [152] is granted, based on the unforeseen additional
work explained in the motion. Defendant's summary judgment motion is due on 03/02/12.
Plaintiffs' response is due on 04/13/12. Defendant's reply is due on 05/14/12. Status
hearing of 06/14/12 is reset to 07/10/12 at 9:00 a.m. The word limits set forth in R. 150
still apply. Mailed notice(slb, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at *www.ilnd.uscourts.gov*.

# Exhibit B

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 5.0.3
### Eastern Division

Kenneth Pacholski, et al.

                              Plaintiff,

v.                                              Case No.: 1:10−cv−04184
                                                Honorable Edmond E. Chang

The City of Chicago, et al.

                              Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, April 10, 2012:

      MINUTE entry before Honorable Edmond E. Chang: Plaintiffs' unopposed motion for extension [171] to respond to Defendant's summary−judgment motion is granted to 04/27/12. Defendant's reply is due 05/28/12. Mailed notice(slb, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# Exhibit C

Nos. 12-1269 and 12-1788

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| MICHAEL MOORE, et al., | ) | Appeal from the United States |
| | ) | District Court for the |
| Plaintiffs-Appellants, | ) | Central District of Illinois |
| | ) | |
| v. | ) | No. 11-3134 |
| | ) | |
| LISA MADIGAN and HIRAM GRAU, | ) | The Honorable |
| | ) | Sue E. Myerscough, |
| Defendants-Appellees. | ) | Judge Presiding. |

| | | |
|---|---|---|
| MARY E. SHEPARD and ILLINOIS STATE RIFLE ASSOCIATION, | ) | Appeal from the United States |
| | ) | District Court for the |
| | ) | Southern District of Illinois |
| Plaintiffs-Appellants, | ) | |
| | ) | No. 11-405 |
| v. | ) | |
| | ) | |
| LISA MADIGAN, et al., | ) | The Honorable |
| | ) | William D. Stiehl, |
| Defendants-Appellees. | ) | Judge Presiding. |

**BRIEF OF DEFENDANTS-APPELLEES LISA MADIGAN, HIRAM GRAU, TYLER R. EDMONDS, AND PATRICK J. QUINN**

LISA MADIGAN
Attorney General of Illinois

MICHAEL A. SCODRO
Solicitor General

JANE ELINOR NOTZ
Deputy Solicitor General

DAVID A. SIMPSON
RACHEL MURPHY
EVAN SIEGEL
KARL TRIEBEL
NADINE J. WICHERN
Assistant Attorneys General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
Telephone: (312) 814-3000

*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES................................................ iii

JURISDICTIONAL STATEMENT........................................ 1

ISSUES PRESENTED FOR REVIEW.................................... 1

STATEMENT OF THE CASE............................................ 1

STATEMENT OF FACTS................................................. 2

SUMMARY OF ARGUMENT............................................. 3

ARGUMENT............................................................ 4

I.     Standard Of Review............................................. 4

II.    The Second Amendment Does Not Confer A Right To Carry Operable
       Firearms In Public Places........................................ 5

       A.     The Relevant Historical Moment For Determining The Scope Of The
              Second Amendment Is The Period Beginning With The Creation Of
              The English Right To Bear Arms And Ending With The Second
              Amendment's Ratification.................................. 6

       B.     The Second Amendment's Right To Bear Arms, As Originally
              Understood, Did Not Include A Right To Carry Firearms In Public
              Places For Personal Self-Defense........................... 8

       C.     Other Courts Agree That Second Amendment Rights Do Not Extend
              To Public Places.......................................... 14

       D.     Plaintiffs' Arguments To The Contrary Are Meritless............ 15

              1.     Plaintiffs Misread The Governing History. ............... 15

              2.     Neither The Second Amendment's Text Nor Supreme Court
                     Precedent Establishes A Right To Carry Arms In Public
                     For Personal Self-Defense. .......................... 28

III.   In The Alternative, Illinois Law Satisfies Means-Ends Scrutiny. . . . . . . . .  33

     A.   Even If Within The Scope Of The Second Amendment, The
       Challenged Regulations Are Not Within The Amendment's
       "Core". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

     B.   The State Has A Compelling Interest In Preventing The
       Unwanted Discharge Of Firearms In Public. . . . . . . . . . . . . . . . . . .  38

     C.   Most States Apply A "Reasonable Regulation" Standard Where
       Such Regulations Lie Far From The State Constitutional Core. . . . .  40

     D.   The State's Regulation Of Ready-To-Use Weapons In Public
       Is Closely Related To Its Interest In Barring The Firing Of Those
       Weapons In Public. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

     E.   The Challenged Laws Also Survive The Standard Applied In
       *Ezell*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

     F.   If The Complaints Are Reinstated, This Court Should Remand For
       An Evidentiary Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

IV.   Governor Quinn Is Not A Proper Party. . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

RULE 32(a)(7)(B) CERTIFICATION

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**                                                                                            **Page(s)**

*Aymette v. State,*
    21 Tenn. (Hum.) 154 (1840)..................................... 27

*Bd. of Trs. of the State Univ. of N.Y. v. Fox,*
    492 U.S. 469 (1989)........................................... 46

*Chune v. Piott,*
    (1614) 80 Eng. Rep. 1161 (K.B.)................................ 21

*City of Los Angeles v. Alameda Books, Inc.,*
    535 U.S. 425 (2002)................................... 43, 49, 51

*Commonwealth v. Robinson,*
    600 A.2d 957 (Pa. Super. Ct. 1991)............................ 45

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)..................................... *passim*

*English v. State,*
    35 Tex. 473 (1871)........................................... 27

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011)............................. *passim*

*Florida Bar v. Went for It, Inc.,*
    515 U.S. 618 (1995)...................................... 43, 50

*G.M. Enters., Inc. v. Town of St. Joseph,*
    350 F.3d 631 (7th Cir. 2003)........................... 43, 49, 51

*Gonzalez v. Vill. of West Milwaukee,*
    671 F.3d 649 (7th Cir. 2012).................................. 32

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950).......................................... 32

*Jones v. Hulick,*
    449 F.3d 784 (7th Cir. 2006).................................. 40

*King v. Hutchinson,*
 (1784) 168 Eng. Rep. 273 (C.C.R.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Lorillard Tobacco Co. v. Reilly,*
 533 U.S. 525 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*McDonald v. City of Chicago,*
 130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago,*
 567 F.3d 856 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Nordyke v. King,*
 644 F.3d 776 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Nunn v. State,*
 1 Ga. (1 Kelly) 243 (1846).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Oregon v. Ice,*
 555 U.S. 160 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Parker v. District of Columbia,*
 478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom.*
 *District of Columbia v. Heller,* 554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . 24

*Payton v. New York,*
 445 U.S. 573 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*People v. Buffalo Confectionery Co.,*
 401 N.E.2d 546 (Ill. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*People v. Marin,*
 795 N.E.2d 953 (Ill. App. Ct. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*People v. Smythe,*
 817 N.E.2d 1100 (Ill. App. Ct. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*People v. Williams,*
 305 N.E.2d 186 (Ill. App. Ct. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*R.A.V. v. City of St. Paul,*
 505 U.S. 377 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*St. John's United Church of Christ v. City of Chicago,*
    502 F.3d 616 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Scachitti v. UBS Fin. Servs.,*
    831 N.E.2d 544 (Ill. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Dred Scott v. Sandford,*
    60 U.S. (19 How.) 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Semayne's Case,*
    (1603) 77 Eng. Rep. 194 (K.B.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sir John Knight's Case,*
    (1686) 87 Eng. Rep. 75 (K.B.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*State v. Buzzard,*
    4 Ark. (4 Pike) 18 (1842) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*State v. Chandler,*
    5 La. Ann. 489 (1850) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*State v. Cole,*
    665 N.W.2d 328 (Wis. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

*State v. Hamdan,*
    665 N.W.2d 785 (Wis. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*State v. Huntly,*
    25 N.C. (3 Ired.) 418 (1843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*State v. Workman,*
    14 S.E. 9 (W. Va. 1891) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Tri-State Terminals, Inc. v. Jesse,*
    596 F.2d 752 (7th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Black,*
    525 F.3d 359 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Booker,*
    644 F.3d 12 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Carter,*
    669 F.3d 411 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Cruikshank,*
    92 U.S. 542 (1876). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Masciandaro,*
    638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . 14, 15, 36, 37

*United States v. Miller,*
    307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Moore,*
    666 F.3d 313 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Peterson,*
    483 F.2d 1222 (D.C. Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Reese,*
    627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Salerno,*
    481 U.S. 739 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) (*en banc*). . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Williams,*
    616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Yancey,*
    621 F.3d 681 (7th Cir. 2010) (*per curiam*). . . . . . . . . . . . . . . . . . . . . . . . 46

*Williams v. State,*
    10 A.3d 1167 (Md. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## Constitution, Statutes, and Regulation

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

520 ILCS 5/1.1 *et seq.* (West 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 29

720 ILCS 5/24-1 (West 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 29

17 Ill. Admin. Code § 510.10 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 29

A Bill for the Office of Coroner and Constable (Mar. 1, 1682), *reprinted in The Grants, Concessions & Original Constitutions of the Province of New Jersey* (Aaron Leaming & Jacob Spicer eds., Lawbook Exch. 2002). . . . . . 13

An Act against wearing Swords, &c. (1686), *reprinted in The Grants, Concessions & Original Constitutions of the Province of New Jersey* (Aaron Leaming & Jacob Spicer eds., Lawbook Exch. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 13

An act for the better security of the inhabitants by obliging the white male persons to carry fire arms to places of public worship (Feb. 27, 1770), *reprinted in* 19 *The Colonial Records of the State of Georgia* (Allen Daniel Candler ed., 1911). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

An Act for the punishment of crimes, § 56 (Mar. 18, 1796), *reprinted in Laws of the State of New Jersey* (Trenton 1821). . . . . . . . . . . . . . . . . . . . . . . . 20

An Act to prevent the practice of dueling ¶1 (May 1779), *reprinted in Acts & Laws of the State of Connecticut, in America* (Hartford, Hudson & Goodwin 1796). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

An act to prevent the carrying of dangerous weapons in the City of Washington (Nov. 4, 1857), *reprinted in Corporation Laws of the City of Washington* (James W. Sheahan ed., Washington, D.C., Robert A. Waters 1860). . . . . . 27

An Act to Prevent the Carrying of Fire Arms and Other Deadly Weapons (Dec. 2, 1875), *reprinted in The Compiled Laws of Wyoming* (J.R. Whitehead ed., Cheyenne, H. Glafcke 1876). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Commission and Instructions to the Justices of Peace & Constables, 1661, (R.P.S. 1661/1/423) (Scot.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Statute of Northampton, 2 Edw. 3, c. 3 (Eng. 1328). . . . . . . . . . . . . . . . . . 10

## Other Authorities

A Gentleman of the Law, *A New Conductor Generalis: Being a Summary of the Law Relative to the Duty & Office of Justices of the Peace, Sheriffs, Coroners, Constables, Jurymen, Overseers of the Poor* (Albany, D. & S. Whiting 1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Black's Law Dictionary* (9th ed. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

1 Blackstone, William, *Commentaries*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

2 Blackstone, William, *Commentaries* (Christian 12th ed. 1794). . . . . . . . . . . . . . 22

4 Blackstone, William, *Commentaries*. . . . . . . . . . . . . . . . . . . . . . 8, 12, 15, 17

4 Blackstone, William, *Commentaries* (Christian 12th ed. 1795). . . . . . . . . . . . . . 22

Brady Center to Prevent Gun Violence, *Facts / Gun Violence Overview*, http://www.bradycampaign.org/facts/gunviolence?s=1 (last visited May 3, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Carpenter, John & Whitington, Richard, *Liber Albus: The White Book of the City of London* (Henry Thomas Riley trans., London, Griffin & Co. 1861) (1419). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Charles, Patrick J., *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standard of Review*, 60 Clev. St. L. Rev. (forthcoming 2012), available at http://ssrn.com/abstract=1938950 (last visited May 3, 2012). . . . . . . . . . . . . . . . . . . . . . . . 10, 13, 17, 18-19, 21

