IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, KENNETH PACHOLSKI, KATHRYN TYLER, and MICHAEL HALL, | ) ) ) | |
| | ) | No.10 CV 4184 |
| Plaintiffs, | ) | |
| | ) | Judge Edmond E. Chang |
| v. | ) | |
| | ) | Magistrate Judge Geraldine Soat Brown |
| THE CITY OF CHICAGO and RICHARD M. DALEY, Mayor of the City of Chicago, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975 / 7129 / 4216

Attorneys for Defendants

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      Courts Have Rejected Plaintiffs' Second Amendment Framework . . . . . . . . . . . . . . 3

II.     Chicago's Firearms Acquisition Regulation Is Constitutional . . . . . . . . . . . . . . . . . . 5

        A.      Plaintiffs fail to demonstrate that the Second Amendment
                encompasses a right to acquire firearms in one's home municipality . . . . . . 5

        B.      Even if Second Amendment protection exists, the undue
                burden standard applies and is satisfied . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        C.      Chicago's regulation satisfies intermediate scrutiny . . . . . . . . . . . . . . . . . . 11

                1.      Increasing transaction costs in the illegal market . . . . . . . . . . . . . . 13

                2.      Reducing access to licensed dealers . . . . . . . . . . . . . . . . . . . . . . . . . 16

                3.      ATF's inability to oversee FFLs . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        D.      The regulation satisfies *Ezell* scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

III.    Chicago's Restriction on Carrying Firearms Outside the Home
        Is Constitutional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        A.      The Second Amendment does not protect carrying
                outside the home in Chicago . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                1.      Cities have always been free to ban gun carrying
                        and discharge outside the home . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                2.      The arms right does not protect a right to carry
                        outside the home . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        B.      Chicago's restriction does not implicate Plaintiffs' "homes." . . . . . . . . . . . 29

        C.      Chicago's restriction satisfies intermediate scrutiny . . . . . . . . . . . . . . . . . . 30

1.      **Combating gang and criminal violence**. . . . . . . . . . . . . . . . . . . . . . 30

2.      **Reducing overall gun violence, including by law-abiding residents**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

3.      **Reducing gun theft**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

D.      **Chicago's restriction satisfies *Ezell* scrutiny**. . . . . . . . . . . . . . . . . . . . . . . 34

E.      **Chicago's restriction on handguns in a place of business is constitutional**. . 38

F.      **Chicago's restriction on firearms in the home of another is constitutional**. 39

IV.      **Chicago's Safe Storage Regulation Is Constitutional**. . . . . . . . . . . . . . . . . . . . . . . 40

A.      **The regulation does not pose an undue burden**. . . . . . . . . . . . . . . . . . . . . . . 40

B.      **The regulation satisfies more rigorous scrutiny**. . . . . . . . . . . . . . . . . . . . . . . 41

1.      **Reducing gun acquisition by criminals**. . . . . . . . . . . . . . . . . . . . . . . 41

2.      **Reducing the risk of suicide, homicide, and accidental firearm death**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

3.      **Reducing threats to first responders**. . . . . . . . . . . . . . . . . . . . . . . . . . 43

4.      **The regulation is appropriately tailored**. . . . . . . . . . . . . . . . . . . . . . . 43

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# TABLE OF AUTHORITIES

## Cases

*Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Board of Trustees of the State of New York v. Fox*, 492 U.S. 469  (1989) . . . . . . . . . . . . . 22, 23

*Carey v. Population Services, International*, 431 U.S. 678 (1977) . . . . . . . . . . . . . . . . . . . . . . . 8

*Citizens United v. FEC*, 130 S. Ct. 876 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) . . . . . . . . . . . . . . . . . . . . 4, 19

*Commonwealth v. Couture*, 552 N.E.2d 538 (Mass. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Craig v. Boren*, 429 U.S. 190 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 26, 28, 38

*Dr. Martin Luther King, Jr. Movement v. Chicago*, 419 F. Supp. 667 (1976) . . . . . . . . . . . . . 10

*Edwards v. South Carolina*, 372 U.S. 229 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ezell v. Chicago*, 651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Gonzales v. Carhart*, 550 U.S. 124 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*King v. Hutchinson*, (1784) 168 Eng. Rep. 273 n.a (C.C.R.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Mainstreet Organization of Realtors v. Calumet City, Ill.*, 505 F.3d 742 (7th Cir. 2007) . . . . . . . 9

*Martin v. Harrington and Richardson, Inc.*, 743 F.2d 1200 (7th Cir. 1984) . . . . . . . . . . . . . . . 8

*Million Youth March, Inc. v. Safir*, 18 F. Supp.2d 334 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . 10

*Nordyke v. King*, 644 F.3d 776 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 8

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Stromberg v. California,* 283 U.S. 359 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Terry v. Ohio*, 392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. DeCastro*, __ F.3d __, 2012 WL 1959072 (2nd Cir., June 1, 2012) . . . . . . . 3, 7

*United States v. Marzzarella*, 614 F.3d 85 (3rd Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (*en banc*) . . . . . . . . . . . . . . . 2, 3, 4, 19, 33

*United States v. Ubiles*, 224 F.3d 213 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Virginia*, 518 U.S. 515 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 34

*Woolard v. Sheridan*, __ F. Supp.2d __, 2012 WL 695674 (D. Md. Mar. 2, 2012) . . . . . . . 10, 37

## Statutes and Ordinances

430 ILCS 65/1, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

720 ILCS 5/24-3(A)(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Statute of Northampton (1328) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## Other Authorities

Bishop, 1 Commentaries on the Criminal Law (2d ed. 1858) . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

Bishop, 2 Commentaries on the Criminal Law (2d ed. 1858) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Blackstone, 4 Commentaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Charles, *The Faces of the Second Amendment Outside the Home:
History Versus Ahistorical Standards of Review*,
60 Clev. St. L. Rev. (forthcoming 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26

Coke, 3 Institutes of the Law of England (1797) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Gardiner, The Compleat Constable (3d ed. 1708) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Hawkins, 1 Treatise of the Pleas of the Crown (1716) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Proclamation of Elizabeth I (Dec. 2, 1594) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Parker, Conductor Generalis (1788) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Rosenthal, *Second Amendment Plumbing After* Heller*:*
*Of Standards of Scrutiny, Incorporation,*
*Well-Regulated Militias, and Criminal Street Gangs*, 41 Urb. Lawyer 1 (2009) . . . . . . . . . . . 36

Wilson, 3 Works of the Honorable James Wilson (1804) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## <u>INTRODUCTION</u>

This case presents Chicago's localized response to a grave and unique gun violence problem within its borders. Plaintiffs, however, treat largely in generalities and wholly fail to address the particulars. Their superficial reading of history neglects that, whatever the reach of the right to arms, cities have long been free to heavily restrict the carry and use of firearms due to the special dangers they present in urban centers. On the facts, Plaintiffs turn a blind eye to an undisputed record showing that they suffer no burden in acquiring or using guns for self-defense in the home. Nor do Plaintiffs counter with law enforcement experts at all, much less any that undermine the decades of street experience brought by Chicago's police witnesses. And Plaintiffs have no analysis even approaching the 2007 Chicago Study, in which Dr. Cook examined gun exchange and use by Chicago's criminals. It demonstrated – contrary to popular belief – that Chicago criminals face surprising difficulties in getting guns. Its findings undergird the importance of Chicago's regulations in maintaining that pressure.

Plaintiffs trumpet something different altogether: That Chicago's case rests on imperfect research that, among other things, lacks certainty and does not prove cause and effect. This is hardly a constitutional defect; Plaintiffs merely state what is well-known about all science. Indeed, the National Research Council ("NRC"), together with the Federal Judicial Center (a creation of Congress chaired by the Chief Justice), explain that:

- It is important to emphasize that all studies have "flaws" in the sense of limitations that add uncertainty about the proper interpretation of results. Some flaws are inevitable given the limits of technology, resources, the ability and willingness of persons to participate in a study, and ethical constraints.

- There is a tension between any attempt to reach conclusions with near certainty and the inherently uncertain nature of multiple regression analysis.

1

- Causality cannot be inferred by data analysis alone; rather, one must infer that a causal relationship exists on the basis of an underlying causal theory that explains the relationship between the two variables. Even when an appropriate theory has been identified, causality can never be inferred directly.

- Generally, researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn.

D-RSOF 119 & 122.[1] Not even Dr. Kleck's work is immune from these limitations. *Id.* He readily acknowledges that requiring certainty is an "unreasonable standard" in science. SOF 13.

Jurisprudence can hardly demand empirical certainty of local policymakers when it is unattainable even by scientists. Indeed, legislatures have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). The Seventh Circuit has found it perfectly appropriate to sustain prohibitory gun laws based on the very kind of research (and some of the exact same studies) proffered here. *See United States v. Skoien*, 614 F.3d 638, 643-44 (7th Cir. 2010) (*en banc*). The aim should simply be, according to Dr. Kleck, to "draw rational and reasonable conclusions" based on the evidence. SOF 13. Chicago's efforts to curb urban gun violence are, at the very least, reasonably tethered to its empirical and factual submission.

---

[1] The following citation forms are used in this brief: Defendants' Statement of Material Facts ("SOF"); Plaintiffs' Response to SOF ("RSOF"); Defendants' Reply to RSOF ("D-RSOF"); Plaintiffs' Statement of Additional Facts ("AF"); Defendants' Reply to AF ("RAF"); Defendants' Exhibits ("Def. Ex."); Plaintiffs' Exhibits ("Pl. Ex."); Defendants' Memorandum in Support of Summary Judgement ("Def. Br."); Plaintiffs' Memorandum in Support of Summary Judgment and in Opposition to Defendants Motion ("Pl. Br."). Defendants state that the body of this brief, excluding this footnote, contains less than 14,000 words according to Word Perfect's word count function.

