IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS ASSOCIATION OF FIREARMS )
RETAILERS, KENNETH PACHOLSKI, )
KATHRYN TYLER, and MICHAEL HALL, )
                                              )     No.10 CV 4184
              Plaintiffs, )
                                              )     Judge Edmond E. Chang
     v.                       )
                                              ) Magistrate Judge Geraldine Soat Brown
THE CITY OF CHICAGO and )
RICHARD M. DALEY, Mayor of the )
City of Chicago, )
                                              )
           Defendants. )

**DEFENDANTS' (1) REPLY TO PLAINTIFFS' STATEMENT OF ADDITIONAL
FACTS, AND (2) REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' LOCAL
RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS**

      Pursuant to Local Rule 56.1(a), Defendants City of Chicago and Rahm Emanuel

(collectively, "Defendants"), by their counsel, Stephen R. Patton, Corporation Counsel of the

City of Chicago, hereby submit their Reply to Plaintiffs' Statement of Additional Facts Requiring

the Denial of Summary Judgment ("Plaintiffs' Statement of Additional Facts"). This Reply

begins on page 236 of this document.

      This document also contains Defendants' replies to Plaintiffs' responses to Defendants'

Statement of Material Facts ("Plaintiffs' Response Statement"). Defendants' replies are

contained on pages 3 through 236 of this document. These replies are appropriate for two

reasons.

      First, it is Plaintiffs' Response Statement that, by and large: (a) contains the facts

Plaintiffs proffer in support of their own motion for summary judgment and (b) contains the

"additional facts" Plaintiffs proffer to dispute Defendants' Statement of Facts.[1]  For instance,

Plaintiffs often admit that a study cited by Defendants found what Defendants say it found, but

then go on to offer additional facts showing why, in Plaintiffs' view, the study is unreliable or

irrelevant.  This is improper.  "Although Plaintiff is entitled to submit new factual material in his

statement of additional facts, injecting such facts into his responses is inappropriate." *Kasak v.*

*Village of Bedford Park*, 563 F. Supp.2d 864, 868 (N.D. Ill. 2008).  *See also ExxonMobil Oil*

*Corp. v. Amex Const. Co, Inc.*, 702 F. Supp.2d 942, 958 n.5 (N.D. Ill. 2010) (disregarding party's

"additional factual statements [in response to defendant's statement] as they are not set forth in a

Statement of Additional Undisputed facts as required by Local Rule 56.1(b)(3)(c)").  Thus, in

order to give effect to Local Rule 56.1(a)'s allowance that "[i]f additional material facts are

submitted by the opposing party . . .  the moving party may submit a concise reply in the form

prescribed in that section for a response," Defendants respectfully submit that these replies are

necessary.

Second, most of the paragraphs in Plaintiffs' Response Statement:  (a) fail to proffer facts

creating a dispute with Defendants' asserted facts, (b) improperly engage in argument about the

meaning or relevance of Defendants' facts, and/or (c) proffer facts that do not meet the substance

of the facts asserted by Defendants.  This too is improper.  "Opinion, suggested inferences, legal

arguments, and conclusions are not the proper subject matter of a [Local Rule 56.1] statement.

Including legal arguments . . . is wholly improper, redundant, unpersuasive and irksome; in short,

---

[1]  To be sure, Plaintiffs have filed an independent Local Rule 56.1(a)(3) Statement of
Material Facts ("Plaintiffs' Statement of Facts") in support of their own motion.  But their
memorandum does not cite a single paragraph from that statement.  Further, Plaintiffs'
memorandum cites only 14 of the 34 paragraphs in Plaintiffs' Statement of Additional Facts.

it advances neither the interests of the parties nor of th[e] court." *Phillips v. Quality Terminal Servs., LLC.*, __ F.Supp.2d __, 2012 WL 669054, *2 (N.D. Ill. Feb. 29, 2012). Defendants therefore use their replies to identify these shortcomings for the convenience of the Court.

The following citation forms are used in this document:

| | |
|---|---|
| Defendants' Statement of Material Facts: | SOF |
| Plaintiffs' Response to SOF: | RSOF |
| Defendants' Reply to RSOF: | D-RSOF |
| Plaintiffs' Statement of Additional Facts: | AF |
| Defendants' Reply to AF: | RAF |
| Defendants' Exhibits: | Def. Ex.[2] |
| Plaintiffs' Exhibits: | Pl. Ex. |

**DEFENDANTS' REPLY TO FACTS ASSERTED IN PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS**

1. Plaintiff Kathryn Tyler ("Tyler") resides at 2620 West Jerome Street in Chicago with her husband, Plaintiff Kenneth Pacholski ("Pacholski"). Exhibit 1 (Deposition of Kathryn Tyler) at 51-2, 7:15-18, 1424-15:5; Exhibit 2 (Deposition of Kenneth Pacholski) at 1416-22, 15:4-20. Plaintiff Michael Hall ("Hall") resides at 11254 South Bell Avenue in Chicago with his wife and two children, one of whom is under 17 years old. Exhibit 3 (December 14, 2010 Deposition of Michael Hall) at 5:2-5, 20:22-2115; Exhibit 4 (May 27, 2011 Deposition of Michael Hall) at 34:7-22. Plaintiff Illinois Association of Firearms Retailers ("ILAFR") is an

---

[2] Defendants' Exhibits 1 - 90 were previously filed with Defendants' March 2 summary judgment submission. Defendants' Exhibits 91 - 110 are being filed as exhibits to the instant document.

organization existing under the laws of Illinois and represents firearm retailers and the retail

firearms industry in Illinois.  Exhibit 5 (Deposition of Whitney O'Daniel) at 21:13-18; Exhibit 6

(Plaintiffs' Second Amended Complaint), ¶ 4.  The City of Chicago is a municipal corporation

existing under the laws of Illinois. Rahm Emanuel is the Mayor of Chicago.

**PLAINTIFFS' RESPONSE**: Admitted, except dispute that two of Plaintiff Michael Hall's

children live with him.  While that was true at the time of his deposition, currently only one of

his children live with him.  That child is 16 years old.  *See* Exhibit 1 (Hall Decl.)  ¶ 2.

**DEFENDANTS' REPLY**: None.

2.      Plaintiffs' Second Amendment Complaint seeks redress for alleged violations of

the Second and Fourteenth Amendments to the United States Constitution.  This court has

jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  Venue is proper

under 28 U.S.C. § 1391(b) because Defendants reside in this district and a substantial part of the

events giving rise to the Plaintiffs' claims occurred in this district.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

3.      In 2010, there were:

a.      436 reported murders in Chicago; 81% (353) were committed with a

firearm. Of those committed with a firearm, 348 (99%) were committed

with a handgun.

b.      14,271 reported robberies in Chicago; 38% (5,371) were committed with a

firearm.  Of those committed with a firearm, 98% (5,275) were committed

with a handgun.

      c.      5,060 reported aggravated assaults; 44% (2,216) were committed with a firearm. Of those committed with a firearm, 96% (2,123) were committed with a handgun.

      d.      9,409 reported aggravated batteries; 20% (1,860) were committed with a firearm. Of those committed with a firearm, 97% (1,812) were committed with a handgun.  Exhibit 7 (Affidavit of Timothy Lavery), ¶ 2.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

4.      In 2009, Chicago had the second-highest murder and non-negligent manslaughter rate (16.1 per 100,000 residents) of the 10 U.S. cities with the largest population. Exhibit 8 (Uniform Crime Reporting Statistics - 10 cities).  That rate was nearly double that of Los Angeles (8.1) and nearly triple that of New York City (5.6), the two cities with a higher population than Chicago.  *Id.*  It was also more than three times the national average (5.0). Exhibit 9 (Uniform Crime Reporting Statistics - Nation).

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

5.      Joseph Gorman has been a sworn member of the Chicago Police Department ("CPD") for over 25 years and is the Commander of the CPD's Gang Investigations Unit. Exhibit 10 (Affidavit of Joseph Gorman), ¶¶ 2-16, 31.  He testified that street gangs are a form of urban terrorism in Chicago and that gang violence spearheads violent crime in Chicago.  *Id.*, ¶ 30.  In 2010, 59% of Chicago murders were gang-involved, meaning that the murder was gang related or that the victim and/or offender was a gang member.  Exhibit 11 (January - December

2010 Chicago Crime Summary) at 2. Approximately 55-60% of Chicago shootings are gang related. Exhibit 10, ¶ 27.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

6.      Chicago has at least 80 different street gangs, which operate in different neighborhoods throughout Chicago. *Id.* ¶ 19. There are between 80,000 and 100,000 known members of those gangs. *Id.*, ¶ 21. That number does not include the many gang associates and affiliates who, while not members themselves, assist or facilitate criminal conduct by gang members. *Id.* Most Chicago gangs are subdivided into factions. *Id.*, ¶ 19. There are over 300 different gang factions within Chicago. *Id.* Each gang, and even many gang factions, has its own name and symbols, a hierarchy, a geographic territory ("turf"), a code of conduct, and an organized, continuous course of criminal activity. *Id.*, ¶ 20. Gang members routinely use violence and intimidation to advance their criminal interests, and they rely heavily on the use of firearms. *Id.*, ¶ 25. Handguns, rather than long guns, are predominantly used by gang members because they are easily concealed and readily accessible. *Id.*

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

7.      Gang factions arose, in some part, from the demolition of Chicago public housing projects such as the Robert Taylor Homes by 2007 and Cabrini-Green by 2011. *Id.*, ¶ 19. Gangs based in those residences were forced to relocate, in many instances moving to neighborhoods where rival gangs had been long-established. *Id.* This relocation disrupted the structure and hierarchy of these gangs; groups of relocated gang members split off into their own factions and

6

now often operate within a street or a block of another faction. *Id.* This destabilization of the gang structure in Chicago has fomented violent interactions not only between gangs, but also between factions of the same gang, as leaders try to expand or protect their turf. *Id.*

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

8.     A U.S. Department of Justice study of 22 cities indicates that Chicago and Los Angeles "have unusually high rates of gang membership" and "are outliers ... with respect to gang activity." Exhibit 12 (Philip J. Cook, et al., Underground Gun Markets, The Economic Journal, 117 (2007)), at F573, F576.  Around 20% of arrestees in these two cities reported membership in a gang at the time of their arrest, which is "about eight times the median value [in the study] and about twice as high as the rate reported in the next-highest city, Birmingham." *Id.* at F576.  In addition, 45% of Chicago arrestees, and 34% of Los Angeles arrestees, reported having been in a gang at some point; the next highest rate (Birmingham) was 20%. *Id.* at F577 (Table 4).  Gangs have operated within Chicago for decades and are well-entrenched criminal enterprises.  Exhibit 10, ¶ 22.  It is not uncommon for multiple generations of a family to be members of the same gang. *Id.*

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

9.     In 2007, there were 31,224 firearms deaths in the U.S., 12,632 of which were homicides and 17,352 of which were suicides.  Exhibit 13 (Declaration of Philip J. Cook), Exhibit A thereto, at 3.  Of the 536 law enforcement officers feloniously killed nationally between 2000-2009, 490 (91 %) were assaulted with a firearm. *Id.* at 4.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

10.     Dr. Philip J. Cook is the ITT/Sanford Professor of Public Policy, Professor of

Economics and Sociology, and Senior Associate Dean of the Sanford School of Public Policy at

Duke University. Exhibit 13, ¶ 1.  He has studied firearm violence since 1975 and has published

scholarly books and articles on a number of related topics, including the economic costs of gun

violence, the illicit markets for guns, the consequences of weapon choice in robbery and assault,

the influence of gun availability on gun use in crime, the use of guns in self-defense, and the

effectiveness of gun control regulations.  *Id.*, Exhibit A thereto, at 1.  Dr. Gary Kleck, a

criminologist at Florida State University and Plaintiffs' proffered rebuttal expert, agrees that Dr.

Cook has "contributed consistently to the serious literature on gun control."  Exhibit 14

(Deposition of Gary Kleck) at 19:24-20:3.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

11-A. Dr. Cook estimates that, in the U.S. as a whole, the medical costs of gun violence

are approximately 2% of the total social cost of gun violence.  Exhibit 13, Exhibit A thereto, at 5;

Exhibit 15 (Deposition of Philip J. Cook) at 43:16.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so estimates, but dispute that his estimates

accurately capture the costs of gun violence.  "Cook reports enormous estimates of the 'cost of

gun violence' ... , but none of the data he cites in any way establishes that the costs of violence

would be any lower if the violence were instead committed with knives or other weapons.

Cook's 'costs of gun violence' are not really gun-specific - they largely reflect the costs of

violence in general, rather the costs of gun violence in particular. Nothing in this section can be legitimately construed to establish that the costs of violence in the U.S. or in Chicago would be even slightly lower if guns were less common." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 25.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. The portions of Dr. Kleck's report cited by Plaintiffs merely speculate, rather than support with citation to data or evidence, that Dr. Cook's cost estimates are not unique to firearms violence. Further, the notion that knife violence is just as costly as firearm violence is belied by the documented increased lethality of firearms. *See* SOF 15-17.

11-B. These social costs entail "a variety of costly measures" that residents take to reduce the risk of being shot, such as "moving to safer neighborhoods that may be less conveniently located." Exhibit 13, Exhibit A thereto, at 5. "Furthermore, the threat of gun violence is in some neighborhoods an important disamenity, causing residents to be fearful and take special precautions to protect themselves and their children. That threat depresses property values and puts a drag on economic development." *Id.*

**PLAINTIFFS' RESPONSE**: Admit that this is Professor Cook's opinion, but dispute that Professor Cook has meaningfully accounted for potential social costs and benefits of firearms restrictions. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26 ("Cook is conspicuously one-sided as to which intangible costs and benefits he chooses to measure .... [He] has done nothing to quantify the loss in felt sense of security that would arise from gun restrictions, including bans on gun carriage and limits on the number of operable guns allowed in the home."); Exhibit 3 at 166:5-20 (Cook Dep.) (admitting that there are people who are "motivated to carry a firearm"; that he "suppose[s] that the motivation is about security and self-protection";

9

and that he has not "made any effort to try to quantify the value of individuals feeling more secure by virtue of their ability to lawfully carry a handgun").

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. They proceed to inject an additional factual proposition – namely, that social benefits exist that Dr. Cook failed to account for. Further, Plaintiff provide no evidence showing that Dr. Kleck (or anyone else) has attempted to quantify such benefits, or showing that the benefits are significant to the point that a failure to consider them renders Dr. Cook's social cost estimate invalid. Indeed, Dr. Kleck testified that he has never attempted to measure the "intangible desire for security and self-protection produced by carrying a firearm" because "[i]t's not an area of expertise I have." Def. Ex. 91 (Kleck Dep.), at 385:6-11. Nor does he "have any basis for believing that the benefits from gun carrying . . . outweigh the costs that Dr. Cook has identified." *Id.*, at 385:12-15.

12-A. "In J. Ludwig & P. J. Cook, The Benefits of Reducing Gun Violence: Evidence from Contingent-Valuation Survey Data, 22 Journal of Risk and Uncertainty 207-26 (2001), Dr. Cook and Dr. Jens Ludwig (currently the McCormick Foundation Professor of Social Service Administration, Law, and Public Policy at the University of Chicago) estimated that the total social cost of firearms assault and homicide was approximately $1 million per gunshot wound. Exhibit 13, Exhibit A thereto, at 5; Exhibit 16 (Jens Ludwig June 29, 2010 Written Testimony for Chicago City Council Committee on Police and Fire) at CITY 000400; Exhibit 17 (Ludwig & Cook Report).

**PLAINTIFFS' RESPONSE**: Admit that Drs. Cook and Ludwig so estimated. Dispute that this is a credible estimate of the actual social cost of firearm violence. *See* Exhibit 2 (Kleck Decl.),

Exhibit I thereto, at 25 ("the vast majority of these supposed costs are intangible costs that are not easily measured, and indeed may not be measurable at all."); *id*. (citing critiques of the contingent-valuation method in publication based on the proceedings of a panel chaired by Nobel laureate Kenneth Arrow, and concluding that the method "produces estimates that are illogical, internally inconsistent, and wildly inconsistent across studies" and thus that Dr. Cook's estimates of the costs of gun violence "cannot be regarded as credible"); *id*. ("Cook reports enormous estimates of the 'cost of gun violence' ... , but none of data he cites in any way establishes that the costs of violence would be any lower if the violence were instead committed with knives or other weapons .... Nothing in this section can be legitimately construed to establish that the costs of violence in the U.S. or in Chicago would be even slightly lower if guns were less common. "). Cook and Ludwig themselves acknowledge several limitations of their study and the contingent-valuation method. *See* Chicago Exhibit 17 at 211-12, 220-22 (e.g., "Whether even high-quality [contingent-valuation or] CV studies produce reliable estimates of [what people are willing to pay] remains the topic of ongoing debate"; "[t]he most fundamental issue is whether ... respondents take the CV questions seriously and provide thoughtful answers and, if so, whether these responses reflect underlying preferences about a given quantity of violence reduction rather than social desirability bias, moral satisfaction or some other motivation.").

**DEFENDANTS' REPLY**:  Plaintiffs' response beyond their admission should be disregarded. Plaintiffs fail to proffer facts demonstrating that the asserted estimate is inaccurate.  Instead, their response consists of Dr. Kleck's speculation that the estimate is inaccurate.  Further, the cited excerpts from Dr. Kleck's report cite no study, published critique, or other data showing that Drs. Cook and Ludwig's estimate is faulty.  In fact, Dr. Kleck admitted that he himself has never

11

conducted a contingent valuation study. Def. Ex. 91 (Kleck Dep.) at 385:3-5. Plaintiffs cite a

critique of the contingent-valuation method by Kenneth Arrow, but that critique predates Drs.

Cook and Ludwig's estimate by nearly a decade and was limited to use of that method in the

context of evaluating environmental damage. Pl. Ex. 2, Exhibit I thereto, at 25. Dr. Kleck

admitted that he does not know whether Arrow "has ever criticized the use of [contingent]

valuation studies in the area of gun control and gun violence." Def. Ex. 91 (Kleck Dep.), at

386:6-9. In addition, the portions of Dr. Kleck's report cited by Plaintiffs merely speculate,

rather than support with citation to data or evidence, that Dr. Cook's cost estimates are not

unique to firearms violence. Further, the notion that knife violence is just as costly as firearm

violence is belied by the documented increased lethality of firearms. *See* SOF 15-17.

12-B. This study also found that "murder rates have a direct effect on the rate of

population growth or decline, with each murder associated with a reduction of 70 residents."

Exhibit 13, Exhibit A thereto, at 5. Testimony submitted by Dr. Ludwig during the City

Council's hearings on Chicago's Responsible Gun Ownership Ordinance ("Ordinance") indicates

that "if Chicago's homicide rate for the past 8 or 9 years had been more like New York City's,

which has a homicide rate that is around one-third of [Chicago's], then Chicago's population

would have actually increased by several hundred thousand residents, rather than declined."

Exhibit 16 at CITY 000399.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Ludwig offered the cited testimony. Dispute that

Drs. Cook and Ludwig's research found that each murder is associated with a population

reduction of 70 residents. *See* Exhibit 3 at 65 (Cook Dep.) ("assumption that each murder causes

a reduction of 70 residents ... is actually based on analysis that was done ... not by Ludwig or

myself"); Chicago Exhibit 16 at CITY 000399 ("Previous research has found that every homicide reduces a city's population by around 70 people.").

**DEFENDANTS' REPLY**: Plaintiffs' response amounts to a parsing of the word "found." Regardless of who originally performed the analysis demonstrating that each murder is associated with a reduction of 70 residents, Plaintiffs fail to dispute the fact (or the other facts asserted in SOF 12-B).

12-C. Dr. Ludwig's calculations also suggest that "eliminating gun involvement in crime in Chicago might increase total property values in the city by perhaps $30 billion or so, and increase property tax revenues by around $30 million per year." *Id.*

**PLAINTIFFS' RESPONSE**: Admit that Dr. Ludwig so testified. Dispute the validity Dr. Ludwig's calculations. Dr. Ludwig's calculations were based on his "assum[ptions]," "guess[es]," and "approximat[ions]." Chicago Exhibit 16 at CITY 000399-400 n.5. They are also based on the assertion that "[e]liminating gun involvement in crime in Chicago would have the equivalent impact on property values (and hence taxes) as cutting the violent crime rate in half," which appears to be based on the implausible assumption that criminals would not substitute other weapons for guns or would not commit crimes in the first place if they did not access to a gun. *Id. See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 25.

**DEFENDANTS' REPLY**: Plaintiffs fail to proffer facts demonstrating that the asserted estimate is inaccurate. Instead, their response consists of speculation that the estimate is inaccurate. Further, the excerpt from Dr. Ludwig's testimony that Plaintiffs cite shows that his estimate is based on calculations, research conducted by Schwartz and colleagues, research conducted by Cullen and Levitt, data from the City of Chicago, and data from Cook County.

13

Further, Dr. Kleck merely speculates, rather than supports with citation to data or evidence, that the substitution of weapons other than firearms, or the commission of crimes without weapons, would be just as costly as firearm violence. And the proposition is belied by the documented increased lethality of firearms. *See* SOF 15-17.

12-D. Dr. Ludwig estimates that "the total social cost of gun violence for Chicago annually is around $2.5 billion, or $2,500 per year for each Chicago household." *Id.* at CITY 000400.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Ludwig so estimated. Dispute that this is a credible estimate of the actual cost of gun violence for Chicago. The estimate is based on his and Dr. Cook's research on the social cost of gun violence, *see* Chicago Exhibit 16 at CITY 000400, and is thus subject to the same critiques recounted in our response to Chicago's SOF 11.

**DEFENDANTS' REPLY**: *See* D-RSOF 11.

13. Dr. Kleck testified that requiring "a factual basis" for "being certain" about a proposition is an "unreasonable standard" in criminology. Exhibit 14 at 355:2-6. "You're never certain about anything in science." *Id.* at 355:5-6. "Everything is uncertain in science." *Id.* at 356:19-25. The appropriate question is whether there is "a factual basis" for "drawing conclusions one way or another." *Id.* at 355:6-7. Researchers must work with the data they have and try to "draw rational and reasonable conclusions from the results, taking into account the fact that there are certain unknowns." *Id.* at 460:6-14. "No study is perfect." *Id.* at 460:15-16. "[Y]ou draw your conclusions on the best available evidence, not based on perfect evidence." *Id.* at 353:7-8.

**PLAINTIFFS' RESPONSE**: Admitted.

14

**DEFENDANTS' REPLY**: None.

14-A.  No provision of the Ordinance has prevented or restrained Tyler, Pacholski, or Hall from engaging in self defense in response to a threat. Exhibit 1 at 168:17-19; Exhibit 2 at 215:17-216:10; Exhibit 3 at 234:11-14.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

14-B.  Dr. Cook opines that MCC 8-20-020(a) and -030(a), to the extent that they "limit possession of a handgun to the owner's home and a long gun to the owner's home or fixed place of business ... serves to promote public safety, and in particular to reduce gun use in violence." Exhibit 13, Exhibit A thereto, at 2-3.

**PLAINTIFFS' RESPONSE**:  Admit that Dr. Cook so opined, but dispute the validity of his opinion.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 35-46; Exhibit 4 at 1082 (Philip J. Cook, et al., Gun Control After Heller, 56 UCLA L. REV. 1041 (2009)) ("Based on available empirical data, therefore, we expect relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand."); Exhibit 3 at 184:8-185:12 (Cook Dep.) (admitting that the "net effect" of eliminating the City's ban on carriage "is not something we can study right now or draw an empirical conclusion to.").

**DEFENDANTS' REPLY**:  Plaintiffs improperly sever Dr. Cook's opinion from the rest of SOF 15 (as well as other SOFs discussing the basis for Dr. Cook's opinion).  Dr. Cook's opinion is valid for the reasons stated in his report and summarized in those SOFs.  Further, Plaintiffs mischaracterize the cited materials.  Dr. Cook indicated in his deposition that while he cannot

"quantify" how much the Chicago murder rate would change in response to legal gun carrying in public, he opined that carrying would "make the current police tactics more problematic and more difficult to execute," that "there would be more guns on the street that would be available that could be stolen," and that "[i]t might escalate kind of routine confrontations that people have and induce still further gun carrying." Pl. Ex. 3, at 184:15-185:7. *See also* Def. Ex. 13, Exhibit A thereto, at 18 (Cook Report) (concluding that "quantitative evaluation methods do not provide a reliable basis for determining whether [Right to Carry] laws increase or reduce crime and violence" but that Chicago's carry restrictions are nonetheless supported by the preceding discussions in the report, which include "the association between gun carrying and the increased lethality of crime" and the utility of carry restrictions on targeted policing tactics).

In addition, Dr. Cook opines that, while the prevalence of gun ownership "does not affect the *volume* of violence," it "has a positive effect on . . . the death rate in assault and robbery – the criminal homicide rate." Def. Ex. 13, Attachment A thereto, at 10 (citing data showing that increase in prevalence of gun ownership increases homicide rate).

Likewise, the cited except from the article at Pl. Ex. 4 discusses the general, overall, impact of permissive carrying "[b]ased on available empirical data," but does not purport to address how increased public carry in an environment like Chicago, which is pervaded by urban street gangs and high crime, would impact homicide or violence rates. Indeed, Dr. Cook notes in that document that "the change in gun carrying" observed in the studies on public carry "appears to be concentrated in rural and suburban areas where crime rates are already relatively low, among people who are at relatively low risk of victimization – white, middle-aged, middle-class males. The available data about permit holders also imply that they are at fairly low risk of

misusing guns." *Id.* at 1082.  Dr. Kleck also testified that "[m]ost people . . . tend to associate

gun ownership with urban areas, high crime areas and so on.  But gun ownership is, in fact,

higher in areas that have very little violence, rural areas and small towns . . .   So the gun culture

appears to be concentrated precisely in those places where there isn't much dangerous use of

firearms, where it's recreational or relatively inconsequential from a violence standpoint, either

violence causing or violence preventing."  Def. Ex. 91 (Kleck Dep.), at 299:8-19.

15-A.  Dr. Cook opines that "whether the victim of an assault or robbery dies is not just a

reflection of the offender's intentions."  *Id.*, Exhibit A thereto, at 7.  For "[t]he bulk of people

who are shot and killed," the killing results from "a spontaneous encounter and not a sustained

clear intent to kill."  Exhibit 15 at 188:11-15.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so opined, but dispute to the extent he

suggests that offenders who shoot their victims generally do not intend to kill them.  *See* Exhibit

5 at 57 (Philip J. Cook, *The Influence of Gun Availability on Violent Crime Patterns*, 4 CRIME

& JUST. 49 (1983)) ("[T]he assailants' intent is a major determinant of his choice of weapon.

The assailant who clearly intends for his victim to survive will not fire a gun at him."); Exhibit 3

at 189-90 (Cook Dep.) (admitting that "by and large" if someone had the intent to kill they would

use a firearm if it was available to them); Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26 ("the

attackers who use guns are also likely to be more lethal in their intentions"); Exhibit 6 at 166

(GARY KLECK, POINT BLANK, Chapter 5 (1991)) ("when a gun is used in an attack, it is

almost always the result of a choice, however hastily made, among weapon alternatives"); *id.* at

168-69.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded.

17

Plaintiffs fail to dispute the facts asserted and improperly sever SOF 15 into pieces that separate

Dr. Cook's opinion from an explanation of its bases. And rather than dispute the proposition

asserted by Defendants, Plaintiffs proffer facts in support of a different proposition – namely, that

offenders who shoot their victims generally intend to kill them. Further, this additional

proposition is irrelevant. Dr. Cook does not disclaim the role of intent, but opines that the

presence of a firearm, as opposed to other weapon types, also influences whether an encounter

turns deadly. *See* SOF 15. In addition, Plaintiffs mischaracterize the record. While Dr. Cook

acknowledged that a person who intends to kill will probably use a gun if it is available, he added

that a gun may also "often" be selected "because you want to control the situation or – for some

other reason." Pl. Ex. 3, at 189:5-190:8.

15-B. "The type of weapon used in an assault or robbery affects the likelihood that the

victim will be killed." Exhibit 13, Exhibit A thereto, at 2. "In particular, with other things being

equal, violent crimes committed with firearms are far more likely to result in the death of the

victim than violent crimes committed with knives, blunt objects, or bare fists." *Id.* "In other

words, the likelihood that an assault or a robbery 'converts' to a homicide is much higher if a gun

is involved." *Id.* at 10. This is known as the "instrumentality effect." *Id.* at 6.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so opined, but dispute to the extent he

suggests that the use of a gun, rather than an offender's intentions, causes an assault or robbery to

be more likely to end in the victim's death. *See* Exhibit 5 at 57 (Philip J. Cook, The Influence of

Gun Availability on Violent Crime Patterns, 4 CRIME & JUST. 49 (1983)); Exhibit 2 (Kleck

Decl.), Exhibit I thereto, at 26; Exhibit 6 at 166 (GARY KLECK, POINT BLANK, Chapter 5

(1991)); *see* generally *id.* at 161-70. Indeed, Dr. Cook admitted that, to the best of his

18

recollection, none of the studies cited in his report "purport to hold constant for an attacker's intent to kill." Exhibit 3 at 191:13- 25 (Cook Dep.).

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Plaintiffs fail to dispute the facts asserted and instead proffer facts in support of a different proposition – namely, that an offender's intent, moreso than use of a gun, causes an assault or robbery to result in death. Further, the cited materials do not support that proposition. Even if those offenders who clearly intend to kill a victim will select a gun, those offenders who do not clearly intend to kill a victim also "often" choose to use a gun so that the offender can "control the situation or – for some other reason." Pl. Ex. 3, at 189:5-190:8. In addition, Plaintiffs mischaracterize the record. While Dr. Cook gave the cited testimony, Dr. Kleck believes that intent is "an issue we'll never really have solid evidence on." Def. Ex. 91 (Kleck Dep.), at 387:25-388:11. And, in any event, Dr. Kleck agrees, based on that evidence, that, controlling for the user's intent (and all else being equal), guns are more lethal than other weapons. *See* SOF 15-C.

15-C. Dr. Kleck "tentatively" agrees that, if the user's intent to inflict lethality is controlled for, and all other things being equal, guns are more lethal than other weapons. Exhibit 14 at 388:12-16.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Kleck so testified, but this tentative agreement was based on "weak evidence" because studies have not been successful in attempting to control for an attacker's intent. Exhibit 7 at 388 (Kleck Dep.); *see also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26 (conceding that while it "might be true to some extent" that "guns are intrinsically more lethal than other commonly available weapons," Dr. Cook "overstates the difference, and

overstates the degree of support for this assertion").

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Plaintiffs' response admits the asserted fact but then goes on to proffer additional facts. Further, the additional facts are irrelevant. Regardless of the state of the academic evidence concerning lethality, Dr. Kleck himself agrees, as documented both in this statement of fact, and Plaintiffs' response to it, that guns are more lethal than other weapons.

15-D. "As a result, while only a small fraction (5 percent) of criminal assaults are perpetrated with guns, over two-thirds of fatal assaults (murders and nonnegligible homicides) are perpetrated with guns." Exhibit 13, Exhibit A thereto, at 6.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so opined, but based on the evidence cited in response to this Statement of Fact, dispute that this statistic is based on inherent lethality of guns rather than offenders' intent. *See also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26 (opining that Dr. Cook's "claims about weapon lethality have no sound scientific foundation").

**DEFENDANTS' REPLY**: *See* D-RSOF 15-A, 15-B & 15-C.

16-A. Dr. Cook bases this conclusion on "two seminal articles" by Franklin Zimring: *Is Gun Control Likely to Reduce Violent Killings*", 35 University of Chicago L. Rev. 721 (1968) and *The Medium Is The Message: Firearm Caliber As A Determinant Of Death From Assault,* 1 Journal of Legal Studies 97 (1972). Exhibit 13, Exhibit A thereto, at 6; Exhibits 18 & 19 (Zimring Studies).

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook relied on the Zimring studies. However, "[n]one of the studies that Cook cites to support his claim that guns are 'more intrinsically lethal' measured or controlled for attacker lethality and thus none can establish to what degree the

20

higher fatality rate of gun attacks is due to the weapon's lethality rather than the attacker's more lethal intentions." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26. *See also* Exhibit 3 at 191:13-25 (Cook Dep.).

**DEFENDANTS' REPLY**: *See* D-RSOF 15-C.

16-B. Dr. Cook also relies on his own prior research: The Technology of Personal Violence in 14 Crime and Justice: An Annual Review of Research (M. Tonry ed. 1991); Robbery Violence, 78 Journal of Criminal Law & Criminology 366 (1987). Exhibit 13, Exhibit A thereto, at 6-7; Exhibits 20 & 21 (Cook Studies).

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook relied on his own prior research. However, "[n]one of the studies that Cook cites to support his claim that guns are 'more intrinsically lethal' measured or controlled for attacker lethality and thus none can establish to what degree the higher fatality rate of gun attacks is due to the weapon's lethality rather than the attacker's more lethal intentions." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26. *See also* Exhibit 3 at 191:13-25 (Cook Dep.).

**DEFENDANTS' REPLY**: *See* D-RSOF 15-C.

17-A. Dr. Cook opines that "the incidence of gun carrying contributes directly to gun use in assault." Exhibit 13, Exhibit A thereto, at 13. Dr. Kleck agrees that Dr. Cook is "probably correct ... that the prevalence of firearms has a positive effect on gun use" - i.e., the percent of violent crimes in which guns are used. Exhibit 14 at 414:8-24.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so opined and that Dr. Kleck is quoted correctly, but dispute that this indicates that permitting law-abiding citizens to carry guns will lead to an increase in criminal violence. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 36 (It

would have been more informative for Cook to also conclude that where there is more gun carrying by crime victims, there are more injury-preventing defensive uses of guns by crime victims"); Exhibit 3 at 184-85 (Cook Dep.) (admitting that the "net effect" of eliminating the City's ban on carriage "is not something we can study right now or draw an empirical conclusion to"); *id*. at 186 (admitting that "it has not been possible ... to isolate any kind of consistent result or to document what might be thought of as a causal average result" regarding the impact of right to carry laws).

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Plaintiffs fail to dispute the facts asserted and instead proffer facts in support of a different proposition – namely, that allowing law-abiding citizens to carry will not lead to an increase in criminal violence. Further, the materials cited by Plaintiffs do not support that proposition. As to the excepts from Dr. Cook's deposition, *see* D-RSOF 14-B. As to Dr. Kleck's assertion that increased carrying by crime victims will lead to more injury-preventing defensive uses of guns by crime victims, Dr. Kleck admitted that "well-respected" researchers disagree with his assessment of the number of defensive gun uses per year, which is based on survey data. Def. Ex. 91 (Kleck Dep.) at 339:8-11, 349:25-350:2. And Dr. Cook testified that "there is reason to doubt survey-based estimates of the utility of carrying a firearm for self-defense." Def. Ex. 13, Exhibit A thereto, at 17. He testified that these survey estimates "are an order of magnitude higher than those generated by the large ongoing federal survey of crime victimization (Nation Criminal Victimization Survey), and far higher than would be logically compatible with other sources of data on crime and violence, including the number of cases treated for gunshot wounds." *Id.* at 18. *See also* Def. Ex. 65, Exhibit A thereto, at 15 (expert report of Dr. Webster) (Dr. Kleck's

estimate is "22 times higher than what was estimated from the National Crime Victimization Survey (NCVS)," and indicates that there are over 200,000 assailants wounded by civilians defending themselves each year, even though data from hospital emergency rooms indicates that fewer than 100,000 people are treated annually for gunshot wounds).

In addition, Dr. Cook testified, citing P.J. Cook, et al., *Defensive Gun Uses: New Evidence from a National Survey*, 14 J. of Quantitative Criminology 111-31 (1998), that "close study of the survey reports of defensive gun use suggest that many of these reports are about events that simply did not happen." Def. Ex. 13, Exhibit A thereto, at 18. Dr. Cook testified that in the study D. Hemenway, et al., *Gun use in the United States: results from two national surveys*, 6 Injury Prevention 263-267 (2000), "a panel of criminal-court judges reviewed reported defensive gun uses from a survey and found that these reports are frequently of actions that are not legitimate self-defense, but rather criminal assault." Def. Ex. 13 at 18. *See also* Def. Ex. 92 (Study). That study reported that "the criminal court judges who rated the incidents determined that at least half were probably illegal – even after assuming that the respondent had a permit to own and carry a gun and described the incident honestly." Def. Ex. 92 (Study) at 266. The study reported that "the number of respondents reporting that they were gun victims exceeded the number of respondents reporting that they had used a gun in self defense by over three to one, 152 to 43" and that "[o]ur results indicate that gun use against adults to threaten and intimidate is far more common than self defense gun use by them." *Id.* at 265, 267. Another study, D. Hemenway, et al., *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 Violence and Victims 257 (2000), reported that the "number of respondents reporting that they were gun victims exceeded the number of respondents claiming to have used a

23

gun in self-defense by more than 4 to 1." Def. Ex. 93 (Study) at 269.

A report by the National Research Council ("NRC") also noted various problems with survey-based defensive gun use data. "Questions about the quality of self-reports of firearms use are inevitable. Response problems occur to some degree in nearly all surveys but are arguably more severe in surveys of firearm-related activities in which some individuals may be reluctant to admit that they use a firearm, and others may brag about or exaggerate such behavior." Pl. Ex. 10, at 108. Further, "[s]ome reports of defensive gun use may involve illegal carrying and possession." *Id.*, at 106 (citing studies by Dr. Kleck). The NRC report also noted that Dr. Kleck admitted that "respondents may be inclined to 'remember with favor their marksmanship' and may tend to exaggerate the seriousness of the event." *Id.* at 112. The report also noted that "[i]nferences drawn from the relatively small subsamples of persons who report using firearms defensively . . . are subject to high degrees of sampling error." *Id.* at 112. At base, the report noted that "[w]e do not know accurately how often armed self-defense occurs or even how to precisely define self-defense." *Id.* at 113.

Finally, in the portion of Dr. Kleck's report cited by Plaintiffs, Dr. Kleck compares an estimate of the number of times (person-days) a gun is carried for defense (even if not used for defense) with the number of gun crimes committed, rather than with the number of times (person-days) a gun is carried for criminal purposes. The report offers no basis for concluding that the number of gun crimes is the same as the number of times (person-days) a gun is carried for criminal purposes (*i.e.*, that criminals carry guns only on the days they actually commit a crime). The report therefore compares apples and oranges. A proper comparison would compare either (1) the number of self-defense uses with the number of crimes or (2) the number of times

24

(person-days) a gun is carried for self-defense with the number of times (person-days) a gun is

carried for criminal use.

17-B.  Dr. Cook opines that "[i]f the fraction of assaults or robberies involving guns

increases, then the death rate (i.e., the criminal homicide rate) will also increase."  Exhibit 13,

Exhibit A thereto, at 7.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so opined but, based on the evidence cited in

response to Statements of Fact 15 and 16, dispute any implication that such an increase would be

due to any inherent lethality of guns rather than the intentions of the offenders using them.

**DEFENDANTS' REPLY**: Plaintiffs admit the stated fact – *i.e.*, that the death rate will increase

is the fraction of assaults or robberies involving guns increases – but then go on to improperly

inject new facts that purport to take issue with the reason for the stated fact.  As to Plaintiffs' new

facts, *see* D-RSOF 15 & 16.

17-C. Dr. Cook's study of annual Uniform Crime Reports data for the 200 largest

counties over 20 years "found that the homicide rate increased with the prevalence of gun

ownership.  On average, a 10 percent increase in the prevalence of gun ownership increased the

homicide rate by about 2 percent."  *Id.* at 10; Exhibit 22 (The Social Costs of Gun Ownership, 90

Journal of Public Economics 379 (2006)).

**PLAINTIFFS' RESPONSE**:  Admit that Dr. Cook's study so found.  Dispute that the study

provides insight into whether higher prevalence of gun ownership causes an increase in the

homicide rate.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 30-31 & Table 3

(comprehensively reviewing research on gun prevalence and homicide rates, and concluding that

"no methodologically competent studies have found that gun ownership levels have a significant

positive effect on total homicide rates"); *id*. at 31 (explaining that Dr. Cook's study "is so

technically flawed that I used it as an exemplar of poor research in this area, in an expository

article I published a few years ago," and concluding that this "crude study therefore cannot be

relied upon to provide a meaningful estimate of the effect of gun rates on homicide rates").  *See*

*also* Exhibit 3 at 168 (Cook Dep.) (admitting that it is only his "best guess" that a 10% increase

in the prevalence in gun ownership would increase the homicide rate by two percent in Chicago);

*id*. at 169 (admitting that he did not consider the distinction between legally and illegally

possessed firearms in making this calculation); *id*. at 171 (admitting that he does not know

whether "there would be a different causal impact on homicide rates" between an increase in

legal and illegal firearms).

Indeed, "competently conducted research on the effect of gun ownership rates on

homicide rates has found either no significant effect (Kleck and Patterson 1993) or a modest

negative homicide-reducing) effect (Kovandzic et al. 2008).  *See* Exhibit 8 at 272 (Gary Kleck &

E. Britt Patterson, *The Impact of Gun Control and Gun Ownership Levels on Violence Rates*, 9 J.

QUANT. CRIM. 249 (1993)); Exhibit 9 at 41 (Tomislav Kovandzic et al., *Estimating the Causal*

*Effect of Gun Prevalence on Homicide Rates* (2008)).

**DEFENDANTS' REPLY**:  Plaintiffs' response beyond their admission should be disregarded.

Plaintiffs fail to dispute the facts asserted and instead proffer facts in support of a different

proposition – namely, the argumentative proposition that the cited study does not "provide

insight"  into whether higher prevalence of gun ownership causes an increase in the homicide

rate.  Further, the materials cited by Plaintiffs do not establish that higher gun prevalence does

not cause an increase in the homicide rate; the cited materials merely argue the point.

Moreover, Plaintiffs' statement that "competently conducted research on the effect of gun ownership rates on homicide rates has found either no significant effect (Kleck and Patterson 1993) or a modest negative (homicide-reducing) effect (Kovandzic et al. 2008)" is based on two articles. Pl. Ex. 2, Exhibit I thereto, at 14 (citing G. Kleck, et al., *The impact of gun control and gun ownership levels on violence rates*, 9 Journal of Quantitative Criminology 249-288 (1993) and T. Kovandzic, et al., *Estimating the causal effect of gun prevalence on homicide rates* (2008)). Dr. Kleck admitted that the first of these two studies was criticized in an analysis by Steven Messner, "a well-respected criminologist," in the Journal of Quantitative Criminology. Def. Ex. 91 (Kleck Dep.) at 279:25-280:4, 282:19-25. *See also* Def. Ex. 94 (R. Alba & S. Messner, Point Blank *Against Itself: Evidence and Inference About Guns, Crime, and Gun Control*, 11 Journal of Quantitative Criminology 391-410 (1995)). That critique noted that Dr. Kleck's "evidence is not adequate to the case he wishes to build. Upon close examination, the critical propositions do not always follow directly from the data reported. Further, the original evidence and analyses that are invoked in their support are seriously deficient in our view, and in one instance, his interpretation of statistical results appears grossly misleading if not simply wrong." Def. Ex. 94 at 393. In particular, the study found that "Kleck's analysis of the effect of gun ownership on city crime rates is seriously flawed by ambiguous measurement of a key construct and by severe model misspecification." *Id.* at 397. Dr. Kleck further admitted that, in trying to control for causal order in that study, he used instrumental variables whose validity was not checked via a "validity test," a failure that "impairs" the reliability of the study's results "to some degree." Def. Ex. 91 (Kleck Dep.) at 300:16-302:19, 311:14-19.

The second of those two studies – T. Kovandzic, et al., *Estimating the causal effect of*

*gun prevalence on homicide rates* (2008) – was not submitted for publication in a peer-reviewed journal.  Def. Ex. 91 (Kleck Dep.) at 332:7-23.

18.     Dr. Cook opines that the City's restrictions on carrying firearms outside the home "are plausibly supported" by "the association between gun carrying and the increased lethality of crime."  Exhibit 13, Exhibit A thereto, at 18.  "Carrying firearms away from home contributes directly to the use of guns in violent crime and is associated with increases in violence and lethality." *Id.* at 3.  "That is to say, where there is more gun carrying, we should expert more" firearms injuries and deaths.  *Id.* at 13.  "[E]ven if there was no change in the overall rate of violence" in Chicago, "[a] program or regulation that was effective in reducing gun use in violent crime would save lives (by reducing the case-fatality rate)."  *Id.* at 6.

**PLAINTIFFS' RESPONSE**:  Admit that Dr. Cook so opined, but dispute the validity of that opinion.  As an initial matter, *see* our response to Statement of Fact No. 15.  Furthermore, for the reasons explained by Dr. Kleck, Dr. Cook's conclusions do not flow from the premises that "the prevalence of firearms has a positive effect on gun use" and that "gun use affects the death rate in assault and robbery," even if those premises were true.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 29-30.  In addition, Dr. Cook has admitted that the "net effect" of eliminating the City's ban on carriage "is not something we can study right now or draw an empirical conclusion to."  Exhibit 3 at 184-85 (Cook Dep.); *id* at 182-83 (admitting that "I cannot tell you that I have direct evidence that proves ... or that supports" the statement that Chicago's ban on carrying, coupled with police enforcement targeted on illegal carrying, in fact reduced the misuse of guns outside of the home in Chicago"); Chicago Exhibit 13, Exhibit A thereto, at 18 ("quantitative valuation methods do not provide a reliable basis for determining whether [right to carry] laws

28

increase or reduce crime and violence").  Indeed, in the wake of Heller, Dr. Cook admitted that

he expected "relatively little public safety impact if courts invalidate laws that prohibit gun

carrying outside the home, assuming that some sort of permit system for public carry is allowed

to stand."  Exhibit 4 at 1082 (Philip J. Cook, et al., Gun Control After Heller, 56 UCLA L. REV.

1041 (2009)).  At any rate, the scholarly debate about right-to-carry laws generally is about

whether or not empirical evidence sufficiently supports the view that they reduce violence.

Compare Exhibit 10 at 2 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE

(Wellford, et al., eds. 2005)) ("the committee found no credible evidence that the passage of

right-to-carry laws decreases or increases violent crime"); with id at 270, 271 (Dissent by James

Q. Wilson) ("the best evidence we have is that [right-to-carry laws] impose no costs but may

confer benefits"; "the evidence ... suggests that [right-to-carry] laws do in fact help drive down

the murder rate"); Exhibit 11 at 64 (John R. Lott, Jr. & David B. Mustard, Crime, Deterrence,

and Right-to-Carry Concealed Handguns, 26 J. LEGAL STUDIES 1 (1997)) ("Allowing citizens

without criminal records or histories of significant mental illness to carry concealed handguns

deters violent crimes and appears to produce an extremely small and statistically insignificant

change in accidental deaths .... Our evidence implies that concealed handguns are the most cost

effective method of reducing crime thus far analyzed by economists.").

**DEFENDANTS' REPLY**:  Plaintiffs assert that Dr. Cook's conclusions do not flow from the

premises that "the prevalence of firearms has a positive effect on gun use" and that "gun use

affects the death rate in assault and robbery," even if those premises were true; for this

proposition, they cite pages 29-30 of Dr. Kleck's report.  And, at those pages, Dr. Kleck critiques

Dr. Cook for ignoring (a) the possibility that a higher prevalence of guns among crime victims

acts as a deterrent against a crime being committed in the first place, and (b) the effects of more assault and robbery victims actually using guns for self-defense during a crime.  Pl. Ex. 2, Exhibit I thereto, at 29-30.  However, the notion that these occur to any significant degree is not supported by Plaintiffs, and Dr. Kleck's estimates of their frequency has been roundly criticized. *See* D-RSOF 17.

With respect to Plaintiffs' contentions regarding Dr. Cook's testimony and writings cited herein, *see* D-RSOF 14-B & 15.

In addition, the excerpt from Pl. Ex. 10 cited by Plaintiffs concluded that "the committee found no credible evidence that the passage of right-to-carry laws decreases . . . violent crime."

19.     A high pulse rate and shaking hands during a crime "would" affect "the accuracy with which the [victim) can wield the gun or use the gun," it "might" affect the shooter's judgment, and it "possibl[y] could lead to the accidental shooting of a person who does not actually present a threat. Exhibit 14 at 114:3-17.  Tyler testified that when an attacker is confronting you, "your adrenalin is flowing," and that "I don't know what I'd do."  Exhibit 1 at 119:17-20.  It is possible that she would shoot "the first person that I think is threatening me." *Id.* at 120:18-121:1.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Kleck and Dr. Tyler provided the quoted testimony. Deny that the snippets of Dr. Tyler's testimony convey the substance of her testimony. She also testified that if she sensed a threat, "I would try my very best to get away from it, first and foremost, if I could," Exhibit 12 at 118 (Tyler Dep.); that "[s]hooting someone is the very last thing on my list," so if she could simply "say 'I have a gun' and they'll turn the corner and leave you alone, amen," *id* at 118: 13-16; that her intention would be to "do everything I could

not ever to have to shoot anybody," *id* at 119:21-23; and that her "intention would not be to shoot the first person that I think is threatening me," *id* at 120:18-20.

**DEFENDANTS' REPLY**: Defendants do not contest the quoted testimony, but Plaintiffs' response should be disregarded to the extent that it argues about what constitutes the full "substance" of Dr. Tyler's testimony.

20.    A study of gunshot victims in Philadelphia who possessed a firearm at the time of getting shot reported that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault." Exhibit 23 (C. Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault,* 99 American Journal of Public Health 1-7 (2009)) at 4. It found that persons in possession of a gun were 4.46 times more likely to be shot in an assault than those not in possession. *Id.* It concluded that "[o]n average, guns did not protect those who possessed them from being shot in an assault." *Id.* at 6.

**PLAINTIFFS' RESPONSE**: Admit that the Branas study includes the quoted findings. Dispute, however, that the Branas study found that possessing a gun caused a greater likelihood of being shot in an assault. The study simply found that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault." Chicago Exhibit 23 at 4. Indeed, the authors acknowledged that there were potential confounding variables that they did not control for. *Id.* at 6. The study "also did not account for the potential of reverse causation between gun possession and gun assault," *id*, i.e., it did not account the fact that the likelihood of being assaulted may cause people to carry a gun, not vice versa. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 14-15.

**DEFENDANTS' REPLY**:  Plaintiffs' response beyond their admission should be disregarded.

Plaintiffs fail to dispute the facts asserted and instead proffer facts in support of a different

proposition. Further, Plaintiffs mischaracterize the study. Regarding the potential of reverse

causation, the study stated that "our long list of confounders may have served to reduce some of

the problems posed by reverse causation," and that "the probability of success" of accounting for

reverse causation through other techniques "is low." Def. Ex. 23, at 6.

21.     Currently, CPD is able to arrest and prosecute gang members (or other criminals)

when those members are detected carrying or possessing firearms in the spaces outside of a

home, because that activity is unlawful in Chicago. Exhibit 24 (Declaration of Eugene

Williams), ¶ 11; *see also* Exhibit 10, ¶ 34. Eugene Williams, Acting Chief of Patrol for the CPD

testified that this is an important tool that CPD uses to combat the gang problem in Chicago.

Exhibit 24, ¶ 11; *see also* Exhibit 10, ¶¶ 34-35. It allows CPD to take gang members, and/or

their firearms, "off the street" before they commit a violent act with the firearm. Exhibit 24, ¶

11; *see also* Exhibit 10, ¶ 34. "The existence of a regulation prohibiting [gun carrying] allows

police officers to intervene and remove the weapon before it can be used in the commission of a

crime." Exhibit 13, Exhibit A thereto, at 14. Dr. Kleck agrees that "if you could arrest people for

simply having a gun, it is easier to prevent people from using the gun criminally than having to

wait until after they commit the crime." Exhibit 14 at 445:23-446:4.

**PLAINTIFFS' RESPONSE**: Dispute to the extent it is meant to imply that striking down the

challenged laws on carrying firearms outside of the home would interfere with Chicago's law

enforcement efforts targeted at taking guns away from gang members and criminals before they

can use them in a crime, because a person would still have to get a FOID card and a CFP and

register a firearm with the City before he or she could possess it legally. Chicago has identified

no evidence to indicate that any significant number gang members or other criminals, even if

qualified to own a firearm (itself a dubious proposition, *see* Response to Statement of Fact 27),

would choose to register a weapon with the City before carrying it outside the home.  It has not,

for example, identified any evidence that gang members or criminals have registered handguns

now that they are legal to possess in the home.  Indeed, Commander Gorman testified that

because registering a firearm with the City "puts that particular person on the radar as potentially

having a weapon," a fact they "wouldn't want law enforcement to know," many gang leaders,

members, and associates do not register their weapons even if legally they are able to.  *See*

Exhibit 13 at 23-24, 77 (Gorman Dep.); *see also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 38

("[Those criminals without an officially recorded criminal conviction might be eligible to get a

carry permit if they applied for one, but actual experience indicates that hardly any do, perhaps

because they do not want to be officially identified by authorities as a gun possessor, or maybe

just because they ... do not care that much about conforming with the law.").  For example, to

obtain a CFP (a prerequisite for registering a gun), a person must submit his name, address,

phone number and current photographs and must submit to fingerprinting.  *See* MCC §§

8-20-120(a)&(b).  A CFP application must be submitted in person at police headquarters.  *See*

Exhibit 14 (City of Chicago, Department of Police, Rules and Regulations, Firearms-Chapter

8-20).  And to register a particular gun, an applicant must indicate where it will be stored and the

source from which it was obtained.  *See* MCC § 8-20-140C.  Commander Gorman's testimony is

also consistent with the fact that "the available data about [concealed-carry] permit holders imply

that they are at a fairly low risk of misusing guns, consistent with the relatively low arrest

observed to date for permit holders."  Exhibit 4 at 1082 (Philip J. Cook, et al., *Gun Control After*

*Heller*, 56 UCLA L. REV. 1041 (2009)); *see also* Chicago Exhibit 31 at xxxii (a study analyzing

FBI data found that "less than 0.2% of crimes committed with firearms are committed with by

citizens licensed to carry a concealed weapon"); Exhibit 15 at 29 (Williams Dep.) (conceding

that he has no "evidence that firearms that are lawfully possessed present a risk of increased

violence in the city"); Exhibit 13 at 73:7-15 (Gorman Dep.) (in his experience as a Chicago law

enforcement officer, Commander Gorman could not recall "any instances in which a person has

committed a crime with a firearm while lawfully possessing that firearm"); Exhibit 2 (Kleck

Decl.), Exhibit I thereto, at 36-38. Further, when discussing whether gang members and

criminals would lawfully register guns, Commander Gorman's focus was on gang leaders –

**DEFENDANTS' REPLY**: Plaintiffs do not purport to dispute the asserted facts, and they should

therefore be admitted. Nor do Plaintiffs identify facts indicating that any of the asserted

statements are invalid or unsound. Instead, Plaintiffs offer argument that criminals and gang

members would not take the steps necessary to lawfully possess firearms outside the home if

such were legal in Chicago. And the Plaintiffs fail to support this proposition. The study cited

by Plaintiffs does not address the scenario presented here – *i.e.*, legalization of gun carrying in a

large urban center plagued by gangs – and does not purport to rebut the notion that gang

members and criminals would take advantage of such legalization. Similarly, the police

testimony cited by Plaintiffs is irrelevant. It regards an absence of evidence under current law,

which confines lawful gun ownership to the inside of the home and does not permit carrying

outside the home. The lack of that evidence under that regime does not suggest (and Plaintiffs do

not provide evidence showing otherwise) that, under a different regime (*i.e.,* one that allowed

carrying outside the home), criminals and gang members would not seek to lawfully possess

firearms, or that they would not commit crimes with those firearms. Indeed, legalized carrying outside the home would provide an incentive that does not currently exist for gang members and criminals to lawfully register their weapons, since it would immunize them from arrest for carrying in public, which is where gang members and criminals ply most of their trade.

Nor do Plaintiffs identify any other facts or law enforcement opinion indicating that the police testimony cited by Defendants lacks basis or is unsound. Indeed, gang members have shown that they will acquire carry permits in other major cities where carry is permitted. For instance, in Miami, gangs "have learned how to structure their crews so that at least one of them can be legally armed" and when police encounter a situation where "one guy holds the gun, another guy holds the dope, and a third guy drives . . . There is nothing [the police] can do about it" because the gun carrier "has no convictions." Def. Ex. 95 ("A Night Inside South Florida's Gang Wars," CBS Miami, May 7, 2012), at 3. *See also id.* at 3 ("They've figured out the system and still have a firearm on them"). *See also* video at CBS Miami website listed in Def. Ex. 95 (containing police lieutenant's statements regarding same). Philadelphia requires permit applicants to submit the application in person at the police department; to tender a photograph; to be fingerprinted; and to submit to reference sheets. Def. Ex. 96 (Philadelphia Police Department, Instructions for Completion of an Application for a Pennsylvania License to Carry Firearm), at 1. Even so, Philadelphia criminals have pursued applications for a carry permit. Def. Ex. 97 (Testimony of Joe Grace regarding Pennsylvania HB 2536), at 2 (person with prior arrest history for narcotics and homicide, and person known as extremely dangerous individual from prior arrests, applied for permits); Def. Ex. 98 (Testimony of Lt. Lisa King regarding Pennsylvania HB 2536), at 1 ("In recent years . . . we have noticed a trend of suspects" who

"often times" have sought a carry permit).

22.     The value of this tool is magnified when combined with targeted policing efforts (where CPD focuses resources on areas of high gang activity), because it creates a disincentive for gang members to carry or possess firearms.  Exhibit 24, ¶ 11; *see also* Exhibit 10, ¶ 34. Targeted policing entails "a large volume of police contacts with suspicious individuals who are stopped for questioning and frisked if there is reason to believe that they are carrying a weapon." Exhibit 13, Exhibit A thereto, at 14.  The CPD has "a tradition" of "targeted enforcement directed at confiscating guns that are being carried illegally," in an "effort to reduce gun misuse." Exhibit 15 at 181:5-12; Exhibit 13, Exhibit A thereto, at 14.  This "high priority" is known to residents of Chicago neighborhoods with high gang activity.  Exhibit 15 at 182:3-21. Consequently, when CPD officers are frequently patrolling a gang area or neighborhood, gang members know that they stand a higher chance of being detected (and arrested) if they have a firearm outside of a home.  Exhibit 24, ¶ 11; *see also* Exhibit 10, ¶ 34.  Chief Williams testified that, as a result, the gang member will be less likely to carry or possess the gun outside the home, which benefits both public and officer safety by removing a key driver of the crime problem in Chicago - namely, a gun in the hand of a gang member in public.  Exhibit 24, ¶ 11; *see also* Exhibit 10, ¶ 33.

**PLAINTIFFS' RESPONSE**: For the reasons cited in response to Statements of Fact 21 and 23-28, dispute that striking down the challenged laws will make it more likely for Chicago gang members to carry guns outside the home.

**DEFENDANTS' REPLY**: *See* D-RSOF 21, 23-28.

23-A.  Dr. Cook opines that this "enhanced probability that if you're armed in public that

36

you'll end up being detected and arrested ... reduces the incentive to carry a gun by creating a deterrent."  Exhibit 15 at 161:9-15.  Dr. Cook testified that it is "plausible" that Chicago's ban on carrying outside the home, coupled with police enforcement targeted at illegal carrying, has reduced the misuse of guns outside the home, given that "large sections of the active criminal community ... do not have a gun and do not carry a gun." *Id.* at 182:23-183:14.

**PLAINTIFFS' RESPONSE**:  *See* response to Statement of Fact 21.  Also dispute Dr. Cook's statement to the extent he suggests that Chicago's carriage ban has contributed significantly to a reduction in the incidence of gun ownership or carrying by criminals in Chicago.  Indeed, Dr. Cook has previously written that "Chicago's [former] handgun ban ... was ineffective in reducing the prevalence of gun ownership in the City. The frictions we observe in the underground market are more likely due to the general scarcity of guns in the city (gun ownership rates are quite low, a fact that predates the ban) and on Chicago's emphasis on anti-gun policing."  Chicago Exhibit 12 at F560; *see also id.* at F573 ("To the extent to which Chicago's gun market works less well than in other places, the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns."); Exhibit 3 at 147:1-9 (Cook Dep.) (admitting that "at the end of the day we could not say with confidence" that "the regulations that were in place at that time in the City of Chicago" were responsible for difficulty criminals encountered in obtaining guns); *id.* at 182-83 (admitting that "I cannot tell you that I have direct evidence that proves ... or that supports" the statement that Chicago's ban on carrying, coupled with police enforcement targeted on illegal carrying, in fact reduced the misuse of guns outside of the home in Chicago"); *id* at 183 (admitting that "Chicago has a high murder rate, and the murders they do have are to a very large extent

37

committed ... with guns. So [the ban on carriage coupled with targeted policing] clearly is not completely effective, far from it").

**DEFENDANTS' REPLY**: Plaintiffs' response fails to dispute the facts asserted and instead argues that the carriage ban has not "contributed significantly" to a reduction in the incidence of gun ownership or carrying by criminals in Chicago. However, the materials cited by Plaintiffs do not support that proposition. Plaintiffs first cite three statements by Dr. Cook regarding the City's prior ban on handgun possession in the home, not its ban on carry. Indeed, those statements expressly acknowledge the import of targeted police emphasis on guns, a tactic that goes hand-in-hand with a carry ban.

Further, even if the handgun possession ban had been less than successful in reducing the overall *prevalence* of guns in Chicago, it does not follow (and Plaintiffs provide no evidence showing that it does) that the City's ban on firearms sales and transfers is unsuccessful in reducing criminal *access* to guns. As to whether the handgun ban reduced gun availability (as distinct from gun prevalence), the 2007 Chicago Study stated that it had "no direct test" of the ban's influence. Def. Ex. 12, at F560. The study also stated that handgun bans can "affect gun availability to criminals in ways other than by reducing household gun ownership rates, as might occur if owners are now less likely to resell their guns through unregulated secondary market transactions. . . . Chicago's handgun ban may also have helped to reduce criminal access to guns by preventing the location of licensed gun dealers in high-crime neighborhoods." Def. Ex. 12 at F576. And immediately after the passage quoted by Plaintiffs from p. F560 of Def. Ex. 12 (the 2007 Chicago Study) concerning the handgun ban, the study states that "we are also (or perhaps especially) interested in the question of whether friction in the underground gun market winds up

38

influencing gun involvement in crime. Section 4 reviews evidence suggesting an affirmative answer.").

In addition, the last two statements that Plaintiffs cite from Dr. Cook are mischaracterized. While perhaps indicating an absence of "direct evidence" that the carry ban has been "completely effective," they do not suggest that the carry ban has had no impact, nor that Dr. Cook's opinion regarding the same is unsound. Indeed, as Dr. Cook noted, evidence from the 2007 Chicago Study and surveys of arrestees indicates that the carry ban, coupled with targeted policing, has had an effect: That evidence shows that "large sections of the active criminal community, if you call it that, do not have a gun and do not carry a gun" and that, "compared with other cities, that there's a fairly low gun ownership rate" in Chicago. Pl. Ex. 13, at 183:6-14.

23-B. Dr. Cook opines that "[t]argeted patrol against illicit gun carrying has been shown to be effective," citing J. Cohen & J. Ludwig, Policing Crime Guns in Evaluating Gun Policy: Effects on Crime and Violence 217-250 (J. Ludwig & P. J. Cook eds. 2003) and E. F. McGarrell, et al., Reducing Gun Violence: Evaluation of the Indianapolis Police Department's Directed Patrol Project, National Institutes of Justice (2002). Exhibit 13, Exhibit A thereto, at 14; Exhibits 25 & 26 (studies).

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so opined, and that he cited the two referenced studies.

**DEFENDANTS' REPLY**: None.

24. Policing Crime Guns studied targeted patrols in Pittsburgh that were undertaken in certain areas of the city on certain days ("on days") but not on others ("off days"). Exhibit 25

at 219. The patrols involved police contacts with citizens "initiated mainly through traffic stops and 'stop-and-talk' activities with pedestrians in public areas." *Id.* at 221. "When warranted for reasons of officer safety (usually because of suspicious actions or demeanor), these stops sometimes moved to the types of pat-downs on the outside of clothing to check for weapons that are allowed" as Terry stops. *Id.* The study "suggest[s] that Pittsburgh's targeted policing program against illegal gun carrying may have reduced shots fired by 34 percent and gunshot injuries by as much as 71 percent in the targeted areas." *Id.* at 238. The study reported that since the "number of actual arrests and guns confiscated as a result of these patrols was fairly modest. .. [t]hese reductions are likely to occur because of deterred gun carrying or criminal behavior." ld. at 220.

**PLAINTIFFS' RESPONSE**: Admit that Policing Crime Guns made these findings, but dispute that these findings support the flat carriage bans at issue here. As Dr. Cook admits, "in Pittsburgh at the time of [their successful firearm suppression patrol program] citizens who qualified could get a permit and carry a gun lawfully." Exhibit 3 at 200 (Cook Dep.); *see also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 36-37. Indeed, if Dr. Cook's assessment of this program is correct, "it shows that you do not need a complete Chicago-style ban on carriage to carry out effective targeted patrol programs." *Id.* Furthermore, in the Pittsburgh program "police contacts were initiated mainly through traffic stops and 'stop-and-talk' activities with pedestrians in public areas," Chicago Exhibit 25 at 221, not through apprehending individuals on their own property.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Plaintiffs fail to dispute the facts asserted and instead argue that the cited study does not support

40

a flat ban on carry.  Further, Plaintiffs fail to proffer facts supporting that argument.  Even if

some form of legal gun carrying was permitted in Pittsburgh at the time of the study, that does

not mean that targeted policing is not more effective when carrying is completely banned.

Plaintiffs also cite pages 36-37 of Dr. Kleck's report.  While those pages contain Dr. Kleck's

speculation, they cite no evidence or studies at all, much less those showing that targeted policing

is just as effective in cities that permit carry as in those that do not.

      25.    Reducing Gun Violence evaluated an Indianapolis policing strategy of focusing

on "specific suspicious behavior and individuals" in a particular area. Exhibit 26 at 2.  It

"reduced gun crime, homicide, aggravated assault with a gun, and armed robbery." *Id.* "[T]otal

gun crimes declined 29 percent" and "aggravated assaults with a gun and armed robberies

declined 40 percent" in the area.  *Id.* at 10.

**PLAINTIFFS' RESPONSE**: Admit that Reducing Gun Violence made these findings, but

dispute that these findings support the flat carriage bans at issue here. The Indianapolis program

took place in 1997.  *See* Chicago Exhibit 26 at 5.  At that time, Indiana issued licenses that

permitted qualified citizens lawfully to carry handguns in public.  *See* IC 35-47-2-1 et seq. (1997)

(West); *see also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 36-37.  Indeed, if Dr. Cook's

assessment of this program is correct, "it shows that you do not need a complete Chicago-style

ban on carriage to carry out effective targeted patrol programs." *Id.*  Furthermore, the

Indianapolis program focused on a "selective approach to vehicle and pedestrian stops" in a

certain part of the city, Chicago Exhibit 26 at 8, not on apprehending people on their own

property.

**DEFENDANTS' REPLY**:  Plaintiffs' response beyond their admission should be disregarded.

Plaintiffs fail to dispute the facts asserted and instead argue that the cited study does not support a flat ban on carry.  Further, Plaintiffs fail to proffer facts supporting that argument.  Even if some form of legal gun carrying was permitted in Indianapolis at the time of the study, that does not mean that targeted policing is not more effective when carrying is completely banned. Plaintiffs also cite pages 36-37 of Dr. Kleck's report.  While those pages contain Dr. Kleck's speculation, they cite no evidence or studies at all, much less those showing that targeted policing is just as effective in cities that permit carry as in those that do not.

26-A.  "Targeted patrol against guns has been a prominent feature of New York City policing for the last two decades, a period during which that city has enjoyed an unprecedented reduction in violent crime."  Exhibit 13, Exhibit A thereto, at 14.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so opined, but dispute that this in any way supports Chicago's flat carriage ban.  As an initial matter, Dr. Cook conceded that "analysts have found it difficult to identify the precise contribution of targeted patrol to the crime drop." Chicago Exhibit 13, Exhibit A thereto, at 14.  Furthermore, New York does not have a flat ban on carrying firearms in public.  *See* N.Y. PENAL LAW §§ 265.20(a)(3) & 400.00.

**DEFENDANTS' REPLY**:  Plaintiffs' response beyond their admission should be disregarded. Plaintiffs fail to dispute the facts asserted and instead argue that New York targeted policing does not support a flat ban on carry.  Further, Plaintiffs fail to proffer facts supporting that argument. Even if some form of legal gun carrying is permitted in New York, that does not mean that targeted policing is not more effective when carrying is completely banned.  Further, the fact that the "precise contribution" of New York targeted policing to the crime drop may be unknown does not mean that the practice has had no impact on the crime drop.

42

26-B. Further, Dr. Cook's 2007 study of disadvantaged neighborhoods and criminal access to guns in Chicago ("2007 Chicago Study") found that "[p]olice pressure against guns ... does discourage participation in the gun trade in Chicago." Exhibit 12 at F570.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook's study so found, but dispute any implication that the study found that the City's legal restrictions against possessing and carrying guns themselves contributed to frictions in the underground gun market. To the contrary, the study found that "Chicago's [former] handgun ban ... was ineffective in reducing the prevalence of gun ownership in the City. The frictions we observe in the underground market are more likely due to the general scarcity of guns in the city (gun ownership rates are quite low, a fact that predates the ban) and on Chicago's emphasis on anti-gun policing." Chicago Exhibit 12 at F560; *see also id* at F573 (To the extent to which Chicago's gun market works less well than in other places, the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns."); Exhibit 3 at 147 (Cook Dep.) (admitting that "at the end of the day we could not say with confidence" that "the regulations that were in place at that time in the City of Chicago" were responsible for difficulty criminals encountered in obtaining guns). At any rate, the data from the 2007 Chicago Study indicates that "the median price paid by for handguns by Chicago criminals was ... less than half the average new-gun retail price of the guns confiscated from Chicago criminals." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 32.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. It fails to dispute the facts asserted and instead asserts a different proposition – namely, that the 2007 Chicago Study failed to find that the City's carry restrictions contributed to frictions in the

43

underground gun market. Moreover, the excerpts from that study cited by Plaintiffs do not support that proposition. In fact, they demonstrate just the opposite. While failing to attribute an impact to the City's prior ban on handgun possession in the home, the excerpts expressly acknowledge the import of targeted policing, a tactic that goes hand-in-hand with a carry ban. Further, regarding Plaintiffs' contentions about the efficacy of the prior handgun possession ban, *see* D-RSOF 23-A. Regarding Plaintiffs' contention about the price of guns in the underground Chicago market, *see* D-RSOF 53.

27-A. Dr. Cook opines that if "stop-and- frisk tactics (or other targeted patrol tactics) became unavailable for any reason (including because the legal basis for conducting them was eliminated through the striking down of strict carrying restrictions), then the reductions of gun misuse resulting from these tactics would be lost," and there "would be more guns on the street." Exhibit 13, Exhibit A thereto, at 15; Exhibit 15 at 184:23-185:3.

**PLAINTIFFS' RESPONSE**: Admit, but for the reasons cited in responses to Statements of Fact 21 through 26, dispute the basis for any claim by Dr. Cook that striking down the carriage limitations at issue in this case would interfere with targeted patrol tactics.

**DEFENDANTS' REPLY**: *See* D-RSOF 21-26.

27-B. Many Chicago gang members and affiliates may not have a recorded criminal history that would disqualify them from receiving a gun permit. Exhibit 24, ¶ 10. Chief Williams testified that if it became legal to possess guns in the spaces outside a home, CPD would not be able to arrest CFP-holding gang members or their acquaintances for possessing guns in these spaces, and they would be more likely to do so. *Id.*, ¶¶ 10-11; *see also* Exhibit 10, ¶¶ 33-34. And because, many times, firearms possession is the only crime being committed during an

encounter between police and a gang member, there would be no other basis for an arrest.

Exhibit 24, ¶ 11; Exhibit 10, ¶ 34. Instead, rather than being able to arrest the gang member

before a violent firearm act occurs, law enforcement will have to wait until after the gang

member actually commits a violent act with the gun. Exhibit 24, ¶ 11; Exhibit 1 0, ¶¶ 34- 35.

**PLAINTIFFS' RESPONSE**: Admit that Chief Williams so testified, but dispute at least two

premises of his testimony: (1) that any significant number of gang members and their affiliates

are eligible to qualify for a CFP, and (2) that any significant number of qualified gang members

and their affiliates actually would obtain a CFP and register their guns. With respect to the first

premise, Chief Williams has presented no empirical evidence relating to the number of Chicago

gang members and their affiliates who are not disqualified from obtaining a CFP by virtue of

their criminal history. And he completely ignores the fact that criminal history is not the only

factor that can make a person ineligible for a CFP. *See* MCC § 8-20-110(b). For example, to

obtain a CFP a person must not be an unlawful drug user. *See* MCC § 8-20-110(b)(5); 18 U.S.C.

§ 922(g)(3). Given that criminals are very likely to use drugs (and given that Chicago's gangs

are criminal enterprises), it is likely that this qualification would make many Chicago gang

members and affiliates ineligible for a CFP. *See* Chicago Exhibit 10, ¶ 24 (Chicago's "[g]angs

engage in extensive criminal activity, including but not limited to the sale of illegal drugs .... ");

Chicago Exhibit 31 at 53 (survey of convicted felons finding that "27% said they only took drugs

from time to time ... , 12%, used drugs only on the weekends, and ... nearly two-fifths, used drugs

just about every day"). Other factors that would make a person ineligible for a CFP but that

Chief Williams ignores include mental disability illegal alien status. *See* MCC § 8-20-110(b)(2);

430 ILCS 65/8(g)&(I). With respect to the second premise, *see* our response to Statement of Fact

21.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. They purport to dispute two premises of Chief Williams' testimony, but fail to cite facts establishing a dispute.

As to the first premise, Plaintiffs cite no facts, evidence, or police testimony relating to how many Chicago criminals and gang members would be disqualified from acquiring a CFP under any of the exclusions discussed by Plaintiffs. Plaintiffs simply speculate that many such individuals would be disqualified. In fact, evidence indicates that the many disqualified individuals will actually not be screened out, due to problems in Illinois' reporting systems for mental disability. The Illinois Auditor General recently completed an audit of the Illinois State Police's ("ISP") implementation of the Illinois Firearm Owner's Identification ("FOID") Card program, and found that:

- There are significant deficiencies in the reporting of individuals with potentially disqualifying mental health conditions to ISP

- During 2010, only 3 of the 102 circuit court clerks (3%) submitted mental health court orders to ISP as required by the [Illinois Firearm Owners Identification Card Act].

- As a result, ISP did not receive the information needed from the circuit court clerks to revoke or deny FOID cards. Due to the lack of reporting by circuit court clerks in Illinois, ISP could not report all individuals adjudicated as a "mental defective" or "intellectually disabled" . . . to the FBI's National Instant Criminal Background Check System (NICS), as required by the Act.

46

- Unless reported by another source . . . individuals from those counties could receive or continue to hold a valid FOID card and could use it to purchase firearms and ammunition.

Def. Ex. 99 (FOID Program Audit Summary Report Digest), at i, iv. The audit concluded that, due in part to these problems, "[T]he effectiveness of the Illinois FOID card program operated by the ISP is limited in promoting and protecting the safety of the public." *Id.* at iii.

As to the second premise, *see* D-RSOF 21.

28. Further, "by providing an independent basis for arrest and prosecution, the illegality of firearms outside the home allows CPD to take gang members off the street without disclosing evidence of larger criminal gang activity in which that gang member is involved (or the sources of that evidence, such as confidential informants) that the CPD may be currently investigating. If this basis did not exist, CPD would have to make a choice between letting the armed gang member remain free or risk compromising a larger investigation." Exhibit 10, ¶ 35.

**PLAINTIFFS' RESPONSE**: Admit that Commander Gorman so opines. Dispute that Chicago has established that striking down the challenged laws would eliminate the basis for taking an armed gang member off the street without disclosing evidence of larger criminal gang activity in which that member is involved. *See* Responses to Statements of Fact 21 and 27. Additionally, Plaintiffs are not challenging Chicago's carriage ban to the extent it prohibits carriage on "the street."

**DEFENDANTS' REPLY**: *See* D-RSOF 21 & 27. Defendants further note that, in Plaintiffs' responses to those two paragraphs, Plaintiffs nowhere address the issue of the carry ban's relationship to disclosing evidence of arger criminal activity.

47

29-A.  "An ex ante permitting regime for carry is not sufficient to screen out all potential bad actors because many people who commit gun crimes do not, in fact, have a prior record that would disqualify them from carrying under typical prescreening regimes."  Exhibit 13, Exhibit A thereto, at 3.  "[A] majority of criminal homicides and other serious crimes committed are committed by individuals who have not been convicted of a felony."  *Id.* at 16.  A study of Illinois data published by Dr. Cook in Criminal Records of Homicide Offenders, 294 Journal of the American Medical Association 598-601 (2005), found that "just 43 percent of adults arrested for criminal homicide ... had a felony conviction on their record."  *Id.*; Exhibit 27 (Cook study).

**PLAINTIFFS' RESPONSE**:  Admit that Dr. Cook so opines, but dispute his conclusion that "a majority of criminal homicides and other serious crimes committed are committed by individuals who have not been convicted of a felony."  He relies on his cited study for this assertion, but it is misleading to state that this study found that "just 43 percent of adults arrested for criminal homicide had a felony conviction on their record."  Rather, it found that 43 percent of adults arrested for criminal homicide in Illinois had a felony conviction in Illinois in the decade prior to their arrest.  *See* Chicago Exhibit 27 at 599; compare 430 ILCS 65/8(c); 18 U.S.C. § 922(g)(1).  *See also* Chicago Exhibit 31 at xxxii ("70-80% of firearms offenders have criminal records with an average of four major felony arrests prior to the commission of a homicide").  The study also has other shortcomings.  *See* Chicago Exhibit 27 at 600 (e.g., "the identification of homicide offending with homicide arrest," because "an unknown fraction of homicide arrestees in Illinois in 2001 was not factually guilty").  Additionally, Dr. Cook has admitted that this study of Illinois cannot be used to "infer the percentage of murderers in Chicago who have a prior felony conviction."  Exhibit 3 at 231 (Cook Dep.).  And he has also written that "most gun crime in the

48

U.S. is accounted for by people not legally allowed to have guns."  Chicago Exhibit 12 at F561.

We also dispute the implication that a felony is the only type of criminal conviction that disqualifies a person from possessing a firearm under governing law.  For example, federal law additionally prohibits firearms possession by those convicted of a misdemeanor crime of domestic violence.  18 U.S.C. § 922(g)(9).  Illinois similarly denies eligibility for a license to possess a firearm for domestic abusers.  *See* 430 ILCS 65/8(1).  This likely has implications for the effectiveness of prescreening regimes because, according Dr. Cook, "most domestic homicides are preceded by a history of assaults."  Chicago Exhibit 27 at 600.  And, as we explained in response to Statement of Fact 27, other factors in addition to a person's criminal record, such as drug use and mental disability, can also disqualify a person from possessing a firearm.

Finally, we dispute that Dr. Cook's opinion to the extent it implies that "bad actors" would obtain a license to carry a handgun even if eligible for one.  *See* our Response to Statement of Fact 21.

**DEFENDANTS' REPLY**:  Plaintiffs' response beyond their admission should be disregarded.  Plaintiffs purport to dispute the proposition that "a majority of criminal homicides and other serious crimes are committed by individuals who have not been convicted of a felony," but they fail to proffer facts or evidence doing so.  While Plaintiffs quibble with how to characterize Dr. Cook's Illinois study (Def. Ex. 27), they offer no study that refutes the proposition or affirmatively questions Dr. Cook's results.  Their citation to a statistic from Def. Ex. 31 also fails on this score, because it addresses the number of arrestees with a prior *arrest*, not a prior *conviction*.  Further, Plaintiffs mischaracterize Dr. Cook's deposition testimony.  He testified that

49

the Illinois study "did not break out Chicago as a separate case from the Illinois' data." Pl. Ex. 3, at 231:21-22. And even if the Illinois study cannot be used to infer the precise percentage of Chicago murderers with a prior felony conviction, this does not mean that the study has no bearing on the soundness of Chicago's restrictions. Indeed, Plaintiffs cite no expert opinion that it has no bearing.

In addition, Plaintiffs merely speculate that disqualifications for domestic battery convictions "likely has implications" for the effectiveness of prescreening regimes. They neither identify what these implications actually are, much less support them with facts or evidence. As to the remainder of Plaintiffs' response, *see* D-RSOF 21 & 27.

29-B. Dr. Kleck agrees that under a permitting system, "some criminals will be able to carry guns" and "some people who have permits will commit crimes with those guns." Exhibit 14, at 446:5-11.

**PLAINTIFFS' RESPONSE**: Admit. Dr. Kleck "is not aware of any responsible party who has asserted that there is no risk whatsoever from issuing permits to [persons not identified as criminals from public records] .... A more reasonable argument that is not a mere straw man is that this risk is quite small relative to the benefits of genuinely noncriminal persons having the legal right to carry guns. . . .").

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. In any event, regarding the assertion in the second sentence of the parenthetical, *see* D-RSOF 21 & 27.

29-C. Data compiled by the Violence Policy Center indicates that between May 2007 and August 2011, concealed-carry permit holders killed 370 people (net of justifiable homicide

killings).  Exhibit 13, Exhibit A thereto, at 17.

**PLAINTIFFS' RESPONSE**: Admit, but dispute that this data does anything to undermine the

fact that "the available data about [concealed-carry] permit holders imply that they are at a fairly

low risk of misusing guns, consistent with the relatively low arrest observed to date for permit

holders." Exhibit 4 at 1082 (Philip J. Cook, et al., *Gun Control After Heller*, 56 UCLA L. REV.

1041 (2009)); *see also* Response to Statement of Fact 21.

Even taking the 370 figure at face value, the VPC report simply confirms that concealed

carry permit holders are more likely to be law-abiding than the average citizen.  In 2007 there

were approximately 3.5 million concealed-carry permits in the United States.  *See* Exhibit 16 at

671 (Don B. Kates & Gary Mauser, *Would Banning Firearms Reduce Murder and Suicide?  A*

*Review of International and Some Domestic Evidence*, 30 HARV. J. L. & PUB. POL'Y 649

(2007)).  If we make the conservative assumption that this number did not increase after 2007,

that means that a mere one-ten-thousandth of one percent of concealed-carry permit holders

committed homicide over the approximately four-year time span covered by VPC's report.  That

works out to a homicide commission rate of about 2.6 per 100,000 per year.  By contrast, the

national homicide rate between 2007 and 2010 (the latest year for which we have data), varied

from 5.9 per 100,000 (in 2007) to 4.9 per 100,000 (in 2010).  *See* Exhibits 17, 18, 19, and 20

(Federal Bureau of Investigation, Crime in the United States (2007 - 2010) (Available at

http://www2.fbi.gov/ucr/cius2007/data/table_16.html;

http://www2.fbi.gov/ucr/cius2008/data/table_16.html;

http://www2.fbi.gov/ucr/cius2009/data/table_16.html; http://www.fbi.gov./about-

us/cjis/ucr/crime-in-the-u.s./2010/crime-in-the-U.S.-2010/tables/10tbl16.xls))

And note that this actually overstates the homicide rate of carry-permit holders, because the 370 deaths cited by the VPC include not just murder, but also suicides (over 100) and all types of manslaughter and even firearm accidents, whereas the FBI's figure includes only murder and non-negligent manslaughter.

Further, Dr. Kleck examined an earlier report by the same organization and concluded that "most of the homicides identified by VPC do not support an argument that possession of a carry permit makes criminal homicide more likely" because a carry permit did not in any way facilitate many of the reported murders. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 38-40.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as it merely argues the implications of the asserted facts. Moreover, Plaintiffs' calculations regarding the homicide rate of concealed carry permit holders versus the national homicide rate are faulty. First, they fail to support their assertion that, in 2007, there were approximately 3.5 million concealed carry permits in the U.S. They cite page 671 of Pl. Ex. 16, but that page, in turn, cites footnote 29 of that Exhibit 16, which cites an article published in 2005, not 2007. Second, the calculations rest on the unsupported assumption that the Violence Policy Center data reflects all, rather than just a subset, of deaths by the hands of concealed carry permit holders. Plaintiffs provide no support for this premise, and it is in fact rebutted by the Violence Policy Center itself. *See* Def. Ex.100 (VPC website) ("Because detailed information on such killings is not readily available, the VPC is forced to rely primarily on news accounts for reports of such killings and subsequent legal proceedings;" as a result, "the actual numbers are most likely far higher"). *See also* D-RSOF 21.

30.     Dr. Cook opines that "if it could be established by a witness" that the "nominally

private spaces ... outside of the main dwelling structure of a residence such as yards or porches . . . were no different than public spaces in terms of the ability of people in those spaces to inflict public gun violence or be the victim of public gun violence, then [his] opinions on the carry regulations set out in [his] report would apply equally to those private spaces. If a bullet fired from one space into the other would not respect the nominal change in ownership status, there is no reason to expect that outcomes which are true 'on the street' would not hold true just off of it." *Id.* at 15.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so opined.

**DEFENDANTS' REPLY**: None.

31.      The Tyler/Pacholski home lies between Jerome Street to the south and an alley to north; the front of the home faces Jerome Street and the rear faces the alley. Exhibit 2 at 120:4-9; Exhibit 1 at 57:4-9 and Exhibit 6 thereto. The front of the property line extends to a sidewalk that runs parallel to Jerome Street, and the rear property line extends to the alley. Exhibit 2 at 120:23-121 :20; Exhibit 1 at 57:7-10. The parcel contains a detached two-and-a-half car garage behind the house; the garage opens into the alley. Exhibit 2 at 122:10-19; Exhibit 1 at 51:24, 54: 19-55:5, and Exhibit 6 thereto. The garage is used to store cars and other items; it is not used for residential purposes. Exhibit 1 at 57:15-58:5; Exhibit 2 at 125:7-15. The garage is 5 to 6 feet away from the neighboring residential parcels on either side of the Tyler/Pacholski parcel. Exhibit 1 at 60:7-22, and Exhibit 6 thereto. The parcel has a back yard which extends all the way to the alley on either side of the garage. *Id.* The backyard is "very accessible" to the alley. Exhibit 1 at 78:6-11. A fence with three gates encloses the back yard, but there is no fence in the front yard. Exhibit 1 at 64: 17-24. The home has three porches: a second-storey balcony that is

accessible from the bedroom; a two foot by three foot exterior landing attached to the house's

rear door; and a two foot by four foot slab attached to the house's front door. Exhibit 1 at 61:3-

62:21. The porch outside the front door is 30 feet from the Jerome Street sidewalk. Exhibit 2 at

129:20-130:11.

**PLAINTIFFS' RESPONSE**: Admitted, with the understanding that the statement that Dr. Tyler

and Mr. Pacholski's garage is not used for "residential purposes" simply means that no one lives

in the garage. They keep items such as cars and gardening equipment there and are in the garage

"every day." Chicago Exhibit 1 at 57:11-58:8.

**DEFENDANTS' REPLY**: None.

32.     Hall's home is on a corner, 90 by 100 foot parcel on the northwest corner of West

113th Street and Bell Avenue. Exhibit 3 at 94:9-11; Exhibit 28 (PLMH 000017). Immediately

west of the home is a driveway leading into West 113th Street. Exhibit 3 at 97:4-15, 105:3-10,

and Exhibit 4 thereto. The parcel has a detached two-car garage, which is used to store various

items, such as tools, bikes, and toys. Exhibit 3 at 94:15-16, 99:21-100:1. No cars are kept in the

garage, nor does anyone live there. *Id.* at 100:2-9. The garage is about 18 inches from the

western neighbor's property line, and between 12 and 18 inches from the northern neighbor's

property line. *Id.* at 105:11-21. There is an 8 by 20 feet porch on the east side of the home,

which faces Bell Avenue. *Id.* at 97:16-23, 101:21-102:1, Exhibit 4 thereto. It is about 15 feet

from the sidewalk that runs parallel to Bell Avenue, and 20 feet from the sidewalk that runs

parallel to West 113th Street. *Id.* at 103:5-8, 104:23-105:2, Exhibit 4 thereto. There is also a

side porch on the south side of the house that is 15 feet from the sidewalk that runs parallel to

West 113th Street. *Id.* at 104:12-22. The property also contains a 3 and a half to four foot high

54

fence. *Id.* at 106:16-23. A baseball diamond belonging to Morgan Park Academy, a K-12 school, lies to the east of his home on the western side of Bell Avenue. *Id.* at 105:22-106:10.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

33. The dimensions and layouts of the Tyler/Pacholski and Hall residential parcels are typical of those commonly found in Chicago. Exhibit 24, ¶¶ 5,6. In a typical Chicago neighborhood, "the lots are 25 by 125 [feet] and people live very closely to each other." Exhibit 29 (Deposition of Vance Henry) at 11:19-12:3. Much of the space on a typical residential parcel is taken up by the residential building containing the dwelling unit( s), for instance, a home or a condominium building. Exhibit 24, ¶ 4. Thus, spaces outside this structure, such as porches, stairways, yards, or common areas, are typically a short distance away from the public way (i.e., adjacent streets, sidewalks, or alleys). *Id.* An even shorter distance typically separates these spaces from neighboring parcels. *Id.* Yards, driveways, and garages in particular typically directly abut sidewalks, streets, alleys, and/or neighboring parcels. *Id.*

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

34. Chief Williams testified that "given these compact dimensions, private spaces outside the home, such porches, yards, stairs, garages, and common areas, are essentially 'public' when it comes to committing firearms violence. The shootings, gunshot injuries, and intimidation that can occur in these places are virtually identical to those that can take place in purely public areas." *Id.*, ¶ 7. Chief Williams testified that a person with a gun on his porch, in his yard, or on his staircase can use the firearm to intimidate or shoot a person on the sidewalk, or

in neighboring yard, in virtually the same way that he could if he were standing on the sidewalk or neighboring yard itself. *Id.* The person on the sidewalk or neighboring yard can see the possessor's gun, can hear threatening speech by the possessor, and can be targeted and shot by the possessor. *Id.* These risks befall not only members of the public, but law enforcement officers as well. *Id.*, ¶ 6; Exhibit 30 (Deposition of Dana Alexander) at 33:8-20.

**PLAINTIFFS' REPLY**: Admit that Chief Williams so testified, but dispute his suggestion that all areas on a person's property outside of the main dwelling unit are "essentially 'public' when it comes to committing firearms violence." Chief Williams bases his conclusion on the "compact dimensions" of property in Chicago. "Compact dimensions" do not convert the inside of a garage with the door closed, for example, into an "essentially public" space. *See* Exhibit 3 at 202:11-23, 204:6-13 (Cook Dep.) (admitting that he would consider a garage that "does not have direct open access to the street" to be "strictly speaking, private"; admitting that "the garage with the garage door shut is more similar to the house"). Furthermore, according to Chief Williams' logic, a home with an open door or window would be just as "essentially public" as a front porch or a yard.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Plaintiffs merely argue that a garage is more private than other areas outside a home. Dr. Cook's unsurprising testimony that a garage is, "strictly speaking," private does nothing to undermine Chief Williams' testimony that firearms violence essentially public in character can be inflicted from garage. And Plaintiffs' equating of a garage with a home whose door or window is open amounts to a legal argument that *Heller* should extend outside the home.

35. Further, Chief Williams testified that escalation of disputes can happen in these

areas in just the same way that an encounter between two people on a sidewalk or on opposite sides of the street when guns are present. Exhibit 24, ¶ 7. And even if the gun is not initially used to intimidate or shoot, a firearm possessed in these spaces outside the home will embolden the possessor to be more aggressive than he or she otherwise would. *Id.* This can cause otherwise conventional disputes or arguments between neighbors or neighborhood residents to escalate into serious confrontations where the gun would be used to intimidate or shoot. *Id.*

**PLAINTIFFS' RESPONSE**: Admit that Chief Williams so testified, but for the reasons explained in response to Statement of Fact 34, dispute that his reasoning applies to all areas of a person's property outside of the main dwelling unit. Also dispute his contention that possessing a firearm causes a person to be more aggressive. He has offered no evidence other than his bare assertion to support that statement. And it is inconsistent with evidence that "the number of harmful instances of gun carriage are far less than a tenth of one percent of the number of instances of gun carriage for defensive purposes." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 36. It is also inconsistent with evidence that concealed-carry permit holders are more likely to be law-abiding than members of the general public. *See* Response to Statement of Fact 2l.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Regarding the first sentence of Plaintiffs' response, *see* D-RSOF 34.

Regarding the second and third sentences, Plaintiffs argue, but fail to support with facts, that Chief Williams lacks the competence or expertise to testify regarding how individuals act or would act in Chicago when armed with firearms. And that argument cannot be taken seriously, given Chief Williams' over 30 years of experience on the force (particularly in Chicago neighborhoods beset by gun violence) and his current position as Acting Chief of Patrol. Def.

Ex. 24, ¶¶ 1-2.

Regarding the fourth sentence, Plaintiffs' citation does not support the assertion. In the cited portion of Dr. Kleck's report, Dr. Kleck compares an estimate of the number of times (person-days) a gun is carried for defense (even if not used for defense) with the number of gun crimes committed, rather than with the number of times (person-days) a gun is carried for criminal purposes. The report offers no basis for concluding that the number of gun crimes is the same as the number of times (person-days) a gun is carried for criminal purposes (*i.e.*, that criminals carry guns only on the days they actually commit a crime). The report therefore compares apples and oranges. A proper comparison would compare either (1) the number of self-defense uses with the number of crimes or (2) the number of times (person-days) a gun is carried for self-defense with the number of times (person-days) a gun is carried for criminal use. Further, even if guns are used in crime less than they are used for self-defense, that says nothing about whether a gun makes one more aggressive that they otherwise would be.

Regarding the last sentence of the paragraph, *see* D-RSOF 29-C.

36.    Chief Williams also testified that these same interactions and misuses can take place in the common areas inside residential buildings, such as elevators, hallways, stairwells, and lobbies. *Id.*, ¶ 8. In fact, they could be magnified in these areas because they are not private. *Id.* For instance, unlike a homeowner who can control who and how many people are allowed onto his property, any number of people living in a high-rise residential building could congregate in hallways and lobbies. *Id.*

**PLAINTIFFS' RESPONSE**: Admit that Chief Williams so testified.

**DEFENDANTS' REPLY**: None.

37.     Chief Williams testified that requiring guns to be kept within the confines of the
home reduces these risks. *Id.*, ¶ 9.  Before a gun can be misused outside the home, it must first be
be taken outside the home.  *Id.*  In the case of a dispute, in the time it takes for a resident to go
back inside the home to retrieve a gun before bringing it outside, the resident may "cool down"
and decide against getting the firearm and/or to call the police.  *Id.*  Similarly, the other disputant
may flee the scene or call the police.  *Id.*  Further, the walls and roof of a home makes it much
more secure than the spaces outside the home.  *Id.*  They can stop a misdirected bullet from
exiting the home and hitting innocent victims outside.  *Id.*  These benefits are lost when firearms
are taken outside the home.  *Id.*  In the dense neighborhoods of Chicago, a misdirected bullet
fired from outside the home stands a much greater risk of injuring an innocent bystander on a
nearby sidewalk or parcel.  *Id.*

**PLAINTIFFS' RESPONSE**: Admit that Chief Williams so testified, but for the reasons
explained in response to Statements of Fact 35 and 36, dispute his conclusions regarding the
"risks" of not requiring guns to be kept within the confines of the home.

**DEFENDANTS' REPLY**: Plaintiff's response beyond their admission should be disregarded.
Plaintiffs merely argue that the asserted risks of allowing guns outside the home do not exist, but
they cite no facts undermining Chief Williams' testimony.  Their reference to their responses to
SOF 35 & 36 are irrelevant, as those responses say nothing about the particular risks asserted in
this SOF.

38-A.  Illegal gang activity in Chicago occurs not only in public places (such as streets,
playgrounds, alleys), but also in spaces such as yards, porches, hallways, and stairwells on private
property.  Exhibit 10, ¶¶ 24, 32.  Chief Williams further testified that gang members seeking to

59

protect their turf or criminal operations (such as narcotics dealing or other vice activities) would be especially prone to engage in the these abuses discussed above.  Exhibit 24, ¶ 20; *see also* Exhibit 10, ¶ 25.  Gang members (as well as non-gang members) have done so when in the private spaces outside a home in the past.  Exhibit 24, ¶ 10; Exhibit 10, ¶ 32.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

38- B. In Chief Williams's opinion, they would be more prone to do so if it became legal for them to possess guns in those spaces.  Exhibit 24, ¶ 10; *see also* Exhibit 10, ¶ 33.  Qualified members would therefore be free to possess firearms in places like a lobby or stairwell of a residential high-rise, or on the porch or in the front yard of a three-flat. Exhibit 24, ¶ 10; Exhibit 10, ¶ 33.

**PLAINTIFFS' RESPONSE**: Admit that Chief Williams so opined, but dispute the validity of his opinion for the reasons explained in response to Statements of Fact 21 and 27.  Furthermore, dispute Chief Williams' opinion to the extent it implies that gang members and other lawbreakers decline to carry weapons because Chicago's firearms ordinance makes it illegal.  *See* Chicago Exhibit 10 ¶ 22 ("Gangs engage in extensive criminal activity, including but not limited to the sale of illegal drugs, assaults, shootings, and homicides, in furtherance of their interests .... Gangs and their members routinely use violence and intimidation to advance their criminal interests, and they rely heavily on the use of firearms. "); Exhibit 21 at 4, 6-7, 80-81 (Henry Dep.) (Deputy Chief of Staff in Mayor's office and Former Director of Chicago Police Department's community policing program:  "Q.  In your experience, do gang members typically attempt to avoid committing crimes or otherwise transgress provisions of the criminal law? . . .

60

A. I know them to be people who terrorize communities, who because of their enterprises take innocent lives, like the incidents that I mentioned and so many more that we don't have time enough to discuss today. That's what I know gang members to do, is to terrorize and to destroy the fabric of our City by destroying neighborhoods and blocks and corners where they traffic narcotics and intimidate people and destroy families by the kind of violence that they're involved in."); Exhibit 22 at 6, 67-68 (Johnson Dep.) (Sergeant of the Chicago Anti-Gun Enforcement Team: "the number of guns that are making their way onto the city streets" is not "responsive to changes in local law"); Exhibit 23 at 11-13, 35 (Martin Dep.) (Commander in Chicago Police Department: "Q. But in your experience, when you see a group of gang members or dope dealers, are they currently all potentially armed, regardless of the law about carrying weapons? A. Well, they could be, yes."); Exhibit 13 at 17:4-7 (Gorman Dep.) ("I believe that ... gangs will violate the laws to get firearms within the City of Chicago . . . .").

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Plaintiffs fail to undermine the basis for Chief Williams' testimony or otherwise dispute the assertion that gang members would be more prone to carry in the described areas if carrying were legal. Instead, Plaintiffs essentially argue Chicago's carry laws have no impact on gang members' carrying practices. None of the material they cite, however, supports this notion. Rather, the material consists of general statements supporting the unsurprising proposition that gang members commit crimes and violate the law. That does not mean, however, that Chicago's laws have no effect. Indeed, the evidence indicates that gun carrying by Chicago gang members and criminals is deterred by Chicago's laws and related policing tactics. *See* SOF 21-27. Finally, Plaintiffs take Sgt. Johnson's testimony out of context. Regarding the responsiveness of the

number of illegal guns to changes in local law, Sgt. Johnson testified that he didn't understand the question. The colloquy is as follows:

> Q.      Okay. Now, is it -- in your experience, are the number of guns that are making their way onto the city streets responsive to changes in local law?
>
> MR. AGUIAR:     Objection to the form of the question. You could answer.
>
> THE WITNESS:    No.
>
> BY MR. PATTERSON:
>
> Q.      So local law in your experience does not have an impact in the number of guns that are on the city streets?
>
> A.      I didn't understand the question.

Pl. Ex. 22 (Johnson Dep.) at 67:22-68:6-9. And rather than rephrase the question, Plaintiffs' counsel simply decided to "move on" to another topic. *See id.* at 68:10.

38-C. From those spaces they could easily use guns to oversee drug dealing taking nearby, or just feet away on a sidewalk or street corner. Exhibit 24, ¶ 10; Exhibit 10, ¶ 33. From those spaces, they could also easily use guns to intimidate or shoot at rival gang members or other people viewed as threats, or other members of the public that they merely wished to intimidate. Exhibit 24, ¶ 10; Exhibit 10, ¶ 33.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

39.      Dr. Cook's 2007 Chicago Study reported that "[j]ust showing rather than actually firing guns is usually sufficient" for the possessor to be taken seriously or intimidate. Exhibit 12

at F563. It found that even for older gang members and professional criminals regularly engaged in crime, "gun use was typically limited to simply brandishing the weapon." *Id.* Simply drawing a gun on a person can be enough to "make the person change their mind about what their intentions are." Exhibit 1 at 118:24-119:4. Dr. Cook's study further reported that sometimes it is not even necessary to explicitly show the gun, as "it's all about the bulge." Exhibit 12 at F563.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

40-A. Chief Williams testified that even if the gun is not overtly used to intimidate or shoot, it will embolden the gang member to be more aggressive, which will lead to more violent gang altercations. Exhibit 24, ¶ 10; *see also* Exhibit 10, ¶ 33.

**PLAINTIFFS' RESPONSE**: Admitted that Chief Williams so testified.

**DEFENDANTS' REPLY**: None.

40-B. Similarly, this increased gun possession would provide an incentive to rival gang members to carry guns, even if it remained illegal for them to do so, in order to protect themselves. Exhibit 24, ¶ 10. Research published in J. Wright & P. Rossi, Armed and Considered Dangerous (new 2nd ed. 2008) found that 62% of criminals who carried guns said that the chance their victim might be armed was a "very" or "somewhat important" factor in their decision to carry a gun. Exhibit 31 (Wright & Rossi study) at 150. Chief Williams testified that this proliferation of guns will further inflame the violent crime problem in Chicago. Exhibit 24, ¶ 10.

**PLAINTIFFS' RESPONSE**: Admit that Chief Williams so testified, but dispute that gang members currently lack an "incentive" to carry firearms, and thus dispute that striking down the

laws at issue here will cause a "proliferation" of guns in the hands of gang members or "further inflame" Chicago's problem with violent crime. Chicago gangs already "rely heavily on the use of firearms." *See* Chicago Exhibit 10 ¶ 22 ("Gangs engage in extensive criminal activity, including but not limited to the sale of illegal drugs, assaults, shootings, and homicides, in furtherance of their interests .... Gangs and their members routinely use violence and intimidation to advance their criminal interests, and they rely heavily on the use of firearms."); Exhibit 3 at 159:14-15 (Cook Dep.) (gangs have "unusual access and incentive to obtain guns and use them"). *See also* Response to Statement of Fact 38. This is illustrated by the Wright & Rossi survey. The chance that the victim would be armed was just one of nine reasons that at least 50% of gun offenders identified as a very or somewhat important reason for carrying a gun. *See* Chicago Exhibit 31 at 128, Table 6.1; *see also id* at 134 ("most men who were able to cite any reason to carry a gun would often be able to cite numerous reasons").

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Plaintiffs fail to undermine the basis for Chief Williams' testimony or otherwise dispute the assertion that gang members would be more likely to carry in response to legal carrying by their rivals, or the assertion that this would inflame violent crime in Chicago. Plaintiffs essentially argue that Chicago's carry laws have no impact on gang members' carrying practices. None of the material they cite, however, supports this notion. Rather, the material consists of general statements supporting the unsurprising proposition that gang members commit crimes and violate the law. That does not mean, however, that Chicago's laws have no effect. Indeed, the evidence indicates that gun carrying by Chicago gang members and criminals is impacted by Chicago's laws and related policing tactics. *See* SOF 21-27.

Morever, regarding the Wright & Rossi survey, Plaintiffs neglect to mention that of the 9 reasons offered by at least 50% of gun offenders as being a very or somewhat important reason for carrying a gun, at least 5 of those are entirely consistent with the proposition that legal gun carrying by gang members will incentive rivals to carry for self-protection. Def. Ex. 31, at 128 ("Prepared for anything"; "Ready to defend myself"; "Might need gun to escape"; "Felt better with gun"; "People don't mess with you"). Thus, 6 out of the 9 reasons offered related to a criminal wanting to carry for self-defense.

41.     People possessing firearms in the spaces outside their home are more prone to having the firearm stolen from them. *Id.*, ¶ 12. These areas are generally less secure than the home and are easier for criminals to access. *Id.* This includes garages, which are generally less secure than the home and are the target of break-ins or other crime to a greater degree than homes. *Id.*; Exhibit 1 at 84:14-21. In 2010, Chicago Police Officer Thor Soderberg was accosted in the parking lot of a CPD station and his firearm was wrestled away from him and used to shoot and kill him. Exhibit 24, ¶ 12. Chief Williams testified that "[i]f criminals are willing to take firearms from CPD officers on CPD grounds, they would not hesitate to take guns from private residents on the residents' private property." *Id.*

**PLAINTIFFS' RESPONSE**: Disputed. Chicago cites no empirical evidence to permit an evaluation of the relative probability of a person having a firearm stolen while possessing the firearm in the home versus possessing the firearm in the spaces outside the home. Chicago relies on the testimony of Chief Williams, but he admitted that he has no "empirical evidence that the risk of theft of a firearm is greater outside of the home than it is inside the home." Exhibit 15 at 63:1-5 (Williams Dep.). His experience in law enforcement alone does not allow him to answer

this empirical question. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 2, and his "anecdotal"

evidence regarding Officer Soderberg is "unscientific, and can reveal nothing about the

consequences of Chicago's restrictions on guns," *id.* Furthermore, empirical evidence

demonstrates that most criminals prefer to avoid victims possessing firearms, not to target them.

*See* Chicago Exhibit 31 at 146 (56% of convicted felons agreed or strongly agreed that "a

criminal is not going to mess around with a victim he knows is armed with a gun"; 74% agreed

or strongly agreed that "one reason burglars avoid houses when people are at home is that they

fear being shot"). Commander Gorman likewise admitted that gang members are deterred from

attacking a person if they know that the person has a firearm. Exhibit 13 at 46 (Gorman Dep.). It

is also not the case that garages are broken into more often than residences. *See* Exhibit 61 at

CITY 001415 (in Chicago from 1999 to 2010, there were 112,268 reported incidents of

residences being burglarized versus 60,836 reported instances of garages being burglarized).

**DEFENDANTS' REPLY**: Plaintiffs fail to proffer any facts showing that Chief Williams lacks

the competence or expertise to testify regarding the theft of firearms from people in the spaces

outside their homes. Instead, they argue that a different kind of evidence – empirical evidence –

is lacking. Even if true, that does not undermine the basis for Chief Williams' testimony.

Further, Plaintiffs' proffered facts do not establish an empirical case against Chief Williams'

testimony. The Wright & Rossi survey, while reporting that 56% of felons agreed or strongly

agreed that a criminal "is not going to mess around with a victim he knows is armed with a gun,"

also reported that the remaining 44% of felons disagreed or strongly disagreed with that

statement. Def. Ex. 31, at 146. That is, while some criminals may be deterred from stealing

from an armed victim, nearly half of criminals would not fear stealing from an armed victim.

66

And Plaintiffs fail to support their assertion that "[i]t is not the case that garages are broken into more often that residences." They cite aggregate totals of the number of burglaries reported at garages and those reported at residences, but that comparison is valid only if the number of garages is the same as the number of residences. Plaintiffs cite no facts showing that this is the case. Indeed, in a dense city like Chicago, with innumerable multi-unit residential buildings and scores of high rises, the number of residences far outstrips the number of garages. It is therefore not surprising that there are more reported burglaries at residences than garages, because there are many more residences to target.

42. Tyler is the only Plaintiff identified as having a "desire to possess a handgun for armed self-defense at her place of business." Exhibit 6, ¶ 31. Tyler is a veterinarian and part owner of Uptown Animal Hospital, a clinic located at 5545 North Clark Street in Chicago that is amidst a pedestrian shopping district. Exhibit 1 at 5:16-18; 6:9-14,134:1-10. The clinic is on the first floor of a building that contains two other business, one of which is a coffee shop. *Id.* at 131:7-16. The clinic can be accessed from the outside by three different doorways: One in the front that is accessed through a small vestibule that is accessed from the sidewalk, one in the back, and one that is accessed via a common interior hallway in the building that leads to the coffee shop. *Id.* at 138:5-139:11; Exhibit 32 at PLKPKT 000038. The front, "main," doorway is unlocked during business hours. *Id.* at 145:20-22. The clinic has an alarm system. *Id.* at 139:20- 22.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

43-A. There are relatively more accidents with short guns than with long guns in the

67

United States. Exhibit 14 at 320:6-11. "[T]he only kind of gun that can result in a fatal gun accident is a loaded one," and "[h]andguns are much more likely to be kept loaded [than long guns] and thus at risk of a gun accident." *Id.* at 320: 15-321:1. Long guns "often" are loaded only when they are "being used for recreational purposes and so on." *Id.* at 320:22-24.

**PLAINTIFFS' RESPONSE**: Admit that there are relatively more accidents with short guns than with long guns due to the fact that short guns are kept loaded more often. *See* Exhibit 7 at 322:9-14 (Kleck Dep.) (handguns "are not more likely to be involved in accidents relative to long guns if you control for whether they are kept loaded or not").

**DEFENDANTS' REPLY**: None.

43-B. Compared to long guns, handguns are generally less accurate and more prone to accidental discharge. Exhibit 24, ¶ 14.

**PLAINTIFFS' RESPONSE**: Disputed. *See* Exhibit 7 at 320 (Kleck Dep.) ("And relative to the rate at which they are kept loaded, handguns are less likely to be involved in accidents. But mechanically speaking, if you had a long gun and a handgun ... both loaded, it would be the long gun that would be easier to accidentally discharge."); *id.* at 319:12-320:5 (testifying that "it's easier to have an accident with a long gun than a handgun," because a long gun "requires less trigger pressure" to fire and because "long guns are more lethal firearms than handguns"); Exhibit 25 at 233 (Webster Dep.) (admitting that, "generally speaking, it's harder to handle a longer gun than a smaller gun"); *see also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 17.

**DEFENDANTS' REPLY**: None.

43-C. Like the spaces outside a person's home, a place of business is generally less secure than a home. *Id.* There is generally more foot traffic in a place of business than in a

home, and a place of business is generally open to members of the public and/or to other employees, all of whom cannot be controlled by the person wishing to possess a handgun there. *Id.*

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

43-D. Chief Williams testified that, consequently, allowing handguns to be maintained in a person's fixed place of business increases the risk of hitting an innocent bystander when the gun is discharged. *Id.*

**PLAINTIFFS' RESPONSE**: Admit that Chief Williams so testified. Dispute that allowing handguns rather than long guns in a person's fixed place of business increases the risk of hitting an innocent bystander when the gun is discharged. We have disputed above Chief Williams' claim that handguns are generally less accurate and more prone to accidental discharge than long guns.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Plaintiffs fail to proffer any facts showing that Chief Williams lacks the competence or expertise to testify that allowing handguns to be maintained in a person's fixed place of business increases the risk of hitting an innocent bystander when the gun is discharged. Further, although Plaintiffs dispute that handguns, compared to long guns, are generally less accurate and more prone to accidental discharge than long guns, they have admitted that (a) "[h]andguns are much more likely to be kept loaded [than long guns] and thus at risk of a gun accident" and (b) that there are relatively more accidents with short guns than with long guns in the United States. *See* RSOF 43-A.

44.     Compared to long guns, handguns are much more likely to be used in a crime in Chicago.  *Id.*; Exhibit 7, ¶ 2. Chief Williams testified that "because a handgun is concealable, a person possessing a handgun in the workplace would be more likely to use it as a tool of intimidation or other crime in the workplace."  Exhibit 24, ¶ 14.

**PLAINTIFFS' RESPONSE**: Admit that handguns are more likely to be used in a crime in Chicago than long guns in the sense that more crimes in Chicago are committed with handguns than with long guns. Also admit that Chief Williams gave the quoted testimony, but dispute that his conclusion (a handgun would be more likely used for intimidation or crime in the workplace) follows from his premise (a handgun is concealable).  Chief Williams does not explain why this is so, and as a matter of logic it is not apparent why it would be.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as it consists of argument and does not purport to offer any facts supporting their argument or creating a dispute as to the facts asserted by Defendants.

45-A. Chicago's restriction on gun sales and transfers does not prevent Plaintiffs from acquiring firearms; they have purchased firearms outside of Chicago, including in the Chicago suburbs.  Exhibit 1 at 150:23-151:1; Exhibit 3 at 208:8-14; Exhibit 2 at 9420-95:9.

**PLAINTIFFS' RESPONSE**: Admit that Chicago's restriction on gun sales does not prevent Plaintiffs from acquiring firearms outside of Chicago.

**DEFENDANTS' REPLY**: None.

45-B. Within 6 miles of Chicago, there are six stores that sell firearms to the public; within 25 miles, there are 29 stores; within 50 miles, there are 46 stores. Exhibit 33 (June 3, 2011 Stipulation); Exhibit 34 (Map of Chicago Area Gun Stores). Chuck's Guns ("Chuck's") is a retail

Gun store located at 14310 South Indiana in Riverdale, Illinois, approximately 7 blocks from the

Chicago border.  Exhibit 35 (Deposition of John Riggio) at 10:5-10.  Approximately 53% of

Chuck's customers who purchase firearms are Chicago residents. *Id.* at 16:18-24, 26:6-9.  Illinois

Gun Works is retail gun store located at 7229 West Grand Avenue in Elmwood Park,

approximately 500 feet from the Chicago border. Exhibit 36 (Deposition of Henry Rush) at

9:15-20.  Dr. Kleck asserts that a law-abiding, low income Chicago resident wanting a gun for

self-defense would have to spend 30 minutes driving, or 2 hours taking public transportation

(and perhaps more time learning how to take public transportation), to a suburban gun store.

Exhibit 14 at 434:25-435:8.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

46.     "[G]uns are fairly durable [and] they last for a long time." *Id.* at 168:18-20.  "In

all likelihood" a law-abiding civilian needs to go to a gun store to get a gun for self defense only

"once," if the store has the kind of gun the person wants. *Id.* at 435:9-15.  Tyler's firearms have

never needed maintenance or repairs, and she has never taken a firearm to a store for that

purpose.  Exhibit 1 at 162:14-19.  Hall has never needed to take a firearm to a dealer for

maintenance or repair.  Exhibit 3 at 220:7-9, 221:17-21.

**PLAINTIFFS' RESPONSE**: Disputed to the extent it implies that a person needs or is entitled

to only a single firearm for self-defense.  Dr. Kleck, in the cited testimony, was plainly

addressing how often a person would need to go to a gun store to get a particular weapon for

self-defense.  *See* Exhibit 7 at 435:9-15 (Kleck Dep.) ("Q. How frequently does a ... law abiding

civilian, need to go to a gun store to ... get a gun for self-defense? ... A. In all likelihood, once, if

71

they have the kind of gun the person wanted. ").

**DEFENDANTS' REPLY**: None.

47.     Since 2005, Tyler has visited gun stores in the Chicago suburbs at least 14 times.

She has visited Maxon Shooter's Supply ("Maxon's") in Des Plaines, Illinois, a 45 minute drive,

three or four times. Exhibit I at 153:5-17.  She has visited Bass Pro Shops ("Bass") in Gurnee,

Illinois, an hour drive, five or six times. *Id.* at 158:5-15. She has visited Dick's Sporting Goods

("Dick's") in Niles, Illinois, "just" a 20 minute drive, five times.  *Id.* at 159:18-160:2.  She has

visited The Adventure Store ("Adventure") in Waukegan, Illinois one time. *Id.* at 160:3-6.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

48.     Pacholski has been to Maxon's "numerous" times and goes up to 10 times a year.

Exhibit 2 at 193:22-194:5. He drives to Dick's 8 to 10 times a year. *Id.* at 199:1-10. He goes to

Bass three or four times a year. *Id.* at 110:12-16.  He visits GAT Guns in Dundee, Illinois once a

year. *Id.* at 197:23-198:4. He has also visited Adventure.  *Id.* at 199:23-200:6.  Pacholski has

purchased firearms in Wisconsin; Waukegan, Illinois; Oak Lawn, Illinois; Rosemont, Illinois;

Champaign/Urbana, Illinois; Gurnee, Illinois.  *Id.* at 77:16-19, 83:14-84:18, 94:20-95:2, 98:3-19,

104:2-12, 105:21-106:4.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

49.     Hall has bought three firearms from Check's. Exhibit 3 at 72:20-24, 74:8-16,

80:10-14; Exhibit 28 at PLMH 0000116-117.  Check's is about a 25 minute drive from Hall's

home, and he has visited it at least 10 times since 2005. Exhibit 3 at 73:24-74:2, 76:12-13,

210:15-17. Since 2005, Hall has visited Gun stores in the Chicago suburbs at least 24 times. He visited Sporting Arms & Supply in Posen, Illinois, a 45 minute drive, one time; Cabela's in Hammond, Indiana, a 30 minute drive, ten times; Cabela's in Hoffman Estates, Illinois, a 90 minute drive, two times; Bass, a 90 minute drive, one or two times; Dick's Sporting Goods in Highland, Indiana, a 40 minute drive, one time; and various Walmart locations in Illinois, ten to twenty times. *Id.* at 211:16-214:21, 215:23-216:8, 229:8-230:1.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

50. Tyler lives "right on the City limits" and "pop[s] into Evanston quite frequently." Exhibit 1 at 151:5-13. She also goes to the suburbs once or twice a month for dinner or shopping. *Id.* at 151:14-16. Pacholski drives three times a week to Gary, Indiana, a 50 minute drive from his home, for work at his aircraft hangar. Exhibit 2 at 28:18-29:7. Once a month, Hall drives 40 miles to his employer's office in Highland Park. Exhibit 3 at 6:2-16. He drives to client locations in the suburbs 5 times month. *Id.* at 9: 18-10:3, 11:9-15. Hall also travels to the suburbs once every two weeks during basketball season to referee. *Id.* at 13:4-7, 13:22-14:7.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

51. Dr. Cook opines that "it is plausible that legal restrictions on sales and other transfers of firearms, such as those in the current Chicago ordinance, have the effect of reducing the prevalence and availability of firearms to people who may be inclined to use them in violent crime." Exhibit 13, Exhibit A thereto, at 2.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so opined, but dispute the validity of his

opinion. Dr. Cook himself has acknowledged that Chicago regulations have not been responsible for reducing firearms prevalence in Chicago: "Chicago's handgun ban ... was ineffective in reducing the prevalence of gun ownership in the City. The frictions we observe in the underground market are more likely due to the general scarcity of guns in the city (gun ownership rates are quite low, a fact that predates the ban) and on Chicago's emphasis on anti-gun policing." Chicago Exhibit 12 at F560; *see also id.* at F573 ("To the extent to which Chicago's gun market works less well than in other places, the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns."); Exhibit 3 at 147:1-9 (Cook Dep.) (admitting that "at the end of the day we could not say with confidence" that "the regulations that were in place at that time in the City of Chicago" were responsible for difficulty criminals encountered in obtaining guns); *id.* at 97-98 (admitting that it wasn't surprising that the D.C.'s ban on handgun transfers failed to reduce the murder rated because the "city was attempting to control the distribution of handguns, but surrounded by other jurisdictions very much nearby that did not have those restrictions"); *see also* Exhibit 22 at 67-68 (Johnson Dep.) (the number of guns that are making their way onto the city streets" is not "responsive to changes in local law"); *id.* at 67 (admitting that as of 2009 (i.e., when the City's handgun freeze was still in place), there were "more guns than ever making their way onto Chicago city streets"); Exhibit 26 at CITY 000176 - CITY 000177 (City of Chicago, Committee on Police & Fire, June 29, 2010 Tr. of Hr'g) ("we average more weapon recoveries than any other city in the United States") (Testimony of Jody Weis, Superintendent of the Chicago Police Department). Dr. Cook also admits that "it is possible that for some criminals it is easy to obtain a gun," and that this is particularly so for gang members because they may be

able to "get access to the gang's arsenal."  *See* Exhibit 3 at 195:23-196:2 (Cook Dep.); *see also id.* at 159:14-15 (gangs have "unusual access and incentive to obtain guns and use them").

Chicago officials also testified that criminals are already able to obtain guns in Chicago without difficulty.  *See* Exhibit 22 at 87 (Johnson Dep.) (it's "not difficult at all" for a criminal to get a handgun in Chicago); Exhibit 27 at 13:8-9, 14:6-9, 34:1-10 (Brown Dep.) (agreeing that "it's fairly easy for criminals in the City of Chicago to obtain a gun illegally if they want to"); Exhibit 21 at 27: 7-16 (Henry Dep.) (agreeing that "Yes. We know that" gang members and other criminals are able to get guns in the City of Chicago.); Exhibit 28 at 14: 1-2 (Reyes Dep.) (admitting that "it's just really easy to go and buy a gun.").  This evidence is consistent with Wright & Rossi's survey of convicted felons:  "Every man in this sample has at least one felony conviction and is therefore legally prohibited from acquiring a handgun upon release .... This aside, three quarters also reported that it would be little or no trouble for them to obtain a handgun once they were released from prison, that they could arm themselves in a matter of a few hours or, at most, a few days, and that the out-of-pocket cost to do so would be approximately $100.  Since the sample averages three prior imprisonments, one may assume that many of these men will have been in the same situation in question at some prior time; we suspect, therefore, that these data reflect prior experience as much as judgments about future possibilities." Chicago Exhibit 31 at 16; *see also* Exhibit 29 at 66 (Daniel W. Webster et al., How Delinquent Youths Acquire Guns, 79 J. URBAN HEALTH 60 (March 2002)) ("Consistent with prior research, we found firearms were readily accessible, although not always instantaneously, among the crime-involved youths in our study."). In sum, "there is no logical reason to believe that the city's existing ordinance reduces the number of criminals with guns."

Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 21-22.

**DEFENDANTS' REPLY**:  Most of Plaintiffs' response attempts to impugn Dr. Cook's opinion by referring to statements by him and City officials concerning the effect of the City's prior ban on handgun possession.  This is improper, because those statements did not address the City's restrictions on gun sales and transfers.  Even if the handgun possession ban had been less than successful in reducing the overall prevalence of guns in Chicago, it does not follow (and Plaintiffs provide no evidence showing that it does) that the City's ban on firearms sales and transfers is unsuccessful in reducing criminal access to guns.

Further, even if the handgun possession ban had been less than successful in reducing the overall *prevalence* of guns in Chicago, it does not follow (and Plaintiffs provide no evidence showing that it does) that the City's ban on firearms sales and transfers is unsuccessful in reducing criminal *access* to guns.  As to whether the handgun ban reduced gun availability (as distinct from gun prevalence), the 2007 Chicago Study stated that it had "no direct test" of the ban's influence.  Def. Ex. 12, at F560.  The study also stated that handgun bans can "affect gun availability to criminals in ways other than by reducing household gun ownership rates, as might occur if owners are now less likely to resell their guns through unregulated secondary market transactions. . . .  Chicago's handgun ban may also have helped to reduce criminal access to guns by preventing the location of licensed gun dealers in high-crime neighborhoods."  Def. Ex. 12 at F576.  And immediately after the passage quoted by Plaintiffs from p. F560 of Def. Ex. 12 (the 2007 Chicago Study) concerning the handgun ban, the study states that "we are also (or perhaps especially) interested in the question of whether friction in the underground gun market winds up influencing gun involvement in crime.  Section 4 reviews evidence suggesting an affirmative

76

answer.").

Further, even though it might be "possible" that some criminals can easily obtain a gun in Chicago, the 2007 Chicago Study found that "most criminals do not have a gun" and "would have difficulty" in obtaining one due to high transaction costs in underground market. Pl. Ex. 3 (Cook Dep.) at 196:3-15. Plaintiffs attempt to undermine this finding by citing various statements made by City employees concerning criminals' ability to acquire guns. But it is clear from the transcripts that these general statements were made in the abstract; they were not in response to questions asking the witness to compare the ability of Chicago criminals to acquire guns to criminals in other jurisdictions. They were also made by non-experts who made no claim to having studied the matter like Dr. Cook. Hence, they do not undermine Dr. Cook's expert opinions with respect to the difficulties faced by Chicago criminals when trying to acquire guns. And while Plaintiffs cite Wright & Rossi's survey and a study by Dr. Webster, they offer no reason why those studies, which are not specific to Chicago and predate the 2007 Chicago Study, impugn the 2007 Chicago's study's findings.

Finally, other statements cited by Plaintiffs are taken out of context and/or misrepresent the record. Regarding Washington, D.C., Dr. Cook testified that "there is some contrast" between ability of residents of Washington, D.C. to acquire guns from neighboring jurisdictions and ability of Chicago residents to do so, since "[t]he Illinois suburbs are subject to Illinois' [purchase] regulations, which are some of the most stringent in the country." Pl. Ex. 3 (Cook Dep.) at 99:2-18. Further, Ms. Brown testified that allowing gun stores "would create additional opportunities or sources for criminals to get guns . . . [a]bove and beyond those that exist in the current climate." Def. Ex. 101 (Brown Dep.) at 114:9-18.

And, as to Sgt. Johnson's response to a question about the responsiveness of the number of illegal guns to changes in local law, Sgt. Johnson testified that he didn't understand the question. The colloquy is as follows:

Q.	Okay. Now, is it -- in your experience, are the number of guns that are making their way onto the city streets responsive to changes in local law?

MR. AGUIAR:	Objection to the form of the question. You could answer.

THE WITNESS:	No.

BY MR. PATTERSON:

Q.	So local law in your experience does not have an impact in the number of guns that are on the city streets?

A.	I didn't understand the question.

Pl. Ex. 22 (Johnson Dep.) at 67:22-68:6-9. And rather than rephrase the question, Plaintiffs' counsel simply decided to "move on" to another topic. *See id.* at 68:10.

52-A. "[T]he private transfer of guns in the informal, illegal market is the proximate source of most guns that end up being used in crime." *Id.* at 10.

**PLAINTIFFS' RESPONSE**: Admit, with the understanding that "private transfer ... in the informal, illegal market" includes theft. *See* Chicago Exhibit 13 (Cook Decl.), Exhibit A thereto, at 8 ('Typical transactions include ... thefts .... ").

**DEFENDANTS' REPLY**: None.

52-B. While "[a]lmost all firearms used in crime in the United States were first sold at retail by a federally licensed dealer ... in most cases [of crime] the firearm is not purchased

78

directly by the ultimate perpetrator, but rather goes through a series of transactions first." *Id.* at 8. A nationwide study of traced guns found that "just 11 percent" were confiscated from the individual who had first purchased them from a federally licensed firearm dealer (FFL"). *Id.* ATF data indicates that for the 3,054 Chicago crime gun traces in 2000 in which both the possessor and purchaser could be identified, the possessor purchased the gun directly from an FFL only 2.8% of the time. Exhibit 37 (July 2002 ATF Crime Gun Trace Reports - Chicago) at 8.

**PLAINTIFFS' RESPONSE**: Admit, except dispute any implication that traced guns are representative of guns used in crime. *See* Exhibit 7 at 80 (Kleck Dep.) (ATF trace data "concern samples of crime guns that are not representative of crime guns in general that have been basically selected samples"); Exhibit 3 at 140 (Cook Dep.) (admitting that "there is then a variety of ways in which those guns which are successfully traced might not be representative"); *id.* at 140 (admitting that "there's no perfect match between those that are successfully traced ... and the original population that you're talking about, which is all guns used in crime").

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as it does not dispute the asserted facts but instead advances a different proposition – that traced guns are not representative of guns used in crime. Further to the extent that Plaintiffs' response suggests that reliance on traced gun data is improper, Defendants note that Dr. Kleck himself has cited such data in his own work. *See* Def. Ex. 91(Kleck Dep.) at 81:11-14 (admitting that even though ATF tracing data might not be perfect, it was "worthwhile to publish results based on that data"); *id.* at 80:15-22 (admitting to having used "gun trace indicators of trafficking as measures of the possible levels of trafficking in a set of cities"). He has also written that "[l]aw

enforcement evidence" regarding gun trafficking is "the best evidence available." Plaintiffs

Exhibit 30, at 1246. *See also* Def. Ex. 102 (Mayors Against Illegal Guns, *The Movement of*

*Illegal Guns in America* (Dec. 2008)), at 28 (ATF tracing data is "the best available information

for evaluating the movement of crime guns"); Def. Ex. 58, at 20 (ATF tracing data provides "the

only available national sample of guns used in crime and otherwise possessed or carried by

criminal and high-risk groups").

53.     The 2007 Chicago Study found that the underground gun market in Chicago

"[does] not work smoothly." Exhibit 13, Exhibit A thereto, at 10. The study found that the

market is "characterized by substantial transaction costs, by which we mean large mark-ups over

legal prices, substantial search times, uncertainty about product quality, and the physical risk

associated with the exchange." Exhibit 12 at F561. The study reported that these transaction

costs "stand in contrast to conventional wisdom in the sociology and criminology literatures,

which in the context of the US has emphasized the ease with which criminals can access guns in

the informal market, as well as the inelasticity of demand by criminals." *Id.* at F580.

**PLAINTIFFS' RESPONSE**:  Admit that the study so found, but dispute the validity of its

conclusions. Dr. Kleck has thoroughly critiqued the study and the conclusions Dr. Cook has

drawn from it. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 32-33. Indeed, he concluded that

Dr. "Cook's own data on prices paid for guns by Chicago's criminals directly contradict his

claim that guns are scarce for criminals or hard to get." *Id.* at 32; *see also* Exhibit 30 at 1248-52

(Gary Kleck et al., The Myth of Big-Time Gun Trafficking, 56 UCLA L. REV. 1233 (2009)). At

any rate, the study did not attribute any difficulty in criminals obtaining guns to the City's gun

regulations. *See* Chicago Exhibit 12 at F560 ("Chicago's handgun ban ... was ineffective in

reducing the prevalence of gun ownership in the City. The frictions we observe in the underground market are more likely due to the general scarcity of guns in the city (gun ownership rates are quite low, a fact that predates the ban) and on Chicago's emphasis on anti-gun policing."); *id.* at F573 ("To the extent to which Chicago's gun market works less well than in other places, the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns."); *id.* at F571, F581 ("The general rule is that [gang] members can only own gun if authorised by gang leaders." "Gang leaders control a stash of guns and regulate their distribution and use by members."). *See also* Exhibit 3 at 142-144 (Cook Dep.) (acknowledging that study was not based on a representative sample of participants or Chicago neighborhoods).

Chicago officials also testified that criminals are already able to obtain guns in Chicago without difficulty. *See* Exhibit 22 at 87 (Johnson Dep.) (it's "not difficult at all" for a criminal to get a handgun in Chicago); Exhibit 27 at 13:8-9, 14:6-9,34:1-7 (Brown Dep.) (agreeing that "it's fairly easy for criminals in the City of Chicago to obtain a gun illegally if they want to" *see also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 21-22 (concluding that "there is no logical reason to believe that the city's existing ordinance reduces the number of criminals with guns"). This testimony is consistent with Wright & Rossi's survey of convicted felons: "Every man in this sample has at least one felony conviction and is therefore legally prohibited from acquiring a handgun upon release .... This aside, three quarters also reported that it would be little or no trouble for them to obtain a handgun once they were released from prison, that they could arm themselves in a matter of a few hours or, at most, a few days, and that the out-of-pocket cost to do so would be approximately $100. Since the sample averages three prior imprisonments, one

may assume that many of these men will have been in the same situation in question at some prior time; we suspect, therefore, that these data reflect prior experience as much as judgments about future possibilities." Chicago Exhibit 31 at 16.

**DEFENDANTS' REPLY**:  Dr. Kleck's critiques contained in pages 32-33 of his rebuttal report (*see* Pl. Ex. 2 (Kleck Decl.), Exhibit I thereto) address either the price of guns or how long it takes to acquire guns in the illegal market.  They do not even purport to address, much less rebut, two other transaction costs identified by Dr. Cook (*i.e.*, uncertain product quality and physical risk associated with the exchange).  Those transaction costs are undisputed.

Further, as to the price of guns, Dr. Kleck claims that the price for guns in the Chicago underground market is not substantially higher than the retail price in the legal market, because the average underground market price is $325 and the average retail price is $316.  *See id.* at 32. However, comparing these two prices is appropriate only if the guns sold in the two markets are substantially the same.  And Dr. Kleck admitted that they are not.  Dr. Kleck admitted that the retail price of $316 is based on the gun being new.  Def. Ex. 91 (Kleck Dep.) at 423:14-424:2. *See also* Def. Ex. 12 (2007 Chicago Study) at F586, Table A4.  At the same time, Dr. Kleck testified that there is no "reason to believe that the guns in the illegal market are all new," and that he does not know how many of the illegal guns analyzed in the 2007 Chicago Study were new.  Def. Ex. 91 (Kleck Dep.) at 424:3-5, 13-15.  *See also id.* at 425:20-25 (testifying that while "a new gun would always be in good condition," he does not know what percentage of the illegal guns in the 2007 Chicago Study are in good condition).  The study reported that roughly 75% of illegal guns in Chicago are at least 4 years old, and 25% to 30% are 20 or more years old.  Def. Ex. 12 (2007 Chicago Study) at F586, Table A4.

These same problems plague Dr. Kleck's comparison of retail prices with the underground market pricing data drawn from the Justice Department's Drug Use Forecasting ("DUF") program reported on page F573 of the 2007 Chicago Study, *see* Pl. Ex. 2 (Kleck Decl.), Exhibit I thereto, at 32, data that was, in any event, from 10 years earlier. Dr. Kleck's analysis of this data also improperly compares the median price ($150) with an average price ($331). Further, Dr. Kleck testified that he does not know "what the price [of] guns would be on the street if there were no gun control laws" in Chicago. Def. Ex. 91 (Kleck Dep.) at 426:1-3.

In addition, Dr. Kleck admitted that his paper, Pl. Ex. 30 (Gary Kleck et al., *The Myth of Big-Time Gun Trafficking,* 56 UCLA L. REV. 1233 (2009)), was probably not peer reviewed because it was published in a law review, and law reviews "are basically edited by kids in law school." Def. Ex. 91 (Kleck Dep.) at 81:17-82:3. It therefore was "probably an exaggeration" for him to list the study on his CV as being peer-reviewed. *Id.* at 82:8-11.

As to the time it takes to acquire a gun in the underground Chicago market, Dr. Kleck asserts Dr. Cook's reliance on DUF data was improper because the DUF interviewees had never actually acquired a gun in that market. *See* Pl. Ex. 2 (Kleck Decl.), Exhibit I thereto, at 33. However, Dr. Kleck provides no basis for concluding that the interviewees' answers are unreliable. Indeed, he admitted that a person who does not have previous personal experience in obtaining a gun in the illegal market in Chicago, doesn't "necessarily have no knowledge at all" about how long it takes to get a gun, Def. Ex. 91 (Kleck Dep.) at 428:8-12, and he agreed that it is a "logical possibility" that they may know from their affiliation with a gang how long it takes to get a gun. *Id.* at 427:18-23.

As to Plaintiffs' claim that the 2007 Chicago Study did not attribute any difficulty in

criminals obtaining guns to Chicago's regulations, and the remainder of Plaintiffs' response to

Paragraph 53, Defendants refer to D-RSOF 51.

54.     The study examined Chicago's Grand Boulevard/Washington Park neighborhood,

"a large contiguous swatch of poor and working-class neighbourhoods in the South Side of

Chicago" whose homicide rate is about 75% higher than that of Chicago as a whole and whose

residents "are much more disadvantaged than other residents of Chicago or the US as a whole"

according to education, employment, and poverty statistics. *Id.* at F562, F563. This area is of

"particular interest given that gun crime in America is disproportionately concentrated in large

cities and within these cities occurs disproportionately in highly disadvantaged neighborhoods."

*Id.* at F562.

**PLAINTIFFS' RESPONSE**: Admit that the study so found, but *see* our response to Statement

of Fact 53 for a critique of the study's conclusions.

**DEFENDANTS' REPLY**: *See* D-RSOF 53.

55-A. The study found that those who were able to obtain a gun "reported paying prices

that tended to be substantially higher than in the legal market, despite the questionable quality of

the guns that were changing hands."  Exhibit 13, Exhibit A thereto, at 10.

**PLAINTIFFS' RESPONSE**: Admit that this is how Dr. Cook characterized the study's

findings, but dispute the validity of Dr. Cook's characterization.  *See* Response to Statement of

Fact 53.

**DEFENDANTS' REPLY**: *See* D-RSOF 53.

55-B. Three manufacturers' guns frequently turn up as Chicago crime guns, and while

most pistols from these manufacturers listed in excellent condition are offered on websites for

between $50 - $100, guns from these manufacturers sell in the Chicago underground market for between $150 - $400. Exhibit 12 at F564. In addition, local brokers who facilitate exchanges in the underground Chicago market were found to typically charge $30 to $50 per transaction, "a large percentage of the sales price." *Id.* at F565.

**PLAINTIFFS' RESPONSE**: Admit that the study so found, but *see* our response to Statement of Fact 53 for a critique of the study's conclusions.

**DEFENDANTS' REPLY**: Plaintiffs' response to SOF 53 does not address these particular findings of the 2007 Chicago Study. Further, *see* D-RSOF 53.

55-C. Further, Commander Gorman testified that guns sold in the underground Chicago market often sell above retail, and that guns have been sold to undercover CPD officers in sting operations for between $100 to $200 above the retail price. Exhibit 10, ¶ 29.

**PLAINTIFFS' RESPONSE:** Admit that Commander Gorman so testified, but dispute that his testimony establishes that criminals in Chicago have a difficult time obtaining guns. Commander Gorman acknowledged that he has not reviewed any studies on this topic, and that he has also had experiences where any markup was "minimal." Exhibit 13 at 20:10-21:13 (Gorman Dep.). *See also* Response to Statement of Fact 51.

**DEFENDANTS' REPLY**: Plaintiffs' response does not undermine the asserted facts. The fact that there may have been instances of "minimal" markups does not mean that underground gun prices in Chicago are not often above retail. And Commander Gorman's testimony is based on his experience, not his review of academic studies. Defendants further refer to D-RSOF 51.

56. The study further found that, "[s]ince gun transactions are illegal in Chicago, communication between potential buyers and sellers is made difficult." Exhibit 12 at F581.

"The illegality of the gun market in Chicago creates information problems in matching prospective buyers and sellers. Neither side of the market can take advantage of the well-developed infrastructure for legal advertising. In addition the illegality of the market means that participants do not have recourse to the courts to enforce transactions." *Id.* at F568.  The study reported that "[e]ven local gun brokers report that a large share of their transaction attempts fall- around 30-40%. Reasons included the inability to get a gun from a supplier; the customer and broker could not agree on the location for the transaction; and the broker either did not trust the customer's intentions or thought he or she was an undercover police officer." *Id.* at F565.  The study reported that "reliable 'connections' appear to be scarce," and "executing transactions with strangers is surely a risky business." *Id.* at F566.

**PLAINTIFFS' RESPONSE**: Admit that the study so found, but dispute that the study attributed frictions in Chicago's underground gun market to the City's laws. *See* Chicago Exhibit 12 at F560 ("Chicago's handgun ban ... was ineffective in reducing the prevalence of gun ownership in the City.  The frictions we observe in the underground market are more likely due to the general scarcity of guns in the city (gun ownership rates are quite low, a fact that predates the ban) and on Chicago's emphasis on anti-gun policing."); *id.* at F573 (To the extent to which Chicago's gun market works less well than in other places, the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns."); Exhibit 3 at 147:1-9 (Cook Dep.) (admitting that "at the end of the day we could not say with confidence" that "the regulations that were in place at that time in the City of Chicago" were responsible for difficulty criminals encountered in obtaining guns). Furthermore, because criminals rarely obtain guns directly from retail sources even where gun

sales are legal, these findings have little implication for analyzing the effect of Chicago's ban on gun sales. *See* Chicago Exhibit 31 at xxxvi ("[T]he large majority of criminal firearms transactions do not involve conventional over-the-counter retail transactions .... That being the case, restrictions imposed at the point of retail sale cannot possibly have much of an effect. "); *id.* at xxxv ("most of the methods through which criminals acquire guns and virtually everything they ever do with those guns are already against the law"); Exhibit 24 at I (Bureau of Justice Statistics, Firearm Use by Offenders (Nov. 2001 )).

**DEFENDANTS' REPLY**: As to the first sentence of Plaintiffs' response and the associated citations, Defendants refer to D-RSOF 51. As to the second sentence and associated citations, the material should be disregarded, as it is irrelevant and does not meet the facts asserted by Defendants. Even if few criminals buy guns from retail dealers, that does not mean that Chicago's restriction on private transfers (apart from its restriction on retail sales) fails to maintain or increase transaction costs in the underground market.

57-A. Dr. Cook testified that guns are "quite scarce 'on the street' " in Chicago, that "most criminals in Chicago currently lack a gun and have difficulty obtaining one," and that "it is unusual for criminals in Chicago to be in possession of a gun." Exhibit 13, Exhibit A thereto, at 10: Exhibit 15 at 173 :3-22.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so opined, but dispute the validity of his opinion. *See* Response to Statement of Fact 51.

**DEFENDANTS' REPLY**: *See* D-RSOF 51.

57-B. U.S. Department of Justice data [discussed in] the 2007 Chicago Study indicates that only 21% of Chicago arrestees said they had ever owned a handgun. Exhibit 13, Exhibit A

thereto, at 11; Exhibit 12 at F573. The study reported that of 17 regular thieves interviewed, only one said that they could find a gun in less than a week. Exhibit 12 at F566. The study further reported that the U.S. Department of Justice data indicates that, of Chicago arrestees who never owned a gun but indicated that they might want one someday, about 70% reported that it would take them at least a week or that they would simply be unable to obtain one. *Id.* at F574; Exhibit 13, Exhibit A thereto, at 11. This number was roughly 60% for arrestees surveyed in other cities. Exhibit 12 at F574. That same data indicated that the percentage of Chicago arrestees who reported owning a gun (21 %) "is much lower than" the mean and median values for other surveyed cities (31 % and 33% respectively). *Id.* This data is evidence that "Chicago was not an easy place for thieves and other criminals to obtain guns;" in fact, relative to other cities, "it was one of the most difficult." Exhibit 15 at 146:19-147:5.

**PLAINTIFFS' RESPONSE**: Admit that the 2007 Chicago Study discussed the cited U.S. Department of Justice data, but dispute that this data establishes that it is unusually difficult for criminals in Chicago to obtain guns, much less that any such difficulty is attributable to Chicago's gun laws. The study acknowledged that it is "difficult" to draw "reliable inferences" from the Department of Justice data, that "sample characteristics [in several cities] appear far out of line with what we learn from other sources," and that gun ownership levels of arrestees in certain cities was "implausibly low." Chicago Exhibit 12 at F574. *See* also Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 33 (critiquing DOJ data on criminals obtaining firearms). The study further acknowledged that "the underground gun market in the high-crime South Side Chicago neighbourhood studied ... is not unique," because "[o]ther data sources [i.e., the DOJ data] indicate that high transactions costs characterise the underground gun market elsewhere ... in

88

some other large cities." Chicago Exhibit 12 at F581. Indeed, "[t]o the extent to which Chicago's gun market works less well than in other places," the study concluded, "the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns." *Id.* at F573; *see also id.* at 576 (The fact that Chicago and DC have low gun ownership rates may be more cause than consequence of restrictive local gun laws."). In sum, the Department of Justice data does not undercut the evidence we have cited elsewhere demonstrating that Chicago has conceded that it is not difficult for criminals in Chicago to obtain guns. *See* Response to Statement of Fact 51.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as it injects additional, argumentative facts in an effort to show that the evidence Plaintiffs "have cited elsewhere" is not "undercut." Further, Plaintiffs selectively quote from the 2007 Chicago Study. While the study acknowledged limitations of the Department of Justice data, it reported that that data "provide one of the best (albeit imperfect) ways to compare gun markets across cities." Def. Ex. 12, at F574. Its finding that reported gun ownership levels were "implausibly low" was made with reference to two particular cities – Dallas and San Antonio – and that "the overall finding that a minority of arrestees had ever owned a gun, and a still smaller percentage currently owned one, is plausible, since it is in line with the prevalence of gun use in crime." *Id.*

Further, the fact that, generally speaking, some other large cities may also have high transaction costs in their underground gun markets is irrelevant. Even if true, Chicago can have uniquely-high transaction costs, and Plaintiffs provide no evidence showing that Chicago's are not higher than elsewhere, or that Chicago's sale and transfer ban does not help maintain or increase those costs in Chicago. Nor does it undermine (and Plaintiffs proffer no other evidence

89

undermining) the data reported in this paragraph showing that Chicago has an unusually high number of arrestees reporting that it would take them at least a week to get a gun and an unusually low number of arrestees who reported having ever owned a gun.

As to the remainder of Plaintiffs' response, Defendants refer to D-RSOF 51.

58.     Dr. Cook concludes that "[b]y rendering sales and transfers illegal, the Chicago ordinance helps to maintain these transactions costs, which in turn, it is reasonable to suppose, depresses possession rates by criminals" and "help[s] preserve" the scarcity of guns in the illegal Chicago market. Exhibit 13, Exhibit A thereto, at 10, II.

**PLAINTIFFS' RESPONSE**:  Admit that Dr. Cook so concludes, but for all the reasons cited in response to Statements of Fact 51-57, dispute this conclusion.  In sum, Dr. "Cook has no reliable foundation for his claim [that] Chicago's gun enforcement efforts (or any other forces) have made it hard for the city's criminals and youth to get guns."  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 33.

**DEFENDANTS' RESPONSE**: *See* D-RSOF 51-57.

59.     Joseph J. Vince, Jr. is currently the Director of Criminal Justice Programs at Mount St. Mary's University in Emmitsburg, MD. Exhibit 38 (Declaration of Joseph J. Vince, Jr.), Exhibit A thereto, at 2.  He is also President of Crime Gun Solutions LLC ("CGS"), a company that assists law enforcement in the collection, access, management, analysis, training, and dissemination of crime-gun information.  *Id.*  He is also a member of the International Association of Chiefs of Police ("IACP") and serves on the IACP's Firearms Committee, which examines firearms-related violent crime and makes recommendations to the IACP's Executive Committee.  *Id.*  He previously worked as a special agent at the ATF for 28 years.  *Id.* at 1.  His

tenure at ATF included the following positions: field agent in Detroit investigating crimes concerning the firearms industry and federal firearms laws; resident agent in charge of the Omaha office; operations officer in the Firearm Division at ATF headquarters in Washington, D.C.; special agent in charge of the Firearm Tracing Branch; special agent in charge of the Intelligence Branch; chief of the Firearm Enforcement Division; and chief of the Crime Gun Analysis Branch. *Id.* at 2; Exhibit 39 (Deposition of Joseph Vince, Jr.) at 12:11-13:9.  In his career, Mr. Vince has visited firearms manufacturing facilities, audited FFLs, scrutinized firearms industry safety and security procedures, and trained firearms industry personnel. Exhibit 38, Exhibit A.

**PLAINTIFFS' RESPONSE**: Admit that these facts are true, but dispute to the extent they are meant to imply that Mr. Vince has the expertise to comment on empirical issues presented by this case.  *See* Exhibit 7 at 85 (Kleck Dep.) (noting that Mr. Vince's experience in law enforcement has no relevance to the factual issues in this case); *id.* at 86 (agreeing that Mr. Vince does not claim to have "done any research on the effects of firearms availability on crime, suicide or gun accidents or the impact of Gun controls laws or firearms storage practices on these forms of violence."); Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 2.  These shortcomings affect all of the opinions Mr. Vince offers.

**DEFENDANTS' REPLY**: Plaintiffs' response admits the stated facts but then proceeds to engage in argument about the level of Mr. Vince's expertise and the "implications" of the admitted facts.  That portion of the response should be disregarded.  Moreover, Plaintiffs' argument lacks merit.  In particular, it cannot seriously be contended that Mr. Vince's 28 years of experience at the ATF, including numerous supervisory positions over departments dealing with the gun industry and crime guns, "has no relevance to the factual issues in this case."  Dr. Kleck,

on the other hand, has "never had any experience or involvement with enforcement of federal

gun laws." Def. Ex. 91 (Kleck Dep.) at 34:12-15. He has never inspected a gun dealer or other

FFL for compliance with federal law. *Id.* at 33:24-34:3. He has never audited an FFL. *Id.* at

34:10-11. He has never been involved in the licensing of a gun dealer. *Id.* at 34:4-6. He has

never worked for ATF nor has he conducted research on behalf of ATF or had a consulting

relationship with ATF. *Id.* at 34:16-24.

   60-A. Vince opines that "when firearms sales are allowed to occur, firearms frequently

fall into the hands of criminals or others who are not lawfully qualified to possess them." *Id.*

**PLAINTIFFS' RESPONSE**:  Admit that Mr. Vince so opined, but dispute this opinion to the

extent it is meant to suggest that Chicago's law forbidding firearms sales causes firearms to fall

into the hands of criminals and others who are not lawfully required to possess them less

frequently than they otherwise would. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 5 ("Vince

also implies that banning gun sales in Chicago will reduce gun possession among the city's

criminals and thereby reduce firearms crime, but does not city any research indicating that local

sales bans have such effects.  Existing evidence indicates that they do not.") (citations omitted).

*See also* Chicago Exhibit 31 at xxxvi ("[T]he large majority of criminal firearms transactions do

not involve conventional over-the-counter retail transactions .... That being the case, restrictions

imposed at the point of retail sale cannot possibly have much of an effect."); Exhibit 31 at CITY

000024 CITY 000025 (City of Chicago Committee on Police and Fire, June 18, 2010 Tr. of

Hr'g) ("So there's a variety of ways to approach regulating gun dealers to insure that they're

operating as safely as possible and to insure that guns are not making their way out onto the street

from gun dealers as well.") (testimony of Robyn Thomas, Legal Community Against Violence);

92

Exhibit 26 at CITY 000247 (City of Chicago Committee on Police and Fire, June 29, 2010 Tr. of Hr'g) ("the combination of a permitting system for firearm purchasers, as well as a registration system for the firearms that they possess, appears to be the most prudent way, set of policies to try to keep guns from leaking into the hands of dangerous individuals") (Testimony of Daniel Webster); Exhibit 28 at 88:1-8 (Reyes Dep.) (admitting that she has no empirical evidence that the ban on sales will enhances the public health, safety, and welfare); Response to Statement of Fact 51.

**DEFENDANTS' REPLY**: Plaintiffs improperly sever Mr. Vince's opinion from the other material cited in Statement of Fact 60 (and in Mr. Vince's expert report) that supports it, and they inject additional facts in an argumentative fashion. And while Plaintiffs cite Dr. Kleck's report for the proposition that "[e]xisting evidence indicates" that local sales bans do not reduce gun possession by criminals, *see* Pl. Ex. 2 (Kleck Decl.), Exhibit I thereto, at 5, the two studies cited there to support this proposition predate, and do not purport to address, Dr. Cook's more recent and Chicago-specific analysis in the 2007 Chicago Study, as well as his associated expert opinion, providing evidence that local sales bans do reduce possession by criminals.

Further, Plaintiffs' citation to testimony regarding ways in which gun dealers may be regulated does not address, much less undermine, the proposition that banning gun dealers is a more effective way to combat gun acquisition by criminals.

60-B. New York City investigation demonstrated that suburban dealers supplying large numbers of crime guns to New York did not follow federal laws and regulations. *Id.* at 17-18.

**PLAINTIFFS' RESPONSE**: Admit that Mr. Vince so opined. Mr. Vince does not supply any research or other description of the New York City investigation to support his allegations. At

any rate, we dispute Mr. Vince's opinion to the extent it is meant to suggest that corrupt dealers contribute significantly to the stock of guns possessed by criminals. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 6 ("'Bad' FFLs are of virtually no significance in supplying guns to criminals, directly or indirectly."); Exhibit 30 at 1294 (Gary Kleck et al., The Myth of Big-Time Gun Trafficking, 56 UCLA L. REV. 1233 (2009)) ("the belief that ... corrupt licensed gun dealers significantly contribute to the arming of America's criminals is a myth"); Exhibit 13 at 71-72 (Gorman Dep.) (admitting that "licensed firearms dealers knowingly engaging in illegal transactions" are not "a significant source of guns for criminals in Chicago").

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as it offers additional facts that does not create a dispute as to the point asserted by Defendants (*i.e.*, that New York-area dealers failed to comply with the law). Plaintiffs' response generally addresses dealers who are "corrupt," "[b]ad," or who "knowingly engag[e]" in illegal transactions, but the failure to follow federal law does not necessarily mean that a dealer does so knowingly or is corrupt. Plaintiffs' response therefore does not undermine the proposition that a large number of dealers who fail to follow federal law and regulation supplied large numbers of New York crime guns.

In addition, Dr. Kleck admitted that his paper, Pl. Ex. 30 (Gary Kleck et al., *The Myth of Big-Time Gun Trafficking,* 56 UCLA L. REV. 1233 (2009)), was probably not peer reviewed because it was published in a law review, and law reviews "are basically edited by kids in law school." Def. Ex. 91 (Kleck Dep.) at 81:17-82:3. It therefore was "probably an exaggeration" for him to list the study on his CV as being peer-reviewed. *Id.* at 82:8-11.

Further, an analysis of Dr. Kleck's paper has concluded that Dr. Kleck errs to the extent

94

he focuses only on whether high-volume traffickers dominate illegal transfers of guns. *See* Def.

Ex. 103 (Braga, et al., *Interpreting the Empirical Evidence of Illegal Gun Market Dynamics*,

Journal of Urban Health (forthcoming)).  The Braga study reports that "gun trafficking

enterprises of many shape[s] and sizes play an important role in supplying crime guns to

criminals," and that most trafficking investigations involve the diversion of 20 or fewer firearms.

*Id.* at 3.  The study notes that Dr. Kleck's "definition of a large scale trafficker as someone who

has been caught illegally selling 100 or more firearms seems to be set artificially high." *Id.*

Since "[g]uns are durable goods that can remain in the hands of criminals for many years," the

"illegal diversion of 20, 30, or 50 guns to criminals by one individual in 1 year generates a

considerable public safety threat." *Id.*  Further, the study notes that "the number of guns diverted

in ATF gun trafficking investigation[s] is based solely on diversions known to the case agent.  A

gun trafficker caught selling 10 guns to a violent street gang would not be classified as a large-

scale gun trafficker under [Kleck's] definition," even though "this gun trafficker may have been

funneling hundreds of guns to street gangs for many years without being caught by ATF doing

so." *Id.*

60-C. Further, in 1998, the CPD initiated "Operation Gunsmoke" to investigate the sales

practices of suburban Chicago gun dealers who sold guns later identified as crime guns in

Chicago. *Id.* at 17.  Undercover officers posed as criminals or unqualified purchasers, and,

"[r]epeatedly, [they] had minimal difficulty acquiring guns with little regard from dealers for the

purchaser's ineligibility and/or nefarious reason or purpose." *Id.*  "Several dealers were willing

to make the sale nonetheless and even provided advice to those acting as customers about how to

make an illegal purchase." Exhibit 13, Exhibit A thereto, at 11.

95

**PLAINTIFFS' RESPONSE**: Admit that Mr. Vince and Dr. Cook gave the cited testimony regarding "Operation Gunsmoke," but dispute that this evidence establishes that corrupt dealers account for any significant share or crime guns, in Chicago or elsewhere. "Since citing 'several' anecdotal cases cannot support a claim that such misconduct is common among FFLs, the relevance of these cases to Chicago's ban on local handgun sales is unclear." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 34. *See* also Exhibit 3 at 178 (Cook Dep.) (admitting that "based on our trace data .. . [the] flow of guns from the suburbs into the city is not accounting for a large percentage of the guns that are being used in crime"); Exhibit 13 at 71-72 (Gorman Dep.) (admitting that "licensed firearms dealers knowingly engaging in illegal transactions" are not "a significant source of guns for criminals in Chicago").

**DEFENDANTS' REPLY**: Plaintiffs' response does not proffer facts undermining the facts asserted in this paragraph, but proceeds to assert additional facts that question the relevance of the Operation Gunsmoke investigation.

Further, as to that relevance point, Dr. Kleck has never studied the issue of corrupt gun dealers in Chicago or conducted studies on an aggregate or national level, other than reviewing other people's research and ATF reports. Def. Ex. 91 (Kleck Dep.) at 428:25-429:10. He further admits that the Operation Gunsmoke documents support the notion that there are at least "some" scofflaw FFL dealers. *Id.* at 429:21-430:6. He also testified that, to test whether scofflaw FFL dealers are common, it would be necessary to select a random sample of FFLs. *Id.* at 430:8-18. However, Dr. Kleck is not aware of that research having been done, and it is not, "in practice, likely to be law enforcement practice." *Id.* at 430:11-13, 431:4-7. Instead, "as is appropriate from a law enforcement standpoint," the CPD's sting operations were "highly

selective." *Id.* at 430:18-20.

Further, Plaintiffs selectively quote from Dr. Cook's deposition. Dr. Cook testified that, even though the flow of guns from the suburbs into Chicago is not a "large percentage" of crime guns, it is "true" and "accurate" that, as found in the Gunsmoke investigation, guns from suburban Chicago dealers are available to criminals and gang members, and that 12 percent of Chicago crime guns had been sold by a suburban dealer in the previous three years. Pl. Ex. 3 at 178:9-23.

61.    For example, B&H Sports, Ltd., in Oak Lawn, Illinois ("B&H") sold guns to buyers even though the buyers lacked a FOID card and stated that they were otherwise ineligible to get one. Exhibit 40 ("Operation Gunsmoke" documents) at CITY 006321-23, 6342-44. To complete the transaction, B&H fraudulently completed an ATF Form 4473, indicating that another individual was the purchaser of the firearm, even though B&H knew that another who could not legally buy the firearm was the actual purchaser. *Id.* at CITY 006342-44. B&H also sold a gun in violation of the waiting period required by 720 ILCS 5/24-3(g). *Id.* at CITY 006348-53,006262-66.

**PLAINTIFFS' RESPONSE**: The cited "Operation Gunsmoke" documents speak for themselves, and we dispute this finding to the extent it mischaracterizes those documents. We further dispute this finding to the extent it suggests that corrupt dealers account for any significant share or crime guns, in Chicago or elsewhere. "Since citing 'several' anecdotal cases cannot support a claim that such misconduct is common among FFLs, the relevance of these cases to Chicago's ban on local handgun sales is unclear." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 34. *See also* Exhibit 3 at 178 (Cook Dep.) (admitting that "based on our trace data ...

97

[the] flow of guns from the suburbs into the city is not accounting for a large percentage of the

guns that are being used in crime."); Exhibit 13 at 71-72 (Gorman Dep.) (admitting that "licensed

firearms dealers knowingly engaging in illegal transactions" are not "a significant source of guns

for criminals in Chicago"); Response to Statement of Fact 60.  At any rate, even if these

documents did demonstrate "that police investigations were able to successfully identify ...

corrupt FFLs operating in the Chicago area," it "could be regarded as evidence that sales bans are

not necessary and that ordinary regulation and law enforcement activities can effectively regulate

gun commerce in Chicago." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 34.

**DEFENDANTS' REPLY**: *See* D-RSOF 60-A & 60-C.

62.     Undercover officers also visited Midwest Sporting Goods in Lyons, Illinois,

Suburban Sporting Goods in Melrose Park, Illinois, Chicago Ridge Gun Shop & Range, Inc. in

Chicago Ridge, Illinois, and Chuck's Gun Shop and Pistol Range in Riverdale, Illinois.

Although the undercover officer purchasing the firearm made it clear that the firearm was for

another person, these stores still made the sale without determining whether the actual purchaser

had a FOID card and was otherwise qualified to possess the firearm.  *Id.* at CITY 005459-62,

005212-14, 006070-72, 005027-29.

**PLAINTIFFS' RESPONSE**: *See* our response to Statement of Fact 61.

**DEFENDANTS' REPLY**: *See* D-RSOF 61.

63.     On other occasions, store clerks would advise undercover agents seeking to

purchase multiple firearms to stagger their purchases over a number of days so that the clerk

would not have to notify the ATF of the sale of multiple firearms. *Id.* at CITY 005870-71,

005862-64, 005874-76, 005301-05.

98

**PLAINTIFFS' RESPONSE**: *See* our response to Statement of Fact 61.

**DEFENDANTS' REPLY**: *See* D-RSOF 61.

64.     Suburban Sporting Goods sold a gun after the purchaser examined the serial numbers on numerous firearms and asked the clerk if they could withstand "a little metal work." *Id.* at CITY 005164-67. He purchased a .380 caliber semi-automatic pistol, informing the clerk that it was the one with which he could work.  *Id.* at CITY 005166.

**PLAINTIFFS' RESPONSE**: *See* our response to Statement of Fact 61.

**DEFENDANTS' REPLY**: *See* D-RSOF 61.

65.     A 2004 report by the U.S. Department of Justice's Office of the Inspector General ("DOJ Report") indicated that, for FFLs discovered to have violated federal law in 2002, the average number of violations per FFL was almost 70, and FFLs in the ATF's Chicago Field Division had the highest average number of violations - 178.2 per FFL. Exhibit 41 (U.S. Department of Justice, Office of the Inspector General, Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives, Report No. 1-2004-005 (July 2004) at vi.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**:  None.

66- A. A study of handgun dealers in the 20 largest U.S. cities having more than 10 dealers reported that "more than half were willing to sell a handgun even when it would be illegal to do so."  Exhibit 42 (S.B. Sorenson & K. A. Vittles, Buying a handgun for someone else: firearms dealer willingness to sell, 9 Injury Prevention 147 (2003)) at 148-149.  It found that 53% of dealers were willing to sell when the purchaser indicated that the gun was for another person (his or her boyfriend/girlfriend) who "needs" it. *Id.* at 148.

**PLAINTIFFS' RESPONSE**: Admit that the study found that 53% of dealers were willing to sell when the purchaser indicated that the gun was for another person who needs it and admit that the study characterized these agreed-to sales as "illegal." Dispute that these were unambiguously illegal sales. As the study recognizes, federal law permits a person to purchase a firearm as a gift for another person. Chicago Exhibit 42 at 148 ("Under federal law, licensed firearm dealers may legally sell a firearm to any person who is not a prohibited purchaser ... including guns that will be given as a gift."). And the "boyfriend/girlfriend needs it" question was designed to be "intentionally ambiguous." *Id.* The DOJ Report characterized the study as finding that "up to 20% of gun dealers exhibited a willingness to likely prohibited persons obtain guns through straw purchases." Chicago Exhibit 41 at 27. Furthermore, the study did not involve actual sales, but rather an expressed willingness to sell by dealers over the telephone. As the authors conceded, "dealers" stated intent may not correspond to their actual behavior." *Id.* at 149. And the authors did not even verify that the dealers they studied were licensed dealers. *Id.*

**DEFENDANTS' REPLY**: Plaintiffs's response essentially admits the asserted facts, but then injects additional facts to arguing the relevance and meaning of the study's findings. Plaintiffs selectively quote from the study, and, in context, the quoted snippets fail to undermine the study's findings. While stating that federal law permits a person to purchase a gun as a gift, the study then immediately reported that "[i]n most cases, however, a licensed dealer may not knowingly sell a firearm to someone who the dealer knows is not the intended possessor, independent of the intended possessor's eligibility." Def. Ex. 42 at 148. Further, while the study acknowledged that dealers' intent may not correspond to their actual behavior, the study likewise acknowledged that it is not "a usual business practice" for a dealer to say he would sell a gun

while on the telephone "but not do so if the potential customer was on-site." Def. Ex. 42 at 149. In addition, the study added that "[a]lternatively, some dealers might resist persuasion attempts on the telephone but might yield to in-person pressure," *id.*, a phenomenon that would cause the reported number of dealers willing to engage in an illegal sale to be conservative.

66-B. Even when the purchaser expressly indicated that the purchase was one prohibited by law - i.e., by saying "[m]y girl/boyfriend needs me to buy her/him a handgun because s/he isn't allowed to" - 4 out of 20 dealers agreed to the sale. *Id.* at 149-150.

**PLAINTIFFS' RESPONSE**: Admit in the sense that only 4 out of 20 dealers did not "respond[] with an unequivocal 'no' and comment[] about such a purchase being clearly illegal, a straw purchase, etc." Chicago Exhibit 42 at 150. As noted above, dispute that any illegal sales actually took place. The authors also noted that their findings ran counter to a GAO investigation finding that "almost all FFLs adhered to federal and state firearm purchase laws." *Id.*

**DEFENDANTS' REPLY**: Plaintiffs's response essentially admits the asserted facts, but then injects additional facts to arguing the relevance and meaning of the study's findings. Plaintiffs' response suggests that the study categorized dealers who simply failed to respond with an unequivocal "no" when confronted with an illegal sale as having "agreed" to an illegal sale. The study does not support that conclusion, and in fact reports verbatim statements by the 4 dealers showing that the dealer agreed to the sale. *See* Def. Ex. 42 at 150 ("you can come down here and pick one up and put it in your name"; "[y]ou can do whatever you want after you walk out the door"; "you're more than welcome to buy one"; "I'd have no problem with [the purchase]").

66-C. The DOJ Report cited this study as "highlight[ing] ... the need to better identify the potential universe of dealers involved in gun trafficking." Exhibit 41 at 27.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

67. A study of California handgun dealers that averaged at least 50 handgun sales annually reported that 20% of dealers "agreed to assist a potential handgun buyer with a transaction that had many attributes of an illegal surrogate or 'straw' purchase. Others, while saying no, offered the buyer concrete assistance in completing a purchase they appeared to understand was against the law." Exhibit 43 (G. Wintemute, Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase, 87(5) Journal of Urban Health 865-78 (2010)) at 872. The study observed that this percentage is less than the 53% found in the Sorensen & Vittles study described in Paragraph 66, supra, but stated that California "regulates and polices gun commerce to a degree that is perhaps unique," noting that, in California, retailers must have state licenses, the state has its own retailer inspection program, and "enforcement is generally more active than elsewhere." *Id.* at 872, 876.

**PLAINTIFFS' RESPONSE**: Admit that the study described its findings in this manner. As with the prior study, however, these were not unambiguously illegal sales. *See* Chicago Exhibit 43 at 873, 876 (noting "ambiguity of the question we posed to retailers" and that "an unexpectedly high number of retailers understood the transaction to be a gift"). And as with the prior study, this study did not involve actual sales but rather telephone conversations. *See id.* at 867-68.

**DEFENDANTS' REPLY**: Plaintiffs's response essentially admits the asserted facts, but then injects additional facts to arguing the relevance and meaning of the study's findings. Further, Plaintiffs inaccurately suggest that all dealers found the question to be ambiguous. Even if the

number of dealers who understood the transaction to be a gift was "unexpectedly high" compared to an expected benchmark, this does not mean that all or even most dealers believed the transaction to be a gift. Further, Plaintiffs fail to note that the study explained that, "[f]ollowing [the Sorenson & Vittles study discussed in SOF 66], we had purposely not scripted a completely transparent request for assistance with a straw purchase" because such a question "would not be realistic." Def. Ex. 43 at 873.

68-A. The ATF has concluded that, "[c]learly, FFLs' access to large numbers of firearms makes them a particular threat to public safety when they fail to comply with the law." Exhibit 44 (June 2000 ATF Following the Gun: Enforcing Federal Laws Against Firearms Traffickers), at ix, x. A 2000 ATF examination of 1,530 firearms trafficking investigations between July 1996 through December 1998 ("2000 ATF Report") found that "[a]lthough corrupt FFLs are relatively rare, they are associated with the diversion of large volumes of firearms." Exhibit 44 at 10, 28.

**PLAINTIFFS' RESPONSE**: Admit that cited ATF report includes the quoted language. Dispute that corrupt FFLs are a significant source of crime guns. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 34 ("corrupt ... FFLs are extremely rare, and are unimportant as sources of crime guns"); *id.* at 28 (the 2000 ATF Report "is not relevant" to the question of how criminals get guns); Exhibit 30 at 1294 (Gary Kleck et al., The Myth of Big-Time Gun Trafficking, 56 UCLA L. REV. 1233 (2009)) ("the belief that ... corrupt licensed gun dealers ... significantly contribute to the arming of America's criminals is a myth").

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as it is irrelevant and fails to meet the facts asserted. SOF 68 acknowledges that corrupt FFLs are relatively rare. The point of SOF 68 is that, when an FFL does happen to engage in corrupt

103

practices, the result is "the diversion of large volumes of firearms." Plaintiffs do not cite facts that undermine that conclusion.

Further, regarding Dr. Kleck's study cited by Plaintiffs and their contention that corrupt dealers do not supply significant numbers of crime guns, *see* D-RSOF 60-B.

68-B. Another ATF report found that in 2000, "[i]n all jurisdictions, many traceable crime guns were first purchased from a small number of Federally licensed gun dealers." Exhibit 45 (July 2002 ATF Crime Gun Trace Report - National) at 46. In general, less than 1% of firearms dealers contribute 60% of crime guns. Exhibit 39 at 55:15-19.

**PLAINTIFFS' RESPONSE**: Dispute that less than 1 % of firearms dealers contribute to 60% of crime guns. Rather, "in 1998, 1.2 percent of dealers accounted for 57% of all guns that were submitted by law enforcement agencies for tracing' to the ATF, Chicago Exhibit 13, Exhibit A thereto, at 11, and traced crime guns are not a representative sample of all crime guns. *See* Exhibit 7 at 80 (Kleck Dep.) (ATF trace data "concern samples of crime guns that are not representative of crime guns in general"); Exhibit 3 at 140 (Cook Dep.) (admitting that "there is then a variety of ways in which those guns which are successfully traced might not be representative"); id, at 140 (admitting that "there's no perfect match between those that are successfully traced ... and the original population that you're talking about, which is all guns used in crime"). Also dispute any implication that a high trace count evinces dealer involvement in trafficking or any other misconduct. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 33 ('To date, there is no research whatsoever that indicates that, once one accounts for sales volume and local crime rates, dealer misconduct is responsible for any nonnegligible part of the disproportionate share of traced crime guns for which a few dealers account."); Exhibit 30 at

1268-70 (Gary Kleck et al., The Myth of Big-Time Gun Trafficking, 56 UCLA L. REV. 1233 (2009)); Exhibit 3 at 141 (Cook Dep.) (admitting that standard trace analysis does not show whether a firearm has been trafficked); *id.* at 219-20 (admitting that "the fact that a gun was traced to an FFL isn't proof that the FFL did anything wrong"). Indeed, the cited ATF report found that "few crime gun possessors bought their guns directly from federally licensed gun dealers .... About 88 percent of traced crime guns changed hands at least once before recovery by law enforcement as crime guns." Chicago Exhibit 45 at ix.

**DEFENDANTS' REPLY**: Plaintiffs' response is irrelevant and fails to meet the facts asserted. The fact that, in 1998, 1.2 percent of dealers accounted for 57% of all guns submitted for tracing does not undermine the statement that "[i]n general" less than 1% of dealers contribute 60% of crime guns. Further, even if Plaintiffs properly dispute the asserted fact, Plaintiffs proceed to improperly inject additional facts to argue that a high trace count is not evidence of wrongdoing. Regarding Plaintiffs' critique of crime gun tracing data, *see* D-RSOF 52.

69-A. In 2000, 936 FFLs were identified through a gun trace as having sold a gun that was recovered in Chicago as a crime gun. Exhibit 37 at 17. 1.3% of those FFLs -12 out of 936 - accounted for 41% of the traces (1,111 of 2,723), an average of 93 traces per FFL. *Id.* 3.3%- 31 out of 936 - accounted for 51% of the traces (1,386 of 2,723), an average of 45 traces per FFL. *Id.*

**PLAINTIFFS' RESPONSE**: Admit that the cited report so found, but dispute that this data evinces dealer involvement in trafficking or other misconduct. *See* Response to Statement of Fact 68. Indeed, the report found that "more than 97% of Chicago crime guns changed hands at least once before reaching the crime gun possessor"; i.e., "few crime gun possessors bought their

guns directly from federally licensed gun dealers." Chicago Exhibit 37 at 5.

**DEFENDANT'S REPLY**: *See* D-RSOF 68. In addition, the second sentence of Plaintiff's

response to this paragraph is nonresponsive, as Plaintiffs fail to explain how a high number of

crime guns changing hands impugns statistics showing that a small number of dealers contribute

a large proportion of crime guns.

69-B. In 2000, 10 FFLs accounted for 70% of traceable crime guns in Indianapolis; 5

FFLs accounted for 65% of traceable crime guns in Gary; 4 FFLs accounted for 53% of traceable

crime guns in Milwaukee. Exhibit 45 at 46.

**PLAINTIFFS' RESPONSE**: Admit that the cited report so found, but dispute that this data

evinces dealer involvement in trafficking or other misconduct. *See* Response to Statement of Fact

68.

**DEFENDANT'S REPLY**: *See* D-RSOF 68.

70.    The 2000 ATF Report found that "[t]he most frequent type of trafficking channel

identified ... is straw purchasing from [FFLs]. Nearly 50 percent of the ATF investigations

involved firearms being trafficked by straw purchasers either directly or indirectly." Exhibit 44

at 10. A straw purchaser is "[a] person illegally purchasing a firearm from a [FFL] for another

person, including for unlicensed sellers, criminal users, juveniles, and other prohibited

possessors. Straw purchasers may be friends, associates, relatives, or members of the same

gang." Exhibit 45 at A-6.

**PLAINTIFFS' RESPONSE**: Admit that the cited ATF report so found, but dispute that this

establishes that straw purchases are a significant source of crime guns. As an initial matter,

figures such as these "merely reflect where ATF focused its investigative efforts," and are not

representative of all crime guns. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 34. Furthermore, "even some scholars who have adopted the theory that traffickers use straw purchasers to acquire guns from FFLs concede that criminals rarely use straw purchases from FFLs to obtain guns for themselves." Exhibit 30 at 1253 (Gary Kleck et al., The Myth of Big-Time Gun Trafficking, 56 UCLA L. REV. 1233 (2009)). *See* Chicago Exhibit 12 at F567 n.19 (finding "that straw purchasing is rare in Chicago's underground gun market"); Exhibit 29 at 66 (Daniel W. Webster et al., How Delinquent Youths Acquire Guns, 79 J. URBAN HEALTH 60 (March 2002)) ("only 3 of the more than 50 gun acquisitions described by respondents in the study involved the juvenile instigating a straw purchase from a licensed gun dealer").

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as they admit the asserted facts but then proceed to inject additional facts and argue the significance of the admitted facts. Further, the disputation in the first sentence of the response is not properly supported, as the material cited by Plaintiffs does not purport to affirmatively establish that straw purchases are *not* a significant source of crime guns. It merely asserts that the ATF focuses its resources in certain areas. The second sentence of the response is unresponsive to the asserted facts. Further, the proposition it asserts is irrelevant. Even if criminals rarely use straw purchasing to acquire guns for themselves, that does not mean that straw purchasing is not frequently used by criminals to acquire guns that they then traffic – *i.e.*, sell to another.

71. The 2000 ATF Report also documented trafficking by FFLs directly. It noted that "[l]icensed dealers, including pawnbrokers, have access to a large volume of firearms, so a corrupt licensed dealer can illegally divert large numbers of firearms. Although FFL traffickers were involved in the smallest proportion of ATF trafficking investigations, under 10 percent,

FFL traffickers were associated with by far the highest mean number of illegally diverted firearms per investigation, over 350, and the largest total number of illegally diverted firearms, as compared to the other trafficking channels." *Id.* at ix, 12.  The report found that 25,741 diverted firearms were trafficked by straw purchasers, and 40,365 were trafficked by licensed dealers. *Id.* at 13.  Of the 133 investigations involving illegal diversion from an FFL, 26 percent (35 of 133) involved the FFL's transfer of firearms to prohibited persons, such as felons and juveniles, 24 percent (32 of 133) involved straw purchasing, and 19 percent (25 of 133) involved FFLs making false entries in their acquisition and disposition record book. *Id.* at 28, 29.

**PLAINTIFFS' RESPONSE**:  Admit that the 2000 ATF report so found, but dispute that these findings represent documentation of "trafficking by FFLs directly."  While these 133 cases are described as involving "illegal diversion of firearms by a federally licensed firearm dealer," Chicago Exhibit 44 at 28, the report does not indicate that the licensees intended to traffic in firearms.  For example, many of the investigations involved recordkeeping violations that are mere "misdemeanor offenses." *Id.*   And even in the cases that involved FFLs transferring firearms to prohibited persons or straw purchasing, the report does not indicate that these transfers were knowingly or intentionally made to a prohibited person or a straw purchaser. *Id.* These were also not proven violations; as the report acknowledges they were "observed but not necessarily presented as charges for prosecution." *Id.* at 29.

Furthermore, we dispute that the 2000 ATF report is relevant to the question of how criminals generally get guns.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 28 (critiquing Dr. Cook's reliance on this study because "data concerning the guns that ATF comes across in the course of its investigations cannot legitimately be considered to be in any way representative of

108

all crime guns or even those recovered by police" and thus that this source is not "relevant to th[e] question" of "how criminals get guns"); Exhibit 30 at 1246-48 (Gary Kleck et al., The Myth of Big-Time Gun Trafficking, 56 UCLA L. REV. 1233 (2009)).

**DEFENDANTS' REPLY**:  Plaintiffs' response beyond their admission should be disregarded. The materials cited by Plaintiffs do not purport to support Plaintiffs' disputed point – *i.e.*, they do not establish that the findings asserted by Defendants fail to represent documentation of trafficking by FFLs "directly."  Indeed, Defendants' materials indicate that the cited statistics are for firearms trafficked "by licensed dealer[s]."  Def. Ex. 44, at 13.  *See also id.* at 28 ("There were 133 ATF investigations . . . that involved the illegal diversion of firearms by a [FFL].").

72-A. Sergeant Kevin Johnson of the CPD's Chicago Anti-Gun Enforcement ("CAGE") Team, whose primary purpose is to investigate illegal firearms trafficking in Chicago, testified that gun stores create an opportunity for guns to be stolen.  Exhibit 47 (Deposition of Kevin Johnson) at 11:13-15, 93:5-10.

**PLAINTIFFS' RESPONSE**: Admit that Sergeant Johnson so testified, that he is with the CAGE team, and that the CAGE team's primary purpose is to investigate illegal firearms trafficking in Chicago, but dispute that his testimony supports any implication that permitting gun stores in Chicago would increase the number of illegal firearms in the City.  *See* Exhibit 22 at 67:22-68:4 (Johnson Dep.) (admitting that "the number of guns that are making their way onto the city streets" is not "responsive to changes in local law"); *id.* at 83:16-19 (admitting that CAGE team does not "have any empirical evidence whatsoever that banning gun sales reduces the size of the illegal gun market"); *id.* at 93:24-94:5 (admitting that he does not have "any evidence, empirical or otherwise, that the stores selling firearms operating in a particular

community leads to an increase in the size of the illegal firearms market in that community").

**DEFENDANTS' REPLY**:  The court should disregard Plaintiffs' response beyond their admission, as it is irrelevant and does not meet the facts asserted.  Further, Plaintiffs take Sgt. Johnson's testimony out of context.  Regarding the responsiveness of the number of illegal guns to changes in local law, Sgt. Johnson testified that he didn't understand the question.  The colloquy is as follows:

> Q.             Okay. Now, is it -- in your experience, are the number of guns that are making their way onto the city streets responsive to changes in local law?
>
> MR. AGUIAR:    Objection to the form of the question. You could answer.
>
> THE WITNESS:   No.
>
> BY MR. PATTERSON:
>
> Q.             So local law in your experience does not have an impact in the number of guns that are on the city streets?
>
> A.             I didn't understand the question.

Pl. Ex. 22 (Johnson Dep.) at 67:22-68:6-9.  And rather than rephrase the question, Plaintiffs' counsel simply decided to "move on" to another topic.  *See id.* at 68:10.

72-B. In January 2012, 195 handguns were stolen from Maxon's in Des Plaines, Illinois. Exhibit 10, ¶ 39.  In December 2011, 33 firearms were stolen from Deb's Gun Range in Hammond, IN.  Exhibit 48 (ATF News Release).  In February 2011, 26 firearms were stolen in a break-in at Freddie Bear Sports, a Tinley Park, IL gun store.  Exhibit 47 at 92:24-93:4; Exhibit 49 (Tinley Park police reports) at CITY 004921.  A couple of years ago, Chuck's was the victim of

an attempted break-in.  Exhibit 35 at 10:5-10, 25:18-21.  Illinois Gun Works has been the victim

of a break-in.  Exhibit 36 at 18:12-18.  From 1998-1999, firearms were stolen from at least 9

dealers in Cook County.  Exhibit 50 (Illinois - State, Local, ATF Report) at 18.

**PLAINTIFFS' RESPONSE**:  With the exception of the Illinois Gun Works incident and the

incidents reported in Chicago's Exhibit 50, admit that these incidents have taken place. The

deposition testimony of Henry Rush on behalf of Illinois Gun Works included in Chicago's

exhibit is from the Ezell litigation, and it does not have anything to do with break-ins.  Mr. Rush

was deposed in this case, and he testified that he did not know whether Illinois Gun Works has

ever been the victim of a break-in or a robbery, although he has "heard" that "longer than ten

years ago there was a break in." Exhibit 33 at 18:12-18 (Rush Dep.).  The copy in the record of

the cited page of Chicago's Exhibit 50 dealing with thefts from firearms dealers in Cook County

is for the most part illegible; we can make out the partial name of only two firearms dealers.  If

the document does in fact report that firearms were reported stolen from 9 dealers in Cook

County, we do not dispute that fact.

Also dispute that these incidents demonstrate that thefts from gun dealers are a significant

source of crime guns.  These "anecdotal ... and unscientific" examples "can reveal nothing about

the consequences of Chicago's restrictions on guns," nor about the degree to which thefts from

gun stores contribute to the number of guns possessed by criminals . *See* Exhibit 2 (Kleck Decl.),

Exhibit I thereto, at 2.  Furthermore, in at least some of these cases no firearms were taken or

firearms that were taken were quickly recovered, *see* Chicago Exhibit 49 at CITY 004921 ("all

26 handguns that were stolen in reference to this incident were recovered and accounted for");

Chicago Exhibit 35 at 25:18-26:5 (recalling a single unsuccessful break-in at Chuck's Guns), and

this evidence hardly goes to show that robberies and break-ins at gun stores are common or a significant source of crime guns, *see*, e.g., Exhibit 34 at 8:9-14 (Riggio Dep.) (Chuck's Guns opened in 1968); Exhibit 33 at 18:12-20 (Rush Dep.) (no break-ins or robberies at Illinois Gun Works in the past 10 years); Chicago Exhibit 50 at 2 (Chicago PD submitted 18,763 crime gun traces in 1999).

**DEFENDANTS' REPLY**: Plaintiffs' discussion of whether gun dealer theft is a significant source of crime guns should be disregarded, as it injects additional facts to argue the significance of the facts asserted by Defendants and admitted by Plaintiffs. Further, Plaintiffs' citations do not support their argument on that point; they do not indicate that a significant number of guns stolen from gun stores does not end up as crime guns.

73.    In February 2012, more than 80 firearms were stolen from an Ohio gun store. Exhibit 51 (ATF and DOJ news releases). In December 2011, 43 firearms were stolen from a Roanoke, VA gun store. *Id.* In November 2011, 90 firearms were stolen from a Pennsylvania gun store. *Id.* In November 2011, a total of 17 firearms were stolen from two Lincoln, Nebraska gun stores. Exhibit 52 (August 2011 Sacramento Bee article). In August 2011, 22 firearms were stolen from a Henderson, Nevada gun store. Exhibit 51. In July 2011, 19 firearms were stolen from a gun store in Raleigh, North Carolina. *Id.* In July 2011, 27 firearms were stolen from the Fort Irwin Army Post in Fort Irwin, California. *Id.* In April 2011, firearms were stolen from a Kentucky gun store. *Id.* March 2011, 12 firearms were stolen from a Florida gun store, the second time in 18 months the store had been burglarized. *Id.* In February 2011, 15 firearms were stolen from a Michigan gun store. *Id.* In December 2010, 73 firearms were stolen from a North Carolina gun store. *Id.* In August 2010, 58 firearms were stolen from an Ohio gun store. *Id.* In

March 2010, 20 firearms were stolen from a Wisconsin gun store. *Id.*

**PLAINTIFFS' RESPONSE**: Admit that these incidents took place, but for the reasons cited in

response to Statement of Fact 72 dispute that they demonstrate that thefts from gun dealers are a

significant source of crime guns. Indeed, the incidents cited in this finding report a total of about

500 firearms stolen from dealers across the United States over a nearly two-year period of time.

Each year from 2001 to 2010, members of the Chicago Police Department alone recovered at

least 9,856 guns. Exhibit 35 at 22 (Chicago Police Department, 2010 Annual Report); Exhibit 22

at 38:18-39:12 (Johnson Dep.) (less than 10% of firearms recovered are recovered from lawful

owners). And each year in the United States, more than 500,000 firearms are stolen in the United

States from all sources. Chicago Exhibit 12 at F561. From 2008 to 2010, firearms dealers

reported an average of about 20,700 firearms lost or stolen. *See* Exhibit 36 at 2 (ATF, Federal

Firearms Licensee Statistics, Theft/Loss Reports, Calendar Years 2008 - 2010). Even if one were

to assume that all of these lost or stolen firearms were stolen, this would still represent only about

4% of the total number of stolen guns.

**DEFENDANTS' REPLY**: *See* D-RSOF 72.

74.     William Campion, a member of Plaintiff ILAFR and the owner and operator of

Cameo Sales and Service, a gun dealership, does not store firearms in his shop because the

potential for burglary of the firearms presents a "safety concern." Exhibit 53 (Deposition of

William Campion) at 7: 13-22, 33:8-17, 35:2-6, 50:21-51:5, 67:22-68:12.

**PLAINTIFFS' RESPONSE**: Admit that Mr. Campion does not store firearms in his shop, but

dispute that this is because storing firearms is necessarily unsafe. Mr. Campion does store

firearms, but he stores them in a safe in an "adjacent building" rather than in his shop itself

because the safe "is just too big" to put in the store; his "safety concern" is that he doesn't "have the safe in the store." Chicago Exhibit 53 at 33:12-34:8, 35:14-20. *See also id.* at 67:17-21. Also dispute that Mr. Campion's concerns about burglary are unique to firearms stores. *See id.* at 68:1-3 (As with any business, the potential for burglary is there.").

**DEFENDANTS' REPLY**: Plaintiffs mischaracterize the deposition testimony and fail to proffer facts disputing the facts asserted by Defendants. Mr. Campion did not state that his safety concern is that he does not have the safe in the store. The colloquy is as follows:

> Q.   Okay. But you have a safety concern of putting [guns] in the actual store itself?
>
> A.   Yes.
>
> Q.   What is that concern? What are you afraid is going to happen, if anything?
>
> A.   As with any business, the potential for burglary is there.
>
> Q.   You are concerned someone would break in and steal the firearms?
>
> A.   Which can't happen without a blowtorch, where they are stored now, not in the store.
>
> Q.   But if they were in the store, they could?
>
> A.   If they were in the store, physically, they could, sure.

Def. Ex. 53, at 67:22-68:12.

75.   In May 2010, at least 21 firearms were stolen from the Harvey, Illinois police department's shooting range. Exhibit 54 (Deposition of Eugene Williams) at 56:21-24; Exhibit 55 (Chicago Tribune article). Chief Williams testified that if criminals are willing to steal guns from a police department facility, they would be willing to steal guns from a civilian gun store.

Exhibit 54 at 57:1-11.

**PLAINTIFFS' RESPONSE**: Admit that this incident took place. "Law enforcement sources said the shooting range wasn't a secure facility and isn't equipped for storing weapons." Chicago Exhibit 55. Days later, "most of the weapons that were stolen" were found in "a wooded area on the north side of town," where "it appeared someone had tried to bury the weapons." *See* Exhibit 37 (John Garcia, Most guns stolen from Harvey gun range recovered, abclocal.go.com, May 12, 2010). Further admit that Chief Williams gave the cited testimony in response to leading questioning. *See* Chicago Exhibit 54 at 57:1-11, Exhibit 15 at 47:20-22 (Williams Dep.). Dispute that this lone piece of anecdotal evidence establishes anything about the likely consequences of permitted gun sales in the City of Chicago, or that it supports banning firearms sales in the City. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 2; Exhibit 15 at 63:13-23 (Williams Dep.) (admitting that the Chicago Police Department continues to operate shooting ranges); Exhibit 37 (John Garcia, Most guns stolen from Harvey gun range recovered, abclocal.go.com, May 12, 2010) (reporting that although some wanted to close the range, "the mayor says they will make changes to make it more secure in the future").

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Plaintiffs do not purport to proffer facts disputing the facts asserted by Defendants. Instead, Plaintiffs argue the significance of the asserted facts.

76-A. Chief Williams testified that the kinds of intimidation, escalation, and deadly gun use that has taken place in public in Chicago could take place in the parking lots or other gathering spaces around gun stores located in Chicago. *Id.* at 55:2-19.

**PLAINTIFFS' RESPONSE**: Admit that Chief Williams so testified in response to leading

questioning. *See* Chicago Exhibit 54 at 55:2-19, Exhibit 15 at 47:20-22 (Williams Dep.). But, for the reasons cited in response to Chief Williams' testimony about gun use outside of the home, *see* Response to Statement of Fact 35, dispute that Chief Williams' concerns are well-founded. Indeed, even if Plaintiffs prevail in this case it will still be unlawful to carry an operable firearm in "gathering spaces around gun stores located in Chicago," so Chief Williams' concerns are even less supported in this context.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as they admit the asserted facts and then proceed to argue their significance. As to the second sentence of Plaintiffs' response, *see* D-RSOF 35. As to the third sentence, Plaintiffs assert argument rather than dispute the facts asserted by Defendants.

76-B. Commander Gorman testified that if gun stores were allowed in Chicago "patrons coming from gun stores would be targeted for theft and/or violent crime by gang members seeking to obtain a firearm. In addition to increasing violent crime in Chicago, it would increase the availability of guns for sale on the illegal market and would do so more quickly." Exhibit 10, ¶ 41.

**PLAINTIFFS' RESPONSE**: Admit that Commander Gorman so testified, but dispute his conclusions. Criminals tend to avoid, not target, potential victims who are armed. *See* Chicago Exhibit 31 at 146 (56% of convicted felons agreed or strongly agreed that "a criminal is not going to mess around with a victim he knows is armed with a gun"; 74% agreed or strongly agreed that "one reason burglars avoid houses when people are at home is that they fear being shot"); Exhibit 13 at 46:1-5 (Gorman Dep.) (admitting that in his experience, "if a gang member knows that a person has a firearm," it is "a deterrent from a gang member assaulting that

person"). Steven Elliot, President of C&E Gun Shows, states that in 25 years of organizing gun

shows he is not aware of a single patron or vendor being targeted for then going to or from one of

his shows. Exhibit 38 ¶ 13 (Elliot Decl.) Just last year, over 300,000 people attended shows put

on by C&E Gun Shows. *Id.* ¶ 3. In addition, "the availability of guns in a jurisdiction does not

have an effect on the volume or rate of robbery or assault." Exhibit 3 at 73 (Cook Dep.).

Further, even if a certain number of gun store patrons were targeted for then by gang

members, that fact, standing alone, does not establish that on balance violent crime in Chicago

would increase or that more guns would be available for sale on the illegal market more quickly

if gun stores were allowed. For example, Commander Gorman does not account for evidence

that "gun ownership among criminal is already 'saturated'-everyone who wants one has one,"

and he "completely ignores the issue of crimes deterred by gun ownership and carrying," Exhibit

2 (Kleck Decl.), Exhibit I thereto, at 21, 45. In other words, Commander Gorman's conclusion is

a non sequitur.

At any rate, Commander Gorman admitted that he has never reviewed research regarding

whether "cities that prevent sales of firearms have greater problems with gun violence than cities

that do not permit the sale of firearms." Exhibit 13 at 66 (Gorman Dep.).

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as

Plaintiffs inject additional facts in an effort to argue the significance of Commander Gorman's

testimony. In addition, Defendants dispute those facts. Plaintiffs refer to Chicago Exhibit 31 for

the proposition that 56% of convicted felons agreed or strongly agreed that "a criminal is not

going to mess around with a victim he knows is armed with a gun," but that same survey reported

that 44% of convicted felons disagreed or strongly disagreed with that statement, and that 24% of

criminals agreed or strongly agreed that "[c]ommitting crime against an armed victim is an exciting challenge." Def. Ex. 31, at 146.

Further, Commander Gorman's testimony cited by Plaintiffs does not undermine his testimony in SOF 76-B about the targeting of gun store patrons. Those patrons would presumably be transporting a firearm lawfully, *i.e.*, in an inoperable state, and would therefore present less risk to criminals that those carrying operable guns. *See* RSOF 76-A ("Indeed, even if Plaintiffs prevail in this case it will still be unlawful to carry an operable firearm in 'gathering spaces around gun stores located in Chicago.'"). Nor is Commander Gorman's testimony undermined by Mr. Elliot's experiences with gun shows that have taken place outside of Chicago and removed from Chicago's gang and crime problem.

Further, Dr. Cook's testimony is irrelevant here: Even if the volume or rate of robbery or assault (*i.e.*, the total number of those crimes) does not change in response to an increase in gun availability, that does not mean that robberies of gun store patrons (a particular subset of total robberies) would not exist or increase.

Finally, Defendants dispute Plaintiffs' assertion that "gun ownership among criminals is already 'saturated'-everyone who wants one has one." Plaintiffs' cite Dr. Kleck's report in support of this statement, but the studies cited there do not support the proposition. Indeed, the statement is inconsistent with Plaintiffs' admission that 500,000 firearms are stolen each year. *see* D-RSOF 118-B, as well as documented instances of theft from gun stores. *See* SOF 72 & 73. *See also* SOF 57-A (guns are "quite scarce 'on the street'" in Chicago, that "most criminals in Chicago currently lack a gun and have difficulty obtaining one," and "it is unusual for criminals in Chicago to be in possession of a gun"). Further, Dr. Kleck testified that "most gun criminals

118

acquire their guns directly or indirectly as a result of theft." SOF 118-A. And Dr. Kleck has

written that "[w]here more guns are owned, more guns will be stolen, other things being equal,

which results in more guns circulating among criminals." Pl. Ex. 30, at 1282. He also cites

survey data indicating that criminals who already have a gun use theft "as a way of upgrading the

quality of their weaponry." *Id.* at 1252.

77. Dr. Cook testified that "the fact that there are no FFLs within city limits [in

Chicago] makes illegal transactions from an FFL somewhat more difficult for youths and

criminals." Exhibit 13, Exhibit A thereto, at 12. Just like now, it was the case at the time of the

2007 Chicago Study that a Chicago resident "seeking to buy a firearm of any sort must travel

outside of city limits." Exhibit 12 at F561. The study noted that "any Chicago resident can

identify the location of numerous licensed suburban gun dealers with a quick search of the local

phone directory or the Internet." *Id.* at F566. The study reported, however, that guns recently

purchased (i.e., within three years) at suburban Cook County dealers accounted for only 11 % of

confiscated crime guns. *Id.* at F566-67.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so testified and that the 2007 Chicago Study

included the cited findings. Dispute, however, that the 2007 Chicago Study attributed

inefficiencies in Chicago's underground gun market to the City's gun regulations. *See* Chicago

Exhibit 12 at F560 ("Chicago's handgun ban ... was ineffective in reducing the prevalence of gun

ownership in the City. The frictions we observe in the underground market are more likely due to

the general scarcity of guns in the city (gun ownership rates are quite low, a fact that predates the

ban) and on Chicago's emphasis on anti-gun policing."); *id.* at F573 ('To the extent to which

Chicago's gun market works less well than in other places, the most likely explanations are the

119

city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns."); Exhibit 3 at 147:1-9 (Cook Dep.) (admitting that "at the end of the day we could not say with confidence" that "the regulations that were in place at that time in the City of Chicago" were responsible for difficulty criminals encountered in obtaining guns).

Furthermore, Chicago's own evidence shows that the "time-to-crime" rate for crime guns in Chicago is nearly identical to the national rate. *See* Chicago Exhibit 37 at 5 ("The median time-to-crime for guns traced from Chicago, where time-to-crime could be determined was 6.2 years, as compared to the national median of 6.1 years.").

**DEFENDANTS' REPLY**: As to the first paragraph of Plaintiffs' response, *see* D-RSOF 51. As to the second paragraph, the cited material is irrelevant and does not create a dispute as to the percentage of Chicago crime guns that originate from Cook County dealers.

78- A. Dr. Cook testified that "[a] partial explanation for why active criminals do not acquire guns at suburban FFLs" is that, as found in the study, they rarely leave their own neighborhood. Exhibit 13, Exhibit A thereto, at 12. The 2007 Chicago Study reported that the studied neighborhoods "are notorious for having among the city's most powerful street gangs," aud that the residents "are very parochial, perhaps because gang turf increases the risks of travel[]ing to other areas." Exhibit 12 at F566, F572.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so testified, and that the 2007 Chicago Study includes the cited findings. Dispute, however, any implication that the 2007 Chicago study found that "active  criminals" in particular rarely leave their own neighborhoods. Rather, it found that "the residents of [the studied] neighborhoods are very parochial, perhaps because gang

turf increases the risks of traveling to other areas." Chicago Exhibit 12 at F566. Also admit that the study offered this as a "partial" explanation. "Another possible explanation is that [FFLs] are by law required to record the identity of the official purchaser, which increases the legal risk associated with buying a gun from a dealer (even if one's girlfriend or wife makes a straw purchase)." *Id.* at F566 n.18. At any rate, in the end the 2007 Chicago Study concluded that "neighbourhood specific factors cannot be a very important explanation for the transactions costs documented" by the study. *Id.* at F573.

**DEFENDANTS' REPLY**: Plaintiffs fail to proffer facts or expert opinion showing that Dr. Cook's conclusion concerning the unwillingness of "active criminals" to travel to suburban stores cannot reasonably be extrapolated from, or is not supported by, the study's findings concerning the studied neighborhoods. Indeed, because Chicago's violent crime problem is driven by gangs, most of the "active criminals" impacted by Chicago's sales restrictions are by definition those that reside in the kinds of neighbourhoods examined in the study (*i.e.*, gang-infested neighborhoods). Further, the Wright & Rossi study reported that "[c]riminals typically do not live in the safest areas nor do they lead calm, safe, sheltered lives." Def. Ex. 31 at xxxiv.

Plaintiffs also mischaracterize the 2007 Chicago Study's statement that "neighbourhood specific factors cannot be a very important explanation for the transaction costs documented." The study made that statement in the context of observing that the "prices, availability and other characteristics of the gun market" in the studied neighborhoods "appear to be similar to the rest of Chicago." Def. Ex. 12 at F572.

78-B. In fact, Dr. Kleck recognizes that being a gang member is "an obstacle" to a person leaving their neighborhood. Exhibit 14 at 436:7-12. Other things being equal, an individual who

does not have a gang affiliation "probably would have an easier time ... crossing through other neighborhoods" than one who does. *Id.* at 436:2-6. Commander Gorman testified that a gang member traveling to a suburban gun store involves "great risk because it involves crossing gang and gang faction boundaries both in Chicago and its suburbs (because Chicago based gangs also operate in many surrounding suburbs)." Exhibit 10, ¶ 38. He testified that therefore "trips by gang members to suburban gun stores require significant planning and forethought" and that "the risks of making such a trip, and the preparation needed to alleviate those risks, cause some gang members, particularly those acting alone, sporadically, or in a small group, to forego making a trip to a suburban store." *Id.*

**PLAINTIFFS' RESPONSE**: Admit that Dr. Kleck and Commander Gorman so testified, but dispute any implication that individuals living low-income or crime-ridden neighborhoods that are not gang members do not face obstacles to traveling outside of the neighborhood. The 2007 Chicago Study, as we have explained, says that the residents of such neighborhoods potentially face risk in traveling outside the neighborhood. *See* Chicago Exhibit 12 at F566. And in addition to the cited testimony, Dr. Kleck also testified that sales ban places "a more significant burden, in particular, on law-abiding low-income residents." Exhibit 7 at 434: 19-24 (Kleck Dep.).

**DEFENDANTS' REPLY**: Plaintiffs fail to proffer any facts disputing the facts asserted in SOF 78-B. Instead, they improperly offer argument on a different topic – *i.e.*, whether non-gang members face obstacles to traveling outside their neighborhood. Further, the basis for Dr. Kleck's claim that law-abiding, low-income residents face a "significant burden" is that they have to spend 30 minutes driving, or 2 hours taking public transportation (and perhaps more time

learning how to take public transportation), to a suburban gun store. Def. Ex. 14 at 434:25-435:8.

He further testified that "guns are fairly durable [and] they last for a long time." *Id.* at 168:18-20.

"In all likelihood" a law-abiding civilian needs to go to a gun store to get a gun for self defense

only "once," if the store has the kind of gun the person wants. *Id.* at 435:9-15.

79-A. Dr. Cook opines that "were FFLs free to operate in the City, these criminals would

be more likely to acquire guns from an FFL." Exhibit 13, Exhibit A thereto, at 12.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so opined, but dispute the validity of his

opinion, which is based on a single source interviewed in connection with the 2007 Chicago

Study who said that "people like him rarely left their own neighborhood," which "suggests" that

this would be the case. Chicago Exhibit 13, Exhibit A thereto, at 12. In the 2007 Chicago Study,

Dr. Cook also offered "another possible explanation" for the low incidence of criminals

purchasing guns at suburban gun stores: "[FFLs] are by law required to record the identity of the

official purchaser, which increases the legal risk associated with buying a gun from a dealer."

Chicago Exhibit 12 at F566 n.18. This explanation, of course, undermines the conclusion that

more criminals would buy firearms from gun stores if they operated in the City. And this

explanation is consistent with the evidence that criminals rarely acquire their guns by buying

them from a retail outlet. *See* Chicago Exhibit 31 at xxxvi. At any rate, even if criminals would

be more likely to acquire guns from FFLs if they operated in the City, it does not follow that

criminals would be more likely to acquire more guns, period. And Chicago admits that it is

already easy for criminals to obtain guns. *See* Response to Statement of Fact 51; AF 6.

**DEFENDANTS' REPLY**: Plaintiffs fail to proffer facts or expert opinion showing that it is

unreasonable for Dr. Cook to base his opinion on the matters reported in the 2007 Chicago

123

Study.  They merely argue that the opinion is not properly supported.  Nor do Plaintiffs establish

that the mere existence of another possible reason for the low incidence of Chicago criminal

travel to suburban stores means that Dr. Cook's opinion is invalid.

Further, while the 2007 Chicago Study quoted one gang leader in particular regarding

gang member propensity to travel outside their neighborhood, the study was not based on a single

source.  Rather, the study interviewed at least 412 residents (190 non-gang affiliated youths aged

18-21; 75 gang-affiliated youths; 90 non-gang affiliated adults; and 57 gang-affiliated adults).

Def. Ex. 12 at F562.

The remainder of Plaintiffs' response consists of argument that does not meet the

substance of the asserted fact.  Even if it is true that most criminals do not acquire their guns

directly from a retail dealer, that does not address, much less undermine, whether those who wish

to do so "would be more likely to acquire guns from an FFL" if retail dealers were allowed in

Chicago.  *See also* D-RSOF 51, and RAF 6.

79-B. Commander Gorman testified that allowing gun stores in Chicago "would therefore

increase the likelihood that a gang member will acquire a firearm or that stolen firearms will

enter the illegal gun market" because "[a] gang member needing to travel only a few blocks or

miles, all while in Chicago, would have less risk to visit a gun store compared to having to travel

to a suburban store, and would need less time to prepare." Exhibit 10, ¶ 38.

**PLAINTIFFS' RESPONSE**: Admit that Commander Gorman so testified, but dispute his

opinion that allowing gun stores in Chicago would entail any significant increase in the

likelihood that a gang member will acquire firearms or that stolen firearms will enter the illegal

gun market.  Despite the sales ban, it is not difficult for gang members in Chicago to obtain

firearms.  *See* Response to Finding of Fact 51.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as

Plaintiffs argue the significance of the asserted facts.  Further, Plaintiffs fail to proffer facts

undermining the basis for Commander Gorman's testimony or, in particular, the substance of his

testimony that gang members would face less risk in traveling to a store located in Chicago

versus in the suburbs.  Plaintiffs' contention that it is not difficult for Chicago gang members to

obtain firearms does not speak to this particular fact, and, in any event, is not supported by the

record.  *See* D-RSOF 51.

80-A. The DOJ Report observed that "the preponderance of crime guns are recovered in

the same geographic area in which they were originally sold by an FFL."  Exhibit 41 at 24.

**PLAINTIFFS' RESPONSE**: Admit that the DOJ report so observed, based on ATF data.

Dispute that this ATF data-which is presumably based on trace data-is representative of all crime

guns.  *See* Exhibit 7 at 80 (Kleck Dep.) (noting that ATF trace data "concern samples of crime

guns that are not representative of crime guns in general that have been basically selected

samples.").  Also dispute any implication that the undefined term "geographic area" is limited to

the city in which an FFL is located.  According to the ATF, at the national level "a majority of

crime guns among all age groups ... were first purchased from FFLs in the State where the guns

were recovered by law enforcement."  Chicago Exhibit 45 at 41. Indeed, more recovered crime

guns were from out-of-state sources ("more than 40 percent") than from sources in the same

county ("35 percent"). *Id.*

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as

they inject additional facts that purport to take issue with the meaning and significance of the

admitted facts.  Further, as to Plaintiffs' contention regarding ATF trace data, *see* D-RSOF 52-B.

80-B.  FFLs operating in a high-crime area "expos[e] that neighborhood to more gun

crime than might be true for a rural dealer."  Exhibit 15 at 221:18-23.  Dr. Kleck testified that

because "Chicago is a high crime area," "if there were FFLs in [Chicago] a larger fraction of

guns sold by [Chicago FFLs] would make it into the illegal market than for FFLs that were not

located in a high crime area."  Exhibit 14 at 163:10-19.

**PLAINTIFFS' RESPONSE**: Admit to the extent that, all other things being equal, guns sold by

FFLs operating in high crime areas are more likely to eventually be stolen by criminals than guns

sold by FFLs operating in low-crime areas.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 33

("[S]ome dealers do business in areas with higher crime rates, and thus higher rates of residential

burglary and gun theft.  This means that no matter how closely they follow laws and ethical

practices in selling guns, a higher fraction of their lawfully stolen guns will eventually be

stolen.").  Dispute any further implications of this finding.  *See* Exhibit 2 (Kleck Decl.), Exhibit I

thereto, at 32-35.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as

they inject additional facts to argue that the number of crime guns flowing from a dealer is solely

a function of its operating in a high-crime area.  Defendants dispute that proposition, as evidence

exists showing that some dealers are corrupt.  *See* D-RSOF 60-B, 68-A.

81.  A study of California handgun dealers that averaged at least 50 handgun sales

annually reported that a dealer's location in an urban setting is a risk factor "strongly associated

with handgun retailers' risk of disproportionate sales of guns that are later used in crimes."

Exhibit 56 (G. Wintemute, Disproportionate sales of crime guns among licensed handgun

126

retailers in the United States: a case-control study, 15 Injury Prevention 291-299 (2009)) at 296-97. The study reported an odds ratio over 5 for dealers located in an urban setting. *Id.* at 297.

**PLAINTIFFS' RESPONSE**: Admitted that the study made these findings, but dispute that the study supports Chicago's sales ban. Indeed, the study concluded that "screening and focused enforcement could help disrupt illegal gun commerce without unduly affecting the legitimate gun market." Chicago Exhibit 56 at 298.

**DEFENDANTS' REPLY**: Plaintiffs' response takes no issue with the facts asserted in SOF 81 and merely argues that the facts are irrelevant. It should therefore be disregarded.

82. A 2009 study of a county's per capita rate of licensed firearm dealers and its rate of firearm homicide found that "the relation between FFLs and gun homicide was found to vary significantly by urbanization" and that "in major cities, a disproportionately high prevalence of FFLs was associated with significantly higher gun homicide rates." Exhibit 57 (D. Wiebe et al.,) Homicide and geographic access to gun dealers in the United States, BMC Public Health 9:199 (2009) at CITY 000592. It found that "major cities having the most FFLs per capita also have the highest rates of gun homicide." *Id.* at CITY 000593. The study observed that "[ i]n major city areas with higher crime rates, there will be greater criminal demand for guns and, hence, a larger illegal market for guns. It thus seems more likely that a weapon sold in a major city, as compared to one sold in another county type, will end up in the hands of a criminal user through theft, straw purchase, gun trafficking, or some other kind of transaction in the secondhand market." *Id.* at CITY 000595.

**PLAINTIFFS' RESPONSE**: Admit that the study found an association between FFLs and gun homicide rates (not overall homicide rates) in major cities, but dispute that it found any causal

relationship between those variables. Indeed, the study expressly acknowledged that "it may be that high rates of homicide may lead to increased demand for firearms and hence additional FFLs, in which case the results of the 'FFL as risk factor' hypothesis that our models have been designed to test would be spurious." Chicago Exhibit 57 at CITY 000596; *see also id.* (acknowledging that alternative approaches would be needed to "remove from the models the influence of circularity that may exist"). Because the study did nothing to account for this "causal order" issue, "it is more likely that the association merely reflected the well-established fact that higher crime rates motivate many people to acquire guns for protection." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 27; *see also id.* at 14-15 (addressing "causal order"). In addition, the authors acknowledged other limitations in the study. *See* Chicago Exhibit 57 at CITY 000596 (e.g., "we could not account for the actual volume of firearms introduced by each FFL into the community").

**DEFENDANTS' REPLY**: Plaintiffs' response does not proffer any facts that undermine the facts asserted in SOF 82. Instead, Plaintiffs argue the study's relevance. And Plaintiffs fail to note that, while the study acknowledged that high homicide rates might lead to an increase in FFLs, the study explained that empirical models that could potentially test for this "causal order" issue were problematic. Def. Ex. 57 at CITY 000596.

Further, the portions of Dr. Kleck's expert report cited by Plaintiffs do not address the study cited in SOF 82. Thus, Dr. Kleck has not opined that, as to that study, "it is more likely" that higher crime rates motivate gun acquisition rather than vice-versa.

Moreover, Dr. Kleck's theory that "the best available evidence indicates that . . . high murder rates cause more people to acquire guns for self-defense" rather than an increase in guns

causing an increase in homicide is based on two articles.  Pl. Ex.  2, Exhibit I thereto, at 14

(citing G. Kleck, et al., *The impact of gun control and gun ownership levels on violence rates*, 9

Journal of Quantitative Criminology 249-288 (1993) and T. Kovandzic, et al., *Estimating the*

*causal effect of gun prevalence on homicide rates* (2008)).  Dr. Kleck admitted that the first of

these two studies was criticized in an analysis by Steven Messner, "a well-respected

criminologist," in the Journal of Quantitative Criminology.  Def. Ex. 91 (Kleck Dep.) at 279:25-

280:4, 282:19-25.  *See also* Def. Ex. 94 (R. Alba & S. Messner, Point Blank *Against Itself:*

*Evidence and Inference About Guns, Crime, and Gun Control*, 11 Journal of Quantitative

Criminology 391-410 (1995)).  That critique noted that Dr. Kleck's "evidence is not adequate to

the case he wishes to build.  Upon close examination, the critical propositions do not always

follow directly from the data reported.  Further, the original evidence and analyses that are

invoked in their support are seriously deficient in our view, and in one instance, his interpretation

of statistical results appears grossly misleading if not simply wrong."  Def. Ex. 94 at 393.  In

particular, the study found that "Kleck's analysis of the effect of gun ownership on city crime

rates is seriously flawed by ambiguous measurement of a key construct and by severe model

misspecification."  *Id.* at 397.  Dr. Kleck further admitted that, in trying to control for causal

order in that study, he used instrumental variables whose validity was not checked via a "validity

test," a failure that "impairs" the reliability of the study's results "to some degree."  Def. Ex. 91

(Kleck Dep.) at 300:16-302:19, 311:14-19.

The second of those two studies – T. Kovandzic, et al., *Estimating the causal effect of*

*gun prevalence on homicide rates* (2008) – was not submitted for publication in a peer-reviewed

journal.  Def. Ex. 91 (Kleck Dep.) at 332:7-23.

83.     A 2007 study, sponsored by the United States Department of Justice, studied crime guns sold by Maryland dealers and recovered in Baltimore and Washington, D.C. Exhibit 58 (Christopher Koper, Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use, Report to the National Institute of Justice, U.S. Department of Justice (2007)). It found the following:

- A dealer's distance to a city was the "primary characteristic of importance" as to whether a dealer is likely to sell a gun recovered as a crime gun in the city. *Id.* at 82.

- Guns sold by dealers operating within 5 miles of either city were over twice as likely to be recovered as were guns sold by dealers operating further than 20 miles from both cities, and this risk declined as a dealer's distance from both cities increased. *Id.* at 72.

- As to Baltimore specifically, "proximity to Baltimore stood out as the most powerful predictor" of whether a gun sold from a dealer would be recovered as a crime gun in Baltimore. Sales made by dealers in or within 5 miles of the city were about 2.6 times as likely to be recovered as were guns sold by dealers located more than 20 miles from the city. Risk levels were also substantially elevated, ranging from 1.5 times to 2 times more likely, for other dealers operating within 20 miles of the city. *Id.* at 74 & Table 46.

- As to Washington, D.C. specifically, a dealer's proximity to the city was an "important" factor as to whether a gun it sold was recovered as a crime gun. Relative to dealers operating more than 20 miles from the city, risk levels were

130

nearly 2.5 times higher for dealers within 10 miles of the city and about 1.7 times

higher for dealers located 11-15 miles from the city. *Id.* at 77 & Table 47.

- Dealers located within 20 miles of Baltimore sold 90% of the Maryland guns

  recovered in Baltimore; dealers located within 20 miles of D.C. sold 75% of the

  Maryland guns recovered in D.C. *Id.* at 5.

**PLAINTIFFS' RESPONSE**: Admit that the study included the cited findings, but dispute that it

supports Chicago's ban on gun sales. The authors expressly stated that "we must ... be cautious

about generalizing these findings to other states." Chicago Exhibit 58 at 85. Furthermore, the

authors give a number of policy recommendations but never suggest banning gun dealers from

operating in cities, *id.* at 85-87 (e.g., "emphasis should be given to the monitoring of large

volume dealers in urban areas"), and there were a number of other factors that were also

important to whether a gun ended up being recovered by police: "Guns were more likely to be

recovered by police when the buyers were black ... , young, female or living in or close to

Baltimore or D.C.," *id.* at 82; *see also id.* at 79 ("Overall, the strongest predictor's tended to be

the buyer's race, buyer's area of residence, and the dealer's location."). At any rate, the study

certainly offers no support for the proposition that "stringent gun controls" such as Chicago's

sales ban are effective: "Despite having a handgun ban in place since the mid-1970s, D.C. has

high levels of gun violence. During the 1990s, ... the city's murder rate ranked first or near the

top among the nation's largest cities." *Id.* at 18.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded.

The materials cited by Plaintiffs fail to support the proposition that the study does not support

Chicago's ban on gun sales. In particular, even if there are other factors that influence whether a

gun is recovered by police, Plaintiffs fail to dispute the study's finding that a dealer's distance to a city was the "primary characteristic of importance."

And even though the study cautioned against generalizing its findings to other states, it stated that, "[n]otwithstanding" that caveat, "the study's results help to illuminate the workings of illegal gun markets and have a number of implications for gun policy and enforcement. One implication is that law enforcement should place greater emphasis on local gun markets and networks." Def. Ex. 58 at 85.

84-A. The ATF conducts compliance inspections to examine whether an FFL is complying with federal firearms laws. Exhibit 59 (William J. Krouse, The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF): Budget and Operations for FY 2011, Congressional 81 Research Service (June 6, 20 II)) at 5. FFLs are required by federal law to verify that customers are not prohibited from possessing a firearm and to verify that customers are residents of the state in which the FFL is located. Exhibit 41 at 2. FFLs also are prohibited from knowingly transferring a firearm to an individual known to be prohibited from possessing a gun. *Id.* at 27 n.56. FFLs must verify the identity of potential customers by examining a government-issued identification document, such as a driver's license, and have the customer complete a Form 4473, Firearms Transaction Record, which captures data related to the purchaser and firearm(s) purchased. *Id.* at 2. FFLs are also required to request a query of the National Instant Criminal Background Check System (NICS) to confirm that the potential customers are not prohibited from purchasing firearms. *Id.* Federal law requires that FFLs maintain completed Forms 4473 as well as a log of all firearms that they have acquired and sold, known as an Acquisition and Disposition Book (A&D Book). *Id.* The A&D Book must contain information including a

description of the firearm, the name and address of the person from whom the firearm was acquired and, once sold, the name and address of the purchaser and the date the gun was sold. *Id.* at 2-3. Combined, these record-keeping requirements are intended to deter the illegal transfer of firearms to prohibited persons. *Id.* at 3. The records kept by FFLs enable the ATF to trace firearms recovered by law enforcement agencies to learn when those firearms were purchased and by whom. *Id.* Inspection of the records also allows the ATF to uncover evidence of corrupt FFLs transferring firearms "off the books," straw purchases, and other patterns of suspicious behavior. Exhibit 59 at 12.

**PLAINTIFFS' RESPONSE**: Admit, except dispute any implication that every record-keeping error or oversight is evidence of a corrupt dealer. Here is the quote from Chicago's cited source, which certainly does not make such an allegation: "by inspective these records, ATF investigators are often able to uncover evidence of corrupt FFLs transferring firearms 'off the books,' straw purchases, and other patterns of suspicious behavior." Chicago Exhibit 59 at 12.

**DEFENDANTS' REPLY**: None.[3]

86.     A report by the U.S. Department of Justice's Office of the Inspector General ("OIG") "assessed the effectiveness of [ATF's] program for inspecting [FFLs] to ensure that they are complying with federal firearms laws and regulations." Exhibit 41 at I. The DOJ Report concluded that "the ATF's inspection program is not fully effective for ensuring that FFLs comply with federal firearms laws because inspections are infrequent and of inconsistent quality, and follow-up inspections and adverse actions have been sporadic." *Id.* Among other numerous detailed findings, the Report noted that:

---

[3]  Plaintiffs' RSOF 84-A actually contains SOF 84 & SOF 85.

- The ATF faces significant shortfalls in resources. *Id.* at ii.

- While the ATF's goal is to inspect each FFL at least once every three years, "most FFLs are inspected infrequently or not at all." In FY 2002, the ATF inspected only 4.5% of the approximately 104,000 FFLs for compliance with federal firearms laws. "At that rate, it would take the ATF more than 22 years to inspect all FFLs." *Id.* at iii. *See also id.* at xi.

- A sample of 100 FFLs that had been in business for an average of 11.2 years revealed that: in 23 cases, the ATF had never conducted a full compliance, application, or renewal inspection; in 22 cases, the ATF had conducted an application inspection but no further inspection even though these FFLs had been active for an average of 5.1 years; in 29 cases, while the ATF had conducted at least one compliance inspection on the FFL, the inspections occurred on average once every 9.2 years and the FFLs had been active for an average of 14.8 years; in 26 cases, the ATF had never conducted a compliance inspection but had conducted at least one renewal inspection, which occurred, on average, once every 6.9 years. *Id.* at 20-21.

- Even though "[l]arge-scale retailers sell a higher volume of guns than small dealers" and present "the potential for large numbers of improper sales," such retailers "are not inspected on a routine basis. *Id.* at 21. ATF supervisors indicated that "they avoid selecting large FFLs for compliance inspections because the large volume of records makes the inspections more difficult and time-consuming." *Id.* The nine-large scale dealers in the DOJ's sample were

134

inspected roughly once every 9.9 years. *Id.* at 22. Five of those nine had never received a compliance inspection. *Id.*

- Even though ATF "focuses its inspections on those FFLs that exhibit most severely the established indicators of trafficking ... it does not identify all FFLs that exhibit those indicators. Instead, the ATF manipulates the criteria it uses to target FFLs for inspection so that it only identifies as many such FFLs as it has the resources to inspect." *Id.* at iiiiv, *See* also *id.* at 23-24.

- "[T]he ATF overall did not focus its resources to conduct more inspections in those Field Divisions that had more crime guns traced" and there was "little correlation between the number of traces and the number of compliance inspections conducted the next year." *Id.* at 25. In 2001, of the ATF's 21 Field Divisions for which it had discernable data, the Chicago Field Division had the highest number of trace requests in 2001; however, in 2002, it had only the 11th highest number of compliance inspections. *Id.*

- 'The lack of standardized inspection procedures resulted in inconsistent inspections of FFLs and significant variation in the implementation of the inspection program by Field Divisions." *Id.* at 54. Compliance inspections averaged 24.5 hours in one Field Division and up to 90 hours in other Field Divisions, yet the report "found no operational reasons" for this discrepancy. *Id.* In fact, the report "found little or no correlation between inspection times and enforcement activities, such as referrals of suspected criminal activity and adverse actions taken." *Id.*

135

- 14 of 18 Inspectors interviewed by the OIG indicated that they "only examine [Form 4473s] to see if they were filled out properly - not for indications that a purchaser may be part of a firearms trafficking ring or acting as a straw purchaser for someone else (e.g., purchasing patterns, similarities in purchasers' addresses)." *Id.* at 30.

- Of the 1,530 firearms trafficking investigations conducted by the ATF from July 1996 to December 1998, just 43 -less than 3% - were initiated based on information found during ATF inspections of an FFL. *Id.* at 38.

- "Even when numerous or serious violations were found, the ATF did not uniformly take adverse actions, refer FFLs for investigation, or conduct timely follow-up inspections." *Id.* at I.

- In 2002, even though violations were found in 1,934 inspections, and such inspections found au average of almost 70 violations each, the ATF issued only 30 notice of license revocation. *Id.* at vi, 39.

- "[T]he process for revoking the licenses of FFLs that violated federal firearms laws, or clearing the FFL, is lengthy." *Id.* at vi.

- "Because the ATF does not conduct regular inspections of FFLs and lacks adequate resources to meet agency goals, it cannot effectively monitor the overall level of FFL compliance with federal firearms laws." *Id.* at 54.

**PLAINTIFFS' RESPONSE**: Admit that the OIG report included the cited findings, but dispute that the ATF lacks the ability to effectively monitor FFLs. Dr. Kleck analyzed more recent data and concluded that ATF conducts "a number [of compliance inspections] sufficient to inspect all

136

'real' gun 85 dealers (those annually selling more than 50 guns) every year, plus a sample of low-volume dealers. Thus, it is not true that ATF lacks the resources and authority to regulate gun stores." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 5; *see also id.* at 33-34; Exhibit 39 at 6 (ATF, Operation Snapshot Final Report (1993)) (finding that only "7% of dealers disposed of over 50 firearms" over the course of one year); Exhibit 3 at 223 (Cook Dep.) (admitting that he doesn't "know for a fact about what has happened to the resources available to the ATF or - - or how they're deployed" since the nine year old ATF report).

Further dispute any implication that cited revocation data indicates that ATF is either unwilling or unable to revoke the licenses of any corrupt dealers. Dr. Kleck testified that available evidence indicates that "few FFLs' licenses are revoked because few engage in misconduct serious enough ... to merit license revocation." Id. at 34. And any delays in revocation proceedings "should only result in time lags in revocation ... , but should not prevent revocations from occurring at all." *Id.*; *see also* Exhibit 30 at 1244-48 (Gary Kleck et al., The Myth of Big Time Gun Trafficking, 56 UCLA L. REV. 1233 (2009)).

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Plaintiffs do not meet the facts asserted in SOF 86 and improperly proffer additional facts to argue that the ATF is able to inspect all "real" gun dealers, and that the ATF is not unwilling or unable to revoke licenses of corrupt dealers.

Further, Defendants dispute those additional facts. For one, Dr. Kleck's opinion lacks basis. He "ha[sn't] ever studied the effectiveness of ATF inspection procedures." Def. Ex. 91 (Kleck Dep.) at 156:12-15. He has "no basis for disagreeing or agreeing" that the ATF "is not properly using its resources to monitor FFLs." *Id.* at 166:10-20. He "ha[sn't] independently

studied the use of resources by ATF other than the fact that I know how many compliance inspections they do relative to the number of FFLs." *Id.* at 166:23-167:1. More broadly, he has "never had any experience or involvement with enforcement of federal gun laws." *Id.* at 34:12-15. He has never inspected a gun dealer or other FFL for compliance with federal law. *Id.* at 33:24-34:3. He has never audited an FFL. *Id.* at 34:10-11. He has never been involved in the licensing of a gun dealer. *Id.* at 34:4-6. He has never worked for ATF nor has he conducted research on behalf of ATF or had a consulting relationship with ATF. *Id.* at 34:16-24.

In addition, as to the ability of the ATF to revoke licenses, Dr. Kleck purported to support his opinions by citation to Gary Kleck et al., The Myth of Big Time Gun Trafficking, 56 UCLA L. REV. 1233 (2009), *see* Pl. Ex. 2, Exhibit I thereto, at 35 (citing paper), which Plaintiffs also cite herein as Pl. Ex. 30. However, the cited pages from that paper, which was published in a law-review and likely not peer reviewed, *see* D-RSOF 53, do not purport to support the proposition the ATF is always able to revoke those licenses that it wishes to.

On the other hand, that paper indicates that ATF resources are inefficiently allocated, and allocated based on considerations other than the volume of crime guns supplied by a dealer. It asserts that the ATF "focuses disproportionately on more vulnerable investigative targets," such as "gun shows and flea markets" – even though only 1.7 percent of gun criminals obtain their crime gun from such a source – because such sources "may simply be easier to investigate than trafficking rings that operate secretly." Pl. Ex. 30 at 1248.

Moreover, Dr. Kleck's opinion that "it is not true that ATF lacks the resources and authority to regulate gun stores" is erroneous. Dr. Kleck's calculations assume, based on a 1993 statistic, that only 7% of FFLs are "real" dealers. But that number is no longer accurate in light

of significant in federal licensing laws that caused many "small time" FFLs to drop out. . *See* Def. Ex. 104 (Vince Dec.), ¶ 6-7. Today the percentage of "real" FFL dealers is likely at least two times as high as the number of annual compliance inspections conducted by ATF. *Id.*, ¶ 8.

87. In FY 2002, the year reviewed in the DOJ Report, the ATF had 5,143 appropriated permanent positions. Exhibit 59 at 7. In FY 2010, ATF had 5,206 appropriated permanent positions. *Id.* In FY 2002, ATF had an appropriated overall budget of $854,747,000. *Id.* In FY 2010, the ATF had an appropriated overall budget of $1.158 billion. *Id.* at 5, 7.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

88. ATF conducted the following number of compliance inspections from FY 2007 to FY 2010:

| Year | Total Number of FFLs | FFLs Inspected | % of FFLs Inspected |
| --- | --- | --- | --- |
| FY 2010: | 118,487 | 10,538 | 8.9 |
| FY 2009: | 115,101 | 11,375 | 9.9 |
| FY 2008: | 111,600 | 11,169 | 10.0 |
| FY 2007: | 109,000 | 10,106 | 9.3 |

Exhibit 60 (ATF Fact Sheet, Facts and Figures (FY 2010)) at 2; Exhibit 61 (ATF, Firearms Commerce in the United States 2011) at 27; Exhibit 59 at 12-13.)

**PLAINTIFFS' RESPONSE**: Admit that the number of FFLs inspected for FY 2009 and FY 2010. For FY 2007 and FY 2008, Exhibit 61 at 30 reports slightly different figures than Exhibit 59 at 12-13; the figures in the Statement are consistent with the latter. Also admit that the total number of FFLs for FY 2007 - FY 2009 are consistent with Exhibit 59 at 12-13; Exhibit 61 at 27

139

gives slightly different numbers for those years. Admit total number of FFLs for FY 2010. The

total number of FFL figures from FY 2007 through FY 2010 is not limited to licensees permitted

to engage in the business of selling firearms. For example, the total for each year includes

between 47,690 and 56,680 licensed collectors. *See* 28 C.F.R. § 478.41(d) ("The collector

license provided by this part shall apply only to transactions related to a collector's activity in

acquiring, holding or disposing of curios and relics. A collector's license does not authorize the

collector to engage in a business required to be licensed under the Act or this part."); Exhibit 40

(ATF Fact Sheet - Compliance Inspections) ("There were approximately 65,000 FFLs engaged in

business in fiscal year 2011 (excluding persons holding collector licenses). During that time,

ATF conducted more than 13,100 firearms compliance inspections.").

**DEFENDANTS' REPLY**: None.

89. As to the subset of Type I FFLs (retail dealers in firearms) and Type 2

FFLs (retail dealers in firearms who also receive firearms in pawn), ATF conducted the following

numbers of compliance inspections in the following years:

| Year | Total Number of FFLs | FFLs Inspected | % of FFLs Inspected |
|------|----------------------|----------------|---------------------|
| FY2009 | 54,184 | 11,375 | 21.0 |
| FY2008 | 54,948 | 11,170 | 20.3 |

Exhibit 62 (October 21, 2010 letter from Ronald Weich, Assistant Attorney General, U.S.

Department of Justice to the Honorable Mike Quigley, U.S. House of Representatives) at 1.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY** None.

90. Of these dealers inspected in FY 2009:

- 29% (3,260 dealers) had violated federal law and regulations; and

- 7% (745 dealers) had a total of 28,325 guns missing from inventory (after reconciliation), for an average of 38 guns per dealer. *Id.*

**PLAINTIFFS' RESPONSE**: Admitted, but note that these inspections led to a total of just 100 "proceedings initiated by ATF to revoke licenses or deny renewals." Chicago Exhibit 62 at 2. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 34 (available evidence indicates that "few FFLs' licenses are revoked because few engage in misconduct serious enough ... to merit license revocation") Exhibit 40 (ATF Fact Sheet - Compliance Inspections) ("[O]n rare occasions ATF encounters a licensee who fails to comply with the laws and regulations and demonstrates a lack of commitment to improving his or her business practices"; such situations "may require revocation of the federal firearms license.").

**DEFENDANTS' REPLY**: Plaintiffs admit SOF 90 but then go on to add extraneous material that does not meet the facts asserted; such matter should be disregarded. Further, as to Dr. Kleck's statement cited by Plaintiffs, *see* D-RSOF 86.

91. Of the 10,538 FFL compliance inspections conducted by ATF in FY 2010, 35% resulted in a report of violations, a warning letter, a warning conference, license revocation, denial of license renewal, or the surrender of the license. Exhibit 60.

**PLAINTIFFS' RESPONSE**: Admitted. The total for each category was:

- Report of Violations: 1,366

- Warning Letter: 1,408

- Warning Conference: 820

- Revoke License or Denial of Renewal: 67

- Surrender of License: 33

*See* Exhibit 60 at 2.

**DEFENDANTS REPLY**: Plaintiffs admit SOF 91 but then go on to add extraneous material that does not meet the facts asserted; such matter should be disregarded.

92. For crimes committed between 1996 and 2000, Chuck's Guns in Riverdale, Illinois, had the highest number of crime guns traced to it - 2,370 - of any FFL in the U.S. Exhibit 63 (Selling Crime: High Crime Gun Stores Fuel Criminals, Americans For Gun Safety (Jan. 2004)) at 9. The next highest number traced to an Illinois dealer for that period was 738. *Id.* at 23. Chuck's Guns was not inspected by the ATF during that period. *Id.* Between 2003 and 2011, Chuck's was audited by the ATF only two times, with the second audit occurring approximately three years ago. Exhibit 35 at 33:24-34:11. Camco Sales and Service has never been investigated or inspected by the ATF. Exhibit 53 at 48:14-19.

**PLAINTIFFS' RESPONSE**: Admit except for the following: Dispute that Chuck's Guns was not inspected by the ATF during the period 1996 to 2000. Rather, the cited source ("Selling Crime") claims that it was not inspected from January 1, 2000 to May 31, 2003. *See* Chicago Exhibit 63 at 11. Also dispute that the Selling Crime establishes the truth of this claim. *See id.* at 11 n.12 (ATF inspection records were obtained from the Department of Justice, but "on occasion, ATF may inspect a dealer but fail to record the licensee's name in its records"). Also dispute that Selling Crime supports any finding that Chuck's Guns has not received law enforcement scrutiny: it notes that undercover detectives visited Chuck's Guns "so often that they were on a first name basis with the store clerks." *Id.* at 16. Dispute that a high trace count implies in any way that a dealer is "corrupt" or irresponsible. *See* Response to Statement of Fact

142

68.

**DEFENDANTS' REPLY**:   Plaintiffs' response should be disregarded to the extent it injects

additional facts in support of the argument that Chuck's has received "law enforcement scrutiny"

beyond that of ATF.  Further, as to the last sentence of Plaintiffs' response, *see* D-RSOF 52.

93.     Mr. Vince opines that the ATF "lacks the resources and statutory authority to

provide sufficient oversight and regulation of gun stores.  Exhibit 38, Exhibit A thereto, at 1.

Mr. Vince testified that the federal firearms laws governing dealers "have been gutted" and

"weakened" to the point that they "are not effective."  Exhibit 39 at 168:20-169:2.  "Except in

very limited circumstances, the ATF is prohibited by law from inspecting an FFL more than once

a year."  Exhibit 41 at 5.  Moreover, the ATF routinely provides advanced notice of an inspection

to an FFL. Exhibit 38, ¶ 8.  Dr. Kleck testified that this "make[s] it harder" for the ATF to detect

illegal activity by an FFL.  Exhibit 14 at 155:23-156:11.  Mr. Vince opines that "the lack of

proper inspection of gun dealers by ATF, as well as insufficient federal laws and ATF resources

to properly monitor these businesses, results in criminals and other ineligible purchasers being

able to easily acquire firearms from these businesses."  Exhibit 38, Exhibit A thereto, at 18.

**PLAINTIFFS' RESPONSE**:  Disputed.  Dr. Kleck has thoroughly rebutted Mr. Vince's opinion

on these matters. Dr. Kleck testified that "there are two problems with Mr. Vince's argument: (1)

the premise that ATF lacks the resources and authority to regulate gun stores is false, and (2)

there is no sound evidence that banning gun sales, for whatever reason, has the benefits Vince

claims for the measure."  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 5.  On the first point,

Mr. Vince relies primarily on the 2004 OIG report that we addressed in response to Statement of

Fact 86. On the second point, "Vince ... implies that banning gun sales in Chicago will reduce

gun possession among the city's criminals and thereby reduce firearms crime, but does not cite any research indicating that local sales bans have such effects. Existing evidence indicates that they do not." *Id.* (citations omitted). *See* also Response to Statement of Fact 59.

Furthermore, with respect to the frequency of permitted inspections, in addition to one routine annual inspection for compliance with record-keeping requirements, Federal law also permits unlimited inspections of FFLs (a) with a warrant based on "reasonable cause to believe a violation of [chapter 18 of the United States Code] has occurred and that evidence thereof may be found on such premises," (b) without a warrant "in the course of a reasonable inquiry during the course of a criminal investigation of a person or persons other than the licensee," and (c) without a warrant "at any time with respect to records relating to a firearm involved in a criminal investigation that is traced to the licensee." *See* 18 U.S.C. § 923(g)(1)(A)&(B). *See* also Chicago Exhibit 61 at 6. Finally, even if it is true that "ATF agents customarily provide at least 24 hours before conducting routine compliance investigations," Chicago Exhibit 38 ¶ 8, at most this simply gives FFLs a short period of time to get their paperwork in order.

**DEFENDANTS' REPLY**: As to the first point offered by Dr. Kleck (that the ATF has sufficient resources to regulate gun stores), see D-RSOF 86. On the second point (that there is no evidence that banning gun sales has benefits), see D-RSOF 60-A.

In addition, Plaintiffs offer no facts showing that the cited statutory bases for inspecting an FFL more than once a year are effective in detecting FFL malfeasance. Basis (a) is triggered only when there is a reasonable basis for believing a violation has already occurred; it therefore does not permit inspections to detect violations in the first instance. Basis (b) is triggered only when someone other than the FFL is the subject of investigation. Basis (c) is triggered only in

connection with an investigation of a particular firearm involved in a criminal investigation.

Plaintiffs offer no facts showing that these limited exceptions are invoked with any frequency, or

that they otherwise allow ATF sufficient ability to police FFLs.

Further, as to Plaintiffs' statement that the 24-hour notice given prior to an inspection "at

most" gives FFLs time to get their paperwork in order, this is contradicted by Dr. Kleck's

testimony (cited in SOF 93) that advance notice "make[s] it harder" for the ATF to detect illegal

activity by an FFL.

94-A. Further, Dr. Cook indicates that the ATF "provides little oversight and is rarely

able to revoke a license." Exhibit 13, Exhibit A thereto, at 12. "[I]t takes on average over six

years for ATF to revoke a license from [an FFL], even under the most egregious circumstances."

Exhibit 38, Exhibit A thereto, at 17.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook and Mr. Vince gave the cited testimony.

Dispute that ATF is either unwilling or unable to revoke licenses when justified.  Dr. Kleck

testified that available evidence indicates that "few FFLs' licenses are revoked because few

engage in misconduct serious enough ... to merit license revocation." *Id.* at 34.  And any delays in

revocation proceedings "should only result in time lags in revocation ... , but should not prevent

revocations from occurring at all." *Id.*; *see also* Exhibit 30 at 1244-48 (Gary Kleck et al., *The

Myth of BigTime Gun Trafficking*, 56 UCLA L. REV. 1233 (2009)).

**DEFENDANTS' REPLY**: As to the ability of the ATF to revoke licenses, Dr. Kleck purports to

support his opinions by citing Gary Kleck et al., The Myth of Big Time Gun Trafficking, 56

UCLA L. REV. 1233 (2009), *see* Pl. Ex. 2, Exhibit I thereto, at 35 (citing paper), which Plaintiffs

also cite herein as Pl. Ex. 30.  However, the cited pages from that paper, which was published in

145

a law-review and likely not peer reviewed, *see* D-RSOF 53, do not purport to support the proposition the ATF is always able to revoke those licenses that it wishes to.

94-B.  In addition, even where an FFL is convicted of a serious felony or has poor business practices that allow criminals, terrorists, or minors to acquire firearms, the license can be passed to a relative or associate. *Id.*

**PLAINTIFFS' RESPONSE**: Disputed. Chicago & Mr. Vince cite no provision of law to support this assertion. And Federal regulations provide that federal firearms licenses "are not transferable.  In the event of the lease, sale, or other transfer of the operations authorized by the license, the successor must obtain the license required by this part prior to commencing such operations."  27 C.F.R. § 478.51.  There are limited rights of succession for "(1) The surviving spouse or child, or executor, administrator, or other representative of a deceased licensee, and (2) A receiver or trustee in bankruptcy, or an assignee for benefit of creditors." *Id.* § 478.56.  This succession right only lasts "for the remainder of the term of. .. a current license." *Id.* The duration of a license is three years. *Id.* § 478.49. Indeed, even corporate licensees must file a new application following a change in corporate control once the existing license expires. *Id.* § 478.54.

**DEFENDANTS' REPLY**:  Plaintiffs fail to properly dispute the asserted fact.  They cite provisions of regulatory law, but they cite no factual evidence showing that licenses are not passed.   And even Plaintiffs' reference to regulatory law does not establish a dispute with the asserted fact.  While federal regulations provide that, technically, FFLs are non-transferable and that a successor must independently acquire an FFL, those regulations also state that a FFL "shall" be issued to a qualified applicant.  27 C.F.R. § 478.47.  Thus, so long as the successor is

qualified, it can obtain an FFL and in effect continue a preceding business. This phenomenon

occurs and is well-documented. Def. Ex. 105 (David Fallis, *Gun dealers often stay in business*

*with new licenses after ATF shuts them down*, Washington Post, Dec. 14, 2010) (roughly 60

cases where "the business stayed open, often re-licensed through relatives, employees, associates

or newly formed companies").

95.     Dr. Kleck has "no basis for disagreeing or agreeing" that the ATF "is not properly

using its resources to monitor FFLs." Exhibit 14 at 166: 10-20. He "ha[s'nt] independently

studied the use of resources by ATF other than the fact that I know how many compliance

inspections they do relative to the number of FFLs." *Id.* at 166:23-167:1. He has never studied

the effectiveness of the ATF's inspection procedures. *Id.* at 156:12-15.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Kleck gave the cited testimony, but dispute to the

extent this suggests that Dr. Kleck lacks a basis for his opinions with respect to the ATF's

monitoring practices and capacities. Indeed, he has studied "the resources that the ATF has for

regulating gun laws or enforcing federal ... Gun laws" by reviewing several ATF publications.

Exhibit 7 at 143:1-25 (Kleck Dep.). *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 5, 33-34

(citing several ATF publications); Exhibit 30 at 1239 n.20, 1268-70 (Gary Kleck et al., The Myth

a/Big-Time Gun Trafficking, 56 UCLA L. REV. 1233 (2009)) (same).

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as

it injects additional facts to argue the issue of Dr. Kleck's qualifications regarding ATF matters.

As to that contention, Dr. Kleck testified that he has "never had any experience or involvement

with enforcement of federal gun laws." Def. Ex. 91 at 34:12-15. He has never inspected a gun

dealer or other FFL for compliance with federal law. *Id.* at  33:24-34:3. He has never audited an

FFL. *Id.* at 34:10-11. He has never been involved in the licensing of a gun dealer. *Id.* at 34:4-6. He has never worked for ATF nor has he conducted research on behalf of ATF or had a consulting relationship with ATF. *Id.* at 34:16-24.

96-A. Even with tracing data indicating that the majority of crime guns originate from less than 1 % of FFLs, the ATF "has not been able to curtail the flow of firearms to [criminals] in major cities." Exhibit 38, Exhibit A thereto, at 17.

**PLAINTIFFS' RESPONSE**: Admit that some research has shown that a majority of traced crime guns originate from less than 1 % of FFLs; dispute that this demonstrates that a majority of all crime guns so originate. *See* Response to Statement of Fact 52. Admit that criminals continue to obtain firearms.

**DEFENDANTS' REPLY**: *See* D-RSOF 52.

96-B. The DOJ Report recommendations for enhancing regulation of FFLs include:

• Develop a standard, streamlined inspection process that includes in-person inspections of all FFL applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.

• Conduct a pilot program to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.

• Update the inspection tracking system to accurately segregate and report on Inspector time spent preparing for inspections, in travel, on-site at FFLs, and conducting other administrative duties.

• Direct the National Licensing Center to develop an adverse action tracking system

to monitor the progress and timeliness of FFL denials and revocations from the

time an Inspector makes a recommendation until the proceedings are finalized.

Exhibit 41 at 56.

**PLAINTIFFS' RESPONSE**: Admit that the DOJ Report included the cited recommendations.

**DEFENDANTS' REPLY**: None.

97-A. Under MCC 8-20-040, every qualified Chicago resident is permitted to have a fully

loaded and operable firearm in the home, to place it anywhere in the home, and to carry it

anywhere in the home, including from room to room. Exhibit 1 at 86:13-14; 98:11-15; Exhibit 2

at 174:19-175:18; Exhibit 3 at 159:3-7; Exhibit 38, Exhibit A thereto, at 12-13.

**PLAINTIFFS' RESPONSE**: Admitted, with the understanding that Chicago law defines

"home" in an artificially narrow way to exclude porches, garages, yards, and any other locations

outside of the four walls of the dwelling unit. *See* MCC 8-20-010.

**DEFENDANTS' REPLY**: None, except that Defendants' dispute Plaintiffs' argumentative

characterization of Chicago's definition of "home" as "artificially narrow," a proposition for

which they provide no support.

97- B. This allows the resident to have a firearm ready for self-defense at all times within

the home. Exhibit 14 at 123:17-20.

**PLAINTIFFS' RESPONSE**: Admit that a qualified Chicago resident lawfully may carry a

loaded, operable firearm with them in the home. Many "civilians in their homes," however, "do

not ordinarily carry their guns on their person as they move from room to room, nor do they sleep

with a gun on their person." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 4. *See also* Exhibit 41 ¶

9 (Tyler Decl.); Exhibit 12 at 101 (Tyler Dep.). Thus dispute the extent to which, as a practical

matter, the ordinance allows such residents to have a firearm ready for self-defense at all times within the home.  *See* Exhibit 25 at 86-87 (Webster Dep.) (admitting that someone who carried a firearm from room to room in their home would be at higher risk for suicide than someone who storied multiple firearms in safes throughout his home).

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Plaintiffs admit the fact asserted but then improperly goes on to assert additional facts to argue that "as a practical matter" residents do not have guns ready for self-defense at all times.  And even that proposition is not supported by the material they cite.  In addition, Plaintiff Tyler admits that, while she may prefer having multiple operable guns throughout the home, she is, as a practical matter,  "perfectly willing to carry [her gun] around" in her house on her person, has no safety concerns with doing so, and does not have "any reason to think that [she is] less able to defend [herself] by carrying around a weapon on [her] person versus storing weapons around the house."  *See* SOF 101.

98-A. Jody Weis, then-Superintendent of the CPD, testified at the City Council hearings on the Ordinance that "[O]ne operable firearm is all a person should need for self-defense.  This rule does not burden the right to self defense." Exhibit 64 (June 29, 2010 Chicago City Council hearing transcript) at 71.

**PLAINTIFFS' RESPONSE**: Admit that Mr. Weis so testified, but dispute that the limitation to one operable firearm does not burden the right to self-defense. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24 ("Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would, based on this body of research [regarding defensive

gun use] generally reduce the victim's chances of being killed, raped, otherwise injured, or of

losing property.

Thus, the restrictions are likely to reduce the number of beneficial uses of guns by crime victims

in their homes."); *see also* Exhibit 41 at ¶ 9 (Tyler Decl.); Exhibit 12 at 94-95 (Tyler Dep.);

Exhibit 42 at ¶ 6 (Pacholski Decl.); Exhibit 43 at 155-56 (Pacholski Dep.).

**DEFENDANTS' REPLY**:  Plaintiffs' response purports to proffer an expert opinion of Dr.

Kleck, but the opinion is not supported.  It does not purport to be based on studies that addressed

whether a resident's ability to use a firearm in self defense is reduced by safe storage

requirements in a situation where the resident is still free to keep an operable gun ready at all

times.

In fact, Dr. Kleck admitted that his opinion that locking devices will "sometimes" prevent

effective defensive gun use is a "hypothesis" that he bases on "common sense" and not his

expertise in criminology.  SOF 113.  The proposition "hasn't been scientifically established," he

has no scientific evidence supporting it, and it has never been tested in any scientific manner. *Id.*

He did not rely upon any tests of how long it takes to remove a trigger lock. *Id.*  He is not aware

of any study demonstrating that trigger locks prevent effective defensive gun use.  *Id.*  He is not

aware of any study showing that keeping one operable firearm in a home but trigger locking a

second, third, or fourth firearm reduces a person's ability to effectively resist crime versus not

securing the additional firearms with a trigger lock.  *Id.*  He is not aware of anyone in the gun

industry who asserts that trigger locks or other safety mechanisms impair defensive gun use. *Id.*

Moreover, the statements of Plaintiffs Tyler and Pacholski cited herein should be

disregarded because they testified that they follow safe storage practices as to *all* of their guns,

even the one gun that Chicago law permits them to keep operable at all times.  SOF 103 & 107.

98-B. Mr. Vince opines that MCC 8-20-040 "does not prohibit individuals from effectively utilizing a firearm for self defense."  Exhibit 38, Exhibit A thereto, at 1, 13.  Mr. Vince bases this opinion in part on his law enforcement experience and training. *Id.* at 13.  Mr. Vince indicates that even though "[l]aw enforcement officers face threats to their personal security much more frequently than the average citizen and are therefore much more likely to need to use a firearm as a defensive weapon," they "almost always carry only a single firearm" and "do not need to have immediate access to multiple loaded and ready firearms to do their job." *Id.*

**PLAINTIFFS' RESPONSE**: Admit that Mr. Vince so opined, but dispute his opinion.  In particular, even if it is true that on-duty law-enforcement officers typically carry only one firearm, but *see* Exhibit 2 (Kleck Decl.), Exhibit I thereto, it does not follow that civilians should be permitted only a single firearm in their homes.  "Police officers usually do not need more than one operable gun because while on duty they always carry that one gun on their person, and thus it is always immediately available for use. It is a cumbersome but required condition of police work that they always carry a gun.  In contrast, civilians in their homes do not ordinarily carry their guns on their person as they move from room to room, nor do they sleep with a gun on their person .... Thus, the fact that many police officers carry only one gun on their person is of no relevance to whether Chicago's limits on number of operable guns impair effective DGU." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 4.

**DEFENDANTS' REPLY**:  Plaintiffs' response beyond their admission should be disregarded, as it injects additional facts to argue a different point – *i.e.*, that it is cumbersome for civilians to

carry a firearm because law enforcement personnel find it cumbersome. Further, Plaintiffs fail to properly support even that point. They rely upon an opinion of Dr. Kleck, but the opinion lacks basis. Dr. Kleck has no experience in law enforcement, and he testified that he "has no knowledge one way or the other" as to whether "law enforcement officers find it cumbersome" to carry a firearm. Def. Ex. 91 (Kleck Dep.) at 33:21-23; 99:11-100:12. Nor is his statement based on his personal experience, a survey, or scientific testing. *Id.* at 100:21-101:2; 101:13-15.

99. Dr. Kleck is not aware of "any study or evidence that indicates that there is a defensive benefit to having more than one operable gun per Chicago firearms permit holder in the home." Exhibit 14 at 114:18-23.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Kleck testified; to his knowledge "no one has ever studied that subject" directly. Chicago Exhibit 14 at 114:22-23. Dispute any implication that in Dr. Kleck's opinion no scholarly research bears on this question: "The relevance of the DGU effectiveness research to the present case is straightforward. Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would, based on this body of research, generally reduce the victim's chances of being killed, raped, otherwise injured, or losing property. Thus, the restrictions are likely to reduce the number of beneficial uses of guns by crime victims in their homes." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded. Plaintiffs admit the asserted fact but then inject additional facts in arguing that other research bears on the issue. Further, regarding the opinion of Dr. Kleck proffered in Plaintiffs' response, *see* D-RSOF 98-A.

l00-A. Dr. Daniel W. Webster is a professor at the Johns Hopkins Bloomberg School of Public Health and has studied gun-related injuries and violence for the past 22 years, serving as Co-Director of the Johns Hopkins Center for Gun Policy for the past 10 years. Exhibit 6 (Declaration of Daniel Webster), Exhibit A thereto, at 1. He teaches graduate courses in violence prevention and research and evaluation methods, and serves on the steering committee of a National Institutes of Health-funded pre- and post-doctoral training program in violence prevention research. *Id.* He has published 62 articles in scientific, peer-reviewed journals. *Id.*

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

l00-B. Dr. Webster opines that "no research [ ] supports the notion that increasing the number of operable firearms in homes makes occupants safer." *Id.* at 15.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Webster so opined because, in his view, the subject has not been studied directly. *See* Chicago Exhibit 65, Exhibit A thereto, at 16 ("No prior study of civilian defensive gun use has examined questions most directly relevant to Chicago's regulations for keeping firearms in the home."). Dispute the implication that existing defensive gun use research does not support the notion that increasing the number of operable firearms in homes makes occupants safer. "The relevance of the DGU effectiveness research to the present case is straightforward. Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would, based on this body of research, generally reduce the victim's chances of being killed, raped, otherwise injured, or losing property. Thus, the restrictions are likely to reduce the number of beneficial uses of guns by crime victims in their

154

homes." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as it injects additional facts in arguing that other research bears on the issue. Further, regarding the opinion of Dr. Kleck proffered in Plaintiffs' response, *see* D-RSOF 98-A.

      101. Tyler is "perfectly willing to carry [her gun] around" in her house on her person and has no safety concerns with doing so. Exhibit 1 at 86:13-14, 98:11-15, 101:16-20. She doesn't carry it around in her house because she doesn't have a holster, but she thinks that its "not a bad idea" to get a holster and carry it from room to room. *Id.* at 87:16-88:1, 96:13-22. She does not have "any reason to think that [she is] less able to defend [herself] by carrying around a weapon on [her] person versus storing weapons around the house." *Id.* at 110:14-18.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Tyler made the quoted statements, but dispute Chicago's characterization of her testimony. Dr. Tyler testified that she would like to keep operable guns "in different locations" throughout the house "so they were handier." Exhibit 12 at 94:7-19 (Tyler Dep.). And while she did testify that she is "perfectly willing to carry [her gun] around" if she's "feeling nervous for some reason," *id.* at 86:10-14, and that she does not have any safety concerns with carrying a gun on her person, *id.* at 101:16-20, she "would much prefer [to store guns in] different locations" than generally to carry one around the house, *id.* at 96:23-97:19. "[I]t's just cumbersome to have a gun strapped on you," and, because Dr. Tyler does not typically "stay in [her] house for hours and hours and hours and never leave the premises," she would have frequently have to "take it off" whenever she left the house. *Id.* at 97:13-19.

**DEFENDANTS' REPLY**: Plaintiffs' response improperly and argumentatively proffers a

"characterization" of Dr. Tyler's testimony.  Further, while Dr. Tyler's statements proffered herein may indicate that she prefers having multiple operable guns throughout the home, her testimony indicates that she is, as a practical matter, able and willing to carry a single gun throughout her home.

102. Dr. Kleck owns two handguns and uses a trigger lock on both. Exhibit 14 at 3:18-25.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

103. Pacholski keeps 18 guns in his home: thirteen rifles, three shotguns, one revolver, and one semiautomatic pistol. Exhibit 2 at 63:7-22: 64:23-65:6. It is "not a problem" for Pacholski to keep his guns secured, "even with a trigger lock." *Id.* at 155:24-156:3. Pacholski has Franzen trigger locks, which prevent the firearm from being shot, on all of his firearms. *Id.* at 165:20-23, 168:16-169:4; Exhibit 66 (Plaintiffs' Response to Interrogatory 2 of City's 3rd Set of Interrogatories) at 9.

**PLAINTIFFS' RESPONSE**: Dispute that Mr. Pacholski does not have a problem with keeping his guns secured by a trigger lock.  When giving the quoted testimony, he stated that he'd "like to have one [firearm] in each part of the house sometimes, concealed or locked, even with a trigger lock that is not a problem, but I don't like that idea."   Exhibit 43 at 155:19-156:7 (Pacholski Dep.).  He made clear why he does not like the idea: "I guarantee if I didn't have to unlock a gun and have it available, I could use it. It would take seconds instead of eight to ten seconds if I had an intruder." *Id.* at 180:1-9.  *See also id.* at 170:11-171:9, 172:22-173:4.  Admit the rest.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as it injects additional facts to argue the meaning of Mr. Pacholski's quoted testimony.  Further, as

to those additional facts, while Mr. Pacholski's testimony cited by Plaintiffs may indicate that he

prefers having multiple operable guns throughout the home, his testimony indicates that it is, as a

practical matter, "not a problem" for him to keep them secured, as he uses a lock on even the one

operable gun he is allowed to have under the Chicago ordinance.

104-A.   The Franzen lock contains two halves that cover each side of the trigger guard,

lock together (thereby preventing access to the trigger), and offer a "[q]uick, easy release."

Exhibit 32 at PLKTKP 000057.  All of Pacholski's trigger locks use the same key, which he

carries on his person. Exhibit 2 at 138:2-13; 139:8-10;140:23-24.

**PLAINTIFFS' RESPONSE**:  Admit, but clarify that Mr. Pacholski carries the key to his trigger

lock on his person when he has his key chain with him.  *See* Exhibit 43 at 142:15-17 (Pacholski

Dep.).

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded.

The deposition page cited by Plaintiffs does not support the proposition that Mr. Pacholski only

sometimes carries his keychain with him.

104-B. With the key present, Pacholski can unlock the locks in 8 to 10 seconds.  *Id.* at

139:3-7, 142:18-22. When it comes to using a firearm for self-defense, Pacholski believes that

time is "not really of the essence as much as you got to have your head together and kind of make

sure you are doing the right thing."  *Id.* at 171:20-24.  Pacholski's only basis for believing that

this 8 to 10 seconds impacts the use of a firearm for self defense is "stories [he] heard" when

receiving firearms training. *Id.* at 171:6-11.

**PLAINTIFFS' RESPONSE**: Admit that Mr. Pachoslki gave the quoted testimony, but dispute

the characterization of that testimony.  Mr. Pacholski testified that his firearms courses have

taught him that "time is critical" - including the course he was required to take to possess

firearms in Chicago.  Exhibit 43 at 171:14-19 (Pacholski Dep.).  He believes that "in eight to ten

seconds I could be dead."  *Id.* at 170:21-22.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded.

Plaintiffs admit the asserted facts but then improperly proceed to argumentatively quarrel with

the "characterization" of the testimony.  Further, the additional testimony proffered by Plaintiffs

does not undercut the testimony cited by Defendants, which shows that Mr. Pacholski believes

that "hav[ing] your head together" is more critical than time.

105. Hall keeps two firearms in his home: a 9 millimeter handgun, and 12 gauge shotgun.

Exhibit 3 at 69:13-70:9; 71:6-14.  He uses a Master Lock 94 Resettable Combination firearm

lock ("Master Lock") on the handgun, and a Regal Model RETL06 firearm lock ("Regal") on the

shotgun. Exhibit 4 at 13:8-20; 16:1-17:5; and Exhibit I thereto, at PLMH 000120, 125, 126.

Both locks consist of two halves that cover either side of the trigger guard/trigger and lock

together, thereby preventing access to the trigger.  Exhibit 4 at 28:18- 29:18, 31:11-32:1; and

Exhibit 1 thereto, at PLMH 000120, 125, 126.  The Master Lock is a combination lock; it has

three numeric dials that must be set to the proper combination in order to open the lock. Exhibit 4

at 31:11-22; and Exhibit 1 thereto, at PLMH 000120, 125.  The Regal requires use of a separate

key. Exhibit 4 at 18:8-11; and Exhibit 1 thereto, at PLMH 000126.  Both locks render the firearm

inoperable and can be affixed without having to break down the gun.  Exhibit 4 at 27:20-28:6,

31:11-32:15,36: 19-37:8.  Hall has also secured the handgun with a cable lock supplied by

Stroger, the gun's manufacturer, which ran through the open slide of the firearm; and secured the

shotgun with a keyed padlock supplied by Ruger, the gun's manufacturer, which contained a 4

inch steel loop that ran through the weapon's chamber when the barrel was removed. Exhibit 4 at 7:10-23; 17:11-13; 26:18-21; Exhibit 66 at 9.  Both devices rendered the weapons inoperable. Exhibit 4 at 7:17-23; 9:13-21.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

106. Hall does not have "much experience" or "much expertise" in unlocking devices that render firearms inoperable.  *Id.* at 47:2-5.  He has never unlocked the Regal and has no idea how long it takes to unlock.  *Id.* at 47:7-23.  He has unlocked the Master Lock three or four times; he believes that, each time, it took about 40 or 50 second to move the tumblers into the correct combination to unlock the lock.  *Id.* at 48:11-49:3.  Hall has not timed himself unlocking the device, nor has he practiced it. *Id.* at 66:14-67:7. Prior to buying the Master Lock. Hall did not find out how long it would take to unlock. *Id.* at 52:4-7. Hall has never tried to see whether other locks are available that would require less time to unlock. *Id.* at 50:4-12. 55:19-56:24.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

107. Tyler owns one firearm. a Makarov 9mm handgun. Exhibit 1 at 41:6-13.  She keeps it in a locked safe that is attached to her bed in her bedroom.  *Id.* at 42: 1-3.  The gun is stored with its ammunition clip inside it, but no round is chambered.  *Id.* at 72:7-17.  It takes five seconds to open the safe. and another 2 or 3 seconds to chamber a round and make the gun fully ready for use.  *Id.* at 73:20-74:11.

**PLAINTIFFS' RESPONSE**: Admitted. except that Tyler now also owns a shotgun that she acquired in November 2011. *See* Exhibit 41 ¶ 4 (Tyler Decl.).

**DEFENDANTS' REPLY**: None.

108. Tyler has no experience in using firearms that have trigger locks; she has never handled such a firearm, nor does she know how long it takes to unlock a trigger lock. *Id.* at 98:21-99:7; 99:22-100:4, 111:5-8. Nor has she ever tried to figure out how long it would take her to unlock a trigger lock. *Id.* at 110:19-23. She is not familiar with other devices that could be used to render a firearm temporarily inoperable under MCC 8-20-040. *Id.* at 105:18-106:13.

**PLAINTIFFS' RESPONSE**: Admit that this was true at the time of Tyler's deposition. She currently keeps a trigger lock on her newly acquired shotgun. *See* Exhibit 41 ¶ 4 (Tyler Decl.).

**DEFENDANTS' REPLY**: Plaintiffs fail to dispute that Dr. Tyler does not know how long it takes to unlock a trigger lock. Even though Dr. Tyler may now possess a trigger lock, her declaration does not establish that she has ever tried to remove it, has any experience using it, or has ever determined how long it takes her to unlock. As Mr. Hall's testimony shows, one may possess a trigger lock and secure it to a firearm without ever having tried to unlock it. *See* SOF 106. Plaintiffs also fail to dispute the last sentence of SOF 108, as the material cited by Plaintiffs says nothing about that issue.

109. Mr. Vince's colleague, Gerald Nunziato ("Nunziato"), tested how long it takes to unlock two different types of trigger locks - a Bellock Keyed Trigger Lock and a Remington Trigger Block - purchased at Dick's Sporting Goods. Exhibit 38, Exhibit A thereto, at 14. Mr. Nunziato was approximately 65 years old at the time and, having been retired from the ATF for approximately 10 years, was "rusty" in the handling of firearms. Exhibit 39 at 134:5-11. His test results include the time it takes to load the firearm after removing the lock. *Id.* at 136:5-14. The average time it took to unlock the Bellock lock and load the weapon was 4.30 seconds; the fastest

was 2.79 seconds and the slowest was 6.62 seconds. Exhibit 38, Exhibit A thereto, at 14. The average time it took to unlock the Remington lock and load and weapon was 5.30 seconds; the fastest was 3.27 seconds and the slowest was 8.66 seconds, during which the key was dropped. *Id.*

**PLAINTIFFS' RESPONSE**: Admitted that this accurately describes what occurred. Disputed to the extent that it implies that a law-abiding citizen would exhibit the same performance when responding to a threat. *See* Exhibit 44 at 134 (Vince Dep.) (admitting that these tests were conducted in a well lit room); *id.* at 134-45 (admitting that Nunziato wasn't "woken out of a deep sleep right before he performed" these tests); *id.* at 135 (admitting that Nunziato was wearing his glasses while performing these tests); *id.* (admitting that Nunziato wasn't in a life threatening situation while performing these tests). *See also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 3-4; Exhibit 7 at 18 (Kleck Dep.) (describing Vince's tests regarding unlocking as "totally unrealistic" and "irrelevant to the issues at hand"); *id.* at 117 (noting that the amount of time it takes to retrieve the key should be included in the amount of time required to unlock a gun and that "[i]f you keep it too close, it doesn't have much value in securing it").

**DEFENDANTS' REPLY**: Plaintiffs fail to properly dispute this paragraph. Plaintiffs speculate that various conditions of Mr. Nunziato's testing distinguish it from the circumstances a citizen might face, but they fail to assert any basis establishing that a citizen would in fact face those circumstances, or otherwise be unable to achieve the same performance times as documented in Mr. Nunziato's testing. Dr. Kleck's opinion is insufficient, because it lacks basis. *See* SOF 113 & 115.

110. Nunziato conducted the same test on trigger lock make and models used by Hall and

Pacholski. Exhibit 38, ¶ 6. On a revolver, the average time to unlock the Franzen and load the weapon was 6.3 seconds; the fastest was 4.5 seconds and the slowest was 8.6 seconds. *Id.*, Exhibit B thereto. On a semi-automatic pistol, the average time to unlock the Franzen and load the weapon was 4.3 seconds; the fastest was 2.9 seconds and the slowest was 6.3 seconds. *Id.* On a revolver, the average time to unlock the Master Lock and load the weapon was 7.4 seconds; the fastest was 5.34 seconds and the slowest was 9.6 seconds. *Id.* On a semi-automatic pistol, the average time to unlock the Master Lock and load the weapon was 4.8 seconds; the fastest was 3.8 seconds and the slowest was 6.0 seconds. *Id.*

**PLAINTIFFS' RESPONSE**: *See* our response to Statement of Fact No. 109.

**DEFENDANTS' REPLY**: *See* D-RSOF 109.

111. Mr. Vince opines that 10 seconds or less is "sufficient time to respond to the threat of a home intruder" and that a citizen who learns how to properly use the locks should be able to achieve times similar to those of Nunziato. *Id.*

**PLAINTIFFS' RESPONSE**: Admit that Mr. Vince so opined, but dispute the validity of his opinion. Mr. Vince asserts that 10 seconds or less is sufficient time to respond to the threat of a home intruder, but he offered no sound basis for this opinion. Dr. Kleck testified that "none of the evidence Vince presents contradicts the hypothesis that requiring a gun to be secured by a locking device will sometimes prevent effective defensive use of the gun." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 4; *see also* Exhibit 7 at 108 (Kleck Dep.) (stating that it is a "commonplace assertion" that the use of a trigger lock or other safety mechanism impairs defensive gun use). With respect to Mr. Vince's assertion that a citizen who learns how to properly use the locks should be able to achieve times similar to those of Nunziato, we do not

162

dispute that fact to the extent the citizen is operating in circumstances similar to Nunziato. *See* Response to Statement of Fact 109.

**DEFENDANTS' REPLY**: Plaintiff fail to properly dispute this paragraph. As documented in his report, Mr. Vince's opinion is based on his decades of law-enforcement experience, experience with trigger locks, and experience in dealing with the firearms industry on the issue of trigger locks. *See* Def. Ex. 38, Exhibit A thereto, at 1-3. Regarding Dr. Kleck's assertion that trigger locks will sometimes prevent effective gun use, *see* D-RSOF 98-A. *See also* D-RSOF 109.

112. MCC 8-20-040's safe storage requirements are "in accord" with the practices of the United States Military and law enforcement. *Id.* at 14. Despite the extensive training they receive in using firearms, and their role as first responders to violent situations, both law enforcement and military personnel are required to lock and secure their weapons when not in use. *Id.* at 6. On military bases, aside from military law enforcement personnel, soldiers' firearms, when not in use, are generally secured via unloading, disassemblage, and secure storage, even though soldiers are highly-trained individuals who use firearms as a tool of the trade. *Id.* at 6; Exhibit 39 at 85:1-86:10. While law enforcement personnel may sometimes have multiple firearms present while on duty, the additional firearms are securely stored by, for instance, keeping them locked in police vehicles. Exhibit 38, Exhibit A thereto, at 13. Mr. Vince testified that law enforcement's following of these practices while operating in the face of "a more severe security threat than the average citizen is strong evidence that Chicago's requirements do not impose a hardship on using a firearm for self-defense in the home." *Id.*

**PLAINTIFFS' RESPONSE**: Dispute that Chicago's "safe storage" requirements are in accord

with the practices of the U.S. Military. The military storage practices discussed by Mr. Vince apply "on military bases," not in the field where soldiers may be required to use their weapons. *See* Chicago Exhibit 38, Exhibit A thereto, at 6; *see also* Exhibit 44 at 184:6-17 (Vince Dep.); *id.* at 87:6-10 (admitting that soldiers are not even allowed to have firearms on base).

Also dispute that Chicago's "safe storage" requirements are in accord with the practices of law enforcement. As an initial matter, law enforcement personnel in Chicago are permitted to have multiple operable weapons. The Chicago Police Department allows its uniformed sworn officers to carry "two exposed firearms." Exhibit 45 at IV.B.2 (Chicago Police Department, Uniform and Property U04-02, Department Approved Weapons and Ammunition). And if Chicago police officers elect to carry an auxiliary subcompact semiautomatic pistol, they generally must also carry another weapon. *See* Exhibit 46 at II-F. (Chicago Police Department, Uniform and Property U04-02-04, Department Approved Auxiliary Subcompact Semiautomatic Pistols and Ammunition). At any rate, even if law enforcement officers generally only carry a single weapon, that has little bearing on storage practices for civilians who generally do not have a weapon on their person at all times. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 4. Furthermore, while the Chicago police department requires members to secure their prescribed duty weapon when that weapon is not on their person, that requirement does not apply to other weapons the member may have. Exhibit 45 at XVI.A (Chicago Police Department, Uniform and Property U04-02, Department Approved Weapons and Ammunition) (members "strongly encourage[d]," but not required, to "secure any/all other firearms"). At any rate, how law enforcement officials store their duty weapons when off-duty (and hence when the weapons are not expected to be used) is of little relevance to how private citizens should store defensive weapons. Far more probative is

164

the fact that when on-duty, police officers always have a weapon operable and ready for

immediate use. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 3; *see also* Exhibit 47 at XLI

(Chicago Police Department, Uniform and Property U04-01-02) ("Sworn members will have in

their possession the following items while on duty .... Prescribed firearm, fully loaded ... ");

Exhibit 44 at 12 (Vince Dep.) (admitting that he did not use a trigger lock while carrying a

firearm on duty with the Trumbull County Sheriffs department).

**DEFENDANTS' REPLY**: Plaintiffs fail to dispute the facts asserted.  The fact that members of

the military use operable weapons in the field does not detract from the fact that when not in the

field, they secure their firearms, even though they are highly-trained in firearm use.  Further, even

though Chicago regulations permit police officers to carry multiple weapons, Dr. Kleck admitted

that he does not know "how many officers actually take advantage of that"  Def. Ex. 91 (Kleck

Dep.) at 104:7-9.  He merely "assume[s]" that some officers do.  Exhibit 91 hereto (Kleck Dep.)

at 103:10-13.  Nor does that allowance undermine Mr. Vince's testimony regarding routine law

enforcement storage practices.  Further, Plaintiffs quizzically discuss police officers' storage of

firearms when off duty while simultaneously asserting that that matter has "little relevance" to

how private citizens should store their firearms.  And Plaintiffs' reference to police officers

always a having an operable firearm when on duty is a non sequitur, since the Chicago ordinance

allows citizens to have an operable firearm at all times.

113. Dr. Kleck's opinion that locking devices will "sometimes" prevent effective

defensive gun use is a "hypothesis" that he bases on "common sense" and not his expertise in

criminology. Exhibit 14 at 112:16-113:11,128:23-129:3.  The proposition "hasn't been

scientifically established," he has no scientific evidence supporting it, and it has never been

tested in any scientific manner. *Id.* at 112: 16-113:11, 131:16-22. He did not rely upon any tests of how long it takes to remove a trigger lock. *Id.* at 119:1-7. He is not aware of any study demonstrating that trigger locks prevent effective defensive gun use. *Id.* at 111:9-13. He is not aware of any study showing that keeping one operable firearm in a home but trigger locking a second, third, or fourth firearm reduces a person's ability to effectively resist crime versus not securing the additional firearms with a trigger lock. *Id.* at 345:17-24. He is not aware of anyone in the gun industry who asserts that trigger locks or other safety mechanisms impair defensive gun use. *Id.* at 108:3-6.

**PLAINTIFFS' RESPONSE**: Dispute that Dr. Kleck.'s opinion with respect to locking devices is without any scientific foundation: "The relevance of the DGU effectiveness research to the present case is straightforward. Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would, based on this body of research, generally reduce the victim's chances of being killed, raped, otherwise injured, or losing property. Thus, the restrictions are likely to reduce the number of beneficial uses of guns by crime victims in their homes." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24. The "common sense" "hypothesis" involved is that "you can't have a way of securing a gun that secures unauthorized use, which doesn't also make it harder to have authorized use of the gun." Exhibit 7 at 111:24-112:2-6 (Kleck Dep.). And although that hypothesis has not been scientifically established, it is "a highly plausible hypothesis." *Id.* at 11124-25; *see also id.* at 112:16-18; Exhibit 15 at 61 (Williams Dep.) (admitting that rendering a firearm inoperable "extends the amount of time that would take place between a time [a person] would want to use that firearm

166

and when a person could use that firearm").

**DEFENDANTS' REPLY**: Plaintiffs' response fails to dispute the facts asserted.  Instead, it injects additional opinion and speculation that Plaintiffs use to argue that Dr. Kleck's opinion regarding locking devices has scientific foundation.  And that additional opinion and speculation lacks basis.  In particular, it does not purport to be based on studies that addressed whether a resident's ability to use a firearm in self defense is reduced by safe storage requirements in a situation where the resident is free to keep an operable gun ready at all times.  *See* D-RSOF 98-A.  Further, Dr. Kleck testified that even under the assumption that the devices impair authorized access for defensive use, they impair unauthorized access "a lot more" than they impair authorized access.  *See* SOF 125.

114.  Dr. Kleck does not know and has never tried to determine how often "the fact that you have a trigger lock will make a difference about whether you could use a gun defensively," or at what point during a home intrusion or attack the owner will not have enough time to disengage a trigger lock in order to use a gun defensively.  *Id.* at 140:20-141:18.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Kleck so testified, but dispute that this renders his opinion that a trigger lock could impair defensive gun use unreliable.  As Dr. Kleck testified, it is "indisputable logic" that "there has to be intermediate points between having lots of time and having little time" when having a gun trigger locked would make a difference in whether or not a person is able to defend themselves with a firearm. Exhibit 7 at 14121-142:1 (Kleck Dep.).  *See* also Response to Statement of Fact 113.

**DEFENDANTS' REPLY**: *See* D-RSOF 113.

115. Dr. Kleck asserts that an owner's ability to disengage a locking device is affected

when their pulse rate and blood pressure are elevated, and their hands are shaking, but he bases this belief only on "common sense." *Id.* at 113:12-19. No study has established this, and Dr. Kleck himself has never tried to remove a locking device under such conditions. *Id.* at 113 :20-114:2. Dr. Kleck is not aware of any study that has examined the effect of darkness on retrieving a gun to use in self-defense. *Id.* at 120:16-19. While Dr. Kleck believes that training can reduce the physiological impairments from stress on being able to disengage a locking device on a gun, he has not "see[n] the need" to undertake such training. *Id.* at 120:20-121:5.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

116. Dr. Webster is not aware of research indicating that requirements like those in MCC 8-20-040 reduce the ability of a person to effectively use a firearm for self-defense in the home. Exhibit 65, Exhibit A thereto, at 16.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Webster is not aware of such research, because in his view "no prior study of civilian defensive gun use has examined questions most directly relevant to Chicago's regulations for keeping firearms in the home." Chicago Exhibit 65, Exhibit A thereto, at 16. Dispute the implication that existing defensive gun use research does not support the notion that requirements like those in MCC 8-20-040 reduce the ability of a person to effectively use a firearm for self-defense in the home. "The relevance of the DGU effectiveness research to the present case is straightforward. Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would, based on this body of research, generally reduce the victim's chances of being killed, raped, otherwise injured, or of losing

property. Thus, the restrictions are likely to reduce the number of beneficial uses of guns by crime victims in their homes." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24.

**DEFENDANTS' REPLY**: *See* D-RSOF 98-A.

117. The price of trigger locks offered by two major firearms retailers operating in the Midwest (Gander Mountain and Dick's Sporting Goods) is slightly over $7. Exhibit 38, Exhibit A thereto, at 10. Hall found the two trigger locks he currently uses by doing a Google search online, and he purchased them online. Exhibit 4 at 18:23-19:24. He purchased the Master Lock for $14.99, which was "relatively inexpensive." *Id.* at 17:18-19; 19:1; 20: 1-7. He purchased the Regal lock for $10.50. *Id.* at 20:1-7. Pacholski purchased a 12-pack of Frauzen trigger locks for $69.99, plus $15.32 postage and tax, via the website of a gun store. Exhibit 32 at PLKTKP 000056.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

118-A. Dr. Kleck asserts that "probably the strongest rationale for keeping guns stored in a secure manner of some sort is to reduce gun theft and thereby reduce acquisition of guns by criminals" since "most gun criminals acquire their guns directly or indirectly as a result of theft." Exhibit 14 at 132:16-23.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Kleck so asserted, but dispute any implication that he opines that this rationale justifies Chicago's one-operable-gun limitation: "[T]here is no evidence of even a modest effect on the gun theft rate of the city's limits on the number of operable guns allowed in households. In this light, there is no logical reason to believe that the city's existing ordinance reduces the number of criminals with guns." Exhibit 2 (Kleck Decl.),

Exhibit I thereto, at 22.

**DEFENDANTS' REPLY**: Plaintiffs' response consists of improper argument about the "implications" of Dr. Kleck's testimony.  Indeed, Dr. Kleck asserts that it is "reasonable" to believe that trigger locks deter gun theft, because it is "very hard" to remove a trigger lock from a stolen gun; he has never heard of a criminal who has successfully done so.  SOF 118-D.  Further, Plaintiffs fail to proffer evidence showing that Chicago's safe storage regulation fails to have an impact on gun theft in the City.

118-B. Over 500,000 guns are stolen each year in the United States. Exhibit 12 at F561.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

118-C. The average U.S. gun owner owns between 6 and 7 guns, many of which are not locked up. Exhibit 65, Exhibit A thereto, at 15.

**PLAINTIFFS' RESPONSE**: Admit that the study cited by Dr. Webster for this assertion found that, on average, respondent gun owners owned between 6 and 7 guns. *See* Exhibit 48 at 17 (L. Hepburn, et al., The US Gun Stock, 13 INJURY PREVENTION 15 (2007)). "On further examination, it seemed that individuals who owned >4 firearms . . .were greatly affecting the mean.  When outliers representing the top 3% of gun owners . . . were removed, the average number of working firearms per owner was 5.0." *Id.*  Admit that "many" of these firearms are not "locked up," although Dr. Webster does not cite anything for this assertion.

**DEFENDANTS' REPLY**: None.

118-D. Dr. Kleck asserts that it is "reasonable" to believe that trigger locks deter gun theft, because it is "very hard" to remove a trigger lock from a stolen gun; he has never heard of a

criminal who has successfully done so. Exhibit 14 at 109:7-21.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Kleck so testified, "with the qualifier to the extent criminals are aware of that or think about it. The problem being criminals often don't think much into the future, and they often are not very knowledgeable about a wide variety of things." Exhibit 7 at 109:25-110:4 (Kleck Dep.); *see also id.* at 109:8-11. And although Dr. Kleck stated that this belief is a reasonable one, he emphasized that "[w]e don't know for sure." *Id.* at 109:8. And again, his bottom-line conclusion is that "there is no logical reason to believe that the city's existing ordinance reduces the number of criminals with guns." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 22.

**DEFENDANTS' REPLY**: Plaintiffs' response admits the asserted facts but then proceeds to improperly inject additional testimony into their response. Further, Dr. Kleck admitted that "even if the criminals aren't aware of the problem with getting the trigger lock off, the fact that [the gun] has a trigger lock on it would prevent the gun from being used in the future is it was stolen." Pl. Ex. 7, at 110:5-10.

119-A. In prior research, Dr. Cook performed multiple analyses on multiple data sets and found that "residential burglary rates tend to increase with community gun prevalence." Exhibit 67 (P. Cook and J. Ludwig, Guns and Burglary, in Evaluating Gun Policy 74-107 (J. Ludwig & P. J. Cook, ed. 2003)) at 76. The authors employed statistical tools to address the potential of reverse causation - i.e., that high burglary rates induce homeowners to acquire guns for protection, rather than an increase in gun ownership causing higher burglary rates. *Id.* The authors' "preferred explanation" for why an increase in gun prevalence would lead to a higher burglary rate is that "guns are valuable loot because they are portable and readily sold or fenced."

171

*Id.* at 98.

**PLAINTIFFS' RESPONSE**: Admit that the cited study purported to find that "residential

burglary rates tend to increase with community gun prevalence," but dispute that the study

supports any finding that increased gun prevalence causes an increase in residential burglary

rates. According to the authors, "the results reported here provide suggestive evidence that

increases in gun ownership may lead to more burglaries." Chicago Exhibit 67 at101 (emphasis

added). "The challenge to establishing a causal interpretation to these results comes from the

possibility that gun ownership may be both cause and effect of local burglary patterns or that

variables may be driven by some unmeasured third factor" and "there is no entirely persuasive

way to rule out such competing explanations." *Id.* at 76. *See* also Exhibit 3 at 116-17 (Cook

Dep.) (admitting that "if you observe an - - association between the rate of gun ownership in a

jurisdiction and the burglary rate in the jurisdiction, then it can be perhaps the result of the

influence of gun ownership on burglars or it could be the result of the influence of burglars on

gun ownership"). And while the authors did attempt to address the causal-order issue, they do

not do so effectively-and some of their analyses failed to find a statistically significant

relationship between gun prevalence and burglary rate. *See* Exhibit 2 (Kleck Decl.), Exhibit I

thereto, at 19-2l. Thus, "while Cook and Ludwig did indeed draw this conclusion [that firearm

availability within homes increases the risk of home burglaries], their methods cannot sustain it,

and some of their findings directly contradict it." *Id.* at 19. "In addition to being unsupported by

the empirical evidence, the argument that higher gun rates increase burglary rates by increasing

the 'incentives' for committing burglary is highly implausible on logical and theoretical

grounds." *Id.* at 20 (e.g., "Guns claim only about two percent of the dollar value of stolen

property in the U.S., an amount too small to even be perceptible to the average burglar."). Indeed, the authors' "preferred explanation" for their findings (which, as we have shown, are not valid anyway), is tempered by their recognition that "the implied effect of gun prevalence on the overall profitability of residential burglary is not great." *See* Chicago Exhibit 67 at 98.

**DEFENDANTS' REPLY:** Plaintiffs' response beyond their admission should be disregarded, as it improperly argues and injects additional facts as to whether the cited study properly supports an inference of causation, whether it reported statistically-significant results, and whether the study's findings contradict the proposition that higher gun rates increase burglary rates. And as to these arguments, Defendants dispute Plaintiffs' submission, as follows:

*Causation*: The Federal Judicial Center ("FJC") is the research and education agency of the federal judicial system, is established by Congress, and its board is chaired by the Chief Justice of the United States. Federal Judicial Center, *Reference Manual on Scientific Evidence* ii (3d ed. 2011) (available at http://www.fjc.gov/public/pdf.nsf/lookup/SciMan3D01.pdf/$file/SciMan3D01.pdf) ("FJC Manual"). The FJC, in partnership with the National Research Council ("NRC"), produced the FJC Manual, which is "the leading reference source for federal judges for difficult issues involving scientific testimony." FRC Manual, at ix. The FJC Manual was overseen by a NRC committee composed of judges, scientists, and engineers. *Id.* at ix.

The FJC Manual states: "Causality cannot be inferred by data analysis alone; rather, one must infer that a causal relationship exists on the basis of an underlying causal theory that explains the relationship between the two variables. Even when an appropriate theory has been identified, causality can never be inferred directly." FJC Manual, at 310. "As a general rule, there are no basic direct statistical tests for determining the direction of causality; rather, the

expert, when asked, should be prepared to defend his or her assumption based on an understanding of the underlying behavior evidence relating to the business or individuals involved." *Id.* at 323. The FJC Manual states: "Generally, researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn." *Id.* at 599. Further, Dr. Kleck testified that "[w]hen trying to infer causality, it's best to have a number of different studies that were done with multiple different methods; if they are all coming out in the same direction, it gives you more confidence that the result is correct." Def. Ex. 91 (Kleck Dep.), at 63:14-19.

*Statistical Significance*: Dr. Kleck explained that statistical significance is "a measure of the likelihood that the statistical result you obtain could have been the product of pure simple random chance." Def. Ex. 91 (Kleck Dep.), at 44:21-23. And something known as a "P Value" is "the conventional way of designating a statistical significance level." *Id.* at 45:1-2. Further, while there are customary P values used in the field for designating whether a result is statistically significant (such as .05 or, phrased differently, 5%), Dr. Kleck testified that "picking any one level is arbitrary." *Id.* at 45:3-7. Dr. Kleck is "not rigid" about adhering to any particular P value "because statistical significance is just one issue that's relevant to the interpretation of results." *Id.* at 45:18-23. "[Y]ou don't simply dismiss results because, let's say, they barely missed passing a test at an arbitrarily defined significance level." *Id.* at 46:4-6. "So when you find a result that has a P value that is greater than, say, .05, that doesn't necessarily mean that there isn't a true correlation between the variables." *Id.* at 46:7-11. "[T]here's nothing magical about the .05 level." *Id.* at 47:14-17.

As to Dr. Cook's study in particular, Dr. Kleck admitted the study found a statistically

significant effect of gun prevalence on burglary rates if the study used a "two-tailed test." Def.

Ex. 91 (Kleck Dep.), at 394:6-19. He further testified that if the study used a "one-tailed test,"

the study failed "at the conventional 5 percent level to find a significant effect." *Id.* at 394:13-15.

When asked why he stated in his expert report that Dr. Cook's study "found no significant

effect," Dr. Kleck answered that "it's a matter of phrasing subtleties" *Id.* at 20-24. He stated that

"it's not meaningful to say there's a complete absence of significance. There's just level of

significance, which can be anything from zero to 1.0. And so it may have been less than the

conventionally accepted customary cutoff of 5 percent . . . ." *Id.* at 394:25-395:6.

*Contradictory Findings in the Study*: When asked "Did any of their data [in the Cook

study] show a negative effect between gun prevalence and burglaries?", Dr. Kleck answered:

"No." Def. Ex. 91 (Kleck Dep.), at 400:12-14.

119-B. Dr. Webster opines that MCC 8-20-040 "will minimize the number guns available

to criminals" because it "decrease] s] the number of operable guns in the home and the potential

value of such guns to would-be thieves." Exhibit 65, Exhibit A thereto, at 15.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Webster so opined, but dispute the validity of his

opinion. As an initial matter, he primarily relies upon the Cook and Ludwig study we have

critiqued in response to the first part of this finding. Webster also cites the large number of guns

stolen each year, but he "misunderstands ... the significance of this fact and its relevance to the

Chicago ordinance." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 21. "It is precisely because

there are so many gun thefts that criminals who want a gun can already obtain one .... Under

current conditions, gun ownership among criminals is already 'saturated'--everyone who wants

one has one." *Id.* "When there is already an oversupply of guns available to criminals, marginal

reductions in gun thefts would at best reduce this oversupply, not prevent criminals from

obtaining a gun.  In any case, there is no evidence of even a modest effect on the gun theft rate of

the city's limits on the number of operable guns allowed in households. In this light, there is no

logical reason to believe that the city's existing ordinance reduces the number of criminals with

guns." *Id.* at 21- 22.  *See* also Exhibit 13 at 51 (Gorman Dep.) (admitting that it has not become

easier for criminals to obtain firearms since July 2010 (i.e., when Chicago's prior freeze on

handguns in the home was lifted)).

**DEFENDANTS' REPLY**:  Plaintiffs' response beyond their admission should be disregarded,

as it improperly argues and injects additional facts as to whether Dr. Webster's opinion is valid.

As to those matters, Defendants' dispute Plaintiffs' assertions.  As to Plaintiffs' critique of Dr.

Webster's reliance on Dr. Cook's study discussed in RSOF 119-A, *see* D-RSOF 119-A.

Further, Defendants dispute Plaintiffs' assertion that "gun ownership among criminal is

already 'saturated'-everyone who wants one has one."  Plaintiffs cite to Dr. Kleck's report in

support of this statement, but the studies cited there do not support the proposition.  Indeed, the

statement is inconsistent with Plaintiffs' admission that 500,000 firearms are stolen each year.

*see* D-RSOF 118-B, as well as documented instances of theft from gun stores.  *See* SOF 72 & 73.

 *See also* SOF 57-A (guns are "quite scarce 'on the street'" in Chicago, "most criminals in

Chicago currently lack a gun and have difficulty obtaining one," and "it is unusual for criminals

in Chicago to be in possession of a gun").  Further, Dr. Kleck testified that "most gun criminals

acquire their guns directly or indirectly as a result of theft."  SOF 118-A.  And Dr. Kleck has

written that "[w]here more guns are owned, more guns will be stolen, other things being equal,

which results in more guns circulating among criminals.  A large volume of stolen guns . . .

depresses black market prices." Pl. Ex. 30, at 1282. He also cites survey data indicating that criminals who already have a gun use theft "as a way of upgrading the quality of their weaponry." *Id.* at 1252.

120-A. Chief Williams testified that MCC 8-20-040 "reduc[es] the ability of a burglar or intruder to use a gun they might come across in the course of breaking into a house against the home owner." Exhibit 54 at 49:19-24.

**PLAINTIFFS' RESPONSE**: Admit that Chief Williams so testified in response to leading questioning. *See* Exhibit 15 at 47:20-24, 49:19-24 (Williams Dep.). Even if this is true in the abstract (i.e., that an intruder coming across a locked gun will have a reduced ability to use that gun against the home owner than an intruder coming across an unlocked gun), dispute that this would translate into any meaningful public-safety benefit, as Chicago has not cited any evidence of criminals turning homeowners' guns against them. Indeed, even when murders committed by members of a person's household are included, "murder victims are almost never killed with a gun belonging either to themselves or to some other member of their household." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 13; *see also* Exhibit 49 at 68-71 (Gary Kleck, Can Owning a Gun Really Triple the Owner's Chances of Being Murdered", 5 HOMICIDE STUDIES 64 (2001)).

**DEFENDANTS' REPLY**: Plaintiffs fail to proffer facts disputing the asserted facts. Indeed, they admit that an intruder coming across a locked gun will have a reduced ability to use it against an owner. Plaintiffs' reference to murders committed by members of the household is irrelevant, since the asserted fact concerns burglar and intruders. Further, Dr. Kleck has computed that "the percent of residential shootings that involved a gun kept in the home" is 14.2

percent. Def. Ex. 91 (Kleck Dep.) at 255:10-16. And he testified, contrary to the assertion in

Plaintiffs' response that there is no meaningful public safety benefit from trigger locks, that

trigger locks "have a safety benefit" and are a "sensible step to take in order to prevent

unauthorized use." *See* SOF 125.

120-B. Tyler believes that "[y]ou just don't leave firearms laying around in your house"

because "that's not responsible," as someone could steal the gun, use it against the owner, or

accidentally discharge it. Exhibit 1 at 89:22-90:12. Tyler generally keeps her gun in her safe

because it prevents unauthorized users from accessing it. *Id.* at 85:15-19.

**PLAINTIFFS' RESPONSE**: Admit that Tyler so testified, but she made plain (a) that she keeps

her gun assembled and operable, *see* Exhibit 12 at 73:24-74:11 (Tyler Dep.); (b) that she thinks it

would be safe to keep her firearm "elsewhere in [her] house," *id.* at 87:5-8; (c) that she would

like to be able to keep multiple "fully assembled and operable" guns, *id.* at 94:13-14; (d) that she

would "keep [these weapons] in different locations so they were handier," *id.* at 94:18-19; and (e)

that she would not necessarily store each weapon in a safe, *id.* at 95:3-4 (testifying that she may

'Just keep on in my desk" in her home office), although she would store an additional operable

gun in a safe if she had to, *see* Exhibit 41 ¶ 9 (Tyler Decl.).

**DEFENDANTS' REPLY**: Plaintiffs admit the asserted fact but then proceed to inject

additional, irrelevant facts, which should therefore be disregarded. Regardless of how Dr. Tyler

may wish to keep additional operable guns, she admitted that unsecured guns can be stolen, used

against the owner, or accidentally discharged.

121. One of the purposes served by MCC 8-20-040 is "reducing the number of firearms

accidents or suicides or domestic violence shootings that would occur in the home by

178

reducing the number of operable firearms that could be misused in those sorts of situations."
Exhibit 54 at 50:6-12.

**PLAINTIFFS' RESPONSE**: Admit that Chief Williams so testified in response to leading questioning, but dispute the validity of that testimony. *See* Exhibit 15 at 47:20-24,54:6-12 (Williams Dep.). Suicides: "In light of the obvious fact that people who commit suicide by shooting themselves use only one gun, it is unclear why ... having more than one would have any effect not produced by just having one." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 6. Further, "the standard finding in the field is that gun rates have no effect on how many people kill themselves; rather they only affect how many of those who do kill themselves do so with guns. Thus, gun rates affect rates of gun suicide, but not the total suicide rate." *Id.* at 10; *see also id.* ("there is no sound foundation to expect that suicide attempts would become less lethal if restrictions on gun availability caused suicide attempters to substitute hanging as their method"); Exhibit 10 at 192 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)) ("Some gun control policies may reduce the number of gun suicides, but they have not yet been shown to reduce the overall risk of suicide in any population."); Exhibit 25 at 234:4-7 (Webster Dep.) (admitting that one operable firearm is sufficient for committing suicide); Exhibit 3 at 238-39 (Cook Dep.) (admitting that "the cross national surveys do not reveal a consistent association between gun ownership and overall suicide rates"). Domestic violence: Dr. Kleck's testimony with respect to suicide applies equally here: since it only takes a single gun to commit a domestic violence shooting, it is unclear why having more than one would have any effect not produced by just having one. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 18. Furthermore, "even those who are killed in their own homes are typically

killed by outsiders who bring their guns with them," Exhibit 2 (Kleck Decl.), Exhibit I

thereto, at 13, not with guns owned by members of the household. At any rate, Dr. Kleck has

thoroughly demonstrated that there is no scientific foundation for the assertion that gun

ownership increases homicide risk. *See id.* at 12-15. Furthermore, the one-operable-firearm

limit may actually increase the number of domestic violence shootings by making it more

difficult for a victim to access a weapon to defend herself. *See id.* at 23-24.

Firearms accidents. Dr. Kleck and a colleague conducted a study finding "no significant effect of

gun ownership rates on the [Fatal Gun Accident] rate." *Id.* at 17. And a study cited by Dr.

Webster found no significant difference in the fatal gun accident rate for persons in households

with multiple guns versus persons in households with more than one gun. *Id.* at 16. And the NRC

"found no credible scientific evidence ... that demonstrates whether [firearm] safety devices can

effectively lower injury." Exhibit 10 at 219 (NATIONAL RESEARCH COUNCIL, FIREARMS

AND VIOLENCE (Wellford, et al., eds. 2005)).

**DEFENDANTS' REPLY:** Plaintiffs admit Chief Williams' testimony, but then proceed to

dispute it by discussing Dr. Kleck's opinion and empirical research. Defendants therefore refer

to D-RSOF 122 & 123.

122-A.[4] Dr. Webster opines that the availability of firearms in the home increases the

risks for suicide, homicide, and deaths from unintentional shootings, and that these risks increase

as the number of firearms kept in the home increases, a phenomenon known as a "dose-response

relationship." Exhibit 65, Exhibit A thereto, §§ V, VI. In forming his opinion, Dr. Webster relied

upon more than 30 studies. *Id.*, Exhibit A thereto. Some of those studies found a relationship

---

[4] Defendants' Reply to SOF 122-A begins on page 190.

between the number of firearms in the home and an increased risk of suicide, homicide, and/or unintentional death.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Webster so opines, but dispute the validity of his opinion. As an initial matter, *see* our response to Statement of Fact 121. Furthermore, Dr. Kleck has thoroughly and convincingly rebutted Dr. Webster's opinion. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 6-18, 24. Dr. Kleck demonstrates that the studies Dr. Webster relies upon simply do not support his opinion. For example:

- "Webster's review of household (case-control) studies [on firearms ownership and suicide risk] is highly selective, fails to acknowledge studies that contradict his conclusions, covers studies that are not relevant to any element of Chicago's gun ordinance, and relies on studies that are far too methodologically weak to sustain even the (irrelevant) conclusions that Webster draws." *Id*. at 9.

- "Webster's review of 'ecological studies' [on firearms ownership and suicide risk] ... is likewise both highly selective and irrelevant to the Chicago gun ordinance .... Further, the handful of 'ecological' studies that Webster does cite are conspicuously flawed." *Id*. at 10. For example, "they fail to separate the effects of gun ownership rates from the effects of other variables that affect suicide rates." *Id*. at 11.

- "The homicide section suffers from the same problems as the suicide section-the research reviewed is largely irrelevant to the factual issues at state in this case, Webster is extremely selective about which studies he reviews, ... and the studies he does stress are of very poor quality." *Id.* at 12.

181

- "The homicide studies, however, also have their own unique problems." For example, "murder victims are almost never killed with a gun belonging either to themselves or to some other member of their household .... Webster appears to be unaware of this problem, and fails to note that none of the homicide studies on which he relies established that even a single one of the homicide victims studied had been killed with a household gun." *Id.* at 13.

- "None of the studies on which Webster relies applied any accepted research methods that can differentiate the effect of guns on homicide from the effect of homicide rates on gun rates." *Id.* at 15.

- With respect to firearms accidents, "once again, the research cited by Webster is largely irrelevant to the factual issues involved in this case .... The research would be relevant only if it assessed the effects of limiting operable guns to one per permitted occupant, or the effects of a local sales ban, but these topics were not addressed in the cited studies." *Id.* at 16.

- "Webster claims he could only find one ecological study of the relationship between firearm availability and rates of death due to unintentional shootings, but this is incorrect. Kleck and Patterson conducted an ecological study of this very topic, finding no significant effect of gun ownership rates on the FGA rate .... This is an unfortunate omission since the Kleck and Patterson study that Webster ignored was methodologically superior to the Miller et al. study that Webster discussed at length." *Id.* at 17. *See* Exhibit 8 at 280 (Gary Kleck & E. Britt Patterson, The Impact of Gun Control and Gun Ownership Levels on Violence

182

Rates, 9 J. QUANT. CRIM. 249 (1993)) ("No impact of gun prevalence on fatal gun accident rates was detected.  Given the random component of accident causation and the rarity of fatal gun accidents (one or two a year in most cities) the absence of a relationship is perhaps not that surprising.").

Indeed, in its comprehensive review of the literature (including many of the studies cited by Dr. Webster) a committee of the National Research Council similarly concluded that "existing research studies ... do not credibly demonstrate a causal relationship between the ownership of firearms and the causes or prevention of criminal violence or suicide." Exhibit 10 at 6 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005); *see also id.* at 192 ("Some gun control policies may reduce the number of gun suicides, but they have not yet been shown to reduce the overall risk of suicide in any population."); *id.* at 119 ("[W]hile the observed associations between [firearms ownership and being murdered] may reflect a causal albeit unspecified path-way, they may also be entirely spurious.").

Dr. Webster has also admitted to many shortcomings in the research on which he relies. *See* Exhibit 25 at 44 (Webster Dep.) (admitting that he has not "seen any study that ... actually measured suicidal intent in a way [he] believes is scientifically reliable") *id.* at 51-52 (admitting that "I don't think that the question of whether gun ownership causes increases in homicide and suicide can be determined through some type of randomized control trial. Any - any study or set of studies is going to rely upon non-experimental data. And so that will always leave some degree of uncertainty about inferring cause and effect from any single study"); *id.* at 226: 13-227:10 (admitting that he has not looked at a single study regarding the effects of a regime that would allow only one operable gun per licensee or per household); *see also* Exhibit 3 at 165

(Cook Dep.) (admitting that he is unable to answer whether "a jurisdiction with a larger number

of guns, but the same percentage of households that own guns, [will] have a higher murder rate,

because "in none of the studies that I've done have I been able to distinguish between the number

of guns in circulation and the prevalence of gun ownership").

        a.       P. Cummings, et al., The Association between the Purchase of a Handgun and

Homicide or Suicide, 87 American Journal of Public Health 974-978 (1997).  Exhibit 68.  This

study found that "[t]he association between handgun purchase and suicide tended to become

stronger as the number of handguns purchased increased." and reported an adjusted relative risk

of 1.6 for one family purchase, 1.8 for two family purchases, and 2.7 for three or more family

purchases. *Id.* at 976.  It further found that "[t]here was a stronger association between handgun

purchase and death by homicide as the number of handguns purchased increased," and reported

an adjusted relative risk of 1.1 for one family purchase, 2.1 for two family purchases, and 6.2 for

three or more family purchases.  *Id.*  Dr. Kleck testified that this study has "some relevance" to

MCC 8-20-040 and was published in a "leading journal" in the field of public health." Exhibit 14

at 26:8-10, 171:7-10.

**PLAINTIFFS' RESPONSE**: Admit that the Cummings study reported these findings, but

dispute that they support the hypothesis that having more than one operable firearm in the home

increases the risk for suicide or homicide by a member of the household.  As an initial matter, the

variable the study used to measure firearms prevalence - the number of handguns purchased by

family members from licensed dealers in the State of Washington (where the study subjects

lived) - is dubious: "Since people frequently get rid of guns, this is not a good measure of the

number of guns owned at anyone time," Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 17, much

less the number of operable guns kept in the home at anyone time. *See also* Chicago Exhibit 68 at

177 ("Some study subjects classified as exposed to handguns may have disposed of their

handguns; others classified as not exposed may have possessed handguns that they purchased

legally from sources other than a registered dealer, purchased out of state, or obtained illegally.")

More importantly, Chicago ignores the fact that the cited reported differences in relative risk

were statistically insignificant. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 17-18. *See also*

Chicago Exhibit 68 at 976, Tables 2 and 3 (showing overlapping confidence intervals for relative

risk based on number of family handgun purchases for both suicide and homicide). The study

has a number of other shortcomings that limit its utility. *See id.* at 977-78 (e.g., "Inability to

measure and control for other differences between case and control subjects could have biased

our relative risk estimates.")

'The most important limitation is that these studies [i.e., Wintemute (1999) and Cummings

(1997)] do not indicate whether handgun purchasers would have substituted other methods of

suicide if a gun were not available, and do not measure other factors, such as history of substance

abuse, psychiatric illness, criminal activity, or domestic violence, which might explain or modify

a link between gun ownership and propensity for suicide." Exhibit 10 at 183 (NATIONAL

RESEARCH COUNCIL, FIREARMS AND Violence (Wellford, et al., eds. 2005)).

Dr. Webster has acknowledged many of these and other limitations. *See* Exhibit 25 at 79-80

(Webster Dep.) (admitting that the study's finding that more guns purchased led to a higher rate

of suicides was not statistically significant under the study's measure of statistical significance);

*id.* at 79 (admitting that "in instances in which a firearm was purchased by someone other than

the decedent, the person who committed suicide, the risk was not statistically different from no

added risk" despite having a firearm in the home); *id.* at 70-71 (admitting that this study did not control for mental illness); *id.* at 74 (admitting that "the sample used in this study is not representative of the United States as a whole"); *id.* at 78 (admitting that "the study by Cummings did not even check to confirm that the original legally purchased handgun was still in the home" at the time of the homicide); *id.* at 80 (admitting that the study did not look at the number of operable guns in the home); *id.* at 80-81 (admitting that the study also found an elevated risk of non-firearm homicide among families who recently purchased a firearm and that this is an indication of the possibility that "handgun purchasers were more inclined toward violence or lived in more dangerous surroundings and these factors induced them to purchase handguns. This violent personality or environment may have increased the risk for both gun-related and other homicide death regardless of exposure to handgun purchase. If this theory is true, then the apparent association between handgun purchase and all homicide deaths may be due to uncontrolled confounding").

Furthermore, the status of the journal "really means nothing with regard to the issue of whether this particular paper was carefully reviewed. The problem is public health journals don't have a lot of expert reviewers to draw on that are expert in this area." Exhibit 7 at 186-87 (Kleck Dep.).

   b.    D. Wiebe, Firearms in US homes as a risk factor for unintentional gunshot fatality, 35 Accident Analysis and Prevention 711-716 (2003). Exhibit 69. This study found that "the magnitude of the association" between gun availability and unintentional gunshot fatality "increased with the availability of multiple guns." *Id.* at 713. Compared to homes where no guns were present, the relative risk of death in a home with one gun was 3.4, and was 3.9 in a home with multiple guns. *Id.* The study states that "[h]aving multiple guns appeared to

186

compound the hazard, as did having handguns in particular." *Id.* at 714. Dr. Kleck asserts that while not "perfectly relevant," this study is the "closest to being relevant" to MCC 8-20-040. Exhibit 14 at 315:4-1.

**PLAINTIFFS' RESPONSE**: Admit that the Wiebe study reported these findings, but dispute that they support the hypothesis that having more than one firearm in the home increases the risk of a fatal gun accident. The difference in relative risk between having one firearm and multiple firearms was statistically insignificant-indeed the confidence intervals are strikingly similar. *See* Chicago Exhibit 69 at 714, Table 3 (95% confidence interval for relative risk associated with one firearm: 1.5 - 7.6; multiple firearms: 2.0 - 7.8). "[T]his means there is no statistically reliable basis for concluding that persons in households with multiple guns are at even slightly higher risk of suffering an unintentional gunshot injury. Even this finding, however, is not entirely relevant to the present legal case since Wiebe never made any comparisons of risk with regard to the number of guns kept in operable condition." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 16. "In any case, these [relative risks] cannot be taken at face value as estimates of causal effects because Wiebe controlled for only one actual confounding variable." *Id.* The authors of the study acknowledged a number of other shortcomings. *See* Chicago Exhibit 69 at 714 (e.g., "These data ... did not establish whether a gun used in a shooting had actually been kept in the decedent's home."; "Differential misclassification of cases and controls as either having or not having guns in the home could have biased the estimates."). *See also* Exhibit 25 at 170-71 (Webster Dep.) (admitting that missing data was a possible problem for this study); *Id.* at 170 ("Data were missing for the variable indicating the presence of a firearm for 3 percent of controls and 21 percent of the cases").

c.      D. Brent, et al., Firearms and Adolescent Suicide: A Community Case- Control Study, 147 American Journal of Diseases of Children 1066-1071 (1993). Exhibit 70.  This study reported that "the more guns in the home, the more likely suicide by firearms was to occur." *Id.* at 1068.  Of suicide victims who used a firearm, 18.8% of those with no guns in the home committed suicide, 75% of those with one gun in the home committed suicide, and 91.2% of those with more than one gun committed suicide. *Id.* at 1068.  It found that "[t]he odds of suicide with more than one handgun in the home were greatly increased relative to having just one handgun in the home," based on an estimated odds ratio of 17.1. *Id.*

**PLAINTIFFS' RESPONSE**: Dispute that this study demonstrates a methodologically sound, generalizable association between more firearms and more suicide.  As an initial matter, most of the findings cited by Chicago merely find that having guns in the home is associated with a greater likelihood of committing suicide with a gun.  The third sentence of the finding obscures this and does not accurately describe the results of the study; it should read: Of suicide victims, 18.8% of those with no guns in the home committed suicide with a gun, 75% of those with one gun in the home committed suicide with a gun, and 91.2% of those with more than one gun committed suicide with a gun.  *See* Chicago Exhibit 70 at 1068.  In other words, suicides were more likely to use a gun versus another method of suicide when one or more guns were available in the home.  This simply does not speak to the question whether more guns are associated with more suicides.  The study did, as Chicago indicates, report that "the odds of suicide with more than one handgun in the home were greatly increased relative to having just one handgun in the home," with an estimated odds ratio of 17.1.  *Id.*  Chicago fails to mention, however, that the 95% confidence interval for this odds ratio includes 1.0, *id.*, and an odds ratio of 1.0 "would

represent no relationship in either direction," Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 8.

Furthermore, the study also found that "no increased risk of suicide was associated with having

more than one long-gun in the home"; "having access to long guns was not associated with

suicide in the total sample"; and "the association of suicide with having a loaded gun in the home

also escaped statistical significance." Chicago Exhibit 70 at 1068. The study did not control for

whether guns were kept in an operable condition. Indeed, the study did not control for any likely

confounding variables. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 53 Table 1; *see also id.*

at 7-9 (discussing importance of controlling for potentially confounding variables). The study

also has a number of other limitations. The study population was 67 adolescent suicide victims in

Western Pennsylvania. *See* Chicago Exhibit 70 at 1067. Not only is this sample size small, but,

as the authors caution, "it may be impossible to generalize these findings to other geographic

locales." *Id.* at 1070. And "as a case-control study, one cannot simply draw causal inferences

between firearms availability and risk for suicide." *Id.* *See* also Exhibit 10 at 181 (NATIONAL

RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005» ("the

association between household gun ownership and risk of suicide [found in this and other

studies] may be due to factors beyond the relative lethality of firearms"). Also, since we are not

challenging Chicago's child-safety storage restrictions, this study of adolescent suicides bears

precious little relevance to this case. *See* MCC 8-20-050. Finally, Dr. Webster acknowledged a

number of the shortcomings in this study. *See*, e.g., Exhibit 25 at 126 (Webster Dep.) (admitting

that the study did not look to see how many of the firearms in the home were operable); *id.*

(admitting that the study did not look at the exact number of guns in the home, and merely

looked at one gun vs. multiple, multiple could be "two to a hundred").

189

**DEFENDANTS' REPLY:** Plaintiffs' response improperly injects additional facts to critique the studies Dr. Webster relies upon, all in arguing the validity of Dr. Webster's opinion. Those facts and critiques do not undermine the studies or Dr. Webster's opinion. While Defendants do not purport here to respond to each of Plaintiffs' specific critiques of each of the studies relied upon by Dr. Webster (since Defendants' description of those studies' findings is sufficient to indicate their relevance and reliability), Defendants note the following facts pertinent to (and which undermine) Dr. Kleck's thematic critiques of those studies.

*Nature of scientific studies*: The FJC Manual (*see* D-RSOF 119) states that "[i]t is important to emphasize that all studies have 'flaws' in the sense of limitations that add uncertainty about the proper interpretation of results. Some flaws are inevitable given the limits of technology, resources, the ability and willingness of persons to participate in a study, and ethical constraints." *Id.* at 553. The FJC Manual states that "[t]here is a tension between any attempt to reach conclusions with near certainty and the inherently uncertain nature of multiple regression analysis." FJC Manual, at 310.

The FJC Manual cites caselaw for the proposition that "[a]lmost all genres of research articles in the medical and behavioral sciences conclude their discussion with qualifying statements such as 'there is still much to be learned.' This is not, as might be assumed, an expression of ignorance, but rather an expression that all scientific fields are open-ended and can progress from their present state." *Id.* at 599 n.143. In addition, the FJC Manual cites caselaw explaining that the standard of proof for the scientific community "is not necessarily appropriate" for expert opinion in civil litigation. *Id.*

Dr. Kleck testified that while a randomized controlled trial study design is the best

190

design, "it's virtually impossible to do a randomized control trial" to study the effect of gun

possession on crime and violence. Def. Ex. 91 (Kleck Dep.), at 62:10-19. As a result,

researchers in this field "are confined to largely nonexperimental research of all sorts, some

longitudinal, some cross sectional, and some retrospective, some not." *Id.* at 62:19-21. "One

study design over another is not black and white." *Id.* at 63:11-13. "[E]very study has strengths

and weaknesses and in evaluating a study, [one] should take into consideration the strengths and

weaknesses of the [study]." *Id.* at 336:9-13. Dr. Kleck does not "categorize findings as reliable

or unreliable, valid or invalid; they're simply along a continuum and the better the methods, the

more likely it is you can rely on the findings." *Id.* at 63:7-10.

*Statistical Significance*: Dr. Kleck explained that statistical significance is "a measure of

the likelihood that the statistical result you obtain could have been the product of pure simple

random chance." Def. Ex. 91 (Kleck Dep.), at 44:21-23. And something known as a "P Value"

is "the conventional way of designating a statistical significance level." *Id.* at 45:1-2. Further,

while there are customary P values used in the field for designating whether a result is

statistically significant (such as .05 or, phrased differently, 5%), Dr. Kleck testified that "picking

any one level is arbitrary." *Id.* at 45:3-7. Dr. Kleck is "not rigid" about adhering to any

particular P value "because statistical significance is just one issue that's relevant to the

interpretation of results." *Id.* at 45:18-23. "[Y]ou don't simply dismiss results because, let's say,

they barely missed passing a test at an arbitrarily defined significance level." *Id.* at 46:4-6. "So

when you find a result that has a P value that is greater than, say, .05, that doesn't necessarily

mean that there isn't a true correlation between the variables." *Id*. at 46:7-11. "[T]here's nothing

magical about the .05 level." *Id*. at 47:14-17.

191

*Causation*: The FJC Manual states: "Causality cannot be inferred by data analysis alone; rather, one must infer that a causal relationship exists on the basis of an underlying causal theory that explains the relationship between the two variables. Even when an appropriate theory has been identified, causality can never be inferred directly." FJC Manual, at 310. "As a general rule, there are no basic direct statistical tests for determining the direction of causality; rather, the expert, when asked, should be prepared to defend his or her assumption based on an understanding of the underlying behavior evidence relating to the business or individuals involved." *Id.* at 323. The FJC Manual states: "Generally, researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn." *Id.* at 599. Further, Dr. Kleck testified that "[w]hen trying to infer causality, it's best to have a number of different studies that were done with multiple different methods; if they are all coming out in the same direction, it gives you more confidence that the result is correct." Def. Ex. 91 (Kleck Dep.), at 63:14-19.

*Suicide studies*: According to Dr. Kleck, "[t]he primary problem facing researchers trying to discover whether gun ownership actually causes an increased risk of suicide is to separate the effects of guns from the effects of other factors, called 'confounders' or confounding variables, correlated with guns. In this context, a confounder is a factor that affects suicide risk, but also has a significant correlation with gun ownership. Unless the researcher measures and statistically controls for all the likely confounders, s/he will confuse the purported effects of gun ownership with the effects of the uncontrolled confounders." Pl. Ex. 2, Exhibit I thereto, at 7.

Dr. Kleck asserts that case control gun ownership-suicide studies "have generally devoted little or no effort to controlling for likely confounders," and that there are ten such "likely"

192

confounders the studies have not included: (1) alcoholism or heaving drinking, (2) illicit drug

use, (3) urban vs. rural location, (4) residence in a high crime neighborhood, (5) experience as a

victim of crime (e.g. rape), (6) gang membership, (7) drug dealing, (8) perception of the world as

a hostile place, (9) a personality that emphasizes self-reliance and consequently self-blame for

problems, and (10) strength of suicidal intent. *Id.*, at 7-8.

However, Dr. Kleck has never conducted a case control individual level study on the

relationship between gun ownership and suicide. Def. Ex. 91(Kleck Dep.), at 199:20-25.

Moreover, it is "not [Kleck's] position" that a study must control for "every one of these ten

[likely confounders]." *Id.* at 227:16-22. According to Dr. Kleck, a study's failure to control for

the ten likely confounders does not mean that the study is invalid; "it just means that they – you

have less confidence that any associations you find represent actual causal effects." *Id.* at

205:11-16.

Moreover, Dr. Kleck agrees that "[t]o find out what effects these potentially confounding

variables would have, you would have to actually measure them and then plug them into the

regression equation and see what effect that had. You can't just assume that they had a

significant effect on the result until after you do the calculation." Def. Ex. 91 (Kleck Dep.), at

207:3-13. Further, Kleck does not know whether the researchers had data available to them on

these confounders that would have allowed them to control for the confounders. *Id.* at 225:11-

17. It is possible that they tried to control for the confounder but were unable to obtain data. *Id.*

at 227:13-15.

In macro-level studies that Kleck did of gun ownership and suicide rates, Kleck did not

control for at least 9 of his 10 likely confounders (illicit drug use, urban vs. rural location,

residence in a high-crime neighborhood, experience of a victim of a crime, gang membership, drug dealing, perception of the world as a hostile place, a personality that emphasizes self-reliance and consequently self-blame for problems, and strength of suicidal intent), although it was "possible" that he "attempted" to control for alcoholism.  Def. Ex. 91 (Kleck Dep.), at 199:25-202:16.  Dr. Kleck asserts that, in a macro-study of guns and suicide, "existing data don't permit [alcohol consumption] to be [controlled for] in a meaningful way;" there "aren't any useful proxies for" gang membership; "probably you don't have any meaningful measures" of drug dealing independent of drug use; there is "no existing data" measuring perception of the world as a hostile place; personality traits could not be controlled for; and strength of suicidal intent "almost certainly" cannot be controlled for.  Exhibit 91 hereto (Kleck Dep.), at 202:20-203:1, 204:6-7, 204:12-15, 204:17-21, 204:24-205:2, 205:3-7.

In addition, regarding the National Research Council report cited by Plaintiffs, the report was reviewed by a workgroup of prominent academics from prominent institutions.  Def. Ex. 106 (J. Weiner, et al., *Reducing firearm violence: a research agenda*, 13 Injury Prevention 80-84 (2007)).  This panel observed that the NRC report "found a clear association between firearms and gun suicide.  It concluded, however, that the evidence did not credibly demonstrate that the association was causal, because of data and methodological limitations."  *Id.* at 81.  The workgroup, however, concluded that "the accumulated evidence supports a causal relationship between firearm availability and suicide.  The magnitude of the statistical associations between firearm availability and suicide, the consistency of findings over multiple studies in different populations, and the reality that a firearm greatly increases the risk that a suicide attempt will be lethal, all point to a causal connection."  *Id.* at 81.

194

Finally, a review of over 40 suicide studies concluded that "[g]enerally speaking," that when a particular method of suicide is restricted, "the risk of substitution or displacement towards other methods seems small. At the individual level, studies tend to demonstrate that many suicidal persons have a preference for a specific method. Similarly, the fact that suicidal crises are very often short-lived (and, what is more, influenced by ambivalence or impulsiveness) suggests that a given individual who has limited access to a given means will not put off his intentions to later or shift to another method." Def. Ex. 107 (M. Daigle, *Suicide prevention through means restriction: Assessing the risk of substitution. A critical review and synthesis*, 37 Accident Analysis and Prevention 625-632 (2005), at 630 (citations omitted).

*Homicide studies*: Of 32 macro-level (or "ecological") studies evaluating the connection between gun ownership rates and homicide rates, Kleck asserts that only two of them are methodologically sound; and those two were authored in part by Dr. Kleck. Def. Ex. 91 (Kleck Dep.), at 276:1-277:11. Dr. Kleck admitted that the first of these two studies was criticized in an analysis by Steven Messner, "a well-respected criminologist," in the Journal of Quantitative Criminology. Def. Ex. 91 (Kleck Dep.) at 279:25-280:4, 282:19-25. *See also* Def. Ex. 94 (R. Alba & S. Messner, Point Blank *Against Itself: Evidence and Inference About Guns, Crime, and Gun Control*, 11 Journal of Quantitative Criminology 391-410 (1995)). That critique noted that Dr. Kleck's "evidence is not adequate to the case he wishes to build. Upon close examination, the critical propositions do not always follow directly from the data reported. Further, the original evidence and analyses that are invoked in their support are seriously deficient in our view, and in one instance, his interpretation of statistical results appears grossly misleading if not simply wrong." Def. Ex. 94 at 393. In particular, the study found that "Kleck's analysis of the

effect of gun ownership on city crime rates is seriously flawed by ambiguous measurement of a key construct and by severe model misspecification." *Id.* at 397. Dr. Kleck further admitted that, in trying to control for causal order in that study, he used instrumental variables whose validity was not checked via a "validity test," a failure that "impairs" the reliability of the study's results "to some degree." Def. Ex. 91 (Kleck Dep.) at 300:16-302:19, 311:14-19.

The second of those two studies – T. Kovandzic, et al., *Estimating the causal effect of gun prevalence on homicide rates* (2008) – was not submitted for publication in a peer-reviewed journal. Def. Ex. 91 (Kleck Dep.) at 332:7-23.

123-A.[5] Dr. Webster also relied on studies and other data demonstrating an association between the availability of any firearm in the home and suicide, homicide, and unintentional death. Exhibit 65, Exhibit A thereto, § V. He opines that "if a variable is associated with an outcome, it is often the case that more of the variable will be associated with more of the outcome." *Id.* at 12. The studies differed in their design (e.g., case control study, cohort study, ecological study), samples, populations, or analytic methods. *Id.* at 3-12. The studies relied upon by Dr. Webster include the following:

**PLAINTIFFS' RESPONSE**: Admit that Dr. Webster relied on studies and other data examining the relationship between having any firearm in the home and suicide, homicide, and intentional death. But, because Chicago allows qualified citizens to keep an operable gun in the home, we dispute that these studies are particularly relevant to the case at hand. And while Dr. Webster opines that "if a variable is associated with an outcome, it is often the case that more of the variable will be associated with more of the outcome," dispute that Dr. Webster has shown that

---

[5] Defendants' Reply to SOF 123 begins on page 217.

this is the case for the variable "number of firearms" and the outcomes of homicide, suicide, and unintentional death. Indeed, as we have shown in our response to Statement of Fact 122, the three studies Dr. Webster has cited that actually test this hypothesis provide very weak if any support for it. Furthermore, Dr. Kleck thoroughly and convincingly rebutted the claim that the studies and other data Dr. Webster relies on support his conclusions.  *See* Response to Statement of Fact 122; Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 6-18, 24. We highlight certain limitations of the particular studies listed by Chicago below, although we refer the reader to Dr. Kleck's report for a more complete critique of Dr. Webster's reliance on this body of research.

a.    A Kellerman, et al., Suicide in the Home in Relation to Gun Ownership, 327 New England Journal of Medicine 467-472 (1992). Exhibit 71.  This case control study found an adjusted odds ratio of 4.8 for suicides in a home with one or more firearms compared to a home with no firearms, and concluded that its results "offer strong evidence that the ready availability of guns increases the risk of suicide in the home."  *Id.* at 470.

**PLAINTIFFS' RESPONSE**:

• This study controlled for only 4 likely confounding variables. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 53 Table 1; *id.* at 7-9 (discussing importance of controlling for confounders in this context).

• The study did not control for suicidal intent or self-reliance/self blame (none of Dr. Webster's studies controlled for the latter). *Id.* at 8-9 (discussing confounding potential of these variables). Indeed, the authors acknowledged that they could not "exclude the possibility that gun owners (and people who live in homes with guns) may be psychologically predisposed to commit suicide" because "one

197

cannot readily control for 'psychological confounding' of this sort in a case-control study." Chicago Exhibit 71 at 471.

- The study found a number of variables that had a higher adjusted odds ratio for suicide than haviug guns in the home: psychotropic medication prescribed (35.9), previous hospitalization due to drinking (16.4), active use of illicit drugs (10.0), and living alone (5.1 ).

- The study is also limited by its focus on suicide in the home, "because it is likely that decisions about method and location of suicide are made together. This means that a study of gun access in a study restricted to suicides that take place in the home may be no more informative than a study of bridge access in a study restricted to suicides that take place from a bridge." Exhibit 10 at 178 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)). Indeed, this "possibly biased sample selection strategy, as well as other problems in the execution of the study and reporting of results, provoked a storm of attacks on the research team, the federal funding agency, and the medical journal in which the results were published." "An informal calculation using assumptions that are favorable to the investigators suggests that omission of suicides taking place outside of the home may have led to an overstatement of the true relative risk by about 20 percent. There are other problems with the execution of this study that may have actually let do biases of larger magnitude."

- Dr. Webster acknowledged a number of limitations of this study. *See*, e.g.,

198

Exhibit 25 at 57-59 (Webster Dep.) (admitting that the sample in this study may not be generalizable to the city of Chicago due to differences relating to population density, racial composition, indices of mental illness, and religiosity); *id.* at 63 (agreeing that "the results are clearly sensitive to the assumption that the rates of gun suicide by ownership do not vary by the location of the suicide"); *id.* at 64-65 (admitting alcohol and drug abuse, mental illness, and depression were more prevalent in the case group than the control groups and that those factors are associated with suicide); *id.* at 66-67 (admitting that the study's attempt to control for mental illness by controlling for prescription medication would only work if the people were taking their medication).

b.      P. Cummings, et al., The Association between the Purchase of a Handgun and Homicide or Suicide, 87 American Journal of Public Health 974-978 (1997). Exhibit 68. This case control study found that, for members of households where a family member had legally purchased a handgun from a licensed dealer, the risk of suicide involving a firearm was 3.1 times higher, and the risk of homicide involving a firearm was 2.2 times higher, than for members of households with no purchase. *Id.* at 975-76. Further, the study found that the median interval between the first handgun purchase by the victim or any family member and any suicide with a gun was 10.7 years. *Id.* at 976. Dr. Webster opines that this indicates "that, in most instances, the suicide victim did not purchase a gun in order to complete a plan to commit suicide but rather used a firearm that had been purchased years ago, sometimes by individuals other than the one who committed suicide." Exhibit 65, Exhibit A thereto, at 4. Further, the study found that the median interval between the first family handgun purchase and any homicide death was 11.3

years and that "[t]he relative risk of death by homicide associated with family handgun purchase

bore no statistically significant relationship to time since purchase." Exhibit 68 at 976. Dr.

Webster opines that this indicates that "it seems unlikely" that the risk of being a homicide

victim is what "prompt[ed] gun ownership." Exhibit 65, Exhibit A thereto, at 8.

**PLAINTIFFS' RESPONSE**:

- This study controlled for only 3 likely confounding variables. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 53 Table 1.

- It did not control for suicidal intent.

- "The most important limitation is that these studies [i.e., Wintemute (1999) and Cummings (1997)] do not indicate whether handgun purchasers would have substituted other methods of suicide if a gun were not available, and do not measure other factors, such as history of substance abuse, psychiatric illness, criminal activity, or domestic violence, which might explain or modify a link between gun ownership and propensity for suicide." Exhibit 10 at 183 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)).

- This study's "observed association[] between [firearms ownership and being murdered] may ... be entirely spurious." *Id.* at 119.

- While the relative risk for suicide involving a gun was 3.1 times higher in households with firearms purchases, the relative risk for suicide by any method was only 1.9 times higher. *See* Chicago Exhibit 68 at 975, 976 Table 2.

- Furthermore, the results are consistent with suicidal intent being a confounding

variable given that there was a statistically significant increased relative risk for suicide for the purchaser of a firearm in households with firearms purchases, but not for other members of the household. *See* Chicago Exhibit 68 at 975, 976 Table 2 ("The relative risks for suicide given a personal or family member handgun purchase were also elevated, although the elevated risk for family member purchase was not statistically significant."). Also consistent with suicidal intent being a confounding variable is the finding that "the relative risk for suicide given a family handgun purchase was greatest within the first year of purchase." *Id.* at 976.

- It is a "non sequitur" to conclude that a "long average time interval between 'the first family handgun purchase and homicide death' " means that it is "unlikely that the guns-homicide association 'could be due to homicide risks prompting gun ownership.' "Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 13-14. Not only could the family have had more recent handgun purchases after the first one, but in addition "many of the same risk factors that placed family members at greater risk at the time of homicide would also have prevailed years before .... Thus, the fact that guns were acquired years before a family member was killed does not mean that the gun acquisition was not prompted by homicide risk factors such as a high neighborhood crime rate or association with dangerous people." *Id.*

- Furthermore, while the risk of being murdered with a firearm increased by 2.2 with a history offamily handgun purchase, the risk of being murdered by some

other method also increased by 2.0, and the two figures had almost identical 95% confidence intervals. Chicago Exhibit 68 at 176. "[I]f gun ownership in the study samples were merely a correlate of unmeasured risk factors that influence homicide in general, ... gun ownership would be no more strongly associated with gun homicide than non-gun homicide. [This ] larger pattern is precisely what Cummings et al. found, supporting the view that gun ownership had no net causal effect on homicide risk but rather was correlated with uncontrolled factors that influenced both gun and non-gun homicide victimization." Exhibit 49 at 75 (Gary Kleck, Can Owning a Gun Really Triple the Owner's Chances of Being Murdered", 5 HOMICIDE STUDIES 64 (2001)).

- The study also does not support a hypothesis that persons purchased handguns for the purpose of killing other family members, as the relative risk that the purchaser or a nonpurchasing family member was killed was nearly identical. *Id.*

- The study did not take into account whether the murders were even perpetrated with a household firearm.

- *See* our response to Statement of Fact 122 for additional limitations of this study.

c.     D. Wiebe, Homicide and Suicide Risks Associated With Firearms in the Home: A National Case-Control Study, 41 Annals of Emergency Medicine 771-782 (2003). Exhibit 72. This case control study found that, "[c]ompared with persons living in a home with no firearms, the adjusted [odds ratio] for suicide was 3.44 ... for persons living in a home where a gun was present." *Id.* at 776. It also concluded that "[h]aving a gun in the home was a strong risk factor for gun-related suicide," reporting an adjusted odds ratio of 16.89. *Id.* at 777. "The increased risk

202

of suicide connected to guns in the home was exclusive to suicides committed with a firearm."

Exhibit 65, Exhibit A thereto, at 4.

**PLAINTIFFS' RESPONSE**:

- This study did not control for suicidal intent and a number of other potentially confounding variables. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 53 Table 1. Indeed, the authors acknowledged that "the greatest source of potential bias might be confounding from risk factors that were not measured or were controlled only partially" Chicago Exhibit 72 at 780. "Other potential factors that were not controlled were mental illness among subjects or family members and histories of violence, illicit drug and alcohol use, time spent (exposed) at home, and lifestyle factors like gang membership and drug dealing." *Id.*

- Indeed, the authors specifically recognized that "the association between having a gun at home and committing suicide with a gun could emerge because suicidal persons acquire a gun to take their own life." Chicago Exhibit 72 at 777.

- The authors acknowledge that "the main contribution of the present findings might simply be their consistency with past results," but caution that it would be "unwarranted to infer that such a limited body of research conclusively links gun availability to gun-related mortality." *Id.* at 777. (The "body of research" from which such an inference is unwarranted consists of this study plus the two Kellerman et al. studies and the Cummings et al. study also cited in support of this finding. *See Id.* & *id.* at 781 nn. 4, 5, & 8.)

- Further, "large proportions of responses were missing in the variable of interest:

203

whether the firearm was in the home," and techniques used to address this problem "do not obviate the limitations of complete data." *Id.* at 779.

- Another "limitation comes from not knowing whether the gun used fatally had actually been kept in the victim's home." *Id.* at 780.

d. G. Wintemute, et al., Mortality among recent purchasers of handguns, 341 New England Journal of Medicine 1583-89 (1999). Exhibit 73. This cohort study found that "handgun purchasers, as compared with the general adult population during the same period, were at substantially greater risk for suicide in the first year after a handgun purchase (standardized mortality ratio, 4.31), and the increase was attributable entirely to the substantial excess mortality from suicide by firearm (standardized mortality ratio, 7.12)." *Id.* at 1585. A standardized mortality ratio is the ratio of the number of deaths among handgun purchasers to the number of deaths expected in the general population based on age and sex-specific death rates. Exhibit 65, Exhibit A thereto, at 5. In the 6-year period following the purchase, the risk for suicide (standardized mortality ratio, 2.16) and suicide by firearm (standardized mortality ratio, 3.50) remained elevated. Exhibit 73 at 1586.

**PLAINTIFFS' RESPONSE**:

- This study controlled for only two potential confounders (age and sex), and did not control for suicidal intent. *See* Chicago Exhibit 73 at 1585.

- The authors acknowledged that "we cannot determine the extent to which increases or decreases in the risk of violent death are attributable specifically to the purchase of a handgun, since we lack information about other risk factors .... An increased risk of suicide by firearm might be due to an increased prevalence of

these risk factors among handgun purchasers, and not due to the handgun purchase itself." *Id.* at 1588.

- The study is consistent with suicidal intent being confounding, particularly the finding that "the rate of suicide by firearm among handgun purchasers was greatest immediately after the purchase and declined thereafter." *Id.*; *id.* at 1586 Figure I. Indeed, the suicide rate "for the first week after purchase was ... 57 times as high as the adjusted statewide rate." *Id.* at 1585. "A stronger [suicidal intent] is also likely to induce some people to acquire a gun for the purpose of carrying out the suicide attempt. Even if possessing or using a gun did not actually influence whether a person attempted suicide or whether an attempt was fatal, one would still find higher gun ownership among those who killed themselves, i.e. one would find a positive guns/suicide association. Indeed, one would find an especially strong positive association between suicide and a recent gun purchase." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 8.

- With respect to homicide, the study found that male handgun purchasers were at a decreased risk for homicide through up to six years after purchase, while female handgun purchasers experienced an increased risk. *See* Chicago Exhibit 73 at 1586, Table 4. This "pattern makes perfect sense if the gun/homicide [association] is interpreted as spurious. When women purchase handguns, it is especially likely to be for purposes of self-defense, whereas men are more likely to purchase handguns for a variety of purposes, including recreational activities like hunting and target shooting, unrelated to self-defense .... Thus, among recent

205

handgun purchasers, women are more likely than men to have been responding to factors raising their risk of homicide, and for this reason are more likely to be murdered after buying the handgun." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 14.

- The authors also did "not know whether the handguns purchased by persons in our study cohort were actually involved in the deaths we analyzed." Chicago Exhibit 73 at 1588.

- 'The most important limitation is that these studies [i.e., Wintemute (1999) and Cummings (1997)] do not indicate whether handgun purchasers would have substituted other methods of suicide if a gun were not available, and do not measure other factors, such as history of substance abuse, psychiatric illness, criminal activity, or domestic violence, which might explain or modify a link between gun ownership and propensity for suicide." Exhibit 10 at 183 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)).

e.      M. Miller, et al., The association between changes in household firearm ownership and rates of suicide in the United States, 12 Injury Prevention 178-182 (2006). Exhibit 74.  This longitudinal ecological study found that "changes in household firearm ownership over time were associated with significant changes in rates of suicides for men, women, and children." *Id.* at 181.  Each 10% decline in firearm prevalence was accompanied by "significant declines in suicide by firearm and suicide overall: firearm suicide rates dropped by 4.2% ... and total suicide rates by 2.5%." *Id.* at 180. Further, "[t]he relation between changes in

household firearm ownership and overall rates of suicide is due to the association of firearm ownership and suicide by firearms (that is, changes in non-firearm suicide are not related to changes in firearm ownership)." *Id.* at 181.

**PLAINTIFFS' RESPONSE**:

- The proxy this study used to track gun ownership, percentage of suicides with guns, is "worthless for use in longitudinal studies like [this one], which examined changes over time in gun ownership and suicide. . .. Since Miller et al. did not have a valid measure of changes in gun prevalence over time, their findings can tell us nothing about what effects such changes may have on suicide rates." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 11.

- The authors also acknowledged a "possible interpretive cost of assuming that group-level associations reflect individual risk factors .... The greatest threat to the validity of our findings in this respect is that we do not know whether firearm suicide victims actually lived in homes with guns." Chicago Exhibit 74 at 181.

- The authors also acknowledged that there "many ... factors may affect suicide rates" that they did not control for-including "annual changes in suicidality over time." *Id.*

- The study also did not collect information "about many characteristics of firearm availability that may be related to the rate of suicide deaths," including "the number of firearms in a gun owning household" and "firearm storage practices." *Id.* It is thus not well adapted to the Chicago law being challenged here.

f.  A. Kellerman, et al., Gun Ownership as a Risk Facto/for Homicide in the Home,

329 New England Journal of Medicine 1084-1091 (1993). Exhibit 75. This case control study found that "the presence of one or more firearms in the home was strongly associated with an increased risk of homicide in the home," reporting an adjusted odds ratio of 2.7, and that "[g]un ownership was most strongly associated with homicide at the hands of a family member or intimate acquaintance," reporting an adjusted odds ratio of 7.8. *Id.* at 1087. The study further noted that "[n]ot surprisingly, the link between gun ownership and homicide was due entirely to a strong association between gun ownership and homicide by firearms." *Id.*

**PLAINTIFFS' RESPONSE**:

- "Kellerman et al. (1993) ... did not say why or how gun ownership by a given person or members of the person's household would increase that person's risk of being murdered . . . . The obvious, most direct, and perhaps the only plausible mechanism would be that attackers, especially those living in the same home as the victim, would use a gun kept in the victim's household to kill the victim .... Thus, the plausibility of the authors' interpretation of their findings depends heavily on what fraction of homicides are committed with a gun kept in the victim's home. The authors, however, were silent on this matter." Exhibit 49 at 67 (Gary Kleck, Can Owning a Gun Really Triple the Owner's Chances of Being Murdered", 5 HOMICIDE STUDIES 64 (2001)).

- "Based largely on Kellerman's own data, revealed in a later study, less than two percent of homicides in the areas he studied were committed with a gun belonging to the victim or another member of the victim's household. Thus, if people with guns in their homes are more likely than those without guns to be murdered, there

is no reason to infer from this fact that their household gun ownership somehow caused gun owners' elevated risk of being murdered." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 13 (citation omitted); *see also* Exhibit 49 at 69-70 (Gary Kleck, Can Owning a Gun Really Triple the Owner's Chances of Being Murdered", 5 HOMICIDE STUDIES 64 (2001 )).

- Furthermore, "the association discovered by Kellerman et al. (1993) looked like a spurious association attributable to confounding factors not controlled by the analysts, such as membership in a street gang or involvement in illicit drug dealing." Exhibit 49 at 66 (Gary Kleck, Can Owning a Gun Really Triple the Owner's Chances of Being Murdered", 5 HOMICIDE STUDIES 64 (2001)). *See* also Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 13 ("Kellerman et al. ... perfectly exemplify the failure to control for important likely confounders.").

- "A number of other flaws in this research have been identified, including the use of local samples that were not representative of any larger populations as well as errors in measurement of gun ownership that were sufficiently common to completely account for the observed association." Exhibit 49 at 66 (Gary Kleck, Can Owning a Gun Really Triple the Owner's Chances of Being Murdered", 5 HOMICIDE STUDIES 64 (2001)).

- *See* also Chicago Exhibit 75 at 1089, it is possible that reverse causation accounted for some of the association we observed between gun ownership and homicide"); Exhibit 25 at 153 (Webster Dep.) (admitting that reverse causation may have influenced the results).

209

- *See* also Exhibit 10 at 118 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)) (discussing this study and stating that its conclusions are "not tenable").

g.     J. Campbell, et al., Risk Factors for Femicide in Abusive Relationships: Results From A Multisite Case Control Study, 93 American Journal of Public Health 1089-1097 (2003). Exhibit 76. This case control study found that gun availability "had substantial independent effects that increased homicide risks" at the hands of an intimate partner, with at least a 5-fold increase in risk. *Id.* at 1092.

**PLAINTIFFS' RESPONSE**:

- The study reports the results of seven models testing hypothesized risk factors for intimate partner femicide among women involved in physically abusive intimate relationships.

- The study found that previous "physical violence against the victim is the primary risk factor for intimate partner femicide." Chicago Exhibit 76 at 1091.

- One of the models found that "victims' risk of being killed by their intimate partner was lower when they lived apart from the abuser and had sole access to a firearm." Chicago Exhibit 76 at 1090. Dr. Webster admitted that a possible explanation for this finding was that the women used firearms in self-defense. *See* Exhibit 25 at 163-64 (Webster Dep.).

- According to the authors, "the variables that remained significant ... in model 7 are particularly important in prevention of the lethal incident itself." Chicago Exhibit 76 at 1094. "Abuser access to gun" was not a statistically significant risk

210

factor in model 7. *Id.* at 1095, Table 3.

- As Dr. Kleck has testified, quoting Dr. Cook, an" 'assailant's choice of weapon is a good indicator of his intent in assault offenses' " and an " 'assailant who is determined to kill the victim probably will use a gun, if one is available.' ... Consequently, by Cook's own logic, the attackers who use guns are also likely to be more lethal in their intentions."

- Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26. It is thus noteworthy that model 7 of the study found that the abuser's use of a gun, as well as the abuser's having threatened the victim with a weapon, were statistically significant risk factors for femicide. *See* Chicago Exhibit 76 at 1096. Indeed, "abuser's use of a gun in the worst incident of abuse was associated with a 41-fold increase in risk of femicide after control for other risk factors." *Id.* at 1091. This study is thus consistent with the hypothesis that murderous abusers are simply more lethal in their intentions.

- The authors also noted several limitations in the study. *See id.* at 1093-94.

- Dr. Webster also acknowledged that the study was "not an experimental design" and that "there [are] always uncertainties about causal connections." Exhibit 25 at 165 (Webster Dep.).

h.     M. Miller, et al., State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003, 64 Social Science & Medicine 656-664 (2007). Exhibit 77. This ecological study of state-wide firearm ownership and homicide data found that "[s]tates with higher rates of household firearm ownership had significantly higher homicide victimization rates in multivariate analyses. The association

211

between firearm prevalence and homicide victimization in our study was driven by gun-related homicide victimization rates; non-gun-related victimization rates were not significantly associated with rates of firearm ownership." *Id.* at 660-61. The study found that "each one percentage point difference in household firearm ownership was associated with a 3.3% difference in firearm homicide victimization ... and a 2.2% difference in the rate of homicide victimization." *Id.* at 659.

**PLAINTIFFS' RESPONSE**:

- This study did not use a technically sound method for controlling for causal order. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 59 Table 3. Thus, its "positive guns/homicide association may merely indicate that higher murder rates cause more people to acquire guns for self-protection." *Id.* at 14.

- Indeed, the authors plainly admit that "our study does not establish a causal relationship between guns and homicide," and that "the association we observe might have arisen because individuals in states with historically high homicide rates acquired more guns (than individuals in low-homicide states), as a defensive response to actual high homicide rates in their communities (i.e., 'reverse causation')." Chicago Exhibit 77 at 662.

- They also acknowledged that "other factors not included in the analysis may affect homicide rates," i.e., may be confounders. *Id.*

- The study also suffers from the "ecologic fallacy," i.e., "assuming group-level associations reflect individual risk factors." *Id.*

212

I.      M. Miller, et al., Firearm Availability and Unintentional Firearm Deaths, Suicide, and Homicide among 5-14 Year Olds, 52 Journal of Trauma, Injury, Infection, and Critical Care 267-275 (2002). Exhibit 78. This ecological study of state-wide data found "a positive and statistically significant association between gun availability and state-level rates of unintentional firearm deaths, homicides, firearm homicides, suicides, and firearm suicides among children. The increased rate of homicide and suicide in states with high gun levels was accounted for by significantly elevated firearm (but not nonfirearm) suicide and homicide rates." *Id.* at 271. Further, in comparing data from the five states with the highest estimated gun availability levels (Louisiana, Alabama, Mississippi, Arkansas, and West Virginia) with the five states with the lowest (Hawaii, Massachusetts, Rhode Island, New Jersey, and Delaware), the study concluded that children in the high-gun states "were 16 times as likely to die from unintentional firearm injury, 7 times as likely to die from firearm suicide, 3 times as likely to die from firearm homicide and, overall, twice as likely to die from suicide and homicide." *Id.*

**PLAINTIFFS' RESPONSE**:

- The study controlled for a small number of confounding variables. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 59 Table 3. *See also* Chicago Exhibit 78 at 273 ("Another limitation of our study is that our analyses may not account for some reasons that states with higher household gun levels have higher violent death rates. Although we include some state-level confounders ... , these represent only a small number of the characteristics likely to affect suicides, homicides, or unintentional firearm deaths.").

- This study did not use a technically sound method for controlling for causal order.

213

*See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 59 Table 3. Thus, its "positive guns/homicide association may merely indicate that higher murder rates cause more people to acquire guns for self-protection." *Id.* at 14. *See* Chicago Exhibit 78 at 273 CA potentially more problematic issue is that of reverse causation ....").

- For its state-level analysis, the study did not use a valid measure of gun prevalence. *See* Exhibit 2 (KleckDecl.), Exhibit I thereto, at 59 Table 3.

j.  M. Miller, et al., Firearm Availability and Suicide, Homicide, and Unintentional Firearm Deaths Among Women, 79 Journal of Urban Health 26-38 (2002). Exhibit 79. This study found "positive and statistically significant associations between gun availability and state level rates of suicide, homicide, and unintentional firearm death among adult women. The increased rate of suicide in states with high gnn levels was accounted for by elevated firearm suicide rates ... [and] [t]he increased rate of homicide in states with high gnn levels was accounted for primarily by significantly elevated firearm homicide rates." *Id.* at 29-32. Further, in comparing data from the five states with the highest estimated gun availability to the five with the lowest, the study found that women living in the high gun states "were 1.5 times as likely to die from suicide, 2.7 times as likely to die from homicide, and 11.2 times as likely to die from an unintentional firearm injury." *Id.* at 33-34. Dr. Webster opines that, since women and children are rarely the ones who bring a firearm into the home, "positive associations between gun availability and homicide risks are unlikely to be due to individuals being motivated by their own risk of homicide to acquire a gun." Exhibit 65, Exhibit A thereto, at 9.

**PLAINTIFFS' RESPONSE**: This study employed a similar methodology as the study listed directly above, and is subject to the same criticisms.

214

k.      D. McDowall, Firearm Availability and Homicide Rates in Detroit, 1951-1986, 69 Social Forces 1085-1101 (1991). Exhibit 80. This study of changes in gun availability and homicide rates in Detroit from 1951 to 1986 estimated that each 1 % increase in gun availability was associated with an increase of more than 1 % in homicides per 100,000 residents. *Id.* at 1090. It found that if the gun ownership rate (i.e., the gun density index) from 1964 is applied to 1986, and "all other explanatory variables were held at their 1986 levels," the homicide rate predicted for 1986 would be 21.4 per 100,000 residents, rather than the rate of 56.4 that was actually observed. *Id.* at 1091. The study reported that "[t]his is only 38% of the actual rate for 1986 and represents a difference of 379 lives." *Id.*

**PLAINTIFFS' RESPONSE**:

•      This study used an invalid measure of gun prevalence, controlled for only 3 potential confounders, and did not use a technically sound method to establish the causal order between gun levels and homicide rates. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 58 Table 3. It thus suffers from each of the three "fatal errors" Dr. Kleck has identified in this body of research. *Id.* at 30.

l.      M. Duggan, More Guns, More Crime, 109 Journal of Political Economy 1086-1114 (2001). Exhibit 81. This study of state and county-level data found that "changes in homicide and gun ownership are significantly positively related" and that its findings suggest "that an increase in the number of guns leads to a substantial increase in the number of homicides." *Id.* at 1088. It reported that its findings suggest that "a 10 percent increase in the rate of gun ownership is associated with approximately a 2 percent increase in the homicide rate." *Id.* at 1096.

215

**PLAINTIFFS' RESPONSE**:

- This study used an invalid measure of gun prevalence, controlled for zero potential confounders, and did not use a technically sound method to establish the causal order between gun levels and homicide rates. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 58 Table 3. It thus suffers from each of the three "fatal errors" Dr. Kleck has identified in this body of research. *Id.* at 30.

m.    P. Cook, et al., The social costs of gun ownership, 90 Journal of Public Economics 379-391 (2006). Exhibit 22.

**PLAINTIFFS' RESPONSE**:

- This study used an invalid measure of gun prevalence and did not use a technically sound method to establish the causal order between gun levels and homicide rates. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 59 Table 3. It thus suffers from "fatal errors" Dr. Kleck has identified in this body of research. *Id.* at 30.

- Indeed, "this study is so technically flawed that [Dr. Kleck has 1 used it as an exemplar of poor research in this area. . .. This crude study therefore caunot be relied upon to provide a meaningful estimate of the effect of gun rates on homicide rates." *Id.* at 3l. *See* Exhibit 50 at 71-80 (Gary Kleck, How Not to Study the Effect of Gun Levels 011 Violence Rates, 21 J. ON FIREARMS & PUB. POL'Y 65 (2009)).

n.    D. Wiebe, Firearms in US homes as a risk factor for unintentional gunshot fatality, 35 Accident Analysis and Prevention 711-716 (2003). Exhibit 69. This case control

216

study found that "the relative risk of death by an unintentional shooting, comparing subjects living in homes with and without at least one gun, was 3.7." *Id.* at 713.

**PLAINTIFFS' RESPONSE**: We have already addressed this study in our response to Statement of Fact 122.

**DEFENDANTS' REPLY**: Plaintiffs offer no response to subsection (o) of SOF 123. As to the rest of Plaintiffs' response, *see* D-RSOF 122.

124-A. The majority of firearm-related deaths that occur in U.S. homes are suicides. *Id.* at 2-3. Even within the most urban counties in the U.S., suicides account for more than one third of all firearm-related deaths. *Id.* at 3.

**PLAINTIFFS' RESPONSE**: Admit.

**DEFENDANTS' REPLY**: None.

124-B. 10 of the 16 published case control studies of firearm ownership and suicide "found a significant relationship between gun ownership and suicide." Exhibit 14 at 188: 17-20. An additional one of those 16 studies - Conwell (2002) - found statistically significant increased risk associated with gun ownership for males. *Id.* at 192:7-10.

**PLAINTIFFS' RESPONSE**: Admit, but dispute the significance of this fact; "it would scarcely matter even if 'nearly all' of the case-control studies really had found a positive guns/suicide correlation, since this body of research is far too weak to support any conclusions." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 7. Furthermore, the association for males "doesn't make sense if its interpreted as a causal effect of gun ownership because there's no reason why females would be impervious to the effect of guns .... [I]t suggests you are really seeing the effect of a confounder that's correlated with gun ownership." Exhibit 7 at 191-92 (Kleck Dep.).

**DEFENDANTS' REPLY**:  Plaintiffs' response beyond their admission should be disregarded, as it improperly argues the "significance" of the admitted fact.  As to Plaintiffs' argument, *see* D-RSOF 122.

125.  Dr. Kleck owns two handguns, uses a trigger lock on both, and considers trigger locks to be a safe method of storing those guns. *Id.* at 35:18-25,36:35.  He agrees that trigger locks "have a safety benefit," are a "sensible step to take in order to prevent unauthorized use," and provide "some assurance against somebody firing the guns who didn't have a key to the lock." *Id.* at 104:10-13,105:5-10,105:14-18.  He agrees that "guns with trigger locks are much less likely to be involved in accidents than guns without trigger locks;" indeed, they are "virtually not involved in accidents at all" and it is "virtually impossible" for an unauthorized user to use a trigger-locked gun. *Id.* at 121:6-8, 322:15-19.  Even under the assumption that the devices impair authorized access for defensive use, they impair unauthorized access "a lot more" than they impair authorized access. *Id.* at 112:11-15.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

126.[6]  Dr. Webster opines that the safe storage of firearms reduces the risks of suicide, homicide, and deaths from unintentional shootings associated with keeping firearms in the home. Exhibit 65, Exhibit A thereto, §§ VII, X.  The sources relied upon by Dr. Webster in forming this opinion include:

**PLAINTIFFS' RESPONSE**: Admit that Dr. Webster so opined, and that the sources below are among those he relied upon, but dispute Dr. Webster's opinion. Dr. Kleck has thoroughly

---

[6] Defendants' Reply to SOF 126 begins on page 225.

rebutted Dr. Webster's opinion with respect to "safe storage" of firearms. *See* Exhibit 2 (Kleck

Decl.), Exhibit I thereto, at 18-19.  For example, "[t]he feature that is most conspicuous in

Webster's discussion of 'safe' storage in the absence of any discussion of how keeping guns

locked away and unloaded affects their readiness for use in self-defense. . .. This is a critical

matter, since if keeping guns locked and unloaded substantially reduced the number of

life-saving defensive uses of gun, but had little or no effect on harmful uses, it could hardly be

reasonably argued that keeping guns locked and unloaded is 'safe' storage." *Id.* at 18.  *See* also

Exhibit 10 at 216 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE

(Wellford, et al., eds. 2005» ("[L]ocking devices may compromise the ability of authorized users

to defend themselves.  A lock may fail entirely or may take too much time for the weapon to be

of use.").  Dr. Kleck also emphasized that Dr. "Webster's discussion of research is irrelevant to

the [challenged] Chicago ordinance .... [T]he studies attempted to assess the effect of having any

guns in operable condition, not the effect of having one operable gun versus multiple operable

guns." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 18.  Dr. Kleck continues to offer additional

criticisms of the research relied on by Dr. Webster, see *id.* at 18-19, and we highlight several

points in response to the particular studies listed below.  Also, it bears noting that during his

deposition Dr. Webster could not identify a single study finding a positive association between

homicide and firearm storage practices.  *See* Exhibit 25 at 191:3-9 (Webster Dep.).

Dr. Kleck's opinion on this subject is consistent with the findings of comprehensive literature

reviews concluding that research has not proven that locking devices or mandates reduce injury

from firearms. *See* Exhibit 51 at 56 (Robert Hahn, et al., Firearms Laws and the Reduction of

Violence: A Systematic Review, 28 AM. J. PREVo MED. 40 (2005)) ("the small number of

studies of CAP laws, all of limited quality of execution and inconsistent findings, is insufficient to determine the effectiveness ofthe laws in reducing violence or unintentional firearm-related injury and other violent outcomes"); Exhibit 10 at 219 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)) ("we found no credible scientific evidence ... that demonstrates whether safety devices can effectively lower injury").

a.      A. Kellerman, et al., Suicide in the Home in Relation to Gun Ownership, 327 New England Journal of Medicine 467-472 (1992).  Exhibit 71.  This study concluded that "[h]omes with handguns and homes where firearms were not locked up or were kept loaded were even more likely to be the scene of a suicide than homes where firearms were kept securely stored."  *Id.* at 470.  The study reported, as compared to a home with no firearms, the following adjusted odds ratios: 2.4 for suicide by firearm where all guns were kept locked up; 5.6 where any gun was kept unlocked; 3.3 where all guns were kept unloaded; and 9.2 where any gun was kept loaded. *Id.* at 471. Dr. Webster opines that these figures "clearly show a progression of increasing risk with increasing ease of access."  Exhibit 65, Exhibit A thereto, at 13.

**PLAINTIFFS' RESPONSE**:

•       This study actually found no statistically significant difference in suicide risk based on method of storage. While Chicago accurately reports adjusted odds ratios for various methods of storage, it fails to mention that the 95% confidence intervals for these odds ratios overlap.  *See* Chicago Exhibit 71 at 471 Table 6. *See also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 17-18 (discussing statistical significance and overlapping confidence intervals).

•       *See also* our response to Statement of Fact 23 regarding this study.

b.       D. Grossman, et al., Gun Storage Practices and Risk of Youth Suicide and

Unintentional Firearm Injuries, 293 Journal of the American Medical Association 707-714

(2005).  Exhibit 82.  This case control study concluded that "[s]afe storage practices, including

keeping firearms ... secured with an extrinsic safety device, were shown to be protective for

unintentional firearm shootings and suicide attempts among adolescents and children."  *Id.* at

712.  It further concluded that: "case guns" (those guns used in a suicide attempt or unintentional

injury) "were less likely to be stored locked" than control guns (tbose guns tbat had not been used

in a suicide attempt or unintentional injury), reporting an odds ratio of .27; "[r]elative to firearms

that were unlocked and loaded, those stored locked and unloaded were less likely to be involved

in a shooting," reporting an odds ratio of .16; and that "[h]aving only tbe ammunition accessible

(with the reference firearm locked) was associated with a reduced risk of a case shooting event ...

relative to having both tbe gun and ammunition unlocked," reporting an odds ratio of .34. *Id.* at

711.  This study "indicate[s] that the risk of self-inflicted and unintentional firearm injuries was

about 70 percent lower in gun-owning homes that stored their firearms locked up and unloaded

compared with homes where guns were not stored locked up and unloaded.  The relationship

between gun storage practices and firearm deaths to adolescents was similar for suicide and

unintentional shootings." Exhibit 65, Exhibit A thereto, at 13.

**PLAINTIFFS' RESPONSE**:

•       Given that we are not challenging the "Protection of Minors" provision of

Chicago's firearms ordinance, this study about the impact of firearm storage

practices on risks to adolescents and children is not particularly relevant here.  *See*

MCC § 8-20-050.  The authors expressly recognize that their findings "may ... not

221

be generalizable to adults." Chicago Exhibit 82 at 713.

- Furthermore, the use of a trigger lock was not associated with a statistically significant decreased risk for a firearm injury. *See id.* at 712 Table 3; *see also id.* at 711 (of the particular devices studied, "only the use of a lockbox/safe was associated with a statistically significant decreased OR for a firearm injury"). Indeed, the use of a trigger lock was associated with an increased risk for unintentional firearm injury, although not a statistically significant one. *See id.* at 713 Table 5.

- At any rate, the "case-control studies cited by Webster ... cannot sustain the conclusion that keeping guns locked and unloaded reduces the risk of homicide, suicide, and unintentional shootings, since none of the studies made a serious effort to control for confounding variables." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 18.

c.      M. Miller, et al., Firearm storage practices and rates of unintentional firearm deaths in the United States, 37 Accident Analysis and Prevention 661-667 (2005).  Exhibit 83. This state-level analysis found that, on average, a 1 % increase in the proportion of households that store firearms loaded is associated with a 4% increase in the rate of unintentional firearm deaths, and that this increase "appears to reside largely and significantly in those households in which at least one of the loaded firearms is also unlocked: the unintentional firearm death rate was 6% higher in states where an additional l-percentage point of gun owning households stored firearms loaded and unlocked, compared to households in which all firearms were unloaded." *Id.* at 665.  The study also compared the 6 states with the highest percentage of people living in

homes with loaded firearms with the 10 states with the lowest percentage of people living in such homes. *Id.* Even though the 6 states had a smaller overall population, and a smaller number of people living in homes with loaded firearms, the 6 states had approximately twice as many unintentional firearm deaths than the 10 states. *Id.* Dr. Webster opines that, from this study, one "can infer ... that generally in areas with safer storage practices of firearms, you will see lower risk and rates for unintentional firearm deaths." Exhibit 84 (Deposition of Daniel Webster) at 201:4-14.

**PLAINTIFFS' RESPONSE**:

• This study did not differentiate between keeping a gun trigger locked and, for example, locking it in a safe. *See* Chicago Exhibit 83 at 662 ("By unlocked, we mean you do not need a key or combination to get the gun or to fire it.").

• For loaded guns, there was no statistically significant difference in the rate of unintentional firearms deaths based on whether the gun was stored locked or unlocked. *See id.* at 664 Table 2 (reporting overlapping confidence intervals for these variables).

• The authors also acknowledged a number of limitations, including:

• Gun storage data was from 2002, while mortality data pertained to years 1991-2000.

• "Nothing, however, is known about the cross sectional stability of firearm storage practices over time." *Id.* at 666.

• The "findings are subject to the ecologic fallacy (i.e., drawing causal inferences from group data to individual risk factors)." *Id.*

223

d.      D. Webster, et al., Association Between Youth-Focused Firearm Laws and Youth

Suicides, 292 Journal of the American Medical Association 594-601 (2004).  Exhibit 85.  This

study of states that have safe storage laws intended to keep firearms from youth ("Child Access

Prevention" laws) found that the laws were associated with an 8.3% reduction in suicide rates for

persons aged 14 to 17 years.  *Id.* at 596.  It found that "[a]s would be expected if these reductions

were attributable to reduced access to firearms, the reductions were specific to suicides

committed with firearms and to the age group principally targeted by [the] laws." *Id.* at 599. Dr.

Webster opines that this reduction is "significant."  Exhibit 65, Exhibit A thereto, at 14.

**PLAINTIFFS' RESPONSE**:

- Given that we are not challenging the "Protection of Minors" provision of
  Chicago's firearms ordinance, this study is not particularly relevant here.  *See*
  MCC § 8-20-050.

- The "significance" of the findings depended upon "how national suicide trends
  were modeled," as certain models "found no statistically significant association
  between CAP laws and suicide rates in the group aged 14 to 17 years."  *See*
  Chicago Exhibit 85 at 598.

- Furthermore, Dr. Webster's own research has found that "when Florida was
  excluded from the analysis, there were no statistically significant aggregate of
  state-specific CAP law effects on childhood unintentional firearm death rates
  among the other 14 states that had adopted CAP laws."  *See* Exhibit 52 at 1468
  (Daniel W. Webster et al., Reexamining the Association between Childhood
  Access Prevention Gun Laws and Unintentional Shooting Deaths of Children, 106

PEDIATRICS 1466 (Dec. 2000). (Another study has found a statistically significant effect in one additional state, California.) These results "indicate that the laws were a failure." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 19.

e.      P. Cummings, et al., State Gun Safe Storage Laws and Child Mortality Due to Firearms, 278 Journal of the American Medical Association 1084-1086 (1997). Exhibit 86. This study of states that have safe storage laws intended to keep firearms from youth found that "unintentional firearm-related deaths among children younger than 15 years were 23% ... lower than expected in these states." *Id.* at 1085.

**PLAINTIFFS' RESPONSE**: *See* our response to the prior study regarding safe storage laws intending to keep firearms from youth.

**DEFENDANTS' REPLY**: Plaintiffs' response beyond their admission should be disregarded, as it improperly argues and injects additional facts as to whether Dr. Webster's opinion is valid. As to Plaintiffs' argument, *see* D-RSOF 122.

127. Dr. Webster opines that although MCC 8-20-040 allows each holder of a Chicago Firearm Permit to keep an operable firearm in their home at all times, the ordinance "should lead to reduced availability of operable firearms to household members when they become distraught, suicidal, angry, or otherwise lose control of their emotions and, thus, lead to fewer tragic deaths." Exhibit 65, Exhibit A thereto, at 16.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Webster so opines, but dispute the validity of his opinion. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24. Indeed, under Webster's own logic-that increased availability to operable weapons leads to an increased number of tragic deaths Chicago's law would have a perverse effect to the extent it provides an incentive for

225

residents to carry their one operable firearm on their person within the home because they are not allowed to store multiple operable firearms throughout the home.

**DEFENDANTS' REPLY**: Dr. Webster's opinion is valid for the reasons stated elsewhere in Defendants' SOF. The remainder of Plaintiffs' response consists of improper argument, rather than the assertion of facts creating a dispute, and should therefore be disregarded. Further, Plaintiffs' contention that carrying an operable firearm on one's person is "perverse" is not supported by any facts.

128-A. The International Association of Chiefs of Police recommends "[m]andating safe storage of firearms by private citizens." Exhibit 87 (2007 Taking a Stand Report) at 7.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY:** None

128-B. ATF guidelines recommend that FFLs "[ d]isable display firearms" by using "trigger locks or plastic ties to ensure that the firearms cannot be loaded or fired while being examined," and that FFLs "[r]ecommend safe storage methods," including locking devices, to customers. Exhibit 38, Exhibit A thereto, at 7; Exhibit 88 (ATF Publication 3317.2, revised Feb. 2, 2010) at 12, 14. Those guidelines further recommend that FFLs should "[s]how only one firearm at a time to a customer. If the customer requests to handle another firearm, secure the first firearm before displaying another." *Id.* at 12. These recommendations are designed to prevent firearm theft and accidental discharge in gun stores, as well as the use of a retailer's firearm by a customer to rob the retailer. Exhibit 38, Exhibit A thereto, at 8; Exhibit 39 at 108:20-109:16. They were developed by Mr. Vince's staff at the ATF through consultation with firearms industry members. Exhibit 38, Exhibit A thereto, at 7. They were selected because they

226

were found to work. *Id.* at 8. Mr. Vince testified that the reason firearms retailers use locking

devices is also "applicable to your home" - i.e., "you want to make sure your visitors are safe

there and you want to make sure that visitors don't inadvertently get a hold of a firearm." Exhibit

39 at 93:3-7. Mr. Vince testified that the owner "can't be assured that [a visitor] going to the

bathroom ... inadvertently seeing something won't pick it up and use it." *Id.* at 110:13-16.

**PLAINTIFFS' RESPONSE**: Dispute that guidelines for securing firearms displayed for sale are

relevant to the storage of self-defense weapons in the home. *See* Exhibit 44 at 94 (Vince Dep.)

(admitting that firearms on display in gun shops are not intended to be used for self defense);

Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 3 ("storage practices [by gun dealers] have no

bearing on whether keeping guns locked or otherwise inoperable reduces their utility for

self-defense").

**DEFENDANTS' REPLY**: Plaintiffs fail to assert facts creating a dispute as to the facts asserted

by Defendants. Instead, Plaintiffs improperly argue the relevance of Defendants' facts.

Defendants' facts should therefore be deemed admitted. And Plaintiffs' argument is wrong.

Even if not intended for self-defense use in the store, guns displayed in stores can still be

improperly accessed and discharged by unauthorized users just as much as guns stored in the

home. The fact that stores employ safe storage methods to combat these risks shows the efficacy

of those methods in preventing unauthorized access and discharge.

129. An NRA publication entitled "Home Firearm Safety" states that a firearm kept in

the home "must be stored in a secure place, inaccessible to unauthorized users (children or

adults) and in accordance with local laws." Exhibit 14 at 345:8-12; and Exhibit 17 thereto, at 4.

It further states that "there is one general rule that *must* be applied under all conditions: Store

guns so they are not accessible to untrained or unauthorized persons." Exhibit 14, Exhibit 17

thereto, at 37 (emphasis in original).

**PLAINTIFFS' RESPONSE**: Admit that the publication so states, but dispute that it advocates

keeping self-defense weapons in an inoperable state. Indeed, it specifically says that "a gun

stored primarily for personal protection must be ready for immediate use. It may be kept loaded,

as long as local laws permit .... " Exhibit 53 at 3 7 (NRA, Home Firearm Safety).

**DEFENDANTS' REPLY**: Plaintiffs admit Defendants' asserted facts, but then proceed to

improperly argue their meaning. Plaintiffs' response should therefore be disregarded. Moreover,

Plaintiffs' cited excerpt is irrelevant, because the NRA publication itself states that the excerpt

cited by Defendants takes precedence: The directive to "[s]tore guns so that they are not

accessible to untrained or unauthorized persons" is the rule "that *must* be applied under all

conditions." Pl. Ex. 53 at 37.

130. The National Shooting Sports Foundation ("NSSF") is the largest trade group

representing the firearms industry as a whole, with a membership of more than 6,000 firearms

manufacturers, distributors, firearms retailers, shooting ranges, sportsmen's organizations and

publishers. Exhibit 89 (NSSF webpages); Exhibit 5 at 60:4-9. Plaintiff ILAFR is the Illinois

affiliate of the NSSF. Exhibit 89; Exhibit 38, Exhibit A thereto, at 10. NSSF guidelines state in

part that

- "[N]early all firearms accidents in the home can be prevented simply by making

  sure that guns are kept unloaded and locked up."

- Firearms owners "must make absolutely sure that guns in your home are stored so

  that they are not accessible to ... unauthorized persons. Hiding a gun in a closet,

drawer or similar location is not safe storage."

- "If you must have quick access to a loaded firearm in your home, you need to take special safety measures. Keeping a gun to defend your family makes no sense if that same gun puts your family members or visitors to your home at risk."

- Even as to a firearm owned "for home security," the "objective should be to create a situation in which the firearm is readily available to [the owner], yet inaccessible or inoperative to others." Exhibit 38, Exhibit A thereto, at 31-33 (emphasis in original).

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

131. The NSSF guidelines further references trigger and cable locks as "options for securely storing firearms." *Id.* at 33-34. NSSF has distributed 35 million safety kits containing free gun locking devices. Exhibit 89.

**PLAINTIFFS' RESPONSE**: Admit, but dispute that NSSF recommends using trigger or barrel locks for self defense weapons. Indeed, the cited guidelines state that: "If you must have quick access to a loaded firearm in your home, you need to take special safety measures. . . . If you choose to keep a firearm for home security, your objective should be to create a situation in which the firearm is readily available to you, yet inaccessible or inoperative to others. Special lockable cases that can be quickly opened only by authorized individuals are options to consider." Chicago Exhibit 38, Exhibit A thereto, at 33. Trigger locks, on the other hand, "should never be used on a loaded gun because it can cause the gun to fire under certain circumstances." *Id.* at 34.

**DEFENDANTS' REPLY**: Plaintiffs admit Defendants' facts, but then improperly inject additional facts and argument, which should therefore be disregarded. Moreover, the citations offered by Plaintiffs do not support the proposition that the NSSF does not recommend trigger or barrel locks for self-defense weapons. Rather, they speak of the lockable cases as being an "option[]." And the statement that trigger locks should not be used on a loaded gun does not mean that trigger locks should not be used on a self-defense weapon. Indeed, the NSSF states that, even as to a firearm owned "for home security," the "objective should be to create a situation in which the firearm is readily available to [the owner], yet inaccessible or inoperative to others." *See* SOF 130.

132. The NSSF owns and sponsors the Shooting, Hunting, Outdoor Trade Show, the largest and most comprehensive trade show for law enforcement, hunting, and shooting sports professionals. Exhibit 38, Exhibit A thereto, at II. The show is not open to the public or persons under 16 years of age. *Id.* at 12; Exhibit 89. Access is restricted to members of the shooting, hunting, and outdoor trades and commercial buyers and sellers of military, law enforcement and tactical products and services. Exhibit 89. No personal firearms are permitted at the show, and only firearms whose firing pins have been removed are permitted on the show floor for display. *Id.* In addition, persons wishing to sell guns at gun shows are required to have a locking device affixed to the guns in order to ensure that they cannot be loaded or fired. Exhibit 38, Exhibit A thereto, at 12.

**PLAINTIFFS' RESPONSE**: Dispute that guidelines for securing firearms displayed for sale are relevant to the storage of self-defense weapons in the home. *See* Response to Statement of Fact 128.

**DEFENDANTS' REPLY**: Plaintiffs fail to assert facts creating a dispute as to the facts asserted by Defendants. Instead, Plaintiffs improperly argue the relevance of Defendants' facts. Defendants' facts should therefore be deemed admitted. And Plaintiffs' argument is wrong. *See* D-RSOF 128.

133. The manufacturer's documentation that came with Hall's Master Lock states in part, under the heading "Firearm Safety Tips," "Store firearms unloaded under lock and key" and "Store ammunition separately under lock and key." Exhibit 28 at PLMH 000125. The manufacturer's documentation that came with Hall's Regal lock states "Store firearms and ammunition separately and securely." *Id.* at PLMH 000126.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

134-A. Another purpose of MCC § 8-20-040 is "reducing the number of firearms in that home that [may] be misused as against a first responder," which is achieved by "reducing the number of operable weapons that would be in the home." Exhibit 54 at 51:1-12, 59:2-8.

**PLAINTIFFS' RESPONSE**: Admit that Chief Williams gave the cited testimony in response to leading questioning, *see* Chicago Exhibit 54 at 51:1-11, 59:2-8, Exhibit 15 at 47:20-22 (Williams Dep.), but dispute the validity of his opinion. Indeed, Chief Williams testified that he was relying solely on his understanding, knowledge, and experience as a police officer, yet he could not identify any specific experiences supporting his conclusion that limiting the number of operable firearms in the home would lead to a reduction in violence. *See id.* at 22: 8-23:1. He testified that he does not have any evidence that lawfully possessed firearms present a risk of increased violence in Chicago, *see id.* at 28:22-29:6, and he could not identify any instance when

231

a police officer was injured by the use of a lawfully possessed firearm, *see id.* at 38:6-15. *See also id.* at 58:12-22.

**DEFENDANTS' REPLY**: Plaintiffs fail to properly dispute Chief Williams' testimony and improperly separate SOF 133 into two parts. While Chief Williams could not recall specific experiences in his deposition, he testified that Chicago police officers have been harmed by guns in the course of responding to emergency calls at residences in Chicago, a proposition that Plaintiffs sever into SOF 134-B and then admit. *See* SOF 134-B.

134-B. In the course of responding to emergency calls at Chicago residences, Chicago police officers have been harmed by guns possessed by people in those residences. *Id.* at 51:13-17, 52:10-13.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

135. The "paramount" concern of Chicago Fire Department paramedics when responding to an emergency call is "scene safety." Exhibit 90 (Deposition of Marc Levison) at 15: 2-11. A scene is considered safe for a paramedic to render emergency care when either Chicago police officers have secured the scene or when the paramedic does not perceive a threat. *Id.* at 15:13-19. A scene is not considered safe when a firearm is present (other than a firearm possessed by a police officer), as the firearm presents a threat to the paramedic and the paramedic does not know how it will be used. *Id.* at 17:14-16, 28:6-14, 29:22-30:2, 38:22-39:5.

**PLAINTIFFS' RESPONSE**: Admitted.

**DEFENDANTS' REPLY**: None.

136. A firearm at the scene thereby impedes and prevents CFD paramedics from

delivering emergency care. *Id.* at 42:24-43:5, 45:20-46:8. If paramedics know that a firearm is present, they "stand back and stage out" - i.e., refrain from rendering care - until the police secure the scene. *Id.* at 45:20-46:8. CFD paramedics are not responsible for securing the safety of a scene and are not trained to secure a firearm found at the scene; that is the responsibility of the CPD. *Id.* at 22:6-12, 42:17-23. If the firearm is secured in the home, it does not present a threat to scene safety; scene safety is enhanced by reducing the number of operable firearms at the scene. *Id.* at 30:3-10, 42:12-16.

**PLAINTIFFS' RESPONSE**: Dispute that the one-operable-firearm limitation appreciably enhances "scene safety" for CFD paramedics. Levison testified that:

- To his knowledge, passage of the challenged ordinance had no effect on emergency response practices, Exhibit 54 at 23 (Levison Dep.);

- He does not know of any circumstances in which the fire department would obtain information about whether a location has firearms registered, *id.* at 23-24;

- He does not know how the goal of responding safely to emergency medical calls is affected by the City's firearms ordinance, *id.* at 27-28;

- He does not know whether the City's firearms ordinance has the effect of reducing the number of operable firearms at the scene of emergencies, *id.* at 45;

- In the past 20 years, he is not aware of a single firefighter or paramedic being fatally shot responding to a scene, *id.* at 31-35; and

- He has never studied and has no empirical evidence on the issue of how often people commit crimes with lawfully possessed firearms, *id.* at 39.

Deputy Chief of Patrol Alexander similarly testified that:

- He is not aware of any different policies for first responders the City of Chicago has put in place that are attributable to the policy that says there can only be one operable gun.  Exhibit 60 at 48-49 (Alexander Dep.).

- Police officers are not trained to access a database that lists persons with firearms registered in the City of Chicago.  *Id.* at 80.

- "If we have excellent intelligence to say that there are multiple weapons in the house, period, operable and inoperable, you would probably want to wait for additional officers."  *Id.* at 85.  He thus agreed that it would be safe to say that when officers "know that there are multiple firearms in [a] house, they assume that there are multiple operable firearms in the house when they enter it, if they enter it at all."  *Id.*

**DEFENDANTS' REPLY**:  Plaintiffs fail to proffer facts creating a dispute as to the asserted facts, but rather engage in argument that the scene safety enhancement provided by the safe storage requirement is not "appreciable," a proposition for which they provide no support.  Their response should therefore be disregarded.  None of the deposition testimony cited by Plaintiffs contradicts the fact that the fewer operable firearms there are at a scene, the fewer threats to scene safety exist.  In particular, even if the practices of first responders have not changed, or first responders do not learn whether a residence has firearms present before responding, reducing the number of operable firearms encountered by the responder when he or she does arrive enhances scene safety.

137.  Dr. Cook opines that Dr. Webster's expert testimony regarding the risks from increasing the number of unsecured firearms in the home "is relevant to judging the risks of

introducing a gun, or an additional gun, into a home, even if permission is granted by a member

of the household." Exhibit 13, Exhibit A thereto, at 15. Allowing a CFP holder (i.e., a guest) to

take firearms to home of another person (i.e., a host) introduces at least one additional unsecured

firearm to that house, and thereby presents the same risks that arise from increasing the number

of unsecured firearms in any home. Exhibit 24, ¶ 13.

**PLAINTIFFS' RESPONSE**: Admit that Dr. Cook so testified. That testimony, of course, is

subject to the same criticisms as the testimony by Dr. Webster he relies on. *See* Response to

Statements of Fact 122- 23, 126.

**DEFENDANTS' REPLY**: *See* D-RSOF 122-23, 126.

138. Further, the guest cannot be controlled by the host and may use the firearm

unlawfully despite the host's wishes. *Id.* These risks would only increase as the number of

armed guests increased. *Id.* For instance, a house party where multiple guests are armed with

firearms and drinking, or a congregation of armed CFP-holding gang members in a single home

(say, a drug house), would present serious risks of intimidation, escalation, and potential

discharge. *Id.*

**PLAINTIFFS' RESPONSE**: Dispute that this has anything to do with allowing responsible,

law-abiding citizens to possess firearms as an invitee on another's property. And Chicago has

produced no remotely reliable evidence that the prospect of a "congregation of armed

CFP-holding gang members" is anything more than a figment of the City's imagination or that

the City's firearms ordinance currently does anything to discourage gang members from

congregating with arms. *See*, *e.g.*, Responses to Statements of Fact 21, 27, 38, and 40.

**DEFENDANTS' REPLY**: Plaintiffs fail to proffer facts creating a dispute as to any of the

matters asserted in SOF 138, but rather engage in argument. Their response should therefore be disregarded. Further, as to the impact of Chicago's ordinance on gun carrying by gang members, *see* D-RSOF 21, 27, 38, 40.

139. In addition, it would allow a host who does not qualify for a CFP to effectively evade the CFP requirement. *Id.* The host could simply claim that firearms in his or her home (or in the spaces outside the home) belong to his or her CFP-holding guest, and these firearms would be at risk of misuse by the host. *Id.*

**PLAINTIFFS' RESPONSE**: Dispute that this would allow a host who does not qualify for a CFP to effectively evade the CFP requirement. Even if we prevail here, the host still would not be permitted lawfully to possess the guest's firearm.

**DEFENDANTS' REPLY**: Plaintiffs fail to proffer facts creating a dispute as to any of the matters asserted in SOF 139, but rather engage in argument. Their response should therefore be disregarded. And even if the host could not lawfully possess the firearm, it would still be available for misuse by the host and the host would be immunized from arrest so long as a "guest" were present who could demonstrate lawful possession of the firearm.

### DEFENDANTS' REPLY TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

1. One of the purposes of Chicago's firearms ordinance, including the provisions of the ordinance challenged here, is to limit the number of firearms in the City, regardless of whether they are possessed by responsible, law-abiding citizens or gang members and other criminals. *See* Exhibit 55 at CITY 000312 (Committee on Police & Fire, July 1, 2010 Tr. of Hr'g) ("Limiting the number of handguns in circulation is essential to public safety."); Exhibit 56

at CITY 000792 (Findings of the City Council Committee on Police and Fire, July 1, 2010)

(same); Exhibit 26 at City000109 (Committee on Police & Fire, June 29, 2010 Tr. of Hr'g)

("Reducing the number of handguns in Chicago is critical to public safety.") (Corporation

Counsel Georges); *id.* at CITY 000109 - City 000110 ("The same concerns that motivate a one

handgun per person, per residence limit, reducing the number of guns in circulation in Chicago

and the risk of illegal trafficking in guns motivates the gun dealer ban."): Exhibit 27 at 95

(Brown Dep.) ("We want to limit the number of guns that are in circulation."); Exhibit 21 at 26

(Henry Dep.) ("More guns are a recipe for disaster. We need to depend upon the police

department to ensure the safety and security of our citizens."); *id.* at 28-29 (admitting that "one

of the interests served by prohibiting the sales of guns in the City of Chicago [is] limiting access

of even law abiding citizens to guns"); Exhibit 28 at 5:1-4; 86:24-87:4; 100:24-101:8 (Reyes

Dep.) (sales ban protects public health, safety, and welfare by "reducing the number of guns in

the city"); Exhibit 15 at 15 (Williams Dep.) (City "want[s] to limit the number of handguns in

the City of Chicago").  In introducing the ordinance to the public, Chicago Corporation Counsel

Mara Georges said that "we've gone farther than anyone else ever has."  Exhibit 57 (Don

Babwin, Daley Introduces Strictest Handgun Ordinance, AP, July 1, 2010).

**DEFENDANTS' RESPONSE**:  Defendants admit that one of the purposes furthered by the

Ordinance is limiting the number guns, particularly handguns, that are possessed in the City by

criminals.  The excerpts from the Ordinance record cited by Plaintiffs are expressly limited to

"handguns" that are "in circulation," and expressly state that a goal of this policy is to reduce gun

use in crime.  *See* Pl. Ex. 55 at CITY 000312 ("would help limit handgun injuries and also

reduce crime"); Pl. Ex. 56 at CITY 000792 ("will help limit handgun injuries and crimes, as well

237

as illegal handgun trafficking and straw purchasing"); Pl. Ex. 26 at CITY 000109 ("would reduce the ability of people to act as straw purchasers of handguns for others who are not entitled to possess handguns").  The fourth excerpt from the Ordinance record cited by Plaintiffs connected these concerns to possession by law-abiding citizens, but did so in the context of discussing a proposed "one handgun per person, per residence limit," a proposal which was ultimately not enacted.  Nothing in the Ordinance limits the number of handguns or long guns that a law-abiding resident may own.

In addition, Dr. Kleck has written that "[w]here more guns are owned, more guns will be stolen, other things being equal, which results in more guns circulating among criminals.  A large volume of stolen guns . . . depresses black market prices."  Pl. Ex. 30, at 1282.

Also, Dr. Cook testified, based on extensive research summarized in his report, that (1) "[t]he likelihood that a gun will be used in a crime, and thereby render the crime more lethal that it otherwise would be, is closely linked to the general availability of guns, and especially handguns;" (2) "[t]he household prevalence of gun ownership affects their use in crime and suicide both directly – by providing members of gun-owning households with immediate access to guns – and indirectly – by making it easier to steal a gun or arrange a purchase or loan;" (3) "[t]he prevalence of gun ownership differs widely across the counties and states, and is lower in Cook County, and still lower in the City of Chicago, than is true for the United States as a whole;" (4) "the relatively low prevalence of gun ownership [in Chicago] and the tradition of gun emphasis in policing have made guns quite scarce 'on the street,' [and] most criminals in Chicago currently lack a gun and have difficulty obtaining one;" and (5) "[i]t is reasonable to suppose that [Chicago's transfer restrictions] will help preserve that scarcity."  Def. Ex. 13,

Attachment A thereto, at 7-8, 10.

2.      The ordinance's legislative history is replete with examples of legislators expressing hostility to Second Amendment rights and the Supreme Court's enforcement of those rights.  *See*, e.g., Exhibit 58 at 4 (Chicago City Council, July 2, 2010 Tr. of Hr'g[7]) ("We need to pass this legislation to conform with the Supreme Court [B]ut Monday's decision was not a good decision for law-abiding citizens, not only in this city, but in cities across this country.") (Alderman Fioretti); *id.* at 5 ("we realized that the decision that has been made by the Supreme Court is not really in the best interest of our citizens") (Alderman Solis); *id.* at 6 ("We're here today because of [the Supreme Court's] poor judgment in my estimation of their understanding of how life is in large urban settings and cities like the City of Chicago.") (Alderman Maldonado); *id.* at 6 ("This really breaks my heart today that the City of Chicago is being forced into this position.  I thank everyone who has worked to try to create as restrictive a tool as possible.") (Alderman Smith); *id.* at 9 ("I think that 40 to 50 years from now, students are going to study United States history just in shock and awe, and they are going to be amazed that in a country that told itself to be of the leader of the free nation that we have such a reckless, love affair with guns.") (Alderman Lyle); *id.* at 12 ("[T]he message that the Supreme Court is sending, and I think that's the same message that the gang bangers are sending is that a life is not valuable .... I think the Supreme Court is wrong just like they've been wrong before.") (Alderman Hairston); *id.* at 16 ("I deeply regret that we're in a position where we have to struggle to figure out how to devise a law that meets what I think is an unreasonable test set before us by the

---

[7]      We have created an unofficial transcript from the video recording of the July 2, 2010 City Council meeting.  The video recording is included as Exhibit 59 (Special Meeting of the City Council of the City of Chicago, July 2,2010 (video recording)).

Supreme Court.") (Alderman Preckwinkle).

**DEFENDANTS' RESPONSE**: Defendants admit that the quoted snippets are accurate, with the exception of the quote attributed to Alderman Lyle, in which the word "told" should be "held." Defendants dispute the assertion that these snippets express "hostility" to the Second Amendment or the Supreme Court. The record indicates the City Council's effort to abide by the Supreme Court's ruling. *See* Pl. Ex. 58, at 1 (ordinance "abides by the Constitution.") (Ald. Balcer); *id.* at 4 (ordinance "conform[s]" with the Supreme Court) (Ald. Fioretti); *id.* at 5 (ordinance "is responsive to what was dictated to us by the Supreme Court) (Ald. Thomas); *id.* at 6 ("we need to . . . follow what our U.S. Supreme Court told us to do") (Ald. Thomas); *id.* at 15 (City Council's aim is to "meet the test that the Supreme Court has set for us") (Ald. Preckwinkle); *id.* at 17 ("we can disagree with the Supreme Court all we want, but since last week when they ruled this is law and we're going to have to [follow] it") (Ald. Burke).

3. Sergeant Johnson testified that the CAGE team is "not at all" concerned with "legitimate law abiding citizens purchasing firearms for ... lawful reasons" or with "law abiding firearms dealers selling them for lawful purposes." Exhibit 22 at 34 (Johnson Dep.). Deputy Chief Dana Alexander acknowledged that there has been no recognized "problem in the City of Chicago with law abiding citizens defending themselves in their home against criminal intruders with firearms." Exhibit 60 at 6, 71 (Alexander Dep.). And Dr. Webster testified that "the risk is greater among individuals who obtain guns illegally. There is, generally the pattern of results that you see is the greater the risk of the individual, the more guns elevate that risk for the bad outcome. That's the general pattern in the results." Exhibit 25 at 134 (Webster Dep.). *See also* Exhibit 27 at 81-83 (Brown Dep.) (drawing a distinction between legal and illegal gun ownership

because "where you have a person who's willing to possess an illegal gun, that person is clearly showing a propensity to ignore the law and would potentially, you know, lead to the use of that gun in other crimes").

**DEFENDANTS' RESPONSE**: Undisputed.

4.      Criminal attacks in Chicago are not limited to victims' homes, and they have taken place on or in porches, yards, garages, and other locations. *See* Exhibit 61 at CITY 001376 - CITY 001470 (City of Chicago, Reported Incidents - By Offense Type, Location Description, and Year (1999-2010)). Indeed, from 1999 to 2010 nearly as many murder victims were found dead in yards, porches, garages, and driveways in Chicago as were found in houses. *Id.* at CITY001376 - CITY001379.

**DEFENDANTS' RESPONSE**: Defendants do not dispute the first sentence. Plaintiffs dispute the second sentence to the extent the Plaintiffs' use of the word "houses" includes other residential locations, such as apartments. The cited reports indicate that, over a 12-year period, a total of 332 homicide victims were found in yards (108), porches (176), garages (39), and driveways (9), and 346 were found in a "house." However, an additional 676 victims were found in an apartment (631) or CHA apartment (45). Thus, there were 1,022 victims found in a residence versus 332 found in yards, porches, garages, and driveways. Further, Defendants clarify that, as indicated by the header of the cited data reports ("Where Body Found"), the reported location for a homicide is based on where the body is found, and does not necessarily indicate that the homicide occurred at that location.

5.      Chicago's first responders do not always arrive at a scene quickly enough to avert a violent attack. *See* Exhibit 13 at 63 (Gorman Dep.); Exhibit 54 at 49-50 (Levison Dep.) (EMS

has an average response time of six to seven minutes, and frequently arrives before police).

**DEFENDANTS' RESPONSE**: Undisputed.

6.     Criminals in Chicago who want a gun generally do not have a difficult time obtaining one. Sergeant Johnson testified that it is "not difficult at all" for a criminal to get a handgun in Chicago. Exhibit 22 at 86-87:19-1 (Johnson Dep.) (admitting that "regardless of the laws Chicago has in place, it's not difficult at all for [criminals] to obtain the weapon that they want to obtain."). His testimony was echoed by Carol Brown, Chief of Policy in the Mayor's Office with responsibilities including policies relating to firearms. Exhibit 27 at 13:8-9, 14:6-9 (Brown Dep.). Testifying as a 30(b)(6) witness on behalf of the City, Ms. Brown agreed that and "it's fairly easy for criminals in the City of Chicago to obtain a gun illegally if they want to." *Id.* at 7: 18-23,34:1-7; 104:5-7. Dr. Kleck concluded that these "officials are correct-it is already easy for criminals to get guns, even with the current ordinance in force." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 21. *See* also Exhibit 30 at 1251 (Gary Kleck et al., The Myth of Big Time Gun Trafficking, 56 UCLA L. REV. 1233 (2009)) (concluding that "even in ... exceptional urban areas with stringent gun controls [including Chicago] ... criminals pay under the retail price for handguns").

**DEFENDANTS RESPONSE**: Defendants do not dispute that the persons listed herein made the quoted statements, but Defendants dispute the remainder of the paragraph. First, Defendants dispute that Chicago criminals who want a gun do not have difficulty obtaining one. Dr. Cook testified that guns are "quite scarce 'on the street'" in Chicago, that "most criminals in Chicago currently lack a gun and have difficulty obtaining one," and that "it is unusual for criminals in Chicago to be in possession of a gun." *See* Def. SOF 57. *See also generally* Def. SOF 51-58

(discussing, *inter alia*, expert opinions of Dr. Cook and 2007 Chicago Study). Further, it is clear from the transcripts of the City employees that their statements were general and made in the abstract; they were not in response to questions asking the witness to compare the ability of Chicago criminals to acquire guns to criminals those in other jurisdictions. They were also made by non-experts who made no claim to having studied the matter like Dr. Cook.

Second, Defendants dispute the assertion in Dr. Kleck's paper (*see* Pl. Ex. 30) that gun prices in the underground Chicago market are less than retail. Dr. Cook's 2007 Chicago Study found that the underground gun market in Chicago "[does] not work smoothly." *See* SOF 53. The study found that the market is "characterized by substantial transaction costs, by which we mean large mark-ups over legal prices, substantial search times, uncertainty about product quality, and the physical risk associated with the exchange." *Id.* The study reported that these transaction costs "stand in contrast to conventional wisdom in the sociology and criminology literatures, which in the context of the US has emphasized the ease with which criminals can access guns in the informal market, as well as the inelasticity of demand by criminals." *Id. See also generally* Def. SOF 53; D-RSOF 53 (listing faults with Dr. Kleck's pricing analysis); Def. SOF 55 (documenting additional evidence of underground prices being greater than legal market).

In addition, Dr. Kleck admitted that his paper, Pl. Ex. 30 (Gary Kleck et al., *The Myth of Big-Time Gun Trafficking,* 56 UCLA L. REV. 1233 (2009)), was probably not peer reviewed because it was published in a law review, and law reviews "are basically edited by kids in law school." Def. Ex. 91 (Kleck Dep.) at 81:17-82:3. It therefore was "probably an exaggeration" for him to list the study on his CV as being peer-reviewed. *Id.* at 82:8-11.

7.      Statistics maintained by the Federal Bureau of Investigation indicate that

Chicago's murder rate is consistently among the highest when compared to other cities of

comparable size.  *See* Exhibit 62 (Uniform Crime Reporting Statistics, Murder Rate 1991-2010,

Agencies Serving Cities 1,000,000 or Over)).  Even following enactment of the City's handgun

freeze in the early 1980's, "violent crime committed by the use of firearms continued to be a

challenge" for the City.  Exhibit 26 at CITY 000166 - CITY 000167 (City of Chicago,

Committee on Police & Fire, June 29, 2010 Tr. of Hr'g) (Testimony of Jody Weis,

Superintendent of the Chicago Police Department).

**DEFENDANTS' RESPONSE**: Defendants dispute the paragraph to the extent that

"consistently" is a vague term.  Defendants admit that Pl. Ex. 62 indicates that in 2010, 2009 &

2008, Chicago had the second-highest murder rate among comparable cities.

8.      Americans use guns for self-defense an enormous number of times each year.  Dr.

Kleck's research indicates that "each year in the U.S. there are about 2.2 to 2.5 million [defensive

gun uses (DGUs)] of all types by civilians against humans." Exhibit 63 at 164 (Gary Kleck &

Marc Gertz, Armed Resistance to Crime, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)).  "At

least 19 other surveys have resulted in estimated numbers of defensive gun uses that are similar

(i.e., statistically indistinguishable) to the results found by Kleck."  Exhibit 10 at 103

(NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds.

2005)).  *See* also Exhibit 2 (Kleck Decl.), Exhibit II thereto; Exhibit 2 (Kleck Decl.), Exhibit I

thereto, at 22- 24, 36, 45.  Chief Williams is aware of instances in which a citizen has used a

firearm to avert an attempted crime against the citizen's person or property. Exhibit 15 at 63-64.

(Williams Dep.).

244

**DEFENDANTS' RESPONSE**:  Defendants do not dispute that firearms are used for self-defense.  Defendants do dispute that this occurs and "enormous" number of times, and Defendants dispute Dr. Kleck's estimates.

Dr. Kleck admitted that "well-respected" researchers disagree with his assessment of the number of defensive gun uses per year, which is based on survey data.  Def. Ex. 91 (Kleck Dep.) at 339:8-11, 349:25-350:2.  And Dr. Cook testified that "there is reason to doubt survey-based estimates of the utility of carrying a firearm for self-defense."  Def. Ex. 13, Exhibit A thereto, at 17.  He testified that these survey estimates "are an order of magnitude higher than those generated by the large ongoing federal survey of crime victimization (Nation Criminal Victimization Survey), and far higher than would be logically compatible with other sources of data on crime and violence, including the number of cases treated for gunshot wounds."  *Id.* at 18.  *See also* Def. Ex. 65, Exhibit A thereto, at 15 (expert report of Dr. Webster) (Dr. Kleck's estimate is "22 times higher than what was estimated from the National Crime Victimization Survey (NCVS)," and indicates that there are over 200,000 assailants wounded by civilians defending themselves each year, even though data from hospital emergency rooms indicates that fewer than 100,000 people are treated annually for gunshot wounds).

In addition, Dr. Cook testified, citing P.J. Cook, et al., *Defensive Gun Uses: New Evidence from a National Survey*, 14 J. of Quantitative Criminology 111-31 (1998), that "close study of the survey reports of defensive gun use suggest that many of these reports are about events that simply did not happen."  Def. Ex. 13, Exhibit A thereto, at 18.  Dr. Cook testified that in the study D. Hemenway, et al., *Gun use in the United States: results from two national surveys*, 6 Injury Prevention 263-267 (2000), "a panel of criminal-court judges reviewed reported

defensive gun uses from a survey and found that these reports are frequently of actions that are

not legitimate self-defense, but rather criminal assault." Def. Ex. 13 at 18. *See also* Def. Ex. 92

(Study). That study reported that "the criminal court judges who rated the incidents determined

that at least half were probably illegal – even after assuming that the respondent had a permit to

own and carry a gun and described the incident honestly." Def. Ex. 92 (Study) at 266. The study

reported that "the number of respondents reporting that they were gun victims exceeded the

number of respondents reporting that they had used a gun in self defense by over three to one,

152 to 43" and that "[o]ur results indicate that gun use against adults to threaten and intimidate is

far more common than self defense gun use by them." *Id.* at 265, 267. Another study, D.

Hemenway, et al., *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a

National Survey*, 15 Violence and Victims 257 (2000), reported that the "number of respondents

reporting that they were gun victims exceeded the number of respondents claiming to have used a

gun in self-defense by more than 4 to 1." Def. Ex. 93 (Study) at 269.

A report by the National Research Council ("NRC") also noted various problems with

survey-based defensive gun use data. "Questions about the quality of self-reports of firearms use

are inevitable. Response problems occur to some degree in nearly all surveys but are arguably

more severe in surveys of firearm-related activities in which some individuals may be reluctant to

admit that they use a firearm, and others may brag about or exaggerate such behavior." Pl. Ex.

10, at 108. Further, "[s]ome reports of defensive gun use may involve illegal carrying and

possession." *Id.*, at 106 (citing studies by Dr. Kleck). The NRC report also noted that Dr. Kleck

admitted that "respondents may be inclined to 'remember with favor their marksmanship' and

may tend to exaggerate the seriousness of the event." *Id.* at 112. The report also noted that

"[i]nferences drawn from the relatively small subsamples of persons who report using firearms defensively . . . are subject to high degrees of sampling error." *Id.* at 112. At base, the report noted that "[w]e do not know accurately how often armed self-defense occurs or even how to precisely define self-defense." *Id.* at 113.

In addition, the NRC report stated, with respect to the fact that other surveys found estimates similar to Dr. Kleck's, that "[u]ltimately, the committee found no comfort in numbers: the existing surveys do not resolve the ongoing questions about response problems and do not change the fact that different subpopulations are queried. Mere repetition does not eliminate bias." Pl. Ex. 10, at 113.

Further, the FBI defines "justifiable homicide" as "[t]he killing of a felon, during the commission of a felony, by a private citizen." Def. Ex. 108 (FBI Uniform Crime Reports, Expanded Homicide Data Table 15 - Justifiable Homicide, 2006-2010) n.1. Between 2006 and 2010, there were on average 213 justifiable firearms homicides per year. *Id.* There are approximately 30,000 total firearm deaths per year. Def. Ex. 13, Attachment A thereto, at 3. Thus, justifiable firearm homicides constitute less than 1% of all firearm homicides.

9. Americans frequently use guns defensively outside of the home. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 36 ("[T]he National Self-Defense Survey indicated that 63 percent of defensive gun uses occur in a location other than the defender's home .... That survey indicated that in 1993 there were about 2.5 million defensive gun uses ... , so about 1.6 million defensive gun uses required carriage of the gun to the scene."); Exhibit 63 at 185 (Gary Kleck & Marc Gertz, Armed Resistance to Crime, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)).

**DEFENDANTS' RESPONSE**: Defendants do not dispute that guns are used defensively outside

the home. Defendants do dispute Plaintiffs' that this occurs "frequently," and Defendants dispute

Plaintiffs' estimates. *See* RAF 8.

10. Crime victims use guns for defensive purposes more often than criminals use guns

to commit crimes. *Id.* at 170 ("DGUs are about three to five times as common as criminal uses,

even using generous estimates of gun crimes."); Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 45

("the full body of evidence consistently indicates more defensive uses of guns by crime victims

tha[n] criminal uses by offenders").

**DEFENDANTS' RESPONSE**: Disputed. *See* Def. Ex. 92 (D. Hemenway, et al., *Gun use in the*

*United States: results from two national surveys*, 6 Injury Prevention 263-267 (2000)) at 265,

267 (reporting that "the number of respondents reporting that they were gun victims exceeded the

number of respondents reporting that they had used a gun in self defense by over three to one,

152 to 43" and that "[o]ur results indicate that gun use against adults to threaten and intimidate is

far more common than self defense gun use by them"); Def. Ex. 93 (D. Hemenway, et al., *The*

*Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15

Violence and Victims 257 (2000)), at 269 (reporting that the "number of respondents reporting

that they were gun victims exceeded the number of respondents claiming to have used a gun in

self-defense by more than 4 to 1"). Further, to the extent that the comparison asserted by

Plaintiffs in this paragraph is based on Dr. Kleck's estimates of the number of self-defense gun

uses, *see* RAF 8.

11. The number of times guns are carried for defensive purposes dwarfs the number

of times they are carried for harmful purposes. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at

36 ("the number of harmful instances of gun carriage are far less than a tenth of one percent of

the number of instances of gun carriage for defensive purposes"); Exhibit 64 at 218 (Gary Kleck

& Marc Gertz, Carrying Guns for Protection, 35 J. RESEARCH IN CRIME & DELINQUENCY

193 (1998) ("Carrying guns in public places is common in the United States, is primarily done

for protection, and is rarely done for purposes of committing a violent crime.").

**DEFENDANTS' RESPONSE**: Disputed. Only the first of the two citations (Dr. Kleck's expert

report) purports to address the asserted fact. However, the citation does not support the assertion.

In the cited portion of the report, Dr. Kleck compares an estimate of the number of times (person-

days) a gun is carried for defense (even if not used for defense) with the number of gun crimes

committed, rather than with the number of times (person-days) a gun is carried for criminal

purposes. The report offers no basis for concluding that the number of gun crimes is the same as

the number of times (person-days) a gun is carried for criminal purposes (*i.e.*, that criminals carry

guns only on the days they actually commit a crime). The report therefore compares apples and

oranges. A proper comparison would compare either (1) the number of self-defense uses with

the number of crimes or (2) the number of times (person-days) a gun is carried for self-defense

with the number of times (person-days) a gun is carried for criminal use. *See also* RAF 10.

12. Defensive gun use is effective in making crime victims safer. *See* Exhibit 2

(Kleck Decl.), Exhibit I thereto, at 23-24. *See* also *id.* ("Findings from [analyses of crime

incidents reported in the National Crime Victimization Survey] have unanimously indicated that,

even after controlling for many possible confounding variables, crime victims who used guns to

protect themselves were found to be less likely to suffer injur[y] after taking their self-protective

actions, and less likely to lose property, than victims who did not resist at all, victims who

resisted by force but not with a gun, or victims who resisted in nonforceful ways."); Exhibit 65 at

902 (Jongyeon Tark & Gary Kleck, Resisting Crime: The Effects of Victim Action on the

Outcomes of Crime, 42 CRIMINOLOGY 861 (2004)) (concluding that "resistance with a gun

appears to be most effective in preventing serious injury" and "the data strongly indicate that

armed resistance is the most effective tactic for preventing property loss"); Exhibit 66 at 367-68

(Lawrence Southwick Jr., *Self-Defense With Guns*: The Consequences, 28 J. CRIM. JUSTICE

351 (2000)) (concluding that "the best choice for the victim is to use a gun" and that "potential

victims who choose to carry guns provide an external benefit to the class of potential victims");

Exhibit 67 at 290 (GARY KLECK AND DON B. KATES, ARMED, Chapters 6 & 7 (2001))

(The most effective form of self-protection is use of a gun."); Exhibit 68 at 16 (Gary Kleck,

*Crime Control Through the Private Use of Armed Force*, 35 SOCIAL PROBLEMS 1 (1988))

("Victim gun use in crime incidents is associated with lower rates of crime completion and of

victim injury than any other defensive response, including doing nothing to resist. ").

**DEFENDANTS' RESPONSE**: Disputed.  The Tark & Kleck study cited by Plaintiffs (which is

contained at Pl. Ex. 63) compares 15 different self-protection actions and the likelihood of a

victim being injured, or seriously injured, after taking the action.  Pl. Ex. 63, at 878-880, Table 2.

It reports that, across all offenses, calling the police or a guard is least likely to result in the

victim being injured.  Pl. Ex. 63, at 878-880, Table 2.  Further, threatening an attacker with a gun

is the second most-likely method to result in the victim being seriously injured.  *Id.*  As to

robberies, threatening an attacker with a gun is most likely to result in the victim being injured,

and seriously injured.  *Id.*  As to assaults, using a gun to attack the attacker is most-likely to result

in injury.  In addition, as to the study's statement that "[r]esistance with a gun appears to be most

effective in preventing serious injury," the study immediately states "though this finding is not

250

statistically significant due to the small number of reported gun uses." *Id.* at 902. Further, as to the statement that armed resistance is the most effective tactic for "preventing property loss," the study immediate states that "it is not clear which [self-protection] strategy is most effective in averting injury." *Id.* at 902-03.

In addition, Dr. Kleck testified that, as to his those instances where he determined that defensive gun use was effective in avoiding injury, he "can't know" whether fleeing the scene would have "also been effective at avoiding injury" because there is "no way of modeling or simulating alternate set[s] [sic] of conditions that didn't occur." Def. Ex.  (Kleck Dep.) at 456:25-457:8. Because it was not controlled for, Kleck cannot say what effect flight would have had on his results; it is "a logical possibility" that it could have negated the benefit of defensive gun use. *Id.* at 458:2-6, 17-24. Further, the "physical size and strength of the parties involved" are potentially confounding factors that Kleck did not control for. *Id.* at 458:25-459:23.

Further, a study of gunshot victims in Philadelphia who possessed a firearm at the time of getting shot reported that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault." *See* Def. SOF 20 (discussing C. Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault,* 99 American Journal of Public Health 1-7 (2009)). It found that persons in possession of a gun were 4.46 times more likely to be shot in an assault than those not in possession. *Id.* It concluded that "[o]n average, guns did not protect those who possessed them from being shot in an assault." *Id.* at 6.

13.    For many law-abiding individuals who are properly trained in the use of firearms, an accessible, operable firearm adds to a subjective sense of safety and security. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26 (discussing "the loss in felt sense of security that would

arise from gun restrictions, including bans on gun carriage and limits on the number of operable guns allowed in the home."); Exhibit 3 at 166:5-20 (Cook Dep.) (admitting that there are people who are "motivated to carry a firearm" and that he "suppose[s] that the motivation is about security and self-protection"). *See* also Exhibit 69 at 164 (Hall Dep.); Exhibit 43 at 176, 186-87 (Pacholski Dep.); Exhibit 12 at 78, 145 (Tyler Dep.).

**DEFENDANTS' RESPONSE**: Defendants do not dispute that some law-abiding individuals who are properly trained in the use of firearms may feel a subjective sense of safety and security when an accessible, operable firearm is available. Dispute that "many" individuals do so, as the word is argumentative and not supported by the citations. Further dispute that Chicago's regulations detract from any subjective sense of safety and security, as the proposition is not supported by any evidence other than Dr. Kleck's speculation.

14. Successful defensive gun use often does not require actually firing a weapon. *See* Exhibit 63 at 173 (Gary Kleck & Marc Gertz, Armed Resistance to Crime, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)) ("Only 24% of the gun defenders in the present study reported firing the gun, and only 8% report wounding an adversary.").

**DEFENDANTS' RESPONSE**: Defendants do not dispute that successful defensive gun use can result without the gun being fired. Dispute that this is "often" the case, as the word is argumentative. Further, Plaintiffs purport to support that assertion by reference to Dr. Kleck's self-defense survey analysis, which is fraught with error. *See* RAF 8.

15. Citizens who obtain a license to possess or carry guns are disproportionately unlikely to misuse guns. *See* Exhibit 4 at 1082 (Philip J. Cook et al., Gun Control After Heller, 56 UCLA L. REV. 1041 (2009)) ("The available data about permit holders ... imply that they are

at fairly low risk of misusing guns, consistent with the relatively low arrest rates observed to date for permit holders."); Exhibit 70 at 1 (H. Sterling Burnett, Nat'l Ctr. for Policy Analysis, Texas Concealed Handgun Carriers: Law-Abiding Public Benefactors (2000)) ("concealed carry licensees had arrest rates far lower than the general population for every category of crime"); Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 38 ("carry permit holders do not contribute more than a negligible share of violent crimes").

**DEFENDANTS' RESPONSE:** Disputed to the extent that Plaintiffs assert this proposition as to would-be permit-holders in Chicago. Dr. Cook notes in Pl. Ex. 4 that "the change in gun carrying" and the "permit holders" observed in the studies on public carry "appears to be concentrated in rural and suburban areas where crime rates are already relatively low, among people who are at relatively low risk of victimization – white, middle-aged, middle-class males." *Id.* at 1082. Dr. Kleck also testified that "[m]ost people . . . tend to associate gun ownership with urban areas, high crime areas and so on. But gun ownership is, in fact, higher in areas that have very little violence, rural areas and small towns, where the gun ownership is, obviously, for reasons that aren't very crime related, either committing crimes or defending against crimes. So the gun culture appears to be concentrated precisely in those places where there isn't much dangerous use of firearms, where it's recreational or relatively inconsequential from a violence standpoint, either violence causing or violence preventing." Def. Ex. 91, at 299:8-19.

Indeed, in states that allow some form of gun carrying in public, relatively few permits are issued in large cities. For instance, as of September 2011, there were 32,666 total active civilian carry permits in California, but only 220 of those were in Los Angeles and 716 were in San Diego. Def. Ex. 109 (Calguns Foundation, *2011 Carry License Statistics, Active LTC*

*Licenses*), at 20, 38, 60.   Thus, only 2.9% of active California permits were in those two cities.

The total adult population of California is 27,958,916; that of Los Angeles is 7,416,397, and San

Diego's is 2,371,145.   *Id.*   Thus, Los Angeles and San Diego comprise 35% of California's adult

population.   And, given these statistics, less than one one-hundredth of a percent of Los Angeles

and San Diego adults have carry permits.

16.     Measures that effectively reduce gun availability among the noncriminal majority

reduce defensive gun uses that otherwise would save lives, prevent injuries, thwart rape attempts,

drive off burglars, and help victims retain their property.   Exhibit 63 at 180 (Gary Kleck & Marc

Gertz, Armed Resistance to Crime, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)); *see also id.*

at 180-81 ("[A]s many as 400,000 people a year use guns in situations in where the defenders

claim that they 'almost certainly' saved a life by doing so .... If even one-tenth of these people are

accurate in their stated perceptions, the number of lives saved by victim use of guns would still

exceed the total number of lives taken with guns. "); Exhibit 71 at 244 (Lawrence Southwick, Jr.,

Guns and Justifiable Homicide: Deterrence and Defense, 18 ST. LOUIS U. PUB. L. REV. 217

(1999) (concluding that "there are almost certainly some two to four million fewer completed

crimes each year as the result of civilian gun ownership").

**DEFENDANTS' RESPONSE**: Defendants do not dispute that lack of a gun can prevent a law-

abiding resident from using a gun to deter an attack or otherwise in self-defense.   However,

Defendants dispute the asserted fact to the extent that it suggests that a gun is the only method

one can use to deter or avoid a criminal attack, or, relatedly, that deterring or avoiding a criminal

attack through other means are not available alternatives; such an assertion is not supported by

the citations.   *See also* RAF 12.   Further, Defendants dispute that survey-based defensive gun use

statistics are accurate. *See* RAF 8. In particular, the NRC, after considering the Kleck and Gertz

article cited herein, stated that "[i]t is not known, however, whether Kleck's, Hemenway's, or

some other assumptions are correct." Pl. Ex. 10, at 110.

17. Actual defensive use of guns by victims during the commission of a crime serves

to improve the victim's chances of coming out of the incident unscathed, but guns may also

prevent prospective offenders from even attempting crimes in the first place. There is a wealth of

evidence suggesting that widespread ownership, carrying, and defensive use of guns by potential

and actual crime victims has a deterrent effect on crime. *See* Exhibit 2 (Kleck Decl.), Exhibit I

thereto, at 45; Exhibit 71 at 244 (Lawrence Southwick, Jr., Guns and Justifiable Homicide:

Deterrence and Defense, 18 ST. LOUIS U. PUB. L. REV. 217 (1999) (concluding that

"somewhere around 0.8 to 2.0 million violent crimes are deterred each year because of gun

ownership and use by civilians"); Chicago Exhibit 31 at 146-47 & Table 7.l (56% of convicted

felons agreed or strongly agreed that "a criminal is not going to mess around with a victim he

knows is armed with a gun"; 74% agreed or strongly agreed that "one reason burglars avoid

houses when people are at home is that they fear being shot"; 58% agreed or strongly agreed that

"a store owner who is known to keep a gun on the premises is not going to get robbed very

often"; 39% "had at some time in their lives decided not to do a crime because they 'knew or

believed the victim was carrying a gun'"); Exhibit 13 at 46 (Gorman Dep.) (admitting that gang

members are deterred from attacking victims that they know are armed).

**DEFENDANTS' RESPONSE**: Disputed. Regarding injury to victims who use guns, *see* RAF

12. Further, Defendants dispute the assertion that there is a "wealth" of evidence suggesting a

deterrent effect, as the term is argumentative and not supported. In fact, the NRC "found no

credible evidence that the passage of right-to-carry laws decreases . . . violent crime." Pl. Ex. 10, at 2.

Further, as to the survey responses of convicted felons cited herein (which are culled from Def. Ex. 31, and which are relied upon by Dr. Kleck in the cited page from Pl. Ex. 2), the cited statistics are drawn from Table 7.1, which documents whether felons "are made nervous" – not whether they are actually deterred – by the prospect of encountering an armed victim, and noted that "[h]ow easy it is for felons to find out whether a potential victim is armed is not revealed in these answers." Def. Ex. 31, at 145. Further, the table shows that 44% of criminals disagreed or strongly disagreed that "[a] criminal is not going to mess around with a victim he knows is armed with a gun" and that 24% of criminals agreed or strongly agreed that "[c]ommitting crime against an armed victim is an exciting challenge." *Id.* at 146. The survey also reported that, as to things criminals "worry about" when contemplating criminal activity, more criminals worried regularly or often about (a) getting caught (54%), (b) going to prison (50%), or (c) their family looking down on them (48%) than they did about getting shot at by a victim (34%). *Id.* at 148 (Table 7.2).

18.    Less gun carrying by prospective crime victims, including in areas around the victims' homes, will mean fewer injury-preventing defensive gun uses by victims, and thus a larger share of crime incidents resulting in injury. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 36-37.

**DEFENDANTS' RESPONSE:** Defendants do not dispute that lack of a gun can prevent a law-abiding resident from using a gun to deter an attack or otherwise in self-defense. However, Defendants dispute the asserted fact to the extent that it suggests that a gun is the only method

one can use to deter or avoid a criminal attack, or, relatedly, that deterring or avoiding a criminal attack through other means are not available alternatives; such an assertion is not supported by the citation. *See also* RAF 12. Further, Defendants dispute the citation to the extent that it is based upon survey-based defensive gun use statistics. *See* RAF 8.

19.     Securing a gun with a trigger lock or otherwise storing a gun in an inoperable condition may compromise the ability of an authorized user to use the gun for self-defense. *See* Exhibit 10 at 216 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)) ("[L]ocking devices may compromise the ability of authorized users to defend themselves. A lock may fail entirely or may take too much time for the weapon to be of use."); Exhibit 53 at 37 (NRA, Home Firearm Safety) ("[A] gun stored primarily for personal protection must be ready for immediate use. It may be kept loaded, as long as local laws permit .... ").

**DEFENDANTS' RESPONSE**: Defendants do not dispute the asserted statement, but Defendants dispute that the NRA's position is that a gun kept for personal protection must be ready for immediate use. An NRA publication entitled "Home Firearm Safety" states that a firearm kept in the home "must be stored in a secure place, inaccessible to unauthorized users (children or adults) and in accordance with local laws." Def. SOF 129. It further states that "there is one general rule that *must* be applied under all conditions: Store guns so they are not accessible to untrained or unauthorized persons." *Id.* (emphasis in original).

20.     Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would generally reduce the victim's chances of being killed, raped, or

otherwise injured or of losing property.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24.

**DEFENDANTS' RESPONSE**:  Disputed.  This paragraph proffers an opinion of Dr. Kleck, but the opinion is not supported.  It does not purport to be based on studies that addressed whether a resident's ability to use a firearm in self defense is reduced by safe storage requirements in a situation where the resident is free to keep an operable gun ready at all times.

In fact, Dr. Kleck admitted that his opinion that locking devices will "sometimes" prevent effective defensive gun use is a "hypothesis" that he bases on "common sense" and not his expertise in criminology.  Def. SOF 113.  The proposition "hasn't been scientifically established," he has no scientific evidence supporting it, and it has never been tested in any scientific manner. *Id.*  He did not rely upon any tests of how long it takes to remove a trigger lock. *Id.*  He is not aware of any study demonstrating that trigger locks prevent effective defensive gun use.  *Id.*  He is not aware of any study showing that keeping one operable firearm in a home but trigger locking a second, third, or fourth firearm reduces a person's ability to effectively resist crime versus not securing the additional firearms with a trigger lock.  *Id.*  He is not aware of anyone in the gun industry who asserts that trigger locks or other safety mechanisms impair defensive gun use. *Id.*

21. Existing empirical evidence indicates that local sales bans do not have the effect of reducing gun possession among criminals and thereby reducing firearms crimes.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 5.  Sergeant Johnson admitted that "the number of guns that are making their way onto the city streets" is not "responsive to changes in local law ," Exhibit 22 at 67-68 (Johnson Dep.), and that he is not aware of any evidence that gun stores operating in a community leads to an increase in the size of the illegal firearms market in that community, *id.*

at 93:24-94:5.

**DEFENDANTS' RESPONSE**: Disputed.  *See generally* Def. SOF 51-58, which discuss, *inter alia*, the expert opinions of Dr. Cook regarding effects Chicago's sales ban and bases therefor, including the 2007 Chicago Study.  While Plaintiffs cite Dr. Kleck's report for the proposition that "[e]xisting empirical evidence indicates that local sales bans do not have the effect of reducing gun possession among criminals and thereby reducing firearms crimes," *see* Pl. Ex. 2 (Kleck Decl.), Exhibit I thereto, at 5, the two studies cited in that report to support this proposition predate, and do not purport to address, Dr. Cook's more recent and Chicago-specific analysis in the Chicago Study, as well as his expert opinion, which provide evidence that local sales bans do reduce possession by criminals.

Further, Plaintiffs take Sgt. Johnson's testimony out of context.  Regarding the responsiveness of the number of illegal guns to changes in local law, Sgt. Johnson testified that he didn't understand the question.  The colloquy is as follows:

Q.              Okay. Now, is it -- in your experience, are the number of guns that are making their way onto the city streets responsive to changes in local law?

MR. AGUIAR:    Objection to the form of the question. You could answer.

THE WITNESS:   No.

BY MR. PATTERSON:

Q.              So local law in your experience does not have an impact in the number of guns that are on the city streets?

A.              I didn't understand the question.

Pl. Ex. 22 (Johnson Dep.) at 67:22-68:6-9. And rather than rephrase the question, Plaintiffs'

counsel simply decided to "move on" to another topic. *See id.* at 68:10.

22. Once one accounts for sales volume and local crime rates, research does not

indicate that dealer misconduct is responsible for any nonnegligible part of the disproportionate

share of traced crime guns for which a few dealers account. *See* Exhibit 2 (Kleck Decl.), Exhibit

I thereto, at 33; Exhibit 30 at 1268-70 (Gary Kleck et al., The Myth a/Big-Time Gun Trafficking,

56 UCLA L. REV. 1233 (2009).

**DEFENDANTS' RESPONSE**: Disputed. ATF investigations have revealed that corrupt FFLs

exist and divert large numbers of firearms. *See* Def. SOF 68-A. Further, scientific research

indicates that some dealers are willing to engage in illegal gun sales. *See* Def. SOF 66 & 67.

23. The best-supported explanation for some researchers finding a significant positive

association between gun prevalence rates and crime rates is that higher crime rates motivate

many people to acquire guns for self-protection, not that higher gun rates cause higher crime

rates. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 19; Exhibit 8 at 272-73 (Gary Kleck & E.

Britt Patterson, The Impact of Gun Control and Gun Ownership Levels on Violence Rates, 9 J.

QUANT. CRIM. 249 (1993)); Exhibit 9 at 33-34 (Tomislav Kovandzic et al., Estimating the

Causal Effect of Gun Prevalence on Homicide Rates (2008)); Exhibit 72 at 272 (Lawrence

Southwick, Jr., Do Guns Cause Crime? Does Crime Cause Guns", 25 ATL. ECON. J. 256

(1997).

**DEFENDANTS' RESPONSE**: Disputed. Dr. Kleck admitted that the first of his two studies

cited here (Pl. Ex. 8) was criticized in an analysis by Steven Messner, "a well-respected

criminologist," in the Journal of Quantitative Criminology. Def. Ex. 91 (Kleck Dep.) at 279:25-

280:4, 282:19-25.  *See also* Def. Ex. 94 (R. Alba & S. Messner, Point Blank *Against Itself:*
*Evidence and Inference About Guns, Crime, and Gun Control*, 11 Journal of Quantitative
Criminology 391-410 (1995)).  That critique noted that Dr. Kleck's "evidence is not adequate to
the case he wishes to build.  Upon close examination, the critical propositions do not always
follow directly from the data reported.  Further, the original evidence and analyses that are
invoked in their support are seriously deficient in our view, and in one instance, his interpretation
of statistical results appears grossly misleading if not simply wrong."  Def. Ex. 94 at 393.  In
particular, the study found that "Kleck's analysis of the effect of gun ownership on city crime
rates is seriously flawed by ambiguous measurement of a key construct and by severe model
misspecification."  *Id.* at 397.  Dr. Kleck further admitted that, in trying to control for causal
order in that study, he used instrumental variables whose validity was not checked via a "validity
test," a failure that "impairs" the reliability of the study's results "to some degree."  Def. Ex. 91
(Kleck Dep.) at 300:16-302:19, 311:14-19.

The second of those two studies – T. Kovandzic, et al., *Estimating the causal effect of*
*gun prevalence on homicide rates* (2008) – was not submitted for publication in a peer-reviewed
journal.  Def. Ex. 91 (Kleck Dep.) at 332:7-23.

Further, the study, M. Duggan, *More Guns, More Crime*, 109 Journal of Political
Economy 1086-1114 (2001) analyzed state and county-level data and found that "changes in
homicide and gun ownership are significantly positively related" and that its findings suggest
"that an increase in the number of guns leads to a substantial increase in the number of
homicides."  Def. Ex. 81, at 1088.  It reported that its findings suggest that "a 10 percent increase
in the rate of gun ownership is associated with approximately a 2 percent increase in the

homicide rate." *Id.* at 1096.

In addition, Dr. Cook's study of annual Uniform Crime Reports data for the 200 largest counties over 20 years "found that the homicide rate increased with the prevalence of gun ownership. On average, a 10 percent increase in the prevalence of gun ownership increased the homicide rate by about 2 percent." Def. Ex. 13, Exhibit A thereto, at 10; Def. Ex. 22 (*The Social Costs of Gun Ownership*, 90 Journal of Public Economics 379 (2006)).

24. No methodologically competent studies have found that gun ownership levels have a significant positive effect on total homicide rate. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 30-31. And even Dr. Cook admits that "the availability of guns in a jurisdiction does not have an effect on the volume or rate of robbery or assault." Exhibit 3 at 72 (Cook Dep.).

**DEFENDANTS' RESPONSE**: Disputed. *See* RAF 23. Further, Plaintiffs mischaracterize Dr. Cook's testimony. While Dr. Cook has opined that the availability of guns in a jurisdiction does not impact the volume or rate of robbery or assault (*i.e.*, the total number of robberies and assaults, or the total number of such crimes in relation to the population), he does opine that, due to the lethality effect, gun availability impacts the number of such crimes that result in serious injury or death. *See* Def. SOF 15-18.

25. Fatal gun accidents are rare. In 2008, the most recent year for which the CDC has published final mortality data, a total of 592 deaths in the United States were attributed to accidental discharge of firearms. *See* Exhibit 73 at 36 (National Vital Statistics Reports, Deaths: Final Data for 2008 (Dec. 7, 2011 )). Only sixty-two of those deaths involved children under the age of 15. *Id.*; Exhibit 26 at CITY 000172 (City of Chicago, Committee on Police & Fire, June 29, 2010 Tr. of Hr'g) ("Researchers have found that millions of children live in homes with

262

easily accessible guns.") (Testimony of Jody Weis, Superintendent of the Chicago Police Department). For the sake of comparison, a total of 3,548 deaths were attributed to accidental drowning or submersion, 745 of which involved children under 15. Exhibit 73 at 36 (National Vital Statistics Reports, Deaths: Final Data for 2008 (December 7, 2011)). And over 42,000 fatalities were attributed to motor vehicle accidents, over 1,600 of which involved children under 15. *Id.* Fatal gun accidents accounted for only about 0.5% of deaths from accidental injuries, and only about 2% of deaths attributed to discharge of firearms. *Id.* The Census Bureau estimates that the population of the United States in 2008 was about 304 million. *See* Exhibit 74 (U.S. Census Bureau, Annual Estimates of the Population of the United States). There were thus about 2 fatal gun accidents per million Americans in 2008. *See also* Exhibit 8 at 280 (Gary Kleck & E. Britt Patterson, The Impact of Gun Control and Gun Ownership Levels on Violence Rates, 9 J. QUANT. CRIM. 249 (1993)) ("No impact of gun prevalence on fatal gun accident rates was detected. Given the random component in accident causation and the rarity of fatal gun accidents (one or two a year in most cities), the absence of a relationship is perhaps not that surprising."); Exhibit 75 at 296 (GARY KLECK, TARGETING GUNS, Chapter 9 (1997)) (finding, among other things, that "the risk of a fatal accident among small children is over one hundred times higher for swimming pools than for guns"); *id.* at 322 ("it is doubtful whether, for the average gun owner, the risk of a gun accident could counterbalance the benefits of keeping a gun in the home for protection: the risk of an accident is quite low overall, and is virtually nonexistent for most gun owners").

**DEFENDANTS' RESPONSE:** Defendants object to Plaintiffs' assertion in the first sentence of Paragraph 25, that "[f]atal gun accidents are rare[,]" as an improper legal argument. Defendants

admit the statistics and citations contained in Paragraph 25, except that Defendants dispute that

"over 42,000 fatalities were attributed to motor vehicle accidents, over 1,600 of which involved

children under 15." Instead, the study cited by Plaintiffs actually shows that under 40,000

fatalities were attributed to motor vehicle accidents, and less than 1,600 involved children under

15. *See* Pl. Ex. 73 at 36 (National Vital Statistics Reports, Deaths: Final data for 2008

(December 7, 2011)). Further, Dr. Kleck agrees that "[e]ven a few gun accident deaths are worth

preventing." Pl. Ex. 75, at 317.

26. Fatal gun accidents commonly involve unusually reckless behavior. They are

generally committed by unusually reckless people with records of heavy drinking, repeated

involvement in automobile crashes, many traffic citations, and prior arrests for assault. *See*

Exhibit 75 at 321 (GARY KLECK, TARGETING GUNS, Chapter 9 (1997)); *see also id.* at

308-310, 312-13. One of the purposes of licensing requirements is to reduce accidental

shootings by "insur[ing] that gun owners know how to safely use guns, store firearms, that they

understand what the laws are regarding firearms, and what is needed for compliance, and what

the consequences of noncompliance would be." Exhibit 31 at CITY 000017, CITY 000020 -

CITY 000021(City of Chicago Committee on Police and Fire, June 18, 2010 Tr. of Hr'g)

(testimony of Robyn Thomas, Legal Community Against Violence); *see also* Exhibit 26 at CITY

000229 (City of Chicago Committee on Police and Fire, June 29, 2010 Tr. of Hr'g) (Testimony

of Juliet Leftwich, Legal Community Against Violence).

**DEFENDANTS' RESPONSE**: Defendants dispute the first two sentences. The cited portion of

Dr. Kleck's book, Pl. Ex. 75, at 312, relies upon data from the following study: J. Waller, et al.,

*Unintentional Shooting, Highway Crashes and Acts of Violence - A Behavior Paradigm*, 5

Accident, Analysis & Prevention 351-56 (1973). Def. Ex. 110. Data from that study found that 81% of shooters had no citations for careless or negligent driving, 79% had no arrests for alcohol, 68% had no history of violence, and 38% had no highway crashes. *See id.* at 353, Table 1.

27. Research conducted by Dr. Kleck and a colleague did not detect any "impact of gun prevalence on fatal gun accident rates." Exhibit 8 at 280 (Gary Kleck & E. Britt Patterson, The Impact of Gun Control and Gun Ownership Levels on Violence Rates, 9 J. QUANT. CRIM. 249 (1993).

**DEFENDANTS' RESPONSE**: Defendants do not dispute that the cited study so found, but Defendants dispute that the study is valid. *See* RAF 23.

28. An operable gun stored in a locked safe is at least as secure as an inoperable gun secured by a trigger lock. *See* Chicago Exhibit 82 at 711 (only the use of a lockbox safe was associated with a statistically significant decreased [risk] for a firearm injury"). Indeed, the provision of Chicago's firearms ordinance aimed at protecting children permits firearms to be stored either secured by a trigger lock or in "a securely locked box or container." MCC 8-20-050(a). According to the National Shooting Sports Foundation, "if you choose to keep a firearm for home security, your objective should be to create a situation in which the firearm is readily available to you, yet inaccessible or inoperative to others. Special lockable cases that can be quickly opened only by authorized individuals are options to consider." Chicago Exhibit 38, Exhibit A thereto, at 33. A trigger lock, on the other hand, "should never be used on a loaded gun because it can cause the gun to fire under certain circumstances." *Id.* at 34. A biometric safe that opens upon recognition of an authorized user's fingerprint would be particularly effective in

denying access by a burglar or other unauthorized user.  *See*, e.g., Exhibit 76 (Compact Biometric Gun Safe by Barska) ("Only the person or persons who have recorded a fingerprint in the safe will be successful in opening it. ").

**DEFENDANTS' RESPONSE**: Defendants do not dispute this paragraph, except as to the first sentence, which is not supported by the citation, and as to the assertion in the last sentence that a biometric safe is "particularly effective," as that is an argumentative proposition not supported by the citation.

29.     Dr. Gary Kleck is a Professor of Criminology and Criminal Justice at Florida State University, where he has been a member of the faculty since 1978.  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 1.  His research has focused on the impact of firearms and gun control on violence, and he has been called "the dominant social scientist in the field of guns and crime." *Id.*  He has published comprehensive reviews of evidence concerning guns and violence in the scholarly literature, and he has also published scholarly research in the leading professional journals in his field.  *Id.*  His testimony rebuts the criminological claims advanced in defense of the provisions challenged here. *See id.* at 2-46.

**DEFENDANTS' RESPONSE**: Undisputed, except to the extent that the paragraph asserts that Dr. Kleck's work is necessarily "comprehensive" or that it "rebuts the criminological claims advanced in defense of the provisions challenged here."  The bases for this dispute are set forth throughout this document in response to the particular claims made by Dr. Kleck in other paragraphs of the document.

30.     The National Academies were asked by a consortium of federal agencies (the National Institute of Justice and the Centers for Disease Control and Prevention) and private

foundations to assess the data and research on firearms. *See* Exhibit 10 at 13 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)). The National Research Council's Committee to Improve Research and Data on Firearms was charged, among other things, with providing an assessment of the strengths and limitations of the existing research and data on gun violence. *Id.* According to the Committee:

- "[E]xisting research studies and data include a wealth of descriptive information on homicide, suicide, and firearms, but, because of the limitations of existing data and methods, do not credibly demonstrate a causal relationship between the ownership of firearms and the causes or prevention of criminal violence or suicide." *Id.* at 6.

- "Some gun control policies may reduce the number of gun suicides, but they have not yet been shown to reduce the overall risk of suicide in any population." *Id.* at 192.

- "[O]bserved associations between [firearms ownership and homicide victimhood] may ... be entirely spurious." *Id.* at 119.

- "The evidence to date does not adequately indicate either the sign or the magnitude of a causal link between the passage of right-to-carry laws and crime rates." *Id.* at 7. This was not a unanimous conclusion. James Q. Wilson dissented. He concluded that existing evidence "suggests that [right to carry] laws do in fact help drive down the murder rate, though their effect on other crimes is ambiguous" and that "the best evidence we have is that [right to carry laws] impose no costs but may confer benefits." *Id.* at 270-71.

- "[W]e found no credible scientific evidence ... that demonstrates whether [firearm] safety devices can effectively lower injury." *Id*. at 219.

- "Locking technologies may also cause unintended injuries. In particular, locking devices may compromise the ability of authorized users to defend themselves. A lock may fail entirely or may take too much time for the weapon to be of use." *Id*. at 216.

**DEFENDANTS' RESPONSE**:  Undisputed, except to the extent the paragraph suggests that these were the only statements of the NRC.  Other statements of the NRC pertinent to this case are cited elsewhere in this document by Defendants.  Further, the report was reviewed by a workgroup of prominent academics from prominent institutions.  Def. Ex. 106 (J. Weiner, et al., *Reducing firearm violence: a research agenda*, 13 Injury Prevention 80-84 (2007)).  This panel observed that the NRC report "found a clear association between firearms and gun suicide.  It concluded, however, that the evidence did not credibly demonstrate that the association was causal, because of data and methodological limitations." *Id.* at 81.  The workgroup, however, concluded that "the accumulated evidence supports a causal relationship between firearm availability and suicide.  The magnitude of the statistical associations between firearm availability and suicide, the consistency of findings over multiple studies in different populations, and the reality that a firearm greatly increases the risk that a suicide attempt will be lethal, all point to a causal connection." *Id.* at 81.

31. The Task Force on Community Preventive Services is an independent body supported by the federal Centers for Disease Control and Prevention.  *See* Exhibit 51 at 42 (Robert Hahn, et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28

AM. J. PREV. MED. 40 (2005)).  The Task Force conducted a systematic review of scientific evidence about the effectiveness of firearms laws in preventing violence.  *Id.* at 40.  The Task Force concluded that:

- "Further research is needed to assess the effects of shall issue laws on violence." *Id.* at 54.

- "Further research with longer follow-up periods is needed to assess effects of [child access prevention] laws on violence, unintentional injury, and other outcomes of interest." *Id.* at 56.

- "Based on findings from national law assessments, cross-national comparisons, and index studies, evidence is insufficient to determine whether the degree or intensity of firearms regulation is associated with decreased (or increased) violence." *Id.* at 59.

**DEFENDANTS' RESPONSE:** Undisputed.

32.     Illinois is the only State that flatly bans the public carriage of firearms by all private, law-abiding citizens.  *See* Exhibit 2 (Kleck DecL), Exhibit I thereto, at 37. *See also* Ala. Code § 13A-11-75; Alaska Stat. §§ 11.61.220(a), 18.65.700(a); Ariz. Rev. Stat. Ann. §§ 13-3102(A), 13-3112(A); Ark. Code § 5-73-309; Cal. Penal Code § 26170; Colo. Rev. Stat. § 18-12-203(1); Conn. Gen. Stat. §§ 29-28(b), 29-35(a); Del. Code tit. 11 § 1441-42; Fla. Stat. § 790.06(2); Ga. Code § 16-11-129; Haw. Rev. Stat. § 134-9; Idaho Code § 18-3302(1); Ind. Code § 35-47-2-3(e), Iowa Code § 724.7; Kan. Stat. § 75-7c03; Ky. Rev. Stat. § 237.110; La. Rev. Stat S. 40:1379.3; Md. Code, Pub. Safety § 5-306; Mass. Gen. Laws ch. 140, § 131; Me. Rev. Stat. tit. 25, § 2003; Mich. Compo Laws § 28.422(3); Minn. Stat. § 624.714, subdiv. 2(b); Miss. Code

269

§ 45-9-101(2); Mo. Stat. § 571.101; Mont. Code § 45-8-321(1); Neb. Rev. Stat. § 69-2430; Nev. Rev. Stat.§ 202.3657(2); N.H. Rev. Stat.§ 159.6; N.J. Stat. § 2C:58-4; N.M. Stat.§ 29-19-4; N.Y. Penal Law § 400.00(2)(f); N.C. Gen. Stat. § 14-415.1l(b); N.D. Cent. Code § 62.1-04-03; Ohio Rev. Code § 2923. 125(D)(I); Okla. Stat. tit. 21, § 1290.12(A); Or. Rev. Stat § 166.291; 18 Pa. Cons. Stat. § 6109(e); R.I. Gen. Laws § 11-47-11(a); S.C. Code § 23-31-215(A); S.D. Codified Laws § 23-7-7; Tenn. Code § 39-17-1351(b); Tex. Gov't Code § 411.177(a); Utah Code § 53-5-704(1)(a); Va. Code § 18.2-308(D); 13 Vermont Stat. Ann. § 4003; Wash. Rev. Code § 9.41.070(1); W.Va. Code § 61-7-4(f); WI. ST. § 175.60(2); Wyo. Stat. Ann. § 6-8-104(b).

**DEFENDANTS' RESPONSE**:  Undisputed.

33.     Researchers have estimated that there are over 200 million privately owned firearms in the United States.  *See* Exhibit 77 at 94 (GARY KLECK, TARGETING GUNS, Chapter 3 (1997)) ("There were probably over 235 million guns in private hands in the United States at the end of 1994."); Exhibit 48 at 17 (L. Hepburn, et al., *The US Gun Stock*, 13 INJURY PREVENTION 15 (2007)) (estimating 283 million or 218 million privately owned firearms, depending upon the method of estimation used).

**DEFENDANTS' RESPONSE**: Undisputed.

34.     Chicago has looked to the experience of other cities when considering firearms policy, including New York, Philadelphia, Los Angeles, Milwaukee, Washington, D.C., and possibly Boston. *See* Exhibit 27 at 128-29 (Brown Dep.).

**DEFENDANTS' RESPONSE**: Undisputed.

Dated: June 29, 2012

Respectfully submitted,

STEPHEN R. PATTON
Corporation Counsel
City of Chicago


BY:    /s/ Andrew Worseck
        One of Its Attorneys



Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William M. Aguiar
Rebecca Alfert Hirsch
Constitutional & Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, IL 60602