# Exhibit 91

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
CASE NO. 10-CV-4184
Judge Edmond E. Chang

ILLINOIS ASSOCIATION OF
FIREARMS RETAILERS, KENNETH
PACHOLSKI, KATHRYN TYLER, and
MICHAEL HALL,
        Plaintiffs,
vs.                                        Volume 1
                                           Page 1 - 327
THE CITY OF CHICAGO and
RICHARD M. DALEY, Mayor of the
City of Chicago,

        Defendants.

_____

VIDEOTAPED
DEPOSITION OF:            GARY KLECK


TAKEN AT INSTANCE OF:     The Defendants


DATE:                     October 28, 2011


TIME:                     Commenced at  9:03 a.m.
                          Concluded at 12:11 a.m.


LOCATION:                 200 North Monroe Street
                          Tallahassee, Florida


REPORTED BY:              L. DANIELLE FREEZE
                          Certified Realtime Reporter
                          Lfreeze37@comcast.net

ACCURATE STENOTYPE REPORTERS, INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL  32308    850.878.2221
asreporters@nettally.com



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1  APPEARANCES:

2

3          REPRESENTING PLAINTIFFS:

4

           CHARLES J. COOPER, ESQUIRE
5          ccooper@cooperkirk.com
           COOPER & KIRK
6          1523 New Hampshire Ave., N.W.
           Washington, D.C.  20036
7          202.220.9660

8

9          REPRESENTING DEFENDANTS:

10

           CRAIG WOODS, ESQUIRE
11         cwoods@mayerbrown.com
           RANJIT J. HAKIM, ESQUIRE
12         rhakim@mayerbrown.com
           MAYER BROWN LLP
13         71 South Wacker Drive
           Chicago, IL  60606-4637
14         312.701.8758

15

16

17

18         ALSO PRESENT:

19         Barbara Kirkland-Graves, Videographer

20

21

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

33

1    very unstable, that simply adding five more years of

2    data altered the conclusion.  So it revealed the fact

3    that there was a very fragile basis for the initial

4    conclusion that more guns lead to more homicide.

5         Q    Your initial study was from '47 to '76.  Is

6    that correct?

7         A    No -- well, in a way.  1947 to 1973 was the

8    period on which most of the results were based.  And then

9    I took a few additional years as a way of testing the

10   adequacy of the statistical model.  And then the later

11   study, 1984 study, extended it up through 1978.  So the

12   findings were based on 1947 through 1978.

13        Q    All right.  And that 1984 study, did you

14   publish that?

15        A    Yes.

16        Q    Where is that published in?

17        A    It was published in an edited collection edited

18   by Don Kates called Armed, I think.

19        Q    Okay.  And when was that published?

20        A    1984.

21        Q    Okay.  Do you personally have any law

22   enforcement experience?

23        A    No.

24        Q    Have you ever inspected a gun dealer or other

25   FFL --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

34

1     A     No.

2     Q     -- for compliance with federal law?

3     A     No.

4     Q     Have you ever been involved in licensing of a

5     gun dealer?

6     A     No.

7     Q     Have you seen the paperwork that's needed to

8     fill out, to apply for a license?

9     A     Possibly.

10    Q     Have you ever audited an FFL?

11    A     No.

12    Q     And you've never had any experience or

13    involvement with enforcement of federal gun laws, I

14    assume; correct?

15    A     That's correct.

16    Q     Never worked for ATF?

17    A     Yes, that's correct.

18    Q     Yeah.   Okay.   Not even as -- have you ever

19    consulted with ATF before?

20    A     I have never had any formal consulting

21    relationship with ATF.

22    Q     Have you ever conducted any research on behalf

23    of ATF?

24    A     No.

25    Q     Are you a gun owner?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

44

1          If a study is repeated over and over using

2    the same method, does that make -- and essentially

3    yields the same results, does that make the study

4    results valid all other things being equal?

5          A    Not by itself.

6          Q    What would you need to have to show that that's

7    valid?

8          A    Again, I would have to have more specifics to

9    --

10         Q    Okay.

11         A    -- to intelligently respond to that.

12         Q    We'll talk about that a little bit later.

13              What is a correlation?

14         A    Correlation is a measure of statistical

15    association.

16         Q    And when you're doing a study in which you're

17    using statistics to test the validity of a hypothesis,

18    what you're measuring is correlation; is that correct?

19         A    That is, at minimum, what you are doing, yes.

20         Q    What is statistical significance?

21         A    Statistical significance is a measure of the

22    likelihood that the statistical result you obtain could

23    have been the product of pure simple random chance.

24         Q    Okay.  So, and along with that, can you define

25    what a P value is?


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1       A     A P value would be the conventional way of

2   designating a statistical significance level.

3       Q     And is there a certain P value that you use in

4   your research as designating a level that is

5   statistically significant versus not significant?

6       A     There is no one level; picking any one level is

7   arbitrary.  But there are certain customary levels that

8   are commonly used in the field.  And the most common ones

9   would be a 5 percent significance level or a 1 percent

10  significance level.

11      Q     And can you explain what that means, a

12  5 percent significance level?

13      A     A 5 percent significance level would mean

14  that -- if some result passed a 5 percent significance

15  test, it would mean there's a less than 5 percent chance

16  that a result that strong or stronger could have been

17  produced by purely random chance factors.

18      Q     And do you typically either adhere to a

19  1 percent or a 5 percent level for statistical

20  significance in your research?

21      A     I'm not rigid about it because statistical

22  significance is just one issue that's relevant to the

23  interpretation of results.

24            Sometimes it's not possible to have a large

25  sample size, for example, which means it's very



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

46

1    difficult for even strong results to pass a test of

2    significance.  And so you -- we have to interpret the

3    evidence according to how significant the results are,

4    which means you don't simply dismiss results because,

5    let's say, they barely missed passing a test at an

6    arbitrarily defined significance level.

7         Q    All right.  So when you find a result that has

8    a P value that is greater than, say, .05, that doesn't

9    necessarily mean that there isn't a true correlation

10   between the variables; correct?

11        A    That's correct.

12        Q    I mean, it's kind of like saying you can't

13   prove a negative.  There could be a correlation, but what

14   the P value says is you can't exclude chance to a certain

15   level?

16        A    That's correct, and you're less confident that

17   you can reject pure chance as an alternative explanation

18   of the result.

19        Q    What's the difference between something that is

20   measured -- a P value of .06 and versus a P value of .05?

21        A    Very little difference.

22        Q    It means that there is a one in 100 -- the

23   result that you measure at a P value of .6 has a one in

24   100 chance more than the result that's measured a P value

25   of .05 being due to chance; correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

47

1      A      I think you meant .06.

2      Q      Yeah, it's .06.

3      A      You said .6.

4      Q      Yeah, I apologize.

5      A      Yes, that's correct.

6             There's a slightly greater chance with the P

7      equals .06 result of it being a product of random

8      chance than with the P equals .05 result.

9      Q      Would you say that the result that is a -- has

10     a P value of .06 is not significant but the result in

11     which you obtained a P value of .05 is significant?

12     A      If you were communicating to your readers with

13     the understanding that P equals .05 was the cutoff, then

14     it would be legitimate to say that.  But to say one is

15     significant and one is not significant is somewhat

16     arbitrary because there's nothing magical about the .05

17     level.  It's simply a customary level that's frequently

18     used in the field.

19     Q      Okay.  We've got to change the tape, so why

20     don't we stop for a second, and we'll get the tape

21     changed and maybe take a real short break.

22            THE VIDEOGRAPHER:  Off the record, please.

23            (Brief recess was taken.)

24            THE VIDEOGRAPHER:  We're back on the record

25     with tape No. 2.  The time is 10:10 a.m.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    longitudinal study.

2        Q      Is -- is matching another method for

3    controlling for confounding without adding confounding

4    variables to a regression model?

5        A      It is a method.  It is probably about

6    equivalent in its value for controlling for confounding

7    variables, but it's well short of the value of randomly

8    assigning people different values on the explanatory

9    factor.

10       Q      Is the best study design randomized controlled

11   trial?

12       A      It would be if it were possible.  It's just

13   rarely possible in any crime-related fields other than

14   imposing treatment intended to reduce criminal behavior.

15       Q      And that's why typically in -- in your field,

16   your -- you perform cross-sectional studies or

17   retrospective studies of data because it's virtually

18   impossible to do a randomized control trial; correct?

19       A      Yes.  It's why we are confined to largely

20   nonexperimental research of all sorts, some longitudinal,

21   some cross sectional and some retrospective, some not.

22   But it's all nonexperimental in the sense that the

23   researchers are not able to randomly assign differing

24   levels of the explanatory variable to different subjects.

