# Exhibit 92

*Injury Prevention* 2000;6:263–267

263

# Gun use in the United States: results from two national surveys

D Hemenway, D Azrael, M Miller

**Abstract**

*Objectives*—To determine the relative incidence of gun victimization versus self defense gun use by civilians in the United States, and the circumstances and probable legality of the self defense uses.

*Methods*—National random digit dial telephone surveys of the adult population were conducted in 1996 and 1999. The Harvard surveys appear unique among private surveys in two respects: asking (1) open ended questions about defensive gun use incidents and (2) detailed questions about both gun victimization and self defense gun use. Five criminal court judges were asked to assess whether the self reported defensive gun uses were likely to have been legal.

*Results*—Even after excluding many reported firearm victimizations, far more survey respondents report having been threatened or intimidated with a gun than having used a gun to protect themselves. A majority of the reported self defense gun uses were rated as probably illegal by a majority of judges. This was so even under the assumption that the respondent had a permit to own and carry the gun, and that the respondent had described the event honestly.

*Conclusions*—Guns are used to threaten and intimidate far more often than they are used in self defense. Most self reported self defense gun uses may well be illegal and against the interests of society.

(*Injury Prevention* 2000;6:263–267)

Keywords: firearms; guns; self defense; legality

The United States has a higher homicide rate than other developed nations, and most of our murders are committed with firearms. On an average day in the 1990s in the United States, 35–50 Americans were murdered with firearms, and another 120–160 were shot in assaults but did not die.[1] Shootings that result in injury are a small percentage of hostile events involving firearms.[2] In some of these events guns may thwart criminal assaults, in others they may be instruments of aggression.

Evidence about the incidence and characteristics of gun victimization and self defense gun use come from two types of survey. The first is the large, public National Crime Victimization Survey (NCVS). The NCVS, conducted by the Census Bureau for the Bureau of Justice Statistics, asks questions of the same household every six months for three years. By excluding incidents reported in the first interview (that is,

by "bounding" the responses), the NCVS greatly reduces the substantial problem of "telescoping" (the reporting of events that actually occurred outside the time frame in question). In criminal victimization surveys, telescoping can increase estimates by between 40% and 50% depending on the type of crime; the inflation rate is greatest for violent crimes.[3 4]

The NCVS focuses on six specific serious crimes (for example, assault, rape, robbery) and asks the respondent whether s/he has been the victim of an attempted or completed crime within the preceding six months. Follow up questions ask whether the offender used a gun in the criminal attempt, as well as what, if anything, the respondent did to protect him/herself. Estimates from the NCVS suggest that each year about one million violent crimes involve guns while victims use guns in self defense perhaps 60 000 to 120 000 times.[5 6]

Many smaller, one shot private surveys have asked one or more questions about self defense gun use.[7] Estimates of self defense gun use from such surveys are an order of magnitude higher than the NCVS estimates. Two features of these private surveys probably explain most of this difference: (1) responses are unbounded and (2) all respondents are asked about defensive gun use, not just those respondents who report that they have been the victim of an attempted crime.[8–11] These two features should also make private survey estimates of gun victimization higher than the NCVS estimates.[2]

In 1996 and 1999 national surveys focusing on defensive and offensive gun use were conducted under the auspices of the Harvard Injury Control Research Center. The Harvard surveys appear to be the only private surveys to ask either (1) *open ended* questions about defensive gun uses, or (2) detailed questions of each respondent about *both* gun victimization and self defense gun uses. This article presents evidence on the relative frequency and circumstances of these two types of gun use, as well as on their probable legality.

## Methods

Data come from two national random digit dial surveys conducted by Fact Finders, Inc in the spring of 1996 and the spring of 1999. The samples comprise, respectively, 1905 and 2521 adults living in the 50 states.

The samples were stratified by state, with the number of interviews designated for each state determined by that state's population relative to the total population according to the 1990 census. All households with a single telephone line, including those with unlisted numbers, had an equal probability of inclusion in the

**Department of Health Policy and Management, Harvard School of Public Health, 677 Huntington Avenue, Boston, MA 02115, USA**
D Hemenway
D Azrael
M Miller

Correspondence to:
Professor Hemenway
(hemenway@hsph.harvard.edu)

sample. Households without a telephone were excluded from the sample.

No more than one adult from each household was interviewed. Rather than interview the adult who happened to be at home at the time of the call, the interviewers alternately asked to speak with a man or with a woman living in the household. If there was no adult living in the household of the requested gender, the initial respondent was interviewed. Results show unweighted data.

Once a telephone number was randomly selected, as many as 10 repeat phone calls were made until a final disposition was assigned. In 1996, 27% of contacted households refused to participate in the survey; in 1999, 35% refused. These response rates are comparable to other self defense gun use surveys.[11 12]

Respondents who answered yes to either gun use qualifying question were asked up to 30 follow up questions about the most recent event, including an open ended question which asked them to describe the incident. All results eliminate respondents who were police officers, security guards, or military personnel. Results also eliminate cases in which the respondent reported that the event occurred more than five years before the survey or outside the United States.

In the case of hostile gun displays, we also eliminated incidents in which the respondent refused to provide any detailed information about the event at the time of the initial interview, the respondent appeared to be an observer rather a participant in the event, or was thought to be a criminal (for example, by the police). We were more stringent about what was counted as a hostile gun display, and more permissive about was counted as a self defense gun use.

The specific qualifying questions in both surveys were similar.[13] In 1999 respondents were asked "In the past five years, has anyone used, displayed or brought out a gun in a hostile manner *against you* [italics added], even if this event did not take place as part of the commission of a crime?" The 1996 question did not include the "against you" and so obtained more instances when the respondent was merely a witness.

The 1999 survey inadvertently omitted an open ended question about the most recent

hostile gun display. Four to eight months after the initial interview we tried to recontact all those who had reported a hostile gun display against them. We were able to gain a verbatim description of the most recent event from half these respondents. In 6% of these instances it appeared that the respondent merely witnessed the hostile gun display. In calculating the number of hostile gun displays, we thus excluded 6% of all non-contacted respondents who reported a hostile gun display.

All respondents in the 1999 survey were asked "In the past five years, have you used, displayed or brought out a gun in self defense to protect yourself from a person or people?" The 1996 survey asked "In the past five years, have you used a gun to protect yourself from a person or people?"

In order to obtain a generous estimate of self defense gun uses, we included incidents even when the respondent refused to give any information about the event or, from the description, it appeared the other party never knew the respondent displayed the gun.

Self defense gun use incidents were summarized and sent to five criminal court judges (from California, Pennsylvania, and Massachusetts) who were assured anonymity. The judges were told to assume that the respondent had a permit to own and carry the gun and had described the event honestly from his/her own perspective. The judges were then asked to give their best guess whether, based on the respondent's description of the incident, the respondent's use of the gun was very likely legal, likely legal, as likely as not legal, unlikely legal, or very unlikely legal.

## Results
The percentages of respondents reporting hostile gun displays in the two surveys are not statistically different, nor are the percentages of respondents reporting a self defense gun use. Results of the two surveys are therefore combined in the analysis.

HOSTILE GUN DISPLAYS
On the 1996 survey, 122 respondents reported a hostile gun display against them. We eliminated over half of these for a variety of reasons (table 1), leaving 58 civilians who

*Table 1  Hostile gun displays: gun use against respondents*

|  | 1996 (n=1905) | | 1999 (n=2521) | | Combined | |
|---|---|---|---|---|---|---|
|  | *Respondents* | *Incidents* | *Respondents* | *Incidents* | *Respondents* | *Incidents* |
| Total positives | 122 | 450 | 131 | 342 | 253 | 792 |
| Exclusions: |  |  |  |  |  |  |
| Witness only | 31 | 112 | 6* | 12* | 37 | 124 |
| Thought to be criminal | 8 | 16 | 14 | 35 | 22 | 51 |
| Police officer | 10 | 150 | 11 | 30 | 21 | 180 |
| Security guard | 2 | 3 | 2 | 4 | 4 | 7 |
| Military personnel | 3 | 6 | 2 | 1 | 5 | 7 |
| Arson investigator | 1 | 2 | 0 | 0 | 1 | 2 |
| Private investigator | 1 | 25 | 0 | 0 | 1 | 25 |
| Outside of US | 2 | 3 | 0 | 0 | 2 | 3 |
| Out of time frame (>5 years) | 1 | 1 | 1 | 4 | 2 | 5 |
| Insufficient information | 3 | 16 | 0 | 0 | 3 | 16 |
| Other | 2 | 4 | 1 | 97 | 3 | 101 |
| Total exclusions | 64 | 338 | 37 | 183 | 101 | 521 |
| Cases | 58 | 112 | 94 | 159 | 152 | 271 |

*Based on % of a sample of cases in which the narrative indicated that respondent had only witnessed the event.

reported 112 hostile gun displays against them in the previous five years.[2]

On the 1999 survey, 131 respondents reported a hostile gun uses against them. One man reported 97 gun uses and was excluded. We also excluded 15 police, security guards and military personnel, 14 people who responded that the gun user might have thought s/he was a criminal, and one who reported that the event took place six years before the survey. Of the remaining 100, we received a verbatim description from 50; 6% appeared to have merely witnessed the event ("It was between two other people; a gun was displayed, it could have ricocheted"). We eliminated 6% of the 100, leaving 94 respondents who reported 159 events.

After appropriate exclusions, 152 respondents from the combined surveys reported 271 incidents (table 1).

Three examples of hostile gun displays against respondents from the 1999 survey are:
- "I'm a cattle farmer and he's a cattle farmer. He was putting his bulls and heifers up near the fence and my bull broke out and he got mad".
- "I was on a date. He pulled the gun when I mentioned breaking up with him".
- "I was mugged in New York".

SELF DEFENSE GUN USE

On the 1996 survey, 14 civilian respondents reported using a gun in self defense in the past five years, accounting for 54 incidents. On the 1999 survey, 29 civilian respondents reported using a gun in self defense, accounting for 92 gun uses. For both surveys combined, a total of 146 self defense gun uses were reported by 43 people who were not police, military personnel, or security guards (table 2).

In each survey, the number of respondents reporting that they were gun victims exceeded the number of respondents reporting that they had used a gun in self defense by over three to one, 152 to 43 (p<0.001) overall.

On both surveys combined, 2.9% of gun owners, 0.3% of those living in the home with someone who owns a gun, and 0.4% of non-gun owners reported a self defense gun use (table 3). After eliminating police, security guards and military personnel, approximately 1% of respondents reported a self defense gun use (43/4378).

Of the 43 respondents reporting a self defense gun use, six did not provide a description of the most recent event, and for two more the descriptions indicated that the respondent

did not use the firearm (for example, one never encountered the thieves who had stolen his truck). The criminal court judges were shown summaries of the remaining 35 events; each judge rated each event. Twenty per cent of the time a judge rated a case as "as likely legal as illegal". Excluding these ratings (when judges often said there was not enough information), a majority of the judges rated 18 of the 35 (51%) as probably illegal and 15 of the 35 (43%) as probably legal. For two there was no majority opinion. In 23 of 35 events the judges were unanimous in their ratings; nine times there was one dissenter; and in three instances the ratings were either 3–2 or 2–2 in terms of the probable legality of the self defense gun use.

Two examples from the 1999 survey of incidents that were unanimously deemed probably illegal were:
- A 62 year old male said that at 6 pm "the police called. My alarm at my business went off so I went there to shut it off. Two men were outside my building, so from my car I shot at the ground near them". The respondent said the men were trespassing.
- A 58 year old male was inside his home at 2 pm. "I was watching a movie and [an acquaintance] interrupted me. I yelled that I was going to shoot him and he ran to his car". The respondent said his acquaintance was committing a verbal assault. The respondent's gun, a .44 Magnum, was located "in my holster on me".

Two examples of self defense gun use from the 1999 survey that were unanimously deemed probably legal were:
- A 26 year old male was with friends at another's home. At 8:30 am "a friend of mine was in the process of getting robbed and he was drunk. We went to help him just as the robbers were leaving". The respondent's gun was not loaded and "I never really took it out of my pocket".
- A 38 year old male was inside his home at 4 am. "Someone broke in; I woke up to the sound. I got my gun from the safe [loaded it] and went downstairs. The person left and I called the police". The respondent did not know whether the burglar had a weapon.

Over two thirds (68%) of the 146 self defense gun use incidents from the two surveys were reported by six respondents. Three people claimed 50, 20 and 15 self defense incidents in the previous five years, but refused to describe the most recent event. In the 1999 survey, an 18 year old male reported six cases. He described the most recent incident: "I was at

*Table 2 Self defense gun use by respondents*

| | 1996 (n=1905) | | 1999 (n=2521) | | Combined | |
|---|---|---|---|---|---|---|
| | Respondents | Incidents | Respondents | Incidents | Respondents | Incidents |
| Total positives | 23 | 222 | 47 | 445 | 70 | 667 |
| Exclusions: | | | | | | |
|   Police officer | 6 | 161 | 15 | 254 | 21 | 415 |
|   Security guard | 0 | 0 | 1 | 2 | 1 | 2 |
|   Military personnel | 2 | 6 | 2 | 97 | 4 | 103 |
|   Out of time frame (>5 years) | 1 | 1 | 0 | 0 | 1 | 1 |
| Total exclusions | 9 | 168 | 18 | 353 | 27 | 521 |
| Cases | 14 | 54 | 29 | 92 | 43 | 146 |

Table 3   Number (%) of individuals reporting a self defense gun use by reported gun ownership

| Firearm | 1996 | | | 1999 | | | Combined | | |
|---|---|---|---|---|---|---|---|---|---|
| | Defensive use | Total | % | Defensive use | Total | % | Defensive use | Total | % |
| Personally own gun | 9 | 457 | 2.0 | 22 | 618 | 3.6 | 31 | 1075 | 2.9 |
| Gun in household | 1 | 307 | 0.3 | 1 | 417 | 0.2 | 2 | 724 | 0.3 |
| Household without gun | 4 | 1085 | 0.4 | 6 | 1462 | 0.4 | 10 | 2547 | 0.4 |
| Refuse | 0 | 30 | 0.0 | 0 | 22 | 0.0 | 0 | 32 | 0.0 |
| Excluded | — | 26 | — | — | 22 | — | — | 48 | — |
| Total | 14 | 1905 | 0.7 | 29 | 2521 | 1.2 | 43 | 4469 | 1.0 |

school and they pulled a gun during an argument. They fired and I fired".

## Discussion

Consistent with results from the NCVS and private one shot surveys,[2] we find that far more respondents report criminal gun uses against them than self defense gun uses by them. The results hold even though, in order to be as conservative as possible, we (1) eliminate many of the reported hostile gun uses against the respondent, and (2) include virtually all the reported self defense gun uses.

Our surveys yield higher estimates of both criminal and self defense gun use than does the NCVS, probably due to telescoping and due to the fact that our respondents could report a gun use without first reporting that someone tried to commit a crime against them.[8 11] These factors need not differentially affect the *relative* incidence of gun victimization versus self defense gun use, which we report here.

However, our results should not be extrapolated to obtain population based estimates of the absolute number of gun uses. If we have as little as 1% random misclassification, our results could be off by orders of magnitude. It appears we can obtain substantially higher rates of self defense gun use if we ask respondents about events in the previous six months rather than the previous five years.[7] On the other hand, we can obtain substantially lower rates of self defense gun use if we eliminate the handful of respondents who report the vast majority of uses, the various respondents who report uses that do not appear to meet reasonable criteria for actual use, or the respondents whose use appears offensive rather than defensive.

