# Exhibit 96



# CITY OF PHILADELPHIA POLICE DEPARTMENT
990 Spring Garden Street, 2nd Floor, Philadelphia, PA 19123





Phone: (215) 685-3656, 3657    Fax: (215) 685-3673

## INSTRUCTIONS FOR COMPLETION OF AN APPLICATION FOR A PENNSYLVANIA LICENSE TO CARRY FIREARM

Only applicants 21 years of age or older, residing in the county of Philadelphia, may apply for a Pennsylvania license to carry a firearm through the Philadelphia Police Department.

Out of county residents must apply in their county of residence.

Out of state applications will only be considered if the applicant currently has a similar license from their home state.

1. Applications may be picked up at the Gun PermitsUnit,990 Spring Garden Street, 2nd Floor, Monday through Friday, 8:30 AM to 2:00 PM. This Unit is Closed on Saturdays, Sundays and Holidays, and from December 20th to January 3rd. Only 1 application per person. This Information can also be found at the following website: www.ppdonline.org/hq_gunpermit.php
*(If downloaded from internet applicant must bring all paperwork, including this instruction sheet.)*

2. Applicants must have an **APPLICATION AND TWO (2) REFERENCE SHEETS FILLED OUT COMPLETELY** and **APPLICABLE ITEMS LISTED BELOW** or they will not be accepted.  (Do not use pencil)

3. When completed, the entire application must be returned **IN PERSON BY THE APPLICANT** to the above location, Monday through Friday, 8:30 AM to 2:00 PM. *(New applications and renewals will only be handled during this time.)*

Also needed at this time of **RENEWAL OR NEW APPLICATION:**

  a. One (1) 2" x 2 " (inch) Passport Type color photo of the applicant's head and shoulders,  **(NO SUNGLASSES, HATS, VEILS, BANDANNAS, ETC.).**

  b. A $20.00 money order (**no other amount will be accepted**) payable to "City of Philadelphia". **(NO CASH OR CHECKS WILL BE ACCEPTED.)**

  c. A **VALID** Pennsylvania Drivers License or Non-Drivers ID, along with two (2) acceptable forms of proof of residence, all addresses must match.  **NO PO BOXES WILL BE ACCEPTED,** *(see back of this sheet for examples).*

  d. **ALL APPLICANTS WILL BE FINGERPRINTED.**

  e. If you were previously a member of the Armed Forces, a copy of your discharge papers (DD-214) must accompany the application.

  f. **Foreign born applicants** who are presently American citizens **must bring their naturalization papers, passports are not acceptable**

  g. Registered aliens must have their current alien registration identification card, i.e., **GREEN CARD** and last **3 monthly utility bills**, i.e., gas bill, PECO bill, water bill, etc. for proof of residency. **THESE 3 BILLS MUST BE THE SAME BILL AND IN CONSECUTIVE MONTHLY ORDER OF THE MOST RECENT MONTH.**

  h. Must show current or expired permits at time of application.  Expired permits to carry will be retained by the Gun Permits Unit.

4. **NOTE:** Failure to provide (2) references **(NOT FAMILY MEMBERS),** as required on your application, will result in your application being denied, and forfeiture of your application fee. Enclosed are two references information sheets that your references may use for their convenience. References should include name, address, date of birth and PA State ID or drivers license number at the top of the form.

5. If all paperwork is in order, the applicant will then be interviewed by Gun Permits Unit personnel. When the interview is completed, a state and local background investigation will be conducted to ascertain if the applicant is acceptable under law, to be issued a "Pennsylvania license to carry a firearm"

6. All applicants will receive written notice by U.S. mail of either approval or disapproval of their application for a Pennsylvania license to carry a firearm. Upon approval the applicant has thirty (30) days to pick-up their License to Carry.

    **ALL APPLICANTS SHOULD BE AWARE THAT FALSE STATEMENTS (WHETHER ORAL OR WRITTEN) WILL BE CAUSE FOR DENIAL AND MAY RESULT IN ARREST.**

    **PLEASE NOTE THAT THE SAME PROCEDURES ARE APPLICABLE FOR RENEWALS.**

Below are examples of, but not limited to, acceptable forms for proof of your residency:

- Current Utility Bills: (within the last three months)

    o Phone Bill – Home/Cellular
    o Electric Bill
    o Gas Bill
    o Water Bill
    o Cable/Satellite Bill

- Current Credit Card Statements
- Current Bank/Student Loan Statements
- Valid Vehicle Registration
- Valid Vehicle Insurance Card
- Voters Registration Card
- **JUNK MAIL IS NOT ACCEPTABLE**

SP 4-127 (8-2007)

COMMONWEALTH OF PENNSYLVANIA

RENEWAL ☐

COUNTY OF ___PHILADELPHIA___

# APPLICATION FOR A PENNSYLVANIA LICENSE TO CARRY FIREARMS

**FOR USE BY ISSUING AUTHORITY**

SIGNATURE _____ LICENSE NUMBER _____

DATE APPLIED ___/___/___ DATE APPROVED ___/___/___ PICS APPROVAL NUMBER _____

DATE REJECTED ___/___/___ REASON FOR REJECTION _____

PHOTOGRAPH
IF
REQUIRED

## APPLICANT INFORMATION – TYPE/PRINT IN BLUE OR BLACK INK

| 1. LAST NAME | 2. JR., ETC. | 3. FIRST NAME | 4. MIDDLE NAME | 5. PHOTO ID/DRIVER LICENSE NO. | 6. STATE |
|---|---|---|---|---|---|
| | | | | | |

| 7. DATE OF BIRTH | 8. SOCIAL SECURITY NUMBER (Optional, but will help prevent misidentification) | 9. AGE | 10. SEX | 11. RACE | 12. HEIGHT | 13. WEIGHT | 14. HAIR COLOR | 15. EYE COLOR |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| 16. STREET ADDRESS | 17. CITY | 18. STATE | 19. ZIP CODE | 20. HOME TELEPHONE NO. |
|---|---|---|---|---|
| | | | | |

| 21. EMPLOYER/BUSINESS NAME | 22. WORK TELEPHONE NO. | 23. OCCUPATION |
|---|---|---|
| | | |

| 24. ADDRESS | 25. CITY | 26. STATE | 27. ZIP CODE |
|---|---|---|---|
| | | | |

28. REASON FOR A LICENSE TO CARRY FIREARMS:

☐ SELF-DEFENSE ☐ EMPLOYMENT ☐ HUNTING & FISHING

☐ TARGET SHOOTING ☐ GUN COLLECTING ☐ OTHER

29. PLACE OF BIRTH

30. TWO REFERENCES – NOT FAMILY MEMBERS

| NAME | ADDRESS | TELEPHONE NO. |
|---|---|---|
| | | |
| NAME | ADDRESS | TELEPHONE NO. |
| | | |

APPLICANTS ARE DETERMINED TO BE ELIGIBLE FOR LICENSURE BASED UPON CRITERIA SET FORTH WITHIN THE PENNSYLVANIA UNIFORM FIREARMS ACT (18 PA.C.S. CHAPTER 61) SECTIONS 6105 DEALING WITH INDIVIDUALS NOT TO POSSESS FIREARMS AND SECTION 6109 DEALING WITH THE ISSUANCE OF A LICENSE TO CARRY FIREARMS. REFERENCE THE REVERSE SIDE OF THIS FORM WHERE INDICATED.

| | | |
|---|---|---|
| 31. | HAVE YOU EVER BEEN CONVICTED OF A CRIME ENUMERATED IN SECTION 6105(b), OR DO ANY OF THE CONDITIONS UNDER 6105(c) APPLY TO YOU? **(READ INFORMATION ON BACK PRIOR TO ANSWERING)** | ☐ YES ☐ NO |
| 32. | ARE YOU NOW CHARGED WITH, OR HAVE YOU EVER BEEN CONVICTED OF A CRIME PUNISHABLE BY IMPRISONMENT FOR A TERM EXCEEDING ONE YEAR? THIS IS THE MAXIMUM SENTENCE THAT YOU "COULD HAVE RECEIVED," NOT THE ACTUAL SENTENCE YOU DID RECEIVE. (THIS DOES NOT INCLUDE FEDERAL OR STATE OFFENSES PERTAINING TO ANTITRUST, UNFAIR TRADE PRACTICES, RESTRAINTS OF TRADE, OR REGULATION OF BUSINESS; OR STATE OFFENSES CLASSIFIED AS MISDEMEANORS AND PUNISHABLE BY A TERM OF IMPRISONMENT NOT TO EXCEED TWO YEARS.) **(READ INFORMATION ON BACK PRIOR TO ANSWERING)** | ☐ YES ☐ NO |
| 33. | HAVE YOU EVER BEEN ADJUDICATED A DELINQUENT FOR A CRIME ENUMERATED IN SECTION 6105, OR FOR AN OFFENSE UNDER THE CONTROLLED SUBSTANCE, DRUG, DEVICE AND COSMETIC ACT? **(READ INFORMATION ON BACK PRIOR TO ANSWERING)** | ☐ YES ☐ NO |
| 34. | HAVE YOU EVER BEEN CONVICTED OF ANY DRUG OR CONTROLLED SUBSTANCE OFFENSE UNDER THE ACT OF APRIL 14, 1972 (P.L. 233, NO. 64) KNOWN AS THE CONTROLLED SUBSTANCE, DRUG, DEVICE AND COSMETIC ACT? **(ALL DRUG-RELATED CONVICTIONS WILL PROHIBIT LICENSING, UNDER SECTION 6109 RELATING TO LICENSES)** | ☐ YES ☐ NO |
| 35. | HAVE YOU EVER BEEN INVOLUNTARILY COMMITTED TO A HEALTH CARE FACILITY FOR A MENTAL CONDITION, OR ADJUDICATED INCOMPETENT/INCAPACITATED? | ☐ YES ☐ NO |
| 36. | ARE YOU AN INDIVIDUAL WHO IS A HABITUAL DRUNKARD, OR WHO IS ADDICTED TO OR AN UNLAWFUL USER OF MARIJUANA OR A STIMULANT, DEPRESSANT, OR NARCOTIC DRUG? | ☐ YES ☐ NO |
| 37. | IS YOUR CHARACTER AND REPUTATION SUCH THAT YOU WOULD BE LIKELY TO ACT IN A MANNER DANGEROUS TO PUBLIC SAFETY? | ☐ YES ☐ NO |
| 38. | ARE YOU A UNITED STATES CITIZEN? IF NO, COUNTRY OF BIRTH _____ COUNTRY OF CITIZENSHIP _____ IMMIGRATION IDENTIFICATION NUMBER _____ **(Applications for non-U.S. Citizens must be provided to the Pennsylvania State Police along with a copy of the License to Carry.)** | ☐ YES ☐ NO |
| 39. | HAVE YOU EVER RECEIVED A DISHONORABLE DISCHARGE FROM THE UNITED STATES ARMED FORCES? | ☐ YES ☐ NO |
| 40. | OTHER THAN PENNSYLVANIA, DO YOU POSSESS A CURRENT LICENSE, PERMIT, OR SIMILAR DOCUMENT TO CARRY A FIREARM ISSUED FROM ANOTHER STATE? IF YES, ATTACH A PHOTOCOPY OF THE DOCUMENT TO THIS FORM. | ☐ YES ☐ NO |

