# PART FOUR: THE RELATIONSHIP BETWEEN EXPORT RATES AND PARTICULAR GUN LAWS

To understand the relationship between illegal gun laws and crime gun export rates, this report examines five different gun laws and the differences in crime gun export rates among states that have these regulations and states that do not:

(1) Closing the gun show loophole or requiring universal background checks;
(2) Purchase permits for all handgun sales;
(3) Mandatory reporting of lost and stolen guns to law enforcement;
(4) State laws that allow local jurisdictions to regulate firearms; and
(5) Dealer inspections.

These five laws were selected based on discussions with mayors, policy-makers, and current and former federal, state, and local law enforcement officials. Also, some of these laws address what ATF has identi-fied as major sources of crime guns, including unlicensed dealers at gun shows and lost or stolen guns.[14] Further research should be done in order to determine which other regulations may be associated with lower crime gun export rates.

In each of the five cases, there proves to be a strong association between illegal gun laws and crime gun export rates. States that have high crime gun export rates – *i.e.,* states that are top sources of guns recovered in crimes across state lines – tend to have comparatively weak gun laws. The analysis that follows relies primarily on per-capita export rates. However, when NICS checks are used as the control instead of population, a similar relationship is found with four of the five gun laws. Only dealer inspections do not exhibit the same association with lower crime gun export rates when controlling for NICS checks.

## THE FIVE GUN LAWS EXAMINED IN THIS REPORT

(1) Background Checks on All Handgun Sales at Gun Shows

(2) Purchase Permits for All Handgun Sales

(3) Mandatory Reporting of Lost or Stolen Guns to Law Enforcement

(4) Local Control of Firearms Regulations

(5) State Inspection of Gun Dealers

## (1) BACKGROUND CHECKS FOR ALL HANDGUN SALES AT GUN SHOWS:

*States that do not require background checks for all handgun sales at gun shows have an average crime gun export rate that is about twice the rate of states that do require such background checks.*

Under federal law, both federally licensed firearms dealers (FFLs) and unlicensed private sellers are permitted to sell firearms at gun shows. Licensed dealers are required to run background checks to identify prohibited purchasers and maintain sales records for all firearm transactions, including at gun shows.[15] However, persons who maintain that they sell guns only occasionally – private, unlicensed sellers – are currently exempt from these federal background check and sales record retention requirements at all locations, including gun shows.

This so-called "gun show loophole" allows individuals who are prohibited from possessing or purchasing firearms, such as convicted felons and persons with mental illness, to sidestep the background check and obtain guns from unlicensed sellers at gun shows. A 2000 ATF report found gun shows to be involved with the trafficking of approximately 26,000 firearms over a two and a half year period. This figure represents 30% of all guns identified in federal criminal trafficking cases over that period.[16]

Nine states and the District of Columbia require some form of background check for all handgun sales at gun shows. These include:

- states with universal background checks, which include background checks for all gun sales regardless of the type of gun or venue of sale: California, District of Columbia, and Rhode Island;[17]
- states with background checks for handgun sales regardless of venue: Connecticut, Pennsylvania, and Maryland;[18]
- states that require background checks for all sales at gun shows, regardless of the type of gun: Illinois, New York, Colorado, and Oregon;[19]

This report uses the broadest definition to include all of these states in the category of states with background checks for all handgun sales at gun shows.

The national crime gun export rate is 11.3 crime gun exports per 100,000 inhabitants.[20] States that require background checks for all handgun sales at gun shows have an average crime gun export rate of 5.7 per 100,000 inhabitants – about half the national average. States that do not have any background check requirements at gun shows have an average crime gun export rate of 13.0, which is more than two times the rate of states that have these requirements.

Moreover, none of the ten states with the highest crime gun export rates require background checks for all handgun sales at gun shows.

## STATES THAT REQUIRE BACKGROUND CHECKS FOR ALL HANDGUN SALES AT GUN SHOWS



KEY

- Background Checks Required for All Sales Regardless of Type of Gun or Venue
- Background Checks Required for All Handgun Sales Regardless of Venue
- Background Checks Required for All Sales at Gun Shows, Regardless of Type of Gun
- Background Checks Not Required at Gun Shows for Unlicensed Sellers

## RELATIONSHIP BETWEEN CRIME GUN EXPORT RATES AND STATE LAWS REQUIRING BACKGROUND CHECKS FOR ALL HANDGUN SALES AT GUN SHOWS



## (2) PURCHASE PERMITS:

***States that require purchase permits for all handgun sales export crime guns at less than one-third the rate of states that do not.***

Some states require prospective gun buyers to obtain a license or permit before purchasing a firearm from a licensed dealer. Such purchase permits are mandated in an effort to ensure compliance with gun safety laws and to decrease illegal gun sales by verifying in advance that all buyers are legally eligible to purchase or possess a gun under local, state and federal law.

Purchase permit requirements vary widely between states, but they typically involve further scrutiny from local or state police, above and beyond the federal requirements for background checks. There are 11 states that require purchase permits for all handgun sales from licensed gun dealers.[21] Among these 11 states, four states require purchase permits for all firearms (Hawaii, Illinois, Massachusetts, New Jersey)[22] and seven states require purchase permits for handguns only (California, Connecticut, Iowa, Michigan, New York, North Carolina, Rhode Island).[23]

### STATES THAT REQUIRE PURCHASE PERMITS FOR HANDGUN SALES



KEY

- Purchase Permit Required for All Firearms Sales
- Purchase Permits Required for Handgun Sales Only
- Purchase Permits Not Required for Handgun Sales

States that require purchase permits for all handgun sales have a significantly lower crime gun export rate than states that do not. The national crime gun export rate is 11.3 crime gun exports per 100,000 inhabitants. The average crime gun export rate among the 11 states that require purchase permits is 4.6 crime gun exports per 100,000 inhabitants – 60% below the national average.

Conversely, the crime gun export rate for states that do not require purchase permits is 15.3 – more than three times the rate of states that require purchase permits.

Moreover, only one of the ten states with the highest crime gun export rates requires purchase permits for handgun purchases.



