# Exhibit 103

Author's personal copy

Journal of Urban Health: Bulletin of the New York Academy of Medicine
doi:10.1007/s11524-012-9681-y
© 2012 The New York Academy of Medicine

# Interpreting the Empirical Evidence on Illegal Gun Market Dynamics

Anthony A. Braga, Garen J. Wintemute, Glenn L. Pierce, Philip J. Cook, and Greg Ridgeway

**ABSTRACT** *Thousands of Americans are killed by gunfire each year, and hundreds of thousands more are injured or threatened with guns in robberies and assaults. The burden of gun violence in urban areas is particularly high. Critics suggest that the results of firearm trace data and gun trafficking investigation studies cannot be used to understand the illegal supply of guns to criminals and, therefore, that regulatory and enforcement efforts designed to disrupt illegal firearms markets are futile in addressing criminal access to firearms. In this paper, we present new data to address three key arguments used by skeptics to undermine research on illegal gun market dynamics. We find that criminals rely upon a diverse set of illegal diversion pathways to acquire guns, gun traffickers usually divert small numbers of guns, newer guns are diverted through close-to-retail diversions from legal firearms commerce, and that a diverse set of gun trafficking indicators are needed to identify and shut down gun trafficking pathways.*

**KEYWORDS** *Gun violence, Gun policy, Gun trafficking, Injury prevention*

Gun violence remains a serious problem in the USA, with some 10,226 gun homicide victims[1] and 326,090 victims[2] of nonfatal violent firearms crimes in 2009. Rates of murder, robbery, and aggravated assault are much higher in large cities than elsewhere.[1,2]

Much of this serious violence is generated by guns that end up in the wrong hands. Research suggests that only about one of every six firearms used in crime was obtained legally[3] and that most serious gun violence is committed by a relatively small number of very active criminals.[4–7] Clearly, the USA has a large problem with the illegal acquisition of guns by high-risk individuals who should not have access to them. One broad class of gun-control policy instruments are those designed to influence who has access to different kinds of firearms.[8] The intuitive notion here, which is backed by empirical evidence,[9,10] is that if we could find a way to keep guns out of the hands of "bad guys" without denying access to the "good guys," then gun crimes would fall without infringing on the legitimate uses of guns.

Braga is with the School of Criminal Justice, Rutgers University, Newark, NJ, USA; Braga is with the Program in Criminal Justice Policy and Management, Harvard University, Cambridge, MA, USA; Wintemute is with the Violence Prevention Research Program and Department of Emergency Medicine, University of California, Davis, CA, USA; Pierce is with the School of Criminology and Criminal Justice, Northeastern University, Boston, MA, USA; Cook is with the Sanford School of Public Policy, Duke University, Durham, NC, USA; Ridgeway is with the RAND Corporation, Santa Monica, CA, USA.
Correspondence: Anthony A. Braga, School of Criminal Justice, Rutgers University, Newark, NJ, USA. (E-mail: anthony_braga@harvard.edu)

Published online: 06 June 2012

Author's personal copy

In maintaining legal firearms commerce for law-abiding citizens, there is the serious problem of preventing illegal transfers. That task is currently being done very poorly indeed. Loopholes in existing gun laws weaken accountability of licensed gun dealers and private sellers; this facilitates illegal transfers by scofflaw licensed gun dealers, generates difficulty in screening out ineligible buyers, and, most important, results in a vigorous and largely unregulated secondary market—gun sales by private individuals—in which used guns change hands.[8] Nonetheless, those who support "supply-side" measures directed at reducing access by those who are legally proscribed suggest that it is feasible to increase the transaction costs in illegal firearm markets and thereby reduce the prevalence of illegal gun possession by criminals.[11–14]

Much of the evidence in support of supply-side interventions comes from recent analyses of Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) firearm trace data and firearms trafficking investigations that indicate some percentage of the guns used in crime were recently diverted from legal firearms commerce.[4,13–21] Firearm tracing makes it possible, at least in principle, to determine the chain of commerce for a firearm from the point of import or manufacture to the first retail sale (and beyond, in states that maintain records of gun purchases).[22] Unfortunately, not all firearms can be traced and firearm trace data have some widely recognized limits.[11,23] The National Academies' Committee to Improve Research Information and Data on Firearms, however, suggests that the validity of conclusions drawn from firearm trace data research depends on the care taken in the application and analyses of these data.[23]

Among the main findings of these research studies are: (1) New guns are recovered disproportionately in crime;[11,13,16–18,22] (2) Some licensed firearm retailers are disproportionately frequent sources of crime guns; these retailers are linked to more guns traced by ATF than would be expected from their overall volume of gun sales;[24] (3) Under test conditions, significant proportions of licensed retailers and private party gun sellers will knowingly participate in illegal gun sales;[25,26] (4) On average, about one third of guns used in crime in any community are acquired in that community, another third come from elsewhere in the same state, and a third are brought from other states;[11,13,16–18,22] (5) There are longstanding interstate trafficking routes for crime guns, typically from states with weaker gun regulations to states with stronger ones. The best known of these is the "Iron Pipeline" from the Southeast to the Middle Atlantic and New England.[11,13,16–18,22]

Research studies based on analyses of firearm trace data and firearms trafficking investigations have been greeted with a healthy dose of skepticism. Gun rights groups, such as the National Rifle Association,[27,28] and certain academics, most notably Professor Gary Kleck of Florida State University,[29,30] suggest that firearm trace data cannot be properly used to understand the illegal supply of guns to criminals. These criticisms are then followed by arguments that regulatory and enforcement efforts designed to disrupt illegal firearms markets are futile in addressing criminal access to firearms. In this paper, we present new data to address three key arguments used by skeptics to undermine research on illegal gun market dynamics and associated approaches to limit the illicit acquisition of guns diverted from legal firearms commerce.

## THE SCALE OF GUN TRAFFICKING: BIG-TIME ORGANIZED GUN RUNNERS OR DIVERSE BLEND OF ILLEGAL DIVERSION PATHWAYS?

One strategy used to refute a proposition is to setup a "straw man" argument. To "attack a straw man" is to create the illusion of having refuted a proposition by

Author's personal copy

substituting a superficially similar proposition (the "straw man"), and refuting it, without ever having actually refuted the original position.[31] In a recent *UCLA Law Review* article, Kleck and Wang set forth the straw man argument that advocates of the proposition that criminals acquire guns through a variety of gun trafficking pathways assert a central role for high-volume gun traffickers, usually involving corrupt or negligent licensed dealers, in supplying guns to criminals.[30] Kleck and Wang define a large-scale trafficker as a person who sold 100 guns or more annually and then incorrectly characterize the picture presented by ATF and selected scholars of illegal gun markets as relatively organized markets with significant numbers of high-volume traffickers.[30]

The academic studies that Kleck and Wang used as reference do not argue, however, that organized high-volume gun traffickers dominate illegal transfers of guns to criminals. Rather, these studies highlight the importance of a flow of new guns to criminal consumers and implicate close-to-retail diversions from licensed dealers as generating a noteworthy minority of recovered crime guns.[4,11–13,15,19,20,32] ATF publications make the case that gun trafficking enterprises of many shape and sizes play an important role in supplying crime guns to criminals and do not claim that high-volume, organized gun runners are the modal form of illegal gun diversion in the USA.[16–18]

In fact, two ATF reviews of gun trafficking investigations explicitly contradict the organized big-time gun trafficking characterization. A 1999 report examining 314 ATF gun show trafficking investigations found that 41% of these cases involved the diversion of 10 or fewer firearms.[33] A 2000 report examining 1,530 gun trafficking investigations made by ATF between July 1, 1996 and December 31, 1998 found that 61% of the cases involved the diversion of 20 or fewer firearms and concluded that most but not all gun trafficking investigations involve relatively small number of firearms.[17]

When the existing data are considered, Kleck and Wang's definition of a large-scale trafficker as someone who has been caught illegally selling 100 or more firearms seems to be set artificially high to support their straw man argument. Guns are durable goods that can remain in the hands of criminals for many years. The illegal diversion of 20, 30, or 50 guns to criminals by one individual in 1 year generates a considerable public safety threat. Clearly, putting this individual out of business and shutting down this more modest pipeline of guns to criminals would increase public safety. It is also important to consider that the number of guns diverted in ATF gun trafficking investigation is based solely on diversions known to the case agent. A gun trafficker caught selling 10 guns to a violent street gang would not be classified as a large-scale gun trafficker under Kleck and Wang's definition. However, this gun trafficker may have been funneling hundreds of guns to street gangs for many years without being caught by ATF doing so. Kleck and Wang's use of this definition to make generalizations about the structure of illegal gun markets is highly problematic given the limits of ATF gun trafficking investigation data.

## New Data

To shed additional insights on the nature of illegal gun market dynamics, we present new data on 2,608 ATF gun trafficking investigations made between January 1, 1999 and December 31, 2002. These data were collected by ATF as an update to their 2000 *Following the Gun* report on gun trafficking in the USA. Following the same methodology, a survey instrument was sent to each of ATF's 23 field divisions requesting information for each gun trafficking investigation made by special agents and the disposition of investigations referred by ATF for prosecution during the

Author's personal copy

study time period. Because these analyses are based on a survey of ATF special agents, they reflect what ATF encountered and investigated in trafficking investigations. As such, they do not necessarily reflect typical criminal diversions of firearms or the typical acquisition of firearms by criminals. A majority of these investigations were still ongoing at the time the survey was distributed; only 40.5% were fully adjudicated (1,056 of 2,608).

Table 1 presents the gun trafficking pathways identified by ATF agents in the 2,608 investigations. Many gun trafficking investigations involved close-to-retail diversions of guns from legal firearms commerce. A plurality (41.3%) of investigations involved straw purchasing from federally licensed dealers (Federal Firearms Licensees—FFLs), with firearms trafficked by straw purchasers either themselves or indirectly. The investigations also involved trafficking by unlicensed sellers (27.1%), by FFLs (6.3%), illegal diversions at gun shows (7.1%), and illegal diversions from flea markets and other secondary market sources (4.3%). When aggregated into one category, firearms stolen from FFLs, residences, and common carriers were involved in 22.5% of the trafficking investigations.

Though 117,138 firearms were involved altogether, most investigations involved relatively small numbers of guns (Table 2).The mean and median were 45.3 and eight guns per case, respectively; a majority involved 10 firearms or less. Large-scale trafficking was uncommon; roughly 5% of investigations involved more than 100 firearms. One investigation involved 30,000 firearms. Different trafficking pathways were associated with large differences in the numbers of guns linked to the investigations (Table 3). FFLs, including pawnbrokers, have access to a large volume of firearms, so a corrupt licensed dealer can illegally divert large numbers of firearms. FFL traffickers were involved in only 6% of investigations, but had by far the largest mean number of guns per case (348.7) and accounted for 47% of all guns linked to the investigations (55,088 of 117,138 firearms). If the investigation involving 30,000 diverted firearms is excluded as an outlier, the mean number of guns per case involving a corrupt FFL drops to only 159.8, this further suggests that large-scale trafficking is a rare event. With or without the investigation involving 30,000 diverted firearms, the median number of guns per FFL trafficker case was 50.

**TABLE 1   Gun trafficking pathways identified in ATF investigations**

| Source | Number | Percent |
|---|---|---|
| Firearms diverted by straw purchaser or straw purchasing ring | 1,078 | 41.3 |
| Firearms diverted by unregulated private sellers[a] | 708 | 27.1 |
| Prohibited persons lying and buying firearms | 364 | 14.0 |
| Diverting firearms stolen from residence or vehicle | 338 | 13.0 |
| Diverting firearms stolen from FFL | 239 | 9.2 |
| Diverting firearms at gun shows | 185 | 7.1 |
| Firearms diverted by licensed dealer, including pawnbroker | 163 | 6.3 |
| Diverting firearms at flea markets, auctions, or want ads and gun magazines | 112 | 4.3 |
| Diverting firearms stolen from common carrier | 28 | 1.1 |
| Diverting firearms over the Internet | 22 | 0.8 |
| Other | 5 | 0.2 |

*N*=2,608

Sum exceeds 100% since investigations may be included in more than one category. Gun trafficking investigations can be very complex and involve a variety of sources of illegal guns

[a]As distinct from straw purchasers and other traffickers

Author's personal copy

**TABLE 2   Number of firearms involved in ATF trafficking investigations**

| Range | Number of investigations | Percent |
|---|---|---|
| <5 | 962 | 36.9 |
| 5–10 | 516 | 19.8 |
| 11–20 | 427 | 16.4 |
| 21–50 | 374 | 14.3 |
| 51–100 | 165 | 6.3 |
| 101–250 | 89 | 3.4 |
| 251 or greater | 54 | 2.1 |
| Unknown | 21 | 0.8 |

$N = 2,608$

## NEW CRIME GUNS: AN INDICATOR OF ILLEGAL GUN DIVERSION OR THEFT?

ATF and academic analyses of firearms trace data typically focus on a critical dimension of the illegal firearms market: the time between a firearm's first sale at retail and its subsequent recovery by a law enforcement agency, most often in connection with a crime ("time-to-crime"). Law enforcement investigators consider a traced firearm with short time-to-crime as possibly having been recently and illegally diverted from a retail outlet.[18] For investigative and tactical purposes, guns with quick time-to-crime offer law enforcement an opportunity to identify illegal gun transfers soon after they occur. Newer guns have also passed through fewer hands, making it much easier for law enforcement to investigate illegal gun trafficking and to mount prosecutions. Records are likely to be more complete and more available; individuals listed on paperwork are easier to find; guns are less likely to have been resold, given away, or stolen; and the chain of transfers to illicit consumers is likely to be shorter.[4]

**TABLE 3   Volume of firearms diverted, by trafficking pathway**

| Source | N (%) | N firearms | Mean | Median |
|---|---|---|---|---|
| Firearms diverted by straw purchaser or straw purchasing ring | 1,074 (41.5) | 38,032 | 35.4 | 12 |
| Firearms diverted by unregulated private sellers[a] | 697 (26.9) | 38,734 | 55.6 | 7 |
| Prohibited persons lying and buying firearms | 364 (14.1) | 8,192 | 22.5 | 3 |
| Diverting firearms stolen from residence or vehicle | 337 (13.0) | 7,758 | 23.0 | 5 |
| Diverting firearms stolen from FFL | 238 (9.2) | 6,694 | 28.1 | 16 |
| Diverting firearms at gun shows | 182 (7.0) | 30,471 | 167.4 | 72 |
| Firearms diverted by licensed dealer, including pawnbroker | 158 (6.1) | 55,088 | 348.7 | 50 |
| Diverting firearms at flea markets, auctions, or want ads and gun magazines | 110 (4.3) | 23,164 | 210.6 | 69 |
| Diverting firearms stolen from common carrier | 28 (1.1) | 994 | 35.5 | 14 |
| Diverting firearms over the Internet | 21 (0.8) | 6,335 | 301.7 | 50 |

$N$ investigations = 2,587
$N$ firearms included = 117,138
Sum exceeds 100% since the investigations may be included in more than one category. Table excludes 22 cases with an unknown number of diverted firearms
[a]As distinct from straw purchasers and other traffickers

Author's personal copy

Franklin Zimring first documented the disproportionate representation of new guns among those recovered by the police.[20] More recently, Kennedy, Piehl, and Braga analyzed comprehensive trace data for firearms recovered from Boston youth ages 21 and under between 1991 and 1995.[4] They documented that 26% of traced firearms were recovered in crime within 2 years of their first retail sale and none of these new guns were recovered in the possession of the first retail buyer.[4] Cook and Braga analyzed comprehensive trace data on handguns recovered in 32 US cities participating in ATF's YCGII program in 1999.[11] They found that 32% of traced handguns were recovered within 3 years of their first retail purchase and only 18% of these new guns were recovered in the possession of the first retail buyer. A California study of crime guns recovered from adolescents and young adults in 1999 emphasized the link between time to crime and policies regulating the purchase of firearms.[22] A time-to-crime of less than 3 years was observed for 17.3% of guns recovered from persons younger than 18 years, who cannot purchase guns themselves, but 34.6% of guns recovered from persons ages 21–24.

While survey research highlights the importance of theft and secondary market acquisitions in supplying adult criminals and juveniles with guns,[34–36] these studies also suggest a fairly substantial role, either direct or indirect, for retail outlet sales in supplying criminals with guns. About 27% of state prisoners in a US Bureau of Justice Statistics survey said they acquired their most recent handgun from a retail outlet.[36] Similarly, Wright and Rossi reported that 21% of male prisoners had acquired their most recent handgun from a licensed dealer.[35] Sheley and Wright found that 32% of juvenile inmates had asked someone, typically a friend or family member, to purchase a gun for them in a gun shop, pawnshop, or other retail outlet.[34] This purchasing arrangement, known as a "straw purchase," is likely to result in relatively short times-to-crime. All three survey studies also find that "street" and "black market" sources are important sources that may well include traffickers who are buying from retail outlets and selling on the street.[4,21] Regrettably, since surveys of criminals only ask about proximate sources of illegal firearms, these research studies are limited in establishing the role of gun trafficking in criminal acquisition of firearms as they do not ascertain how guns are diverted into these "street" and "black market" sources.[4,21]

Critics suggest that a short average time-to-crime among traced crime guns in a given area may serve more as an indirect indicator of property crime, especially burglary, in that area rather than of widespread firearms trafficking. Kleck and Wang, for instance, argue that many guns move quickly into criminal hands because they were stolen from their owners shortly after retail purchase.[30] Their basic thesis is that new crime guns are usually stolen because (1) criminals prefer new guns to older guns and (2) criminals who steal guns disproportionately retain newer guns for later personal use.

Unfortunately, there is little survey research evidence to support their overall thesis. Neither the Wright and Rossi survey of convicted felons[35] nor the Sheley and Wright survey of juvenile inmates and high school students[34] asked whether respondents preferred new guns. In those studies, convicted felons and juveniles report as some of the "very important" characteristics of desirable handguns that they be accurate, untraceable, well made, easy to shoot, concealable, easy to get (both the gun and ammunition), and have sufficient firepower.[34,35] Stolen guns that had these traits were more likely to be kept by criminals who stole them. These desirable traits are not linked to the age distinctions (such as a time-to-crime of 3 years or less) that most academic analyses of firearm trace make in characterizing a crime gun as new or old.[4,11,13,14]

Author's personal copy

There is some evidence that certain criminal consumers do have preferences for newer guns. In Boston, interviews with youthful probationers in the mid-1990s revealed that they preferred modern and stylish semiautomatic pistols that were "new in the box."[4] The preference for newer semiautomatic pistols that were still in the original packaging by the manufacturer arose from "street wisdom" that older, less expensive firearms may have a "body" on it, and they wished to avoid being caught and charged with crimes they did not personally commit.[4] Similarly, in Maryland, Webster et al. found that older teens had a strong preference for guns which were new due to their concerns about being linked through ballistics imaging to crimes that may have been committed with secondhand guns.[37] New pistols that are still in the original packaging are usually acquired through FFLs or directly from manufacturers rather than stolen from their owners' residences. To the extent that gun age may matter, desire for new guns in the manufacturers' original packaging would support the perspective that close-to-retail diversions are an important source of guns for certain young criminals.

Theft risk varies by source and type of firearm. Residential theft is the most frequent source of stolen guns for gun thieves, with between 500,000 and 600,000 guns stolen from residences each year.[32,38] This yearly estimate dwarfs the number of stolen guns reported in ATF investigations involving thefts from FFLs (6,694 guns) and common carriers (994 guns) over a 4-year period (Table 3). To understand the age distribution of stolen guns, therefore, it is important to examine the age distribution of privately held guns in gun-owning households.

The most detailed national survey on the private citizen gun stock is the National Survey of the Private Ownership of Firearms (NSPOF) conducted in 1994.[38] According to the NSPOF, the average firearm was acquired 13 years earlier and 22.4% were acquired within the past 2 years.[38] Only 64% of firearms acquired within the past 2 years were reported as new when the respondent first acquired it. This suggests that, if recovered in crime, 14.3% of firearms in private hands $(0.224 \times 0.64 \times 100)$ would be traced by ATF and characterized as having a time-to-crime of 2 years or less. In contrast, analyses of ATF trace data for crime guns recovered in 32 US cities participating in the YCGII program in 1999 found that the median time-to-crime for all recovered crime guns was 5.7 years, and 25.9% of crime guns had a time-to-crime of 2 years or less.[39] If property crime, especially burglary, were the predominant generator of traced crime guns with short time-to-crime, the age distribution of the private gun stock would more closely match the age distribution of recovered crime guns.

Finally, there is a growing body of evaluation evidence that challenges Kleck and Wang's assertion that most short time-to-crime guns are obtained through theft by demonstrating a clear link between interventions focused on retail sales practices and subsequent reductions in new guns recovered in crime. In Detroit and Chicago, the number of guns recovered within a year of first retail sale from someone other than the original purchaser was sharply reduced after undercover police stings and lawsuits targeted scofflaw retail dealers.[40] In Boston, a gun market disruption strategy focused on the illegal diversion of new handguns from retail outlets in Massachusetts, southern states along Interstate 95, and elsewhere resulted in a significant reduction in the percentage of handguns recovered in crime by the Boston Police Department that were new.[14] In Milwaukee, the number of guns recovered within a year of first retail sale from someone other than the original purchaser dramatically decreased after voluntary changes in the sales practices of a gun dealer

Author's personal copy

that received negative publicity for leading the USA in selling the most guns recovered by police in crime.[41]

**New Data**

Another way to examine the role of theft in supplying guns to criminals is to compare the age distribution of crime guns and the age distribution of legally owned firearms in the USA over a similar time period. If theft is the predominant source of crime guns, the age distribution of crime guns should follow the age distribution of legally owned firearms—the broader pool of guns at risk for theft. Thieves stealing firearms would not know the age of the firearms they were stealing; the selection of guns would resemble a random selection process with respect to the age of the stolen guns. Conversely, if close-to-retail illegal diversions of guns from licensed dealers contribute to the supply of guns to criminals, then the age distribution of crime guns should be disproportionately concentrated among newer guns relative to the age distribution of all legally owned firearms. The following new data are used to examine this proposition.

We compare the age distribution of 85,511 crime guns recovered by US law enforcement agencies and traced by ATF in 1999 to the production history of all firearms manufactured or imported for sale in the USA between 1979 and 1998. We selected 1999 because this was the first year that ATF traced all firearms to their first retail sale regardless of the length of time between the first retail sale and subsequent recovery in crime. ATF also maintains data on the number of firearms produced by US manufacturers, the number of firearms exported by US manufacturers, and the number of firearms imported by foreign manufacturers for a given calendar year.[42] (The data were collected through a National Institute of Justice grant to study illegal gun markets that was completed prior to the 2003 passage of the Tiahrt Amendment that greatly restricts the use of such data by non-law enforcement personnel.[43])

Table 4 presents annual aggregate handgun data for 1979–1998. Firearm manufacturers produced an average of 2,264,000 handguns for sale each year and 45,275,000 handguns in total. Only 3.8% of these handguns were produced for sale in 1998. However, 17.3% of recovered crime guns in 1999 were first sold at retail in 1998. One-year-old handguns are overrepresented by a factor of nearly 4.6 times when the handgun production history age distribution and time-to-crime distribution are compared.

We fit a binomial regression model to the annual aggregate crime gun recovery data to assess the relationship between the year the gun was manufactured and the probability of it being recovered in crime. As Figure 1 shows, there is a sharp increase in the rate of recovery for guns manufactured after 1994. To allow the model to capture this, we allowed the coefficient on year to change in 1994. The model has the form:

$$\log P(\text{recovered}|\text{year}) = \beta_0 + \beta_1 \text{year} + \beta_2 \text{year} \times I(\text{year}1994). \quad (1)$$

For years prior to 1994, the value of $\exp(\beta_1)-1$ gives the percent increase in the probability of a gun's recovery in crime relative to the prior year. After 1994, $\exp(\beta_1+\beta_2)-1$ gives the percent increase in the probability of a gun's recovery in crime relative to the prior year. Note that this is essentially a logistic regression model; however, we model the log probability rather than the log odds. Since the recovery probabilities are small, the log and the logit are nearly identical.

