# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No: 10-CV-4184 |
| | ) | Judge Edmond E. Chang |
| v. | ) ) | |
| THE CITY OF CHICAGO, ET AL., | ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR
## MOTION FOR  SUMMARY JUDGMENT

Stephen Kolodziej
FORD & BRITTON, P.C.
33 N. Dearborn St., Suite 300
Chicago, IL 60602
Tel: (312) 924-7500
Fax: (312) 924-7516
Email: skolodziej@fordbritton.com

Charles J. Cooper*
David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT .................................................................................................................... 1

I. THIS CASE SHOULD BE RESOLVED WITHOUT RESORT TO MEANS-ENDS SCRUTINY AND WITHOUT HOLDING ANY FURTHER PROCEEDINGS. ............................................. 1

II. THE SALES BAN IS UNCONSTITUTIONAL. ........................................................... 3

    A.    There is No Historical Support for the Sales Ban. .................................... 3

    B.    The Sales Ban Heavily Burdens the Right to Keep and Bear Arms. ....... 5

    C.    The Sales Ban Fails Any Form of Heightened Scrutiny. .......................... 8

III. THE POSSESSION RESTRICTIONS ARE UNCONSTITUTIONAL. ............................. 11

    A.    The Second Amendment Right Is Not Limited to the Home ................... 11

    B.    The Possession Restrictions Fail Any Form of Heightened Scrutiny. .... 16

        1.    *Ban on Firearms Outside of the "Home."* ................................. 16

        2.    *Ban on Handguns in a Place of Business.* .................................. 18

        3.    *Ban on Invitees' Possessing Firearms.* ...................................... 19

IV. THE ONE-OPERABLE- GUN LIMIT IS UNCONSTITUTIONAL. ................................ 19

    A.    History Does Not Support the One-Operable-Gun Limit. ...................... 19

    B.    The One-Operable-Gun Limit Fails Any Form of Heightened Scrutiny. ............. 20

        1.    *Reducing Gun Theft.* ................................................................. 20

        2.    *Reducing the Risk of Suicide, Homicide, and Accidental Firearm Death.* ........................................................................................ 21

        3.    *Reducing Threats to First Responders.* ...................................... 21

CONCLUSION .............................................................................................................. 21

i

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Page**

*Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460 (7th Cir. 2009)....................11

*Arizona v. Washington*, 434 U.S. 497 (1978) ...............................................................2

*City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416 (1983),
    *overruled in part on other grounds*,
    *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992).................................7

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002)........................10, 11

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)....................................6

*Collins v. Youngblood*, 497 U.S. 37 (1990) .................................................................2

*Crawford v. Washington*, 541 U.S. 36 (2004) .............................................................2

*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. 1981) .............7

*District of Columbia v. Heller*, 554 U.S. 570 (2008).............1, 2, 3, 4, 8, 11, 12, 13, 14, 16, 18, 20

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................2, 4, 5, 6, 7, 8, 12

*Frisby v. Schultz*, 487 U.S. 474 (1988).......................................................................8

*Gideon v. Wainright*, 372 U.S. 335 (1963) .................................................................2

*Gowder v. City of Chicago*, No. 11-c-1304, 2012 WL 2325826 (N.D. Ill. June 19, 2012)............2

*In re Winship*, 397 U.S. 358 (1970) ............................................................................2

*Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676 (1968).....................................3

*Isbell v. City of San Diego*, 258 F.3d 1108 (9th Cir. 2001) ..........................................7

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)........................2

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)...............................2, 8, 9, 13, 16

*Queen v. Soley*, 88 Eng. Rep. 935 (1707) (Q.B.).......................................................13

*Rex v. Dewhurst*, 1 St. Tr. 529 (Lancaster Assize 1820) ..........................................13

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991)...............................................................................................2

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012).............................................6

*United States v. Gaudin*, 515 U.S. 506 (1995)...........................................................2

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010)..............................................4, 9

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ...........................................6, 7, 16

*Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir. 2002)........................................8

## Constitutional and Legislative Materials

U.S. Const. amend. III .................................................................................12

U.S. Const. amend. IV..................................................................................12

18 U.S.C. § 922(a)(3)......................................................................................6

720 ILCS 5/7-1(a) .......................................................................................20

MCC § 8-20-100 ............................................................................................3

## Other

4 Blackstone Commentaries ........................................................................12

2 Blackstone Commentaries (Tucker ed. 1803)........................................13

5 Blackstone Commentaries (Tucker ed. 1803)........................................14

3 James Wilson, Works of the Honourable James Wilson (1804).....................19

1 Joel Prentiss Bishop, Commentaries on the Criminal Law (2d ed. 1858) ......................12

1 Matthew Hale, Historia Placitorum Coronae (George Wilson, ed. 1778) ....................12

1 William Hawkins, Treatise of the Pleas of the Crown (1716)........................13

William Rawle, A View of the Constitution
    of the United States of America (1825) ..........................................14

Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*,
    80 Geo. Wash. L. Rev. 703 (2012)..............................................................2

Benjamin Ogle Tayloe, In Memoriam (1872) ........................................14

Brief for English/Early American Historians, *McDonald v. City of Chicago*, No. 08-1521 .........13

Brief for the United States as Amicus Curiae, *District of Columbia v. Heller*,
    No. 07-290 ....................................................................................................1

*First Day Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray
    and Others, in the Boston Riot of 1770, in* 6 Masterpieces of Eloquence 2569
    (Hazeltine et al. eds. 1905) .........................................................................15

Gary Kleck, *Using Speculation to Meet Evidence*, 22 J. Quant. Crim. 411 (1995)......................8

Joel Tiffany, A Treatise on the Unconstitutionality of American Slavery (1849).......11

