# Exhibit  A

Westlaw.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))**

**H**
Only the Westlaw citation is currently available.

United States Court of Appeals,
Second Circuit.
Alan **KACHALSKY**, Christina Nikolov, Johnnie
Nance, Anna Marcucci–Nance, Eric Detmer, Second
Amendment Foundation, Inc., Plaintiffs–Appellants–
Cross–Appellees,
v.
COUNTY OF WESTCHESTER, Defendant–
Appellee–Cross–Appellant,
Susan Cacace, Jeffrey A. Cohen, Albert Lorenzor,
Robert K. Holdman, Defendants–Appellees.

Docket Nos. 11–3642 (Lead), 11–3962(XAP).
Argued: Aug. 22, 2012.
Decided: Nov. 27, 2012.

**Background:** Applicants and association that pro-
moted exercise of right to keep and bear arms
brought § 1983 action presenting facial and as-
applied constitutional challenge to New York's li-
censing scheme for full-carry handgun permits. Par-
ties filed cross-motions for summary judgment. The
United States District Court for the Southern District
of New York, Cathy Seibel, J., 817 F.Supp.2d 235,
granted state's motion, and plaintiffs appealed.

**Holdings:** The Court of Appeals, Wesley, Circuit
Judge, held that:
(1) state law that restricted individuals' ability to
carry firearms in public, where Second Amendment
guarantees were not at their zenith, was subject to
intermediate scrutiny, and would pass constitutional
muster if it was substantially related to achievement
of important governmental interest, and
(2) New York legislation that prevented individuals
from obtaining a full-carry concealed-handgun li-
cense to possess concealed firearm in public, in gen-
eral and not for specific purposes such as hunting and
target practice, except upon showing of "proper
cause," as interpreted by courts to require that these
individuals demonstrate a special need for self-
protection distinguishable from that of the general
community, did not violate the Second Amendment.

Affirmed.

West Headnotes

**[1] Weapons 406 ⌸107(1)**

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regu-
latory Provisions
            406k107 Construction
                406k107(1) k. In General. Most Cited
Cases

    Second Amendment guarantees are at their ze-
nith within the home. U.S.C.A. Const.Amend. 2.

**[2] Weapons 406 ⌸106(3)**

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regu-
latory Provisions
            406k106 Validity
                406k106(3) k. Violation of Right to
Bear Arms. Most Cited Cases

    State's ability to regulate firearms is qualitatively
different in public than in the home. U.S.C.A.
Const.Amend. 2.

**[3] Weapons 406 ⌸106(3)**

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regu-
latory Provisions
            406k106 Validity
                406k106(3) k. Violation of Right to
Bear Arms. Most Cited Cases

    State enjoys fair degree of latitude to regulate
use and possession of firearms in public. U.S.C.A.
Const.Amend. 2.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))**

[4] Weapons 406 ☜══106(3)

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regulatory Provisions
            406k106 Validity
                406k106(3) k. Violation of Right to Bear Arms. Most Cited Cases

Second Amendment does not foreclose regulatory measures with regard to use and possession of firearms to a degree that would result in handcuffing lawmakers' ability to prevent armed mayhem in public places. U.S.C.A. Const.Amend. 2.

[5] Weapons 406 ☜══106(3)

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regulatory Provisions
            406k106 Validity
                406k106(3) k. Violation of Right to Bear Arms. Most Cited Cases

State law that restricted individuals' ability to carry firearms in public, where Second Amendment guarantees were not at their zenith, was subject to intermediate scrutiny, and would pass constitutional muster if it was substantially related to achievement of important governmental interest. U.S.C.A. Const.Amend. 2.

[6] Weapons 406 ☜══106(3)

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regulatory Provisions
            406k106 Validity
                406k106(3) k. Violation of Right to Bear Arms. Most Cited Cases

State had a substantial, indeed a compelling, interest in public safety and crime prevention, and as long as state law restrictions on possession of firearms in public were substantially related to that interest, they would be upheld from Second Amendment challenge. U.S.C.A. Const.Amend. 2.

[7] Constitutional Law 92 ☜══3852

92 Constitutional Law
    92XXVII Due Process
        92XXVII(A) In General
            92k3848 Relationship to Other Constitutional Provisions; Incorporation
                92k3852 k. Second Amendment. Most Cited Cases

Weapons 406 ☜══106(3)

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regulatory Provisions
            406k106 Validity
                406k106(3) k. Violation of Right to Bear Arms. Most Cited Cases

New York legislation that prevented individuals from obtaining a full-carry concealed-handgun license to possess concealed firearm in public, in general and not for specific purposes such as hunting and target practice, except upon showing of "proper cause," as interpreted by courts to require that these individuals demonstrate a special need for self-protection distinguishable from that of the general community, did not violate the Second Amendment, as applicable to the states through the Fourteenth Amendment; these legislative restrictions were substantially related to state's interest in public safety and crime prevention. U.S.C.A. Const.Amends. 2, 14; McKinney's Penal Law § 400.00(2)(f).

[8] Weapons 406 ☜══106(3)

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regulatory Provisions
            406k106 Validity
                406k106(3) k. Violation of Right to Bear Arms. Most Cited Cases

In assessing whether state law restrictions on possession of firearms in public were substantially related to state's substantial, indeed compelling, interest in public safety and crime prevention, as re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))**

quired for court to uphold these restrictions from Second Amendment challenge, it was appropriate for court to accord substantial deference to the predictive judgments of state legislature; court's role was merely to ensure that, in formulating its judgments, state legislature had drawn reasonable inferences based on substantial evidence. U.S.C.A. Const.Amend. 2.

**[9] Weapons 406 &#9755;106(3)**

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regulatory Provisions
            406k106 Validity
                406k106(3) k. Violation of Right to Bear Arms. Most Cited Cases

In applying intermediate level of scrutiny to decide whether state law restrictions on possession of firearms in public violated Second Amendment rights of state citizens, court was not required to ensure that legislature's chosen means were narrowly tailored or the least restrictive available means to serve the stated governmental interests; rather, to survive intermediate scrutiny, the fit between the challenged regulation needed only be substantial, not perfect. U.S.C.A. Const.Amend. 2.

**[10] Constitutional Law 92 &#9755;996**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(C) Determination of Constitutional Questions
            92VI(C)3 Presumptions and Construction as to Constitutionality
                92k996 k. Clearly, Positively, or Unmistakably Unconstitutional. Most Cited Cases

**Constitutional Law 92 &#9755;2478**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)2 Encroachment on Legislature
                92k2478 k. Invalidation, Annulment, or Repeal of Statutes. Most Cited Cases

Proper respect for coordinate branch of govern-

ment requires that courts strike down legislation only if legislature's lack of constitutional authority to pass legislation in question is clearly demonstrated.

**[11] Weapons 406 &#9755;106(2)**

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regulatory Provisions
            406k106 Validity
                406k106(2) k. Vagueness and Overbreadth. Most Cited Cases

**Weapons 406 &#9755;106(3)**

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regulatory Provisions
            406k106 Validity
                406k106(3) k. Violation of Right to Bear Arms. Most Cited Cases

Persons to whom New York state law restrictions on public possession of firearms could constitutionally be applied without violating their Second Amendment rights would not be heard to challenge these same restrictions as unconstitutionally overbroad, based on their purported effect on Second Amendment rights of other hypothetical persons not before the court, even assuming that overbreadth doctrine applied in the Second Amendment context. U.S.C.A. Const.Amend. 2; McKinney's Penal Law § 400.00(2)(f).

**[12] Constitutional Law 92 &#9755;1163**

92 Constitutional Law
    92X First Amendment in General
        92X(A) In General
            92k1162 Overbreadth in General
                92k1163 k. In General. Most Cited Cases

Overbreadth challenges are generally limited to First Amendment context. U.S.C.A. Const.Amend. 1.

**[13] Constitutional Law 92 &#9755;667**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
       92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
         92VI(A)1 In General
           92k667 k. Third-Party Standing in General. Most Cited Cases

    Person to whom statute may constitutionally be applied will not be heard to challenge that statute on ground that it may conceivably be applied unconstitutionally to others in other situations not before court.

**[14] Constitutional Law 92 &#128273;961**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
       92VI(C) Determination of Constitutional Questions
         92VI(C)1 In General
           92k960 Judicial Authority and Duty in General
              92k961 k. In General. Most Cited Cases

    Courts are not roving commissions assigned to pass judgment on validity of the nation's laws.

Plaintiffs–Appellants appeal from a September 2, 2011 Opinion and Order of the United States District Court for the Southern District of New York (Seibel, J.), granting Defendants–Appellees summary judgment. Plaintiffs seek declaratory and injunctive relief under 42 U.S.C. § 1983, barring New York State handgun licensing officials from requiring that applicants prove "proper cause" to obtain licenses to carry handguns for self-defense pursuant to New York Penal Law section 400.00(2)(f). They argue that application of section 400.00(2)(f) violates the Second and Fourteenth Amendments to the Constitution. Because the proper cause requirement is substantially related to New York's compelling interests in public safety and crime prevention, we affirm. AFFIRMED.Alan Gura, Gura & Possessky, PLLC, Alexandria, VA, for Plaintiffs–Appellants–Cross–Appellees.

Thomas G. Gardiner, Sr. Assistant County Attorney (James Castro–Blanco, Chief Deputy County Attorney, on the brief), for Robert F. Meehan, County Attorney for the County of Westchester, Westchester, NY, for Defendant–Appellee–Cross–Appellant.

Simon Heller, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Richard Dearing, Deputy Solicitor General, on the brief), for Eric T. Schneiderman, Attorney General of the State of New York, New York, NY, for Defendants–Appellees.

Before KATZMANN, WESLEY and LYNCH, Circuit Judges.

WESLEY, Circuit Judge:
    *1 This appeal presents a single issue: Does New York's handgun licensing scheme violate the Second Amendment by requiring an applicant to demonstrate "proper cause" to obtain a license to carry a concealed handgun in public?

