**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, KENNETH PACHOLSKI, KATHRYN TYLER, and MICHAEL HALL, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No: 10-CV-4184 |
| v. | ) | Judge Edmond E. Chang |
| | ) | Magistrate Judge Geraldine Soat Brown |
| THE CITY OF CHICAGO and RAHM EMANUEL, Mayor of the City of Chicago, | ) ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' SUPPLEMENTAL BRIEF ON THE SEVENTH CIRCUIT'S DECISION IN *MOORE AND SHEPARD V. MADIGAN* (DEC. 11, 2012)

Plaintiffs hereby submit this supplemental brief in light of the Seventh Circuit's decision on December 11, 2012 in *Moore v. Madigan* and *Shepard v. Madigan* (Nos. 12-1269 & 12-1788) (hereafter *Moore*). (All citations will be to the Seventh Circuit's slip opinion, which is attached hereto.)

### I.    INTRODUCTION.

The decision in *Moore* forecloses the City's defense of its restrictions on carrying operable firearms outside of the home – restrictions that Plaintiffs challenge only to the extent they are *more severe* than the Illinois restrictions struck down in *Moore*. Indeed, emphasizing that the Second Amendment guarantees " 'the right of the people to keep *and bear* Arms,' " slip op. 5 (emphasis in original) (quoting the Second Amendment), the Seventh Circuit squarely held that "[a] right to bear arms thus implies a right to carry a loaded gun outside the home," *id*. That

ruling shatters the foundation on which the City of Chicago has heretofore propped up its defense of the challenged restrictions on possession outside of the home.

Furthermore, *Moore* confirms that the City's restrictions can be upheld only if they survive an extremely demanding standard of judicial review. In *United States v. Skoien*, the Seventh Circuit held "that the government had to make a 'strong showing' " that a regulation denying firearms to violent misdemeanants was "vital to public safety." *Moore*, slip. op. 14 (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc)). In *Ezell v. Chicago*, the Court of Appeals held that the phrase "strong showing" denoted, at the very least, the demanding standard of "intermediate scrutiny." 651 F.3d 684, 703, 708 (7th Cir. 2011). In *Moore*, the Seventh Circuit found that Illinois

> ha[d] not made that strong showing—*and it would have to make a stronger showing in this case than the government did in Skoien*, because the curtailment of gun rights was much narrower: there the gun rights of persons convicted of domestic violence, here the gun rights of the entire law-abiding adult population of Illinois.

Slip op. 14 (emphasis added). The City's restrictions on possessing operable firearms outside of the home cannot withstand this exacting level of scrutiny. Nor can its ban on the sale and acquisition of firearms or its law limiting law-abiding citizens to a single operable firearm in the home.

*Moore*'s procedural rulings also govern this case. The Seventh Circuit made clear that no evidentiary hearing or trial need be held to resolve the constitutionality of a ban on public carriage of firearms: "The constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial. … *Only adjudicative facts are determined in trials*, and only *legislative facts* are relevant to the constitutionality of the Illinois gun law." *Moore*, slip op. 20 (emphasis added). This same reasoning applies here, not just to Plaintiffs'

challenge to Chicago's restrictions on possessing operable firearms outside the home, but also to their challenge to the City's sales ban and one-operable-firearm limit.

In the pages that follow, we first summarize the Seventh Circuit's analysis in *Moore* and then apply those controlling principles to Plaintiffs' challenges to the City's Ordinance.

## II.     THE DECISION IN *MOORE AND SHEPARD V. MADIGAN.*

In *Moore*, the State of Illinois, like the City here, defended the State's ban on public carriage of firearms by offering "historical evidence that there was no generally recognized private right to carry arms in public in 1791." *Moore*, slip op. 3. But the Seventh Circuit made short work of this frivolous argument:

> Similar evidence against the existence of an eighteenth-century right to have weapons in the home for purposes of self-defense rather than just militia duty had of course been presented to the Supreme Court in the *Heller* case. …
> The Supreme Court rejected the argument. The appellees [Illinois officials] ask us to repudiate the Court's historical analysis. That we can't do. Nor can we ignore the implication of the analysis that the constitutional right of armed self-defense is broader than the right to have a gun in one's home.

