**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| CITY OF CHICAGO, ET AL., | ) ) |
| Defendants. | ) |

No. 10-CV-4184
Judge Edmond E. Chang
Magistrate Judge Geraldine Soat Brown

**DEFENDANTS' MEMORANDUM ADDRESSING *MOORE V. MADIGAN***

Defendants City of Chicago and Mayor Rahm Emanuel ("Defendants" or "Chicago"), by their attorney, Stephen R. Patton, Corporation Counsel of the City of Chicago, hereby submit, pursuant to the Court's December 18, 2012 order, this memorandum addressing the Seventh Circuit's December 11, 2012 decision in *Moore v. Madigan* and *Shepard v. Madigan*, __ F.3d __, 2012 WL 6156062 (7th Cir. Dec. 11, 2012) ("*Moore*").

**ARGUMENT**

*Moore* reaffirms that even if carrying outside the home is protected under the Second Amendment, a complete ban can be justified and upheld. *See* 2012 WL 6156062, at *7 (allowing for "showing of justification" for even a "blanket prohibition on carrying guns in public"). *See also Ezell v. Chicago,* 651 F.3d 684, 703, 708-09 (7th Cir. 2011) (court inquires into government's justification even when "ban" or "prohibition" is at issue). Illinois lost not because carry bans are *per se* unconstitutional, but because the Illinois statute was an extremely broad ban that Illinois failed to justify: Illinois did not offer a "pragmatic" defense for why it, uniquely among the 50 states, needs to completely ban carry on a state-wide basis. *Moore*, 2012 WL

6156062 at *6. Importantly, Illinois failed to demonstrate "some unique characteristic" of criminal activity in Illinois that "justifies the state's taking a different approach from the other 49 states." *Id.* at *7. *See also id.* at *8 ("[O]ur analysis is not based on degrees of scrutiny, but on Illinois's failure to justify the most restrictive gun law of any of the 50 states."). Illinois established "merely a rational basis" for its ban, which is insufficient under the Second Amendment. *Id.* at *9. *See also id.* at *6 ("a ban as broad as Illinois's can't be upheld merely on the ground that it's not irrational").

These deficiencies do not exist in this case. Chicago has never argued that rational basis scrutiny applies to any of Plaintiffs' claims. And Chicago has justified its carry restriction with a robust and locally-tailored evidentiary record showing how Chicago's restriction is a pragmatic response to the unique characteristics of violent crime in this city. Further, *Moore* confirms that less scrutiny is required when a regulation minimally burdens protected conduct, and this supports Chicago's argument that the undue burden standard should be applied to its gun sales and firearm storage regulations.

I.     **Chicago's Carry Restriction Is Constitutional.**

    A.     **Chicago's evidence establishes a pragmatic justification for its restriction.**

Chicago has abundantly justified why it needs to restrict carrying guns outside the home, even if its law may be unique in the country: The restriction helps combat Chicago's singular violent-crime and gang epidemic. The restriction directly addresses this problem by (1) deterring gang members and other criminals from carrying guns in the first place, and (2) as to those who do carry guns, allowing the police to quickly and easily take the carrier and the gun off the street. *See* Defendants' Memorandum in Support of Their Motion for Summary Judgment ("Def.

2

Mem.") [Dkt. No. 158] at 16-20; Defendants' Memorandum in Response to Plaintiffs' Motion for Summary Judgment and in Reply in Support of Defendants' Motion for Summary Judgment ("Def. Reply") [Dkt. No. 186] at 30-32. Likewise, in contrast to the suburban and rural communities that constitute almost all of Illinois' geography, Chicago is a metropolis of densely-packed neighborhoods where neighbors are separated from each other by mere feet. *See* Def. Mem. at 15-16. This heightens the risk that arguments between neighbors will turn deadly if guns can lawfully be carried outside the home onto a porch or into a yard, and that accidental discharges in these spaces will result in injury or death. *See* Def. Mem. at 16-17, 20-21; Def. Reply at 32-34. None of these phenomena exists on a state-wide basis in Illinois and hence could not justify the state-wide ban struck down in *Moore*.

