**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, KENNETH PACHOLSKI, KATHRYN TYLER, and MICHAEL HALL, <br><br>  Plaintiffs, <br><br>  v. <br><br> THE CITY OF CHICAGO and RAHM EMANUEL, Mayor of the City of Chicago, <br><br>  Defendants. | No: 10-CV-4184 <br> Judge Edmond E. Chang <br> Magistrate Judge Geraldine Soat Brown |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'**
**SUPPLEMENTAL BRIEF ON *MOORE V. MADIGAN***

**ARGUMENT**

In *Moore v. Madigan* (7th Cir. Dec. 11, 2012), the Seventh Circuit struck down the State of Illinois's "flat ban on carrying ready-to-use guns outside the home." Slip op. 15. As we demonstrate in our supplemental brief, *see* Plaintiffs' Supplemental Brief on *Moore* (Doc. No. 206) ("Pl. Suppl. Br."), *Moore* fatally undermines the City's defense of its own flat ban on possessing and carrying ready-to-use guns outside the home—a ban that Plaintiffs challenge only to the extent it is *more restrictive* than the State of Illinois's. Chicago's "arguments in support of [its carry restrictions] either were already rejected in [*Moore*], or fail to meaningfully distinguish that case." *Am. Tradition P'ship v. Bullock*, 132 S. Ct. 2490, 2491 (2012) (summarily reversing state court judgment affirming state-law restrictions on corporate political speech that attempted to distinguish *Citizens United v. FEC*, 130 S. Ct. 876 (2010), on the basis of state-specific

considerations). *Moore* also undermines the City's defense of its laws banning the sale of firearms and restricting licensed gun owners to a single operable firearm in the home.

I.   **Chicago's Carry Ban Is Not Subject to a Lesser Degree of Scrutiny than Illinois's Ban.**

The State of Illinois went further than any other state in the nation in restricting the right to bear arms; it was "the *only* state that maintain[ed] a flat ban on carrying ready-to-use guns outside the home." *Moore*, slip op. 15. Yet even this draconian, unconstitutional law did not go far enough for the City of Chicago, as the City's ban reaches carrying that the State's ban left untouched. Chicago's counterintuitive argument that its ban nevertheless should be subject to a more lenient standard of review than Illinois's is erroneous.

As an initial matter, Chicago's argument rests on an unsound premise: that "*Moore* reaffirms that even if carrying outside the home is protected under the Second Amendment, a complete ban can be justified and upheld." Defendants' Memorandum Addressing *Moore v. Madigan* (Doc. No. 207) ("Chicago Suppl. Br.") at 1. *Moore*, to be sure, concluded that "the empirical literature on the effects of allowing the carriage of guns in public fails to establish a pragmatic defense of the Illinois law," slip op. 13, but the Court hastened to add that "[a]nyway the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts," *id.* Thus, *Moore*'s analysis was "not based on degrees of scrutiny, but on Illinois's failure to justify the most restrictive gun law of any of the 50 states." *Id*. at 18-19. Like a ban on possessing handguns in the home, in other words, a flat ban on possessing ready-to-use firearms outside of the home "would fail constitutional muster" "[u]nder any of the standards of scrutiny that [the Supreme Court has] applied to enumerated constitutional rights," *District of Columbia v. Heller*, 554 U.S. 570, 628-29 (2008). *See Moore*, slip op. 20. Such a

2

"broadly prohibitory law[]" is "categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011). Chicago's carry ban, of course, is even more broadly prohibitory than Illinois's, and it is equally unconstitutional.