3 Coke, Edward, *Institutes of the Laws of England* (London, E. & R. Brooke 1797). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 19

Colvin, John B., *The Magistrate's Guide, & Citizen's Counsellor; Adapted to the State of Maryland & Washington County, in the District of Columbia* (Washington, D.C., Weens 1819). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Cook, Philip J. & Ludwig, Jens, *Gun Violence: The Real Costs* (Oxford Univ. Press 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Cook, Philip J., *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Cromwell, Oliver, *Instructions Concerning Constables* (1665). . . . . . . . . . . . . . . .  12

Donohue, John, *The Impact of Concealed-Carry Laws*, in *Evaluating Gun Policy
    Effects On Crime & Violence* (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

Dunlap, John A., *The New-York Justice* (New York, Isaac Riley 1815). . . . . . . . . .  18

Epps, Garret, *Any Which Way But Loose: Interpretive Strategies &
    Attitudes Toward Violence in the Evolution of the Anglo-American
    "Retreat Rule"*, 55 Law & Contemp. Probs. 303 (Winter 1992). . . . . . . . . . . .  9

FBI, *Uniform Crime Reports, Expanded Homicide Data Table 15 / Justifiable
    Homicide*, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/
    crime-in-the-u.s.-2010/tables/10shrtbl15.xls (last visited May 3, 2012). . . .  45

Gardiner, Robert, *The Compleat Constable* (London, Tho. Bever 3d ed. 1708). . . .  12

Hawkins, William, *Treatise on the Pleas of the Crown* (Thomas Leach ed.,
    London, His Majesty's Law Printers 6th ed. 1787), *available at*
    http://books.google.com/books?id=lqYDAAAAQAAJ&pg=PP5
    (last visited May 3, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18, 19, 24, 25

Haywood, John, *A Manual of the Laws of North-Carolina* (Raleigh, J. Gales 3d
    ed. 1814) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

1 Haywood, John & Cobbs, Robert L., *The Statute Laws of the State of Tennessee
    of a Public & General Nature* (Knoxville, F.S. Heiskell 1831) . . . . . . . . . . .  14

Hemenway, David & Azrael, Deborah, *The Relative Frequency of Offensive &
    Defensive Gun Uses: Results from a National Survey*, 15 Violence &
    Victims (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44, 48

Hemenway, David, *Road Rage in Arizona: Armed & Dangerous*,
    34 Accident Analysis & Prevention (2002) . . . . . . . . . . . . . . . . . . . . . . . . . .  45

Hemenway, David & Vriniotis, Mary, *Comparing the Incidence of
    Self-Defense Gun Use & Criminal Gun Use*, http://www.hsph.harvard.
    edu/research/hicrc/files/Bullet-ins_Spring_2009.pdf
    (last visited May 3, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

Howard, A., *The Road from Runnymede* (1968). . . . . . . . . . . . . . . . . . . . . . . . . .  11

1 Hutcheson, Gilbert, *Treatise on the Offices of Justice of Peace; Constable; Commissioner of Supply; & Commissioner Under Comprehending Acts, in Scotland* (Edinburgh, Mundell & Son 1806) . . . . . . . . . . . . . . . . . . . . . . . 12

Ill. Council Against Handgun Violence, http://www.ichv.org/facts-about-gun-violence/general-facts-about-gun-violence (last visited May 3, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

2 LaFave, Wayne R., *Substantive Criminal Law* § 10.4 (2d ed. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7 *Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred* (John Bioren ed., Philadelphia 1822). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Letter to Peter Carr (Aug. 19, 1785), *reprinted in* 1 *The Writings of Thomas Jefferson* 397-98 (H.A. Washington ed., Washington, D.C., Taylor & Maury 1853). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Opinion on the Legality of the London Military Foot-Association (1780), *reprinted in* William Blizard, *Desultory Reflections on Police* 63 (London, Bauer & Galabin 1785). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Parker, James, *Conductor Generalis: Or, The Office, Duty & Authority of Justices of the Peace, High-Sheriffs, Under-Sheriffs, Coroners, Constables, Gaolers, Jury-Men, & Overseers of the Poor* (Woodbridge N.J., Parker 1764) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24

Richardson, Erin G. & Hemenway, David, *Homicide, Suicide, & Unintentional Firearm Fatality: Comparing the United States With Other High-Income Countries, 2003,* 70 J. of Trauma, Injury, Infection, & Critical Care (Jan. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Rosenthal, Lawrence, *Second Amendment Plumbing After* Heller: *Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, & Criminal Street Gangs,* 41 Urb. Law. 1 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

1 Russell, William Oldnall, *A Treatise on Crimes & Indictable Misdemeanors* n.h. (London, Butterworth & Son 2d ed. 1826). . . . . . . . . . . . . . . 18, 19, 22

3 Tomlins, Thomas Edlyn & Granger, Thomas Colpitts, *The Law-Dictionary, Explaining the Rise, Progress, & Present State of the British Law* (Philadelphia, R. H. Small 1st American ed. 1836) . . . . . . . . . . . . . . . . . . . . 22

Urban, Sylvanus, *Obituary of Sir William Blizard, F.R.S.*, 5 The Gentleman's Magazine (New Series) (1836). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Violence Policy Center, *Concealed Carry Killers*, http://vpc.org/ccwkillers.htm (last visited May 3, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

2 Warden, David Bailie, *A Statistical, Political, & Historical Account of the United States of North America* (Edingburgh, Ramsay & Co. 1819) . . . . . . 20

Wellford, Charles, *et al.*, *Firearms & Violence: A Critical Review* (2005). . . . . . 49, 50

3 Wilson, James, *The Works of the Honourable James Wilson* (Philadelphia, Lorenzo Press 1804). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Winkler, Adam, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants' jurisdictional statements are complete and correct.

## ISSUES PRESENTED FOR REVIEW

1.     Does the Second Amendment embody a right to carry ready-to-use firearms in public places for self-defense?

2.     If so, do the challenged Illinois laws satisfy the appropriate means-ends test?

3.     Is Governor Quinn a proper defendant?

## STATEMENT OF THE CASE

1.     *Moore v. Madigan*

On May 19, 2011, the *Moore* plaintiffs filed an amended complaint against Lisa Madigan, in her official capacity as Illinois Attorney General, and Hiram Grau, in his official capacity as Director of the Illinois State Police, seeking declaratory and injunctive relief under 42 U.S.C. § 1983 and alleging that Illinois statutes barring the carrying of ready-to-use firearms in public places for personal self-defense violated their Second Amendment rights.  Moore Doc. 5; A1.[1]  On February 3, 2012, the district court denied plaintiffs' motion for injunctive relief and dismissed plaintiffs' complaint for failure to state a claim.  Moore Doc. 38; Moore SA1-48.  Later that day, plaintiffs timely filed a notice of appeal.  A37.

---

[1] In this brief, district court docket entries appear as "Moore Doc. __" and "Shepard Doc. __," respectively; plaintiffs' short appendices as "Moore SA __" and "Shepard SA __," respectively; the *Moore* plaintiffs' additional appendix as "A__"; and plaintiffs' briefs as "Moore Br. __" and "Shepard Br. __," respectively.

2.     *Shepard v. Madigan*

On May 13, 2011, the *Shepard* plaintiffs filed an action against the Illinois

Attorney General in her official capacity, Governor Pat Quinn, in his official

capacity as Governor of Illinois, Tyler R. Edmonds, in his official capacity as State's

Attorney of Union County, Illinois, and David Livesay, in his official capacity as

Sheriff of Union County, Illinois, for declaratory and injunctive relief under 42

U.S.C. § 1983, alleging that Illinois statutes barring the carrying of ready-to-use

firearms in public places for personal self-defense violated plaintiffs' Second

Amendment rights.  Shepard Doc. 2.  On March 30, 2012, the district court denied

plaintiffs' motion for injunctive relief and dismissed their complaint for failure to

state a claim.  Shepard Doc. 57; Shepard SA1-19.  On April 3, 2012, plaintiffs timely

filed a notice of appeal.  Shepard Doc. 61.

*     *     *

On April 13, 2012, this Court ordered that arguments in the two appeals be

held before the same panel on the same day and, on April 26, denied defendants'

motion to consolidate but indicated that defendants were free to file a single,

consolidated brief in the two appeals.

## STATEMENT OF FACTS

In both cases, plaintiffs raise a facial challenge to Illinois' statutes barring

the carrying of ready-to-use firearms in public places for personal self-defense.

Moore is a jail superintendent and wishes to carry firearms to guard against attack

by former inmates.  A15-16.  Fletcher seeks to protect herself on and around her

farm. A21-22. The remaining *Moore* plaintiffs are firearms owners who wish to

carry their weapons in a ready-to-use condition, in public, for personal self-defense

or are organizations dedicated to promoting Second Amendment rights. A18-20,

A24-30. Shepard was attacked while working at a church in Anna, Illinois, and

wishes to carry a ready-to-use firearm for self-defense. Shepard SA21, SA23. The

Illinois State Rifle Association is an organization with members who wish to carry

ready-to-use firearms, in public, for self-defense. Shepard SA40-41.

## SUMMARY OF ARGUMENT

In Illinois, most adults may possess and carry firearms for self-defense in

their home, at their fixed place of business, or on private property with permission

of the property owner. The Illinois General Assembly long ago determined,

however, that the presence of ready-to-use firearms in public places is a threat to

the health and safety of Illinois residents. Accordingly, since 1961, Illinois has

generally prohibited the carrying of firearms on public streets and on public lands

within the limits of a city, village, or unincorporated town, unless the firearms are

not immediately accessible, unloaded, or enclosed in a case. These statutes comply

with the Second Amendment.

First, the historical record demonstrates that Illinois' laws regulate conduct

outside the scope of the Second Amendment. An early English act, the Statute of

Northampton, banned most people from carrying weapons in public; English courts

recognized this prohibition hundreds of years later; and prominent common-law

scholars including Blackstone and Coke confirmed that there was no right to carry

-3-

weapons in public for personal self-defense.  Adopting this understanding, many colonies and early States prohibited carrying arms in public for self-defense, prohibitions that continued well after the Second Amendment's ratification.

Second, even if the challenged Illinois statutes implicate conduct within the Second Amendment's scope, this Court should uphold those laws under any form of heightened scrutiny.  The statutes do not implicate activity within the Amendment's "core"—which history confirms is the right "to use arms in defense of hearth and home," *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)—and therefore are not subject to the "not quite 'strict scrutiny'" that *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011), reserves for laws implicating core rights. In any event, the statutes readily satisfy both intermediate scrutiny and the scrutiny *Ezell* applied, as well as the more deferential, reasonable regulation test that state courts have applied under their state constitutions.  Illinois has a strong and compelling public-safety interest in preventing people from discharging firearms in public places, and both data and common sense demonstrate that the statutes advance this interest.

## ARGUMENT

### I.     Standard Of Review

"To win a preliminary injunction, a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell*, 651 F.3d at 694. The courts below did not rely on factual findings, and the judgments of the district

courts granting defendants' motions to dismiss, and denying their motions for preliminary injunction, therefore are reviewed *de novo*. *See id.*

## II.    The Second Amendment Does Not Confer A Right To Carry Operable Firearms In Public Places.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." By these words, the Amendment did not create a new right, "but rather codified a right inherited from our English ancestors." *Heller*, 554 U.S. at 599 (internal markings omitted). Thus, judicial review under the Second Amendment proceeds in two steps. The Court must answer a "threshold" question: whether "the restricted activity [is] protected by the Second Amendment in the first place." *Ezell*, 651 F.3d at 701. "[I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment . . . then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id.* at 702-03.