## ARGUMENT

**I. Courts Have Rejected Plaintiffs' Second Amendment Framework.**

Plaintiffs offer a method of Second Amendment analysis that has been roundly rejected. A plaintiff does not prevail simply by showing that the Amendment's text, as historically understood, protects an activity. A second step follows: "inquiry into the strength of the government's justification" for the regulation. *Ezell v. Chicago*, 651 F.3d 684, 703 (7th Cir. 2011). *See also id.* ("*McDonald* emphasized that the Second Amendment 'limits, but by no means eliminates, governmental discretion to regulate activity falling within the scope of the right.'"); Def. Br. at 2-3. The second step is necessary even for a "ban" or "prohibition." *Ezell*, 651 F.3d at 708-09. *See also Skoien*, 614 F.3d at 641-42 (intermediate scrutiny applied to ban on possession by domestic violence misdemeanants). While *District of Columbia v. Heller*, 554 U.S. 570 (2008), "suggest[ed]" that means-end scrutiny may not be warranted for a ban on handgun possession in the home, "[f]or all other cases . . . we are left to choose an appropriate standard of review." *Ezell*, 651 F.3d at 703, 708.

Plaintiffs then argue that if a standard is necessary, it should be strict scrutiny. But "[s]trict scrutiny does not apply automatically any time an enumerated right is involved," *United States v. Marzzarella*, 614 F.3d 85, 96 (3rd Cir. 2010) (discussing examples), and the Seventh Circuit has yet to apply it in a single Second Amendment case. On the other hand, it has applied intermediate scrutiny three out of four times (*Skoien*, *Williams*, *Yancey*), and two federal Courts of Appeal have determined that the undue burden standard can apply too. *See United States v. DeCastro*, __ F.3d __, 2012 WL 1959072 (2nd Cir., June 1, 2012) (upholding ban on out-of-state gun acquisition); *Nordyke v. King*, 644 F.3d 776, 788 (9th Cir. 2011) (discussed at Def. Br. at

3

25). Indeed, *Ezell* expressly requires a court to examine the amount of burden: A "severe burden" produces more scrutiny than a "modest burden[]," which "may be more easily justified." 651 F.3d at 708.

Next, in discussing the requirements of intermediate scrutiny, Plaintiffs completely ignore *Skoien*, and they cite no other Second Amendment case. Pl. Br. at 8-9.[2] That standard does not demand an "exceedingly persuasive" justification that predated litigation, proof that regulations "will in fact alleviate" the targeted harms, or that the regulation be "no more extensive than necessary." Instead, Chicago can prevail with nothing more than "logic and data" (which need not meet the standards of courtroom evidence and can be accumulated after the statute is passed),[3] and it need not "pro[ve], satisfactory to a court," that its regulation "is vital to the public safety." Dr. Br. at 12-13. Chicago also has a wide berth to experiment in devising solutions to the serious problem of gun violence. *Id.* at 13-14. Finally, even if Plaintiffs' evidentiary submission can be viewed as casting doubt on Chicago's rationales (and it does not), Chicago still prevails: There is no requirement that Chicago "rule[] out every theory . . . that is inconsistent with its own." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 437

---

[2] Plaintiffs put their stock in two cases – *United States v. Virginia*, 518 U.S. 515 (1996) and *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) – that are irrelevant. *Virginia* was a gender discrimination case, and based its scrutiny on "volumes" of a "long and unfortunate history of sex discrimination" against women, and the Court's tradition of "carefully inspect[ing] official action that closes a door or denies opportunity to women (or to men)." 518 U.S. at 531-32. *Rubin* addressed a commercial speech claim against a prohibition on listing alcohol content on beer labels. Unlike here, the Government in *Rubin* failed to present "any credible evidence" in support of its theory, and relied instead on "anecdotal evidence" and "educated guesses." 514 U.S. at 490.

[3] In upholding a 1996 law, *Skoien* cited studies from 1997, 1999, 2001-2005, and 2009; at the same time, it did not consider whether the legislature had any data or evidence before it. *See* 614 F.3d at 643-44.

4

(2002).

On the other hand, if Plaintiffs are correct about what Chicago must establish, then summary judgment cannot be granted for Plaintiffs. Chicago has submitted an extensive record of expert testimony, fact witness testimony, and other data. Plaintiffs dispute almost all of this based on the rebuttal opinion of Dr. Kleck, but *Skoien* intermediate scrutiny allows Chicago to prevail in the face of this dispute, Def. Br. at 14-15, as it can also under *Ezell* scrutiny. *See infra*, at 22. These standards permit uncertainty and sensibly do not require a non-expert court to decide matters of gun policy based on which side's evidence or expert is "correct," so long as a government's showing is logically plausible and facially reliable. Plaintiffs' approach, however, requires the Court to determine who in fact is correct. This is because a finding at this stage that Chicago's showing is not sufficiently credible would, in effect, amount to a determination that Dr. Kleck's critiques are meritorious and eviscerate any reasonable reliance on Chicago's showing. Put another way, it would be crediting Plaintiffs' submission over that of Chicago and its experts. Chicago's position does not require the Court to resolve that quintessential "battle of the experts," but if it need be done, Chicago respectfully submits that it could only happen after trial.

**II.    Chicago's Firearms Acquisition Regulation Is Constitutional.**

   **A.    Plaintiffs fail to demonstrate that the Second Amendment encompasses a right to acquire firearms in one's home municipality.**

Chicago does not prohibit "acquiring any and all arms," Pl. Br. at 12, but simply requires residents to go to the suburbs to get a gun. The founding generation could not have understood the Second Amendment – which speaks only to "keeping" and "bearing" – as prohibiting local

government from narrowly regulating gun acquisition in this way. Plaintiffs do not even attempt an argument that acquiring guns in one's home municipality is implicit in, or necessary to, the effective exercise of self-defense.

Plaintiffs instead hang their hat on a singular historical moment: The English Crown's attempt to subdue its American colonies on the eve of war by banning weapons imports. To be sure, the Second Amendment was codified due to fear that the new Federal Government would destroy the citizen's militia by "taking away their arms," a fear fanned by George III's efforts "to disarm" American colonists. *Heller*, 554 U.S. at 594, 598. But this international power-play is worlds away from Chicago's modern and localized acquisition regulation. Nothing about it remotely approaches a disarmament policy. Indeed, Dr. Tyler has *added* to her arms stock since this suit began. Pl. Ex. 41, ¶ 4. Plaintiffs also invoke "expect[ations]" that colonial militia members would bring their own arms to service, and argue that, "*a fortiori*, they had to have a means of doing so." Pl. Br. at 12. Maybe so, but Chicago residents have ample means of arming themselves. SOF 45. Plaintiffs cite no evidence that a law like Chicago's would have presented any concern to the Framers, or that early Americans would even have bristled at traveling a few miles to get a gun. Indeed, the advent of modern transportation and dense urbanization means that Chicago residents today likely spend less time, and traverse a shorter distance, than did our forebearers.[4]

---

[4] Plaintiffs' other sources (Pl. Br. at 11 & n.7) are also irrelevant. Thomas Jefferson's quotation appears in a letter to the British Minister regarding French arms purchases in America during British/French hostilities, and merely affirms the right of America to sell arms to France. The Curwen cite simply confirms that an American (assuming he could afford it) could keep a gun in his home for self-defense. And the Virginia statute does no more than grant the right to sell arms in that State. Indeed, such a statute would have been unnecessary if the Constitution already protected that right.

Finally, Plaintiffs argue that the absence of a historical regulation like the one here confirms the existence of a constitutional right to acquire in one's locality. Pl. Br. at 12. The Seventh Circuit has rejected this "negative implication" argument. The absence of a historical ancestor is hardly fatal; it may just mean that there was no need for the law then. Def. Br. at 9-10 (citing *Skoien* and *Yancey*). Here, Plaintiffs' history shows that the Founders' foremost focus was preventing national disarmament by England. They were not concerned with passing laws to prevent local criminals in yet-to-be established cities of millions from acquiring the yet-to-be devised rapid-fire and sophisticated firearms of today.

**B.      Even if Second Amendment protection exists, the undue burden standard applies and is satisfied.**

Because Chicago's regulation only tangentially impacts the right to acquire firearms, it should, under *Ezell*'s sliding scale, be evaluated under the undue burden standard. Def. Br. at 23-26. In adopting the standard, *DeCastro* explained that *Heller* "emphasized the practical impact of" and the "weight of the burden imposed" by a regulation on the ability to possess guns. 2012 WL 1959072, at *4-5. From this, it reasoned that heightened scrutiny is not appropriate for "any marginal, incremental, or even appreciable restraint" on firearm acquisition, but "only [for] those regulations that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden." *Id.* at *5. *DeCastro* also drew upon First Amendment time, place, and manner doctrine to conclude that a law that "regulates the availability of firearms is not a substantial burden on the right to keep and bear arms" so long as "adequate alternatives remain for law-abiding citizens to acquire a firearm." *Id.* at *6.

Plaintiffs do not even attempt an argument that, on the facts, Chicago's regulation

imposes an undue burden, and the evidence is clear that it does not.  Def. Br. at 26-27.  Plaintiffs

instead argue for a stricter form of scrutiny, but their arguments are unavailing.

First, Plaintiffs contend that the regulation should be summarily invalidated because it

amounts to a ban on acquisition and is "tantamount to restricting [a firearm's] use."  Pl. Br. at 10.

But, again, Chicago's regulation does not ban firearm acquisition.[5]  And there is no evidence that

it has in any way restricted anyone from using firearms for self-defense.  Further, even if

Chicago's regulation were a ban, that would not make it automatically unconstitutional.  *See*

*supra*, at 3.[6]

Plaintiffs then argue that *Ezell* scrutiny applies because *Ezell* rejected the argument that

the ability to exercise a right elsewhere allows it to be restricted locally.  Pl. Br. at 13.  Plaintiffs

stretch *Ezell* too far.  The cited portion of *Ezell* addressed questions of standing and irreparable

harm in the context of a preliminary injunction.  *See* 651 F.3d at 696-97.  Those issues are very

different from the merits.  They focus on whether a plaintiff has suffered a tangible injury in fact,

---

[5]  *Martin v. Harrington and Richardson, Inc.*, 743 F.2d 1200 (7th Cir. 1984) is therefore readily distinguishable.  That tort case merely ventured that imposing state-wide tort liability on handgun manufacturers would drive the industry out of business; it did not suggest that a regulation allowing residents to purchase guns in the suburbs would extinguish handgun possession.