25       Q      But that doesn't mean you still can't draw



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    reliable conclusions or valid conclusions from using the

2    techniques that are available in criminology; correct?

3        A    You would be able to draw less valid con -- you

4    would be able to draw conclusions about which you had

5    less confidence than had you been able to address the

6    same subject with random assignment experimental methods.

7    But I don't categorize findings as reliable or

8    unreliable, valid or invalid; they're simply along a

9    continuum and the better the methods, the more likely it

10   is you can rely on the findings.

11       Q    Right.  It's not black and white.  One study

12   design over another is not black and white?

13       A    Correct.

14       Q    And that's why when trying to infer causality,

15   it's best to have a number of different studies that were

16   done with multiple different methods; if they are all

17   coming out in the same direction, it gives you more

18   confidence that the result is correct?

19       A    Correct.

20       Q    Will -- will a confounding variable that's

21   input or used in a regression model always have a

22   statistically significant result or significant effect on

23   the result?

24       A    I'm not sure what you mean.  If you mean the

25   association between the key explanatory factor and the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    those publications?

2         A    No.

3         Q    Or involved in that work?

4         A    No.

5         Q    Or -- or do you consider those reliable

6    research pieces on youth crime, guns?

7         A    It's deeply flawed information.

8         Q    Why do you say that?

9         A    It -- it's heavily based on trace data, and the

10   trace data, in turn, concern samples of crime guns that

11   are not representative of crime guns in general that have

12   been basically selected samples.  People have used that

13   report to draw conclusions as if they were representative

14   of crime guns in general.

15        Q    Have you ever used the youth crime gun

16   interdiction reports for any purposes in your research?

17        A    Yes.

18        Q    What have you used them for?

19        A    I used them in a study of gun trafficking, and

20   I took gun trace indicators of trafficking as measures of

21   the possible levels of trafficking in a set of cities,

22   the YCGII cities.

23        Q    So there -- there's at least some valid uses of

24   gun trace data in conducting criminology research;

25   correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

1      A      Actually, I -- I took a -- a nuanced position

2    on that in -- in the study.  I said:  Here's the results.

3           If you believe the YCGII data are valid, here

4    is what the results say.  They say that gun trafficking

5    is unimportant in supplying guns to criminals and has

6    little impact on crime rates.

7           On the other hand, I also said there's strong

8    reason to doubt that they're valid, in which case they

9    shouldn't have been used either by me or anyone else as

10   reflecting the prevalence of gun trafficking.

11     Q      You thought it was, at least, worthwhile to

12   publish results based on that data with that caveat;

13   correct?

14     A      Yes.

15     Q      And which paper was that?

16     A      (Views document.)

17           That is the one on page 6 of my vita in the

18   appendix to the rebuttal report:  2009, the article

19   with Shun-Yang Wang, The Myth of Big-Time Gun

20   Trafficking published in the UCLA Law Review.

21     Q      Now, the UCLA Law Review is that a

22   peer-reviewed publication?

23     A      No, I don't think law reviews are typically

24   considered typically peer-reviewed.  I -- I can't say

25   that that article was not peer-reviewed because I'm not



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                    October 28, 2011

82

1    familiar with the internal review processes, but normally

2    law reviews are basically edited by kids in law school

3    so...

4          Q     I've edited one of those journals.

5          A     Yeah.

6          Q     Does that give you any confidence?

7          A     Absolutely.

8          Q     Now, you actually include that listing under

9    the heading:  "Articles in Peer-reviewed Journals" in

10   your r'sum'; correct?

11         A     Yeah, that's probably an exaggeration.  I

12   didn't really know for sure it was refereed.  It could

13   have been refereed.  The problem is:  You can have the

14   paper being sent out to referees, or reviewers, and even

15   if it's not a standard part of the -- of the reviewing

16   process at the journal.  So I can't really be sure one

17   way or another.

18         Q     You couldn't rule it out, so you included it

19   under peer-reviewed journals?

20         A     Yeah, in this case.

21         Q     So have you ever used anecdotal or experiential

22   information to draw conclusions about the relationship

23   between firearms and crime?

24         A     Could you repeat the question?  I didn't hear

25   that.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

99

1    about police use of force on duty, and that probably

2    had a section on carrying practices.  And I read that

3    report.

4         Q    Now, is that report cited as material that you

5    reviewed or relied on in connection with your report?

6         A    No, I did not rely on that for any of the

7    conclusions in here.

8         Q    And you are not relying on it now; is that

9    correct?

10        A    That's correct.

11        Q    Can you turn over to page 4 of your report for

12   a second.  We are going to skip around just a little bit.

13   I apologize.

14             If you go in the paragraph that starts:

15   Vince asserts, (p.13) that law enforcement officers; do

16   you see that paragraph?

17        A    Yes.

18        Q    And then we're going to have to go down, maybe

19   two-thirds of the paragraph, there's a sentence that

20   start -- that starts:  It is a cumbersome but required

21   condition of police work that they always carry a gun?

22        A    Yes, I see that.

23        Q    Actually, I'll read the sentence before that

24   too:  Police officers usually do not need more than one

25   operable gun because while on duty they always carry that



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

100

1    one gun on their person, and thus it is always

2    immediately available for use.  It is a cumbersome but

3    required condition of police work that they always carry

4    a gun.

5              Now, what do you mean by cumbersome there?

6         A    Cumbersome because you have a heavy object that

7    requires moving about with this object in your way and

8    meaning that you have to have that additional weight

9    carried around with you.

10        Q    Are you aware of whether law enforcement

11   officers find it cumbersome?

12        A    I have no knowledge one way or the other.

13        Q    So that statement is based on your own personal

14   experience?

15        A    Yes, you would say common sense, I guess.

16        Q    Anecdotal experience?

17        A    No, I wouldn't say it's anecdotal because it's

18   not based on individual persons or events.  It's just an

19   understanding of the world at large, which could

20   encompass lots of people.

21        Q    Well, it's based on your experience; right?

22        A    Not my personal experience, no, my knowledge of

23   the larger world.

24        Q    Okay.  Did -- and did you survey in the larger

25   world to find out if they find carrying a sidearm



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    cumbersome?

2         A    No.

3         Q    So I'm trying to understand; how do you know

4    that other people think it is cumbersome to carry a

5    sidearm on person?

6         A    I would have regarded it as self-evident.

7         Q    Based on your own personal experience?

8         A    Well, I guess that would have a minor role in

9    my thinking about it.  But I also think I'm not different

10   from other people in seeing it to be more cumbersome to

11   be toting an object around than not toting an object

12   around.

13        Q    You have not tested your assumptions

14   scientifically; correct?

15        A    No.

16        Q    And exactly what makes it cumbersome, just the

17   weight of it and the size of it?

18        A    Yes, yes.

19        Q    Now, in your home, the guns that you carry, do

20   you -- or the guns that you have in your home, do you

21   ever carry it around on your person while you are at

22   home?

23        A    No, except, in, you know, cases where I'm

24   taking it somewhere to clean it.  Like, I like -- I

25   usually clean it outside in the garage or in the -- on



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

103

1      Q      And how does that lead to that conclusion?

2      A      As I recall, it described the carry practices

3   that were required by the Chicago Police Department.

4      Q      So do you know if, given those carry practices,

5   that police officers, in fact, do carry two weapons?

6      A      I don't recall if it said they do.  It said

7   they could --

8      Q      Okay.

9      A      -- or they were permitted to do so.

10     Q      So is it your assumption that just because they

11  could that they do, that many of them do?

12     A      I assume, yes, many of them do, that they take

13  advantage of that.

14     Q      And why do you believe that they take advantage

15  of that?

16     A      Again, I would suspect, but not know from

17  personal knowledge, that they believe that they might be

18  disarmed of one of those weapons; and they'd like to have

19  another weapon available to them.

20     Q      Do you have any basis for believing that

21  Chicago -- many Chicago police officers think that?

22     A      No, other than what I've inferred from the

23  reports I mentioned before, like that review of police

24  use of force and the -- the two FBI reports that

25  concerned...



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 28, 2011

104

1     Q    Does that mean it's your position that when

2   someone is permitted to do something, that they typically

3   do or many people do take advantage of that?

4     A    It would be a combination of being allowed to

5   do that by departmental regulations, plus having a strong

6   motive to do so.

7     Q    But you don't know how many officers actually

8   take advantage of that; correct?

9     A    No, I do not.

10     Q    I assume since you use trigger locks on your

11   gun, that you would agree that they do have a safety

12   benefit?