While it is sometimes presumed that self defense gun use is beneficial for society, that notion has been viewed with increasing skepticism.[10 11] It is noteworthy that in prison surveys, about half of convicted felons who have fired a gun claim to have done so in self defense.[14]

In our survey, the criminal court judges who rated the incidents determined that at least half were probably illegal—even after assuming that the respondent had a permit to own and carry a gun and described the incident honestly. We expect that the true percentage of reported self defense gun uses that are illegal is higher than 50% for at least two reasons.

First, three respondents reported over 58% of the self defense gun uses, and none of their accounts were read by the judges (since all refused to provide a description of the most recent event). Many reported self defense gun uses from a respondent creates a suspicion that the uses may be aggressive rather than defensive.

Second, the reports read by the judges are only one side of a hostile interaction that usually occurred months or years before the survey. We expect respondents will view the hostile encounter from their own perspective; in any mutual combat both participants may believe that the other side is the aggressor and that they themselves are acting in self defense. In addition, when describing the event, respondents will typically want to present themselves in the best possible light.[15–20]

Certainly some self defense gun uses are legal and in the public interest. But many are not. The possibility of using a gun in a socially useful manner—against a criminal during the commission of a crime—will rarely, if ever, occur for the average gun owner. By contrast, at any other moment, the use of a gun against another human is illegal, and socially undesirable. Regular citizens with guns, who are sometimes tired, angry, drunk or afraid, and who are not trained in dispute resolution or on when it is proper to use a firearm, have many opportunities for inappropriate gun use. People engage in innumerable annoying and somewhat hostile interactions with others in the course of a lifetime. We might expect that unlawful "self defense" gun uses will outnumber the legitimate and socially beneficial ones.

Trained police officers are often inadequately prepared to handle ambiguous but potentially dangerous situations. Heavy stress, confusion, and fear are inherent in most possible shooting situations. Heart rates skyrocket, and it is difficult to think clearly and to act deliberately. Not surprisingly, even the police make serious mistakes in their firearm use. Individuals without training or experience can be expected to do much worse.

Our findings have various limitations. Our results are based on self reports of past events, with the potential of recall bias. The surveys under-sampled poor people who may have more hostile conflicts with firearms than their richer counterparts. The key questions from the two surveys, though very similar, were not identical, and neither survey sampled anyone under age 18. In addition, we have detailed information only on the most recent self defense and criminal gun incidents; to the extent that the most recent incident is not typical of all the incidents experienced by the respondent, our findings may not be representative.

Only five judges, from three states, assessed the self defense gun incidents from the surveys;

they were a convenience rather than a random sample, and the sample is too small to be confident of the stability of the aggregate ratings we report here.

Despite these limitations, our surveys provide evidence about gun uses in American society that has not been available before. Our results indicate that gun use against adults to threaten and intimidate is far more common than self defense gun use by them, and that most self reported self defense gun uses are probably illegal, and may be against the interests of society.

This research was supported in part by the grants from the Centers for Disease Control and Prevention, the National Institute of Justice, the Open Society Institute, and the Joyce Foundation.

1 Annest JL, Mercy JA, Gibson DR, *et al.* National estimates of nonfatal firearm-related injuries. *JAMA* 1995;273:1749–54.
2 Hemenway D, Azrael D. The relative frequency of offensive and defensive gun uses: results from a national survey. *Violence and Victims* (in press)
3 Skogan W. The National Crime Survey redesign. *Public Opinion Quarterly* 1990;54:256–72.
4 Cantor D. Substantive implications of longitudinal design features: the National Crime Victimization Survey as a case study. In: Kasprzyk D, Duncan G, Kalton G, *et al*, eds. *Panel surveys.* New York: John Wiley, 1989.
5 National Archives of Criminal Justice Data. *National Crime Victimization Survey: 1986–1991, 1992–1995.* http: \\www.icpsr.umich.edu:80/NACJD.
6 McDowall DB, Wiersema B. The incidence of civilian defensive firearm use by US crime victims. *Am J Public Health* 1994;84:1982–5.
7 Kleck G. *Targeting guns: firearms and their control.* New York: Aldine de Gruyter, 1997.
8 Hemenway D. Survey research and self-defense gun use: an explanation of extreme overestimates. *Journal of Criminal Law and Criminology* 1997;87:1430–45.
9 Hemenway D. The myth of millions of annual self-defense gun uses: a case study of survey overestimates of rare events. *Chance* 1997;10:6–10
10 Cook PJ, Ludwig J, Hemenway D. The gun debate's new mythical number: HOW many defensive uses per year? *Journal of Policy Analysis and Management* 1997;16:463–9.
11 Cook PJ, Ludwig J. Defensive gun uses: new evidence from a national survey. *Journal of Quantitative Criminology* 1998;14:111–31.
12 Kleck G, Gertz M. Armed resistance to crime: the prevalence and nature of self-defense with a gun. *Journal of Criminal Law and Criminology* 1995;273:1749–54.
13 Azrael D, Hemenway D. "In the safety of your own home". Results from a national survey on gun use at home. *Soc Sci Med* 2000;50:285–91.
14 Wright JD, Rossi PH, Daly K. *Under the gun: weapons, crime and violence in America.* Hawthorne, NY: Aldine Publishing Company, 1983.
15 Krosnick JA. Survey research. *Annu Rev Psychol* 1999;50:537–67.
16 DeMaio TJ. Social desirability and survey measurement: a review. In: Turner CF, Martin E, eds. *Surveying subjective phenomena.* New York: Russell Sage, 1984.
17 Gosling SD, John OP, Craik KH, *et al.* Do people know how they behave? Self-reported act frequencies compared with on-line coding by observers. *J Pers Soc Psychol* 1998;74:1337–49.
18 John OP, Robins RW. Accuracy and bias in self-perception: individual differences in self-enhancement and the role of narcissism. *J Pers Soc Psychol* 1994;66:206–19.
19 Smith TW. Discrepancies between men and women in reporting number of sexual partners: a summary from four countries. *Soc Biol* 1992;39:203–11.
20 DelPrete LR, Caldwell M, English C, *et al.* Self-reported and measured weights and heights of participants in community-based weight loss programs. *J Am Diet Assoc* 1992;92:1483–6.

**From the journals**

A report in *JAMA* shows that the risk of death in cars driven by 16 and 17 year olds is related to the number of passengers. Using data from various national sources the authors found that when compared with drivers of the same age who had no passengers, the relative risk of 16 year old drivers' deaths per 10 million trips was 39% higher for those with one passenger, 86% higher for those with two, and nearly three times higher for those with three or more passengers. Similar patterns were found for 17 year old drivers. Perhaps not surprisingly, driver crashes were greater when the passengers were male and under 30 and the death rates for teen drivers were substantially increased late at night. The authors note that a previous survey of high school drivers found that dangerous driving behaviors were strongly associated with the presence of peers. They conclude that the results support the need for graduated driver's licensing system for teens. Such a system is in place in 24 states. An accompanying editorial by Robert Foss states "This is clear and convincing evidence that state [graduated driver's licensing] systems should include passenger restrictions during the initial stages of driver licensing" (*JAMA* 2000 (March), Li-Hui Chen and colleagues).

Many papers in our most formidable rival, *Accident Analysis and Prevention*, are noteworthy. In the January 2000 issue (vol 32) one by Gregersen *et al* reports on the beneficial effects of a 16 years age limit for learner drivers in Sweden (p 25–36) and another, by Elvik, describes the relevant costs and benefits of road safety measures for pedestrians and drivers (p 37–46), There is also an exploration of the barriers to bicycle helmet use in 12 and 13 year olds by Loubeau (p 111–16). The entire March 2000 issue is devoted to whiplash and most of the papers are quite technical, mainly of interest to engineers. In the May issue the theme was domestic and personal injury. It includes important papers by Marsh and Kendrick on near miss and minor injuries; one on burn injuries in the Netherlands (Hertog *et al*); another on personal watercraft injuries (Jones). Also included is a report by Macarthur *et al* on playground falls and a meta-analysis of studies linking smoking to injury fatalities by Leistikow *et al*.

A report based on data from the National Electronic Injury Surveillance System in the US notes that injuries at fast food restaurants account for more than one quarter of the occupational injuries among 15–17 year olds in the US. This makes this the largest single source of work related injuries in this age group. One of the most important solutions proposed is better training, along with proper supervision and safety practices (*J Occup Environ Med* 1999; 41:1146–53).

# Exhibit 93

*Violence and Victims, Vol. 15, No. 3, 2000*
© 2000 Springer Publishing Company

# The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey

**David Hemenway**
**Deborah Azrael**
*Harvard Injury Control Research Center*

Some controversy exists about the relative frequency of criminal and self-defense gun use in the United States. Using data from a national random-digit-dial telephone survey of over 1900 adults conducted in 1996, we find that criminal gun use is far more common than self-defense gun use. This result is consistent with findings from other private surveys and the National Crime Victimization Surveys. In this survey, all reported cases of criminal gun use and many cases of self-defense gun use appear to be socially undesirable. There are many instances of gun use, often for intimidation, that are not reported to the police and may not appear in official crime statistics.

From a public health perspective, private ownership of firearms can have both detrimental and beneficial effects. For example, guns can be used to frighten, intimidate, and injure innocent victims (offensive gun use). They can also be used to prevent crime and protect against unlawful activity (defensive gun use).

The purpose of this article is to examine the relative frequency of offensive versus defensive gun use in the United States. A priori, it would seem logical to expect that in the U.S., where guns are easily obtainable, criminal gun uses would far outnumber self-defense gun uses by victims. After all, the criminal chooses the time and place of most robberies, assaults, and burglaries, and criminals are more likely to own and carry guns than potential victims. Surprisingly, however, one of the few criminologists to discuss the issue claims that "the best available evidence indicates that guns are used defensively by crime victims four to five times more often than they are used by offenders to commit crime" (Kleck 1997a, p. 295).

The claim is made by comparing results for offensive and defensive gun use from two very different types of survey. First, data on criminal gun use are taken from the large, semi-annual National Crime Victimization Survey (NCVS), the gold-standard for most U.S. victimization estimates. Then, these offensive gun use results are compared to self-defense gun use estimates from one-shot private surveys (Kleck, 1997b; Kleck & Gertz, 1995). Given their very different methodologies, however, this comparison between surveys seems inappropriate. It is far more appropriate to make comparisons of offensive and defensive gun uses from the same survey.

The article is organized as follows: First, we briefly describe and discuss the results from the one public survey that provides evidence about both offensive and defensive gun use, the large, longitudinal NCVS. Second, we present data from our own private survey, the first to ask detailed questions about both types of gun use. We then present the limited results from other private surveys that have asked questions about both types of gun use. Finally, we examine the societal benefits of offensive and defensive gun uses, and discuss some of the major implications of our findings.

The NCVS, conducted by the Census Bureau for the Bureau of Justice Statistics, asks questions of the same household every 6 months for 3 years. By excluding incidents reported in the first interview (i.e., by "bounding" the responses), the NCVS greatly reduces the substantial problem of "telescoping" (the reporting of events that actually occurred outside the time frame in question). In criminal victimization surveys, telescoping can increase estimates "by between 40% and 50% depending on the time of crime; the inflation rate is greatest for violent crimes" (Cantor, 1989; Skogan, 1990, p. 262).

The NCVS focuses on a half dozen specific serious crimes (e.g., assault, rape, robbery), and asks the respondent whether or not s/he has been the victim of an attempted or completed crime within the preceding 6 months. Follow-up questions ask whether the offender used a gun in the criminal attempt, as well as what, if anything, the respondent did to protect him/herself. Recent estimates from the NCVS suggest that each year there are about one million violent crimes involving guns (Kleck, 1997b; National Archive of Criminal Justice Data, 1998), while victims use guns in self-defense perhaps 60,000 to 120,000 times (McDowall & Wiersema, 1994; National Archive of Criminal Justice Data, 1998).

The NCVS estimates are not ideal. For example, the survey does not ask about all crimes, and it prompts respondents not by asking directly whether or not they used a gun in self-defense but only by asking "what did you do?" and "anything else?" However, the consistent order of magnitude difference between offensive and defensive gun use estimates from the NCVS on repeated annual surveys seems strong evidence that offensive gun use is far more common than defensive use.

Many private surveys have asked one or more questions about self-defense gun use (Kleck, 1997b). These estimates are an order-of-magnitude higher than the NCVS estimate. The two features of private surveys which seem to explain most of this difference are that

1. responses are unbounded and
2. all respondents are typically asked about defensive gun use, not just those respondents who report they have been the victim of an attempted crime. (Cook & Ludwig, 1998; Cook, Ludwig, & Hemenway, 1997; Hemenway, 1997a, b)

Indeed, these two features should also make private survey estimates of offensive gun use higher than the NCVS estimates.

Our survey is the first private survey to provide detailed information about both types of gun use and the results provide a supplement to NCVS comparisons. In addition, the descriptions of the offensive and defensive gun uses reported by respondents allow a crude qualitative comparison of the social desirability of these gun uses. We also discovered three other previously unreported private surveys that asked specific questions about both offensive and defensive gun use. Limitations in the questionnaires, however, make their results, at best, suggestive.

## METHODS

Data come from a national random-digit-dial telephone survey conducted by Fact Finders, Inc. of Albany, New York, for the Harvard Injury Control Research Center under a grant from the National Institute of Justice. The survey was conducted in the spring of 1996. The sample comprises 1,905 adults, age 18 and older, living in the 50 states of the U.S. To increase the precision of the estimates, the sample was stratified by state. The number of interviews designated for each state was determined by that state's population relative to the total U.S. population. The 1990 Census was used to calculate the sample population.

The random-digit-dial technique is designed to ensure an equal probability of inclusion in the sample for all households with a single telephone line, including households with unlisted as well as listed numbers. Households without a telephone are excluded from the sample. Households with more than one telephone number have a higher likelihood of being included.

No more than one adult from each household was interviewed. As a result, an adult in a single adult household was more likely to be interviewed than an adult in a household with more than one adult. Rather than interview the adult who answered the phone or who happened to be home at the time of the call, the study was designed to select an adult from the household chosen at random. In practice, this meant alternately asking to speak with a man or with a woman living in the household. If there was no person living in the household of the requested gender, the initial respondent was interviewed.

Once a telephone number had been randomly selected for inclusion in the survey sample, as many as 10 repeat phone calls were made until a final disposition was assigned. Respondents were guaranteed anonymity, and no identifying information was collected. Of the households randomly selected for the survey, 27% refused to participate. Once the interview began, fewer than 2% did not complete the entire survey.

All respondents were asked: "In the past five years, have you used a gun in self-defense to protect yourself from a person or people?" Many additional questions followed a positive response, focusing on the most recent incident.

All respondents were also asked: "In the past five years, has anyone displayed or brought out a gun in a hostile manner, even if this event did not take place during the commission of a crime?" A positive response led to many further questions about the most recent incident, including: "Was the gun displayed during an unplanned argument or other interaction that was not part of the commission of a crime?" From the answer to these questions and the respondents' open-ended descriptions of the events, the most recent hostile gun display incidents were classified into two mutually exclusive categories: planned crimes and events in which there seemed to be less criminal planning involved. The latter category was further divided into three subcategories: "arguments," "unprovoked brandishings," and cases in which the respondent answered "Yes" when asked if those using a gun against him might have believed he was a criminal. Cases were eliminated in which the respondent appeared to be a witness to the gun display, but not one of its intended victims.