41. I have never been convicted of a crime that prohibits me from possessing or acquiring a firearm under Federal or State law. I am of sound mind and have never been committed to a mental institution or mental health care facility. I hereby certify that the statements contained herein are true and correct to the best of my knowledge and belief. I understand that if I knowingly make any false statements herein, I am subject to penalties prescribed by law. I authorize the sheriff, or his designee, or, in the case of first class cities, the chief or head of the police department, or his designee, to inspect only those records or documents relevant to information required for this application. *If I am issued a license and knowingly become ineligible to legally possess or acquire firearms, I will promptly notify the sheriff of the county in which I reside or, if I reside in a city of the first class, the chief of police of that city.* This certification is made subject to both the penalties of section 4904 of the Crimes Code (18 Pa.C.S. 4904) relating to unsworn falsifications to authorities and the Uniform Firearms Act.

SIGNATURE - APPLICANT _____ DATE OF APPLICATION _____

**Section 6105(a):**

Effective November 22, 1995, 18 Pa.C.S. § 6105(a) prohibits persons convicted of any of the following offenses under 18 Pa.C.S. from possessing, using, controlling, transferring, manufacturing, or obtaining a license to possess, use, control, transfer, or manufacture a firearm in the Commonwealth of Pennsylvania. A conviction includes a finding of guilty or the entering of a plea of guilty or nolo contendere, whether or not judgement has been imposed, as determined by the law of the jurisdiction in which the prosecution was held. The term does not include a conviction which has been expunged or overturned or for which an individual has been pardoned unless the pardon expressly provides that the individual may not possess or transport firearms.

**Section 6105(b):**

| | | | |
|---|---|---|---|
| § 908 | Prohibited offensive weapons. | § 3921 | Theft by unlawful taking or disposition, upon conviction of the second felony offense. |
| § 911 | Corrupt organizations. | | |
| § 912 | Possession of weapon on school property. | § 3923 | Theft by extortion, when the offense is accompanied by threats of violence. |
| § 2502 | Murder. | | |
| § 2503 | Voluntary manslaughter. | § 3925 | Receiving stolen property, upon conviction of the second felony offense. |
| § 2504 | Involuntary manslaughter, if the offense is based on the reckless use of a firearm. | § 4912 | Impersonating a public servant, if the person is impersonating a law enforcement officer. |
| § 2702 | Aggravated assault. | | |
| § 2703 | Assault by prisoner. | § 4952 | Intimidation of witnesses or victims. |
| § 2704 | Assault by life prisoner. | § 4953 | Retaliation against witness or victim. |
| § 2709.1 | Stalking. | § 5121 | Escape. |
| § 2716 | Weapons of mass destruction | § 5122 | Weapons or implements for escape. |
| § 2901 | Kidnapping. | § 5501(3) | Riot, if the offense relates to a firearm or other deadly weapon. |
| § 2902 | Unlawful restraint | | |
| § 2910 | Luring a child into a motor vehicle. | § 5515 | Prohibiting of paramilitary training. |
| § 3121 | Rape. | § 5516 | Facsimile weapons of mass destruction. |
| § 3123 | Involuntary deviate sexual intercourse. | § 6110.1 | Possession of firearm by minor. |
| § 3125 | Aggravated indecent assault. | § 6301 | Corruption of minors. |
| § 3301 | Arson and related offenses. | § 6302 | Sale or lease of weapons and explosives. |
| § 3302 | Causing or risking catastrophe. | | |
| § 3502 | Burglary. | Any offense equivalent to any of the above-enumerated offenses under the prior laws of this Commonwealth, or any offense equivalent to any of the above-enumerated offenses under the statutes of any other state or of the United States. | |
| § 3503 | Criminal trespass, if the offense is graded a felony of the second degree or higher. | | |
| § 3701 | Robbery. | | |
| § 3702 | Robbery of motor vehicle. | | |

**Section 6105(c):**

Effective November 22, 1995, 18 Pa.C.S. § 6105(c) also prohibits the following persons from possessing, using, controlling, transferring, manufacturing, or obtaining a license to possess, use, control, transfer, or manufacture a firearm in the Commonwealth of Pennsylvania.

**ARE YOU A PERSON WHO:**

1. is a fugitive from justice; or

2. has been convicted of an offense under the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, or any equivalent Federal statute or equivalent statute of any other state, that may be punishable by a term of imprisonment exceeding two years; or

3. has been convicted of driving under the influence of alcohol or controlled substance as provided in 75 Pa.C.S. § 3802 (relating to driving under influence of alcohol or controlled substance) or the former 75 Pa.C.S. § 3731, on three or more separate occasions within a five-year period. For the purposes of this paragraph only, the prohibition of Section 6105(a) shall only apply to transfers or purchases of firearms after the third conviction; or

4. has been adjudicated as an incompetent or who has been involuntarily committed to a mental institution for inpatient care and treatment under section 302, 303, or 304 of the provisions of the act of July 9, 1976 (P.L. 817, No. 143), known as the Mental Health Procedures Act; or

5. being an alien, is illegally or unlawfully in the United States; or

6. is the subject of an active protection from abuse order issued pursuant to 23 Pa.C.S. § 6108 (relating to relief), which order provides for the relinquishment of firearms during the period of time the order is in effect. This prohibition shall terminate upon the expiration or vacation of an active protection from abuse order or portion thereof relating to the relinquishment of firearms; or

7. was adjudicated delinquent by a court pursuant to 42 Pa.C.S. § 6341 (relating to adjudication) or under any equivalent Federal statute or statute of any other state as a result of conduct which if committed by an adult would constitute an offense under 18 Pa.C.S. sections 2502, 2503, 2702, 2703, 2704, 2901, 3121, 3123, 3301, 3502, 3701, and 3923; or

8. was adjudicated delinquent by a court pursuant to 42 Pa.C.S. § 6341 or under any equivalent Federal statute or statute of any other state as a result of conduct which if committed by an adult would constitute an offense enumerated in 18 Pa.C.S. § 6105(b) with the exception of those crimes set forth in paragraph 7. This prohibition shall terminate 15 years after the last applicable delinquent adjudication or upon the person reaching the age of 30, whichever is earlier.

9. is prohibited from possessing or acquiring a firearm under 18 U.S.C. § 922(g)(9) (relating to unlawful acts) who has been convicted in any court of a misdemeanor crime of domestic violence by a person in any of the following relationships: (i) the current or former spouse, parent or guardian of the victim; (ii) a person with whom the victim shares a child in common; (iii) a person who cohabits with or has cohabited with the victim as a spouse, parent or guardian; or (iv) a person similarly situated to a spouse, parent, or guardian of the victim; then the relationship need not be an element of the offense to meet the requirements of this paragraph.

## PRIVACY ACT NOTICE

*Solicitation of this information is authorized under Title 18 Pa.C.S. §6111. Disclosure of your social security number is voluntary. Your social security number, if provided, may be used to verify your identity and prevent misidentification. All information supplied, including your social security number, is confidential and not subject to public disclosure.*



# CITY OF PHILADELPHIA POLICE DEPARTMENT

990 Spring Garden Street, 2nd Floor, Philadelphia, PA 19123

Phone: (215) 685-3656, 3657     Fax: (215) 685-3673



## REFERENCE INFORMATION

**NAME:** _____     **PA DRIVERS LICENSE#:** _____

**ADDRESS:** _____     **DATE OF BIRTH:** _____

**PHONE#:** _____     _____     _____
                Home                Work                Cellular

## Please answer all the following questions about your knowledge of the applicant.

How long have you known the applicant? _____

How often do you associate with the applicant? _____ (Example: daily, weekly, monthly)

What type of relationship do you have with the applicant? _____ (Example: friend, co-worker, neighbor etc.)

**Given their character and reputation, would you consider the applicant likely to act in a dangerous manner?**
☐ **No** ☐ **Yes.** *(If yes, please explain)*

_____

_____

To the best of your knowledge, is the applicant a citizen of the U.S.? ☐ No ☐ Yes

- Has the applicant ever been arrested? ☐ No ☐ Yes *(If yes, explain)* _____

- Does the applicant use illegal drugs? ☐ No ☐ Yes *(If yes, explain)* _____

- Is the applicant a habitual drunkard? ☐ No ☐ Yes *(If yes, explain)* _____

- Has the applicant ever been committed to a mental institution? ☐ No ☐ Yes *(If yes, where & why)*

_____

**In your opinion and if it was your choice, would YOU grant the applicant a permit to carry a concealed firearm?**
☐ **No** ☐ **Yes** *(Please explain)*

_____

_____

_____

I hereby certify that the statements contained herein are true and correct to the best of my knowledge and belief. I understand that, if I knowingly make any false statements herein, I am subject to penalties prescribed by law. This certification is made subject to both the penalties of section 4904 of the Crimes Code (18 PA C.S. 4904) relating to unsworn falsifications to authorities and the Uniform Firearms Act.