RELATIONSHIP BETWEEN CRIME GUN EXPORT RATES AND
STATE LAWS REQUIRING PURCHASE PERMITS FOR HANDGUN SALES

## (3) REPORTING LOST OR STOLEN GUNS:

***States that require gun owners to report lost or stolen guns to law enforcement export crime guns at less than one-third the rate of states that do not require such reporting.***

Thousands of criminals use guns that have been lost or stolen from legitimate owners. One study estimated that about 500,000 guns are lost by, or stolen from, gun owners each year.[24] Requiring a gun owner to report a lost or stolen gun to law enforcement is intended to deter trafficking. For example, if several crime guns are traced to a trafficking suspect, then lost and stolen reporting requirements make it much more difficult for that suspect to later make claims that his or her guns were stolen. In such cases, reporting requirements can help law enforcement more easily identify and prosecute gun traffickers.

Seven states (Connecticut, Massachusetts, Michigan, New Jersey, New York, Ohio, and Rhode Island)[25] and the District of Columbia[26] require gun owners to report their guns lost or stolen to law enforcement.

STATES THAT REQUIRE REPORTING OF LOST OR STOLEN GUNS TO LAW ENFORCEMENT



KEY

- Reporting of Lost or Stolen Guns Required
- Reporting of Lost or Stolen Guns not Required

The national crime gun export rate is 11.3 crime gun exports per 100,000 inhabitants. The average crime gun export rate among the seven states and the District of Columbia that require reporting lost and stolen guns is 4.2 crime gun exports per 100,000 inhabitants. In contrast, the average crime gun export rate among states that do not require reporting lost and stolen guns is 13.1 crime gun exports per 100,000 inhabitants, which is three times the rate of states with these requirements.

Moreover, none of the ten states with the highest crime gun export rates require reporting of lost or stolen guns.

### RELATIONSHIP BETWEEN CRIME GUN EXPORT RATES AND STATE LAWS REQUIRING THE REPORTING OF LOST OR STOLEN GUNS TO LAW ENFORCEMENT



## 4) LOCAL CONTROL OF FIREARMS REGULATIONS:

***States that allow cities to enact their own gun laws export crime guns at roughly one-fifth the rate of states that preempt local control of gun laws in cities.***

State "preemption" refers to the practice of a state limiting the home-rule powers of its local governments, *i.e.*, cities and counties. Forty-two states have adopted preemption statutes, which substantially or wholly limit the authority of local government to regulate firearms. Six states and the District of Columbia, however, do not have preemption statutes expressly limiting the authority of local government to regulate firearms (Connecticut, Hawaii, Illinois, Massachusetts, New Jersey, and New York).[27] California and Nebraska expressly preempt local firearms regulation in limited areas, such as registration or licensing,[28] but local governments in both states retain broad authority to regulate firearms outside these areas. This analysis grouped California and Nebraska with the other six states and the District of Columbia that do not have preemption statutes to create a category of states that have broad local control of firearms regulation.

### STATES THAT ALLOW LOCAL CONTROL OF GUN LAWS



KEY

■ No preemption statutes limiting local control

▦ Limited preemption, broad local control

■ Broad preemption statutes expressly limit local control

On average, states export crime guns at a rate of 11.3 per 100,000 inhabitants. The eight states and the District of Columbia that do not expressly preempt local firearms regulations for most circumstances, have an average crime export rate of 3.3 per 100,000 inhabitants. In contrast, states that preempt local control have an average crime gun export rate of 14.8 per 100,000 inhabitants – more than four times the rate of states with local control.

Moreover, none of the ten states with the highest crime gun export rates allow for local control of gun regulations.



**RELATIONSHIP BETWEEN CRIME GUN EXPORT RATES AND STATE LAWS ALLOWING LOCAL CONTROL OF GUN LAWS**

## (5) State Inspection of Gun Dealers:

***States that do not require or permit inspections of gun dealers export crime guns at a rate that is 50 percent greater than the average export rate of states with these regulations.***

ATF is generally permitted, under current federal law, to conduct a maximum of one inspection per year of federally licensed dealers (FFLs) to ensure compliance with all federal laws.[29] In practice, however, ATF reported in 2007 that it only inspects a dealer once every 17 years, on average.[30]

To achieve greater oversight of dealers, several states have inspection laws that allow or require state authorities to supplement the federal ATF inspections. These laws can allow and sometimes require state law enforcement to compare a dealer's sales records with the store's inventory on a regular basis. Such routine inspections provide law enforcement with more opportunities to uncover dealers in violation of the law. They also help identify dealers who exercise lax oversight over their inventory, and may lead to improved compliance with federal, state, and local laws. Twenty-three states and the District of Columbia allow or require state inspections in addition to federal inspections.[31]

### STATES THAT ALLOW OR REQUIRE STATE INSPECTIONS OF GUN DEALERS



KEY

State Inspections Allowed or Required

State Inspections Not Allowed or Required

The 23 states and the District of Columbia that permit or require state inspections of gun dealers have lower crime gun export rates than states that do not allow or require state inspections. The average crime gun export rate of these 23 states and the District of Columbia is 9.4 per 100,000 inhabitants. Conversely, the average crime gun export rate of the states that do not require or allow state inspection of gun dealers is 14.2 exports per 100,000 inhabitants – 50% greater than states with state inspections.

Moreover, five of the ten states with the highest crime gun export rates permit or mandate dealer inspections.



RELATIONSHIP BETWEEN CRIME GUN EXPORT RATES AND
STATE LAWS ALLOWING OR REQUIRING INSPECTION OF DEALERS

## SUMMARY: LAX ILLEGAL GUN LAWS ARE ASSOCIATED WITH HIGH CRIME GUN EXPORT RATES

As the summary chart below indicates, states that have strong illegal gun regulations have significantly lower crime gun export rates, on a per capita basis, than states with comparatively weak illegal gun regulations. The enactment of each of these regulations is associated with lower crime gun export rates. In fact, three of these regulations are associated with crime gun export rates that are less than one-third the rates of states without these regulations. A fourth regulation – closing the gun show loophole – is associated with export rates that are less than half that of states without this regulation. This demonstrates a strong connection between gun laws and reductions in the movement of crime guns across state lines.