Author's personal copy

INTERPRETING THE EMPIRICAL EVIDENCE ON ILLEGAL GUN MARKET DYNAMICS

TABLE 4   The age distribution of handguns produced for the US market, 1979–1998, and the time-to-crime age distribution of traced handguns recovered in crime

| Year | Annual $N$ handguns produced for US market | % Distribution of handguns produced | % Distribution of traced 1999 crime handguns first retail sale |
|------|------|------|------|
| 1979 | 2,171 | 4.80 | 1.54 |
| 1980 | 2,449 | 5.41 | 1.88 |
| 1981 | 2,591 | 5.72 | 1.92 |
| 1982 | 2,708 | 5.98 | 1.84 |
| 1983 | 2,219 | 4.90 | 1.80 |
| 1984 | 1,905 | 4.21 | 1.94 |
| 1985 | 1,684 | 3.72 | 1.97 |
| 1986 | 1,538 | 3.40 | 2.23 |
| 1987 | 1,842 | 4.07 | 2.60 |
| 1988 | 2,236 | 4.94 | 2.97 |
| 1989 | 2,353 | 5.20 | 3.60 |
| 1990 | 2,110 | 4.66 | 4.27 |
| 1991 | 1,941 | 4.29 | 5.29 |
| 1992 | 2,803 | 6.19 | 7.63 |
| 1993 | 3,881 | 8.57 | 9.01 |
| 1994 | 3,324 | 7.34 | 6.86 |
| 1995 | 2,199 | 4.86 | 7.30 |
| 1996 | 1,821 | 4.02 | 8.36 |
| 1997 | 1,773 | 3.92 | 9.70 |
| 1998 | 1,727 | 3.81 | 17.30 |

The annual number of handguns produced for US markets equals the total of the number of handguns produced by US manufacturers, minus the number of firearms exported by US manufacturers to foreign countries, plus the number of handguns imported to the US by foreign manufacturers for a given calendar year. While guns are durable goods, a small number of firearms are removed each year from the private stock of guns due to various forms of depreciation such as confiscation by law enforcement agencies and disposal by owners. Research suggests that some 200,000 guns are confiscated by law enforcement agencies each year and some 36,000 guns are thrown away by their owners each year.[12,34] We ran the same analyses presented here with various adjustments for depreciation; there were no substantive differences in the results of these analyses. These analyses are available upon request from the authors

Numbers are reported in thousands

However, relative rates, which the model in (1) estimates, are generally easier to understand than relative odds. Under the hypothesis that the age of the gun is unrelated to its probability of being recovered, we would expect $\beta_1$ and $\beta_2$ to be 0.

Table 5 shows the parameter estimates. For guns manufactured prior to 1994, the newer guns are more likely to be recovered in crime with each additional year increasing the probability of recovery by 9%. The recovery rate accelerates after 1994; with each additional year, the recovery rate increases by 37%. The curve plotted in Figure 1 shows the model fits closely to the data. This analysis provides strong evidence that the newer guns are disproportionately recovered in crime relative to their prevalence among guns in circulation.

The age distributions of many specific types of crime guns are disproportionately concentrated among newer guns. Table 6 presents overrepresentation ratios for the basic firearm types (handguns, rifles, and shotguns) and for selected manufacturers featured in ATF trace reports as the makers of frequently recovered crime guns.[16,18]





**FIGURE 1.** Guns recovered as a fraction of guns in circulation by year manufactured. *Points* computed from the raw data. The *horizontal line* is what we would expect if the recovered guns were a random sample from the guns in circulation. The *curve* is the fit from the binomial regression model.

Overall, firearms produced in 1998 were overrepresented by a factor of 3.7 times among recovered crime guns that were traced in 1999. Overrepresentation was greater for handguns (ratio of 4.6) than for rifles (2.2) or shotguns (2.8). Selected semiautomatic pistols generally had higher overrepresentation ratios than did revolvers. The highest overrepresentation ratio for guns included in the analysis (6.0) was seen for Bryco Arms pistols.

## SHOULD OBLITERATED SERIAL NUMBERS BE THE ONLY INDICATOR OF GUN TRAFFICKING?

ATF and gun trafficking researchers suggest that an obliterated serial number on a recovered crime gun is a very strong indicator of illegal gun trafficking.[4,11,14,18,39] Since defacing the serial numbers on a firearm is itself a crime, obliterated serial numbers establish that a criminal possessed the gun at some time and also constitute strong evidence that some past possessor wanted to obstruct tracing and prevent the firearm from being linked to a past transfer. Despite the obvious advantage in avoiding detection by law enforcement agencies, most gun traffickers do not obliterate the serial numbers on their guns. In the 2,608 ATF gun trafficking investigations described earlier, agents reported violations of Federal Law 18 USC § 922(k) barring possession of and commerce in firearms with obliterated serial

**TABLE 5   Estimates of the average year-to-year percent increase in recovery rates**

|  | Model parameter | Estimate (%) | 95% CI |
|---|---|---|---|
| Before 1994 | $\exp(\beta_1)-1$ | 9.3 | 9.0%, 9.5% |
| After 1994 | $\exp(\beta_1+\beta_2)-1$ | 37.1 | 36.3%, 37.9% |

Years of data=20
Null deviance=34,542.8, with *df*=19
Model deviance=1,345.9, with *df*=17

Author's personal copy

**TABLE 6   Overrepresentation ratios for selected firearm types and manufacturers**

| Firearm | % Distribution produced in 1998 | % Distribution 1999 crime guns first sold in 1998 | Overrepresentation ratio |
|---|---|---|---|
| Firearms, all manufacturers | 4.4 | 16.3 | 3.7 |
| Handguns, all manufacturers | 3.8 | 17.3 | 4.6 |
| Rifles, all manufacturers | 5.3 | 11.8 | 2.2 |
| Shotguns, all manufacturers | 4.5 | 12.7 | 2.8 |
| Selected revolvers | | | |
| Colt revolvers | 5.6 | 10.5 | 1.9 |
| Smith & Wesson revolvers | 1.9 | 6.4 | 3.4 |
| Sturm Ruger revolvers | 6.5 | 11.7 | 1.8 |
| Selected semiautomatic pistols | | | |
| Bryco pistols | 5.7 | 34.0 | 6.0 |
| Lorcin pistols | 7.1 | 25.3 | 3.6 |
| Smith & Wesson pistols | 4.7 | 19.9 | 4.2 |
| Sturm Ruger pistols | 6.7 | 23.6 | 3.5 |

All figures are rounded to the first decimal place. Over-representation ratios were calculated by dividing the percentage of a particular gun produced for sale in 1998 into the percentage of 1999 traced crime guns of that type that were first sold at retail in 1998

numbers in only 7.8% ($N=203$) of cases. This proportion varied little by the specific trafficking channel involved, except for cases involving trafficking over the Internet (18.2%; Table 7).

The small proportion of obliterated serial numbers may reflect the presence of lax gun laws and weak penalties for making illegal gun sales as well as low risks of detection, arrest, and prosecution for gun trafficking across many jurisdictions in the USA. In these low-risk environments, the obliteration of serial numbers to conceal illegal purchases of firearms may not be necessary. As such, it may not be surprising

**TABLE 7   Firearms diversion channels identified in ATF investigations by reported violations of Federal Law 18 USC § 922(k) barring possession and commerce of firearms with obliterated serial numbers**

| Source | 922(k) violation N reported | % of Channel N |
|---|---|---|
| Firearms diverted by straw purchaser or straw purchasing ring | 45 | 4.2% of 1,078 |
| Firearms diverted by unregulated private sellers[a] | 66 | 9.3% of 708 |
| Prohibited persons lying and buying firearms | 15 | 4.1% of 364 |
| Diverting firearms stolen from residence or vehicle | 10 | 2.9% of 338 |
| Diverting firearms stolen from FFL | 17 | 7.1% of 239 |
| Diverting firearms at gun shows | 12 | 6.5% of 185 |
| Firearms diverted by licensed dealer, including pawnbroker | 10 | 6.1% of 163 |
| Diverting firearms at flea markets, auctions, or want ads and gun magazines | 7 | 6.3% of 112 |
| Diverting firearms stolen from common carrier | 2 | 7.1% of 28 |
| Diverting firearms over the Internet | 4 | 18.2% of 22 |

Sum exceeds 100% since the investigations may be included in more than one category
[a]As distinct from straw purchasers and other traffickers

Author's personal copy

to find low overall rates of serial number obliteration violations in these ATF gun trafficking investigations.

Data on obliterated serial numbers are very limited and must be used with great caution to avoid incorrect conclusions about illegal gun market dynamics. In particular, while obliterated serial numbers are an important indicator of illegal gun trafficking, they are insufficient in themselves; other indicators must also be used to determine whether gun trafficking has occurred. Kleck and Wang, in contrast, use obliterated serial number data as their sole measure to develop a tentative estimate of the trafficking share of crime guns.[30] Based on their own interpretation of published ATF data on crime guns recovered from 46 US cities in 2000,[18] they posit that only 1.6% of handguns with time-to-crime of 1 year or less had obliterated serial numbers. It is important to note that the column of a key ATF table contained information on only 52 handguns.[18] Without any supporting evidence or analytic rationale, Kleck and Wang then argued that some guns with obliterated serial numbers were probably not trafficked and estimated that the trafficked share of crime guns is probably less than 1%.

Kleck and Wang misinterpreted a key ATF table that explored possible links between guns with obliterated serial numbers and multiple handgun sales.[18] To be included in that table, an obliterated serial number gun had to be traced, which requires the serial number to be restored. Many handguns with obliterated serial number cannot be traced, and the guns in the table therefore represent a selective undercount of guns with obliterated serial numbers. Kleck and Wang's estimate is therefore incorrect.

ATF does not report the success rate of serial number restoration attempts; therefore, it is very difficult to make a grounded calculation of the true prevalence of handguns with obliterated serial numbers and a time-to-crime of 1 year. However, since 2,705 handguns with obliterated serial numbers were included in the obliterated serial number section of the ATF report,[18] the 52 handguns with restored serial numbers that form the basis of Kleck and Wang's estimate are almost certainly a sizeable underestimate of the true prevalence of recovered handguns with obliterated serial numbers and short times to crime.

Kleck and Wang also use obliterated serial number data in two exploratory multivariate analyses.[30] The first uses principal components techniques to understand the relationship among various potential gun trafficking indicators, such as median time-to-crime, gun sold by first retail dealer located over 250 miles away, and the percent of recovered guns with obliterated serial numbers. They find that many of their indicators load on factors separate from the factor that mainly reflects the prevalence of guns with obliterated serial numbers; since they regard obliterated serial number guns as a strong trafficking indicator, they conclude that the other indicators must be measuring something other than gun trafficking and are probably not good trafficking indicators.[30] The second analysis uses multiple regression models to examine the causal effects of the percent of recovered guns with obliterated serial numbers on criminal gun possession (measured as the percent of homicides committed with guns), murder rates, robbery rates, and assault rates. They find that the prevalence of obliterated serial number guns is not significantly related to criminal gun possession or violent crime rates.

Unfortunately, the ATF report from which Kleck and Wang collected their obliterated serial number data clearly states that these data were seriously limited: they were reported from just eight cities, did not include long guns, and did not include older guns.[18] The flaws in the data raise serious doubts about the reliability and validity of Kleck and Wang's conclusions.

Author's personal copy

## CONCLUSION

It is important to note that the empirical data used in this article to refute wrong-headed claims by Kleck and Wang on illegal gun market dynamics have some noteworthy limitations. As described earlier, ATF firearms trace data may not be representative of firearms possessed and used by criminals; furthermore, a substantial proportion of recovered firearms cannot be traced to the first known retail sale.[7] ATF gun trafficking investigation data only provide information on gun trafficking investigations that come to the attention of ATF agents.[12] These gun trafficking enterprises may not be representative of broader gun trafficking pathways at work in the USA. The trace- and investigation-based information that results is biased to an unknown degree by these factors. These concerns certainly apply to the trace and investigation data used in the empirical analyses presented here. However, as suggested by the National Research Council's Committee to Improve Research Information and Data on Firearms, these data can provide policy relevant insights on illegal gun market dynamics when conclusions are based on careful analyses that are coupled with clear acknowledgments of the data limitations.[23]

The research presented here identifies three important points about how criminals acquire guns. First, they rely on a diverse set of illegal pathways, including corrupt licensed dealers, unlicensed sellers, straw purchasers, residential theft, and theft from licensed dealers, common carriers, and firearm manufacturers. Organized, large-scale trafficking exists, but it is not predominant. Where they occur, high-volume gun trafficking operations are attractive targets for regulatory and enforcement efforts. (Certain trafficking routes, such as those supplying firearms to large criminal organizations in Mexico, may behave differently.) Second, new guns are disproportionately recovered in crime, suggesting an important role for close-to-retail diversion of guns in arming criminals. Third, given the diversity of channels through which criminals can acquire guns, law enforcement agencies need to consider a variety of gun trafficking indicators that go well beyond whether a crime gun is recovered with an obliterated serial number or not.

Our findings refute three key arguments against the proposition that interventions aimed at curtailing illegal transfers of firearms could be used to good effect in reducing gun availability to criminals and gun crime. The case for a supply-side approach to gun violence is well supported by the empirical evidence on illegal gun market dynamics. To date, however, there is little empirical evidence that such an approach reduces rates of gun crime. We believe that it is time to develop experimental evidence on whether interventions designed to limit illegal transfers of firearms can reduce gun violence.

## REFERENCES

1. US Federal Bureau of Investigation. *Crime in the United States, 2009*. Available at http://www2.fbi.gov/ucr/cius2009. Accessed March 18, 2011.
2. Truman JL, Rand MR. *Criminal victimization, 2009*. Washington: Bureau of Justice Statistics; 2010. NCJ231327.
3. Reiss AJ, Roth J. *Understanding and preventing violence*. Washington: National Academy Press; 1993.
4. Kennedy DM, Piehl AM, Braga AA. Youth violence in Boston: gun markets, serious youth offenders, and a use-reduction strategy. *Law & Contemp Probl*. 1996; 59: 147–196.

Author's personal copy

5. Braga AA. Serious youth gun offenders and the epidemic of youth violence in Boston. *J Quant Criminology*. 2003; 19: 33–54.
6. Braga AA, Hureau DM, Winship C. Losing faith? Police, black churches, and the resurgence of youth violence in Boston. *Ohio St J Crim Law*. 2008; 6: 141–172.
7. Cook PJ, Ludwig J, Braga AA. The criminal records of homicide offenders. *JAMA*. 2005; 294: 598–601.
8. Cook PJ, Braga AA, Moore MH. Gun control. In: Wilson JQ, Petersilia J, eds. *Crime and public policy*. New York, NY: Oxford University Press; 2011: 257–292.
9. Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. *JAMA*. 2001; 285: 1019–1026.
10. Wright MA, Wintemute GJ, Rivara F. Effectiveness of a program to deny legal handgun purchase to persons believed to be at high risk for firearm violence. *Am J Public Health*. 1999; 89: 88–90.
11. Cook PJ, Braga AA. Comprehensive firearms tracing: strategic and investigative uses of new data on firearms markets. *Arizona Law Rev*. 2001; 43: 277–309.
12. Braga AA, Cook PJ, Kennedy DM, Moore MH. The illegal supply of firearms. In: Tonry M, ed. *Crime and justice: a review of research*, vol. 29. Chicago: University of Chicago Press; 2002: 229–262.
13. Pierce GL, Braga AA, Hyatt RR, Koper CS. The characteristics and dynamics of illegal firearms markets: implications for a supply-side enforcement strategy. *Justice Q*. 2004; 21: 391–422.
14. Braga AA, Pierce GL. Disrupting illegal firearms markets in Boston: the effects of operation ceasefire on the supply of new handguns to criminals. *Criminol Publ Pol*. 2005; 4: 717–748.
15. Koper CS. Purchase of multiple firearms as a risk factor for criminal gun use. *Criminol Publ Pol*. 2005; 4: 749–778.
16. Bureau of Alcohol, Tobacco and Firearms (ATF). *Crime gun trace analysis reports (1997): the illegal firearms market in 17 communities*. Washington: Bureau of Alcohol, Tobacco and Firearms; 1997.
17. Bureau of Alcohol, Tobacco and Firearms (ATF). *Following the gun: enforcing federal laws against firearms traffickers*. Washington: Bureau of Alcohol, Tobacco and Firearms; 2000.
18. Bureau of Alcohol, Tobacco and Firearms (ATF). *Crime gun trace analysis (2000): national report*. Washington: Bureau of Alcohol, Tobacco and Firearms; 2002.
19. Moore MH. Keeping handguns from criminal offenders. *Annals*. 1981; 452: 22–32.
20. Zimring FE. Street crime and new guns: some implications for firearms control. *J Crim Justice*. 1976; 4: 95–107.
21. Wachtel J. Sources of crime guns in Los Angeles, California. *Policing*. 1998; 21: 220–239.
22. Wintemute GJ, Romero MP, Wright MA, Grassel KM. The life cycle of crime guns: a description based on guns recovered from young people in California. *Ann Emerg Med*. 2004; 43: 733–742.
23. Wellford C, Pepper JV, Petrie CV, eds. *Firearms and violence: a critical review*. Washington: The National Academies Press; 2005.
24. Wintemute GJ. Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Inj Prev*. 2005; 11: 357–363.
25. Sorenson SB, Vittes KA. Buying a handgun for someone else: firearm retailer willingness to sell. *Inj Prev*. 2003; 9: 147–150.
26. Wintemute GJ. Firearm retailers' willingness to participate in an illegal gun purchase. *J Urban Health*. 2010; 87: 865–878.
27. National Rifle Association. *Firearm traces: The anti-gunners' big lie*. Available at: http://www.nraila.org/Issues/Articles/Read.aspx?id=12&issue=014. Accessed January 2, 2010.
28. Blackman PH. The limitations of BATF firearms tracing data for policymaking and homicide research. In: *Proceedings of the Homicide Research Working Group meetings*,

Author's personal copy

*1997 and 1998*. Washington: National Institute of Justice, US Department of Justice; 1999: 58–113.

29. Kleck G. BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals. *St Louis Univ Publ Law Rev.* 1999; 18: 23–45.

30. Kleck G, Wang S-YK. The myth of big-time gun trafficking and the overinterpretation of gun tracing data. *UCLA Law Rev.* 2009; 56: 1233–1294.

31. Pirie M. *How to win every argument: the use and abuse of logic.* UK: Continuum International Publishing Group; 2007.

32. Cook PJ, Molloconi S, Cole T. Regulating gun markets. *J Crim Law Criminol.* 1995; 86: 59–92.

33. US Department of the Treasury and U.S. Department of Justice. *Gun shows: Brady checks and crime gun traces.* Washington: US Department of the Treasury and US Department of Justice; 1999.

34. Sheley JF, Wright JD. *In the line of fire: youth, guns, and violence in urban America.* New York: Aldine de Gruyter; 1995.

35. Wright JD, Rossi PH. *Armed and considered dangerous.* 2nd ed. New York: Aldine de Gruyter; 1994.

36. US Bureau of Justice Statistics (BJS). *Survey of state prison inmates, 1991.* Washington: Bureau of Justice Statistics, US Department of Justice; 1993. NCJ 136949.

37. Webster DW, Freed LH, Frattaroli S, Wilson MH. How delinquent youth acquire guns: initial versus most recent gun acquisitions. *J Urban Health.* 2002; 79: 60–69.

38. Cook PJ, Ludwig J. *Guns in America: results of a comprehensive national survey on firearms ownership and use.* Washington: Police Foundation; 1996.

39. Bureau of Alcohol, Tobacco and Firearms (ATF). *Crime gun trace analysis (1999): national report.* Washington: Bureau of Alcohol, Tobacco and Firearms; 2000.

40. Webster DW, Zeoli AM, Bulzacchelli MT, Vernick JS. Effects of police stings of gun dealers on the supply of new guns to criminals. *Inj Prev.* 2006; 12: 225–230.

41. Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. *J Urban Health.* 2006; 83: 778–787.

42. Bureau of Alcohol, Tobacco and Firearms (ATF). *Commerce in firearms in the United States.* Washington: US Department of the Treasury; 2000.

43. Pierce GL, Braga AA, Koper CS, et al. *The characteristics and dynamics of gun markets: report submitted to the US National Institute of Justice.* Boston: Northeastern University; 2003.

# Exhibit 104

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, KENNETH PACHOLSKI, KATHRYN TYLER, and MICHAEL HALL, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No: 10-CV-4184 Judge Edmond E. Chang |
| v. | ) ) | |
| THE CITY OF CHICAGO and RICHARD M. DALEY, Mayor of the City of Chicago, | ) ) ) | |
| Defendants | ) ) ) ) | |

## ADDITIONAL DECLARATION OF JOSEPH J. VINCE, JR.

I, JOSEPH J. VINCE, JR., declare, pursuant to 28 U.S.C. § 1746, the following to be true and correct under penalty of perjury:

1.      I am currently the President of Crime Guns Solutions, LLC ("CGS"). CGS is a consultancy that obtains, analyzes and interprets crime-gun data. I founded CGS in 1999. For almost thirty years prior to that, I served as a special agent with the ATF. During my tenure, I held a number of frontline, managerial and policymaking positions, including Chief of the Firearms Enforcement Division and Chief of the Crime Gun Analysis Branch. In this capacity, I worked with members of law enforcement and the firearms industry to research and publish safety and security practices for citizens and industry members.

2.      During my career with ATF and now as a consultant, I have been intimately involved in all aspects of the firearms business—manufacturing, wholesaling and retailing. I have visited numerous manufacturing facilities, audited federally licensed dealers, scrutinized

1

safety and security procedures required of the firearms industry, examined federal, state and local firearms laws, and trained law enforcement and firearms industry personnel.

3.     Among other topics, I am an expert in firearms safety and security, including the use and impact of various safety and security measures, *inter alia*, by law enforcement and the firearms industry. I am also an expert in ATF's processes for inspecting firearms dealers, including the resources necessary and available to perform safety, security and compliance inspections.

4.     I have been retained by the Defendants in the above-captioned matter as an expert witness and submitted a Declaration in Support of the Defendant City of Chicago's Motion for Summary Judgment dated February 25, 2012.

5.     The expert report of Dr. Gary Kleck, disclosed by Plaintiffs on September 30, 2011, contends, among other things, that ATF has sufficient resources to inspect all "real" gun dealers (*i.e.*, those selling more than 50 guns a year) annually. *See* Kleck Rebuttal Report 5. I find Dr. Kleck's presentation of this argument to be both incorrect and misleading.

6.     Between 1993 and 2007, the number of FFLs declined by over half. This reduction was primarily attributable to an increase in licensing fees for FFLs under the Brady Handgun Violence Prevention Act of 1993 ("Brady Bill"). *See* ATF, "Decline in Number of Federal Firearms Licenses," ATF Fact Sheet (June 2008), online at http://www.atf.gov/publications/factsheets/factsheet-decline-in-ffls.html (last visited June 13, 2012). Small-volume license holders were less willing to pay the increased licensing fees than their larger-volume counterparts. As a result, the observed reduction in the number of FFLs between 1993 and 2007 is primarily attributable to the elimination of small-volume license

702362155 11070255

holders. In other words, as the overall number of FFLs decreased over this period, large-volume dealers came to represent a larger proportion of the remaining FFLs.

7. The error in Dr. Kleck's analysis is its reliance on a 1993 statistic for the percentage of FFLs selling more than 50 guns annually. In 1993, this statistic was 7 percent according to Dr. Kleck. Dr. Kleck's analysis, however, applies this 1993 statistics to 2007 data for the number of FFLs to compute the number of "real" gun dealers in 2007. This is a mistake. Because the percentage of large volume dealers changed with (and in relation to) the decrease in the number of all license holders, the 1993 statistic is completely inapplicable to 2007. In 2007, the percentage of FFLs that are large-volume dealers is certainly higher than the 7 percent reported in 1993.

8. Acknowledging that Dr. Kleck has erred in the direction of severely underestimating the number of "real" gun dealers in 2007, it is difficult to calculate exactly how large the error is because ATF has not publicly reported this figure or even the percentage of all FFLs in 2007 that are large-volume dealers. A more accurate methodology than that proposed by Dr. Kleck, however, would be to assume that because large-volume dealers in 1993 were relatively insensitive to increased licensing fees that accompanied the Brady Bill, those that maintained an FFL in 1993, continued to do so in 2007. While it is certainly possible that some large-volume dealers may have lost their licenses or otherwise gone out of business during the 14-year period, it is also possible that others sprung up to fill the void left by so many small-volume dealers leaving the market, leaving the number of large-volume dealers at a relatively constant 19,880. If this figure is accurate, there were more than four times the number of "real" gun dealers than annual ATF compliance inspections of all license holders in 2002 and nearly twice as many "real" gun dealers as inspections in 2007. As I opined in my report (attached to

3

my February 25, 2012 Declaration), ATF simply does not have the resources necessary to provide meaningful oversight to firearms sales.

Dated: June 2 6, 2012                         Further the Declarant Sayeth Not,

By: _____
      Joseph L. Vince, Jr.