Letter of August 19, 1785, *in* 1 Writings of Thomas Jefferson
    (H.A. Washington, ed. 1858) ....................................................................14

Nicholas J. Johnson, David B. Kopel, et al., Firearms Law & The Second Amendment
    (2012)..........................................................................................................14

Patrick Charles, *The Faces of the Second Amendment Outside the Home*,
    60 Clev. St. L. Rev. 1 (2012) ....................................................................13

**ARGUMENT**

I.    **THIS CASE SHOULD BE RESOLVED WITHOUT RESORT TO MEANS-ENDS SCRUTINY AND WITHOUT HOLDING ANY FURTHER PROCEEDINGS.**

1.    Chicago argues that other "[c]ourts [h]ave [r]ejected Plaintiffs' Second Amendment [f]ramework" and have instead moved beyond text and history to consider "the strength of the government's justification" for a challenged law.  Chi. Resp. 3 (quotation marks omitted).[1]  The Supreme Court, however, has already rejected the "sliding scale" means-ends test advanced by the City.  *Id*. at 7.

Indeed, in *Heller* the United States urged the Court to reject a "categorical" approach in favor of one that "balances the impact of the challenged restrictions on protected conduct and the strength of the government's interest in enforcement of the relevant restriction."  Brief for the United States as Amicus Curiae 27-28, *District of Columbia v. Heller*, No. 07-290 (2008).  And the dissent asserted that courts should balance "interests protected by the Second Amendment" against "governmental public-safety concerns."  *District of Columbia v. Heller*, 554 U.S. 570, 689 (2008) (Breyer, J., dissenting).  The *majority*, by contrast, rejected "conduct[ing] … anew" the balancing of interests already conducted by the People when they adopted the Second Amendment.  *Heller*, 554 U.S. at 634-35.  Thus, grafting a means-ends test onto Second Amendment analysis "effectively embrace[s] the sort of interest-balancing approach …

---

[1] The following citation forms are used in this brief:  Defendants' Statement of Material Facts ("D-SOF"); Plaintiffs' Response to D-SOF ("P-RSOF"); Plaintiffs' Statement of Additional Facts ("P-SAF"); Plaintiffs' Statement of Material Facts ("P-SOF"); Defendants' Exhibits ("Chi. Ex."); Plaintiffs' Exhibits ("Pl. Ex."); Defendants' Memorandum in Support of Summary Judgment ("Chi. Br."); Appendix of Exhibits to Defendants' Memorandum in Support of their Motion for Summary Judgment ("Chi. App'x"); Plaintiffs' Memorandum in Support of Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment ("Pl. Br."); Defendants' Memorandum in Response to Plaintiffs' Motion for Summary Judgment and in Reply in Support of Defendants' Motion for Summary Judgment ("Chi. Resp.").  Plaintiffs state that the body of this brief contains less than 7,000 words according to Microsoft Word's word count function.

condemned" by the Supreme Court in *Heller*. Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*, 80 GEO. WASH. L. REV. 703, 706-07 (2012).

*Heller*'s rejection of means-ends review is hardly novel or unusual. As Chief Justice Roberts remarked during the oral argument, the "standards that apply in the First Amendment just kind of developed over the years as sort of baggage that the First Amendment picked up." Tr. at 44, *Heller*, No. 07-290; *see also Simon & Schuster, Inc. v. Members of N.Y. St. Crime Victims Bd.*, 502 U.S. 105, 124 (1991) (Kennedy, J., concurring in judgment). Categorical tests apply in many other contexts. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 68 (2004) (Confrontation Clause); *United States v. Gaudin*, 515 U.S. 506, 511 (1995) (right to jury trial); *Collins v. Youngblood*, 497 U.S. 37, 43 (1990) (Ex Post Facto Clause); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434-35 (1982) (permanent physical takings); *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (double jeopardy); *In re Winship*, 397 U.S. 358, 364 (1970) (proof of crime beyond reasonable doubt); *Gideon v. Wainright*, 372 U.S. 335, 340 (1963) (right to counsel). And means-ends scrutiny is particularly inapt here given the Supreme Court's express assurance that resolving Second Amendment cases will not require courts to make "difficult empirical judgments" because it had "specifically rejected" interest balancing. *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3050 (2010) (plurality).

In sum, this Court not only is free to resolve this case without resorting to any sort of means-ends test, *see Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) (recognizing that "broadly prohibitory laws restricting the core Second Amendment right" may be "categorically unconstitutional"), *Gowder v. City of Chicago*, No. 11-c-1304, 2012 WL 2325826, at *10 (N.D. Ill. June 19, 2012) (applying "text, history, and tradition approach" to strike down Chicago ban on non-violent misdemeanants obtaining a firearm permit), but *Heller* and *McDonald* compel

that result. The social-science evidence and expert testimony proffered by the City are simply irrelevant.

2. Even if some form of means-ends scrutiny were to apply (indeed, even if it were the deferential form of intermediate scrutiny advanced by the City), Chicago would not be able to satisfy it in this case. This is again demonstrated by *Heller*, which emphasized that the District of Columbia's handgun ban would flunk "any of the standards of scrutiny [the Court has] applied to enumerated constitutional rights"—including, presumably, intermediate scrutiny. 554 U.S. at 628. If a flat ban on handguns is not substantially related to public safety, then surely the same is true for the restrictions at issue here. Thus, regardless of the level of review that applies, there is no need for this Court to hold a trial or any other further proceedings in this case before ruling for Plaintiffs. Further proceedings are neither required nor advisable for the additional reason that the "factual" questions presented here are questions of legislative fact that this Court is authorized to decide. *See* Pl. Br. 3-4.