    Plaintiffs Alan Kachalsky, Christina Nikolov, Johnnie Nance, Anna Marcucci–Nance, and Eric Detmer (together, the "Plaintiffs") all seek to carry handguns outside the home for self-defense. Each applied for and was denied a full-carry concealed-handgun license by one of the defendant licensing officers (the "State Defendants") [FN1] for failing to establish "proper cause"—a special need for self-protection—pursuant to New York Penal Law section 400.00(2)(f). Plaintiffs, along with the Second Amendment Foundation ("SAF"), thereafter filed this action to contest New York's proper cause requirement. They contend that the proper cause provision, on its face or as applied to them, violates the Second Amendment as interpreted by the Supreme Court in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

    The State Defendants moved for summary judgment. The district court granted that motion and granted Defendant County of Westchester summary judgment sua sponte. Kachalsky v. Cacace, 817 F.Supp.2d 235, 273–74 (S.D.N.Y.2011). The district court found that SAF lacked standing to sue on its own behalf or on behalf of its members. Id. at 251. Addressing the merits, the district court concluded that the concealed carrying of handguns in public is "outside the core Second Amendment concern articulated in Heller: self-defense in the home." Id. at 264. In the alternative, the district court determined that the proper cause requirement would survive constitutional scrutiny even if it implicated the Second Amendment. Id. at 266–72. For the reasons that follow, we affirm.[FN2]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))**

# I
## A

New York's efforts in regulating the possession and use of firearms predate the Constitution. By 1785, New York had enacted laws regulating when and where firearms could be used, as well as restricting the storage of gun powder. *See, e.g.,* Act of Apr. 22, 1785, ch. 81, 1785 Laws of N.Y. 152; Act of Apr. 13, 1784, ch. 28, 1784 Laws of N.Y. 627. Like most other states, during the nineteenth century, New York heavily regulated the carrying of concealable firearms. In 1881, New York prohibited the concealed carrying of "any kind of fire-arms." 1881 Laws of N.Y., ch. 676, at 412. In 1884, New York instituted a statewide licensing requirement for minors carrying weapons in public, *see* 1884 Laws of N.Y., ch. 46, § 8, at 47, and soon after the turn of the century, it expanded its licensing requirements to include all persons carrying concealable pistols, *see* 1905 Laws of N.Y., ch. 92, § 2, at 129–30.

Due to a rise in violent crime associated with concealable firearms in the early twentieth century, New York enacted the Sullivan Law in 1911, which made it unlawful for any person to possess, without a license, "any pistol, revolver or other firearm of a size which may be concealed upon the person." *See* 1911 Laws of N.Y., ch. 195, § 1, at 443 (codifying N.Y. Penal Law § 1897, ¶ 3); *see also* N.Y. Legislative Service, *Dangerous Weapons—"Sullivan Bill,"* 1911 Ch. 195 (1911). A study of homicides and suicides completed shortly before the law's enactment explained: "The increase of homicide by shooting indicates ... the urgent necessity of the proper authorities taking some measures for the regulation of the indiscriminate sale and carrying of firearms." *Revolver Killings Fast Increasing,* N.Y. Times, Jan. 30, 1911 (quoting N.Y. State Coroner's Office Report). As a result, the study recommended that New York

**\*2** should have a law, whereby a person having a revolver in his possession, either concealed or displayed, unless for some legitimate purpose, could be punished by a severe jail sentence.... [A] rigid law, making it difficult to buy revolvers, would be the means of saving hundreds of lives.

*Id.* (quoting N.Y. State Coroner's Office Report).

The Sullivan Law survived constitutional attack

shortly after it was passed. *People ex rel. Darling v. Warden of City Prisons,* 154 A.D. 413, 422, 139 N.Y.S. 277 (1st Dep't 1913). Although the law was upheld, in part, on what is now the erroneous belief that the Second Amendment does not apply to the states, the decision provides additional background regarding the law's enactment:

There had been for many years upon the statute books a law against the carriage of concealed weapons.... It did not seem effective in preventing crimes of violence in this State. Of the same kind and character, but proceeding a step further with the regulatory legislation, the Legislature has now picked out one particular kind of arm, *the handy, the usual and the favorite weapon of the turbulent criminal class,* and has said that in our organized communities, our cities, towns and villages where the public peace is protected by the officers of organized government, the citizen may not have that particular kind of weapon without a permit, as it had already said that he might not carry it on his person without a permit.

*Id.* at 423, 139 N.Y.S. 277 (emphasis added).

In 1913, the Sullivan Law was amended to impose a statewide standard for the issuance of licenses to carry firearms in public. 1913 Laws of N.Y., ch. 608, at 1627–30. To obtain a license to carry a concealed pistol or revolver the applicant was required to demonstrate "good moral character, and that proper cause exists for the issuance [of the license]." *Id.* at 1629, 139 N.Y.S. 277. One hundred years later, the proper cause requirement remains a feature of New York's statutory regime.

## B

New York maintains a general prohibition on the possession of "firearms" absent a license. *See* N.Y. Penal Law §§ 265.01–265 .04, 265.20(a)(3). A "firearm" is defined to include pistols and revolvers; shotguns with barrels less than eighteen inches in length; rifles with barrels less than sixteen inches in length; "any weapon made from a shotgun or rifle" with an overall length of less than twenty-six inches; and assault weapons. N.Y. Penal Law § 265.00(3). Rifles and shotguns are not subject to the licensing provisions of the statute.[FN3]

Section 400.00 of the Penal Law "is the exclu-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))

sive statutory mechanism for the licensing of firearms in New York State." _FN4_ _O'Connor v. Scarpino,_ 83 N.Y.2d 919, 920, 615 N.Y.S.2d 305, 638 N.E.2d 950 (1994) (Mem.); _see_ N.Y. Penal Law § 265.20(a)(3). Licenses are limited to those over twenty-one years of age, of good moral character, without a history of crime or mental illness, and "concerning whom no good cause exists for the denial of the license." N.Y. Penal Law § 400.00(1)(a)-(d), (g).

*3 Most licenses are limited by place or profession. Licenses "shall be issued" to possess a registered handgun in the home or in a place of business by a merchant or storekeeper. N.Y. Penal Law § 400.00(2)(a)-(b). And licenses "shall be issued" for a messenger employed by a banking institution or express company to carry a concealed handgun, as well as for certain state and city judges and those employed by a prison or jail. § 400.00(2)(c)-(e).

This case targets the license available under section 400.00(2)(f). That section provides that a license "shall be issued to ... have and carry [a firearm] concealed ... by any person when proper cause exists for the issuance thereof." N.Y. Penal Law § 400.00(2)(f). This is the **only** license available to carry a concealed handgun "without regard to employment or place of possession." _Id._ Given that New York bans carrying handguns openly, applicants—like Plaintiffs in this case—who desire to carry a handgun outside the home and who do not fit within one of the employment categories must demonstrate proper cause pursuant to section 400.00(2)(f).

"Proper cause" is not defined by the Penal Law, but New York State courts have defined the term to include carrying a handgun for target practice, hunting, or self-defense. When an applicant demonstrates proper cause to carry a handgun for target practice or hunting, the licensing officer may restrict a carry license "to the purposes that justified the issuance." _FN5_ _O'Connor,_ 83 N.Y.2d at 921, 615 N.Y.S.2d 305, 638 N.E.2d 950. In this regard, "a sincere desire to participate in target shooting and hunting ... constitute[s] a legitimate reason for the issuance of a pistol permit." _In re O'Connor,_ 154 Misc.2d 694, 585 N.Y.S.2d 1000, 1003 (Westchester Cty. Ct.1992) (citing _Davis v. Clyne,_ 58 A.D.2d 947, 947, 397 N.Y.S.2d 186 (3d Dep't 1977)).

To establish proper cause to obtain a license

without any restrictions—the full-carry license that Plaintiffs seek in this case—an applicant must "demonstrate a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." _Klenosky v. N.Y City Police Dep't,_ 75 A.D.2d 793, 793, 428 N.Y.S.2d 256 (1st Dep't 1980), _aff'd on op. below,_ 53 N.Y.2d 685, 439 N.Y.S.2d 108, 421 N.E.2d 503 (1981). There is a substantial body of law instructing licensing officials on the application of this standard. Unlike a license for target shooting or hunting, "[a] generalized desire to carry a concealed weapon to protect one's person and property does not constitute 'proper cause.' " _In re O'Connor,_ 585 N.Y.S.2d at 1003 (citing _Bernstein v. Police Dep't of City of New York,_ 85 A.D.2d 574, 574, 445 N.Y.S.2d 716 (1st Dep't 1981)). Good moral character plus a simple desire to carry a weapon is not enough. _Moore v. Gallup,_ 293 N.Y. 846, 59 N.E.2d 439 (1944) (per curiam), _aff'g_ 267 A.D. 64, 66, 45 N.Y.S.2d 63 (3d Dep't 1943); _see also_ _In re O'Connor,_ 585 N.Y.S.2d at 1003. Nor is living or being employed in a "high crime area[ ]." _Martinek v. Kerik,_ 294 A.D.2d 221, 221–22, 743 N.Y.S.2d 80 (1st Dep't 2002); _see also_ _Theurer v. Safir,_ 254 A.D.2d 89, 90, 680 N.Y.S.2d 87 (1st Dep't 1998); _Sable v. McGuire,_ 92 A.D.2d 805, 805, 460 N.Y.S.2d 52 (1st Dep't 1983).

*4 The application process for a license is "rigorous" and administered locally. _Bach v. Pataki,_ 408 F.3d 75, 79 (2d Cir.2005). Every application triggers a local investigation by police into the applicant's mental health history, criminal history, moral character, and, in the case of a carry license, representations of proper cause. _See_ N.Y. Penal Law § 400.00(1)-(4). As part of this investigation, police officers take applicants' fingerprints and conduct a series of background checks with the New York State Division of Criminal Justice Services, the Federal Bureau of Investigation, and the New York State Department of Mental Hygiene. N.Y. Penal Law § 400.00(4). Upon completion of the investigation, the results are reported to the licensing officer. _Id._

Licensing officers, often local judges,_FN6_ are "vested with considerable discretion" in deciding whether to grant a license application, particularly in determining whether proper cause exists for the issuance of a carry license. _Vale v. Eidens,_ 290 A.D.2d 612, 613, 735 N.Y.S.2d 650 (3d Dep't 2002); _see also_ _Kaplan v. Bratton,_ 249 A.D.2d 199, 201, 673

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))**

N.Y.S.2d 66 (1st Dep't 1998); _Unger v. Rozzi, 206 A.D.2d 974, 974–75, 615 N.Y.S.2d 147 (4th Dep't 1994); Fromson v. Nelson, 178 A.D.2d 479, 479, 577 N.Y.S.2d 417 (2d Dep't 1991)._ An applicant may obtain judicial review of the denial of a license in whole or in part by filing a proceeding under Article 78 of New York's Civil Practice Law and Rules. A licensing officer's decision will be upheld unless it is arbitrary and capricious. _O'Brien v. Keegan, 87 N.Y.2d 436, 439–40, 639 N.Y.S.2d 1004, 663 N.E.2d 316 (1996)._

**C**

Each individual Plaintiff applied for a full-carry license under section 400.00(2)(f). Four of the five Plaintiffs made no effort to comply with New York's requirements for a full-carry license, that is, they did not claim a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession. Plaintiff Kachalsky asserted that the Second Amendment "entitles him to an unrestricted permit without further establishing 'proper cause.' " J.A. 33. He noted: "[W]e live in a world where sporadic random violence might at any moment place one in a position where one needs to defend onself or possibly others." J.A. 33–34. Plaintiffs Nance and Marcucci–Nance asserted that they demonstrated proper cause because they were citizens in "good standing" in their community and gainfully employed. J.A. 43–44, 48–49. Plaintiff Detmer asserted that he demonstrated proper cause because he was a federal law enforcement officer with the U.S. Coast Guard.[FN7] J.A. 39. Unlike the other Plaintiffs, Plaintiff Nikolov attempted to show a special need for self-protection by asserting that as a transgender female, she is more likely to be the victim of violence. J.A. 36. Like the other applicants, she also asserted that being a law-abiding citizen in itself entitled her to a full-carry license. _Id._

Plaintiffs' applications were all denied for the same reason: Failure to show any facts demonstrating a need for self-protection distinguishable from that of the general public. J.A. 34 (Kachalsky), 37 (Nikolov), 39 (Detmer), 43–44 (Nance), 48–49 (Marcucci–Nance). Nikolov's contention that her status as a transgender female puts her at risk of violence was rejected because she did not "report ... any type of threat to her own safety anywhere." J.A. 36. Plaintiffs aver that they have not reapplied for full-carry licenses because they believe it would be futile, and

that they would carry handguns in public but for fear of arrest, prosecution, fine, and/or imprisonment.[FN8] J.A. 75, 77, 79, 81, 83, 85.