*Id.* at 3-4. That both *Heller* and *McDonald* acknowledged that the " 'need for defense of self, family, and property is *most* acute' in the home … doesn't mean it is not acute outside the home." Slip op. 4 (emphasis in original).

The Seventh Circuit deemed the Second Amendment's specific protection of the right to *bear* arms unambiguous and self-explanatory:

> To speak of "bearing" arms within one's home would at all times have been an awkward usage. A right to bear arms thus implies a right to carry a loaded gun outside the home.
> And one doesn't have to be an historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home.

Slip op. 5.  With respect to particular historical materials, *Moore* dismissed authorities on which

the City relies here, including the fourteenth-century Statute of Northampton and a seventeenth-

century decision interpreting it, *Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686).  *Moore*

concluded that Illinois—just like Chicago here—had simply misread those authorities, which

restrained "armed gangs, thieves, and assassins" and were "intended to protect the public from

being frightened or intimidated by the brandishing of weapons," particularly in such sensitive

places as public fairs or courthouses.  Slip op. 5-6.  Thus, neither authority even spoke to the

issue of gun possession inside or outside the home, let alone supported the Illinois ban.  *Id.*

Chicago's reliance on these same (and other English) sources is equally misguided for the same

reasons expressed in *Moore*.[1]

　　*Moore* went on to reiterate that *Heller* had found that "English law recognized a right to

possess guns for resistance, self-preservation, self-defense, and protection against both public

and private violence."  Slip op. 7 (citing 554 U.S. at 594).  "American law was the same."  *Id.*

(citing 554 U.S. at 594-95).

> And in contrast to the situation in England, in less peaceable America a
> distinction between keeping arms for self-defense in the home and carrying
> them outside the home would, as we said, have been irrational.  All this is
> debatable of course, but we are bound by the Supreme Court's historical
> analysis because it was central to the Court's holding in *Heller*.

*Id.* at 7.  *See also id.* at 18 (rejecting contrary authorities from other circuits because "we regard

the historical issues as settled by *Heller*"); *id.* at 20 ("We are disinclined to engage in another

round of historical analysis to determine whether eighteenth-century America understood the

---

[1] *See* Defendants' Memorandum in Support of Their Motion for Summary Judgment (Doc. 158)
("City SJ Br.") at 5-6.  The City likewise misunderstands the writings of both Edward Coke and
William Blackstone, *id.* at 6, just as Illinois did in *Moore*, *see* slip op. 6-7.

Second Amendment to include a right to bear guns outside the home. *The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside.*") (emphasis added).

The Seventh Circuit in *Moore* exhibited no patience for the courts that have recoiled from applying the principles promulgated in *Heller* and *McDonald. See, e.g.*, slip op. 18-19 (discussing and rejecting *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011)).[2] "To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald.*" *Moore*, slip op. 8.

## III.    *MOORE* MANDATES INVALIDATION OF THE CITY'S RESTRICTIONS ON POSSESSING FIREARMS OUTSIDE OF THE HOME.

*Moore* establishes not only that the Second Amendment protects a right to armed self-defense outside the home but also that Chicago cannot succeed in its attempt to justify its carriage restrictions as an effort to promote public safety by reducing gang violence, crime, homicide, suicide, and accidental deaths due to firearms.

### A.    *Moore* Establishes That the City's Restrictions on Possession of Firearms Outside of the "Home" Are Subject to Exacting Judicial Scrutiny.