Chicago's case differs from *Moore* in another critical respect. The evidence discussed in *Moore* consisted of general studies analyzing the effect of increased carrying on crime. They did not address carrying in Illinois or advance a rationale as to why Illinois, uniquely among the 50 states, needs a complete ban on carry. *See Moore*, 2012 WL 6156062, at *7. Chicago's case, on the other hand, is built on ample Chicago-specific evidence. Chicago illustrates the uniqueness of its gang-violence plight with Chicago crime statistics and the testimony of Chicago Police leadership who have decades of gang and street crime experience. Chicago also relies on the 2007 Chicago Study and Dr. Cook's expert testimony, both of which examine the carrying, use, and policing of guns in Chicago. In particular, Dr. Cook's work addresses the CPD's targeted patrol tactics, which focus police resources in high-crime neighborhoods and emphasize stopping suspicious individuals for questioning and frisking if there is reason to believe they are carrying a weapon, and the "high priority" CPD places on confiscating illegally-carried guns. *See* Def.

3

Mem. at 17-18.  Dr. Cook opines that these two features of CPD policing make it less likely for criminals in Chicago to carry, because they know they stand a higher chance of being detected (and arrested) if they do.  *Id.*  And this opinion is supported by findings in the 2007 Chicago Study, which concluded that "[p]olice pressure against guns . . . does discourage participation in the gun trade" because it "has the effect of jeopardising gang profits from the more lucrative drug trade."  Def. Mem. at 18.

Consequently, *Moore*'s citation, *see* 2012 WL 6156062, at \*4, to Dr. Cook's article *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041 (2009), is of no moment here.  *Moore* cites the article for the proposition that the net effect on crime from allowing carrying is likely not large.  But as Chicago has already demonstrated, the changes in permit-seeking and gun carrying addressed in the article took place largely in rural and suburban communities – communities very different from Chicago.  *See* Def. Reply at 33-34.  These are places where crime rates are low, where gun ownership is more prevalent, and where ownership is not related to the commission of or defense against crime.  *See id.*  Accordingly, while perhaps tending to show that a state (like Illinois) comprised almost exclusively of suburban and rural areas cannot ban carrying state-wide on the theory that crime would increase, the article (like the other studies discussed in *Moore*) has little to say about whether violent crime and death would increase in urban Chicago if carrying were allowed.  Indeed, on that point, Dr. Cook's Chicago-specific evidence and testimony is clear that they would.

Also inapplicable is *Moore*'s speculation about the interplay between allowing carrying and the ability of police to preemptively remove guns from the street via "stop and frisk" tactics.

4

*Moore* mused that police "may" still be able to apprehend criminals in the absence of a complete ban, because concealed carrying could still be banned if guns were allowed to be carried openly, and "[m]any" criminals would continue to carry their guns concealed. *See* 2012 WL 61556062 at *4. But *Moore* did not purport to address how this would play out for Chicago gang members, and, while open carry might be a viable option in other areas of the state, it is not in Chicago. Chicago has demonstrated that because merely showing or brandishing a gun is enough to intimidate rivals and regular residents alike, openly displaying guns is a major way Chicago gang members intimidate others. Consequently, far from carrying guns concealed, Chicago gang members would roundly exercise and abuse the ability to lawfully carry guns openly. *See* Def. Mem. at 18-19; Def. Reply at 30-32. Nothing in *Moore* suggests that the risk posed by gang members openly toting guns on porches, in yards, in common areas, or in stairwells is anything but a grave threat to public safety in Chicago.