Furthermore, the purported distinctions Chicago identifies fail to support a lower standard of review for Chicago's carry restrictions. First, *Moore* did not turn on "the broad *geographical* sweep of Illinois' ban," Chicago Suppl. Br. 6, but rather on its broad *jurisdictional* sweep. And just as Illinois's ban restricted the rights of the "entire law-abiding adult population of Illinois," *Moore*, slip op. 14, Chicago's restricts the rights of the entire law-abiding adult population under its jurisdiction. Chicago's misplaced focus on geography cannot be squared with *Heller*, which accorded no weight to the fact that the District of Columbia's handgun ban applied to "only 61.4 square miles" of area, 554 U.S. at 708 (Breyer, J., dissenting), which is just over one-quarter of the 237 square miles to which Chicago's carry restrictions apply, Chicago Suppl. Br. 7 n.1. It cannot be squared with *McDonald*, which makes clear that the Second Amendment applies with full force to "the States *and their subdivisions*." *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3046 (2010) (emphasis added). And it cannot be squared with *Ezell*, which deemed "unimaginable" the notion that one jurisdiction's curtailment of Second Amendment rights may be justified by the ability to exercise those rights in a neighboring jurisdiction. 651 F.3d at 697.

Second, it is immaterial that Chicago "is a densely-packed urban metropolis." Chicago Suppl. Br. 7. As an initial matter, there is no "rich American tradition" of allowing "cities to ban guns for self-defense outside the home," *id.*, and there certainly is no such tradition stretching back to 1791, "the critical year for determining the [Second] [A]mendment's historical meaning," *Moore*, slip op. 3. *See* Plaintiffs' Summary Judgment Brief (Doc. No. 175) ("Pl. SJ Br.") at 24-32; Plaintiffs' Summary Judgment Reply (Doc. No. 197) ("Pl. SJ Reply") at 11-15.

3

Furthermore, *Heller* has already rejected the notion that residents of urban areas enjoy only a "watered-down" version of Second Amendment rights. *McDonald*, 130 S. Ct. at 3035. There, the District of Columbia argued that its handgun ban was justified by "the [u]nique [h]arms [p]osed by [h]andguns in an [u]rban [e]nvironment." Brief for Petitioners, *Heller*, No. 07-290, 2008 WL 102223, at *49. The City of Chicago as an amicus emphasized that "criminals with firearms—especially handguns—wreak havoc in American cities." Brief of City of Chicago et al., *Heller*, No. 07-290, 2008 WL 136352, at *28. And Justice Breyer, in dissent, emphasized that the District's handgun ban "focuses upon the presence of handguns in high-crime urban areas." *Heller*, 554 U.S. at 681 (Breyer, J., dissenting). None of this, of course, made a difference to the *Heller* majority. *See, e.g.*, *Heller*, 554 U.S. at 634-35. And to the extent it makes a difference in this case, it should only make the standard of review more stringent. For surely the risk of harm imposed by "prevent[ing] a person from defending himself anywhere except inside his home," *Moore*, slip op. 14, is at its zenith when that person resides in a city plagued by a "violent-crime and gang epidemic," Chicago Suppl. Br. 2. *Cf.* Ray Long, *Illinois concealed carry ban tossed by federal appeals court*, Chicago Tribune, Dec. 12, 2012, *available at* http://articles.chicagotribune.com/2012-12-12/news/ct-met-conceal-carry-ruling-20121212_1_gun-control-gun-ordinance-todd-vandermyde/2 ("Chicago Ald. Howard Brookins, 21st, chairman of the City Council black caucus, welcomed the court's decision, saying that allowing Chicagoans to carry concealed weapons would help level the playing field in neighborhoods where law-abiding citizens think they need firearms to protect themselves.").

**II.     Chicago Cannot Justify Its Carry Ban.**

While the foregoing demonstrates that Chicago's restrictions on carrying firearms outside the home are either categorically unconstitutional or subject to highly stringent judicial scrutiny,

4

the City has failed to justify them under even the *Skoien* intermediate scrutiny standard that it argues should apply. Under that standard, Chicago "ha[s] to make a 'strong showing' that [its carry] ban [is] *vital* to public safety." *Moore*, slip op. 14 (emphasis added).