If the historical evidence suggests that the regulated activity falls within the Amendment's scope, then the Court proceeds to the second step: means-ends scrutiny.[2]  *Id.* at 703. But there is no need to do so here. The Second Amendment

---

[2] Public policy is presumptively left to elected legislatures; the Supreme Court has "long recognized the role of the States as laboratories for devising solutions to difficult legal problems," and courts "should not diminish that role absent impelling reason to do so." *Oregon v. Ice*, 555 U.S. 160, 171 (2009). Although *Ezell* suggests that some democratically enacted laws are subject to

was not originally understood to include a right to carry guns in public places for personal self-defense.  Accordingly, the challenged statutes fall outside the Amendment's scope.

> **A.     The Relevant Historical Moment For Determining The Scope Of The Second Amendment Is The Period Beginning With The Creation Of The English Right To Bear Arms And Ending With The Second Amendment's Ratification.**

Determining the scope of the Second Amendment "requires a textual and historical inquiry into original meaning" to determine whether the activity at issue fell "outside the scope of the Second Amendment right as it was understood at the relevant historical moment." *Ezell*, 651 F.3d at 701-03.  Because the Second Amendment "codified a right inherited from our English ancestors," *Heller*, 554 U.S. at 599 (internal markings omitted), the "relevant historical moment" begins with an understanding of the English right to bear arms and ends with its ratification, *United States v. Williams*, 616 F.3d 685, 691 (7th Cir. 2010) (Second Amendment does not apply to conduct "outside the scope of the Second Amendment's protection at the founding"); *see United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012) ("If such restrictions were outside the scope of Second Amendment coverage at ratification, then obviously it is not within Second Amendment protection now.").

---

means-ends scrutiny under the Second Amendment even where "the historical evidence is inconclusive" as to whether the Amendment was ever intended to apply to such laws, 651 F.3d at 703, this suggestion turns that presumption on its head. The better approach would be to leave the question to the democratic process where the evidence is "inconclusive."  But the Court need not address this question here, for, as explained, the challenged statutes fall conclusively outside the Amendment's scope.

Constitutional rights are "enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634-35. Thus, historical sources from *after* the Second Amendment's ratification are useful only to the extent that they inform our understanding of the *original* meaning of the Second Amendment, and their usefulness for that purpose diminishes with time. *See id.* at 584 ("most relevant" state constitutional sources are those "written in the 18th century or the first two decades of the 19th"); *id.* at 614 ("Since those discussions took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."); *id.* at 605 (post-ratification sources may illuminate original public meaning of Second Amendment but should not be used as "postenactment legislative history").

To be sure, this Court stated in *Ezell* that "when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." 651 F.3d at 702. But any holding that the Second Amendment has two different "scopes"—one for federal laws, determined by Eighteenth Century history, and another for state laws, determined by Nineteenth Century history—would conflict with Supreme Court precedent, as the *Shepard* plaintiffs appear to recognize. *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3035 n.14 (2010) (plurality op.) (describing "well-established rule that incorporated Bill of Rights protections

-7-

[including Second Amendment protections] apply identically to the States and the
Federal Government"); *id.* at 3035 (citing other Supreme Court decisions for same
proposition); Shepard Br. 15 n.5.

**B.      The Second Amendment's Right To Bear Arms, As Originally
Understood, Did Not Include A Right To Carry Firearms In
Public Places For Personal Self-Defense.**

Here, the relevant history demonstrates that Illinois' firearms laws are
outside the scope of the Second Amendment.  Neither English nor Founding-era
American law interpreted the right to bear arms to include a right to carry operable
firearms in public places for personal self-defense.  Because Illinois' firearms laws
are nothing more than a continuation of these long-permissible practices, they are
outside the scope of the Second Amendment.

English common law drew a sharp distinction between self-defense in the
home and self-defense in public.  Because a man's home was his castle, he had
broad powers to defend himself there.  *See* 4 William Blackstone, *Commentaries*
*223.  But this principle did not extend to self-defense in public.  *See id.* at *181-82.
Rather, English law actively *discouraged* violent self-defense in public places,
imposing a duty on individuals to retreat from an attack "as far as he conveniently
or safely can, to avoid the violence of the assault, before he turns upon his
assailant." *Id.* at *184-85; *see also* 3 Edward Coke, *Institutes of the Laws of England*
55 (London, E. & R. Brooke 1797) (person assaulted in public must retreat "untill he
commeth unto a hedge, wall, or other strait, beyond which he cannot passe" before

using deadly force in self-defense).[3]  Using deadly force in public without

"retreat[ing] to the wall" was not merely frowned upon at common law, it was

prosecutable as homicide.  *See, e.g., United States v. Peterson*, 483 F.2d 1222, 1234-

38 (D.C. Cir. 1973) (surveying history of common-law duty to retreat and upholding

manslaughter conviction of defendant who failed to retreat before using deadly

force).  This duty to retreat from attacks in public places was universally

understood at the time of the Second Amendment's ratification, and it remained the

majority rule in both the United States and England well into the late Nineteenth

Century.[4]

   This pronounced distinction between self-defense in public places and

self-defense in the home carried over into weapons regulations.  As *Heller*

recognized, the English right to bear arms allowed individuals to keep arms for

self-defense on their own property.  *See* 554 U.S. at 592-95.  But a different rule

prevailed in public places, where arms-carrying could be completely restricted.  The

_____

   [3] Unless otherwise noted, the historical sources cited in this brief are
available online through Google Books at http://books.google.com/.  Additional
citation information is provided where the sources are difficult to locate using the
Google Books search engine.

   [4] Starting in the late Nineteenth Century, some States began to allow violent
self-defense in public places without a duty to retreat.  *See* Garret Epps, *Any Which
Way But Loose: Interpretive Strategies & Attitudes Toward Violence in the Evolution
of the Anglo-American "Retreat Rule"*, 55 Law & Contemp. Probs. 303, 311-14
(Winter 1992).  This approach later became the majority one, although a "strong
minority" of States still retain the common law duty to retreat.  2 Wayne R.
LaFave, *Substantive Criminal Law* § 10.4 (2d ed. 2011); *Peterson*, 483 F.2d at 1235.
But this change in the law began decades after the Second Amendment was
ratified.

Statute of Northampton, an early law regulating weapons possession, provided that, unless he was on the King's business, no man was permitted to "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." Statute of Northampton, 2 Edw. 3, c. 3 (1328). English courts continued to recognize the vitality of this prohibition hundreds of years later. In *Sir John Knight's Case*, (1686) 87 Eng. Rep. 75 (K.B.), for example, the Chief Justice noted that carrying arms in public was not merely banned by the Statute of Northampton, but was "likewise a great offence at the *common law*." *Id.* at 76. The reason was not merely that carrying arms in public was dangerous, but also that it was an insult to the sovereign and the social compact. *See id.* In this way, the Statue of Northampton was "but an affirmance" of the longstanding common-law rule that there is no right to carry weapons in public. *Id.*; *see also* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standard of Review*, 60 Clev. St. L. Rev. (forthcoming 2012) (manuscript at 27-31), available at http://ssrn.com/abstract=1938950 (last visited May 3, 2012) (discussing *Sir John Knight's Case* and dispelling common misconceptions about its holding).

The most prominent common-law scholars agreed that there was no right to carry arms outside the home. Lord Coke, for instance, was "widely recognized by the American colonists as the greatest authority of his time on the laws of

England," *Payton v. New York*, 445 U.S. 573, 593-94 (1980) (internal markings omitted), and his works were "'[f]oremost among the titles to be found in private libraries of the time,'" *id.* at 594 n.36 (quoting A. Howard, *The Road From Runnymede* 118-19 (1968)). And Coke confirmed—in a chapter entitled "Against going or riding armed," *see* 3 Coke, *Institutes* at 160—that English law forbade carrying weapons in public. Under the Statute of Northampton, Coke explained, one could possess weapons in the home "to keep his house against those that come to rob, or kill him, or to offer him violence in it." *Id.* at 162. "But he cannot assemble force, though he be extreamly threatned, to goe with him to church, or market, or any other place." *Id.*; *see also Semayne's Case*, (1603) 77 Eng. Rep. 194, 195 (K.B.) ("every one may assemble his friends and neighbors to defend his house against violence: but he cannot assemble them to go with him to the market, or elsewhere for his safeguard against violence"). That the weapons were carried for self-defense was no excuse under the Statute. *See* 3 Coke, *Institutes* at 162. Indeed, even an immediate threat of harm did not permit one to go armed in public spaces. *See id.*

William Blackstone, whose works "constituted the preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593-94 (internal quotations omitted), confirmed that there was no right to carry weapons in public for personal self-defense. "The offence of *riding* or *going armed* with dangerous or unusual weapons," he wrote,

-11-

is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the [Statute of Northampton], upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour.

4 Blackstone, *Commentaries* *148-49.

In light of this long legal tradition, British constables, magistrates, and justices of the peace were to arrest anyone found carrying arms in public. *See* Robert Gardiner, *The Compleat Constable* 18 (London, Tho. Bever 3d ed. 1708) ("if any Person shall Ride or go Arm'd offensively . . . in Fairs or Markets or elsewhere, by Day or by Night, in affray of her Majesties Subjects, and Breach of the Peace; or wear or carry any Daggers, Guns or Pistols Charged; the Constable upon Sight thereof, may [seize the weapons, arrest the person, and bring him before a justice of the peace]"); 1 Gilbert Hutcheson, *Treatise on the Offices of Justice of Peace; Constable; Commissioner of Supply; & Commissioner Under Comprehending Acts, in Scotland* app. I at xlviii (Edinburgh, Mundell & Son 1806) (citing Oliver Cromwell's *Instructions Concerning Constables* (1665)) ("A constable shall arrest any person, not being in his Highness service, who shall be found wearing naugbuts, or guns, or pistols, of any sort."); *id.* at app. I at lxv-lxvi (citing Commission and Instructions to the Justices of Peace & Constables, 1661 (R.P.S. 1661/1/423) (Scot.)) ("All Constables shall arrest any persons not being in his Majesties service, who shall be found wearing of Hagbuts, Guns or Pistols of any sort.").

The American colonists adopted this centuries-old understanding. In 1686, for instance, New Jersey passed a law providing that "no person . . . shall presume privately to wear any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province," and that "no planter shall ride or go armed with sword, pistol, or dagger" unless he was a government officer or a foreign traveler passing peacefully through. An Act against wearing Swords, &c., *reprinted in The Grants, Concessions & Original Constitutions of the Province of New Jersey* 289-90 (Aaron Leaming & Jacob Spicer eds., Lawbook Exch. 2002). Similarly, the States of Massachusetts, North Carolina, and Virginia all had versions of the English Statute of Northampton on the books well after the Second Amendment's ratification. *See* Charles, *Faces of the Second Amendment* at 32 n.167.

Even in States and colonies with no specific statutory provisions, carrying arms in public remained a common-law offense. American constables, magistrates, and justices of the peace were expected to arrest persons carrying arms in public, just like their British counterparts. *See, e.g.*, A Bill for the Office of Coroner and Constable (Mar. 1, 1682), *reprinted in Grants, Concessions & Original Constitutions* at 251 (constable oath) ("I will endeavour to arrest all such persons, as in my presence, shall ride or go arm'd offensively."); John Haywood, *A Manual of the Laws of North-Carolina* pt. 2 at 40 (Raleigh, J. Gales 3d ed. 1814) (1777 constable oath) ("you shall arrest all such persons as in your sight shall ride or go armed

-13-

offensively"); 1 John Haywood & Robert L. Cobbs, *The Statute Laws of the State of Tennessee of a Public & General Nature* 10 (Knoxville, F.S. Heiskell 1831) (1801 statute) ("If any person or persons shall publicly ride, or go armed to the terror of the people or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice on his own view [to bind the person to good behavior or commit him to jail].").