[6]  The smattering of non-Second Amendment cases cited by Plaintiffs further show that restrictions on use are not categorically unconstitutional, as they employ various forms of scrutiny.  *See Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010); *Carey v. Population Services, International*, 431 U.S. 678, 688 (1977); *Craig v. Boren*, 429 U.S. 190, 197 (1976);  *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 744-46 (5th Cir. 2008).  And while *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (2010) suggested in *dicta* that a ban on commercial sales may present a "constitutional defect," it did not suggest that it would be categorically unconstitutional. Indeed, the court offered its observation while addressing whether certain conduct falls inside the Second Amendment's scope; it did not suggest that conduct falling inside the scope could never be restricted under means-end scrutiny.  *See id.*

8

not whether his or her "rights" were violated; the latter is a question for the merits. *See Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008) ("[S]tanding and entitlement to relief are not the same thing. Standing is a prerequisite to *filing suit*, while the underlying merits of a claim (and the laws governing its resolution) determine whether the plaintiff is *entitled to relief*.") (emphasis in original). Courts routinely use a wider lens when assessing standing than they use when determining whether, on the merits, a violation of a right has occurred. *See id*; *Mainstreet Organization of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 744 (7th Cir. 2007) (standing "does not require a certainty or even a very high probability that the plaintiff is complaining about a real injury, suffered or threatened").

Given these differences, it would be a mistake to read *Ezell* as determining that exercise of a right outside the jurisdiction is irrelevant to the merits. Indeed, *Ezell* rested its standing ruling on analogy to the First Amendment, *see* 651 F.3d at 697, but that analogy breaks down when extended to the merits. The reason the First Amendment does not tolerate laws that shunt speech and assembly to outside the jurisdiction is that exercise within the jurisdiction is essential for those rights to have meaning. For instance, a fundamental purpose of the First Amendment is to protect speech "uttered during a campaign for political office," *Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010), because free political speech ensures "that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic." *Stromberg v. California*, 283 U.S. 359, 369 (1931). This aim would be eviscerated if the government could require political speech to be held in another jurisdiction, away from the object of the speech – *i.e.*, local officeholders – or from those in the community that can effect change – *i.e.*, local voters; a protest against Chicago City Hall

9

does little good if staged in DuPage County rather than Daley Plaza. *See also Edwards v. South Carolina*, 372 U.S. 229, 235 (1963) (demonstration "at the site of the State Government" allows demonstrators to reach "the citizens of South Carolina, along with the Legislative Bodies of South Carolina"); *Dr. Martin Luther King, Jr. Movement v. Chicago*, 419 F. Supp. 667, 673-74 (1976) (plaintiffs had right to demonstrate "in the Marquette Park area," a community "composed of Caucasians," so as to "call their dissatisfaction to the attention of those people, solicit their support, and bring action from the public authorities").

Location is also protected because it can be a critical component of the message itself. *See City of Ladue v. Gilleo*, 512 U.S. 43, 56-57 (1994) ("An espousal of socialism may carry different implications when displayed on the grounds of a stately mansion than when pasted on a factory wall or an ambulatory sandwich board."); *Million Youth March, Inc. v. Safir*, 18 F. Supp.2d 334, 348 (S.D.N.Y. 1998) (staging rally in Harlem "will infuse substantial and unique additional meaning to the message of the event"). And all of this can be said as to religious exercise, too: A practicioner may derive unique religious meaning from prosthelytizing to attendees at a particular festival, or from attending a particular house of worship among a particular community of officiants and congregants.

Acquiring a gun for self-defense – the interest protected by the Second Amendment – does not remotely trigger these interests; location of purchase has no connection to a gun's utility. Def. Br. at 24. Plaintiffs make no attempt to rebut this fact. Thus, on the merits, the Court may, and should, consider that Chicago residents have a bevy of options available to them for acquiring guns just outside Chicago.

10

### C.   Chicago's regulation satisfies intermediate scrutiny.

Plaintiffs fail to cast any serious doubt on Chicago's expert testimony, empirical evidence, and fact testimony, all of which justify Chicago's regulation under intermediate scrutiny.

Plaintiffs first invoke First Amendment secondary effects jurisprudence and argue that the regulation is improperly overbroad because it reduces the number of guns available to even law-abiding residents. Pl. Br. at 14. This argument fails for three reasons. First, it mischaracterizes the aim of the regulation. The legislative record is clear that, to the extent the ordinance seeks to reduce the number of guns in the City, it is aimed at the possession of handguns by criminals. RAF 1.

Second, and more important, Plaintiffs fail to establish any overbreadth. The conduct protected by the Second Amendment is not the possession of guns for their own sake, but for use in self-defense. And there is no evidence whatsoever that Chicago's acquisition regulation reduces, much less prevents, that activity by law-abiding residents. (Nor is there any evidence that Plaintiffs are unable to own the number of guns they wish). Plaintiffs' discussion of the number of estimated self-defense uses of firearms nationwide, Pl. Br. at 16, is therefore irrelevant.[7] This is a far cry from *Woolard v. Sheridan*, 2012 WL 695674 (D. Md. Mar. 2, 2012), where Maryland's regulation completely prevented law-abiding residents from engaging in self-

---

[7] Plaintiffs' estimates are also highly inflated, and Dr. Kleck's methodology has been criticized by numerous scholars and undermined by other research. RAF 8. Indeed, the NRC concluded that, at base, "we do not know accurately how often armed self-defense occurs or even how precisely to define self-defense." *Id.* Plaintiffs themselves cite the NRC for the proposition that existing data does not "demonstrate a causal relationship between the ownership of firearms and the . . . prevention of criminal violence." Pl. Br. at 15.

defense with firearms.

Third, even if the possession of guns, standing alone, were protected, and even if the regulation reduced the number of guns possessed by law-abiding citizens, the regulation would not produce that result "indiscriminately." Pl. Br. at 14. It would be a small by-product of reducing criminal gun use. Dr. Kleck asserts that "most gun criminals acquire their guns directly or indirectly as a result of theft." RSOF 118-A. And he has that written that "[w]here more guns are owned, more guns will be stolen, other things being equal, which results in more guns circulating among criminals. A large volume of stolen guns . . . depresses black market prices." RAF 1.[8] Thus, law-abiding gun ownership and criminal gun possession are inextricably intertwined, and a regulation that reduces the number of guns owned by law-abiding residents reduces, according to Plaintiffs, the number-one source of criminal guns.

As to Chicago's factual record, Plaintiffs contend that "[e]xisting empirical evidence indicates that local sales bans do not reduce gun possession among criminals," Pl. Br. at 15, and that Chicago's regulation therefore fails even as to its intended purpose. But Chicago need not prove that the regulation works; its evidence need only be sufficient to be legitimately relied upon. Def. Br. at 12-14. Moreover, the "existing empirical evidence" Plaintiffs refer to are two studies that predate the 2007 Chicago Study by over a decade, and, as such, do not even purport to address, much less rebut, that study's localized findings (and Dr. Cook's expert opinion based thereon) that the transaction costs in Chicago caused by the illegality of gun sales do impact criminal gun acquisition. RAF 21. Unable to point to any Chicago-centric analysis conducted by

---

[8] Empirical evidence also shows that an overall increase in gun prevalence in a community is associated with an increase in homicide. SOF 17; D-RSOF 14-B.

themselves (or anyone else), Plaintiffs stoop to a series of futile attempts to contort the 2007 Chicago Study into evidence *supporting them*. This effort falls flat.

### 1. Increasing transaction costs in the illegal market.

Plaintiffs first argue that the 2007 Chicago Study found Chicago's prior handgun possession ban to be ineffective. This grossly mischaracterizes the study. The study spoke of the handgun ban's impact on overall gun prevalence (*i.e.*, the overall number of guns in the city), not on the ability of criminals to acquire those guns. D-RSOF 51. As to that latter issue, the study actually explained that handgun bans can "affect gun availability to criminals . . . as might occur if owners are now less likely to resell their guns through unregulated secondary market transactions. . . . Chicago's handgun ban may also have helped to reduce criminal access to guns by preventing the location of licensed gun dealers in high-crime neighborhoods." D-RSOF 51, 77. More important, Plaintiffs neglect that this case is about a different law – the acquisition regulation. And, on that score, the study states that "we are also (or perhaps especially) interested in the question of whether friction in the underground gun market winds up influencing gun involvement in crime. Section 4 reviews evidence suggesting an affirmative answer." D-RSOF 51. *See also*, *generally*, *id.* & D-RSOF 77.

That market friction – *i.e.*, transaction costs – is furthered in various ways by Chicago's ban on sales and transfers in the city. Def. Br. at 31-32; SOF 53, 55-58. Plaintiffs do not dispute two of those costs – uncertain product quality and the physical risk associated with the exchange. D-RSOF 53. Thus, even if the regulation had no impact on price, it would still be justified in light of these hurdles to actually arranging a criminal buy of a working gun. And, as to price, Plaintiffs' argument that the study found underground prices to be *less* than retail is misguided.

Even if the prices were lower (and they are not, *see* SOF 55), Plaintiffs are wrong to compare the two, for two reasons. First, a comparison would be appropriate only if the guns sold in the two markets are substantially the same. And Dr. Kleck admits that they are not. He testified that the retail price is based on the gun being new, but that there is no "reason to believe that the guns in the illegal market are all new," and that he does not know how many of the illegal guns analyzed in the study were new. D-RSOF 53. Indeed, the study reported that roughly 75% of illegal guns in Chicago are at least 4 years old, and 25-30% are 20 or more years old. *Id.*

Second, the critical comparison is not between the underground price and the retail price (since, by Plaintiffs' argument, few criminals purchase from retail, *see* Pl. Br. at 17), but between the underground price in a world with Chicago's regulation and the underground price without it; if Chicago's regulation increases the underground price, then it raises criminal transaction costs, even if that underground price is still less than retail. And, on this question, Dr. Kleck has no evidence that the underground price is not increased by Chicago's regulation, since he does not know "what the price [of] guns would be on the street if there were no gun control laws" in Chicago. D-RSOF 53. Finally, even Plaintiffs's cited data supported them (and it does not), the study contains other evidence showing that underground prices are more than advertised prices, and Chicago police evidence indicates that underground prices are up to $200 higher than retail. SOF 55. This alone is sufficient to support the regulation.