13     A    Yes.

14     Q    And that's pretty much undisputed?

15     A    No, I -- I'd say almost any assertion you make

16   in the gun area has been disputed by somebody.  It's not

17   disputed by me but...

18     Q    Okay.  So, for instance, Mr. Vince references

19   that confiscated guns are secured with safety locks;

20   right?

21     A    Are you asking did he say that?

22     Q    Something -- he said that guns that are

23   confiscated in crimes are secured with some kind of

24   safety lock or trigger lock to prevent --

25     A    I think he did say something like that, yes.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      Q    Have you looked at that issue now or in the

2   past?

3      A    No, I might have read something about it, but I

4   haven't looked at it in the sense of researching it

5   myself.

6      Q    If that is true, do you think that would have

7   an effect on the ability of ATF to properly detect any

8   illegal activity in FFLs?

9      A    Yes.

10     Q    What effect would it have?

11     A    I think it would make it harder.

12     Q    And I think you answered this before, but you

13  haven't ever studied the effectiveness of ATF inspection

14  procedures?

15     A    No.

16     Q    Now, you mention at the bottom of page 5, I'll

17  just read the last two sentences:  Vince also implies

18  that banning gun sales in Chicago will reduce gun

19  possession among the city's criminals and thereby reduce

20  firearms crime, but does not cite any research indicating

21  that local sales bans have such effect.  And then you

22  say:  Existing evidence indicates that they do not.  And

23  you cite two papers; correct?

24     A    Yes.

25     Q    And these are both studies that you conducted?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011
                                                          166

1       A    No.

2       Q    So just because an FFL has not had their

3  license revoked doesn't necessarily mean that they are

4  not engaging in illegal activity?

5       A    Not necessarily.  But the difference is you

6  would rarely have traffic enforcement efforts focusing on

7  individual drivers, whereas you often have that with

8  suspect FFLs.  So you'd have a much higher probability of

9  detection of their violations.

10      Q    But we have already seen from the OIG report

11  that FFLs that -- that ATF, just to use your assumptions,

12  is not properly using its resources to monitor FFLs;

13  correct?

14      A    Is that my view, that they're not doing that?

15  Is that what you are asking?

16      Q    That was certainly your view of the OIG;

17  correct?

18      A    Yeah, yes.

19      Q    And you disagree with that?

20      A    I have no basis for disagreeing or agreeing.  I

21  have no independent knowledge of that.

22      Q    You haven't studied that?

23      A    No, I haven't independently studied the use of

24  resources by ATF other than the fact that I know how many

25  compliance inspections they do relative to the number of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

167

1    FFLs.

2        Q    A crime gun that is stolen from a lawful

3    purchaser from an FFL or a crime gun that was obtained

4    illegally from an FFL, they're not any more or less

5    dangerous than the other; correct?

6        A    The gun itself, no, but depending on who

7    acquired it, obviously, by definition, a person who

8    acquired the gun as a result of theft is a criminal.  So

9    the gun is more likely to be used for some dangerous

10   purpose for that reason.

11       Q    Right.  And I was suggesting that the

12   alternative to that person who acquired the gun from

13   stealing it from someone's home was someone who acquired

14   the gun from illegally obtaining it via an FFL.  They are

15   also a criminal; correct?

16       A    Illegally obtaining it?

17       Q    Yes.

18       A    Well, yeah.  What do you mean by -- you know,

19   like what kind of transaction are you talking about?

20       Q    I'm talking about either stealing it from

21   the -- from the -- straight from the FFL or reaching some

22   agreement with the FFL owner to sell the gun to that

23   person, even though they wouldn't qualify under the

24   federal law to get that gun.

25       A    Yeah, under the theft scenario, again,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011
                                                          199

1        A    Yes.

2        Q    What's that based on?

3        A    That's based on Lester's reviews.

4        Q    The third one, urban versus rural location.

5        A    Although, actually, if I can amplify on that, I

6    think some of Brent's studies may have looked into that

7    too because in some cases, he was studying people for

8    whom he had measured illicit drug use.  So it's possible

9    some of the Brent, et al. studies do address that issue

10       Q    What do you mean by address that issue?

11       A    Meaning they had a measure of illicit drug use

12   and were studying suicide risk as well as gun ownership

13   relationship.

14       Q    Have any of your studies ever controlled for

15   illicit drug use that you've done?

16       A    I have not done any case control studies of

17   suicide.

18       Q    Okay.  So, well, maybe I should step back a

19   second.

20            All these confounding variables that you

21   claim should be controlled for, you've actually never

22   conducted a study on gun ownership and suicide;

23   correct?

24       A    Correct -- well, not of this sort, not a case

25   control individual level study.  I've done macro-level



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

                                                                    200

1    studies of gun ownership rates and suicide rates for --

2    in larger areas like cities and so forth.

3        Q    Okay.  And you would only need to control for

4    these confounding variables in case control studies?

5        A    No, you might also have to control for their

6    macro-level analogs in -- in a study of, let's say,

7    suicide rates of cities.  So it's likely that factors

8    that operate among individuals would also be -- they

9    would operate collectively in the aggregate for larger

10   populations.

11       Q    And in any of the macro studies that you did,

12   did you control for alcoholism?

13       A    It's possible I had some controls for -- in

14   suicide studies?

15       Q    Yeah.

16       A    I don't recall.  It's possible I attempted to

17   do that in connection with the Kleck and Patterson study.

18   I might have, in some early versions of the analyses,

19   tried to measure for some proxy for alcoholism or heavy

20   drinking.

21       Q    In the published version?

22       A    But -- but there's nothing in the published

23   version that shows such controls.

24       Q    What about illicit drug use in any of the

25   macro-level suicide studies that you did?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      A    No, definitely not.

2      Q    What about urban versus rural locations in the

3  macro studies that you did?

4      A    Well, the --

5      Q    Did you control for those?

6      A    The macro-level studies were all urban areas,

7  so it wasn't relevant.

8      Q    Okay.  What about residents in a high crime

9  neighborhood, did you control for that in your

10  macro-level studies?

11      A    Again, not pertinent because it was not a

12  neighborhood level study.

13      Q    What about --

14      A    But, you know, I mean --

15      Q    You could still -- I mean, there could be

16  certain areas that have higher --

17      A    Right.

18      Q    -- numbers of high crime areas.  Did you

19  attempt to control for that at all in your macro-level

20  studies?

21      A    No.

22      Q    Experience as a victim of a crime, did you

23  attempt to control for that at all, like rape, in any of

24  your macro-level studies?

25      A    No.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

202

1       Q    What about gang membership, did you attempt to

2   control for that in any of your macro-level studies?

3       A    No.

4       Q    Same with drug dealing?

5       A    No.  I mean, yes, it's the same.  No.

6       Q    Yeah.  Did you attempt to study or control for

7   the perception of the world as a hostile place in any of

8   your macro-level studies?

9       A    No.

10      Q    Same with 9, did you attempt to control for a

11  personality that emphasizes self-reliance and

12  consequently self-blame for problems?

13      A    No.

14      Q    And same with No. 10, strength of suicidal

15  intent?

16      A    No.

17      Q    Now, would there be any way to control for

18  these things in the macro-level study?

19      A    Some of them, yes.

20      Q    Which ones could you control for in the

21  macro-level study?

22      A    Well, as I say, I think I tried to control for

23  alcohol consumption, but I don't think there's any

24  reliable city level measures of that.  So it's in

25  principle, possible, but existing data don't permit it to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1   be done in any meaningful way.

2        Illicit drug use, yeah, it's possible.  I've

3   done some studies, macro-level studies where there were

4   macro-level indicators of illicit drug use based on

5   things like emergency room handling of drug cases of

6   overdose cases, drug overdose deaths in medical

7   examiner records.  But I never used those in anal --

8   macro-level analyses of suicide rates.  So yes, in

9   principle, that could be done.

10       Q    Any other items that you could control for in

11  macro-level studies out of the ten?

12       A    Well, let's see.  Three wouldn't be relevant,

13  urban versus rural, because the macro-level studies I did

14  were all urban.  So there's no contrast between urban and

15  rural.  It wouldn't account for differences in suicide

16  rates.

17       Residents in a high crime neighborhood,

18  again, not pertinent to a city level analysis; but in

19  principle, you might do it in a neighborhood level

20  analysis except that suicide is too rare at small units

21  of analysis in any given neighborhood.  You would

22  mostly be contrasting a vast number of neighborhoods

23  that just had zero versus a few that had one and hardly

24  any that had more than that.

25       So most people wouldn't regard that as a very



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    productive way of studying suicide rates at the macro

2    level.  You would rarely see neighborhood level studies

3    done.  Experience as a victim of a crime, well, of

4    course, there's crime rates available for lots of

5    macro-level units and you could control for that.