In order to obtain an unbiased assessment of the hostile and self-defense gun uses, summaries of respondents' descriptions of all self-defense gun uses and a random sample of hostile gun displays were presented in written form to three criminology students at the University at Albany (SUNY). The incidents were unlabeled as "hostile" or "self-defense" and were presented in random order. None of the individuals selected had written about gun issues or was known to have strong beliefs about gun control. They were asked to rate the social desirability of each event on a scale of -2 (least socially desirable) to +2 (most socially desirable), assuming the events took place exactly as described by the respondent.

*D. Hemenway and D. Azrael*

## RESULTS

Respondents were representative of the nation in terms of age and race. However, respondents in the survey were more likely to be female (58%) and less likely to be of very low income (Table 1).

Of the 1905 respondents to the survey, 23 reported a self-defense gun use in the past 5 years. Six of these respondents were police officers and 2 were in the military. One respondent reported the most recent incident as having occurred 6 years ago. These 9 respondents were excluded. That left 14 civilians who reported 54 total incidents of self-defense gun use in the past 5 years.

Of the 14 civilians (Table 2, Table3), 3 claimed a total of 40 self-defense gun incidents, while the remaining 11 claimed 14 total incidents. The survey asked details only about the most recent incident. Ten of the 14 incidents occurred away from home, 2 at home, and 2 respondents refused to provide any information about where the incident took place. Indeed,

### TABLE 1. Descriptive Statistics

|  | Survey (%) | Nation (%)[1] |  |
| --- | --- | --- | --- |
| Gender |  |  |  |
| Male | 42 | 49 |  |
| Female | 58 | 51 |  |
| Race |  |  |  |
| White | 82 | 83 |  |
| Black | 9 | 12 | (includes all Hispanic as Black or White) |
| Hispanic | 5 |  |  |
| Other | 4 | 4 |  |
| Age |  |  |  |
| 18-29 | 19 | 20 |  |
| 30-39 | 23 | 24 |  |
| 40-49 | 21 | 20 |  |
| 50-64 | 20 | 19 |  |
| > 64 | 17 | 18 |  |
| Income ($1,000s) |  |  |  |
| < 15 | 12 | 23 |  |
| 15-35 | 26 | 31 |  |
| 35-50 | 22 | 16 |  |
| 50-75 | 15 | 17 |  |
| > 75 | 12 | 14 |  |
| Missing | 13 |  |  |

### TABLE 2. Self-Defense and Hostile Gun Use Incidents

|  | Number of Respondents | Number of Incidents |
| --- | --- | --- |
| Self defense | 14 | 54 |
| Hostile gun display (total) | 58 | 112 |
| Planned crime | 21 | 37 |
| Argument | 24 | 55 |
| Unprovoked | 13 | 21 |

these last 2 individuals, who between them reported a total of 35 self-defense gun use incidents over the past 5 years (or almost two-thirds of the total number of incidents), refused to provide any information at all about the event (Table 3).

One hundred and twenty-two (122) respondents reported a hostile gun display. Of these, 10 were police officers, 2 were security guards, 3 were in the military, 1 was a private investigator and 1 an arson investigator. In addition, 2 respondents indicated that the most recent gun display took place outside the U.S., and 1 that it took place 8 years ago. Three people provided insufficient information about the most recent event to adequately categorize it (between them, these 3 individuals reported 16 total hostile gun displays). Excluding these 25 individuals leaves 97, who reported 240 hostile gun displays.

Of the 97, the most recent event for 31 appeared to be witnessing a hostile gun display. These 31 respondents reported a total of 112 events (of which a single respondent, a paramedic, reported 50). For another 8 respondents, the most recent incident involved the police or a civilian displaying a gun against them in the belief that the respondent was a criminal. Eliminating these 39 respondents leaves 58 who reported 112 hostile gun displays.

For 21 of these 58 individuals, in the most recent incident the gun was displayed during a planned crime (Table 2, 4). These crimes were primarily either robberies by strangers, which often occurred at work (e.g., restaurants, convenience stores), or assaults by acquaintances, including ex-boyfriends. According to respondents, the police were almost always notified.

For 24 respondents, the most recent hostile gun display took place during an argument which escalated into gun use (Table 2, 5). These respondents reported a total of 55 hostile gun displays in the past 5 years. The majority (58%) of the most recent cases involved family or acquaintances.

Thirteen respondents reported an instance of what might be categorized as an unprovoked brandishing—the offender displayed a gun in a hostile manner against this particular respondent for no readily apparent reason (Table 2, 6). These respondents reported a total of 21 hostile gun displays. The vast majority (85%) of most recent cases was committed by strangers.

Virtually every gun use in the hostile gun displays was rated as highly socially undesirable (a rating of -2) by all three criminology students. By contrast, only 3 of the 12 self-defense gun uses were rated as socially desirable by even a majority of the raters. Self-defense incidents rated as the most socially undesirable by the raters were incidents in which arguments escalated into mutual gun use:

• An 18- to 29-year-old woman was coming out of track practice one night when "some people flashed a gun" at her during a "drug-related incident." She reports using her gun in self-defense. No shots were fired and the incident was not reported to the police.

• An 18- to 29-year-old man was leaving a club with a friend when they were approached by a man who had been in an argument with the respondent's friend earlier. The man pulled a gun on the respondent and his friend, in response to which they also pulled a gun. No shots were fired and the police were not notified.

• A 30- to 39-year-old man was sitting in the park with friends drinking when words were exchanged. According to the respondent, "everyone started running to their cars to get their guns and we got our guns too." No shots were fired and the incident was not reported to the police.

TABLE 3. Most Recent Incident: Gun Self-Defense

| Age | Sex | No. (5 years) | No. of Offenders/ Relationship to Respondent | Crime/Location | Respondent Attacked? | Offenders' Weapon | Police Notified?/ Arrest | Gun Loaded? Pre/Post-Event | Respondent's Gun |
|---|---|---|---|---|---|---|---|---|---|
| 30-39[1] | M | 1 | >1/employees | verbal assault/burglary of R's home | no | none | no/no | no/yes | handgun |
| 30-39[2] | M | 1 | 1/acquaintance | trespassing at R's home | no | none | no/no | no/no | shotgun |
| 18-29[3] | F | 2 | >1/acquaintances | drug-related/school campus | no | handgun | no/no | no/no | handgun |
| 18-29[4] | M | 1 | 1/acquaintance | missing/outside car | no | handgun | yes/yes | yes/yes | shotgun |
| 40-49[5] | M | 1 | >1/strangers | physical assault/at traffic light | yes | none | yes/yes | no/yes | handgun |
| 30-39[6] | F | 1 | 1/stranger | harassment/car | no | none | no/no | no/yes | handgun |
| 65+[7] | M | 5 | >1/strangers | burglary/car | no | knife | yes/yes | yes/yes | handgun |
| 30-39[8] | M | 1 | 1/stranger | verbal assault/park | no | handgun | no/no | yes/yes | handgun |
| 18-29[9] | M | 1 | >1/strangers | offender pulled gun/outside club | no | handgun | no/no | yes/yes | handgun |
| 50-64[10] | F | 2 | >1/strangers | ambiguous/car | no | unknown | no/no | yes/yes | handgun |
| 30-39[11] | M | 1 | >1/employees | theft/crack house | no | none | no/no | no/yes | rifle |
| 18-29[12] | M | 1 | 1/acquaintance | not a crime/friend's house | no | handgun | no/no | yes/yes | handgun |
| 40-49[13] | M | 15 | missing | missing | missing | missing | missing | missing/missing | missing |
| missing[14] | M | 20 | missing | missing | missing | missing | missing | yes/missing | missing |

1. The respondent was "indoors in my living room at 10:30 PM. I was watching TV. I got harassing phone calls before they broke in about a young lady they know nothing about. They tried breaking (in) and I fired at one of them to miss."
2. The respondent was "in my house watching TV." The offender "broke into my yard and was looking in my windows." "The respondent got his unloaded gun from his bedroom and ran after the offender.
3. The respondent came out of track practice where she had a confrontation with offenders at her car. The offenders flashed a gun.
4. The respondent was in a confrontation with a "so-called friend" on the street by his car. The offender "was going to shoot me—he put a gun in my face." "The respondent shot the offender and was arrested.
5. The respondent was in his car on a deserted street. "They rear-ended me at a traffic light and from there tried to assault me." "The respondent was hit by the offenders and required medical attention.
6. The respondent was in her car when a "bum came up to my window. He knocked on my car window and tried to open the door. I pulled out a gun, loaded it, showed it to him and he walked away."
7. The respondent was trying to get out of his car. "Three guys came up to me and said 'I want your money.' The guy had a big knife. I started to blow my horn. I pulled my gun out and they ran away."

8. The respondent was with friends at a park. "We were sitting and talking. Words were exchanged. Everyone started running to their cars to get their guns and we did too. We were drinking."

9. The respondent was "just leaving the club on my way home (trying to catch a cab). My friend was involved in an argument in the club. When we went out side to leave, the other person pulled a gun on us." The gun was in the respondent's friend's possession.

10. The respondent was alone in her car on the way home from shopping and had a loaded gun under her left leg. The respondent, who reports that she did not see the offenders, "let them see" she had a gun. The respondent reports that "nothing occurred that was necessary to report. It could have been perfectly inno cent, but I was scared."

11. The respondent was in a "black neighborhood" at a crack house. "A couple of my employees had stolen my truck. I showed up at one of their houses and his brother-in-law told me where to go to find him, which was a crack house. I went there with my friend so I could confiscate our truck. I don't usually carry a gun on me but in this situation I wouldn't feel safe if I didn't." The respondent did not encounter the offenders.

12. The respondent was "inside a friend's house watching someone trip on LSD. He suddenly pulled a gun and the only way to calm him down was to take it from him. He went off the wall and thought he was in WWII and pulled a gun on me."

13. All information regarding the respondent's most recent self-defense use is missing.

14. The respondent reports an event in which he got an already loaded gun from where it was "hidden in a safe place." The respondent provided no other detail the incident.

264                                                          D. Hemenway and D. Azrael

TABLE 4. Most Recent Incident: Hostile Gun Display During a Planned Crime

| Age | Sex | Number (5 years) | Type of Crime | Location | Respondent Relation to Offender | Have Gun? | Shots Fired? | Police Notified |
|---|---|---|---|---|---|---|---|---|
| 18-29[1] | M | 6 | planned assault | outside | acquaintance | no | no | yes |
| 30-39[2] | F | 2 | planned assault | respondent's home | acquaintance | missing | missing | missing |
| 18-29[3] | F | 1 | harassment | respondent's home | ex-boyfriend | no | no | no |
| 30-39[4] | F | 1 | planned assault | respondent's home | ex-boyfriend | no | no | yes |
| 30-39[5] | F | 3 | robbery | work (bar) | former employee | no | no | yes |
| 50-64[6] | M | 1 | burglary | respondent's home | stranger | no | no | yes |
| 18-29[7] | F | 1 | robbery | parking lot | stranger | no | no | yes |
| 18-29[8] | M | 2 | robbery | work (store) | stranger | no | no | yes |
| 18-29[9] | F | 1 | robbery | work (store) | stranger | no | no | yes |
| 18-29[10] | F | 2 | robbery | work (restaurant) | stranger | no | no | yes |
| 18-29[11] | M | 3 | robbery | respondent's home | stranger | no | no | yes |
| 30-39[12] | F | 2 | robbery | work (store) | stranger | missing | missing | missing |
| 30-39[13] | F | 1 | robbery | restaurant | stranger | no | no | yes |
| 30-39[14] | F | 1 | robbery | work (bank) | stranger | no | no | yes |
| 30-39[15] | M | 2 | robbery | elevator | stranger | no | no | yes |
| 30-39[16] | M | 1 | robbery | work (restaurant) | stranger | missing | missing | missing |
| 40-49[17] | M | 1 | robbery | missing | stranger | no | no | yes |
| 40-49[18] | M | 1 | robbery | outdoors | stranger | no | no | yes |
| 40-49[19] | M | 1 | robbery | casino | stranger | no | no | no |
| 40-49[20] | M | 1 | robbery | work (restaurant) | stranger | yes | no | yes |
| 50-64[21] | M | 3 | trespassing | work | stranger | missing | missing | missing |

1.  "This guy thought I owed him for drugs and he came to kill me. He came over and pulled the gun. I took it away from him. Several friends restrained him."
2.  The respondent did not call the incident a crime, but described that the person who displayed the gun "had been threatening me . . . stalking me for several months because I wouldn't date him. On this particular occasion he came to my home and waved the gun around."
3.  The respondent's "boyfriend was mad because I was seeing someone else. We broke up. Six months later he showed up at my house to talk. He showed me the gun to scare me into seeing him again."
4.  The respondent's "ex-boyfriend called and said he was going to shoot me. I called the police and they chased him off."
5.  A "disgruntled ex-employee" of the respondent's "came in and popped the gun at the bar because it wasn't busy and said he wanted all the money."

*Offensive and Defensive Gun Uses*265

6. "My wife woke me up at 2:15 am because our dogs were barking. I went downstairs into our family room, and I was facing two men with sawed-off shotguns. They started to run toward me instead of away. They beat me within an inch of my life."

7. The respondent was next to her car. She provided no additional information about the incident.

8. The respondent was working the late shift when a man walked in and "asked for free food. When I told him 'no,' he became angry. His anger made me angry, so we exchanged heated words until he said that he had originally come in to rob me. That's when I told him to go ahead and take the money and that he could even shoot me (I was very upset) and then I walked out of the store. He followed me outside. A car pulled up to the store at the same time, so he turned and left."

9. The respondent was "standing behind the counter at the store I work in. He was 19 or 20. He pulled a gun and held it inside his coat. He flashed it at me and asked for all the money in the cash register. I gave it to him and hit the button under the counter that called the police. They showed up and I had been able to run outside and point to them which way he ran. They caught him."

10. The respondent was at work when the offenders "came in and pointed guns at us. They put us in a cooler. One guy held a gun at us while the other took the money."

11. The respondent was in an apartment building "coming off the elevator. There were three people in the hallway. All three pointed guns at me and robbed me. I gave them money and they ran down the stairs."

12. The respondent was working when one of four robbers pointed a gun at her face and took the store's money and cigarettes.

13. The respondent was dining in a restaurant when it was held up.

14. The respondent was at work as a bank teller when the bank was robbed.

15. The respondent was "visiting a friend. It was five PM I was going off the elevator. A man stepped off the elevator, turned and pulled out a gun and held up the elevator. There were about 10 people in it."

16. The respondent was waiting for food at a fast food restaurant when a "bum walked in and asked for money. Then he showed part of a gun. Others in the restaurant came to my aid."

17. The respondent provided no additional information about the incident.

18. The respondent was outside a local store when a "robber came up behind me. He had the gun pointed at my head. When people came the robber took off."

19. The respondent was in Nevada buying chips at the cashier's window of a casino. "I caught a glimpse of the guy's foot. He had the gun pointed at the back of my head and told me to get down. They took off with three quarters of a million dollars."