_____          _____
*Signature of Reference*                    *Date*



# CITY OF PHILADELPHIA POLICE DEPARTMENT
990 Spring Garden Street, 2nd Floor, Philadelphia, PA 19123

Phone: (215) 685-3656, 3657    Fax: (215) 685-3673



## REFERENCE INFORMATION

**NAME:** _____    **PA DRIVERS LICENSE#:** _____

**ADDRESS:** _____    **DATE OF BIRTH:** _____

**PHONE#:** _____    _____    _____
             *Home*              *Work*             *Cellular*

## Please answer all the following questions about your knowledge of the applicant.

How long have you known the applicant? _____

How often do you associate with the applicant? _____ (Example: daily, weekly, monthly)

What type of relationship do you have with the applicant? _____ (Example: friend, co-worker, neighbor etc.)

**Given their character and reputation, would you consider the applicant likely to act in a dangerous manner?**
☐ **No** ☐ **Yes.** *(If yes, please explain)*

_____

To the best of your knowledge, is the applicant a citizen of the U.S.? ☐ No ☐ Yes

- Has the applicant ever been arrested? ☐ No ☐ Yes *(If yes, explain)* _____

- Does the applicant use illegal drugs? ☐ No ☐ Yes *(If yes, explain)* _____

- Is the applicant a habitual drunkard? ☐ No ☐ Yes *(If yes, explain)* _____

- Has the applicant ever been committed to a mental institution? ☐ No ☐ Yes *(If yes, where & why)*

**In your opinion and if it was your choice, would YOU grant the applicant a permit to carry a concealed firearm?**
☐ **No** ☐ **Yes** *(Please explain)*

_____

_____

_____

I hereby certify that the statements contained herein are true and correct to the best of my knowledge and belief.  I understand that, if I knowingly make any false statements herein, I am subject to penalties prescribed by law.  This certification is made subject to both the penalties of section 4904 of the Crimes Code (18 PA C.S. 4904) relating to unsworn falsifications to authorities and the Uniform Firearms Act.

_____    _____
*Signature of Reference*                   *Date*

# Exhibit 97



**Working to prevent gun violence in your community**

## CeaseFirePA Testimony before the House Judiciary Committee

**Presented by: Joe Grace, Executive Director**
**August 10, 2010**

Good morning Chairman Caltagirone, Chairman Marsico, Members of the Committee. I am executive director of CeaseFirePA, Pennsylvania's leading gun violence prevention organization. Thank you for the opportunity to testify on House Bill 2536, which closes a loophole in state law allowing Pennsylvania residents to obtain out-of-state permits to carry a concealed firearm in Pennsylvania – even when those residents were previously <u>denied</u> a permit to carry here by PA law enforcement, or had a PA permit revoked. CeaseFirePA believes this loophole and practice constitutes an end-run around the authority, discretion and judgment of Pennsylvania law enforcement, and we support HB 2536 as proposed by Rep. Bryan Lentz.

### <u>Identifying the Problem: Concealed Carry Permit Loophole in Pennsylvania</u>

Under current law, a Pennsylvania resident whose permit to carry a concealed firearm is *denied* or *revoked* by Pennsylvania law enforcement, may instead obtain a permit from another state, often the state of Florida, circumventing the Pennsylvania law enforcement review process. State law allocates the authority to grant concealed carry permits to Pennsylvania sheriffs, and the duty to enforce that permit to all Pennsylvania law enforcement. (In Philadelphia, police handle the permit review process). Local law enforcement authorities are in the most effective position to review these applications. That authority is <u>seriously undermined</u> by this loophole.

### <u>A Solution: HB 2536</u>

HB 2536 closes the loophole by preventing any Pennsylvania resident who is not eligible for a Pennsylvania permit to carry a concealed weapon, from using a concealed carry permit issued by another state, in Pennsylvania. The bill invalidates the use of any out-of-state concealed carry permit held by a Pennsylvania resident if the resident has had a Pennsylvania permit revoked, if the resident's application for a Pennsylvania permit has been denied, or if the resident fails to meet the requirements under PA law to be granted a Pennsylvania concealed carry permit.

The problems associated with PA residents doing an end-run around Pennsylvania law enforcement and obtaining out-of-state permits to carry concealed firearms in this state are real and well-documented. Here are just a few actual cases from the files of Pennsylvania police departments:

- Police responded to a radio call of a person screaming. Suspect was arguing over money with a woman when he punched her in the face, pulled her off the bed and while she was on the floor, kicked her in the back. The abuse victim was observed by police with a swollen eye and the bedroom in disarray. Suspect was arrested for domestic assault. Database check showed that suspect had applied for and obtained a concealed carry permit in Pennsylvania, which was later revoked. ***Suspect had a Florida permit to carry as well.***

- A warrant was issued for suspect for a homicide. When detectives tried to serve the warrant he fled into a house. Police followed and found inside the house a stolen bullet proof vest from the police department, and two shotguns, one leaning against the wall by the door. Suspect had applied for a Pennsylvania permit and was disapproved due to his prior arrest history, including narcotics and homicide. Suspect appealed, and a Pennsylvania judge upheld the disapproval. ***Suspect had a Florida permit to carry.***

- Suspect was stopped by police for investigation because his vehicle matched the description of a vehicle involved in a shooting. Suspect had in his possession a firearm ***and a Florida permit to carry.*** Suspect was known from prior arrests as an extremely dangerous individual. When asked why he had a permit to carry from Florida, suspect stated that he was turned down for a Pennsylvania permit.

These are just a few cases from the files of Pennsylvania police. There are many others. The common denominator of all the cases uncovered so far: A Pennsylvania resident, unable to obtain or keep a Pennsylvania permit to carry a concealed firearm, usually because of something in his or her background – a prior arrest, a prior incident of domestic abuse, information known to their local police department or county sheriff – mailed away to another state, usually the state of Florida, and obtained a permit to carry a concealed firearm here in Pennsylvania. This loophole not only erodes the ability of Pennsylvania law enforcement to do its job and exercise its judgment on whether an individual should receive a permit to carry a concealed gun in Pennsylvania, it also puts citizens of our state at risk by depriving them of the discretion and authority of their local Pennsylvania police department or county sheriff.

Do we really want the Florida Department of Agriculture – the licensing agency for concealed carry permits in that state – to be the decision-maker when it comes to deciding which Pennsylvania residents have the right to receive a permit to carry a concealed gun in Pennsylvania?

Do we really want to take that authority away from Pennsylvania law enforcement?

It's worth noting that a large number of Pennsylvania police chiefs and law enforcement officials have indicated to this committee that they support closing this loophole through passage of House Bill 2536.

The police chiefs of Philadelphia, Pittsburgh, Reading, Allentown, Lancaster, Erie, Scranton, York, Upper Darby (the committee's host municipality for this hearing) and nearly 100 other Pennsylvania police chiefs have signed onto a letter in support of HB 2536 delivered to this committee. A copy of that letter of support is attached to this testimony as Exhibit "A".

Pennsylvania State Police Commissioner Frank Pawlowski sent a letter to the committee supporting HB 2536 and the closure of this loophole. The Western Pennsylvania Chiefs of Police Association issued a letter in support of this legislation, as did the Allegheny County Chiefs of Police. So did the Pennsylvania Sheriffs Association. The International Association of Police Chiefs, whose president is a Pennsylvania police chief, supports HB 2536.

The Pennsylvania District Attorneys Association is on record with the committee supporting HB 2536 and closing this loophole.

The letter signed by nearly 100 Pennsylvania police chiefs and submitted to the committee explained why the clear weight of Pennsylvania law enforcement supports closing the concealed carry loophole through passage of this legislation.

*"HB 2536 will close that loophole by confirming the authority of Pennsylvania law enforcement as the definitive permitting body for Pennsylvania residents,"* the police chiefs' letter states. *"To be clear, we have no objections to visiting Floridians carrying a Florida permit in Pennsylvania, as per our reciprocity agreement with that state. Likewise, we appreciate the ability of Pennsylvanians to carry in Florida, and other states with which we share reciprocity. However, we firmly believe that within Pennsylvania, Pennsylvania residents should be subject to Pennsylvania law."*

CeaseFirePA agrees with that plain statement by a large number of Pennsylvania police chiefs. Within Pennsylvania, Pennsylvania residents should be subject to Pennsylvania law, and the judgment and discretion of our state's police and law enforcement.

We support closure of this loophole through the passage of House Bill 2536, and respectfully urge this committee to support this bill and report it favorably out of committee for consideration by the House of Representatives.

Thank you for the opportunity to appear today before the committee.

**EXHIBIT "A" – Pennsylvania Police Chiefs' Letter in Support of House Bill 2536**

**See following page.**

# Exhibit 98



**CITY OF PHILADELPHIA**

**Police Department**
HEADQUARTERS, FRANKLIN SQUARE
PHILADELPHIA, PENNSYLVANIA

**CHARLES RAMSEY**
Commissioner

TESTIMONY OF
LT. LISA KING
OFFICER IN CHARGE, PHILADELPHIA GUN PERMITS UNIT
AUGUST 10, 2010

Good morning. My name is Lieutenant Lisa King. I am the officer in charge of the Philadelphia Police Department Gun Permits Unit. Thank you for taking the time to consider House Bill 2536. The concealed carry loophole it aims to remedy is a real problem threatening police officers executing their duty to protect communities in Philadelphia, and across the Commonwealth.

In Philadelphia, there are currently more than 23,000 active permits to carry a concealed firearm. In 2009, we received approximately 5,500 new applications for concealed carry permits, and granted 5000 of them – a 90 percent approval rate. In 2008, we received 6,200, and granted 5,900 – a 95 percent approval rate.