THE AVERAGE EXPORT RATES FOR STATES WITH OR WITHOUT SPECIFIC GUN REGULATIONS (CONTROLLING FOR POPULATION)

Crime Gun Exports per 100,000 Inhabitants

| Closed Gun Show Loophole | 5.7 |
| Open Gun Show Loophole | 13.0 |
| Reporting of Lost/Stolen Guns | 4.2 |
| No Reporting of Lost/Stolen Guns | 13.1 |
| Local Control of Gun Laws | 3.3 |
| No Local Control of Gun Laws | 14.8 |
| Purchase Permit Required | 4.6 |
| Purchase Permit Not Required | 15.3 |
| State Inspections Permitted/Required | 9.4 |
| State Inspections Not Permitted/Required | 14.2 |

■ States that have enacted these regulations

■ States that have not enacted these regulations

This strong association also holds true when controlling for NICS checks, a rough proxy for gun sales. As shown below, four of the five state laws continue to be associated with lower rates of crime gun exports. In fact, two of the five measures – local control of firearms regulations and purchase permit requirements – are associated with crime gun export rates that are less than half the crime gun export rate of states without these measures.

## THE AVERAGE EXPORT RATES FOR STATES WITH OR WITHOUT SPECIFIC GUN REGULATIONS (CONTROLLING FOR NICS CHECKS)



■ States that have enacted these regulations

■ States that have not enacted these regulations

Finally, the chart below shows the extent to which each of the 50 states, and the District of Columbia, have enacted the five regulations examined in this report. The ten states with the lowest crime gun export rates (using population as a control) have enacted, on average, 3.4 of the five regulations, which is over five times the average of the ten states with the highest crime gun export rates that have enacted an average of only 0.6 of the five regulations.

| STATES THAT HAVE ENACTED KEY GUN LAWS EXAMINED IN THIS REPORT | | | | | |
|---|---|---|---|---|---|
| State | State Requires Background Checks for All Handgun Sales at Gun Shows | State Requires Purchase Permit for All Handgun Purchases | State Requires Reporting Lost or Stolen Guns | State Allows Local Control of Gun Regulations | State Mandates or Permits Dealer Inspections |
| Alabama | | | | | |
| Alaska | | | | | |
| Arizona | | | | | |
| Arkansas | | | | | |
| California | ✓ | ✓ | | ✓ | ✓ |
| Colorado | ✓ | | | | ✓ |
| Connecticut | ✓ | ✓ | ✓ | ✓ | ✓ |
| Delaware | | | | | ✓ |
| District of Columbia | ✓ | | ✓ | ✓ | ✓ |
| Florida | | | | | |
| Georgia | | | | | ✓ |
| Hawaii | | ✓ | | ✓ | ✓ |
| Idaho | | | | | |
| Illinois | ✓ | ✓ | | | ✓ |
| Indiana | | | | | |
| Iowa | | ✓ | | | |
| Kansas | | | | | |
| Kentucky | | | | | |
| Louisiana | | | | | |
| Maine | | | | | ✓ |
| Maryland | ✓ | | | | |
| Massachusetts | | ✓ | ✓ | ✓ | ✓ |
| Michigan | | ✓ | ✓ | | ✓ |
| Minnesota | | | | | ✓ |
| Mississippi | | | | | ✓ |
| Missouri | | | | | |
| Montana | | | | | |
| Nebraska | | | | ✓ | |
| Nevada | | | | | |
| New Hampshire | | | | | |
| New Jersey | | ✓ | ✓ | | ✓ |
| New Mexico | | | | | |
| New York | ✓ | ✓ | ✓ | ✓ | ✓ |
| North Carolina | | ✓ | | | ✓ |
| North Dakota | | | | | |
| Ohio | | | ✓ | | |
| Oklahoma | | | | | |
| Oregon | ✓ | | | | ✓ |
| Pennsylvania | ✓ | | | | |
| Rhode Island | ✓ | ✓ | ✓ | | ✓ |
| South Carolina | | | | | ✓ |
| South Dakota | | | | | |
| Tennessee | | | | | ✓ |
| Texas | | | | | |
| Utah | | | | | |
| Vermont | | | | | ✓ |
| Virginia | | | | | ✓ |
| Washington | | | | | |
| West Virginia | | | | | |
| Wisconsin | | | | | |
| Wyoming | | | | | ✓ |

States in red indicate the states with the highest crime gun export rates, when controlling for population.

States in green indicate the states with the lowest crime gun export rates, when controlling for population.

## PART FIVE: THE BALANCE OF TRADE FOR CRIME GUNS

The comparisons of state laws and export rates suggest that criminals and traffickers favor certain states as sources for crime guns. If ease of criminal access to guns is driving high export rates, then one would expect that states that export many guns tend to import few guns. In other words, if guns are easy to acquire in a particular state, then one would expect that there would not be a high demand among criminals for guns from neighboring or far away states. This pattern is, in fact, what one sees when comparing within a state the number of recovered guns originating from out-of-state sources versus in-state sources.

As demonstrated in the chart below, on average, in the ten states with the highest crime gun export rates, just 25% of guns recovered in crimes "at home" had been originally purchased in other states. Meanwhile, in the ten states with the lowest export rates, 54% of guns recovered in crimes "at home" originate from out-of-state dealers. This finding supports the idea that differences in the ease of criminal access to guns may account for differences in export rates.



PERCENT OF RECOVERED CRIME GUNS ORIGINATING FROM OUT-OF-STATE SOURCES FOR TOP AND BOTTOM TEN EXPORT STATES

The ten states with highest crime gun exports are *West Virginia, Mississippi, South Carolina, Kentucky, Alabama, Virginia, Georgia, Indiana, Nevada, and North Carolina.*

The ten states with the lowest crime gun export rates are *Hawaii, District of Columbia, New Jersey, Massachusetts, Rhode Island, New York, Minnesota, Michigan, Connecticut, and Iowa.*

This pattern also holds true when one examines the ratio of each state's crime gun exports to its imports. The table below presents the raw numbers of crime gun exports and imports in each state. It converts these numbers into a ratio, which shows the relationship between exports and imports among the states. For example, in a state with a high ratio of exports to imports, like West Virginia, roughly *four guns are exported* for every *one gun that is imported*. In a state with a low ratio of exports to imports, like New Jersey, for *every gun that is exported*, nearly *50 guns are imported*. Six of the ten states with the highest crime gun export rates are among the ten states with the highest ratio of exports to imports. Eight of the ten

states with the lowest export rates are among the ten states with the lowest ratio of exports to imports. In short, there are substantial trade imbalances in crime guns among states. Some states stand out as major exporters of crime guns, while other states stand out as major importers of crime guns.