# Exhibit 105

# The Washington Post

## Gun dealers often stay in business with new licenses after ATF shuts them down

Advertisement

By David S. Fallis
Washington Post Staff Writer
Tuesday, December 14, 2010; 12:27 AM

About a hundred times a year, regulators strip gun dealers of their licenses for violations of federal law, an extreme step taken only when repeated infractions are deemed a threat to public safety.

But a year-long Washington Post investigation documented about 60 cases since 2003 in which the businesses stayed open, often re-licensed through relatives, employees, associates or newly formed companies.

"We'll just have to play musical licenses," the owner of the Highland Gun Barn in Michigan said when a federal inspector served him with a final notice to surrender his license.

A California sports shop had its license revoked after inspectors from the Bureau of Alcohol, Tobacco, Firearms and Explosives said the 87-year-old owner's repeated violations of gun laws showed she was unable to run a gun business. Before she forfeited her license, the woman's son obtained a permit to sell guns at the same shop. He said he would be at the shop two days a week and that his mother would "exclusively direct all day-to-day business."

A Maryland gun store that ATF said lost track of weapons and failed to do background checks was forced to surrender its license after the owner lost a court battle. Six months later, ATF issued the dealer's wife a license at his old shop in Fallston, Md.

A Georgia gun dealer had its license revoked after ATF said it could not account for hundreds of guns. The dealer's daughter and son-in-law secured their own license to keep the business going.

It is all legal.

"This is the way Congress wrote the law," said James Zammillo, who was with ATF for four decades and served as deputy assistant director of industry operations before retiring this year. "The spirit of the law is that unless the applicant is prohibited, you have to issue a license. There is no discretion."

Because of the secrecy Congress imposed on federal gun records in 2003, the details of inspection violations are typically redacted from public records unless a case ends up in court. When revocations are pursued, the problems can include sales done without background checks, improperly completed forms or missing weapons, one of ATF's chief concerns.

Revoking a gun dealer's license is ATF's most aggressive enforcement action short of criminal prosecution. It is a rare last resort for less than one-quarter of 1 percent of dealers annually. It often follows years of warnings for serious violations and sometimes leads to years of appeals. Although gun dealers complain that ATF harps on clerical errors, the agency says it revokes licenses only when dealers continually fail to comply with gun laws and the violations threaten public safety.

The Post investigation is the first to document the extent of the re-licensing practice, in which about 7 percent of the gun merchants that had licenses revoked continued to operate.

Several merchants involved in the re-licensings told The Post it was the only way to keep their family businesses going.

"This is what we do for a living," said Sandra Mitchell, who secured her own license to sell guns at Gunrunner in Merced, Calif., after the ATF revoked her husband's license.

At the heart of the issue is the fact that the 1968 Gun Control Act treats each new license applicant as a unique entity - even if it is a similarly named company with the same employees. As long as the applicant is a different individual or business entity, ATF cannot consider violations incurred under a former licensee when weighing the new application. Embattled operations can be reborn with a clean slate at the same location trading under the same business name.

To be licensed, applicants at a minimum need to be 21, cannot have been prohibited from owning a gun - as with felons and people with certain disabilities - and must have a fixed address. Companies can apply for licenses, but their principals must meet the restrictions for individuals. Initial fees are $200. Licenses last three years. The agency might spend years in court revoking a

license from a troubled dealer but by law must approve licenses to eligible applicants within 60 days.

Richard Gardiner, a former counsel for the National Rifle Association who has defended many dealers in ATF revocations, said family members, friends or associates who were not directly involved in the old license are legally entitled to their own licenses. "It's not a loophole," he said.

**'A clean slate'**

ATF officials say they do not keep track of how often embattled operations turn to relatives or associates, or set up new companies, for re-licensing in the face of mounting violations or impending revocation. But current and former officials say troubled dealers have increasingly resorted to the tactic.

"Our field people get very frustrated," said Teresa Ficaretta, deputy assistant director for enforcement programs and services at ATF. "Based on the phone calls I get from the field, this is happening more often."

The agency, she said, has been working to train attorneys and inspectors how to identify and legally block these cases, but it is extremely difficult and time-consuming. Denied applications, like revocations, have also led to lengthy appeals and court fights.

"If you're being cited by ATF and you feel you're about to lose your license, you can simply get another person to get a new license and you can transfer your inventory to that person," said Michael Bouchard, former ATF assistant director for field operations. "You don't have to change location. You can keep the same business name. It's like starting the business all over. You can still be working there. For the new licensee, it's a clean slate."

The Post filed public-information requests to obtain previously undisclosed ATF computer files tracking more than a thousand enforcement actions since 2003 and databases of licensed dealers. It compared the data sets to identify more than 75 gun dealers nationwide that had lost or given up licenses at premises where re-licensing occurred.

The Post studied thousands of pages of regulatory files and other public records to determine if the old and new licensees involved relatives or had other people in common. Inspectors sometimes described how inventory would be transferred, sold or simply given as a gift from the embattled licensee to the person securing the new license.

The new applicants were often family members or newly created businesses with similar-sounding names. In some cases, new applicants told ATF they took steps to remove the person responsible for prior problems. In other cases, former licensees were listed as employees, consultants, shareholders or landlords.

In Indianapolis, as inspectors moved to take away the license from Michael Hilton at Popguns Inc., his wife, Carolyn, applied for her own. That was the only way to keep the business going, she told inspectors in 2005.

"Mrs. Hilton stated that she and her husband sat at the kitchen table one evening in September 2004 and discussed the problems he was having," inspectors wrote. "It was at that time that she decided she was going to apply for her own license so that she could operate the business. Mr. and Mrs. Hilton completed the [application] together and Mrs. Hilton signed."

She told ATF that the shop would still have "many of the same employees." Her husband would no longer sell guns, she said, but would sell accessories on-site.

Michael Hilton said ATF initially denied her application, arguing that she would have the same inventory, the same building and the same customers and that he would be involved. Hilton said his wife appealed, arguing that her application was a different legal entity. A hearing officer concurred.

"You are a whole new entity," Michael Hilton said. "By law, they have nothing to stand on."

He said that his wife set up her own checking account and that he no longer handles day-to-day operations or gun logs. But he still helps at the store and works at an office on-site running his wife's Internet business. He said he occasionally helps sell guns but does not handle the federal paperwork.

"I could put in 50 or 60 hours a week if I wanted to. I could open and close the place," he said. "There is nothing anyone can do about it."

ATF has since warned Carolyn about violations at the shop, now called the Family Indoor Shooting Range. Michael Hilton said a more recent inspection found only minor problems.

In Houston, ATF moved in 2008 to revoke the dealer's license of Bailey's House of Guns after citing violations in five inspections dating back to 1992. The owner, Theresa Bailey, sued ATF but dropped the case, saying she had "agreed to transfer its firearms business." ATF revoked her company's license and issued a new one to a new corporation started by the gun store's

Gun dealers often stay in business with new licenses after ATF shuts ...     http://www.washingtonpost.com/wp-dyn/content/article/2010/12/13...

bookkeeper and another employee. The new corporation would buy the inventory and lease space at the gun store from Bailey's company, ATF records show.

Bailey's company, inspectors wrote, would still sell "ammunition and firearms accessories" at the shop, actions that do not require a license. A spokesperson for Bailey's declined to comment.

Some dealers who lost licenses stayed in business because they already had a second license. The second license was in a personal name or at a business in another location and was transferred to the site of the revoked license, records show.

Gun dealers said that in some cases re-licensing operations were the only way to save family livelihoods from overzealous inspectors. In Duncan, Okla., Ken Murphree ran Murfs Guns with a license in his name and that of his father and a brother. Murphree said the shop had enjoyed a good relationship with ATF until a new inspector visited in 2003. The inspector, Murphree said, wrote them up for "100 percent just clerical nothings" and pushed for revocation.

ATF supervisors concurred with the inspector's findings, pointing to violations dating to 1991. Murphree said he appealed inside ATF, to no avail. "I am not a rogue dealer," he said.

A lawyer, Murphree said, told him he would lose if he fought the action in court. That's when a third brother applied for his own license and bought the shop. Murphree said he still helps manage the day-to-day business.

"Our lives have changed, but we are still in business," he said.

**Revocations can take years**

ATF's 600 inspectors are charged with inspecting 60,000 retail dealers throughout the country. Each dealer is inspected on average about once every eight years. ATF revokes about 110 licenses a year. In another 160 cases a year, dealers voluntarily surrender their licenses when told they are at risk of revocation. The Post identified about 15 businesses where dealers surrendered licenses but operations continued under different licenses.

Once a revocation is authorized, the process can take years to resolve. A dealer has 15 days from receiving notice to request a hearing. More than six months or even a year may pass before the hearing officer rules and ATF issues a final notice of revocation. After that, a dealer has 60 days to sue the agency in federal court and have the case heard anew.

The agency typically allows dealers to stay in business while the process plays out.

In more than a dozen cases, records indicate ATF settled suits filed by embattled licensees. Although exact terms were often undisclosed, dealers admitted violations, surrendered their license and dropped the suit. In response, ATF issued new licenses - sometimes to the same entity they sought to put out of business.

When revocations were decided by judges, ATF has typically prevailed. Even then, a few of those dealers secured new licenses to sell guns through family members.

At one, Bel Air Gun & Pawn in Fallston, Md., inspectors said in 2005 that they found a litany of problems - including more than 120 missing firearms and eight sales without background checks. Nationally, unaccounted-for firearms are a huge problem for ATF. Inspectors have found 113,642 guns missing during their visits to 3,847 inspections since 2005.

Charles David Scheuerman, who held the license for Bel Air, asked an inspector "if the findings of the inspection were unfavorable, could he put the business in his wife's name to avoid any problems," officials wrote. The inspectors told him that "changing ownership to avoid consequences with no real change in ownership is considered hidden ownership, is not allowable."

That October, ATF moved to revoke his license. For nearly two years, Scheuerman fought ATF internally and in court, challenging ATF's findings as "inadvertent, technical record-keeping errors." In 2007, a judge upheld the revocation.

Soon, Scheuerman's wife incorporated her own company, Bel Air Gun Supply & Pawn, and applied for her own license.

Inspectors met with her at the shop to go over her application. She told ATF that she had not officially worked at her husband's shop but "at times helped out with gun shows." They asked if "she actually had acquired" the business assets. She gave them a draft contract. Guns "would be sold on consignment and she would pay her husband as the firearms are sold," they wrote. ATF gave her a license.

"She was not involved in running the business," said Gardiner, who represented Scheuerman in the suit. "The law required them to issue her a license, and they followed the law."

In an interview, Shelly Scheuerman said she had been a stay-at-home mom and the idea to apply was hers. "I agreed not to have

him as an employee," she said. "He can be here; he just can't work here."

Scheuerman said that, since she has been licensed, ATF has inspected her every year, which is "what happens when you win." Her husband, she noted, went five years between inspections. She said ATF wrote her a warning last year for violations and she is in the middle of another month-long inspection.

"None of the other dealers in Maryland have to go through what I go through," she said.

Nationally, ATF inspections have uncovered new violations at about a third of the shops that were revoked and re-licensed. At about a fourth, problems were serious enough that ATF warned the new operators that violations could lead to revocation.

Gun laws differ from federal alcohol laws, under which regulators can more fully take into account an individual's direct or indirect ties to previous businesses that were under scrutiny.

"When I was in the ATF and we investigated someone to be an alcohol wholesaler, you looked at their sources of funds," Zammillo said. "You had the right to have them produce bank accounts and other material to show where they got the funds to go into business."

That, he said, helped verify if the business was a front for someone else.

It is different with gun dealers. ATF, for the most part, must accept at face value what gun license applicants tell them about planned business structures and who is in control.

"If we get a new application for the same premises for someone who has the same last name as the licensee that was revoked, the red flag is going to go up," Ficaretta said. "We will investigate to determine if it really is a sham and if the new business is the old business risen from the ashes."

If the agency can gather evidence to prove the new business was created to circumvent a licensing restriction, then ATF can hold the applicant responsible for prior violations and deny the application.

But that evidence is very hard to get. "More and more applicants have access to very good legal counsel," she said. "They know what they need to say and what they need to do to get a license."

In some cases, inspectors in the field pushed the agency to reject new licensees when changes appeared to be only cosmetic, but they were overruled by hearing officers or supervisors.

In Liberty, Ky., the new applicant was Sherry Ritter, the wife of the man who had held the license for the Gun & Gold Connection. After she applied for her own license in 2004, ATF assigned an inspector to make sure "there is no hidden ownership." The inspector recommended a denial, writing that Ritter "does not solely own this business" and that "her husband would partially or fully direct the management, policies and day to day operations."

She appealed within ATF, and an agency hearing officer ruled in her favor.

When she met with an inspector to go over her application, she presented a notarized bill of sale. It showed the transfer of "all firearms owned by the seller [Charles Ritter], to Sherry Ritter for $1.00, other good and valuable consideration, specifically including funds previously invested by Sherry Ritter, and in further consideration of love and affection which Charles Ritter holds for Sherry Ritter, his wife."

*Staff writer Sari Horwitz and staff researcher Julie Tate contributed to this report.*

View all comments that have been posted about this article.

**Post a Comment**

View all comments that have been posted about this article.

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

**Sponsored Links**

**Get up to $250 to spend on board**
Norwegian Cruise Line. Book by June 22
www.ncl.com

**Argosy University**
Apply to Argosy University Today - Now in 19 Locations Nationwide.
visit.argosy.edu

**DeVry University**
95+ Campuses & Globally-Connected Online Degree Programs. Enroll Now.
www.DeVry.edu

**Buy a link here**

© 2010 The Washington Post Company

# Exhibit 106

80

**SPECIAL FEATURE**

# Reducing firearm violence: a research agenda

Janet Weiner, Douglas J Wiebe, Therese S Richmond, Kristen Beam, Alan L Berman, Charles C Branas, Rose A Cheney, Tamera Coyne-Beasley, John Firman, Martin Fishbein, Stephen Hargarten, David Hemenway, Robert Jeffcoat, David Kennedy, Christopher S Koper, Jean Lemaire, Matthew Miller, Jeffrey A Roth, C William Schwab, Robert Spitzer, Stephen Teret, Jon Vernick, Daniel Webster

Injury Prevention 2007;13:80–84. doi: 10.1136/ip.2006.013359

In the United States, firearms are involved in tens of thousands of deaths and injuries each year. The magnitude of this problem prompted the National Academy of Sciences (NAS) to issue a report in 2004 detailing the strengths and limitations of existing research on the relationship between firearms and violence. In response, a multidisciplinary group of experts in the field of firearms and violence formed the National Research Collaborative on Firearm Violence. The Collaborative met for 2 days in June 2005 to (1) critically review the main findings of the NAS report and (2) define a research agenda that could fill research and data gaps and inform policy that reduces gun-related crime, deaths and injuries. This article summarizes the Collaborative's conclusions and identifies priorities for research and funding.

Recent reports have highlighted the global impact of non-conflict-related firearm violence.[1][2] One study estimated that the global burden of firearm mortality is between 196 000 and 229 000 annually.[2] The US has the highest rate of firearm violence among industrialized democracies, with firearms accounting for the majority of homicides and suicides. In 2003, nearly 30 000 people in the US died from gunshot wounds, including 16 859 by suicide and 11 599 by homicide.[3] More than 65 000 people sustained non-fatal gunshot injuries.[4] The Federal Bureau of Investigation (FBI) estimates that in 2003, firearms were used in 67% of murders, 42% of robberies and 19% of assaults reported to police.[5] These statistics describe the significant impact of firearm-related violence, but do not specify the effects of firearms on violence. How many deaths, injuries and crimes would have occurred if a gun were not present at the site of the crime? How often is a gun used to deter crime or avert injury? What interventions can reduce firearm-related violence?

To inform policy makers about the existing evidence, a distinguished committee of the National Academy of Sciences (NAS) issued a landmark report in December 2004, *Firearms and violence: a critical review*.[6] The report assessed the strengths and limitations of the existing research on gun violence, and recommended ways to improve the empirical basis for policy discussions.[7] The report indicates that considerable gaps in research and data make it difficult to draw cause-and-effect relationships between firearms and violence. Further, methodological problems hamper efforts to evaluate policies and to gain consensus on effective strategies to lower gun crime and violence.

As researchers, we may agree or disagree with aspects of the report's conclusions, and still accept the challenge to build the empirical foundation of the violence-prevention field. With funding from the Joyce Foundation, we formed the National Research Collaborative on Firearm Violence, which met for 2 days in June 2005. Coordinated by the Firearm & Injury Center (FICAP) at the University of Pennsylvania, the Collaborative includes 27 researchers who attended a 2-day meeting in Philadelphia, Pennsylvania, USA and invitations to 23 others who could not attend. The Collaborative comprises scientists and practitioners from many disciplines—including criminologists, economists, epidemiologists, lawyers, nurses, physicians and political scientists—most with an enduring track record in the violence-prevention field. Our goal is to identify ways to fill the gaps between data and research to inform policy that reduces gun-related crime, deaths and injuries.

Members of the Collaborative reviewed the NAS report in detail, and formed six workgroups structured around the report's major findings. Table 1 summarizes the major NAS recommendations (the full report can be viewed at http://nap.edu/books/0309091241/html). Each workgroup discussed one or more chapters of the report, including firearms and suicide, deterrence and defense, restricting access, firearm injury prevention programs, and criminal justice interventions. Additionally, the entire collaborative addressed the need for better data and better access to data on firearm violence. Each discussion focused on three points: (1) important questions within each topic; (2) accuracy and comprehensiveness of the NAS recommendations, and other evidence to be considered; and (3) next steps to move the science forward.

The workgroup leaders summarized each group's discussions before the entire Collaborative, which discussed and refined them. Areas of agreement and disagreement were clarified, although no attempt was made to reach

See end of article for authors' affiliations

Correspondence to:
Ms Janet Weiner, Leonard Davis Institute of Health Economics, University of Pennsylvania, 3641 Locust Walk, Philadelphia, PA 19104-6218, USA; weinerja@mail.med.upenn.edu

Accepted
16 December 2006

**Abbreviations:** CDC, Centers for Disease Control and Prevention; FBI, Federal Bureau of Investigation; NAS, National Academy of Sciences; NIBRS, National Incident-Based Reporting System

| Table 1 | National Academy of Sciences' recommendations |
|---------|-----------------------------------------------|
| **Chapter** | **Recommendations** |
| Firearms and suicide | The committee cannot determine whether these associations (between gun ownership, criminal violence and suicide) demonstrate causal relationships. The committee recommends support of further individual-level studies of the link between firearms and both lethal and non-lethal suicidal behavior |
| Deterrence and defense | Accurate measurement on the extent of defensive gun use is the first step for beginning serious dialogue on the efficacy of defensive gun use in reducing injury and crime. For such measurement, the committee recommends that a research program be established to (1) clearly define what is being measured, (2) understand inaccurate response in the national gun use surveys, and (3) apply known methods or develop new methods to reduce reporting errors to the extent possible |
| Restricting access to firearms | It is simply not known whether it is actually possible to shut down illegal pipelines of guns to criminals nor the costs of doing so...the committee recommends that work be started to think carefully about possible research and data designs to address these issues |
| Firearm-injury-prevention programs | In light of the lack of evidence, the committee recommends that firearm-violence-prevention programs should be based on general preventive theory, that government programs should incorporate evaluation into implementation efforts, and that a sustained body of empirical research be developed to study the effects of different safety technologies on violence and crime |
| Criminal justice interventions | The committee recommends that a sustained, systematic research program be conducted to assess the effect of targeted policing and sentencing aimed at firearms offenders |

complete consensus. The entire group then focused its recommendations and identified research priorities, as summarized in the following.

## DATA AND DATA ACCESS

The NAS report noted that inadequate data and inadequate access to existing data, are among the most critical barriers to understanding gun violence. The report recommended that the federal government support a systematic program of data collection on firearms and violence, including emerging data systems on violent events such as the National Violent Death Reporting System[i] and the National Incident-Based Reporting System (NIBRS).[ii] The report also noted the need for better data on firearm markets, ownership and use.

The workgroup strongly agreed with the NAS report, and identified data sources that remain unutilized or underutilized for research. It noted that more data are not necessarily better data—for example, the NIBRS might be more useful if it were redesigned to collect key data on a sample of violent incidents, rather than attempting large-scale data collection on all incidents.

The workgroup acknowledged that some gun owners and dealers have concerns about confidentiality and the use of data in the public domain. Recently, these concerns prompted broad statutory and funding restrictions to data that had previously
.......................................................................

iNVRDS is a state-based monitoring system of all violent deaths. Since 2002, the Centers for Disease Control and Prevention (CDC) has funded 17 states to implement National Violent Death Reporting System.

iiNIBRS represents a modernization of the FBI's Uniform Crime Reporting summary system. Participating law enforcement agencies report data to the FBI on criminal incidents involving 46 specific offenses, with detailed information on the incident, victim(s), offender(s) and arrests. About 23 states, fully or partially, participate in NIBRS. Federal grant funds to help localities and states implement NIBRS have been unavailable since 2001.

been used in research, such as gun-tracing data (which track the sales history of guns recovered by police).[iii] Tracing data enable law enforcement to determine the first retail seller and purchaser of guns used in crimes. The data are vital to understand how criminals obtain guns and are critical in evaluating policies designed to reduce the access of guns to criminals.

With safeguards, the Collaborative believes that qualified researchers should have access to data that have clear research purposes (such as date of death, often withheld in mortality data sources). The Collaborative makes the following recommendations:

- Federal agencies, such as the Department of Justice and the Department of Health and Human Services, should develop protocols that allow researchers access to data while protecting legitimate concerns about confidentiality. Successful models already exist. For example, the Committee on Vital and Health Statistics (Department of Health and Human Services' public advisory body) is well versed in developing protocols to protect health-related information. Members of the Collaborative are willing to work with regulatory and law enforcement agencies to develop these protocols.

- With protocols in place, Congress should restore access to gun-tracing data. At a minimum, Congress should authorize the Bureau of Alcohol, Tobacco, Firearms, and Explosives to resume sharing the trace data with researchers. In addition, it should restore funding for the Youth Crime Gun Interdiction Initiative of the ATF. Youth Crime Gun Interdiction Initiative funded participating cities to comprehensively trace crime guns and improve information about illegal sources of firearms. More than 60 cities participated in the program before it ended in 2005.

## FIREARMS AND SUICIDE

The NAS report reviewed a wealth of observational studies linking suicide and firearms at aggregate levels, and found a clear association between firearms and gun suicide. It concluded, however, that the evidence did not credibly demonstrate that the association was causal, because of data and methodological limitations.

The NAS report also described many case–control studies of firearms and suicide but again concluded that data and methodological problems seriously limit the application of these studies. The report recommended further individual-level, longitudinal studies of the link between firearms and suicide.

The workgroup acknowledged the challenges of establishing causality, but believed that the accumulated evidence supports a causal relationship between firearm availability and suicide. The magnitude of the statistical associations between firearm availability and suicide, the consistency of findings over multiple studies in different populations, and the reality that a firearm greatly increases the risk that a suicide attempt will be lethal, all point to a causal connection. Nevertheless, significant questions remain about the interplay between impulsivity, suicidal intent and the substitution of means used to attempt suicide.

The Collaborative recommends the following steps to improve understanding of the relationship between firearms and suicide:
.......................................................................

iiiThe 2005 Consolidated Appropriation Act (PL 108–447) prohibited federal funds from being used "to disclose part or all of the contents of the Firearms Trace System database maintained by the National Trace Center of the Bureau of Alcohol, Tobacco, Firearms, and Explosives" except to law enforcement officials.

- Form interdisciplinary methodological teams to address and better model the causality and reverse causality between exposure to firearms and suicide. The key question is whether possession of a firearm directly increases the risk of suicide, or whether suicidal intent increases the risk of gun possession.
- Continue to collect and analyze national surveys that measure exposure to firearms and suicide (eg, CDC's Behavioral Risk Factor Surveillance System annual survey).
- Conduct prospective, longitudinal studies that have sufficient statistical power to analyze exposure to firearms and suicide (eg, the planned National Children's Study, which will follow more than 100 000 children from birth until the age of 21 years).
- Use qualitative research techniques to more fully understand statistically determined causal mechanisms of suicide, including exposure to firearms.

## DETERRENCE AND DEFENSE

The NAS report considered the defensive and deterrent effects of firearms. To what extent do firearms allow individuals to defend themselves against criminals and deter crime? The report concluded that no accurate measurement of defensive gun use upon which to base policy discussions exists. It considered the effects of "right-to-carry" laws that allow qualified adults to carry concealed handguns, and found contradictory results in existing studies. The NAS report recommended that new methods and analytic techniques be used to understand the net social costs or benefits of defensive gun use and concealed weapons.