## II. THE SALES BAN IS UNCONSTITUTIONAL.

### A. There is No Historical Support for the Sales Ban.

This case is not about the right to "acquire firearms in one's home municipality." Chi. Resp. 5. It is about the right to acquire firearms *period*. That neighboring jurisdictions allow arms sales is irrelevant. Not only does Chicago lack any regulatory authority over its neighboring jurisdictions, "[b]ut what [Chicago] may constitutionally do, so may other cities." *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 684 (1968). If Chicago's ban is deemed legitimate, in other words, there will be nothing save legislative grace stopping it from "being used as a model for legislation in other localities." *Id.* The sales ban thus must be analyzed for what it is—a flat ban on selling, acquiring, or otherwise transferring firearms. *See* MCC § 8-20-

3

100; *see also Ezell*, 651 F.3d at 704 ("our first question is whether *range training*"—not range training *in one's home municipality*—"is categorically unprotected by the Second Amendment") (emphasis added). Chicago's concession that the right to keep and bear arms "implies a corresponding right to acquire them," Chi. Br. 23 (quotation marks omitted), is therefore the end of the matter.

But the sales ban lacks historical support even if this Court were to adopt the City's narrower focus. It is the City's burden to "establish that [the sales ban] regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment." *Ezell*, 651 F.3d at 702-03. And the City has produced nothing to suggest that the People who ratified either the Second Amendment or the Fourteenth Amendment would have understood it to have allowed a municipality to ban the private exchange of guns. *See* Pl. Br. 12.

The Seventh Circuit has not "rejected this 'negative implication' argument." Chi. Resp. 7. Rather, it has held that the Second Amendment's "original meaning" included an understanding that "statutory prohibitions on the possession of weapons by some persons are proper," and that legislatures retain some flexibility to "fill[] in [the] details" regarding particular applications of this principle. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). In other words, essential to the Court's holding was the conclusion that this limitation was "*part of [the Second Amendment's] original meaning*." *Id.* (emphasis added). Thus, Seventh Circuit precedent does not—and, of course, could not—upset *Heller*'s holding that policy choices like Chicago's sales ban that have no grounding in original meaning are simply "off the table." 554 U.S. at 636; *see also* Tr. at 76, *Heller*, No. 07-290 (Roberts, C.J.) (suggesting that courts should look to restrictions "that existed at the time the amendment was adopted" and "lineal descendants of the restrictions").

Furthermore, we are not simply relying on historical silence. We have cited a wealth of information demonstrating that Chicago's sales ban is inconsistent with the Second Amendment's original meaning. *See* Pl. Br. 10-12. True, none of this evidence directly concerns a city's attempt to flatly ban the sale of guns—but that is because no city was brazen enough to enact such a law. Indeed, if "[t]he English Crown's attempt to subdue its American colonies on the eve of war by banning weapons imports" drew the colonists' ire, Chi. Resp. 6, surely an attempt by the Crown to ban the private transfer of arms in, say, Boston would have led to the same result.

### B.       The Sales Ban Heavily Burdens the Right to Keep and Bear Arms.

1.       *Ezell* rejected both planks of the City's argument that its flat ban on firearms transfers "only tangentially impacts the right to acquire firearms" and thus should "be evaluated under the undue burden standard." Chi. Resp. 7.

First, *Ezell* rejected the relevance of Chicago residents' ability to exercise Second Amendment rights in the suburbs. Pl. Br. 13. The City protests that the statements we have cited from *Ezell* addressed standing and irreparable harm, Chi. Resp. 8, but those statements plainly were not so limited. At any rate, *Ezell*'s merits discussion emphasized the prohibitory character of the City's range ban, without any mention of ranges in the suburbs: "The City's firing-range ban," the court reasoned, "is not merely regulatory, it *prohibits* the 'law-abiding, responsible citizens' of Chicago from engaging in target practice in the controlled environment of a firing range." *Ezell*, 651 F.3d at 708 (original emphasis); *see also id.* at 712 (Rovner, J., concurring in judgment) ("That residents may travel outside the jurisdiction to fulfill the training requirement is irrelevant to the validity of the ordinance inside the City. In this I agree with the majority.").

Second, *Ezell* expressly "declined" the City's "invitation" to "import the 'undue burden'

test from the [Supreme] Court's abortion cases." *Ezell*, 651 F.3d at 706.

2.      *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012), likewise does not support

the City's undue burden argument. *Decastro* held that 18 U.S.C. § 922(a)(3), which generally

prohibits an individual from importing a firearm acquired in another state into his state of

residence, was "not subject to any form of heightened scrutiny" because it "only minimally

affects the ability to acquire a firearm." *Decastro*, 682 F.3d at 165.  But Section 922(a)(3) "does

*nothing* to keep someone from purchasing a firearm in her home state," and does not even "bar

purchases from an out-of-state supplier if the gun is first transferred to a licensed gun dealer in

the purchaser's home state." *Id.* at 168 (emphasis added); *id.* at 170 (Hall, J., concurring) ("all

that the federal statute effected were minor limitations on the channels through which the

handgun was to be shipped from Florida to New York").  Section 922(a)(3) thus is simply

designed "to stop circumvention of state laws regulating gun possession" that may be challenged

directly if they burden Second Amendment rights. *Decastro,* 682 F.3d at 168-69.  *Decastro* thus

does not suggest that a locality that flatly bans firearms transfers does not substantially burden its

residents' Second Amendment rights.

Indeed, *Decastro* "drew upon First Amendment time, place, and manner doctrine."  Chi.

Resp. 7.  That doctrine provides that "the government may impose reasonable restrictions on the

time, place, or manner of protected speech, provided," among other things, "that they leave open

ample alternative channels for communication of the information." *Ward v. Rock Against

Racism*, 491 U.S. 781, 791 (1989) (quotation marks omitted).  Those ample alternative channels

*must be available in the jurisdiction that imposes the regulation.  See, e.g.*, *City of Renton v.