**II**

*5 Invoking _Heller,_ Plaintiffs contend that the Second Amendment guarantees them a right to possess and carry weapons in public to defend themselves from dangerous confrontation and that New York cannot constitutionally force them to demonstrate proper cause to exercise that right. Defendants counter that the proper cause requirement does not burden conduct protected by the Second Amendment. They share the district court's view that the Supreme Court's pronouncement in _Heller_ limits the right to bear arms for self-defense to the home.

_Heller_ provides no categorical answer to this case. And in many ways, it raises more questions than it answers. In _Heller,_ the Supreme Court concluded that the Second Amendment codifies a preexisting "individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. Given that interpretation, the Court struck down the District of Columbia's prohibition on the possession of usable firearms in the home because the law banned "the quintessential self-defense weapon" in the place Americans hold most dear—the home. _Id._ at 628–29.

There was no need in _Heller_ to further define the scope of the Second Amendment or the standard of review for laws that burden Second Amendment rights. As the Court saw it, "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." _Id._ at 629. Because the Second Amendment was directly at odds with a complete ban on handguns in the home, the D.C. statute ran roughshod over that right. Thus, the Court simply noted that the handgun ban would be unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." _Id._ at 628. _Heller_ was never meant "to clarify the entire field" of Second Amendment jurisprudence.[FN9] _Id._ at 635.

Two years after _Heller,_ the Supreme Court held that the Second Amendment's protections, whatever their limits, apply fully to the states through the Fourteenth Amendment. _McDonald v. City of Chicago,_ ––U.S. ––––, ––––, ––––, 130 S.Ct. 3020, 3026, 3042, 177 L.Ed.2d 894 (2010). In _McDonald,_ the Court

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))**

struck down a Chicago law that banned handguns in the home. _Id._ at 3050. But it also reaffirmed _Heller's_ assurances that Second Amendment rights are far from absolute and that many longstanding handgun regulations are "presumptively lawful." _Heller_ 554 U.S. at 627 n. 26; _see McDonald,_ 130 S.Ct. at 3047. The Court also noted that the doctrine of "incorporation does not imperil every law regulating firearms." _McDonald,_ 130 S.Ct. at 3047.

[1] What we know from these decisions is that Second Amendment guarantees are at their zenith within the home. _Heller,_ 554 U.S. at 628–29. What we do not know is the scope of that right beyond the home and the standards for determining when and how the right can be regulated by a government. This vast _"terra incognita"_ has troubled courts since _Heller_ was decided. _United States v. Masciandaro,_ 638 F.3d 458, 475 (4th Cir.2011) (Wilkinson, _J.,_ for the Court). Although the Supreme Court's cases applying the Second Amendment have arisen only in connection with prohibitions on the possession of firearms in the home, the Court's analysis suggests, as Justice Stevens's dissent in _Heller_ and Defendants in this case before us acknowledge, that the Amendment must have _some_ application in the very different context of the public possession of firearms.[FN10] Our analysis proceeds on this assumption.

## A

*6 Plaintiffs contend that, as in _Heller,_ history and tradition demonstrate that there is a "fundamental right" to carry handguns in public, and though a state may regulate open or concealed carrying of handguns, it cannot ban _both._ While Plaintiffs concede that state legislative efforts have long recognized the dangers presented by both the open and concealed carrying of handguns in public places, they contend that states must suffer a constitutionally imposed choice between two equally inadequate alternatives. Thus, according to Plaintiffs, "access to [New York's] only available handgun carry license can[not] be qualified by 'proper cause.'" [FN11] Appellants' Br. at 38.

To be sure, some nineteenth-century state courts offered interpretations of the Second Amendment and analogous state constitutional provisions that are similar to Plaintiffs' position. In _State v. Reid,_ the Supreme Court of Alabama upheld a prohibition on the concealed carrying of "any species of fire arms"

but cautioned that the state's ability to regulate firearms was not unlimited and could not "amount[ ] to a destruction of the right, or ... require[ ] arms to be so borne as to render them wholly useless for the purpose of defence." 1 Ala. 612, 1840 WL 229, at *2–3 (1840). Relying on _Reid,_ the Supreme Court of Georgia held that a statute prohibiting the carrying of concealed pistols was unconstitutional insofar as it also "contains a prohibition against bearing arms _openly._" _Nunn v. State,_ 1 Ga. 243, 1846 WL 1167, at *11 (1846) (emphasis in original).[FN12] And in _State v. Chandler,_ the Supreme Court of Louisiana upheld a concealed-carry ban because "[i]t interfered with no man's right to carry arms ... in full open view." 5 La. Ann. 489, 1850 WL 3838, at *1 (1850) (internal quotation marks omitted).[FN13]

But this was hardly a universal view. Other states read restrictions on the public carrying of weapons as entirely consistent with constitutional protections of the right to keep and bear arms. At least four states once banned the carrying of pistols and similar weapons in public, both in a concealed or an open manner. _See, e.g.,_ Ch. 96, §§ 1–2, 1881 Ark. Acts at 191–92; Act of Dec. 2, 1875, ch. 52, § 1, 1876 Wyo. Terr. Comp. Laws, at 352; Ch. 13, § 1, 1870 Tenn. Acts at 28; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws at 25. And the statutes in Texas, Tennessee, and Arkansas withstood constitutional challenges. _See, e.g., Fife v. State,_ 31 Ark. 455, 1876 WL 1562, at *4 (1876); _English v. State,_ 35 Tex. 473, 1872 WL 7422, at *3 (1871); _Andrews v. State,_ 50 Tenn. 165, 1871 WL 3579, at *11 (1871).[FN14]

It seems apparent to us that unlike the situation in _Heller_ where "[f]ew laws in the history of our Nation have come close" to D.C.'s total ban on usable handguns in the home, New York's restriction on firearm possession in public has a number of close and longstanding cousins.[FN15] _Heller,_ 554 U.S. at 629. History and tradition do not speak with one voice here. What history demonstrates is that states often disagreed as to the scope of the right to bear arms, whether the right was embodied in a state constitution or the Second Amendment. _Compare Bliss v. Commonwealth,_ 12 Ky. 90, 1822 WL 1085, at *3 (1822) (concluding that a prohibition on carrying concealed weapons was unconstitutional), _with Aymette v. State,_ 21 Tenn. 154, 1840 WL 1554, at —— 4–6 (1840) (citing to _Bliss_ but reaching the oppo-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))

site conclusion).

*7 Even if we believed that we should look solely to this highly ambiguous history and tradition to determine the meaning of the Amendment, we would find that the cited sources do not directly address the specific question before us: Can New York limit handgun licenses to those demonstrating a special need for self-protection? Unlike the cases and statutes discussed above, New York's proper cause requirement does not operate as a complete ban on the possession of handguns in public. Analogizing New York's licensing scheme (or any other gun regulation for that matter) to the array of statutes enacted or construed over one hundred years ago has its limits.

Plaintiffs raise a second argument with regard to how we should measure the constitutional legitimacy of the New York statute that takes a decidedly different tack. They suggest that we apply First Amendment prior-restraint analysis in lieu of means-end scrutiny to assess the proper cause requirement. [FN16] They see the nature of the rights guaranteed by each amendment as identical in kind. One has a right to speak and a right to bear arms. Thus, just as the First Amendment permits everyone to speak without obtaining a license, New York cannot limit the right to bear arms to only some law-abiding citizens. We are hesitant to import *substantive* First Amendment principles wholesale into Second Amendment jurisprudence. Indeed, no court has done so. *See, e.g.,* *Woollard v. Sheridan,* 863 F.Supp.2d 462, 472 (D.Md.2012); *Piszczatoski v. Filko,* 840 F.Supp.2d 813, 835–36 (D.N.J.2012).

We recognize that analogies between the First and Second Amendment were made often in *Heller,* 554 U.S. at 582, 595, 606, 635. Similar analogies have been made since the Founding. *See, e .g.,* *Commonwealth v. Blanding,* 20 Mass. 304, 314 (1825) ("The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse; like the right to keep fire arms, which does not protect him who uses them for annoyance or destruction."). Notably, these analogies often used the states' power to regulate firearms, which was taken as unassailably obvious, to support arguments in favor of upholding limitations on First Amendment rights. But it would be as imprudent to assume that the principles and doctrines developed in

connection with the First Amendment apply equally to the Second, as to assume that rules developed in the Second Amendment context could be transferred without modification to the First. Endorsing that approach would be an incautious equation of the two amendments and could well result in the erosion of hard-won First Amendment rights. As discussed throughout, there are salient differences between the state's ability to regulate each of these rights. *See generally* L.A. Powe, Jr., *Guns, Words, and Constitutional Interpretation,* 38 Wm. & Mary L.Rev. 1311 (1997) (discussing problems with efforts to associate firearms with the First Amendment's prohibition on prior restraints).

*8 But even if we decided to apply prior-restraint doctrine to Second Amendment claims, this case would be a poor vehicle for its maiden voyage. To make out a prior-restraint argument, Plaintiffs would have to show that the proper cause requirement lacks "narrow, objective, and definite standards," thereby granting officials unbridled discretion in making licensing determinations. *Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (quoting *Shuttlesworth v. Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)). But Plaintiffs' contention that the proper cause requirement grants licensing officials unbridled discretion is something of a red herring. Plaintiffs admit that there is an established standard for determining whether an applicant has demonstrated proper cause. The proper cause requirement has existed in New York since 1913 and is defined by binding judicial precedent as "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." *Klenosky,* 75 A.D.2d at 793, 428 N.Y.S.2d 256; *see e.g., Brando v. Sullivan,* 290 A.D.2d 691, 693, 735 N.Y.S.2d 660 (3d Dep't 2002); *Bernstein,* 85 A.D.2d at 574, 445 N.Y.S.2d 716.