From the outset of this litigation, Plaintiffs have limited their attack on the City's carry ban to those measures that are actually more restrictive than Illinois's and therefore do not overlap with the state-imposed ban. This was done to ensure that success in the present case

---

[2] For example, *Masciandaro* imagined—and Defendant Chicago stressed—a " 'longstanding out-of-the-home/in-the-home distinction' " that supposedly " 'bears directly on the level of scrutiny applicable.' "  City SJ Br. at 11 (quoting *Masciandaro*, 638 F.3d at 470).  This supposed distinction was dissected and discredited by *Moore*, *see* slip op. 4-7.  The City places great reliance on *Masciandaro*. *See* City SJ Br. at 4, 5, 10, 11, 13, 14, 20, 21, 22.  The City also relies heavily on the district court decision that was reversed by the Seventh Circuit in *Moore. See* City SJ Br. at 5, 10, 11, 12, 21.

would redress Plaintiffs' constitutional injury, as required by Article III standing requirements. But the fact remains that Chicago's Ordinance, by its plain terms, nonetheless constitutes an absolute ban on the public carrying of loaded, accessible, operable firearms for self-defense. And because Chicago's ban is even more restrictive than Illinois's, it must be subject to at least the same exacting level of judicial scrutiny—however it might be labeled—that the Seventh Circuit applied in *Moore.*

In *United States v. Skoien*, the Seventh Circuit held "that the government had to make a 'strong showing' that a gun ban was vital to public safety." *Moore*, slip. op. 14 (quoting *Skoien*, 614 F.3d at 641). *Ezell* held that a "strong showing" denoted the standard of "intermediate scrutiny." 651 F.3d at 703, 708. In *Moore*, the Court of Appeals found that Illinois

> ha[d] not made that strong showing—*and it would have to make a stronger showing in this case than the government did in Skoien*, because the curtailment of gun rights was much narrower: there the gun rights of persons convicted of domestic violence, here the gun rights of the entire law-abiding adult population of Illinois.

Slip op. 14 (emphasis added). Replace "Illinois" with "Chicago" in that sentence and the outcome is the same: Chicago, like the State of Illinois, strips all of its law-abiding adult residents of their Second Amendment right to bear arms for self-defense outside of the home. Under *Heller*, as interpreted by the Seventh Circuit in *Moore*, that ban on the core Second Amendment right of armed self-defense fails constitutional scrutiny under any potentially applicable standard. *See Heller*, 554 U.S. at 628.

> A blanket prohibition on carrying [a] gun in public prevents a person from defending himself anywhere except inside his home; and so substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment, though there is no proof it would.

*Moore*, slip op. 14 (emphasis in original).

In its efforts to show that the carriage of firearms outside of the home by law-abiding citizens would pose grave risks to public safety, the City relied heavily on the opinions of Professor Philip Cook.[3]  Professor Cook's research and opinions were likewise at the center of the Court of Appeals' analysis in *Moore*, *see, e.g.*, *s*lip op. 9, 11, but the Seventh Circuit found this evidence wanting.  The Court of Appeals noted that Professor Cook himself had characterized the controversy over the public carrying of firearms by licensed, law-abiding citizens as a "[s]ideshow," and that his research concluded that permitting public carry would have little, if any, effect on rates of crime and violence:

> "The available data about permit holders also imply that they are at fairly low risk of misusing guns, consistent with the relatively low arrest rates observed to date for permit holders.
>     *"Based on available empirical data, therefore, we expect relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home,* assuming that some sort of permit system for public carry is allowed to stand."

Slip op. 9 (emphasis added) (quoting Philip J. Cook, Jens Ludwig & Adam Samaha, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1082 (2009)).  The Seventh Circuit likewise considered the other evidence marshaled in support of banning public carrying of firearms and found it equally equivocal and insubstantial.  *See* slip op. 8-13.  Relying in part on data from Chicago itself, *id.* at 8-9, the Court of Appeals concluded that there was no strong evidence that laws allowing public carrying of firearms increased crime and violence.  *Id*. at 12.  In his opinion for the Court, Judge Posner concluded that the most that the various studies could demonstrate was "that a person carrying a

---

[3] *See, e.g.*, City SJ Br. at 16-19, 22; City's Reply Brief on Summary Judgment (Doc. No. 186) at 31-33; City's Statement of Material Facts (Doc. No. 164) ("SOF") ¶¶ 14-18, 23, 26-27, 29, 30, 39, 137.

gun is more likely to use it to commit a crime than to defend himself from criminals. But that is like saying that soldiers are more likely to be armed than civilians." *Id*. at 13. "In sum," *Moore* concluded, "the empirical literature on the effects of allowing the carriage of guns in public fails to establish a pragmatic defense of the Illinois law." *Id*.