Similarly, even if some concealed carrying goes undetected, *see Moore*, 2012 WL 6155602, at *4, restricting concealed carry along with open carry still serves a vital purpose in Chicago. Surely there will be times when a Chicago police officer experienced in the habits of Chicago gang members and the tell-tale signs of concealed carrying (such as a bulge in clothing or an abnormal walk) will have reasonable suspicion that a concealed gun is being carried, and the severity of Chicago's gang violence epidemic requires that the police be able to intervene every time this happens, even if the police cannot discern every lawbreaker. More importantly, Chicago has shown that preemptive stop and frisk is most effective when no form of carrying is allowed, and that aggressive enforcement of restrictive carry laws drives down firearms activity in urban streets. *See* Def. Reply at 35-36.

5

Finally, no evidence of the severe shortcomings of Illinois' FOID system seems to have been put before the court in *Moore*. As Chicago has demonstrated here, the Illinois FOID system is woefully inadequate in screening for mental illness. Def. Reply at 36-37. The Illinois Auditor General recently concluded that the FOID system is "limited in promoting and protecting the safety of the public" because "[t]here are significant deficiencies" in the reporting of people with disqualifying mental health conditions to the Illinois State Police – only 3 out of 102 circuit court clerks report mental health court orders to the ISP. *Id.* Recent events remind us of the intolerable mayhem wrought by a gun in the hand of even one mentally-compromised person, and Chicago should not be required to allow carrying in the state's most populous city when the state comes nowhere close to ensuring that FOID cards are denied to those suffering from mental illness.

**B.      A stronger showing than that required by *Skoien* is not warranted here, and even if it is, Chicago satisfies it.**

The intermediate scrutiny set forth in *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (*en banc*), requires that a restriction be "substantially related to an important government objective." *Id.* at 641. Chicago has already demonstrated that its carry restriction satisfies this standard. *See* Def. Mem. at 10-23. To be sure, *Moore* indicated that Illinois "would have to make a stronger showing" than the government did in *Skoien*. 2012 WL 61556062, at *6. But the court's rationale for this higher standard does not apply here, for two reasons.

First, the stronger showing was required in *Moore* due to the broad geographical sweep of Illinois' ban: It curtailed the gun rights of the "entire law-abiding adult population of Illinois." 2012 WL 61556062, at *6. On the other hand, Chicago's restriction applies only in Chicago, and

therefore covers just a fraction of the territory impacted by the Illinois ban. Indeed, Chicago comprises less than 1% of Illinois' total land area.[1]

Second, the kind of territory encompassed by Chicago's restriction is fundamentally different from that found in Illinois on a state-wide basis. Chicago, the nation's third-largest city, is a densely-packed urban metropolis. A rich American tradition has always recognized the special dangers posed by using guns in such places and, consequently, has long-allowed cities to ban guns for self-defense outside the home. *See Def. Mem.* at 6-10; *Def. Reply* at 24-27. Even if the scope of the Second Amendment covers the carrying of guns in cities,[2] the historical necessity and acceptance of urban carry bans shows that Chicago's restriction is hardly an American anathema that can be sustained only with an exacting empirical showing. Chicago's restriction rests comfortably within a regulatory tradition allowing cities a special prerogative to restrict carrying. Anything more stringent than *Skoien* intermediate scrutiny would fail to respect this tradition and would impede essential public safety regulation in Chicago. *See Kachalsky v. County of Westchester*, __ F.3d __, 2012 WL 5907502 (2nd Cir. Nov. 27, 2012), at *11 ("Because our tradition so clearly indicates a substantial role for state regulation of the carrying of firearms in public, we conclude that intermediate scrutiny is appropriate in this case.").

And even if a "stronger showing" were called for in this case, Chicago would still prevail.

_____

[1] According to the Illinois Department of Natural Resources, the area of Illinois is 57,918 square miles. *See* http://dnr.state.il.us/education/CLASSRM/IllinoisFactsFinal.pdf, at 2. And Chicago's area is 237 square miles. *See* http://www.cityofchicago.org/city/en/about/facts.html. Thus, Chicago comprises .4% of Illinois.