Chicago has not made such a showing here. First, *Moore*'s rejection of Illinois's plea for additional factual development, *see* Brief of Defendants-Appellees, *Moore*, Nos. 12-1269 & 12-1788 (Dkt. Entry 23), at 52 (May 9, 2012); *Moore*, slip op. 19-20, has no bearing on how convincing a case Chicago must make to justify its carry ban, *see* Chicago Suppl. Br. 8. The Court of Appeals' decision to dispense with evidentiary proceedings turned on the nature of facts at issue (legislative vs. adjudicative), not on how strong a showing Illinois was required to make. *See Moore*, slip op. 19-20. And that decision surely does not demonstrate that "Illinois was not required to rely on studies that conclusively proved their points or to show that its evidence was more reliable than plaintiffs' evidence," Chicago Suppl. Br. 8, as the Court emphasized that "[t]he key legislative facts in this case are the effects of the Illinois law; *the state has failed to show that those effects are positive*," *Moore*, slip op. 20 (emphasis added). Indeed, in its brief supporting Illinois's petition for rehearing en banc, Chicago asserts that *Moore* "required the State to show … that the public would 'benefit on balance from such a curtailment [of the right of armed self-defense]', slip op. 14, and some degree of certainty about the 'net effect on crime rates … as a matter of theory and empirically,' *id.* at 8," and that *Moore* represented *Skoien* as "requiring a similarly high bar when it required 'a "strong showing" that a gun ban was vital to public safety.' *Id.* at 14." Brief of Amici Curiae City of Chicago et al., *Moore*, Nos. 12-1269 & 12-1788 (Dkt Entry 53-2), at 4 (Jan. 8, 2013).

Second, "Chicago-specific evidence" does not justify the City's carry restrictions. Chicago Suppl. Br. at 3. Indeed, *Moore* relied on Chicago-specific evidence to demonstrate that

5

the State of Illinois could not justify its ban on carrying firearms outside of the home: "Given that *in Chicago*, at least, most murders occur outside the home, the net effect on crime rates in general and murder rates in particular of allowing the carriage of guns in public is uncertain both as a matter of theory and empirically." Slip op. 8 (emphasis added) (citation omitted).

Furthermore, Professor Cook's expectation of "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand," *id.* at 9 (quoting Philip J. Cook, et al., *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1082 (2009)), is far from "of no moment here," Chi. Suppl. Br. 4, and indeed applies with particular force to urban settings like the City of Chicago. According to Professor Cook, "the change in gun carrying" following the relaxation of carry restrictions "appears to be concentrated in rural and suburban areas where crime rates are already relatively low, among people who are at relatively low risk of victimization—white, middle-aged, middle-class males." Cook, *Gun Control After* Heller, at 1082. Easing restrictions on carrying guns outside the home, in other words, appears to have little impact on the gun-carrying habits of urban criminals.

And despite Chicago's contestations to contrary, *see* Chicago Suppl. Br. 4-5, *Moore*'s conclusion that enabling police officers to stop and frisk a person reasonably suspected of carrying a firearm "is a weak argument" for banning gun carrying outside the home is sound and, at any rate, binding on this Court. Slip op. 10. In particular, Chicago has not established that "Chicago gang members would roundly exercise and abuse the ability to lawfully carry guns openly," Chicago Suppl. Br. 5, for it has not established that any significant number of gang members would (a) be eligible for and (b) actually obtain a permit to carry a gun. *See* Pl. SJ Br. 34-36; Pl. SJ Reply 17. Nor has Chicago established that the utility of "preemptive stop and

6

frisk" tactics are materially enhanced "when no form of carrying is allowed." Chicago Suppl. Br. 5. Indeed, studies cited by the City to support the efficacy of such tactics looked at cities that did not flatly ban carrying. *See* Pl. SJ Br. 34; *see also* Pl. SJ Reply 18. At any rate, the City's targeted policing efforts undermine its broad restrictions on carrying firearms, for, as the City emphasizes, those efforts "focus police resources in high-crime neighborhoods and emphasize stopping suspicious individuals for questioning and frisking if there is reason to believe they are carrying a weapon." Chicago Suppl. Br. 3. These policing efforts, in other words, demonstrate the overbreadth of firearms laws that broadly restrict all residents of Chicago from carrying ready-to-use weapons outside the home in all of Chicago's varied neighborhoods, without respect to individual or neighborhood characteristics. *See Morning Edition: U.S. Murder Rate Declines, But Chicago's Goes Up* (NPR radio broadcast Jan. 7, 2013), http://www.npr.org/2013/01/07/168771088/u-s-murder-rate-declines-but-chicagos-goes-up (Professor David Kennedy: "Even city homicide stories are not really about cities. They're about neighborhoods within cities. And even in the most dangerous hot spots, nearly everybody who lives there will not carry a gun, will not use a gun, is not a gang member. Homicide comes down to very, very small numbers of very singular people.").