In short, English and early-American law both understood that the right to bear arms did not include a right to carry weapons in public places for personal self-defense, and the Second Amendment incorporated this understanding when it "codified" the "right inherited from our English ancestors." *Heller*, 554 U.S. at 599 (internal markings omitted). Accordingly, Illinois' firearms laws are outside the scope of the Second Amendment and do not violate the Constitution.

## C.     Other Courts Agree That Second Amendment Rights Do Not Extend To Public Places.

Courts around the country agree that there is no Second Amendment right to carry firearms for personal self-defense in public places. To the degree that courts push the Second Amendment beyond its core in the home, they "circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts [they] cannot foresee." *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011). "We do not wish," the Fourth Circuit has observed, "to be even minutely responsible for some unspeakably tragic act of mayhem because in the

-14-

peace of our judicial chambers we miscalculated as to Second Amendment rights. It

is not far-fetched to think the *Heller* Court wished to leave open the possibility that

such a danger would rise exponentially as one moved the right from the home to the

public square." *Id.* As a result, many courts have declined to extend the Second

Amendment to carrying guns in public places. *See id.* at 475; *Williams v. State,* 10

A.3d 1167, 1177 (Md. 2011); *see also* Moore SA19-22, SA7-28, SA31-33 (collecting

cases).

### D.    Plaintiffs' Arguments To The Contrary Are Meritless.

### 1.    Plaintiffs Misread The Governing History.

At the threshold, plaintiffs misread Blackstone, arguing that he saw the right

to bear arms as "a public allowance . . . of the natural right of resistance and

self-preservation." Shepard Br. 29 (quoting 1 Blackstone, *Commentaries* *139).

This quotation is incomplete: Blackstone actually described the right to bear arms

as "a public allowance, *under due restrictions,* of the natural right of resistance and

self-preservation." 1 Blackstone, *Commentaries* *139 (emphasis added). And these

"due restrictions" included a prohibition on "*riding* or *going armed,* with dangerous

or unusual weapons," for this was "a crime against the public peace, by terrifying

the good people of the land; and [was] particularly prohibited by the Statute of

Northampton." 4 Blackstone, *Commentaries* *148-49.

Plaintiffs also misunderstand what Blackstone meant when he described the

right to bear arms as a "public allowance." Blackstone conceived of two classes of

-15-

rights. First, there were "absolute rights" "as would belong to their persons merely in a state of nature" (including the rights of personal security, personal liberty, and property) and, second, there were "auxiliary subordinate rights of the subject." 1 Blackstone, *Commentaries* *119, 125-36. Rights in the latter class were political rather than personal, intended to serve as "barriers to protect and maintain inviolate the three great and primary rights." *Id.* at 136.

The auxiliary rights included (1) the "constitution, powers, and privileges" of Parliament; (2) the traditional restrictions on the king's royal power; and (3) the right "of applying to the courts of justice for redress of injuries." *Id.* at 136-38. "If there should happen any uncommon injury, or infringement of the rights beforementioned, which the ordinary course of law is too defective to reach," Blackstone continued, there remained "a fourth subordinate right appertaining to every individual, namely, the right of petitioning the king, or either house of parliament, for the redress of grievances." *Id.* at 138-39. Finally, if the foregoing rights all failed, the people could resort to the right of "having arms for their defence, suitable to their condition and degree, and such as are allowed by law," which was "a public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." *Id.* at 139.

In other words, the right to bear arms was not "public" because it allowed people to carry arms in public spaces. It was "public" because it was *political*—the

-16-

right arose only if the constitutional order collapsed, and neither Parliament, nor the crown, nor the courts, would protect individual rights. *See Heller*, 554 U.S. at 599 (right to bear arms "helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down"); *see also Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago*, 567 F.3d 856, 859 (7th Cir. 2009) ("Blackstone discussed arms-bearing as a *political* rather than a *constitutional* right."), *rev'd on other grounds sub nom. McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010); Charles, *Faces of the Second Amendment* at 48-49. In short, Blackstone did not believe that there was a general, everyday right to carry arms in public places. On the contrary, he specifically rejected that notion. *See* 4 Blackstone, Commentaries *148-49.

Next, plaintiffs cite various English treatises for the proposition that "Gentlemen" and "Persons of Quality" were generally permitted to carry arms in public. *See* Moore Br. 37-38; Shepard Br. 30. From this, plaintiffs infer that all "responsible law abiding individuals" could carry arms in public. Moore Br. 40.

But this is mistaken. "Gentlemen" and "Persons of Quality" meant only high-ranking nobles. *See Black's Law Dictionary* 755 (9th ed. 2009) (historical definition of "gentleman" is a "man of noble or gentle birth or rank; a man above the rank of yeoman," or a "man belonging to the landed gentry"). Such nobles played special practical and ceremonial roles in keeping the peace in English society. As a result, they were permitted to wear swords fashionable at the time and to go in

public with armed servants.  Thus, "no one, of whatever condition he be" could

"carry arms, by day or by night,"

> *except the vadlets of the great lords of the land, carrying the swords of*
> *their masters in their presence, and the serjeants-at-arms of* [the royal
> family], and the officers of the City, and such persons as shall come in
> their company in aid of them, at their command, for saving and
> maintaining the said peace[.]

John Carpenter & Richard Whitington, *Liber Albus: The White Book of the City of*

*London* 335 (Henry Thomas Riley trans., London, Griffin & Co. 1861) (1419)

(emphasis added).

   William Hawkins, another prominent treatise writer (whom plaintiffs cite,

*see* Moore Br. 37; Shepard Br. 29),[5] similarly wrote that English law enforcement

overlooked the wearing of "weapons of fashion as swords, &c. or privy coats of mail"

by nobles with "their usual number of attendants with them, for their ornament

and defence, in such places, and upon such occasions, in which it is the common

fashion to make use of them, without causing the least suspicion of an intention to

commit any act of violence or disturbance of the peace."  1 William Hawkins,

*Treatise on the Pleas of the Crown* 267, 735 (Thomas Leach ed., London, His

Majesty's Law Printers 6th ed. 1787), *available at* http://books.google.com/

books?id=lqYDAAAAQAAJ&pg=PP5 (last visited May 3, 2012); *see also* Charles,

---

   [5] Plaintiffs cite three other writers—Wilson, Dunlap, and Russell, *see* Moore
Br. 37-38; Shepard Br. 31 n.11—all of whom relied on Hawkins' treatise for the
same point.  *See* 3 James Wilson, *The Works of the Honourable James Wilson* 79 n.i
(Philadelphia, Lorenzo Press 1804); John A. Dunlap, *The New-York Justice* 8 (New
York, Isaac Riley 1815); 1 William Oldnall Russell, *A Treatise on Crimes &*
*Indictable Misdemeanors* 271 n.h. (London, Butterworth & Son 2d ed. 1826).

*Faces of the Second Amendment* at 26 n.124 (collecting citations from legal dictionaries providing that "it is an Offence for Persons to go or ride *armed* with dangerous and unusual Weapons; But Gentlemen may wear common *Armour* according to their Quality").

In other words, "[g]oing armed in public was not a right, but an exception that most generally applied to men of nobility and their attendants." Charles, *Faces of the Second Amendment* at 21. Indeed, authorities in England and America uniformly held that there was no general right to carry weapons in public for personal self-defense; while a man could use arms to defend his house, "a man cannot excuse the wearing of such armour in publick, by alledging that such a one threatened him, and that he wears it for the safety of his person from his assault." 1 Hawkins, *Pleas of the Crown* at 267; *see also* 3 Coke, *Institutes* at 161-62; James Parker, *Conductor Generalis: Or, The Office, Duty & Authority of Justices of the Peace, High-Sheriffs, Under-Sheriffs, Coroners, Constables, Gaolers, Jury-Men, & Overseers of the Poor* 12 (Woodbridge N.J., Parker 1764) (citing Hawkins); 1 Russell, *Treatise on Crimes* at 272 (citing Hawkins).

History likewise refutes plaintiffs' next argument. Plaintiffs observe that the Statute of Northampton and the common law banned "dangerous" or "unusual" weapons that were apt to "terrify" the people. Moore Br. 36-39. Plaintiffs' ensuing presumption that carrying guns in public was neither dangerous nor unusual and therefore would not have terrified people, *see id.*, is incorrect historically. Carrying

-19-

firearms in public was rare in most parts of England and early America. As a result, *all* firearms were considered dangerous or unusual weapons. *See, e.g., King v. Hutchinson*, (1784) 168 Eng. Rep. 273, 274 n.a (C.C.R.) ("guns, pistols, daggers, and instruments of war" are "dangerous" and "offensive" weapons); An Act to prevent the practice of Dueling ¶1 (May 1779), *reprinted in Acts & Laws of the State of Connecticut, in America* 148 (Hartford, Hudson & Goodwin 1796) ("Pistol . . . or other dangerous Weapon"); An Act for the punishment of crimes, § 56 (Mar. 18, 1796), *reprinted in Laws of the State of New Jersey* 259 (Trenton 1821) ("pistol, or other dangerous weapon"); John B. Colvin, *The Magistrate's Guide, & Citizen's Counsellor; Adapted to the State of Maryland & Washington County, in the District of Columbia* 281 (Washington, D.C., Weens 1819) ("guns, pistols, swords, clubs and other offensive weapons"); 2 David Bailie Warden, *A Statistical, Political, & Historical Account of the United States of North America* 40 n.* (Edingburgh, Ramsay & Co. 1819) ("wearing a short pistol, dagger, or other unusual weapon"); *State v. Huntly*, 25 N.C. (3 Ired.) 418, 422 (1843) ("No man amongst us carries [a gun] about with him, as one of his every day accouterments—as part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment.").[6]

---

[6] The *Huntly* court continued:

But although a gun is an "unusual weapon," it is to be remembered that the carrying of a gun *per se* constitutes no offence. For any lawful

Because *all* firearms were considered dangerous and unusual, carrying one in a public place was considered *inherently* terrifying and was *by itself* a criminal breach of the peace—no further threats, danger, or "terrifying" conduct was required. *See, e.g., Chune v. Piott*, (1614) 80 Eng. Rep. 1161 (K.B.) (Croke, J.) ("Without all question, the sheriffe hath power to commit . . . if contrary to the Statute of Northampton, he sees any one to carry weapons in the high-way, in terrorem populi Regis; he ought to take him, and arrest him, notwithstanding he doth not break the peace in his presence."); A Gentleman of the Law, *A New Conductor Generalis: Being a Summary of the Law Relative to the Duty & Office of Justices of the Peace, Sheriffs, Coroners, Constables, Jurymen, Overseers of the Poor* 27 (Albany, D. & S. Whiting 1803) ("it seems certain, that in some cases there may be an affray, where there is no actual violence: as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror

---

> purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun. It is the wicked purpose—and the mischievous result—which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people.

25 N.C. at 422-23. This admonition is consistent with the historical understanding of common-law arms regulations. The common law allowed (and Illinois law allows, *see* 720 ILCS 5/24-1 *et seq.* (West 2012); 520 ILCS 5/1.1 *et seq.* (West 2012); 17 Ill. Admin. Code § 510.10 *et seq.*) people to transport firearms in public for lawful purposes, including hunting, militia service, using shooting ranges, moving to a new residence, and to facilitate lawful commerce in firearms. *See* Charles, *Faces of the Second Amendment* at 35-36. Given this understanding, *Huntly* recognized that guns could be carried in public for "business" and "amusement." Significantly, however, *Huntly* did not include "self-defense" on this list, for, as discussed *supra* pp. 11, 19, personal self-defense was not a justification for carrying arms in public.

to the people; which is said to have been always an offence at the common law");

1 Russell, *Treatise on Crimes* at 271 (same); *see also* 7 *Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred* 722 (John Bioren, ed. Philadelphia 1822) ("the show of armour" by people in a group is "naturally apt to strike a terror into the people" and will support a conviction for rioting); 3 Thomas Edlyne Tomlins & Thomas Colpitts Granger, *The Law-Dictionary, Explaining the Rise, Progress, & Present State of the British Law* 397 (Philadelphia, R. H. Small 1st American ed. 1836) (same).