Next, Plaintiffs argue that the study did not find that "criminals" were unwilling to travel to suburban FFLs, but only that "residents" were. Pl. Br. at 17. This is wordplay. A criminal is every bit a resident of his neighborhood as is a "resident." Plaintiffs cannot seriously question that most Chicago criminals are residents of neighborhoods like those analyzed in the study – *i.e.*,

14

disadvantaged, gang-infested ones – because Chicago's violent crime problem is driven by gangs. RSOF 54 (failing to dispute study's finding that gun crime in cities "occurs disproportionately in highly disadvantaged neighborhoods"); D-RSOF 78-A ("[c]riminals typically do not live in the safest areas nor do they lead calm, safe, sheltered lives"). And it is the *criminal* residents who are unlikely to leave these neighborhoods. Def. Br. at 29. Plaintiffs also mischaracterize the study's statement that "neighbourhood specific factors cannot be a very important explanation for the transaction costs documented." That statement was made in the context of observing that the "prices, availability and other characteristics of the gun market" in the studied neighborhoods "appear to be similar to the rest of Chicago." D-RSOF 78-A. That is, criminals in the studied neighborhoods could find no better deal even if they went to other Chicago neighborhoods. These city-wide transaction costs support, rather than undermine, Chicago's decision to ban gun transactions throughout the city.

Plaintiffs also trumpet the unsurprising fact that some other large cities have high transaction costs. Pl. Br. at 18. They offer no evidence, however, that Chicago's are the same (or lower) than other cities, or that Chicago's market is more fluid. And they ignore the evidence in the study that certain of Chicago's transaction costs are in fact unusually high, and that Dr. Cook concluded that Chicago is one of the "most difficult" places for criminals to get guns. SOF 57.

Finally, having failed to undermine the study via Dr. Kleck or any other scientific or empirical basis, Plaintiffs trot out a few statements from City employees that it is not difficult for criminals in Chicago to get guns. Pl. Br. at 15. Plaintiffs twist the testimony out of context. These are trite commonplaces. The non-expert employees did not purport to systematically

15

assess the impact of Chicago's regulation or compare the difficulties faced by Chicago criminals with those in other cities. RAF 6. Indeed, as to the statement attributed to Sgt. Johnson that the number of guns on the street is not responsive to changes in local law, Sgt. Johnson said that he did not even understand the question, and Plaintiffs made no attempt to clarify or reask it. D-RSOF 51. On the other hand, Dr. Cook's expert testimony, rooted in the 2007 Chicago Study, shows that guns are "quite scarce 'on the street'" in Chicago, that "most criminals in Chicago currently lack a gun and have difficulty obtaining one," and that "it is unusual for criminals in Chicago to be in possession of a gun." SOF 57. *See also* RAF 6.

**2.      Reducing access to licensed dealers.**

Plaintiffs fare no better in attacking Chicago's reasons for eliminating licensed dealers, which reduces the ability of criminals to skirt the high transaction costs of the underground market and acquire guns from FFLs directly. Def. Br. at 27-31. Plaintiffs do not seriously deny that corrupt FFLs exist,[9] and they do not attempt to show that Chicago's regulation fails to reduce criminal access to FFLs. Instead, Plaintiffs contend that very few criminals buy guns directly from dealers. Pl. Br. at 17. Even if true, this mantra goes nowhere. Undoubtedly some criminals do purchase directly from FFLs, and, as the 2007 Chicago Study shows, keeping dealers out of Chicago reduces this activity by Chicago criminals. Indeed, crime guns purchased directly from an FFL are 75% less likely in Chicago than the national average. Def. Br. at 31.

---

[9] *See* Pl. Br. at 19 (briefly questioning Operation Gunsmoke evidence and empirical studies of dealer behavior). The Gunsmoke evidence, while anecdotal, shows that Chicago's fear of corrupt dealers is based in first-hand experience in the area, and that corrupt dealers would be likely to infiltrate Chicago given that they operate just over the border. And Plaintiffs' quibbles with some of the methods used in the two empirical studies of dealer behavior cited by Chicago, *see* Def. Br. at 27-28, fall far short of undermining them. D-RSOF 66 & 67.

Plaintiffs have no response to this statistic.

Plaintiffs instead rely on statistics showing that, on a nationwide basis, relatively few guns are trafficked by FFLs. Pl. Br. at 19-20. They read too much into these. As nationwide statistics, they include jurisdictions with no or lax gun acquisition laws, where the ease with which a person can legally acquire a gun reduces the need for, and thus the amount of, illegal trafficking. Illegal trafficking is far more likely to be a problem in jurisdictions with stringent acquisition laws, such as Illinois. *See generally* 430 ILCS 65/1 *et seq.* (Illinois Firearm Owners Identification Card Act); 720 ILCS 5/24-3(A)(g) (establishing waiting periods for gun purchase). This is consistent with the DOJ's finding that, among all of ATF's field offices, the Chicago office reported the highest number of violations per FFL among FFLs who had been found to have violated the law. SOF 65.

Further, even if corrupt dealers are rare,[10] Plaintiffs cite no facts disputing that, when an FFL is corrupt, the result is, as found by the DOJ, "the diversion of large volumes of firearms." D-RSOF 68. They cite no facts refuting that a single corrupt dealer in Chicago could supply large numbers of illegal firearms within Chicago. Indeed, Plaintiffs admit that the 2000 ATF Report found that FFL traffickers "were associated with by far the highest mean number of illegally diverted firearms per [trafficking] investigation, over 350, and the largest total number of illegally diverted firearms, as compared to the other trafficking channels." RSOF 71.

Plaintiffs also neglect the risk posed by even low-volume traffickers. A critique of Dr. Kleck's work on this score notes that his "definition of a large scale trafficker as someone who

---

[10] While Plaintiffs marginalize two of Chicago's empirical studies as simply showing that dealers "were willing" to make illegal sales, Pl. Br. at 18, the studies actually showed that this happens quite frequently. SOF 66 & 67.

17

has been caught illegally selling 100 or more firearms seems to be set artificially high" and that "lower-scale" trafficking operations are the most frequent. D-RSOF 60-B. Since "[g]uns are durable goods that can remain in the hands of criminals for many years," the "illegal diversion of 20, 30, or 50 guns to criminals by one individual in 1 year generates a considerable public safety threat." *Id.* The critique further explains that "the number of guns diverted in ATF gun trafficking investigations is based solely on diversions known to the case agent. A gun trafficker caught selling 10 guns to a violent street gang would not be classified as a large-scale gun trafficker under [Kleck's] definition," even though "this gun trafficker may have been funneling hundreds of guns to street gangs for many years without being caught by ATF doing so." *Id.*

Plaintiffs also claim that statistics showing that a fraction of dealers sell a disproportionate share of crime guns suffer from a "serious analytical defect" in that they are based on crime gun tracing data. Pl. Br. at 20. However imperfect that data may be, it is the best information for evaluating the movement of crime guns. D-RSOF 52-B. Dr. Kleck himself has cited such data in his own work, and views "[l]aw enforcement evidence" regarding gun trafficking as "the best evidence available." *Id.*

Plaintiffs also have little to say about the studies linking crime with a dealer's proximity to cities, studies that support Chicago's decision to push dealers out of the city limits. Plaintiffs do not even mention the 2007 Department of Justice-sponsored study (SOF 83) that found that a dealer's geographic location was the "primary characteristic of importance" for whether the dealer is likely to sell a crime gun recovered in the city. Def. Br. at 29-30. And their only critique of the 2009 study linking the number of FFLs in large cities and gun homicide rates (SOF 82) is that it "failed to control for causal order." Pl. Br. at 18. But a failure to prove

18

causation hardly dooms a study's reliability. *See supra*, at 1-2. Indeed, *Skoien* relied upon a series of studies establishing no more than that a gun in the home is "associated" with an increased risk of homicide, 614 F.3d at 643-44, even though those studies expressly stated that they could not prove that the gun caused the increased risk. *See* Bailey, et al., *Risk Factors for Violent Death of Women in the Home: A National Case-Control Study*, 157 Archives of Internal Medicine 777, 781 (1997) (acknowledging that "case-control" method employed by study is "subject to important limitations;" that "statistical associations do not prove causation;" and that "[r]everse causation could explain some of the link between guns and homicide in the home"); Wiebe, *Homicide and Suicide Risks Associated With Firearms in the Home: A National Case-Control Study*, 41 Annals of Emergency Medicine 771-782 (2003), at 777 ("it would be unwarranted to infer that such a limited body of research conclusively links gun availability to gun-related mortality"); *id.* at 778-780 (acknowledging competing explanations for study's findings and noting study's methodological limitations); Kellerman, et al., *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 New England Journal of Medicine 1084-1091 (1993), at 1089 ("it is possible that reverse causation accounted for some of the association we observed between gun ownership and homicide").[11] *See also City of Los Angeles*, 535 U.S. at 436 (approving city's reliance upon study showing correlation between concentration of adult establishments and crime rates).

Finally, Plaintiffs miss the point in downplaying the threat posed by thefts from gun stores. Pl. Br. at 21. Even if the number of guns stolen from FFLs is not a significant portion of

---

[11] Chicago has cited these last two studies in support of its safe storage regulations. SOF 72 & 75.

19

crime guns (and Chicago submits that 195 guns stolen in a single raid is a serious threat, *see* SOF 72), the fact is that gun stores will present a very attractive criminal target, and will at least add to violent crime rate in the city by adding new targets for theft and robbery: the stores themselves and their gun-purchasing patrons. D-RSOF 76 & 77. Plaintiffs demand that they be allowed to choose whether they wish to "run [these] risk[s]," Pl. Br. at 22, but they cite no support for this cavalier dismissal of the harm their choices will wreak upon others – especially the CPD – who will inevitably be called upon to clean up and combat these ills.

### 3. ATF's inability to oversee FFLs.

Plaintiffs have little to say in response to Chicago's demonstration – and the DOJ's conclusion – that ATF lacks the resources to adequately inspect and police FFLs to ensure that they follow laws that stem the flow of guns to criminals and prohibited purchasers. Def. Br. at 34-36. Plaintiffs simply contend, relying on Dr. Kleck's opinion, that more recent data shows that ATF is able to inspect all "real" gun dealers (those selling more than 50 guns) every year, plus a sample of low-volume dealers. Pl. Br. at 20-21.