6            Gang membership, probably not.  There really

7    aren't any useful proxies for that.  Police data are

8    essentially useless, and we don't have much of anything

9    else for large numbers of macro-level units.

10           Drug dealing, well, you'd probably end up

11   using the same kind of proxies that you did for illicit

12   drug use.  For dealing independent of use, probably you

13   don't have any meaningful measures because that's going

14   to be partly a function of just police effort to

15   suppress drug dealing.  So arrests wouldn't be a very

16   good proxy.

17           Perception of the world as a hostile place,

18   again, in principle, you could have surveys that

19   measured that, but there are no existing data like that

20   and nobody has done surveys of large numbers of

21   macro-level units in which that was measured.  So not

22   possible in the studies I did but in principle,

23   possible.

24           Personality traits, I can't imagine under any

25   realistic set of circumstances where a macro-level



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    study could control for the prevalence of personality

2    traits for a large number of macro-level units.

3              Strength of suicidal intent, almost certainly

4    not because that's -- it's a mentalistic concept and

5    surveys of the general public wouldn't have very much

6    useful to say because there would be virtually no

7    variation.  Ninety-nine percent of the population would

8    say they have zero suicidal intent.  But on the other

9    hand, all of those could be measured and controlled for

10   in a case control study, which is individual level.

11        Q    Okay.  Your macro-level studies, because you

12   didn't control or couldn't control for all these

13   variables, are those studies invalid?

14        A    No, it just means that they -- you have less

15   confidence that any associations you find represent

16   actual causal effects.  And since my results were that

17   there weren't any causal effects and the effect of

18   introducing controls for these confounders would be to

19   reduce the association, it would mean it would strengthen

20   the conclusion that there wasn't any effect.

21              There was already no appearance of an effect

22   without the controls for these confounders.  And so

23   there would have been even less support for the

24   proposition that gun availability affects suicides if

25   we introduce these confounders.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011
                                                          207

1    studies didn't control for any of them, they are very,

2    very unconvincing.

3        Q    To find out what effects these potentially

4    confounding variables would have, you would have to

5    actually measure them and then plug them into the

6    regression equation and see what effect that had?

7        A    Correct.

8        Q    You can't just assume that they had significant

9    effect --

10       A    Correct.

11       Q    -- on the result until after you do the

12   calculation?

13       A    Yes.

14       Q    I want to talk to you for a second about the

15   effect of suicidal intent on firearm suicide.  Will a

16   person who is intent on committing suicide use the most

17   lethal means available to them?

18       A    They are likely to use the method they believe

19   is most lethal.

20       Q    Would you agree with me that people would

21   assume that guns would be the most lethal method

22   available?

23       A    I believe that's a very common belief.

24       Q    So if there is no access to guns, would you

25   agree with me that that might, at least, prevent some



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

225

```
 1              MR. WOODS:  Why don't we go ahead and change

 2         the tape.

 3              THE VIDEOGRAPHER:  Off the record.

 4              (Brief recess was taken.)

 5              THE VIDEOGRAPHER:  We're back on the record

 6         with tape No. 6.  The time is 3:31.

 7    BY MR. WOODS:

 8         Q    Dr. Kleck, any answers that you'd like to

 9    change?

10         A    No.

11         Q    Going back to your list of -- partial list of

12    likely confounders on page 7 to 8, for the 16 studies,

13    case control studies that are included in your Table 1,

14    do you know whether they actually had data on all these

15    confounders and could have controlled for all of these in

16    those 16 studies?

17         A    No, I can't know about variables that they

18    didn't mention in their published reports.  I can know

19    that it would have been, in principle, possible to

20    measure them; but I can't know that, in fact, they did

21    measure them.

22         Q    Well, would it be, in principle, possible to

23    know the percentage of FFLs that sell over 50 guns today?

24         A    Yes.

25         Q    But you didn't do that study?
```



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

227

1    that they made an attempt to.  So it's not necessarily an

2    inability; it's maybe a disinclination.

3         Q    Well, there's no affirmative evidence that they

4    didn't do it, but there's no affirmative evidence that

5    they -- that they didn't try to do that either; correct,

6    that they didn't try to control for those things?  But

7    then determining --

8         A    Well, there's the evidence that they, in fact,

9    didn't end up controlling for it.

10        Q    Right.  That's all we know is that in the end,

11   they didn't end up controlling for it?

12        A    That's correct.

13        Q    But they may have tried to see if they could

14   control for it and weren't able to get data; correct?

15        A    It's a logical possibility, certainly.

16        Q    I mean, is it your opinion that the fact that

17   all this -- if -- if -- in order for a study to be --

18   that showed a positive relationship between guns and

19   suicide, in order for you to believe that that

20   relationship is a true relationship, they would have had

21   to control for every one of these ten items?

22        A    No, that's not my position.

23        Q    Okay.  How many of these ten items would they

24   have to control for in order to convince you that a

25   positive association of statistical significance is



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

1    said he hadn't provided it, and that was just quoting the

2    reaction of those other readers.  They had also noted

3    he -- he hadn't documented this crucial link.

4         Q    But yet we know from his 1998 paper that a

5    number of the incidents involved a gun kept in the home;

6    correct?

7         A    Yes, we know that a tiny percentage of all

8    homicides do involve a gun kept in the home of the

9    victim.

10        Q    Right.  Now if you look at -- I want you to go

11   back to Exhibit 12.

12        A    Oh, by the way, I should point out, to amplify

13   a previous answer, this same paragraph you're alluding to

14   does have the percent of residential shootings that

15   involved a gun kept in the home.  So I have computed it

16   and published that result.  It's 14.2 percent.

17        Q    14.2 percent.  That's not what you included in

18   your expert report.  You said 2 percent in your expert

19   report.

20        A    No, because that was -- it was not relevant to

21   the point I was making.  My only point is that yes, I've

22   also noted the percentage you were alluding to in print.

23        Q    Yes, so why did you include 2 percent and not

24   14 percent in your expert report?