20. The respondent was at work. "The man put the gun to my side and demanded that I give him the money in my office. He placed the gun to my head and demanded the money in the safe. I told him "there is no safe.' He made me open the drawers to my desk. He took money from the day before, then casually walked out."

21. The respondent owns a car wash. The respondent told the offender to stay away, but he "kept coming and trashing the grounds. He came back with a gun a half hour later. He pointed the .22 revolver in my face so I knocked him in his face and got the gun from him. He was caught by the police but only served 80-90 days."

266                                                          *D. Hemenway and D. Azrael*

**TABLE 5. Most Recent Incident: Hostile Gun Display During an Argument**

| Age | Sex | Number (5 years) | Location | Other's Relation to Respondent | Respondent thought to be armed? | Description |
|---|---|---|---|---|---|---|
| 18-29[1] | M | 2 | work | acquaintance | don't know | argument |
| 18-29[2] | M | 1 | outside other's home | acquaintance | no | argument |
| 18-29[3] | M | 1 | home (whose unknown) | acquaintance | yes | argument |
| 18-29[4] | M | 2 | outside | acquaintance | no | argument |
| 18-29[5] | M | 2 | car | acquaintance | no | argument |
| 18-29[6] | F | 2 | school hallway | acquaintances | no | argument |
| 50-64[7] | M | 1 | other's home | brother-in-law | no | argument |
| 30-39[8] | F | 6 | work | client | no | argument |
| 50-64[9] | F | 1 | work | client's parent | no | argument |
| 30-39[10] | F | 1 | respondent's home | ex-husband | no | argument |
| 30-39[11] | F | 2 | respondent's home | ex-husband | no | argument |
| 40-49[12] | F | 2 | respondent's home | ex-husband | no | argument |
| 30-39[13] | F | 1 | outside respondent's home | fiancee | yes | argument |
| 30-39[14] | F | 2 | respondent's home | husband | no | argument |
| 18-29[15] | M | 2 | outside a club | stranger | yes | argument |
| 18-29[16] | M | 1 | other's home | stranger | no | argument |
| 18-29[17] | M | 15 | parking lot | stranger | yes | argument |
| 18-29[18] | M | 2 | outside | stranger | no | argument |
| 18-29[19] | M | 1 | car | stranger | no | argument |
| 18-29[20] | M | 2 | car | stranger | yes | argument |
| 30-39[21] | F | 1 | car | stranger | don't know | argument |
| 30-39[22] | M | 2 | outside other's home | stranger | no | argument |
| 30-39[23] | F | 2 | outside | stranger | don't know | argument |
| 50-64[24] | F | 1 | outside respondent's home | stranger | no | argument |

1. No additional information was provided by the respondent.
2. The respondent was "visiting. I parked my motorcycle on the lawn which seemed to annoy my girlfriend's mother."
3. The respondent reported that he thought that the person who displayed the gun was afraid. He reported no additional information.
4. The respondent was "outside at a party. I was walking to my car. A guy was upset. He thought I was hitting on his girlfriend. He pulled out the gun . . . basically to give him the feeling of power. He was pretty drunk. I laughed and then I drove away."
5. The respondent was "in the car sitting in the passenger's seat. The car was not moving. A friend was in an argument, and the other guy pulled the gun out at me because I got out . . . to see what was going on. He asked 'Do you have a problem?' I said 'No' and he put it away."
6. The respondent "turned my back, and they pulled a gun out of their locker and stuck it in my back."
7. The incident took place in the basement of the person who displayed the gun. The respondent reported he displayed the gun "to make a point and be more aggressive during an argument about safety in having a gun in the house."
8. The respondent was at work at a mental health clinic. A patient "was having a psychotic episode. [He] was depressed . . . and off his medication. He was suicidal and wanted to kill himself in front of everybody. He didn't want to take his medication."
9. The respondent reported: "I work at a state developmental center with retarded individuals. . . . A parent that periodically got upset . . . disagreed with [us] and pulled a gun. She threatened the child because he was disobedient and threatened me because she thought we were turning the child against her. It was turned over to the District Attorney."

10. The respondent was arguing with her ex-husband. "He pulled a gun and he threatened to shoot me and my children. He fired the gun but didn't shoot anyone."

11. The respondent was arguing with her ex-husband. He "grabbed the gun, but just waved it around. I didn't call the police. He was angry because we were splitting up. He was going to force me to love him."

12. The respondent was "inside my living room late at night. I let my ex in, and he had a gun and pulled it on me. He was angry about the divorce."

13. The respondent's fiancé displayed the gun during an argument with the respondent about her ex-husband.

14. The respondent was in the kitchen "and my husband pulled a gun on me. He wanted me to be afraid and it worked. He was mad, always mad at me about something. He said he was going to kill me."

15. The respondent was inside a club with a friend. The friend was in a "confrontation" with the person who displayed the gun. "We were leaving and then outside he pulled a gun on [us]. He showed it to me in a threatening manner. I wouldn't see it as a crime. It ended on its own. Words were exchanged and then everyone separated." The respondent thought that the person who displayed the gun may have thought that the respondent's friend had a gun.

16. The respondent was at a friend's house. The person who displayed the gun "was angry and drunk."

17. The respondent was in a parking lot in his home town. The respondent "was walking to the car and someone yelled at me and I yelled back. They didn't like the colors I was wearing and it sparked an argument."

18. The respondent reported that "on the street about a block away from where I live, a kid pulled a 9mm pistol and threatened me because I asked to see his parents because his little brother was throwing rocks at my little brother."

19. The person who displayed the gun "got upset because he thought I cut him off and began to throw objects at me. Then he pulled out the gun and waved it at me."

20. The respondent reported "it happened because of an argument that went on earlier at a club, and when it closed they followed me, pulled up alongside my car and started waving a gun. I then pulled over to the side of the highway."

21. The respondent was in the car with her 12-year-old daughter. The person who displayed the gun "was in the left lane and instead of tailing I had to go around him (he was riding in the left lane under the speed limit). I think he was a redneck with a girlfriend. I simply went around and got in front of him. He caught up and took a rifle from a gun rack in the back of his truck and pointed it at me in what I thought was a threatening way. I drove off. [He] thought he was a cocky S.O.B. and he would scare me and he was wrong."

22. The respondent was at a party at a neighbor's house. "Four young boys, sixteen to seventeen years old, pulled up to the house in a car. They started insulting us verbally. They [were] looking for a fight. They got out of the car, still making insulting comments. At this point I confronted them and told them to leave the property. They displayed a gun, which was a semi-automatic. It looked like a .38. We settled it with words, and they drove away. I think the gun was a bluff. [They wanted] to give the impression that no one could mess with them."

23. The respondent and a friend "were walking to my house and a guy across the street yelled something. My friend yelled back and he crossed the street and pulled a gun out from the front of his pants. He asked if she said something. She said 'no' and left."

24. The respondent reported that "a truck was speeding up and down our road and was being really obnoxious. They also tore up our common area which is a plot of land only to be used by the 12 houses on the street. Total disregard for private property. We started yelling and they pulled out a gun."

TABLE 6. Most Recent Incident: Hostile Gun Display During an Unprovoked Incident

| Age | Sex | Number (5 years) | Location | Other's Relation to Respondent | Respondent thought to be armed? | Description |
|---|---|---|---|---|---|---|
| 50-64[1] | F | 2 | respondent's house | husband | no | unprovoked |
| 40-49[2] | F | 1 | work | acquaintance | no | unprovoked |
| 18-29[3] | M | 1 | street | stranger | yes | unprovoked |
| 18-29[4] | F | 2 | car | stranger | no | unprovoked |
| 18-29[5] | M | 1 | outside other's home | stranger | no | unprovoked |
| 18-29[6] | M | 3 | outside liquor store | stranger | no | unprovoked |
| 30-39[7] | M | 2 | on road | stranger | don't know | unprovoked |
| 30-39[8] | F | 1 | car | stranger | no | unprovoked |
| 30-39[9] | M | 1 | car | stranger | no | unprovoked |
| 40-49[10] | M | 1 | outside other's home | stranger | no | unprovoked |
| 40-49[11] | M | 1 | car | stranger | no | unprovoked |
| 40-49[12] | M | missing | outside respondent's home | stranger | no | unprovoked |
| 50-64[13] | F | 4 | parking lot | stranger | no | unprovoked |

1. The respondent was lying in bed. Her husband "came home and turned on the light and picked up the gun and held it to my head and said: 'I should shoot your mother-f***ing head off.' Then he put down the gun and went into the kitchen. He came back a few minutes later and did it again. He's now my ex-husband. [He wanted] to scare the hell out of me or to kill me—I still don't know which."

2. The respondent was present during a "domestic dispute in a law office between a husband and wife. [He] pulled out the gun and was then pointing it at his wife and anyone that was there. [He wanted] to make a point, to extend hostility."

3. The respondent was at a festival. The person who displayed the gun "just had it on to show off. I was walking with friends. He pulled it out of his pants and waved it around, then he put it back in his pants and ran away."

4. The respondent was driving with her family and stopped at an intersection. "The individuals pulled alongside, pulled out a gun and pointed it at us, taunting us until the light changed. We followed to get their license plate number. We called the police and reported this to them."

5. The respondent was outside at a friend's house. The people who displayed a gun "shouted 'whitey go home!' They shot the gun at us and drove off. We went home."

6. The respondent exited a store when "these guys pulled a gun and pointed it at me. They were about 10 feet away. I said nothing, kept walking and hoped they didn't shoot. Then I just walked home fast."

7. The incident took place outside on a country road. The only other detail provided by the respondent was that he thought the person who displayed the gun was afraid.

8. The respondent was driving in her car. "I was pulling up to a stop light. I glanced over to the next car. Two young men pulled out a gun and pointed it at me. They continued to point it at me until the light changed and then they drove away laughing. The respondent thinks that they were "trying to shock people, for the thrill of it."

9. The respondent was driving at a vacation spot. "Some guy pulled aside me shouting obscenities, and he pulled the gun. He thought he was powerful. He wanted to show me how big a man he was."

10. The respondent "was out walking with my wife . . . down a sidewalk in a neighboring apartment complex. A teenager picked up a .22 and started pointing it at me and threatening to blow my head off. [He was] showing off."

11. The respondent was on the freeway when someone displayed a gun against him. "There are about five to six drive-by shootings a day. People are just driving by pointing guns. It happens all the time."

12. The respondent "was standing at my front door. They pulled up in a red truck on my lawn and pulled a girl out of the other side and beat her. I saw them and turned to go inside and call the police when he came over and put the gun in my face and threatened me not to call. He drove off. I called and nothing was done by the police."

13. The respondent had "just walked to my car from K-Mart, and . . . this guy who was next to me in his car . . . was mouthing off . . . He was cussing at me, threatening me . . . and called me white bitch. He was messed up . . . I don't know if he was drunk or on drugs . . . obscene, really talking. He saw I was leaving and he pulled out his gun and said 'I'll just shoot you.' Then he drove off."

## DISCUSSION

In our survey, after excluding police, security guards, and the military, offensive gun use against respondents was far more common than self-defense gun use. The number of respondents reporting that they were gun victims exceeded the number of respondents claiming to have used a gun in self-defense by more than 4 to 1 (58 to 14). Using a binomial test of a difference in proportions, this difference is statistically significant ($p < .001$).

We emphasize the number of respondents rather than the total number of incidents reported by these respondents because a few individuals report so many uses, particularly self-defense uses; in our survey, 3 people account for 74% of the total number of self-defense incidents, and the 2 respondents who provided no information about the incidents account for 64%. We are concerned about whether the numbers they report are accurate, and whether so many incidents might indicate criminal rather than self-defense gun use.

The 4 to 1 ratio of gun victims to individuals who used a gun in self-defense is a conservative one. The denominator includes every civilian who claimed a self-defense gun use in the past 5 years, despite the fact that—for some events—reasonable observers might not classify the incident as an actual self-defense use (e.g., it was sometimes unclear whether the respondent had actually been threatened). By contrast, no individual who reported a hostile gun display is included in the numerator unless the description of the most recent event made it clear that a gun had been used in a threatening and criminal manner against the respondent personally (e.g., uses when respondent thought she might have been considered a criminal by the gun user have been excluded).

Put another way, applying a definition of "genuine self-defense gun use" used by several researchers (i.e., the incident involved actual contact with a person; Cook & Ludwig, 1997; Kleck & Gertz, 1995), the events reported by respondents 11-14 (Table 3) should not be included in the estimates. Eliminating these 4 individuals leaves 10 civilians, who reported a total of 16 self-defense gun uses. Using this definition, the ratio of respondents reporting hostile gun displays to respondents reporting a self-defense gun use is almost 6 to 1, and the ratio of the number of incidents reported is 7 to 1 (114 to 16).

We searched the Roper Center and other survey databases, and discovered 3 other private surveys which asked about both offensive and defensive gun use in a single survey. All 3 surveys tend to support our finding that hostile gun uses are substantially more common than self-defense gun uses.

In the first survey, a 1997 national random-digit-dial telephone survey of adults conducted by the ICR Survey Research Group for the Hearst Newspapers (ICR Survey Research Group, 1997), over 2,000 individuals were asked, "Have you ever been a victim of a crime?"

The 731 who responded in the affirmative were then asked, "Did the crime involve a firearm?" and 158 said yes. The entire sample was also asked, "Have you ever used a gun in self-defense?" One hundred and four (104) respondents answered in the affirmative, for a hostile to self-defense gun use ratio of 1.5:1 (158/104). Thirty-two (32) respondents answered yes to both the criminal and self-defense gun use question.

In the second survey, conducted in 1992 (Los Angeles Times, 1992), the Los Angeles Times polled 2,600 adults concerning guns. The sample included 878 gun owners and 1,741 nongun owners. One question asked, "In the last two years, in Southern California, have you personally been the victim of a crime or an act of violence that involved a firearm, or not?" Six (6) percent, or 146 respondents, answered in the affirmative. All respondents were also asked, "Other than when you might have been in the military or working for a law enforcement agency, have you ever used a gun for self-defense, or not?" Three percent, or 80 respondents, answered in the affirmative, for a hostile to self-defense gun use ratio of 1.8:1 (146/80).

Finally, the third survey, a 1991 national random-digit-dial telephone survey of the adult population by the Gallup Organization (Gallup, 1991), asked gun-related questions of more than 1,000 individuals. A subsample of 210 handgun owners were asked "Has a handgun ever been used to threaten you in a robbery, mugging, or some other situation?" Sixteen percent (16%) said yes. Handgun owners were also asked, "Have you ever used your handgun to defend yourself, your home, or family or possessions, either by firing it or threatening to fire it?" Eight per cent (8%) said yes, yielding a 2:1 ratio of hostile to self-defense gun uses in this population.

Clearly, many problems exist with the questions in all three surveys (e.g., inconsistent screeners, inconsistent time frames, etc.), which could lead to over- or underestimates of both type of gun uses. It is noteworthy, however, that in all the surveys we have identified, which ask about both offensive and defensive gun use (these 3, the NCVS and our survey), more respondents report having had a gun used against them than report having used a gun in self-defense.