The Philadelphia Police Department reviews and grants permits based on the guidelines established in Pennsylvania Code Section 6109 – which enables us to prevent individuals who pose too great a threat to the community to receive a Pennsylvania permit to carry a concealed gun. This protects neighborhoods. It also protects police officers who serve those neighborhoods. We try to reduce their risk by blocking individuals who we know to be dangerous based on criminal record, psychological problems, a history of violent or anti-social behavior, and local knowledge.

In recent years, however, we have noticed a trend of suspects who are ineligible for a Pennsylvania concealed carry permit – carrying a concealed firearm with a permit to do so issued by the Florida Department of Agriculture. These are often times criminals who were either denied a permit to carry, who had their permit to carry revoked after an incident, or who knew that they would not be eligible to carry in Pennsylvania. In some cases the suspect had even filed an appeal – and had the permit denial upheld by a judge.

Here are just three examples of situations our police officers have been put in as a result of this real problem:

*The Case of Robert T.*

*ROBERT T., of Philadelphia, has a lengthy arrest record. He has been arrested six times since 1997, for crimes such as terroristic threats, harassment, aggravated assault, presenting false ID to purchase a gun, carrying a gun without a license and other, related offenses.*

*This person was convicted in 1997 of making terrorist threats in Delaware County Court.*

*He was convicted in 2004 of carrying a gun without a license in Philadelphia.*

*This conviction makes Robert T. prohibited from possessing or owning a gun or permit to carry in Pennsylvania.*

*On June 23, 2008, subsequent to that Pennsylvania conviction, Robert T. obtained a permit to carry a concealed gun from the Florida - from the Florida Department of Agriculture.*

*On July 27, 2009, Robert T. was stopped by police for careless driving. The car windows were tinted, preventing officers from observing the occupants. The officer asked for license, insurance and registration, and for Robert T. to lower his windows and turn the car off. He closed the tinted windows, and refused to exit the car. Police called for backup. Police ran the car's license and registration and discovered Robert T.'s prior arrests for aggravated assault by handgun and terroristic threats. Robert T. eventually surrendered. Robert T. told police he had a permit to carry a concealed gun – from Florida.*

*For the last 10 months, Philadelphia Police have tried, without success, to have the Florida Department of Agriculture revoke or suspend Robert T.'s Florida permit to carry. It is still an active permit.*

### The Case of Sandford K.

*SANDFORD K., of Philadelphia, applied for and received a permit to carry a concealed gun in Philadelphia on Jan. 19, 2006. On Oct. 31, 2006, Mr. K. also applied for and obtained a Florida permit to carry a concealed gun.*

*On July 28, 2008, Sandford K. was involved in an incident with a stolen cell phone. He went to Temple Hospital and offered to sell the stolen phone back to the victim. A dispute ensued. Sandford K. pulled up his shirt, revealed a semiautomatic handgun, and pointed it directly at the victim and demanded money. The victim grabbed the phone and ran, but not before taking pictures of Sandford K. as he drove away in his vehicle. Sandford K. was stopped by police and charged with robbery, possessing an instrument of crime, theft, simple assault, and other offenses.*

*As a result of this incident, his PA permit to carry was revoked by Philadelphia police.*

*Sandford K. was convicted of possessing an instrument of crime, a first-degree misdemeanor.*
*He was also convicted of robbery in the course of committing a theft, a first-degree felony. These convictions in Pennsylvania render King INELIGIBLE and PROHIBITED to carry a gun in PA.*

*Despite repeated efforts by the Philadelphia Police Department subsequent to Sandford K's criminal conviction in Pennsylvania, at this writing, the Florida Dept. of Agriculture has yet to suspend or revoke his Florida permit to carry.*

### The Case of Jean P.

*JEAN P., of Philadelphia, is a Pennsylvania resident with a lengthy arrest record, including convictions. Mr. P. was arrested in New York in 1987 for selling marijuana, and was convicted on that drug charge.*

*Jean P. was arrested in New York in 1994 for possessing a forged instrument Class D license, and for aggravated unlicensed operator, a felony.*

*He was convicted of these charges, rendering him PROHIBITED and INELIGIBLE to carry or possess a gun in Pennsylvania.*

*Mr. P. was also arrested in June, 2008, in New York for DUI, a misdemeanor, and was convicted of this offense as well. That's three convictions.*

*In February, 2010, he was arrested in Philadelphia for carrying a gun on public streets, a first-degree misdemeanor. He handed police officers an expired Pennsylvania permit to carry, and, a Florida permit to carry which is valid until 2015. Jean P. also had an active Temporary Protection Order issued from New York against him, which expired June 15, 2010.*

*Based on that Order and his other prior convictions, Jean P. should not have any active permits to carry a concealed gun.*

*In April 2010, Mr. P. applied for a Pennsylvania permit to carry. His application was denied. Philadelphia Police have sent proof of Mr. Jean P.'s convictions and the Protection Order to the Florida Department of Agriculture and asked that his Florida permit be suspended or revoked.*

Understanding that these cases might have been exceptions, I personally reached out to the Florida Department of Agriculture to bring this growing problem to their attention, and have been met with a fairly slow response to our department's concerns. There are literally convicted criminals in Pennsylvania jails who *still* have active Florida permits, despite having had their PA permit revoked – because Florida is either unaware of their situation, or unwilling to take prompt action to revoke their Florida permits.

In an attempt to better address this problem, we requested a list of Philadelphia, PA residents with Florida permits. That way, we could cross reference our own database to see if any had had a permit denied, revoked, or were ineligible – and then notify the Florida Department of Agriculture. Our request was denied.

In Pennsylvania the decision to grant a concealed carry permit is made by local law enforcement officers. County Sheriffs (or the Police Department in Philadelphia) are assigned the task of reviewing applications to decide whether or not to allow or deny requests. By putting that authority in the hands of local law enforcement we can reduce the risk of allowing criminals to legally carry a concealed firearm – without blocking the ability of law abiding citizens to do so. In Florida the authority to review applications is not assigned to law enforcement. It is handled by the Florida Department of Agriculture.

This is not a reciprocity issue. This is about law enforcement. In Pennsylvania we are happy to honor the permits carried by Florida residents visiting our state – and likewise, it is understood that PA residents may use their concealed carry permits in Florida. That's reciprocity. This loophole is just a loophole – not reciprocity – and it is growing wider and we believe it is dangerous to our citizens and to our officers.

The Philadelphia Police Department believes that in Pennsylvania, Pennsylvania residents should be subject to Pennsylvania law, as administered by Pennsylvania law enforcement. This loophole undermines the authority of Pennsylvania police – putting officers at risk and eroding our ability to protect our communities.

Thank you again to this committee, especially Chairman Caltagirone and Minority Chairman Marsico, for considering this testimony. The Philadelphia Police Department supports House Bill 2536, to close this dangerous loophole in Pennsylvania law.

# Exhibit 99



**STATE OF ILLINOIS**

# OFFICE OF THE
# AUDITOR GENERAL

### William G. Holland, Auditor General

## SUMMARY REPORT DIGEST

## ILLINOIS FIREARM OWNER'S IDENTIFICATION (FOID) CARD PROGRAM

**Management Audit**
**Release Date: April 2012**

### SYNOPSIS

House Resolution Number 89 required the Office of the Auditor General to conduct a management audit of the Illinois State Police's (ISP) administration of the Firearm Owners Identification Card (FOID) Act. Our audit concluded that the effectiveness of the FOID card program is limited in promoting and protecting the safety of the public.

There are significant deficiencies in the reporting of individuals with potentially disqualifying mental health conditions to ISP. During 2010, **only 3 of the 102 circuit court clerks (3%) submitted mental health court orders to ISP as required by the Act.** As a result, ISP did not receive the information needed from the circuit court clerks to revoke or deny FOID cards. Due to the lack of reporting by circuit court clerks in Illinois, ISP could not report all individuals adjudicated as a "mental defective" or "intellectually disabled" (terms used by the Act) to the FBI's National Instant Criminal Background Check System (NICS), as required by the Act. Fifty-six of the 121 (46%) orders received from circuit court clerks during 2010 did not contain information determined by ISP to be necessary, including date of birth, gender, or race. We found that 27 of the 121 (22%) orders from the circuit court clerks were not reported to NICS.

Mental health admissions data received by the Department of Human Services from private hospitals and nursing homes did not make the distinction between voluntary and involuntary admission; therefore, ISP could not report any individuals with disqualifying mental health admissions (i.e., adjudicated involuntary admissions) from private hospitals or nursing homes to NICS.

Our audit also found that:

- The Illinois State Police's Firearms Services Bureau did not approve all FOID cards in the required 30 days for the 903,139 applications received during 2008, 2009, and 2010. **Over the three year period, 566,616 of 879,906 (64%) applications were approved within 30 days.** In 2008, 40 percent of cards were approved within 30 days. The processing times improved to 80 percent in 2009 and decreased to 70 percent in 2010.

- ISP did not deny all FOID card applications in the required 30 days. For applications received during 2008, 2009, and 2010, ISP denied 20,152. Over the three year period, 71 percent of the denied FOID cards were denied within the required 30 days.

- During 2008, 2009, and 2010, the ISP recorded 21,212 reasons for revocations of FOID cards for 20,227 cardholders. **ISP officials estimated that only 30 percent of revoked FOID cards are returned to ISP.**

- ISP did not have enough Customer Service Representatives to handle the volume of calls that are received by the Bureau related to the FOID card program. According to call logs provided by ISP, during the last quarter of 2010, **25,131 of 29,420 calls (85%) were not answered by ISP.**

- According to documentation provided by ISP, from July 1, 2009, through June 30, 2011, the State Police spent $526,919 on overtime for FOID card processing.

(This page intentionally left blank)

## FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS

### BACKGROUND

To promote and protect the health, safety, and welfare of the public, Illinois residents are required by the Firearm Owners Identification Card Act (430 ILCS 65) to have a valid FOID card in order to possess or purchase firearms or ammunition. The law originally became effective in 1968. The Firearm Owner's Identification Card (FOID) Program is administered by the Firearms Services Bureau (Bureau) within the Illinois State Police (ISP). Although an individual has a valid FOID card, an additional background check will be conducted on the individual at the time a firearm is purchased from a federally licensed firearm dealer, gun show promoter, or gun show vendor. The background check conducted at the time of purchase is also conducted by the Bureau, which administers the Firearm Transfer Inquiry Program.