The imbalances between gun exports and gun imports appear to confirm that criminals and traffickers favor gun dealers in particular states as sources for guns. Criminals who live in top export states appear better able to acquire guns from their more plentiful in-state sources and therefore may not rely as heavily on guns trafficked across state lines.

| STATE-BY-STATE RATIOS OF CRIME GUN EXPORTS TO IMPORTS [32] | | | | | | | |
|---|---|---|---|---|---|---|---|
| State | Gun Exports | Gun Imports | Ratio of Gun Exports to Imports | State | Gun Exports | Gun Imports | Ratio of Gun Exports to Imports |
| 1. New Hampshire | 132 | 29 | 4.6 : 1 | 27. North Carolina | 1774 | 2040 | 1 : 1.2 |
| 2. W. Virginia | 743 | 177 | 4.2 : 1 | 28. South Dakota | 40 | 47 | 1 : 1.2 |
| 3. Mississippi | 1138 | 310 | 3.7 : 1 | 29. Louisiana | 780 | 922 | 1 : 1.2 |
| 4. Arkansas | 402 | 131 | 3.1 : 1 | 30. Arizona | 1239 | 1584 | 1 : 1.3 |
| 5. South Carolina | 1349 | 544 | 2.5 : 1 | 31. Wyoming | 39 | 52 | 1 : 1.3 |
| 6. Indiana | 1665 | 710 | 2.4 : 1 | 32. Montana | 68 | 92 | 1 : 1.4 |
| 7. New Mexico | 273 | 117 | 2.3 : 1 | 33. Washington | 455 | 720 | 1 : 1.6 |
| 8. Alabama | 1362 | 591 | 2.3 : 1 | 34. Nevada | 609 | 984 | 1 : 1.6 |
| 9. North Dakota | 55 | 24 | 2.3 : 1 | 35. Wisconsin | 317 | 560 | 1 : 1.8 |
| 10. Virginia | 2261 | 1100 | 2.1 : 1 | 36. California | 1962 | 3817 | 1 : 2.0 |
| 11. Kentucky | 1261 | 617 | 2.0 : 1 | 37. Iowa | 100 | 234 | 1 : 2.3 |
| 12. Utah | 248 | 128 | 1.9 : 1 | 38. Connecticut | 103 | 328 | 1 : 3.2 |
| 13. Georgia | 2631 | 1598 | 1.7 : 1 | 39. Delaware | 71 | 234 | 1 : 3.3 |
| 14. Pennsylvania | 1539 | 992 | 1.6 : 1 | 40. Missouri | 283 | 1092 | 1 : 3.9 |
| 15. Oklahoma | 483 | 313 | 1.5 : 1 | 41. Nebraska | 62 | 241 | 1 : 3.9 |
| 16. Idaho | 221 | 153 | 1.4 : 1 | 42. Maryland | 445 | 1943 | 1 : 4.4 |
| 17. Ohio | 1813 | 1291 | 1.4 : 1 | 43. Michigan | 288 | 1333 | 1 : 4.6 |
| 18. Texas | 2281 | 1752 | 1.3 : 1 | 44. Minnesota | 94 | 474 | 1 : 5.0 |
| 19. Maine | 90 | 75 | 1.2 : 1 | 45. Illinois | 558 | 3260 | 1 : 5.9 |
| 20. Vermont | 42 | 35 | 1.2 : 1 | 46. Rhode Island | 12 | 77 | 1 : 6.3 |
| 21. Oregon | 500 | 446 | 1.1 : 1 | 47. Massachusetts | 45 | 529 | 1 : 11.1 |
| 22. Kansas | 342 | 312 | 1.1 : 1 | 48. New York | 273 | 3873 | 1 : 14.3 |
| 23. Colorado | 366 | 340 | 1.1 : 1 | 49. New Jersey | 35 | 1467 | 1 : 50.0 |
| 24. Florida | 2328 | 2413 | 1.0 : 1 | 50. D.C. | 0 | 975 | N/A |
| 25. Tennessee | 905 | 983 | 1.0 : 1.1 | 51. Hawaii | 0 | 29 | N/A |
| 26. Alaska | 45 | 49 | 1.0 : 1.1 | | | | |

*States in red indicate the states with the highest crime gun export rates, based on population.*

*States in green indicate the states with the lowest crime gun export rates, based on population.*

## PART SIX: THE RELATIONSHIP BETWEEN EXPORT RATES AND GUN MURDERS

### GUN MURDERS

States that export crime guns at high rates not only pose problems for other states, but they also suffer higher rates of gun murders than states with low export rates.[33]

In 2007, the FBI reported that the national gun murder rate was 3.6 per 100,000 inhabitants.[34] The average gun murder rate among the ten states with the highest crime gun export rate was 59% higher than the gun murder rate of the ten states with the lowest crime gun export rates: 4.3 and 2.7 per 100,000 inhabitants, respectively.

**2007 GUN MURDER RATE AMONG TOP TEN AND BOTTOM TEN EXPORT STATES**



## FATAL SHOOTINGS OF POLICE OFFICERS

The same pattern also holds true when examining the relationship between export rates and the fatal shootings of police officers. According to the FBI, between 2000 and 2007, there were 390 fatal shootings of police officers.[35] During this eight-year period, the national rate of fatal police shootings was 0.13 per 100,000 inhabitants. As shown in the table below, the average rate of fatal police shootings among the ten states with the highest crime export rate is nearly three times that of the ten states with the lowest crime gun export rates.

In short, states that are the largest sources of interstate crime guns are not only supplying other states with guns that are used in crimes, but these states are also suffering from significantly higher gun murder rates and fatal shootings of police officers.