The workgroup agreed that existing evidence was unlikely to provide answers to these issues, and recommends the following approaches:

- Reframe the research question about "defensive gun use", which is poorly defined and understood. Researchers should ask about gun use within a broader array of strategies designed to defend against or deter crime, such as avoiding particular areas or installing burglar alarms. The central policy question is: under what circumstances are these strategies more or less effective than obtaining guns for self-defense?
- Measure all instances of non-sporting gun use, instead of relying on individual perceptions of whether the use was in self-defense. Other sources, such as data from the criminal justice system and video technology, should be used to validate and supplement self-reported gun use.
- Explore the effects of passage of "right-to-carry" laws on social norms and behavior. Understanding where, by whom, and by how much these laws actually prompt gun-carrying behavior and change criminals' perceptions, may help clarify the existing contradictory results.

## RESTRICTING ACCESS

The NAS report reviewed interventions to reduce access to firearms by criminals and others not legally qualified to purchase a gun. These interventions include tough regulation of federal firearm licensees, one-gun-a-month laws, gun buy-back programs, and enforcement of laws against illegal buyers or sellers. It concluded that efforts to shut down the pipeline to illegal markets are based on speculation rather than research. Existing evidence does not answer critical questions about whether the illegal pipeline can be shut down, the costs of

doing so, and whether criminals substitute one source or type of gun with another.

The workgroup agreed that criminal diversion of firearms after the point of sale is a huge problem, but believed that the report conflated illegal access with illegal use. The group suggested a multilevel research strategy to better understand how certain "high-risk" users (eg, felons, people convicted of misdemeanors, people about to be sentenced) acquire guns, whether or not they are proscribed purchasers. Researchers should:

- Investigate why and how high-risk users obtain and use handguns. Promising research strategies include qualitative studies of trafficking investigations, ethnographic studies of violent neighborhoods, end-to-end tracing of samples of crime guns and quantitative analyzes of tracing and law enforcement data from network, spatial and temporal perspectives.
- Study how laws restricting access are implemented and enforced. This is a critical but usually omitted step in evaluating the effects of laws.
- Study comprehensive regulatory, enforcement and public education strategies rather than discrete policies that, by themselves, may be insufficient to reduce the availability and acquisition of firearms.

## FIREARM-INJURY-PREVENTION PROGRAMS AND TECHNOLOGY

The NAS report reviewed the evidence on widely disseminated prevention programs, especially those directed at youth, and found that few had been adequately evaluated for their effects on attitudes or behavior. The report also touched on a variety of safety innovations, (eg, locking technology and "smart gun" features) found little evidence on their efficacy or cost-effectiveness, and noted that some technologies may have dangerous unintended consequences. The NAS report recommended that firearm-injury-prevention programs be based on general prevention theory, and that evaluation be incorporated as programs are implemented.

The workgroup agreed with most of the report's assessments about injury-prevention programs, and debated whether the evidence about the utility of certain technologies such as personalized weapons was persuasive. The workgroup recommends the following steps:

- Use pilot studies and qualitative techniques to understand the determinants of individual behavior, especially among adolescents. The roles of social norms, networks, and neighborhood conditions need to be more fully understood, so that interventions target appropriate behaviors.
- Broaden the scope of prevention research beyond the individual gun owner or user. Prevention research should investigate the actions and motivations of people representing all entities connected to firearms, including gun manufacturers, gun retailers and community members, to study determinants of their behaviors regarding guns, and to inform theory-based prevention programs.
- Develop and evaluate interventions that target both environmental-level and individual-level factors related to gun ownership and use.
- Conduct pilot studies to evaluate the efficacy of firearm technologies, including non-lethal technologies, and their potential for use in particular markets. This research might be carried out in countries that already have greater use of these technologies (eg, Australia or South Africa).

## CRIMINAL JUSTICE INTERVENTIONS

The NAS report reviewed the effectiveness of criminal justice interventions such as gun courts, enhanced sentences for criminal firearm use, and problem-oriented policing. The report found that a number of policing strategies and sentencing enhancements had shown some success, but criticized their quasi-experimental study designs. It recommended that a sustained, systematic research program be conducted, using more rigorous methods such as randomized experiments or pooled time-series cross-sectional studies.

The workgroup believed that the evidence for certain interventions, such as problem-oriented policing strategies in Boston and Indianapolis, USA, was limited but compelling. Although many questions about the mechanisms by which the interventions reduce gun violence remain unanswered, the success of individual programs argues for replication in other communities. Further, the group believed that the nature of many community-level interventions precludes randomization, thereby making the NAS recommendations to conduct randomized trials impractical.

The Collaborative suggests a research strategy that can disentangle the effects of different aspects of the most successful and most sustainable criminal justice interventions, and recommends the following approaches:

- Conduct qualitative studies with offenders to better understand how risk perception and group norms affect gun-related behavior.
- Create innovative and rigorous study designs and identify standards of evidence that are suitable to evaluate evolving programs and community-based research. For example, complementing area-level studies with offender-level data may allow a more detailed examination of crime displacement and deterrence.
- Define and measure intermediate outcomes (eg, attitudes or behavior of criminals and criminal justice professionals) to evaluate progress toward the goal of reducing gun injury and death.

## OVERARCHING THEMES

Over the course of 2 days, the Collaborative discussed how to build upon the NAS report and move the field forward. Several themes emerged that span the individual discussion topics. These themes and each workgroup's recommendations, form a research agenda for reducing firearm violence. The themes include:

- *The centrality of data collection, data quality, and data access.* It is tempting to call for more data to answer almost any scientific question. But in the case of firearms and violence, we lack basic data on gun ownership, storage, use and markets. We lack access to gun-tracing data that can help illuminate the pathway from manufacture to criminal use. We lack reliable, valid data that would clarify the protective, defensive and deterrent effects of firearms. Standards for conducting research with sensitive information work well in other fields and should be applied to research on firearms.
- *The importance of qualitative research.* At their core, questions about the link between firearms and violence involve human decisions, motivation and behavior. Ultimately, interventions to reduce firearm violence must target the factors that influence individual, group or institutional behavior. Qualitative techniques, such as ethnographic study of select

populations, provide a level of detail beyond statistical analyses and a window into social processes. Research that combines quantitative and qualitative techniques offers the best opportunity to understand the complex web-of-causation that underlies gun violence.

- *The necessity of partnerships between university-based researchers and community-based professionals in law enforcement, criminal justice and public health.* Many of the Collaborative's recommendations require a convergence of language, ideas and methods between researchers and "practitioners". Investing in these partnerships is critical to building the empirical basis for policy decisions. Although these partnerships present practical challenges, the benefits far outweigh the challenges in terms of framing questions jointly, sharing resources and developing evidence-based interventions.
- *The need for formative research and pilot studies.* Many interventions to reduce gun violence have been developed in the absence of a clear understanding of the target audience's attitudes, beliefs, motivations, knowledge and behaviors. Moving the science forward requires formative research and pilot studies that inform the development, implementation and evolution of these interventions. In short, researchers and practitioners must "do their homework". A relatively small investment in formative research and pilot studies could have a large payoff in improving the design and effectiveness of interventions to reduce gun violence.
- *The need for increased research funding.* The NAS report noted the critical need for increased funding of research, particularly by the federal government.[6] Funding for research on firearms and violence is severely limited in the US, with the bulk of support provided by a few private foundations.[8] Federal funding has fallen victim to politically contentious issues of "gun control" and debates about Second Amendment rights. Since 1997, the CDC has operated under statutory restrictions on firearm research.[iv] A recent review found that the National Institutes of Health had funded just three major grants for researches on firearm injury in the last 30 years (1973–2002).[9] The National Institute of Justice funds just a handful of studies on firearms and violence each year.[v] The above-outlined research agenda will require a sustained investment of federal dollars and partnerships with foundations. Practically speaking, it will require that the US reframe firearm injury research as a public health issue (as the World Health Organization and many countries have done). By focusing on improving the empirical basis for policy, the NAS report and ongoing efforts of the Collaborative may help overcome political barriers to federal funding. The level of support should reflect both the magnitude of the problem, and the promise this research agenda holds for reducing the impact of firearm-related violence in the US.

. . . . . . . . . . . . . . . . . . . . .

**Authors' affiliations**
**Janet Weiner, Douglas J Wiebe, Therese S Richmond, Charles C Branas, Rose A Cheney, Martin Fishbein, Robert Jeffcoat, Christopher S Koper, Jean Lemaire, Jeffrey A Roth, C William Schwab,** University of Pennsylvania, Philadelphia, USA
**Kristen Beam, John Firman,** International Association of Chiefs of Police, Alexandria, Virginia, USA
**Alan L Berman,** American Association of Sociology, Washington DC, USA
**Tamera Coyne-Beasley,** University of North Carolina, Chapel Hill, North Carolina, USA

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

ivGuidelines state that the CDC will not fund "activities designed to affect the passage of specific Federal, State, or local legislation intended to restrict or control the purchase or use of firearms."

vAccording to NIJ online statistics, it funded two grants in 2002, three each in 2003 and in 2004, which were devoted to research on firearms and violence.

**Stephen Hargarten,** Medical College of Wisconsin, Milwaukee, Wisconsin, USA

**David Hemenway, Matthew Miller,** Harvard University, Boston, Massachusetts, USA

**David Kennedy,** John Jay College of Criminal Justice, New York, USA

**Robert Spitzer,** State University of New York, Courtland, New York, USA

**Stephen Teret, Jon Vernick, Daniel Webster,** Johns Hopkins University, Baltimore, Maryland, USA

Funding: This work was supported by the Joyce Foundation. The funder had no role in the writing of the report or the decision to submit the manuscript.

Competing interests: None.

## REFERENCES

1 Krug EG, Dahlberg LL, Mercy JA, *et al. World report on violence and health.* Geneva: World Health Organization, 2002.
2 Richmond TS, Cheney R, Schwab CW. The global burden of non-conflict related firearm mortality. *Inj Prev* 2005;11:348–52.
3 Hoyert DL, Kung HC, Smith, BL. *Deaths: preliminary data for 2003.* Hyattsville, Maryland: National Center for Health Statistics, 2005, National vital statistics reports, vol 53, number15).
4 Centers for Disease Control and Prevention, National Centers for Injury Prevention and Control. Web-based injury statistics query and reporting system (WISQARS), 2003. http://www.cdc.gov/ncipc/wisqars (accessed 14 Feb 2007).
5 Federal Bureau of Investigation. Crime in the United States, 2003. US Deptartment of Justice. http://www.fbi.gov/ucr/03cius.htm (accessed 14 Feb 2007).
6 National Research Council. Committee on Law and Justice, Division of Behavioral and Social Sciences and Education. Firearms and violence: a critical review, Washington, DC:The National Academies Press, 2005.
7 Hemenway D. Firearms and violence: a critical review. *Inj Prev* 2006;12:277.
8 Alberding ES. Foundations should support firearms research. *Chron Philanthr* 2005;17:47.
9 Branas CC, Wiebe DJ, Schwab CW, *et al.* Getting past the "F" word in federally funded public health research. *Inj Prev* 2005;11:191.

## BMJ Clinical Evidence—Call for contributors

*BMJ Clinical Evidence* is a continuously updated evidence-based journal available worldwide on the internet which publishes commissioned systematic reviews. *BMJ Clinical Evidence* needs to recruit new contributors. Contributors are healthcare professionals or epidemiologists with experience in evidence-based medicine, with the ability to write in a concise and structured way and relevant clinical expertise.

**Areas for which we are currently seeking contributors:**
- Secondary prevention of ischaemic cardiac events
- Acute myocardial infarction
- MRSA (treatment)
- Bacterial conjunctivitis
However, we are always looking for contributors, so do not let this list discourage you.

**Being a contributor involves:**
- Selecting from a validated, screened search (performed by in-house Information Specialists) valid studies for inclusion.
- Documenting your decisions about which studies to include on an inclusion and exclusion form, which we will publish.
- Writing the text to a highly structured template (about 1500–3000 words), using evidence from the final studies chosen, within 8–10 weeks of receiving the literature search.
- Working with *BMJ Clinical Evidence* editors to ensure that the final text meets quality and style standards.
- Updating the text every 12 months using any new, sound evidence that becomes available. The *BMJ Clinical Evidence* in-house team will conduct the searches for contributors; your task is to filter out high quality studies and incorporate them into the existing text.
- To expand the review to include a new question about once every 12 months.
  In return, contributors will see their work published in a highly-rewarded peer-reviewed international medical journal. They also receive a small honorarium for their efforts.
  If you would like to become a contributor for *BMJ Clinical Evidence* or require more information about what this involves please send your contact details and a copy of your CV, clearly stating the clinical area you are interested in, to CECommissioning@bmjgroup.com.

**Call for peer reviewers**
  *BMJ Clinical Evidence* also needs to recruit new peer reviewers specifically with an interest in the clinical areas stated above, and also others related to general practice. Peer reviewers are healthcare professionals or epidemiologists with experience in evidence-based medicine. As a peer reviewer you would be asked for your views on the clinical relevance, validity and accessibility of specific reviews within the journal, and their usefulness to the intended audience (international generalists and healthcare professionals, possibly with limited specialist knowledge). Reviews are usually 1500–3000 words in length and we would ask you to review between 2–5 systematic reviews per year. The peer review process takes place throughout the year, and our turnaround time for each review is 10–14 days. In return peer reviewers receive free access to *BMJ Clinical Evidence* for 3 months for each review.

  If you are interested in becoming a peer reviewer for *BMJ Clinical Evidence*, please complete the peer review questionnaire at www.clinicalevidence.com/ceweb/contribute/peerreviewer.jsp

# Exhibit 107



Accident Analysis and Prevention 37 (2005) 625–632



ACCIDENT
ANALYSIS
&
PREVENTION

www.elsevier.com/locate/aap

# Suicide prevention through means restriction: Assessing the risk of substitution
## A critical review and synthesis

### Marc S. Daigle *

*Centre for Research and Intervention on Suicide and Euthanasia and Philippe Pinel Institute, University of Québec at Trois-Rivières,
P.O. Box 500, Trois-Rivières, Que., Canada G9A 5H7*

Received 30 December 2004; accepted 13 March 2005

### Abstract

The effectiveness of restricting access to certain means of committing suicide has been demonstrated, at least as regards toxic domestic gas, firearms, drugs and bridges. At the individual level, studies tend to indicate that many persons have a preference for a given means, which would limit the possibility of substitution or displacement towards another method. Similarly, the fact that suicidal crisis are very often short-lived (and, what is more, influenced by ambivalence or impulsiveness) suggests that an individual with restricted access to a given means would not put off his plans to later or turn to alternative methods. This has been more difficult to demonstrate scientifically in population studies. Nevertheless, it appears that, should such a shift occur towards other means, it would be put into effect only in part and over a longer term.
© 2005 Elsevier Ltd. All rights reserved.

*Keywords:* Suicide; Means; Restriction; Substitution; Displacement

## 1. Introduction

The field of suicide prevention was marked early on by such characters as the Reverend Chad Varah in the United Kingdom and Dr. Edwin Shneidman in the United States. However, these often cited men, as well as all the volunteers from Samaritans and Suicide Prevention Centres after them and all the professionals of the mental health field, contributed to give an essentially clinical or individual character to interventions in this domain. As early as in 1968, Bagley (1968) turned his focus to measuring the effect of hotline services on suicide rates even though, contemporaneously, other factors such as the detoxification (reduction of the carbon monoxide content) of domestic gas could be at play (Kreitman, 1976). Clinicians have thus tended to overlook broad sections of suicide prevention, namely those centered on environmental

approaches even if it could be the most promising strategy for the future (Johansson et al., 2005). Among these, means restriction has been drawing more and more attention, as evidenced by the fact that nine of the presentations at the 2003 congress of the *International Association for Suicide Prevention* referred to this measure, compared with none at the 1988 congress. The effectiveness of restricting access to certain means has been demonstrated (Leenaars et al., 2000), at least as regards toxic domestic gas (Kreitman, 1976), firearms (Bridges and Kunselman, 2004; Conwell et al., 2002; Hemenway and Miller, 2002), drugs (Hawton et al., 2001; Wilkinson et al., 2002) and bridges (Beautrais, 2001; Berman et al., 1994). However, there remains the question of substitution or displacement, that is, the possibility that suicidal individuals, once deprived of their preferred means of committing suicide, shift their consideration towards alternative methods. The purpose of this article is to examine the issue of means substitution from the point of view of individuals and populations.

\* Tel.: +1 819 376 5011; fax: +1 819 376 5195.
*E-mail address:* marc.daigle@uqtr.ca.

0001-4575/$ – see front matter © 2005 Elsevier Ltd. All rights reserved.
doi:10.1016/j.aap.2005.03.004

## 2. Methods

Printed documentation, in English or French, was searched in the following electronic databases: MedLine and PsychInfo. Two specialized documentation centers, both located in Canada, were also consulted: the Centre for Research and Intervention on Suicide and Euthanasia (Montreal) and the Suicide Information and Education Center (Calgary). The keywords "displacement" or "substitution" not being very productive, the following search strategy was also used: suicide AND (epidemiology OR rate OR rates OR trends OR "statistics & numerical data" OR incidence) AND ("cause of death" OR "prevention & control" OR mortality OR method OR methods).

## 3. At the individual level

In this regard, two types of studies can be distinguished, namely those that have focused on a preference for a particular method of committing suicide and those that have examined the fact that suicide crises tend to be short-lived.

### 3.1. Preference for a particular means of committing suicide

Suicide is not a homogeneous category of behaviour. For instance, regarding suicide from domestic gas intoxication, a method once widely used in England, suicidal persons probably considered this a highly lethal, painless, clean and easy to use method that required little "courage" and planning. Probably, no other means of suicide shares these characteristics (Clarke and Lester, 1989). Individuals who jump off bridges, for their part, often suffer from severe mental illness (see many studies in the summary list of Table 1). In such cases, auditory hallucinations, for example, can influence the decision to commit suicide in a specific manner. It should be pointed out that among the suicides by all other means put together, the percentage of psychotic individuals is usually no way as high as in this group (Cantor et al., 1989). However, at least one study by Nowers and Gunnell (1996) found that those jumping from the Clifton Suspension Bridge in England were no more likely to have psychiatric histories and have been psychiatric inpatients than matched controls using other suicide methods.

In response to a questionnaire, female college students indicated their preference for methods deemed quick and painless and entailing no risk of disfigurement. However, both women and men would use a firearm as they were more concerned with getting it over with quickly than with the danger of disfigurement (Lester, 1988). This type of study tends to show that, notwithstanding gender differences in this regard, individuals have a preference for a specific means and that they would not easily resolve to change method. More specifically, in a study that sought to understand why more people committed suicide by jumping off the *Golden Gate Bridge* than from the nearby *San Francisco-Oakland Bay Bridge* (Seiden and Spence, 1983), the factors mentioned included, in particular, the more or less morbid and contagious publicity that surrounded cases at the *Golden Gate*. The symbolism ("suicide shrine") and romanticism associated with the site would also explain why many suicidal persons chose it, even though the other bridge was sometimes definitely closer to their homes.

A certain copycat and contagion effect has been observed in particular when the media put out information in more or less adequate fashion regarding suicides already perpetrated in a given place. It is believed that this type of coverage pushes certain individuals, especially the most vulnerable, to adopt a given method of suicide rather than another. This contagion phenomenon has been particularly well documented over the years, beginning with the example of Werther, the character created by 18th century German writer Goethe, up until more recent cases, such as those in the Vienna subway and at Mount Mihara in Japan (Clarke and Lester, 1989; Ellis, 1996; Gunnell and Nowers, 1997).

Certain personal and cultural factors are also at play. Depending on the individuals concerned, certain forms of death seem more inculpating or exculpating for the bereaved or more terrifying, more painful or more shameful. Persons who are more ambivalent or who could eventually manipulate the people around them might also prefer a less lethal method (Clarke and Lester, 1989). To understand how people choose a particular method, these authors suggest 20 "choice structuring properties of methods of suicide": availability, familiarity with the method; technical skills needed (hanging, gasing); planning necessary (buy a gun, save up pills); likely pain (cutting wrists); so-called "courage" needed (high building, train); consequence of failure (disability, publicity); disfigurement after death (hanging versus overdose); danger/inconvenience to others (car crash, subway leap); messiness, bloodiness (wrist cutting); discovery of body (by loved ones or strangers); contamination of nest (i.e., avoid home); scope for concealing or publicizing death—shame, insurance (car crash, drowning, subway leap); certainty of death (perceived/actual); time taken to die while conscious (poisons, wrist cutting); scope for second thoughts (swim back to shore, switch off gas); chances of intervention; symbolism (cleansing by fire); masculine/feminine (guns); dramatic impact.

Also, the methods used vary greatly across the countries and even within the countries; consequently, a means restriction approach that might work in under one set of cultural and environmental conditions might not work under another (Cantor, 2000; Cheng and Lee, 2000; Marzuk et al., 1992). Table 2 shows some comparisons between USA, Canada, Australia and England but also gender differences. One can see that data are not always reported the same way from one country to the other despite the now growing use in the death certificates of the *International Classification of Diseases, Ninth Revision*. Nevertheless, that table shows that suicide by firearm is very common in USA for both the sexes but much less in the other countries where hanging is most common,

*M.S. Daigle / Accident Analysis and Prevention 37 (2005) 625–632*                627

Table 1
Summary of included studies on risk of substitution

| Focus | Authors | Location | Population/sample[a] | Key findings |
|---|---|---|---|---|
| **Individual level** | | | | |
| Preferences (vs. mental illness) | Prasad and Lloyd (1983) | Scotland | 18 survivors jumping from height | All have a mental illness |
| | Kontaxakis et al. (1988) | Greece | 46 survivors jumping from height and 214 from drug overdose | More major psychopathologies in the first group |
| | Cantor et al. (1989) | Australia | 40 survivors and 47 suicides from bridge | Most suffer from severe mental illness |
| | Pommereau et al. (1989) | France | 110 survivors jumping from height and 908 from drug overdose | More psychiatric history in first group |
| | Nowers and Gunnell (1996) | England | 127 suicides from bridge and 127 other suicides | Same number of individuals with mental illness |
| | De Moore and Robertson (1999) | Australia | 31 survivors jumping from height and 51 from using firearms | More psychiatric history in first group |
| | Coman et al. (2000) | Australia | 7 survivors and 55 suicides from bridge | Most suffer from severe mental illness |
| | Beautrais (2001) | Australia | 15 suicides from bridges | Most suffer from severe mental illness |
| | Lindqvist et al. (2004) | Sweden | 50 suicides from bridge | Most had psychiatric problems |
| Preferences (other) | Rosen (1975) | USA | 7 survivors from 2 bridges | Preference for one out of two available bridges |
| | Seiden and Spence (1983) | USA | 555 suicides from one bridge and 112 from the nearby other | Publicity, symbolism, romanticism influence the choice of the bridge |
| | Lester (1988) | USA | 429 college students | Men and women choose different methods |
| | Cantor and Hill (1990) | Australia | 73 suicides from 2 bridges | 2 different profiles of suicides |
| | Kaplan and Geling (1999) | USA | Total population | Regional cultural factors influence choice |
| | Cheng and Lee (2000) | Asia and the Far East | Total populations | Methods vary across and within countries and across genders |
| | Hawton et al. (2004a,b) | UK | 428 survivors from self-cutting and 11 065 from self-poisoning | More men and previous deliberate self-harm in self-cutters |
| | see Table 2 | USA, Canada, Australia, England | Total populations | Methods vary across countries and across genders |
| Short-lived crises | Seiden (1978) | USA | 515 suicides bridges and 184 survivors from other types of attempts | Long term follow-up shows 90% do not die later on from violent death |
| | Glatt (1987) | USA | 30 survivors from bridge | Ambivalence about death |
| | Hawton et al. (2001) | UK | Total population | Impulsive or ambivalent people do not accumulate lethal drugs |
| | Lindqvist et al. (2004) | Sweden | 50 suicides from bridges | Peak of alcohol-related suicides during weekends |
| | Suominen et al. (2004) | Finland | 100 survivors from self-poisoning | 87% will not commit suicide after 37 years |
| | Sakinofsky (2000) (review) | Many | Survivors from suicide attempts | 89% will not commit suicide on the long term |
| | Owens et al. (2002) (review) | Many | Survivors from suicide attempts | 93% will not commit suicide on the long term |
| **Population level** | | | | |
| Toxic gas | Kreitman (1976) | UK | Total population | Almost no substitution |
| | Burvill (1980) | Australia | Total population | Substitution for men only |
| | Lester and Abe (1989) | Japan | Total population | Almost no substitution |
| | Lester (1990) | USA | Total population | Almost no substitution |
| Firearms | Carrington and Moyer (1994) | Canada | Total population | No substitution |
| | Lester (1995) | USA | Total population | No substitution |
| | Leenaars and Lester (1996) | Canada | Total population | Substitution for men only |
| | Kaplan and Geling (1998) | USA | Total population | Substitution for men only |
| | Conner and Zhong (2003) | USA | Total population | No substitution |
| | De Leo et al. (2003) | Australia | Male population | No substitution |
| | Bridges (2004) | Canada | Total population | Substitution |
| | Caron (2004) | Canada | Total population | Substitution |
| | Clarke and Lester (1989) (review) | All | Total populations | Mixed results |
| | Lambert and Silva (1998) (review) | All | Total populations | No substitution |
| Drugs | Oliver and Hetzel (1972) | Australia | Total population | Almost no substitution |
| | Whitlock (1975) | Australia | Total population | Almost no substitution |
| | Yamasawa et al. (1980) | Japan | Total population | Almost no substitution |
| | Wilkinson et al. (2002) | England | Total population | Substitution |
| | Hawton et al. (2004a,b) | UK | Total population | Some substitution |
| | Nordentoft et al. (2004) | Denmark | Total population | No substitution |
| Bridges | Berman et al. (1994) | USA | Total population | No substitution |
| | Beautrais (2001) | Australia | Suicides from height | No substitution |

[a] The survivors samples include attempted suicides and failed suicides.