Playtime Theatres, Inc.*, 475 U.S. 41, 54 (1986) ("the First Amendment requires only that Renton

6

refrain from effectively denying respondents a reasonable opportunity to open and operate an

adult theater *within the city*") (emphasis added); *Isbell v. City of San Diego*, 258 F.3d 1108, 1115

(9th Cir. 2001). And there is no merit to the notion that Second Amendment rights are different

than First Amendment rights because "location of purchase has no connection to a gun's utility."

Chi. Resp. 10. Location of purchase has no more connection to the utility of a book on the safe

and lawful use of firearms than it has to the utility of the firearm itself, yet surely the First

Amendment would not allow Chicago to ban the sale of all such books in the City.

3.      Further, the availability of guns in surrounding jurisdictions does not eliminate the

practical burden imposed by the City's sales ban. *See City of Akron v. Akron Ctr. for Reprod.*

*Health, Inc.*, 462 U.S. 416, 435 (1983) (finding "no doubt" that Akron abortion regulation

"places a significant obstacle in the path of women seeking an abortion" because, among other

things, it "may force women to travel to find available facilities"), *overruled in part on other*

*grounds*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992); *Deerfield Med. Ctr. v.*

*City of Deerfield Beach*, 661 F.2d 328, 336 (5th Cir. 1981). Pacholski and Tyler, for example,

have both testified that they would shop for firearms more often if there were gun shops in the

City near their home. *See* P-SOF 11, 17. Indeed, the ban would make little sense if it did not, on

average, make it harder for even law-abiding Chicago residents to obtain guns. *See, e.g.*, *Ezell*,

651 F.3d at 715 (Rovner, J., concurring in judgment) ("The [firearms] ordinance admittedly was

designed to make gun ownership as difficult as possible.").[2]

---

[2] In defending the sales ban, Chicago questions Dr. Kleck's estimated number of
defensive gun uses. *See* Chi. Resp. 11 n.7. The only survey supporting a dissimilar estimate,
however, "*never* directly asked even a single respondent about" defensive gun use. Pl. Ex. 2, Ex.
I, at 23; *see generally id.* at 22-24, 40-46. And while the NRC "ultimately" stopped short of
endorsing Dr. Kleck's estimate, it emphasized that "even the smallest of the estimates indicates
that there are hundreds of defensive uses every day" and "strongly agree[d] with the main
sentiment expressed by Kleck," *i.e.*, that " 'many Americans use guns for self-protection each

An example from the First Amendment context is instructive here as well. In *Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir. 2002), the Seventh Circuit struck down the City's ban on peddling merchandise on the public way within 1,000 feet of the United Center, pursuant to which the City had threatened to arrest the plaintiff for selling a book critical of the owner of the Chicago Blackhawks. The City "suggest[ed] that Weinberg could distribute fliers advertising the sale of his book and include locations outside the 1000-foot radius of the United Center where the book may be purchased," but the Court rejected this argument as requiring "Herculean efforts by Weinberg or his customers to complete the sale." *Id.* at 1042 & n.4. A requirement to travel outside of the City altogether to complete a sale is even more burdensome.

### C.     The Sales Ban Fails Any Form of Heightened Scrutiny.

Even if the City were afforded some opportunity to justify the sales ban—whether under strict scrutiny, *Ezell*'s "not quite" strict scrutiny, or intermediate scrutiny—it could not do so. The principal reason for this is that the sales ban is not tailored to its purported end of "reducing criminal gun use" *at all*, Chi. Resp. 12, but instead applies equally to both the criminal and the law-abiding. In the First Amendment context, even under intermediate scrutiny a "complete ban" can be sufficiently tailored "*only if each activity within the proscription's scope is an appropriately targeted evil.*" *Ward*, 491 U.S. at 800 (emphasis added), *quoting Frisby v. Schultz*, 487 U.S. 474, 485 (1988). "Extrapolat[ing]" this principle "to the Second Amendment context," *Ezell*, 651 F.3d at 708, after *Heller* and *McDonald* it simply cannot be the case that the acquisition of a lawful firearm by a responsible, law-abiding citizen is an "evil" that may properly be targeted by the government. Chicago's complete ban on gun sales therefore fails intermediate scrutiny at the outset.

---

year.' " Pl. Ex. 10 at 102, 113. *See also* Gary Kleck, *Using Speculation to Meet Evidence*, 22 J. QUANT. CRIM. 411, 417-20 (1995).

Furthermore, neither "logic [nor] data establish a substantial relation between" Chicago's sales ban and reducing criminal gun use. *Skoien*, 614 F.3d at 642. The notion that the sales ban makes it appreciably harder for criminals to get guns is refuted by the City's admission that it has a "grave and unique gun violence problem." Chi. Resp. 1. Indeed, the City's own officials testified that it is not difficult for criminals to get guns in Chicago. *See* Pl. Br. 15. These statements cannot be dismissed as "trite commonplaces." Chi. Resp. 15. For example, Sergeant Kevin Johnson, who admitted that "regardless of the laws Chicago has in place, it's not difficult at all for [criminals] to obtain the weapon that they want to obtain," P-SAF 6, has "decades of street experience" as a City of Chicago police officer, Chi. Resp. 1, Pl. Ex. 22 at 8, most recently with the Chicago Anti-Gun Enforcement Team, "whose primary purpose is to investigate illegal firearms trafficking in Chicago," D-SOF 72. Carol Brown, testifying on the City's behalf, likewise admitted that the ease with which Chicago criminals obtain guns does not "ha[ve] anything to do with Chicago" in particular. *See* P-SAF 6, Pl. Ex. 27 at 34.