Plaintiffs' complaint is not that the proper cause requirement is *standardless;* rather, they simply do not like the *standard*—that licenses are limited to those with a special need for self-protection. This is not an argument that licensing officials have unbridled discretion in granting full-carry permits. In fact, the State Defendants' determinations that Plaintiffs do not have a special need for self-protection are unchallenged. Rather, Plaintiffs question New York's ability to limit handgun possession to those demonstrating a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

threat to their safety. This is precisely the type of argument that should be addressed by examining the purpose and impact of the law in light of the Plaintiffs' Second Amendment right.

Plaintiffs' attempts to equate this case with *Heller* or to draw analogies to First Amendment concerns come up short.

**B**

Thus, given our assumption that the Second Amendment applies to this context, the question becomes how closely to scrutinize New York's statute to determine its constitutional mettle. *Heller,* as noted above, expressly avoided deciding the standard of review for a law burdening the right to bear arms because it concluded that D.C.'s handgun ban was unconstitutional "[u]nder any of the standards of scrutiny [traditionally] applied to enumerated constitutional rights." *Heller,* 554 U.S. at 628. The Court did, however, rule out a rational basis review because it "would be redundant with the separate constitutional prohibitions on irrational laws." *Id.* at 629 n. 27.

We have held that "heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller* ) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)." *United States v. Decastro,* 682 F.3d 160, 166 (2d Cir.2012). *Decastro* rejected a Second Amendment challenge to 18 U.S.C. § 922(a)(3), which makes it unlawful for an individual to transport into his state of residence a firearm acquired in another state. Because we concluded that § 922(a)(3) did not impose a substantial burden on the defendant's Second Amendment right, we left unanswered "the level of scrutiny applicable to laws that do impose such a burden." *Id.* at 165. Here, some form of heightened scrutiny would be appropriate. New York's proper cause requirement places substantial limits on the ability of law-abiding citizens to possess firearms for self-defense in public. And unlike *Decastro,* there are no alternative options for obtaining a license to carry a handgun.

*9 We do not believe, however, that heightened scrutiny must always be akin to strict scrutiny when a law burdens the Second Amendment. *Heller* explains that the "core" protection of the Second Amendment

is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller,* 554 U.S. at 634–35. Although we have no occasion to decide what level of scrutiny should apply to laws that burden the "core" Second Amendment protection identified in *Heller,* we believe that applying less than strict scrutiny when the regulation does not burden the "core" protection of self-defense in the home makes eminent sense in this context and is in line with the approach taken by our sister circuits.[FN17] It is also consistent with jurisprudential experience analyzing other enumerated rights. For instance, when analyzing First Amendment claims, content-based restrictions on noncommercial speech are subject to strict scrutiny, *see* United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000), while laws regulating commercial speech are subject to intermediate scrutiny, *see* Florida Bar v. Went For It, Inc., 515 U.S. 618, 624–25, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995).

[2] The proper cause requirement falls outside the core Second Amendment protections identified in *Heller.* New York's licensing scheme affects the ability to carry handguns only *in public,* while the District of Columbia ban applied *in the home* "where the need for defense of self, family, and property is most acute." *Heller,* 554 U.S. at 628. This is a critical difference. The state's ability to regulate firearms and, for that matter, conduct, is qualitatively different in public than in the home. *Heller* reinforces this view. In striking D.C.'s handgun ban, the Court stressed that banning usable handguns in the home is a "policy choice[ ]" that is "off the table," *id.* at 636, but that a variety of other regulatory options remain available, including categorical bans on firearm possession in certain public locations, *id.* at 626–27 & n. 26.

Treating the home as special and subject to limited state regulation is not unique to firearm regulation; it permeates individual rights jurisprudence. For instance, in *Stanley v. Georgia,* the Court held that in-home possession of obscene materials could not be criminalized, even as it assumed that public display of obscenity was unprotected. 394 U.S. 557, 568, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). While "the States retain broad power to regulate obscenity [ ] that power simply does not extend to mere possession by the individual in the privacy of his own home." *Id.* Similarly, in *Lawrence v. Texas,* the Court empha-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))

sized that the state's efforts to regulate private sexual conduct between consenting adults is especially suspect when it intrudes into the home: "Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home." 539 U.S. 558, 562, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003); *see also* Kyllo v. United States, 533 U.S. 27, 37, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) ("In the home, our [Fourth Amendment] cases show [that] the entire area is held safe from prying government eyes."); Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (discussing general right to privacy that was closely connected to "the sanctity of a man's home and the privacies of life" (internal quotation marks omitted)).[FN18]

*10 But while the state's ability to regulate firearms is circumscribed in the home, "outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." Masciandaro, 638 F.3d at 470. There is a longstanding tradition of states regulating firearm possession and use in public because of the dangers posed to public safety. *See* Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L.Rev. 487, 502–16 (2004). During the Founding Era, for instance, many states prohibited the use of firearms on certain occasions and in certain locations. *See, e.g.,* Act of April 22, 1785, ch. 81, 1785 Laws of N.Y. 152; Act of Nov. 16, 1821, ch. LXLIII, 1821 Tenn. Pub. Acts 78; Act of Jan. 30, 1847, 1846–1847 Va. Acts ch. 79, at 67; Act of Dec. 24, 1774, ch. DCCIII, 1774 Pa. Stat. 410.[FN19] Other states went even further. North Carolina prohibited going armed at night or day "in fairs, markets, nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere." *See* Patrick J. Charles, The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review, 60 Clev. St. L.Rev. 1, 31–32 (2012) (citation and internal quotation marks omitted). Massachusetts and Virginia enacted similar laws. Id. [FN20]

In the nineteenth century, laws directly regulating concealable weapons for public safety became commonplace and far more expansive in scope than regulations during the Founding Era. Most states enacted laws banning the carrying of concealed weapons.[FN21] And as Heller noted, "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." Heller, 554 U.S. at 626. Indeed, the nineteenth century Supreme Court agreed, noting that "the right of the people to keep and bear arms ... is not infringed by laws prohibiting the carrying of concealed weapons." Robertson v. Baldwin, 165 U.S. 275, 281–82, 17 S.Ct. 326, 41 L.Ed. 715 (1897).

In some ways, these concealed-carry bans were similar to New York's law because while a few states with concealed-carry bans considered self-defense concerns, the exceptions were extremely limited. For instance, in Ohio there was an exception if "the accused was, at the time of carrying [the concealed weapon] engaged in a pursuit of any lawful business, calling or employment, and that the circumstances ... justif[ied] a prudent man in carrying the weapon ... for the defense of his person." Act of Mar. 18, 1859, 1859 Ohio Laws at 56–57. Similarly, in Tennessee, a person was exempted from the concealed carry ban who was "on a journey to any place out of his county or state." Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts at 15–16. By contrast, Virginia's concealed-carry ban was even stricter than New York's statute because it explicitly rejected a self-defense exception. A defendant was guilty under Virginia's concealed-carry ban even if he was acting in self-defense when using the weapon. 1838 Va. Acts ch. 101 at 76.

*11 Some states went even further than prohibiting the carrying of concealed weapons. As discussed above, several states banned concealable weapons (subject to certain exceptions) altogether whether carried openly or concealed. *See* Part II.A. Other states banned the sale of concealable weapons. For instance, Georgia criminalized the sale of concealable weapons, effectively moving toward their complete prohibition. Act of Dec. 25, 1837, 1837 Ga. Laws at 90 (protecting citizens of Georgia against the use of deadly weapons). Tennessee enacted a similar law, which withstood constitutional challenge. Act of Jan. 27, 1838, ch. CXXXVII, 1837–1838 Tenn. Pub. Acts 200. In upholding the law, the Supreme Court of Tennessee reasoned that "[t]he Legislature thought the evil great, and, to effectually remove it, made the remedy strong." Day v. State, 37 Tenn. (5 Sneed) 496, 500 (1857).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))

The historical prevalence of the regulation of firearms in public demonstrates that while the Second Amendment's core concerns are strongest inside hearth and home, states have long recognized a countervailing and competing set of concerns with regard to handgun ownership and use in public. Understanding the scope of the constitutional right is the first step in determining the yard stick by which we measure the state regulation. *See, e.g., Bd. Of Trustees of Univ. of Alabama v. Garrett,* 531 U.S. 356, 365, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) ("The first step in [analyzing legislation intersecting with enumerated rights] is to identify with some precision the scope of the constitutional right at issue.").

[3][4] We believe state regulation of the use of firearms in public was "enshrined with[in] the scope" of the Second Amendment when it was adopted. *Heller,* 554. U.S. at 634. As Plaintiffs admitted at oral argument, "the state enjoys a fair degree of latitude" to regulate the use and possession of firearms in public. The Second Amendment does not foreclose regulatory measures to a degree that would result in "handcuffing lawmakers' ability to prevent armed mayhem in public places." *Masciandaro,* 638 F.3d at 471 (internal quotation marks omitted).

[5] Because our tradition so clearly indicates a substantial role for state regulation of the carrying of firearms in public, we conclude that intermediate scrutiny is appropriate in this case. The proper cause requirement passes constitutional muster if it is substantially related to the achievement of an important governmental interest. *See, e.g., Masciandaro,* 638 F.3d at 471; *Skoien,* 614 F.3d at 641–42; *see also Ernst J. v. Stone,* 452 F.3d 186, 200 n. 10 (2d Cir.2006) ("[T]he label 'intermediate scrutiny' carries different connotations depending on the area of law in which it is used.").

[6][7] As the parties agree, New York has substantial, indeed compelling, governmental interests in public safety and crime prevention. *See, e.g., Schenck v. Pro–Choice Network,* 519 U.S. 357, 376, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997); *Schall v. Martin,* 467 U.S. 253, 264, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984); *Hodel v. Va. Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 300 (1981); *Kuck v. Danaher,* 600 F.3d 159, 166 (2d Cir.2010). The only question then is whether the proper cause requirement is substantially related to these interests. We conclude that

it is.

*12 [8][9] In making this determination, "substantial deference to the predictive judgments of [the legislature]" is warranted. *Turner Broad. Sys., Inc. v. FCC,* 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). The Supreme Court has long granted deference to legislative findings regarding matters that are beyond the competence of courts. *See Holder v. Humanitarian Law Project,* ––– U.S. –––, –––, 130 S.Ct. 2705, 2727, 177 L.Ed.2d 355 (2010); *Turner Broad. Sys., Inc.,* 520 U.S. at 195–196; *see also Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 330–31 n. 12, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985). In the context of firearm regulation, the legislature is "far better equipped than the judiciary" to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks. *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Thus, our role is only "to assure that, in formulating its judgments, [New York] has drawn reasonable inferences based on substantial evidence." *Id.* at 666. Unlike strict scrutiny review, we are not required to ensure that the legislature's chosen means is "narrowly tailored" or the least restrictive available means to serve the stated governmental interest. To survive intermediate scrutiny, the fit between the challenged regulation need only be substantial, "not perfect." *Marzzarella,* 614 F.3d at 97.