In *Moore*, the Seventh Circuit emphasized that Illinois's total ban on public carriage of firearms was unique among the fifty states and paralleled only by the District of Columbia. Slip op. 15. It reasoned that "[t]here is no suggestion that some unique characteristic of criminal activity in Illinois justifies the state's taking a different approach [to gun regulation] from the other 49 states. If the Illinois approach were demonstrably superior, one would expect at least one or two other states to have emulated it." Slip op. 16. In any event, as the Seventh Circuit observed, Second Amendment rights do not "depend on casualty counts." Slip op. 13 (citing *Heller*, 554 U.S. at 636). "If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois." *Id*.

### B. The Second Amendment Right To Armed Self-Defense Applies in One's Attached Garage and Other Areas of the Home's Curtilage.

The Seventh Circuit's reasoning likewise dooms the City's "pragmatic defense" of its Ordinance. Indeed, the specific applications of the Ordinance challenged in this case involve the carriage of firearms on *private* property rather than in the public domain. Chicago has strained (unsuccessfully) to drag such private spaces under the rubric "public" by insisting that areas such as the curtilage of one's home are "effectively 'public'" when it comes to firearms violence." City SJ Br. at 15. Putting aside for the moment that the City's analysis depends entirely on labels, the following proposition remains irrefutable: If, as the Seventh Circuit has held, the

8

scientific literature cannot justify banning the carrying of guns in areas that are *actually* public, it follows *a fortiori* that it cannot support banning firearms in places that are, in the City's own words, merely "effectively 'public.' "

Count I of the Complaint challenges the City's Ordinance insofar as it outlaws the use of firearms for self-defense within the curtilage of one's home: the Ordinance excludes from its definition of "home" "(i) any garage, including an attached garage," and "(ii) any space outside the dwelling unit, including any stairs, porches, back, side or front yard space, or common areas." MCC § 8-20-010. *See* Second Amended Complaint (Doc. No. 80) ("Complaint"), Count I, ¶¶ 51-52. A garage that is attached to the house and that has a door connecting it directly to the interior of the house is, by any rational definition, a part of the home, and thus is plainly within the Second Amendment right to keep and use firearms for self-defense in the home recognized by the Supreme Court in *Heller*, 554 U.S. at 635. *See also Moore*, slip op. 2. If anything, the proof demanded of the City is greater here than with respect to genuinely *public* carriage because here the City intrudes into the sacred precinct of the home to dictate how a citizen may protect his or her family. An unattached garage or other structure on the site of one's residence is likewise properly understood as part of the "home." Such a building, where one stores one's vehicle and other belongings and where countless Chicagoans routinely engage in such activities as auto repairs or home maintenance projects, is certainly not open to the public, and the home owner or lessee undoubtedly has the time-honored property right to exclude others from such buildings. *Cf. Kaiser Aetna v. United States*, 444 U.S. 164, 176, 179 (1979) ("[T]he right to exclude others" is the most fundamental hallmark of private property.). Imagine the shock of a homeowner who enters his garage one night to fetch a cold soda, is confronted by an armed burglar intent on stealing his car, and then defends himself with a handgun that

9

Chicago allows him to keep at "home" for self-defense, only to be indicted for illegally carrying a firearm in "public." That is the world in which the City tells us we live, but it is not the real world, and it is certainly not one that can be squared with *Heller* and *Moore*.

The same logic applies with respect to the porches and surrounding grounds of one's house: they are not public spaces and one may properly consider any uninvited stranger found lurking on one's back porch or yard (especially at night) to be an intruder. Therefore, under *Heller*, there is a right to have and use firearms for self-defense (when justified—a question governed by other legal standards that are not at issue here) in these commonly recognized parts of the home.