[2] As Chicago has shown, this historical record demonstrates that the Second Amendment does not encompass the carrying of guns for self-defense in cities. *See* Def. Mem. at 6-9; Def. Reply at 24-27.

By and large, *Moore* did not detail what this "stronger showing" entails. But *Ezell* instructs that

it requires "a strong public interest justification" for a regulation and a "close fit" between it and

the "public interests it serves," 651 F.3d at 708-09, and Chicago has already demonstrated how

its carry restriction satisfies this standard. *See* Def. Reply at 34-38.

Yet *Moore* does confirm one thing about the "stronger showing" (and, by logical

extension, the lesser scrutiny used in *Skoien*): Chicago's evidence can entitle it to judgment even

if the evidence is disputed by Plaintiffs. *See* Def. Mem. at 12-15. Even though both sides

presented contrasting studies and other evidence in *Moore*, the court emphasized that "there are

no evidentiary issues in these two cases" and that the constitutionality of the challenged

provisions "does not present factual questions for determination in a trial." 2012 WL 6156062,

at *9. That is, Illinois was not required to rely on studies that conclusively proved their points or

to show that its evidence was more reliable than plaintiffs' evidence. *See also Skoien*, 614 F.3d

at 641 (there is no requirement of "proof, satisfactory to a court," that a regulation is "vital to the

public safety," and a government need not "establish[]" a "statute's benefits . . . by admissible

evidence"). What Illinois needed to do was establish a "pragmatic" defense of its law that rested

on something more than the "mere possibility" that gun carrying would increase crime or death.

2012 WL 6156062, at *6. While the court in *Moore* found that Illinois' record came up short in

that case, the record in this case dictates precisely the opposite result.

**II.** **_Moore_ supports using the undue burden standard to evaluate Chicago's gun sales and safe storage regulations.**

While *Moore* did not purport to address what form of scrutiny would apply to regulations

other than the state-wide ban before it, it did confirm *Ezell*'s sliding scale approach, under which

the level of scrutiny used for a given regulation is based on the amount of burden the regulation imposes: A "severe burden" produces more scrutiny than a "modest burden[]," which "may be more easily justified." *Ezell*, 651 F.3d at 708. *See Moore,* 2012 WL 6156062, at *7 (where a statute imposes "a lesser burden, the state doesn't need to prove so strong a need"). Use of the undue burden standard to evaluate Chicago's gun sales and firearms storage regulations is therefore entirely consistent with *Moore*. As Chicago has previously established, these regulations should be assessed under the undue burden standard because they pose – at most – a minimal burden on Second Amendment rights. *See* Def. Mem. at 23-27, 37-40; Def. Reply at 7-8, 40-41.

<u>**CONCLUSION**</u>

WHEREFORE, for the foregoing reasons, Chicago respectfully requests that the Court enter judgment in favor of Chicago and against Plaintiffs on all claims.


Dated: January 4, 2013                           Respectfully submitted,

                                                 STEPHEN R. PATTON
                                                 CORPORATION COUNSEL
                                                 CITY OF CHICAGO

                                         BY:     <u>/s/ Andrew Worseck</u>
                                                 One of Its Attorneys

Mardell Nereim
Andrew W. Worseck
William M. Aguiar
Rebecca Alfert Hirsch
Constitutional & Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, IL 60602
(312) 744-9010

## CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the Defendants, hereby certifies that on January 4, 2013, he served a copy of the foregoing **DEFENDANTS' MEMORANDUM ADDRESSING *MOORE V. MADIGAN***, on the parties listed below by electronic means pursuant to Electronic Case Filing (ECF):

Charles J. Cooper
David H. Thompson
Peter Patterson
Cooper & Kirk, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036

Stephen Kolodziej
BRENNER FORD MONROE & SCOTT LTD.
33 N. Dearborn Street, Suite 300
Chicago, IL 60602

/s/ Andrew Worseck