In the final analysis, Chicago, like the State of Illinois, has failed "to provide … more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety." *Moore*, slip op. 20. *See* Pl. SJ Br. 32-38; Pl. SJ Reply 16-19. Indeed, *Moore* confirms that no such evidence exists: "Based on findings from national law assessments, cross-national comparisons, and index studies, evidence is insufficient to determine whether the degree or intensity of firearms regulation is associated with decreased (or increased) violence." Slip op. 9 (quoting Robert A. Hahn et al., *Firearms Laws and the Reduction of*

7

*Violence: A Systematic Review*, 28 AM. J. PREVENTIVE MED. 40, 59 (2005)). This dearth of evidence dooms Chicago's efforts to justify its restrictions on carrying firearms.

### III. *Moore* Does Not Support Using an Undue Burden Standard in Second Amendment Cases.

Chicago argues that *Moore* supports applying an undue burden standard to the City's ban on firearm sales and its limitation of licensed gun owners to a single operable firearm in the home because *Moore* "confirm[ed] *Ezell*'s sliding scale approach, under which the level of scrutiny used for a given regulation is based on the amount of burden the regulation imposes." Chicago Suppl. Br. 8-9. *Ezell*, however, expressly "decline[d] the [City's] invitation" to "import the 'undue burden' test" into the Second Amendment context. 651 F.3d at 706. Thus, whether or not *Moore* confirms *Ezell*'s sliding scale approach, neither it nor *Ezell* authorize this Court to apply an undue burden test to any of Chicago's firearms restrictions. Indeed, as we have explained, *Moore* undermines Chicago's defense of its sales ban and one-operable-firearm limit. *See* Pl. Suppl. Br. at 12-13.

### CONCLUSION

For the foregoing reasons, this Court should enter judgment in favor of Plaintiffs and against Chicago on all claims.

Dated:  January 15, 2013                    Respectfully submitted,


Stephen Kolodziej                           s/ Charles J. Cooper
FORD & BRITTON, P.C.                        Charles J. Cooper*
33 N. Dearborn St., Suite 300               David H. Thompson*
Chicago, IL 60602                           Peter A. Patterson*
Tel: (312) 924-7500                         COOPER & KIRK, PLLC
Fax: (312) 924-7516                         1523 New Hampshire Ave., NW
Email: skolodziej@fordbritton.com           Washington, DC 20036

8

        Tel: (202) 220-9600
        Email: ccooper@cooperkirk.com

        Brian S. Koukoutchos*
        28 Eagle Trace
        Mandeville, LA 70471
        Tel: (985) 626-5052
        Email: bkoukoutchos@gmail.com

        *Admitted *pro hac vice*.

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Charles J. Cooper, hereby certify that on this 15th day of January, 2013, I caused a copy of the foregoing to be served by electronic filing on:

| | |
|---|---|
| Mardell Nereim | Craig Woods |
| Andrew W. Worseck | Ranjit Hakim |
| William Macy Aguiar | MAYER BROWN LLP |
| Rebecca Alfert Hirsch | 71 S. Wacker Dr. |
| CITY OF CHICAGO, DEPARTMENT OF LAW | Chicago, IL  60606-4637 |
| Constitutional and Commercial Litigation Division | |
| 30 N. LaSalle St., Suite 1230 | |
| Chicago, IL  60602 | |

                                          s/ Charles J. Cooper
                                            Charles J. Cooper