Plaintiffs also misdescribe several other historical sources by taking statements out of context. They cite Edward Christian's commentaries on Blackstone, for instance, for the proposition that "every one is at liberty to keep or carry a gun, if he does not use it for the destruction of game." Shepard Br. 30-31 (citing 2 Blackstone, *Commentaries* *411-12 n.2 (Christian 12th ed. 1794)). But Christian was not addressing the Statute of Northampton—a provision on which Christian had no comment. *See* 4 Blackstone, *Commentaries* *149 (Christian 12th ed. 1795). Rather, Christian was discussing the purposes behind England's *game laws*. In his original *Commentaries*, Blackstone had speculated that England's game laws were a secret attempt to disarm the people; Christian disagreed, arguing that the game laws did not forbid all possession of guns, for this was not the game laws' purpose. 2 Blackstone, *Commentaries* *411-12 & n.2 (Christian 12th ed. 1794).

In other words, Christian's comment was a response to a specific scholarly debate about the purposes of English game laws, not a statement about the scope of the right to bear arms in general, including where or under what circumstances they could be "carr[ied]." Indeed, without this scholarly context, Christian's observation would be absurd. "Every one" is not at liberty to carry a gun—felons and those with sufficient mental impairments may not be permitted to possess arms. *See Heller*, 554 U.S. at 626. Nor is a person free to carry a gun anywhere, and for any purpose, so long as he does not use it for "the destruction of game." *See id.* (guns may be excluded from "sensitive places such as schools and government buildings"). When viewed in its proper context, therefore, Christian's comment does not support plaintiffs' assertions.

Plaintiffs similarly cite the Recorder of London's legal opinion regarding the legality of the London Military Foot-Association, which stated that arms could be used for "immediate self-defence, . . . suppression of violent and *felonious* breaches of the peace, the assistance of the civil magistrate in the execution of the laws, and the defence of the kingdom against foreign invaders." Shepard Br. 30 (citing Opinion on the Legality of the London Military Foot-Association (1780), *reprinted in* William Blizard, *Desultory Reflections on Police* 63 (London, Bauer & Galabin 1785)). But once again, plaintiffs take this statement out of context. The London Military Foot-Association was not a group of people seeking to carry weapons in public for personal self-defense—it was a private militia formed by gentlemen to

support the government in suppressing riots. *See* Sylvanus Urban, *Obituary of Sir William Blizard, F.R.S.*, 5 The Gentleman's Magazine (New Series) 318-19 (1836) ("the London Military Foot Association" was "formed for the purpose of supporting the civil power in the maintenance of peace and order, and . . . rendered important service during the riots of 1780"). Bearing arms in response to a "hue and cry"—an official call for immediate support in keeping the peace—was a recognized exception to the common-law ban on carrying arms in public. *See* 1 Hawkins, *Pleas of the Crown* at 267-68; Parker, *Conductor Generalis* at 11; *see also id.* at 219-24 (describing law of hue and cry). Thus, Hawkins wrote that "private persons may arm themselves in order to suppress a riot" and "may also make use of arms in the suppressing of it, if there be a necessity for their so doing." 1 Hawkins, *Pleas of the Crown* at 298. It is to this narrow exception that the Recorder of London was referring, not a broader right to carry arms in public for personal self-defense. *See Parker v. District of Columbia*, 478 F.3d 370, 382 n.8 (D.C. Cir. 2007) (Recorder's opinion regarded "the legality of private organizations armed for defense against rioters"), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008).

Indeed, the fact that commentators felt the need to clarify that arms *could* be carried in public to suppress immediate riots, *see* 1 Hawkins, *Pleas of the Crown* at 298, demonstrates that arms *could not* be so carried otherwise. And even the right to carry arms to suppress riots was limited. It was "extremely hazardous for private persons to proceed to those extremities; and it seems no way safe for them to

go so far in common cases, lest under the pretence of keeping the peace, they cause a more enormous breach of it." *Id.* "[T]herefore, such violent methods seem only proper against such riots as favour of rebellion, for the suppressing whereof no remedies can be too sharp or severe." *Id.*

Next, plaintiffs observe that over the course of American history, some jurisdictions have tolerated greater public carriage of arms, and that some people have thought that gun ownership was a good idea. We are told, for instance, that carrying guns was common in some areas, that some frontier colonies required arms-bearing by statute for public safety reasons, and that Thomas Jefferson told his nephew to let a gun "be the constant companion of your walks." Shepard Br. 32-34. These arguments mistake policy analysis for constitutional analysis. Reasonable people differ on how guns should be regulated, and democratically elected legislatures have always had the power to expand gun rights beyond the constitutional minimum. But the fact that some people held a particular policy view does not mean they thought the contrary view was *unconstitutional*. Thomas Jefferson may have thought it was a good idea to carry a gun at times, just as he thought it was a good idea to avoid "[g]ames played with the ball," which are "too violent for the body, and stamp no character on the mind." Letter to Peter Carr (Aug. 19, 1785), *reprinted in* 1 *The Writings of Thomas Jefferson* 397-98 (H.A. Washington ed., Washington, D.C., Taylor & Maury 1853). But this tells us nothing about whether States lack the constitutional power to regulate guns in public. Similarly, the colony of Georgia may have thought it was a good idea to require its

citizens to carry guns to church to defend against "internal dangers and insurrections." *See* An act for the better security of the inhabitants by obliging the white male persons to carry fire arms to places of public worship (Feb. 27, 1770), *reprinted in* 19 *The Colonial Records of the State of Georgia* pt. 1 at 137-40 (Allen Daniel Candler ed., 1911). But that does not mean that different policy choices were unconstitutional.

Finally, plaintiffs mistakenly rely on sources from decades—or centuries—after the relevant time period. *See, e.g.*, Moore Br. 29 (citing 1980 Oregon Supreme Court case interpreting Oregon Constitution, as "[p]articularly instructive"); Shepard Br. 34-35. But attitudes about arms and self-defense began to change to some degree in the mid-Nineteenth Century, and some state courts and legislatures became more willing to tolerate self-defense in public. *See, e.g.*, *supra* at 9 n.4 (describing shift away from common-law duty to retreat). As part of this trend, a few state courts concluded, with no historical analysis, that the Second Amendment protects a right to carry weapons in public, so long as they are in plain view. *See, e.g.*, *State v. Chandler*, 5 La. Ann. 489, 490 (1850) (dicta); *Nunn v. State*, 1 Ga. (1 Kelly) 243, 251 (1846).

Other courts harshly criticized this new approach, however. West Virginia's high court, for instance, said of it:

> It would thus seem that the state cannot constitutionally prohibit the carrying of deadly weapons; and, secondly, that upon a mere threat to kill, made by your enemy, you may hunt him down, and, without waiting for any hostile demonstration on his part, may take his life. We have but to put these two alleged principles of law together, in order to destroy

that security of life and that social order which are absolutely essential to civilization. In the state where they have been announced, a prolific harvest of murders, street fights, and family feuds has been their natural fruition, to the degradation and terror of society, and the abasement of justice and civil order. In this state, just the reverse has been held as to both the principles alluded to.

*State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891). Many other state courts and

legislatures were in accord. *See, e.g., Aymette v. State*, 21 Tenn. (Hum.) 154, 159

(1840) ("The Legislature, therefore, have a right to prohibit the wearing or keeping

weapons dangerous to the peace and safety of the citizens, and which are not usual

in civilized warfare, or would not contribute to the common defence."); *English v.*

*State*, 35 Tex. 473, 475-80 (1871) (upholding ban on carrying non-military weapons

and citing Statute of Northampton); An act to prevent the carrying of dangerous

weapons in the City of Washington (Nov. 4, 1857), *reprinted in Corporation Laws of*

*the City of Washington* app. at 75 (James W. Sheahan ed., Washington, D.C., Robert

A. Waters 1860) ("it shall not hereafter be lawful for any person or persons to carry

or have about their persons any deadly or dangerous weapons, such as [a] dagger,

pistol, bowie knife, dirk knife, or dirk, colt, slung shot, or brass or metal knuckles,

within the city of Washington"); An Act to Prevent the Carrying of Fire Arms and

Other Deadly Weapons (Dec. 2, 1875), *reprinted in The Compiled Laws of Wyoming*

352 (J.R. Whitehead ed., Cheyenne, H. Glafcke 1876) (it shall be unlawful "to bear

upon his person, concealed or openly, any fire arm or other deadly weapon, within

the limits of any city, town or village"); *cf. State v. Buzzard*, 4 Ark. (4 Pike) 18, 27

(1842) (opinion of Ringo, C.J.) (upholding concealed weapons ban because "the

Legislature possesses competent powers to prescribe, by law, that any and all arms, kept or borne by individuals, shall be so kept and borne as not to injure or endanger the private rights of others, [or] distur[b] the peace or domestic tranquility").

But even if there had been a Nineteenth Century judicial trend universally in their favor, it would not affect the outcome here. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future . . . judges think that scope too broad." *Heller*, 554 U.S. at 634-35. As a result, these mistaken understandings, reached decades after the relevant time period, "cannot nullify the reliance of millions of Americans . . . upon the true meaning of the right to keep and bear arms." *Id.* at 624 n.24. Because the Framers did not understand the English right to bear arms, codified in the Second Amendment, to include a right to carry firearms in public for personal self-defense, Illinois' firearms laws are constitutional.

> **2.      Neither The Second Amendment's Text Nor Supreme Court Precedent Establishes A Right To Carry Arms In Public For Personal Self-Defense.**

None of plaintiffs' legal or textual arguments overcomes this original, historical understanding of the Second Amendment. Plaintiffs argue that the Second Amendment protects a right to "bear" arms, and that to "bear" means to "carry." *See, e.g.*, Moore Br. 24-27; Shepard Br. 23-24. Moreover, plaintiffs note, several Founding-era state constitutions guaranteed citizens the right to "'bear arms in defense of themselves and the state'" or "'bear arms in defense of himself and the state.'" Shepard Br. 31-32; *see also* Moore Br. 27-28.

-28-

But plaintiffs' reliance on the word "bear" is misplaced. To be sure, the right to "bear" arms includes a right to "carry" them "in case of confrontation." *Heller*, 554 U.S. at 584, 592. It is equally indisputable, however, that this right is limited; *Heller* cautioned that the Second Amendment does not "protect the right of citizens to carry arms for *any sort* of confrontation," *id.* at 595, and that the right to carry arms is subject to exceptions that will be determined—not by the Amendment's text—but by its history, *id.* at 635. Thus, while true, plaintiffs' observation that there is a right to "carry" arms in self-defense is unhelpful; it begs the question whether the particular "carrying" in question is within the Second Amendment's scope.

Plaintiffs also argue that limiting the Second Amendment to the "home" would "effectively read the term 'bear' out of the Constitution," Shepard Br. 23, 26, and would prevent people from engaging in hunting, firearms training, and military service, *see id.* at 25-27, 36-37; Moore Br. 23-24. But Illinois law does not confine the right to bear arms to "toting a weapon from room to room in one's house," as plaintiffs suggest. Shepard Br. 32. Nor does it prevent Illinois citizens from hunting, target shooting, or serving in the military. Illinois citizens may carry arms on their own land; in their fixed place of business; in someone else's home or on their land (with their permission); in designated hunting areas; and during militia service. *See* 720 ILCS 5/24-1 *et seq.* (West 2012); 520 ILCS 5/1.1 *et seq.* (West 2012); 17 Ill. Admin. Code § 510.10 *et seq.* Conversely, Illinois law generally

restricts the "carrying" of arms on: (1) private property, if the owner has not given

permission; and (2) public property. As discussed, restrictions on carrying weapons

in these areas were permissible when the Second Amendment was adopted, and

they therefore remain permissible now.