This assertion has no footing, and Dr. Kleck is not even qualified to make it.[12] He testified that he has "no basis" for disagreeing that ATF "is not properly using its resources to monitor FFLs." D-RSOF 86. He "ha[sn't] ever studied the effectiveness of ATF inspection procedures," and "ha[sn't] independently studied the use of resources by ATF other than the fact that I know how many compliance inspections they do relative to the number of FFLs." *Id.*

---

[12] Unlike Mr. Vince, Dr. Kleck has never: "had any experience or involvement with enforcement of federal gun laws;" inspected a gun dealer or other FFL for compliance with federal law; audited an FFL; been involved in the licensing of a gun dealer; or worked for ATF. D-RSOF 86.

Further, Plaintiffs do not dispute recent data showing that ATF inspects only about 10% of all FFLs, and only about 20% of retail FFLs, per year. Def. Br. at 36; RSOF 87-89. And as to the "analysis" Dr. Kleck purported to conduct, his calculations assume, based on a 1993 statistic, that only 7% of FFLs are "real" dealers. But that number is no longer accurate. D-RSOF 86. Today the percentage of "real" dealers is almost certainly much higher, due to the fact that changes in federal licensing laws caused many "small time" FFLs to drop out. *Id.* A better-reasoned analysis suggests that – at best – ATF is able to inspect only about half of the "real" dealers a year. *Id.*

Even if ATF could conduct enough inspections, Plaintiffs fail to show that those inspections have enough teeth. Plaintiffs contend that ATF can inspect an FFL more than once a year, Pl. Br. at 21, but that authority exists only in limited circumstances, such as when there is reasonable cause to believe that evidence of a violation is on the premises, or in connection with a criminal investigation. RSOF 93. The power to inspect an FFL when the ATF *already* has evidence of wrongdoing says little about whether once a year is sufficient to detect whether wrongdoing exists in the first place. Further, Plaintiffs offer no facts showing that these limited exceptions are invoked with any frequency, or that they otherwise enable ATF to sufficiently police FFLs. Nor do Plaintiffs dispute that ATF usually gives advance notice of the inspection. RSOF 93. While they now argue that this "at most" gives FFLs time to get their paperwork in order, Dr. Kleck previously admitted that the notice actually "make[s] it harder" for ATF to detect illegal activity. D-RSOF 93.[13]

---

[13] Plaintiffs also question that an FFL convicted of wrongdoing can easily pass the license to a relative or spouse. Pl. Br. at 21. But they cite no evidence disputing that this happens. Federal law provides that, technically, FFLs are non-transferable and that a successor

### D. The regulation satisfies *Ezell* scrutiny.

*Ezell* scrutiny is not warranted here because Chicago's regulation does not ban acquisition, but Chicago easily passes muster in any event. *Ezell* requires "a strong public-interest justification" for a regulation and a "close fit" between it and the "public interests it serves." 651 F.3d at 708-09. While this is more rigorous than intermediate scrutiny, the difference lies in requiring a close fit. Nothing in *Ezell* suggests that the City's factual justification needs to meet a higher evidentiary threshold than established by *Skoien* – *i.e.*, that Chicago must prove that its regulation works, or that its evidence is beyond all doubt. The problem with the factual record in *Ezell* was simply that the City's "entire defense" rested on "speculation" about range accidents, and offered "no data or expert opinion" nor any "empirical evidence" for the court to assess. 651 F.3d at 709. Here, of course, Chicago does all that and more.

Chicago satisfies the first prong of *Ezell* scrutiny: Keeping guns away from criminals is one of the core and compelling interests of a government that wishes to enhance public safety. As to the second prong, *Ezell* provides little guidance on what constitutes a "close fit." Caselaw addressing the "narrow tailoring" requirement in other areas of constitutional law is instructive. Narrow tailoring is not a "least-restrictive-means" test; it does not "require elimination of all less restrictive alternatives." *Board of Trustees of the State of New York v. Fox*, 492 U.S. 469, 477-78 (1989). Narrow tailoring is satisfied "so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock*

---

must independently acquire an FFL, but it also states that a FFL "shall" be issued to a qualified applicant. 27 C.F.R. § 478.47. Thus, so long as the successor is qualified, it can obtain an FFL and in effect continue a preceding business – a phenomenon that is well-documented. RSOF 94.

*Against Racism*, 491 U.S. 781, 799 (1989). The"fit" need not "necessarily [be] perfect, but reasonable," and represent "not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Fox*, 492 U.S. at 480. A regulation is valid so long as it does not burden "substantially more" activity "than is necessary to further the government's legitimate interests." *Id.* at 477-78. "Within those bounds," the Court is "loath to second-guess the Government's judgment" as to "what manner of regulation may be best employed." *Id.* at 478, 480. Lower courts are not to "sift[] through all the available or imagined alternative means of regulating [activity at issue] in order to determine whether the city's solution was the least intrusive means of achieving the desired end." *Ward*, 491 U.S. at 797.

Chicago satisfies the "close fit" requirement. By banning acquisition in the city, it closely tracks the ill it is designed to combat: criminal access to guns in the city. Chicago's goal would be achieved much less effectively if gun sales were allowed subject to regulation. The undisputed evidence shows that even a federal regulatory bureaucracy devoted to the task does not stem gun diversions to criminals. And there is no basis for thinking that private and dispersed person-to-person transactions could be regulated any more effectively than exchanges taking place at licensed, brick and mortar stores. For their part, Plaintiffs provide no evidence showing that allowing sales subject to regulation in Chicago could be implemented safely or would be anywhere near as effective as Chicago's restriction. And while the regulation does also cover sales to legitimate purchasers, the "fit" need not be perfect, and the regulation does not burden substantially more conduct than is necessary – indeed, as the undisputed evidence shows,

it does not burden acquisition by law-abiding residents at all.[14]

## III. Chicago's Restriction on Carrying Firearms Outside the Home Is Constitutional.

Perhaps a State sweeps too broadly when it bans, across all of its diverse environs, carrying firearms outside the home. But firearms have always presented great risk in densely-populated urban centers, and cities have been free for centuries to restrict their carry and use outside the home. This local prerogative is just as much a part of the original understanding of the Second Amendment as anything else. Plaintiffs' historical argument therefore misses the mark: Even if there were a general understanding reflected in treatises and the like that guns could be carried outside the home, Plaintiffs identify nothing rebutting the wealth of evidence showing that this general understanding did not apply in cities. Nor do Plaintiffs undermine Chicago's justifications for its carry restrictions.

### A. The Second Amendment does not protect carrying outside the home in Chicago.

#### 1. Cities have always been free to ban gun carrying and discharge outside the home.

The historical tradition of banning gun carrying or discharge in cities, both before and during the Framing, is well-documented. Def. Br. at 6-7 (discussing bans in London and English towns); *id.* at 7-9 (discussing bans in, *inter alia*, Philadelphia, Boston, New York City, New Orleans, Chicago, and Dodge City). *See also* Patrick Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. (forthcoming 2012), available at http://ssrn.com/abstract=1938950, ("*Faces*") at 13-17, 21-

---

[14] Plaintiffs also suggest that banning the most dangerous types of guns would be a less restrictive measure. Pl. Br. at 14. This gets Plaintiffs nowhere because the driver of Chicago's crime problem is handguns, SOF 3, items which, pursuant to *Heller*, cannot be banned.

24

24 (discussing carry bans in various English municipalities, including York and Newcastle).

Plaintiffs do little to rebut this tradition. They "question[]," in a footnote, the relevance of the English restrictions by arguing that these predate adoption of the English arms right in 1689. Pl. Br. at 30 n.13. But surely a restriction's vintage confirms rather than undermines its rooting in common understanding at the time a right is adopted. And Plaintiffs do not actually argue that these restrictions were inconsistent with, or superceded by, the English arms right. Indeed, examples abound of carry bans in English cities continuing after adoption of that right. *See* Charles, *Faces*, at 23-30.

Further, even if Plaintiffs were correct that English common law and the Statute of Northampton only banned carrying if it involved "dangerous and unusual weapons in a terrifying manner" – and they are wrong about this[15] – they ignore that, historically, a firearm was considered an inherently dangerous and terrifying weapon. *See, e.g.*, *King v. Hutchinson*, (1784) 168 Eng. Rep. 273, 274 n.a (C.C.R.) ("guns, pistols, daggers, and instruments of war" are "dangerous" and "offensive" weapons); Charles, *Faces*, at 27-30 (discussing *Sir John Knight's Case*). This was especially so in cities, where "common carrying," in and of itself, was

_____

[15] Carrying "dangerous and unusual Weapons, in such a Manner as will naturally cause a Terror to the People" actually constituted the common law offense of affray. 1 William Hawkins, Treatise of the Pleas of the Crown, ch. 63, § 4 (1716). And under the plain language of the Statute of Northampton, "bring[ing] force in affray" was a distinct offense from "go[ing] [or] rid[ing] armed." Def. Br. App. 33. *See also* 3 Coke, Institutes of the Law of England 160 (1797) (listing "affray" separately from going or riding "armed by night [or] by day"). While Plaintiffs cite Parker, Conductor Generalis 11 (1788) for the proposition that carrying arms was lawful unless "accompanied with such circumstances as are apt to terrify the people," Pl. Br. at 30 n.15, it is clear from the bracketed section heading on the treatise page that this discussion pertained to that part of the Statute of Northampton prohibiting carrying "In affray of the peace." Later on that page and continuing to page 12, Parker addressed the portion prohibiting "go[ing] [or] rid[ing] armed," which lends no support to Plaintiffs' argument.

considered to cause "the terrour of all people professing to travel and live peacably." Def. Br.

App. 38 (Proclamation of Elizabeth I (Dec. 2, 1594)) (discussing disorders caused by carrying

"especially in and about" London). Urban constables could therefore arrest not only persons who

went "arm[ed] offensively" and "in affray of Her Majesties Subjects," but also persons who

simply wore or carried "any Daggers, Guns or Pistols Charged." Def. Br. App. 44 (Gardiner, The

Compleat Constable 18 (3d ed. 1708)).[16] This understanding continued in America well past the

founding. In the mid-19th century, Joel Bishop, who Plaintiffs rely upon elsewhere, Pl. Br. at 23,

wrote, in a section titled "Deadly Weapons – Dangerous Weapons," that "a pistol may be

regarded as a dangerous weapon, even without proof of its having been loaded," and even when

it "is not pointed." 1 Joel Prentice Bishop, Commentaries on the Criminal Law § 198 (2d ed.