25        A    Because it goes to the issue of how likely it



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

```
1    valid measure of gun ownership.  Now, well, let me ask

2    you this:  Any studies that have involved evaluating gun

3    ownership, the connection between gun ownership rates and

4    homicide rates, any studies that have met those three

5    criteria other than studies you have performed?

6         A    No.

7         Q    Do you know how many studies have been

8    published on gun ownership rates and homicide rates?

9         A    (Views document.)

10        Q    Is Table 3 all of the studies?  I'll strike

11   that other question.

12        A    (Views document.)

13             Yes, those are all of the ones I knew of up

14   through 2009.

15        Q    How many of those were published by you or were

16   you an author in?  I mean, maybe we should say how many

17   total studies are -- there are and how many were

18   published by -- you were an author on?

19        A    Four.

20        Q    You were an author in four?

21        A    Correct.

22        Q    And what's the total number of studies?

23        A    Thirty-two.

24        Q    So all the studies that you published in this

25   area, are they all valid or did some of your studies fail
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011
                                                          277

1    to meet the three criteria you laid out?

2        A    The earliest two failed to meet that criterion

3    or all three criterion.

4             Let me rephrase that.  At least one of the

5    three criteria and then the Kleck and Patterson 1993

6    and Kovandzic, et al., 1998, did meet all the criteria.

7        Q    Okay.  And I think you say that on page 15:

8    The only studies that meet all three criteria are Kleck

9    and Patterson (1993) and Kovandzic, et al., (2008);

10   correct?

11       A    Yes.

12       Q    And Kovandzic, et al., 2008, is that a

13   published paper?

14       A    It's in -- it's in press right now.  It will be

15   coming out in a couple of weeks.

16       Q    And where is that being published?

17       A    It's being published in -- it's something like

18   the Handbook of Criminological Research Methods or

19   something like that, but it's -- it's an edited

20   collection of chapters, and that appears as a chapter in

21   that book.

22       Q    Is it a peer-reviewed publication?

23       A    The concept of peer review isn't really

24   relevant to edit collections.  The editor serves as -- or

25   editors, in this case, there's three of them -- serve as



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1       into my head.

2               Q    Well, if you remember, tell me.

3               A    He's fairly well known, so I'm ashamed that I'm

4       not remembering it right now, but he's the only one I

5       knew of.

6               Q    Okay.  What's the purpose of this handbook?

7               A    It -- it presents cutting edge research

8       methods, new research methods that would be useful in

9       criminology.  And our contribution was on -- on

10      statistical methods so fancy I barely understand them.

11              We have now reached the limits of my

12      understanding and so one of my coauthors was an

13      econometrician, who is extremely advanced in

14      statistics.

15              Q    Is that Kovandzic?

16              A    No.  It's Mark Schaffer.

17              Q    Well, if you -- if you can imagine that you're

18      at the limits of your understanding of statistics, you

19      can imagine how fun -- how much fun I had last night,

20      trying to review that paper.

21              A    I don't want to imagine it.  I already have an

22      ache in my head.

23              Q    That's right.  Kleck and Patterson, that study,

24      where was that published?

25              A    The Journal of Quantitative Criminology.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

280

1       Q    Is that one of the leading journals in

2   criminology?

3       A    Yeah, I think it probably -- it would be, you

4   know, somewhere in the top five or six.

5       Q    And has -- has that paper received any

6   criticism at all?

7       A    Yes.

8       Q    By whom?

9       A    You know, it might be that same Steve somebody

10  or other.  It was the name I am blanking on, ironically

11  enough.  Some -- somebody wrote a published response to

12  it, if you have it there.

13           MR. HAKIM:  Shall I mark it?

14           MR. WOODS:  Sure.

15           (Exhibit No. 14 was marked for

16       identification.)

17           THE WITNESS:  Steve Messner, yes.  I think

18       Steve Messner is -- is one of the editors of that

19       collection.  Don't tell him I completely forgot

20       his name.

21           MR. WOODS:  I won't tell him, trust me.  I

22       don't know him.

23  BY MR. WOODS:

24       Q    And I guess we know where he's from, too,

25  probably, if you look on the first page of the -- the


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    the book Point Blank; right?

2        A    Yes.

3        Q    Although, it's essentially the same type of

4    analysis; correct?

5        A    Well, I mean, it's -- it's really a lot broader

6    than the article.

7        Q    Yeah.

8        A    So that was sort of odd.

9        Q    Okay.  Well, if you turn -- if you turn to

10   page 397.

11       A    (Views document.)

12       Q    Above Point 3 where it says:  Offender Gun Use

13   and the Lethality of Incidents, the paragraph above that.

14   It says:  In short, Kleck's analysis of the effect of gun

15   ownership on city crime rates is seriously flawed by

16   ambiguous measurement of key construct and by severe

17   model misspecification.  Do you see that?

18       A    Yes, I do.

19       Q    And when you said earlier that there was a

20   paper criticizing your analysis, is that what you were

21   referring to?

22       A    Yes.

23       Q    And is Steven Messner a well-respected

24   criminologist?

25       A    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

299

1   as adult.

2        Q    Why would necessarily increased gun ownership

3   only happen in a culture where people are raised with

4   guns?

5        A    It's not the only circumstances under which it

6   could happen.  It's just that that appears to be the

7   reality as -- as it exists today.

8             Most people, they probably think of -- they

9   tend to associate gun ownership with urban areas, high

10  crime areas and so on.  But gun ownership is, in fact,

11  higher in areas that have very little violence, rural

12  areas and small towns, where the gun ownership is,

13  obviously, for reasons that aren't very crime related,

14  either committing crimes or defending against crimes.

15            So the gun culture appears to be concentrated

16  precisely in those places where there isn't much

17  dangerous use of firearms, where it's recreational or

18  relatively inconsequential from a violence standpoint,

19  either violence causing or violence preventing.

20       Q    But you can't point to any study that has

21  actually established that greater availability of guns

22  results in people handling them safer?

23       A    No.

24       Q    Why don't we get a copy of Kleck and Patterson.

25            (Exhibit No. 16 was marked for



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

                                                        300

1          identification.)

2     BY MR. WOODS:

3          Q    I've handed you what's been marked as

4     Exhibit 16.  Can you identify that for the record?

5          A    The Impact of Gun Control and Gun Ownership

6     Levels on Violence Rates by Kleck and Patterson.

7          Q    Okay.  And what measure of gun ownership does

8     this use?

9          A    This is the percent of suicides committed with

10    guns in a cross-sectional context.

11         Q    All right.  And this is what you said earlier,

12    you can use it in a cross-sectional context but not

13    longitudinal?

14         A    Yes, it's been strongly validated for use in

15    cross-sectional studies.

16         Q    And what exactly -- now, as I understand

17    because this is cross-sectional, you used a method to

18    control for the causal order issue; correct?

19         A    Yes.

20         Q    And I think we've talked about that method way

21    back when we first started this, something like a

22    two-stage least squares method?

23         A    Yes, that's a variant of instrumental variables

24    analysis.

25         Q    Okay.  And that's the method you used in this



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

301

1    case; correct?

2        A    Yes.

3        Q    And I think you told me that in order to

4    validly use an instrumental variable, you had to choose

5    an instrumental variable that was strongly correlated

6    with the -- in this case, it would be gun availability

7    and had no direct effect on in this case.  It would be

8    homicide or correlation with other effects that are not

9    in the model but that are correlated with the homicide

10   rate?

11       A    Yes, the stronger its effect on gun ownership

12   in combination -- the better it is in combination with

13   the fact that it doesn't directly affect the other

14   endogenous variable, in this case, violence rates.

15       Q    Right.  And what was your instrumental variable

16   that you chose in Kleck and Patterson for variables?

17       A    (Views document.)

18           We use subscriptions, rate of subscriptions,

19   to gun-related magazines and the state hunting license

20   rate as instruments for gun ownership levels; that is,

21   they are variables that would affect rates of gun

22   ownership.

23       Q    Okay.  I just want to make sure I got that.

24   The first was?

25       A    Rate of subscriptions to gun-related magazines.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

302

```
 1        Q    Okay.

 2        A    And the second would be the state hunting

 3   license rate.

 4        Q    Did you use NRA membership as part of that

 5   analysis?

 6        A    No.

 7        Q    Okay.  And I think you mentioned awhile back

 8   that there are -- there are ways to test whether the

 9   choice of an instrumental variable, statistical ways to

10   test whether the choice of an instrumental variable is

11   proper.

12        A    Yes.

13        Q    And did you perform those statistical tests to

14   check that in the Kleck and Patterson paper?

15        A    We performed a relevance test.  At the time, I

16   didn't know how to do the validity test.  So I did not

17   perform that one.

18        Q    Have you performed it at any time before today?

19        A    On this body of data, no.

20        Q    Remind me.  What is the relevance test?

21        A    The relevance -- well, the relevance test in

22   this case would be -- it would address the question of

23   whether those two instruments, magazines -- gun-related

24   magazine subscriptions and hunting license rate, have an

25   effect on gun ownership rate or strongly -- strong
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

                                                               311

1       Q    Why not?

2       A    Because there's no artifactual association.

3  The artifactual association is because there's literally

4  the same element in one variable and the other one.

5            Like in this case, the number of gun

6  robberies is part of the dependent variable because

7  it's -- you know, it's -- it's the robberies divided by

8  population.  But it's also part of one of those five

9  indicators of gun prevalence if I had used it.

10           So it's literally the same quantity appearing

11 in both the gun prevalence measure and the dependent

12 variable, the robbery rates.  And that would be -- that

13 would be illegitimate.  You couldn't do that.

14      Q    And the fact that you didn't run a validity

15 test on your instrumental variables for Kleck and

16 Patterson, would you agree that that places a -- or

17 significantly impairs the reliability of the results in

18 this study?

19      A    It impairs it to some degree.  As to whether it

20 seriously impairs it, you can't directly tell that unless

21 you basically did the analysis with and without that to

22 see if you would have gotten different results.  But we

23 didn't perform a test.

24           We didn't perform the overidentification

25 test, which is the way you check the validity.  So, you



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                                October 29, 2011

328

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASE NO. 10-CV-4184
Judge Edmond E. Chang

ILLINOIS ASSOCIATION OF
FIREARMS RETAILERS, KENNETH
PACHOLSKI, KATHRYN TYLER, and
MICHAEL HALL,
          Plaintiffs,
vs.                                        Volume 2
                                           Page 328 - 474
THE CITY OF CHICAGO and
RICHARD M. DALEY, Mayor of the
City of Chicago,

          Defendants.
_____

CONT'D
VIDEOTAPED
DEPOSITION OF:              GARY KLECK


TAKEN AT INSTANCE OF:      The Defendants


DATE:                      October 29, 2011


TIME:                      Commenced at  8:17 a.m.
                           Concluded at 11:50 a.m.