Our survey findings have various limitations. Our results are based on a single survey of fewer than 1900 "civilians." The survey undersampled males and poor people, both of whom may have more hostile conflicts involving firearms. The questions on offensive and defensive gun use were not completely symmetric, since the former asked about "hostile gun displays" rather than "uses." However, all described incidents which did not appear to be criminal gun use against the respondent were eliminated (e.g., events which were witnessed by the respondent). Compared to the 6 other comparable surveys which asked about self-defense gun use in the past 5 years while excluding defense against animals and defensive use by police and the military, our defensive gun use results are well below 4, while in line with 2 [a 1994 CDC-sponsored survey of 800 gun owners and 400 nonowners (Hemenway & Azrael, 1997) and the 1994 Tarrance survey in which 1% of respondents reported a defensive gun use (see Kleck, 1997b)].

There are problems with using data based on self-reports, particularly of rare events with potential for self-presentation bias (Hemenway, 1997a, b; Cook, Ludwig, & Hemenway, 1997). Yet even accepting the responses at face value, there is the question of how some events should be classified, particularly some of the reported self-defense gun uses. It is also not clear how incidents should be counted when multiple parties are involved. Our comparisons effectively assume that there was one offender and defender in each case.

Determining the social benefits and costs of any gun use will always be somewhat subjective, and our survey presents only limited information about the event from which to judge. Moreover, all of the reported incidents are a one-sided version of a hostile interaction that usually occurred many months or years before the survey.

Nonetheless, raters were unanimous in describing the hostile gun uses reported by respondents as highly socially undesirable. By contrast, only 3 of the 12 self-defense gun uses were rated as socially desirable by even 2 of the 3 raters, suggesting that a simple comparison of numbers of events may be an inadequate means of measuring the social costs and benefits of gun use. While the raters did not describe why they rated the incidents as they did, the self-defense gun uses they rated as least socially desirable appear to be little more than gun use as part of an escalating argument. One suspects that, were the story told from the other combatant's perspective, s/he would seem to have been the one who was assaulted and forced to act in self-defense.

The U.S. has many private guns, and they are often used against humans. Civilians use guns far more often to kill and wound innocent victims than to kill or wound criminals, particularly at home (Kellermann & Reay, 1986; Kellermann, Rivara et al., 1993; Kellermann, Somes et al., 1998). Our study provides evidence that guns are also used far more often to intimidate and threaten than they are used to thwart crimes.

Our results suggest that there are many uses of guns against humans that do not make official statistics, such as crime reports, emergency room logs, or death certificates. When determining the benefits and costs of various measures to increase or reduce the availability of and access to guns it is important to consider the effect not only on reported crime, suicide and accidental injury, but also on these more hidden gun uses.

## REFERENCES

Cantor, D. (1989). Substantive implications of longitudinal design features, the National Crime Victimization Survey as a case study. In, D. Kasprzyk, Kalton, G., Duncan, G., Singh, M. P. (Eds.), *Panel surveys.* New York, NY: John Wiley & Sons.

Cook, P. J., & Ludwig J. (1997). *Guns in America.* National Institute of Justice Report.

Cook, P. J., Ludwig J., & Hemenway D. (1997). The gun debate's new mythical number, HOW many defensive uses per year? *Journal of Policy Analysis and Management, 16,* 463-469.

Cooke, P. J., Ludwig, J. (1998). Defensive gun uses: New evidence from a National survey, *Journal of Quantitative Criminology, 14:* 111-131.

Hemenway, D. (1997a). Survey research and self-defense gun use, An explanation of extreme overestimates. *Journal of Criminal Law and Criminology, 87,* 1430-1445.

Hemenway D. (1997b). The myth of millions of annual self-defense gun uses, a case study of survey overestimates of rare events. *Chance, 10,* 6-10.

Hemenway D., & Azrael, D. (1997). *Gun use in the United States, results of a national survey.* Report to the National Institute of Justice. Washington, DC: National Institute of Justice.

Kellermann, A. L., & Reay, D. T. (1986). Protection or peril? An analysis of firearm-related deaths in the home. *New England Journal of Medicine, 314,* 1557-1560.

Kellermann, A. L., Rivara, F. P., Rushforth, N. B., Banton, J. G., Redy, D. T., Francisco, J. T., Locci, A. B., Prodzinski, J., and Hackman, B. B., Somes, G. (1993). Gun ownership as a risk factor for homicide in the home. *New England Journal of Medicine, 329,* 1084-1091.

Kellermann, A. L., Somes, G., Rivara, P., Lee, R. K., & Banton, J. G. (1998). Injuries and deaths due firearms in the home. *Journal of Trauma, 45,* 263-267.

Kleck, G. (1997a). Struggling against 'common sense,' The pluses and minuses of gun control. *The World and I,* 287-299.

Kleck, G. (1997b). *Targeting guns, firearms and their control.* New York: Aldine de Gruyter.

Kleck, G., & Gertz, M. (1998). Carrying guns for protection. Results from the National Self-Defense Survey. *Journal of Research in Crime and Delinquency, 35*(2), 193-224.

Kleck, G., & Gertz, M. (1997). The illegitimacy of one-sided speculation. Getting the defensive gun use estimate down. *Journal of Criminal Law and Criminology, 87,* 1446-1461.

Kleck, G., & Gertz, M. (1995). Armed resistance to crime, The prevalence and nature of self-defense with a gun. *Journal of Criminal Law and Criminology, 86,* 150-187.

McDowall, D. B., & Wiersema, D. (1994). The incidence of civilian defensive firearm use by U.S. crime victims. *American Journal of Public Health, 84,* 1982-1985.

National Archive of Criminal Justice Data. (1998). *National crime victimization survey, 1986-1991, 1992-1995* (On-line). Available: www.icpsr.umich.edu,80/NACJD.

Skogan, W. (1990). The national crime survey redesign. *Public Opinion Quarterly, 54,* 256-272.

*Acknowledgments.* The survey was funded by a grant from the National Institute of Justice to the Harvard Injury Control Research Center. The authors received additional research support from the Centers for Disease Control and Prevention, the Robert Wood Johnson Foundation and the Soros Foundation's Center for Crime, Communities and Culture (David Hemenway) and the National Institute of Justice (Deborah Azrael). Thanks to Judy Chen for her help in assembling and managing the survey data.

*Offprints.* Requests for offprints should be directed to David Hemenway, PhD, Department of Health Policy and Management, Harvard School of Public Health, 677 Huntington Avenue, Boston, MA 02115.

# Exhibit 94

*Journal of Quantitative Criminology, Vol. 11, No. 4, 1995*

# *Point Blank* Against Itself: Evidence and Inference About Guns, Crime, and Gun Control

## Richard D. Alba[1] and Steven F. Messner[1]

This essay considers the empirical foundations for some of the more important and controversial conclusions concerning guns, crime, and gun control advanced in Gary Kleck's highly influential treatise, *Point Blank*. We reveal significant flaws in his original data analyses and identify problematic linkages between his evidence and his inferences. We suggest alternative interpretations for some of Kleck's findings.

**KEY WORDS:** crime; deterrence; gun control; gun ownership; homicide.

## 1. INTRODUCTION

In the study of guns and crime, Gary Kleck's award-winning *Point Blank* (1991) has achieved a stature few other works can match. With a magisterial command of the literature and a formidable array of data, the book presents a strong intellectual challenge to those who would argue the seemingly commonsensical case that the widespread availability of guns is a critical factor behind the high rates of violent crime in the United States. The book and the arguments that animate it have become paradigmatic for scholars who adopt a critical stance toward gun control (e.g., Kopel, 1992). But its impact goes well beyond the scholarly audience, for *Point Blank* has been cited in the popular press for its demonstration of the futility of many gun-control measures (e.g., Wilson, 1994) and has informed a more polemical literature that identifies gun control as a contributing factor in criminal violence (e.g., Polsby, 1994). The book, along with the ancillary research articles that have appeared in this journal and others (e.g., Kleck and McElrath, 1991; Kleck and Patterson, 1993), holds a place of unusual importance and influence in the gun-control literature and, more broadly, in the public debate on gun control. Accordingly, a close look at its arguments and evidence is fully justified.

[1] Department of Sociology, State University of New York at Albany, Albany, New York 12222.

0748-4518/95/1200-0391S07.50/0 © 1995 Plenum Publishing Corporation

**EXHIBIT** 14
Witness Kleck
Date 10.28.11
Reporter: Danielle Freeze

Kleck sets the stage for his treatise by calling attention to the "abysmal" quality of the gun-control debate (p. xiii).[2] In his view, previous discussions have been dominated by "emotional appeals" and by "logical argumentation without factual material" (p. xiv). There is, accordingly, a pressing need for "more and better empirical information" (p. xiv). His book is explicitly intended to provide such information and, in so doing, "to make public, democratic debate on the issue of gun control a productive exercise rather than a hollow political ritual" (p. xv).

We concur with Kleck's position that the gun control debate needs grounding in the empirical evidence and set out in this paper to scrutinize the empirical foundations for some of the more important and controversial conclusions advanced by him, in *Point Blank* and elsewhere. Our focus is on the key question of the "balance sheet" of guns and crime. Kleck acknowledges the potential role of guns as a factor contributing to violent crime rates, but he counterposes the "bad side" of guns with the "good side," calling attention to the use of guns by noncriminals to thwart and deter crime. On the basis of extensive and original analyses, he determines that the positive and negative consequences of widespread gun ownership are roughly equivalent. Specifically, he puts forward the following propositions, which serve as the central pillars supporting his overall argument.

1. Guns have important defensive and deterrent uses in the battle against crime. According to survey data, guns are used for defensive purposes about as often as for criminal ones (p. 107). In addition, criminals' knowledge of the widespread possession of guns by citizens exerts a deterrent effect on crime (pp. 131–141). Hence, restricting access to guns would involve significant social costs in the form of decreased self-defense of citizens and possibly increased violent crime (pp. 143–144).

2. There is little, if any, net effect of levels of gun ownership on overall rates of violent crime. This claim is supported by an aggregate, inter-city analysis, which purports to show that the effect of the gun-ownership level in the population on crime rates is positive only in the case of a type of crime, burglary, that rarely involves guns (pp. 197–198; see also Kleck and Patterson, 1993).

3. Moreover, crime committed with guns does not involve much greater risk of homicide than any other type of violent crime, including that where the criminal possesses no weapon. An analysis of violent-incident data demonstrates, to be sure, that once a gun is used to inflict an injury, the prospect of the victim's death increases markedly

---

[2]Unless otherwise specified, all page citations and table references are to *Point Blank*.

(p. 182); but this increase in lethality is counterbalanced by the ability a gun gives an offender to control a criminal encounter, thus reducing victim resistance and the need to fire a gun in the first place (pp. 180–181). The net effect of the presence of a gun on homicide is therefore almost negligible (pp. 182–183; see also Kleck and McElrath, 1991).

4. Gun-control laws are generally ineffective in reducing levels of violent crime and presumably the same is true with respect to the availability of guns to those likely to use them to commit crimes. These claims are supported by further analysis of the intercity data, which indicates that gun restrictions exert no significant, broadly consistent effect on total violence rates of gun-ownership levels (p. 398; Kleck and Patterson, 1993). But one pattern does replicate a positive finding from previous research—mandatory penalties for illegal carrying reduce robbery rates (p. 402). However, gun-control laws may have perverse effects, reducing, for example, gun availability to law-abiding citizens who might use them in self-defense or causing criminals to substitute more lethal weapons (e.g., sawed-off shotguns) for banned or difficult-to-obtain ones (e.g., handguns) (p. 91).

From these propositions, Kleck concludes that "the most fundamental flaw in advocacy of gun control as violence reduction is not that gun laws could not disarm anyone but, rather, that doing so would not necessarily produce any net violence-reducing impact" (p. 429). Nevertheless, Kleck does, at the end, present a series of gun-control proposals that he regards as workable (in Chap. 11). But the tone pervading the book is one of skepticism about the role of guns in crime and the possible benefits of gun control.

Kleck's research is undeniably impressive for the range of data and methods that he employs. However, we will argue that his evidence is not adequate to the case he wishes to build. Upon close examination, the critical propositions do not always follow directly from the data reported. Further, the original evidence and analyses that are invoked in their support are seriously deficient in our view, and in one instance, his interpretation of statistical results appears grossly misleading if not simply wrong. These inadequacies do not mean that conclusions opposed to Kleck's are necessarily correct, although in one case we argue that Kleck's evidence does support a conclusion opposite to the one he draws. Rather, our analysis implies that the issues at stake remain largely unresolved. We believe that it is especially important to draw attention to these limitations of Kleck's research because the arguments and findings from *Point Blank* are likely to inform the increasingly intense public debate about gun control.

We proceed to develop our critique by examining, first, Kleck's analysis of the impact of guns on violent crime (propositions 2 and 3), where the weaknesses of evidence and analysis do the most unambiguous damage to his argument; second, his discussion of the deterrent and defensive uses of guns (proposition 1); and finally, his analysis of the impact of gun-control laws (proposition 4).

## 2. GENERAL LEVELS OF GUN OWNERSHIP AND RATES OF CRIMINAL VIOLENCE

Some of the most original empirical analyses developed by Kleck deal directly with the contribution of guns to the overall level of violent crime. He addresses this relationship in two distinct ways, with separate analyses on aggregate and individual levels (we deal with the latter in the next section and the former in this one). On the aggregate plane, using data for 170 cities, Kleck attempts to assess the net impact of levels of gun ownership on violent crime rates. The analysis employs multiple indicators of the gun supply and structural-equation models for the possibly reciprocal effects of the gun supply and crime rates, i.e., easy access to guns increases crime, while increased crime causes citizens to purchase more guns. [*Point Blank* presents one version of these models, estimated with LISREL, while Kleck and Patterson (1993) present another, estimated by a two-stage least-squares procedure. Our critique below is developed mainly in terms of the former, but applies also to the latter.] According to Kleck, the analysis demonstrates that "levels of general gun ownership had little apparent effect on violence rates" (p. 197), which bolsters his contention that the widespread availability of guns is not a factor in high crime rates. (Kleck notes two exceptions to the general pattern, neither of which supports the gun-control position.) However, his overall conclusion is vitiated by a series of methodological weaknesses, which involve the measurement of the gun-supply concept and the specification and identifiability of the structural-equation models. These problems render the results of the modeling procedure highly suspect at best.

The weakness in the measurement of the gun-supply concept has the most intriguing implications. Lacking a direct measure of gun ownership at the city level, Kleck selects five indicators of what is, in his model (schematically presented in our Fig. 1), a latent construct. Four of them involve guns and crime (e.g., the percentage of homicides committed with guns). In this, he is following precedents established by other researchers, such as Cook (1979, 1991). Yet the choice creates a conundrum for him, since he implies at various points in the book that there is not a strong correspondence between gun possession by law-abiding citizens and that by criminals, and his own gun-control proposals are founded on the notion that gun possession





Fig. 1. A schematic model of the reciprocal relationships between the gun supply and violent crime rates (at the city level). $y_1, \ldots, y_5$ are the indicators of the gun supply; the $x_i$'s are exogenous variables that affect both the gun supply and a particular crime rate; the $x_j$'s affect the crime rate only.

among the "violence-prone" can be separately targeted (p. 433). In *Point Blank*, Kleck seems initially unsure whether these gun-supply indicators better reflect criminal or noncriminal possession of guns (see pp. 194–195), although he ultimately decides in favor of the broader gun-supply interpretation. Kleck and Patterson (1993, p. 263) adopt a more ambiguous stance, arguing that, although the distinction between criminal and noncriminal gun ownership must be preserved at the individual level, they cannot be empirically distinguished at the aggregate one.