**The Illinois State Police's Firearms Services Bureau received 903,139 FOID applications and approved 879,906 during 2008, 2009, and 2010.**

As seen in Digest Exhibit 1, the Illinois State Police's Firearms Services Bureau received 903,139 FOID applications and approved 879,906 during 2008, 2009, and 2010. The Bureau denied 20,152 of the 903,139 applications during the three year period. According to ISP, as of January 2011, there were 1,316,508 individuals with active FOID cards in Illinois. (page 4, 44)

| | Digest Exhibit 1 FOID CARD APPLICATIONS RECEIVED, APPROVED, AND DENIED For applications received during 2008 - 2010 | | | |
|---|---|---|---|---|
| | Applications Received | Applications Approved | Applications Denied | Other [1] |
| 2008 | 285,707 | 277,727 | 6,426 | 1,554 |
| 2009 | 327,442 | 319,612 | 6,893 | 937 |
| 2010 | 289,990 | 282,567 | 6,833 | 590 |
| **Totals** | **903,139** | **879,906** | **20,152** | **3,081** |

Note: [1] Includes duplicate applications that were cancelled or applications that were pending receipt of additional information.
Source: ISP data summarized by the OAG.

### OVERALL CONCLUSION

**The effectiveness of the Illinois FOID card program operated by the ISP is limited in promoting and protecting the safety of the public.**

The effectiveness of the Illinois FOID card program operated by the ISP is limited in promoting and protecting the safety of the public. There are significant deficiencies in the reporting of individuals with potentially disqualifying mental health conditions to the Illinois State Police. In addition, because many of these

iii

disqualifying conditions are also required to be reported to the Federal Bureau of Investigation's (FBI) National Instant Criminal Background Check System (NICS), which is used by other states when individuals purchase firearms, the safety of the general public as a whole is at risk. (pages 17, 23)

## MENTAL HEALTH REPORTING TO DHS AND ISP

**We reviewed all mental health reports ISP reported receiving from Illinois circuit court clerks during 2010 and determined that only 3 of the 102 circuit court clerks (3%) submitted mental health court orders to ISP as required.**

We reviewed all mental health reports ISP reported receiving from Illinois circuit court clerks during 2010 and determined that only 3 of the 102 circuit court clerks (3%) submitted mental health court orders to ISP as required by the Firearm Owners Identification Card Act (Act). Consequently, in most counties, if the court finds individuals to be a "mental defective" or "intellectually disabled" (terms used by the Act), ISP is not receiving the information needed from the circuit court clerks to revoke or deny FOID cards for individuals from those counties. Unless reported by another source (such as a State-operated mental health facility, hospital, etc.), individuals from those counties could receive or continue to hold a valid FOID card and could use it to purchase firearms and ammunition. Due to the lack of reporting by circuit court clerks in Illinois, ISP could not report all individuals adjudicated as a "mental defective" or "intellectually disabled" to the FBI's NICS, as required by the Act. (page 25)

**Due to the lack of reporting by circuit court clerks in Illinois, ISP could not report all individuals adjudicated as a "mental defective" or "intellectually disabled" to the FBI's NICS, as required by the Act.**

Furthermore, the information submitted by the three circuit court clerks to ISP was missing critical information needed for the FOID card eligibility determination process. Fifty-six of the 121 (46%) orders received from circuit court clerks during 2010 did not contain information determined by ISP to be necessary, including date of birth, gender, or race. We found that 27 of the 121 (22%) orders from the circuit court clerks were not reported to NICS. Of those 27, 18 of the orders received did not contain the necessary information needed to report to NICS. (page 26)

There are also issues related to the reporting of mental health data by the Department of Human Services (DHS) to the State Police. Mental health admissions data received by the DHS from private hospitals and nursing homes does not make the distinction between voluntary and involuntary admission. Since State law considers both voluntary and involuntary admissions as firearm prohibitors, the lack of distinguishing between type of admission does not impact ISP's FOID card eligibility determination process. However, under federal law, only individuals **adjudicated** as a "mental defective" (i.e., involuntarily admitted) are considered to have a firearm prohibitor and can be reported to NICS. Since there is no distinction between voluntary and involuntary admissions within the DHS data, ISP could not report any individuals with disqualifying mental health admissions from private hospitals or nursing homes to the NICS database.

**Since there is no distinction between voluntary and involuntary admissions within the DHS data, ISP could not report any individuals with disqualifying mental health admissions from private hospitals or nursing homes to the FBI's NICS database.**

Hospitals and nursing homes did not report mental health admissions to DHS within seven days from admission as required by 740 ILCS 110/12(b). During calendar year 2010, only 13 of

105 private hospitals and nursing homes reported admissions to DHS within an average of 7 days. (pages 29-31)

## MENTAL HEALTH REPORTING TO NICS BY ISP

Although the Illinois State Police were required by Illinois law to report mental health prohibitors to NICS effective June 1, 2008, the first mental health events reported to NICS by ISP were in December 2010. In December 2010, ISP reported 5,154 events. As of August 31, 2011, Illinois had reported 6,732 prohibited mental health events, which is far fewer than states such as California, Texas, New York, Virginia, Michigan, and Washington.

In December 2010, ISP reported 5,154 events. The average time it took ISP to report these events from the time the information was entered by DHS was 469 days. ISP has been reporting regularly since April 2011. According to information provided by ISP, since April 2011, the average days to report events are 56.

The data submitted to NICS by ISP, with some exceptions, contains the following: Patient ID; Event Date; Last Name; First Name; Gender; Date of Birth; and Social Security Number. The data did not include the physical description as required by the Act.

Our review of the information submitted by ISP to NICS identified issues with the accuracy of the information submitted. Our review of the 6,932 mental health events reported to NICS by ISP as of September 26, 2011, determined that the 6,932 events were for 3,729 individuals. We compared the entries and determined that individuals who were entered into the system more than once had incorrect information. We identified 63 NICS entries from Illinois with incorrectly spelled names, 53 with incorrect dates of birth, and 52 with incorrect social security numbers. (pages 31-34)

## FOID CARD PROGRAM ISSUES AT ISP

We conducted reviews of the FOID eligibility process and identified significant management control problems with ISP's administration of the program that impact program effectiveness. The Firearms Services Bureau did not have up-to-date policies and procedures, up-to-date administrative rules, and did not provide formal training to the Bureau staff related to the process for determining FOID card eligibility. (pages 18-19)

**The Firearms Services Bureau did not have up-to-date policies and procedures, up-to-date administrative rules, and did not provide formal training to the Bureau staff related to the process for determining FOID card eligibility.**

During our review of the FOID card process, we observed thousands of FOID cards were not being delivered to the applicants. State Police officials noted FOID cards are often returned by the post office as undeliverable. We estimated as of September 14, 2011, there were more than 6,200 returned FOID cards at ISP that were not being worked. (page 36-37)

v

ISP did not have enough Customer Service Representatives to handle the volume of calls that are received by the Bureau related to the FOID card program. As seen in Digest Exhibit 2, call logs provided by ISP showed that during the last quarter of 2010, 25,131 of 29,420 calls (85%) were not answered by ISP. (page 37)

| Digest Exhibit 2<br>**ISP FOID HOTLINE CALLS**<br>4th Quarter Calendar Year 2010 | | | |
|---|---|---|---|
| | Calls Received | Calls Answered | Calls Abandoned |
| Oct. 2010 | 10,257 | 1,119 | 9,138 |
| Nov. 2010 | 9,757 | 1,299 | 8,458 |
| Dec. 2010 | 9,406 | 1,871 | 7,535 |
| **Totals** | **29,420** | **4,289** | **25,131** |
| Source: Call log provided by ISP. | | | |

**The Firearms Services Bureau lacks effective controls to ensure timely processing of FOID card applications.**

The Firearms Services Bureau lacks effective controls to ensure timely processing of FOID card applications. We found that the November 15, 2011, Jeopardy Report (which identifies pending applications that are older than 30 days) contained 2,284 applications of which 2,043 were from October 11, 12, or 13. It appears that these were never processed to be manually worked by eligibility staff. (pages 39-40)

The Illinois State Police could not produce complete procurement documentation for the contracts related to the FOID card process. Some information was provided, which included bid proposals for the remittance, keying, and scanning. We could not find any decision documents such as evaluation or scoring sheets within the information provided by ISP. (pages 40-41)

**FOID CARD PROCESSING STATISTICS**

**The Bureau did not approve all FOID cards in the required 30 days during 2008, 2009, and 2010.**

As seen in Digest Exhibit 3, the Bureau did not approve all FOID cards in the required 30 days during 2008, 2009, and 2010. ISP's timeliness of the FOID card approval process improved since 2008. In 2008, only 40 percent of cards were approved within the required 30 days. The processing times improved to 80 percent in 2009 and decreased to 70 percent in 2010. Over the three year period, 566,616 of 879,906 (64%) applications were approved within 30 days. (page 45)



Digest Exhibit 3
**TIMELINESS OF THE FOID CARD APPLICATIONS APPROVED**
For applications received during 2008 - 2010

Source: ISP data summarized by the OAG.