**FATAL SHOOTINGS OF POLICE OFFICERS AMONG TOP TEN AND BOTTOM TEN EXPORT STATES BETWEEN 2000 AND 2007**

## CONCLUSION: WHAT DOES THIS ANALYSIS TELL US?

The purpose of this report is to describe previously unreported trends in the movement of illegal guns across state lines and to assess some of the factors that may be driving these trends. In aggregating the state trace data reports released by ATF, this report goes beyond the published efforts of the federal government to reveal and analyze trends in illegal firearms trafficking. From this analysis, the following conclusions can be drawn:

- *The rates at which states are sources for crime guns vary significantly:* The stark differences in crime gun export rates appear to confirm the existence of an interstate illegal gun market, where a handful of states stand out as major sources for crime guns.

- *States with few or none of the five laws examined in this report are more often the source of guns recovered in out-of-state crimes than states with most or all of these laws.* States that export illegal guns at the highest rates have comparatively weak gun laws. This association between high crime gun export rates and the absence of these laws suggests criminals and gun traffickers favor states without such laws.

- *States that are the top sources of guns used in out-of-state crimes also suffer from higher in-state gun murder rates:* States with high crime gun export rates not only supply crime guns to other states, but they themselves also suffer higher rates of gun murders and fatal shootings of police officers than states with low crime gun export rates. Adopting more of the five laws examined in this report could potentially reduce not only interstate trafficking, but also reduce in-state gun murders.

- *Trace data analysis has enormous potential and the continued restrictions on access to trace data hinder more comprehensive analysis:* In shedding light on previously unreported trends, this report highlights the potential of trace data as a tool to identify and analyze the illegal gun market. Restricted access to trace data impedes a more comprehensive understanding of trafficking trends in the United States and severely hinders the efforts of states and cities to develop effective legislative and law enforcement strategies to combat illegal gun crimes.

# APPENDIX I: LIMITED RELEASE OF TRACE DATA AND OTHER METHODOLOGICAL CONSIDERATIONS

## LIMITED RELEASE OF TRACE DATA

Despite the recent improvements in access to trace data, ATF's limited release of aggregate trace data and the remaining Tiahrt Amendment restrictions hinder comprehensive analysis of the movement of illegal guns in America.

- Lack of "Time-to-Crime" data. If ATF provided Time-to-Crime data for each source state, this data would allow more precise analysis of which states gun traffickers appear to favor. Time-to-Crime (TTC) measures how much time passes between when a gun is initially sold at a retail dealer and when it is recovered in a crime. ATF reports that TTC is an important indicator of gun trafficking because the quick turnover of a gun from the first retail purchase to recovery in a crime may indicate the intent of the buyer or dealer to divert the gun from the legal market into the illegal market for criminal activity.[36] ATF currently reports only Time-to-Crime data by recovery state – the state where a crime is recovered – but does not provide TTC data by source state. One might expect states with high export rates to be a source of relatively short TTC guns.

- Lack of date of sale data. If an analysis could categorize recovered guns based on their date of sale, one could examine the effect of enacting particular laws on a state's gun export rate through a before-and-after study. However, the Tiahrt Amendment restrictions limit comprehensive access to raw trace data, including date of sale.

- Lack of dealer-level data. Prior to the enactment of the Tiahrt Amendment, the federal government provided dealer-level trace data. Such data allowed ATF to report in 2000, for example, that just 1.2% of gun dealers originally sold 57% of traced

crime guns.[37] Likewise, dealer-level data was available to identify the specific gun dealers that were the top sources nationally of crime guns. The Tiahrt Amendment restrictions continue to prohibit access to this dealer-level data, making it impossible to show the degree to which certain gun dealers may drive a state's high export rate. These restrictions not only limit this report, but also hinder state and local law enforcement in their efforts to identify gun dealers who disproportionately supply guns to criminals.

## OTHER METHODOLOGICAL CONSIDERATIONS

In addition to limited access to trace data, there are other methodological considerations relevant to this analysis. Trace data is the best available information for evaluating the movement of crime guns, but there are some limitations that are important to note:

- Traced firearms do not represent all crime guns. While there is a strong relationship between the number of guns that are traced and the number of guns used in crime, these figures are not identical. Traced guns do not include all crime guns for two main reasons. First, guns are only traced after being recovered by police, and some guns used in crimes are never recovered. Second, while police in some jurisdictions trace every gun they recover in a crime, police in other jurisdictions do not have iron clad trace policies. For these reasons, traces can undercount guns used in crimes.

- Not all efforts to trace guns are successful. In 2007, ATF was unable to identify the source states – and possibly the source dealers – in 39% of all trace attempts.[38] In order to successfully trace a gun, ATF relies on accurate record-keeping by gun manufacturers, gun wholesalers, and gun retailers. Failure to keep complete records or fail-

ure to comply with ATF requests can make it impossible to trace all firearms. Moreover, guns that were purchased 20 or more years ago are often untraceable because gun dealers are only required to keep sales records for 20 years. While these failed traces mean that the overall export rates calculated in this report undercount the number of guns, there is no evidence that this distorts this report's findings because the distribution of incomplete traces does not vary substantially among states.

- Not all source states are identified in ATF trace reports. For every recovery state, the ATF reports released in 2006 and 2007 identify the 15 states that are the largest sources for crime guns. For guns that come from states that are not among the top 15 sources, ATF provides only generic identification that these guns came from "other" out-of-state sources. In 2007, ATF identified the specific source state for 80.5% of the 42,450 exported crime guns. The data presented in this report account for over 80% of all crime gun exports – a very substantial sample. Given the size of this sample, it is unlikely that data from other unidentified source states, not in the top 15, would substantially skew the findings of this report.

This report finds substantial differences in the rate that states supply interstate crime guns. It also finds strong associations between the absence of five key gun regulations and the likelihood that a state exports crime guns at high rates. It does not appear that any of the methodological considerations or limitations on access to data have a substantial effect on those findings. Nonetheless, the conclusions could be bolstered by further analysis when, and if, additional data is made available.