*M.S. Daigle / Accident Analysis and Prevention 37 (2005) 625–632*

Table 2
Percentage of utilization of different methods of suicide in four countries

| Method | Males | | | | Females | | | |
|---|---|---|---|---|---|---|---|---|
| | USA (2000)[a] | Canada (1998)[b] | Australia (1998)[c] | England (2003)[d] | USA (2000)[a] | Canada (1998)[b] | Australia (1998)[c] | England (2003)[d] |
| Firearms | 61.2 | 26.2 | 10.1 | N/R[e] | 37.2 | 6.6 | 3.2 | N/R[e] |
| Hanging, strangulation, suffocation | 20 | 40 | 47.1 | 46.1 | 16.7 | 33.9 | 32.3 | 25.6 |
| Solid and liquid poisoning | 7.1 | 9.6 | 8.3 | 18.5 | 30.6 | 32.4 | 29.6 | 43.9 |
| Gas poisoning (motor vehicle exhaust and other) | 4.8 | 12.4 | 21 | 8.4 | 5.5 | 9 | 14.4 | 3.1 |
| Jumping from height | 1.8 | 3.9 | N/R[f] | 3.2 | 3.1 | 5.8 | N/R[f] | 4.6 |
| Cutting and piercing | N/R[g] | 1.6 | 1.8 | N/R[g] | N/R[g] | 1.4 | 1.9 | N/R[g] |
| All other methods | 5.1 | 6.2 | 11.8 | 23.8 | 7 | 7 | 18.6 | 22.8 |

[a] McIntosh (2003).
[b] Langlois and Morrison (2002) (Population aged 10 or older).
[c] Steenkamp and Harrison (2000).
[d] National Institute for Mental Health in England (2005).
[e] Not reported for England. Included in "all other methods".
[f] Not reported for Australia. Included in "all other methods".
[g] Not reported for USA and England. Included in "all other methods".

at least for men. As for applying means restriction to this last method, this represents a real challenge except in hospitalized or incarcerated populations. Dahlberg et al. (2004) also report that, in their American sample, 76.3% of all suicides occurred in the home, which is also a challenge for suicide prevention, except if intervention takes place before the suicidal crisis, in controlling the purchase or ownership of means of suicide like firearms.

Regarding more particularly the symbolism associated with suicide from bridges, there is no doubt that the spectacular aspect of the deed is a major factor. Survivors have indicated that not only had they planned to commit suicide by jumping off a bridge but also off a very specific bridge. They generally referred to an association that they had made between death and the particular "beauty/grace" of the given bridge (Rosen, 1975, 1976). Moreover, all this symbolism seems to rest at least in part on a popular myth to the effect that committing suicide by jumping off a bridge is easy to do and hassle free and that the person in question gently disappears under the surface (Seiden, 1978). Be this as it may, studies as a whole indicate that many individuals prefer a particular means of suicide, if not a particular place for it (De Moore and Robertson, 1999). In Australia, researchers found major differences between the persons who committed suicide at two Australian bridges (Cantor and Hill, 1990). It ensues from this that these individuals would not readily go through with their intentions using other means or in other places.

### 3.2. Short-lived crises

It is recognized that suicidal crisis are usually of short duration and that, if their fatal outcome is prevented, they will not be repeated or help will be made available in the meantime. At worst, suicidal individuals deprived of their preferred means of committing suicide will fall back on another, possibly less lethal, method. In this regard, elements

of transitory impulsiveness have been found to be significant in suicidal behaviour, especially among young people and even more specifically in suicides committed by jumping from high places (Pommereau et al., 1989). At the same time, it is important to acknowledge that ambivalence is typical of the suicidal process (Centers for Disease Control and Prevention, 1992), which is precisely what has been observed in suicidal persons who contact crisis lines using telephones installed on bridges (Glatt, 1987). The study by Hawton et al. (2001), showing that restricting pack sizes of drugs lower suicide rates, could also be explained by the fact that impulsive or ambivalent suicidal people do not accumulate their pills and that they change their mind in the mean time.

Immediate help is required just after the attempt. In fact, the risk of repeating a suicide attempt is highest in the period immediately following the first suicidal act. Longitudinal studies as a whole have demonstrated that, after a year, from 1 to 3% only of these individuals will in the end die from suicide. After 5 years, this percentage reaches 9% and in longer studies, 11% (Sakinofsky, 2000). This means, therefore, that of the individuals prevented from using their method of choice, 89% will not commit suicide by some other means on the long term. The percentage of persons saved can even be higher if effective help is provided at the same time. Overall, although it is true that the suicide risk is about 100 times higher for individuals with a history of suicidal behaviour, the majority of these, then, will not die from suicide after all (Seiden, 1978; Owens et al., 2002).

### 4. Population studies

If individuals seem to have a preference for a specific means of suicide and if they essentially experience short-lived crises, restricting access to a specific method should not bring about an increase in the use of other means. By the same token, overall suicide rates should decrease, all other

things remaining the same. This is what population studies should confirm. However, it is evident that the direct effects of restricting access to means of suicide are hard to observe, as is an eventual shift towards other means, when the method targeted is already seldom used in the population (see Table 2). At the statistical level, proving a phenomenon whatsoever is rendered much more difficult. This is true for suicides, completed or not, committed from bridges and for an eventual displacement towards other methods (Gunnell and Nowers, 1997). This is why it would be interesting also to look at what has been reported about means that are much more commonly used and relatively easier to restrict like firearms. Consequently, we will examine the issue of displacement when access is restricted to the following four means of suicide: domestic toxic gas, firearms, drugs and bridges.

### 4.1. Domestic toxic gas

It has been demonstrated that the detoxification of domestic gas in Great Britain brought about a considerable reduction in both the number of suicides by this method and the overall suicide rate (down by one-third) (Clarke and Lester, 1989). Kreitman (1976) was among the first to make the connection between the decline in overall suicide rates and the detoxification of domestic gas in the United Kingdom. As domestic gas poisoning had always been the preferred means of suicide in this country (49.8% in 1958), a reduction in the gas's lethality is believed to have had a direct effect on the overall suicide rates, without giving rise to displacement towards other means. The same effect has been observed in Japan (Lester and Abe, 1989) and the United States (Lester, 1990). The gradual detoxification of domestic gas did not bring about a genuine displacement towards other methods of suicide. Thousands of lives have thus been saved by simply reducing the toxicity level of domestic gas. If any displacement occurred in these studies, it was very weak and towards intoxication by motor vehicle exhaust fumes which had become much more easily available in the meantime (Clarke and Lester, 1989). In Australia, Burvill (1980) found this type of displacement towards car exhaust fumes but only for men.

### 4.2. Firearms

Results have been mixed regarding restricted access to firearms, at least as far as the very specific situation in the United States (Clarke and Lester, 1989) but a recent review is more optimistic (Lambert and Silva, 1998). A large Canadian study reached such conclusions in favour of firearms control (Carrington and Moyer, 1994). In this case, researchers investigated the effect of Bill C-51 which imposed certain restrictions on firearms possession as of 1978. Their interrupted time series statistical analyses revealed positive associations between restrictions on firearms and reduction of suicide rates and found no evidence of displacement regarding the means used in Canada. Other researchers, instead, have noted a certain displacement in Canada, although only with respect to

men (Leenaars and Lester, 1996). However, the methodology of this study has been contested rather convincingly by the first team (Carrington and Moyer, 1994; Carrington, 1999). In fact, Leenaars (2001, p. 260) himself concluded that "people did not switch to other methods of suicide". Two more recent Canadian studies (Bridges, 2004; Caron, 2004) analyzed the effect of another Canadian law (Bill C-17) enforced in 1992 on the safe storage of firearms. In a specific region of northern Quebec, Caron compared suicide methods 6 years prior to the enactment of the law and 5 years after. Suicide by firearms decreased for both sexes but not among men over 45 who may be the owners of the key giving access to the firearms. In his study, hanging increased among youths and suicide by poisoning doubled in the female population. Caron concludes that his findings support the substitution hypothesis despite the unexplained high rise in hanging method. Bridges (2004) reaches similar conclusion for the total Canadian population. De Leo et al. (2003) were particularly interested in such an apparent displacement from firearms towards hanging in Australia. Rates of suicide by hanging were found to have begun increasing prior to the decline in firearm suicide in Australia. They concluded that individual suicide method choice may be related to independent changes in the social acceptability of each method as well as to an increasing prevalence of suicide in younger males who are more likely to use the hanging method. It seems that such a method is no more associated to shame in new generations.

### 4.3. Drugs and other toxic substances

Numerous studies have shown that no displacement effect occurs when access to lethal drugs is restricted (Clarke and Lester, 1989). Oliver and Hetzel (1972) showed that, following control on sales of sedatives in Australia, suicides related to such a means decreased with no substitution of other methods. Whitlock (1975) did the same in the specific region of Brisbane. In this regard, a study conducted in Japan demonstrated that since 1956, the availability of certain drugs by prescription only had diminished the rate of suicide by this method without displacement towards other intoxicants such as chemical farming products or cyanide (Yamasawa et al., 1980). More recently, Hawton et al. (2004a,b) showed that a legislation restricting pack sizes of drugs like paracetamol and salicylates had substantial beneficial effects on the mortality and morbidity in UK; in the mean time, ibuprofen overdoses increased, but with little or no effect on deaths. Nevertheless, looking only at hospital admissions for the same period, Wilkinson et al. (2002) found also a decrease in admissions following paracetamol overdoses but an increase in other types of admissions.

### 4.4. Bridges

The installation of an anti-suicide fence on the *Duke Ellington Bridge* in Washington, DC, where an average 3.67 suicides a year were committed, resulted in only one such

death in the following 5 years. Meanwhile, the average number of suicides remained essentially the same at a less popular bridge nearby with no such fence (1.69 before and 2 after). Over the same period of time, the overall number of suicides in Washington, DC, declined from 76.4 to 71.6, thereby indicating that no displacement had occurred towards other methods (Lester, 1993; Berman et al., 1994). This last paper being a "case consultation" between three specialists, one should otherwise note that the second author, O'Carroll, is less convinced, pointing to the fact that this was not a real controlled study. Actually, most studies reported on means restriction are ecological ones. He argues that only interrupted time series analyses, if really specific data could be made available, would give us the right answer about displacement in this case. These analyses would then take into account the overall and specific trends in suicide rates and show if real changes appear when a specific intervention is implemented.

In an Australian study examining the effects of the removal of an anti-suicide fence from an overpass often used by suicidal psychiatric patients in large part suffering from schizophrenia, the number of suicides was shown to have increased from 3 in 1992–1995 to 15 in 1997–2000, while the total number of suicides in the region from jumping off high places remained stable. At first glance, this seemed to indicate that displacement occurred towards the overpass that was once again accessible, all the more so that, over this period, fewer suicides were committed by jumping off other sites. However, a more in-depth analysis revealed that the profiles of the persons who died from suicide were very different from one site to another. Indeed, 78% of the persons who jumped from the overpass in question suffered from schizophrenia compared with just 21% of those who jumped off other high places. This would indicate, then, that there was actually no displacement, but rather an increase in suicides (by persons with schizophrenia) off the overpass and at the same time, a decrease in suicides from jumping off other high places (for other reasons) (Beautrais, 2001). As seen above, this was again the case of a very specific site holding a particular interest for certain persons. Note also that bridge barriers, like some control on firearms, may have another injury preventive effect on homicides (Berman et al., 1994) but also on traumatization of surrounding people.

On a similar topic, Reisch and Michel (2004) reported that, after the installation of a protective net at a well known terrace in Berne (Switzerland), no suicides occurred at this site. Furthermore, the number of people jumping from all high places (including from bridges) in this city was reduced compared to the years before the installation, although no safety means were installed at the other sites.

## 5. Conclusion

Generally speaking, then, the risk of substitution or displacement towards other methods seems small (Clarke and Lester, 1989; Gunnell and Nowers, 1997; Prévost et al.,

1996). At the individual level, studies tend to demonstrate that many suicidal persons have a preference for a specific method. Similarly, the fact that suicidal crises are very often short-lived (and, what is more, influenced by ambivalence or impulsiveness) suggests that a given individual who has limited access to a given means will not put off his intentions to later or shift to another method. However, where population studies are concerned, scientific proof to this effect is sometimes harder to establish and most studies are ecological. This notwithstanding, means restriction can in the meantime save lives and buy time for interventions of a more clinical nature.

## Acknowledgements

Marc Daigle acted as a consulting expert for the engineering firm Tecsult Inc. of Montreal as part of Contract 3-00-02-17—Jacques Cartier Bridge, Consultant Services, Feasibility Study to Erect an Anti-Jumping Barrier (2002) awarded by The Federal Bridge Corporation Limited of Ottawa (Canada).

## References

Bagley, C.R., 1968. The evaluation of a suicide prevention scheme by an ecological method. Soc. Sci. Med. 2, 1–14.

Beautrais, A.L., 2001. Effectiveness of barriers at suicide jumping sites: a case study. Aust. N. Z. J. Psychiatry 35, 557–562.

Berman, A.L., O'Carroll, P.W., Silverman, M.M., 1994. Case consultation. Community suicide prevention: the effectiveness of bridge barriers. Suicide Life Threat. Behav. 24, 89–99.

Bridges, F.S., 2004. Gun control law (Bill C-17), suicide, and homicide in Canada. Psychol. Rep. 94, 819–826.

Bridges, F.S., Kunselman, J.C., 2004. Gun availability and use of guns for suicide, homicide, and murder in Canada. Percept. Mot. Skills 98, 594–598.

Burvill, P.-W., 1980. Changing patterns of suicide in Australia, 1910–1977. Acta Psychiatr. Scand. 62 (3), 258–268.

Cantor, C.H., 2000. Suicide in the western world. In: Hawton, K., van Heeringen, K.P. (Eds.), The International Handbook of Suicide and Attempted Suicide. Wiley, Chichester, England, pp. 9–28.

Cantor, C.H., Hill, M.A., 1990. Suicide from river bridges. Aust. N. Z. J. Psychiatry 24, 377–380.

Cantor, C.H., Hill, M.A., McLachlan, E.K., 1989. Suicide and related behaviour from river bridges—a clinical perspective. Br. J. Psychiatry 155, 829–835.

Caron, J., 2004. Gun control and suicide: possible impact of Canadian legislation to ensure safe storage of firearms. Arch. Suicide Res. 8, 361–374.

Carrington, P.J., 1999. Gender, gun control, suicide and homicide in Canada. Arch. Suicide Res. 5, 71–75.

Carrington, P.J., Moyer, S., 1994. Gun availability and suicide in Canada: testing the displacement hypothesis. Stud. Crime Crime Prev. 3, 168–178.

Centers for Disease Control and Prevention, 1992. Youth Suicide Prevention Programs: A Resource Guide. Department of Health and Human Service, Centers for Disease Control and Prevention, Atlanta.

Cheng, A.T.A., Lee, C.-S., 2000. Suicide in Asia and the Far East. In: Hawton, K., van Heeringen, K.P. (Eds.), The International Handbook of Suicide and Attempted Suicide. Wiley, Chichester, England, pp. 29–48.

Clarke, R.V.G., Lester, D., 1989. Suicide: Closing the Exits. Springer Verlag, New York.

Coman, M., Meyer, A.D., Cameron, P.A., 2000. Jumping from the Westgate Bridge, Melbourne. Med. J. Aust. 172, 67–69.

Conner, K.R., Zhong, Y., 2003. State firearm laws and rates of suicide in men and women. Am. J. Prev. Med. 25, 320–324.

Conwell, Y., Duberstein, P.R., Connor, K., Eberly, S., Cox, C., Caine, E.D., 2002. Access to firearms and risk for suicide in middle-aged and older adults. Am. J. Geriatr. Psychiatry 10, 407–416.

Dahlberg, L.L., Ikeda, R.M., Kresnow, M.J., 2004. Guns in the home and risk of a violent death in the home: findings from a national study. Am. J. Epidemiol. 160 (10), 929–936.

De Leo, D., Dwyer, J., Firman, D., Neulinger, K., 2003. Trends in hanging and firearm suicide rates in Australia: substitution of method? Suicide Life Threat. Behav. 33 (2), 151–164.

De Moore, G.M., Robertson, A.R., 1999. Suicide attempts by firearms and by leaping from heights: a comparative study of survivors. Am. J. Psychiatry 9, 1425–1431.

Ellis, A.M., 1996. Suicide from the Clifton Suspension Bridge in England. J. Epidemiol. Community Health 50, 474.

Glatt, K.M., 1987. Helpline: suicide prevention at a suicide site. Suicide Life Threat. Behav. 17, 299–309.

Gunnell, D., Nowers, M., 1997. Suicide by jumping. Acta Psychiatr. Scand. 96, 1–6.

Hawton, K., Harriss, L., Simkin, S., Bale, E., Bond, A., 2004a. Self-cutting: patient characteristics compared with self-poisoners. Suicide Life Threat. Behav. 34 (3), 199–208.

Hawton, K., Simkin, S., Deeks, J., Cooper, J., Johnston, A., Waters, K., Arundel, M., Bernal, W., Gunson, B., Hudson, M., Suri, D., Simpson, K., 2004b. UK legislation on analgesic packs: before and after study of long term effect on poisonings. Br. Med. J. 329 (7474), 1076.

Hawton, K., Townsend, E., Deeks, J., Appleby, L., Gunnell, D., Bennewith, O., Cooper, J., 2001. Effects of legislation restricting pack sizes of paracetamol and salicylate on self-poisoning in the United-Kingdom, before and after. Br. Med. J. 19, 1203–1207.

Hemenway, D., Miller, M., 2002. Association of rates of household handgun ownership, lifetime major depression, and serious suicidal thoughts with rates of suicide across US census regions. Inj. Prev. 8, 313–316.

Johansson, L., Stenlund, H., Lindqvist, P., Eriksson, A., 2005. A survey of teenager unnatural deaths in northern Sweden 1981–2000. Accid. Anal. Prev. 37 (2), 253–258.

Kaplan, M.S., Geling, O., 1998. Firearm suicides and homicides in the United States: regional variations and patterns of gun ownership. Soc. Sci. Med. 46 (9), 1223–1227.

Kaplan, M., Geling, O., 1999. Sociodemographic and geographic patterns of firearm suicide in the United States, 1989–1993. Health Place 5, 179–185.

Kontaxakis, V., Markadis, M., Vaslamatzis, G., Ionnidis, H., Stephanis, C., 1988. Attempted suicide by jumping: clinical and social features. Acta Psychiatr. Scand. 77, 435–437.

Kreitman, N., 1976. The coal gas story—United Kingdom suicide rates, 1960–1971. Br. J. Prev. Soc. Med. 30, 86–93.

Lambert, M.T., Silva, P.S., 1998. An update on the impact of gun control legislation on suicide. Psychiatr. Q. 69 (2), 127–134.

Langlois, S., Morrison, P., 2002. Suicide deaths and suicide attempts. Health Rep. 13 (2), 9–22.

Leenaars, A.A., 2001. Controlling the environment to prevent suicide. In: Wasserman, D. (Ed.), Suicide: An Unnecessary Death. Martin Dunitz, London, pp. 259–263.

Leenaars, A., Cantor, C., Connolly, J., EchoHawk, M., Gailiene, D., Xiong He, Z., Kokorina, N., Lester, D., Lopatin, A., Rodriquez, M., Schlebusch, L., Takahashi, Y., Vijayakumar, L., Wenckstern, S., 2000. Controlling the environment to prevent suicide. International perspectives. Can. J. Psychiatry 45, 639–644.

Leenaars, A.A., Lester, D., 1996. Gender and the impact of gun control on suicide and homicide. Arch. Suicide Res. 2, 223–234.

Lester, D., 1988. Why do people choose particular methods for suicide? Activitas Nervosa Superior (Praha) 30 (4), 312–314.

Lester, D., 1990. The effects of detoxification of domestic gas on suicide in the United States. Am. J. Public Health 80, 80–81.

Lester, D., 1993. Suicide from bridges in Washington, DC. Percept. Mot. Skills 77, 534.

Lester, D., 1995. The availability of guns and the rates of personal violence (homicide and suicide). Ital. J. Suicidol. 5 (2), 73–76.

Lester, D., Abe, K., 1989. The effect of restricting access to lethal methods for suicide: a study of suicide by domestic gas in Japan. Acta Psychiatr. Scand. 80, 180–182.

Lindqvist, P., Jonsson, A., Eriksson, A., Hedelin, A., Björntig, U., 2004. Are suicides by jumping off bridges preventable? An analysis of 50 cases from Sweden. Accid. Anal. Prev. 36, 691–694.

Marzuk, P.M., Leon, A.G., Tardiff, K., Morgan, E.B., Stajic, M., Mann, J.J., 1992. The effect of access to lethal methods of injury on suicide rates. Arch. Gen. Psychiatry 49 (6), 451–458.

McIntosh, J.L., 2003. 2000 Official Final Statistics U.S.A. Suicide. American Association of Suicidology, Washington, DC, retrieved February 11, 2005, from the World Wide Web: http://mypage.iusb.edu/~jmcintos/SuicideStats.html.

National Institute for Mental Health in England, 2005. National Suicide Prevention Strategy for England: Annual Report 2004. Department of Health, London, England.

Nordentoft, M., Qin, P., Helweg-Larsen, K., Juel, K., 2004. Development in suicide rates in Denmark and availability of means for suicide. In: Proceedings of the 10th European Symposium on Suicide and Suicidal Behaviour, Copenhagen, p. 54.

Nowers, M., Gunnell, D., 1996. Suicide from the Clifton Suspension Bridge in England. J. Epidemiol. Community Health 50, 30–32.

Oliver, R.G., Hetzel, B.S., 1972. Rise and fall of suicide rates in Australia: relation to sedative availability. Med. J. Aust. 2, 919–923.

Owens, D., Horrocks, J., House, A., 2002. Fatal and non-fatal repetition of self-harm: systematic review. Br. J. Psychiatry 181, 193–199.

Pommereau, X., Tedo, P., Penouil, F., 1989. Attempted suicide by jumping from a height: a five-year retrospective study. In: Platt, S.D., Kreitman, N.P. (Eds.), Current Research on Suicide and Parasuicide. University of Edinburgh, Edinburgh, pp. 153–162.

Prasad, A., Lloyd, G.G., 1983. Attempted suicide by jumping. Acta Psychiatr. Scand. 68, 394–396.

Prévost, C., Julien, M., Brown, B.P., 1996. Suicides associated with the Jacques-Cartier Bridge, Montreal, Quebec 1988–1993: descriptive analysis and intervention proposal. Can. J. Public Health 87, 377–380.

Reisch, T., Michel, K., 2004. Suicide data before and after installation of the safety net at the Berne Muenster Terrace and its influence on nearby jumping sites. In: Proceedings of the 10th European Symposium on Suicide and Suicidal Behaviour, Copenhagen, p. 54.

Rosen, D.H., 1975. Suicide survivors, a follow-up study of persons who survived jumping from the Golden gate and San Francisco-Oakland Bay Bridges. West. J. Med. 122, 289–294.

Rosen, D.H., 1976. Suicide survivors: psychotherapeutic implications of egocide. Suicide Life Threat. Behav. 6, 209–215.

Sakinofsky, I., 2000. Repetition of suicidal behaviour. In: Hawton, K., van Heeringen, K.P. (Eds.), The International Handbook of Suicide and Attempted Suicide. Wiley, Chichester, England, pp. 385–404.