The 2007 Chicago Study does not undermine this testimony. *See* Pl. Br. 17-18. We have not "grossly mischaracterize[d] the study." Chi. Resp. 13. While it found that the underground gun market in Chicago does "not work smoothly" and is "characterized by substantial transaction costs," D-SOF 53, it concluded that these "frictions … are more likely due to the general scarcity of guns in the city … and on Chicago's emphasis on anti-gun policing" than to "Chicago's handgun ban." P-RSOF 53. To be sure, this case is about "a different law" than the handgun ban that the 2007 Chicago Study refers to and that *McDonald* struck down. Chi. Resp. 13. But if a flat ban on the type of firearm the City claims is "the driver of Chicago's crime problem" did not stem the flow of guns in the City's underground market, *id*. at 24 n.14, there is no reason to suspect that banning firearm sales will lead to a different result.

9

The 2007 Chicago Study also does not support the notion that it is more difficult for criminals to travel to the suburbs to get guns than it is for law-abiding citizens. That is the point of our citation of the study's comment that the "residents" of the neighborhoods it studied are "very parochial." Pl. Br. 17. A law-abiding citizen "is every bit a resident of his neighborhood as is" a criminal. Chi. Resp. 14. And a law-abiding resident that stays in his own neighborhood is by definition less likely than a criminal who stays in that neighborhood to obtain a gun illegally in the underground market. Thus, to the extent the "residents" of Chicago's "disadvantaged, gang-infested" neighborhoods are unlikely to venture beyond those neighborhoods, *id*. at 14-15, the sales ban has a disproportionate impact on the most vulnerable of the City's law-abiding residents.

Finally, the City's concerns about corrupt FFLs and the shortcomings of the federal agency that regulates them not only lack merit, *see* Pl. Br. 19-22, but they are also beside the point given the lack of any substantial evidence that the sales ban impedes criminals' access to guns. And even if there were merit to concerns about potential side effects of allowing citizens to acquire firearms, the constitutional answer would not be to ban gun sales. The City cannot seek to address the "secondary effects" of the exercise of a fundamental constitutional right by attacking the right itself. Thus, in the First Amendment context, "a city may not regulate the secondary effects of speech by suppressing the speech itself." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (Kennedy, J., concurring in judgment); *see also id.* ("Though the inference may be inexorable that a city could reduce secondary effects by reducing speech, this is not a permissible strategy."); *id.* at 450 ("a city may not attack secondary effects

indirectly by attacking speech").[3]  In this context, a city likewise should not be able to regulate alleged secondary effects of firearms sales by suppressing firearms sales, much less flatly banning them.

### III.    THE POSSESSION RESTRICTIONS ARE UNCONSTITUTIONAL.

#### A.    The Second Amendment Right Is Not Limited to the Home.

1.    *Heller* did not require the Supreme Court to explore the "full scope of the Second Amendment" right to keep arms, 554 U.S. at 626, and this case does not require the Court to explore the full scope of the right to bear them.  For if the right to bear arms has any independent force, it must extend at least to the locations at issue here—*i.e.*, to a person's own property outside the four walls of the home, to a person's own place of business, and to the property of another with that person's permission. *See* Pl. Br. 25.  Whether the right to bear arms extends beyond these locations is not a question this Court need address.

Chicago argues that a right to bear arms is necessary to secure the right to carry guns even in the homes where they are kept.  *See* Chi. Resp. 28.  But it is implausible that a right to keep arms within one's own home, standing alone, would not include the right to use them in the home for self-defense.  Surely there would be no reason to grant a right to keep something that could not be used.  *See Heller*, 554 U.S. at 609 ("the right to keep and bear arms, also implies the right to use them if necessary in self defence; without this right to use the guaranty would have hardly been worth the paper it consumed") (quoting JOEL TIFFANY, A TREATISE ON THE UNCONSTITUTIONALITY OF AMERICAN SLAVERY 117-18 (1849)).

Furthermore, the Second Amendment protects a general right "to carry weapons in case of confrontation," *id.* at 592; unlike other provisions of the bill of rights, the Amendment's text

---

[3] Justice Kennedy's opinion in *Alameda Books* is controlling.  *See Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 465 (7th Cir. 2009).

does not focus on a person's house or any other particular location, *compare* U.S. CONST.

amends. III, IV. Nor is the need for the right's "central" self-defense component in any way so

limited. *Heller*, 554 U.S. at 599. Indeed, the City itself acknowledges that "one cannot know *ex

ante* the time and place where one will need to discharge a gun in self-defense." Chi. Resp. 27.

The unpredictability of when and where defensive action will be necessary thus also renders

implausible any interpretation of the Second Amendment that limits its protection to the home.

The City's contention that, historically, "[t]he right to use deadly force in self defense did

not exist in the spaces outside the dwelling unit" is erroneous. Chi. Resp. 30. It was understood

that "[i]f a thief assaults a true man *either* abroad *or* in his house to rob or kill him, the true man

is not bound to give back, but may kill the assailant." 1 MATTHEW HALE, HISTORIA PLACITORUM

CORONAE 481 (George Wilson ed., 1778) (emphasis added); *see also* 1 JOEL PRENTISS BISHOP,

COMMENTARIES ON THE CRIMINAL LAW § 553 (2d ed. 1858); Pl. Br. 25-28. And even when it

did apply, the common-law duty to retreat applied *only* "as far as the fierceness of the assault

[would] permit …, without manifest danger of [the victim's] life, or enormous bodily harm";

otherwise "in his defence he [could] kill his assailant instantly." 4 BLACKSTONE COMMENTARIES

*185.