New York's legislative judgment concerning handgun possession in public was made one-hundred years ago. In 1911, with the enactment of the Sullivan Law, New York identified the dangers inherent in the carrying of handguns in public. N.Y. Legislative Service, *Dangerous Weapons-"Sullivan Bill,"* 1911 Ch. 195 (1911). And since 1913, New York's elected officials determined that a reasonable method for combating these dangers was to limit handgun possession in public to those showing proper cause for the issuance of a license. 1913 Laws of N.Y., ch. 608, at 1627–30. The proper cause requirement has remained a hallmark of New York's handgun regulation since then.[FN22]

The decision to regulate handgun possession was premised on the belief that it would have an appreciable impact on public safety and crime prevention. As explained in the legislative record:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))

The primary value to law enforcement of adequate statutes dealing with dangerous weapons is prevention of crimes of violence before their consummation.

....

... In the absence of adequate weapons legislation, under the traditional law of criminal attempt, lawful action by the police must await the last act necessary to consummate the crime.... Adequate statutes governing firearms and weapons would make lawful intervention by police and prevention of these fatal consequences, before any could occur.

Report of the N.Y. State Joint Legislative Comm. On Firearms & Ammunition, Doc. No. 6, at 12–13 (1965). Similar concerns were voiced in 1987, during a floor debate concerning possible changes to the proper cause requirement. *See* N.Y. Senate Debate on Senate Bill 3409, at 2471 (June 2, 1987).

**\*13** The connection between promoting public safety and regulating handgun possession in public is not just a conclusion reached by New York. It has served as the basis for other states' handgun regulations, as recognized by various lower courts. *Piszczatoski,* 840 F.Supp.2d 813 at 835–36; *Richards v. Cty. of Yolo,* 821 F.Supp.2d 1169, 1172 (E.D.Cal.2011); *Peruta v. Cty. of San Diego,* 758 F.Supp.2d 1106, 1110 (S.D.Cal.2010).

Given New York's interest in regulating handgun possession for public safety and crime prevention, it decided not to ban handgun possession, but to limit it to those individuals who have an actual reason ("proper cause") to carry the weapon. In this vein, licensing is oriented to the Second Amendment's protections. Thus, proper cause is met and a license "shall be issued" when a person wants to use a handgun for target practice or hunting. N.Y. Penal Law § 400.00(2)(f); *see, e.g., Clyne,* 58 A.D.2d at 947, 397 N.Y.S.2d 186. And proper cause is met and a license "shall be issued" when a person has an actual and articulable—rather than merely speculative or specious—need for self-defense. N.Y. Penal Law § 400.00(2)(f); *see, e.g., Klenosky,* 75 A.D.2d at 793, 428 N.Y.S.2d 256. Moreover, the other provisions of section 400.00(2) create alternative means by which applicants engaged in certain employment may se-

cure a carry license for self-defense. As explained earlier, a license "shall be issued" to merchants and storekeepers for them to keep handguns in their place of business; to messengers for banking institutions and express companies; to state judges and justices; and to employees at correctional facilities. N.Y. Penal Law § 400.00(2)(b)-(e).

Restricting handgun possession in public to those who have a reason to possess the weapon for a lawful purpose is substantially related to New York's interests in public safety and crime prevention. It is not, as Plaintiffs contend, an arbitrary licensing regime no different from limiting handgun possession to every tenth citizen. This argument asks us to conduct a review bordering on strict scrutiny to ensure that New York's regulatory choice will protect public safety more than the least restrictive alternative. But, as explained above, New York's law need only be *substantially related* to the state's important public safety interest. A perfect fit between the means and the governmental objective is not required. Here, instead of forbidding anyone from carrying a handgun in public, New York took a more moderate approach to fulfilling its important objective and reasonably concluded that only individuals having a bona fide reason to possess handguns should be allowed to introduce them into the public sphere. That New York has attempted to accommodate certain particularized interests in self defense does not somehow render its concealed carry restrictions unrelated to the furtherance of public safety.

To be sure, we recognize the existence of studies and data challenging the relationship between handgun ownership by lawful citizens and violent crime. Plaintiffs' Reply Br. at 37–38. We also recognize that many violent crimes occur without any warning to the victims. But New York also submitted studies and data demonstrating that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces. J.A. 453, 486–90. It is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments. Indeed, assessing the risks and benefits of handgun possession and shaping a licensing scheme to maximize the competing public-policy objectives, as New York did, is precisely the type of discretionary judgment that officials in the legislative and executive branches of state government regularly make.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))

**\*14** According to Plaintiffs, however, New York's conclusions as to the risks posed by handgun possession in public are "totally irrelevant." Plaintiffs' Reply Br. at 38. Because the constitutional right to bear arms is specifically for self-defense, they reason that the state may not limit the right on the basis that it is too dangerous to exercise, nor may it limit the right to those showing a special need to exercise it. In Plaintiffs' view, the "'enshrinement'" of the right to bear arms "'necessarily takes [these] policy choices off the table.'" *Id.* at 39, 428 N.Y.S.2d 256 (quoting *Heller,* 554 U.S. at 636).[FN23] We disagree.

Plaintiffs misconstrue the character and scope of the Second Amendment. States have long chosen to regulate the right to bear arms because of the risks posed by its exercise. As Plaintiffs admit and *Heller* strongly suggests, the state may ban firearm possession in sensitive places, presumably on the ground that it is too dangerous to permit the possession of firearms in those locations. 554 U.S. at 626–27. In fact, New York chose to prohibit the possession of firearms on school grounds, in a school building, or on a school bus precisely for this reason. N.Y. Penal Law § 265.01(3); *see also* N.Y. Legislative Service, Governor's Bill Jacket, 1974 Ch. 1041, at 2–4 (1974). Thus, as the Supreme Court has implicitly recognized, regulating firearms because of the dangers posed by exercising the right is entirely consistent with the Second Amendment.

We are also not convinced that the state may not limit the right to bear arms to those showing a "special need for self-protection." Plaintiffs contend that their "desire for self-defense ... is all the 'proper cause' required ... by the Second Amendment to carry a firearm." Plaintiffs' Br. at 45. They reason that the exercise of the right to bear arms cannot be made dependent on a *need* for self-protection, just as the exercise of other enumerated rights cannot be made dependent on a *need* to exercise those rights. This is a crude comparison and highlights Plaintiffs' misunderstanding of the Second Amendment.

State regulation under the Second Amendment has always been more robust than of other enumerated rights. For example, no law could prohibit felons or the mentally ill from speaking on a particular topic or exercising their religious freedom. *Cf. Simon & Schuster, Inc. v. New York State Crime Victims Bd.,* 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (invalidating a state law requiring profits from books authored by criminals to be distributed to crime victims). And states cannot prohibit speech in public schools. *Tinker v. Des Moines Indep. Comty. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."). Not so with regard to the Second Amendment. Laws prohibiting the exercise of the right to bear arms by felons and the mentally ill, as well as by law-abiding citizens in certain locations including public schools, are, according to *Heller,* "presumptively lawful." 554 U.S. at 627 n. 26.

**\*15** Moreover, as discussed above, extensive state regulation of handguns has never been considered incompatible with the Second Amendment or, for that matter, the common-law right to self-defense. This includes significant restrictions on how handguns are carried, complete prohibitions on carrying the weapon in public, and even in some instances, prohibitions on purchasing handguns. In this vein, handguns have been subject to a level of state regulation that is stricter than any other enumerated right.

In light of the state's considerable authority—enshrined within the Second Amendment—to regulate firearm possession in public, requiring a showing that there is an objective threat to a person's safety—a "special need for self-protection"—before granting a carry license is entirely consistent with the right to bear arms. Indeed, there is no right to engage in self-defense with a firearm until the objective circumstances justify the use of deadly force.[FN24] *See, e.g., People v. Aiken,* 4 N.Y.3d 324, 327–29, 795 N.Y.S.2d 158, 828 N.E.2d 74 (2005) (discussing duty to retreat in New York).

Plaintiffs counter that the need for self-defense may arise at any moment without prior warning. True enough. But New York determined that limiting handgun possession to persons who have an articulable basis for believing they will need the weapon for self-defense is in the best interest of public safety and outweighs the need to have a handgun for an unexpected confrontation. New York did not run afoul of the Second Amendment by doing so.

[10] To be sure, "the enshrinement of constitu-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))**

tional rights necessarily takes certain policy choices off the table." *Heller,* 554 U.S. at 636. But there is also a "general reticence to invalidate the acts of [our] elected leaders." *Nat'l Fed'n of Indep. Bus. v. Sebelius,* —— U.S. ——, ——, 132 S.Ct. 2566, 2579, 183 L.Ed.2d 450 (2012). " 'Proper respect for a coordinate branch of government' requires that we strike down [legislation] only if 'the lack of constitutional authority to pass [the] act in question is clearly demonstrated.' " *Id.* (quoting *United States v. Harris,* 106 U.S. 629, 635, 1 S.Ct. 601, 27 L.Ed. 290 (1883)). Our review of the history and tradition of firearm regulation does not "clearly demonstrate[ ]" that limiting handgun possession in public to those who show a special need for self-protection is inconsistent with the Second Amendment. *Id.* Accordingly, we decline Plaintiffs' invitation to strike down New York's one-hundred-year-old law and call into question the state's traditional authority to extensively regulate handgun possession in public.

### III

[11][12][13][14] In view of our determination that New York's proper cause requirement is constitutional under the Second Amendment as applied to Plaintiffs, we also reject their facial overbreadth challenge. [FN25] Overbreadth challenges are generally limited to the First Amendment context. *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). But even if we assume that overbreadth analysis may apply to Second Amendment cases, it is well settled "that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). This principle "reflect[s] the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *Id.* at 610–11; *see also Gonzales v. Carhart,* 550 U.S. 124, 167–68, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). Accordingly, we reject Plaintiffs' facial challenge.

### IV

*16 For the foregoing reasons, the judgment of the district court is hereby **AFFIRMED.**

FN1. The State Defendants include Susan

Cacace, Jeffrey A. Cohen, Albert Lorenzo, and Robert K. Holdman.

FN2. Because we affirm the dismissal of Plaintiffs' suit, we do not address whether SAF has standing. Where, as here, at least one plaintiff has standing, jurisdiction is secure and we can adjudicate the case whether the additional plaintiff has standing or not. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 263–64, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). We also do not address Defendant County of Westchester's contention that it is not a proper party to this case.

FN3. The possession of rifles and shotguns is also regulated. Subject to limited exceptions, it is unlawful to possess a rifle or shotgun "in or upon a building or grounds, used for educational purposes, of any school, college or university ... or upon a school bus." N.Y. Penal Law § 265.01(3). It is also unlawful for a person under the age of sixteen to possess a rifle or shotgun unless he or she has a hunting permit issued pursuant to the environmental conservation law. N.Y. Penal Law § 265.05; *see also* N.Y. Envtl. Conserv. Law § 11–0929.

FN4. The prohibition on carrying rifles and shotguns on school grounds, in a school building, and on a school bus also applies to those licensed to carry a firearm under section 400.00. N.Y. Penal Law §§ 265.20(3), 265.01(3).