### C. The Second Amendment Guarantees The Right to Bear Arms In Public and Therefore Plainly Applies to the Curtilage of One's Home.

Architectural technicalities about the scope of the curtilage need not detain nor trouble this Court, for the result is the same even if one assumes, counter-intuitively, that garages, porches, stairs, and yards are "public" areas not properly deemed part of one's home. Again, *Moore* confirms that the "right to bear arms thus implies a right to carry a loaded gun outside the home." Slip op. 5. Regardless of whether a garage, porch, or side yard of one's home constitutes part of the home or instead constitutes a "public" area—thereby bringing it within the scope of the right to bear arms in public recognized in *Moore*—the outcome in this case is the same. As the Seventh Circuit has ruled, "the interest in self-protection is as great outside as inside the home." *Id.* at 18.

### D. The Second Amendment Right To Keep and Bear Arms Includes The Right To Keep A Handgun For Self-Defense In One's Place Of Business.

Under Count V, Plaintiffs object to the City's Ordinance insofar as it outlaws the possession and use of handguns (as opposed to long arms such as rifles and shotguns) for self-

10

defense in one's place of business. *See* MCC §§ 8-20-020, -030, -140(a), -180(c). The Second Amendment right to keep and use firearms—and handguns in particular—for self-defense in the home was recognized by the Supreme Court in *Heller*, 554 U.S. at 635. Handguns, the Court explained, are particularly suited to self-defense within the narrow confines of such structures. *See id.* at 629.[4] There is no rational basis on which to distinguish one's place of business from one's home with respect to this right. Neither location is a public thoroughfare. In each instance, the individual is within the walls of his own private property, and the narrow halls and tight spaces of a home that make a handgun a uniquely appropriate firearm for self-defense apply equally to the interior of one's place of business. Moreover, the result would be the same were we to posit that one's place of business is a public space, due to *Moore's* holding that the Second Amendment protects the right to bear arms in said public spaces. *See* slip op. 8.

     **E.   The Second Amendment Right To Keep and Bear Arms Includes The Right Of An Invitee To Carry A Firearm For Self-Defense On The Private Property Of A Third Party Who Has Consented To The Carrying Of Such Weapons.**

Plaintiffs also challenge the Ordinance insofar as it outlaws the possession and use of firearms for self-defense by an invitee when on the property of a third party who has given his or her permission for the carrying of said firearms. *See* MCC §§ 8-20-010, -020, -030, -140(a), -

---

[4] "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller,* 554 U.S. at 629.

11

180(c). Such private property is not a public space, and if the property owner has the right to keep and bear arms there and has consented to have third parties do the same, the state has no legitimate basis on which to interfere with the Second Amendment rights of such invitees. *Moore* found the public-safety evidence mustered by Illinois—similar to that offered by Chicago here—to fall well below what would be required to ban guns from all public spaces. Much higher still is the standard the City must meet before it dictates to the owners of private property that they may not permit invitees to bear arms for self-defense in such private preserves. In any event, if the private property of third parties were, counter-intuitively, deemed a public space, the result would be the same in light of the Seventh Circuit's holding that the Second Amendment protects the right to bear arms in public. *See Moore*, slip op. 8.

## IV. *MOORE* SUPPORTS PLAINTIFFS' CHALLENGES TO THE CITY'S FIREARMS SALES BAN AND ITS ONE-OPERABLE-FIREARM LIMIT.

In Count II, Plaintiffs challenge provisions of Chicago law that generally make it unlawful to sell or acquire a firearm in the City. Complaint ¶¶ 54-57. And Count IV challenges provisions that make it unlawful for a licensed firearm owner to possess more than a single assembled and operable firearm within the home. *Id.* at ¶¶ 64-66. Several aspects of *Moore* support Plaintiffs' challenge to these provisions of Chicago law.