Next, plaintiffs rely on *Heller*'s statement that the English right to bear arms

was "'an individual right protecting against both public and private violence.'"

Shepard Br. 28 (quoting *Heller*, 554 U.S. at 594). But *Heller* used these terms in its

discussion of Blackstone's right to bear arms. His description, *Heller* held,

> cannot possibly be thought to tie it to militia or military service. It was,
> he said, "the natural right of resistance and self-preservation," and "the
> right of having and using arms for self-preservation and defence." Thus,
> the right secured in 1689 as a result of the Stuarts' abuses was by the
> time of the founding understood to be an individual right protecting
> against both public and private violence.

554 U.S. at 594 (internal citations omitted). As *Heller*'s context makes clear, the

Court did not mean "public" and "private" in the sense of "public spaces" and

"private spaces." Rather, it meant that the right to bear arms applies both to

"public" militias and "private" individuals.

Plaintiffs further rely on *Heller*'s list of presumptively lawful restrictions on

gun use. *See* Moore Br. 30-31; Shepard Br. 38. *Heller* cautioned that it did not

"undertake an exhaustive historical analysis . . . of the full scope of the Second

Amendment." 554 U.S. at 626. Thus, the Court wrote, "nothing in our opinion

should be taken to cast doubt on longstanding prohibitions on the possession of

firearms by felons and the mentally ill, or laws forbidding the carrying of firearms

in sensitive places such as schools and government buildings, or laws imposing

conditions and qualifications on the commercial sale of arms." *Id.* at 626-27.

    Plaintiffs argue that this explicit limitation was, in fact, an implicit

*expansion* of the Court's holding.  Plaintiffs reason that the "obvious implication" of

*Heller*'s list of presumptively lawful restrictions is that "the Second Amendment

forbids Illinois from *totally banning* the carrying of firearms in *all* public spaces, but

not in particularly sensitive places."  Shepard Br. 38; *see also* Moore Br. 30-31.  This

argument reduces to an application of the *"expressio unius est exclusio alterius"*

canon of construction: Because the Supreme Court's list of "presumptively lawful"

restrictions did not include limits on carrying arms in public, such restrictions must

not be "presumptively lawful."  But "[t]he maxim Expressio unius est exclusio

alterius is premised on the assumption that the [decision-maker] considered and

rejected all factors not listed."  *Tri-State Terminals, Inc. v. Jesse*, 596 F.2d 752, 756

n.2 (7th Cir. 1979).  And that assumption fails here.  "[S]ince this case represents

this Court's first in-depth examination of the Second Amendment," the *Heller* Court

wrote, "one should not expect it to clarify the entire field."  554 U.S. at 635.  Thus,

while *Heller* provided a list of "presumptively lawful" regulations, it cautioned that

these were only "examples" and that "our list does not purport to be exhaustive."

*Id.* at 627 n.26.  In so doing, the Court "warn[ed] readers not to treat *Heller* as

containing broader holdings than the Court set out to establish: that the Second

Amendment creates individual rights, one of which is keeping operable handguns at

home for self-defense." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (*en banc*). "What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open." *Id.*; *see also Gonzalez v. Vill. of West Milwaukee*, 671 F.3d 649, 659 (7th Cir. 2012) ("Whatever the Supreme Court's decisions in *Heller* and *McDonald* might mean for future questions about open-carry rights, for now this is unsettled territory.").

Plaintiffs extend this same faulty logic to other Supreme Court decisions, citing five cases for the proposition that the Court "has always accepted that the right to guard against confrontation extends beyond the threshold of one's home." Moore Br. 21-22. But four of these cases are silent about whether the Second Amendment confers a right to carry arms for personal self-defense in public. *See Heller*, 554 U.S. at 620; *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950); *United States v. Miller*, 307 U.S. 174, 175 (1939); *United States v. Cruikshank*, 92 U.S. 542, 553 (1876). Plaintiffs infer from this silence that such a right must exist; they reason that if it did not, the Court would have said so. *See* Moore Br. 21-22. But a judicial opinion "is not a comprehensive code; it is just an explanation for the Court's disposition" and "must be read in light of the subject under consideration." *Skoien*, 614 F.3d at 640. As discussed, the fact that a question has not been resolved does not mean that it has been settled; it means that the Court has not had reason to answer it.

As for the fifth case, *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857),

cited by plaintiffs for its suggestion that recognizing the full privileges of citizenship

for African-Americans would allow them to "'keep and carry arms wherever they

went,'" Moore Br. 21-22; Shepard Br. 35, that discredited case was decided nearly

seven decades after the Second Amendment was ratified and provided no

support—historical or otherwise—for this dicta.

In sum, then, the Second Amendment's history and text, and its construction

by the Supreme Court, establish that it does not embody a right to carry

ready-to-use arms in public spaces.

## III.   In The Alternative, Illinois Law Satisfies Means-Ends Scrutiny.

If, however, this Court concludes that the challenged statutes implicate

activity within the scope of the Second Amendment, this activity is so far removed

from the core Second Amendment purpose of permitting self-defense in the home

that the relatively deferential, "reasonable regulation" level of means-ends scrutiny

applies, scrutiny that Illinois law easily survives.  Indeed, the challenged statutes

are constitutional even if the Court applies intermediate scrutiny, which other

circuits have used when faced with similar Second Amendment challenges, or the

"not quite 'strict scrutiny'" that *Ezell* reserves for violations of core Second

Amendment rights, 651 F.3d at 708.

### A.   Even If Within The Scope Of The Second Amendment, The Challenged Regulations Are Not Within The Amendment's "Core."

The Supreme Court has yet to decide what degree of heightened scrutiny applies to firearms regulations that implicate Second Amendment rights. *See Ezell*, 651 F.3d at 703 (citing *Heller*, 554 U.S. at 628-29). *Ezell* imported a sliding-scale analysis from First Amendment doctrine, under which "the rigor of . . . judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." 651 F.3d at 703. Laws that severely burden core Second Amendment rights are subject to "not quite 'strict scrutiny.'" *Id.* at 708. By contrast, "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified." *Id.* Critically, *Ezell* did not apply strict scrutiny (nor deem categorically unlawful) even the gun range ban that was an "important corollary" to the exercise of the core, home-defense right recognized in *Heller*. *Id.* Thus, *Ezell* forecloses plaintiffs' arguments that the Illinois laws should be invalidated without applying any scrutiny at all because they are "complete ban[s]." Moore Br. 40-41; *see also* Shepard Br. 46-47.

Indeed, even if Illinois passed a law implicating the core right, voiding the challenged law without first undertaking means-ends scrutiny would run afoul of the First Amendment jurisprudence on which *Ezell* relied for its sliding scale. For

even "'presumptively invalid,'" content-based speech restrictions and laws
prohibiting speech in public forums are subject to strict scrutiny. *Ezell*, 651 F.3d at
707 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)). Nor did *Heller*
suggest a different approach for the Second Amendment, as plaintiffs contend. *See*
Moore Br. 40-41; Shepard Br. 46. Rather, the Court held that the handgun ban
there failed constitutional muster "[u]nder any of the [available] standards of
scrutiny"—not that courts should forego scrutiny entirely. 554 U.S. at 628.

The Court's reasoning in *Heller* also is inconsistent with applying strict
scrutiny to firearms regulations, as plaintiffs request. *See* Moore Br. 41; Shepard
Br. 48-50. *Heller* held that certain firearms regulations are "presumptively lawful"
under the Second Amendment, an approach that defers to the legislature in a
manner irreconcilable with strict scrutiny. *See* 554 U.S. at 688 (Breyer, J.,
dissenting) ("the majority implicitly . . . rejects [a 'strict scrutiny' test] by broadly
approving a set of laws . . . whose constitutionality under a strict scrutiny standard
would be far from clear").

Nor should this Court accept plaintiffs' invitation to apply "not quite 'strict
scrutiny'" to Illinois' laws. *See* Moore Br. 41; Shepard Br. 52. The challenged laws
do not implicate core Second Amendment rights and thus do not call for this form of
heightened scrutiny. In *Heller*, the Supreme Court identified the core purpose of
the right conferred by the Second Amendment as permitting "law-abiding,

responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635.[7]

The Court held that the Second Amendment right was not an "unlimited" right to

carry arms "for *any sort* of confrontation," *id.* at 595, but included a right to carry a

handgun "for self-defense in the home," *id.* at 629. Likewise, much of the Court's

reasoning arose from the need for home defense. *See id.* at 628 (challenged statute

"extends, moreover, to the home, where the need for defense of self, family, and

property is most acute"); *id.* at 629 (listing potential reasons that "a citizen may

prefer a handgun for home defense" and concluding that "handguns are the most

popular weapon chosen by Americans for self-defense in the home").

The historical meaning of the Second Amendment confirms that the right to

carry firearms in public spaces for personal self-defense is not at the Amendment's

core. Neither English statutory nor common law provided any right to carry

weapons in public, and state and local governments frequently restricted citizens

from carrying firearms in public at the time the Second and Fourteenth

Amendments were ratified. *See supra* Part II. In short, "as we move outside the

home, firearm rights have always been more limited, because public safety interests

often outweigh individual interests in self defense." *Masciandaro*, 638 F.3d at 470.

And "[s]ince historical meaning enjoys a privileged interpretative role in the Second

Amendment context, *see Heller*, 554 U.S. at [625-26]; *Skoien*, 587 F.3d at 809, this

---

[7] Because plaintiffs are "law-abiding, responsible citizens," Shepard Br. 51, their Second Amendment rights "are entitled to full solicitude," *Ezell*, 651 F.3d at 708. This Court must still find, however, that their conduct—carrying firearms in public for self-defense—implicates the core of those rights. *See id.*

longstanding out-of-the-home/ in-the-home distinction bears directly on the level of scrutiny applicable." *Masciandaro*, 638 F.3d at 470.

The courts of appeals likewise agree that "[a]t its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense *in the home*." *United States v. Marzzarella*, 614 F.3d 85, 92 (3d Cir. 2010) (emphasis added); *accord Masciandaro*, 638 F.3d at 470; *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010); *see also United States v. Booker*, 644 F.3d 12, 25 n.17 (1st Cir. 2011) ("While we do not attempt to discern the 'core' Second Amendment right vindicated in *Heller*, we note that *Heller* stated that the Second Amendment 'elevates above all other interests the right of law-abiding responsible citizens to use arms in defense of hearth and home.'"). These courts thus applied intermediate scrutiny to various firearms regulations that did not implicate this core right. *See Masciandaro*, 638 F.3d at 471; *Reese*, 627 F.3d at 801-02; *Marzzarella*, 614 F.3d at 97.

A holding that carrying firearms in public implicates core Second Amendment rights (triggering almost-strict scrutiny) would conflict with these decisions. Nor does *Ezell* require it. *Ezell* referred to "the core right to possess firearms for self-defense." 651 F.3d at 708. But in context this was an apparent reference to the right to possess firearms for self-defense *in the home*—the right at issue in that case and the one discussed throughout the remainder of the opinion. *See id.* at 698 (describing plaintiffs' assertion "that the range ban impermissibly

-37-

burdens the core Second Amendment right to possess firearms at home for protection"); *id.* at 703, 708; *see also id.* at 712 (Rovner, J., concurring in the judgment) (describing "'core' Second Amendment . . . right to use a firearm in the home for self-defense"). Because the laws at issue here do not infringe on the core values identified in *Heller* in the way that the gun range ban did in *Ezell*, a more lenient standard of scrutiny applies.