1858).

   As to the American tradition of banning discharge in cities, Plaintiffs venture that the

restrictions either would not have been enforced against a citizen acting in self-defense, or were

simply licensing regimes. Pl. Br. at 31. Plaintiffs cite no evidence that the restrictions were not

enforced in self-defense instances. *See also Heller*, 554 U.S. at 630 (declining to read self-

defense exception into District's requirement that firearms be kept inoperable at all times). And

if self-defense were an excuse, that would simply tighten the match between these historical

predecessors and Chicago's restriction, as Illinois provides an affirmative defense against a

---

   [16] Plaintiffs cite page 136 of Hawkins' treatise for the proposition that ordinary carrying was permissible. Pl. Br. at 29. But that page makes clear that this was a limited exception, applying only to "Persons of Quality" wearing arms "for their Ornament or Defence" in "such Places, and upon such Occasions" in which "it is the common Fashion" to do so. "Going armed in public was not a right, but an exception that most generally applied to men of nobility and their attendants." Charles, *Faces*, at 21.

municipal gun law violation when the gun is used in self-defense. Def. Br. at 38 n. 9 (citing 720 ILCS 5/24-10). Thus, under both regimes, discharge would be prohibited but could be excused in acts of self-defense; but this would not mean that citizens are free to carry.

Nor were the historical restrictions mere licensing regimes. Many of them contained no allowance for a license. Def. Br. App. at 81 (Boston), *id.* at 84 (New York); *id.* at 94 (Baltimore). Indeed, New Orleans banned discharge "on any account whatever." *Id.* at 87. And those jurisdictions that allowed licenses do not help Plaintiffs. For one, Plaintiffs identify no evidence that residents had a right to a license. And a benefit that "government officials may grant or deny [] in their discretion" cannot be evidence of a "protected entitlement" to engage in the activity. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Moreover, the laws do not support the idea that self-defense discharge was an activity for which a license would, or even could, be granted. The licenses amounted to "time, place, and manner" regulations, as they allowed for controlled discharged at pre-designated times and locations. *Ezell*, 651 F.3d at 705-06; Def. Br. App. at 96 (permitting discharge at a specific "time and place"); *id.* at 102 (license "shall limit the time of such firing"). As such, the licenses would not have authorized the kind of self-defense use Plaintiffs seek here, because one cannot know *ex ante* the time and place where one will need to discharge a gun in self-defense.[17] Nothing in *Ezell* indicates that these laws authorized an individualized, instantaneous decision to discharge in response to a perceived threat.

## 2. The arms right does not protect a right to carry outside the home.

---

[17] While Plaintiffs argue that the discharge bans allowed guns to be used in the sense of being brandished, Pl. Br. at 31, Plaintiffs do not seek a right to brandish; they seek a right to discharge. *See*, *e.g.*, SOF 19.

Even if cities enjoyed no special prerogative to regulate under the Second Amendment, Plaintiffs' challenge would still fail because the Amendment's scope does not encompass even a general right to carry firearms outside the home. Each of Plaintiffs' arguments to the contrary falls short.

First, Plaintiffs argue that the word "bear" would be meaningless if carry were not permitted outside the home. This assumes that the "carry" of a firearm can only take place outside the home, but the remedy *Heller* ordered was that Heller receive a license "to carry [his handgun] in the home." 554 U.S. at 635. Indeed, the work performed by the word "bear" is not to specify where arms may be carried, but to indicate that they may be used "for a particular purpose – confrontation" (*i.e.*, self-defense). *Id.* at 584. Without "bear," the Amendment would protect only the "keeping" of arms, which would not allow their use for self-defense, since to "keep" means only to "have." *Id.* at 582. Plaintiffs' argument simply begs the question whether the right to bear arms in self-defense extends beyond the home.

Next, Plaintiffs contend that a carry right must exist out of doors because the need for self-defense can arise there. Again, *Heller* has rejected this. The right to bear arms "is not unlimited," 554 U.S. at 626, and the fact that one can be attacked in a particular place is not enough to give rise to a carry right; people can undoubtedly be attacked in government buildings and schools, but "laws forbidding the carrying of firearms" those places are "presumptively lawful." *Id.* at 626-27 & n.26. Just as these "longstanding prohibitions" establish zones where Second Amendment protection does not exist, *id.* at 626, so too does the tradition of banning carry in cities.

Plaintiffs also cite sources discussing carrying outside the home for purposes other than

28

self-defense, such "assistance of the civil magistrate in the execution of the laws, and the defence

of the kingdom against foreign invaders." Pl. Br. at 26. By definition, these cannot establish the

existence of a right to carry for self-defense. Relatedly, Plaintiffs argue that limiting carry to the

home would defeat the militia-protecting purpose behind the Amendment. *Id.* at 28. But this

case is not about the militia, and, in any event, Plaintiffs cite nothing showing that Chicago's law

impedes Illinois militia training, or that Chicago would enforce it against a duly-constituted State

militia. Indeed, many of the early-American restrictions on carry or discharge expressly

exempted militia activity from their scope. *See* Def. Br. App. at 81 (Boston); *id.* at 87 (New

Orleans); *id.* at 94 (Baltimore); *id* at 100 (New Haven).

> **B.      Chicago's restriction does not implicate Plaintiffs' "homes."**

Trying to shoehorn this carrying case into the bounds of *Heller*, Plaintiffs argue that

Chicago's carry restriction infringes the right to arms in the home. But their historical evidence

is inapt, because it addresses the parcels or structures that could serve as the basis of a burglary

or arson charge. *See* 3 Wilson, Works of the Honorable James Wilson 62 (1804) (arson

encompasses "the outhouses; as the barn, the stable, the cow house, the dairy house, the mill

house, the sheep house"); *id.* at 64 (burglary "can be committed" in "the outhouses adjoining to

the principal house"); 1 Bishop, Commentaries on the Criminal Law § 173 (2d ed. 1858) ("In

arson, as in burglary, the word house extends . . . not only to the very dwelling-house, but to all

outhouses which are parcel thereof"); 4 Blackstone Commentaries Ch. 16. These sources do not

establish that a right of armed self-defense existed in those places. Indeed, when it came to self-

defense, the right was limited to the dwelling unit itself: It was "while a man keeps the doors of

his house closed" that he "within the house may exercise all needful force to keep the aggressor

29

out, even to the taking of his life." 2 Bishop, Commentaries on the Criminal Law § 569 (2d ed. 1858). This is also consistent with the historical duty to retreat from an attack "as far as [one] conveniently or safely can, to avoid the violence of the assault, before he turns upon his assailant." 4 Blackstone Commentaries, at *184-85. The right to use deadly force in self defense did not exist in the spaces outside the dwelling unit because one could retreat from them into the home. Only once inside the home – where the owner could retreat no further – did the right to "stand one's ground" arise.[18]

### C. Chicago's restriction satisfies intermediate scrutiny.

Even if the Amendment encompasses carrying outside the four-corners of the home, the Court should still sustain Chicago's restriction because it is justified by substantial, even compelling, government interests. Among other things, the restriction helps deter gun carrying by gangs, allows the police to take immediate action against those gang members (and other criminals) who do carry, and eliminates the risk posed by even law-abiding citizens discharging guns in the squeezed neighborhoods of Chicago. Plaintiffs fail to create any serious dispute as to the ample factual record supporting all of these rationales. On the flip side, there is no evidence that any Plaintiff is unable to defend themself through use of another weapon, flight, or calling the police if they cannot carry a gun outside the home.

### 1. Combating gang and criminal violence.

Plaintiffs cite no evidence showing that the deterrent on carrying by gang members and

---

[18] Plaintiffs note that Fourth Amendment protections can extend outside the four corners of the home, Pl. Br. at 23 n.9, but that body of law is inapplicable here. The right to be free from unwarranted governmental intrusion onto one's land has little to teach about whether one has a right to inflict violence, or the risk of violence, upon others when on that land.

30

criminals (*see* Def. Br. at 17-18) is "minimal." Pl. Br. at 34. Plaintiffs instead cite the obvious: Chicago gangs engage in violence, rely on firearms, and have "unusual access and incentive" to use guns. *Id*. Far from helping Plaintiffs, this shows why Chicago's restriction is critical: A bulwark is required to combat what is otherwise a strong inclination by gang members to carry. Chicago's evidence shows that vigorous enforcement of carrying restrictions through targeted policing provides precisely this: It yields significant drops in violent crime through its deterrent effect. SOF 23-25; Def. Br. at 17.

Chicago's restriction is also critical against gang members who are not deterred: It allows police officers to arrest and remove the gun-carrying criminal *before* he commits a violent crime, a benefit that would be lost if gang members could legally carry guns. Def. Br. at 18-20. Plaintiffs point to no evidence showing that this benefit is neither real nor substantial. Plaintiffs instead argue, with no evidence, that it is "implausible" to think that gang members either could qualify for, or would bother to go through the steps necessary, to get a CFP. Pl. Br. at 34-36. As to whether a gang member *could* qualify, Plaintiffs do not point to any evidence contradicting Chief Williams and Commander Gorman's testimony – based on decades of police experience – that many Chicago gang members and affiliates lack the kind of criminal record that would disqualify them. *See* D-RSOF 27. And while Plaintiffs quibble with how to characterize Dr. Cook's study showing a lack of criminal history in Illinois homicide arrestees, Pl. Br. at 36, they offer no study that refutes Dr. Cook's findings.