LOCATION:                  200 North Monroe Street
                           Tallahassee, Florida


REPORTED BY:               L. DANIELLE FREEZE
                           Certified Realtime Reporter
                           Lfreeze37@comcast.net

ACCURATE STENOTYPE REPORTERS, INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL  32308    850.878.2221
asreporters@nettally.com



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

APPEARANCES:

REPRESENTING PLAINTIFFS:

CHARLES J. COOPER, ESQUIRE
ccooper@cooperkirk.com
COOPER & KIRK
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
202.220.9660

REPRESENTING DEFENDANTS:

CRAIG WOODS, ESQUIRE
cwoods@mayerbrown.com
RANJIT J. HAKIM, ESQUIRE
rhakim@mayerbrown.com
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
312.701.8758

ALSO PRESENT:

Barbara Kirkland-Graves, Videographer

Gary Kleck                                          October 29, 2011

1              MR. HAKIM:   It's as if you guys never met.

2              MR. WOODS:   I guess.

3    BY MR. WOODS:

4         Q    I did get more sleep last night, so that's

5    good.  I hope -- I hope you are well rested this morning.

6         A    I'm delighted to hear it.

7         Q    Yes.  We talked yesterday about a -- a paper

8    that you said is recently coming out that was authored

9    between you and a Dr. Kovandzic?

10        A    Yes.

11        Q    And you --

12        A    And Mark Schaffer.

13        Q    And Mark Schaffer.  And you mentioned that this

14   paper is a superior methodology to the current papers

15   that are currently published relating to the effects of

16   gun availability on various crime end points?

17        A    Yes, in particular in connection with homicide.

18        Q    Okay.  But you're not publishing that paper in

19   a peer-reviewed journal; correct?

20        A    Could ask you that again?

21        Q    You are not publishing that paper in a -- or

22   submitting it for publication in a peer reviewed --

23        A    No.

24        Q    Have you ever submitted that publication to a

25   peer-reviewed journal?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

336

1          A     Yes, but some weaknesses are utterly critical.

2    And in this case, that happens to be an utterly critical

3    one in the sense that you get radically different results

4    depending on whether you fix that problem.

5          Q     Right.  And I'm not -- I understand that you

6    believe the causal order is a very important point for

7    that literature, and that's certainly one of the

8    weaknesses that you believe you should take into

9    consideration.  But just as a general principle, every

10   study has strengths and weakness and in evaluating a

11   study, you should take into consideration the strengths

12   and weaknesses of the article; correct, or the study?

13         A     Yes.

14         Q     And you need to look at the body of literature

15   as a whole in coming to a conclusion about whether the

16   studies do or do not suggest causality; correct?

17         A     Yes, you do have to take account of the full

18   body of relevant evidence, but you also have to weight

19   the evidence by how reliable the methods were used and

20   there's huge a chasm between a few studies that solve the

21   principal problems facing researchers in this area and

22   the vast majority of studies that did not.

23         Q     Well, I mean, you would agree with me that in

24   the field of gun control in general, respected

25   researchers have come to varying conclusions relating to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

339

1       A    Not so much so.  Actually, what other

2  researchers do is they are somewhat evasive.  They don't

3  actually say what they think the number of defensive gun

4  uses is.  So they haven't exactly come to different

5  conclusions.  They simply hint that they don't believe

6  the estimates I come up with.

7       Q    That's right.  So researchers, some researchers

8  don't agree with your assessment; some well-respected

9  researchers don't agree with your assessment on the

10  number of defensive gun uses per year; correct?

11      A    Yes.

12      Q    And the same thing is true with respect to

13  whether defensive gun uses present injuries; some well

14  respected researchers disagree with your point on that.

15      A    I'm not so sure about that.  I don't know of

16  anybody who has actually explicitly said they don't think

17  defensive gun use is effective in preventing injuries,

18  not in published literature anyway.  That seems to be an

19  area of consensus; that is, either people explicitly

20  agree that defensive gun use is effective or they don't

21  overtly and in print disagree.

22      Q    What about the area of whether defensive gun

23  uses deter or prevent crime?

24      A    That, I think everybody agrees that it's

25  difficult to determine that, that it's probably always



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    explanation because the simple response to that is you

2    just have partisans of both sides, and they chose to not

3    have any experts at all or specialists in this area.  So

4    it was somewhat puzzling.

5         Q    Is -- the National Research Council is a part

6    of the National Academies?

7         A    Yes.

8         Q    And that's a pretty prestigious organization?

9         A    Yes.

10        Q    Are you a member of the National Academies of

11   Science?

12        A    No.

13        Q    Is that a prestigious recognition to be a

14   member of the National Academies of Science?

15        A    In my field, I -- I think it's irrelevant.  I

16   don't know that there are any criminologists who are -- I

17   don't think they draw their membership from my

18   discipline.

19        Q    How do you become a member of the National

20   Academies of Science?

21        A    I don't know.

22        Q    Okay.  All right.  One of the things that the

23   panel of the National Academies or the National Research

24   Council did is they looked at the issue of whether --

25   well, let me step back.  So your opinion on the numbers



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                              October 29, 2011

                                                                    350

1    of defensive gun uses is based on survey data; correct?

2         A    Correct.

3         Q    And which survey data do you rely on?

4         A    There are about 18 national surveys based on

5    probability samples of the adult population that have

6    asked defensive gun use questions.  The two best surveys,

7    the technically soundest surveys, are the one I did

8    published in 1993 with Marc Gertz and then a follow-up

9    survey that was based on that one that was sponsored by

10   the U.S. Justice Department done the following year in

11   1994.  That's the national survey of the private

12   ownership of firearms, NSPOF.

13        Q    Okay.  And I think you -- a list of those

14   studies was contained in your expert report under Exhibit

15   No. 4; is that correct?

16        A    Yes.

17        Q    Or I'm sorry, Table No. 4?

18        A    Yes.

19        Q    Okay.  And -- and you gave us an update of

20   that, I think, two days ago; correct?

21        A    Yes.

22        Q    Why was that updated?  What did you change on

23   the table?

24        A    Oh, I was just compulsively trying to improve

25   it to the last minute.  The changes are basically in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1   contingent valuation analysis principles; correct?

2       A    Correct.

3       Q    Have you ever conducted a contingent valuation

4   study?

5       A    No.

6       Q    Have you ever attempted to measure the intangi

7   -- intangible desire for security and self-protection

8   produced by carrying a firearm?

9       A    No.

10      Q    Why haven't you done that?

11      A    It's not an area of expertise that I have.

12      Q    Do you have any basis for believing that the

13  benefits from gun carrying in terms of their contingent

14  value outweigh the costs that Dr. Cook has identified?

15      A    No.

16      Q    Now, you point out -- I was going to try to

17  find it here.

18           All right.  I'm sorry.  If you'll look at the

19  bottom of page 25, a paragraph you reference a study by

20  Ken Arrow.

21      A    (Views document.)

22      Q    And what's your point of mentioning that study?

23      A    They assessed what they thought of the utility

24  of contingent valuation methods and came to extremely

25  negative conclusions that they just thought this just



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

386

1    shouldn't even be used as a public policy tool.

2         Q    Now, that particular evaluation involved the Ex

3    -- Exxon Valdez?

4         A    Among other things, yes.  It was broadly

5    concerned with environmental damage.

6         Q    Do you know if Ken Arrow has ever criticized

7    the use of continued valuation studies in the area of gun

8    control and gun violence?

9         A    No.

10        Q    Do you know if -- I assume that Dr. Arrow laid

11   out what he felt his criticisms were with the use of

12   contingent value studies in the environmental areas in

13   his paper?

14        A    Yes.

15        Q    Do you know if Dr. Cook, in conducting his

16   contingent valuation study in the area of firearms,

17   whether he addressed the concerns of Ken Arrow that Ken

18   Arrow had raised in his paper relating to the use in the

19   environmental area?

20        A    Yes.

21        Q    He did address those concerns?

22        A    No, I --

23        Q    Dr. Cook.

24        A    No, I don't know whether or not he addressed

25   them.



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      Q    Oh, you don't know whether or not?

2      A    No, no, you asked me do I know whether or not

3  he addressed them.  And I said yes, I know whether or not

4  he addressed them.

5      Q    And, in fact, he did address those criticisms;

6  correct?

7      A    No.

8      Q    Which criticisms did he not address?

9      A    Well, he didn't address the issue of yielding

10  internally inconsistent estimates, for example.  He

11  didn't have any tests one way or another on that.

12      Q    Anything else?

13      A    He did not address whether there would be

14  results that are inconsistent across studies because he

15  only did one study.  And so he wasn't in a position to

16  discover the problems that the Arrow panel had discovered

17  with the use of contingent valuation methods in other

18  areas.

19      Q    Anything else?

20      A    Not that occurs to me right now.

21      Q    And doing contingent value studies is not an

22  area within your expertise; correct?