The issue is not trivial. If, on the one hand, the indicators reflect primarily criminal gun possession, then they are inadequate for assessing the causal effect of crime on the level of gun ownership, one of the central motivations for the modeling procedure. This effect presumably involves the purchase of guns for defensive purposes by the general noncriminal population. If, on the other hand, the linkage between the use of guns in crime and the supply of guns in the general population is so tight that criminal gun use can be used to measure the total gun supply (this is the position that Kleck ultimately takes), then a central tenet of the case in favor of gun control is established: where guns are widely available, they are more frequently used for criminal purposes.

The validity of the models—there are five in all, one for each type of violent crime rate—is further clouded by deficiencies in their specification, for the exogenous variables shift inexplicably from one model to another. To be sure, it is appropriate for the predictors of the violent crime rate

under analysis to differ in each model. Yet the gun ownership-level construct is common throughout, but its predictors also change markedly from model to model. In fact, only two instrumental variables (discussed in the next paragraph) are employed consistently as predictors. Of the 12 other exogenous variables that are used to predict gun-ownership level, the majority (8) appears in one model only, and none appears in all five; only 1 appears in as many as three of the models (see Kleck's Table 5.14). Standardized effects as large as 0.478 (for an index of Southernness) in one model are dropped from all the other models, even though the dependent variable is the same. [The models of Kleck and Patterson (1993), while not identical to those in the book, show similar inconsistencies.] We are unable to think of any theoretical rationale that makes sense of these inconsistencies; a reasonable conclusion is that the models are not adequately specified.

Inadequate specification may mean lack of identification for all or parts of a model, and that is a definite possibility here. The identification status of Kleck's models is questionable in part because he uses statistical significance tests, rather than theory, to eliminate exogenous variables from models, the key step in establishing identification (p. 193). In addition, Kleck inserts two variables as "instruments that should have a direct effect on gun ownership but not on violence or crime rates, thereby permitting identification of the model" (p. 197). These variables are necessary because, in a never-explained feature of the modeling procedure, the other exogenous variables determining the gun supply are in each model included also in the equation for the crime rate (Table 5.14; see also our Fig. 1). Without additional, distinguishing variables in the gun-supply equation, the rank condition for identification is not met (Bollen, 1989, pp. 98–103; Long, 1983, p. 37), and the equation for the crime rate is not identified. The instruments chosen are gun-magazine subscription rates and hunting-license rates, both of which seem more attuned to gun ownership among noncriminals in small cities or rural areas than would appear to be required in a national analysis of cities (it is hard to imagine that these instruments have the posited causal connection to gun levels for cities such as New York, for example).[3] In any event, the instruments do not have the robust empirical relationship to the gun supply that their role demands, for in three of the five models they are not statistically significant (see Table 5.14); and in the others, they have small effects. A well-known principle in structural-equation modeling is that

---

[3]Kleck's choice of instruments may have been stimulated by Bordua and Lizotte's (1979) analysis of *all* Illinois counties, where they find that hunting permits and sporting magazines are significantly related to male gun ownership, as measured by owner identification cards. The effect of hunting permits is particularly strong (Bordua and Lizotte, 1979, p. 161). However, such an effect, which appears when rural and urban areas are included and thus compared in the same analysis, need not translate into an analysis of urban areas alone.

instrumental variables must have substantial effects; identification cannot be achieved by throwing incidental variables into a model (Duncan, 1975, p. 89). When this principle is violated, the condition of "empirical" under-identification ensues (Rindskopf, 1984). Such appears to be the case here.

One reader has pointed out to us that Kleck's models might not fail identification if the two instrumental variables are highly correlated with each other, inflating their standard errors, but together have a substantial effect on the gun supply. This possibility cannot be checked in the results Kleck reports, which do not contain a correlation or covariance matrix. We remain skeptical, nevertheless, in view of the further damaging evidence regarding the value of these instruments appearing in Kleck and Patterson (1993). The authors conduct an OLS analysis of "suicide models" using a factor which combines four of the five indicators of the gun supply. They include the two instrumental variables among the predictors of this gun-prevalence factor. This analysis is not muddled by identification issues, because it does not posit reciprocal effects. But even though there are few other significant predictors in the OLS equation, the instruments do not have significant effects, and their coefficients are very close to 0 (see Kleck and Patterson, 1993, p. 271). The case for their use as instruments, which requires that they have substantial effects on the gun supply, appears dubious.

In short, Kleck's analysis of the effect of gun ownership on city crime rates is seriously flawed by ambiguous measurement of a key construct and by severe model misspecification. These flaws appear to render moot Kleck's conclusion that the net impact of the various positive and negative effects of gun possession is "not significantly different from zero" (p. 203).

## 3. OFFENDER GUN USE AND THE LETHALITY OF INCIDENTS

Kleck not only rejects the hypothesis that gun prevalence is related to overall rates of crime. He also challenges the widely shared belief that the use of guns by aggressors increases the lethality of criminal incidents. Specifically, he maintains that crimes committed with guns do not involve much greater risk of homicide than other types of violent crime, including crimes where the criminal possesses no weapon. This conclusion combines two effects that are largely offsetting, according to Kleck: on the one hand, when a gun is used to inflict an injury, the likelihood of the victim's death is substantially greater than if another weapon were used, but on the other, a gun enhances the ability of an offender to control a criminal encounter, thus reducing the need to fire the weapon in the first place. The net effect of the presence of a gun on homicide is therefore almost negligible (pp. 182–183).

This is a startling conclusion which upon close examination is undermined by possible bias in the data and what we believe is a serious error in interpretation. To lay out the basis for his claim that a gun in the hands of an offender exerts a powerful pacifying influence on a criminal encounter and thereby reduces the chance of injury to the victim, Kleck performs an individual-level analysis of violent criminal incidents involving strangers as reported in the National Crime Survey (NCS) data for the period 1979–1985 (this analysis also appears in Kleck and McElrath, 1991). While the NCS is undoubtedly the best national source of data on violent criminal incidents, the possibility of selectivity bias affects the conclusion that Kleck wishes to draw here. Assaults, most of them so-called simple assaults, which by definition do not involve weapons, make up the great majority of violent incidents in these data (assaults were three-quarters of all incidents in 1985, according to Kleck's Table 2.9). A plausible hypothesis is that many of the assaults in the NCS data are reported precisely because they involve physical attacks of a non-minor kind. Verbal threats that are issued without a visible weapon and never develop into an attack, or even attacks with little injury, especially when acquaintances are involved, probably have a low likelihood of being reported in the NCS, at least by comparison with similar situations where a gun is shown by one of the participants (see Kleck's remarks on p. 175). In other words, the NCS sample of incidents is likely to be produced by unequal thresholds of recognition accorded to the threats posed by different weapon types versus no weapon at all; the no-weapon incidents that appear in the data are likely to fall toward the high end in terms of actual violence (attack and injury), compared to incidents where weapons are present. The analysis, in relative terms, thus probably overstates the nonviolent character of encounters with guns. Kleck acknowledges the possibility that such a problem is present (see p. 184), but he does no more than raise the issue. He uses, without significant qualifications, the conclusions he draws from this analysis as a linchpin to the book's overall argument (see p. 430).

We thus caution that Kleck's evidence on the harm associated with incidents involving different weapon types probably exaggerates the violence of non-gun (and especially non-weapon) incidents. Nevertheless, even if Kleck's data are taken at face value, his statistical results, when interpreted correctly, demonstrate the lethal consequences of offender use of guns quite convincingly. To establish the lethality of different weapon types or no weapon at all, Kleck continues the analysis of NCS individual violent-crime incidents, but supplemented by data on homicide from the Supplementary Homicide Reports (SHR) for 1982. It is here that Kleck appears to commit a serious error. The critical analysis is one in which homicide as an outcome is analyzed as a function of the type of weapon present, along with a series of control variables (presented in Kleck's Table 5.11), to estimate total

effects. OLS regression of a dummy dependent variable (homicide vs no homicide) is the method of analysis, so that regression coefficients can be interpreted as linear differences in the probability of the occurrence of homicide.

Finding that the regression coefficient associated with the presence of a handgun, compared to no weapons at all (the omitted category), is 0.014 (i.e., 1.4%), Kleck concludes (pp. 182–183) that "the aggressor's possession of a handgun in a violent incident apparently exerts a very slight net positive effect on the likelihood of the victim's death .... Thus, the violence-increasing and violence-suppressing effects of gun possession and use almost exactly cancel each other out. This small an association is statistically significant, however, because of the very large ($n = 14,922$) sample size." We believe this conclusion to be wrong. Kleck has been misled by the rarity of homicide (even as an outcome of violent crimes), as well as by the use of a statistical method inappropriate for a highly skewed dichotomous dependent variable. In our view, the coefficient expresses a very large effect: incidents where a gun is present are much more likely to end in a homicide than are incidents without weapons, just as common sense predicts.[4] They are also considerably more likely to produce a homicide than are incidents where other types of weapons, such as knives, are involved.

To appreciate the magnitude of weapon effects, it helps to have a table that Kleck does not present, namely, a table with the overall rates of homicide by weapon type. Regrettably, Kleck does not present the data in a way that makes it possible to derive these key rates precisely, but one can approximate them by combining information he does present, albeit for different years. Thus, one can derive the distribution of weapon types in violent incidents from the means for the NCS sample (1979–1985) and the NCS/SHR sample (1982), presented in the book as Table 5.7. The overall percentage of violent incidents resulting in homicide (0.36%) can be derived from the same table by multiplying the appropriate probabilities—that an incident results in an attack, that an attack results in an injury, and that an injury results in death (i.e., $0.495 \times 0.522 \times 0.014$).[5] Further, homicides can

---

[4] As one reviewer reminds us, an ambiguity in the language of percentages needs to be clarified here. A percentage increase can mean one of two things: an increase by a given percentage of the base amount (e.g., a 50% increase in a probability of 0.20 is therefore 0.30) or an increment added to a base percentage (e.g., 50% added to 20% equals 70%). Given the binary dependent variable in Kleck's analysis, the second meaning is warranted. If the first meaning were appropriate, then Kleck's conclusion would, in fact, be correct.

[5] Our estimate of the percentage of violent incidents resulting in homicide, derived from Kleck's Table 5.7, which is limited to stranger incidents and which combines information for different years, is very similar to the estimate for all violent incidents in the single year of 1991. In that year, the F.B.I. reported 24,703 criminal homicides (Maguire *et al.*, 1993 p. 358), while the NCS estimated a total of 6,587,000 non-homicidal violent incidents (Bastian 1993 p. 2). The ratio of homicides to the total number of violent crimes using these figures is 0.37%.

**Table I.** Approximate Risk of Homicide in Violent Incidents by Type of Weapon Present (Hypothetical Base of 10,000 Incidents)[a]

| Weapon | Expected No. of homicides | % incidents resulting in death | No. of incidents |
|---|---|---|---|
| Gun | 22.6 | 1.662 | 1,360 |
| Knife | 7.1 | 0.582 | 1,220 |
| Other Weapon | 3.9 | 0.287 | 1,360 |
| No Weapon | 2.3 | 0.038 | 6,060 |
| TOTAL | 36.0 | 0.360 | 10,000 |

[a]Sources: Kleck's Table 5.7 provides data on incidents by weapon type for 1979–1985; Table 5.3 shows the distribution of homicides across weapon type (excluding homicides associated with robbery and rape) for 1988. Because of the categories in the latter table, handgun and longgun incidents are combined here.

be approximately distributed among the weapon types by using 1988 data on deaths by different wound types (found in Table 5.3, which shows, for example, that 62.8% of homicides in that year were due to gunshot wounds). These different pieces of information are combined in our Table I, where we use a hypothetical base of 10,000 incidents to derive the expected number of homicides for each weapon type and, from it, a death rate.

The results are eye-opening. When a gun is present (we are unable to distinguish here between handguns and other guns, because of the categories in the table on deaths by wound types), 1.662% of violent encounters with criminals end in homicide. In comparison, only 0.038% of violent incidents without weapons end up this way. Note that, in additive terms, the difference in percentages (1.624%) is roughly the same as that in Kleck's regression (where a difference of 1.4% is found), but stated in the way we have just done, it is clear that the risks are very different. A percentage difference is not an appropriate method of comparison in this case because of the rarity of the event; ratios are preferable. Thus, when a gun is involved, the risk of homicide is 43.7 times (i.e., 1.662/0.038) its magnitude when no weapon is present—hardly a minor difference. Guns are also almost 3 times (specifically, 2.9) more lethal than knives and 6 times (5.8) more lethal than other weapons. Since the additive differences here are very similar to those Kleck obtains from his regression, it is fair to conclude that the regression equation implies effects of the same order of magnitude. The presence of guns, in short, makes incidents much more lethal than they otherwise would be. Kleck's own results demonstrate this.

To be sure, the rates we have just constructed can be regarded only as approximations to the true rates, because we have had to combine 1988 data with data from an earlier time period. Moreover, without the individual-level

data in hand, we cannot limit our estimates to incidents between strangers, as Kleck does. But we think it quite unlikely that the true rates will turn out much differently, and the fact that our approximate rates parallel so closely Kleck's regression results supports us.[6] Of course, OLS coefficients are not good measures of effects when the dependent variable is a low-frequency event. Kleck should have reported probit coefficients, as he did for other models in this part of his analysis; even better might be logit coefficients, which can be directly converted into ratios (of odds, which closely approximate probabilities for low-frequency events).[7]

Kleck might still argue that such coefficients are not the "true" effects, because offender "lethality," the desire of the offender to inflict harm on the victim, is not controlled. In discussing his results, he claims that "the slight apparent net positive effect of guns on the death outcome would be reduced, and could easily disappear altogether, if motivation could be properly measured and controlled" (p. 183). We are skeptical that effects of this apparent order of magnitude could be made to disappear with further controls; this flies in the face of our experience with multivariate analysis [see also Cook's (1991) discussion of "instrumentality"]. In any event, counterbalancing the absence of controls for offender motivations is the bias in the sample explained above toward the more serious of the incidents without weapons.

If our reinterpretation of Kleck's findings concerning the lethality of weapon is joined with Kleck's arguments about measuring the supply of guns, the result is a powerful argument diametrically opposed to the one that Kleck intends. Kleck's corrected finding about the heightened probability of homicide in violent incidents involving guns goes beyond most previous research, such as Zimring's classic 1968 article. Moreover, as a prelude to his modeling procedure in the aggregate analysis of crime rates, he appears to establish that there is a strong ecological correlation between the level of

---

[6]Moreover, using data Kleck separately reports for 1985, we can confirm directly a crucial figure in Table I—namely, the percentage of crimes committed with guns that result in homicide. In Table 2.9, Kleck reports that the number of violent criminal incidents involving guns in that year was 657,119; Table 2.7 states that the number of homicides due to guns was 11,621. These data indicate that 1.74% of gun-related crimes in 1985 resulted in a death [11,621/(657,119 + 11,621)]. Note that the homicide total must be added into the denominator because the NCS, the source for the count of violent crimes with guns, does not include homicides.

For handgun crime only, data compiled by the Bureau of Justice Statistics for the 1987–1991 period imply a slightly lower homicide percentage—1.56%—based on annual averages of 10,600 homicides and 667,000 handgun crimes (Rand, 1994).