**During 2008, 2009, and 2010, the Bureau did not deny all FOID card applications in the required 30 days.**

During 2008, 2009, and 2010, the Bureau did not deny all FOID card applications in the required 30 days. In 2008, 67 percent of FOID cards were denied within 30 days. The percentage increased to 78 percent in 2009 and decreased to 67 percent in 2010. Over the three year period, 71 percent of the denied FOID cards were denied within the required 30 days. During 2008, 2009, and 2010, the Firearms Services Bureau received 903,139 FOID applications, approved 879,906 and denied 20,152. (page 44, 46)

During 2008, 2009, and 2010, the ISP recorded 21,212 reasons for revocations of FOID cards for 20,227 cardholders. ISP officials estimated that only 30 percent of revoked FOID cards are returned to ISP. While an individual who retained a revoked FOID card would be unable to purchase a firearm from a licensed firearm dealer (since the ISP matches should identify that the card was revoked), the individual would still be able to present the FOID card and purchase ammunition (since the purchaser is only required to show his FOID card -- no background check is run when ammunition is sold). Furthermore, when a firearm is privately sold, the seller is required only to record the FOID card number of the buyer. Since no background check is done, the seller would have no knowledge that the FOID card the buyer is presenting had been revoked. (page 48)

**The Firearms Services Bureau spent hundreds of thousands of dollars on overtime for its employees to process FOID card applications.**

The Firearms Services Bureau spent hundreds of thousands of dollars on overtime for its employees to process FOID card applications. According to documentation provided by ISP, from July 1, 2009, through June 30, 2011, the State Police spent $526,919 on overtime for FOID card processing. Three employees accounted for $239,156 of the $526,919 (45%). We looked at the FY10 salaries for the four individuals with the most overtime and determined that the four received $84,451 in

overtime pay in addition to the $279,090 earned in annual salary. (pages 52-53)

The audit resolution asked whether the ISP has denied any applications because the applicant provided false information and, if so, whether the ISP made any referrals for criminal prosecution for providing false information. ISP officials noted that it's difficult to determine whether the information was false or whether it was a mistake. According to ISP, ISP did not refer these cases for prosecution. (page 53)

## RECOMMENDATIONS

The audit contains 12 recommendations. Eleven of the recommendations were specifically directed to the Illinois State Police. One recommendation was directed to both the Illinois State Police and the Illinois Department of Human Services. The State Police and the Department of Human Services agreed with all 12 recommendations. Appendix F to the report contains the agency responses.

WILLIAM G. HOLLAND
Auditor General

WGH:SAW

AUDITORS ASSIGNED: This Management Audit was performed by the Office of the Auditor General's staff.

# Exhibit 100

 **Violence Policy Center**
Research, Investigation, Analysis, & Advocacy for a Safer America

| Firearm Laws | Press Releases | Publications | About VPC | Donate Now | Tuesday, June 26, 2012 |

# Concealed Carry Killers

Click on the tally for each category to be linked to vignettes describing the circumstances for each killing, listed by state. A listing for all incidents by state can be found by clicking on "Total People Killed by Concealed Carry Killers."

| Law Enforcement Officers Killed by Concealed Carry Killers | Private Citizens Killed by Concealed Carry Killers | Total People Killed by Concealed Carry Killers | Number of Mass Shootings Committed by Concealed Carry Killers | Number of Murder-Suicides Committed by Concealed Carry Killers |
|---|---|---|---|---|
| 0 0 1 2 | 0 4 3 5 | 0 4 4 7 | 0 0 2 0 | 0 0 3 1 |

ShareThis

In 1996 at a Dallas, Texas, press conference, Tanya Metaksa, then the executive director of the National Rifle Association's Institute for Legislative Action, promised, "As we get more information about right-to-carry, our point is made again and again...People who get permits in states which have fair right-to-carry laws are law-abiding, upstanding community leaders who merely seek to exercise their right to self-defense." This assertion, summarized by Metaksa in the blunt and absolute assertion that "these citizens don't commit violent crimes," was a key factor when state legislatures debated weakening concealed weapons laws to allow private citizens to carry concealed handguns in public. Had the NRA informed policymakers that concealed handgun permit holders would routinely be killing law enforcement personnel and perpetrating, rather than preventing, mass murders and other gun homicides few legislators--applying Metaksa's own standard--would have voted in favor of such laws.

These unfounded assertions are repeated to this day. In a September 28, 2010, opinion piece on *Foxnews.com*, concealed carry advocate John Lott asserted, "Fears about accidents and rampages by permit holders, and blood running in the streets however never materialized where concealed carry has been allowed."

Such false claims are endlessly repeated by pro-gun advocates in their ongoing efforts to expand the carrying of concealed handguns into bars, churches, schools, and places of employment. In addition, the gun lobby has been successful at hiding the truth about crimes committed by concealed handgun permit holders by forcing most states to keep secret the identities of permit holders. As a result, until recently, the false claims made by pro-gun advocates regarding these "upstanding community leaders" have been left unchallenged.

In 2009, the Violence Policy Center began an ongoing research project to identify killings from May 2007 to the present involving citizens legally allowed to carry concealed handguns. Because detailed information on such killings is not readily available, the VPC is forced to rely primarily on news accounts for reports of such killings and subsequent legal proceedings.

Above is the current tally from May 2007 to the present of killings involving persons with concealed carry permits or who committed a killing in public with a legal handgun in a state that allows concealed carry without a permit (Alaska, Arizona, and Vermont allow the carrying of concealed handguns without a permit). The killings are broken out by specific categories and a killing may fit into more than one category. Because the VPC relies primarily on news reports for the majority of incidents, the actual numbers are most likely far higher. This tally is updated monthly. **Clicking on each category's tally will link you to vignettes describing the circumstances for each killing, listed by state. The descriptions also include the current, known status of any charges filed against the permit holder as well as noting instances where the perpetrator committed suicide.**

The Violence Policy Center welcomes any new information regarding the status of any case (with verifiable source(s)). Any new information or corrections to the information contained in the database will be posted in the next monthly update.

Use this link to contact the VPC: http://www.vpc.org/contact.htm.

*Last updated: May 31, 2012*

The Violence Policy Center is a national tax-exempt educational organization working for a safer America through research, investigation, analysis, and advocacy. The VPC provides information to policymakers, journalists, organizations, advocates, and the general public. Click here to learn more about the VPC.

# Exhibit 101

**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS ASSOCIATION OF )
FIREARMS RETAILERS, )
KENNETH PACHOLSKI, )
KATHRYN TYLER, and )
MICHAEL HALL )
    Plaintiffs, )
  vs. ) No. 10 CV 04184
THE CITY OF CHICAGO and )
RICHARD M. DALEY, Mayor )
of the City of Chicago, )
    Defendants. )

    The deposition of CAROL BROWN, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before JENNIE MODI, a notary public within and for the County of Cook and State of Illinois, at 33 North Dearborn Street, Suite 300, Illinois, on the 21st day of April, 2011, at the hour of 9:03 o'clock a.m.

**Page 2**

1 APPEARANCES:
2
3     COOPER & KIRK, by
4     MR. DAVID THOMPSON,
5     1523 New Hampshire Avenue Northwest,
6     Washington, D.C. 20036,
7     202-220-9600,
8       Representing the Plaintiffs;
9
10     MR. ANDREW WORSECK,
11     ASSISTANT CORPORATION COUNSEL,
12     DEPARTMENT OF LAW,
13     30 North LaSalle Street, Suite 1230,
14     Chicago, Illinois 60602,
15     312-744-7129,
16       Representing the Defendants.
17
18
19
20
21
22
23
24

**Page 3**

1                I N D E X
2 WITNESS             EXAMINATION
3 CAROL BROWN
4   By MR. THOMPSON       6, 128
5   By MR. WORSECK      113, 167
6
7
8
9
10
11           E X H I B I T S
12 NUMBER        MARKED FOR ID
13 BROWN Deposition Exhibit
14   No. 1        8
15
16
17
18
19
20
21
22
23
24

**Page 4**

1       (Whereupon, the witness was
2       duly sworn.)
3     MR. THOMPSON: Good morning, Ms. Brown. I'm
4 David Thompson from the law firm of Cooper & Kirk.
5 And I represent the plaintiffs in ILAFR, et al. v.
6 Chicago.
7     And would counsel for the city like to
8 introduce himself?
9     MR. WORSECK: Sure. My name is Andrew Worseck.
10 I'm an attorney for the defendants in this case.
11     And before we go any further, David, I
12 would just like to put on the record that we're
13 producing Ms. Brown today subject to various
14 limitations with respect to the scope of the
15 30(b)(6) that the parties have agreed to previously
16 in correspondence. We're also producing her
17 subject to various objections that defendants have
18 raised in that same correspondence and among other
19 pieces of correspondence in my letter of December
20 8th, 2010 and in my letters of January 25th and
21 April 13th of this year.
22     And, of course, Judge Chang last month
23 made a significant ruling with respect to the scope
24 of permissible discovery in the case, that of

EXAMINATION

BY MR. WORSECK:

Q. Ms. Brown, I would like to ask you a few questions.

Do you recall earlier this morning the discussion about the city's ban on shooting ranges?

A. Yes.

Q. And you talked about various public safety, health and welfare interests that the city has in banning shooting ranges?

A. Yes.

Q. And one of those interests or purposes would be reducing theft and crime connected with the shooting range?

A. Yes.

Q. And one of the sorts of theft or crime that could be committed against a shooting range would be a theft of guns or ammunition from the range itself?

A. Correct.

Q. And another would be the theft of guns or ammunition from patrons of the range?

A. Correct.

Q. And another would be the possibility that

113

people congregating with weapons in or about a shooting range could lead to instances, that otherwise may not be deadly or unduly violent, escalating into such a situation because firearms are present?

MR. THOMPSON: Objection, leading.

THE WITNESS: Yes.

BY MR. WORSECK:

Q. Do you recall earlier being asked questions about the ability of criminals in the City of Chicago to acquire guns?

A. Yes.

Q. And do you agree that the city has a governmental purpose in limiting the existence of gun stores in the city, as that would create additional opportunities or sources for criminals to get guns?

A. Yes.

Q. Above and beyond those that exist in the current climate?

A. Yes.

Q. Do you recall the discussion about regulation or oversight of gun stores?

A. Yes.

114

Q. And you talked about some of the city's interests with respect to that. Would those same interests be present with respect to regulation of shooting ranges?

MR. THOMPSON: Objection, leading.

THE WITNESS: Yes.