For more information on the data used in this report, please see:

Raw trace data reports for 2006 and 2007, on a state by state basis, are available at the Mayors Against Illegal Guns website: http://www.mayorsagainstillegalguns.org/html/trace/analysis.shtml

NICS data, as provided to Mayors Against Illegal Guns by the FBI, is available at: http://www.mayorsagainstillegalguns.org/trace/NICS

Crime data, as compiled by the FBI Uniform Crime Reports, is available at: http://www.fbi.gov/ucr/cius2007/index.html

Police officers killed data, as compiled by the FBI Law Enforcement Officers Killed and Assaulted Reports, is available at: http://www.fbi.gov/ucr/ucr.htm#leoka

## APPENDIX II: UNDERSTANDING HOW AN ATF CRIME GUN TRACE WORKS



Law enforcement recovers a gun at a crime scene.







The recovering law enforcement agency identifies the gun's make, model, and serial number and reports this information to ATF.



ATF checks the serial number of the recovered gun against its records of multiple handgun sales and the records of out-of-business federally licensed dealers and some records gathered from dealers who are under special scrutiny. If these checks of internal records do not produce any results, ATF will contact the gun manufacturer and then the wholesaler to identify where the gun was originally sold. ATF then contacts the retailer who sold the gun to identify the first person who purchased the gun.







In order to identify the first purchaser, the retailer manually checks the federal form 4473, which is the federal background check form that all prospective purchasers must complete in order to buy a gun from a federally licensed dealer (FFL). Gun dealers are required to keep the completed 4473 forms on file for 20 years after each purchase. From these forms, the retailer provides the purchaser's identification information to local law enforcement.



With the identification of the first purchaser, ATF and local law enforcement can then investigate the relationship of the buyer to the crime, identifying possible links between the source and the crime.

# APPENDIX III: MAPS SHOWING THE PRIMARY RECOVERY LOCATIONS OF GUNS FROM THE TEN STATES WITH THE HIGHEST EXPORT RATES

### WEST VIRGINIA AS A SOURCE STATE:
5 STATES THAT RECEIVED THE MOST CRIME GUNS FROM WEST VIRGINIA IN 2007



The numbers of guns originating from West Virginia are indicated in red.

KEY

■ Source State
■ Top 5 States Where Source Guns Ended Up

### MISSISSIPPI AS A SOURCE STATE:
5 STATES THAT RECEIVED THE MOST CRIME GUNS FROM MISSISSIPPI IN 2007



The numbers of guns originating from Mississippi are indicated in red.

KEY

■ Source State
■ Top 5 States Where Source Guns Ended Up

## SOUTH CAROLINA AS A SOURCE STATE:
### 5 STATES THAT RECEIVED THE MOST CRIME GUNS FROM SOUTH CAROLINA IN 2007



The numbers of guns originating from South Carolina are indicated in red.

KEY
- Source State
- Top 5 States Where Source Guns Ended Up

## KENTUCKY AS A SOURCE STATE:
### 5 STATES THAT RECEIVED THE MOST CRIME GUNS FROM KENTUCKY IN 2007



The numbers of guns originating from Kentucky are indicated in red.

KEY
- Source State
- Top 5 States Where Source Guns Ended Up

## ALABAMA AS A SOURCE STATE:
### 5 STATES THAT RECEIVED THE MOST CRIME GUNS FROM ALABAMA IN 2007



The numbers of guns originating from Alabama are indicated in red.

KEY
- Source State
- Top 5 States Where Source Guns Ended Up

## VIRGINIA AS A SOURCE STATE:
### 5 STATES THAT RECEIVED THE MOST CRIME GUNS FROM VIRGINIA IN 2007



The numbers of guns originating from Virginia are indicated in red.

KEY
- Source State
- Top 5 States Where Source Guns Ended Up

## GEORGIA AS A SOURCE STATE:
### 5 STATES THAT RECEIVED THE MOST CRIME GUNS FROM GEORGIA IN 2007



The numbers of guns originating from Georgia are indicated in red.

KEY
- Source State
- Top 5 States Where Source Guns Ended Up

## INDIANA AS A SOURCE STATE:
### 5 STATES THAT RECEIVED THE MOST CRIME GUNS FROM INDIANA IN 2007



The numbers of guns originating from Indiana are indicated in red.

KEY
- Source State
- Top 5 States Where Source Guns Ended Up

## NEVADA AS A SOURCE STATE:
### 5 STATES THAT RECEIVED THE MOST CRIME GUNS FROM NEVADA IN 2007



The numbers of guns originating from Nevada are indicated in red.

KEY
- Source State
- Top 5 States Where Source Guns Ended Up

## NORTH CAROLINA AS A SOURCE STATE:
### 5 STATES THAT RECEIVED THE MOST CRIME GUNS FROM NORTH CAROLINA IN 2007



The numbers of guns originating from North Carolina are indicated in red.

KEY
- Source State
- Top 5 States Where Source Guns Ended Up

# ENDNOTES

[1] See, *e.g.*, Wintemute, Garen. "Gun Shows Across a Multistate American Gun Market: Observational Evidence of the Effect of Regulatory Policies." *Injury Prevention 2007* 13: 150-156; Webster, Daniel. "Association between Regulations and Oversight of Firearm Dealers and Gun Trafficking." Paper presented at the annual meeting of the *American Society of Criminology*, Atlanta Marriott Marquis, Atlanta, Georgia, Nov 14, 2007, accessed at http://www.allacademic.com/meta/p201895_index.html; Cohen, Jacqueline & Ludwig, Jens. "Policing Crime Guns." in *Evaluating Gun Policy: Effects on Crime and Violence*, edited by Jens Ludwig and Philip Cook (Brookings Institution Press, 2003).

[2] See, *e.g.*, Lott, John. More Guns, Less Crime: Understanding Crime and Gun Control Laws (The University of Chicago Press, 2000); Dugan, Mark, Hjalmarsson, Randi & Jacob, Brian. "The Effect of Gun Shows on Gun Related Deaths: Evidence from California and Texas." Working Paper Accessed 10/2/2008 at http://www.closup.umich.edu/research/workingpapers/papers/gunshows-sept08-final.pdf.