Seiden, R.H., 1978. Where are they now? A follow-up study of suicide attempters from the Golden Gate bridge. Suicide Life Threat. Behav. 8, 203–216.

Seiden, R.H., Spence, M., 1983. A tale of two bridges: comparative suicide incidence on the Golden Gate and San Francisco Oakland Bay Bridges. Omega 14, 201–209.

Steenkamp, M., Harrison, J.E., 2000. Suicide and Hospitalised Self-Harm in Australia. Injury Research and Statistics Series. Australian Institute of Health and Welfare, Adelaide, Australia.

*M.S. Daigle / Accident Analysis and Prevention 37 (2005) 625–632*

Suominen, K., Isometsa, E., Suokas, J., Haukka, J., Achte, K., Lonnqvist, J., 2004. Completed suicide after a suicide attempt: a 37-year follow-up study. Am. J. Psychiatry 161 (3), 562–563.

Whitlock, F.A., 1975. Suicide in Brisbane, 1956 to 1973: the drug-death epidemic. Med. J. Aust. 1, 737–743.

Wilkinson, S., Taylor, G., Templeton, L., Mistral, W., Salter, E., Bennett, P., 2002. Admissions to hospital for deliberate self-harm in England 1995–2000: an analysis of hospital episode statistics. J. Public Health Med. 24, 179–183.

Yamasawa, K., Nishimukai, H., Ohbora, Y., Inoue, S., 1980. Statistical study of suicides through intoxication. Acta Med. Leg. et Soc. 30, 187–192.

# Exhibit 108



## Uniform Crime Reports



Criminal Justice Information Services Division

Feedback | Contact Us | Data Quality Guidelines | UCR Home

## Expanded Homicide Data Table 15

### Justifiable Homicide

by Weapon, Private Citizen,[1] 2006–2010

Download Excel

| Year | Total | Total firearms | Handguns | Rifles | Shotguns | Firearms, type not stated | Knives or cutting instruments | Other dangerous weapons | Personal weapons |
|------|-------|----------------|----------|--------|----------|---------------------------|-------------------------------|-------------------------|------------------|
| 2006 | 238 | 192 | 154 | 12 | 15 | 11 | 31 | 12 | 3 |
| 2007 | 257 | 202 | 161 | 8 | 21 | 12 | 37 | 8 | 10 |
| 2008 | 265 | 219 | 171 | 13 | 13 | 22 | 35 | 9 | 2 |
| 2009 | 266 | 218 | 167 | 9 | 19 | 23 | 30 | 10 | 8 |
| 2010 | 278 | 232 | 170 | 8 | 26 | 28 | 30 | 11 | 5 |

[1] The killing of a felon, during the commission of a felony, by a private citizen.

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice

Close

# Exhibit 109



GUN RIGHTS.
CIVIL RIGHTS.
YOUR RIGHTS.

# 2011 CARRY LICENSE STATISTICS
# ACTIVE LTC LICENSES

## Data captured Sept. 1, 2011
## As Reported by Licensing Authorities to
## CA. Dept of Justice
### (IN ALPHABETICAL ORDER OF COUNTY)

## Proudly brought to you by
## Calguns Foundation

**This and other CGF documents may be downloaded at**
**www.calgunsfoundation.org/resources/downloads**

The Calguns Foundation (www.calgunsfoundation.org) is a 501(c)3 non-profit organization which serves its members by providing Second Amendment-related education, strategic litigation and the defense of innocent California gun owners from improper or malicious prosecution. The Calguns Foundation seeks to inform government and protect the rights of individuals to acquire, own, and lawfully use firearms in California.

## Freedom Isn't Free – Donate Today!
## www.calgunsfoundation.org/donate

# Explanation of LTC Report Column Headings

## Kinds of Licenses to Carry

California Penal Code establishes a license to carry a concealable firearm at § 26170 (formerly § 12050). Penal Code § 26220 distinguishes different types of licenses to carry by to whom issued and by duration of the license:

- *Civilians* – A license to carry is valid for two years for 'civilians' (26220(a))
- *Employment* – Ninety days for 'civilians' when based on the licensee's place of employment (26220(b))
- *Judicial* – Three years for a judge of a court of record, court commissioner, or magistrate of a federal court (26220(c))
- *Custodial Officer* – Four years for a custodial officer who is an employee of a sheriff (26220(d))
- *Reserve Officer* – Four years for a reserve police officer (26220(e))

## License Status

A license may be

- *Active* – all requirements have been met and the license has been issued
- *Pending* – some step in the process is not yet completed
- *Cancelled* – the licensee has chosen not to proceed further in the licensing process
- *Revoked* – the issuing agency has revoked the license
- *Prohibited* – after investigation, the licensee was determined to be prohibited from receiving a license to carry

## Population Comparison

Licenses to carry/1,000 adult residents in the city or county.


# Data for this report came from the following sources

## Population Data

California Department of Finance. California State Data Center. 2011. *Table 1—Total population, median age, sex, age, household and family size.* Last accessed October 10, 2011. Downloadable at: www.dof.ca.gov/research/demographic/state_census_data_center/census_2010/view.php #CQR

## License to Carry Data

California Department of Justice. Bureau of Firearms. 2011. Data files *11_XXXX_01_Alameda* through *11_XXXX_58_Yuba*. Received September 14, 2011.

# CA ACTIVE LTC REPORT
# TABLE OF CONTENTS

| COUNTY | REPORT PAGE | COUNTY | REPORT PAGE |
|---|---|---|---|
| Alameda County | 1 | Orange County | 31 |
| Alpine County | 2 | Placer County | 32 |
| Amador County | 3 | Plumas County | 33 |
| Butte County | 4 | Riverside County | 34 |
| Calaveras County | 5 | Sacramento County | 35 |
| Colusa County | 6 | San Benito County | 36 |
| Contra Costa County | 7 | San Bernardino County | 37 |
| Del Norte County | 8 | San Diego County | 38 |
| El Dorado County | 9 | San Francisco County | 39 |
| Fresno County | 10 | San Joaquin County | 40 |
| Glenn County | 11 | San Luis Obispo County | 41 |
| Humboldt County | 12 | San Mateo County | 42 |
| Imperial County | 13 | Santa Barbara County | 43 |
| Inyo County | 14 | Santa Clara County | 44 |
| Kern County | 15 | Santa Cruz County | 45 |
| Kings County | 16 | Shasta County | 46 |
| Lake County | 17 | Sierra County | 47 |
| Lassen County | 18 | Siskiyou County | 48 |
| Los Angeles County | 19 | Solano County | 49 |
| Madera County | 21 | Sonoma County | 50 |
| Marin County | 22 | Stanislaus County | 51 |
| Mariposa County | 23 | Sutter County | 52 |
| Mendocino County | 24 | Tehama County | 53 |
| Merced County | 25 | Trinity County | 54 |
| Modoc County | 26 | Tulare County | 55 |
| Mono County | 27 | Tuolumne County | 56 |
| Monterey County | 28 | Ventura County | 57 |
| Napa County | 29 | Yolo County | 58 |
| Nevada County | 30 | Yuba County | 59 |

**All Licensing Authorities (statewide)**        **60**

| County | Total Civilian LTC 2010* | Total Civilian LTC 2011** | Increase (Decrease) Year over Year | % +/- (shading indicates delta >10%) | Total Approved Pending LTC 2011** | Total Possible LTC 2011** |
|---|---|---|---|---|---|---|
| Alameda | 75 | 85 | 10 | 13% | 47 | 132 |
| Alpine | 8 | 8 | 0 | 0% | 2 | 10 |
| Amador | 426 | 429 | 3 | 1% | 28 | 457 |
| Butte | 1674 | 1905 | 231 | 14% | 79 | 1984 |
| Calaveras | 464 | 547 | 83 | 18% | 82 | 629 |
| Colusa | 76 | 91 | 15 | 20% | 6 | 97 |
| Contra Costa | 11 | 36 | 25 | 227% | 60 | 96 |
| Del Norte | 95 | 123 | 28 | 29% | 17 | 140 |
| El Dorado | 478 | 506 | 28 | 6% | 357 | 863 |
| Fresno | 2559 | 3469 | 910 | 36% | 278 | 3747 |
| Glenn | 103 | 116 | 13 | 13% | 17 | 133 |
| Humboldt | 620 | 746 | 126 | 20% | 41 | 787 |
| Imperial | 201 | 144 | (57) | -28% | 21 | 165 |
| Inyo | 183 | 195 | 12 | 7% | 19 | 214 |
| Kern | 3457 | 3798 | 341 | 10% | 336 | 4134 |
| Kings | 207 | 261 | 54 | 26% | 51 | 312 |
| Lake | 275 | 309 | 34 | 12% | 39 | 348 |
| Lassen | 224 | 270 | 46 | 21% | 25 | 295 |
| Los Angeles | 214 | 220 | 6 | 3% | 186 | 406 |
| Madera | 941 | 1059 | 118 | 13% | 110 | 1169 |
| Marin | 35 | 33 | (2) | -6% | 9 | 42 |
| Mariposa | 271 | 300 | 29 | 11% | 42 | 342 |
| Mendocino | 1057 | 1122 | 65 | 6% | 42 | 1164 |
| Merced | 396 | 483 | 87 | 22% | 46 | 529 |
| Modoc | 137 | 128 | (9) | -7% | 11 | 139 |
| Mono | 55 | 77 | 22 | 40% | 16 | 93 |
| Monterey | 54 | 91 | 37 | 69% | 29 | 120 |
| Napa | 317 | 315 | (2) | -1% | 26 | 341 |
| Nevada | 272 | 363 | 91 | 33% | 30 | 393 |
| Orange | 532 | 551 | 19 | 4% | 98 | 649 |
| Placer | 934 | 1205 | 271 | 29% | 88 | 1293 |
| Plumas | 404 | 417 | 13 | 3% | 37 | 454 |
| Riverside | 306 | 428 | 122 | 40% | 151 | 579 |
| Sacramento | 269 | 897 | 628 | 233% | 627 | 1524 |
| San Benito | 18 | 3 | (15) | -83% | 32 | 35 |
| San Bernardino | 1537 | 1627 | 90 | 6% | 177 | 1804 |
| San Diego | 724 | 716 | (8) | -1% | 60 | 776 |
| San Francisco | 1 | 0 | (1) | -100% | 3 | 3 |
| San Joaquin | 265 | 321 | 56 | 21% | 123 | 444 |
| San Luis Obispo | 192 | 209 | 17 | 9% | 32 | 241 |
| San Mateo | 101 | 120 | 19 | 19% | 29 | 149 |
| Santa Barbara | 35 | 31 | (4) | -11% | 12 | 43 |
| Santa Clara | 53 | 57 | 4 | 8% | 26 | 83 |
| Santa Cruz | 21 | 18 | (3) | -14% | 9 | 27 |
| Shasta | 1950 | 2375 | 425 | 22% | 200 | 2575 |
| Sierra | 65 | 75 | 10 | 15% | 4 | 79 |
| Siskiyou | 214 | 247 | 33 | 15% | 25 | 272 |
| Solano | 56 | 85 | 29 | 52% | 90 | 175 |
| Sonoma | 52 | 50 | (2) | -4% | 10 | 60 |
| Stanislaus | 505 | 913 | 408 | 81% | 212 | 1125 |
| Sutter | 644 | 688 | 44 | 7% | 65 | 753 |
| Tehama | 525 | 689 | 164 | 31% | 92 | 781 |
| Trinity | 208 | 174 | (34) | -16% | 242 | 416 |
| Tulare | 1695 | 1918 | 223 | 13% | 61 | 1979 |
| Tuolumne | 541 | 558 | 17 | 3% | 42 | 600 |
| Ventura | 239 | 487 | 248 | 104% | 143 | 630 |
| Yolo | 82 | 125 | 43 | 52% | 11 | 136 |
| Yuba | 352 | 453 | 101 | 29% | 46 | 499 |
| **TOTALS** | **27405** | **32666** | **5261** | **19%** | **4799** | **37465** |