To be sure, Second Amendment rights, like First Amendment rights, are subject to

"*narrowly limited*" exceptions that are consistent with our "history and legal tradition." *Ezell*,

651 F.3d at 702 (emphasis added). Thus, there may be some "sensitive" places where the need

for self-defense may arise—*Heller* suggests schools and government buildings, 554 U.S. at

626—but where a person's right to carry a gun may nevertheless be restricted. But a holding that

the right to bear arms extends *only* to the narrow confines of a person's home would transform

any such "narrowly limited" exception into the general rule.

2.      The City insists that "English common law and the Statute of Northampton" barred all "ordinary carrying" outside of the home, with a "limited exception" for "men of nobility and their attendants."  Chi. Resp. 25, 26 n.16.  It is telling that the City's historical presentation relies extensively on the work of Patrick Charles, *see id.* at 24, 25, 26 n.16, who continues to insist that "[t]he historical underpinnings of *District of Columbia v. Heller* are not built upon a solid foundation."  Patrick Charles, *The Faces of the Second Amendment Outside the Home*, 60 CLEV. ST. L. REV. 1, 3 n.9 (2012).  *See also* Brief for English/Early American Historians 3, *McDonald*, 130 S. Ct. 3020 (No. 08-1521); *McDonald*, 130 S. Ct. at 3121 (Stevens, J., dissenting).

Furthermore, "*no* wearing of arms [was] within the meaning of [the Statute of Northampton], *unless* it be accompanied with such Circumstances as are apt to terrify the People," 1 WILLIAM HAWKINS, TREATISE OF THE PLEAS OF THE CROWN 136 (1716) (emphasis added); *see also id.* at 71; *Rex v. Dewhurst*, 1 St. Tr. 529, 601-02 (Lancaster Assize 1820) (a "man has a clear right to protect himself [with arms] when he is going singly or in a small party upon the road where he is travelling or going for the ordinary purposes of business"); *Queen v. Soley*, 88 Eng. Rep. 935, 937 (1707) (Q.B.) ("a man may ride with arms"); Pl. Br. 29-30.[4]

The People of this Nation likewise did not understand the common law or the Statute of Northampton to bar defensive arms carrying by law-abiding citizens outside of the home. William Rawle, for example, "a prominent lawyer who had been a member of the Pennsylvania Assembly that ratified the Bill of Rights," *Heller*, 554 U.S. at 607, wrote that "the carrying of arms abroad by an individual, *attended with circumstances giving just reason to fear that he*

---

[4] Even if the English right to carry firearms was limited to nobility (and it was not), the Second Amendment itself negates any such class-based limit by guaranteeing the right of "*the people*" to keep and bear arms.  *See* 2 BLACKSTONE COMMENTARIES *143 n.40 (Tucker ed. 1803); *Heller*, 554 U.S. at 579-81.

*purposes to make an unlawful use of them*, would be sufficient cause to require him to give surety of the peace." A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 123 (1825) (emphasis added); *see also* Pl. Br. 30-31. And judge and law professor St. George Tucker, author of "the most important early American edition of Blackstone's Commentaries," *Heller*, 554 U.S. at 594, both (a) observed that, "in many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in hand, than an European fine gentleman without a sword by his side," and (b) acknowledged that Virginia had enacted a law analogous to the Statute of Northampton. *See* 5 BLACKSTONE COMMENTARIES App. n.B, at 19 (Tucker ed. 1803), *id.* at 149 & n.14. Either the citizens of the fledgling republic—including some of the most prominent—were scofflaws, or the common law and Northampton did not flatly ban carrying guns in public. George Washington, for example, rode between Alexandria and Mount Vernon with pistols holstered to his horse's saddle, "[a]s was then the custom." BENJAMIN OGLE TAYLOE, IN MEMORIAM 95 (1872). And Thomas Jefferson advised his nephew to "[l]et your gun … be the constant companion of your walks." Letter of August 19, 1785, *in* 1 WRITINGS OF THOMAS JEFFERSON 395, 398 (H.A. Washington ed., 1858).

Indeed, many of the earliest Americans would have been scofflaws if they *had not* carried a weapon: "about half the colonies had laws *requiring* arms-carrying in certain circumstances," such as when traveling or attending church. NICHOLAS J. JOHNSON, DAVID B. KOPEL, ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106-08 (2012) (emphasis added).

3.     Chicago also argues that cities have a "special prerogative to regulate under the Second Amendment," because "firearms have always presented great risk in densely-populated urban centers." Chi. Resp. 24, 28. But the *Heller* majority rejected the dissent's contention that the District of Columbia's "focus[] upon the presence of handguns in high-crime urban areas"

14

made its handgun ban less objectionable.  554 U.S. at 681-82 (Breyer, J., dissenting); *Heller*, 554 U.S. at 634-35.  Indeed, given *Heller*'s focus on where the need for self-defense is particularly "acute," *id*. at 628, the right of law-abiding citizens to bear arms should be at its *zenith* in a City "pervade[d]" by "street gangs" that have fomented "a singular gun violence epidemic."  Chi. Br. 1.

And to the extent there was any "historical tradition" of restricting gun carrying in cities, Chi. Resp. 24, that tradition was rooted in the Statute of Northampton.  *See* Chi. Br. 6 (arguing that "[t]he Statute's restrictions were especially critical in towns and cities").  But as we have shown, the Statute of Northampton and the corresponding common-law restriction *did not* prohibit law-abiding citizens from carrying common weapons for self-defense.  Thus, in defending British soldiers charged with murder in the Boston Massacre, John Adams did "not deny [that] the inhabitants [of Boston] had a right to arm themselves."  *First Day Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905).  The "material" distinction was not whether arms were borne within city limits, but rather whether they were borne for "offence" rather than "defence."  *Id*.