FN5. A license restricted to target practice or hunting permits the licensee to carry concealed a handgun "in connection" with these activities. *In re O'Connor,* 154 Misc.2d 694, 585 N.Y.S.2d 1000, 1003 (Westchester Cty. Ct.1992). For instance, a license restricted to target practice permits the licensee to carry the weapon to and from the shooting range. *Bitondo v. New York,* 182 A.D.2d 948, 948, 582 N.Y.S.2d 819 (3d Dep't 1992).

FN6. Except in New York City, Nassau County, and Suffolk County, a "licensing officer" is defined as a "judge or justice of a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))

court of record having his office in the county of issuance." N.Y. Penal Law § 265.00(10). "Licensing officer" is defined in New York City as "the police commissioner of that city"; in Nassau County as "the commissioner of police of that county"; and in Suffolk County as "the sheriff of that county except in the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown, the commissioner of police of that county." Id.

FN7. Plaintiffs Nance, Marcucci–Nance, and Detmer have carry licenses limited to the purpose of target shooting. Their applications sought to amend their licenses to full-carry licenses.

FN8. Plaintiff Kachalsky was the only Plaintiff who appealed the denial of his full-carry license application. The Appellate Division, Second Department affirmed the denial, holding that Kachalsky "failed to demonstrate 'proper cause' for the issuance of a 'full carry' permit." Kachalsky v. Cacace, 65 A.D.3d 1045, 884 N.Y.S.2d 877 (2d Dep't 2009). The New York Court of Appeals dismissed Kachalsky's application for leave to appeal "upon the ground that no substantial constitutional question [was] directly involved." Kachalsky v. Cacace, 14 N.Y.3d 743, 743, 899 N.Y.S.2d 748, 925 N.E.2d 80 (2010).

FN9. A number of courts and academics, take the view that Heller's reluctance to announce a standard of review is a signal that courts must look solely to the text, history, and tradition of the Second Amendment to determine whether a state can limit the right without applying any sort of means-end scrutiny. See Heller v. District of Columbia, 670 F.3d 1244, 1271–74 (D.C.Cir.2011) (Kavanaugh, J., dissenting); see also Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda, 56 UCLA L.Rev. 1443, 1463 (2009); Joseph Blocher, Categoricalism and Balancing in First and Second Amendment Analysis, 84 N.Y.U. L.Rev. 375, 405 (2009). We dis-

agree. Heller stands for the rather unremarkable proposition that where a state regulation is entirely inconsistent with the protections afforded by an enumerated right—as understood through that right's text, history, and tradition—it is an exercise in futility to apply means-end scrutiny. Moreover, the conclusion that the law would be unconstitutional "[u]nder any of the standards of scrutiny" applicable to other rights implies, if anything, that one of the conventional levels of scrutiny would be applicable to regulations alleged to infringe Second Amendment rights.

FN10. The plain text of the Second Amendment does not limit the right to bear arms to the home.

FN11. Plaintiffs' argument is premised, in part, on Heller's enunciation of certain "longstanding" regulatory measures, including concealed carry bans, that the Court deemed "presumptively lawful." Heller, 554 U.S. at 626–27; see also McDonald, 130 S.Ct. at 3047 (plurality opinion) (same). Thus, plaintiffs contend that regulations that are not similarly "longstanding" are not valid restrictions on Second Amendment rights. We do not view this language as a talismanic formula for determining whether a law regulating firearms is consistent with the Second Amendment. While we find it informative, it simply makes clear that the Second Amendment right is not unlimited.

Moreover, even if this language provided a "test" for determining the validity of a handgun regulation, it is not self-evident what that test might be. The "longstanding" prohibitions on the possession of firearms by felons and the mentally ill were identified as "presumptively lawful," Heller, 554 U.S. at 626–27 and n. 26, but these laws were not enacted until the early twentieth century, see Carlton F.W. Larson, Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L.J. 1371, 1374–79 (2009). New York's proper cause requirement is similarly "longstanding"—

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))

it has been the law in New York since 1913. 1913 Laws of N.Y., ch. 608, at 1627–30.

FN12. *Nunn* is cited in Justice Scalia's majority opinion in *Heller* as an example of state court responses to handgun regulatory efforts within the states. *Heller, 554 U.S. at 629.*

FN13. Notably, *Chandler* and *Reid* conflict with Plaintiffs' position, at least in part. Plaintiffs contend that a state may choose to ban open carrying so long as concealed carrying is permitted. But both *Chandler* and *Reid* suggest that open carrying *must* be permitted. The *Reid* court explained:

> Under the provision of our constitution, we incline to the opinion that the Legislature cannot inhibit the citizen from bearing arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence.

1840 WL 229, at *5; *see also Chandler, 1850 WL 3838, at *1.*

FN14. These cases were decided on the basis of an interpretation of the Second Amendment—that pistols and similar weapons are not "arms" within the meaning of the Second Amendment or its state constitutional analogue—that conflicts with the Supreme Court's present reading of the Amendment. *Fife, 31 Ark. 455, 1876 WL 1562, at *4; English, 35 Tex. 473, 1872 WL 7422, at *3; Andrews, 50 Tenn. 165, 1871 WL 3579, at *11.* For instance, the Texas court construed the Second Amendment as protecting only the "arms of a militiaman or soldier," which include "the musket and bayonet ... holster pistols and carbine ... [and] side arms." 35 Tex. 473, 1872 WL 7422, at *3.* To refer to the non-military style pistols covered by the statute as necessary for a "well-regulated militia" was, according to the court, "simply ridiculous." *Id.* Similarly, the Tennessee court invalidated

the statute to the extent it covered revolvers "adapted to the usual equipment of a solider." *Andrews, 50 Tenn. 165, 1871 WL 3579, at *11.*

FN15. The extensive history of state regulation of handguns in public is discussed in detail in Part II.B.

FN16. Plaintiffs also contend that New York's requirement that license applicants be "of good moral character" is an unconstitutional prior restraint. Because, as Plaintiffs admit, this provision was not challenged in their complaint or below, we choose not to consider it here.

FN17. *Heller v. District of Columbia,* 670 F.3d 1244, 1261–64 (D.C.Cir.2011) (applying intermediate scrutiny to prohibition on possession of magazines with a capacity of more than ten rounds of ammunition); *United States v. Booker,* 644 F.3d 12, 25 (1st Cir.2011) (applying intermediate scrutiny to 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by a person convicted of a misdemeanor crime of domestic violence), *cert. denied,* ── U.S. ──, 132 S.Ct. 1538, 182 L.Ed.2d 175 (2012); *United States v. Masciandaro,* 638 F.3d 458, 470 (4th Cir.2011) (applying intermediate scrutiny to 36 C.F.R. § 2.4(b), which prohibits "carrying or possessing a loaded weapon in a motor vehicle" within national park areas), *cert. denied,* ── U.S. ──, 132 S.Ct. 756, 181 L.Ed.2d 482 (2011); *United States v. Chester,* 628 F.3d 673, 683 (4th Cir.2010) (applying intermediate scrutiny to 18 U.S.C. § 922(g)(9)); *United States v. Marzzarella,* 614 F.3d 85, 97 (3d Cir.2010) (applying intermediate scrutiny to 18 U.S.C. § 922(k), which prohibits the possession of firearms with obliterated serial numbers), *cert. denied* ── U.S. ──, 131 S.Ct. 958, 178 L.Ed.2d 790 (2011); *United States v. Reese,* 627 F.3d 792, 802 (10th Cir.2010) (applying intermediate scrutiny to 18 U.S.C. § 922(g)(8), which prohibits the possession of firearms while subject to a domestic protection order), *cert. denied,* ── U.S. ──, 131 S.Ct. 2476, 179 L.Ed.2d 1214 (2011); *United*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))**

_States v. Skoien,_ 614 F.3d 638, 641–42 (7th Cir.2010) (en banc) (applying form of intermediate scrutiny to 18 U.S.C. § 922(g)(9)), _cert. denied,_ ––– U.S. ––––, 131 S.Ct. 1674, 179 L.Ed.2d 645 (2011).

FN18. That the home deserves special protection from government intrusion is also reflected in the Third Amendment, which provides: "No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law." U.S. Const. amend. III.

FN19. Regulations concerning the militia and the storage of gun powder were also common. _See_ Act of May 8, 1792, 1792 Conn. Pub. Acts 440 (forming the state militia); Act of July 19, 1776, ch. I, 1775–1776 Mass. Acts 15 (regulating the militia of Massachusetts); Act of Apr. 3, 1778, ch. 33, 1778 Laws of N.Y. 62 (regulating the militia of New York State); Act of Mar. 20, 1780, ch. CLXVII, 1780 Pa. Laws 347 (regulating the militia of Pennsylvania); Act of Mar. 26, 1784, 1784 S.C. Acts 68 (regulating militia); _see also_ Act of June 26, 1792, ch. X, 1792 Mass. Acts 208 (regulating storage of gun powder in Boston); Act of Apr. 13, 1784, ch. 28, 1784 Laws of N.Y. 627 (regulating storage of gun powder in New York); Act of Dec. 6, 1783, ch. CIV, 1783 Pa. Laws 161, ch. MLIX, 11 Pa. Stat. 209 (protecting the city of Philadelphia from the danger of gunpowder).

FN20. Curiously, North Carolina referred to the "King's Justices" after the colonies had won their independence. The laws in North Carolina, Massachusetts, and Virginia track language from the 1328 Statute of Northampton, which provided that no person shall "go nor ride armed by Night nor by Day in Fairs, Markets, nor in the Presence of the Justices or other Ministers nor in no Part elsewhere ." 2 Edw. 3, c. 3 (1328) (Eng.). There is debate in the historical literature concerning whether the Statute of Northampton, and laws adopting similar language, prohibited the carrying of weapons in public

generally or only when it would "terrorize" the public. _See_ Charles, _The Faces of the Second Amendment Outside the Home,_ 60 Clev. St. L.Rev. at 31–32.

FN21. _See_ Act of Feb. 1, 1839, ch. 77, 1839 Ala. Acts at 67–68; Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts at 191; Act of Feb. 1, 1881, 1881 Colo. Sess. Laws at 74; Act of Feb. 12, 1885, ch. 3620, 1885 Fla. Laws at 61; Act of Apr. 16, 1881, 1881 Ill. Laws at 73–74; Act of Jan. 14, 1820, ch. 23, 1820 Ind. Acts at 39; 29 Ky. Gen.Stat. art. 29, § 1 (as amended through 1880); Act of Mar. 25, 1813, 1813 La. Acts at 172; 1866 Md. Laws, ch. 375, § 1; Neb. Gen.Stat., ch. 58, ch. 5, § 25 (1873); Act of Mar. 5, 1879, ch. 127, 1879 N.C. Sess. Laws at 231; N.D. Pen.Code § 457 (1895); Act of Mar. 18, 1859, 1859 Ohio Laws at 56; Act of Feb. 18, 1885, 1885 Or. Laws at 33; Act of Dec. 24, 1880, no. 362, 1881 S.C. Acts at 447; S.D. Terr. Pen.Code § 457 (1883); Act of Apr. 12, 1871, ch. 34, 1871 Tex. Gen. Laws at 25–27; Act of Oct. 20, 1870, ch. 349, 1870 Va. Acts at 510; Wash.Code § 929 (1881); W. Va.Code, ch. 148, § 7 (1891); _see also_ Cornell & DeDino, _A Well Regulated Right,_ 73 Fordham L.Rev. at 502–16.