First, *Moore* confirms *Heller*'s holding that 1791, the year the Second Amendment was ratified, is "the critical year for determining the amendment's historical meaning," slip op. 3, and, as we have demonstrated, neither the sales ban nor the one-operable-firearm limit finds support in history from that era. *See* Plaintiffs' Summary Judgment Brief (Doc. No. 175) ("Pl. SJ Br.") at 10-13, Plaintiffs Summary Judgment Reply (Doc. No. 197) ("Pl. SJ Reply") at 3-5, 19-20.

Second, under *Moore* the sales ban and the one-operable-firearm limit should be subject to more stringent review than the intermediate scrutiny standard applied in *Skoien* for, like the State of Illinois's carry ban, and unlike the federal ban on domestic violence misdemeanants possessing firearms at issue in *Skoien*, the City's restrictions burden "the gun rights of the entire law-abiding adult population of" the relevant jurisdiction. Slip op. 14.

Third, *Moore* indicates that the sales ban and the one-operable-firearm limit cannot be justified under any form of heightened scrutiny. Again, *Moore* held that "the empirical literature on the effects of allowing the carriage of guns in public fails to establish a pragmatic defense of the Illinois law," slip op. 13, and indeed that Illinois could not provide anything more than "*merely a rational basis* for believing that its uniquely sweeping ban [was] justified by an increase in public safety," *id.* at 20 (emphasis added). Here, the empirical evidence that allegedly supports the sales ban and the one-operable-firearm limit is, if anything, even weaker than the evidence allegedly supporting Illinois's (and Chicago's) carry ban. *See* Pl. SJ Br. at 15-22, 39-42; Pl. SJ Reply 9-11, 20-21. It follows that these restrictions also cannot survive anything more stringent than rational basis review.

## V. *MOORE* ENABLES THIS COURT TO DISPENSE WITH AN EVIDENTIARY HEARING BECAUSE THE CHALLENGED PROVISIONS IMPLICATE ONLY "LEGISLATIVE FACTS" ON WHICH THE CITY HAS FAILED TO CARRY ITS BURDEN.

*Moore* held that no evidentiary hearing was necessary to determine the fate of Illinois's public-carriage ban, because the only "facts" needed are "legislative facts" and there were "no evidentiary issues in th[at case]":

> The constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial. … Only adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality

13

of the Illinois gun law. The key legislative facts in this case are the effects of the Illinois law; the state has failed to show that those effects are positive.

…The theoretical and empirical evidence (which overall is inconclusive) is consistent with concluding that a right to carry firearms in public may promote self-defense. Illinois had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety. It has failed to meet this burden.

Slip op. 20. The very same shortcoming infects the showing of legislative facts made by the City here, and it entails the same result: invalidation of the specified sections of the Ordinance and issuance of an injunction without further ado. *See id.* at 21 (remanding for "declarations of unconstitutionality and permanent injunctions"). *Moore* makes clear that there is no need to— and indeed that it is inappropriate to—have a trial to resolve any material legislative facts that are in dispute as to any of the Plaintiffs' counts.

Dated: January 4, 2013

Stephen Kolodziej
FORD & BRITTON, P.C.
33 N. Dearborn St., Suite 300
Chicago, IL 60602
Tel: (312) 924-7500
Fax: (312) 924-7516
Email: skolodziej@fordbritton.com

Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper*
David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
Tel: (202) 220-9600

Brian S. Koukoutchos*
28 Eagle Trace
Mandeville, LA 70471
Tel: (985) 626-5052
Email: bkoukoutchos@gmail.com

*Admitted *pro hac vice*.

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Charles J. Cooper, hereby certify that on this 4th day of January, 2013, I caused a copy

of the foregoing to be served by electronic filing on:

| | |
|---|---|
| Mardell Nereim | Craig Woods |
| Andrew W. Worseck | Ranjit Hakim |
| William Macy Aguiar | MAYER BROWN LLP |
| Rebecca Alfert Hirsch | 71 S. Wacker Dr. |
| City of Chicago, Department of Law | Chicago, IL 60606-4637 |
| Constitutional and Commercial Litigation | |
| Division | |
| 30 N. LaSalle St., Suite 1230 | |
| Chicago, IL 60602 | |

s/ Charles J. Cooper
Charles J. Cooper