**B.     The State Has A Compelling Interest In Preventing The Unwanted Discharge Of Firearms In Public.**

Under any level of scrutiny, the State has a compelling interest in preventing the discharge of firearms in public. Such discharge, whether intentional or accidental, presents a genuine and serious risk to public safety, *see Skoien*, 614 F.3d at 642, and there can be no dispute that protecting the safety and lives of citizens is a compelling government interest for purposes of constitutional scrutiny, *see United States v. Salerno*, 481 U.S. 739, 750, 754-55 (1978). Statistically, "guns are about five times more deadly than knives," *Skoien*, 614 F.3d at 642 (citing data), and regulations that reduce the likelihood of "stray bullets" therefore serve a vitally important government interest, *Ezell*, 651 F.3d at 709.

For example, in 2007 alone, there were 1,032 gun-related deaths (including 150 children) in Illinois. *See* Ill. Council Against Handgun Violence ("ICHV"), http://www.ichv.org/facts-about-gun-violence/general-facts-about-gun-violence (last visited May 3, 2012) (citing Centers for Disease Control National Center for Health Statistics mortality report online 2010). On average 31,593 people die from gun

violence each year in the United States. *See* Brady Center to Prevent Gun Violence

("Brady Center"), *Facts / Gun Violence Overview*, http://www.bradycampaign.org/

facts/gunviolence?s=1 (last visited May 3, 2012) (citing National Center for Injury

Prevention and Control, Web-based Injury Statistics Query and Reporting System).

Firearms-related homicides in the United States are 19.5 times higher than in

other populous, high-income countries. *See* Erin G. Richardson & David

Hemenway, *Homicide, Suicide, & Unintentional Firearm Fatality: Comparing the

United States With Other High-Income Countries, 2003*, 70 J. of Trauma, Injury,

Infection, & Critical Care 238-43 (Jan. 2011). Nor are these the only costs firearms

impose. "Medical costs, costs of the criminal justice system, security precautions

such as metal detectors, and reductions in quality of life because of fear of gun

violence" together total approximately $100 billion each year. Brady Center,

*Facts / Gun Violence Overview*, http://www.bradycampaign.org/facts/gunviolence?s=1

(last visited May 3, 2012) (citing Philip J. Cook & Jens Ludwig, *Gun Violence: The

Real Costs* (Oxford Univ. Press 2000)).

Given the serious risk that gun violence poses, the State does not complete its

obligations to protect the health, safety, and welfare of its citizens merely by

averting the "armed mayhem" that could occur if felons widely possessed weapons.

*Skoien*, 614 F.3d at 642. The State also can act to advance its broader interest in

limiting injury and death arising from the discharge of weapons in public spaces.

Plaintiffs offer no persuasive argument why limitations on where handguns may be

carried promote a less vital government interest than restrictions on who may carry

them. Illinois not only has an important state interest, but also a compelling one,

and both data and common sense establish the fit between that interest and the

challenged laws.

**C.    Most States Apply A "Reasonable Regulation" Standard Where Such Regulations Lie Far From The State Constitutional Core.**

As a matter of first impression, this Court should follow most state courts

and apply a reasonable regulation test to firearms laws that implicate

constitutional protections but lie far from the constitutional core. Although

defendants did not raise the reasonable regulation test below, it was advanced

by *amicus curiae* the Brady Center, *see* Moore Doc. 28, and, in any event, this Court

may affirm dismissal of the complaints "on any ground supported by the record,"

*Jones v. Hulick*, 449 F.3d 784, 787 (7th Cir. 2006).

Over forty States have established a constitutional right to bear arms, *see*

*State v. Hamdan*, 665 N.W.2d 785, 801 n.21 (Wis. 2003), and nearly every one to

address the question has held that the right is subject to reasonable regulation, *see*

*State v. Cole*, 665 N.W.2d 328, 337 (Wis. 2003); *see also* Adam Winkler, *Scrutinizing*

*the Second Amendment*, 105 Mich. L. Rev. 683, 686-87 (2007). By "reasonable

regulation," the States do not mean that laws restricting arms need only satisfy

rational basis scrutiny; "[t]he explicit grant of a fundamental right to bear arms

clearly requires something more, because the right must not be allowed to become

illusory." *Cole*, 665 N.W.2d at 338. The reasonable regulation test therefore

-40-

"focuses on the balance of the interests at stake, rather than merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare." *Id.* And—unlike the interest-balancing test proposed in Justice Breyer's dissent in *Heller*—it leaves a core of protected conduct inviolate, striking down provisions that effectively destroy the right. *See Hamdan*, 665 N.W.2d at 798.

Defendants acknowledge that no court has applied the reasonable regulation test to laws challenged under the Second Amendment, as opposed to its state constitutional counterparts. *But see Nordyke v. King*, 644 F.3d 776, 795 (9th Cir. 2011) (Gould, J., concurring) ("I would subject incidental burdens on the Second Amendment right . . . to reasonableness review."). Yet there is good reason to do so. The States "have far more experience than the federal government when it comes to charting the lines between gun rights and safety regulation, and the 'reasonableness' standard they have unanimously endorsed both reflects their collective wisdom on the subject and permits individual states to tailor gun regulations to their own circumstances." *Id.* at 798 (Gould, J., concurring) (internal quotations omitted). The text and history of the Second Amendment also support a reasonableness test: The text recognizes that the "militia" must be "well regulated," U.S. Const. amend. II, thereby calling for reasonable regulation of firearm use. And it is beyond dispute that firearms have been subject to reasonable restrictions throughout the history of Anglo-American law. *Heller*, 554 U.S. at 626.

-41-

Furthermore, application of the reasonable regulation test is consistent with Supreme Court and Seventh Circuit jurisprudence. As explained, the Supreme Court has left open the appropriate level of scrutiny, stating only that Second Amendment rights should be accorded the same treatment as other enumerated constitutional rights. *See id.* at 628-29 & n.27. Nor has this Court foreclosed application of a standard stricter than rational basis yet more deferential than intermediate scrutiny to laws, like those here, that do not implicate the core Second Amendment right of self-defense in the home. *See Ezell*, 651 F.3d at 703.

Here, given the State's significant interest in preventing the discharge of firearms in public, *see Skoien*, 614 F.3d at 642, the statutes are reasonable regulations on the right to bear arms, for they restrict only the public carrying of operable firearms, while safeguarding the core right to bear arms for self-defense on private property and the corollary right to transport weapons from place to place. *See Cole*, 665 N.W.2d at 344 (given "the danger of wide-spread presence of weapons in public places and police protection against attack in these places," regulation that did "not restrict possession in homes or businesses" was reasonable).

**D.     The State's Regulation Of Ready-To-Use Weapons In Public Is Closely Related To Its Interest In Barring The Firing Of Those Weapons In Public.**

In any event, the challenged Illinois laws satisfy intermediate scrutiny, the means-ends scrutiny that most federal courts have applied in analogous cases. Under that test, the precise fit of a firearm regulation need not be "established by admissible evidence," for a court may look to "logic" in deciding whether a

"substantial relation" exists between the regulation and its objective. *Skoien*, 614

F.3d at 641-42; *see also Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995)

(speech regulations may survive First Amendment challenge "based solely on

history, consensus, and 'simple common sense'"). A court also may consider "data,"

including scholarly journals and studies. *Skoien*, 614 F.3d at 642, 643-44.

Nor does reasonable, empirical disagreement over a law's fit mean that the

law fails intermediate scrutiny. *See City of Los Angeles v. Alameda Books, Inc.*, 535

U.S. 425, 437 (2002) (plurality op.) (under intermediate scrutiny, government "does

not bear the burden of providing evidence that rules out every theory . . .

inconsistent with its own"); *G.M. Enters., Inc. v. Town of St. Joseph*, 350 F.3d 631,

639 (7th Cir. 2003) ("[a]lthough this evidence shows that the Board might have

reached a different and equally reasonable conclusion . . . , it is not sufficient to

vitiate the result reached in the Board's legislative process" under intermediate

scrutiny). And courts should not "substitute [their] judgment in regards to whether

a regulation will best serve a community, so long as the regulatory body" has met

its responsibility to consider "evidence that it reasonably believed to be relevant to

the problem addressed." *G.M. Enters.*, 350 F.3d at 639-40 (internal quotations and

citation omitted).

When enacting the challenged statutes, the Illinois General Assembly

determined that "permit[ting] citizens to carry loaded, immediately accessible guns

in holsters on the public streets of Illinois" presents "inherent dangers to police

-43-

officers and the general public." *People v. Smythe*, 817 N.E.2d 1100, 1103-04 (Ill.

App. Ct. 2004) (internal quotations omitted); *see also People v. Marin*, 795 N.E.2d

953, 958-59 (Ill. App. Ct. 2003) (legislative purpose was "to protect the public from

gun violence"); *People v. Williams*, 305 N.E.2d 186, 188 (Ill. App. Ct. 1973)

(explaining that predecessor to challenged laws was "designed to protect innocent

persons from being victimized by those who carry hidden weapons, as the potential

for injury is very grave"). Logic supports the legislature's conclusion that the more

guns there are in public, the greater the likelihood that one will be discharged, and

the more victims of gun violence there will be.

Data likewise support the Illinois General Assembly's exercise of its police

power in passing the challenged laws. Evidence suggests that "criminal gun use is

far more common than self-defense gun use," and that guns are used "far more often

to intimidate and threaten than . . . to thwart crimes." David Hemenway &

Deborah Azrael, *The Relative Frequency of Offensive & Defensive Gun Uses: Results

from a National Survey*, 15 Violence & Victims 257, 257, 271 (2000); *see also* John J.

Donohue, *The Impact of Concealed-Carry Laws*, in *Evaluating Gun Policy Effects On

Crime & Violence* 289, 320-25 (2003) (finding statistical correlation between less

restrictive gun laws and increases in crime, recognizing that existing data make it

difficult to isolate the causal effect of such laws). Such evidence is not limited to

urban areas, for guns and highway confrontation are a particularly deadly

combination. *See* David Hemenway, *Road Rage in Arizona: Armed & Dangerous*, 34

Accident Analysis & Prevention 807-14 (2002).

Plaintiffs' view that "firearms are frequently used to deter and defend against

criminal violence," Shepard Br. 57, thus is inconsistent with the available evidence.

Indeed, of the approximately 30,000 gun deaths in the United States each year,

only a small percentage are "justifiable homicides" (defined by the FBI as "[t]he

killing of a felon, during the commission of a felony, by a private citizen)," FBI,

*Uniform Crime Reports, Expanded Homicide Data Table 15 / Justifiable Homicide*,

http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/

tables/10shrtb l15.xls (last visited May 3, 2012).  Between 2006 and 2010, there

were on average only 212 justifiable homicides.  *See id.*  In other words, justifiable

homicides account for less than 1% of all gun deaths.

Studies also show that laws restricting people from carrying firearms in

public actually reduce gun violence, by discouraging people from carrying guns and

enabling police officers to take *illegal* guns off of the streets.  In jurisdictions where

public carry is restricted, if a police officer encounters a person reasonably

suspected of carrying a gun, that officer may stop and frisk, and, upon finding a

firearm, make an arrest and confiscate it.  *See, e.g., United States v. Black*, 525 F.3d

359, 364-65 (4th Cir. 2008); *Commonwealth v. Robinson*, 600 A.2d 957, 959-60 (Pa.