As to whether gang members *would* seek a CFP, it is surely true that some would not. But Chicago's evidence that some would stands unrebutted. Indeed, Dr. Kleck admits that, under a permitting regime, "some criminals will be able to carry guns." RSOF 29-B. And evidence

31

from other jurisdictions confirms that criminals do seek gun permits. For instance, in Miami, gangs "have learned how to structure their crews so that at least one of them can be legally armed," and when police encounter a situation where "one guy holds the gun, another guy holds the dope, and a third guy drives . . . there is nothing [the police] can do about it" because the gun carrier "has no convictions." D-RSOF 21. And Philadelphia, like Chicago, requires applicants to appear in person at the police department, be photographed, and be fingerprinted. D-RSOF 21. Yet Philadelphia criminals persist in applying for carry permits. *Id.*

More fundamentally, Plaintiffs ignore that, even if few gang members currently seek a CFP, their incentives would change if carry became legal. Right now, a CFP does little good for a gang member wanting to ply his trade out-of-doors (which is where most gang and drug activity takes place) because firearms can only be lawfully possessed in the home.[19] If, however, gang members could lawfully take their guns into the outdoor spaces adjacent to the home that are effectively "public," they would have a powerful new incentive to seek a CFP and registration permit, due to the immunity from arrest they would provide.

### 2. Reducing overall gun violence, including by law-abiding residents.

In the compact and dense neighborhoods of Chicago, residents stand in close quarters to both neighbors and strangers. This presents significantly more opportunities for heated confrontation than arise in suburban and rural towns. Adding guns to this mix in Chicago would only increase the risk of intentional and accidental gun death and injury, based on the increased lethality of guns over other weapons. Def. Br. at 15-17. Dr. Cook cites evidence showing that

---

[19] It is therefore no surprise that Chicago's witnesses could not recall specific instances of crimes committed with lawfully-possessed weapons. For decades, the only weapons that have been lawful to carry are those kept inside the home.

increased gun prevalence leads to an increase in the homicide rate, even if it does not increase the overall violent crime rate; this results from some robberies and assaults being "converted" into homicides as a result of a gun being used rather than some other weapon. SOF 15 & 17. Plaintiffs relegate this fact to a footnote, even though the Seventh Circuit has endorsed it as a basis for a ban on possession even in the home, *see Skoien*, 614 F.3d at 642, and even though Dr. Kleck agrees that guns are more lethal than other weapons. D-RSOF 15-C.[20]

Again eschewing the realities of life in Chicago, Plaintiffs invoke studies of increased gun carrying in other states, which they argue show that Chicago's restrictions have no benefits. Pl. Br. at 32-33. These state studies say little about how safety would be impacted in a large city like Chicago, because they measured increases in gun carrying that take place largely outside of cities. While Dr. Cook did write – in an article canvassing the general post-*Heller* landscape – that these studies generally predict "relatively little public safety impact" from increased carrying, Pl. Br. at 32, he noted in the very same article that "the change in gun carrying" observed in the studies "appears to be concentrated in rural and suburban areas where crime rates are already relatively low, among people who are at relatively low risk of victimization – white, middle-aged, middle-class males." RAF 15.[21] And Dr. Kleck explains that "[m]ost people . . .

---

[20] Plaintiffs appear to criticize Dr. Cook's reliance on lethality studies that did not purport to control for an attacker's intent to kill. Pl. Br. at 34 n.17. If so, that would be unwarranted, for Dr. Kleck believes that intent is "an issue we'll never really have solid evidence on." RSOF 15-B. *See also* RSOF 15-A.

[21] Indeed, relatively few permits are issued in large cities in states that permit gun carrying. RAF 15. For instance, as of September 2011, there were 32,666 total active civilian carry permits in California, but only 220 of those were in Los Angeles and 716 were in San Diego. *Id.* Thus, only 2.8% of active California permits holders resided in those two cities, even though 35% of California's adult population lives in those two cities. *Id.* Further, less than one one-hundredth of a percent of Los Angeles and San Diego adults have carry permits. *Id.*

tend to associate gun ownership with urban areas, high crime areas and so on. But gun ownership is, in fact, higher in areas that have very little violence, rural areas and small towns" – places where ownership is "for reasons that aren't very crime related, either committing crimes or defending against crimes." *Id.* "So the gun culture appears to be concentrated precisely in those places where there isn't much dangerous use of firearms, where it's recreational or relatively inconsequential from a violence standpoint, either violence causing or violence preventing." *Id.* In short, these studies largely examined a phenomenon occurring in areas that bear no resemblance to Chicago, and, for that reason, they hardly show that increased permitted carrying in Chicago would pose no risk.[22] Plaintiffs have no evidence undercutting Chicago's evidence that, in Chicago, carrying outside the home is simply too dangerous.

### 3.    Reducing gun theft.

Confining carry to the inside of the home also reduces the opportunities for criminals to steal guns from carriers in places like garages, yards, and stairwells. Plaintiffs' only argument here is that, to support this rationale, Chicago must show that gun thefts outside the home are more likely than indoors. Pl. Br. at 37. They cite no authority for this notion, and it is enough that Chicago has shown that the risk exists. Def. Br. at 21.

### D.    Chicago's restriction satisfies *Ezell* scrutiny.

Even under more heightened scrutiny, Chicago's restriction bears a "close fit" to the problems it seeks to address. Chicago need not adopt a permitting regime simply because it is less restrictive. *See supra*, at 22-23. A complete ban, even if somewhat overinclusive, is valid so

---

[22]  Relatedly, since most existing permit holders do not live in large cities, it is irrelevant that existing permit holders may be disproportionately unlikely to misuse guns or commit accidents (although Chicago disputes this proposition, *see* RAF 15 & 26).

long as the benefits it targets "would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. That is certainly the case here.

As to targeting gangs and criminals, Plaintiffs note that studies have shown that targeted policing is effective in cities that allow some form of carry with a permit. But they do not show that those benefits are just as good as those flowing from a ban. Indeed, a ban is superior, for at least two reasons. First, under a permit system, police would be unable to arrest gun-carrying gang members who have a permit, and gang members would abuse that right. Def. Br. at 18-19. Second, the ability of police to preventively interdict even those who lack a permit is undercut by a permit system. This is because, when carrying is completely banned, the mere act of carrying creates probable cause to arrest (since carrying is a crime). Accordingly, police officers can immediately apprehend the gang member, confiscate the gun, and/or complete an arrest, all before a gun crime occurs, and all without having to worry about whether the carrier has a permit. Where carrying is allowed with a permit, however, the mere act of carrying may not be enough to create probable cause; the officer may also need a basis to believe that the person lacks a permit before having probable cause to believe that a crime has been committed. This gravely complicates the officer-carrier interaction; after spotting a carrier, the officer would need to try to sort out whether the carrier has a permit, which would allow the carrier valuable time to flee or threaten the officer. The officer is safer, and the interdiction more effective, when he can immediately apprehend the carrier, no questions asked. Indeed, where carry with a permit is allowed, the officer may lack even the reasonable suspicion that would allow him to at least stop-and-frisk under *Terry v. Ohio*, 392 U.S. 1 (1968). *See, e.g.*, *United States v. Ubiles*, 224 F.3d 213, 217-18 (3d Cir. 2000) (officers' suspicion that defendant had gun in crowded street festival

35

was not a reason to believe criminal activity was afoot, since possession was lawful if gun was registered, and "authorities here had no reason to know that Ubiles's gun was unregistered"); *Commonwealth v. Couture*, 552 N.E.2d 538, 541 (Mass. 1990) ("mere possession of a handgun was not sufficient to give rise to a reasonable suspicion that the defendant was illegally carrying that gun [without a license]"). That stop-and-frisk authority is itself critical to preventing urban gun violence before it occurs. *See* Rosenthal, *Second Amendment Plumbing After Heller: Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, and Criminal Street Gangs*, 41 Urb. Lawyer 1, 30-44 (2009) (discussing stop-and-frisk's effectiveness against criminal carrying in New York City). While some form of targeted policing may be possible where permits are allowed, Chicago's singular gun and gang problem demands that it be able to take advantage of every incremental policing benefit afforded by a complete ban.

Finally, as to preventing gun violence by "law-abiding" residents, a permit system is less effective than a ban because it is underinclusive: It does not screen out everyone who will eventually commit a violent crime with a gun since many applicants lack a disqualifying criminal history. Def. Br. at 19; SOF 29. Recent evidence shows that another disqualifying factor – intellectual disability – is not likely to bar most applicants, because the Illinois FOID system largely fails to screen for this. As a recent report by the Illinois Auditor General found:

- "There are significant deficiencies in the reporting of individuals with potentially disqualifying mental health conditions to [the Illinois State Police]."

- "During 2010, only 3 of the 102 circuit court clerks (3%) submitted mental health court orders to ISP as required by the Act."

- "As a result, ISP did not receive the information needed from the circuit court

clerks to revoke or deny FOID cards."

- "Unless reported by another source . . . individuals from those counties could receive or continue to hold a valid FOID card and could use it to purchase firearms and ammunition."

D-ROSF 27. The audit concluded that, due in part to these problems, "[t]he effectiveness of the Illinois FOID card program operated by the ISP is limited in promoting and protecting the safety of the public." *Id.* Chicago's interest in reducing violence from would-be gun abusers is achieved most effectively when all residents are precluded from carrying. The same can be said as to Chicago's interest in reducing gun theft. Theft risk is best minimized by a ban, because that reduces the number of guns that would be available to be stolen outside the home.

With all of this in mind, *Woolard*, far from aiding Plaintiffs, shows precisely why Chicago's ban is well-tailored. *Woolard* faulted a law requiring carry permit applicants to demonstrate a "good and substantial reason," because the law "does no more to combat" public safety threats "than would a law indiscriminately limiting the issuance of a permit to every tenth applicant." 2012 WL 695674 at *11. It "will not prevent those who meet it from having their guns taken from them, or from accidentally shooting themselves or others, or from suddenly turning to a life of crime." *Id.* "If anything," the law "puts firearms in the hands of those *most* likely to use them in a violent situation by limiting the issuance of permits to groups of individuals who are at greater risk than others of being the victims of crime." *Id.* It is precisely to close these holes, and best align Chicago's public safety goals with its regulatory policy, that a complete restriction is required. *See Ezell*, 651 F.3d at 714 (Rovner, J., concurring) ("public safety was a paramount value to our ancestors, a value that, in some circumstances, trumped the

37

Second Amendment right to discharge a firearm in a particular place").