23      A    Correct.  I'm relying on the expertise of the

24  Arrow panel.

25      Q    If you control for intent of the user of a gun,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 29, 2011

1    would you -- or other weapon, would you agree that guns

2    are more lethal than other weapons?

3         A    Intent to do what?

4         Q    The intent -- whatever the intent is, whether

5    it's lethality or not, the intent of -- to harm.

6         A    Okay.  Well, then, lethality intent?

7         Q    Yes.

8         A    Discuss that?  Probably.  Although, I suspect

9    it's an issue we'll never really have solid evidence on.

10   But based on the weak evidence we're going always to be

11   stuck with, my -- my view is yes, probably.

12        Q    So just to make sure I understand, if you

13   control for the intent of the user for lethality, you

14   would agree, all other things being equal, guns would be

15   more lethal than other weapons?

16        A    I would tentatively say yes.

17        Q    And are you aware of any studies that have

18   actually attempted to control for the intent of the

19   attacker and found that weapon choice affected lethality?

20        A    Attempted, yes.  Unsuccessfully attempted, yes.

21        Q    Do you agree that controlling for lethality for

22   intent of lethality, that some guns are more lethal than

23   others?

24        A    Yes.

25        Q    So doesn't it also hold that controlling for



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                                    October 29, 2011

394

1    Q    -- dash 3, they didn't find a significant

2    effect of gun --

3    A    Right.

4    Q    -- ownership levels?

5    A    Right.  And page 92 should read page 90.

6    Q    But, in fact, if you look on Table 3-3, they

7    did find a significant effect of gun prevalence on

8    burglary rates; correct?

9    A    It was am -- well, let's see.

10   (Views document.)

11   Yeah, I couldn't tell if they were doing a

12   one-tailed or two-tailed test there.  So if it's a --

13   if it's a one-tailed test, then they failed at the

14   conventional 5 percent level to find a significant

15   effect of gun prevalence on logged burglary rates.

16   Q    If it -- if it's a two-tailed test, they showed

17   a significant level -- a significant effect of gun

18   prevalence on burglary rates; correct?

19   A    Yes, and if it's a one-tailed test, it fails.

20   Q    But that's not what you say on page 27 of your

21   expert report.  You said they found no significant

22   effect.  That's not true; correct?

23   A    Well, again, it's a matter of phrasing

24   subtleties.  If you consider significance a binary issue,

25   yes, no.  It's -- it's not meaningful to say there's a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

395

1    complete absence of significance.  There's just level of

2    significance, which can be anything from zero to 1.0.

3    And so it may have been less than the conventionally

4    accepted customary cutoff of 5 percent, depending on

5    whether or not that's a one-tailed test or a two-tailed

6    test.

7         Q    Or it may be if it's two-tailed test, it is

8    at -- significant at the customary cutoff for

9    significance; correct?

10        A    Possibly.

11        Q    Okay.  So this statement that you make on page

12   27, the last sentence, is actually wrong; correct?

13        A    No.

14        Q    Well, it's wrong, first of all, because you

15   referred to the wrong table; correct?

16        A    Well, yes, there is a typo.

17        Q    But we've corrected that.  But it's also wrong

18   because their data actually does show significant -- a

19   significant effect of gun ownership on burglary rates;

20   correct?

21        A    No, not necessarily, not if you use the

22   customary 5 percent level.

23        Q    So this -- this sentence should say:  This

24   analysis might show no significant effect of gun

25   ownership levels on burglary rates, depending on whether



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

400

1   variable analysis; is that correct?  Am I right?

2        A    Yes.

3        Q    Okay.  And that's the analysis where you say

4   they didn't find a significant effect?

5        A    Yes.

6        Q    And then they also did a similar analysis with

7   the NCVS data too; correct?

8        A    Yeah, similar in some ways, yes.

9        Q    And they looked at the household level for

10  that; correct?

11       A    Yes.

12       Q    Did any of their data show a negative effect

13  between gun prevalence and burglaries?

14       A    No.

15       Q    And some of their data showed a statistically

16  significantly positive effect; correct, some of the

17  analysis that they did?

18       A    Yes.  Well, let me modify that.  That's the way

19  they interpreted the results.

20       Q    And in Table 3-7, this was an analysis that

21  showed positive numbers, but they weren't statistically

22  significant; correct?

23       A    Correct.

24       Q    Now, if you go over to page 28 of your expert

25  report at the first -- the top paragraph, it says:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 29, 2011

                                                              423

1        A       Underground Gun Markets by Cook, et al.

2        Q       Okay.  And this is the article from which you

3   derived the price of a -- retail price of a handgun of

4   $316 --

5        A       Yes.

6        Q       -- that you reference in your expert report? 

7        A       Yes.

8        Q       And if you go over to page F-586, there's a

9   Table A4?

10       A       Yes.

11       Q       And in this table, if you look under youth, 18

12  to 24?

13       A       Yes.

14       Q       And under the mean price for the guns

15  confiscated from youth age 18 to 24 is $316; correct?

16       A       Correct.

17       Q       And do you see down at the bottom of the table

18  where it says:  Retail price is estimated price of guns

19  sold new at retail from Blue Book figures and does not

20  account for actual conditions of guns, which is not

21  available in the ATF data; correct?

22       A       Correct.

23       Q       So when you say that the price of sale of

24  handguns on the street in the illegal market is similar

25  to the re -- to the retail price, what you mean is it's



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

424

1     similar to new gun sales; correct?

2         A    Yes.

3         Q    Is there any reason to believe that the guns in

4     the illegal market are all new?

5         A    That they're all new?  No.

6         Q    Yeah.

7              Is there any reason to believe that the

8     316-dollar figure applies to any guns in the illegal

9     market?

10        A    Yes.

11        Q    Why do you say that?

12        A    Because some would have been purchased new.

13        Q    Do you know how many would have been -- in the

14    illegal market were new as opposed to used?

15        A    In this -- no, in this particular market, no.

16             But we know from surveys of prison inmates

17    that maybe 1/6 of gun purchases they make are from gun

18    dealers, and we know that roughly 2/3 of the sales made

19    by gun dealers are of new guns, so you can kind of

20    indirectly infer it.  But there's no direct information

21    within this study to establish that.

22        Q    Right.  And so there's nothing to say that the

23    guns that -- the guns that are in the illegal market on

24    the street are actually in new condition when they're

25    being sold and, therefore, comparable to new gun prices;



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

425

1  correct?

2      A    No.

3      Q    Why not?

4      A    Well, partly relying on Cook's own writings, he

5  asserts that guns are relatively new in criminal's hands.

6  Then he bases this on primarily gun trace data, and so

7  the guns are relatively new, sometimes absolutely new.

8  Sometimes simply young enough, so to speak, to -- not to

9  have had any significant wear and tear so, you know.

10     Q    Well, in order to do this comparison between

11 the guns in the illegal market and these new gun retail

12 prices, you would have to know what percentage of guns on

13 the illegal market are new versus used and what their

14 conditions are; correct?

15     A    If you wanted very precise price figures on the

16 guns.  In fact, the only way to get absolutely precise

17 figures is to somehow know exactly what a gun of that

18 exact character and wear level was selling for in a gun

19 store.

20     Q    Would you agree that a new gun would always be

21 in good condition?

22     A    Yes.

23     Q    Do you know what percentage of these illegal

24 guns are in good condition?

25     A    No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

426

1        Q      Do you know what the price guns would be on the

2    street if there were no gun control laws?

3        A      No.

4        Q      Would you expect the gun -- the price to be

5    higher or lower than it would be, say, under the Chicago

6    ordinance?

7        A      I would expect it to be fairly similar.

8        Q      So you don't think that would have any effect

9    on the price of weapons?

10       A      Not given the kinds of gun control we've --

11   we've actually tried out.

12       Q      Would it have any effect on the number of

13   criminals who acquired weapons on the street?

14       A      It could if -- if the restrictions were strict

15   enough.

16       Q      Some -- some criminals are not able to purchase

17   a weapon at a retail given their prior record; right?

18       A      Yes.

19       Q      Now, I want to direct your attention to

20   page 33.

21       A      (Views document.)

22       Q      At the top.  This is page 33 of your expert

23   report.  You're referencing Cook's reference to survey of

24   Chicago arrestees done by the Justice Department.

25              And Dr. Cook, as you say, claimed that these



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

427

1    data indicated that the city's criminals take a long

2    time to acquire handguns, implying that it is hard for

3    criminals to get them; do you see that?

4        A    Yes.

5        Q    But you disagree with that statement; right?

6        A    Yes.

7        Q    And one of the reasons you disagree with that

8    statement is that the people who were asked how long it

9    would take to get a gun hadn't previously gotten a gun;

10   right?