Both percentages are close to the hypothetical one in Table I and thus are consistent with the order of magnitude of the weapon-type differences discussed in the text.

[7]This approximation is clear from the definition of the odds: odds $= P/(1 - P)$. When $P$ is very small, the denominator is close to 1.

gun ownership in the general population, as established by survey data, and the rate of gun use in crime, specifically in robbery and aggravated assault, two of his gun-supply indicators (pp. 194–195). These findings support a chain of logic that directly links the gun supply to the rate of homicide, to wit:

1. Where the level of gun ownership in the general population is high, guns frequently substitute for other weapons in the commission of crime;
2. Where guns are frequently used in crime, the rate of homicide is higher, *ceteris paribus*.

That Kleck's (corrected) finding at the incident level about the impact of gun use on homicide can be translated to an aggregate plane (as in step 2) is supported by Cook's (1987) research. He finds that the gun robbery rate of a city makes a markedly higher contribution to its homicide rate than does its non-gun robbery rate, as one would anticipate from the incident-level finding.

The centrality of these erroneous conclusions about the lethality of guns and the contributions guns make to the homicide rate for Kleck's overall argument can hardly be overstated. Kleck refers to them at various points to suggest the futility of measures aimed at reducing gun possession. For instance, he speculates at one point that, "if gun possession were reduced among aggressors in violent situations, total assault injuries would increase, the fraction of injuries resulting in death would decrease, and the total number of homicides would remain about the same" (p. 184). Presumably, such meager outcomes will hardly look desirable to most readers in light of the difficulties of achieving meaningful gun control. However, his own results demonstrate that a very different conclusion could be drawn.

## 4. DEFENSIVE GUN USE AND THE DETERRENT EFFECTS OF GUN OWNERSHIP

Kleck claims that the topic of the ownership and use of guns for defensive purposes has been largely ignored in past scholarship, and he maintains that this neglect has impeded the formulation of rational gun policies (pp. 101–102). In Chapter 4, he presents several empirical propositions about defensive gun use in an effort to reveal the positive side of gun ownership:

1. According to survey data, guns are used for defensive purposes about as often as for criminal ones (p. 107);
2. Civilians use guns legally to kill a large number of felons each year (p. 114);

3. Most gun owners feel safer because of gun possession (p. 120);
4. Victim resistance with a gun reduces both the likelihood that an attempted robbery or assault will be completed (p. 123) and the likelihood that the intended victim will be injured (p. 124);
5. Appreciable percentages of prisoners report in surveys that they have been discouraged from committing certain crimes at some time because of fear of encountering an armed victim (p. 133);
6. Three communities (Orlando, FL; Kansas City, MO; Kennesaw, GA) experienced decreases in crime rates following programs that publicized the private ownership of guns (pp. 134–138);
7. Many burglars report that they have avoided occupied residences because of fear of encountering an armed victim (pp. 138–139).

Several of these empirical claims have been challenged in the literature. Cook (1994, p. 374) observes that Kleck's estimate for the number of defensive use of guns exceeds that from the National Crime Survey by a factor of almost 10 times. Cook (1991, p. 55) also identifies potentially serious methodological limitations of the surveys that Kleck uses for his estimate. Methodological concerns have similarly been raised about Kleck's estimates of the frequency of civilian justifiable homicides and the killings of felons (see Sherman, 1993, p. 15). Finally, research published subsequent to *Point Blank* has reexamined the impact on crime rates of the programs drawing publicity to gun ownership in Orlando, Kansas City, and Kennesaw. These recent analyses "do not support the idea that publicity about gun ownership measurably deters criminal behavior" (McDowall *et al.*, 1991, p. 554).

Our major criticism of Kleck's discussion of deterrent gun use, however, is that even if his empirical claims are granted, his most controversial inferences do not follow directly from the evidence he cites. Kleck arrives at the following overarching conclusions about the positive side of gun ownership and the significant costs of gun control:

1. The crime-inhibiting effect of routine gun ownership may be roughly equal to any crime-generating effect (p. 143);
2. Gun-control measures applied to the general population are likely to do more harm than good because the positive deterrent effect of routine gun ownership would be decreased more than would the crime-causing effect of criminal gun ownership (pp. 144–145).

In very general terms, Kleck's set of empirical propositions lends plausibility to the claim that there is a deterrent effect of gun ownership. For example, whether defensive gun use is roughly equivalent to the criminal use of guns or about one tenth as frequent, as suggested in the NCS data,

it would seem to be frequent enough to be relevant to the criminal decision-making process for a nontrivial number of potential criminals (Wright and Rossi, 1986). The surveys with prisoners confirm this point, although the extent to which crimes are actually curtailed rather than merely displaced to more vulnerable targets is open to question (Green, 1987, p. 72). In any event, the critical issue is not whether gun ownership has *any* deterrent effect but whether such an effect is *sufficient in magnitude* to counterbalance the crime-inducing effect of guns in the hands of criminals, an effect which Kleck acknowledges. The evidence summarized above actually does not permit any clear inference about the magnitude of such a deterrent effect.[8]

An exception here might be the findings of the quasi-experimental studies on the reduction in crime following gun publicity. If the more recent re-analyses indicating null effects are disregarded, the data cited by Kleck could be interpreted as indicating a deterrent effect of gun ownership which is actually greater than any crime-inducing effect, as reflected in the decrease in crime associated with increased awareness of general levels of gun ownership. However, Kleck recognizes the ambiguities surrounding such an interpretation and proposes an alternative. He writes (p. 138),

> ...The results of the natural quasiexperiments are not cited for the narrow purpose of demonstrating the short-term deterrent effects of gun training programs or victim gun use. There is no reason to believe that citizens used the training in any significant number of real-life defensive situations, nor any solid evidence that gun ownership increased in the affected areas. Rather, the results are cited to support the argument that routine gun ownership and defensive use by civilians may have a pervasive, *ongoing* [original emphasis] impact on crime, with or without such programs or incidents. This impact is intensified and made more salient at times when criminals' awareness of potential victims' gun possession is dramatically increased, thereby offering an opportunity to detect an effect that is ordinarily invisible.

According to Kleck, then, the quasi-experiments merely support the claim that there is some (ongoing) deterrent effect associated with routine gun ownership which is strengthened and rendered more visible under circumstances of increased awareness of guns. Once again, however, the important issue is not the presence of any deterrent effect of gun ownership, but the balance sheet of the positive and negative roles of guns and the net contribu-

---

[8]When considering the consequences of defensive gun use, it is important to distinguish between a "thwarting effect" and a "deterrent effect." If the use of a gun by a potential victim prevents the completion of a crime, the attempted crime has been effectively thwarted. However, as Green (1987, p. 64) explains, "Deterrence refers to the prevention of crimes from occurring altogether rather than to the altering of crimes already in progress." There is no logical basis for concluding that each "thwarted crime" results in a "deterred crime," and thus the aggregate number of incidents in which guns are used defensively is not a clear indicator of the deterrent effect of defensive gun use. See Green (1987) for an extended discussion of difficulties associated with inferring deterrence from information on citizen gun ownership and use.

tion of gun ownership to social order or to criminal violence. Kleck's evidence relating specifically to defensive gun use in Chapter 4 is actually incapable of resolving this issue one way or another, and his inference about the counterbalancing of the crime-inhibiting and crime-generating effects of gun possession among prospective criminals and the general public cannot be securely grounded in this evidence.[9]

Kleck's other general inference in this section of *Point Blank*—the inference about the harmful consequences of popular gun-control policies—is susceptible to a similar criticism. Kleck writes that *"in view of this chapter's evidence* [italics added], this sort of 'blunderbuss' policy [across-the-board gun control] would facilitate victimization because legal restrictions would almost certainly be evaded more by aggressors than nonaggressors, causing a shift in gun distribution that favored the former over the latter" (p. 145). Upon close examination, Kleck's conclusion here rests upon two premises. One, he assumes that gun controls will be honored more by the law-abiding public than criminals, resulting in greater disarmament of the former than of the latter. Two, he assumes that any crime-reducing consequences of a lower supply of guns in general will be insufficient to counteract the crime-inducing effect of the shift in gun distribution in favor of aggressors, thereby increasing overall levels of victimization. The first assumption is rather compelling; persons who abide by laws in general would seem to be most likely to abide by gun laws. The second assumption, however, is very much an open question. Gun-control advocates would argue that the availability of guns can be a key factor underlying the emergence of criminal motivations in the first place—surely, some persons who use guns for criminal purposes would choose not to do so without access to guns, and this effect may be equal to, or greater than, the unknown change in the deterrent effect associated with civilian disarmament.[10] In any event, the specific evidence on defensive gun use presented in *Point Blank* does not provide a secure empirical foundation for either of Kleck's premises.

Kleck is well aware of the inherent difficulties associated with the demonstration of deterrent effects (p. 131), and he cautions at the outset that the evidence on self-defense and guns "should be regarded only as suggestive" (p. 132). In the absence of more solid evidence, however, Kleck's

---

[9] Kleck's intercity analysis of the effect of levels of gun ownership on crime rates discussed earlier does speak directly to this issue, but as we have seen, his results are seriously impaired by methodological deficiencies.

[10] To his credit, Kleck explicitly identifies many of the more persuasive arguments suggesting a positive effect of the gun supply on rates of violence. See, for example, Kleck and Patterson (1993, p. 250).

remarks about the implications of defensive gun use for crime-control policy
are highly speculative.

## 5. EFFECTS OF GUN CONTROL LAWS

Kleck addresses the effectiveness of gun control more directly at a later
stage in the book (in Chapter 10), as well as in Kleck and Patterson (1993).
However, the already discussed deficiencies in the modeling procedures have
a direct bearing on his conclusions about gun-control laws, which derive
from further analysis of the 170-city data. To test the effects of these laws,
Kleck (and Kleck and Patterson, 1993) adds a series of dummy variables
to the models for the reciprocal effects of gun-ownership levels and violent-
crime rates. Since the new variables are added to both equations (because
the laws they represent may affect both gun ownership and crime), the
previously noted deficiencies in the models remain in force. In particular,
the problematic specification and identification of the models are unchanged,
and the results should be regarded as moot.

Even so, it is worth looking at his evaluation of these results in the
book and of those from similar models reported by Kleck and Patterson
(1993). This evaluation is unduly negative based on the coefficients reported
and given the difficulty to be anticipated in finding effects of local laws,
which are undercut by the leakage of guns among jurisdictions. We are not
claiming, of course, that these results constitute meaningful evidence of the
positive effects of gun-control laws. The methodological defects noted above
preclude such a conclusion. Rather, we suggest that Kleck could easily have
interpreted these results in a more positive light.

Kleck does take note of a few instances where gun-control laws appear
to reduce crime rates, but his bottom-line conclusion is that the "results
generally do not support the idea that existing gun controls reduce city gun
ownership or violence rates" (p. 402). He states in Point Blank, for example,
that of 121 tests of the direct effects of gun laws on violence rates, only 10
are significant and negative, the predicted direction of the effect of gun
control on violence, and that this result is no better than chance. This formu-
lation, however, understates the relative frequency of supportive coefficients,
because it includes the coefficients from the model for burglary, even though
Kleck argues that burglary is "rarely committed with guns" (p. 394). If the
coefficients from this model are excluded (none is significantly negative),
then there are 10 supportive coefficients of 102 tests. The claim that the
results are no better than one would obtain by chance also goes too far.
Kleck employs, it appears, a two-tailed, 0.05 significance test. Hence, under
the assumption that the null hypothesis is true, one would expect 2.5% of
the tests to yield a falsely significant negative coefficient and 2.5% to yield

a falsely significant positive one. In this event, one should expect only about three significantly negative coefficients (i.e., $0.025 \times 121$), rather than $10$.[11]

Kleck's assessment of the effects of gun control on gun prevalence misses equally striking results. In the book, he takes no notice of the number (14) of apparently significant, negative coefficients in the gun-ownership equations (see the summary in Kleck's Table 10.5). In the article by Kleck and Patterson (1993), the authors conclude flatly (p. 278) that "existing gun control laws do not reduce gun prevalence in U.S. cities," although their own summary table (p. 273) shows that 21 of 102 tests wholly or partly support the hypothesis that such laws do reduce gun prevalence. Even more telling is their use of a "gun law index," which combines the different gun-law variables into a single factor. When used in their models, this index does not have any effect on rates of criminal violence, which Kleck and Patterson (p. 278) duly note, concluding that "treating gun control as a single endogenous variable did not strengthen support for the gun control efficacy hypothesis." The index does, however, appear in their Table III to have large, negative effects on gun prevalence in several models, as would be predicted from the same hypothesis. These coefficients are not discussed by the authors.

## 6. A FINAL NOTE OF SKEPTICISM

We have argued throughout that the evidence Kleck presents in *Point Blank* is not sufficient to establish his conclusions and that they represent only one of the possible interpretations of his data. This ambiguity results partly from the methodological deficiencies and difficulties that we have detailed above. But, in our view, it also results partly from what could fairly be called an underlying "paradigm," in the Kuhnian sense (Kuhn, 1962), about the place of guns in the social order. Like any paradigm, Kleck's imparts a degree of structure to the raw data, the relevant parts of the observable world, and thus gives his argument overall coherence, but some data and alternative interpretations remain out of its reach. In other words, it has "blind spots." To be fair, all social science operates with paradigms and thus is vulnerable to their blind spots, and total objectivity may be

[11] We recognize that one can test the possibility that 10 seemingly significant outcomes are significantly better than one would expect by chance or, perhaps even more appropriately, apply a multiple comparison methodology in this situation (Toothaker, 1993). We do not pursue these possibilities here because the results obtained by Kleck and by Kleck and Patterson are problematic because of the flaws in their modeling procedures.

unattainable in any area of inquiry, no less one as highly charged as gun control.[12]

Kleck's paradigm seems most clearly visible to us in his statements about the positive contribution of guns to maintaining an orderly society. The crime-inhibiting role of guns receives so much emphasis in his hands that he is led to conclude, at one point, that "much of the social order in America may depend on the fact that millions of people are armed and dangerous to each other" (p. 143). In his view, the deterrent effects of gun ownership are virtually universal, enjoyed by both gun owner and non-owner alike. This casts those who do not own guns in the role of free riders, enjoying benefits for which they do not have to pay ["whereas owners bear the costs of gun ownership, their unarmed neighbors share in any deterrent benefits" (p. 104)].

This is one side of the coin. But there is another side that gets less notice in the book, although it is equally plausible given the same evidence. It turns on the possibility that criminals would have less reason to arm themselves if gun ownership were less widespread in the general population (see Green, 1987, p. 71). Supportive evidence comes from a survey of imprisoned criminals (Wright and Rossi, 1986), on which Kleck relies quite heavily to demonstrate deterrence: it shows that criminals acquire guns mainly for their own self-protection, because they fear either becoming the victims of other armed criminals (pp. 46–47) or encountering armed victims in committing crimes themselves (p. 133). Either way, these data suggest that the perception of others' ownership of guns prods those who would commit crime into acquiring guns themselves. Once they possess guns, they are likely to use them in crime, with a greater likelihood of killing their victims, according to the chain of reasoning established earlier. While Kleck's discussion implies that those who are not gun owners should feel in debt to those who are for the deterrence guns create, there would appear to be as much reason for non-owners to blame non-criminal owners for contributing indirectly to the spread of gun violence. Both claims can be justified by the evidence.