BY MR. WORSECK:

Q. And in the context of the gun store discussion, do you remember a discussion about providing an attraction to youth?

A. Yes.

Q. And would that same interest be present in the context of shooting ranges?

A. Absolutely.

MR. THOMPSON: By the way, objection, leading. But go ahead.

BY MR. WORSECK:

Q. And again relating to the colloquy about regulations, is it your understanding that there are firearm stores in other jurisdictions in the country that are regulated by the federal government, federal law, federal agencies?

A. Yes.

Q. They may also be regulated by state law?

115

A. Some, yes.

Q. They may also be regulated by municipal law?

A. Yes.

Q. And despite regulations at any or all of those levels of government governing the practices and conduct of gun stores, guns nonetheless still find their way into illegal markets?

A. Yes.

Q. And into the hands of criminals?

A. Yes.

Q. And presumably with respect to the regulatory regime that exists, taxes are charged to fund that regime?

A. Yes.

Q. People are hired by governments to implement that regime?

A. Yes.

Q. And nonetheless, guns still find their way into illegal markets?

A. Without question.

Q. And into the hands of criminals?

A. Without question.

Q. Do you recall a discussion generally about

116

29 (Pages 113 to 116)

# Exhibit 102

# THE MOVEMENT OF ILLEGAL GUNS IN AMERICA



## The Link between Gun Laws and Interstate Gun Trafficking

DECEMBER 2008

**MAYORS AGAINST ILLEGAL GUNS**

# THE MOVEMENT OF
# ILLEGAL GUNS
# IN AMERICA

## The Link between Gun Laws and Interstate Gun Trafficking

A REPORT FROM MAYORS AGAINST ILLEGAL GUNS

DECEMBER 2008

www.mayorsagainstillegalguns.org

© 2008. Mayors Against Illegal Guns.
All Rights Reserved.

# TABLE OF CONTENTS

**Executive Summary**     2

**Part One:** The Importance of Trace Data     4

**Part Two:** The Scope of Interstate Trafficking of Crime Guns     5

**Part Three:** Identifying the Rate at which States "Export" Crime Guns     7

   *Controlling for Population*     7
   *Controlling for NICS Checks*     8

**Part Four:** The Relationship Between Export Rates and Particular Gun Laws     9

   *Background Checks for All Handgun Sales at Gun Shows*     10
   *Purchase Permits for All Handgun Sales*     12
   *Mandatory Reporting of Lost or Stolen Guns to Law Enforcement*     14
   *Local Control of Firearms Regulations*     16
   *State Inspection of Gun Dealers*     18
   *Summary*     20

**Part Five:** The Balance of Trade for Crime Guns     23

**Part Six:** The Relationship Between Export Rates and Gun Murders     25

**Conclusion**     27

**Appendix I:** Methodological Considerations     28

**Appendix II:** How a Gun Trace Works     30

**Appendix III:** Maps of Top Ten Export States     32

**Endnotes**     37

# EXECUTIVE SUMMARY

In the highly contentious debate about the appropriate scope of gun laws, it is important to keep in mind two propositions that almost all sides agree on. *First,* the vast majority of gun owners in this country are law-abiding citizens; most gun crimes are committed by a small minority of the gun-owning population. *Second,* gun laws must be designed to keep firearms away from the criminal minority without infringing on the rights of the law-abiding majority.

One such law that has won broad support among both advocates for stricter gun laws and gun rights advocates is the requirement that federally licensed gun dealers conduct background checks on all purchasers. Under federal law, felons, domestic violence misdemeanants, and other categories of individuals are prohibited from possessing or purchasing firearms. Background checks identify these "prohibited purchasers," helping to keep guns out of the hands of those most likely to use them in crimes. Nevertheless, thousands of guns make their way into the hands of such prohibited possessors through an illegal market. This report looks at how guns move from the legal to the illegal marketplace – and into the hands of criminals.

Different researchers have come to a variety of conclusions on the broad question of the relationship between gun regulation and crime. A number of studies have suggested that oversight of gun dealers, regulation of private gun sales, and aggressive enforcement of illegal gun possession laws can reduce crime rates.[1] Others have suggested that easing access to guns can drive crime down by deterring criminals and contend that precautionary regulations, such as those at gun shows, do not lead to reductions in crime rates.[2]

This report – the first of its kind – examines a more focused question: *What is the relationship between a state's gun regulations and the likelihood that it will be a source of guns recovered in out-of-state crimes?* While all states operate under the same federal gun laws, many states have enacted a series of additional laws – such as background checks on all gun show sales, mandatory reporting of lost and stolen guns to police, and state gun dealer inspections – to choke off the illegal market and reduce criminal access to guns. The states that have not enacted these additional regulations, or others beyond federal law, have comparatively weak gun laws. This report begins to shed light on the interstate marketplace for illegal guns and suggests that it flourishes in states with weaker laws.

Part One of the report explains how this analysis is possible, whereas less than two years ago it was not. The key to unlocking the relationship between gun laws and the movement of crime guns lies in "trace data," which refers to the tracing of a gun's origins. Such traces occur when law enforcement officers recover guns used in crimes and request that the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) conduct an investigation to identify the original retail seller and buyer of the gun. When aggregated, trace data also provides a wealth of information about the buyers, dealers, and geographic areas that are associated with guns used in crimes across the country.

Part Two uses trace data to identify the scope of interstate trafficking of crime guns and to highlight the top source states for interstate crime guns.

Part Three analyzes which states "export" crime guns to other states at the highest rates, on the basis of both population and gun sales volume. These export rates identify states that are outliers as sources of crime guns – states that are either major or minor sources of interstate crime guns. On the basis of population, ten states –West Virginia, Mississippi, South Carolina, Kentucky, Alabama, Virginia, Georgia, Indiana, Nevada, and North Carolina – supply interstate crime guns at a rate two and a half times the national average.

Part Four seeks to answer the question of *why* some states export crime guns at higher rates by comparing the average export rates of states that have enacted specific gun laws to the export rates of states that have not. In doing so, it finds a strong relationship between high crime gun export rates and the absence of certain state gun laws. Five such laws are examined, and the report finds that the ten states that supply interstate crime guns at the highest rates have, on average, 0.6 of these regulations in place, compared to 3.4 in the ten states that supply interstate crime guns at the lowest rates – five times higher than the states with the highest export rates.

Part Five examines the relationship of a state's crime gun exports to its crime gun imports and finds that states with high crime gun export rates typically export far more guns than they import. This finding bolsters the notion that, within states with high export rates, ready access to crime guns reduces the need for crime gun imports.

Part Six examines the relationship between export rates and gun murder rates, finding that states with the highest crime gun export rates suffer from 59% more gun murders than the states with the lowest crime gun export rates. In addition, these high export states suffer nearly three times as many fatal shootings of police officers as states that are the least frequent suppliers of guns trafficked across state lines.

This report's conclusion summarizes how the preceding analysis sheds light on a decades-old debate about the nature of the illegal gun market. Many law enforcement officials have long maintained that a pattern of illegal gun trafficking exists between states. For example, there has been much discussion of an "Iron Pipeline" through which guns from states in the Southeast are trafficked into the hands of criminals in Mid-Atlantic and Northeast cities along Interstate 95.[3] This report confirms these accounts, suggesting there is an interstate illegal gun market driven, at least in part, by the relative ease of access to guns in particular states. **The key finding of this report is that states that supply crime guns at the highest rates have comparatively weak gun regulations. This association strongly suggests that gun traffickers favor these states as sources.**

## PART ONE: THE IMPORTANCE OF TRACE DATA

There are any number of ways in which a gun may enter the illegal market. According to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), virtually all guns that are recovered in crimes were originally sold by licensed dealers or other federal firearms licensees (FFLs).[4] These guns may enter the illegal market because of robberies that occur in homes, cars, or dealers' stores – or because a gun dealer or dealer employee: (1) fails to follow background check requirements; (2) sells to a "straw purchaser," someone who purchases a gun on behalf of a prohibited purchaser; or (3) sells guns under the table without any background checks. Guns may also enter the black market through sales by non-licensed dealers at gun shows; such dealers are not required to perform background checks under federal law.

When a gun is recovered from a crime scene, law enforcement can call in its manufacturer and serial number to the ATF, which can then trace the gun's movement from the manufacturer to the wholesaler to the retail outlet to the first purchaser. This information is called "crime gun trace data." Trace data can be a critical element of criminal investigations, and, when aggregated, trace data allows law enforcement to identify trends in the illegal market and even the routes that traffickers tend to use.

**Appendix II to this report describes in further detail how the tracing process works.**

Crime gun trace data is enormously useful to federal, state, and local law enforcement in the investigation of individual crimes.[5] Trace data can lead law enforcement to the perpetrator of the crime in cases where a gun is recovered but the perpetrator is not immediately known. Last year, for example, ATF traced 141,577 recovered guns, including guns used in murders, armed robberies, and drug crimes.

When aggregated, trace data can also identify gun traffickers and gun dealers who may not be following the law.[6] ATF and local law enforcement routinely use trace data to identify trafficking sources and trends. For example, over a two and a half year period, ATF found that it used trace data in 60% of all gun trafficking investigations.[7] More broadly, trace data can also identify trafficking patterns across a region and across the nation, helping law enforcement map where guns are originating from and where they end up being used in crimes. Trace data analysis enables law enforcement to identify the states that supply crime guns – source states – and the states where crime guns from other states are recovered – recovery states.[8] Interstate trafficking patterns can be established when a large number of guns that were purchased in one state are recovered in crimes in another state.

This report examines trace data to answer three key questions:

1. Which states disproportionately supply guns used in crimes in other states?
2. Do states that disproportionately supply guns used in out-of-state crimes have gun regulations that are different from states that are not major sources of crime guns?
3. Do states that are major sources of interstate crime guns also suffer higher rates of in-state gun murders, including fatal shootings of police officers?