[3] For a government account of the Iron Pipeline in a gun trafficking case, see, *e.g.*, US Attorney for the Northern District of Georgia Press Release 2/21/08, accessed at http://www.usdoj.gov/usao/gan/press/2008/02-21-08.pdf. For an academic account of the Iron Pipeline, see, *e.g.*, Wintemute, Garen. "Where Guns Come From: The Gun Industry and Gun Commerce." *The Future of Children* 2002: Volume 12: 2: p.64.

[4] Department of Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives. *Following the Gun: Enforcing Federal Law Against Firearms Traffickers.* Washington, DC; Department of the Treasury, 2000, Foreword.

[5] Law enforcement can ask ATF to trace any gun. The vast majority of these trace requests involve guns that are linked to crimes. For example, an ATF study of New York City gun trace data determined that more than 99% of traced guns were recovered at a crime scene or otherwise connected to crime. U.S. Department of the Treasury, Bureau of Alcohol, Tobacco & Firearms. "Crime Gun Trace Reports (2000) New York," published July 2002, p.9, available at http://www.atf.gov/firearms/ycgii/2000/cityreports/newyorkcity.pdf.

[6] It is unusual, for example, for a single person to be the first retail purchaser of five guns that are recovered in separate crimes. There may be an innocent explanation, such as the buyer was a gun collector whose collection was stolen. But trace data could also identify buyers with more sinister motives: perhaps the buyer is an illegal trafficker or perhaps he is an illegal straw purchaser who earns money as a stand-in for persons who are legally prohibited from buying guns. Likewise, it is unusual for a dealer to be consistently identified as the retail source of guns that are recovered in several different crimes. According to ATF data, in a given year, 85% of gun dealers are not associated with a single trace. In fact, just 1% of gun dealers will be the sources of 57% of guns recovered in crimes. U.S. Department of Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives. *Commerce in Firearms in the United States.* Washington, D.C.: Department of the Treasury, 2000, p.23-24.

[7] Department of Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives. *Following the Gun: Enforcing Federal Law Against Firearms Traffickers.* Washington, DC; Department of the Treasury, 2000, p.8.

[8] *Id.* p. 23.

[9] These reports include trace data specific to each recovery state, including the total number of crime guns recovered and traced, the top 15 crime gun source states for each recovery state, and a breakdown of recovered guns by firearm type (*i.e.*, pistols, revolvers, rifles, etc.). The reports provide information about guns recovered and traced in 2006 and 2007. For all the original data in the form it was released by ATF, please visit http://www.mayorsagainstillegalguns.org/html/trace/trace.shtml. Also please note that, in referencing states, this report includes the District of Columbia, unless otherwise noted. The District of Columbia is treated as a "state" for the purposes of federal gun law. 18 U.S.C. § 921 (a) (2).

[10] Department of Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives. *Following the Gun: Enforcing Federal Law Against Firearms Traffickers.* Washington, DC; Department of the Treasury, 2000, p.23.

[11] See, *e.g.*, Iowa Admin. Code § 661-91.4 (3). There are a number of methodological issues of note with NICS data. First, NICS checks are done only once per transaction. A person who purchases 10 guns in a single transaction will yield only one NICS check. Second, a number of states use the NICS system as a way of conducting background checks for the application and renewal of gun permits. Meanwhile, some other states do background checks on permit applicants with systems other than NICS. See, e.g., Michigan Comp. Laws 28.425(b). At least one state, Kentucky, appears to have recently started doing monthly NICS checks on its concealed carry permit holders in the summer of 2006. These monthly checks have dramatically inflated Kentucky's NICS check numbers. See Kimberlin, Joanne. "In Virginia, firearms aren't a tough sell." The Virginian-Pilot, March 3, 2008. Accessed at http://hampton-roads.com/2008/03/virginia-firearms-arent-tough-sell. Also, there are some states that that use the NICS system for background checks on gun purchases in the secondary market, such as at gun shows. See, *e.g.*, N.Y. Gen. Bus. Law § 896 (a). In short, there are some inconsistencies in how NICS checks are used by states. For all these reasons, NICS data serves as only a rough proxy for the gun sales occurring in each state.

[12] The two remaining states with the highest export rates, when controlling for population, remain among the 14 states with the highest export rates, when controlling for NICS checks.

[13] The four remaining states with the lowest export rates, when controlling for population, remain among the 17 states with the lowest export rates, when controlling for NICS checks.

[14] Department of Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives. *Following the Gun: Enforcing Federal Law Against Firearms Traffickers.* Washington, DC; Department of the Treasury, 2000, p.12.

[15] 27 C.F.R. § 478.100.

[16] Department of Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives. *Following the Gun: Enforcing Federal Law Against Firearms Traffickers.* Washington, DC; Department of the Treasury, 2000, p.17.

[17] California: Cal. Penal Code §§ 12072 (d), 12082; District of Columbia: D.C. Code Ann. §§ 7-2501.01, 7-2502.03, 7-2505.01, 7-2505.02; Rhode Island: R.I. Gen. Laws §§ 11-47-35-11-47-35.2.

[18] Connecticut: Conn. Gen. Stat. § 29-33c; Pennsylvania: 18 Pa. Cons. Stat. §§ 6111(b), 6111(c), 6111(f)(1), (2); Maryland: Md. Code Ann., Pub. Safety §§ 5-101(r), 5-124, 5-130(j). Maryland also requires universal background checks for all assault rifle sales.

[19] Illinois: 430 Ill. Comp. Stat. 65/3, 65/3.1; New York: N.Y. Gen. Bus.

Law §§ 895-897; Colorado: Colo. Rev. Stat. § 12-26.1-102; Oregon: Or. Rev. Stat. §§ 166.432-166.441.

[20] Unless otherwise noted, the export rates relied upon in this part of the report are controlled for population.