\* Data as received from CA. Dept. of Justice July 2010

\*\* Data as received from CA. Dept. of Justice Sept. 2011

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Alameda** | | | |
| ALAMEDA CO SO | | | |
| Civilian | 82 | | 57.7% |
| Judicial | 3 | | 2.1% |
| Reserve Officer | 15 | | 10.6% |
| ALBANY PD | | | |
| Reserve Officer | 3 | | 2.1% |
| FREMONT PD | | | |
| Civilian | 1 | | 0.7% |
| HAYWARD PD | | | |
| Reserve Officer | 14 | | 9.9% |
| OAKLAND PD RECORDS | | | |
| Reserve Officer | 19 | | 13.4% |
| PIEDMONT PD | | | |
| Judicial | 1 | | 0.7% |
| Reserve Officer | 2 | | 1.4% |
| PLEASANTON PD | | | |
| Civilian | 2 | | 1.4% |
| Civilian | 85 | 0.07267 | 59.9% |
| Law Enforcement/Government Employees | 57 | 0.04873 | 40.1% |
| Alameda Total (Adult Residents: 1,169,650) | 142 | 0.12140 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Alpine** | | | |
| ALPINE CO SO | | | |
| Civilian | 8 | | 88.9% |
| Reserve Officer | 1 | | 11.1% |
| Civilian | 8 | 8.70511 | 88.9% |
| Law Enforcement/Government Employees | 1 | 1.08814 | 11.1% |
| Alpine Total (Adult Residents: 919) | 9 | 9.79325 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Amador** | | | |
| AMADOR CO SO | | | |
|     Civilian | 408 | | 94.9% |
|     Judicial | 1 | | 0.2% |
| IONE PD | | | |
|     Civilian | 10 | | 2.3% |
| JACKSON PD | | | |
|     Civilian | 1 | | 0.2% |
| SUTTER CREEK PD | | | |
|     Civilian | 10 | | 2.3% |
| Civilian | 429 | 13.53398 | 99.8% |
| Law Enforcement/Government Employees | 1 | 0.03155 | 0.2% |
| Amador Total (Adult Residents: 31,698) | 430 | 13.56552 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Butte** | | | |
| BUTTE CO SO | | | |
|    Civilian | 1,892 | | 97.5% |
|    Custodial Officer | 16 | | 0.8% |
|    Judicial | 2 | | 0.1% |
|    Reserve Officer | 16 | | 0.8% |
| CHICO PD #1 | | | |
|    Civilian | 7 | | 0.4% |
| GRIDLEY PD | | | |
|    Civilian | 6 | | 0.3% |
|    Reserve Officer | 1 | | 0.1% |
| Civilian | 1,905 | 10.95886 | 98.2% |
| Law Enforcement/Government Employees | 35 | 0.20134 | 1.8% |
| Butte Total (Adult Residents: 173,832) | 1,940 | 11.16020 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Calaveras** | | | |
| ANGELS CAMP PD | | | |
| Civilian | 35 | | 6.4% |
| Reserve Officer | 1 | | 0.2% |
| CALAVERAS CO SO | | | |
| Civilian | 512 | | 93.1% |
| Custodial Officer | 1 | | 0.2% |
| Reserve Officer | 1 | | 0.2% |
| Civilian | 547 | 14.93108 | 99.5% |
| Law Enforcement/Government Employees | 3 | 0.08189 | 0.5% |
| Calaveras Total (Adult Residents: 36,635) | 550 | 15.01297 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Colusa** | | | |
| COLUSA CO SO | | | |
| Civilian | 61 | | 66.3% |
| Custodial Officer | 1 | | 1.1% |
| COLUSA PD | | | |
| Civilian | 23 | | 25.0% |
| WILLIAMS PD | | | |
| Civilian | 7 | | 7.6% |
| Civilian | 91 | 6.06303 | 98.9% |
| Law Enforcement/Government Employees | 1 | 0.06663 | 1.1% |
| Colusa Total (Adult Residents: 15,009) | 92 | 6.12966 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Contra Costa** | | | |
|    ANTIOCH PD | | | |
|       Civilian | 1 | | 1.4% |
|    BRENTWOOD PD | | | |
|       Civilian | 2 | | 2.7% |
|    CLAYTON PD | | | |
|       Civilian | 1 | | 1.4% |
|       Reserve Officer | 1 | | 1.4% |
|    CONTRA COSTA CO SO | | | |
|       Civilian | 26 | | 35.1% |
|       Judicial | 1 | | 1.4% |
|       Reserve Officer | 18 | | 24.3% |
|    HERCULES PD | | | |
|       Civilian | 1 | | 1.4% |
|    MARTINEZ PD | | | |
|       Civilian | 1 | | 1.4% |
|       Reserve Officer | 2 | | 2.7% |
|    MORAGA PD | | | |
|       Civilian | 1 | | 1.4% |
|       Reserve Officer | 2 | | 2.7% |
|    RICHMOND PD | | | |
|       Civilian | 3 | | 4.1% |
|       Reserve Officer | 1 | | 1.4% |
|    WALNUT CREEK PD | | | |
|       Reserve Officer | 13 | | 17.6% |
| Civilian | 36 | 0.04566 | 48.6% |
| Law Enforcement/Government Employees | 38 | 0.04819 | 51.4% |
| Contra Costa Total (Adult Residents: 788,520) | 74 | 0.09385 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Del Norte** | | | |
| DEL NORTE CO SO | | | |
| Civilian | 123 | | 100.0% |
| Civilian | 123 | 5.47348 | 100.0% |
| Law Enforcement/Government Employees | 0 | 0.00000 | 0.0% |
| Del Norte Total (Adult Residents: 22,472) | 123 | 5.47348 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **El Dorado** | | | |
| EL DORADO CO SO | | | |
| Civilian | 505 | | 96.6% |
| Custodial Officer | 10 | | 1.9% |
| Judicial | 2 | | 0.4% |
| Reserve Officer | 5 | | 1.0% |
| EL DORADO CO SO (SLT) | | | |
| Civilian | 1 | | 0.2% |
| Civilian | 506 | 3.61731 | 96.7% |
| Law Enforcement/Government Employees | 17 | 0.12153 | 3.3% |
| El Dorado Total (Adult Residents: 139,883) | 523 | 3.73884 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Fresno** | | | |
| CLOVIS PD | | | |
| Civilian | 11 | | 0.3% |
| COALINGA PD | | | |
| Civilian | 23 | | 0.6% |
| Reserve Officer | 1 | | 0.0% |
| FIREBAUGH PD | | | |
| Civilian | 1 | | 0.0% |
| Reserve Officer | 1 | | 0.0% |
| FOWLER PD | | | |
| Civilian | 3 | | 0.1% |
| FRESNO CO SO | | | |
| Civilian | 3,295 | | 91.5% |
| Custodial Officer | 82 | | 2.3% |
| Judicial | 16 | | 0.4% |
| Reserve Officer | 27 | | 0.7% |
| FRESNO PD | | | |
| Civilian | 134 | | 3.7% |
| Custodial Officer | 1 | | 0.0% |
| Judicial | 1 | | 0.0% |
| Reserve Officer | 3 | | 0.1% |
| KINGSBURG PD | | | |
| Civilian | 1 | | 0.0% |
| SANGER PD | | | |
| Civilian | 1 | | 0.0% |
| Civilian | 3,469 | 5.31287 | 96.3% |
| Law Enforcement/Government Employees | 132 | 0.20216 | 3.7% |
| Fresno Total (Adult Residents: 652,943) | 3,601 | 5.51503 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Glenn** | | | |
| GLENN CO SO | | | |
| Civilian | 113 | | 95.8% |
| Custodial Officer | 2 | | 1.7% |
| ORLAND PD | | | |
| Civilian | 3 | | 2.5% |
| Civilian | 116 | 5.72642 | 98.3% |
| Law Enforcement/Government Employees | 2 | 0.09873 | 1.7% |
| Glenn Total (Adult Residents: 20,257) | 118 | 5.82515 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Humboldt** | | | |
| HUMBOLDT CO SO | | | |
| Civilian | 746 | | 96.6% |
| Custodial Officer | 20 | | 2.6% |
| Judicial | 2 | | 0.3% |
| Reserve Officer | 4 | | 0.5% |
| Civilian | 746 | 6.93553 | 96.6% |
| Law Enforcement/Government Employees | 26 | 0.24172 | 3.4% |
| Humboldt Total (Adult Residents: 107,562) | 772 | 7.17726 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Imperial** | | | |
| IMPERIAL CO SO #1 | | | |
| Civilian | 144 | | 94.7% |
| Judicial | 2 | | 1.3% |
| Reserve Officer | 6 | | 3.9% |
| Civilian | 144 | 1.16665 | 94.7% |
| Law Enforcement/Government Employees | 8 | 0.06481 | 5.3% |
| Imperial Total (Adult Residents: 123,430) | 152 | 1.23147 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Inyo** | | | |
| BISHOP PD | | | |
| Civilian | 7 | | 3.5% |
| Reserve Officer | 1 | | 0.5% |
| INYO CO SO | | | |
| Civilian | 188 | | 93.5% |
| Custodial Officer | 2 | | 1.0% |
| Reserve Officer | 3 | | 1.5% |
| Civilian | 195 | 13.31422 | 97.0% |
| Law Enforcement/Government Employees | 6 | 0.40967 | 3.0% |
| Inyo Total (Adult Residents: 14,646) | 201 | 13.72388 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Kern** | | | |
| ARVIN PD | | | |
| Civilian | 1 | | 0.0% |
| BAKERSFIELD PD | | | |
| Civilian | 165 | | 4.3% |
| Judicial | 2 | | 0.1% |
| Reserve Officer | 10 | | 0.3% |
| CALIF. CITY PD | | | |
| Civilian | 4 | | 0.1% |
| Custodial Officer | 1 | | 0.0% |
| DELANO PD | | | |
| Civilian | 1 | | 0.0% |
| Custodial Officer | 2 | | 0.1% |
| Reserve Officer | 1 | | 0.0% |
| KERN CO SO | | | |
| Civilian | 3,514 | | 90.9% |
| Custodial Officer | 1 | | 0.0% |
| Judicial | 7 | | 0.2% |
| Reserve Officer | 42 | | 1.1% |
| RIDGECREST PD | | | |
| Civilian | 46 | | 1.2% |
| SHAFTER PD | | | |
| Civilian | 23 | | 0.6% |
| TAFT PD | | | |
| Civilian | 44 | | 1.1% |
| Reserve Officer | 2 | | 0.1% |
| Civilian | 3,798 | 6.48621 | 98.2% |
| Law Enforcement/Government Employees | 68 | 0.11613 | 1.8% |
| Kern Total (Adult Residents: 585,550) | 3,866 | 6.60234 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Kings** | | | |
| CORCORAN PD | | | |
|     Civilian | 3 | | 1.1% |
|     Reserve Officer | 2 | | 0.7% |
| HANFORD PD | | | |
|     Civilian | 68 | | 24.8% |
|     Judicial | 1 | | 0.4% |
|     Reserve Officer | 1 | | 0.4% |
| KINGS CO SO | | | |
|     Civilian | 178 | | 65.0% |
|     Custodial Officer | 5 | | 1.8% |
|     Judicial | 2 | | 0.7% |
|     Reserve Officer | 1 | | 0.4% |
| LEMOORE PD | | | |
|     Civilian | 12 | | 4.4% |
|     Reserve Officer | 1 | | 0.4% |
| Civilian | 261 | 2.36340 | 95.3% |
| Law Enforcement/Government Employees | 13 | 0.11772 | 4.7% |
| Kings Total (Adult Residents: 110,434) | 274 | 2.48112 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Lake** | | | |
| CLEARLAKE PD | | | |
| Judicial | 1 | | 0.3% |
| LAKE CO SO | | | |
| Civilian | 307 | | 96.8% |
| Custodial Officer | 5 | | 1.6% |
| Judicial | 1 | | 0.3% |
| Reserve Officer | 1 | | 0.3% |
| LAKEPORT PD | | | |
| Civilian | 2 | | 0.6% |
| Civilian | 309 | 6.05966 | 97.5% |
| Law Enforcement/Government Employees | 8 | 0.15688 | 2.5% |
| Lake Total (Adult Residents: 50,993) | 317 | 6.21654 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Lassen** | | | |
| LASSEN CO SO | | | |
| Civilian | 270 | | 99.6% |
| Judicial | 1 | | 0.4% |
| Civilian | 270 | 9.43990 | 99.6% |
| Law Enforcement/Government Employees | 1 | 0.03496 | 0.4% |
| Lassen Total (Adult Residents: 28,602) | 271 | 9.47486 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Los Angeles** | | | |
| ALHAMBRA PD | | | |
|     Reserve Officer | 2 | | 0.3% |
| ARCADIA PD | | | |
|     Civilian | 1 | | 0.1% |
| AZUSA PD | | | |
|     Reserve Officer | 3 | | 0.4% |
| BEVERLY HILLS PD | | | |
|     Civilian | 1 | | 0.1% |
|     Reserve Officer | 2 | | 0.3% |
| BURBANK PD | | | |
|     Reserve Officer | 8 | | 1.2% |
| CULVER CITY PD | | | |
|     Civilian | 1 | | 0.1% |
|     Reserve Officer | 13 | | 1.9% |
| DOWNEY PD | | | |
|     Civilian | 1 | | 0.1% |
| EL MONTE PD | | | |
|     Civilian | 13 | | 1.9% |
|     Reserve Officer | 7 | | 1.0% |
| GLENDALE PD | | | |
|     Civilian | 1 | | 0.1% |
|     Reserve Officer | 6 | | 0.9% |
| GLENDORA PD | | | |
|     Civilian | 1 | | 0.1% |
|     Reserve Officer | 2 | | 0.3% |
| LA VERNE PD | | | |
|     Reserve Officer | 3 | | 0.4% |
| LAPD-DETECTIVE HDQTR | | | |
|     Civilian | 12 | | 1.8% |
|     Reserve Officer | 19 | | 2.8% |
| LASD-CENTRAL SUPPLIES | | | |
|     Civilian | 1 | | 0.1% |
|     Reserve Officer | 102 | | 15.1% |
| LONG BEACH PD | | | |
|     Civilian | 1 | | 0.1% |
| LOS ANGELES CO SO | | | |
|     Civilian | 181 | | 26.8% |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Los Angeles** | | | |
| LOS ANGELES CO SO | | | |
|     Custodial Officer | 1 | | 0.1% |
|     Judicial | 95 | | 14.1% |
|     Reserve Officer | 138 | | 20.4% |
| MANHATTAN BEACH PD | | | |
|     Civilian | 2 | | 0.3% |
|     Reserve Officer | 2 | | 0.3% |
| MONROVIA PD | | | |
|     Judicial | 1 | | 0.1% |
|     Reserve Officer | 1 | | 0.1% |
| MONTEBELLO PD | | | |
|     Reserve Officer | 10 | | 1.5% |
| MONTEREY PARK PD | | | |
|     Reserve Officer | 8 | | 1.2% |
| PALOS VERDES ESTATES PD | | | |
|     Civilian | 3 | | 0.4% |
|     Reserve Officer | 2 | | 0.3% |
| PASADENA PD | | | |
|     Reserve Officer | 6 | | 0.9% |
| REDONDO BEACH PD | | | |
|     Reserve Officer | 2 | | 0.3% |
| SAN FERNANDO PD | | | |
|     Reserve Officer | 15 | | 2.2% |
| SANTA MONICA PD | | | |
|     Civilian | 1 | | 0.1% |
| WEST COVINA PD | | | |
|     Reserve Officer | 7 | | 1.0% |
| Civilian | 220 | 0.02966 | 32.6% |
| Law Enforcement/Government Employees | 455 | 0.06135 | 67.4% |
| Los Angeles Total (Adult Residents: 7,416,397) | 675 | 0.09101 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Madera** | | | |
| MADERA CO SO #1 | | | |
| Civilian | 1,059 | | 98.7% |
| Judicial | 1 | | 0.1% |
| Reserve Officer | 13 | | 1.2% |
| Civilian | 1,059 | 9.80410 | 98.7% |
| Law Enforcement/Government Employees | 14 | 0.12961 | 1.3% |
| Madera Total (Adult Residents: 108,016) | 1,073 | 9.93371 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Marin** | | | |
| MARIN CO SO | | | |
| Civilian | 21 | | 56.8% |
| Judicial | 1 | | 2.7% |
| MILL VALLEY PD | | | |
| Reserve Officer | 1 | | 2.7% |
| NOVATO PD | | | |
| Civilian | 4 | | 10.8% |
| SAN RAFAEL PD | | | |
| Civilian | 3 | | 8.1% |
| Reserve Officer | 2 | | 5.4% |
| TIBURON PD | | | |
| Civilian | 1 | | 2.7% |
| TWIN CITIES PD | | | |
| Civilian | 4 | | 10.8% |
| Civilian | 33 | 0.16484 | 89.2% |
| Law Enforcement/Government Employees | 4 | 0.01998 | 10.8% |
| Marin Total (Adult Residents: 200,195) | 37 | 0.18482 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Mariposa** | | | |
| MARIPOSA CO SO | | | |
| Civilian | 300 | | 97.1% |
| Custodial Officer | 4 | | 1.3% |
| Judicial | 2 | | 0.6% |
| Reserve Officer | 3 | | 1.0% |
| Civilian | 300 | 19.98801 | 97.1% |
| Law Enforcement/Government Employees | 9 | 0.59964 | 2.9% |
| Mariposa Total (Adult Residents: 15,009) | 309 | 20.58765 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Mendocino** | | | |
| MENDOCINO CO SO | | | |
| Civilian | 1,119 | | 99.2% |
| Custodial Officer | 2 | | 0.2% |
| Judicial | 1 | | 0.1% |
| Reserve Officer | 2 | | 0.2% |
| UKIAH PD | | | |
| Civilian | 3 | | 0.3% |
| WILLITS PD #1 | | | |
| Reserve Officer | 1 | | 0.1% |
| Civilian | 1,122 | 16.40831 | 99.5% |
| Law Enforcement/Government Employees | 6 | 0.08774 | 0.5% |
| Mendocino Total (Adult Residents: 68,380) | 1,128 | 16.49605 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Merced** | | | |
| ATWATER PD | | | |
|    Civilian | 3 | | 0.6% |
| DOS PALOS PD | | | |
|    Civilian | 3 | | 0.6% |
| GUSTINE POLICE DEPT | | | |
|    Civilian | 3 | | 0.6% |
| LOS BANOS PD | | | |
|    Civilian | 4 | | 0.8% |
| MERCED CO SO | | | |
|    Civilian | 467 | | 95.3% |
|    Custodial Officer | 6 | | 1.2% |
|    Reserve Officer | 1 | | 0.2% |
| MERCED PD | | | |
|    Civilian | 3 | | 0.6% |
| Civilian | 483 | 2.75850 | 98.6% |
| Law Enforcement/Government Employees | 7 | 0.03998 | 1.4% |
| Merced Total (Adult Residents: 175,095) | 490 | 2.79848 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Modoc** | | | |
| ALTURAS PD | | | |
| Civilian | 5 | | 3.9% |
| MODOC CO SO | | | |
| Civilian | 123 | | 96.1% |
| Civilian | 128 | 16.92674 | 100.0% |
| Law Enforcement/Government Employees | 0 | 0.00000 | 0.0% |
| Modoc Total (Adult Residents: 7,562) | 128 | 16.92674 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Mono** | | | |
| MAMMOTH LAKES PD | | | |
| Civilian | 10 | | 12.5% |
| MONO CO SO | | | |
| Civilian | 67 | | 83.8% |
| Custodial Officer | 1 | | 1.3% |
| Reserve Officer | 2 | | 2.5% |
| Civilian | 77 | 6.86091 | 96.2% |
| Law Enforcement/Government Employees | 3 | 0.26731 | 3.8% |
| Mono Total (Adult Residents: 11,223) | 80 | 7.12822 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Monterey** | | | |
| DEL REY OAKS PD | | | |
| Civilian | 1 | | 0.9% |
| Reserve Officer | 5 | | 4.6% |
| GREENFIELD PD | | | |
| Civilian | 2 | | 1.9% |
| MONTEREY CO SO | | | |
| Civilian | 87 | | 80.6% |
| Judicial | 6 | | 5.6% |
| Reserve Officer | 6 | | 5.6% |
| SOLEDAD PD | | | |
| Civilian | 1 | | 0.9% |
| Civilian | 91 | 0.29930 | 84.3% |
| Law Enforcement/Government Employees | 17 | 0.05591 | 15.7% |
| Monterey Total (Adult Residents: 304,044) | 108 | 0.35521 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Napa** | | | |
| NAPA CO SO | | | |
| Civilian | 237 | | 70.5% |
| Reserve Officer | 21 | | 6.3% |
| NAPA PD | | | |
| Civilian | 77 | | 22.9% |
| ST. HELENA PD | | | |
| Civilian | 1 | | 0.3% |
| Civilian | 315 | 3.00006 | 93.8% |
| Law Enforcement/Government Employees | 21 | 0.20000 | 6.2% |
| Napa Total (Adult Residents: 104,998) | 336 | 3.20006 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Nevada** | | | |
| GRASS VALLEY PD | | | |
|     Civilian | 1 | | 0.3% |
|     Reserve Officer | 1 | | 0.3% |
| NEVADA CITY PD | | | |
|     Civilian | 4 | | 1.0% |
| NEVADA CO S O- TRUCKEE | | | |
|     Civilian | 1 | | 0.3% |
| NEVADA CO SO | | | |
|     Civilian | 335 | | 86.3% |
|     Custodial Officer | 17 | | 4.4% |
|     Reserve Officer | 6 | | 1.5% |
| TRUCKEE POLICE DEPT | | | |
|     Civilian | 22 | | 5.7% |
|     Reserve Officer | 1 | | 0.3% |
| Civilian | 363 | 4.55698 | 93.6% |
| Law Enforcement/Government Employees | 25 | 0.31384 | 6.4% |
| Nevada Total (Adult Residents: 79,658) | 388 | 4.87082 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Orange** | | | |
| ANAHEIM PD | | | |
| Reserve Officer | 2 | | 0.3% |
| BUENA PARK PD | | | |
| Reserve Officer | 7 | | 1.0% |
| COSTA MESA PD #1 | | | |
| Reserve Officer | 2 | | 0.3% |
| LOS ALAMITOS PD | | | |
| Reserve Officer | 3 | | 0.4% |
| NEWPORT BEACH PD | | | |
| Civilian | 2 | | 0.3% |
| Judicial | 2 | | 0.3% |
| Reserve Officer | 9 | | 1.2% |
| ORANGE CO SO | | | |
| Civilian | 549 | | 74.9% |
| Judicial | 24 | | 3.3% |
| Reserve Officer | 131 | | 17.9% |
| ORANGE PD | | | |
| Reserve Officer | 2 | | 0.3% |
| Civilian | 551 | 0.24235 | 75.2% |
| Law Enforcement/Government Employees | 182 | 0.08005 | 24.8% |
| Orange Total (Adult Residents: 2,273,573) | 733 | 0.32240 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Placer** | | | |
| AUBURN PD | | | |
| Civilian | 4 | | 0.3% |
| PLACER CO SO - COMM | | | |
| Civilian | 1,170 | | 95.5% |
| Custodial Officer | 5 | | 0.4% |
| Judicial | 3 | | 0.2% |
| Reserve Officer | 10 | | 0.8% |
| PLACER CO SO-TAHOE SUB#1 | | | |
| Civilian | 31 | | 2.5% |
| ROCKLIN PD | | | |
| Reserve Officer | 2 | | 0.2% |
| Civilian | 1,205 | 4.57571 | 98.4% |
| Law Enforcement/Government Employees | 20 | 0.07595 | 1.6% |
| Placer Total (Adult Residents: 263,347) | 1,225 | 4.65166 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Plumas** | | | |
| PLUMAS CO SO | | | |
| Civilian | 417 | | 99.3% |
| Judicial | 1 | | 0.2% |
| Reserve Officer | 2 | | 0.5% |
| Civilian | 417 | 25.41753 | 99.3% |
| Law Enforcement/Government Employees | 3 | 0.18286 | 0.7% |
| Plumas Total (Adult Residents: 16,406) | 420 | 25.60039 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Riverside** | | | |
| CATHEDRAL CITY PD | | | |
| Civilian | 2 | | 0.3% |
| Reserve Officer | 3 | | 0.5% |
| CORONA PD-RECORDS | | | |
| Civilian | 1 | | 0.2% |
| DESERT HOT SPRINGS PD | | | |
| Civilian | 1 | | 0.2% |
| INDIO PD COMMUNICATIONS | | | |
| Civilian | 1 | | 0.2% |
| Reserve Officer | 2 | | 0.3% |
| PALM SPRINGS PD-COMM | | | |
| Civilian | 9 | | 1.5% |
| Reserve Officer | 10 | | 1.6% |
| RIVERSIDE CO SO-RECORDS | | | |
| Civilian | 408 | | 66.8% |
| Custodial Officer | 127 | | 20.8% |
| Judicial | 16 | | 2.6% |
| Reserve Officer | 25 | | 4.1% |
| RIVERSIDE PD | | | |
| Civilian | 6 | | 1.0% |
| Civilian | 428 | 0.27269 | 70.0% |
| Law Enforcement/Government Employees | 183 | 0.11660 | 30.0% |
| Riverside Total (Adult Residents: 1,569,533) | 611 | 0.38929 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Sacramento** | | | |
| FOLSOM PD | | | |
| Civilian | 1 | | 0.1% |
| SACRAMENTO CO SO #1 | | | |
| Civilian | 896 | | 92.1% |
| Judicial | 6 | | 0.6% |
| Reserve Officer | 70 | | 7.2% |
| Civilian | 897 | 0.84965 | 92.2% |
| Law Enforcement/Government Employees | 76 | 0.07199 | 7.8% |
| Sacramento Total (Adult Residents: 1,055,735) | 973 | 0.92163 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **San Benito** | | | |
| SAN BENITO CO SO | | | |
| Civilian | 3 | | 100.0% |
| Civilian | 3 | 0.07652 | 100.0% |
| Law Enforcement/Government Employees | 0 | 0.00000 | 0.0% |
| San Benito Total (Adult Residents: 39,203) | 3 | 0.07652 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **San Bernardino** | | | |
| BARSTOW PD | | | |
| Civilian | 2 | | 0.1% |
| Reserve Officer | 1 | | 0.1% |
| COLTON PD | | | |
| Civilian | 1 | | 0.1% |
| FONTANA PD | | | |
| Reserve Officer | 2 | | 0.1% |
| MONTCLAIR PD | | | |
| Reserve Officer | 3 | | 0.2% |
| ONTARIO PD | | | |
| Reserve Officer | 5 | | 0.3% |
| REDLANDS PD | | | |
| Civilian | 23 | | 1.3% |
| Judicial | 1 | | 0.1% |
| Reserve Officer | 1 | | 0.1% |
| RIALTO PD | | | |
| Reserve Officer | 1 | | 0.1% |
| SAN BERDO SO-BIG BEAR | | | |
| Civilian | 1 | | 0.1% |
| SAN BERNARDINO CO SO | | | |
| Civilian | 1,594 | | 88.0% |
| Custodial Officer | 2 | | 0.1% |
| Judicial | 16 | | 0.9% |
| Reserve Officer | 142 | | 7.8% |
| SAN BERNARDINO PD | | | |
| Reserve Officer | 1 | | 0.1% |
| UPLAND PD | | | |
| Civilian | 6 | | 0.3% |
| Judicial | 1 | | 0.1% |
| Reserve Officer | 8 | | 0.4% |
| Civilian | 1,627 | 1.12937 | 89.8% |
| Law Enforcement/Government Employees | 184 | 0.12772 | 10.2% |
| San Bernardino Total (Adult Residents: 1,440,622) | 1,811 | 1.25710 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **San Diego** | | | |
| EL CAJON PD | | | |
| Civilian | 1 | | 0.1% |
| LA MESA PD | | | |
| Judicial | 1 | | 0.1% |
| SAN DIEGO CO SO | | | |
| Civilian | 715 | | 83.9% |
| Custodial Officer | 2 | | 0.2% |
| Judicial | 27 | | 3.2% |
| Reserve Officer | 106 | | 12.4% |
| Civilian | 716 | 0.30196 | 84.0% |
| Law Enforcement/Government Employees | 136 | 0.05736 | 16.0% |
| San Diego Total (Adult Residents: 2,371,145) | 852 | 0.35932 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **San Francisco** | | | |
| Civilian | 0 | 0.00000 | |
| Law Enforcement/Government Employees | 0 | 0.00000 | |
| San Francisco Total (Adult Residents: 697,711) | | | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **San Joaquin** | | | |
| ESCALON POLICE DEPT | | | |
|     Civilian | 11 | | 3.0% |
|     Reserve Officer | 7 | | 1.9% |
| LODI POLICE DEPT | | | |
|     Civilian | 10 | | 2.7% |
| MANTECA PD | | | |
|     Civilian | 19 | | 5.1% |
|     Reserve Officer | 3 | | 0.8% |
| RIPON PD | | | |
|     Civilian | 47 | | 12.6% |
|     Custodial Officer | 1 | | 0.3% |
|     Reserve Officer | | | |
| SAN JOAQUIN CO SO | | | |
|     Civilian | 204 | | 54.8% |
|     Custodial Officer | 16 | | 4.3% |
|     Judicial | 5 | | 1.3% |
|     Reserve Officer | 12 | | 3.2% |
| STOCKTON PD | | | |
|     Civilian | 29 | | 7.8% |
|     Judicial | 1 | | 0.3% |
|     Reserve Officer | 5 | | 1.3% |
| TRACY PD | | | |
|     Civilian | 1 | | 0.3% |
|     Judicial | 1 | | 0.3% |
| Civilian | 321 | 0.66243 | 86.3% |
| Law Enforcement/Government Employees | 51 | 0.10525 | 13.7% |
| San Joaquin Total (Adult Residents: 484,582) | 372 | 0.76767 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **San Luis Obispo** | | | |
| ARROYO GRANDE PD | | | |
| Civilian | 4 | | 1.6% |
| PASO ROBLES PD | | | |
| Civilian | 4 | | 1.6% |
| Reserve Officer | 2 | | 0.8% |
| PISMO BEACH PD | | | |
| Civilian | 1 | | 0.4% |
| SAN LUIS OBISPO CO SO | | | |
| Civilian | 200 | | 77.5% |
| Custodial Officer | 39 | | 15.1% |
| Judicial | 6 | | 2.3% |
| Reserve Officer | 2 | | 0.8% |
| Civilian | 209 | 0.95523 | 81.0% |
| Law Enforcement/Government Employees | 49 | 0.22395 | 19.0% |
| San Luis Obispo Total (Adult Residents: 218,796) | 258 | 1.17918 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **San Mateo** | | | |
| BROADMOOR PD | | | |
| Reserve Officer | 1 | | 0.7% |
| SAN MATEO CO SO RECORDS | | | |
| Civilian | 120 | | 87.0% |
| Judicial | 1 | | 0.7% |
| Reserve Officer | 16 | | 11.6% |
| Civilian | 120 | 0.21479 | 87.0% |
| Law Enforcement/Government Employees | 18 | 0.03222 | 13.0% |
| San Mateo Total (Adult Residents: 558,679) | 138 | 0.24701 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Santa Barbara** | | | |
| SANTA BARBARA CO SO | | | |
| Civilian | 21 | | 50.0% |
| Custodial Officer | 2 | | 4.8% |
| Judicial | 1 | | 2.4% |
| Reserve Officer | 5 | | 11.9% |
| SANTA MARIA PD | | | |
| Civilian | 10 | | 23.8% |
| Reserve Officer | 3 | | 7.1% |
| Civilian | 31 | 0.09514 | 73.8% |
| Law Enforcement/Government Employees | 11 | 0.03376 | 26.2% |
| Santa Barbara Total (Adult Residents: 325,848) | 42 | 0.12889 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Santa Clara** | | | |
| CAMPBELL PD | | | |
| Civilian | 1 | | 1.1% |
| GILROY PD | | | |
| Civilian | 1 | | 1.1% |
| Reserve Officer | 1 | | 1.1% |
| MILPITAS PD | | | |
| Reserve Officer | 2 | | 2.2% |
| SANTA CLARA CO SO | | | |
| Civilian | 55 | | 59.8% |
| Judicial | 9 | | 9.8% |
| Reserve Officer | 15 | | 16.3% |
| SANTA CLARA PD #1 | | | |
| Reserve Officer | 8 | | 8.7% |
| Civilian | 57 | 0.04216 | 62.0% |
| Law Enforcement/Government Employees | 35 | 0.02589 | 38.0% |
| Santa Clara Total (Adult Residents: 1,352,097) | 92 | 0.06804 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Santa Cruz** | | | |
| CAPITOLA PD | | | |
| Civilian | 1 | | 4.0% |
| Reserve Officer | 1 | | 4.0% |
| SANTA CRUZ CO SO | | | |
| Civilian | 16 | | 64.0% |
| Judicial | 1 | | 4.0% |
| Reserve Officer | 2 | | 8.0% |
| SCOTTS VALLEY PD | | | |
| Civilian | 1 | | 4.0% |
| Reserve Officer | 3 | | 12.0% |
| Civilian | 18 | 0.08697 | 72.0% |
| Law Enforcement/Government Employees | 7 | 0.03382 | 28.0% |
| Santa Cruz Total (Adult Residents: 206,964) | 25 | 0.12079 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Shasta** | | | |
| REDDING PD | | | |
|     Civilian | 2 | | 0.1% |
| SHASTA CO SO | | | |
|     Civilian | 2,364 | | 98.0% |
|     Custodial Officer | 21 | | 0.9% |
|     Judicial | 7 | | 0.3% |
|     Reserve Officer | 9 | | 0.4% |
| SHASTA CO SO BURNEY | | | |
|     Civilian | 9 | | 0.4% |
| Civilian | 2,375 | 17.26381 | 98.5% |
| Law Enforcement/Government Employees | 37 | 0.26895 | 1.5% |
| Shasta Total (Adult Residents: 137,571) | 2,412 | 17.53276 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Sierra** | | | |
| SIERRA CO SO | | | |
| Civilian | 75 | | 98.7% |
| Judicial | 1 | | 1.3% |
| Civilian | 75 | 27.90179 | 98.7% |
| Law Enforcement/Government Employees | 1 | 0.37202 | 1.3% |
| Sierra Total (Adult Residents: 2,688) | 76 | 28.27381 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Siskiyou** | | | |
| MT. SHASTA PD | | | |
|     Civilian | 18 | | 7.1% |
|     Reserve Officer | 1 | | 0.4% |
| SISKIYOU CO SO | | | |
|     Civilian | 206 | | 81.4% |
|     Reserve Officer | 3 | | 1.2% |
| TULELAKE PD | | | |
|     Civilian | 1 | | 0.4% |
| WEED PD | | | |
|     Civilian | 9 | | 3.6% |
|     Reserve Officer | 1 | | 0.4% |
| YREKA PD | | | |
|     Civilian | 13 | | 5.1% |
|     Reserve Officer | 1 | | 0.4% |
| Civilian | 247 | 6.94308 | 97.6% |
| Law Enforcement/Government Employees | 6 | 0.16866 | 2.4% |
| Siskiyou Total (Adult Residents: 35,575) | 253 | 7.11174 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Solano** | | | |
| BENICIA PD | | | |
| Civilian | 3 | | 2.4% |
| DIXON PD | | | |
| Civilian | 3 | | 2.4% |
| Custodial Officer | 1 | | 0.8% |
| FAIRFIELD PD | | | |
| Civilian | 2 | | 1.6% |
| SOLANO CO SO | | | |
| Civilian | 67 | | 52.8% |
| Custodial Officer | 33 | | 26.0% |
| Judicial | 1 | | 0.8% |
| Reserve Officer | 5 | | 3.9% |
| VACAVILLE PD | | | |
| Civilian | 6 | | 4.7% |
| Reserve Officer | 1 | | 0.8% |
| VALLEJO PD | | | |
| Civilian | 4 | | 3.1% |
| Reserve Officer | 1 | | 0.8% |
| Civilian | 85 | 0.27260 | 66.9% |
| Law Enforcement/Government Employees | 42 | 0.13470 | 33.1% |
| Solano Total (Adult Residents: 311,809) | 127 | 0.40730 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Sonoma** | | | |
| COTATI PD | | | |
| Civilian | 1 | | 1.6% |
| ROHNERT PARK PD | | | |
| Civilian | 2 | | 3.3% |
| SANTA ROSA PD #1 | | | |
| Civilian | 2 | | 3.3% |
| SEBASTOPOL PD | | | |
| Reserve Officer | 5 | | 8.2% |
| SONOMA SHERIFF-RECORDS | | | |
| Civilian | 45 | | 73.8% |
| Judicial | 4 | | 6.6% |
| Reserve Officer | 2 | | 3.3% |
| Civilian | 50 | 0.13248 | 82.0% |
| Law Enforcement/Government Employees | 11 | 0.02915 | 18.0% |
| Sonoma Total (Adult Residents: 377,407) | 61 | 0.16163 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Stanislaus** | | | |
| CERES PD | | | |
| Civilian | 2 | | 0.2% |
| MODESTO PD | | | |
| Civilian | 48 | | 4.7% |
| Custodial Officer | 1 | | 0.1% |
| Reserve Officer | 7 | | 0.7% |
| NEWMAN PD | | | |
| Civilian | 4 | | 0.4% |
| Reserve Officer | 1 | | 0.1% |
| OAKDALE PD | | | |
| Civilian | 5 | | 0.5% |
| Reserve Officer | 1 | | 0.1% |
| STANISLAUS CO SO | | | |
| Civilian | 838 | | 81.8% |
| Custodial Officer | 85 | | 8.3% |
| Judicial | 2 | | 0.2% |
| Reserve Officer | 14 | | 1.4% |
| TURLOCK PD | | | |
| Civilian | 15 | | 1.5% |
| WATERFORD PD | | | |
| Civilian | 1 | | 0.1% |
| Civilian | 913 | 2.48574 | 89.2% |
| Law Enforcement/Government Employees | 111 | 0.30221 | 10.8% |
| Stanislaus Total (Adult Residents: 367,295) | 1,024 | 2.78795 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Sutter** | | | |
| SUTTER CO SO | | | |
| Civilian | 688 | | 97.0% |
| Custodial Officer | 9 | | 1.3% |
| Reserve Officer | 12 | | 1.7% |
| Civilian | 688 | 10.02550 | 97.0% |
| Law Enforcement/Government Employees | 21 | 0.30601 | 3.0% |
| Sutter Total (Adult Residents: 68,625) | 709 | 10.33151 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Tehama** | | | |
| CORNING PD | | | |
| Civilian | 15 | | 2.2% |
| RED BLUFF PD | | | |
| Civilian | 40 | | 5.7% |
| TEHAMA CO SO | | | |
| Civilian | 634 | | 91.0% |
| Custodial Officer | 2 | | 0.3% |
| Judicial | 1 | | 0.1% |
| Reserve Officer | 5 | | 0.7% |
| Civilian | 689 | 14.56567 | 98.9% |
| Law Enforcement/Government Employees | 8 | 0.16912 | 1.1% |
| Tehama Total (Adult Residents: 47,303) | 697 | 14.73479 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Trinity** | | | |
| TRINITY CO SO | | | |
| Civilian | 174 | | 98.9% |
| Custodial Officer | 1 | | 0.6% |
| Judicial | 1 | | 0.6% |
| Civilian | 174 | 15.44470 | 98.9% |
| Law Enforcement/Government Employees | 2 | 0.17753 | 1.1% |
| Trinity Total (Adult Residents: 11,266) | 176 | 15.62223 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Tulare** | | | |
|     TULARE CO SO | | | |
|         Civilian | 1,917 | | 99.3% |
|         Judicial | 2 | | 0.1% |
|         Reserve Officer | 11 | | 0.6% |
|     TULARE PD | | | |
|         Civilian | 1 | | 0.1% |
| Civilian | 1,918 | 6.43505 | 99.3% |
| Law Enforcement/Government Employees | 13 | 0.04362 | 0.7% |
| Tulare Total (Adult Residents: 298,055) | 1,931 | 6.47867 | |



| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Tuolumne** | | | |
| SONORA PD | | | |
| Civilian | 2 | | 0.4% |
| TUOLUMNE CO SO | | | |
| Civilian | 556 | | 99.5% |
| Judicial | 1 | | 0.2% |
| Civilian | 558 | 12.21461 | 99.8% |
| Law Enforcement/Government Employees | 1 | 0.02189 | 0.2% |
| Tuolumne Total (Adult Residents: 45,683) | 559 | 12.23650 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Ventura** | | | |
| OXNARD PD | | | |
|     Civilian | 1 | | 0.2% |
| SANTA PAULA PD | | | |
|     Reserve Officer | 1 | | 0.2% |
| SIMI VALLEY PD | | | |
|     Civilian | 4 | | 0.8% |
| VENTURA CO SO CENT RCDS | | | |
|     Civilian | 482 | | 92.0% |
|     Judicial | 19 | | 3.6% |
|     Reserve Officer | 17 | | 3.2% |
| Civilian | 487 | 0.79653 | 92.9% |
| Law Enforcement/Government Employees | 37 | 0.06052 | 7.1% |
| Ventura Total (Adult Residents: 611,403) | 524 | 0.85705 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Yolo** | | | |
| DAVIS PD | | | |
| Civilian | 2 | | 1.5% |
| Reserve Officer | 2 | | 1.5% |
| WOODLAND PD | | | |
| Civilian | 1 | | 0.8% |
| YOLO CO SO | | | |
| Civilian | 122 | | 93.1% |
| Judicial | 1 | | 0.8% |
| Reserve Officer | 3 | | 2.3% |
| Civilian | 125 | 0.80532 | 95.4% |
| Law Enforcement/Government Employees | 6 | 0.03866 | 4.6% |
| Yolo Total (Adult Residents: 155,218) | 131 | 0.84397 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **Yuba** | | | |
| MARYSVILLE PD | | | |
| Civilian | 2 | | 0.4% |
| Reserve Officer | 1 | | 0.2% |
| YUBA CO SO | | | |
| Civilian | 451 | | 97.6% |
| Custodial Officer | 3 | | 0.6% |
| Reserve Officer | 5 | | 1.1% |
| Civilian | 453 | 8.85371 | 98.1% |
| Law Enforcement/Government Employees | 9 | 0.17590 | 1.9% |
| Yuba Total (Adult Residents: 51,165) | 462 | 9.02961 | |

| County/Agency/LTC Type | Active | Per 1,000 Adult Residents | % of Total |
|---|---|---|---|
| **All Counties/Agencies Combined** | | | |
| Civilian | 32,666 | 1.16836 | 93.6% |
| Law Enforcment/Government Employees | 2,238 | 0.08005 | 6.4% |
| Total (Adult Residents: 27,958,916) | 34,904 | 1.24840 | |

Exhibit 110

Case: 1:10-cv-04184 Document #: 187-6 Filed: 06/29/12 Page 112 of 117 PageID #:9036

*Accid. Anal. & Prev.* Vol. 5, pp. 351–356. Pergamon Press 1973. Printed in Great Britain.

# UNINTENTIONAL SHOOTINGS, HIGHWAY CRASHES AND ACTS OF VIOLENCE—A BEHAVIOR PARADIGM*

Julian A. Waller

Department of Community Medicine, University of Vermont College of Medicine,
Burlington, Vermont, U.S.A.

and

Elbert B. Whorton

Department of Preventive Medicine and Community Health, University of Texas Medical Branch,
Galveston, Texas, U.S.A.

(Received 10 March 1973)

The weight of scientific evidence suggests that the concept of "accident proneness" is not applicable to the vast majority of injury producing events. Nevertheless certain individuals do have a propensity for injury, and especially for death by injury (Hirschfield and Behan, 1963; Brenner, 1967; Waller, 1965). These persons appear to be involved in a relatively small proportion of all crashes and other events producing either property damage alone or minor injury, but are involved in a larger proportion of those events producing more serious injury. Probably the most important of the groups so far identified is persons with alcoholism.

Studies are beginning to identify relationships in specific situations between unintentional injury or so-called "accidents" and intentional injury, such as assault, homicide, suicide or other forms of violence. Frequently these also occur in conjunction with excessive use of alcohol (Waller, 1969). Drivers with arrests for drunken driving, nonfatal crashes involving alcohol and fatal crashes involving alcohol have histories of previous violence significantly more often than do drivers without drunken driving arrests or drivers in nonfatal and fatal crashes in which alcohol is not a factor (Wickstrom, Sayre and Leven, 1965; Waller, 1967). Other work has shown that children with high rates of unintentional nonhighway injury more often have aggressive behavior patterns than do children with low nonhighway injury experience (Manheimer and Mellinger, 1967). Few investigations, however, have studied the simultaneous relationships among unintentional nonhighway injury, highway injury and intentional violence. The purpose of this paper is to examine some of these relationships.

It was hypothesized that if a relationship between unintentional injury and violence exists in the nonhighway setting just as it does in the highway situation, it would most likely involve a product that is commonly associated with the perpetration of violence, namely guns. In 1966, there were 2558 fatalities in the United States as a result of unintentional shooting events (U.S. Dept. Health, 1968). We estimate that as many as 50,000 nonfatal injuries may have occurred during the same time period. Therefore, a study was made of individuals involved in unintentional shootings in the state of Vermont during 1967.

---

* Presented in briefer version at Third Triennial Congress on Medical and Related Aspects of Motor Vehicle Accidents, New York, 29 May 1969.

According to Vermont law, physicians are required to report all persons who are treated for gunshot wounds, no matter how minor, and it is believed that most if not all such events actually are reported.

A total of 64 shooting incidents were reported to the State Police during 1967. Sixty-two of these involving 87 persons were studied. Records concerning one additional shooting were not available. The second incident was excluded because it involved an explosive-actuated rivet machine rather than a gun. Of these 87 persons, 32 shot themselves, 25 shot someone else, and 30 were shot by someone else, in 5 cases by unidentified hunters.

Seventy-nine per cent of these shootings resulted in minor injury only, 15 per cent in more serious injury, and 6 per cent in death. Thirty-seven per cent occurred during hunting, 31 per cent during target practice, 8 per cent while the gun was being cleaned and 24 per cent during other activities such as transporting the gun or showing it to someone. Almost two-thirds of the shootings involved rifles, and one-third hand guns.

Twelve of the shooters and eight of the persons shot were nonresidents of Vermont. Half of the shooters were aged 10–19, 30 per cent aged 20–29 and 19 per cent aged 30 or older. Among persons shot 7 per cent were under aged 10, 33 per cent aged 10–19, 39 per cent aged 20–29 and 30 per cent aged 30 or older. Ninety-seven per cent of the shooters and 80 per cent of the persons shot were men.

This study was limited to Vermont residents of driving age because both the police and driving records were not available for nonresidents. Records of the numbers and types of previous arrests and investigations by the police were compared for three groups: 34 residents who shot themselves or others, 13 persons who were shot by someone else, and 94 randomly selected licensed drivers of the same sex and similar age to the shooters and those they shot.

These 94 drivers chosen as the comparison group were selected from records of the Department of Motor Vehicles according to the following procedure. Drivers' licenses were selected of the first persons of same sex and within 10 yr of age located alphabetically in front of and behind the license of each person involved in a shooting. Where the index case was not licensed the first appropriate licenses were chosen in front of and behind where the index license would have been if the person had been licensed.

In Vermont licenses are stored according to a phonetic modification of alphabetical order. Care was taken, therefore, not to place into the comparison group persons with the same last names and addresses as the individuals in shootings in order to avoid comparing those involved in shootings with members of their own families.

Most of the drivers in the comparison group own guns and obtained hunting licenses during 1967, but none of them had been involved in previous shootings in Vermont as determined by search of their records in the State Police files. In 1967 resident hunting licenses were sold to over 102,000 persons, 95 per cent of whom were males aged 10 yr or older. Since there are 167,000 males in this age range in Vermont it seems probable that at least two-thirds of males of driving age had hunting licenses in 1967 and that substantially more than two-thirds had guns available to them. The three groups were basically similar in age, sex, residence and gun ownership but differed in that two groups had been involved in shootings, whereas the third had not. Twenty-six (76 per cent) of the 34 shooters and 10 (77 per cent) of the 13 persons they shot had driving licenses. Lifetime driving records were examined for these 36 persons involved in shootings and for their matched comparison group of 72 drivers of similar age and sex who were not involved in shootings.

Relationships observed between the shooter group and the other two groups were analyzed

Case: 1:10-cv-04184 Document #: 187-6 Filed: 06/29/12 Page 114 of 117 PageID #:9038

using either the Chi-square test for independence in those situations where the smallest expected cell size was five or more cases, or by the Fisher's Exact Test for homogeneity where appropriate (Steele and Torrie, 1960; Sokal and Rohlf, 1969).

## RESULTS

The shooters had previous records of arrests, violence, alcohol abuse, highway crashes and citations for moving traffic violations substantially more often, and in most cases significantly more often, than did the comparison group. On the other hand persons shot tended to be more similar with respect to these variables to the comparison group than to the shooters. No observed differences between those shot and the shooters were statistically significant for any variables studied. It is important to note, however, that real relationships or differences, if they exist, could easily go undetected simply because of the small number of cases involved, especially in the group of those persons shot.

TABLE 1. PERCENTAGE OF SHOOTERS, PERSONS SHOT AND DRIVERS WITHOUT SUCH INCIDENTS WHO HAD NON-HIGHWAY ARRESTS AND POLICE INVESTIGATIONS, HIGHWAY CRASHES, AND TRAFFIC CITATIONS

| Type of previous arrest or driving incident | Drivers not involved in shootings* | Persons shot by someone else* | Shooters of selves or others* |
|---|---|---|---|
| Nonhighway arrests and investigations | 14 | 15 | 41 |
| Arrests and investigations of violence | 5 | 8 | 32 |
| Arrests involving alcohol (includes driving while intoxicated) | 5 | 8 | 21 |
| Highway crashes in previous 3 yr† | 29 | 20 | 50 |
| Highway crashes since first licensed† | 39 | 40 | 62 |
| Traffic citations in previous 3 yr† | 22 | 30 | 50 |
| Traffic citations since first licensed† | 39 | 50 | 65 |
| Citations for careless and negligent driving since first licensed† | 6 | 20 | 19 |
| Suspensions or revocations since first licensed* | 1 | 20 | 19 |
| Number of persons | 94 (72†) | 13 (10†) | 34 (26†) |

* Differences between shooters and uninvolved drivers were significant at $p \leq 0.05$ for all variables compared except for 3 yr crash record where $p \leq 0.10$ and lifetime crash record where $p = 0.075$. No observed differences between shooters and persons shot were significant at $p \leq 0.10$.
† Eight shooters and 3 persons shot did not have drivers' licenses. These persons and comparison drivers matched with them were not included in the crash and citation analysis which is based on 26 shooters, 10 shot and 72 uninvolved drivers.

As shown in Table 1, 41 per cent of shooters, 15 per cent of persons shot and 14 per cent of uninvolved drivers had been previously investigated or arrested by the police. Thirty-two per cent of the shooters had police records for previous acts of intentional violence and 21 per cent had records for misuse of alcohol. All persons with alcohol arrests also had arrests for violence, in most cases for unrelated events. In contrast 8 per cent of the shot individuals and 5 per cent of the uninvolved drivers had arrests either for misuse of alcohol or for violence. Two shooters, but no persons in the other two groups, had previous arrests for drunken driving. However, it was apparent from police reports of arrests for illegal posses-

sion of malt beverage by minors that such possession and use often had occurred in a vehicle, and there is reason to suspect that in some of these cases an arrest for drunken driving might have been as appropriate or more appropriate than an arrest for a nonhighway offense. In almost all cases these alcohol arrests involved shooters.

Although the number of individuals was too small to permit precise statistical detection of possible association it appeared that even among shooters some groups were more consistently deviant than others. Thus, persons who shot themselves or others while hunting were similar to the uninvolved drivers whereas those who shot themselves or others during target practice or other nonhunting activity frequently had previous arrests. Only 1 out of 8 hunters, for example, had previous arrests, whereas 6 of 14 persons in shootings during target practice had arrests, and all 6 had previous arrests for violence. It appears more than coincidental that several of the injuries occurred during target practice to persons who were practicing Western style "quick draw" and shot themselves in the leg when they fired prematurely. However, the circumstances of the shootings were such that only rarely did serious consideration have to be given to the possibility that the injuries were intentionally inflicted.

Half of the shooters who had drivers' licenses also had crashes during the previous 3 years and 62 per cent had crashes since first licensed. In contrast, 20 per cent of persons shot and 29 per cent of uninvolved drivers had crashes in the previous 3 years, and 40 and 39 per cent respectively had crashes since first licensed. No differences were observed between shooters and the other two groups in proportions of drivers with single vehicle crashes.

Half of the shooters had traffic citations in the 3 years previous to the shooting in comparison to 30 and 22 per cent for persons shot and uninvolved drivers. Sixty-five per cent of the shooters had citations since first licensed whereas 50 and 39 per cent respectively of persons shot and uninvolved drivers had received citations. Nineteen and 20 per cent respectively of shooters and persons shot had citations for careless and negligent driving, a citation issued only for very serious infractions of traffic laws, and similar proportions among the 2 groups had previous suspensions or revocations of licenses. In contrast, 6 per cent of the uninvolved drivers had citations for careless and negligent driving and only 1 per cent had had a license suspended or revoked.

These data certainly suggest that *as a category* persons involved in unintentional shootings, especially those who fired the guns, are more likely to have previous arrest records and worse traffic records than does the comparison group of persons not involved in shootings. However, it is also important to know whether such relationships exist among *individuals* as well. For this reason the data also were analyzed to determine whether individuals who had records of arrests were the same individuals who had poor driving records and conversely whether individuals with poor driving records were the same ones who had arrests.

Among the 11 shooters who had previous nonhighway arrests (Table 2) 7 (64 per cent) had crashes since first licensed. Four (36 per cent) of the 11 uninvolved drivers with nonhighway arrests had crashes since first licensed. This difference between the shooters and the uninvolved drivers was not statistically significant. However, examined conversely, 7 (44 per cent) of the 16 shooters who had crashes also had previous nonhighway arrests, whereas only 4 (14 per cent) of the 28 uninvolved drivers with histories of crashes also had arrests ($\leq 0.07$). Among drivers who were shot only 2 had arrests and 4 had crashes so analysis was not attempted because of small sample size. It appears, therefore, that a relationship between arrests and highway crashes may exist for individuals who are shooters but that it does not exist for individuals in the comparison group.

TABLE 2. RELATIONSHIP BETWEEN NONTRAFFIC ARRESTS AND
HIGHWAY CRASHES AMONG SHOOTERS AND UNINVOLVED DRIVERS

| Previous crashes | Previous nontraffic arrests | | Total |
|---|---|---|---|
| | No arrests | Arrests | |
| Shooters | | | |
| No crashes | 6 | 4 | 10 |
| Crashes | 9 | 7 | 16 |
| Total | 15 | 11 | 26 |
| Uninvolved drivers | | | |
| No crashes | 37 | 7 | 44 |
| Crashes | 24 | 4 | 28 |
| Total | 61 | 11 | 72 |

## DISCUSSION

The results of this study demonstrate that with respect to injuries involving guns individuals who initiate unintentional injury producing events in the nonhighway setting also are excessively represented in highway crashes and in acts of intentional violence. The data do not and cannot indicate whether such a relationship exists for other forms of nonhighway injury as well. We wish to emphasize another possible relationship, however, that was suggested by this study. Payne and Selzer (1962) Selzer *et al.* (1967) and Waller (1968) have noted the role of alcohol ingestion in activating deviant driving and other behavior among problem drinkers. Alcohol also was found frequently in the past histories of shooters in this study although its role in the events leading to the shootings themselves is not known because the police reports commented on the presence or absence of alcohol in only four of the investigations. A study by Wolfgang (1958) demonstrated that alcohol was an important factor in about 70 per cent of homicides in Philadelphia and that usually *both* the perpetrater and the recipient of the violence had been drinking. In fact, in many cases the injured persons could not be considered victims because their provocative actions had been important in initiating the attacks. For this reason persons shot were studied as a separate group in the present study to determine if their past histories were similar to those of the shooters. Such similarity was not observed in the present study of unintentional shootings.

In light of the relationships described in this study we suggest a behavioral model relevant to specific situations, perhaps commonly involving alcohol, in which poor control of aggressive tendencies is associated with intentional acts of violence and with unintentional injury both on the highway and elsewhere.

*Acknowledgements*—Appreciation is expressed to Commissioner James E. Malloy of the Vermont Department of Motor Vehicles and E. A. Alexander, formerly commissioner of the Vermont Department of Public Safety and their staffs for assistance in this project.

## REFERENCES

BRENNER, B. (1967) Alcoholism and fatal accidents. *Q. Jl Stud. Alc.* **28**, 517–528.
HIRSCHFELD, A. H. and BEHAN, R. C. (1963) The accident process. *J. Am. Med. Ass.* **186**, 193–199; 300–306.
MANHEIMER, D. I. and MELLINGER, G. D. (1967) Personality characteristics of the child accident repeater. *Child Devel.* **38**, 491–513.

356                JULIAN A. WALLER AND ELBERT B. WHORTON

PAYNE, C. E. and SELZER, M. L. (1962) Traffic accidents, personality and alcoholism: a preliminary study. *J. Abd. Surg.* 4, 21–26.

SELZER, M. L., PAYNE, C. E., WESTERVELT, F. H. and QUINN, J. (1967) Automobile accidents as an expression of psychopathology in an alcoholic population. *Q. Jl Stud. Alc.* 28, 505–516.

SOKAL, R. R. and ROHLF, F. J. (1969) *Biometry.* Freeman & Co., San Francisco.

STEELE, R. G. D. and TORRIE, J. H. (1960) *Principles and Procedures of Statistics.* McGraw-Hill, New York.

U.S. DEPARTMENT OF HEALTH (1968) *Vital Statistics of the United States*, 1966, Vol. II—*Mortality, Part A*, pp. 1–168. National Center for Health Statistics, Washington, D.C.

WALLER, J. A. (1965) Chronic medical conditions and traffic safety: review of California experience. *New Engl. J. Med.* 273, 1413–1420.

WALLER, J. A. (1967) Identification of problem drinking among drunken drivers. *J. Am. Med. Ass.* 200 114–120.

WALLER, J. A. (1968) Patterns of traffic accidents and violations related to drinking and to some medical conditions. *Studies in Driving and Drinking*, Supplement No. 4, *O. Jl Stud. Alc.* 118–137.

WALLER, J. A. (1969) Accidents and violent behavior—are they related? In: *Crimes of Violence, A Staff Report to the National Commission on the Causes and Prevention of Violence* (eds. MULVIHILL, D. J., TUMIN, M. M. and CURTIS, L. A.), Vol. 13, Appendix 33, pp. 1525–1558. U.S. Government Printing Office, Washington, D.C.

WICKSTROM, P. H., SAYRE, B. M. and LEVEN, R. (1965) Alcohol involvement in single vehicle, fatal traffic accidents. Unpublished paper, Division of Alcoholic Rehabilitation, California Department of Public Health, Berkeley.

WOLFGANG, M. E. (1958) *Patterns in Criminal Homicide.* University of Pennsylvania, Philadelphia.

**Abstract**—Characteristics of Vermont residents involved as shooters in unintentional shootings of all degrees of severity were compared with those of residents whom they shot and residents of same sex and similar age, most of whom owned guns but who were not involved in shooting incidents. In comparison with the other two groups, the shooters more often were previously known to the police, had arrests for violence, had arrests involving alcohol, and crashes and traffic citations during the previous 3 years and during their lifetimes. A behavior model is suggested, commonly involving alcohol, in which poor control of aggressive tendencies results in intentional acts of violence, and unintentional injury both on the highway and elsewhere.

**Résumé**—Les caractéristiques des résidents de Vermont, impliqués comme tireurs dans des fusillades involontaires de tous les degrés de sévérité, ont été comparées avec celles des résidents visés et des résidents du même sexe et d'un âge similaire, la majorité desquels possédant des armes à feu mais n'étant pas impliqués dans des incidents de fusillade. En comparaison avec les deux autres groupes, les tireurs, le plus souvent, étaient connus par la police, et avaient été déjà arrêtés pour délits de violence, alcoolisme, collisions et contraventions de circulation dans les trois dernières années ou autrement, durant leurs vies. On suggère un modèle de comportement impliquant ordinairement l'alcool, dans lequel il résult un mauvais contrôle des tendances agressives dans des actes intentionnels de violence et accidents involontaires, tant sur l'autoroute qu'ailleurs.

**Zusammenfassung**—Es wurden die Eigenschaften von Einwohnern von Vermont als Schützern in versehentlichen Schussverletzungen aller Schwerheitsgrade mit den Einwohnern verglichen, welche sie angeschossen haben und mit Einwohnern des gleichen Geschlechts und in ähnlichem Alter, welche meistens Gewehre besaßen, aber nicht in Schießvorfälle verwickelt waren. Im Vergleich zu den zwei anderen Gruppen, waren die Schützen der Polizei häufiger zuvor bekannt, waren wegen Gewalttätigkeit verhaftet worden, waren im Zusammenhang mit Alkohol verhaftet worden und hatten Zusammenstöße und hatten Verkehrsvergehen während der vorangegangenen drei Jahre und während ihres Lebens begangen. Es wird ein Verhaltungsmodell vorgeschlagen, das allgemein Alkohol umfaßt, in welchem schwache Kontrolle aggressiver Tendenzen vorsetzliche Gewaltakte verursacht und unbeabsichtigte Verletzungen auf der Landstraße wie an anderer Stelle.