Municipal discharge bans likewise provide no support for limiting Second Amendment rights to the home.  *Heller* itself explained that it was "unlikely" and "implausible" that such bans "would have been enforced against a citizen acting in self-defense."  554 U.S. at 633.  And contrary to the City's argument, *see* Chi. Resp. 27, there is a world of difference between a discharge ban subject to a self-defense exception and a flat ban on carriage.  The former permits a citizen to be "armed and ready" to defend himself from criminal attack, *Heller*, 554 U.S. at 584; the latter does not.

15

### B.    The Possession Restrictions Fail Any Form of Heightened Scrutiny.

Because the Second Amendment's protection is not limited to the four walls of one's home, the City cannot broadly restrict the right of law-abiding, responsible citizens to armed self-defense on their own land and in their own places of business and to assist each other in defending their own homes.  This is true whether the Court applies *Heller*'s categorical test or some type of heightened scrutiny.  Again, even under intermediate scrutiny a "complete ban" can be sufficiently tailored "only if each activity within the proscription's scope is an appropriately targeted evil."  *Ward*, 491 U.S. at 800 (quotation marks omitted).  At any rate, Chicago's asserted justifications lack merit.

1.    *Ban on Firearms Outside of the "Home."*  The City bans all of its residents from possessing firearms on their own property outside of the four walls of their homes because, in the City's judgment, "in Chicago, carrying outside the home is simply too dangerous."  Chi. Resp. 34.  The Second Amendment, however, "is the very *product* of an interest-balancing by the people," *Heller*, 554 U.S. at 635, and they determined that the benefits of the right to bear arms outweighed the potential costs.  The decision "whether the right is *really worth* insisting upon," *id.* at 634, or whether it is "simply too dangerous" is not Chicago's to make.

Many constitutional rights have "controversial public safety implications."  *McDonald*, 130 S. Ct. at 3045 (plurality).  Indeed, "[a]ll of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category."  *Id*.  Thus, whatever the public safety implications of being unable to "screen out *everyone* who will eventually commit a violent crime with a gun," Chi. Resp. 36 (emphasis added), or to arrest citizens for "the mere act of carrying" a gun on their own property, Chi. Br. 35, those

16

implications neither make the Second Amendment unique among constitutional rights nor give Chicago warrant to ignore it.

In any event, Chicago has failed to show a substantial relationship between public safety and banning all of its residents from carrying firearms on their own property outside of their homes. *See* Pl. Br. 32-37. The City's response underscores at least three reasons why this is the case. First, the City fails to come to grips with Commander Gorman's admission that Chicago's gang members do not want law enforcement officials to know that they have a gun. *See* P-RSOF 21. Indeed, the City has not produced evidence that *a single* member of a Chicago gang has registered a gun with the City.[5] The City speculates that a gang member's incentives to register his gun may change if instead of simply allowing him to possess a gun in the home it also allowed him to carry one in his yard, *see* Chi. Resp. 32, but the impact of this on a gang member's gun-carrying behavior is doubtful, to put it charitably, given the City's concession of the "obvious" fact that gangs already have "unusual access and incentives to use guns." *Id*. at 31 (quotation marks omitted).

Second, Chicago fails to defuse Dr. Cook's admission that he "expect[s] relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand." P-RSOF 14-B; *see* Pl. Br. 32-33. Indeed, the City's response strengthens *our* case, for it emphasizes Dr. Cook's conclusion that "the change in gun carrying" resulting from state laws easing restrictions on gun carrying "*appears to be concentrated in rural and suburban areas*." Chi. Resp. 33 (emphasis

---

[5] The City cites anecdotal evidence that criminals in Miami and Philadelphia have applied for carry permits. *See* Chi. Resp. 32. But according to Chicago's own expert Dr. Cook, "the available data about [concealed-carry] permit holders imply that they are at a fairly low risk of misusing guns." P-RSOF 29-C. Thus, the evidence demonstrates that licensed arms carriers are disproportionately law-abiding.

added).  Dr. Cook's conclusion, in other words, simply underscores the common-sense conclusion that laws regarding gun carrying have little impact on the behavior of urban criminals.

Third, Dr. Cook's additional warning against "confidently predicting the implications of extending *Heller* [to public carrying] for stop-and-frisk tactics," Pl. Ex. 4 at 1080 n.214, casts further doubt on the City's assertion that allowing law-abiding—and, indeed, licensed—citizens to lawfully carry firearms on *their own property* will interfere with the City's anti-gun policing efforts, *see* Chi. Resp. 35-36; *see also* Pl. Br. 34.

2.      *Ban on Handguns in a Place of Business*.  *Heller* squarely rejected the argument that it is "permissible to ban the possession of handguns so long as the possession of … long guns … is allowed."  554 U.S. at 629.  The City argues that "[h]andguns are protected in the home under *Heller* … because they are 'the most popular' weapon chosen for defense of the sanctity of the home."  Chi. Resp. 38.  But handguns are not merely the most popular weapon chosen for home defense, they are "*overwhelmingly* chosen by American society for [the] lawful purpose" of self-defense in general.  *Heller*, 554 U.S. at 628 (emphasis added); *see id.* at 629 ("the American people have considered the handgun to be the quintessential self-defense weapon").  Thus, once it is determined that the right to "keep and carry arms … in common use" extends to a place of business, *id.* at 627 (quotation marks omitted), it necessarily follows that the right to keep and carry *handguns* extends to a place of business.

Furthermore, the City's public safety rationale for banning handguns, but not long guns, in a place of business is dubious.  The law obviously provides an incentive for business owners to substitute long guns for handguns, and as a general matter long guns are both (a) "more lethal

firearms than handguns," and (b) "mechanically speaking, … easier to accidentally discharge." P-RSOF 43-B.