FN22. New York's statutory scheme was the result of a "careful balancing of the interests involved" and not a general animus towards guns. Report of the N.Y. State Joint Legislative Comm. On Firearms & Ammunition, Doc. No. 6, at 12 (1965). The legislature explained that "[s]tatutes governing firearms ... are not desirable as ends in themselves." _Id._ Rather, the purpose was "to prevent crimes of violence before they can happen, and at the same time preserve legitimate interests such as training for the national defense, the right of self defense, and recreational pursuits of hunting, target shooting and trophy collecting." _Id._

FN23. Plaintiffs are quick to embrace the majority's view in _Heller_ that handguns are the "quintessential self-defense weapon" for law abiding Americans today and extrapolate that right to public possession of a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 5907502 (C.A.2 (N.Y.)))**

handgun. Thus, for Plaintiffs, handgun possession in public has the ring of an absolute constitutional right. This of course overlooks *Heller's* careful restriction of its reach to the home and is in sharp contrast with New York's view of concealed handguns one-hundred years ago as "the handy, the usual and the favorite weapon of the turbulent criminal class." *Darling,* 154 A.D. at 423–24, 139 N.Y.S. 277. It seems quite obvious to us that possession of a weapon in the home has far different implications than carrying a concealed weapon in public.

FN24. There is no question that using a handgun for self-defense constitutes deadly physical force. *See, e.g., People v. Magliato,* 68 N.Y.2d 24, 29–30, 505 N.Y.S.2d 836, 496 N.E.2d 856 (1986).

FN25. We also decline to consider Plaintiffs' claim under the Equal Protection Clause. "It

is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Tolbert v. Queens Coll.,* 242 F.3d 58, 75 (2d Cir.2001). Plaintiffs made only passing references to the Equal Protection Clause in their brief, noting that "[t]o the extent that [New York's proper cause requirement] implicates the Equal Protection Clause ... the case might well be decided under some level of means-end scrutiny." Plaintiffs' Br. at 15–16; 54. Thus, this claim is forfeited.

C.A.2 (N.Y.),2012.
Kachalsky v. County of Westchester
--- F.3d ----, 2012 WL 5907502 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Exhibit   B**



**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ESPANOLA JACKSON, et al.,

          Plaintiffs,

   v.

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

          Defendants.

No. C 09-2143 RS

**ORDER DENYING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

## I.  INTRODUCTION

Plaintiffs move to enjoin preliminarily the City and County of San Francisco from enforcing two of its local ordinances, one of which requires firearms in the home either to be carried on the person, or kept under lock and key, and one which bans the sale of particular types of ammunition within the jurisdiction.  While courts of appeal in other circuits have articulated standards to be applied in Second Amendment cases in the wake of *District of Columbia v. Heller*, 554 U.S. 570 (2008), the only Ninth Circuit decision directly to address those points has been superseded by an opinion that did not.  *See Nordyke v. King*, 644 F.3d 776 (9th Cir. 2011)(rehearing *en banc* granted) ("the *Nordyke* panel opinion"); *Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012) (*en banc*).  *Heller* itself focused on addressing the more fundamental question of whether the Second Amendment enshrined any individual rights at all.  After concluding that it did, *Heller* overturned the extremely broad handgun ban before it, but expressly left for future consideration the full scope of the Second

1    Amendment, and the mode of analysis to be employed in evaluating the constitutionality of

2    particular regulations.

3        Plaintiffs insist that the principles explicated in *Heller* compel the conclusion that San

4    Francisco's ordinances are invalid, even if its holding does not. Ultimately, however, *Heller* left too

5    much unsettled for it to dictate a particular result here. Against the backdrop of evolving law, and in

6    the absence of controlling precedent, the conclusion emerges that plaintiffs have failed to show a

7    probability of success on the merits of their claims that the challenged ordinances are

8    constitutionally infirm. Accordingly, the motion for a preliminary injunction will be denied.

9

10

11                                    II. BACKGROUND

12       Two provisions of the San Francisco Police Code ("SFPC") remain under challenge in this

13   action. Section 4512, "The Safe Storage Law," generally allows San Francisco residents to possess

14   handguns in their homes at any time, but requires them to apply trigger locks or to store such

15   weapons in locked containers when not carried on their persons.[1]

16       Section 613.10(g), entitled "Prohibiting Sale Of Particularly Dangerous Ammunition,"

17   prohibits gun shops from selling ammunition that has been enhanced to increase the damage it

18   inflicts on the human body, such as fragmenting bullets, expanding bullets, bullets that project shot

19   or disperse barbs into the body, or other bullets that serve no "sporting purpose." Plaintiffs contend

20   that while bullets designed to expand or fragment upon impact fall within this ban, they are

21   particularly suited for self-defense because they are designed, for safety reasons, to prevent ricochet

22   and to eliminate over-penetration of unarmored assailants. Plaintiffs assert the police often use such

23   bullets for the same reasons, and that they are unlike so-called "cop killer" or armor-penetrating

24   bullets that might more reasonably be characterized as "particularly dangerous."

25   _____

26   [1]  In a prior order, the ordinance was described as only requiring that handguns be secured when not
     "under direct, personal control." Plaintiffs argue that, except for peace officers, San Francisco
27   residents must actually be carrying handguns on their persons to avoid the requirement of using
     trigger locks or gun safes. The prior language, although imprecise, was not intended to suggest
28   otherwise.

2

United States District Court
For the Northern District of California

1    Plaintiffs' prior motion for judgment on the pleadings was denied. They now seek a

2    preliminary injunction, in what they candidly acknowledge is at least in part an attempt to obtain a

3    legal ruling, one way or the other, that would permit appellate review.

4

5                              III.  LEGAL STANDARDS

6    A preliminary injunction order is an "extraordinary remedy" that is "never granted as of

7    right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain preliminary

8    relief, a plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer

9    irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

10   and that an injunction is in the public interest." *Id.* at 21-22. The Ninth Circuit has clarified,

11   however, that courts in this Circuit should still evaluate the likelihood of success on a "sliding

12   scale." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) ("[T]he 'serious

13   questions' version of the sliding scale test for preliminary injunctions remains viable after the

14   Supreme Court's decision in *Winter*."). As quoted in *Cottrell*, that test provides that, "[a]

15   preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going

16   to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," provided,

17   of course, that "plaintiffs must also satisfy the other [*Winter*] factors" including the likelihood of

18   irreparable harm. *Id.* at 1135.

19

20

21                                IV.  DISCUSSION

22   The ordinances at issue in *Heller* in effect (1) completely banned possession of handguns,

23   and (2) required long guns kept in the home to be "unloaded and disassembled or bound by a trigger

24   lock or similar device." *Heller*, 554 U.S. at 574-575. Notably, the relief sought by the *Heller*

25   plaintiff was a declaration of his right, "to render a firearm operable and carry it about his home in

26   that condition only when necessary for self-defense." *Id.* at 576.[2]   After extensively reviewing

27   _____

28   [2]   While not dispositive, this weighs against a conclusion that section 4512 is plainly invalid under
     *Heller*, as it provides exactly the relief the *Heller* plaintiff sought and obtained, or even more, in that
     it does not require an explicit need for self-defense.

1    historical and legal authorities, and parsing the grammatical construction of the Second

2    Amendment, *Heller* declared that "the inherent right of self-defense has been central to the Second

3    Amendment right" and that "the need for defense of self, family, and property is most acute" in the

4    home. *Id.* at 628. Accordingly, the Court held, "[u]nder any of the standards of scrutiny that we

5    have applied to enumerated constitutional rights, banning from the home the most preferred firearm

6    in the nation to keep and use for protection of one's home and family, would fail constitutional

7    muster." *Id.* at 628-29 (footnote, citations, and internal quotations omitted).

8         *Heller* cautioned, however, "the right secured by the Second Amendment is not unlimited."

9    *Id.* at 626. The Court specifically observed that "nothing in our opinion should be taken to cast

10   doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or

11   laws forbidding the carrying of firearms in sensitive places such as schools and government

12   buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at

13   626-27. Moreover, it stated that this list of permissible types of regulations, "does not purport to be

14   exhaustive." *Id.* at 627 n. 26.

15        Circuit court decisions after *Heller* have generally applied a "two-step" approach, first

16   examining whether the challenged law places a burden on conduct falling within the scope of the

17   Second Amendment as historically understood, and then applying either strict or intermediate

18   scrutiny, depending on the severity of any such burden. *See, e.g.*, *U.S. v. Marzzarella*, 614 F.3d 85,

19   89 (3d Cir. 2010); *U.S. v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). The Ninth Circuit has yet to

20   issue a binding determination on the point, but concurring opinions in the most recently issued

21   decision in the *Nordyke* matter suggest at least some of its judges would embrace the two-step

22   approach. *See Nordyke v. King*, 681 F.3d 1041, 1045-1046 (9th Cir. 2012)(O'Scannlain, J.,

23   concurring).

24        Plaintiffs read in *Heller* a rejection of *any* approach that would call for a court to engage in

25   balancing or evaluation of the claimed benefits of a gun control regulation with respect to either the

26   degree to which it burdens rights of gun owners, or is well-designed to achieve its stated ends.

27

28

United States District Court
For the Northern District of California

4

1    Plaintiffs rely on a portion of the majority opinion addressing a proposal in Justice Breyer's

2    Justice Breyer advocated an "interest-balancing inquiry" that "asks whether the statute burdens a

3    protected interest in a way or to an extent that is out of proportion to the statute's salutary effects

4    upon other important governmental interests." 554 U.S. at 689-90 (Breyer, J., dissenting).  In

5    response, the majority said:

6        We know of no other enumerated constitutional right whose core protection has been
         subjected to a freestanding "interest-balancing" approach.  The very enumeration of
7        the right takes out of the hands of government—even the Third Branch of
         Government—the power to decide on a case-by-case basis whether the right is really
8        worth insisting upon.  A constitutional guarantee subject to future judges'
         assessments of its usefulness is no constitutional guarantee at all.  Constitutional
9        rights are enshrined with the scope they were understood to have when the people
10       adopted them, whether or not future legislatures or (yes) even future judges think that
         scope too broad.
11

12   554 U.S. at 634-635.