Super. Ct. 1991).  These policing strategies increase the likelihood that either gang

members and others likely to misuse guns will refrain from carrying them in public,

-45-

or the police will take the guns before they are used in crimes. *See* Lawrence

Rosenthal, *Second Amendment Plumbing After* Heller: *Of Standards of Scrutiny,*

*Incorporation, Well-Regulated Militias, & Criminal Street Gangs*, 41 Urb. Law. 1,

30-48 (2009). Thus, contrary to plaintiffs' suggestion, *see* Shepard Br. 57, it is

neither "naïve" nor "nonsensical" to conclude that laws restricting public carry deter

criminals from carrying (and using) guns. But these strategies are less likely to be

effective in places where carrying a gun with a license is allowed, because courts

may well conclude that an officer's reasonable suspicion that a person is carrying a

gun does not justify a stop and frisk.

To be sure, restrictions on public carry also affect people who are unlikely to

misuse guns. But intermediate scrutiny tolerates laws that are more extensive

than necessary to serve the government's interests as long as they are not

unreasonably so. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) ("'the

least restrictive means' is not the standard"). And courts should be "loath to

second-guess the Government's judgment to that effect." *Bd. of Trs. of the State*

*Univ. of N.Y. v. Fox*, 492 U.S. 469, 478 (1989). Thus, courts consistently have

upheld laws prohibiting felons from possessing firearms, even though those laws

"could be criticized as 'wildly overinclusive' for encompassing nonviolent offenders."

*United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (*per curiam*). Here, the

legislature's interest in reducing gun violence would not be as effectively served by

a licensing regime, because, contrary to plaintiffs' suggestion, it is impossible to

-46-

predict everyone who can "be trusted to carry a firearm in public." Shepard Br.
55-56.

Because every criminal was at one time a law-abiding citizen, strategies for
preventing gun violence are under-inclusive when they target only prior offenders.
*See* Philip J. Cook, *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598,
600 (2005) (homicide prevention strategies targeted toward prior offenders "leave a
large portion of the problem untouched"). Indeed, according to one study, concealed
handgun permit holders killed at least 428 private citizens and 12 law enforcement
officers in the last five years. *See* Violence Policy Center ("VPC"), *Concealed Carry
Killers*, http://vpc.org/ccwkillers.htm (last visited May 3, 2012). And even plaintiffs'
*amici* cite data in their brief that authorities in just four States revoked substantial
numbers of individual gun permits. Brief *Amici Curiae* of Michael Hall, Kenneth
Pacholski, Kathryn Tyler and the National Rifle Association of America, Inc., in
Support of Plaintiffs-Appellants ("NRA Br.") 18-19 (collecting data for Florida,
North Carolina, Tennessee, and Texas).[8] In short, the Illinois legislature acted
within its authority when it concluded that a general prohibition on carrying
ready-to-use firearms in public would more effectively prevent gun violence than a
licensing scheme.

Nevertheless, plaintiffs' *amici* argue that allowing individuals to carry guns
in public improves public safety rather than threatens it, criticizing contrary

---

[8] As of the filing of this brief, the NRA's motion for leave to file its *amicus*
brief was pending.

studies. *See* NRA Br. 5-28. Those criticisms are misguided from the start, however, for they focus unduly on the State's interest is crime prevention, whereas in fact Illinois advances its broader, and indisputable, interest in preventing the dangerous discharge of firearms in public. *See supra* Part III.B.

But even aside from the fact that these critiques are off point, they fail on their own terms. For example, the *amici* attack a study by Hemenway and Azrael finding far fewer defensive gun uses than Gary Kleck and Don B. Kates, Jr., reported in their study, contending that the Hemenway/Azrael "study has been discredited for misrepresenting its own survey results: his actual data indicate at least *six times* as many defensive gun uses as the estimates he reports in the article." NRA Br. 6-7. That is an overstatement, however, and it overlooks that the study disclosed its reason for omitting some data from its analysis—namely, that these data were unreliable. *See* Hemenway & Azrael, *The Relative Frequency of Offensive & Defensive Gun Uses* at 259-71. Specifically, as Hemenway later explained, people over-report their defensive uses of guns and under-report their criminal uses, a bias for which his study (unlike Kleck/Kates') attempts to account. *See* David Hemenway & Mary Vriniotis, *Comparing the Incidence of Self-Defense Gun Use & Criminal Gun Use*, http://www.hsph.harvard. edu/research/hicrc/ files/Bullet-ins_Spring_2009.pdf (last visited May 3, 2012).

The study by the National Research Council of the National Academies of Sciences ("NRC"), on which plaintiffs' *amici* itself rely, *see* NRA Br. 7-10, 14-15,

makes this same point. As the NRC explained, determining whether a gun use was defensive or criminal is often difficult, and over- and under-reporting occurs depending on how the data are collected. *See* Charles F. Wellford, *et al.*, *Firearms & Violence: A Critical Review* 103-14 (2005); *id.* at 109 ("[I]t is widely thought that inaccurate response biases the estimates of defensive gun use."). The NRC also noted criticisms of the Kleck/Kates approach and concluded that "[i]t is not known . . . whether Kleck's, Hemenway's, or some other assumptions are correct." *Id.* at 110. Without consistently reliable data on whether defensive gun uses are "common," it is impossible to know whether they are "effective" at preventing crime, as the *amici* posit. *See* NRA Br. 6, 9. Likewise, while the NRC identified "19 other surveys" with numbers similar to Kleck's and Kates', *see* NRA Br. 8-9; Wellford, *Firearms & Violence* at 103, the *amici* omit the NRC's ultimate conclusion—it "found no comfort" in these repeated results, for "[m]ere repetition does not eliminate bias," *id.* at 113. Far from unequivocally supporting plaintiffs, therefore, the NRC's inconclusive findings show that a reasonable legislature considering the available data could reach competing conclusions, *see Alameda Books,* 535 U.S. at 437; *G.M. Enters.*, 350 F.3d at 639, and that the Illinois General Assembly therefore acted within its police power in concluding that operable firearms in public spaces threaten public safety.

Finally, plaintiffs' *amici* contend that studies supporting the General Assembly's choice show a mere statistical correlation—rather than a causal

link—between gun regulations and a reduction in crime. *See* NRA Br. 11, 24, 25

n.7. But the *amici*'s critique again falls short, for it asks too much of nearly any

study. After all, not even the *amici*'s preferred studies, *see, e.g., id.* at 8, 12-13, 23-

24, concluded that more guns *cause* less crime, *see* Wellford, *Firearms & Violence* at

120 ("[I]t is not clear a priori that [right-to-carry laws] deter[ ] [crime].").

Cause-in-fact need not be proven to support passage of a law, and here there is

abundant data and literature on which a legislature could rely for a link between

firearms regulation and a reduction in violent crime. Intermediate scrutiny

requires "logic" and "data," not empirical perfection. *See Skoien*, 614 F.3d at 642;

*Ezell*, 651 F.3d at 708. Likewise, while the *amici* criticize the "vignettes" on the

VPC's website, *see* NRA Br. 15-17; *see id.* at 12 (questioning reliance on interviews

of criminals), it offers no authority requiring legislatures to confine themselves to

statistical data in crafting regulation, particularly when the data merely reinforce

common sense. *See Florida Bar*, 515 U.S. at 628.

In the end, even if the parties' data and logic point to different or inconclusive

results regarding crime rates, *see* NRA Br. 24-25, plaintiffs still cannot avoid

dismissal of their complaint. This is so chiefly because, again, the challenged laws

exist to prevent the discharge of firearms in public, not merely to reduce crime. *See*

*supra* Part III.B. But in any event, the State's data need not conclusively support

an ideal solution for, as explained, under intermediate scrutiny the government

"does not bear the burden of providing evidence that rules out every theory . . .

inconsistent with its own." *Alameda Books*, 535 U.S. at 437 (plurality op.). Even if crime control were the sole reason for the challenged Illinois laws, that lawmakers "might have reached a different and equally reasonable conclusion" on the link between firearms regulation and violent crime "is not sufficient to vitiate the result reached" by the Illinois General Assembly. *G.M. Enters.*, 350 F.3d at 639.

In sum, this Court should hold that the challenged statutes survive a traditional intermediate scrutiny analysis.

E.     **The Challenged Laws Also Survive The Standard Applied In *Ezell*.**

As discussed above, the challenged regulations do not implicate core Second Amendment rights, and thus the standard applied in *Ezell* is inapplicable. In the alternative, the challenged regulations survive even *Ezell* scrutiny.

*Ezell* did not precisely define the State's evidentiary burden under "not quite 'strict scrutiny,'" stating only that there must be a "genuine and serious" threat to public safety and a "close fit" between the law and "the actual public interests it serves." 651 F.3d at 708-09. Regardless, the challenged provisions satisfy this standard without need for remand. First, as explained, Illinois has an "extremely strong" interest in preventing serious bodily injury or death resulting from the discharge of firearms in public. *Id.* at 708. In addition, the "logic and data" detailed above bind that legislative objective into a close fit with the statutory means to accomplish it. *See Skoien*, 614 F.3d at 642. And because *Ezell* did not apply strict scrutiny, that fit need not be "necessarily perfect." 651 F.3d at 708.

**F.     If The Complaints Are Reinstated, This Court Should Remand For An Evidentiary Hearing.**

Alternately, if this Court disagrees with defendants and holds both that the regulations fall within the scope of the Second Amendment and fail on the existing record under means-ends testing, the Court should remand to permit the district courts in the first instance to make the factual findings necessary to determine whether the State can demonstrate a sufficient fit between the challenged statutes and their public-safety purpose. *See United States v. Carter*, 669 F.3d 411, 421 (4th Cir. 2012).

\* \* \*

In sum, plaintiffs are unlikely to succeed on the merits, the harms suffered by the public and the State outweigh any harms suffered by plaintiffs, and the district courts thus properly denied plaintiffs' requests for injunctive relief. *See St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007). Moreover, because the challenged statutes are constitutional, plaintiffs' claims fail as a matter of law and the complaints were properly dismissed.

**IV.     Governor Quinn Is Not A Proper Party.**

Finally, the Shepard plaintiffs name Governor Quinn as a defendant, but the Governor lacks the constitutional authority to commit the conduct that plaintiffs allege and therefore is not a proper party. Plaintiffs in both suits seek to enjoin enforcement of a criminal statute. *See* Moore Doc. 5; Shepard Doc. 2. But Illinois law vests prosecutorial authority in the Illinois Attorney General and in county

-52-

State's Attorneys, *see People v. Buffalo Confectionery Co.*, 401 N.E.2d 546, 549 (Ill. 1980), not the Governor.  As a result, the Governor cannot initiate prosecutions on behalf of the State, and "the Attorney General possesses the *exclusive* constitutional power and prerogative to conduct the state's legal affairs."  *Scachitti v. UBS Fin. Servs.*, 831 N.E.2d 544, 553 (Ill. 2005).  Accordingly, Governor Quinn should be dismissed.

## CONCLUSION

Defendants respectfully request that this Court affirm the district courts' judgments.

May 9, 2012                                     Respectfully submitted,

                                                LISA MADIGAN
                                                Attorney General of Illinois

                                                MICHAEL A. SCODRO
                                                Solicitor General

                                                JANE ELINOR NOTZ
                                                Deputy Solicitor General


                                                _____/s/ David A. Simpson_____
                                                DAVID A. SIMPSON

                                                RACHEL MURPHY
                                                EVAN SIEGEL
                                                KARL TRIEBEL
                                                NADINE J. WICHERN
                                                Assistant Attorneys General

                                                100 West Randolph Street, 12th Floor
                                                Chicago, Illinois 60601-3218
                                                Telephone: (312) 814-3000

                                                *Attorneys for Defendants-Appellees*

## RULE 32(a)(7)(B) CERTIFICATION

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B)(I) in that it contains 13,828 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  In preparing this certificate, I relied on the word count of WordPerfect X4.

/s/ David A. Simpson
DAVID A. SIMPSON

## CERTIFICATE OF SERVICE

I certify that on May 9, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ David A. Simpson
DAVID A. SIMPSON