  **E. Chicago's restriction on handguns in a place of business is constitutional.**

  Because there is no right to firearms outside the home, there can be no right to possess a handgun (or any gun) in a place of business. And even if a right to firearms in the workplace did exist, Chicago's restriction would not infringe it. This is because long guns are allowed, and Plaintiffs fail to show that long guns are insufficient for effective self-defense with firearms. Plaintiffs' only response is to invoke *Heller*, but it does not control here. Handguns are protected in the home under *Heller* not because they are empirically superior to long guns, but because they are "the most popular" weapon chosen for defense in the sanctity of the home, a place that has always enjoyed special protection under the Constitution (*see* Amend. IV), and where the need for self-defense "is most acute." 554 U.S. at 628. Outside the home, Chicago's interest in protecting public safety holds much more sway, *see* Def. Br. at 10-11, and it should be free to restrict handguns there, especially when there is no evidence that the restriction burdens self-defense.

  The restriction also rests on sound justifications. Indeed, although they quibble over the reason why, Plaintiffs admit that "there are relatively more accidents with short guns than with long guns." RSOF 43-A. And handguns – which are the tool in more than 95% of violent firearm crime in Chicago, SOF 3 – are clearly more prone to criminal use in the workplace than a long gun. SOF 44. Far from illustrating that other of Chicago's restrictions are overbroad, the allowance of long guns reflects appropriate tailoring (which, again, need not be perfect) based on evidence that handguns are much more likely to be abused.

### F.    Chicago's restriction on firearms in the home of another is constitutional.

Since a friend's home is outside one's own home, the lack of a right to carry outside one's home means that there is no right to carry in the friend's home. Even if that right did exist, Plaintiffs fail to identify any burden imposed by Chicago's regulation. There is no evidence that the friend would be unable to, using his own weapons, protect Plaintiffs.

As to the bases for Chicago's restriction, Plaintiffs rest primarily on their attacks to Chicago's safe storage regulations. Those attacks have no merit, and adding additional operational firearms to another's home poses serious safety risks. Def. Br. at 22, 41-43. Nor have Plaintiffs provided evidence disputing or contradicting the experience-based testimony of Chief Williams that a right to bring guns into the home of another would be roundly abused in Chicago. SOF 138 & 139.

Plaintiffs also fail to the extent that they challenge the restriction as prohibiting them from inviting friends to their own home. For one, Plaintiffs do not demonstrate that this is part of the *Heller* right. Nothing in *Heller* suggests that a resident has a right to armed assistance from others, and Plaintiffs' historical sources establish no more than that one could gather others in his home for self-defense – not that these guests could bring firearms. Further, Plaintiffs lack standing to assert such a claim. They assert no interest in having people over to assist in their own self-defense. Hall does not assert a desire to invite guests with a gun to his home at all, *see* Pl. Ex. 1 (Hall Dec.), ¶ 6 ("I would sometimes possess a firearm as a guest on another person's property"), and Tyler and Pacholski, while asserting that they would invite guests who have guns, do not assert that it would be for assisting either of them in self-defense. Pl. Ex. 41 (Tyler Dec.) (would invite friend to bring newly-acquired weapon to Tyler's house to "look[] at" and "show"

39

firearm; would invite a housesitter with a gun to watch their dogs when Tyler and Pacholski are out of town); Pl. Ex. 42 (Pacholski Dec.), ¶ 8 (would invite a housesitter with a gun to watch their dogs when Tyler and Pacholski are out of town). And, in any event, the restriction would be justified based on the same harms discussed above regarding additional operable arms in any home.

## IV.     Chicago's Safe Storage Regulation Is Constitutional.

Plaintiffs have no response to Chicago's demonstration that, as historically understood, laws regulating the storage of firearms do not fall within the Second Amendment's scope. For this reason alone, Chicago's regulation should be sustained.

And even if storage is protected by the Amendment, Chicago satisfies means-end scrutiny.

### A.     The regulation does not pose an undue burden.

Plaintiffs cite no evidence showing that requiring additional guns to be safely stored when a resident remains free to have an operable firearm on their person or nearby at all times places a significant burden on the ability to defend oneself in the home. Their speculation that the safe storage formats required by Chicago may compromise self defense is based on no data or analysis. D-RSOF 113. Nor do they cite evidence showing that any Plaintiff is compromised in their self defense by storing their additional guns using trigger locks, which require just a few seconds to unlock.[23] Indeed, far from posing a constitutional problem, safe storage is touted by the industry, and Plaintiffs use trigger locks even on the firearms that they are not required to

---

[23] Plaintiffs argue that the unlocking times reported by Chicago would not hold in the case of a real threat, but they cite no evidence demonstrating this or otherwise contradicting the times. D-RSOF 109.

secure (as does Dr. Kleck). Def. Br. at 39-40, 42-43. Plaintiffs also speculate that, for someone wishing to operationalize a second firearm, the affirmative defense provided by Illinois law would not be available until just before defensive force is justified. But they cite no support for this, either, and, in any event, it does not matter: The record shows that having one always-ready firearm is sufficient, by itself, for self-defense. Def. Br. at 37-38.

**B.      The regulation satisfies more rigorous scrutiny.**

**1.      Reducing gun acquisition by criminals.**

Try as they might, Plaintiffs cannot escape Dr. Kleck's testimony that reducing theft is "probably the strongest rationale for keeping guns stored in a secure manner" since "most gun criminals acquire their guns directly or indirectly as a result of theft." D-RSOF 118. Plaintiffs now contend that, due to the saturation of the local illegal gun market, Chicago's regulation at most marginally reduces an oversupply of guns, but they are wrong in their premise: Half a million guns are stolen each year, the Chicago market is far from saturated, and, as Dr. Kleck teaches, even criminals who already have a gun will steal additional ones to either sell or upgrade their arsenal. D-RSOF 119-B. And even if criminals have no special incentive to start casing Chicago homes, the regulation prevents those criminals who do enter a home from acquiring operable guns.

Plaintiffs also argue that there is no evidence that the regulation has reduced gun theft. That evidence is unnecessary because both sides' experts support this rationale for the regulation. Dr. Cook's research (which Plaintiffs fail to impugn, *see* D-RSOF 119) shows that burglary rates rise when gun prevalence rises, which he attributes to guns being attractive loot to criminals. And Dr. Kleck testified that it is "reasonable" to believe that trigger locks deter gun theft,

because it is "very hard" to remove a trigger lock from a stolen gun; he has never heard of a criminal who has successfully done so. SOF 118-D.

### 2. Reducing the risk of suicide, homicide, and accidental firearm death.

Dr. Kleck's testimony alone seals this point for Chicago: He admits that trigger locks "have a safety benefit" and "prevent unauthorized use." RSOF 125. He further agrees that "[e]ven a few gun accident deaths are worth preventing." RAF 25. If more were needed (and it is not), reams of academic research, as well as Dr. Webster's expert opinion, permit a reasonable conclusion that limiting the number of operable guns in the home – even if one gun remains operable – reduces the risk of suicide, homicide, and accidental injury. Def. Br. at 41-42. Plaintiffs criticize these studies, but their critiques simply note limitations common in this field of research, and the studies remain a suitable basis for forming gun policy. D-ROSF 122, 123, 126. Further, as to suicide in particular, a panel of prominent scholars disagrees with the NRC and concludes that "the accumulated evidence supports a causal relationship between firearms availability and suicide. The magnitude of the statistical associations between firearm availability and suicide, the consistency of findings over multiple studies in different populations, and the reality that a firearm greatly increases the risk that a suicide attempt will be lethal, all point to a causal connection." RAF 30. Because suicide is the leading cause of firearm death, SOF 9, a regulation that reduces suicides goes a long way in enhancing public safety.

Plaintiffs also cannot evade the industry's touting of safe storage's effectiveness. Def. Br. at 42-43. Industry statements that a gun may need to be available for quick use are entirely consistent with Chicago's regulation (which allows this) as well as with the industry's recommendation that guns should otherwise be safely stored. The NSSF would not freely

42

distribute 35 million locking devices if safe storage did not work.  SOF 131.

### 3.    Reducing threats to first responders.

Plaintiffs cite no evidence undermining the common-sense notion (and one backed by the years of experience of Chicago's first responders, SOF 134-136) that the fewer operable firearms there are at a scene, the fewer threats to first responders exist.  Plaintiffs instead criticize Chicago for failing to identify specific instances where first responders have been injured by lawfully-possessed firearms in the home, but, in the end, they admit that Chicago first responders have been harmed by guns kept in the home.  RSOF 134-B.  Plaintiffs also spin vague testimony from Chicago's paramedic witness about the impact of the ordinance, but they cannot dispute that this same witness very clearly established that if a firearm is secured in the home, it does not present a threat to scene safety, and that scene safety is enhanced by reducing the number of operable firearms at the scene.  SOF 136.

### 4.    The regulation is appropriately tailored.

When the ill sought to be remedied is harm from operable guns, a regulation must necessarily require that they be inoperable.  Indeed, Plaintiffs make no argument that the regulation strikes too broadly in combating firearm death and injury, or first responder safety.  Their tailoring argument is that, as to reducing gun theft, the regulation is underinclusive because it allows guns to be broken down, rather than trigger locked.  This does not doom the regulation, since the fit need not be perfect, but merely reasonable.  And it is reasonable to believe that most guns will be secured via trigger locking rather than via being broken down; indeed, all Plaintiffs use trigger locks on their additional guns; none break their guns down.  SOF 103 & 105; Pl. Ex. 41, ¶ 4.  Plaintiffs also contend that the regulation is overinclusive to the extent that a gun kept in

a locked safe needs to also be inoperable.  Pl. Br. at 40.  But, as the ordinance does not require guns to be kept in a safe, Plaintiffs cannot lay that choice at Chicago's feet.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, and those stated in Chicago's Memorandum In Support of Its Motion for Summary Judgment, Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment, grant Defendants' motion for summary judgment, and enter judgment in favor of Defendants and against Plaintiffs on all claims.


Dated: June 29, 2012                                    Respectfully submitted,

                                                        STEPHEN R. PATTON
                                                        CORPORATION COUNSEL
                                                        CITY OF CHICAGO


                                               BY:     /s/ Andrew Worseck
                                                        One of Its Attorneys

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William M. Aguiar
Rebecca Alfert Hirsch
Constitutional & Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, IL 60602
(312) 744-9010