11       A    Yes.

12       Q    But you're assuming that these people, even

13   though they asked or even though they hadn't previously

14   gotten a gun, wouldn't have an idea of how to get the

15   guns; right?

16       A    I'm assuming they have no idea based on

17   personal experience.

18       Q    Right.  Just on personal experience, their own

19   personal experience.  But they may actually know from

20   their affiliation with a gang how long it takes to get a

21   gun; correct?

22       A    It's a logical possibility, but there's no

23   evidence that's true.

24       Q    But it's -- it's just as likely that that

25   happens as if they -- these people have no idea and have



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 29, 2011

428

1    no experience at all as to how one would go to get a gun;

2    correct?

3         A    No.

4         Q    Why do you say that?

5         A    Because people always know their own personal

6    experiences much better than they know the experiences of

7    other people.

8         Q    But even though they haven't gotten a gun

9    before, that doesn't mean they don't know how to get a

10   gun or how long it would take?

11        A    No, it doesn't mean they necessarily have no

12   knowledge at all.  It means they don't have any knowledge

13   of the sort that's most reliable.

14        Q    Would you agree with me that people who --

15   criminals who live in a high crime area would know who to

16   talk to to get a gun; right?

17        A    Many of them would not.

18        Q    So you're saying criminals -- many criminals

19   would not --

20        A    Correct.

21        Q    -- know how to get a gun?

22        A    Well, I don't know if it's many or not.  I

23   wouldn't have an opinion on that, but certainly some

24   would not, how to illegally obtain one, I mean.

25        Q    Now, have you ever actually studied the issue


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    of corrupt dealers in Chicago itself?

2          A     Only by reviewing other people's research.

3          Q     And have you conducted any studies of the

4    aggregate or national level?

5          A     Of what?

6          Q     Of corrupt FFL dealers --

7          A     Only in --

8          Q     -- or the extent to which they are corrupt?

9          A     Only in the sense of reviewing Bureau of

10   Alcohol, Tobacco & Firearms reports.

11         Q     Now, have you ever -- okay.

12               So you yourself haven't ever done any

13   research to see the effects, for instance, of having a

14   FFL in the city of Chicago that is a scofflaw?

15         A     No -- I mean correct; I have not.

16         Q     Right.  Yeah, we're -- lawyers are very good at

17   being ambiguous, as maybe you've figured out.  Thank you

18   for the clarification.

19               If you go to page 34 of your report.

20         A     (Views document.)

21         Q     If you look at the first full paragraph down,

22   you say:  Cook cites (page 11) the cases of "several"

23   FFLs in the suburbs of Chicago who are found, as a result

24   of police "sting" operations, to be willing to make

25   illegal gun sales.  And then you refer to these as



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

430

1  "several" anecdotal cases; right?

2      A    Yes.

3      Q    That don't support a general inference that

4  there are scofflaw FFL dealers; correct?

5      A    Well, it supports the notion that there are

6  some, but it doesn't support the notion that they're

7  common.

8      Q    What would be necessary to test whether this is

9  common or not?

10     A    Well, imagine that the sting operations were

11  done in a very different way.  This is something in

12  principle possible but not, in practice, likely to be law

13  enforcement practice.

14          But if you could somehow gain police

15  cooperation, you would have them select a random sample

16  of FFLs and then, you know, test their credibility,

17  their -- their law-abiding character or whatever with

18  these sting operations.  Instead of what they did,

19  which was, of course, highly selective, as is

20  appropriate from a law enforcement standpoint.  But

21  it's poor practice were it regarded as a research

22  effort.

23     Q    What if a researcher went to a random

24  representative sample of dealers and solicited various

25  legal and illegal purchases; would that be a better way



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

431

1    to evaluate the extent to which FFLs are willing to

2    violate laws in selling guns?

3        A    Yes.

4        Q    Do you know any of study according to that

5    design has been done?

6        A    No, I don't not -- I do not know of any such

7    study.

8        Q    Do you have any opinion as to what you think

9    the city of Chicago should do to effectively regulate

10   sales of gun transactions within the city of Chicago?

11       A    I've expressed views about what I think are

12   good con -- gun control practices in general, not in

13   reference to Chicago in particular; but I think they

14   would apply in Chicago as well as anywhere else.

15       Q    And what would those be?

16       A    Support a national background check that's

17   imposed on all gun transfers, including private transfers

18   which are not currently covered by the Brady law.  I

19   support enforced -- increased enforcement of carry laws

20   to detect and punish unlicensed gun carrying.

21            I support expanding the -- the

22   comprehensiveness of criminal history files so that you

23   have more effective background checks prior to guns

24   being acquired.  And those would be good practices in

25   either Chicago or anywhere else.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      A    Yes.

2      Q    And there's also a time period over which other

3  responses to crime could be effective or ineffective, for

4  instance, if a person is jumped and he's in a confined

5  space, fleeing may not be an option for avoiding injury

6  in that case; right?

7      A    Correct.

8      Q    And -- but there could be another time where

9  you were in an open space, the assault -- the person

10  assaulting you is far away; and you could flee and avoid

11  an injury in that circumstance; correct?

12     A    Right.

13     Q    And so there's all different scenarios that

14  could arise as to whether guns might result in avoiding

15  injury versus fleeing might result in avoiding an injury?

16     A    Correct.

17     Q    And they occur at different time frames?

18     A    Yes.

19     Q    And fleeing might be effective under some

20  circumstances and not effective under other circumstances

21  in the same way that defensive gun use could be effective

22  under some circumstances and not effective under other

23  circumstances?

24     A    Correct.

25     Q    For the instances in your analysis where you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    determine that defensive gun use was effective in

2    avoiding injury, how do you know that under those

3    circumstances fleeing would have also been effective at

4    avoiding injury?

5         A    You can't know because we could only analyze

6    the events as they actually occurred.  We have no way of

7    modeling or simulating alternate set of conditions that

8    didn't occur.

9         Q    Yeah.  So this goes back maybe to our

10   discussion that we had in the beginning, the best type of

11   study would be a randomized control trial where you

12   looked at the same crime occurring 100 times; and in 100

13   times, people used a gun, a gun defensively, to try to

14   avoid injury and then another 100 times, they fled; and

15   then you see how much more or less injury occurs with

16   each scenario.

17        A    Yes.

18        Q    And we can't do that.

19        A    Correct.

20        Q    And so you agree that your analysis of the

21   benefits of defensive gun use, at least, have the

22   limitation that you aren't comparing like scenarios to

23   like scenarios?

24        A    I wouldn't go that far.  They -- they were

25   known to be like with respect to a lot of variables that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

458

1    we controlled for.

2          So everything that was measured and

3    controlled for, we've taken account of those

4    differences, but are there other circumstances that we

5    did not -- that weren't measured and that we didn't

6    control for, yes, there were others.

7        Q    And that's what I asked.

8          I asked you if there are limitations to your

9    analysis because you can't perfectly compare like

10   scenarios to like scenarios.

11       A    Well, the only thing I was quibbling about was

12   that like to like.  They are pretty similar.  They're

13   just not totally.  We can't negate the influences of all

14   circumstances, but if -- if -- the simple point is:  That

15   there are uncontrolled factors in our analyses,

16   absolutely.

17       Q    And since you have uncontrolled factors, you

18   can't say what effect those uncontrolled factors would

19   have had on your results?

20       A    Correct.

21       Q    And those uncontrolled factors might negate the

22   benefit of gun -- defensive gun use or your analysis;

23   correct?

24       A    It's a logical possibility.

25       Q    What are the things that you couldn't control



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

459

1    for in your analysis of the injury-preventing benefits of

2    defensive gun use?

3        A    Well, one I can think of offhand would be I

4    would like to know the physical size and strength of the

5    parties involved, both victim and offenders, so I could

6    tell what their relative power was based on just their --

7    their physical attributes.

8        Q    And -- and how would that affect the analysis?

9        A    Well, the -- the greater the power advantage of

10   the offender over the victim would affect how capable

11   they would be of inflicting injury and also how capable

12   they would be of inflicting serious injury rather than

13   minor injury, which is another distinction we made.

14       And if that physical size is correlated with

15   victim's choices as to self-protective actions like,

16   for example, if people who were physically weaker

17   decided -- were more likely to use guns as a way of

18   compensating for that physical weakness, then that can

19   alter the estimated effects of the defensive gun use

20   because it's a confounder.

21       It's correlated with the choice of defensive

22   method or -- self-protective action and it affects the

23   injury outcome.

24       Q    And without doing that analysis of attempting

25   control for that, we don't know exactly what effect that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com