We wonder, finally, about the quality of life in the kind of society where routine social order depends upon the massive armament of the citizenry. Fear is a keynote, we presume, because in a society where many are armed, others will be afraid to assert their rights in ordinary encounters with

---

[12]In recognition of the problem of objectivity, Kleck includes a "voluntary disclosure notice" to inform the reader that he is not a member of an advocacy group on this issue (p. vi). Following Kleck's example, we note that the first author of this paper is a member of Handgun Control. The second author is not affiliated with any advocacy group on the gun-control issue. Like Kleck, we are both committed to the principle that cogent reasoning and empirical evidence, rather than personal opinion, must guide social analysis.

strangers—to honk their horn when their car is cut off, for example—out of fear of being confronted with a gun. Kleck does speak to the role of fear of crime in leading non-criminals to acquire guns (pp. 27–32) and to the possible psychological comfort afforded individuals by gun ownership (pp. 119–120). What he does not raise as an issue, but deserves to be raised, in our view, is the psychological effect on a community's residents of the knowledge that many guns are in its homes, on its streets, and even in its schools. These are the conditions in many inner-city, minority communities in the United States, and a great deal of persuasive personal testimony (Ayers, 1994; Dugger, 1994), if not yet systematic evidence, indicates that fear is the dominant emotion inspired by the pervasiveness of guns and gun crime. Are these the conditions we should be willing to accept in a hellish bargain to obtain, if Kleck is right, some check on criminal propensities?

## ACKNOWLEDGMENTS

We are grateful for the comments of Richard Felson, Allen Liska, and Alan Lizotte on an early version of this paper. In this case, however, the usual acceptance of blame by the authors, normally but an academic courtesy, has particular relevance: we alone are responsible for remaining errors in the text.

## REFERENCES

Ayers, B. D., Jr. (1994). Children frightened by gunfire plead with Congress for an end to violence. *The New York Times* Feb. 4: A 12.

Bastian, L. D. (1993). *Criminal Victimization 1992*, U.S. Department of Justice, Bureau of Justice Statistics, Bulletin NCJ-144776, Washington, D.C.

Bollen, K. (1989). *Structural Equations with Latent Variables*, John Wiley, New York.

Bordua, D. J., and Lizotte, A. J. (1979). Patterns of legal firearms ownership: A cultural and situational analysis of Illinois counties. *Law Policy Q.* 1: 147–175.

Cook, P. (1979). The effect of gun availability on robbery and robbery murder: A cross section study of 50 cities. In Haveman, R., and Zeliner, B. B. (eds.), *Policy Stud. Rev. Ann.*, Sage, Beverly Hills, CA.

Cook, P. (1987). Robbery violence. *J. Crim. Law Criminol.* 78: 357–376.

Cook, P. (1991). The technology of personal violence. In Tonry, M. (ed.), *Crime and Justice: A Review of Research*, University of Chicago, Chicago.

Cook, P. (1994). Review of *Point Blank, N. Engl. J. Med.* Feb. 3: 374–375.

Dugger, C. (1994). Youthful, impressionable and accused of murder. *N.Y. Times* May 17: A1, B6–B7.

Duncan, O. D. (1975). *Introduction to Structural-Equation Models*, Academic Press, New York.

Green, G. (1987). Citizen gun ownership and criminal deterrence. *Criminology* 25: 63–81.

Kleck, G. (1991). *Point Blank: Guns and Violence in America*, Aldine de Gruyter, New York.

Kleck, G., and McElrath, K. (1991). The effects of weaponry on human violence. *Soc. Forces* 69: 669–692.

Kleck, G., and Patterson, E. B. (1993). The impact of gun control and gun ownership levels on violence rates. *J. Quant. Criminol.* 9: 249–287.

Kopel, D. B. (1992). *The Samurai, the Mountie, and the Cowboy*, Prometheus, Buffalo, NY.

Kuhn, T. (1962). *The Structure of Scientific Revolutions*, University of Chicago Press, Chicago.

Long, J. S. (1983). *Covariance Structure Models: An Introduction to LISREL*, Sage, Beverly Hills, CA.

Maguire, K., Patore, A. L., and Flanagan, T. J. (1993). *Sourcebook of Criminal Justice Statistics 1992*, U.S. Department of Justice, Bureau of Justice Statistics, Washington, D.C.

McDowall, D., Lizotte, A. J., and Wiersema, B. (1991). General deterrence through civilian gun ownership: An evaluation of the quasi-experimental evidence. *Criminology* 29: 541–559.

Polsby, D. (1994). The false promise of gun control. *Atlantic Monthly* Mar.

Rand, M. J. (1994). *Guns and Crime. Crime Data Brief* (*April*), Bureau of Justice Statistics, U.S. Department of Justice, Washington, D.C.

Rindskopf, D. (1984). Structural equation models: Empirical identification, Heywood cases, and related problems. *Sociol. Methods Res.* 13: 109–120.

Sherman, L. (1993). Review of *Point Blank, Criminologist* 18: 15–16.

Toothaker, L. E. (1993). *Multiple Comparison Procedures.* Sage, Newbury Park, CA.

Wilson, J. Q. (1994). Just take away their guns. *N.Y. Times Mag.* Mar. 20: 47.

Wright, J., and Rossi, P. (1986). *The Armed Criminal in America: A Survey of Incarcerated Felons*, Aldine, Hawthorne, NY.

Zimring, F. (1968). Is gun control likely to reduce violent killings? *Univ. Chicago Law Rev.* 35: 721–737.

# Exhibit 95

  

Home    News    Health    Sports    Best Of    Events    Video & Pics    Traffic    Weather    Directory    Deals    Autos
Latest News    Local    Politics    Business    Consumer    Entertainment    Health    CBS4 Investigates    National    World    Blogs



Search        ☁ 84°

FOLLOW US

Buy Tickets   Your Home   More        LOGIN    REGISTER

Expand +


THE BIG MEMORIAL DAY SAVINGS EVENT!    New 2012 Jeep GRAND CHEROKEE $24,500    CLICK HERE TODAY!

# LOCAL

## A Night Inside South Florida's Gang Wars

May 7, 2012 11:45 PM

Share this    Like  59    .    0    View Comments



MIAMI (CBS4) — Spend a night with the Miami-Dade Police Department's Gang Unit, and its commander, Lt. Luis Almaguer, and you will be forever on the move.

On a recent night in which the gang task force was operating, Almaguer and his fellow cops were racing on calls from Liberty City to Miami Gardens and **CBS4's Jim DeFede** joined them every step of the way.

### MORE FROM CBS

Burglary Suspect Shot In Pembroke Pines Apartment

Teen Seriously Burned In Opa-Locka Kitchen Fire

Protesters Want Fire Capt. Disciplined For Trayvon...



Reporting Jim DeFede

**Filed Under**

CBS4 Investigates, Local, News, Syndicated Local

**Related Tags**

Crime, Fighting Crime, Gang Unit, Gang War, Gang Wars, Gangs, Jim DeFede, Lt. Luis Almaguer, Miami-Dade Police Gang Unit, South Florida Gangs

**South Florida Crime**

Crime Coverage

**Get Answers**

will you ever anchor the news ?

### FROM AROUND THE WEB

Kelly Ripa Dons Skintight Catwoman Costume at TV Land Awards (Us Weekly)

Netanyahu's Timetable (The Daily Beast)

Giant, awesome 'tree lobster' survived 80 years in hiding (Grist Magazine)

**LATEST VIDEOS**



TODAY
Storms Likely A Few Strong
87°

There are at least 250 gangs in Miami-Dade County with a minimum of 2,000 gang members.

By comparison, Miami-Dade's gang unit is comprised of Almaguer, three sergeants, and thirteen officers. That's 17 against 2,000. Add to that as many as another 10,000 "associate" gang members – hangers on who aren't formally members of the gang but often participate in their crimes – and you quickly get the sense of how tall a challenge the police are facing.

On this night in March, the county's north end was in the midst of one of its bloodiest months in recent memory. At least 30 individuals would be shot — almost all of it attributable to street gangs. Of course not all of the victims were gang members — some, like 5-year-old Mckayla Bazile — were caught in the crossfire.

when will todays episode of the bold and the beautiful be shown because of the presidents conference was on

If you are hit by a car while riding a bicycle and have no insurance no matter how badly you are injured they will release you and not provide rehab necessary. Is this right??

How do I get a copy of a video from the foreclosure event on 2/22/12

how soon before rihanon is pregnant?

When the task force gathered earlier that afternoon for a briefing, it was the violence that was on everyone's mind.

"Gentlemen, we've had numerous shootings up here on the north end, you guys need to back each other up," Almaguer said.

In addition to Miami-Dade's gang unit, this task force will include officers from Opa-Locka, Aventura, North Miami Beach, Sunny Isles, Golden Beach, Miami Gardens, and a half dozen other agencies.

The night jumps off with a series of calls. Cruising though a 79th Street gas station, a Sunny Isles task force officer spooked one of the drivers at the pumps. When the driver realized there was a police officer in the unmarked car cruising the gas station, he abandoned his vehicle and took off running. A quick check of the license plates revealed that the car was stolen.

As the officer in pursuit shouts out the man's direction over the radio, Almaguer pleads for more information.

"Keep calling it," Almaguer demanded over his radio. "Set up the box."

The "box" is cop speak for establishing a perimeter around the neighborhood. In a matter of minutes police surround the area hoping to cut off any avenue of escape.

Almaguer takes one corner, and begins stopping cars leaving the area to make sure the suspect isn't hiding in one of them. Police dogs are brought in as a police helicopter circles overhead.

Sure enough in less than 30 minutes they find him. Fearing police had a description of his clothing, the man stripped down to his boxers, believing he would be less conspicuous in his underwear.

"Fantastic," Almaguer said as he walked up to where the suspect was hiding.

"He was sitting right there in front of the house," a detective tells the lieutenant.

"Yeah, well that's what you get," Almaguer said.

A homeowner spotted the half naked 20-year-old hiding in her bushes and called 911.

"He said somebody let him hold the car," Almaguer said. "Somebody let me hold it."

The car was stolen from Miami Lakes and the boxer bandit admitted being a member of an Opa-Locka gang.

Gangs are not merely a problem in dangerous or low-income neighborhoods. More often than not the crimes they commit are in the more upscale parts of town. Which is why fighting the gangs — and the violence that comes with them — should be important to everyone.

A short time after the stolen car arrest is made other members of the later gang unit conduct a traffic stop of known gang members.

"We're just introducing ourselves to the community," Almaguer said with a wry smile.

CBSMiami.com Weather @ Your Desk ...

More Videos


LOVE MY TEACHER @4
Click to Tell us about Great Teachers
Rhiannon Ally

CBS MIAMI SECTIONS

Select Category

SHOPPING AROUND SOUTH FLORIDA


**Best Shopping Centers & Malls**
e Falls, these are your best bets for malls.


**Best South Florida Thrift Stores**
Malls too expensive? Check out the bargains and be thrifty.


**Best Swimsuit Shops In Miami**
It's South Florida, you have to have the perfect look for the beach!


**Best Small Boutique With Big Fashion**
The perfect place to find high fashion in a small store.


THOUSANDS OF TEENS IN FOSTER CARE WOULD LOVE TO PUT UP WITH YOU

Ad Council    AdoptUsKids    ADOPTUSKIDS.ORG

There are at least three separate gang wars taking place on the north end among rival gangs. Tensions are running high on this night and one of the things Almaguer on his officers is looking to do is make their presence felt, hoping it will allow things to cool down.

During this traffic stop, police find a handgun and some powder cocaine inside the car. Almaguer says the gangs have learned how to structure their crews so that at least one of them can be legally armed.

Advertisement


Discover the best free real-time news, networking and information portal on the web...


Newscircles are a quick, convenient way to create and publish your own customized news portals...


Get the most up to date breaking new stories as they happen across the globe...


Choose an industry to view real-time news organized from over 25,000 sources...

One member of a crew will have a concealed weapons permit, allowing them to be armed.

In Florida, anyone can get a gun permit as long as they have not been convicted of a crime. In some cases, Almaguer claimed, individuals may have multiple of arrests, but they get to keep their gun permit until they have an actual conviction.

So you end up with a situation where one guy holds the gun, another guy holds the dope, and a third guy drives.

"And there is nothing you can do about it because [the guy with the gun] has no convictions," Almaguer said. "They've figured out the system and still have a firearm on them."

The traffic stop ends with the guy holding the cocaine going to jail while the man with the concealed weapons permit was given back his gun and let go.

No one in the unit thinks they'll eradicate the gangs, this is about trying to manage and control the violence.

Two nights earlier, a drive by shooting in Miami Gardens killed two people. Worried retaliation was imminent, the task force made a point of cruising the area where the gangs were known to stay.

Driving past the house of one of the victims, a Miami Gardens task force officer spotted a group of men, including one brandishing a handgun. The officer chased him over a fence, tearing up his knee in the process. The bad guy got away — but not before dropping his gun in the scuffle.
Once again units flood the area.

"We got a guy running around here with a gun, you might want to go inside," Almaguer shouted to residents. "I said we've got a guy running around here holding a gun so you might want to go inside."

One of Almaguer's officers walked up to him.

"This is where our homicide occurred, right around the corner," the detective offered. "It's going to be the same gang."

"Okay," Almaguer said with a nod.

Checking the crowd, the police find one of the men also carrying a gun. But he has a concealed weapons permit. They find another individual with a pocket full of bullets. He'll go to jail tonight because he was on probation.

Arthur Rolle came out to see he commotion. He said he had just come from his cousin's funeral. "He got shot," Rolle explained. "Somebody set him up, supposedly what the word on the street is."

Rolle said he has gone to more funerals than he can count.

"I'm tired of going to funerals," he said. "Like I told you, I'm tired man, its other things that our young adults could do. Back in the day we use to fight but now we got a bunch of cowards. Everyone wants to grab a gun."

This night ends when they find their suspect hiding in the house where one of the victims lived.

"Fabulous night, huh," Almaguer said to anyone who would listen. "Fantastic police work going on around here."

As everyone prepares to leave, the man with a concealed weapons permit wants his gun back.

"When do I get my gun?" he asked one of the task force officers.

The detective said he needed to check on the status of his permit with the state and wouldn't be able to do that until morning. In the meantime, the officer said, he was holding on to the man's gun and his permit.

For this night anyway, this gun was going to stay quiet.

The night's accomplishments may seem modest – a couple of handguns seized, a dozen people arrested. The victory came in what didn't happen — on this night at least, there were no shootings in the north end.
If it seems that fighting the gangs is like trying to clear a beach by removing one grain of sand at a time, you'd be right. And the victories can be fleeting. The night after the gang unit conducted their sweep, 14 people were shot outside a funeral home when rival gangs showed up to pay their respects.

**Buy Skincare Products and Cosmetics - from StrawberryNET.com Free worldwide shipping.**

Share this    Like   59                  0                  View Comments

## WE RECOMMEND

Humane Society Worker Accused Of Having Sex With A Dog

Cops: Chili's Waitress Skimmed Customers Credit Cards

## MORE FROM AROUND THE WEB

Levi Johnston Will Name Daughter-to-Be After a Gun (Us Weekly)

Correspondent Involved in Misleading 'Today' Segment Leaves NBC News (The New York