The analysis in this report is only possible because, after a lag of six years, ATF has once again begun releasing reports based on aggregated gun trace data. In August 2007 and May 2008, ATF released trace data collected respectively in 2006 and 2007.[9] ATF had regularly released such trace data reports for years. However, a 2004 change to annual Congressional appropriations riders known as the "Tiahrt Amendments" prohibited ATF from releasing these reports. Only after a national campaign by a coalition of Mayors Against Illegal Guns and more than 30 police organizations did Congress relax some of these restrictions in 2007. While significant restrictions still remain on access to trace data, the resumption of ATF's release of limited data in public reports paved the way for this analysis.

# PART TWO: THE SCOPE OF INTERSTATE TRAFFICKING OF CRIME GUNS

In 2006, ATF traced and identified the source states of 141,380 guns. In 2007, 141,577 guns were traced to source states. In both 2006 and 2007, three in ten of these guns crossed state lines before they were recovered in crimes. Moreover, ATF reported in 2000 that 44% of its trafficking investigations involved interstate trafficking.[10]

When such a large percentage of crime guns originate out-of-state, it raises two fundamental questions about the illegal market: Is the market disproportionately supplied by particular states? And if so, what distinguishes those states – called "source states" – from other states that have far fewer guns being used in out-of-state crimes? The second question will be tackled in Part Four of this report, but answering the first question requires only a look at the 2006 and 2007 trace data, which show that some states are disproportionate sources of illegally trafficked guns. In analyzing that data, two alarming findings emerge:

- *In 2007, just ten states supplied more than half of the guns that crossed state lines before being recovered in crimes.*
- *The ten states that supply crime guns at the highest rates do so at roughly 17 times the rate of the ten states with the lowest crime gun export rates.*

| 2006 TRACED CRIME GUNS | | |
|---|---|---|
| Traced Guns Purchased and Recovered In the Same State | 69% | 97,669 |
| Traced Guns Purchased in One State and Recovered In Another | 31% | 43,711 |
| | Total | 141,380 |

| 2007 TRACED CRIME GUNS | | |
|---|---|---|
| Traced Guns Purchased and Recovered In the Same State | 70% | 99,127 |
| Traced Guns Purchased in One State and Recovered In Another | 30% | 42,450 |
| | Total | 141,577 |

ATF trace data shows that 42,450 guns crossed state lines before being recovered in crimes in 2007. For 34,127 of these guns, ATF identified the state where the guns were originally purchased. Just ten states accounted for the majority of these guns – 57% (19,616 guns).

This pattern is similar to 2006, when ten states accounted for 19,946 guns, or 57%, of the 35,223 guns from identified out-of-state sources. In addition, the top source states remained remarkably consistent between 2006 and 2007. Nine of the top crime gun source states in 2006 remained among the top ten in 2007.

It is important to note that these figures represent the raw numbers of recovered crime guns that cross state lines. States with larger populations and states with greater gun sales volumes may be expected to be a source of more crime guns. Therefore, to more accurately determine which states are disproportionate suppliers of interstate crime guns, two different controls were applied: population and the volume of background checks, the latter of which is a rough proxy for gun sales volume.

| 2007 Top 10 Interstate Crime Gun Suppliers | |
|---|---|
| Number of Interstate Crime Guns | |
| 1. Georgia | 2,631 |
| 2. Florida | 2,328 |
| 3. Texas | 2,281 |
| 4. Virginia | 2,261 |
| 5. California | 1,962 |
| 6. Ohio | 1,813 |
| 7. North Carolina | 1,774 |
| 8. Indiana | 1,665 |
| 9. Pennsylvania | 1,539 |
| 10. Alabama | 1,362 |

| 2006 Top 10 Interstate Crime Gun Suppliers | |
|---|---|
| Number of Interstate Crime Guns | |
| 1. Georgia | 2,804 |
| 2. Virginia | 2,311 |
| 3. Texas | 2,302 |
| 4. Florida | 2,229 |
| 5. California | 1,968 |
| 6. Indiana | 1,846 |
| 7. Ohio | 1,819 |
| 8. North Carolina | 1,656 |
| 9. Pennsylvania | 1,574 |
| 10. South Carolina | 1,437 |

*States in red were among the top ten out-of-state crime gun suppliers in both 2006 and 2007.*

## PART THREE: IDENTIFYING THE RATE AT WHICH STATES "EXPORT" CRIME GUNS

### CONTROLLING FOR POPULATION

By controlling for population, one can determine the *rate* at which each state "exports" or supplies guns that are recovered in crimes in other states. Crime gun export rates measure the total number of traced guns that are purchased from gun dealers in one state but recovered in another, controlling for the population of the state where the gun was purchased. In this way, the crime gun export rate identifies which states are the largest *per capita* suppliers of guns recovered in out-of-state crimes.

As the table below shows, some states have far higher crime gun export rates than others. In 2007, the national crime gun export rate was 11.3 guns exported per 100,000 inhabitants. The ten states with the highest export rates averaged 27.8 per 100,000 inhabitants. This is 17 times greater than the ten states with the lowest export rates, which averaged 1.6 crime guns per 100,000 inhabitants.

**Appendix III provides maps showing the destination of guns from the ten states that exported guns at the highest rates in 2007.**

### 2007 EXPORT RATE RANKINGS BASED ON POPULATION (HIGHEST TO LOWEST)

| State | Guns Exported per 100,000 inhabitants | State | Guns Exported per 100,000 inhabitants |
|---|---|---|---|
| West Virginia | 41.0 | North Dakota | 8.6 |
| Mississippi | 39.0 | Delaware | 8.2 |
| South Carolina | 30.6 | Maryland | 7.9 |
| Kentucky | 29.7 | Colorado | 7.5 |
| Alabama | 29.4 | Wyoming | 7.5 |
| Virginia | 29.3 | Montana | 7.1 |
| Georgia | 27.6 | Washington | 7.0 |
| Indiana | 26.2 | Maine | 6.8 |
| Nevada | 23.7 | Vermont | 6.8 |
| North Carolina | 19.6 | Alaska | 6.6 |
| Arizona | 19.5 | Wisconsin | 5.7 |
| Louisiana | 18.2 | California | 5.4 |
| Ohio | 15.8 | South Dakota | 5.0 |
| Idaho | 14.7 | Missouri | 4.8 |
| Tennessee | 14.7 | Illinois | 4.3 |
| Arkansas | 14.2 | Nebraska | 3.5 |
| New Mexico | 13.9 | Iowa | 3.3 |
| Oklahoma | 13.4 | Connecticut | 2.9 |
| Oregon | 13.3 | Michigan | 2.9 |
| Florida | 12.8 | Minnesota | 1.8 |
| Pennsylvania | 12.4 | New York | 1.4 |
| Kansas | 12.3 | Rhode Island | 1.1 |
| *National Average* | *11.3* | Massachusetts | 0.7 |
| New Hampshire | 10.0 | New Jersey | 0.4 |
| Texas | 9.5 | District of Columbia | 0.0 |
| Utah | 9.4 | Hawaii | 0.0 |



*States in red indicate the ten states with the highest rate of guns recovered in out-of-state crimes.*

*States in green indicate the ten states with the lowest rate of guns recovered in out-of-state crimes.*

## CONTROLLING FOR NICS CHECKS

The Federal Bureau of Investigations' NICS (National Instant Criminal Background Check System) is the mechanism through which FFLs conduct background checks on every gun sale. State-by-state data about the number of background checks performed by NICS provides something of a proxy for gun sales by FFLs. While NICS data is a less than perfect match, especially because some states use NICS for purposes other than gun sales by FFLs (such as checks for concealed carry permit applicants),[11] it does provide an approximation of gun sales by state. In fact, eight of the ten states with the highest crime gun export rates, when controlling for population, remain among the ten states with the highest crime gun export rates, when controlling for NICS checks.[12] Six of the ten states with the lowest crime gun export rates, when controlling for population, remain among the ten states with the lowest crime gun export rates, when controlling for NICS checks. The four states not included in the bottom ten under this analysis still remain well below the national export rate average.[13]

Although NICS data offers a sound method of estimating export rates based on gun sales, because of the variations among the states regarding its use, this report relies primarily on population as the control when conducting the analyses that follow.

| 2007 EXPORT RATE RANKINGS BASED ON NICS CHECKS (HIGHEST TO LOWEST) | | | |
|---|---|---|---|
| State | Crime Guns Exported per 100,000 NICS Checks | State | Crime Guns Exported per 100,000 NICS Checks |
| Georgia | 973 | California | 229 |
| Virginia | 937 | Vermont | 211 |
| South Carolina | 899 | New Hampshire | 203 |
| Indiana | 891 | Utah | 195 |
| Nevada | 867 | Wisconsin | 176 |
| Mississippi | 649 | Maine | 176 |
| Arizona | 643 | Colorado | 165 |
| North Carolina | 613 | Washington | 165 |
| West Virginia | 561 | North Dakota | 130 |
| Ohio | 556 | New York | 130 |
| Alabama | 555 | Nebraska | 119 |
| Maryland | 555 | Rhode Island | 117 |
| Florida | 546 | Illinois | 104 |
| Kentucky* | 542 | Missouri | 103 |
| Delaware | 446 | Iowa | 101 |
| Louisiana | 375 | New Jersey | 96 |
| Tennessee | 374 | Michigan | 92 |
| *National Average* | *348* | Wyoming | 91 |
| Oregon | 307 | Alaska | 91 |
| Kansas | 307 | Connecticut | 89 |
| New Mexico | 293 | Montana | 75 |
| Texas | 291 | South Dakota | 74 |
| Pennsylvania | 274 | Minnesota | 38 |
| Oklahoma | 255 | Massachusetts | 27 |
| Arkansas | 237 | District of Columbia | 0 |
| Idaho | 235 | Hawaii | 0 |



*States in red indicate the top ten sources of crime guns identified by using population as a control.*

*States in green indicate the lowest ten sources of crime guns identified by using population as a control.*

*\*This analysis uses 2005 NICS data for Kentucky, while using 2007 data for all other states, because it appears Kentucky changed the state practice in 2006 by using NICS to recheck concealed carry permit holders every month, vastly inflating the number of NICS checks conducted in Kentucky in 2006 and 2007.*