[21] Some states, such as New Jersey and Michigan, require all gun sellers, including unlicensed private sellers, to inspect a purchase permit from all prospective buyers. See, e.g., Mich. Comp. Laws § 28.422 (5); N.J. Stat. Ann § 2C: 58-3(b); N.J. Admin. Code § 13:54-1.3. Some states, such as New York and Michigan, also allow for an additional form of law enforcement oversight of gun sales by giving local law enforcement discretion in the issuance of purchase permits, should background checks reveal that an applicant has a troubling history, e.g., multiple misdemeanor convictions, even if that history would not be an absolute bar under federal law. See, e.g., N.Y. Penal Law § 400.00(1)(b), (g); Mich. Comp. Laws §§ 28.422(3), 28.425(7)(n).

[22] Hawaii: Haw. Rev. Stat. §§ 134-2, 134-13; Illinois: 430 Ill. Comp. Stat. 65/1-65/15a; Massachusetts: Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E, 131P; New Jersey: N.J. Stat. Ann. § 2C: 58-3.

[23] California: Cal. Penal Code §§ 12701(b)(8), 12800-12808; Connecticut: Conn. Gen. Stat. §§ 29-33, 29-36f - 29-36i; Iowa: Iowa Code §§ 724.15 – 724.20; Michigan: Mich. Comp. Laws §§ 28.422, 28.422a; New York: N.Y. Penal Law §§ 400.00- 400.01; North Carolina: N.C. Gen. Stat §§ 14-402 – 14-404; Rhode Island: R.I. Gen. Laws §§ 11-47-35 – 11-47-35.1.

[24] Department of Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives. Following the Gun: Enforcing Federal Law Against Firearms Traffickers. Washington, DC; Department of the Treasury, 2000, p.41 (based on a study by Cook, Philip & Jens Ludwig, Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use, Summary Report, Police Foundation, Washington, D.C., 1996). Also, an analysis of 2007 ATF data showed that more than 30,000 went missing from gun dealer inventories during that year. Bureau of Alcohol, Tobacco, Firearms and Explosives. FFL Compliance Inspections: Fact Sheet. Washington, DC; Department of Treasury, June 2008, accessed at http://www.atf.gov/press/factsheets/0608-factsheet-ffl-inspections.pdf.

[25] Connecticut: Conn. Gen. Stat. § 53-202g; Massachusetts: Mass. Gen. Laws Ch. 140, § 129C; Michigan: Mich. Comp. Laws § 28.430; New Jersey: N.J. Stat. Ann. § 2C:58-19; New York: N.Y. Penal Law § 400.10; Ohio: Ohio Rev. Code Ann. § 2930.20(A)(5), (B); Rhode Island: R.I. Gen. Laws § 11-47-48.1.

[26] District of Columbia: D.C. Code Ann. §§ 7-2502.08(1)(A), 7-2502.09(4).

[27] Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State and Selected Local Gun Laws, Legal Community Against Violence (LCAV), 2008, p. 11-14, details the case law surrounding preemption in these states.

[28] California: Cal. Gov't Code §§ 53701, 53701.5, Cal. Penal Code § 12026(b); Nebraska: Neb. Rev. Stat. Ann. § 69-2401, Neb. Rev. Stat. Ann. § 69-2425, Neb. Rev. Stat. Ann. §§ 14-102, 15-255, 16-227, 17-556.

[29] 18 U.S.C. § 923(g)(1). Exceptions include a search warrant and other special circumstances.

[30] Bennett, Brian, "Turning a Blind Eye to Gun Dealers," Time, http://www.time.com/time/nation/article/0,8599,1618392,00.html, May 8, 2007. While the once every 17 year figure is the most recent public statement by ATF about its average inspection rate, other unpublished

accounts provided to Mayors Against Illegal Guns suggest that by 2008, the inspection rate has increased to once every eight or nine years. Nonetheless, such a rate of inspection is still far off from ATF's target of inspecting gun dealers at least once every three years.

[31] Vernick, Jon, Webster, Daniel, Bulzacchelli, Maria, & Mair, Julie, "Regulation of Firearm Dealers in the United States: An Analysis of State Law and Opportunities for Improvement." Journal of Law, Medicine, & Ethics (Winter 2006): p.3-6.

[32] Data on gun exports are necessarily incomplete because ATF has not released full data on guns that cross state lines before they are recovered in crimes. ATF reports on crime guns recovered in each state provide data only on the top 15 out-of-state sources, along with a total number of guns for which a source state was identified. If, therefore, state X exports only a few crime guns to state Y, ATF will not report the number of exports because state X will not be among the top 15 sources to state Y, and we cannot include those guns in state X's export total. ATF only omits a specific source state, however, for 19.5% of crime guns. Due to such omissions, the total number of exported guns shown in the table does not equal the total number of imported guns shown in the table. For a further description of this discrepancy, please see the section entitled "Other Methodological Considerations" in Appendix I of this report.

[33] The export rates relied upon in this section of the report controlled for population.

[34] Crime rates are based on 2007 FBI Uniform Crime Reports, http://www.fbi.gov/ucr/cius2007/index.html, unless otherwise noted. Please note that 2007 FBI Uniform Crime Reports (UCR) do not provide gun murder data for the District of Columbia. This report therefore used 2005 gun murder data provided by the the federal Centers for Disease Control and Prevention (CDC) in its gun murder rate calculations for the District of Columbia.

[35] Fatal Shooting Rates are based on the 2000-2007 FBI Law Enforcement Officers Killed and Assaulted Reports, http://www.fbi.gov/ucr/ucr.htm#leoka. This figure only includes felonious shootings of police officers in all 50 states and the District of Columbia. It does not include accidental fatal shootings of police officers, suicides or non-felonious fatal shootings of police officers.

[36] U.S. Department of Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives, Commerce in Firearms in the United States, Washington, DC, U.S. Department of Treasury, February 2000, p.32. In fact, the ATF noted in April 2008 that "the most important piece of information of a traced firearm, other than the purchaser, is the Time to Crime statistic." April 3, 2008 press release from ATF New York Field Division, accessed at http://www.atf.gov/press/2008press/field/040308ny_atf_shares_state_tracedata.pdf.

[37] Department of Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives. Commerce in Firearms in the United States. Washington, D.C.: Department of the Treasury, 2000, p.23-24.

[38] 2007 ATF State Trace Data Reports, available at http://www.mayorsagainstillegalguns.org/html/trace/trace.shtml