3. *Ban on Invitees' Possessing Firearms.*  Chicago suggests that the ancient right to assemble others in defense of the home did not include the right of those assembled to bear arms. *See* Chi. Resp. 39.  Chicago cites nothing for this proposition, for there is nothing.  As Justice James Wilson explained, "one may assemble people together in order to protect and defend his house" because "every man's house is deemed, by the law, to be his castle; and the law … invests him with the power … of the commanding officer."  3 JAMES WILSON, WORKS OF THE HONOURABLE JAMES WILSON 85 (1804).  It is inconceivable that a "commanding officer" defending his "castle" could not enlist armed charges.

The City also argues that Plaintiffs lack standing to make this argument, but Pacholski and Tyler have testified that if it were lawful they would invite others to possess firearms on their property, including guests who watch their home while they are out of town.  *See* P-SOF 16; Pl. Ex. 41 ¶ 8; Pl. Ex. 42 ¶ 8.  The injury inflicted by banning a person from enlisting another to assist in defending his home does not turn on whether the person intends to be present in the home along with his armed guest.  Indeed, if the homeowner is the only person allowed to possess a gun in the home, the constitutional harm inflicted by Chicago's law is *greater* when the homeowner is absent.

## IV.    THE ONE-OPERABLE-GUN LIMIT IS UNCONSTITUTIONAL.

### A.    History Does Not Support the One-Operable-Gun Limit.

Chicago's one-operable-gun limit does not merely "regulat[e] the storage of firearms." Chi. Resp. 40.  It restricts the ability of citizens to *use* more than a single firearm for defense in the home.  And any self-defense exception to this limit would kick in only when a person was

19

faced with the "*imminent* use of unlawful force," 720 ILCS 5/7-1(a) (emphasis added), *i.e.*, precisely when the person could not afford to fumble around with a trigger lock or rush to a distant part of his home to retrieve his lone operable gun. *Cf.* Tr. at 83-84, *Heller*, No. 07-290 (Roberts, C.J. & Scalia, J.).

Further, Chicago has not cited a single historical example of a law that purported to limit a law-abiding citizen to using a certain number of firearms for self-defense in the home. Indeed, evidence regarding the right to assemble force in defense of the home demonstrates that a single-firearm limit is inconsistent with the Second Amendment's historic scope. *See* Pl. Br. 23.

Most of the laws the City does cite, *see* Chi. Br. 38-39, regulated the storage of gunpowder, not guns, and did "not clearly prohibit loaded weapons." *Heller*, 554 U.S. at 632. The lone exception is a 1783 Massachusetts law banning loaded guns with a "historical justification," *id*. at 635—fire suppression, *see* Chi. App'x 116—distinct from Chicago's and upon which *Heller* expressly declined to "stake [its] interpretation of the Second Amendment," *Heller*, 554 U.S. at 632.

**B.     The One-Operable-Gun Limit Fails Any Form of Heightened Scrutiny.**

Again, *Ezell* rejected importing an undue burden test into the Second Amendment context. *See* 651 F.3d at 706. And the City's rationales fail to justify the one-operable-gun limit under any form of heightened scrutiny.

1.     *Reducing Gun Theft.* The City trumpets Dr. Kleck's testimony that reducing theft is "probably the strongest rationale for keeping guns stored in a secure manner." Chi. Resp. 41 But the City ignores Dr. Kleck's opinion that even this rationale is a weak one: because there "is no evidence of even a modest effect on the gun theft rate of the city's limits on the number of

operable guns allowed in households[,] there is no logical reason to believe that the city's existing ordinance reduces the number of criminals with guns." P-RSOF 118-A.

2. *Reducing the Risk of Suicide, Homicide, and Accidental Firearm Death*. A person needs only a single operable gun to commit suicide or to murder. Thus even if trigger locks "have a safety benefit," Chi. Resp. 42, it is not apparent why that benefit would extend to reducing the incidence of suicide or homicide when an unlocked, operable gun is also available in the home.[6] And with respect to accidents, a separate ordinance provision not challenged here requires all firearms to be stored in a secure manner if children are likely to gain access to them. *See* Pl. Br. 41 n.18.

3. *Reducing Threats to First Responders*. We do not deny that there have been instances in which Chicago first responders have been harmed by firearms. But Chicago has failed to identify even a single instance in which a first responder was harmed by a *lawfully possessed* firearm. *See* P-RSOF 134-A. This is hardly a mere quibble or a matter of semantics. *Cf.* Chi. Resp. 43. It is unlikely, to say the least, that a person who is willing to shoot a first responder is likely to be deterred by the City's limit on the number of operable guns that may be kept in the home.

## CONCLUSION

For these reasons, and for the reasons stated in Plaintiffs' opening brief, the Court should grant Plaintiffs' motion for summary judgment, deny Defendants' motion for summary judgment, and enter judgment for Plaintiffs and against Defendants on all claims.

---

[6] Even researchers who disagreed with the NRC's conclusion that a causal connection cannot be shown between access to even a single gun and suicide acknowledged that "significant questions remain" and recommended further research into the "key question" of "whether possession of a firearm directly increases the risk of suicide, or whether suicidal intent increases the risk of gun possession." Chi. Ex. 106 at 81-82.

21

Dated: August 3, 2012

Stephen Kolodziej
FORD & BRITTON, P.C.
33 N. Dearborn St., Suite 300
Chicago, IL 60602
Tel: (312) 924-7500
Fax: (312) 924-7516
Email: skolodziej@fordbritton.com

Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper*
David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Charles J. Cooper, hereby certify that on this 3rd day of August, 2012, I caused a copy

of the foregoing to be served by electronic filing on:

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
CITY OF CHICAGO, DEPARTMENT OF LAW
CONSTITUTIONAL AND COMMERCIAL
LITIGATION DIVISION
30 N. LaSalle St., Suite 1230
Chicago, IL  60602

Craig Woods
Ranjit Hakim
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL  60606-4637

s/ Charles J. Cooper
Charles J. Cooper