13       Because both intermediate and strict scrutiny, as traditionally applied in other areas, require

14   evaluation of, and balancing among, the goals of the law, the degree of infringement on rights, and

15   the "fit" between the law's effects and the governmental interests purportedly served, arguably

16   tension arises between this passage and any application of those traditional forms of scrutiny.[3]

17   *Heller*, however, does not actually hold that some form of further analysis will *never* be appropriate;

18   it merely concluded that as to the ordinance before it, "[u]nder any of the standards of scrutiny that

19   we have applied to enumerated constitutional rights, banning from the home "the most preferred

20   firearm in the nation to 'keep' and use for protection of one's home and family," would fail

21   constitutional muster." 554 U.S. at 628-29.

22       Plaintiffs' proposed analytical framework  is wholly unsatisfactory, because it would

23   effectively mean that virtually any regulation of firearms is impossible unless the law plainly fell

24   into one of the categories specifically mentioned in *Heller* (despite the Court's express warning that

25

26   [3] Although likely dicta, there is no dispute that a footnote in *Heller* precludes application of rational
     basis review scrutiny—the City does not argue otherwise. *See*, 554 U.S. at 629 n. 27 ("If all that was
27   required to overcome the right to keep and bear arms was a rational basis, the Second Amendment
     would be redundant with the separate constitutional prohibitions on irrational laws, and would have
28   no effect.").

**United States District Court**
For the Northern District of California

1   its list was non-exhaustive) or could otherwise be shown as a type of regulation with long historical

2   pedigree.  Plaintiffs contend that the first *Heller* "step" requires examination of historical precedents

3   to determine if the law is within the "scope" of the Second Amendment, and then, if it is, a further

4   historical evaluation to determine if it falls within some exception.

5        As an threshold matter, the *Heller* opinion does not plainly adopt or support such an

6   approach.  There, most of the historical analysis was addressed to the question of whether the

7   Second Amendment is an *individual* right—an issue no longer in play in this or in any other

8   litigation.  *See* 554 U.S. at part II.  While the Court also reviewed historical precedents to identify

9   some longstanding exceptions, *see* 554 U.S. at part III, that analysis more properly should be seen as

10  part of the first "step"—i.e., whether the challenged law falls within the scope of the Second

11  Amendment's protections in the first instance.  When the Court ultimately turned to the question of

12  the validity of the particular law before it, its reference to historical precedents was more

13  abbreviated, and does not represent the type of analysis plaintiffs suggest must be undertaken in the

14  second "step."  *See* 554 U.S. at part III.

15       Furthermore, as proposed by plaintiffs, the second "step" would be little more than a

16  reiteration of the first, with the result that virtually no regulations of firearms other than those with

17  long historical antecedents would ever be permissible.  While some portions of *Heller* could be read

18  to support that view, the Court drew no such bright line, and expressly cautioned that it was not

19  providing "utter certainty" as to the parameters of constitutionally permissible gun control measures.

20  *See* 554 U.S. at 635 ("since this case represents this Court's first in-depth examination of the Second

21  Amendment, one should not expect it to clarify the entire field.").

22       The question remains, then, as to the appropriate framework for analyzing the

23  constitutionality of these SFPC provisions, post-*Heller*, in the absence of any controlling Circuit

24  precedent.  It may well be that before any final judgment is entered in this action, the Circuit will

25  settle the now-existing questions, or at least case law will emerge providing clearer answers.  At this

26  juncture, however, the concurring opinion in *Nordyke*, which is consistent with the trends

27  developing in other circuits, represents the best available guidance.  Under that approach, which

28  incorporates by reference the *Nordyke* panel opinion, a court is to "consider[] carefully the extent of

**United States District Court**
For the Northern District of California

1  the regulation's burden on Second Amendment rights." 681 F.3d at 1045 (O'Scannlain, J.,

2  concurring). Furthermore, "only regulations which substantially burden the right to keep and to bear

3  arms trigger heightened scrutiny." *Nordyke* panel opinion, 644 F.3d at 786.[4]

4       Utilizing that analytical structure, it is clear that plaintiffs have not met their burden to show

5  that issuance of a preliminary injunction is warranted against section 613.10(g), which prohibits the

6  sale of certain types of ammunition within city limits. As explained in the *Nordyke* panel opinion,

7  "when deciding whether a restriction on gun sales substantially burdens Second Amendment rights,

8  we should ask whether the restriction leaves law-abiding citizens with reasonable alternative means

9  for obtaining firearms sufficient for self-defense purposes." 644 F.3d at 787. Additionally, "a law

10  does not substantially burden a constitutional right simply because it makes the right more

11  expensive or more difficult to exercise." *Id.* at 787-88. Even assuming a constitutional right to

12  possess and use the particular types of ammunition within the ambit of section 613.10(g) could be

13  found, plaintiffs simply have not shown that prohibiting sales of such ammunition within City limits

14  imposes a substantial burden on their ability to acquire it.[5]

15       Plaintiffs' showing as to the severity of the burdens imposed by section 4512, "The Safe

16  Storage Law," is only marginally better. As noted above, section 4512 gives San Francisco

17  residents the very set of rights the *Heller* plaintiff sought and obtained. San Franciscans may

18  lawfully possess handguns in their own homes, may carry them in their own homes at any time, and

19  may use them for self-defense without running afoul of any aspect of the ordinance.[6] Plaintiffs have

---

20  [4] The panel opinion declined to decide "precisely what type of heightened scrutiny applies to laws

21  that substantially burden Second Amendment rights." 644 F.3d at 786 n. 9.

22  [5] Plaintiffs' alternative argument that section 613.10(g) is unconstitutionally vague is not

23  persuasive.

24  [6] In examining the Second Amendment phrase "keep and bear arms," *Heller* concluded that it
   refers to two separate concepts. "Bear arms" means "carrying [arms] for a particular purpose—

25  confrontation." "Keep arms" means to "have weapons" or "possess weapons." 554 U.S. at 583-84.
   Section 4512 imposes no *direct* restrictions at all on the right to "bear" arms. Nor does it preclude

26  anyone from "keeping" arms. The only question is whether its restrictions on how handguns maybe

27  stored interferes with the underlying purposes served by the rights, insofar as they might delay a
   person's ability to go from merely "keeping" a handgun to "bearing" it in a condition suitable for

28  use in self-defense.

United States District Court
For the Northern District of California

1   offered only the possibility that in a very narrow range of circumstances, the delay inherent in

2   rendering a handgun operable or in retrieving it from a locked container theoretically could impair a

3   person's ability to employ it successfully in self-defense. Even assuming this rises to the level of a

4   "substantial" burden, however, thereby triggering some heightened degree of scrutiny, plaintiffs

5   have not shown the regulation to be overreaching or improper in any way, or that it fails to serve a

6   legitimate governmental interest. Indeed, as noted in *Heller* itself, nothing in its analysis "suggest[s]

7   the invalidity of laws regulating the storage of firearms to prevent accidents." 554 U.S. at 632.

8          At heart, plaintiffs' contention that the challenged ordinances are unconstitutional turns on a

9   reading of *Heller* that goes well beyond its text. Although the law in this arena undoubtedly will

10  continue to develop, especially with respect to the precise analytical standards and terminology to be

11  employed, plaintiffs have not shown there is reason to believe these provisions of the SFPC are in

12  conflict with the Second Amendment regardless of the particular articulations that may emerge as

13  other district and appellate courts attempt to answer the questions explicitly left open by *Heller*.

14  Accordingly, plaintiffs have not met their burden to show that a preliminary injunction should

15  issue.[7]

16

17                              V. CONCLUSION

18          The motion for a preliminary injunction is denied.

19

20  IT IS SO ORDERED.

21  Dated:  11/26/12

22                              RICHARD SEEBORG
                                UNITED STATES DISTRICT JUDGE

23

24

25

26  ――――――――――――
    [7]  Because plaintiffs are claiming infringement of constitutional rights, and contend that their ability
27  to exercise self-defense is impaired, some degree of irreparable harm and hardship to them likely
    could be presumed. Even on the "sliding scale" of *Cottrell*, however, the balance of the
28  circumstances do not warrant preliminary relief.

# Exhibit  C

Print

San Francisco Police Code

# SEC. 4512. HANDGUNS LOCATED IN A RESIDENCE TO BE KEPT IN A LOCKED CONTAINER OR DISABLED WITH A TRIGGER LOCK.

(a)   **Prohibition.** No person shall keep a handgun within a residence owned or controlled by that person unless the handgun is stored in a locked container or disabled with a trigger lock that has been approved by the California Department of Justice.

(b)   **Definitions.**

(1)   "Residence." As used in this Section, "residence" is any structure intended or used for human habitation including but not limited to houses, condominiums, rooms, in law units, motels, hotels, SRO's, time-shares, recreational and other vehicles where human habitation occurs.

(2)   "Locked container." As used in this Section, "locked container" means a secure container which is fully enclosed and locked by a padlock, key lock, combination lock or similar locking device.

(3)   "Handgun." As used in this Section, "handgun" means any pistol, revolver, or other firearm that is capable of being concealed upon the person, designed to be used as a weapon, capable of expelling a projectile by the force of any explosion or other form of combustion, and has a barrel less than 16 inches in length.

(4)   "Trigger lock." As used in this Section, a "trigger lock" means a trigger lock that is listed in the California Department of Justice's list of approved firearms safety devices and that is identified as appropriate for that handgun by reference to either the manufacturer and model of the handgun or to the physical characteristics of the handgun that match those listed on the roster for use with the device under Penal Code Section 12088(d).

(c)   **Exceptions.** This Section shall not apply in the following circumstances:

(1)   The handgun is carried on the person of an individual over the age of 18.

(2)   The handgun is under the control of a person who is a peace officer under Penal Code Section 830.

(d)   **Lost or Stolen Handguns.** In order to encourage reports to law enforcement agencies of lost or stolen handguns pursuant to San Francisco Police Code Section 616, a person who files a report with a law enforcement agency notifying the agency that a handgun has been lost or stolen shall not be subject to prosecution for violation of Section 4512(a) above.

(e)   **Penalty.** Every violation of this Section shall constitute a misdemeanor and upon conviction shall be punished by a fine not to exceed $1,000.00 or by imprisonment in the county jail not to exceed six months, or by both.

(f)   **Severability.** If any provision, clause or word of this chapter or the application thereof to any person

or circumstance is held invalid, such invalidity shall not affect any other provision, clause, word or application of this Section which can be given effect without the invalid provision, clause or word, and to this end the provisions of this Section are declared to be severable.

(Added by Ord. 193-07, File No. 070683, App. 8/1/2007)

**Disclaimer:**

This Code of Ordinances and/or any other documents that appear on this site may not reflect the most current legislation adopted by the Municipality. American Legal Publishing Corporation provides these documents for informational purposes only. These documents should not be relied upon as the definitive authority for local legislation. Additionally, the formatting and pagination of the posted documents varies from the formatting and pagination of the official copy. The official printed copy of a Code of Ordinances should be consulted prior to any action being taken.

For further information regarding the official version of any of this Code of Ordinances or other documents posted on this site, please contact the Municipality directly or contact American Legal Publishing toll-free at 800-445-5588.

© 2012 American Legal Publishing Corporation
techsupport@amlegal.com
1.800.445.5588.