# EXHIBIT 1

Gary Kleck                                    October 28, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
CASE NO. 10-CV-4184
Judge Edmond E. Chang

ILLINOIS ASSOCIATION OF
FIREARMS RETAILERS, KENNETH
PACHOLSKI, KATHRYN TYLER, and
MICHAEL HALL,
          Plaintiffs,
vs.                                  Volume 1
                                     Page 1 - 327
THE CITY OF CHICAGO and
RICHARD M. DALEY, Mayor of the
City of Chicago,
          Defendants.
_____


VIDEOTAPED
DEPOSITION OF:          GARY KLECK


TAKEN AT INSTANCE OF:   The Defendants


DATE:                   October 28, 2011


TIME:                   Commenced at  9:03 a.m.
                        Concluded at 12:11 a.m.


LOCATION:               200 North Monroe Street
                        Tallahassee, Florida


REPORTED BY:            L. DANIELLE FREEZE
                        Certified Realtime Reporter
                        Lfreeze37@comcast.net

          ACCURATE STENOTYPE REPORTERS, INC.
               2894 REMINGTON GREEN LANE
        TALLAHASSEE, FL  32308   850.878.2221
               asreporters@nettally.com



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                              2

1    APPEARANCES:

2

3           REPRESENTING PLAINTIFFS:

4

            CHARLES J. COOPER, ESQUIRE
5           ccooper@cooperkirk.com
            COOPER & KIRK
6           1523 New Hampshire Ave., N.W.
            Washington, D.C.  20036
7           202.220.9660

8

9           REPRESENTING DEFENDANTS:

10

            CRAIG WOODS, ESQUIRE
11          cwoods@mayerbrown.com
            RANJIT J. HAKIM, ESQUIRE
12          rhakim@mayerbrown.com
            MAYER BROWN LLP
13          71 South Wacker Drive
            Chicago, IL  60606-4637
14          312.701.8758

15

16

17

18          ALSO PRESENT:

19          Barbara Kirkland-Graves, Videographer

20

21

22

23

24

25



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

3

INDEX

WITNESS                                            PAGE
GARY KLECK                                            4
      Direct Examination by Mr. Woods                4


                    INDEX OF EXHIBITS

                 (Exhibits are attached.)

  NO.   Description                                PAGE

    1   Expert Rebuttal Report of Gary Kleck        12
    2   Shots in the Dark by William J. Vizzard     17
    3   Expert Report of Joseph J. Vince, Jr.       77
    4   Book Chapter entitled: The Nature and      132
        Effectiveness of Owning, Carrying, and
        Using Guns for Self-Protection

CERTIFICATE OF REPORTER                            134



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

4

1                          STIPULATIONS
2              The following videotaped deposition of
3    GARY KLECK was taken on oral examination, pursuant to
4    notice, for purposes of discovery, and for use as
5    evidence, and for other uses and purposes as may be
6    permitted by the applicable and governing rules.
7    Reading and signing is not waived.
8                          *  *  *
9              (The videographer read the style of the
10        case, counsel introduced themselves on the
11        video record, and the witness was sworn.)
12             THE COURT REPORTER:  Do you swear or affirm
13        to tell the truth, the whole truth, and nothing
14        but the truth?
15             THE WITNESS:  I do.
16   Thereupon,
17   was called as a witness, having been first duly sworn,
18   was examined and testified as follows:
19                    DIRECT EXAMINATION
20             MR. WOODS:  This deposition is being taken
21        pursuant to the Federal Rules of Civil Procedure.
22        All objections are reserved except as to form.
23             MR. COOPER:  Yes.
24   BY MR. WOODS:
25        Q    Good morning, Dr. Kleck.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

5

```
 1       A     Morning.

 2       Q     My name is Craig Woods.  I don't believe we've

 3   met before.  I assume you don't recall it either?

 4       A     (Witness nods head.)

 5       Q     What is your current employment?

 6       A     I'm a professor at Florida State University.

 7       Q     And where do you reside?

 8       A     I reside at 489 Teenie Court, Tallahassee,

 9   Florida 32312.

10       Q     Now, have you ever been deposed before?

11       A     Yes.

12       Q     How many times?

13       A     Probably on the order of a half dozen times.

14       Q     When was the last time?

15       A     It was over four years ago.  They are listed in

16   my report so...

17       Q     Okay.  Yeah.  I think your report says that --

18       A     Oh, that --

19       Q     -- you haven't been deposed in the last four

20   years.

21       A     -- I haven't been deposed in the last four

22   years, right.  Well past four years, I mean, it was quite

23   a few years ago.

24       Q     And what were the nature of these other cases

25   that you were deposed in?
```



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

6

1      A     They would be gun-related cases having to do

2   with lawsuits against gun dealers or gun manufacturers,

3   gun distributors, that sort of case.

4      Q     Do you know where those cases were pending?

5      A     One was in West Palm Beach, Florida.  The

6   others are two -- way, way back in the '80s.  They would

7   be in Dallas, two cases in Dallas.

8           One case, I was being deposed in, I think,

9   White Plains, New York.  I'm not sure where the case

10  itself was located.  I was probably deposed in

11  connection with a challenge to the Connecticut assault

12  weapons ban, so that would have been in maybe

13  Bridgeport, some city in Connecticut.  And that's about

14  all I can recall.

15     Q     And do you recall the firms that retained you

16  in any of those cases?

17     A     That, I really couldn't tell you.

18     Q     Yeah.  Now, in all those cases, were you

19  retained as an expert witness?

20     A     Yes.

21     Q     Okay.  And the nature of your testimony, was

22  it, typically, against gun control measures?

23     A     No.  Most of them didn't directly concern gun

24  control measures.  They would -- they would have to do

25  with issues like the distribution of firearms, for



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

7

1  example, and the way that gun companies sold guns.  And

2  my contribution to that would be how guns got distributed

3  and ended up in criminals' hands.

4          The only one that really directly related to

5  gun control laws would be the challenge to the

6  Connecticut assault weapons ban.  The rest had to do

7  with the sale, manufacture, distribution and so on of

8  firearms.

9      Q    And do you recall who retained you as an expert

10  in the challenge to the Connecticut assault weapons ban?

11      A    No, I couldn't remember the name of the law

12  firm.  All I -- all I really remember about who -- who I

13  was working with, he was the guy who wrote the textbook

14  on the Connecticut constitution.  And it was -- it was,

15  you know, the issue was what did the Connecticut

16  constitution have to say about a right to keep and bear

17  arms.  So that sort of stuck in my mind, but the names, I

18  would have to consult records to know that.

19      Q    Okay.  Well, it sounds like you've been deposed

20  a number of times.  You are familiar with the rules

21  relating to depositions?

22      A    Yes.

23      Q    Make sure you give oral answers.  Nodding,

24  court reporter doesn't like very much.  We should try not

25  to speak over each other, so I will try not to interrupt



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                    8

1    you when you are giving an answer, and I would appreciate

2    it if you would try not to interrupt me.

3            We are probably going to be using some

4    technical terms today, statistical terms.  I may not

5    understand those concepts as well as you, so if there

6    is ever a question you don't understand, please tell

7    me.  If you don't tell me you don't understand the

8    question and you answer the question, I'm going to

9    assume that you understood what I'm asking; is that

10   fair?

11       A    Yes.

12       Q    If you need to take breaks, any time is fine,

13   just speak up.  I just ask that you finish -- if there's

14   a pending question, you finish answering that question

15   and then we can take a break; all right?

16       A    Good.

17           MR. COOPER:  Before we proceed --

18           MR. WOODS:  Sure.

19           MR. COOPER:  -- and while we are on

20       preliminaries, it's my recollection that the

21       deposition today has an extended limit of ten

22       hours instead of seven.  That just -- and I am

23       going to trust, I guess, the court reporter and

24       the videographer to kind of keep us aware of

25       where -- where things stand on time.  I'm sure you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

9

1    probably won't use more than half of that anyway.

2         MR. WOODS:  That's right.

3         MR. COOPER:  But -- but anyway, I just want

4    to make sure we're on the same page on that score.

5         MR. WOODS:  Yeah.  Well, if the witness gives

6    only yes or no answers, I'm sure we can be out of

7    here even more quickly.

8         MR. COOPER:  As he's been admonished.

9         MR. WOODS:  So we're happy with that.  Yeah.

10   BY MR. WOODS:

11        Q    Did you do anything, Doctor, to prepare for the

12   deposition today?

13        A    Yes, I reviewed my report, rebuttal report.

14        Q    Anything else?

15        A    I spoke with Chuck.

16        Q    Okay.  And what was the nature of your

17   discussions with Chuck?

18        MR. COOPER:  I would like to object.  I

19        recall, I guess, that we had a stipulation that

20        that -- that -- in which we agreed that

21        conversations between the expert witness and

22        counsel would not be inquired into.

23        MR. WOODS:  Okay.

24        MR. COOPER:  Is that right?

25        MR. WOODS:  I know we have an agreement as to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

10

1    draft reports.  I wasn't aware that we had an

2    agreement about conversation with counsel.

3         MR. COOPER:  I think it does cover

4    conversations and communications between counsel

5    and the expert.

6         MR. WOODS:  Okay.  Is there anything in

7    writing to this regard --

8         MR. COOPER:  It's --

9         MR. WOODS:  -- as you're aware of?

10        MR. COOPER:  Yeah, it's in the stipulation.

11        MR. WOODS:  All right.  Well, why don't we --

12   I'll reserve asking those questions, and we'll

13   take a look at the stipulation.  I just want to

14   make sure.  And I understand.  I'm certainly not

15   trying to violate a stipulation.

16        MR. COOPER:  Of course not.  May -- may I --

17   I have the stipulation here.  I've just called it

18   up.

19        MR. WOODS:  Okay.  Sure.

20        MR. COOPER:  If it would be helpful.

21        MR. WOODS:  Sure.

22        MR. COOPER:  It stipulates that discovery of

23   witnesses disclosed pursuant to Federal Rule of

24   Civil Procedure 26(a)(2)(a), blah, blah, blah,

25   one, for communications taking place after the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

11

1        date of the filing of this lawsuit, no party is

2        entitled to discover the contents of

3        communications that involve counsel for any party

4        and any witness disclosed pursuant to Rule

5        26(a)(2)(a) as a witness that may present evidence

6        pursuant to Rule of Evidence 702, '03 and '05.

7        And it goes on but...

8             MR. WOODS:  Okay.

9             MR. COOPER:  It's --

10            MR. WOODS:  Yeah.  And the reason why I

11       thought those were fair game is I had a

12       conversation with David Thompson outside of our

13       experts, and he specifically asked me whether

14       conversations with experts were off limits or not.

15       And I said I assumed they were on limits, but I

16       did not have the stipulation in front of me.

17            MR. COOPER:  Okay.  And well, I -- my

18       conversation with David and, obviously, I wasn't

19       -- I wasn't involved in that, but there -- there

20       may have been a miscommunication there because he,

21       to my knowledge, is -- is on the same page as I am

22       here on this.

23  BY MR. WOODS:

24       Q    Did you make any notes in preparation for your

25  deposition today?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

12

 1      A     No.

 2      Q     All right.  Why don't we go ahead and mark as

 3   Exhibit 1 a copy of your expert report as an exhibit.

 4            (Exhibit No. 1 was marked for

 5            identification.)

 6   BY MR. WOODS:

 7      Q     Can you identify Exhibit 1, please, for the

 8   record.

 9      A     Expert Rebuttal Report of Gary Kleck.

10      Q     This is the report that you prepared in this

11   matter; is that correct?

12      A     Yes.

13      Q     And attached to the report is a copy of your

14   CV; is that correct, Exhibit A?

15      A     Yes.

16      Q     Now, your educational background is in

17   sociology; is that right?

18      A     Yes.

19      Q     College and post graduate education?

20      A     Yes.

21      Q     That was done at the University of Illinois?

22      A     Yep.

23      Q     And then after graduating from the University

24   of Illinois, you became an instructor at Florida State;

25   is that correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

13

1       A    Yes.

2       Q    And you've been at Florida State ever since; is

3   that right?

4       A    Yes.

5       Q    You're a professor, a full professor now?

6       A    Yes.

7       Q    Tenured; is that correct?

8       A    Yes.

9       Q    Now, is your expertise in criminology, is that

10  --

11      A    Yes.

12      Q    Is that correct?

13      A    Yes.

14      Q    Anything else besides criminology that you

15  consider yourself an expert in?

16      A    Research methods and statistics.

17      Q    Okay.  Anything other than -- than criminology

18  and research methods and statistics?

19      A    No.

20      Q    You don't have any medical training, for

21  instance; correct?

22      A    That is correct.

23      Q    You don't have any training in public health;

24  is that correct?

25      A    No.  I mean, yes, that is correct that I don't.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

14

1      Q    Okay.  Your appointment, is it part of the

2   college of criminology?

3      A    Yes.

4      Q    Is that distinct from the sociology department

5   --

6      A    Yes.

7      Q    -- at Florida State?  There's a separate

8   sociology department?

9      A    Those are independent units.

10      Q    Okay.  Is -- does -- does Florida State also

11   have a public health department?

12      A    No.

13      Q    Public health is, I assume, part of sociology?

14      A    No.

15      Q    Okay.  Do you have any training in mental

16   health at all?

17      A    No.

18      Q    Do you have any training in economics?

19      A    No.

20      Q    Do you have any training in suicide

21   intervention at all?

22      A    No.

23      Q    Any training in counseling relating to

24   suicides?

25      A    No.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

15

1      Q     Are you currently teaching any classes at

2   Florida State?

3      A     Yes.

4      Q     What classes do you teach?

5      A     I'm teaching an undergraduate class titled

6   "Guns and Violence," which covers the entire field of how

7   firearms are related to violence and how gun control laws

8   are related to violence.  And I'm teaching a graduate

9   course on survey research methods.

10     Q     And how long have you been teaching those

11  classes?

12     A     I'm teaching -- I've been teaching the survey

13  research class probably for the last four years,

14  approximately, and the gun control class maybe five or

15  six years.

16     Q     Do you have any standard textbooks that you use

17  in research methods?

18     A     I've changed from one semester to the next.  I

19  use Don Dillman's text in survey research methods as the

20  primary text currently in the survey class, and I use two

21  of my own books as the text in the gun control class,

22  Armed, published in 2001 and Targeting Guns, published in

23  1997.

24     Q     Now, in connection with your reference

25  materials that you use, is there a standard statistical



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    methods or epidemiological methods book that you consult?

2         A    No, no one text.

3         Q    Is there more than one that you would consider

4    authoritative in the field of statistics and

5    epidemiology?

6         A    There would be many that are authoritative.

7         Q    Can you name a couple that you would consider

8    authoritative?

9         A    No, I couldn't, not at this point.  I would

10   have to refer to citations in my articles.

11        Q    The -- the book by Don Dillman, does that also

12   cover statistical methods?

13        A    No.

14        Q    Are you familiar with a book called Modern

15   Epidemiology?

16        A    No.

17        Q    Kenneth Rothman; have you ever heard of him

18   before?

19        A    No.

20        Q    Why don't we turn to your expert report, the

21   first page, if you would.

22        A    (Views document.)

23        Q    Do you see at the last sentence in the first

24   paragraph, you indicate that you've been called the

25   dominant social scientist in the field of guns and crime,



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

17

1  citing Vizzard, 2000.  Who is Vizzard?

2      A    William Vizzard is a Ph.D. criminologist who

3  was also an employee of the Bureau of Alcohol, Tobacco &

4  Firearms for many years.

5      Q    His background is in law enforcement?

6      A    Originally, and now it's also in criminology

7  because he had a master's and Ph.D. in criminology and

8  criminal justice.

9      Q    Okay.  And what -- what's his background in

10 ATF?  Do you know?

11     A    I'm not really familiar with the details of his

12 background.

13     Q    Do you consider Dr. Vizzard to be -- or Vizzard

14 (different pronunciation), excuse me, to be an expert in

15 his field, criminology?

16     A    He's an expert in the area of law enforcement

17 as it relates to the enforcement of gun control laws.

18     Q    And is that based in part upon his law

19 enforcement background?

20     A    Yes.

21          MR. WOODS:  Why don't we go ahead and get

22     that...

23          (Exhibit No. 2 was marked for

24     identification.)

25



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

18

1   BY MR. WOODS:

2        Q    All right.  I've handed you what's been marked

3   as Exhibit No. 2; can you identify that document or that

4   publication?

5        A    A book titled Shots in the Dark by William J.

6   Vizzard.

7        Q    And is this the book that you were citing in

8   your expert report?

9        A    Yes.

10       Q    And this is -- this is the publication in which

11  Mr. Vizzard refers to you as a dominant expert in the

12  field?

13       A    Yes.

14       Q    Can you turn to page 183, please.

15       A    (Views document.)

16       Q    And I'm going to direct you to about halfway

17  down on the right-hand side, it says:  Four other

18  authors; do you see where that paragraph starts?

19       A    Yes.

20       Q    It says:  Four other authors have contributed

21  consistently to the serious literature on gun control

22  over an extended period of time:  University of

23  California law professor Frank Zimring.  Are you familiar

24  with Mr. Zimring?

25       A    Yes.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

19

 1      Q     Do you agree with Mr. -- Dr. Vizzard's

 2   assessment that he's contributed consistently to the

 3   serious literature on gun control?

 4      A     I'd quibble over the word "serious."  I would

 5   say it's less serious than the literature contributed by

 6   the others mentioned there.

 7      Q     Okay.  The next person mentioned is Florida

 8   State University criminologist Gary Kleck; that would be

 9   you?

10      A     Yes.

11      Q     Then attorney for civil rights activist --

12   attorney -- excuse me, attorney and civil rights activist

13   Don Kates; do you agree that he's contributed to the

14   serious literature on gun control?

15      A     He's contributed conceptually in clarifying

16   the -- the issues that need to be debated.  Don Kates

17   does not claim to be a methodological expert or a person

18   who has improved the technical quality of research on

19   guns and violence.

20      Q     Does he have expertise in research methods?

21      A     No.

22      Q     Does he have expertise in statistics analysis?

23      A     No.

24      Q     And then finally he says:  And Duke University

25   public-policy Professor Philip J. Cook; do you agree that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 28, 2011

20

1    he has con -- contributed consistently to the serious

2    literature on gun control?

3         A    Yes.

4         Q    Would you agree that Don Kates engages in

5    unabashed advocacy for firearms issues?

6         A    I don't know if it's abashed or unabashed but

7    --

8         Q    Well, the reason I use --

9         A    -- I'd say it's pretty clear he has a pro-gun

10   stance on these issues.

11        Q    And the reason I ask that, if you go down to

12   the bottom of page 183, the last paragraph --

13        A    (Views document.)

14        Q    -- where it says:  Although both Kates and

15   Kleck describe themselves as liberals, their approaches

16   differ significantly.  Kates admits a strong attachment

17   to firearms and engages in unabashed advocacy.  You

18   wouldn't use those words; right?

19        A    No.

20        Q    But you agree that he's a pro-gun advocate;

21   correct?

22        A    Yes.

23        Q    Okay.  We can put that aside.  And I'm going to

24   go back to your expert report in the second full

25   paragraph where you say that you have published the most



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

21

1    comprehensive reviews of evidence concerning guns and

2    violence.  How do you define comprehensive?

3         A    A higher percentage of the relevant literature.

4         Q    So if I were just to take all of the relevant

5    literature on guns, your name would come up more than any

6    other in that field?

7         A    No.  The review of the literature is -- covers

8    research done by anybody, me or anyone else.  And so if

9    you were to count up how many articles there were

10   relevant to a given issues, these reviews would have

11   covered a higher percentage than any other published

12   source.

13        Q    So that -- when you say most comprehensive, you

14   mean in terms of numerical percentage, you have more

15   articles on -- that have reviewed the evidence relating

16   to gun control; is that what you are saying?

17        A    No, it's when I do reviews, they cover a higher

18   percentage of the articles, chapters and books out there.

19        Q    Oh, okay.  I see what you are saying.  And did

20   you do anything to make that calculation or is that just

21   a sense that you have that you always discuss more

22   articles in your reviews than other authors?

23        A    It is not based on a count.  It is based on a

24   very confident assessment.

25        Q    So it's not a statistical analysis that you



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

22

1   did?

2        A    No.

3        Q    Correct?  It's just your own personal sense

4   that you review more literature than other authors in the

5   field of gun control?

6        A    I would describe it as more than a sense.

7             For example, I can tell that a given article

8   or chapter that I've written would have many, many

9   pages of references of articles that I had cited and

10  other reviews would have much fewer pages.  While I

11  haven't counted the articles, that gives you a very

12  good sense of who is more comprehensive in their

13  coverage.

14       Q    Does the fact that your reviews are more

15  comprehensive make your reviews more reliable?

16       A    It's one factor that would make them more

17  reliable.

18       Q    What are the other factors?

19       A    How careful you were in assessing the quality

20  of each article or each source.

21       Q    Anything else?

22       A    How careful you are in judging the relevance of

23  a source.  It might be good quality but not really

24  relevant to the issue at hand.

25       Q    You mentioned in your report a few lines down



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

23

1    in paragraph 2 that for the -- for your book Point Blank,

2    you won the 1993 Michael J. Hindelang award; correct?

3        A    Yes.

4        Q    What is that award?

5        A    It is a book (sic) given for the book in

6    criminology of the last several years that made the most

7    distinguished contribution.  It's basically a best book

8    award.

9        Q    And is it a yearly award?

10       A    It is offered in most years, not every year.

11   They've skipped some years.

12       Q    Do you know what year the award was established

13   or when it started being given?

14       A    No.

15       Q    You won in what year, 1993; correct?

16       A    Yes.

17       Q    Yeah.

18            Do you know if the American Society of

19   Criminologists has other awards?

20       A    Yes.

21       Q    Are you aware of the Edwin H. Sutherland award?

22       A    Yes.

23       Q    And what is that award?

24       A    It's like a career award for criminologists.  I

25   don't recall the exact wording of what defines an



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

24

1   eligibility, but it's distinguished career in

2   criminology.

3        Q    Are you aware that Frank Zimring won that

4   award?

5        A    No, I was not.

6        Q    Are you familiar with the August Vollmer award?

7        A    Yes; although, beyond the name and that it's an

8   associated -- an ASC award, I wouldn't be able to tell

9   you anything else about it.

10       Q    So that's also an award of the American Society

11  of Criminologists?

12       A    I believe so, yes.

13       Q    And are you aware that Frank Zimring won that

14  award in 2006?

15       A    No.

16       Q    Okay.  You mention later, I guess in the next

17  paragraph, you say in Exhibit 1:  I have also published

18  scholarly research in all the leading professional

19  journals in your field?

20       A    Yes.

21       Q    What do you consider the leading professional

22  journals in your field?

23       A    My two fields would be sociology that my degree

24  was from and criminology, which is the field I work in

25  now.  The four leading journals by consensus in sociology



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

25

1    are the American Sociological Review, the American

2    Journal of Sociology, the Social Forces, and Social

3    Problems.  And in criminology, there's less consensus,

4    but the leading journal would be Criminology and then

5    probably the second through fourth most prestigious

6    journals there would be contenders, many contenders, but

7    they would be Journal of Research in Crime and

8    Delinquency, Crime and Delinquency, possibly Law and

9    Society Review, and then others that, you know, there

10   would be less consensus that they belong in the leading

11   ranks.

12       Q    And have you published in all the journals that

13   we just mentioned?

14       A    Yes.

15       Q    Do you know what the leading journals are in

16   economics?

17       A    American Economics Review, certainly.

18       Q    And is that a journal that you review or read?

19       A    Not regularly.  I have read articles from it,

20   but I don't regularly read it.

21       Q    What about the Journal of Public Economics; are

22   you familiar with that journal?

23       A    Not familiar with it.

24       Q    Do you know if it's a leading journal in

25   economics?  I guess if you're not familiar, you probably



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1   don't?

2       A    Correct.

3       Q    Okay.  What about the Journal of Political

4   Economy; are you familiar with that?

5       A    Yes, I would -- I should have mentioned that.

6   That would also definitely be a leading journal in the

7   field of economics.

8       Q    What about leading journals in the field of

9   public health?

10      A    American Journal of Public Health.

11      Q    Are there any other leading journals that you

12  would consider -- well, strike that.

13           Would you consider the Journal of the

14  American Medical Association to be a leading

15  peer-reviewed journal, scholarly journal in the United

16  States?

17      A    In the medical field, yes.

18      Q    In the medical field.

19           What about the New England Journal of

20  Medicine, the same in the medical --

21      A    The same.

22      Q    Okay.  Have you ever been awarded any grants

23  for your research on firearms and violence?

24      A    No.

25      Q    Any of the work that you've done, has it been



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 28, 2011

                                                           27

1    supported by funds outside of Florida State University?

2         A    No.

3         Q    So all the -- I assume you get a salary from

4    Florida State University?

5         A    Yes.

6         Q    Do you get any funds outside of Florida State

7    University for work that you do in your field of

8    research?

9         A    Not in the guns field.

10        Q    Not in the -- excuse me?

11        A    Not in the guns field.

12        Q    Okay.  Any of the publications that you've

13   published, have they been funded by any outside sources

14   other than Florida State?

15        A    I don't understand what the term "financing a

16   publication" means.

17        Q    Oh, funded.

18        A    Funded, funding a publication.

19        Q    Anybody pay for the research that went into the

20   publication --

21        A    No.

22        Q    -- other than Florida State?

23             Now, in your CV, you mentioned presenting a

24   paper, The Brady Act, and Increasing the Utility of

25   BATF Tracing Data; do you recall that presentation?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

28

1       A     Vaguely.

2       Q     Okay.  Can you recall what the presentation was

3    about?

4       A     It was given at a -- at a conference at the

5    headquarters of the Bureau of Alcohol, Tobacco & Firearms

6    in West Virginia.  And it was a meeting of people from

7    ATF and scholars, and among other issues, they were

8    addressing what you could do with ATF data that might be

9    of value to research and researchers, in turn, including

10   me, were suggesting better ATF data that would be more

11   useful for research purposes.

12          And I made some suggestions that had to do

13   with -- they had to do with identifying the people from

14   whom guns had been confiscated and presumably used in

15   crimes and linking that with the trace data.  And it

16   currently wasn't linked at that time.  And as to what

17   value I thought it would have, it had something to do

18   with evaluating the impact of the Brady Act because if

19   the Brady Act was going to have an impact, it should

20   have reduced the number of criminals who acquired guns

21   through retail purchase of a gun at a gun store.

22          And so the -- the alterations in data

23   gathering by ATF were going to advance that interest

24   somehow.  I forget the details, though.

25      Q     Was -- according to your CV, this was presented



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

29

1    at the annual meetings of the Homicide Research Working

2    Group?

3         A    That's correct.  They were the sponsors of the

4    meeting along with ATF.

5         Q    Okay.  Are you familiar with that group,

6    Homicide Research Working Group?

7         A    I know of them.

8         Q    You're -- are you a member?

9         A    I'm not real familiar.  I'm not a member.  I

10   don't think I --

11        Q    Oh, you're not a member?

12        A    I don't think I was a member at the time

13   either.

14        Q    And you haven't -- okay.  Have you been to any

15   other meetings, any other of their meetings other than

16   that meeting?

17        A    I'm not sure.  They have sessions at the

18   regular annual meetings of the American Society of

19   Criminology, and I probably attended at least one of

20   those.  But they also have meetings on their own,

21   independent of ASC.  And I don't think I've been to any

22   of those meetings besides the one in West Virginia.

23        Q    Do you know what the purpose of the Homicide

24   Working Research Group is, what their mission is or what

25   they typically do?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

30

1     A     Broadly speaking, it's to understand homicide
2  better.
3     Q     Is it a respectable group?
4     A     Yes.
5     Q     Have they made any advancements in the field of
6  homicide research and understanding?
7     A     I'm not qualified to say.
8     Q     The presentation that you made, was it later
9  published in a '99 article?
10    A     No.
11    Q     Okay.  There's a -- there's a -- I think --
12  look and see if I can find it.  There's an article on
13  BATF Gun Trace Data and the Role of Organized Gun
14  Trafficking in Supplying Guns to Criminals that you
15  published in the St. Louis University Public Law Review?
16    A     That's a different paper.
17    Q     Okay.  And those are on different issues than
18  you were talking about with the --
19    A     There would be some overlap but not really much
20  because the West Virginia presentation was intended to
21  get ATF to do something in their data gathering
22  differently.  And the latter paper was just about broad
23  issues of what can you learn from gun trace data and what
24  does it tell us about gun trafficking and so forth.
25          So there's -- there's virtually no overlap



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

31

1   other than that they're alluding to gun trace data in

2   both papers.  The presentation was not designed for

3   publication.  There was never any intent to publish

4   that.

5       Q    So what got you interested in the field of

6   guns?

7       A    I had a professor when I was in graduate school

8   named David Bordua.  He was a professor of sociology at

9   the University of Illinois.  And I was a doctoral student

10  and needed a topic for my dissertation.  And I was

11  initially doing a piece of research on the death penalty

12  and its deterrent effect, but it seemed a logical thing

13  to introduce availability of guns as a control variable

14  just for the sake of isolating the effect of the death

15  penalty.

16          And after a while, I had more interest in

17  that control variable and the effect of guns than I did

18  in the original topic.  I've continued to have some

19  interest in the death penalty; but, obviously, most of

20  my focus since then has been on gun issues.

21      Q    And what was the nature of your -- or what was

22  your dissertation on?

23      A    The dissertation was on the impact of the

24  frequency of executions and, secondarily, the size of the

25  U.S. gun stock on the U.S. homicide rate.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

                                                          32

1       Q     And what -- did you draw any conclusions about

2    the size of the U.S. gun stock on the execution rate?

3       A     At the time, I drew the conclusion that

4    execution frequency had no effect on the homicide rate

5    and that a higher rate of gun ownership had a positive

6    effect on the homicide rate.

7       Q     And when was that published, in '79?

8       A     The dissertation --

9       Q     Or when did you write it?  I'm sorry.

10      A     Yeah.  The dissertation was published in 1979.

11      Q     And you've since changed your view?

12      A     Yes, on the gun issue.

13      Q     Yeah.  When did you change your view on the gun

14   issue?

15      A     By 1984, I had extended that analysis to

16   encompass a bigger chunk of history.  I added five

17   additional years of data, and the gun availability

18   measure no longer showed a significant association with

19   the homicide rate.

20            At that point, I had changed from more guns

21   leads to more homicide to being a lot more skeptical on

22   the issue.  I wasn't confident in either direction that

23   it either had an effect or didn't have an effect.

24            At that point, I was really just extremely

25   skeptical because I had found that the findings were



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

33

1    very unstable, that simply adding five more years of

2    data altered the conclusion.  So it revealed the fact

3    that there was a very fragile basis for the initial

4    conclusion that more guns lead to more homicide.

5         Q    Your initial study was from '47 to '76.  Is

6    that correct?

7         A    No -- well, in a way.  1947 to 1973 was the

8    period on which most of the results were based.  And then

9    I took a few additional years as a way of testing the

10   adequacy of the statistical model.  And then the later

11   study, 1984 study, extended it up through 1978.  So the

12   findings were based on 1947 through 1978.

13        Q    All right.  And that 1984 study, did you

14   publish that?

15        A    Yes.

16        Q    Where is that published in?

17        A    It was published in an edited collection edited

18   by Don Kates called Armed, I think.

19        Q    Okay.  And when was that published?

20        A    1984.

21        Q    Okay.  Do you personally have any law

22   enforcement experience?

23        A    No.

24        Q    Have you ever inspected a gun dealer or other

25   FFL --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

34

```
1       A     No.

2       Q     -- for compliance with federal law?

3       A     No.

4       Q     Have you ever been involved in licensing of a

5   gun dealer?

6       A     No.

7       Q     Have you seen the paperwork that's needed to

8   fill out, to apply for a license?

9       A     Possibly.

10      Q     Have you ever audited an FFL?

11      A     No.

12      Q     And you've never had any experience or

13  involvement with enforcement of federal gun laws, I

14  assume; correct?

15      A     That's correct.

16      Q     Never worked for ATF?

17      A     Yes, that's correct.

18      Q     Yeah.  Okay.  Not even as -- have you ever

19  consulted with ATF before?

20      A     I have never had any formal consulting

21  relationship with ATF.

22      Q     Have you ever conducted any research on behalf

23  of ATF?

24      A     No.

25      Q     Are you a gun owner?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

35

1        A      Yes.

2        Q      Currently?

3        A      Yes.

4        Q      How long have you owned guns?

5        A      Since the early 1980s.

6        Q      And do you typically carry a weapon on your

7   person?

8        A      No.

9        Q      Now, in Florida, if I'm right, there's a right

10  to carry a concealed carry; is that correct?

11       A      Yes.

12       Q      Do you have a permit for a concealed carry?

13       A      No.

14       Q      Do you need a permit for a concealed carry in

15  Florida?

16       A      Yes.  And -- if you were going to carry on the

17  person.

18       Q      How do you store -- how many weapons do you

19  have?

20       A      Two.

21       Q      Are they both handguns?

22       A      Yes.

23       Q      And how do you store them at home?

24       A      I keep them stored with a trigger lock on each

25  one.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

36

1       Q       Do you have a -- a gun safe in your house?

2       A       No.

3       Q       Do you consider a trigger lock to be a safe

4    method of storing those guns?

5       A       Yes.

6       Q       In your home, do you typically have a gun in --

7    loaded at all times?

8       A       Yes.

9       Q       Do you have a trigger lock on the gun when it

10   is loaded?

11      A       Yes.

12      Q       Why do you do that?

13      A       At this point, there's probably not much

14   rational reason because my kids are out of the house.

15   But at the time I had kids, my primary concern was that

16   the kids not get ahold of a loaded gun.  Now it's a

17   matter of habit, I guess.

18      Q       Have you ever discharged those weapons before?

19      A       Yes.

20      Q       Have you gone through training at all?

21      A       I've never gone through any formal training.

22      Q       Have you ever used your gun in a defensive

23   manner?  Have you ever discharged your gun in a defensive

24   manner before?

25      A       No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

37

1      Q     Have you ever discharged it accidentally
2   before?
3      A     No.  Well, let me -- let me elaborate on that a
4   little bit.
5            I shouldn't inter -- I shouldn't guess what
6   you mean -- mean by that.  If I were at a target range
7   and I was aiming at a target very carefully and I
8   pulled the trigger a little bit earlier than I intended
9   to and the shot was off, I suppose you could call that
10  an accidental discharge so probably I've --
11     Q     You've done that?
12     A     On many -- on many occasions, I've done that.
13     Q     But you've never discharged the gun when you
14  were -- had no intention of discharging the gun in the
15  immediate time period in which it was discharged?
16     A     That's correct.
17     Q     Have you ever been a victim of a crime?
18     A     Yes.
19     Q     What crime?
20     A     My wife and I were driving in a car in a rural
21  area outside of Tallahassee and what we think was a
22  bullet hit the passenger side window on my wife's side.
23  It was the very start of hunting season, so it could have
24  been an accident except that we were in a depressed road
25  where probably the likeliest trajectory that could have



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

                                                                  38

1    hit a car in that depressed area would have been somebody

2    aiming over the -- the lip of the surrounding area down

3    into the road.  So that could have been an assault.

4         Q    So you take that to mean that it most likely

5    was an assault in that case because of the trajectory

6    that the bullet must have taken?

7         A    I would say more likely than not.  We reported

8    it to the sheriff, but I never heard of any investigation

9    that confirmed one way or another on what it was.

10        Q    Okay.  I want to ask you some -- just some

11   general questions about terms, statistical terms, so that

12   we can make sure we're on the same page and maybe you can

13   educate me a little about some -- what these terms mean

14   so that I can try to use them correctly.

15             What do you consider scientific research

16   methods in your field, at least?

17        A    Methods that follow as closely as possible the

18   recommended procedures outlined in research methods

19   textbooks.

20        Q    Any particular research methods textbook that

21   you think captures that?

22        A    The Dillman book on -- or series of textbooks

23   on how to do survey research would certainly be part of

24   that body of text that explain how to do survey research.

25   Many relatively interchangeable textbooks on statistical



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    methods would guide the application of statistical

2    methods.

3           Certainly there are introductory research

4    texts that cover the full array of research methods,

5    not just statistics and survey research methods but

6    also a wide variety of other methods.  I wouldn't say

7    any one text is dominant or any more important or

8    influential than others.

9        Q    How do you define or what is sampling?

10       A    Sampling is selecting a subset of a larger set

11   of units, such as sampling selecting a small subset of a

12   large population of individual persons.

13       Q    And sampling is done a lot in research because

14   it's impossible to survey the whole field for a

15   particular piece of information that you're looking for;

16   correct?

17       A    Yes, it would usually be impractical to study

18   large populations in their entirety.

19       Q    And what is random sampling?

20       A    Random sampling means that there is no bias

21   towards selecting some cases rather than others.

22       Q    And what is a generalizable sample?

23       A    A generalizable sample is a sample that yields

24   findings that can be generalized to a larger population

25   from which the sample was selected.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

40

1      Q    Does the sample have to be random in order to
2  be generalizable to the large population?
3      A    It has to be a probability sample, meaning
4  there are known probabilities of selection of any one
5  member of the population into the sample.
6      Q    So as long as you know what the probability
7  is of -- what the probability of the relationship between
8  the sample and the population is, you can generalize it;
9  is that what you are saying?
10     A    That would be one factor that would make the
11  findings generalizable.
12     Q    What other factors would make it generalizable?
13     A    In some cases, the -- the research methods
14  would have to be aimed at studying elements of the
15  reality that correspond to that reality.
16          For example, if you were doing an
17  experimental study, you might not only want a sample
18  that's representative of some larger population, but
19  you would also want the variables to realistically
20  represent their corresponding variables in the real
21  world.
22          So if people were testing the impact of
23  exposure to a gun, it would be better if somebody were
24  actually exposed to a real gun rather than, let's say,
25  a picture of a gun.  That would make the results more



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

41

1    generalizable because they more realistically reflect

2    elements of reality to which you are trying to

3    generalize.

4        Q    Okay.  Anything else that would make it

5    generally -- or a sample generalizable?

6        A    It would have to be a sample of a relevant

7    population, a population that's relevant to the issues

8    you're addressing.  So you could have a representative

9    sample of a population that isn't all that pertinent to

10   the issue at hand, like, a representative sample of

11   elderly nuns would not be relevant to the issue of how

12   common the use of guns defensively is in the U.S. adult

13   population.

14       Q    What is the statistical concept of power?

15       A    Statistical power is largely a function of

16   sample size:  The greater the sample size, the greater

17   the statistical power.  And it gives you greater ability

18   to -- to draw conclusions about how reliable your

19   estimates are.

20       Q    What does it mean if a study is underpowered?

21       A    Underpowered would usually reflect the fact

22   that it has too small -- it has a relatively small sample

23   size.

24       Q    And what effect does an underpowered study have

25   on your confidence in a result?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

42

1      A    It basically means there's a larger plus or

2  minus amount around any estimates you produce.  So it

3  doesn't have any effect on the level of an estimate,

4  whether it's large or small, but it means you can only be

5  confident that the true result is within a broader range,

6  that that range gets larger as the sample size and

7  statistical power declines.

8      Q    What does the statistical concept of precision

9  mean?

10     A    Precision would be, in effect, the narrowness

11 of that, that confidence interval; the narrower that

12 range in which the estimates fall, then the greater the

13 precision of the estimate.

14     Q    Okay.  In terms of statistical concepts, what

15 would be your understanding of what the term

16 "reliability" of a result is?

17     A    Well, I'm -- I'm not sure.  You'd probably have

18 to elaborate a little bit on what you are talking about.

19     Q    Is there -- I can ask it this way.  Is there a

20 difference between the reliability of a result and the

21 validity of a result?

22     A    Those two terms are usually con -- contrasted

23 in connection with measurement.

24     Q    Okay.

25     A    A measurement is valid or reliable.  And in



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

43

1    that context, validity means you're measuring what you

2    intended to measure rather than some other concept being

3    measured.  And reliability refers to, in some sense, the

4    consistency of your measurement procedure, so that if you

5    had a bathroom scale that always gave you the same

6    result, it might be wrong, but it's wrong in a consistent

7    way.

8         Q    Right.

9         A    In that narrow sense, it's considered reliable.

10        Q    Right.

11        A    Like, you know, if you had a bathroom scale

12   that was always 5 pounds too light.

13        Q    So if you repeat a method, the same method over

14   and over and get the same result, then you would say that

15   that method is a reliable method?

16        A    It's reliable in the narrow sense of

17   measurement reliability.

18        Q    Measurement reliability, right.  However, it

19   may not be a valid method?

20        A    That's correct.

21        Q    Because it may giving -- be giving you the

22   wrong answer, even though it's giving you the same answer

23   every time?

24        A    That's correct.

25        Q    Okay.  So let me apply this to a study.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

44

1              If a study is repeated over and over using

2      the same method, does that make -- and essentially

3      yields the same results, does that make the study

4      results valid all other things being equal?

5          A     Not by itself.

6          Q     What would you need to have to show that that's

7      valid?

8          A     Again, I would have to have more specifics to

9      --

10         Q     Okay.

11         A     -- to intelligently respond to that.

12         Q     We'll talk about that a little bit later.

13               What is a correlation?

14         A     Correlation is a measure of statistical

15      association.

16         Q     And when you're doing a study in which you're

17      using statistics to test the validity of a hypothesis,

18      what you're measuring is correlation; is that correct?

19         A     That is, at minimum, what you are doing, yes.

20         Q     What is statistical significance?

21         A     Statistical significance is a measure of the

22      likelihood that the statistical result you obtain could

23      have been the product of pure simple random chance.

24         Q     Okay.  So, and along with that, can you define

25      what a P value is?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

45

1       A     A P value would be the conventional way of
2    designating a statistical significance level.
3       Q     And is there a certain P value that you use in
4    your research as designating a level that is
5    statistically significant versus not significant?
6       A     There is no one level; picking any one level is
7    arbitrary.  But there are certain customary levels that
8    are commonly used in the field.  And the most common ones
9    would be a 5 percent significance level or a 1 percent
10   significance level.
11      Q     And can you explain what that means, a
12   5 percent significance level?
13      A     A 5 percent significance level would mean
14   that -- if some result passed a 5 percent significance
15   test, it would mean there's a less than 5 percent chance
16   that a result that strong or stronger could have been
17   produced by purely random chance factors.
18      Q     And do you typically either adhere to a
19   1 percent or a 5 percent level for statistical
20   significance in your research?
21      A     I'm not rigid about it because statistical
22   significance is just one issue that's relevant to the
23   interpretation of results.
24            Sometimes it's not possible to have a large
25   sample size, for example, which means it's very



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    difficult for even strong results to pass a test of

2    significance.  And so you -- we have to interpret the

3    evidence according to how significant the results are,

4    which means you don't simply dismiss results because,

5    let's say, they barely missed passing a test at an

6    arbitrarily defined significance level.

7         Q    All right.  So when you find a result that has

8    a P value that is greater than, say, .05, that doesn't

9    necessarily mean that there isn't a true correlation

10   between the variables; correct?

11        A    That's correct.

12        Q    I mean, it's kind of like saying you can't

13   prove a negative.  There could be a correlation, but what

14   the P value says is you can't exclude chance to a certain

15   level?

16        A    That's correct, and you're less confident that

17   you can reject pure chance as an alternative explanation

18   of the result.

19        Q    What's the difference between something that is

20   measured -- a P value of .06 and versus a P value of .05?

21        A    Very little difference.

22        Q    It means that there is a one in 100 -- the

23   result that you measure at a P value of .6 has a one in

24   100 chance more than the result that's measured a P value

25   of .05 being due to chance; correct?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                    October 28, 2011

47

1       A     I think you meant .06.

2       Q     Yeah, it's .06.

3       A     You said .6.

4       Q     Yeah, I apologize.

5       A     Yes, that's correct.

6             There's a slightly greater chance with the P

7    equals .06 result of it being a product of random

8    chance than with the P equals .05 result.

9       Q     Would you say that the result that is a -- has

10   a P value of .06 is not significant but the result in

11   which you obtained a P value of .05 is significant?

12      A     If you were communicating to your readers with

13   the understanding that P equals .05 was the cutoff, then

14   it would be legitimate to say that.  But to say one is

15   significant and one is not significant is somewhat

16   arbitrary because there's nothing magical about the .05

17   level.  It's simply a customary level that's frequently

18   used in the field.

19      Q     Okay.  We've got to change the tape, so why

20   don't we stop for a second, and we'll get the tape

21   changed and maybe take a real short break.

22            THE VIDEOGRAPHER:  Off the record, please.

23            (Brief recess was taken.)

24            THE VIDEOGRAPHER:  We're back on the record

25       with tape No. 2.  The time is 10:10 a.m.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

48

1    BY MR. WOODS:

2        Q    Good morning, Dr. Kleck.  After further

3    reflection, are there any answers that you'd like to

4    change at this point?

5        A    No.

6        Q    My colleague reminded me that I forgot to ask

7    you a couple of questions about the journals that you

8    considered leading in your field.

9        A    (Witness nods head.)

10       Q    What do you believe makes a journal a leading

11   journal, at least, in the field of criminology?

12       A    It's a matter of reputation.  So it's a

13   subjective measure, but they formalize this subjective

14   measure by actually surveying people in the discipline

15   and they ask them to rate them.

16       Q    Okay.  So is --

17       A    So people in academia are very big on rating

18   stuff.

19       Q    So is there a formal published rating number

20   associated with journals?

21       A    There are quite a few.  I haven't seen any

22   recently on sociology, but certainly on criminology,

23   yeah.  Every few years somebody comes out with one.  It's

24   not exactly official, necessarily.  I mean, it's not

25   something that's generated by the American Sociological



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

49

1   Association or the American Society of Criminology.  It's

2   usually, you know, private scholars and they conduct a

3   survey of people in the field and then ask them for

4   ratings of journals.

5        Q    Is there any rating agency that you believe is

6   the one that you would turn to in terms of assessing the

7   --

8        A    No.

9        Q    -- the reliability of journals or the --

10       A    No, there's no one rating agency.  There is no

11  such thing.

12       Q    Fac -- okay.

13            Factors that would go into whether a journal

14  is leading would -- one might be whether it's

15  peer-reviewed or not?

16       A    Yes.

17       Q    One might be who is on the editorial board?

18       A    Not so much so, no.

19       Q    Okay.

20       A    It would be primarily the quality of the

21  research --

22       Q    Impact score --

23       A    -- or the quality of the articles in general.

24       Q    Impact score of the research?

25       A    No, impact score is not a very good measure.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

50

1      Q     What about rejection rate?

2      A     Probably a little more relevant because it

3   indicates how stringent they are in their standards of

4   what they accept for publication.

5      Q     What about the acceptance criteria?

6      A     I'm not sure what that would mean.

7      Q     Okay.  Are you aware that journals have

8   published criteria for submitting papers to them for

9   publication?

10     A     Certainly, they would establish criteria of

11   relevance, not exactly -- they wouldn't be able to state

12   minimum quality, for example, but they'd state what the

13   areas are that they're interested in receiving

14   manuscripts on.

15     Q     So the criteria published by a journal doesn't

16   relate to quality at all, just to subject matter?

17     A     In terms of what they would accept as a

18   submission --

19     Q     Yes.

20     A     -- it would have to be relevant in subject

21   matter.  In terms of what they would accept, then the

22   quality of the work, obviously, would be a very important

23   criteria.

24     Q     So quality of work would certainly be a -- a

25   criteria that you would consider would make a journal a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

51

1    leading journal?

2         A    Yes.

3         Q    Academic affiliation of the journal?

4         A    I don't know what that means.

5         Q    Like what organization the journal is

6    affiliated with, either academic or -- or a professional

7    society?

8         A    I -- I wouldn't consider that a direct measure

9    of whether it's a leading journal or not.  It -- but it

10   does happen in many cases that leading journals are

11   affiliated with a disciplinary organization.

12        Q    But leading journals in terms of criminology,

13   are they all associated with the American Society of

14   Criminologists?

15        A    No.  The leading one is, Criminology, but the

16   others I mentioned are not.  They may be affiliated with

17   other organizations, but not ASC.

18        Q    What about the leading journals of sociology;

19   what organizations are they affiliated with?

20        A    The American Sociological Review is an official

21   publication of the American Sociological Association.

22   The -- I think Social Problems is associated with -- is

23   an official publication of the Society for the Study of

24   Social Problems.  And I don't think Social Forces is

25   affiliated with any organization, nor do I think American



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

52

1    Journal of Sociology is associated with any organization.

2    Those two, the latter two, are linked with universities.

3         Q    Okay.  What universities are they linked with?

4         A    The University of North Carolina is where the

5    -- where Social Forces is published, and the University

6    of Chicago is where American Journal of Sociology is

7    published.

8         Q    Okay.  What about the nature or quality or the

9    prestige of the peer reviewers or the referees for the

10   journal?  Is that an indication of the -- whether a

11   journal is a leading journal or not?

12        A    Normally people wouldn't know that.  It's --

13   it's typically secret who was doing reviews.  At best,

14   they might judge it -- if they were really assiduous

15   readers, they might read in the back of some journal

16   issue who had previously served as reviewer the previous

17   year.  And it's just sort of an undifferentiated list of

18   people.  And I doubt that anybody uses that as a way of

19   judging the prestige of the journal.  They're more likely

20   to make that judgment on the basis of what they think is

21   the quality of the research appearing in the journal.

22        Q    So it sounds to me like, at least for you, the

23   most important factor into whether considering a journal

24   is leading or not is the quality of the research that's

25   published in the journal; is that fair?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

53

1        A     Yes.

2        Q     Is there anything that's a close second?

3        A     Well, I could make a distinction between

4    prestige and quality.  Prestige is a subjective thing,

5    and it's not just a judgment on the part of me or any

6    other one individual; it's a matter of the collective

7    reputation of the journal.  And a journal can have an

8    unearned reputation, often because the current

9    assessments are out of date.

10             Like older faculty will assess a journal's

11   prestige based on how good it was ten years earlier or

12   20 years earlier, and they haven't updated their

13   assessment.  So it could have a currently high prestige

14   rating, even though it's not publishing very good

15   research anymore.

16             So prestige is not quite the same thing as

17   quality.  But at one time or another, the quality of

18   the work publishing in a journal would have influenced

19   its prestige assessment within the discipline.

20        Q     Okay.  So I want to go back to some of the

21   statistical terms and analyses, general -- general issues

22   and ask if you can tell me what the difference between a

23   one-sided test for significance is and a two-sided test

24   for significance?

25        A     In some cases, a researcher has predicted a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

54

1    direction of a relationship; for example, they might have

2    predicted a positive correlation as just -- as opposed to

3    just saying there was a correlation without respect to

4    whether it was positive or negative.

5           When you have a prediction about the sign of

6    the result, then you make a one-sided test of

7    statistical significance.  If you don't have a

8    prediction as to the sign, so that, for example, any

9    correlation, positive or negative, that's substantially

10   different from zero causes you to pass the test, then

11   you would use a two-sided test.

12        Q    And is that -- is that you always employ a

13   one-sided test when you have a prediction as to the

14   direction of the association --

15        A    Yes.

16        Q    -- or the correlation?

17        A    Now, if I'm at all aware of what I'm doing.

18        Q    Okay.

19        A    I mean, I can't say I've never done anything

20   accidentally but...

21        Q    Okay.  And when you use a one-sided test, what

22   do you typically use as the level of significance?

23        A    Again, I don't necessarily use a particular

24   level.  It's just that the smaller the P value, the more

25   confident I am the result is not attributable to chance.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      Q     What's the difference between, say, a

2   one-tailed P value of .5 and a two-tailed P value of .1.

3   I'm sorry, I'm going to -- I messed that up.

4          What's the difference between a one-tailed

5   significance or statistical significant level of P

6   value of .05 and a two-tailed statistical significance

7   value or P value of .1?

8      A     Well, it would take an equally strong result to

9   pass either of the tests.

10     Q     Okay.  So they're equivalent in terms of the --

11     A     Not quite --

12     Q     -- level of significance?

13     A     Not quite equivalent, because the two-tailed

14  test, you could pass it regardless of the direction of

15  the result.

16     Q     Right.

17     A     But in terms of the strength of the result, it

18  would take an equally strong result to pass either of the

19  two tests you outlined.

20     Q     Okay.  So if -- all right.

21          I gather from this discussion that it's not

22  improper to rely on a result that doesn't technically

23  meet the definition of statistical significance of P

24  equals .05 in and of itself; correct?

25     A     No, it would only be improper if you had an



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

56

1    exaggerated notion of how much you could rely on the

2    result.

3         Q    I mean, you have to take into consideration the

4    P value in assessing the meaning of the result, for

5    instance?

6         A    You'd have to take account of a P value in

7    connection with how likely it is that that result could

8    have been a product of chance.

9         Q    What is a regression analysis?

10        A    It's a statistical procedure usually done for

11   the purpose of separating the strength of association

12   between one factor and a dependent variable or phenomenon

13   you are studying and the influence of other factors that

14   might influence that same phenomenon.

15        Q    So is it a way of controlling for potentially

16   confounding factors?

17        A    Yes.

18        Q    What is an explanatory variable?

19        A    As its name implies, it's a variable that's

20   thought to be able to explain on why the dependent

21   variable is as high or low as it is.

22        Q    Okay.  What about a confounding variable?  How

23   would you define that?

24        A    A confounding variable is a variable that if

25   you fail to control it, you will get a biased estimate of



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

57

1    the association between your primary independent variable

2    of interest or explanatory variable and the dependent

3    variable.

4         Q    And can you explain how -- how that confounding

5    variable causes that confounding?

6         A    Well, it could be a number of ways; but

7    ultimately, it's because, for some reason or another, the

8    confounding variable is correlated with the principal

9    independent variable of interest and also influences the

10   dependent variable.

11        Q    So in order for a variable to be confounding,

12   it has to be correlated with both the independent and

13   dependent variable?

14        A    Yes.

15        Q    How do you decide what variables to put into a

16   regression equation?

17        A    Good researchers do it, at least, partly on the

18   basis of a thorough review of the literature; that is,

19   they review other studies of the same or a

20   closely-related topic.

21             And you can create a laundry list of

22   variables that fit that description of a confounding

23   variable; that is, other variables that have been found

24   to be significantly related to the dependent variable

25   but also are known or suspected to be correlated with



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

58

1     the explanatory factor you're focusing on.

2          Q    Now, just because there's been a report in

3     another study or in the literature that a variable may be

4     a confounding variable for a particular issue that you're

5     researching doesn't mean that it will be a confounding

6     variable in the particular research that you're doing;

7     correct?

8          A    Not necessarily, but it means you certainly

9     should be aware that it might be a confounder.

10         Q    And if you don't control for a confounding

11    variable, that doesn't mean that in and of itself that

12    the result is invalid; correct?

13         A    No, it really does.  It means it's -- well, I'm

14    not sure what you mean by invalid, but it means your

15    estimate of the effect of your explanatory factor on that

16    phenomenon is to some degree biased, meaning it's in

17    error.

18         Q    Right.  You can't --

19         A    So it's invalid in that sense if that's what

20    you mean.

21         Q    It's invalid in the sense that you can't

22    exclude the confounding variables maybe having some

23    effect on the result; correct?

24         A    Certainly, yes.

25         Q    But it may be that the confounding variable



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

59

1    didn't have a result on the effect as well; correct?

2         A    Well, you can tell that easily enough.

3              You simply estimate the regression equation

4    or whatever your statistical procedure is with and

5    without that confounding variable being controlled.

6    And if your estimate of the effect of the explanatory

7    variable differs under those two conditions, then it's

8    pretty definitive evidence that controlling or failing

9    to control for the confounder has an effect on the key

10   results.

11        Q    Okay.  But is there any method for controlling

12   for potential confounders without adding the confounding

13   variables to a regression equation?

14        A    Not that I can think of offhand.

15        Q    What about different types of study design,

16   like a longitudinal study?

17        A    Could you ask the previous question again?

18        Q    Yeah, why don't -- I probably can't, but why

19   don't we have the court reporter read it back.

20             (The record was read by the reporter.)

21        A    Okay.  Then let me revise my answer.

22             If -- if you use the fundamentally different

23   research design, you can do a true experimental study

24   in which the issue of statistical controls becomes more

25   much less important and -- and, for example, if you



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

60

1    could randomly assign people to have more or less of

2    the explanatory variable, then it's -- it's less

3    important to control for confounding factors because

4    the random assignment ensures that virtually nothing

5    that affects the outcome measure is going to be

6    correlated with how much of the explanatory factor they

7    were exposed to.

8            So that's a way that you more or less largely

9    render it unnecessary to control for confounding

10   variables.

11       Q    Yeah.  And -- and one of the issues that comes

12   up in your report is reverse causality.

13           Is a longitudinal study better able to ferret

14   out issues of reverse causality than a cross-sectional

15   study?

16       A    It gives the researcher advantages.  Whether on

17   net, it gives you a better ability to infer causality, is

18   a function of a lot of other things.  Often in doing

19   longitudinal research, you gain some knowledge of time

20   order of what happened when and in what sequence, but you

21   often lose other valuable things, other valuable aspects.

22       Q    What do you lose in doing a longitudinal

23   study --

24       A    Well --

25       Q    -- that's valuable?  Sorry.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

61

1      A      Are you finished?

2      Q      -- that's valuable.  Go ahead.

3      A      Well, for example, if you do a longitudinal

4   survey study, usually called a panel study, it means you

5   survey the same people at multiple points in time.  And

6   usually what happens is there's case loss; that is, some

7   of the people you can't locate again --

8      Q      Right.

9      A      -- or, you know, they decline to participate in

10   later waves of the panel study.

11           So sample size declines and the comparability

12   of the samples at each point in time is lowered.  And

13   often just as a practical matter of expense, because a

14   longitudinal study may be more expensive, you have to

15   give up other things that cost, such as having smaller

16   sample sizes to begin with, which means less

17   statistical power.

18           In many situations, there are fewer variables

19   available that are available at multiple points in time

20   than there would have been at a single point in time.

21   So you end up estimating less realistic models because

22   you can't control for as many of the confounding

23   variables; the data aren't available.

24           So there are sacrifices, but you do gain

25   something with respect to establishing time order in a



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

62

1   longitudinal study.

2       Q    Is -- is matching another method for

3   controlling for confounding without adding confounding

4   variables to a regression model?

5       A    It is a method.  It is probably about

6   equivalent in its value for controlling for confounding

7   variables, but it's well short of the value of randomly

8   assigning people different values on the explanatory

9   factor.

10      Q    Is the best study design randomized controlled

11  trial?

12      A    It would be if it were possible.  It's just

13  rarely possible in any crime-related fields other than

14  imposing treatment intended to reduce criminal behavior.

15      Q    And that's why typically in -- in your field,

16  your -- you perform cross-sectional studies or

17  retrospective studies of data because it's virtually

18  impossible to do a randomized control trial; correct?

19      A    Yes.  It's why we are confined to largely

20  nonexperimental research of all sorts, some longitudinal,

21  some cross sectional and some retrospective, some not.

22  But it's all nonexperimental in the sense that the

23  researchers are not able to randomly assign differing

24  levels of the explanatory variable to different subjects.

25      Q    But that doesn't mean you still can't draw



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

63

1    reliable conclusions or valid conclusions from using the

2    techniques that are available in criminology; correct?

3        A    You would be able to draw less valid con -- you

4    would be able to draw conclusions about which you had

5    less confidence than had you been able to address the

6    same subject with random assignment experimental methods.

7    But I don't categorize findings as reliable or

8    unreliable, valid or invalid; they're simply along a

9    continuum and the better the methods, the more likely it

10   is you can rely on the findings.

11       Q    Right.  It's not black and white.  One study

12   design over another is not black and white?

13       A    Correct.

14       Q    And that's why when trying to infer causality,

15   it's best to have a number of different studies that were

16   done with multiple different methods; if they are all

17   coming out in the same direction, it gives you more

18   confidence that the result is correct?

19       A    Correct.

20       Q    Will -- will a confounding variable that's

21   input or used in a regression model always have a

22   statistically significant result or significant effect on

23   the result?

24       A    I'm not sure what you mean.  If you mean the

25   association between the key explanatory factor and the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

                                                          64

1   dependent variable, changes by a significant --

2   statistically significant amount, not necessarily.  It

3   will definitely change by definition or it wouldn't have

4   been a confounding variable.

5        Q    Okay.

6        A    But whether it passes a test of significance,

7   like the coefficient for the explanatory factor changed

8   by an amount that couldn't be attributable to chance, I

9   don't know.

10       Q    So if it changes at all, if the point estimate

11  changes pre and post adjustment for the confounding

12  variable, you would agree that that variable can be

13  considered at least a partial confounder?

14       A    Correct.

15       Q    I can't read my colleague's writing.  He's

16  going to have to write another.

17            MR. COOPER:  That happens at trial --

18            MR. WOODS:  Yeah.

19            MR. COOPER:  -- much more than in a

20       deposition.

21            MR. WOODS:  Oh, yeah.  At least he's not the

22       client.  I couldn't say that to the client.

23  BY MR. WOODS:

24       Q    I'll just ask it the way he wrote it.

25            What about the coefficient on a confounding



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

65

1   variable, does that have to be statistically

2   significant?

3       A    Yes, because if it weren't statistically

4   significant, you wouldn't really consider it a

5   confounding variable because, as I said, a confounding

6   variable would have to have some relationship with a

7   dependent variable just to meet the first qualification

8   of being a confounder.  And so it's not definitive.

9            No one test is definitive, but if you've got

10  a statistically insignificant association between the

11  confounder and the dependent variable, you usually make

12  the judgment, unless there was strong external evidence

13  to the contrary, that it's probably not a confounder

14  because it doesn't seem to affect the dependent

15  variable.

16      Q    What does it mean to have a coefficient on a

17  confounding variable in a regression equation be

18  statistically significant?

19      A    It means in that body of -- of data that you

20  have an association between the confounder and the

21  dependent variable, which is not likely to be a product

22  of -- purely of chance.

23      Q    So does that mean that the association between

24  the confounder and the dependent variable has to be

25  statistically significant?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                    66

1     A     It's one key piece of information that would

2   suggest it's a confounder.  It's possible that there's

3   strong external evidence from prior studies that

4   established that that confounder does affect the

5   dependent variable.  And in this particular study, maybe

6   due to a small sample size, it didn't pass a test of

7   statistical significance, in which case, you might well

8   continue to think of it as a confounder.

9     Q     Well, let's assume that you have a potential

10  confounder; you put it into your regression equation, you

11  actually find out it didn't have a statistically

12  significant effect or it didn't have a statistically

13  significant coefficient in the regression equation, do

14  you then, when you report the results, do you indicate to

15  the reader that you included that variable in your

16  regression equation or do you report the results without

17  including that variable in your regression equation?

18    A     You are going to have to re -- that was a

19  complicated question.

20    Q     Let's try --

21    A     You are going to have to ask that one again.

22    Q     Let's try that one again.

23          MR. WOODS:  If you can read it back.

24          (The record was read by the reporter.)

25    A     It would be advisable to report to the reader



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

67

1    that you did control for it simply because you're ruling

2    out the possibility that the association between the

3    explanatory factor and the dependent variable was biased

4    due to this confounding variable.  It -- it would make

5    the reader more confident in the findings.

6    BY MR. WOODS:

7        Q    Even though, in that particular instance, it

8    turned out it didn't have a confounding effect on the

9    principal association?

10       A    Yes, but as I said before, there's also

11   external evidence which might suggest that despite these

12   results in this particular body of data that it does

13   affect the dependent variable.

14       Q    Okay.  What --

15       A    They may have -- for -- for example, they may

16   have mismeasured the independent variable or they may

17   have an eccentric sample in which an association that

18   would have been observed in a more representative sample

19   was not observed in this particular sample.

20       Q    What is the effect on the coefficients of a

21   regression model if multiple dependent variables are

22   correlated with each other?

23       A    Are you sure you mean multiple dependent

24   variables or do you mean multiple independent variables?

25       Q    Well, let's try both, if you --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

68

1      A    It wouldn't make any sense as multiple

2    dependent variables that -- you don't -- I don't -- I

3    wouldn't know how to answer that one.

4      Q    Okay.

5      A    But if you meant multiple independent

6    variables, that's called collinearity, and the effect is

7    that the stronger those correlations among the

8    independent variables, the less precise your estimate of

9    the effect of any one of them gets.  There's like a

10   larger confidence interval plus or minus amount around

11   your estimate of the effect of any one of those

12   variables.

13     Q    So you can't tease out the relative effect of

14   each of those --

15     A    Well, you can --

16     Q    -- independent variables if there's a strong

17   correlation?

18     A    You can, but you -- you would have less

19   confidence in the result.

20     Q    Okay.  What happens to the coefficient in your

21   regression model when you add more variables holding the

22   number of observations constant?

23     A    If the variables have an effect on the

24   dependent variable, then one effect is you would account

25   for more of the variation in the dependent variable.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                          October 28, 2011

1          You would have a more complete explanatory

2     model.  And if the additional independent variables

3     were confounders, you would have a less biased,

4     presumably more accurate estimate of the effect of any

5     one of the explanatory factors.

6          Q    Okay.  What is an instrumental variable?

7          A    An instrumental variable is used in a method

8     called instrumental variables analysis in which you're

9     trying to establish causal order; you're trying to

10    discover does X cause Y or does Y cause X.

11         And an instrumental variable in the context

12    of a -- a situation where X affects Y and Y affects X,

13    would help you tease out those two separate effects.

14    Does X cause Y?  What's the effect of X on Y versus

15    what's the effect of Y on X?

16         And in particular, the technical requirements

17    for being a good instrumental variable would be that

18    it's a variable that affects one of those two variables

19    directly and preferably strongly, but has no directive

20    effect of its own on the other variable.

21         Q    And are there statistical tests that you can

22    run to establish the confidence that the instrumental

23    variable that you chose meets those two criteria?

24         A    Yes.

25         Q    What are those tests?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                              October 28, 2011

70

1      A     Well, there's one test which is -- it's called

2   a validity test -- there's two tests.  One is a relevance

3   test and one is a validity test.

4            The relevance one is ease -- is easier to

5   say.  If I have a variable I claim is an instrument for

6   X, then I have to demonstrate that it does apparently

7   have a strong direct effect on X.  That's relevance.

8            And validity is the assertion that it does

9   not affect Y, the other of the two variables that may

10  have a two-way relationship.  And that's sometimes

11  tested with an overidentification test.

12     Q     Okay.  So the validity test, is it called an

13  overidentification test?

14     A     Yes, that's one way of testing instrument

15  validity.

16     Q     We already talked about this, but I want to

17  make sure I get it in one place.  What is a time series

18  study or longitudinal study?

19     A     It is a study in which observations are taken

20  on the same set of cases at more than one point in time.

21     Q     What about a cross-sectional study; what is

22  that?

23     A     A cross-sectional study ordinarily would have

24  measurements pertaining to roughly the same single period

25  of time.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

71

1      Q     Is one study designed better than the other,

2   cross sectional versus longitudinal?

3      A     Not necessarily.  Because as I said before,

4   usually in order to do a longitudinal study, you have to

5   give up certain things that are also valuable.

6           So you often have less complete models that

7   don't control for as many confounding variables when

8   you do the longitudinal study or you may lose sample

9   size and thus statistical power or, you know, you may

10  have less money to do many of the things that cost as a

11  result of having to get measurements at multiple points

12  in time rather than a single point in time.

13     Q     What is a -- a case control study?

14     A     A case control study is a variant of a

15  cross-sectional study.  It's usually an individual level

16  study.  It's individual people who are studied.

17          It really differs from other individual

18  cross-sectional studies mainly in that you have what

19  amounts to an oversample of people with some relatively

20  rare characteristic of interest, like, getting a

21  complete list of people who were murdered in a given

22  county and then comparing them with the rest of the

23  general population.

24          They would be a tiny percentage of the

25  population, so if you simply randomly sampled the



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

72

1    population of that county, you would include very few

2    murder victims.  But by going to the medical examiner's

3    office and getting a list of all of them, you include a

4    large number of murder victims.

5        Q    And so is cri -- or case control study a better

6    way to study rare events?

7        A    It's -- as opposed to what?

8        Q    As opposed to a cohort study or a population

9    study.

10       A    Well, it -- it could be considered a population

11   study.

12       Q    Okay.

13       A    I mean, often the entire population of persons

14   of -- with this rare attribute of interest may well be

15   covered, and then a representative sample of the general

16   population is also studied as a comparison group.  But,

17   you know, case control studies have the advantage of

18   getting more of the rare cases into the sample.

19       Q    In order to come up with a -- in order to study

20   rare events, you pretty much have to do a case control

21   study; correct?

22       A    No, it's not the only way.  There are other

23   ways.  There are sampling techniques that, besides doing

24   case control studies, that result in a larger number of

25   rarer cases.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

73

1          You could sample in high crime neighborhoods,

2     for example.  You could have half of your sample drawn

3     from police districts that were known to have murder

4     rates four and five times the city-wide average and so

5     on.  But certainly case control studies are -- are one

6     valid way of getting more of the rare attribute cases

7     into your sample.

8          Q    What is a confidence interval?

9          A    A confidence interval is a -- a range in which

10    you assert an estimate to fall and you associate that

11    range with a particular level of confidence, thus, you

12    might say:  I'm 95 percent confident that the population

13    parameter I'm trying to estimate is somewhere between 1.8

14    and 2.2.  So it's both a range and a level of confidence.

15         Q    So by reporting a confidence interval, it's

16    your testimony that means that the true point estimate

17    lies somewhere between that range with whatever level of

18    confidence that you're -- you're testing?

19         A    Yes, assuming there's no other flaws that are

20    distorting the estimate, you're saying --

21         Q    Right.

22         A    -- based purely on random chance factors, I

23    have this level of confidence that the estimate falls

24    within this range.

25         Q    What do overlapping confidence intervals



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

74

1    between two point estimates, what does that mean about

2    the difference between those point estimates?

3        A    It's usually interpreted as that difference not

4    being statistically significant, meaning it could be

5    entirely a product of random chance.

6        Q    Does it matter how much overlapping you have as

7    to whether it would be interpreted as being -- their

8    being statistically significantly different or not?

9        A    Yes.  The more overlap, the more of a

10   possibility of there being no significant result --

11   significant difference.

12       Q    Right.  But if it overlaps at all, would it be

13   your opinion that those two point estimates are not

14   statistically significantly different?

15       A    Yeah, it means there's some possibility of them

16   not really being different.

17       Q    Right.

18       A    But not as much as if there were a lot of

19   overlap.

20       Q    Okay.  What is an odds ratio?

21       A    It's a measure of association.  It can be used

22   in lots of different contexts, but it's -- it is as its

23   name implies, a ratio of odds.  And odds, in turn, are

24   the ratio of the number of cases in a category of

25   interest or the number not in that category.  So you can



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    compute the odds and then form the ratio of one odds over

2    another odds, and that's an odds ratio.

3         Q    Okay.  What about a rate ratio?

4         A    A what?

5         Q    A rate ratio.

6         A    Well, a rate ratio is slightly different in the

7    sense that you are not dealing with odds.  You are

8    dealing with the number of events of interest divided by

9    the time -- the number of times they could have occurred,

10   not the number of times they did not occur, which is what

11   you would be dealing with in an odds ratio.

12        Q    Okay.  And what about relative risk?  Is that

13   the same as a rate ratio or is that something else?

14        A    I think the way it's usually used is it's --

15   it's the difference of rate ratios, I think.

16        Q    Okay.

17        A    It's not terminology common in social sciences.

18   It's more common in epidemiology.

19        Q    What -- what are the -- what do you typically

20   refer to as the -- as the measure of the point estimate

21   in sociology studies?  What do you usually use?

22        A    What estimates?

23        Q    Okay.  Like, I mean, what is odds ratio

24   associated with?  What kind of study is that -- is that

25   typically associated with?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

76

1      A     It could be associated with either some sort of

2   cross-tabulation where you have two variables that are

3   just categorical variables, you're just measuring which

4   of a limited number of categories cases fell into, like

5   male versus female.

6           But it's also used in a very different

7   context when people do a variant of multiple regression

8   called logistic regression analysis; the odds ratio is

9   the antilog of a coefficient in that kind of an

10  analysis.

11     Q     Okay.  What's an adjusted odds ratio?

12     A     An adjusted odds ratio is the same as the odds

13  ratio before except it involves controlling for one or

14  more variables besides the two in the association of

15  primary interest.

16     Q     Okay.  I think I'm actually ready to talk about

17  your opinions in the case, hopefully.

18          All the materials that you reviewed in

19  connection with forming your opinions in this case, are

20  they listed in -- I guess, either in the text of your

21  opinion itself or in Exhibit B to your expert report,

22  Exhibit 1?

23     A     Or in the sources I cite.

24     Q     Okay.  On page 2 of your report, if we could

25  turn to that.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

77

```
 1        A     (Views document.)

 2        Q     Under -- under heading I, triple -- triple I,

 3   Rebuttal of Expert Witness, you write:  This report

 4   rebuts the criminology claims made in the expert witness

 5   reports of Joseph J. Vince, Daniel W. Webster, and Philip

 6   Cook.  What is your understanding of criminology claims

 7   and what that means?

 8        A     Claims resulting -- claims relating to the

 9   scientific evidence on the causes and consequences of

10   crime.

11        Q     Is your rebuttal limited to only the

12   criminological claims of these individuals?

13        A     No, because you might define criminological

14   unduly narrowly.  For example, there's no limitation

15   implied by that word with respect to what disciplines

16   generated the research, what kinds of journals they

17   appeared in.

18            If they're related to research on the

19   scientific -- scientific research on the causes and

20   consequences of crime, then it would be within the

21   scope of criminological as far as I'm concerned.

22        Q     Okay.  Why don't we get a copy of Mr. Vince's

23   report just so we can have it.

24            (Exhibit No. 3 was marked for

25         identification.)
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

78

1   BY MR. WOODS:

2        Q    And I should have asked you, I guess,

3   Dr. Kleck; did you bring any documents or materials with

4   you to the deposition today?

5        A    Just this rebuttal report and a revised version

6   of Table 4, which I think has been submitted to you guys

7   in an email.

8        Q    Yeah, I think it was sent a couple of days ago.

9             MR. COOPER:  Actually, we sent --

10            MR. HAKIM:  We got another one last night.

11            MR. COOPER:  Oh, we did?

12            THE WITNESS:  That's the one I have, the last

13        one.

14            MR. WOODS:  I didn't see that one yet, but

15        we'll look at it.  We've got plenty of time.  So

16        -- go ahead.

17            MR. COOPER:  Are we going to mark this as an

18        exhibit?

19            MR. WOODS:  Yeah, so I -- I was going to say

20        that on the record.

21   BY MR. WOODS:

22        Q    So we're going to mark Mr. Vince's report as

23   Exhibit No. 3, which you now have in front of you.

24            Now, have you ever met Mr. Vince before --

25        A    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

79

1      Q      -- Dr. Kleck?

2             When did you meet him?

3      A      I think I might have met him at that meeting in

4  West Virginia.

5      Q      That we spoke about earlier with the ATF?

6      A      Correct.

7      Q      And is that the only time that you recall

8  meeting him?

9      A      That's the only one I recall but...

10     Q      Have you ever attended a conference on fire --

11 of firearm academics at Mr. Vince's request or

12 invitation?

13     A      Well, unless it was that West Virginia one, I'm

14 not sure.  Not that I know of, other than that West

15 Virginia meeting.

16     Q      Do you know if -- if Mr. Vince is a

17 well-respected individual in the area of law enforcement?

18     A      I have no idea.

19     Q      Do you know anything about his professional

20 credentials other than what you've read in Exhibit No. 3?

21     A      No.

22     Q      Have you ever read ATF's youth crime gun

23 interdiction reports?

24     A      Yes.

25     Q      Do you know if Mr. Vince was involved at all in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                80

1    those publications?

2        A    No.

3        Q    Or involved in that work?

4        A    No.

5        Q    Or -- or do you consider those reliable

6    research pieces on youth crime, guns?

7        A    It's deeply flawed information.

8        Q    Why do you say that?

9        A    It -- it's heavily based on trace data, and the

10   trace data, in turn, concern samples of crime guns that

11   are not representative of crime guns in general that have

12   been basically selected samples.  People have used that

13   report to draw conclusions as if they were representative

14   of crime guns in general.

15       Q    Have you ever used the youth crime gun

16   interdiction reports for any purposes in your research?

17       A    Yes.

18       Q    What have you used them for?

19       A    I used them in a study of gun trafficking, and

20   I took gun trace indicators of trafficking as measures of

21   the possible levels of trafficking in a set of cities,

22   the YCGII cities.

23       Q    So there -- there's at least some valid uses of

24   gun trace data in conducting criminology research;

25   correct?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

81

1      A     Actually, I -- I took a -- a nuanced position

2   on that in -- in the study.  I said:  Here's the results.

3           If you believe the YCGII data are valid, here

4   is what the results say.  They say that gun trafficking

5   is unimportant in supplying guns to criminals and has

6   little impact on crime rates.

7           On the other hand, I also said there's strong

8   reason to doubt that they're valid, in which case they

9   shouldn't have been used either by me or anyone else as

10  reflecting the prevalence of gun trafficking.

11     Q     You thought it was, at least, worthwhile to

12  publish results based on that data with that caveat;

13  correct?

14     A     Yes.

15     Q     And which paper was that?

16     A     (Views document.)

17          That is the one on page 6 of my vita in the

18  appendix to the rebuttal report:  2009, the article

19  with Shun-Yang Wang, The Myth of Big-Time Gun

20  Trafficking published in the UCLA Law Review.

21     Q     Now, the UCLA Law Review is that a

22  peer-reviewed publication?

23     A     No, I don't think law reviews are typically

24  considered typically peer-reviewed.  I -- I can't say

25  that that article was not peer-reviewed because I'm not



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

82

1    familiar with the internal review processes, but normally

2    law reviews are basically edited by kids in law school

3    so...

4         Q    I've edited one of those journals.

5         A    Yeah.

6         Q    Does that give you any confidence?

7         A    Absolutely.

8         Q    Now, you actually include that listing under

9    the heading:  "Articles in Peer-reviewed Journals" in

10   your r'sum'; correct?

11        A    Yeah, that's probably an exaggeration.  I

12   didn't really know for sure it was refereed.  It could

13   have been refereed.  The problem is:  You can have the

14   paper being sent out to referees, or reviewers, and even

15   if it's not a standard part of the -- of the reviewing

16   process at the journal.  So I can't really be sure one

17   way or another.

18        Q    You couldn't rule it out, so you included it

19   under peer-reviewed journals?

20        A    Yeah, in this case.

21        Q    So have you ever used anecdotal or experiential

22   information to draw conclusions about the relationship

23   between firearms and crime?

24        A    Could you repeat the question?  I didn't hear

25   that.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1        Q      Yep.  Have you ever used anecdotal or

2    experiential -- experiential information to draw

3    conclusions about the relationship between firearm crime

4    or firearms and suicides or firearms and accidents?

5        A      I have never relied on that kind of evidence in

6    drawing a conclusion.

7        Q      What about using anecdotal or experiential

8    information to draw conclusions about the burden of gun

9    laws on the use of firearms for self-defense?

10       A      No.

11       Q      And why don't you rely on anecdotal or

12   experiential information?

13       A      Because anecdotes commonly pertain to selected

14   events or persons for which there's no formal basis to

15   believe that they are representative of a larger set of

16   persons or events.

17       Q      And is the same true for experiential

18   information?

19       A      What do you mean by experimential --

20   experiential?

21       Q      Just your experiences, personal experiences.

22       A      Oh, my personal experience.  No.

23       Q      Or not necessarily your personal experience,

24   but someone else's personal experience.

25       A      No.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                    October 28, 2011

84

1      Q     That's not scientific either; correct?

2      A     No, not by itself; although, when you

3   accumulate the experiences of many people who have been

4   carefully selected, using probability sampling

5   procedures, then it becomes scientific.

6      Q     But falling short of that, all anecdotal and

7   experiential information is unscientific; correct?

8      A     It's -- it's of limited -- it's of more limited

9   value.  Often what an anecdote account establishes is

10  that such and such a thing can occur because it has

11  occurred.  And so there's some value in that.

12          It's just not -- it doesn't establish that

13  that happens frequently or that's the typical way

14  things happen.  It simply establishes that if you

15  accept the accuracy of the anecdote, it did happen, at

16  least, once, which is not of no significance; it's just

17  not of great significance.

18     Q     All right.  You can't use anecdotal or

19  experiential information to infer causality, for

20  instance; correct?

21     A     That is correct.

22     Q     You need statistical analyses and sampling to

23  do that?

24     A     You would almost always have statistical

25  analysis, but as to sampling, not necessarily.  Sometimes



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      people will study full populations, so there is no

2      sample.

3          Q    Okay.  But you -- in order to test causality,

4      you need some measure of statistical analysis to do so;

5      correct?

6          A    If you don't have random assignment methods

7      combined with a very large sample size.  In a way, if you

8      had those advantages, it renders the need for statistical

9      controls unnecessary.

10         Q    Okay.  Let's go to page 2 of the report

11     under -- where you're talking about Mr. Vince's education

12     and experience.

13              Is it your opinion that Mr. Vince's

14     experience in law enforcement actually has no relevance

15     at all to the factual issues in this case?

16         A    I'm not aware of any relevance.

17         Q    So none of the issues in this litigation relate

18     to anything having to do with law enforcement?

19         A    I'm not aware of any expertise that -- or

20     experience that Mr. Vince has that bears on the

21     enforcement of Chicago gun laws.

22         Q    You understand that he does have experience

23     at -- at the ATF; correct?

24         A    Yes.

25         Q    And so I assume you would agree he has more



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

86

1    experience and knowledge about the operation of ATF than

2    you do; correct?

3         A    Yes.

4         Q    And he would have more information and

5    expertise in the ability of ATF to enforce gun laws than

6    you would; correct?

7         A    Federal gun laws.

8         Q    Yes.

9         A    Yes.

10        Q    Okay.  You mention, then, in the next sentence

11   on page 2 that he has never done any research on the

12   effects of firearms availability on crime, suicide or gun

13   accidents or the impact of gun control laws or firearms

14   storage practice on these forms of violence.

15             You aren't suggesting that Mr. Vince

16   suggested that he had expertise on any of those issues

17   in his report; correct?

18        A    He draws conclusions that don't make any sense

19   unless you're implying some kind of expertise; otherwise,

20   why would your opinions be regarded seriously?

21        Q    Well, Mr. Vince doesn't say that he has that

22   expertise in his report anywhere; correct?

23        A    No.  Does not directly say that.

24        Q    You can't point to me anywhere in his report

25   where he makes the assertion that he's done studies



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                                    October 28, 2011

87

1    relating to firearms availability on crime, suicide or --
2    or gun accidents; correct?
3         A    No, he just draws conclusions that don't make
4    any sense unless one had a knowledge of those bodies or
5    relevant information.
6         Q    Now, if you look down at the bottom of page 2,
7    the last -- well, the last clause on the -- we'll just go
8    to the last sentence on the bottom of page 2.  You say:
9    Use of the term "epidemic" -- well, actually why don't we
10   just go to the first part of that paragraph so we can do
11   it in context:
12            Mr. Vince asserts that firearms-related
13   violence "is a systemic and epidemic problem in the
14   City of Chicago."  And you go on to say:  He does not
15   explain what he means by "systemic" in this context,
16   and I'm not aware of any relevant commonly understood
17   meaning.
18            Do you not know what the term systemic means?
19        A    In this context, I have no idea what he means.
20        Q    Do you know what the word "systemic" means in
21   any context?
22        A    It could mean a lot of things in different
23   contexts.
24        Q    What could it mean in other contexts?
25        A    Well, for example, if you had a systemic



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

88

1    problem in the criminal justice system, you might say,

2    this is a problem that's attributable to the way the

3    criminal justice system is structured.  It is the system

4    that's the source of the problem.

5        Q    Could that be what Mr. Vince meant here by

6    systemic?

7        A    I have no idea what he meant.

8        Q    Use of the word?

9        A    I honestly have no idea.  I couldn't even

10   guess.

11       Q    The next sentence you say:  Use of the term

12   "epidemic" to describe a problem commonly implies that

13   the problem is spreading or becoming worse.  But Mr. --

14   but Vince offers -- proffers no evidence to indicate

15   upward trends in gun violence.

16            Is there anywhere in Mr. Vince's report where

17   he says there's an upward trend in gun violence in

18   Chicago?

19       A    I don't know.  I think he was just hinting at

20   it with the term "epidemic."

21       Q    And it's your -- it's your testimony that

22   epidemic means an increase in something?

23       A    It's my belief that that would be a common

24   layperson's understanding of the term.

25       Q    What's your understanding of the term?  I mean


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    you are not a common layperson.

2        A    That's also my understanding of the term as

3    well.

4        Q    That epidemic means something is increasing?

5        A    That is the common way it's used; that is, that

6    the problem is spreading or becoming worse.

7        Q    But Mr. Vince never said that it was getting

8    worse; correct?

9        A    No, that's the problem.  He seems to hint

10   things rather than stating them explicitly.  So it's kind

11   of hard to nail him down on some assertions.

12       Q    Now, Mr. Vince does say that the problem of gun

13   violence in Chicago is widespread; correct?

14       A    I don't recall if he said that.

15       Q    Well, let me ask it this way.

16            Do you agree that gun violence in Chicago is

17   widespread?

18       A    I would say it's a totally subjective matter as

19   to how widespread is widespread; but it's not a

20   subjective matter as to whether it's increasing or

21   decreasing.  It's not increasing.

22       Q    Do you have an opinion about whether it's

23   widespread in Chicago?

24       A    No.

25       Q    Would you consider the city of Chicago to be a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011
                                                          90
1    high crime area?

2         A    Yes.

3         Q    Why is that?

4         A    Because it has a higher homicide rate than the

5    national average, and the homicide rate is the most

6    accurately measured crime statistic we have.

7         Q    Do you know what the average homicide rate is

8    in the United States?

9         A    Currently it's probably on the order of five

10   homicides per hundred thousand.

11        Q    And do you know what the current homicide rate

12   is in Chicago or the last reported rates are?

13        A    (Views document.)

14             Substantially higher than that.  I can't

15   recall exactly how high, but I would -- I would guess

16   at least twice as high.

17        Q    Okay.  And we'll get to some -- I know that you

18   have some data in here relating to the homicide rate.  So

19   we'll get to those specifics a little bit later.

20             One of your criticisms of Mr. Vince, if you

21   go over to page 3, was that one of the figures that he

22   included in his report, Figure 9b, was poorly labeled?

23        A    (Views document.)

24             Yes.

25        Q    And that's because the axis along the bottom,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

91

1    at least, have numbers instead of years; correct?

2        A    Well, it's unclear exactly what they are.  He

3    simply doesn't label them, but I had to guess what they

4    meant.  I think his horizontal axis refers to years.

5        Q    Now, did you ever look at the Chicago Police

6    Department data that he's including into that Figure 9b?

7        A    I believe I did.

8        Q    What -- what did you do to look at that?

9        A    I don't understand the question.  I --

10       Q    Yeah.

11       A    I read the report.

12       Q    Oh, you read the report?

13       A    Yeah.  I --

14       Q    Did you see that figure in the report?

15       A    I don't recall seeing that version of this

16   exhibit, of Exhibit 9b in the Chicago reports.  I've seen

17   the Chicago homicide, the annual Chicago homicide

18   reports.

19       Q    Did you review that in connection with your

20   work in this case?

21       A    Yes.

22       Q    When did you review that?

23       A    Several months back, I think.

24       Q    Okay.  This was prior to the time that you

25   issued your rebuttal report in this case?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

92

1       A     That's correct.

2       Q     And that's why you looked at that report,

3   again, is for issuing a rebuttal report in this case?

4       A     Well, I'm not sure I was thinking about writing

5   the rebuttal report at that point.  I think they were

6   just materials supplied to me by the attorneys.

7       Q     Oh, okay.  I see.  And this -- this was

8   material that you reviewed in connection with your work

9   in this matter generally?

10      A     Yes.

11      Q     Not specifically for your rebuttal report?

12      A     Correct.

13      Q     So when you got Mr. Vince's rebuttal report,

14  did you go back to the CPD data to try to determine where

15  he got that figure from?

16      A     No.

17      Q     Do you know if the figure that's in Mr. Vince's

18  report has the same labels in the Chicago Police

19  Department report that it does in his report?

20      A     No, I don't know one way or the other.

21            MR. WOODS:  All right.  Why don't we take

22        another break to change the tape.

23            THE VIDEOGRAPHER:  Off the record, please.

24            (Brief recess was taken.)

25            THE VIDEOGRAPHER:  We're back on the record.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

93

1       It's 11:17.  This is tape No. 3.

2    BY MR. WOODS:

3       Q    Okay.  Good morning.  Dr. Kleck, are there any

4    answers that you'd like to change?

5       A    No.

6       Q    One question that my colleague wanted me to ask

7    you about back in our statistics discussion, if you add

8    more variables to a regression equation but keep the

9    number of observations constant, does that erode the

10   power of the analysis?

11      A    It could make your estimates more imprecise to

12   the extent that the additional variables you added into

13   the analysis were correlated with the variables you

14   already had in the analysis.

15      Q    Okay.  And that would mean that your confidence

16   interval would be wider?

17      A    Yes, if they were correlated.

18      Q    Right.  And it would be -- assuming those

19   facts, it would be harder to determine whether an

20   association was statistically significant or not?

21      A    It would have that issue, but it would also

22   have the advantage that the association is less likely to

23   be confounded by the failure to control those variables.

24           So ordinarily, it's not a confounder unless

25   it was correlated with the independent variables you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

94

1   already had in the analysis.  So you're introducing it

2   for the sake of reducing confounding.  So you get that

3   advantage, but you have generally a much less important

4   disadvantage of increasing collinearity and thus the

5   imprecision of the estimates.

6       Q    It makes it harder to observe a true

7   association if it really exists?

8       A    No, it -- it makes it more likely you'll get at

9   the true association because now you're controlling for

10  confounding variables.

11      Q    And also --

12      A    But the estimate of that truer association is

13  more imprecise to the extent that those additional

14  variables are correlated.

15      Q    And because it's more imprecise, it makes it

16  harder to observe the existence of the association?

17      A    I would say it makes it harder to rule out

18  random chance as accounting for that association.

19      Q    Okay.  Another thing you mentioned before the

20  break was that homicide rates are correlated with crime

21  rates?

22      A    Yes.

23      Q    Is that true in -- is that a generalizable

24  statement applicable in -- in every jurisdiction in the

25  U.S.?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

95

1      A    Yes.

2      Q    Why is that?

3      A    Well, partly, it's an artifact of the fact that

4   homicide is a subset of crime, obviously.  So there's

5   bound to be a correlation for that reason alone.  But

6   it's also because they share common causes.  Many of the

7   causes of an assault or robbery or sexual assault would

8   also be causes of homicide.

9      Q    Now, we were talking before the break about the

10  Chicago Police Department data that Mr. Vince had

11  included in his report at Figure 9.

12          Did you reference anywhere in Exhibit B to

13  your report that you have reviewed or relied on that

14  data in connection with your rebuttal opinions?

15     A    (Views document.)

16          No.

17     Q    So is that an oversight or are you just saying

18  you didn't review that in connection with --

19     A    It's an oversight.  It was just such a minor

20  point that it's --

21     Q    Okay.  Is there any --

22     A    None of my important conclusions relied on it,

23  and so yes, I -- I consulted the Chicago homicide

24  reports.

25     Q    All right.  Is there any other data that you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

96

1    consulted that's not included in Exhibit B in connection

2    about your rebuttal report?

3         A    Not that I can think of at that -- at this

4    moment.

5         Q    Okay.  If you look on -- can you turn to page 3

6    of your expert report?

7         A    (Views document.)

8         Q    Under -- under Section B, it says:  Chicago's

9    Firearms-Storage Restrictions and the Use of Firearms for

10   Self-Defense.

11         Now, if you go down to the second paragraph,

12   if you look at the second sentence there, you say:  He

13   notes -- meaning Mr. Vince notes -- that officers face

14   more danger than the average civilian, but fails to

15   note that civilians are no more able to anticipate

16   attacks and other criminal threats than police

17   officers.

18         The first part of that clause, do you agree

19   that officers face more danger than average civilians?

20        A    Yes.

21        Q    And you -- is that something that Mr. Vince

22   would be qualified to opine on, given his law enforcement

23   activities?

24        A    I couldn't say.  Merely being a police officer

25   wouldn't really establish that, since it's, obviously, a



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

97

1    comparison between two groups of people.  If you had

2    consulted the statistics on homicides and assaults for

3    civilians as well as police and compared them, you -- you

4    would have some expertise, but law enforcement experience

5    alone wouldn't allow you to make an intelligent assertion

6    on that point.

7         Q    You say in the first sentence there that:

8    Vince cites the firearms handling and storage practices

9    of law enforcement officers but fails to note that none

10   of his sources indicate that officers maintain their guns

11   in a locked status while they are on-duty and thus at

12   risk of being attacked.

13        Are you aware of how law enforcement officers

14   generally keep their second and third or fourth --

15   fourth weapons while they're on duty?

16        A    No.

17        Q    Do you know if they keep them locked or secured

18   in any way?

19        A    No.

20        Q    For instance, officers who are in cruisers

21   sometimes have shotguns that they have with them;

22   correct?

23        A    Yes.  I think that statement was intended to

24   refer to their primary sidearm.

25        Q    Oh, okay.  So it's your opinion that none of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

98

```
 1    the sources indicate where the -- whether the primary

 2    side -- that the primary sidearm they have is even

 3    locked.

 4         A    Correct.

 5         Q    The Chicago gun ordinance doesn't require the

 6    primary gun used for self-defense to be in a locked and

 7    -- and unusable condition; correct?

 8         A    Correct.

 9         Q    Have you ever studied the gun-carrying

10    practices of law enforcement officers?

11         A    No.

12         Q    Do you think that's something that Mr. Vince

13    has expertise in?

14         A    I don't know one way or the other.

15         Q    Have you ever read a study by someone else

16    discussing the gun-carrying practices of law enforcement

17    officers?

18         A    Yes, probably.

19         Q    Do you recall what that was?

20         A    There's a couple of FBI reports, one of which

21    is called, I think In the Line of Duty, and there was a

22    report by a Washington, D.C. based law enforcement

23    entity.

24              It was like -- I don't recall the name of it,

25    but they did an overview of everything that was known
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

99

1    about police use of force on duty, and that probably

2    had a section on carrying practices.  And I read that

3    report.

4        Q    Now, is that report cited as material that you

5    reviewed or relied on in connection with your report?

6        A    No, I did not rely on that for any of the

7    conclusions in here.

8        Q    And you are not relying on it now; is that

9    correct?

10       A    That's correct.

11       Q    Can you turn over to page 4 of your report for

12   a second.  We are going to skip around just a little bit.

13   I apologize.

14            If you go in the paragraph that starts:

15   Vince asserts, (p.13) that law enforcement officers; do

16   you see that paragraph?

17       A    Yes.

18       Q    And then we're going to have to go down, maybe

19   two-thirds of the paragraph, there's a sentence that

20   start -- that starts:  It is a cumbersome but required

21   condition of police work that they always carry a gun?

22       A    Yes, I see that.

23       Q    Actually, I'll read the sentence before that

24   too:  Police officers usually do not need more than one

25   operable gun because while on duty they always carry that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

100

1    one gun on their person, and thus it is always

2    immediately available for use.  It is a cumbersome but

3    required condition of police work that they always carry

4    a gun.

5            Now, what do you mean by cumbersome there?

6        A    Cumbersome because you have a heavy object that

7    requires moving about with this object in your way and

8    meaning that you have to have that additional weight

9    carried around with you.

10       Q    Are you aware of whether law enforcement

11   officers find it cumbersome?

12       A    I have no knowledge one way or the other.

13       Q    So that statement is based on your own personal

14   experience?

15       A    Yes, you would say common sense, I guess.

16       Q    Anecdotal experience?

17       A    No, I wouldn't say it's anecdotal because it's

18   not based on individual persons or events.  It's just an

19   understanding of the world at large, which could

20   encompass lots of people.

21       Q    Well, it's based on your experience; right?

22       A    Not my personal experience, no, my knowledge of

23   the larger world.

24       Q    Okay.  Did -- and did you survey in the larger

25   world to find out if they find carrying a sidearm



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

101

1    cumbersome?

2         A     No.

3         Q     So I'm trying to understand; how do you know

4    that other people think it is cumbersome to carry a

5    sidearm on person?

6         A     I would have regarded it as self-evident.

7         Q     Based on your own personal experience?

8         A     Well, I guess that would have a minor role in

9    my thinking about it.  But I also think I'm not different

10   from other people in seeing it to be more cumbersome to

11   be toting an object around than not toting an object

12   around.

13        Q     You have not tested your assumptions

14   scientifically; correct?

15        A     No.

16        Q     And exactly what makes it cumbersome, just the

17   weight of it and the size of it?

18        A     Yes, yes.

19        Q     Now, in your home, the guns that you carry, do

20   you -- or the guns that you have in your home, do you

21   ever carry it around on your person while you are at

22   home?

23        A     No, except, in, you know, cases where I'm

24   taking it somewhere to clean it.  Like, I like -- I

25   usually clean it outside in the garage or in the -- on



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

1    the back porch.

2         Q    Do you consider those guns that you have in

3    your home to be guns that you would use for self-defense

4    at all?

5         A    Conceivably, yes.

6         Q    And are they kept in an operable condition?  Is

7    one of those guns kept in an operable condition at all

8    times?

9         A    No.  They have trigger locks on them.

10        Q    Are they kept near you at all times, one of

11   them, at least?

12        A    No.

13        Q    If you'll go back to page 4 of your expert

14   report, this would be the third sentence down, that same

15   paragraph that starts:  Vince asserts, (p 13).

16             It says:  Further, many officers carry a

17   small back-up gun on their person in addition to their

18   standard service weapon; do you see that?

19        A    Yes.

20        Q    What is your basis for saying that that is a

21   practice of many officers?

22        A    I believe I got it from the Chicago Police

23   Department 2007 citation:  Uniform and Property U07-02,

24   Department-Approved Weapons and Ammunition, Effective

25   July 24th, 2007.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

103

1      Q      And how does that lead to that conclusion?

2      A      As I recall, it described the carry practices

3   that were required by the Chicago Police Department.

4      Q      So do you know if, given those carry practices,

5   that police officers, in fact, do carry two weapons?

6      A      I don't recall if it said they do.  It said

7   they could --

8      Q      Okay.

9      A      -- or they were permitted to do so.

10     Q      So is it your assumption that just because they

11   could that they do, that many of them do?

12     A      I assume, yes, many of them do, that they take

13   advantage of that.

14     Q      And why do you believe that they take advantage

15   of that?

16     A      Again, I would suspect, but not know from

17   personal knowledge, that they believe that they might be

18   disarmed of one of those weapons; and they'd like to have

19   another weapon available to them.

20     Q      Do you have any basis for believing that

21   Chicago -- many Chicago police officers think that?

22     A      No, other than what I've inferred from the

23   reports I mentioned before, like that review of police

24   use of force and the -- the two FBI reports that

25   concerned...



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

104

1      Q     Does that mean it's your position that when

2   someone is permitted to do something, that they typically

3   do or many people do take advantage of that?

4      A     It would be a combination of being allowed to

5   do that by departmental regulations, plus having a strong

6   motive to do so.

7      Q     But you don't know how many officers actually

8   take advantage of that; correct?

9      A     No, I do not.

10     Q     I assume since you use trigger locks on your

11  gun, that you would agree that they do have a safety

12  benefit?

13     A     Yes.

14     Q     And that's pretty much undisputed?

15     A     No, I -- I'd say almost any assertion you make

16  in the gun area has been disputed by somebody.  It's not

17  disputed by me but...

18     Q     Okay.  So, for instance, Mr. Vince references

19  that confiscated guns are secured with safety locks;

20  right?

21     A     Are you asking did he say that?

22     Q     Something -- he said that guns that are

23  confiscated in crimes are secured with some kind of

24  safety lock or trigger lock to prevent --

25     A     I think he did say something like that, yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1     Q     And do you know why that is?

2     A     No, I -- I don't know what the motives of

3  police departments that do that are.  I could guess, but

4  I -- I don't have any documentary evidence on it.

5     Q     I mean, you would -- what -- what would be your

6  guess; it would be for safety purposes, to prevent

7  unauthorized use?

8     A     It -- it -- yes, it provides some assurance

9  against somebody firing the guns who didn't have a -- a

10 key to the lock.  That certainly would be part of it.

11    Q     And is that a similar reason to why retailers

12 put safety locks on guns that they have on display?

13    A     Very likely.

14    Q     And that's because they -- they actually do

15 prevent unauthorized use; correct?

16    A     It's because they make a -- they seem a

17 sensible step to take in order to prevent unauthorized

18 use.

19    Q     Now, do you know -- you're familiar with the

20 organization NSSF?

21    A     Yes.

22    Q     What is that?

23    A     It's a -- it's a foundation advancing the

24 interests of the gun industry, National Shooting Sports

25 Foundation, I think is what that stands for.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

106

1     Q     And Mr. Vince references one of their

2   publications in his report?

3     A     Yes.

4     Q     And you're aware that NSSF recommends actually

5   giving away trigger locks with guns; correct?

6     A     Yes.  I think they did at one time, anyway.

7     Q     Do you know why they do that?

8     A     I think their motive might have been political,

9   basically, you know.

10    Q     Do you think there was a --

11    A     It was a public relations thing.

12    Q     That could be, obviously.  Do you think that

13  one reason they did it is to promote safety in connection

14  with guns?

15    A     That's possible.

16    Q     And that's because they believe that trigger

17  locks actually are effective in securing guns and using

18  them more safely; correct?

19    A     Yes, very likely.

20    Q     I mean, you have no reason to believe that

21  NSF -- SSF would recommend a safety device be used with a

22  gun that actually didn't work for its intended purpose?

23    A     Where the device didn't work?

24    Q     Yeah.

25    A     No, I don't think they would do that.  I think,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

1    rather, they would -- they would have many motives for

2    adopting this policy, one of might -- which might be a

3    sincere belief that this was an effective way of

4    preventing unauthorized use of guns.

5            Another motive of which might be good public

6    relations for the gun industry.

7        Q    Right.  Now, on page 4 of the report, if you

8    want to flip back, first bold paragraph, you say:

9    Mr. Vince also cites the opinions of store clerks as to

10   the merits of locking devices sold in their stores.  He

11   shows no awareness of the possibility that store

12   employees might have a vested interest in overstating the

13   virtues of the products they sell; do you see that?

14       A    Yes.

15       Q    And so do you believe that the store clerks'

16   opinions are tainted by their own self-interest in this

17   regard?

18       A    Yes.

19       Q    Okay.  Do you think the gun industry has an

20   interest in portraying gun possession as having a net

21   safety benefit?

22       A    Yes.

23       Q    Do gun manufacturers, retailers, and those

24   portraying or purporting to represent their interests

25   have an interest in suggesting that customers who have a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                              108

1    gun buy a second gun or a third gun?

2        A    Yes.

3        Q    Are you aware of any person or entity in the

4    gun industry who asserts that the use of a trigger lock

5    or other safety mechanism impairs defensive gun use?

6        A    I'm not aware one way or another on that issue.

7        Q    And the same would be true for anyone outside

8    the gun industry?

9        A    Well, actually, could you ask the original

10   question again?

11       Q    Sure.  We'll have her read it back.

12            Two questions ago.

13            (The record was read by the reporter.)

14       A    In that case, the answer to your last question

15   would be yes --

16   BY MR. WOODS:

17       Q    Who --

18       A    -- for persons outside of the gun industry,

19   undoubtedly, there have been many people who have

20   asserted this.

21       Q    And who are -- do you know who they are?

22       A    I wouldn't be able to identify individuals,

23   only it would be a commonplace assertion.

24       Q    Okay.

25       A    Virtually anything that secures the gun,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    somebody has argued that it impairs its usefulness for

2    self-defense.

3         Q    Are you taking the position that the use of

4    trigger locks does impair the ability to use that gun in

5    self-defense?

6         A    Yes.

7         Q    Do trigger locks deter theft at all?

8         A    We don't know for sure.  It seems reasonable

9    that it does that.  It depends on the extent to which

10   thieves are aware of how hard it is to get a trigger lock

11   off of a gun you've stolen.

12        Q    Is it hard to get a trigger lock off a gun

13   you've stolen?

14        A    Yes, very hard.

15        Q    And how do you know that?

16        A    Just because I'm familiar with the

17   construction.  It's really hard steel.  It's curved.  You

18   can't easily get a hacksaw blade on it.  There's no angle

19   by which you can cut it so as to remove it.

20             So, in fact, I've never even heard of a

21   criminal successfully getting a trigger lock off.

22        Q    That was going to be my next question.

23             Okay.  So just common sense would tell you

24   that a trigger lock would deter theft?

25        A    Probably.  Again, with the qualifier to the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    extent criminals are aware of that or think about it.

2    The problem being criminals often don't think much into

3    the future, and they often are not very knowledgeable

4    about a wide variety of things so.

5         Q    But even if -- even if the criminals aren't

6    aware of the problem with getting the trigger lock off,

7    the fact that it has a trigger lock on it would prevent

8    the gun from being used in the future if it was stolen in

9    a criminal enterprise or -- or as a crime gun; correct?

10        A    Correct.  Well -- well, let me -- let me

11   qualify it.  I don't know if this is an important

12   qualifier.  Even an inoperable gun can be used in a

13   threat.

14            So if you concealed the fact that there was a

15   trigger lock on it by holding your hand over it, I

16   suppose it could be used in a criminal threat.  And

17   most gun crimes are threats so...

18        Q    How big are the trigger locks that are on the

19   gun?

20        A    Oh, when it's in position, it's probably about

21   2 to 3 inches wide.  Like if you were the crime victim

22   looking at a person holding the gun --

23        Q    That was kind of my question.

24        A    -- it would be about 2 to 3 inches wide.

25        Q    Could you see the trigger lock from 10 feet?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

111

1      A      If the criminal was concealing, was holding his

2    hand in front of it, no, you wouldn't.  So it's small

3    enough that a person who was thinking in those terms

4    could easily conceal it.

5      Q      Are you aware of any study indicating that

6    trigger locks do not prevent accidental or impulsive

7    discharge?

8      A      No, I'm not aware of any study of that sort.

9      Q      Are you aware of any study that demonstrates

10   the use of a trigger lock prevents effective defensive

11   gun use?

12     A      No, I don't think the -- the topic has ever

13   been studied.

14     Q      Now, if you go to page 4 again, in your expert

15   report, the last sentence of the first paragraph on the

16   page there, it says:  In sum, the half paragraph, the

17   carryover paragraph:  In sum, do you see that?

18     A      Yes.

19     Q      In sum, none of the evidence Vince presents

20   contradicts the hypothesis that requiring a gun to be

21   secured by a locking device will sometimes prevent

22   effective defensive gun use.

23            You agree that that's just a hypothesis?

24     A      Well, I wouldn't say just a hypothesis.  It's a

25   highly plausible hypothesis.  Some hypotheses have more



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                    October 28, 2011

112

1    plausibility than others.

2            And in this case, I'm relying on the

3    commonsensical notion that you can't have a way of

4    securing a gun that secures unauthorized use, which

5    doesn't also make it harder to have authorized use of

6    the gun.

7            None of the locking devices, none of the

8    devices for securing guns, that I'm aware of, can

9    effectively prevent unauthorized access without, at

10   least, to some degree impairing authorized access.

11       Q    But you would agree that even under the

12   assumption that it does impair authorized access, it

13   impairs unauthorized access a lot more than it impairs

14   authorized access; correct?

15       A    Correct.

16       Q    And that hypothesis has never been tested in

17   any scientific manner; correct?

18       A    No, not that I can think of right now.

19       Q    But you -- you still believe that that

20   conclusion --

21       A    Yes.

22       Q    Yeah, I was not quite done.

23       A    Sorry.

24       Q    You still believe that the conclusion that

25   requiring a gun to be secured by a locking device will



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                      October 28, 2011

113

1    sometimes prevent effective defensive gun use of the gun

2    is a scientifically reliable conclusion, even though

3    there's been no study to substantiate it; is that your

4    opinion?

5        A    No, I didn't say anything about it being

6    scientifically reliable.  I'm relying on common sense

7    here.

8        Q    Okay.  But it hasn't been scientifically

9    established; you just think as a matter of common sense,

10   it makes sense?

11       A    That's correct.

12       Q    Now, in the sentence before that, it says:

13            When a person's pulse rate and blood pressure

14   are elevated and his hands are shaking, this surely

15   affects the person's ability to disengage a locking

16   device.

17            Now, is your basis for that sentence just

18   common sense as well?

19       A    Yes.

20       Q    No study that has established that; correct?

21       A    Correct.

22       Q    Have you ever tried to remove a locking device

23   under those kind of conditions --

24       A    No.

25       Q    -- when your pulse rate was high or blood



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

                                                                    114

1    pressure was high?

2         A    No.

3         Q    Would the presence of a high pulse rate and

4    blood pressure and hand shaking also affect the judgment

5    of the person who is trying to unlock the locking device?

6         A    It might.

7         Q    Would it affect the accuracy with which the

8    person can wield the gun or use the gun?

9         A    Yes.

10        Q    Could it also lead to inappropriate misuse of

11   the gun, the fact that the person's pulse rate and blood

12   pressure are high, his hands are shaking, and he's

13   obviously very excited?

14        A    What kind of misuse are you talking about?

15        Q    Let's say accidental shooting of a person who

16   doesn't actually present a threat to the person.

17        A    It's possible.

18        Q    Okay.  Are you aware of any study or evidence

19   that indicates that there is a defensive benefit to

20   having more than one operable gun per Chicago firearms

21   permit holder in the home?

22        A    To my knowledge, no one has ever studied that

23   subject.

24        Q    And so we can't assess the scientific validity

25   of that statement; correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

115

1       A    Correct.

2       Q    All we can do is come up with a hypothesis

3   based on experience and anecdotes; correct?

4       A    Or what I would say is common sense, which is

5   more than anecdotal; it could be a lifetime of experience

6   involving many people, many situations.  So it's the

7   accumulation of a lot of experience.

8       Q    But the only experience you have is your

9   experience; right?

10      A    Well, my experience of what other people have

11  experienced too. I have secondhand knowledge of other

12  people's experiences as well.

13      Q    Based on what they've told you?

14      A    Yeah.

15      Q    Have you -- has anyone ever told you that

16  there's a defensive benefit to having more than one

17  operable gun in their home?

18      A    Actually, yes, when I was in college, I -- I

19  knew a guy who -- his family kept guns all over the house

20  for that very reason.  They had a gun here, there and

21  everywhere throughout their household.

22      Q    Do you think that was a safe way to store guns

23  in their home?

24      A    We never got into the details of how he was

25  storing it, if he had a trigger lock on each and every



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

116

1   one, then, yeah, it probably was pretty safe.  But on the

2   other hand, it would have been less useful for the

3   intended purpose of self-defense because it would have

4   taken longer to get to it.

5         Q    All right.  You wouldn't do that in your home,

6   have guns all over the home?

7         A    No, I live in a very safe neighborhood.

8   There's virtually no serious crime.

9         Q    Yeah, why wouldn't you do it?

10        A    Because there's a very little threat.

11        Q    Okay.  Have you ever performed a test to see

12  how quickly you can remove a trigger lock from a gun?

13        A    I believe I have, but I've never written up any

14  report on that.  So I couldn't really recollect what my

15  results were.

16        Q    Do you -- you've reviewed the results of the

17  studies --

18        A    I mean, I've -- let me revise that answer a

19  little bit.

20             I've obviously removed a trigger lock many

21  times, so I have that foundation for judging how long

22  it takes.  But, you know, 99.9 percent of those times I

23  wasn't timing myself on it.

24        Q    Do you have a sense for how long it takes to

25  remove a trigger lock?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011
                                                          117

1       A    Well, you know, if you're not stressed and, you

2    know, you're under calm conditions, probably under --

3    from the time you already have the key to the time the

4    gun is operable, probably about five seconds.  Again,

5    assuming calm conditions.

6       Q    Right.

7       A    But you also had to retrieve the key and so

8    that's a highly variable element.  It will depend on

9    things like how close to the gun did you keep the key?

10   If you keep it too close, it doesn't have much value in

11   securing it because an unauthorized user might find the

12   key.

13            On the other hand, if you increase safety by

14   putting the key in a remote location, then that's part

15   of the time that it will take to disengage the trigger

16   lock.  You have to retrieve the key, get back to the

17   gun location and then take those five seconds to

18   disengage the trigger lock.

19      Q    And if you have the key on your person, then

20   it's always with you whenever you want to use it to

21   unlock the trigger; right?

22      A    If you did.  I can't imagine a lot of people

23   sleep with a key, for example, but...

24      Q    They might have pockets on their pajamas?

25      A    I suppose.  I suppose.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    Q    You could put the key around -- on a chain
2    around your check?
3    A    You might.
4    Q    If you were very concerned about being able to
5    get the trigger lock on --
6    A    You might.
7    Q    -- off, you could certainly do that; correct?
8    A    Yeah.
9    Q    Nothing illegal about doing that for sure?
10   A    To my knowledge, no.
11   Q    Do you -- do you quibble with the results of
12   Mr. Vince's test for the conditions under which he
13   tested?
14   A    Yes.  I more than quibble with it.  I think
15   it's totally unrealistic.  It's irrelevant to the issues
16   at hand.
17   Q    Yeah, now, maybe I should reask the question,
18   which is for the conditions that he tested under, do you
19   disagree with the results that he got?
20   A    Well, I have no opinion on that.  I...
21   Q    Okay.  I mean, the numbers that he -- how long
22   he says it takes to remove the locks, that's not wildly
23   inconsistent with what you just told me; correct?
24   A    No, it's not wildly inconsistent under those
25   conditions.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

119

1      Q    Are you aware of anyone else who has performed

2    tests to see how fast trigger locks can be removed from

3    guns other than what you've seen in Mr. Vince's report?

4      A    I can't recall any specific instances, no.

5    Very likely they have been done.  It's kind of an obvious

6    topic, but I can't recall any specific instances and

7    certainly didn't rely on any in my opinions.

8      Q    Now, if you go to the bottom of page 3 and it's

9    carryover to page 4 of your report, Exhibit 1.  It says:

10   A well-lighted sporting goods store does not simulate the

11   conditions of darkness that prevail during many crimes.

12   A couple of questions about that part of the sentence.

13         One is, is it your understanding that

14   Mr. Vince conducted his test in a well-lighted sporting

15   goods store?

16     A    Yes.

17     Q    Do you know -- your second statement there was

18   that:  Conditions of darkness prevail during many crimes?

19     A    Yes.

20     Q    What's your basis for saying that?

21     A    We have data on the times that crimes occur.

22         And, of course, you can infer the lack of

23   sunlight as one source of light from the times.  So

24   lots of crimes are committed at night and, therefore,

25   there's no sunlight.  We can also infer it from the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

120

1    fact that lots of crimes are committed while victims

2    are sleeping and people ordinarily would sleep under

3    conditions of darkness.

4          Q    But it could also be light inside the home --

5          A    Might.

6          Q    -- because people have lights in their homes;

7    correct?

8          A    Might be.

9          Q    You would agree with me that darkness could

10   also affect how quickly someone could retrieve a gun from

11   a biometric safe too?

12         A    Yes.

13         Q    And it could also affect how long it takes to

14   retrieve a gun from a hiding place in the home?

15         A    Yes.

16         Q    Do you know of any study that has looked at the

17   effect of darkness on retrieving a gun to use in

18   self-defense?

19         A    No.

20         Q    Can training reduce the physiological

21   impairments from the stress that you mention here, the

22   effects they have on the ability to disengage a locking

23   device?

24         A    I think it could.

25         Q    Do -- have you engaged in any training to try



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

 1   to maximize your ability to remove a trigger lock quickly

 2   on your guns?

 3        A    No.

 4        Q    Is there any reason why you haven't?

 5        A    Didn't see the need.

 6        Q    You agree that an unauthorized user can't use a

 7   trigger-locked gun; correct?

 8        A    It's virtually impossible.

 9        Q    Unless they have the key on themselves or -- or

10   they know the combination.

11        A    Now, are you -- you're asking about

12   unauthorized users?

13        Q    Yes.

14        A    Okay.  Or unless they went to -- went to

15   extraordinary efforts to remove the lock forcibly.  I

16   mean, I can envision using an acetylene torch, for

17   example, not that I know of any real world instances,

18   but, you know, it's hypothetically possible.

19        Q    You would agree that there's a difference in

20   the amount of training that officers receive, law

21   enforcement officers receive, in firearms handling; is

22   that correct?

23        A    Yes.  Well, difference between them and

24   civilians you're asking about?

25        Q    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

122

1      A    Yes.

2      Q    Now, back on page 3, you mentioned -- I'll

3  direct you to where it is.

4           This is back on the first paragraph, the

5  second sentence where after you said:  He notes that

6  officers face more danger than average civilians.  Then

7  you go on to say:  But fails to note that civilians are

8  no more able to anticipate attacks and other criminal

9  threats than police officers.

10     A    (Views document.)

11     Q    What's your basis for that statement?

12     A    The basis is that criminal attacks and other

13  criminal threats would be initiated by a person other

14  than the victim, so it would be -- the criminal would

15  determine the time and place of the -- the attack or

16  threat.

17     Q    You're not saying that civilians couldn't

18  anticipate at all attacks; right, or threats?

19     A    No, I'm just saying they wouldn't have any more

20  ability to do that than police officers.

21     Q    And is that just based on your common sense?

22     A    It's based on the fact that what I just

23  described is the same for civilians and police officers,

24  that in both cases, the time and place of the attack or

25  threat is determined by the offender.  And, thus, short



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

123

1    of, you know, some knowledge of the mental intentions of

2    the offender, neither a civilian nor a police officer

3    would be able to anticipate the attack or threat.

4         Q    It depends on the circumstance as to whether

5    the civilian is able to anticipate or not; correct?

6         A    Yes.  There -- there might be other cues that

7    would tip off either a civilian or a police officer that

8    an attack is imminent.

9         Q    This statement isn't based on any study,

10   though; it's based on your just logic and reasoning?

11        A    Yes.

12        Q    Now, you say in the next sentence:  Not knowing

13   when a threat will arise, civilians must have their guns

14   ready for use much or all the time just as on-duty police

15   officers keep their duty weapons operable, loaded, and

16   ready for immediate use.

17             Chicago gun ordinances allows someone to

18   have -- allows a Chicago permit holder to have a gun

19   ready for use at all times; correct?

20        A    That's correct.

21        Q    So let's go now to page 4 of your report, and I

22   want to ask you about paragraph -- 2nd full paragraph,

23   again, the bottom, towards the bottom.

24        A    (Views document.)

25        Q    Where it says -- well, the sentence starts:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

124

1          They can only use a gun for protection in

2    their home if one is located near enough to them at the

3    time a crime occurs that they can retrieve the gun in a

4    timely fashion.

5          Now, how near does the gun have to be for

6    them to retrieve it in a timely fashion?

7       A    There would be no definite cutoff; the nearer

8    it is, the better.

9       Q    And how do you define timely fashion?

10      A    Quicker.

11      Q    So is there a cutoff as to what -- when

12   something is timely or not?

13      A    No.

14      Q    And it's possible that someone could be

15   attacked and it wouldn't matter if they had a gun or not

16   because they didn't have time to respond at all?

17      A    Under some circumstances, yes.  Under other

18   circumstances, unfortunately, they -- they would have a

19   very brief opportunity to retrieve the gun and be able to

20   use it effectively.

21      Q    Now, in the sentence before, it says:  In

22   contrast, civilians in their homes do not ordinarily

23   carry their guns on their purpose -- person as they move

24   from room to room; what is your basis for your statements

25   about the carrying practices of civilians?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

125

1      A      Again, just common sense, common knowledge.

2      Q      You have not studied that topic?

3      A      I have not studied that or relied on any

4   published...

5      Q      You don't do that.  You don't carry a gun from

6   room to room?

7      A      That's correct.

8      Q      That's your experience?

9      A      That's correct.

10     Q      It makes sense that other people wouldn't do it

11   either?

12     A      That's correct.

13     Q      Are you aware of anyone who has studied the

14   carrying practices of civilians in their homes?

15     A      No.

16     Q      Would it be cumbersome for a -- for a civilian

17   to carry his gun with him from room to room?

18     A      Yes, I believe it would.

19     Q      And that is based on the same analysis that we

20   talked about with police officers?

21     A      Correct.

22     Q      It's heavy and -- and large?

23     A      And only more so because police officers would

24   always be carrying the gun in a holster, which is at

25   least a convenience that makes it less cumbersome, but



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

126

1    civilians would either have to take the additional

2    trouble of also carrying their holster around or some

3    similar device or carry it in their hand, which is really

4    cumbersome.

5         Q    How do you -- how do you define cumbersome, I

6    guess?  When you say really cumbersome, what do you mean

7    by that?

8         A    Difficult.

9         Q    It's really difficult to carry a gun in your

10   hand?

11        A    Difficult, burdensome, requires additional

12   strength, effort, caution.

13        Q    Is that a significant burden, to carry a gun in

14   your hand?

15        A    Yes, definitely.

16        Q    It depends on the weight of the gun; right?

17        A    Well, I wouldn't --

18        Q    Depends on the strength of the individual?

19        A    Even independent of the strength of the

20   individual or the weight of the gun, it would be

21   cumbersome because now you have one hand that can't be

22   used for the other things you would be using it for.

23   It's pretty much inoperative for all other purposes

24   because it's holding a gun.

25        Q    Now, the Chicago ordinance doesn't prevent a



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

127

1    permit holder from keeping a gun near them or her that is

2    operable; correct?

3         A    Correct.

4         Q    And you would also agree with me that a

5    trigger-locked weapon on a night stand would be closer or

6    nearer to someone who was sleeping than a locked and

7    loaded weapon hidden in another room; correct?

8         A    Could you repeat the question, again.

9         Q    Yeah.  She can read it.

10             (The record was read by the reporter.)

11        A    Yes.  It would be nearer.  That doesn't mean

12   it's -- it's more accessible, but yes, it's nearer.

13             MR. WOODS:  Okay.  He's telling me that I --

14        that I asked a sloppy question, so I'm going to

15        try it again.

16   BY MR. WOODS:

17        Q    You would agree with me that a trigger-locked

18   weapon on a night stand would be nearer to someone than a

19   -- an unlocked and loaded weapon hidden in another room

20   if the person was sleeping?

21        A    Yes, it would be nearer.

22        Q    Do you have any evidence that a trigger-locked

23   weapon would prevent a weapon from being available in a

24   timely fashion?

25        A    Only common sense that it takes some time --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

128

1    well, and personal experience, that it does take some

2    time to disengage a trigger lock.

3        Q    But you can't tell me, you can't define timely

4    fashion in terms of seconds or minutes; correct?

5        A    Again, I think I said something to the effect

6    that I think it takes about five seconds from the time

7    you have the key to the time it's disengaged.  So that

8    would be my guess as to that portion of the time.

9            And then there would be some additional time,

10   which I don't have any strong opinion on to retrieve

11   the key if it wasn't kept with the gun.  And so, yes, I

12   mean, retrieving the trigger lock certainly does take

13   additional time.  I mean, sorry, not retrieving; I mean

14   disengaging.

15       Q    This is just based on your common sense?

16       A    Well, if you want to call it that and personal

17   experience and it's sort of a logical condition for

18   disengaging --

19       Q    Yeah, so maybe --

20       A    -- that it has to take some time.

21       Q    So maybe I should ask the question a different

22   way.

23            This opinion that you're offering is not

24   based on your expertise in criminology; correct?

25       A    No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

129

1      Q     It's an expertise that all of us have, common

2  sense; right?

3      A     Yes.  I'd like to think so.

4      Q     Yeah, sometimes you never know.

5            So if you go now to the bottom of page 4.

6      A     (Views document.)

7            Okay.

8      Q     The last sentence there, it says:  It also

9  ignores the legal fact that the instant a second gun is

10  made operable in a Chicago home (i.e. is unlocked and

11  loaded), it constitutes a violation of the Chicago gun

12  ordinance and cannot be legally used for self-defense.

13            What's your basis for giving that legal

14  opinion?

15      A     Well, I shouldn't have given the -- the le --

16  that -- stated that as a legal opinion.  The last clause

17  is kind of a legal assessment.  And the first part of it

18  is just based on my reading of the ordinance.

19            But the ordinance actually directly addresses

20  whether the gun is kept operable, but I don't think it

21  then goes into what happens if you used it in

22  self-defense.  So that was my nonexpert legal opinion

23  in that last clause, the part that reads:  Cannot be

24  legally used for self-defense.

25      Q     So that opinion is outside your expertise in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

130

1    criminology?

2        A    That's correct.

3        Q    That opinion is based on common sense that you

4    would assume everybody would have in reading the plain

5    words of the ordinance; correct?

6        A    Yes, it was based on my assumption that if the

7    gun is illegally possessed, you're not legally allowed to

8    do much of anything with it.

9        Q    Are you aware of any prosecutions under this

10   section of the ordinance for illegally making a second

11   gun operable for purposes of self-defense?

12       A    I am not aware of such cases.

13       Q    I want to direct you now back to page 2.  I

14   apologize for skipping around a little bit.

15            In the first paragraph, there's a sentence

16   about in the middle of the paragraph that starts:  One

17   cannot directly observe effects of gun control

18   provisions in connection with law enforcement expertise

19   or any other kind of personal experience; do you see

20   that?

21       A    Yes.

22       Q    Would you also agree with me that one cannot

23   directly observe the deterrent effects of gun possession

24   either that it may have on the crime rate; correct?

25       A    Not directly, no.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

131

1     Q    So in order to assess that, you would have to

2   perform scientific studies to determine whether there is

3   an effect, a deterrent effect of gun possession on the

4   crime rate?

5     A    Yes.

6     Q    So let's turn now to page 3, the second-to-last

7   paragraph, it says:  Vince cites instances of various

8   parties distributing gun-locking devices or urging their

9   use, but fails to cite any evidence bearing on what

10  fraction of the recipients actually made regular use of

11  the locking devices, whether their use prevented harmful

12  gun discharges, or whether their use impaired DGU.

13         Do you know what fraction of people who

14  obtain locking devices actually use them?

15    A    No.

16    Q    Do you have any evidence that a locking device

17  has ever prevented any defensive gun use ever?

18    A    I -- I probably heard anecdotes to that effect,

19  but I wouldn't be able to cite any as I sit here.

20    Q    Certainly no scientific evidence in that

21  regard?

22    A    No.

23         MR. WOODS:  How much time do we have on this

24      tape?

25         THE VIDEOGRAPHER:  Nine minutes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

132

```
 1            (Exhibit No. 4 was marked for
 2        identification.)
 3    BY MR. WOODS:
 4        Q    And, Dr. Kleck, I'm handing you what has been
 5    marked as Exhibit No. 4.  Can you identify this, please.
 6        A    Yes, it is a chapter of a book that I wrote
 7    called the Nature and Effectiveness of Owning, Carrying,
 8    and Using Guns for Self-Protection.
 9        Q    These are your words in this text that have
10    been provided?
11        A    Yes.
12        Q    Can you turn over to page 308?
13        A    (Views document.)
14        Q    If you look down at the third paragraph where
15    it says given.
16            Given that most gun criminals acquire their
17    guns directly or indirectly as a result of theft,
18    probably the strongest rationale for keeping guns
19    stored in a secure manner of some sort is to reduce gun
20    theft and thereby reduce acquisition of guns by
21    criminals.
22            You agree with that statement today?
23        A    Yes.
24        Q    All right.
25            MR. WOODS:  Why don't we go ahead and take a
```



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

133

1      break for lunch; is that okay?  It's after noon

2      and then -- because I'm kind of at a stopping

3      point.  I'm going to move on to some other topic

4      areas.

5           MR. COOPER:  Okay.

6           THE VIDEOGRAPHER:  Are we off the record?

7           MR. WOODS:  Yeah.

8           THE VIDEOGRAPHER:  The time is 12:11, and

9      we're off the record.

10          (Lunch recess was taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                              October 28, 2011

134

CERTIFICATE OF REPORTER

STATE OF FLORIDA          )

COUNTY OF LEON            )

        I, LISA D. FREEZE, Notary Public, certify
that I was authorized to and did stenographically
report the proceedings herein, and that the transcript
is a true and complete record of my stenographic notes.

        I further certify that I am not a relative,
employee, attorney or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
financially interested in the action.

        WITNESS my hand and official seal this 9th
day of November, 2011.




                    _____

                    LISA D. FREEZE, CRR, NOTARY PUBLIC
                    2894 REMINGTON GREEN LANE
                    TALLAHASSEE, FL   32308
                    850-878-2221



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

135

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3                     CASE NO. 10-CV-4184
                     Judge Edmond E. Chang
 4
        ILLINOIS ASSOCIATION OF
 5      FIREARMS RETAILERS, KENNETH
        PACHOLSKI, KATHRYN TYLER, and
 6      MICHAEL HALL,
                    Plaintiffs,
 7      vs.

 8      THE CITY OF CHICAGO and
        RICHARD M. DALEY, Mayor of the
 9      City of Chicago,

10                  Defendants.
        _____
11      CONT'D
        VIDEOTAPED
12      DEPOSITION OF:            GARY KLECK

13
        TAKEN AT INSTANCE OF:     The Defendants
14

15
        DATE:                     October 28, 2011
16

17      TIME:                     Commenced at 1:17 p.m.
                                  Concluded at 6:09 p.m.
18

19      LOCATION:                 200 North Monroe Street
                                  Tallahassee, Florida
20

21      REPORTED BY:              L. DANIELLE FREEZE
                                  Certified Realtime Reporter
22                                Lfreeze37@comcast.net

23           ACCURATE STENOTYPE REPORTERS, INC.
                  2894 REMINGTON GREEN LANE
24      TALLAHASSEE, FL  32308   850.878.2221
                  asreporters@nettally.com

25
```


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1   APPEARANCES:

2

3            REPRESENTING PLAINTIFFS:

4

         CHARLES J. COOPER, ESQUIRE
5        ccooper@cooperkirk.com
         COOPER & KIRK
6        1523 New Hampshire Ave., N.W.
         Washington, D.C.  20036
7        202.220.9660

8

9            REPRESENTING DEFENDANTS

10

         CRAIG WOODS, ESQUIRE
11       cwoods@mayerbrown.com
         RANJIT J. HAKIM, ESQUIRE
12       rhakim@mayerbrown.com
         MAYER BROWN LLP
13       71 South Wacker Drive
         Chicago, IL  60606-4637
14       312.701.8758

15

16

17

18           ALSO PRESENT:

19       Barbara Kirkland-Graves, Videographer

20

21

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

```
1                          INDEX

2     WITNESS                              PAGE
      GARY KLECK                            138
3        Cont'd Direct Examination by       138
      Mr. Woods
4
                    INDEX OF EXHIBITS
5                 (Exhibits are attached.)

6     NO.   Description                     PAGE

7      5    OIG Report: Inspections of Firearms
            Dealers by the Bureau of Alcohol, Tobacco,
8           Firearms and Explosives July 2004
       6    New England Journal of Medical article
9           entitled: Effects of Restrictive Licensing of
            Handguns on Homicide and Suicide in the District
10          of Columbia
       7    Report by Daniel W. Webster       169          8
            American Journal of Public Health Article 79
11          Entitled: The Association between the Purchase of
            a Handgun and Homicide or Suicide
12     9    Article entitled: The Presence and
            Accessibility of Firearms in the Homes of
13          Adolescent Suicides
      10    Article entitled: Recent Psychopathology, 20
14          Suicidal Thoughts and Suicide Attempts in
            Households with and without Firearms: Findings
15          from the National Co-morbidity Study Replication
      11    Review Paper entitled: Suicide Prevention 31
16          Strategies
      12    Article entitled: Gun Ownership as a Risk
17          Factor for Homicide in the Home
      13    Article entitled: Can Owning a Gun Really
18          Triple the Owner's Chances of being Murdered?
      14    Article entitled: Point Blank Against
19          Itself: Evidence and Inference About Guns, Crime
            and Gun Control
20     15   Article entitled:  Measures of Gun
            Ownership Levels from Macro-Level Crime and
21          violence Research
      16    Article entitled: The Impact of Gun
22          Control and Gun Ownership Levels on Violence Rates
      CERTIFICATE OF OATH                    323
23    CERTIFICATE OF REPORTER                324
      ERRATA SHEET                           325
24    READING & SIGNING LETTER               327

25
```



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

138

                        STIPULATIONS

1                    The following cont'd videotaped deposition of

2        GARY KLECK was taken on oral examination, pursuant to

3        notice, for purposes of discovery, and for use as

4        evidence, and for other uses and purposes as may be

5        permitted by the applicable and governing rules.

6        Reading and signing is not waived.

7                                * * *

8        Thereupon,

9        was recalled as a witness, having been first previously

10       and duly sworn, was examined and testified as follows:

11                    CONT'D DIRECT EXAMINATION

12                    THE VIDEOGRAPHER:  We're back on the record

13           with tape No. 4.  The time is 1:17.

14       BY MR. WOODS:

15           Q    Good afternoon, Dr. Kleck.  Are there any

16       answers from this morning that you would like to change

17       or amend?

18           A    No.

19                    MR. COOPER:  Before you --

20                    MR. WOODS:  Yes.

21                    MR. COOPER:  -- go on --

22                    MR. WOODS:  Yes.

23                    MR. COOPER:  -- I -- I want to clarify our

24           discussion earlier this morning about what is off



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

139

 1          limits and --

 2                  MR. WOODS:  Okay, sure.

 3                  MR. COOPER:  -- what is on limits.  I talked

 4          to David --

 5                  MR. WOODS:  Okay.  Good.

 6                  MR. COOPER:  -- during the break and he --

 7          what he recalls is that counsel is free to inquire

 8          with respect to any communications after the

 9          deposition has gotten underway, for example, on

10          breaks and things, but not apart from that.

11                  MR. WOODS:  Okay.

12                  MR. COOPER:  The stipulation otherwise

13          governs, but I take it he agreed that -- with you,

14          that that would be -- that that would be fine

15          so...

16                  MR. WOODS:  Okay.  Right.  All right.

17                  Now I think we have the clarification.

18          That's fine.

19                  MR. COOPER:  Well, I -- that's -- that's

20          David -- I'm reporting what David recalls and so

21          that's fine with me too.

22                  MR. WOODS:  That's consistent, I guess, with

23          what our discussion is.

24                  MR. COOPER:  Okay.

25                  MR. WOODS:  And I guess I was assuming that



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

140

1          that applied to discussions before the deposition

2          started, but I had forgotten what the stipulation

3          actually said, so I'm fine with your

4          understanding.

5               MR. COOPER:  Okay.  Let's proceed on those

6          grounds, then.

7     BY MR. WOODS:

8          Q    All right.  I wanted to go back to one point

9     about the impairment of defensive gun use associated with

10    gun trig -- trigger locks.

11              You would certainly agree with me that there

12    is some scenario where if you're in your home and

13    you're assaulted -- someone assaults you with a gun and

14    wakes you up immediately out of sleep and has a gun to

15    your head, it's not going to matter whether you --

16    your -- the guns you have in your house have trigger

17    locks or not, you aren't going to be able to use them

18    defensively regardless?

19         A    There certainly are some scenarios like that.

20         Q    And then on the other end of the spectrum, if

21    you are in your home and you hear someone breaking and

22    entering your home and but -- but you are on the third

23    floor and you have a gun right next to you, you have

24    plenty of time to disable a trigger lock in order to use

25    that gun to defend yourself.  That's certainly a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

141

```
 1   plausible scenario too; correct?

 2        A    Yes.

 3        Q    And your point is that somewhere between those

 4   two time periods where you have a lot of time and when

 5   you have zero time, there's going to be a time where the

 6   fact that you have a trigger lock will make a difference

 7   about whether you could use a gun defensively or not;

 8   correct?

 9        A    Yes.

10        Q    And you don't know exactly what that time is;

11   right?

12        A    No.

13        Q    And you don't know how often that scenario

14   might occur; correct?

15        A    Correct.

16        Q    And you haven't done anything to try to

17   determine either of those two points; correct?

18        A    No, I have not.

19        Q    And your basis that there exists such a time is

20   just based on common sense; correct?

21        A    Well, I'd call it logic because there has to be

22   intermediate points between having lots of time and

23   having little time.  I mean, that's -- that's logic.

24   It's not exact -- I wouldn't call it common sense.  It's

25   not a matter of common understandings among people.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    It's -- it's indisputable logic.

2        Q    Okay.  Do you consider carrying a wallet in

3    your pocket to be a burden?

4        A    A minor burden, yes.

5        Q    What about women carrying a purse, is that a

6    major burden?

7        A    A more major burden, yeah.

8        Q    How would carrying a purse compare to carrying

9    a handgun on your person?

10       A    Less of a burden.

11       Q    And what is that based on?

12       A    Well, it's based on the gun having elements

13   that the purse doesn't have, such as the possibility of

14   arousing a shocked reaction among any who would detect

15   it, bystanders, for example.  Also, depending on the size

16   of the purse and the gun, the gun might be heavier.

17       Q    The purse could be heavier too?

18       A    It's possible.  And it's also a matter of the

19   hardness of the object.  I mean, part of the burden would

20   be if you've got something that's very hard and

21   inflexible banging against a part of your body, there's a

22   certain amount of discomfort associated with that.

23       Q    Okay.  I'm going to ask you, if you would, to

24   turn to page 5 of your report.

25       A    (Views document.)



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

143

1      Q    Now, have you ever done anything to study the
2   resources that the ATF has for regulating gun laws or
3   enforcing federal government -- or federal gun laws?
4      A    Only what I've read in the -- the cited reports
5   like the office of Inspector General's report.
6      Q    Any other report other than that that you've
7   reviewed that relates to its resources?
8      A    I think in the past, in the UCLA Law Review
9   article, I probably cited something to the effect that
10  they had ample resources for doing large numbers of
11  inspections.  And I cited data on numbers of inspections
12  versus how many dealers there were to inspect.  So that
13  would be relevant as well.
14     Q    Okay.  Is that part of what you are relying on
15  in connection with your opinions in -- in this matter?
16     A    Yes.
17     Q    Do you know where that data came from?
18     A    Bureau of Alcohol, Tobacco & Firearms reports.
19     Q    Okay.  But you don't know which reports?
20     A    It would be cited in the UCLA Law Review and
21  also in the 1999 St. Louis Law Journal article.
22     Q    Okay.
23     A    So some of them are, like, their annual
24  reports; some of them are online documents that show a
25  number of FFLs, federal firearms licensees.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

144

1      Q    Okay.  On -- on page 5 of your report, if you

2   look at the second paragraph, where you say -- I guess,

3   this is the second sentence, where you say:  Mr. -- He,

4   Mr. Vince, mischaracterizes the findings of this report?

5      A    (Views document.)

6      Q    Do you see that?

7      A    Yes.

8      Q    Okay.  In what way does he mischaracterize the

9   findings?

10     A    He mischaracterizes them as suggesting that the

11  ATF did not have adequate resources for regulating retail

12  gun dealers.

13     Q    So it's your position that the OIG report does

14  not indicate that ATF had inadequate resources?

15     A    No, my reading of that report is that they were

16  misapplying the resources they had.  More than an overall

17  lack of resources, they were misapplying them at less

18  productive activities.

19     Q    Okay.  Why don't we get a copy of the report.

20          (Exhibit No. 5 was marked for

21          identification.)

22  BY MR. WOODS:

23     Q    Dr. Kleck, the court reporter has handed you

24  what has been marked as Exhibit No. 6 -- no, excuse me,

25  exhibit No. 5; can you identify that, please.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

1      A    Inspections of Firearms Dealers by the Bureau

2    of Alcohol, Tobacco, Firearms and Explosives.

3      Q    And is this -- is this the report that you're

4    talking about that indicates the ATF has sufficient

5    resources but simply misapplied them?

6      A    (Views document.)

7           I can't say for sure.

8      Q    Do you understand --

9      A    I think it might be, but I can't say for

10   certain.

11     Q    Okay.  Do you understand that this is the OIG

12   report that Mr. Vince is relying on in his report?

13     A    I believe it is.

14     Q    Okay.  And is this the report that you believe

15   -- let me just clarify.

16          You aren't sure if this is the report that

17   indicates that ATF has adequate resources but simply

18   misapplies them?

19     A    That's correct.  I cannot be sure about that.

20     Q    Okay.  Well, can -- can you find that anywhere

21   in this report, where it says they have adequate

22   resources but misapply them?

23     A    If you gave me, you know, over an hour to look

24   through it, I suppose.

25     Q    Okay.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

146

1          A     But I haven't studied this recently.  And I

2     don't have --

3          Q     Okay.  Did you study it to prepare your

4     rebuttal report in this case?

5          A     At some point -- well, let me -- let me back

6     up.  I'm trying to think when I read it.

7                It's possible that it was at the point where

8     I had begun to do the rebuttal report.  It's -- I'm not

9     sure.  It's also possible I'd started to look at it

10    before then.

11         Q     This actual report isn't cited in -- in your

12    Appendix B; is that correct?

13         A     That's correct.

14         Q     Is it cited anywhere?

15         A     That's part of my un -- uncertainty.  No, I

16    don't think it is.

17         Q     Well, if you look at page 5 of your report, you

18    do indicate or you reference Mr. Vince's reference to

19    this report, a 2004 report by the Office of Inspector

20    General of the Department of Justice; do you see that in

21    the second paragraph?

22         A     Yes.

23         Q     And that's -- that's Exhibit 5?

24         A     Okay.

25         Q     Okay?  Is that -- do you have any reason to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

147

1    doubt that or disagree with that?

2        A    No specific reason to doubt it, no.

3        Q    Can you turn to page 54, please?

4        A    (Views document.)

5        Q    And if you look down at the last paragraph, it

6    says:  Because the ATF does not conduct regular

7    inspections of FFLs and lacks adequate resources to meet

8    agency goals, it cannot effectively monitor the overall

9    level of FFL compliance with federal firearms laws; do

10   you see that?

11       A    Yes.

12       Q    So according to this OIG report, ATF does not

13   have adequate resources to meet its goals; correct?

14       A    To meet agency goals, that's correct.

15       Q    Right.  And this is in the conclusions section

16   of this report; right?

17       A    Right.

18       Q    So we can fairly surmise that this is one of

19   the things that the Department of Justice Office of the

20   Inspector General concluded relating to ATF, at least, in

21   2004?

22       A    Right.  The very unspecific assertion that they

23   had -- they lacked adequate resources to meet whatever

24   those agency goals were that they're referring to.

25       Q    Well, this -- this sentence talks about one of



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

148

1    those agency goals, doesn't it?  One of the agency goals

2    this sentence talks about is effectively monitoring the

3    overall level of FFL compliance with federal firearms

4    laws; correct?

5        A    That's correct, it does say that.

6        Q    Yeah.  And so it's -- the -- what the OIG is

7    saying is because ATF doesn't have adequate resources, it

8    can't monitor the overall level of FFL compliance with

9    federal firearms laws; correct?  That's what this

10   sentence is saying.

11       A    That is what it's saying, but what I said in my

12   report was the OIG did not in -- conclude that ATF lacked

13   the resources and authority to regulate gun stores or

14   otherwise enforce federal gun laws.  And I think that's

15   consistent with that statement that you've just quoted in

16   the conclusions.

17       Q    So you think your statement that the OIG did

18   not conclude ATF lacked resources is consistent with the

19   statement in this report that says they did lack

20   resources; is that what you're saying?

21       A    I'm saying that the OIG statement you quoted is

22   simply too unspecific to figure out exactly what they

23   meant by that.

24       Q    Well, is there -- I mean, why don't you read

25   the conclusions.  Is there anything in the conclusion



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

149

1      that says that ATF has adequate resources; they just

2      misapplied them?

3              A      Let's see.

4                     (Views document.)

5                     Well, if you just go to the paragraph

6      preceding the one you just quoted, they basically say

7      that the allocation of resources has been -- it lacks

8      in standardization and efficiency; that is to say, they

9      specifically said:  Our finding that the field

10     divisions varied significantly in such productivity

11     measures as number of inspections finding violations

12     and number of inspections done by each inspector argues

13     strongly for implementation of a more standardized and

14     efficient inspection regimen, unquote, which I

15     interpret as indicating that they are misapplying the

16     resources, that they are not making standardized and

17     efficient use of those inspection resources.

18          Q     Does it say they are misapplying resources in

19     that sentence?

20          A     It says that they lack standardization and

21     efficiency.

22          Q     All right.  And then in the next sentence, it

23     says:  They lack adequate resources.

24          A     For meeting some unspecified agency goals.

25          Q     Well, not just some unspecified agency goals.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                              October 28, 2011

150

1        They're -- they talk about what goals it

2   can't meet.  It can't meet the goal of monitoring the

3   overall level of FFL compliance with federal firearms

4   laws; correct?

5        A    That is what it says.

6        Q    Okay.  Now, on page 5 of your expert report,

7   you discuss how the number of FFLs decreased between

8   fiscal year 2002 and 2007; correct?

9        A    Yes.

10       Q    Do you know why that is?

11       A    Which years are we talking about again, 2002

12  and 2007?

13       Q    I think that's what you report here.  Let me

14  just confirm.

15       A    No.

16            MR. COOPER:  What page is that?

17            MR. WOODS:  We're talking about page 5 of his

18       expert report.

19            MR. COOPER:  Yeah.

20       A    No, I don't know why they went down.

21  BY MR. WOODS:

22       Q    Did you make any effort to try to determine why

23  the number went down?

24       A    No, I did not.

25       Q    So, specifically, according to this report, it



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

151

1    went down from 104,000 in 2002 to 60,000 in 2007; is that

2    right?  Am I reading that right?

3         A    Correct.

4         Q    Okay.  Do you know how many FFLs there are

5    today?

6         A    No.

7         Q    So there's 60,000 in 2007.

8              It's your contention that ATF has sufficient

9    resources to inspect all of the real FFLs; does that

10   mean ones that sell more than 50 guns?

11        A    Correct.

12        Q    And you base that on the fact that in 1993,

13   only 7 percent of the FFLs sold over 50 guns.

14        A    That's correct.

15        Q    Do you know how many FFLs there were in 1993?

16        A    Probably approaching 200,000 back then.

17        Q    So more than even in 2002?

18        A    Yes.

19        Q    So only 7 percent of the 200,000 sold more than

20   50 guns in 1993?

21        A    That's correct.

22        Q    Do you know why the -- the number of FFLs went

23   down between 1993 and 2002?

24        A    Among other things, they implemented more

25   rigorous screening procedures in the application process



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

152

1    and they increased the license fee.

2        Q    And do you know when that happened?

3        A    Circa '94, mid '90s, maybe, somewhere around

4    then.

5        Q    Was that in connection with the Brady bill?

6        A    Possibly; although, it might have been

7    administrative.  I'm not sure.

8        Q    Now, do you have any reason to believe that the

9    7 percent figure from 1993 was applicable in 2002?

10       A    I have no reason not to believe it.  That's

11   about all I can say.

12       Q    Other than -- other than it's 19 years later?

13       A    It was the most recent available data.

14       Q    Well, nine years later.  I'm sorry.

15       A    No data are perfect, and if I had it from

16   yesterday, it's possible today was different from

17   yesterday.  But that was the latest available because ATF

18   did not repeat that survey.

19       Q    So all we know is that in 2000 -- or, I'm

20   sorry, in 1993, 7 percent of FFLs sold more than 50 guns.

21   We don't know what percentage sold more than 50 guns in

22   2002; right?

23       A    We don't have the benefit of that ATF survey

24   that was conducted in '93 or so.

25       Q    And we don't know what the percentage of guns



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

                                                                153

1      that were sold in 2007 was; correct?

2           A     Say that one again.

3           Q     I'm sorry.  We don't know what the percentage

4      of FFLs that sold more than 50 guns was in 2007?

5           A     No.

6           Q     And we don't know it for today?

7           A     No.

8           Q     So, but we do know that it's some 18 years

9      later today than in 1993?

10          A     We sure do.

11          Q     And if -- and so, I mean, isn't it -- aren't

12     you just speculating to say that -- or to try to figure

13     out the number of FFLs today that sell more than 50 guns

14     based on data from 1993?

15          A     No, that's not speculation.  It's just the

16     inevitability of all evidence being outdated because it's

17     not instantaneously available.

18          Q     Well, do you have --

19          A     It's evidence based and that makes it not

20     speculation.

21          Q     Okay.  Do you have any reason to believe that

22     that 1993 figure would not have changed between 1993 and

23     the present?

24          A     I'm trying to figure out the double negatives

25     there.  Any reason why it would not have changed.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

154

1          Let me rephrase it so that I understand the

2     question.

3          Q    That's fine.

4          A    If you're asking is it possible it's changed

5     since then, yes.

6          Q    Okay.  And do you have any reason to believe

7     that it didn't change?

8          A    I have no reason to believe one way or the

9     other on that.  What I -- what I -- my underlying

10    suspicion is that the basic structure of the gun industry

11    didn't change and that there's still lots of people who

12    have a gun license without really being in the business

13    of selling guns.

14         Q    But you don't know what that percentage is?

15         A    Don't know.  Not for more recent years.  Or to

16    put it another way, we have no affirmative evidence that

17    the number of real dealers, meaning the ones that sell 50

18    or more guns, has increased since then.

19         Q    How many FFLs would ATF have to inspect today

20    in order to inspect all the FFLs that sell more than 50

21    guns?

22         A    My stated estimate on page 5 is 4,200.

23         Q    And that's based on --

24         A    That's based on --

25         Q    -- 18 years old?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

155

1        A    -- the 1993 figure on the percent of FFLs who

2    are that kind of dealer and the 2007 number of FFLs.

3        Q    Now, one of the things that happened between

4    1993 and today is that the fees for being an FFL went up;

5    do you think that would disproportionately affect FFLs

6    that had -- that sold few guns?

7        A    It could.

8        Q    So that would mean that the percentage of FFLs

9    that sold more than 50 guns would go up relatively?

10       A    It could.  But that would be a percentage.  It

11   wouldn't necessarily imply that the raw number of real

12   dealers that had to be inspected had gone up.  We'd just

13   be --

14       Q    We don't know what the real number of FFLs

15   today that sell more than 50 guns is?

16       A    Well, to complete my answer, it -- we'd only

17   know that the percentage who are selling 50 or more would

18   have gone up because the number not doing that had gone

19   down, not because the number who had sold 50 or more guns

20   went up.  And, thus, there's no foundation at all for the

21   belief that ATF's burden of regulating real gun dealers

22   has gone up.

23       Q    Does the ATF have to give notice to an FFL

24   before it conducts an inspection?

25       A    I don't know.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

1      Q     Have you looked at that issue now or in the

2   past?

3      A     No, I might have read something about it, but I

4   haven't looked at it in the sense of researching it

5   myself.

6      Q     If that is true, do you think that would have

7   an effect on the ability of ATF to properly detect any

8   illegal activity in FFLs?

9      A     Yes.

10     Q     What effect would it have?

11     A     I think it would make it harder.

12     Q     And I think you answered this before, but you

13  haven't ever studied the effectiveness of ATF inspection

14  procedures?

15     A     No.

16     Q     Now, you mention at the bottom of page 5, I'll

17  just read the last two sentences:  Vince also implies

18  that banning gun sales in Chicago will reduce gun

19  possession among the city's criminals and thereby reduce

20  firearms crime, but does not cite any research indicating

21  that local sales bans have such effect.  And then you

22  say:  Existing evidence indicates that they do not.  And

23  you cite two papers; correct?

24     A     Yes.

25     Q     And these are both studies that you conducted?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

157

 1        A    Yes.

 2        Q    One of them, Kleck and Patterson 1993; what was

 3   the nature of that study?

 4        A    That was a study of the 170 cities in America

 5   that, at the time, had a population of 100,000 or more.

 6   It was a city-level cross-sectional study with

 7   multi-varied statistical analysis in which we measured

 8   both the existence of state and local gun laws in each

 9   city and in the states in which those cities were located

10   as well as measuring gun availability levels.  And we

11   basically were estimating the effect of those gun laws,

12   one of which was local sales bans on crime rates, on a

13   variety of crime rates:  Murder, robbery, aggravated

14   assault.

15        Q    And how many jurisdictions had local sales bans

16   that you studied in Kleck and Patterson?

17        A    It might have been three or four or five,

18   something like that, a small number, very unusual.

19        Q    And you didn't detect any difference in crime

20   rates or...?

21        A    That's correct.

22        Q    And that article was published where?

23        A    That was in The Journal of Quantitative

24   Criminology.

25        Q    And then the other paper, Britt, Kleck and



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

158

1    Bordua?

2          A    Uh-huh.

3          Q    Am I pronouncing that right?

4          A    That's correct.

5          Q    1996.  What was the nature of that study?

6          A    That was a study of one specific law, the

7    Washington, D.C. handgun freeze.  And that used a time

8    series methodology.  It compared trends in homicide in

9    Washington, D.C. with other comparison areas that hadn't

10   introduced any such handgun freeze.

11         Q    And where was that published?

12         A    That was published in Law and Society Review.

13         Q    And is that peer-reviewed journal?

14         A    That one is, yeah.  It's social science plus

15   law.  So it's not a pure law review.

16         Q    Okay.  And are there any studies that have come

17   to the opposite conclusion of what you say there?

18         A    Yes.  Like on the DC one, our study was in

19   response to a study by Loftin and McDowall, and they

20   insisted that the DC law did reduce homicide.

21         Q    Right.  Why don't we get a copy of that.

22              (Exhibit No. 6 was marked for

23              identification.)

24   BY MR. WOODS:

25         Q    The court reporter is handing you what's been



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

159

1    marked as Exhibit No. 6.

2         A    (Views document.)

3         Q    You just mentioned a Loftin article.  Is this

4    the article that you were referring to?

5         A    That's the one.

6         Q    And this article was published in The New

7    England Journal of Medicine; is that correct?

8         A    That's correct.

9         Q    In 1995; is that right?  Am I getting that

10   right?

11        A    (Views document.)

12             No.  1991.

13        Q    I'm sorry.  You're right.  1991.  See, I've got

14   to put on my glasses to see that.

15             All right.  And New England Journal of

16   Medicine is one of the most respected medical journals

17   in the world; right?

18        A    Yeah, I believe so on medical topics.

19        Q    Well, I mean, they publish quality research on

20   medical topics; correct?

21        A    Well, I'm not really qualified to make a

22   judgment on medical stuff.

23        Q    But, I mean, you told me at the beginning that

24   what made a journal prestigious primarily was the quality

25   of the research that it published.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

160

1      A     Right, but you can't argue in the reverse.

2            It is prestigious, yes, and usually one of

3      the reasons a journal is prestigious is good quality of

4      research.  But it doesn't guarantee that any one

5      prestigious journal is, in fact, publishing research

6      that is either good in quality in general or with

7      respect to, let's say, a topic not traditionally

8      studied by medical researchers.

9      Q     Right.  But would you agree with me that in

10     general, the research as published in The New England

11     Journal of Medicine is of very good quality?

12     A     I'd say I'm not qualified to say.  I'm

13     qualified only to address the material they published of

14     a criminological character.

15     Q     If you look over in the abstract under

16     Conclusions, what these authors concluded is:

17     Restrictive licensing of handguns was associated with a

18     prompt decline in homicide and suicide by firearms in the

19     District of Columbia.  No such decline was observed for

20     homicides or suicides in which guns were not used.  And

21     no decline was seen in adjacent metropolitan areas where

22     restrictive licensing did not apply.  Our data suggest

23     that restrictions on access to guns in the District of

24     Columbia prevented an average of 47 deaths each year

25     after the law was implemented.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

161

1          You would agree with me that preventing 47

2    deaths each year from -- 47 deaths due to homicide each

3    year is certainly a good thing?

4          A    Yes, if that's the meaning of that.  They don't

5    really specify homicide deaths.  They just say 47 deaths.

6    I think they might have been combining homicides and

7    suicides in that number.

8          Q    Okay.  But your -- your article was published

9    in response to this?

10         A    Yes.

11         Q    And I presume that you came out with a

12   different answer?

13         A    Correct.

14         Q    Right?

15         A    I concluded no effect.

16         Q    You agree that there -- there's a large debate

17   even today about whether gun control laws do or do not

18   have a decreasing effect on homicides and crime; correct?

19         A    I think there's less dispute than there used to

20   be.  I'd say the majority of studies say there's no

21   effect; there -- that is, there are fewer and fewer

22   studies arriving at the kind of conclusions that were

23   drawn in the Loftin, et al. study.

24         Q    Let me have you turn now to page 6 of your

25   report.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

162

1          A     (Views document.)

2          Q     And this is the first paragraph at the top

3     where you say:  Contrary to Vince -- Mr. Vince's

4     interpretation, can you see where I'm reading?

5          A     (No response.)

6          Q     Do you see where I'm reading that, Dr. Kleck?

7          A     Yes.

8          Q     I'm sorry.  Contrary to Mr. Vince's

9     interpretation, it is now well established that this

10    concentration of traced crime guns among relatively few

11    FFLs is almost entirely attributable to (1) the fact that

12    those dealers account for a similarly large fraction of

13    all gun sales, which leads to large numbers of these

14    dealers' lawfully sold guns eventually being stolen and

15    falling into criminals' hands, even if the dealers' sales

16    were all completely lawful and ethical, and to (2) the

17    fact that some dealers do business in higher crime areas,

18    which increases the fraction of their lawfully sold guns

19    that are eventually stolen.

20          You believe that those two factors are the

21    primary ways that guns get into the hands of criminals;

22    is that right, at least from FFLs?

23          A     You mean gun theft?

24          Q     Well, guns that are sold by FFLs or guns that

25    start in FFLs, what is -- how do those get into



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

163

1    criminals' hands?

2         A    I believe that a majority of them get into

3    criminals' hands directly or indirectly as a result of

4    theft, most commonly residential burglary.

5         Q    And you think that bad apple, so -- so-called

6    bad apple or illegal transactions from FFLs are not a

7    majority of the path for getting guns into criminals'

8    hands?

9         A    Yes, that's correct.

10        Q    Correct?  We agreed before that Chicago is a

11   high crime area?

12        A    Yes.

13        Q    So if there were FFLs in the city of Chicago,

14   you would agree with me that a larger fraction of guns

15   sold by those FFLs would make it into the illegal market

16   than for, say, FFLs that were not located in a high crime

17   area; correct?

18        A    Other things being equal, yes, I think that's

19   correct.

20        Q    What is the mechanism by which some fixed

21   percentage of guns sold by FFLs get into the hands of

22   criminals, is it -- is it all theft?

23        A    Could you please repeat the question?

24        Q    Yeah.  You say in your point 1 that there's a

25   certain fraction of guns that FFLs sell that's going to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

164

1    make its way into the criminal market.  And so FFLs that

2    sell more guns are going to have more guns that go into

3    the criminal market; FFLs that sell less guns are going

4    to have less guns that go into the criminal market.

5            What is the mechanism for why an FFL that

6    sells more guns leads to more guns going into the

7    criminal market?  Is it all theft?

8        A    Not all but probably the vast majority.

9        Q    And the thefts, are these occurring -- where

10   are they occurring?

11       A    They're occurring in the gun own -- the gun

12   buyers' residences.

13       Q    Mostly from homes?

14       A    Yeah.

15       Q    I assume you're aware of the sting operations

16   that were conducted in Chicago by the Chicago Police

17   Department and other police departments in New York in

18   which dealers appeared to be willing to sell to

19   admittedly unqualified buyers?

20       A    I'm aware of the sting operations in which some

21   people have interpreted the results of the stings that

22   way.

23       Q    You don't interpret them that way?

24       A    I would say in a couple of the instances, they

25   might well have been doing something illegal or



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

165

1    unethical.  In other cases, it's ambiguous.  And the

2    critics were sort of reading something into it that isn't

3    there.

4        Q    So there -- there -- I mean, there's certainly

5    some activity that the FFLs were engaging in that could

6    be considered illegal?

7        A    Every once in a while, there are bad dealers do

8    bad things; and undoubtedly these sting operations

9    detected a little bit of that.

10       Q    Do you know how much of that kind of illegal

11   activity exists among FFLs?

12       A    Very little that results in official action in

13   terms of revocation by ATF.

14       Q    Right.  So is the basis for your saying that

15   very little of this activity occurs the fact that ATF

16   rarely revokes licenses or penalizes FFLs?

17       A    That's part of the foundation.  The other

18   foundation would be knowing the other channels by which

19   guns get into criminals' hands and them being documented

20   as very large.

21       Q    Does the fact that there are a lot of drivers

22   in Tallahassee or, let's say, does the fact that the

23   revocation rate of driver's license for drivers in

24   Tallahassee mean -- if it's a low rate, does that mean

25   that most drivers in Tallahassee are good?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

166

1      A    No.

2      Q    So just because an FFL has not had their

3  license revoked doesn't necessarily mean that they are

4  not engaging in illegal activity?

5      A    Not necessarily.  But the difference is you

6  would rarely have traffic enforcement efforts focusing on

7  individual drivers, whereas you often have that with

8  suspect FFLs.  So you'd have a much higher probability of

9  detection of their violations.

10     Q    But we have already seen from the OIG report

11 that FFLs that -- that ATF, just to use your assumptions,

12 is not properly using its resources to monitor FFLs;

13 correct?

14     A    Is that my view, that they're not doing that?

15 Is that what you are asking?

16     Q    That was certainly your view of the OIG;

17 correct?

18     A    Yeah, yes.

19     Q    And you disagree with that?

20     A    I have no basis for disagreeing or agreeing.  I

21 have no independent knowledge of that.

22     Q    You haven't studied that?

23     A    No, I haven't independently studied the use of

24 resources by ATF other than the fact that I know how many

25 compliance inspections they do relative to the number of



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    FFLs.

2         Q    A crime gun that is stolen from a lawful

3    purchaser from an FFL or a crime gun that was obtained

4    illegally from an FFL, they're not any more or less

5    dangerous than the other; correct?

6         A    The gun itself, no, but depending on who

7    acquired it, obviously, by definition, a person who

8    acquired the gun as a result of theft is a criminal.  So

9    the gun is more likely to be used for some dangerous

10   purpose for that reason.

11        Q    Right.  And I was suggesting that the

12   alternative to that person who acquired the gun from

13   stealing it from someone's home was someone who acquired

14   the gun from illegally obtaining it via an FFL.  They are

15   also a criminal; correct?

16        A    Illegally obtaining it?

17        Q    Yes.

18        A    Well, yeah.  What do you mean by -- you know,

19   like what kind of transaction are you talking about?

20        Q    I'm talking about either stealing it from

21   the -- from the -- straight from the FFL or reaching some

22   agreement with the FFL owner to sell the gun to that

23   person, even though they wouldn't qualify under the

24   federal law to get that gun.

25        A    Yeah, under the theft scenario, again,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    definitely, it's more likely that person would use the

2    gun for a dangerous purpose.  I'm not really so sure

3    about the latter reason, the latter scenario.  I wouldn't

4    have a strong opinion on that.

5        Q    Would you agree with me that the number of

6    crime guns in circulation would decrease if the FFL sold

7    less guns?

8        A    In the very, very long run, like, you know,

9    over a century, undoubtedly, because eventually if

10   there's no new flow of guns, which are all channeled

11   through FFLs being put into the gun stock, then

12   eventually the existing guns would wear out or be

13   destroyed or whatever.  And so the number of guns in

14   circulation would eventually go down.

15            In the short run, even in a matter of

16   decades, it probably would be virtually undetectable,

17   any difference.

18       Q    And is that because guns are fairly durable,

19   they last for a long time?

20       A    Yes.

21            THE VIDEOGRAPHER:  Nineteen minutes.

22   BY MR. WOODS:

23       Q    All right.  Why don't we go ahead, now, and

24   shift gears again.  And now we're going to start talking

25   about Dr. Webster, your opinions regarding Dr. Webster.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

                                                              169

 1          A    (Views document.)

 2               MR. WOODS:  Do you have a copy of his report?

 3       Why don't we get that out just in case.

 4               (Exhibit No. 7 was marked for

 5       identification.)

 6               MR. COOPER:  Dr. Webster has a great name.

 7               THE WITNESS:  Yeah.

 8               MR. WOODS:  There you go.

 9       BY MR. WOODS:

10          Q    Okay.  Dr. Kleck, I've handed you what has been

11       marked as Exhibit No. 7, I believe, which is the expert

12       report of Dr. Daniel Webster in this case.  I assume

13       you're read that before?

14          A    Yes.

15          Q    Okay.  And I'm just giving you that for

16       reference in case you need to look at it in the course of

17       discussing his opinions.

18               What I'd like you to first do is turn back

19       over to your report on page 6.  And if you'd look under

20       Section V-A - Effects of Guns on Suicide, the second

21       sentence.

22          A    (Views document.)

23          Q    It says:  He explicitly links this discussion

24       with "Chicago's limitation to a single operable firearm

25       in the home," but it should be first noted that none of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

170

1    the studies he cites assessed the effects of having more

2    than one operable gun versus having just one.

3              Is that correct?

4        A    Correct.

5        Q    Are you familiar with the Cummings study 1997?

6        A    Yes.

7        Q    And did that study look at the effect of having

8    one gun versus multiple guns on various end points?

9        A    One gun versus multiple guns, yes.  One

10   operable gun versus multiple operable guns, no.

11       Q    Okay.  So your -- your quibble with

12   Mr. Webster's analysis was that his -- his analysis

13   didn't involve -- didn't -- or the Cummings study, at

14   least, didn't state whether the gun was in operable

15   condition versus non-operable conditions --

16       A    I wouldn't charac --

17       Q    -- just how many guns were in the home?

18       A    I wouldn't characterize it as a quibble.  It's

19   a -- it's a substantively important distinction --

20       Q    Now --

21       A    -- since it's what makes that Cummings study

22   finding irrelevant to the Chicago case because the

23   Chicago ordinance pertains only to number of operable

24   guns.

25       Q    Now, is it your position that in order to be



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

171

1    relevant to the Chicago gun ordinance, the research has

2    to involve precisely the conditions of the Chicago gun

3    ordinance, that being one operable weapon versus the rest

4    in storage, in particular?

5        A    Yes, in order to be strongly relevant, it would

6    certainly have to pertain to number of operable guns.

7        Q    Is there any relevance to studies, such as the

8    Cummings study, to -- can -- can you infer anything from

9    the Cummings study that may be relevant to the Chicago --

10       A    Yes, there's some relevance.

11            It doesn't -- it's not quite on point with

12   respect to the Chicago ordinance because that concerns

13   number of operable guns.  But there's an underlying

14   premise of the Chicago ordinance, which is that the

15   number of guns presumably has an effect, but it's going

16   to be most pronounced with operable guns.

17       Q    And could you make at least an argument that if

18   a gun is not operable, that is, at least, similar in

19   effect to not having the gun at all in the home?

20       A    For some purposes, yes, like for -- for

21   purposes that require quick access, yes.

22       Q    Now, would that be true in terms of suicides?

23       A    Rarely.

24       Q    Well, you're -- you're familiar that -- or

25   you're aware that many suicides are -- are done very



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

172

1    impulsively?

2        A    Very impulsively but not impulsively to the

3    extent that we have any reason to believe the impulse to

4    commit suicide lasts under a few minutes; that is, the

5    time it would take to access an inoperable firearm and

6    make it operable.

7        Q    How -- how -- have you studied the literature

8    relating to how impulsive suicide attempts typically are?

9        A    Yes; although, I couldn't cite any specific

10   citation -- sources on that point, because I haven't

11   reviewed that issue since I wrote Point Blank in 1991.

12       Q    You certainly didn't review it in connection

13   with your opinions in this matter?

14       A    No, I did not.

15            THE VIDEOGRAPHER:  Watch your mic.

16            THE WITNESS:  Oh, sorry.  I've just got to

17       get some water.

18            THE VIDEOGRAPHER:  Off the record.

19            (Discussion off the record.)

20            THE VIDEOGRAPHER:  Back on the record at

21       2:03.

22   BY MR. WOODS:

23       Q    Okay.  Dr. Kleck, I want to -- I want to direct

24   your attention to a couple sentences now down in your

25   expert report on page 6 where you say:  Indeed, Webster



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

173

1    does not even offer explanation of why multiple guns

2    might raise suicide risks more than a single gun would.

3           Can you think of any reason why multiple

4    guns, having multiple guns in the home might raise

5    suicide risk more than having a single gun?

6    A    (Views document.)

7           Not the sheer number, no.  But it could make

8    a difference as to whether -- the number of secured --

9    secured versus unsecured guns.

10   Q    If there -- if there was more access to guns.

11          So let me give you an example.  If -- if you

12   had the Chicago ordinance where you had one operable

13   weapon and no additional weapons in one scenario and in

14   the other scenario, you had one operable weapon and two

15   additional weapons, but those were secured with trigger

16   locks, I think what you are saying is in that scenario,

17   because those two extra guns wouldn't necessarily be

18   accessible, say, by a family member, teenage son, that

19   there wouldn't be any real distinction why or any

20   reason why a suicide risk would go up because you had

21   more guns in the house if those guns were trigger

22   locked; is that what you are saying?

23   A    That's correct.  I don't think the additional

24   number of secured guns would make any difference to the

25   likelihood of a gun suicide occurring.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

174

1      Q    However, if you had additional unsecured guns,
2  would you agree that it's, at least, plausible that that
3  may increase the risk of suicide due to gun?
4      A    If the additional number is one rather than
5  zero, yes.  If it's two or more versus one, probably no.
6      Q    And why do you say that?
7      A    Because you can only use one gun to commit
8  suicide.  You only need one gun to commit suicide.
9      Q    Does the fact that you have more than one gun
10 make it easier to find a gun that you can use in the home
11 as opposed to if you only had one gun?
12     A    Hypothetically, if finding the gun was
13 relevant, yeah, it's a logical possibility.
14     Q    You would have to actually find the gun before
15 you could use it; right?
16     A    Correct.
17     Q    So if you had three guns in the house, at least
18 it could be easier to locate one of those to commit
19 suicide than if you only had one?
20     A    Hypothetically, yes.
21     Q    That's a possible scenario?
22     A    It's a logical possibility, yeah.
23     Q    And you could test the scenario about whether
24 having multiple guns in the home could lead to a greater
25 risk of suicide over having a fewer number; correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

175

1       A    Yes.

2       Q    And that's what -- one of the things that

3   Cummings attempted to do; right?

4       A    Correct.  He did.

5       Q    And in the Cummings study, when he attempted to

6   do that, he found that there was a positive trend for

7   risk of suicide associated between zero, one, and two or

8   two or more guns in the home that was almost

9   statistically significant; correct?

10      A    That's the way he chose to interpret it, as a

11  positive trend.  But the point is, there wasn't any

12  statistical association between having more than one gun

13  versus having just one and suicide risk.

14      Q    Well, there was a statistical analysis that was

15  done on the trend; correct?

16      A    Yes.

17      Q    And that statistical analysis showed a P value

18  of about .06?

19      A    Yep.

20      Q    Correct?  And that's plenty close to

21  statistical significance; correct?

22      A    Yeah, it's pretty close, but to a 5 percent

23  significance level, sure.

24      Q    Right.  It's pretty close to a 5 percent

25  significance level.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1        A     Uh-huh.

2        Q     In fact, it's only one in 100 times less likely

3    or more likely due to chance than a 5 percent

4    significance level?

5        A     Correct.

6        Q     Now, is it -- is it your assertion that

7    firearms purchases are not a good proxy for firearms

8    ownership?

9        A     Yes, it's not a good proxy.

10       Q     And why is that?

11       A     Partly because you can acquire guns in ways

12   other than purchasing, partly because gun status is

13   something that changes over the life course.  You could

14   have purchased it and no longer have it later on.

15       Q     Let's talk about the latter.

16             Do you have any evidence or studies that

17   indicate how long people typically keep guns?

18       A     Yes.  Some of the data from the NSPOF survey

19   bears on that issue.

20             Some of these other surveys that I cited in

21   connection with defensive venues asked the question:

22   How long have you had the -- the gun?  And I've also

23   recently done a study that I didn't rely on for this

24   particular report, which was a panel study where we had

25   observations of gun ownership at different points in



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

177

1    time.  And they were only separated by about, I think,

2    a year or so, fairly brief period of time.  And a fair

3    number of people who owned guns at the first point in

4    time didn't have them at the second point in time.

5        Q    Do you know what a fair number of people are --

6    is?

7        A    Oh, it could have been like in the ballpark of

8    10 percent, 15 percent, something like that.  So gun

9    ownership was kind of unstable among this sample.  It was

10   an Illinois sample.

11       Q    And this was a panel survey that you did?

12       A    Yes.

13       Q    And is this in a published paper?

14       A    No -- well, I stand corrected.  It's in -- it's

15   in press.

16       Q    Okay.

17       A    And it's published online, but it has not come

18   out in its print version yet.

19       Q    And what is the journal that it's being

20   published in?

21       A    I think that one is in -- let me see.

22            (Views document.)

23            No, I can't tell you because my vita only

24   lists published stuff, so I'd have to consult my

25   computer in order to know that.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

178

1     Q     Do you know when it was published online?

2     A     No.

3     Q     Do you know what the title is?

4     A     Probably couldn't even tell you the exact title

5     either.  It's something about -- I think the title starts

6     out:  Is fear and gun ownership a one-way street,

7     something like that was the title.

8     Q     And who were the authors, you and who else?

9     A     Will Hauser is the coauthor.

10    Q     Okay.  And is that -- that's not a study that

11    you've relied on in connection with your report in this

12    case?

13    A     No, it is not.

14          MR. WOODS:  Can you get me the Cummings

15          paper?

16    BY MR. WOODS:

17    Q     Now, is one of your criticisms about the

18    Cummings paper that they used firearms purchases as a

19    proxy for gun ownership?

20    A     I'm not sure if I explicitly mentioned that in

21    any written critique, but that certainly would be a valid

22    criticism.

23    Q     Is that one of your opinions that you intend to

24    offer in this case?

25    A     I don't recall making any reference to that



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

179

1      issue in -- or, I mean, in connection with Cummings.

2           Q    Okay.  I mean, my -- I guess my question was a

3      little broader; is that something you intend to -- to --

4      is that a basis that you intend to criticize the Cummings

5      study in this case?

6           A    At this point, no.

7           Q    Okay.

8           A    I mean, I'm just pointing out it's another flaw

9      you could validly point to.

10          Q    Right.  I understand.  Let me go ahead and mark

11     it.

12               (Exhibit No. 8 was marked for

13               identification.)

14     BY MR. WOODS:

15          Q    Dr. Kleck, I've handed you what's been marked

16     as Exhibit No. 8, which is a published study by Cummings,

17     et al. in the American Journal of Public Health,

18     June 1997.

19          A    (Views document.)

20          Q    And I think you mentioned to me earlier that

21     American Journal of Public Health was the -- one of the

22     premier journals in the area of public health; is that

23     correct?

24          A    I think the term I used was "prestigious,"

25     emphasizing the subjective nature of prestigious.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

180

1        Q    Okay.  If you'll turn over to table No. 2.

2        A    (Views document.)

3             Okay.

4        Q    And table No. 2, the title of this is Handgun

5    Purchase History and Relative Risk Estimates for Matched

6    Suicides and Controlled Subjects; do you see that?

7        A    Yes.

8        Q    It goes down to number of family purchases and

9    it lists one, two, and greater than three?

10       A    Uh-huh.

11       Q    And then over on the right, it gives a P value

12   and that's for the whole trend; correct?

13       A    Correct.

14       Q    So according to these authors, the P value for

15   the trend was .06?

16       A    That is correct.

17       Q    Now, if they would have done a one-tailed

18   P value, would -- what would the P value have been or

19   maybe I should ask you first, was that one-tailed or

20   two-tailed?

21       A    I don't know.  You -- you can't tell just from

22   looking at the numbers.  Let me see if there's anything

23   in the footnotes.

24            (Views document.)

25            Yeah, there's -- there's nothing that jumps



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    out at me that indicates whether it was one-tailed or

2    two-tailed.  But you really don't need that information

3    anyway because just from the confidence intervals

4    themselves, you can tell they're not significantly

5    different because they overlap.

6          Basically there's no significant difference

7    in the risk of suicide dependent on the number of gun

8    -- of family purchases of guns.

9      Q    So if they overlap at all, it's your testimony

10   that there's -- that means there's no statistical

11   significance between them?

12     A    It means there's a substantial probability that

13   the result was -- the difference was attributable to

14   chance.

15     Q    Don't you have to have a certain amount of

16   overlap before it can destroy statistical significance to

17   the .05 level?

18     A    Well, any amount of overlap, but the more

19   overlap you have, the less confidence you have that it's,

20   you know, a real difference rather than a product of

21   chance.

22     Q    Okay.

23     A    Okay.  And, in this case, there's substantial

24   overlap.  So there's substantial reason to believe that

25   it's not a statistically significant difference and could



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

182

1      well be due to chance factors.

2          Q    However, the test for trend was very close to

3      statistically significant; are you saying that that's

4      wrong?

5          A    I have no way of independently judging whether

6      the statistic was wrongly computed or its associated

7      significance level.

8          Q    Okay.  At the top, if you --

9          A    But I -- I'm relying on their confidence

10     intervals being correct.  That's the basis of my opinion.

11         Q    Okay.  So on page 976, if you look up at the --

12     in the text, first full paragraph at the top, it says:

13     The association between handgun purchase and suicide

14     tended to become stronger as the number of handguns

15     purchased increased.  Test for trend across categories,

16     P equals .06.

17         A    (Views document.)

18         Q    Do you see that?

19         A    I see that.

20         Q    Now, if -- if that would have said P equals

21     .05, you would agree that the trend is statistically

22     significant to the .05 level?

23         A    Well, it's kind of meaningless because the

24     statement he makes is incorrect.  It -- it simply isn't

25     consistent with what the numbers say.  I mean, he says



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

183

1     that.  That is a -- you are correct in quoting him, but

2     it's not what the numbers say.

3            MR. WOODS:  Okay.  Why -- well, I think we

4        need to change the tape.

5            THE VIDEOGRAPHER:  Off the record, please.

6            (Brief recess was taken.)

7            THE VIDEOGRAPHER:  We're back on the record

8        with tape No. 5.  The time is 2:26.

9     BY MR. WOODS:

10       Q    Dr. Kleck, any answers that you'd like to

11    change?

12       A    No.

13       Q    I'd like to go back to the Cummings article,

14    '97 article that we were just discussing.  And let me see

15    if I understand what your testimony is.  Is it your

16    testimony that if have you -- in this case, we have

17    number of family purchases one, two, and greater than

18    three.

19            If the confidence intervals associated with

20    any of those -- any of the number of family purchases,

21    one, two, or three overlap with each other, you would

22    not expect the P value for trend to be statistically

23    significant?

24       A    It would be less likely that that would be

25    statistically significant.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011
                                                                184

 1          Q    Could it ever be statistically significant if
 2   you had overlap?
 3          A    It's possible if you had overlap between --
 4   let's say, a small amount of overlap between some of the
 5   categories and not others, then the overall trend could
 6   be statistically significant.
 7          Q    So, in this case, just so I understand, and
 8   can put on the record what we mean by overlap, if you
 9   look at number of family purchases for one gun, the
10   95 percent confidence interval spans between 1.1 and 2.2;
11   right?
12          A    Correct.
13          Q    And that's actually statistically significant
14   increase in its own right; correct?
15          A    If --
16          Q    Compared to what?  Compared to a --
17          A    Yeah, yeah, it's barely --
18          Q    It's just --
19          A    It's barely significantly different from one,
20   correct.
21          Q    So the P value for that would be less than .05
22   --
23          A    Correct.
24          Q    -- on its own.  Then if you look at the number
25   of purchases for two guns, you see a 95 percent



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

185

1     confidence interval between 1 and 3.4.

2         A    So that's right on the edge of being

3     significant.

4         Q    In and of itself; right?

5         A    Correct.

6         Q    But it does overlap with the confidence

7     interval for purchasing one gun; right?

8         A    Yes, it --

9         Q    That would --

10        A    -- substantially overlaps it.

11        Q    Right.  It goes up to 3.4 but it goes down to

12    one, which overlaps the number of purchasers -- overlaps

13    the 95 percent confidence interval for one family

14    purchase.

15        A    Yes, there could scarcely be more overlap

16    because the interval for one is entirely within the

17    interval for two so --

18        Q    Well, there's some interval --

19        A    -- there's total overlap.

20        Q    Yeah, there's some interval for two that

21    doesn't overlap, though.  It goes all the way up to --

22        A    That much is correct.  But all of one's

23    interval is within two's interval.

24        Q    Now, and then the third, the number of family

25    purchases greater than three, the 95 percent confidence



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                    186

1     interval span between 1.7 and 4.4, and that overlaps the

2     confidence intervals from one and two?

3          A    Yes, it substantially overlaps both of those.

4               MR. COOPER:  May I ask a point of

5          clarification, Counsel?  I think you've been

6          saying for that last category greater than three.

7               MR. WOODS:  I should say greater than or

8          equal to.

9               MR. COOPER:  Or equal to.

10              MR. WOODS:  Yes.

11              MR. COOPER:  I just want to make sure that --

12              MR. WOODS:  That's clear on the record.

13              MR. COOPER:  Okay, thanks.

14              MR. WOODS:  No problem.

15    BY MR. WOODS:

16         Q    And yet even though there's overlap between

17    these three categories, the P value they report is .06;

18    right?

19         A    That is the one they report, yes.

20         Q    And are you claiming that that's incorrect?

21         A    I have no idea whether it's correct or not.

22         Q    I mean, this is published in one of the most

23    prestigious journals, as you've indicated in public

24    health; correct?

25         A    Yes, but that really means nothing with regard



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

187

1    to the issue of whether this particular paper was

2    carefully reviewed.  The problem is public health

3    journals don't have a lot of expert reviewers to draw on

4    that are expert in this area.  So I think --

5        Q    You mean expert in statistics?

6        A    No, expert in what statistics would be relevant

7    to this substantive topic, in this case, handgun

8    ownership and suicide.  And so they wouldn't be familiar

9    with the critical issues and, therefore, wouldn't be

10   familiar with the appropriate statistical tests.

11            But, in any case, they would not be doing

12   recomputations of people's statistics.  That would

13   require access to the original data set, and that would

14   virtually never happen as a part of a routine journal

15   review.

16       Q    Do you know if they did any recalculation of

17   these statistics at all?

18       A    No, I do not know one way or another.

19       Q    So that's just speculation on your part that

20   they wouldn't do that?

21       A    No, that's not speculation.  It's common

22   practice.  It would be extraordinarily difficult and time

23   consuming for journals to routinely do that.  So I can

24   say with great confidence that journals do not routinely

25   reanalyze data for articles submitted to them.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011
188

1        Q     Well, you questioned that value of .06.

2        A     No, I said I didn't know one way or another

3    whether it was accurate.

4        Q     Okay.  We can put that exhibit aside.

5              And I want to return you to page 7 of your

6    report or actually ask you to turn over to page 7.

7        A     (Views document.)

8        Q     And you state that -- let me see if I can find

9    the sentence in here.  I'm going to direct you to the

10   last sentence of the first half paragraph there before at

11   least the indent, where it says:  In fact, as the review

12   summarized in my Table 1 shows, at least six out of 16

13   published case-control studies of suicides found no

14   significant association between gun ownership and

15   suicide; do you see that?

16       A     Yes.

17       Q     So ten case control studies did find a

18   significant association between gun ownership and

19   suicide?

20       A     Yes.

21       Q     And of the six -- and you list the six here on

22   this page that did not find a statistical significant

23   increased association between gun ownership and suicide;

24   right?

25       A     Yes.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

189

1       Q    How many of that six actually found a positive
2    but not significant association between gun ownership and
3    suicide?
4       A    I couldn't tell you as I sit here.
5       Q    Would you have to look at all the papers?
6       A    I would have to look at those individual
7    papers --
8       Q    Is it --
9       A    -- unless I've mentioned something like that in
10   Table 1.
11      Q    Why -- why don't we look at Table 1 and if you
12   can tell from Table 1, that's fine.  I'm not going to
13   have you review the papers.
14      A    (Views document.)
15           All right.  Miller 1978 found no association
16   whatsoever.  Brent, et al., once there were controlled
17   variables introduced, we don't really know one way or
18   another because it was only reported as not
19   significant.  So you don't know the direction of the
20   association.
21      Q    It was -- it was positive before they did the
22   adjusted odds ratio?
23      A    Correct.
24      Q    But we don't know if it was still positive; we
25   just know it was --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

190

1        A    But we don't know afterwards.

2        Q    We just know it was greater than .025?

3        A    We just know it was nonsignificant, and we know

4    nothing about the direction of the association.   In

5    Buckstein, et al. 1993, well, again, the same problem, it

6    was just reported as not significant; and we don't know

7    the direction of the association.

8        Q    Well, let me stop you right there.

9             For handguns, doesn't it actually show that

10   it is highly significant, the Buckstein article?

11       A    Right, contrasting just handgun ownership

12   versus not handgun ownership.

13       Q    Okay.  They're not -- they're not contrasting

14   handgun ownership to no gun ownership?

15       A    I think it was handgun, not handgun.  My

16   recollection is not perfect about that one, but I think

17   that's what they were contrasting.

18       Q    And was any guns, regardless of the guns,

19   versus no guns?

20       A    Yes, they did do that comparison, and that's

21   the one where we don't know the direction of the

22   association.  We only know that it was not significant.

23       Q    Okay.

24       A    And then for Brent, et al. 1994, it is same

25   issue.  It's exactly the same, nonsignificant but no



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

191

1    direction known.  For Beautrais, et al. 1996, well, for

2    the males, it was exactly zero association.  The adjusted

3    odds ratio was one.

4         Q    Right.

5         A    And it was -- without the adjustment, it was a

6    little under one; although, again, neither of these are

7    statistically significant.

8         Q    Okay.

9         A    And then I don't have any other recorded for

10   the full sample for the adjusted odds ratio so it

11   couldn't address that question.

12        Q    The crude odds ratio is positive, but we -- we

13   don't know if they controlled or not or reported an

14   adjusted odds ratio for the whole sample.

15        A    Well, we know they didn't for that odds ratio.

16   They didn't control for anything.  So it's not a very

17   meaningful measure of risk.

18        Q    Well, it depends on if the controls had a

19   confounding effect or if there were confounding effects

20   by those variables?

21        A    Right.  But I don't know of anybody who

22   disputes the question that there are confounders in this

23   area.

24        Q    Okay.

25        A    And then for the last one, Conwell 2002,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    basically for females, the association is zero.  It's

2    essentially nothing.  And then it's 1.02 odds ratio.  And

3    then for males, it's positive significant association.

4    But I was referring to the female --

5         Q    Okay.

6         A    -- sample in that statement No. 6.

7         Q    So actually Conwell did show a statistically

8    significant increased risk associated with gun ownership

9    for males; right?

10        A    Right.  But it's one that really doesn't make

11   sense if it's interpreted as a causal effect of gun

12   ownership because there's no reason why females would be

13   impervious to the effect of guns.

14             They might have a lower level of gun

15   ownership; but given gun ownership, the effect should

16   be the same.  So it suggests you are really seeing the

17   effect of a confounder that's correlated with gun

18   ownership.

19        Q    Well, couldn't it just be that because there

20   are less females that have guns that you just don't have

21   enough power to see the effect with respect to females,

22   but you can see with respect to males?

23        A    It -- it might have an effect on the power, but

24   it's not going to affect the size of -- the size of the

25   association.  And that's what I'm contrasting here, the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1     fact that there's an association for males and not for

2     females.

3          Q     Do you know what the confidence limit or

4     intervals are for the female breakdown?

5          A     Not right now.  I'd have to see the original

6     studies, but I didn't incorporate that into that table.

7          Q     Well, what -- what is the -- the P value is

8     .985?

9          A     (Views document.)

10               Which study are we talking about?

11         Q     We're talking about Conwell for females.

12         A     (Views document.)

13               Okay.  And what was your question again?

14         Q     My question is wasn't the P value .985?

15         A     Yes, for the adjusted odds ratio for females.

16         Q     Yeah.  And does that tell you anything about

17    the width of the confidence interval, the likely width of

18    the confidence interval?

19         A     No, it can't.  The -- the odds ratio itself,

20    the point estimate is virtually identical to no

21    association.

22               So regardless of the width of the confidence

23    interval, that's almost certainly not going to be

24    statistically significant unless you had immense sample

25    sizes.  And if you look over to the end column, the



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

194

1    number of cases here was 172.  It's not an enormous

2    sample size.

3         Q    Well, I thought you told me before the

4    confidence interval gives the span of what the point

5    estimate might be.

6         A    That's correct, it does.

7         Q    So if you have a wide confidence interval, it

8    may be that the point estimate is at the top of the

9    confidence interval or it may be that the point estimate

10   is at the bottom of the confidence interval.

11        A    In -- in general, that's a possibility.  In

12   this case, it's not because we know what the point

13   estimate is; and it's virtually identical to an adjusted

14   odds ratio of 1, which means no association.

15        Q    So if we know what the point estimate is, then

16   we can't say that the true point estimate might be at the

17   ends of the confidence level?

18        A    In this particular case, we can be confident

19   that that -- the problem is not with the width of the

20   confidence interval; the problem is the point estimate is

21   itself, by itself indicating, virtually no association.

22   And we know that because of the point estimate as

23   reported here, it's 1.02.

24        Q    I understand that the point estimate that is

25   reported is 1.02.  But in this case, we can't -- because



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    the point estimate is close to 1, we can't say that the

2    true point estimate might be at the top of the confidence

3    interval or the bottom of the confidence interval?

4         A    Yeah, it's -- it's possible.  It's not

5    particularly meaningful.  But yes, it's possible it is.

6    It's just that you couldn't have a narrow confidence

7    interval with this sample size.  It's only 172 cases.

8              So the confidence interval is going to be

9    proportional to the sample size.  It's going to be a

10   relatively wide interval.  But, also, we know that the

11   middle of that range is almost exactly no association.

12        Q    If you look -- you can -- you can -- I'm going

13   to move on to another point here.  If you want to go back

14   to page 7.

15             At the bottom of page 7, you make a list of

16   likely confounders that should be controlled for in

17   studies that involve looking at the effects of guns on

18   various outcomes; is that correct; is that fair?

19        A    Yes.

20        Q    Okay.  And you list, I think, ten of them?

21        A    Yes.

22        Q    And how did you determine that all of these

23   should be controlled for in studies involving

24   associations between gun ownership and outcomes such as

25   suicide, homicide, etc.?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

1          A     It's the product of reviews of two kinds of

2     literature, one pertaining to determinants of suicide

3     risk, so there's a very broad literature that's been

4     viewed by people like David Lester, who has done

5     book-length reviews of risk factors for suicide among

6     other things.  And the other body of literature would be

7     the correlates of gun ownership.  And so that that's been

8     reviewed in my books, Point Blank, Targeting Guns and

9     probably a little bit in Armed as well.

10         Q     So for this particular sentence, you don't have

11    a citation at the end of it to any other work that has

12    reached this conclusion?

13         A     (Views document.)

14               No.

15         Q     And is it -- do you know of any other published

16    work that has indicated that these are the ten items that

17    you need to control for when you're doing studies related

18    to gun ownership and suicide?

19         A     No one source other than my own would have

20    cited these ten in particular.  Instead, there would be

21    multiple sources, each of which cited subsets of these

22    ten.

23         Q     And what -- can you name those sources?

24         A     Well, a start would be the articles that are

25    cited in Table 1.  Any of those that had an adjusted odds



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

197

1   ratio, for example, had controlled for confounders.  And

2   some of those confounders overlap with the ten variables

3   that I list here.

4         Q    So what's your basis for saying that alcoholism

5   or heavy drinking is associated with gun ownership?

6         A    Lester's reviews.

7         Q    What about alcohol or heavy drinking associated

8   with suicide?

9         A    I'm sorry.  I -- I may have misunderstood the

10  first question.  Could you repeat the previous one?

11        Q    What's your -- what's your basis for concluding

12  that alcoholism or heavy drinking is associated with gun

13  ownership?

14        A    Actually, I think it was one of David

15  Hemenway's studies; although, I didn't cite it here.  But

16  I think David Hemenway has made that assertion, and I

17  think the way he construed the issue was binge drinking

18  and -- and gun ownership.

19        Q    So -- and let me see if I understand.  So in

20  order for a variable to be a confounder, it has to be

21  associated both with the independent and dependent

22  variables that you're studying?

23        A    Correct.

24        Q    So, in this case, if we are studying gun

25  ownership, the variable has to be associated with gun



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

198

1     ownership; and it also has to be associated with the --

2     the variable of interest that you are studying.  In this

3     case it will be suicide.

4          A    Correct.

5          Q    Right.  And if it's not associated with both,

6     then it wouldn't be a confounder?

7          A    That's correct.

8          Q    So the next item, illicit drug use, what's your

9     basis for saying that that's associated with gun

10    ownership?

11         A    I think that's been studied in the medical

12    literature and, in fact, it may well be case control

13    studies; but I wouldn't be prepared to cite specific

14    studies as I sit here.

15         Q    Well, this is one of the -- one of your partial

16    list of confounders; right?

17         A    Yes.

18         Q    Do you know -- do you know of anyone else who

19    has indicated that illicit drug use needs to be

20    controlled for in a case -- a control study involving

21    association between gun ownership and suicide?

22         A    Yes, I believe there are others, but I couldn't

23    cite which ones they are right now.

24         Q    Okay.  But I assume illicit drug use would be

25    associated with suicide?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

199

1      A     Yes.

2      Q     What's that based on?

3      A     That's based on Lester's reviews.

4      Q     The third one, urban versus rural location.

5      A     Although, actually, if I can amplify on that, I

6   think some of Brent's studies may have looked into that

7   too because in some cases, he was studying people for

8   whom he had measured illicit drug use.  So it's possible

9   some of the Brent, et al. studies do address that issue

10     Q     What do you mean by address that issue?

11     A     Meaning they had a measure of illicit drug use

12  and were studying suicide risk as well as gun ownership

13  relationship.

14     Q     Have any of your studies ever controlled for

15  illicit drug use that you've done?

16     A     I have not done any case control studies of

17  suicide.

18     Q     Okay.  So, well, maybe I should step back a

19  second.

20           All these confounding variables that you

21  claim should be controlled for, you've actually never

22  conducted a study on gun ownership and suicide;

23  correct?

24     A     Correct -- well, not of this sort, not a case

25  control individual level study.  I've done macro-level



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

200

1      studies of gun ownership rates and suicide rates for --

2      in larger areas like cities and so forth.

3          Q    Okay.  And you would only need to control for

4      these confounding variables in case control studies?

5          A    No, you might also have to control for their

6      macro-level analogs in -- in a study of, let's say,

7      suicide rates of cities.  So it's likely that factors

8      that operate among individuals would also be -- they

9      would operate collectively in the aggregate for larger

10     populations.

11         Q    And in any of the macro studies that you did,

12     did you control for alcoholism?

13         A    It's possible I had some controls for -- in

14     suicide studies?

15         Q    Yeah.

16         A    I don't recall.  It's possible I attempted to

17     do that in connection with the Kleck and Patterson study.

18     I might have, in some early versions of the analyses,

19     tried to measure for some proxy for alcoholism or heavy

20     drinking.

21         Q    In the published version?

22         A    But -- but there's nothing in the published

23     version that shows such controls.

24         Q    What about illicit drug use in any of the

25     macro-level suicide studies that you did?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

201

1      A     No, definitely not.

2      Q     What about urban versus rural locations in the

3   macro studies that you did?

4      A     Well, the --

5      Q     Did you control for those?

6      A     The macro-level studies were all urban areas,

7   so it wasn't relevant.

8      Q     Okay.  What about residents in a high crime

9   neighborhood, did you control for that in your

10   macro-level studies?

11      A     Again, not pertinent because it was not a

12   neighborhood level study.

13      Q     What about --

14      A     But, you know, I mean --

15      Q     You could still -- I mean, there could be

16   certain areas that have higher --

17      A     Right.

18      Q     -- numbers of high crime areas.  Did you

19   attempt to control for that at all in your macro-level

20   studies?

21      A     No.

22      Q     Experience as a victim of a crime, did you

23   attempt to control for that at all, like rape, in any of

24   your macro-level studies?

25      A     No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      Q    What about gang membership, did you attempt to

2   control for that in any of your macro-level studies?

3      A    No.

4      Q    Same with drug dealing?

5      A    No.  I mean, yes, it's the same.  No.

6      Q    Yeah.  Did you attempt to study or control for

7   the perception of the world as a hostile place in any of

8   your macro-level studies?

9      A    No.

10     Q    Same with 9, did you attempt to control for a

11  personality that emphasizes self-reliance and

12  consequently self-blame for problems?

13     A    No.

14     Q    And same with No. 10, strength of suicidal

15  intent?

16     A    No.

17     Q    Now, would there be any way to control for

18  these things in the macro-level study?

19     A    Some of them, yes.

20     Q    Which ones could you control for in the

21  macro-level study?

22     A    Well, as I say, I think I tried to control for

23  alcohol consumption, but I don't think there's any

24  reliable city level measures of that.  So it's in

25  principle, possible, but existing data don't permit it to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

203

1    be done in any meaningful way.

2         Illicit drug use, yeah, it's possible.  I've

3    done some studies, macro-level studies where there were

4    macro-level indicators of illicit drug use based on

5    things like emergency room handling of drug cases of

6    overdose cases, drug overdose deaths in medical

7    examiner records.  But I never used those in anal --

8    macro-level analyses of suicide rates.  So yes, in

9    principle, that could be done.

10        Q    Any other items that you could control for in

11   macro-level studies out of the ten?

12        A    Well, let's see.  Three wouldn't be relevant,

13   urban versus rural, because the macro-level studies I did

14   were all urban.  So there's no contrast between urban and

15   rural.  It wouldn't account for differences in suicide

16   rates.

17        Residents in a high crime neighborhood,

18   again, not pertinent to a city level analysis; but in

19   principle, you might do it in a neighborhood level

20   analysis except that suicide is too rare at small units

21   of analysis in any given neighborhood.  You would

22   mostly be contrasting a vast number of neighborhoods

23   that just had zero versus a few that had one and hardly

24   any that had more than that.

25        So most people wouldn't regard that as a very



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

204

1      productive way of studying suicide rates at the macro

2      level.  You would rarely see neighborhood level studies

3      done.  Experience as a victim of a crime, well, of

4      course, there's crime rates available for lots of

5      macro-level units and you could control for that.

6              Gang membership, probably not.  There really

7      aren't any useful proxies for that.  Police data are

8      essentially useless, and we don't have much of anything

9      else for large numbers of macro-level units.

10             Drug dealing, well, you'd probably end up

11     using the same kind of proxies that you did for illicit

12     drug use.  For dealing independent of use, probably you

13     don't have any meaningful measures because that's going

14     to be partly a function of just police effort to

15     suppress drug dealing.  So arrests wouldn't be a very

16     good proxy.

17             Perception of the world as a hostile place,

18     again, in principle, you could have surveys that

19     measured that, but there are no existing data like that

20     and nobody has done surveys of large numbers of

21     macro-level units in which that was measured.  So not

22     possible in the studies I did but in principle,

23     possible.

24             Personality traits, I can't imagine under any

25     realistic set of circumstances where a macro-level



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

205

1    study could control for the prevalence of personality

2    traits for a large number of macro-level units.

3         Strength of suicidal intent, almost certainly

4    not because that's -- it's a mentalistic concept and

5    surveys of the general public wouldn't have very much

6    useful to say because there would be virtually no

7    variation.  Ninety-nine percent of the population would

8    say they have zero suicidal intent.  But on the other

9    hand, all of those could be measured and controlled for

10   in a case control study, which is individual level.

11        Q    Okay.  Your macro-level studies, because you

12   didn't control or couldn't control for all these

13   variables, are those studies invalid?

14        A    No, it just means that they -- you have less

15   confidence that any associations you find represent

16   actual causal effects.  And since my results were that

17   there weren't any causal effects and the effect of

18   introducing controls for these confounders would be to

19   reduce the association, it would mean it would strengthen

20   the conclusion that there wasn't any effect.

21        There was already no appearance of an effect

22   without the controls for these confounders.  And so

23   there would have been even less support for the

24   proposition that gun availability affects suicides if

25   we introduce these confounders.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

206

1      Q     Now, you mentioned a couple of these

2    confounding variables over which there's simply no

3    meaningful data.  One that you mentioned, I think, was

4    gang membership.

5      A     Yes, at the macro level, certainly not; but at

6    the individual level, yes, you could measure that.

7      Q     And is the same thing true with drug dealing,

8    there -- there is meaningful data?

9      A     Yes, you could measure official data.  You

10   could have whether or not a person had been arrested for

11   drug dealing, and you could rely on confidential

12   self-reports, asking people did they deal.

13     Q     So are all these ten items that you mentioned

14   here actually available for purposes of doing a case

15   control study?

16     A     Well, I -- I can't know what variables people

17   had access to and didn't make use of.  I can only say

18   that there are variables that weren't in the published

19   reports controlled for.

20     Q     Is it your opinion that unless a study controls

21   for or, at least, tests the effects of all ten of these

22   variables, the study is invalid?

23     A     No, it's my position that the more of these

24   that a study controlled for, the more convincing the

25   results would be.  And since most of these case control



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

207

1    studies didn't control for any of them, they are very,

2    very unconvincing.

3         Q    To find out what effects these potentially

4    confounding variables would have, you would have to

5    actually measure them and then plug them into the

6    regression equation and see what effect that had?

7         A    Correct.

8         Q    You can't just assume that they had significant

9    effect --

10        A    Correct.

11        Q    -- on the result until after you do the

12   calculation?

13        A    Yes.

14        Q    I want to talk to you for a second about the

15   effect of suicidal intent on firearm suicide.  Will a

16   person who is intent on committing suicide use the most

17   lethal means available to them?

18        A    They are likely to use the method they believe

19   is most lethal.

20        Q    Would you agree with me that people would

21   assume that guns would be the most lethal method

22   available?

23        A    I believe that's a very common belief.

24        Q    So if there is no access to guns, would you

25   agree with me that that might, at least, prevent some



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

208

1      impulsive suicides?

2          A    No, I would not agree with that.

3          Q    And the reason you don't agree with that is you

4      believe people would substitute other means?

5          A    Yes.

6          Q    And I think you specifically mentioned that

7      they would substitute hanging?

8          A    They would substitute what they believed to be

9      the next most lethal method.  And as it -- as a matter of

10     reality, of actual fatality rates, that is the next most

11     lethal and may well be as lethal as shooting.

12         Q    Is there any study that -- that indicates that

13     people intent on suicide, the same level of suicide

14     intent, substitute, as you suggested?

15         A    I'm going to have to hear that question again.

16         Q    Is there any study that indicates that two

17     people that have the same level or -- strike that.

18              Is there anything -- any study that indicates

19     that all other things being equal, that a person will

20     substitute another form of suicide for a gun if a gun

21     is not available?

22         A    I don't know if there's any studies that

23     directly framed the issue that way, instead, there's

24     information that indirectly suggests it.  It's -- it's

25     consistent with it, but it wasn't done by people who had



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

209

1      that idea in mind in designing of the study.

2            For example, what we'll find frequently is

3      that gun ownership rates are positively and

4      significantly related to gun suicide rates, but not

5      total suicide rates.  And the most plausible

6      explanation for that finding would be that people are

7      substituting other methods.  That's why gun

8      availability doesn't affect total suicide rates.

9      Because I -- I've never heard any alternative

10     explanation offered.  Like I don't think anybody

11     suggests that owning a gun reduces your inclination to

12     be unhappy or to commit suicide or whatever.

13           So the most plausible explanation of why gun

14     availability levels would be positively and

15     significantly related to gun suicide rates but not

16     total suicide rates is that when guns are less

17     available, people substitute other methods that are

18     sufficiently lethal to commit suicide with, like

19     hanging.

20        Q    Well, would the invail -- unavailability of

21     guns force substitution to other methods that are less

22     lethal than guns?

23        A    That's the whole question?

24        Q    Yeah.

25        A    Would there be such methods?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

210

1     Q    Yeah.  Would the unavailability of guns force
2  people to substitute methods that are less lethal than
3  guns in trying to commit suicide?
4     A    It would force them to substitute other
5  methods, and it would probably be methods that they
6  believed to be less lethal, but it wouldn't necessarily
7  cause them to substitute methods that were actually less
8  lethal.
9          For example, the most common -- the most
10  likely substitute would be hanging, which as far as I
11  can tell from the research, is indistinguishable from
12  shooting as a meth -- as a le -- as a method of suicide
13  in terms of the lethality.
14     Q    What is your basis for saying that hanging is
15  the most likely substitute as a method of suicide for a
16  gun or using a gun?
17     A    National suicide statistics indicate it's the
18  second-most common method of suicide after shooting.
19     Q    Do any studies indicate that people who wanted
20  to use a gun but couldn't would go to hanging?
21     A    Not that I'm aware of, not that directly asked
22  people, you know, who had survived a suicide attempt
23  would you use hanging, for example.
24     Q    Do you know what the suicide rate is among
25  people who survive a first suicide?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

                                                          211

1          A     I know there are data available on that that

2     I've seen at one time, but I couldn't tell you what they

3     are at this late date.

4                (Exhibit No. 9 was marked for

5          identification.)

6     BY MR. WOODS:

7          Q     All right.  Dr. Kleck, the court reporter has

8     handed you or someone handed you what was marked as

9     Exhibit No. 9 to this deposition, which is an article by

10    David Brent and colleagues, published in 1991?

11         A     Yes.

12         Q     And you are familiar with this article;

13    correct?

14         A     Yes.

15         Q     And this is one of the articles that's in your

16    table No. 1, I believe?

17         A     Yes.

18         Q     And let me direct you in your report where I'm

19    going to ask you some questions.  If you'll go to the

20    bottom of page 8 in your report.

21         A     (Views document.)

22         Q     You discuss two papers by Brent, one from 1988

23    and one from -- on page -- top of page 9, you discuss one

24    from 1991.

25         A     Correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

212

1        Q    And the 1991 study is what we've marked as

2    Exhibit No. 9; correct?

3        A    (Views document.)

4             Yes.

5        Q    And the point you're making in this paragraph

6    is you can't use crude odds ratios; you have to adjust

7    for confounders.  And when Brent, in 1998, adjusted for

8    confounders, the -- a significant effect went to

9    nonsignificant; right?

10       A    I don't think you mean 1998; do you?

11       Q    No, I mean 1988.

12       A    1988, all right.

13       Q    All right.  The point you're making in this

14   paragraph on page 8 of your report is that when Brent and

15   colleagues controlled for the confounding variables that

16   they controlled for in their study, the result went from

17   a significant association you have down here, crude odds

18   ratios, 4.5, to nonsignificant; correct?

19       A    Yes.

20       Q    And then next you point to the 1991 study,

21   which included the same data, but it was larger?

22       A    Yes.

23       Q    But it overlapped the data from 1988 study;

24   correct?

25       A    Yes, they added about ten or 20 more cases.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

213

1          Q     And when they introduced the control for -- in

2     that -- in the 1991 study, the odds ratio dropped from

3     4.5 to 2.1; that's what you say here; right?

4          A     That's correct.

5          Q     But it was still significant after that drop;

6     correct?

7          A     That's what they reported.

8          Q     Well, you did -- did you say that at all in

9     your report here, in the top paragraph, that even though

10    it dropped from 4.5 to 2.1, it was still significant?

11         A     (Views document.)

12               No, I did not.

13         Q     Do you think that's important to note, that

14    it's still significant, even after they controlled for

15    confounding variables?

16         A     No, not in the context in which I raise the

17    issue, because the context was how important it is to

18    control for a confounder, how much the odds ratio can

19    shift due to the control of confounders.  And in this

20    case, it was sort of an extreme test because it was

21    simply the result of a very small number of confounders

22    being controlled for and even that was sufficient to make

23    most of the association disappear.

24         Q     This particular study by Dr. Brent was

25    published in the Journal of the American Medical



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

214

1    Association?

2         A    (Views document.)

3              Yes.

4         Q    And I think we've already talked about before

5    that's a prestigious journal in the medical arena;

6    correct?

7         A    Right.  It's prestigious for medical research

8    but not prestigious for criminological topics.

9         Q    Are you a reviewer, a referee for this journal?

10        A    Yes.

11        Q    Now, if you go to page 2993 of the study.

12        A    (Views document.)

13        Q    You see under Adjusted Odds Ratio, you see

14   where that heading is on page 2?

15        A    Are you talking about Table 4 somewhere?

16        Q    No, I'm talking about --

17        A    Oh, I'm sorry.  It's in the text.  I see.

18        Q    -- in the text.  The heading, adjusted odds

19   ratio; so you see where that is?

20        A    Yes, I see it.

21        Q    And then if you go down probably three

22   sentences, it says:  After controlling?

23        A    Yes.

24        Q    So it says:  After controlling for a diagnosis

25   of affective disorder and suicidal intent, the presence



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                              October 28, 2011

215

1    of a gun in the home was more likely in the completers --

2    was more likely in the completers relative to attempters.

3    And that was an odds ratio of 2.1 with a confidence

4    interval of 1.2 to 3.7; correct?

5         A    Correct.

6         Q    So they did control for suicidal intent here?

7         A    That's correct.

8         Q    And even though they controlled for suicidal

9    intent, they still got a significant positive

10   association?

11        A    Yes, but that was not the point I was making in

12   context.  The point was that controlling for suicidal

13   intent makes a huge difference in the estimated

14   association of gun ownership with suicide.  And in this

15   case, it dropped the asso -- it made most of the

16   association disappear, the implication being that if you

17   made a serious effort to measure and control for

18   confounders, it would disappear altogether.

19        Q    Can you explain to me the basis for your belief

20   that self-reliance and self-blame are both -- are related

21   to both firearm ownership and suicide?

22        A    The basis for it being related to gun ownership

23   is survey data where people have been asked:  Do you

24   believe that you have to rely on yourself for protection

25   of yourself and your family or do you -- can you rely on



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

216

1      the police for that?  And gun owners are much more likely

2      to say they -- they rely on themselves and not the

3      police.

4          Q     And is that data contained in the Feagin 1970

5      study or is there something else?

6          A     That's -- yes, it's in the Feagin study.

7          Q     What about the -- I assumed you believe that

8      self-reliance, self-blame are also associated with

9      suicide?

10         A     Yes.  Although, I've pointed out that there's

11     no empirical test of that association.  So that's a

12     plausible theory or hypothesis, but not an empirically

13     established fact.

14         Q     Okay.  So it's been -- hasn't been

15     scientifically proven?

16         A     Well, we don't use the concept of proof in

17     science, but it hasn't been scientifically subjected to

18     empirical tests, certainly.

19         Q     That's just your belief, that it may be a

20     factor?

21         A     Right.  Well, it's --

22         Q     Is there anyone else -- is there anybody else

23     who has indicated that self-reliance, self-blame is

24     associated with suicide?

25         A     I'm not aware of anybody who has tested that



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

217

1    association.

2        Q    Are you aware of anybody who has raised the

3    hypothesis such as you have done?

4        A    With -- in connection with a gun issue?

5        Q    Yes.

6        A    No, I don't think so.  I'm not aware of such a

7    thing.

8        Q    Are you aware of any study of gun ownership and

9    suicide that's attempted to control for self-reliance,

10   self-blame?

11       A    No.

12       Q    I notice that wasn't -- and maybe I was

13   wrong -- that wasn't in the ten items that you listed

14   above on page 17 and 18 -- I'm sorry, on page --

15       A    Yeah.  It was No. 9.

16       Q    Oh, Number 9, I apologize.

17            Number 9 says:  Strength of suicidal intent.

18       A    No.

19       Q    Am I wrong?

20       A    No, you are looking at No. 10.

21       Q    I apologize.

22       A    Just before that, No. 9 is:  A personality that

23   emphasizes self-reliance and consequently self-blame for

24   problems.

25       Q    I apologize.  That was my notes I had



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

218

1    improperly transcribed.  That's correct.

2              So you're not aware of anyone that has ever

3    controlled for that?

4         A    That's correct.

5         Q    But you --

6              MR. COOPER:  Excuse me.  What is that?

7         Forgive me, I'm not sure what you're referring to.

8              MR. WOODS:  Yeah.  Number -- that is the

9         ninth item, a personality that emphasizes

10        self-reliance and consequently self-blame for

11        problems.

12   BY MR. WOODS:

13        Q    You're not aware of anybody ever controlling

14   for that?

15        A    That is correct.  I'm not aware of a study

16   that's controlled for that.

17        Q    You're not aware of a study that shows you need

18   to control for that?

19        A    Same answer, yeah.

20        Q    Now, so if you turn now to page 9, if you

21   would, in your report, if you look at second full

22   paragraph from the top, where you say all but the last

23   two studies summarized in Table 1 controlled for four or

24   fewer likely confounders.

25              Does the Weibe 2003 article -- that's one of



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

219

1    the studies that did control for more than four

2    confounders -- did the Weibe 2003 article in the

3    American College of Emergency Medicine find a positive

4    statistically significant adjusted odds ratio for the

5    effect of firearms on suicides?

6         A    The Annals of Emergency Medicine one?  Yes,

7    that's correct.

8         Q    And does the Dahlberg, et al. 2004 article in

9    the American Journal of Epidemiology, does that also show

10   a positive statistically significant adjusted odds ratio

11   for the effect of firearms on suicide?

12        A    For males, yes; for females, no.

13        Q    Are these two papers the most recent studies on

14   the topic that you're aware of?

15        A    Yes, I'm pretty sure.  But I wouldn't place too

16   much reliance on that because this was valid as of the

17   time I did this review.  So I couldn't swear that there

18   aren't one or two more recent studies.

19        Q    Did the -- as I understand, the National

20   Research Council did a review of all of this evidence, at

21   least at the time, looking to see whether there was

22   sufficient evidence to conclude there was a -- a positive

23   effect between firearm ownership and suicide?

24        A    Yes, they -- well, with the qualifier that you

25   said "all of this," and I'm not sure -- I'm pretty sure



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

220

1    they didn't cover all of this --

2         Q    Right.

3         A    -- but they certainly did a review.

4         Q    Right.  And that was really my next question.

5              Do you know if they reviewed all of those 16

6    studies that you've mentioned in your rebuttal report?

7         A    They did not.

8         Q    Do you know if they reviewed the Weibe study or

9    the Dalhberg study?

10        A    Well, as I sit here, I wouldn't recall exactly

11   what they did review and didn't review.  I only know for

12   sure that there are some studies that they did not

13   review.

14             (Exhibit No. 10 was marked for

15             identification.)

16   BY MR. WOODS:

17        Q    Okay.  Dr. Kleck, I've handed you what's been

18   marked as Exhibit No. 10, which is a study by Miller and

19   colleagues entitled:  Recent Psychopathology, Suicidal

20   Thoughts and Suicide Attempts in Households with and

21   without Firearms, Finding of the National Co-morbidity

22   Study Replication.

23        A    Yes.

24        Q    Are you familiar with this study?

25        A    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

221

1      Q    Okay.  Now, this study was conducted by the

2  Harvard school of Public Health in Boston; is that right?

3      A    I don't think that's really a meaningful way to

4  describe it.  It's conducted by these five authors so...

5      Q    Oh, okay.

6      A    You know, who are a affiliated with that

7  school.

8      Q    Who are affiliated with the Harvard School --

9      A    Right.

10     Q    -- of Public Health?

11     A    Right.

12     Q    Okay.  And this study looked at whether a

13  number of potential confounders affected suicide

14  attempts; correct?

15     A    Correct.

16     Q    And one of the things they looked at was

17  anxiety disorders --

18     A    (Views document.)

19     Q    -- as a potential confounder; right?

20     A    Yes.

21     Q    And mood disorders?

22     A    Yes.

23     Q    And substance dependence?

24     A    Yes.

25     Q    And suicidal ideation in the past year?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                            222

1          A     Yes.

2          Q     And suicidal planning?

3          A     Yes.

4          Q     And they found that none of those were

5     associated with living in households with firearms;

6     correct?

7          A     The -- I'm not sure if in your list, you

8     included serious suicidal attempt, which was the only one

9     for which they found a significant difference between

10    persons in households with guns and without guns;

11    although, for -- I think you did mention alcohol

12    dependence, and there was an association for women.  And

13    there was also a statistical association for stress

14    disorder and gun ownership.

15         Q     So having made a suicidal attempt over the

16    previous year was the only outcome more common among

17    participants reporting that they currently lived in a

18    home with firearms; correct?

19         A     Well, I'd have to hear that question again.

20         Q     All right.  And I -- I'm just reading from the

21    result section of their paper.

22         A     Okay.

23         Q     They say:  Having made a suicide attempt over

24    the previous year was the only outcome more common among

25    participants reporting that they currently live in a home



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

223

1    with firearms.

2         A    (Views document.)

3              Yes.

4         Q    And so what the authors conclude is the

5    previously reported association between household firearm

6    ownership and heightened suicide risk is not explained by

7    higher risk of psychopathology among gun-owning families;

8    right?

9         A    That's what they say.

10        Q    And -- and this paper also supports, then, the

11   implication that gun ownership is associated with, at

12   least, suicide attempt; correct?

13        A    Well, you say also like the first conclusion

14   they arrived at was correct, that the study supported it.

15   And it doesn't support it.  That was just what they said.

16        Q    So is this a reanalysis from a previous study?

17        A    No, it's -- it's a study of suicide attempts.

18   It -- it's not a study of suicides.  So it doesn't

19   directly bear on suicides.  So that's why their first

20   statement that you quoted is a non sequitur.  But the

21   second statement about an association with suicide

22   attempts, that's correct.

23        Q    What is the percentage of suicide attempts with

24   a gun that are successful; do you know?

25        A    Among the suicide attempts we know about, it's



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

224

1    on the order of 70 to 80 percent.  Varies from study to

2    study, but it's in that range.

3         Q    So can we fairly say that if gun ownership is

4    associated with suicide attempts, it's also associated

5    with suicide?

6         A    No.  No, it wouldn't necessarily follow it.

7         Q    And why not?

8         A    Well, you know, wait a minute, you said

9    associated with?

10        Q    Yeah.

11        A    You just said associated with?

12        Q    Yeah.

13        A    All right.  Let me rethink that, then.

14             No, it's still not necessarily true, even as

15   an associational statement.

16        Q    Yeah, this study wasn't in your table of

17   studies.

18        A    Yeah, because it's not a study of suicide.

19        Q    Right.  It's a study of attempted suicide?

20        A    Correct.

21        Q    With a gun?

22        A    No, I'm not sure they confined it to just

23   suicide attempts with a gun.  They -- they had a

24   subsidiary focus on that as well.  Not only on that.

25        Q    Okay.  We can put that aside.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

1           MR. WOODS:  Why don't we go ahead and change

2       the tape.

3           THE VIDEOGRAPHER:  Off the record.

4           (Brief recess was taken.)

5           THE VIDEOGRAPHER:  We're back on the record

6       with tape No. 6.  The time is 3:31.

7   BY MR. WOODS:

8       Q    Dr. Kleck, any answers that you'd like to

9   change?

10      A    No.

11      Q    Going back to your list of -- partial list of

12  likely confounders on page 7 to 8, for the 16 studies,

13  case control studies that are included in your Table 1,

14  do you know whether they actually had data on all these

15  confounders and could have controlled for all of these in

16  those 16 studies?

17      A    No, I can't know about variables that they

18  didn't mention in their published reports.  I can know

19  that it would have been, in principle, possible to

20  measure them; but I can't know that, in fact, they did

21  measure them.

22      Q    Well, would it be, in principle, possible to

23  know the percentage of FFLs that sell over 50 guns today?

24      A    Yes.

25      Q    But you didn't do that study?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

226

1      A     Correct.

2      Q     All right.  So the fact that you didn't do it

3   affects the validity of your analysis to some extent; at

4   least; right?

5      A     It affects whether or not I can generalize from

6   earlier data to the present.

7      Q     And the same thing is true with these

8   confounding factors, the fact that some of these items

9   weren't controlled for could affect the confidence that

10  you have in the results; correct?

11     A     Well, I think we -- we have more information in

12  this case, because in some cases, we know that the

13  variables are correlated with gun ownership.  So it's not

14  a complete unknown issue.

15           And in some cases, we know that they are risk

16  factors for suicide, and so it's not completely

17  unknown.  But what we can't know is what would have

18  happened to those adjusted odds ratios if among the

19  control variables, we had a control for these variables

20  because they didn't do it.

21     Q     And -- and some of it may have not been

22  controlled for because they couldn't do it; they didn't

23  have the data; correct?

24     A     That's very likely an explanation, a partial

25  explanation.  But there's also no affirmative evidence



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

227

1      that they made an attempt to.  So it's not necessarily an

2      inability; it's maybe a disinclination.

3           Q    Well, there's no affirmative evidence that they

4      didn't do it, but there's no affirmative evidence that

5      they -- that they didn't try to do that either; correct,

6      that they didn't try to control for those things?  But

7      then determining --

8           A    Well, there's the evidence that they, in fact,

9      didn't end up controlling for it.

10          Q    Right.  That's all we know is that in the end,

11     they didn't end up controlling for it?

12          A    That's correct.

13          Q    But they may have tried to see if they could

14     control for it and weren't able to get data; correct?

15          A    It's a logical possibility, certainly.

16          Q    I mean, is it your opinion that the fact that

17     all this -- if -- if -- in order for a study to be --

18     that showed a positive relationship between guns and

19     suicide, in order for you to believe that that

20     relationship is a true relationship, they would have had

21     to control for every one of these ten items?

22          A    No, that's not my position.

23          Q    Okay.  How many of these ten items would they

24     have to control for in order to convince you that a

25     positive association of statistical significance is



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

228

1    actually real?

2         A    More is better.  The more of them they control

3    for, the more convinced I would be.

4         Q    So it's kind of a sliding scale?

5         A    Correct.

6         Q    So if they control for six out of ten, would

7    that be enough for you to be convinced?

8         A    That would be better.  I would be more

9    convinced than if they had only controlled for two or

10   three or four.

11        Q    Let me direct you just quickly to your Table 2

12   in your report.

13        A    (Views document.)

14        Q    And this is the relative lethality of shooting

15   and hanging as a method of suicide.

16        A    (Views document.)

17        Q    And, first of all, all these -- almost all of

18   these studies show that shooting is more fatal than

19   hanging; right?

20        A    Well, seven out of nine.

21        Q    That's almost all of them?

22        A    No, it's just seven out of nine.  I mean, you

23   know, you don't add anything by saying almost all.  It's

24   just kind of a subjective twist on what is much more

25   precise, which is seven out of nine.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

229

1      Q    That's a statistician's way of saying it;

2   right, seven out of nine?

3      A    Well, I mean, it's -- it's the way of saying it

4   if you know how to count.

5      Q    There you go.

6           Now, did any of these studies look at whether

7   hanging is a substitute for -- for shooting as a -- as

8   a way to commit suicide?

9      A    Well, some of the studies might have

10  mentioned -- in fact, almost certainly mentioned that as

11  an issue.  I don't think that was what the studies were

12  intended to do, in any of these nine studies.

13     Q    All right.  Can you turn over now to page 10 of

14  your report?

15     A    (Views document.)

16     Q    Actually, let me go back to -- I'm sorry, table

17  2.  Did any of those studies actually show substitution

18  between guns over to hanging?

19     A    (Views document.)

20          I'd say certainly for all but the first one,

21  the answer would be no, they did not.  I'm not sure

22  about the Shneidman and Farberow.  That's such an old

23  study; it's a half a century old.  It's so long since

24  I've read that one, I -- I can't be sure.  It's

25  remotely possible they might have, but I don't have any



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

230

1     specific recollection of them doing it.

2          Q     All right.  Why don't you go ahead and flip

3     over to page 10.  If you go -- if you go down to -- oh, I

4     don't know, the second paragraph from the bottom, about

5     the middle, says:  For example, ten of the 11 studies,

6     you see that?

7          A     Not yet -- oh, yes, I see it.

8          Q     And that -- you are talking about ten of the 11

9     ecological studies; is that what you are talking about?

10         A     Yes.

11         Q     Did you list somewhere in your report what

12    those 11 studies are?

13         A     I cited my 1997 book in which we -- they were

14    listed.

15         Q     Okay.  Do you know what those studies are as we

16    sit here?

17         A     No, I don't have that book with me.

18         Q     Okay.  Do you know -- why do you say:  Ten of

19    the 11 studies published before 1996 found no significant

20    effect?  Is that because your book was published in 1997?

21         A     That's it.

22         Q     Now I understand.

23         A     I had no ability to forecast future findings.

24         Q     Do you know -- have you looked at any studies

25    after 1996 to see what the results of those studies,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

231

1    ecological studies were?

2        A    I haven't done any similarly systematic review

3    of the post-1996 studies.  I'm certainly familiar with

4    isolated studies here and there but nothing that would

5    allow me to say what proportion of the study supported

6    this hypothesis.

7              (Exhibit No. 11 was marked for

8         identification.)

9    BY MR. WOODS:

10       Q    And the court reporter has handed you what's

11   been marked as Exhibit No. 11.  And it's a study by Mann

12   and colleagues published in the Journal of the American

13   Medical Association in 2005; is this a study that you've

14   seen before?

15       A    Possibly, but I wouldn't describe them as

16   something familiar to me.  I think I might have given it

17   a casual glance.

18       Q    Okay.  And this is -- this is a review paper;

19   is that right?

20       A    Yes.

21       Q    And it was conducted -- if you look on the

22   first page under data extraction by it says:  Experts

23   from 15 countries reviewed the studies that they

24   extracted; do you see that?

25       A    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

232

1       Q    And under their conclusions, they say:
2    Physician education and depression recognition and
3    treatment and restricting access to lethal methods reduce
4    suicide rates; do you see that?
5       A    Yes, that's what they said.
6       Q    Do you have any reason to disagree with that
7    statement?
8       A    Yes, ample reason.
9       Q    I assume you -- your beef is you don't think
10   restricting access to lethal methods reduces suicide
11   rates?
12      A    Well, I think that mostly they are basing that
13   on one specific lethal method; that is, shooting.  So
14   it's primarily based on evidence concerning shooting.
15   And part of the basis for doubting that is it seems to be
16   premised, sometimes explicitly, more usually implicitly,
17   on the notion that the suicide attempts by shooting are
18   more lethal than the likely substitute measures.  And as
19   the data in Table 2 indicate, that's not well-supported.
20      Q    And why does the data in Table 2 indicate that?
21      A    It indicates that there's -- in two out of nine
22   studies, the difference is in the opposite direction,
23   that the shooting attempts were less lethal.  And in
24   almost all the remaining studies, the difference was so
25   slight that we can have no confidence it was attributable



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

233

1    to the method's lethality as distinct from the intention

2    of the people who used them.

3        Q    But that's not what the authors concluded from

4    their review; right?

5        A    That's right; that's not what they concluded.

6        Q    And it was published in the Journal of the

7    American Medical Association?

8        A    That is correct.

9        Q    That is a journal you are a referee for;

10   correct?

11       A    That is correct.  I didn't referee this paper

12   but...

13       Q    Are you finished?

14       A    I -- I am a review for the -- reviewer for the

15   Journal of the American Medical Association.  But I had

16   nothing to do with the review on this particular paper.

17       Q    They didn't ask you to review this paper?

18       A    No.

19       Q    All right.  If you look just a little bit

20   further down on page 10 of your expert report, where you

21   say:  Thus, gun rates affect rates of gun suicide, but

22   not the total suicide rate; do you see that?

23       A    Correct.

24       Q    And that's your point, that people will

25   substitute other methods for suicide if guns aren't



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

234

1    available; right?

2        A    Yes.

3        Q    And it's your premise that it's actually

4    suicidal ideation that causes suicide, not the

5    instrumentality of suicide; right?

6            So if people are very intent on committing

7    suicide, they are going to do it regardless of whether

8    they have a gun or anything else available?

9        A    No, I would not hold to that view.

10       Q    Okay.  Maybe I should ask you what your view

11   is.

12       A    My view is that suicidal intent would be one

13   major determinant of whether people die.  And in some

14   cases, the means available to make that attempt might

15   have an effect, but that guns are no more lethal than

16   hanging; whereas if, for example, you were contrasting

17   guns and hanging with superficial slashes of the wrist,

18   for example, then, yes, then there's a difference in

19   method lethality that could affect the outcome.

20       Q    Well, is it harder to hang yourself than to use

21   a gun to kill yourself?

22       A    Harder in the sense of getting the available

23   means, no.

24       Q    Well, one thing you have to get is a rope?

25       A    Yeah, you have to get a gun on the one hand and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

235

1    you have to get a rope and a noose -- or, I'm sorry, a --

2    some sort of support to hang it from.  But in both cases

3    --

4         Q    And you have to have a sufficient amount of

5    rope to do it?

6         A    If I can complete the answer.

7         Q    Yes.

8         A    In both cases, those materials would be more or

9    less universally available in the case of hanging but

10   more narrowly available in the case of shooting.

11        Q    You mention you rely on Kleck, 1997, this is

12   your book, for your support that gun rates affect rates

13   of gun suicide but not the total suicide rates.  Are

14   there any studies that conclude otherwise?

15        A    Yes, certainly one of those 11 studies

16   concluded that more guns lead to more suicide, total

17   suicide.

18        Q    Is that -- do you know which study that is?

19        A    It was one of Lester's study, I think.

20        Q    Okay.  Are there any other studies that --

21        A    Not in --

22        Q    -- refute this?

23        A    -- pre-1997 literature.

24        Q    What about the post-1997 literature?

25        A    Yes, there are some that made that claim from



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

236

1    invalid data.

2         Q    You don't mention those studies in your report

3    anywhere?

4         A    I think I do, the bottom of page 10.

5         Q    Okay.

6         A    Webster alludes to a study of Miller, et al.,

7    2006.  So yes, I discuss that one and exactly why the

8    conclusions are invalid.

9         Q    Is that the only one you discuss?

10        A    It's the only one I discuss in this context in

11   the report; I'm pretty sure of that.  But some of the --

12   the other studies I've cited have addressed that issue --

13   have addressed other studies.

14             (Views document.)

15             Kleck 2004a, Measures of Gun Ownership Levels

16   for Macro-Level Crime and Violence Research.  It

17   addresses the same problem, which is the use of invalid

18   proxies for gun ownership.  And in particular, the

19   suicide studies that claim that more guns lead to more

20   total suicide use panel designs, macro-level panel

21   designs, which require you to have a measure of gun

22   ownership which is valid for comparisons over time for

23   tracking trends in gun ownership.

24             And in that study, I demonstrate that the

25   proxies that Webster -- I'm sorry, that Miller, et al.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                          237

1    used were not valid measures of changes in gun

2    ownership.

3         Q    You are talking about percent gun suicides

4    or...?

5         A    Yes.

6         Q    Okay.

7         A    Over time, that has no correlation with the

8    criterion measures of gun ownership used to assess its

9    validity.  And it's one of a number of panel studies like

10   that done by Miller and Hemenway in various combinations.

11   So you could probably identify maybe three or four

12   studies that have that same flaw.

13        Q    On page 11, you talk about a paper by Miller in

14   2007.

15        A    Where is this?

16        Q    This is on page 11 of your expert report in the

17   middle paragraph, basically the middle of the page.

18        A    Okay.

19        Q    And you indicate that you actually reanalyzed

20   that study?

21        A    Yes.

22        Q    Correct?  And that's --

23        A    Yes.

24        Q    -- the reanalysis is part of what you reference

25   here as Kleck 2007?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

238

1        A     Yes.

2        Q     And is that a published paper?

3        A     No.

4        Q     Has that reanalysis been peer-reviewed?

5        A     I'm not sure.  It was -- it was submitted as a

6    commentary to the journal in which that was originally

7    published, and that may or may not be subject to peer

8    review.  Sometimes it's internally reviewed by the editor

9    or associate editor, which normally wouldn't be

10   considered a peer review.  So I'm not sure about that.

11       Q     When was it submitted to -- which journal was

12   it submitted to?

13       A     Let's see.  It's whichever one the original

14   article was in.

15       Q     Right.

16       A     So Miller, et al. 2007, wherever that was

17   published.  Social Science in Medicine, possibly.  Yeah,

18   I think that's it.  Social science in Medicine.  No, no,

19   that's homicide.  So it's not that one.

20             (Views document.)

21             Yeah, I think I skipped the citation on that.

22   It's missing from the reference list on page 51.  It

23   ought to be between Miller, et al. 2004 and Miller, et

24   al. 2007.  But it's whatever journal that article was

25   published, that's where I also submitted this as a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

239

1     comment, a brief comment on the article.

2        Q    Okay.  And your comment was entitled:  Fragile

3    Findings on Gun Suicide Link?

4        A    Yes.

5        Q    And in there, there's a reference to Miller,

6    Lippmann, Azrael, Hemenway (2007) published in the

7    Journal of Trauma?

8        A    That might be it.

9        Q    Does that ring a bell?

10       A    Yeah, that might be it if it's a suicide study.

11   What was the -- what was the title again?

12       Q    Well, you don't have the title listed here.

13       A    Oh, okay.

14       Q    You just said they reported on their

15   cross-sectional analysis of state suicide rates around

16   2000.  Here we go.

17            Household Firearm Ownership and Rates of

18   Suicide Across the 50 United States in the Journal of

19   Trauma.

20       A    That could be it, yeah, that's of 2006?

21       Q    2007.

22       A    Yeah, yeah.  I can't really tell you for sure

23   right now because I accidentally omitted that citation.

24       Q    Okay.  Was your commentary rejected by the

25   journal?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

240

1        A    Yes.

2        Q    Did they tell you why?

3        A    They probably did; although, I don't recall

4   what it was, what they said the reason was.  You know,

5   it's -- it's very likely they said something like space

6   limitations, but that doesn't necessarily mean it's the

7   real reason.

8        Q    Do you suspect that there's another reason?

9        A    Well, journals are not too happy about having

10  their own flaws exposed.  And if somebody published a bad

11  piece of research and their review process didn't detect

12  the flaws, it doesn't reflect well on the journal.

13       Q    So do you believe that's --

14       A    So that is a possible motive.

15       Q    Did you submit this commentary to another

16  journal for publication?

17       A    No, you can't really get this kind of thing

18  published elsewhere because it's a comment on a

19  particular article in a particular journal.  It's not of

20  broad interest.  It's of interest to the readers of that

21  particular journal.  So I made no further effort to get

22  it published.

23       Q    Do you know if the Journal of Trauma is a

24  peer-reviewed journal?

25       A    I believe it is.  I don't know for sure, but



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

241

1      I'm pretty confident it is.

2           Q    Do you know who sponsors that journal, what

3      organization or --

4           A    No.

5           Q    -- or university?

6           A    No.

7           Q    Do you know if it's a leading journal?

8           A    No.

9           Q    I assume it's a health-related journal?

10          A    Yeah.

11          Q    Now, you mention in paragraph 11 at the bottom

12     that:  The association is fragile, meaning that it is

13     highly unstable, subject to huge changes when the

14     analysis is done slightly differently.

15          A    Yes.

16          Q    And is -- does -- is that an indication that

17     the results that are fragile in that way mean there's a

18     greater likelihood the results are invalid?

19          A    Yes.  Although, I should qualify what fragility

20     means in this case.  Fragility means not just that the

21     results change with any change in the methods, but

22     rather, they change with valid changes.

23               In other words, if you have in any way

24     improved the research and the results are substantially

25     different.  It's irrelevant what happens when you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

242

1    introduce, you know, inept changes that should have not

2    been made, but when valid changes in the research

3    methods produce substantial differences in results,

4    that undercuts your confidence in the conclusions.

5         Q    Okay.  Why don't you turn to page 12 of your

6    expert report.

7         A    (Views document.)

8         Q    And about mid page, you say:  He, referring to

9    Dr. Webster, fails to tell the reader that these facts --

10   why don't we go back.  We'll go back to the line before.

11             He, meaning Dr. Webster, likewise notes that

12   Chicago's suicide rate was lower than in the rest of

13   the U.S. in 2005 -- an obvious attempt to suggest this

14   low suicide rate was at least partially caused by the

15   handgun ban.  He fails to tell the reader that these

16   facts also prevailed before Chicago's "handgun ban was

17   in force," beginning in 1982.

18             For instance, Chicago's suicide rate in 1980

19   was 7.4 suicides per 1,000, while it was 11.8 in the

20   U.S. as a whole.  Likewise, the percent of suicides

21   committed with guns in 1980 was 41.9 percent in

22   Chicago, compared with 57.3 percent suicide for the

23   U.S. as a whole.

24             Let me ask you this:  Do you know how the

25   suicide rate in Chicago pre-ban compared with the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

243

1    suicide rate in Chicago post-ban?

2        A    I think I have material on that somewhere or

3    another, but I couldn't tell you as I sit here what those

4    changes in suicide rates were.

5        Q    Do you know if the suicide rate went down after

6    the ban?

7        A    I don't know.

8        Q    If it did go down, that would certainly be

9    consistent with an effect of the ban on suicide rates?

10       A    Yes.

11            MR. WOODS:  Why don't we go off the record

12       for just a second.

13            THE VIDEOGRAPHER:  Off the record, please.

14            (Brief recess was taken.)

15            THE VIDEOGRAPHER:  We're back on the record.

16       It's 3:57.

17   BY MR. WOODS:

18       Q    So, Doctor, isn't that the relevant

19   consideration, whether suicide rates went down after the

20   ban went into place or not?

21       A    It is certainly a relevant consideration; but

22   in this context, my point was Professor Webster citing a

23   misleading fact.

24       Q    But -- but you don't cite the fact that the

25   suicide rate in Chicago went down after the ban?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

244

1       A    Right, because I wasn't addressing the issue of

2    what the effect of the ban was.

3       Q    But you know that that's, in fact, the case?

4       A    Well, only because you just told me that.

5       Q    Okay.  You weren't trying to be misleading in

6    your report?

7       A    Nope.

8       Q    Why don't we go now to page 13 of your report.

9       A    (Views document.)

10      Q    And you understand that one of Dr. Webster's

11   contentions is that with the increase in availability of

12   guns in the home, that leads to an increase of homicide

13   in the home as well; correct?

14      A    Yes.

15      Q    And one of the studies that Dr. Webster relies

16   on is the study by Kellermann in 1993; right?

17      A    Yes.

18      Q    And in the first part of page 13, you were

19   critiquing that study?

20      A    Yes.

21      Q    And can you just explain to me what is your --

22   why do you think that the results of the Kellermann study

23   are not valid for contending that as gun availability in

24   the home goes home goes up, homicide in the home also

25   goes up?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                            October 28, 2011

245

1       A      The point I'm emphasizing in this context in

2    page -- on page 13 is that Kellermann didn't document

3    that the people who -- that the elevated risk of homicide

4    in gun owning households was due to people using guns to

5    -- household guns to commit homicides.

6            And, in fact, evidence that he later

7    developed from a largely overlapping body of data on

8    two of the three urban counties he had studied in the

9    earlier study were also covered in the later one.  He

10   found out that the vast majority of homicides were

11   committed with -- in some other way, either with a

12   non-gun method or if it was a gun, it was a gun from --

13   not belonging to the victim's household, which cast

14   doubt on what was presumably the mechanism by which

15   owning a handgun or a gun of some kind would lead to

16   more homicide.

17           I mean, the assumption among many readers

18   was:  Well, it's because there was a gun in the

19   household, that gun got used to commit a homicide that

20   otherwise wouldn't occur.  Well, it turns out that

21   virtually no homicides are committed with a household

22   gun in the sense that it's a gun belonging to somebody

23   in the victim's household.  Instead, the guns usually

24   come from outside the household.

25      Q      But wasn't the Kellermann study focused on



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

246

1    determining whether the guns -- the rate of homicide in

2    the home was associated with the number of guns in that

3    home?

4         A    Yes, it was.

5         Q    And he did conclude that there was a positive

6    relationship; correct?

7         A    That was his conclusion.

8         Q    Let's also get the Kleck paper.

9              (Exhibit No. 12 was marked for

10        identification.)

11             (Exhibit No. 13 was marked for

12        identification.)

13   BY MR. WOODS:

14        Q    You mention in your report, at least, and I

15   guess in the paper that we've marked as Exhibit 12 -- let

16   me just for the record indicate what the exhibits are.

17   Exhibit No. No. 11 is -- or 11 -- Exhibit No. 12 is what?

18        A    Gun Ownership as a Risk Factor for Homicide in

19   the Home by Kellermann, et al.

20        Q    Okay.  And what is Exhibit 13?

21        A    Can Owning a Gun Really Triple the Gun Owner's

22   Chances of Being Murdered?  By Kleck, 2001.

23        Q    And this 2001 paper is your critique of the

24   Kellermann paper?

25        A    It's one critique, yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

247

1     Q    Okay.  And what you mentioned to me a moment

2 ago is that actually only 2 percent of homicides in the

3 areas that Kellermann studied were committed with a gun

4 belonging to the victim or another victim -- another

5 member of the victim's household; correct?

6     A    Yes.

7     Q    And the denominator in that is all homicides in

8 the area; right?

9     A    Yes.

10    Q    That doesn't just include homicides that

11 occurred in the home; right?

12    A    Yes.

13    Q    What was the percentage of homicides in the

14 home that involved a gun belonging to the victim or

15 another member of -- of the victim's family?

16    A    I don't recall.

17    Q    And isn't that what Kellermann was studying,

18 the risk of death in the home from guns that were --

19 belonged to the victim or another member of the family?

20    A    Yes.

21    Q    So why does the 2 percent figure have any

22 relevance to the Kellermann paper at all?

23    A    It has -- it bears on the issue of in the

24 entire population, how often does an in-home gun

25 represent a risk factor for homicide.  It would



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

248

1    presumably represent zero risk for homicides not

2    committed in the home and then for the portion that

3    Kellermann addresses, which is a minority of homicides,

4    less than half.

5            It's also unimportant because his own data

6    indicate that those -- even though in-home homicides

7    are rarely committed with a gun belonging to someone in

8    the victim's household.

9        Q    Yeah, but the 2 percent figure you are citing

10   is not -- it's not that 2 percent of homicides in the

11   home are committed with guns belonging to the victim or

12   another member of the victim's family; right?

13       A    That's correct.

14       Q    Isn't that what you are trying to suggest,

15   though?

16       A    No, I was trying to suggest what I said in my

17   previous answer.

18       Q    Now, you said --

19       A    It's a miniscule percentage, regardless, but

20   it's not quite as miniscule as the percentage of home

21   homicides.

22       Q    But isn't that the relevant percentage?

23       A    Only if you accepted, I guess, the implicit

24   premise of Kellermann's research that somehow we should

25   be focusing only on homicide in the home.  And I would



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

249

1    certainly not accept that premise, but that is what he

2    addressed in that particular piece of research.

3         Q    And isn't that what Webster is commenting on?

4              He is saying that the number of guns in the

5    home affect homicide -- the homicide rate in the home,

6    right?  That -- I mean, that's what we are here to talk

7    about with respect to Mr. -- Dr. Webster's report;

8    correct?

9         A    What -- what part of Webster's report are you

10   referring to?

11        Q    Where Dr. Webster indicates that the number or

12   the availability of guns in the home has a positive

13   effect on homicide in the home.

14        A    I don't think that characterizes his entire

15   discussion of household studies of gun availability and

16   homicides.  I don't think he really confines it that way;

17   although, you might be able to read between the lines to

18   that effect.

19        Q    Well, does your rebuttal opinion apply to the

20   opinion that the number of guns in the home is plausibly

21   associated with homicide in the home?

22        A    Yes, it is relevant.  It does bear on it.

23        Q    And Dr. Webster is talking about the effect of

24   the Chicago gun ordinance, the provisions that allow for

25   a single operable weapon in the home or only a single



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

250

1    operable weapon in the home, the effect that they might

2    have on reducing the homicide rate in the home; right?

3        A    Well, if you could point me to a particular

4    part of his report, I could -- I could give you an

5    intelligent answer to that.

6        Q    So if you look on page 2 of his report under

7    the heading 5, it says:  This is -- I'm speaking of

8    Dr. Webster's report:  Research supports my opinion that

9    the availability of firearms in the home increases the

10   risk of suicide, homicide and deaths from unintentional

11   shootings; do you see that?

12       A    Yeah, and probably what he meant had he been

13   phrasing it a little more precisely was those events in

14   the home.  He just didn't say it.

15       Q    Right.  I mean --

16       A    He says --

17       Q    -- isn't -- that's what we are talking about,

18   is whether guns in the home --

19       A    Right.

20       Q    -- having more guns in the home is going to

21   lead to more homicide.

22       A    Right.  That's the problem with both him and

23   Kellermann and others.  They are not precise about saying

24   where they thought the connection was.  And once you're

25   more explicit about it, that you say:  Guns in the home



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

251

1    should affect these violent events in the home, then the

2    question arises:  Well, okay, was it a gun kept in the

3    home that was used in those violent events in the home,

4    which is precisely what's wrong with all these studies

5    among other things.

6         Q    But your 2 percent number that you've given,

7    that doesn't relate to guns in the home?

8         A    Right.  It doesn't.  It results -- it's a --

9         Q    It's non sequitur.

10        A    The base is all homicides.

11        Q    Right.  And it doesn't --

12        A    And it's definitely not a non sequitur, though,

13   but it is -- it does refer to a different base of all

14   homicides rather than just those occurring in the home.

15        Q    Okay.  So if you go to the Kellermann study,

16   which I think is Exhibit 12; is that correct?

17             MR. COOPER:  Right.

18             MR. WOODS:  Yeah.

19   BY MR. WOODS:

20        Q    And you turn to page 1087.

21        A    (Views document.)

22        Q    And you look at the right column, the first

23   full paragraph?

24        A    (Views document.)

25        Q    Do you see where it says stratified analysis?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

252

1       A     Yes.

2       Q     Stratified analysis with our final regression

3   model revealed that the link between guns and homicide in

4   the home was present among women as well as men, blacks

5   as well as whites, and younger as well as older people.

6   So this Kellermann study is talking about homicides in

7   the home, not homicides outside the home.

8       A     That is the way he defined the issue, yes.

9       Q     All right.  And this is published, again, in

10  the New England Journal of Medicine.  Is that --

11      A     Correct.

12      Q     You dis -- you disagree with his conclusion?

13      A     Yes.

14      Q     And your disagreement is published in, among

15  other places, at least, this 2001 paper:  Can Owning a

16  Gun Really Triple the Owner's Chances of Being Murdered

17  --

18      A     Yes.

19      Q     -- Exhibit 13?

20            Has anyone else agreed with your criticism?

21      A     Yes.

22      Q     Who?

23      A     I really didn't come prepared to list all the

24  people who have agreed with me.

25      Q     Okay.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

253

1        A     But I can -- I can cite a location where

2    there's agreement.  The -- the first immediate reaction

3    to this article by readers of the New England Journal of

4    Medicine was to express some of the same points I had.

5             And I believe I was one of a number of letter

6    writers, but others made some of the same points that

7    are in this 2001 article.  They pointed out, for

8    example, that Kellermann had not documented even a

9    single case where a victim was murdered in the home

10   with a gun kept in the home.  I didn't make that point;

11   it was somebody else.

12            As I recall, it was a collective letter from

13   a bunch of students in a statistics class.  They --

14   they were -- you know, they had discovered -- these

15   kids had discovered, you know, that flaw in the study;

16   although, it had also occurred to other people, but

17   they were the first to publish that particular

18   criticism.

19       Q     Where was that published?

20       A     The New England Journal of Medicine --

21       Q     Did you publish --

22       A     -- in a later issue.

23       Q     Did you publish a commentary in the New England

24   Journal of Medicine?

25       A     Yes, I had a letter, too, making different



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    points.  I think it was -- you know, it was -- it was

2    students of statistics 404 or something like that.  So it

3    was a collective letter.  So I couldn't give you the

4    names of individual people, but that's who did it.

5         Q    So if you look at Exhibit 13, which is your --

6    your 2001 paper, and you turn to page 69.

7         A    (Views document.)

8         Okay.

9         Q    And you're referring to in the middle of the

10   page there, the bottom paragraph, I guess -- or second to

11   the bottom paragraph, Kellermann 1998, which included

12   some of the same data for Kellermann 1993; right?

13        A    Yes.

14        Q    You say:  The authors found that 49 of these

15   incidents involved a gun kept in the home where the

16   shooting occurred.

17        A    Yes.

18        Q    So it's not true that none of -- there's no

19   evidence that any of the guns were in the home where the

20   shooting occurred?

21        A    No, that's not what I said.  I said that

22   Kellermann, in the original New England Journal of

23   Medicine article had not provided any evidence that even

24   one of the home homicides had been committed with a gun

25   kept in the home.  I didn't say there was no evidence.  I



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

255

1    said he hadn't provided it, and that was just quoting the

2    reaction of those other readers.  They had also noted

3    he -- he hadn't documented this crucial link.

4         Q    But yet we know from his 1998 paper that a

5    number of the incidents involved a gun kept in the home;

6    correct?

7         A    Yes, we know that a tiny percentage of all

8    homicides do involve a gun kept in the home of the

9    victim.

10        Q    Right.  Now if you look at -- I want you to go

11   back to Exhibit 12.

12        A    Oh, by the way, I should point out, to amplify

13   a previous answer, this same paragraph you're alluding to

14   does have the percent of residential shootings that

15   involved a gun kept in the home.  So I have computed it

16   and published that result.  It's 14.2 percent.

17        Q    14.2 percent.  That's not what you included in

18   your expert report.  You said 2 percent in your expert

19   report.

20        A    No, because that was -- it was not relevant to

21   the point I was making.  My only point is that yes, I've

22   also noted the percentage you were alluding to in print.

23        Q    Yes, so why did you include 2 percent and not

24   14 percent in your expert report?

25        A    Because it goes to the issue of how likely it



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

256

1    is that homicides could conceivably be attributable to

2    the presence of a gun in the home.  And it's highly

3    unlikely, nearly impossible that that would be of any

4    relevance to homicide outside the home, and then within

5    the home, we have this tiny number that involved a gun

6    kept in the home.

7         Q    14.2 percent?

8         A    Correct.

9         Q    But you didn't mention that in your report?

10        A    That's correct, I did not.

11        Q    If you -- can you turn back to Exhibit No. 12

12   and look at Table 1.

13        A    (Views document.)

14             Okay.

15        Q    And Table 1 is the characteristics of 420

16   homicide -- 420 homicides committed in the homes of the

17   victims; do you see that?

18        A    Yes.

19        Q    And you go down to relationship of offender to

20   victim?

21        A    Yes.

22        Q    And then we have spouse.

23             Isn't it likely that the spouse is killed by

24   a gun that belonged to his or her spouse in the home?

25        A    No, we can't tell that from these figures



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                    October 28, 2011

257

1    because that's all homicides, not gun homicides.  So only

2    about half of these are gun homicides.

3         Q    Okay.

4         A    And you can't tell whether any of those half

5    overlap with the spouse killings.  In fact, it's unlikely

6    very many of them do overlap.

7              We also know as relevant information that

8    spouse killings are less likely to involve guns because

9    they're overwhelmingly males killing females, and those

10   are less likely to involve use of firearms.

11        Q    If you go -- look back at your expert report on

12   page 13.

13        A    (Views document.)

14        Q    You also criticize the Kellermann paper for

15   failing to control for certain items including drug

16   dealers and members of street gangs?

17        A    Yes.

18        Q    Because they're at an extremely high risk of

19   being murdered and also far more likely to possess guns?

20        A    Yes.

21        Q    But isn't it true that drug dealers and street

22   gangs, are they more likely to be killed on the street or

23   in the home?

24        A    They have almost certainly very high risks of

25   homicide regardless of location.  You shouldn't



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

258

1    stereotype in-home homicides as domestic homicides like,

2    you know, wife and husband have argument that escalates

3    to violence.  They usually aren't, in fact.  Most in-home

4    homicides are not domestic killings.

5           So quite a few of them could be, you know,

6    drug dealers doing a drug deal but they happen to be

7    doing it in their home; or coming into violent

8    interaction with other street gang members and they

9    happen to be doing it in their home.

10     Q    But if you are going to control for confounders

11   in a study that involves in-home homicide, you only need

12   control for factors that are relevant to homicides in the

13   home; right?

14     A    Yes.  And what I'm saying is these are almost

15   certainly relevant to homicides in the home as well as

16   homicides out of the home.

17     Q    And what is your evidence that it is relevant

18   to homicides in the home?

19     A    It's -- it's partly a fact -- a result of not

20   just the fact that drug dealers and members of street

21   gangs have overwhelmingly higher homicide risk rates, but

22   also evidence on the location of drug-related killings as

23   well as drug dealing per se.  A lot of those killings

24   occur in the victims', the drug dealer victims' homes.

25           And so the -- the inference drawn from that



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                          October 28, 2011

259

1      combination of factors would that be drug dealers and

2      members of street gangs would also be at higher risk of

3      homicide in the home, even if you confined it just to

4      in-home homicides.

5          Q    If you look back on your expert report on

6      page 13 at the bottom paragraph.

7          A    Okay.

8          Q    See where it says:  Webster notes (page 8) the

9      long average time interval between "the first family

10     handgun purchase and any homicide death"; do you see

11     that?

12         A    Yes.

13         Q    And your point is that there might be reverse

14     causality, that any relationship between gun ownership

15     and homicide might actually be due to people who are at

16     greater risk of homicide going out and getting guns;

17     correct?

18         A    That would certainly be part of my critique.

19         Q    And Dr. Webster says that's not a valid

20     critique because the -- the handguns are purchased long

21     before the homicides?

22         A    Right.  And I point out why that's illogical.

23         Q    And you say that's illogical because while it's

24     true the first handgun might be purchased many years

25     before, other handguns might have been recently acquired



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

260

1    before the homicide?

2        A    Yes.

3        Q    Right?

4        A    Yes.

5        Q    Do you have any evidence to support that

6    that's, in fact, true?

7        A    The evidence would be that people both acquire

8    and get rid of guns frequently and, therefore, that the

9    firsthand gun would not be necessarily the only gun that

10   was owned at the time a murder occurred.

11            So, therefore, the gun that was purchase --

12   that a gun that was, in fact, purchased in response to

13   risks that resulted in the homicide could be a

14   different gun other than the first gun.  So we also

15   have survey data indicating that people own multiple

16   handguns quite commonly.  So the firsthand gun would

17   not be the same as all the other handguns.

18            We have evidence that some handguns are owned

19   for self-defensive reasons and thus possibly in

20   response to threats so on.  And others are not.  So

21   there's a distinction between reasons for some handguns

22   being owned and others being owned.  So you might have

23   acquired one gun for recreational-related reasons and

24   then another handgun acquired for protective reasons.

25            And the first handgun might have been for



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

261

1      protective -- I'm sorry, for recreational reasons and

2      the second one acquired, let's say, shortly before the

3      homicide, could have been a direct response to factors

4      that were perceived as a threat that resulted in --

5      that eventually resulted in a killing.

6           Q     Do you have any empirical evidence that that

7      is, in fact, the case for any of the people that -- in

8      the study Dr. Webster is referring to?

9           A     I have no other information about Webster's

10     data other than what he published.

11          Q     Do you know how frequently it occurs that

12     people go out and buy a second gun long after they had a

13     first gun?

14          A     I would be able to look up data on how many

15     people have more than one handgun.  And I would probably

16     be able to, with the data sets that I have, establish how

17     long the handguns had been owned.  So I might be able to

18     sort of tease out relevant information, but if you're

19     asking do I have any information as I sit here to answer

20     that question, the answer is no.

21          Q     I mean, is -- is your position or is your

22     hypothesis that people might be motivated to go out and

23     buy a handgun shortly before the homicide; is that just a

24     hypothesis that it could happen?

25          A     I wouldn't describe it as just a hypothesis



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

262

1    because you have information when you ask people why they

2    have guns, they say it's for self-protect -- in

3    particular, handguns, they usually say it's for

4    self-protection.

5             I don't think anybody has asked them whether

6    it was in response to specific threats that later on

7    resulted in a homicide.  I'm not sure that's even a

8    feasible study.  But we certainly have relevant

9    evidence that bears on the question of whether people

10   get handguns for self-protection and because they

11   believe they are at risk of being hurt or otherwise

12   victimized.

13        Q    Yeah.  Do you have -- is there any study that

14   shows that anyone has gone out immediately prior to a

15   homicide and purchased a handgun as a result of a

16   specific threat?

17        A    I don't know of anybody who has ever looked at

18   the -- the issue, so I don't know that there's any

19   evidence one way or another.  But certainly there's --

20        Q    But you don't believe it's --

21        A    -- anecdotal evidence of instances like that,

22   but a systematic scientific study, to my knowledge, has

23   not been done on that issue.

24        Q    And are you relying on anecdotal evidence for

25   your position?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

263

1       A    Well, not exactly.  I'm -- well, I guess to a

2   slight degree.  I'm relying on the logical possibility.

3   I don't know if that's anecdotal evidence, but it's a

4   reasonable inference from the fact that most people who

5   have handguns got it because they believed they were at

6   risk of being victimized.

7       Q    So you mentioned that that's a logical

8   possibility, but it's not a scientifically established

9   possibility; correct?

10      A    No, no one has done a scientific study

11  addressing that issue, possibly because they considered

12  it self-evident.

13      Q    Do you know that the reason they didn't do a

14  scientific study on that was because -- that no one has

15  done a scientific study is because they thought it was

16  self-evident, or is that your -- just your belief?

17      A    I don't know that for fact, no.

18      Q    Okay.  That's your personal opinion?

19      A    That's my personal opinion.

20      Q    And is your personal opinion scientifically

21  valid reliable statement?

22      A    Well, it's not the same as the average Joe on

23  the street's opinion.  You know, somebody who's studied

24  the issue for a third of the century probably has a lot

25  more information kicking around in their head that's



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

264

1    relevant.  So call it the personal opinion of a person

2    who knows a lot more about the subject than a lot of

3    other people.

4         Q    You said Joe Vince's personal opinion was not

5    scientifically valid in your report; correct?

6         A    Right.  Because he's -- he doesn't fit that

7    description at all.  He is not a person with a lot of

8    relevant information.  He's a person who has only

9    opinions and very little found -- factual foundation

10   behind his conclusions.

11        Q    We've got about five minutes left.  So why

12   don't we take a break.

13             (Brief recess was taken.)

14             THE VIDEOGRAPHER:  We're back on the record

15             with tape No. 7.  The time is 4:42.

16   BY MR. WOODS:

17        Q    All right.  Dr. Kleck, any answers that you'd

18   like to change?

19        A    No.

20        Q    If you'll turn now to page 14 of your study --

21   or of your report, I'm sorry, in this case.

22        A    (Views document.)

23        Q    Actually, before I forget, I want to go to

24   Exhibit 13 real quick, and we'll come back to that page.

25   This is the paper you wrote entitled:  Can Owning a Gun



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

265

1      Really Triple the Owner's Chances of Being Murdered?

2              Where was this published?

3      A      Homicide Studies.

4      Q      And who puts out that publication?

5      A      The Homicide Research Working Group.

6      Q      And do you know who they're associated with?

7      A      I don't know that they're associated with

8      anybody else.

9      Q      Okay.  They're just on their own?

10     A      Yeah, I think so.

11     Q      Is it a peer-reviewed journal?

12     A      Yes.

13     Q      Okay.  I'm done with that.  Let's go to page 14

14     of your expert report.

15             If you go down to -- well, let's -- let's

16     start at the top where you say Webster cites a study by

17     Kleck and Hogan (1999) to the effect that gun ownership

18     has a weak positive association with the risk of

19     committing homicide but fails to note a crucial

20     qualifier that Kleck and Hogan were careful to state

21     ...and then you go on to enumerate that from the paper.

22             Are you suggesting that the odds ratio of

23     1.36 is not correct?

24     A      Yes, I'm suggesting it would have been smaller

25     had there been controls for those confounding variables.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

266

1      Q     Did you try to control for those confounding

2  variables in the study?

3      A     No, because I was using existing data -- or in

4  these two data sources that I exploited, and they did not

5  have that information.

6      Q     Why did you even do the study if you didn't

7  have the data necessary to control for those variables?

8      A     Because you always do the study as well as you

9  can.  And that was the -- I controlled for all the

10 confounders that I could control for.

11     Q     So out of -- let's go back to your list, if you

12 would, of confounders or potential confounders that you

13 believe should be controlled for, which was on page 7 and

14 8.  Those are the confounders for suicide studies; right?

15     A     Correct.

16     Q     So your Kleck and Hogan paper is a homicide

17 study; right?

18     A     Correct.

19     Q     Okay.  Do you know what confounders you think

20 should be controlled for in homicide studies?

21     A     Well, ideally, it should be in principle

22 possible to measure whether or not individuals belonged

23 in high risk groups like being drug dealers, for example,

24 or being members of street gangs.  Those would be

25 especially important confounders because they're both so



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

267

1    powerfully correlated with gun ownership and so

2    powerfully correlated with risk of being murdered.

3         Q    Let's stop for a second, and I'll come back to

4    any others in a second.  Did your study Kleck and Hogan

5    control for either of those?

6         A    No.

7         Q    Did you try to control for either of those?

8         A    No, it wasn't possible.

9         Q    And it wasn't possible because you didn't have

10   the data?

11        A    Correct.

12        Q    And your failure to control for those things,

13   does it make the study worthless?

14        A    No.

15        Q    It just decreases the confidence that the odds

16   ratio that you found is a true association associated

17   with the independent variables?

18        A    Well, to rephrase it a bit, it makes it -- it

19   makes us less confident that there's a causal effect of

20   that magnitude.

21        Q    Right.  That's an easier way to say it.

22        A    Right.

23        Q    Okay.  But you did find a statistically

24   significant increased risk; right --

25        A    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

268

1       Q       -- without controlling for those two things.

2               Let me go back because I want to finish up.

3       Are there any other -- other than being a drug dealer

4       involved in illicit drugs, are there any other

5       confounders that you think need to be controlled for in

6       homicide studies?

7       A       Yes.

8       Q       What other ones?

9       A       Well, you would -- like a whole broad category

10      of confounders would be risky activities.  Another would

11      be risky locations you move through; another would be

12      risky associations, who do you associate with?  Where do

13      you put your body at risk?  What kind of activities do

14      you engage in that might carry a risk with them?

15              So, you know, I would have liked to have had

16      local crime rates measured.  That would have been nice,

17      but the data were not available.  I would have liked to

18      have known things like how many people with a criminal

19      record did each individual know and associate with.

20              That would be a matter of risky associations.

21      I would like to know how many times a month, for

22      example, they go through an area that they regard as

23      dangerous.  In fact, it would even be in principle

24      possible, I suppose, to measure personality traits like

25      risk-taking.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

269

1          Clearly people are more likely to be
2     victimized if they take risks that carry a chance of
3     victimization with them.  And we know that personality
4     traits like risk-taking vary substantially across
5     individuals.
6          So it would affect the homicide rate, but I
7     also think a lot of people perceive having a gun as
8     risky because it's a deadly weapon.  So it's quite
9     possible that's a confounder because it's correlated
10    with both gun ownership and homicide risk.
11         Q    Okay.  And you didn't control for any of those
12    things in the Kleck --
13         A    Correct.
14         Q    -- Hogan paper; right?
15         A    Correct.
16         Q    Okay.  All of these items that you just
17    mentioned as potential confounders, is the necessity to
18    control for those things, is that published anywhere?
19         A    Those things in particular or in principle
20    controlling for confounders?
21         Q    Those things in particular in homicide studies
22    involving gun availability.
23         A    Yes, I have; probably others have as well, but,
24    yeah, it would be common knowledge, I guess.
25         Q    You've said you need to control for those



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

270

1     things in published papers?

2          A    Yes, including the 2001 homicide studies

3     article.

4          Q    Has anyone else that you know of said that all

5     of those items need to be controlled for in homicide

6     studies?

7          A    Very likely, but I couldn't state at this point

8     who that would be.  I couldn't give you a list.

9          Q    And I think we talked about before that

10    confounders are only -- potential confounders are only

11    confounders if they are correlated with both the

12    independent variable and the dependent variable --

13         A    Correct.

14         Q    -- right, so it would have to be correlated

15    with gun ownership as well as homicide?

16         A    Correct.

17         Q    So is it your -- you have evidence that risky

18    activity is associated with gun ownership?

19         A    Let's see.

20              (Views document.)

21              I'd have to give you an I don't know on that

22    one.  There may be, but I can't speak to it right now.

23         Q    But you think risky activity is also associated

24    with homicide?

25         A    Oh, yes, definitely.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

271

1          Q     And is that published anywhere?

2          A     There is an entire body of literature on

3     situational crime prevention and another body on what are

4     called routine activities.  And they link people's daily

5     activities with crime.

6               And that literature goes to the issue of

7     people who engage in more risky activities are more

8     likely to be victimized in general.  I'm not sure that

9     it's addressed homicide in particular.  It may have,

10    but it certainly links risky activities with

11    victimization in general.

12         Q     And is it your opinion that risk -- risky or

13    living in risky locations is associated with gun

14    ownership?

15         A     Yes.

16         Q     And what -- is there any study that shows that?

17         A     Yes.  I've done a number of studies where we

18    related local crime rates to whether or not individuals

19    own a gun.  So it was characteristics of the area, the

20    crime rate, related to whether an individual person

21    reports a gun in a survey.

22         Q     And there's a positive correlation?

23         A     Yes.

24         Q     Statistically significant?

25         A     Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

272

1      Q     And is risky location also associated with
2   homicide rates?
3      A     Well --
4      Q     Obviously?
5      A     It's more or less by definition.
6      Q     Right.  Risky associations; is that associated
7   with gun ownership?
8      A     I don't know that anybody has studied that.  I
9   can't recollect any studies that would address that
10  issue.
11     Q     So you believe that risky activity and risky
12  associations are also associated with gun ownership, but
13  you're not sure of any studies that have established
14  that; correct?
15     A     Well, the risky activities have been
16  established like drug dealing and, you know, associating
17  with gang members and so on.  So that part of the
18  statement is empirically supported, pretty strongly
19  supported.
20           The activities part of it, it -- it's just
21  sort of an overlapping assertion because those
22  associations also imply certain risky activities.  I
23  mean, in a way, just going about in the same physical
24  space as other dangerous people like drug dealers, drug
25  buyers and gang members and so on could be regarded as



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                October 28, 2011

273

1     a risky activity.

2          Q    Okay.  Let's go down to on page 14, the third

3     paragraph, third full paragraph, Webster.  And you're

4     referring specifically to a paper that Webster cites by

5     Wintemute, W-I-N-T-E-M-U-T-E?

6          A    Yes.

7          Q    Webster also fails to recognize patterns in

8     Wintemute's findings that are inconsistent with the view

9     that gun ownership causes an increased risk of being

10    murdered.  Webster notes that handgun purchase appeared

11    to increase the risk of homicide for women but not for

12    men.  This is not consistent with the view that these

13    associations reflect the effect of gun possession on

14    homicide risk, since a genuine causal effect should be

15    weaker for women than for men.

16              Now, can you explain what you mean there?

17         A    It's based on the fact that -- well, first of

18    all, the simple statistical observation that when women

19    are murdered it's less likely to involve a gun than when

20    men are murdered.  But it's -- that, in turn, is related

21    to the issue of it's -- the broad pattern that's been

22    found in research is that a gun is most likely to be used

23    when a weaker party is overcoming the strength of a

24    stronger party.

25              So in this case, you would expect guns to be



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

274

1    used less for women because they're the weaker party,

2    they're less necessary in order to produce death.

3        Q    But you are aware that women are at higher risk

4    of death at the hands of an intimate partner; correct?

5        A    Compared to what?

6        Q    Compared to men.

7        A    Yes.

8        Q    So more women are going to die at the hands of

9    an intimate partner than men?

10       A    No, that doesn't follow.

11       Q    Women are at a higher risk of death at the

12   hands of an intimate -- at the hands of an intimate

13   partner than women are -- than men are; correct?

14       A    Let me clarify, then.  Maybe this answers the

15   question.  Women are at a much lower risk of being

16   murdered overall, but a higher percentage of their murder

17   victimizations would involve being killed by an intimate

18   partner.

19       Q    Right.  That's right.

20            And if the -- okay.  Strike that.

21            Let's go to page 15 of your expert report,

22   top paragraph or top full paragraph where it says

23   Table 3?

24       A    Uh-huh.

25       Q    Table 3 summarizes a considerably --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

275

1    considerably more complete and representative set of

2    macro-level studies of the effect of gun ownership rates

3    on homicide rates.  And then it says:  The table shows

4    which studies met the minimal methodological criteria for

5    properly estimating gun effect:  (1) using a valid

6    measure of gun ownership levels, (2) controlling for a

7    substantial number of possible confounding variables, and

8    (3) using accepted procedures for establishing causal

9    order (that is, distinguishing the effect of gun levels

10   on homicide rates from the effect of homicide rates on

11   gun ownership levels).

12          Now, these three criteria, methodological

13   criteria for studies of measuring the effect of gun

14   ownership on homicide rates, are these published

15   anywhere?

16       A    Let's see.

17            Yes.  I mean --

18       Q    They're published by you?

19       A    In a lot of locations, yeah.

20       Q    Have they been published by anyone else?

21       A    I couldn't really say.  I don't think there are

22   any experts that would disagree with those.  So there

23   probably are others that have written about it, but,

24   again, I wouldn't be able to cite them right now.

25       Q    Well, let's talk about the first one, having a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

276

1    valid measure of gun ownership.  Now, well, let me ask

2    you this:  Any studies that have involved evaluating gun

3    ownership, the connection between gun ownership rates and

4    homicide rates, any studies that have met those three

5    criteria other than studies you have performed?

6         A    No.

7         Q    Do you know how many studies have been

8    published on gun ownership rates and homicide rates?

9         A    (Views document.)

10        Q    Is Table 3 all of the studies?  I'll strike

11   that other question.

12        A    (Views document.)

13             Yes, those are all of the ones I knew of up

14   through 2009.

15        Q    How many of those were published by you or were

16   you an author in?  I mean, maybe we should say how many

17   total studies are -- there are and how many were

18   published by -- you were an author on?

19        A    Four.

20        Q    You were an author in four?

21        A    Correct.

22        Q    And what's the total number of studies?

23        A    Thirty-two.

24        Q    So all the studies that you published in this

25   area, are they all valid or did some of your studies fail



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

277

1    to meet the three criteria you laid out?

2        A    The earliest two failed to meet that criterion

3    or all three criterion.

4             Let me rephrase that.  At least one of the

5    three criteria and then the Kleck and Patterson 1993

6    and Kovandzic, et al., 1998, did meet all the criteria.

7        Q    Okay.  And I think you say that on page 15:

8    The only studies that meet all three criteria are Kleck

9    and Patterson (1993) and Kovandzic, et al., (2008);

10   correct?

11       A    Yes.

12       Q    And Kovandzic, et al., 2008, is that a

13   published paper?

14       A    It's in -- it's in press right now.  It will be

15   coming out in a couple of weeks.

16       Q    And where is that being published?

17       A    It's being published in -- it's something like

18   the Handbook of Criminological Research Methods or

19   something like that, but it's -- it's an edited

20   collection of chapters, and that appears as a chapter in

21   that book.

22       Q    Is it a peer-reviewed publication?

23       A    The concept of peer review isn't really

24   relevant to edit collections.  The editor serves as -- or

25   editors, in this case, there's three of them -- serve as



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

278

1    the reviewers.

2              So it's peer-reviewed in a different sense

3    because they don't have a series of reviewers that are

4    recruited for the purpose of reviewing each individual

5    paper; instead, the editors basically collectively

6    review all the papers.

7         Q    Who is -- who are the editors that would be

8    reviewing your paper?

9         A    Let's see.

10             One of them is Steve somebody or other, and I

11   just -- I ought to know this, but sorry.  I -- I can't

12   remember their names.

13        Q    Do you know what their back --

14             MR. HAKIM:  We won't tell them.

15   BY MR. WOODS:

16        Q    Do you know what their background is?

17             We won't tell anybody.

18             Do you know what their background is?

19        A    Yeah, the Steve whose last name I'm blanking on

20   is a sociologist/criminologist.  And I just don't know

21   anything about the other two.

22        Q    Do you know where he's -- is he employed at any

23   university or in academics?

24        A    He is and I'm not sure where.  I'll probably

25   remember this, like five minutes from now, it will pop



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

279

1      into my head.

2           Q     Well, if you remember, tell me.

3           A     He's fairly well known, so I'm ashamed that I'm

4      not remembering it right now, but he's the only one I

5      knew of.

6           Q     Okay.  What's the purpose of this handbook?

7           A     It -- it presents cutting edge research

8      methods, new research methods that would be useful in

9      criminology.  And our contribution was on -- on

10     statistical methods so fancy I barely understand them.

11          We have now reached the limits of my

12     understanding and so one of my coauthors was an

13     econometrician, who is extremely advanced in

14     statistics.

15          Q     Is that Kovandzic?

16          A     No.  It's Mark Schaffer.

17          Q     Well, if you -- if you can imagine that you're

18     at the limits of your understanding of statistics, you

19     can imagine how fun -- how much fun I had last night,

20     trying to review that paper.

21          A     I don't want to imagine it.  I already have an

22     ache in my head.

23          Q     That's right.  Kleck and Patterson, that study,

24     where was that published?

25          A     The Journal of Quantitative Criminology.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

280

1          Q     Is that one of the leading journals in

2     criminology?

3          A     Yeah, I think it probably -- it would be, you

4     know, somewhere in the top five or six.

5          Q     And has -- has that paper received any

6     criticism at all?

7          A     Yes.

8          Q     By whom?

9          A     You know, it might be that same Steve somebody

10    or other.  It was the name I am blanking on, ironically

11    enough.  Some -- somebody wrote a published response to

12    it, if you have it there.

13               MR. HAKIM:  Shall I mark it?

14               MR. WOODS:  Sure.

15               (Exhibit No. 14 was marked for

16          identification.)

17               THE WITNESS:  Steve Messner, yes.  I think

18          Steve Messner is -- is one of the editors of that

19          collection.  Don't tell him I completely forgot

20          his name.

21               MR. WOODS:  I won't tell him, trust me.  I

22          don't know him.

23    BY MR. WOODS:

24          Q     And I guess we know where he's from, too,

25    probably, if you look on the first page of the -- the



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

281

1    article.

2         A    Yeah, if he's still there, yeah.

3         Q    Okay.  What -- where was he from in '95?

4         A    State University of New York at Albany, which

5    is now the University at Albany.

6         Q    And if you look at page 397 of that article.

7              And let me just, for the record, you've been

8    handed what has been marked as Exhibit 14, which is an

9    article by Alba and Messner entitled:  Point Blank

10   Against Itself:  Evidence and Inference about Guns,

11   Crime and Gun Control.  This article was published in

12   the Journal of Quantitative Criminology; correct?

13        A    Yes.

14        Q    And that's the same journal that you published

15   your Kleck and Patterson article in; right?

16        A    Yes.

17        Q    In 1993.

18             And this -- this was published in 1995;

19   right?

20        A    (Views document.)

21             Yes.

22        Q    And it's in response to the analysis that

23   appears in Kleck and Patterson; correct?

24        A    Correct.

25        Q    Although, the article is actually written about



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

                                                          282

1     the book Point Blank; right?

2         A    Yes.

3         Q    Although, it's essentially the same type of

4     analysis; correct?

5         A    Well, I mean, it's -- it's really a lot broader

6     than the article.

7         Q    Yeah.

8         A    So that was sort of odd.

9         Q    Okay.  Well, if you turn -- if you turn to

10    page 397.

11        A    (Views document.)

12        Q    Above Point 3 where it says:  Offender Gun Use

13    and the Lethality of Incidents, the paragraph above that.

14    It says:  In short, Kleck's analysis of the effect of gun

15    ownership on city crime rates is seriously flawed by

16    ambiguous measurement of key construct and by severe

17    model misspecification.  Do you see that?

18        A    Yes, I do.

19        Q    And when you said earlier that there was a

20    paper criticizing your analysis, is that what you were

21    referring to?

22        A    Yes.

23        Q    And is Steven Messner a well-respected

24    criminologist?

25        A    Yes.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

283

1          Q     What about Richard Alba?  Do you know who that

2     is?

3          A     I don't think he's a criminologist, at least, I

4     had never heard of him before or since.

5          Q     So of -- of the only two studies that meet your

6     criteria, one was pretty significantly criticized by a

7     respectable criminologist; right, the Kleck and Patterson

8     article?

9          A     Not pretty significantly in the sense of valid

10     criticisms it's just...

11          Q     I understand that you --

12          A     Maybe --

13          Q     -- disagree with the criticism.

14          A     Maybe the better word would be "enthusiastic

15     criticisms," a lot of passion behind them, if not much

16     substance.

17          Q     Right.  And that criticism was published in the

18     leading criminology journal; correct?

19          A     A leading criminology journal.

20          Q     Right.  And the other paper that you said is

21     the gold standard of studies involving gun ownership and

22     homicide rates, that one has not been published anywhere

23     yet; although, it's going to be in a handbook potentially

24     published this year?

25          A     It will be published next -- next month.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

284

1       Q    Next month, okay.

2       A    I would never use the vague term "gold

3    standard."  I have no idea what that means.  But I can

4    say it's technically the soundest estimate of the effect

5    of gun levels on homicide rates done to date.

6       Q    Is there any evidence or any -- well, would you

7    agree that a cross-sectional study design cannot do a

8    better job than a longitudinal study in addressing the

9    reverse causation issue?

10      A    No.

11      Q    You think that a cross-sectional study can do a

12   better job than a --

13      A    Yes.

14      Q    -- longitudinal study?

15      A    Yes.

16      Q    Can you point me to any methods, statistical

17   methods textbooks, that would agree with you on that

18   point?

19      A    Virtually any of them would point out that you

20   need to have -- that there's a number of approaches to

21   establishing causal order, one of which is the use of

22   instrumental variables and virtually any text that

23   explains the application of instrumental variables would

24   note its application in cross-sectional analyses.

25           And so first of all, it would be established



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

285

1    that instrumental variables methods with

2    cross-sectional data would be one way to establish

3    causal order.  And then in combination, any research

4    methods texts would also discuss a number of other

5    issues that are relevant to whether you can get a valid

6    estimate of the effect of one variable on another aside

7    from the issue of causal order, which means, in short,

8    you might well have a cross-sectional analysis that's

9    superior in other ways other than the causal order

10   issue, plus it has an adequate method of dealing with

11   causal order, such as the use of instrumental variables

12   methods.

13       Q    So you think the use of instrumental variables

14   is just as good as a longitudinal study design in

15   addressing causal order?

16       A    It can be not only just as good but even

17   better, depending on what other virtues it has.  In this

18   case, one of the virtues it has is data availability

19   allowed us to measure a lot more potentially confounding

20   variables.

21           Data availability is generally greater in

22   cross-sectional studies than it is in longitudinal

23   studies because in the latter, you can only use

24   variables that have been repeatedly measured at regular

25   time intervals.  So you end up with very constricted



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

286

1     models in many longitudinal studies.

2         Q    Okay.  I want to ask you a few questions about

3     your publication in 2004 if you can get that out.

4              (Exhibit No. 15 was marked for

5         identification.)

6     BY MR. WOODS:

7         Q    The court reporter, Dr. Kleck, has handed you

8     what has been marked as Exhibit No. 15.  And can you

9     identify this exhibit?

10        A    (Views document.)

11             An article titled:  Measures of Gun Ownership

12    Levels from Macro-Level Crime and violence Research by

13    Gary Kleck.

14        Q    Okay.  This was published in 2004?

15        A    Yes.

16        Q    In the Journal of Research in Crime and

17    Delinquency?

18        A    Correct.

19        Q    And this paper addresses one of your criteria

20    for conducting a proper study involving gun -- or, you

21    know, evaluating whether gun ownership -- ownership rates

22    have an effect on homicide rates.  The first criteria of

23    using of using a valid measure of gun ownership level?

24        A    Yes.

25        Q    And what is the gist of this study?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

287

1          A     One of the broad conclusions is that none of

2     the available proxies for gun ownership levels are valid

3     for longitudinal purposes, meaning for tracking changes

4     over time in gun ownership levels.

5                Another major conclusion is that for

6     cross-sectional purposes judging which areas have more

7     guns than others, the percent of suicides with guns is

8     a highly valid measure.

9          Q     So at least one of the imports of this is you

10    shouldn't use percent gun suicides in longitudinal

11    studies to evaluate gun ownership?

12         A     That's correct.

13         Q     But it's fine to use percent gun suicide in

14    cross-sectional studies to evaluate --

15         A     That's correct.

16         Q     -- gun ownership?

17               Okay.  What -- what's your basis for saying

18    that the percent gun suicide is an invalid measure for

19    doing -- for use in longitudinal studies?

20         A     Because it has no correlation over time with

21    the criterion measure, which is a measure that's usually

22    a more direct way of measuring the concept.

23               In this case, that's survey results on the

24    prevalence of gun ownership in probability sample

25    surveys.  So that if you examine how the percent of



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

288

1    households reporting guns in surveys trends over time,

2    it has absolutely no correlation with the percent of

3    suicides committed with guns.

4        Q    Yeah.  The surveys that you used for your

5    criterion, what were those?

6        A    The general social surveys.

7        Q    And what are those?

8        A    These are surveys that are fairly regularly

9    conducted by an organization affiliated with the

10   University of Chicago called the National Opinion

11   Research Center.  And it asks a wide array of questions

12   of interest to social scientists, but one of the

13   questions it fairly regularly asks is whether there's a

14   gun in the household.

15       Q    And is that a survey that's done every year?

16       A    Not necessarily.  It's almost always every year

17   or every other year.  It's a function of how much funding

18   they had.

19       Q    And why -- so why do you say that percent gun

20   suicides -- are you using that as kind of your gold

21   standard for gun ownership rates, that's that study, the

22   GSS?

23       A    Yeah.  Well, in the sense that it's a

24   criterion.  All tests of validity basically involve a

25   correlation between a more questioned measure and a less



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

1    questioned measure.  It's not based on the assumption

2    that anything is perfect, if that's what you mean by gold

3    standard.  But it is based on the assumption that one of

4    them is relatively valid, and then you check the validity

5    of the other by seeing how highly correlated it is with

6    it.

7         Q    So you make an assumption that the GSS is

8    relatively valid?

9         A    Correct.

10        Q    All right.  And then you compare that to

11   percent gun suicides over time; right?

12        A    Correct.  Although, it's not my -- only my

13   assumption; it's basically the assumption of everyone who

14   has checked the validity of gun proxies.

15        Q    Right.  But it starts from the assumption that

16   the survey data is the most valid measure?

17        A    Not exactly.  It just means it has some

18   validity, and it's being used as the standard.  It's

19   possible that there are proxies which are actually more

20   valid, but there's no way to really tell that because

21   you're not certain about any of the measures.

22        Q    I guess so.  How do you know the GSS is better

23   than percent gun suicides if they both have errors in

24   them and neither one is perfect?

25        A    You don't.  All you really know is that the two



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

290

1    don't correlate over time.

2        Q    Okay.  So it could be that percent gun suicides

3    is a better approximator of gun ownership than -- than

4    GSS.  All you know is that they're going to get different

5    answers in longitudinal studies because they don't

6    correlate with each other.

7        A    I don't know if you're right.  At least

8    speculating, I suppose that's possible.  But I -- I think

9    that's extremely unlikely.  I mean, I can't imagine any

10   scenario where that would be plausible.

11       Q    And why is it extremely unlikely?

12       A    Well, because, you know, it's -- it's -- you

13   often have some things that are really related, but, you

14   know, you -- you -- the results appear to make it seem

15   that they aren't related.

16            It's really unusual to have things, you know,

17   that are the reverse of that, which is, I guess, what

18   you are proposing, you know, that percent of suicides

19   committed with guns actually are valid despite the fact

20   that they don't correlate with anything else over time.

21            Is it a logical possibility?  Yeah, but I

22   don't know of any real world examples of measurements

23   that turned out that way.  Basically what we have is

24   the tests we have.  And the tests we have indicate that

25   percent of suicides committed with guns is useless as



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

291

1      a -- as a proxy for trends in gun ownership.

2           Q    Well, percent gun suicide doesn't change

3      significantly year to year; correct?

4           A    Right, which is also part of the problem.  You

5      know, if it isn't really changing, then there's no point

6      in doing a longitudinal study because something that

7      doesn't change couldn't have caused changes in violence

8      rates.

9           Q    The GSS survey results does change a lot from

10     year to year; correct, there's a lot of variability from

11     year to year?

12          A    I mean, some portions of the -- the decades for

13     which we have the data, and other portions, no.

14          Q    But that's why percent gun suicide isn't

15     correlated with GSS because GSS is a lot more variable

16     from year to year than percent gun suicide; correct?

17          A    No, that's not necessarily the reason.

18          Q    So what is the reason?

19          A    Well, the reason is that percent of suicides

20     with guns isn't actually tracking changes in gun

21     ownership.

22          Q    And -- but your basis for saying that is that

23     it doesn't correlate with GSS; is that correct?

24          A    That's correct.

25          Q    Isn't that circular reasoning?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                    October 28, 2011

292

1     A     That is correct.  It is circular reasoning, and

2     that's inherently what a validity check is.  It has to be

3     circular because you don't -- you wouldn't do a validity

4     check if you already had a measure you knew for certain

5     was valid.

6           So it's always comparisons between uncertain

7     measures.  It's just that in this case, there isn't any

8     support for percent of suicides with guns being a valid

9     indicator of trends over time in gun ownership.  It

10    just doesn't correlate with much of anything.

11          It's not just, by the way, the GSS measure.

12    It's a whole bunch of other proxies it doesn't relate

13    to.  It just seems to be reflecting changes in

14    something else.  What that is, we don't know, but it

15    isn't gun ownership as far as we can tell.

16    Q     But you agree for cross-sectional studies, it

17    is a valid proxy for gun ownership?

18    A     Yes.

19    Q     Okay.  In your 2004 study, at what level are

20    you measuring gun ownership from the GSS --

21    A     2004?

22    Q     -- level in terms of --

23    A     2004?  Where is that...

24    Q     Of 2004, yeah.

25    A     (Views document.)



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

293

1           I'm not sure what study you are talking

2    about.  You say Kleck 2004?

3           MR. WOODS:  I think I told him it was the

4       2004 Kleck study.

5           THE WITNESS:  Oh, you're talking about the

6       validity check paper.

7    BY MR. WOODS:

8       Q    Yes.

9       A    Oh, okay.  Okay.  Got you.  All right.

10          MR. HAKIM:  We talked about --

11          THE WITNESS:  And what was the question about

12      that?

13          MR. HAKIM:  I was talking about Exhibit 15.

14   BY MR. WOODS:

15      Q    Exhibit 15.

16      A    Okay.

17          MR. HAKIM:  Yeah.

18      A    All right.  And what was the question about

19   that?

20   BY MR. WOODS:

21      Q    Yeah.  At what level are you measuring gun

22   ownership from the GSS?

23      A    Let's see.  Regions, I think, the census bureau

24   regions.  There are nine regions of the U.S.

25      Q    It's not per city?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

294

1        A     No.

2        Q     It's done per region?

3        A     No, they don't -- they don't sample in a way

4     that provides representative samples of city populations.

5        Q     Yeah.  I mean, there's no -- from the GSS, it's

6     more of a national-type survey?

7        A     It is national --

8        Q     It averages out over nationally or, at least,

9     over regions?

10       A     It is national, but they also sample in a way

11    that allows you to make valid estimates of regions but

12    not anything smaller than that.

13       Q     But you couldn't use it in cities?

14       A     Not validly, no.

15       Q     Okay.  And if you tried to use it to draw

16    conclusions about a city-level analysis, what -- what

17    would happen?

18       A     Well, you wouldn't have a sound foundation for

19    believing that the measurements were accurate as to

20    household gun prevalence in the individual cities; that

21    is to say, you would have poor measurement of gun

22    ownership.

23       Q     Now, if you were doing a longitudinal study

24    using percent gun suicides as your measurement, is one

25    way you could validate whether that proxy or whether your



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

295

1    result is valid using that would be to collapse the

2    longitudinal study into a cross-sectional study and see

3    if the result still holds?

4         A    It wouldn't -- it wouldn't help.  It wouldn't

5    tell you whether there was any cross-temporal or

6    longitudinal validity.  It would muddle the issue by

7    combining both cross-sectional and cross-longitudinal

8    covariation.

9         Q    But if you -- I mean, if you turned it into a

10   cross-sectional study, then it is proper to use a -- a --

11        A    Yeah, if it was a purely cross-sectional study,

12   but if you were -- also had a longitudinal element to it,

13   like a panel study, then you would be using a measure

14   that's not valid for that purpose.

15        Q    Are you aware of any researcher that had used

16   that method of collapsing the longitudinal --

17        A    Yes, the --

18        Q    -- study to attempt to validate the use of

19   percent gun suicides and the correlation?

20        A    Yes, it's -- it's -- all of this is directly

21   demonstrated in the Kovandzic, et al. paper that's coming

22   out next month.  We basically show what the correlation

23   is when you just have cross-sectional, as you put it,

24   everything has been collapsed into cross-sectional data,

25   and then show separately what happens when you have



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

296

1    combined both cross-sectional and longitudinal variation

2    and then what portion of that combined association.

3              You still have -- if you only look at

4    longitudinal covariation and it demonstrates all of the

5    apparent correlation between percent of suicides

6    committed with guns and survey measures, direct survey

7    measures of gun ownership is attributable to the

8    cross-sectional covariation.  None of it is

9    attributable to any correspondence over time between

10   percent of suicides with guns and the survey measures

11   of gun ownership.

12        Q    Would you expect there to be a correlation

13   between gun ownership and -- or gun availability and gun

14   accidents?

15        A    Expect, I mean, could -- you know, could I

16   think of reasons why there ought to be yes, but my own

17   empirical findings indicated no.

18        Q    Yeah.  Why would you expect there would be a

19   correlation?

20        A    There's more opportunities for a gun accident

21   and more people have guns.

22        Q    But Kleck and Patterson didn't find that;

23   right?

24        A    Correct.

25        Q    Does that indicate to you or suggest to you



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    that potentially the Kleck and Patterson analysis is not

2    valid?

3         A    No, not at all.

4         Q    Why not?

5         A    Because I wouldn't have had that strong an

6    expectation that there would be a positive effect of gun

7    availability on accidents.  All I said is there's a

8    plausible reason there might be such an effect.

9              But there's other factors, and I think I may

10   have mentioned it in that paper:  Where there's more

11   gun ownership, there also tends to be a stronger gun

12   culture in which people are socialized into the safe

13   use of firearms, which means there may be more gun

14   owners, but they would be safer in their handling of

15   guns, resulting in fewer accidents or would countervail

16   any effects of more guns, so the net effect apparently

17   was zero.

18        Q    Is there any study that actually shows that the

19   more guns that are in the community, the safer people are

20   with their guns?

21        A    I don't understand the question.

22        Q    Well, I thought you just said there are

23   countervailing factors?

24        A    Oh, you mean safer in their handling?

25        Q    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

298

1      A    Okay.  No.

2      Q    That's just your surmise, that that could --

3  that could explain the results in Kleck and Patterson?

4      A    There might be research that bears on whether

5  or not people were part of a gun culture, for example,

6  the Lizotte and Bordua studies asked questions like:  Did

7  your parents also own guns?

8            So it's more of a transgenerational thing

9  than just something the individual acquired recently.

10  And whether they engage in other gun-related

11  activities, you know, for example, sporting activities

12  and so on or whether they know other gun owners and so

13  on.

14            So certainly there's measures of -- indirect

15  indicators of membership in a gun-owning culture, but I

16  don't think they studied gun accidents per se.  They

17  may have had something about, you know, storage

18  practices or something.  It's a 30-some-year-old study,

19  so I couldn't really say.

20            But I don't know of any studies that relate

21  membership in a gun-owning culture and gun-handling

22  practices.  It just is a logical inference that people

23  who have been raised with guns, taught how to handle

24  them by their parents, are more likely to be handling

25  them safely than just some guy who got a gun on his own



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

299

1    as adult.

2        Q    Why would necessarily increased gun ownership

3    only happen in a culture where people are raised with

4    guns?

5        A    It's not the only circumstances under which it

6    could happen.  It's just that that appears to be the

7    reality as -- as it exists today.

8            Most people, they probably think of -- they

9    tend to associate gun ownership with urban areas, high

10   crime areas and so on.  But gun ownership is, in fact,

11   higher in areas that have very little violence, rural

12   areas and small towns, where the gun ownership is,

13   obviously, for reasons that aren't very crime related,

14   either committing crimes or defending against crimes.

15           So the gun culture appears to be concentrated

16   precisely in those places where there isn't much

17   dangerous use of firearms, where it's recreational or

18   relatively inconsequential from a violence standpoint,

19   either violence causing or violence preventing.

20       Q    But you can't point to any study that has

21   actually established that greater availability of guns

22   results in people handling them safer?

23       A    No.

24       Q    Why don't we get a copy of Kleck and Patterson.

25           (Exhibit No. 16 was marked for



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

300

1       identification.)

2   BY MR. WOODS:

3       Q    I've handed you what's been marked as

4   Exhibit 16.  Can you identify that for the record?

5       A    The Impact of Gun Control and Gun Ownership

6   Levels on Violence Rates by Kleck and Patterson.

7       Q    Okay.  And what measure of gun ownership does

8   this use?

9       A    This is the percent of suicides committed with

10  guns in a cross-sectional context.

11      Q    All right.  And this is what you said earlier,

12  you can use it in a cross-sectional context but not

13  longitudinal?

14      A    Yes, it's been strongly validated for use in

15  cross-sectional studies.

16      Q    And what exactly -- now, as I understand

17  because this is cross-sectional, you used a method to

18  control for the causal order issue; correct?

19      A    Yes.

20      Q    And I think we've talked about that method way

21  back when we first started this, something like a

22  two-stage least squares method?

23      A    Yes, that's a variant of instrumental variables

24  analysis.

25      Q    Okay.  And that's the method you used in this



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                              October 28, 2011
                                                                    301

1    case; correct?

2         A    Yes.

3         Q    And I think you told me that in order to

4    validly use an instrumental variable, you had to choose

5    an instrumental variable that was strongly correlated

6    with the -- in this case, it would be gun availability

7    and had no direct effect on in this case.  It would be

8    homicide or correlation with other effects that are not

9    in the model but that are correlated with the homicide

10   rate?

11        A    Yes, the stronger its effect on gun ownership

12   in combination -- the better it is in combination with

13   the fact that it doesn't directly affect the other

14   endogenous variable, in this case, violence rates.

15        Q    Right.  And what was your instrumental variable

16   that you chose in Kleck and Patterson for variables?

17        A    (Views document.)

18             We use subscriptions, rate of subscriptions,

19   to gun-related magazines and the state hunting license

20   rate as instruments for gun ownership levels; that is,

21   they are variables that would affect rates of gun

22   ownership.

23        Q    Okay.  I just want to make sure I got that.

24   The first was?

25        A    Rate of subscriptions to gun-related magazines.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

1      Q     Okay.

2      A     And the second would be the state hunting

3   license rate.

4      Q     Did you use NRA membership as part of that

5   analysis?

6      A     No.

7      Q     Okay.  And I think you mentioned awhile back

8   that there are -- there are ways to test whether the

9   choice of an instrumental variable, statistical ways to

10  test whether the choice of an instrumental variable is

11  proper.

12     A     Yes.

13     Q     And did you perform those statistical tests to

14  check that in the Kleck and Patterson paper?

15     A     We performed a relevance test.  At the time, I

16  didn't know how to do the validity test.  So I did not

17  perform that one.

18     Q     Have you performed it at any time before today?

19     A     On this body of data, no.

20     Q     Remind me.  What is the relevance test?

21     A     The relevance -- well, the relevance test in

22  this case would be -- it would address the question of

23  whether those two instruments, magazines -- gun-related

24  magazine subscriptions and hunting license rate, have an

25  effect on gun ownership rate or strongly -- strong



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

303

1    predictors of gun ownership rate.  And it passed those

2    tests.  But there was no overidentification test in this

3    study, which would test the validity assumption.

4         Q    Was this a city-level study?

5         A    Yes.

6         Q    Okay.  And would hunting license rates

7    necessarily correlate with city gun ownership since there

8    isn't a lot of hunting that's going on in the cities?

9         A    Broadly speaking.

10             Remember, the -- the point here is to make

11   comparisons across cities.  So the -- the hunting

12   itself, obviously, wouldn't be in cities, but the

13   assumption is that cities that are in states that do

14   have a lot of hunting will have more hunting in

15   non-city locations, obviously, than cities in states

16   with lower hunting license rates.

17        Q    And the reliance test that you mentioned, is

18   that actually published in the Kleck and Patterson paper

19   or referenced?

20        A    The relevance test, you mean?

21        Q    I'm sorry, the relevance test, yes.

22        A    Yes, that's in Table Roman Numeral III.  If you

23   look in the second column of that table -- well,

24   actually, the second, fourth and sixth columns.  And then

25   you look in the rows labeled "R Gun Mag" and "Hunters,"



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    those are the two instrumental variables.

2            And what you are seeing there are

3    standardized regression coefficients along with their

4    associated statistical significance levels.  And it

5    shows that they have a relationship in the predicted

6    positive direction.  These instruments are higher, so

7    is the gun prevalence rate.  And they're -- they're

8    highly statistically significant.

9        Q    So I'm looking at Table 3 and the ones you're

10   -- the instrumental variables are there towards the top

11   where it says "R Gun Mag" and "Hunters"?

12       A    Correct.

13       Q    And all of these coefficients are positive and

14   the asterisks mean what?  Is it the level of

15   significance?

16       A    Level of statistical significance.  So if you

17   continue to the end of the table on page 271 --

18       Q    I see.

19       A    -- you see three asterisks means P under .01

20   and two asterisks mean P under .05.

21       Q    Just on this table, can you explain one thing

22   to me:  At the bottom it says:  Gun prevalence, do you

23   see that on Table 3?

24       A    Yes, uh-huh.

25       Q    And if you go across to non-gun homicide, there



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

305

1    is a negative number and an asterisk?

2         A    Yes.

3         Q    What does that mean?

4         A    It means that cities that have a higher gun

5    prevalence, other things being equal, have less non-gun

6    homicide.

7         Q    Does having a higher amount of guns mean people

8    don't use other things to commit homicide?

9         A    It's subject to a variety of interpretations.

10   I mean, if you are really progun, you'd probably

11   interpret that as an indication of a deterrent effect,

12   the more well-armed potential victims are, the less

13   likely somebody is to attack them.

14           And, in particular, an offender who didn't

15   himself have a gun would be especially deterred for

16   obvious reasons, he's not so well-armed.  So you would

17   expect a deterent effect on non-gun homicide.

18        Q    Do you interpret it that way?

19        A    I didn't interpret it one way or another

20   really.  I...

21        Q    You don't interpret it that way in Kleck and

22   Patterson?

23        A    It wasn't the focus of the study, no.

24        Q    Right.

25        A    My -- my interpretation in that study was that



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

306

1    if gun prevalence is going to have a homicide elevating

2    effect, it should have it on gun homicides.  And so part

3    of the judgment that you are seeing a real causal effect,

4    an actual homicide elevating effect, was if gun

5    prevalence was associated positively with the gun

6    homicide rate but not with the non-gun homicide rate.  I

7    didn't particularly care whether it was a negative

8    association; the point is it's not positively related.

9         Q    Okay.  So using instrumental variables, what

10   was the result of this study?

11        A    The result of the study was that there's no net

12   effect of gun prevalence on homicide rates and a variety

13   of other violent crime rates as well:  Aggravated --

14   aggravated assault, robbery and rape.

15        Q    And this was the paper that Steve Messner

16   criticized; correct?

17        A    Yes.

18        Q    What was his criticism?

19        A    I really don't recall.  I'd have to review

20   that.  And we can go over his paper, if you'd like.  I

21   didn't think any of them were valid, and so they didn't

22   really stick in my mind.  There are a lot of invalid

23   criticisms you can make, but only a limited number of

24   valid ones.

25        Q    In your Table 3, if you can go back to Table 3



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    of Exhibit No. 16.

2         A    (Views document.)

3         Q    At the bottom, you have measures of a log of

4    murder, log of gun murder and then there's one past that;

5    do you see that?

6         A    Yes.

7         Q    What is that log?

8         A    I think that's the log of the non-gun murder

9    rate.

10        Q    Oh, non-gun murder rate.

11        A    That's probably a typo there, that middle M --

12        Q    I see.

13        A    -- should have been an N.

14        Q    Yeah.  And are those included in the relevance

15   test?

16        A    They are not instruments.

17        Q    Okay.  You are not including those in the

18   relevance test?

19        A    No, not as -- not testing the relevance of the

20   gun instruments.

21        Q    Okay.  They're included in your regression

22   model for the result; right?

23        A    Yeah.  They are -- they're testing the effects

24   of violence rates on gun prevalence.

25        Q    Right.  Okay.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

308

```
1              THE VIDEOGRAPHER:  Three minutes.
2    BY MR. WOODS:
3         Q    All right.  So let's go to page 269.
4         A    (Views document.)
5         Q    And if you look at your instrumental variables
6    on this portion of Table 3, this is dealing with
7    robberies; what does it mean that the coefficients for R
8    Gun Mag and Hunters with effect to robbery are not
9    significant?
10        A    Actually, I should amend an answer I gave -- I
11   think I may have to amend an answer I gave before.  Let
12   me -- let check this before we go on.
13             Yeah.  You -- you asked me a question like:
14   Was -- did I use percent of guns committed with suicide
15   as my measure of gun ownership.
16        Q    Yes.
17        A    And that's -- and the partial answer is:  Yes,
18   but it wasn't the only one.  So what I should have said
19   is:  Yes, it was one of five measures.  It's probably the
20   one that's the dominant element.  It's the one that
21   really belongs there, and it didn't add much to have the
22   other four in there.  But there are, in fact, five
23   indicators of gun ownership.
24        Q    Okay.  And what are those?  What are the other
25   ones?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                                    October 28, 2011

309

1          MR. WOODS:  All right.  Why don't we go ahead

2     and change the tape.

3          THE VIDEOGRAPHER:  Off the record, please.

4          (Discussion off the record.)

5          (Brief recess was taken.)

6          THE VIDEOGRAPHER:  We're back on the record

7     with tape No. 7.  The time is 5:49.

8  BY MR. WOODS:

9     Q    And I think when we broke, Dr. Kleck, you were

10 looking to see what were the other proxies for gun

11 ownership that were used in the Kleck and Patterson study

12 other than percent gun suicide?

13    A    Yes.  It was percent of non-felony homicides

14 committed with guns, percent of aggravated assaults known

15 to the police committed with guns, percent of robberies

16 known to the police committed with guns and the percent

17 of the dollar value of all stolen property reported to

18 the police, which was due to firearm thefts.

19    Q    And before -- before we talked about that, we

20 were looking at page 269 of Table 3?

21    A    Yes.

22    Q    Which related to robberies?

23    A    Yes.

24    Q    And the fact that the instrumental variables

25 weren't significantly related to gun prevalence, does



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                                    October 28, 2011

310

1     that mean that for robbery, an instrumental variable is

2     not a reliable measure?

3          A    The background information that you need to

4     know there is that the gun prevalence measure -- because

5     of the indicators I was using, the gun prevalence measure

6     has to change from one model to the next.  So it's a

7     somewhat -- it's a slightly different measure in panel C

8     on page 269 than, for example, what it was in panel B on

9     the previous page.

10              And the reason for that is because the

11    robbery-related indicator of gun ownership would have a

12    tautological or artifactual association with robbery

13    rates.  So it has to be excluded from the gun

14    prevalence index, which would then be composed of the

15    other four predictors, excluding the percent of

16    robberies committed with guns.

17         Q    Well, wouldn't robbery also be correlated with

18    homicide guns?

19         A    Homicide what?

20         Q    Wouldn't robbery -- I'm sorry, wouldn't robbery

21    also be correlated with homicide?

22         A    Yes, it would be causally correlated.

23         Q    And doesn't that add a confounding to your use

24    of that as a proxy in your -- in your homicide model?

25         A    No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

311

1      Q     Why not?

2      A     Because there's no artifactual association.

3   The artifactual association is because there's literally

4   the same element in one variable and the other one.

5            Like in this case, the number of gun

6   robberies is part of the dependent variable because

7   it's -- you know, it's -- it's the robberies divided by

8   population.  But it's also part of one of those five

9   indicators of gun prevalence if I had used it.

10           So it's literally the same quantity appearing

11  in both the gun prevalence measure and the dependent

12  variable, the robbery rates.  And that would be -- that

13  would be illegitimate.  You couldn't do that.

14     Q     And the fact that you didn't run a validity

15  test on your instrumental variables for Kleck and

16  Patterson, would you agree that that places a -- or

17  significantly impairs the reliability of the results in

18  this study?

19     A     It impairs it to some degree.  As to whether it

20  seriously impairs it, you can't directly tell that unless

21  you basically did the analysis with and without that to

22  see if you would have gotten different results.  But we

23  didn't perform a test.

24           We didn't perform the overidentification

25  test, which is the way you check the validity.  So, you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

312

1    know, you can't really say the magnitude of the impact.

2         Q    Right.  It's kind of like when you don't

3    control for a compounding variable:  You think it might

4    have an effect, but you don't how much unless you

5    actually control for it?

6         A    No, sometimes you do have enough prior

7    information in that case because you may know from

8    external sources that this is a variable that is strongly

9    related to the dependent variable and strongly related to

10   the independent variable.  So that's a different kind of

11   thing.

12        You often have a lot more prior information

13   that would tell you yeah, that's a big problem rather

14   than a minor one.  But in this case, we don't have that

15   kind of prior information.

16        Q    And we don't have any information because you

17   didn't run the validity test?

18        A    That's correct.  We don't have any validity

19   test results.

20        Q    Okay.  Let's turn, if you would, to page 16 of

21   your expert report.

22        A    (Views document.)

23        Q    On page 16, if you look at the first paragraph

24   of the -- or first sentence of the first full paragraph:

25   The study cited by Webster that comes closest to being



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

313

1    relevant is the Weibe article cited on p. 12.  And you're

2    referring to Webster's expert report.

3         A    (Views document.)

4         Q    And which Weibe study are you talking about?

5         A    (Views document.)

6              Weibe 2000, which is cited in table -- well,

7    no.  Yeah, I think table -- I think that might have

8    referred to both suicide and gun accidents. Let me see.

9    Let me check.

10             I can't at this time find that Weibe study

11   because the Weibe study I have here in my references is

12   associated with suicide and homicide, but I don't see

13   his gun accident.  He's done another case control study

14   pertaining to accidents.

15        Q    Okay.  So on -- in -- in Dr.  --

16        A    Oh, I'm sorry.  I'm sorry.  I'm sorry.  Yeah,

17   I'm forgetting I'm not listing the things he cites

18   because he's already done that.

19        Q    Right.  Okay.  So I just want to make sure

20   we're talking about the same thing.  On page 12 of

21   Dr. Webster's study, if you -- if you're looking for that

22   --

23        A    Of his expert report?

24        Q    Of his expert report.  I apologize.

25        A    (Views document.)



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

314

1      Q    If you look at the top of the page, top
2  carryover paragraph, he says:  Elevated risk were
3  greatest, i.e., there was more than a five-fold increase
4  risk in unintentional shooting death, relative risk of
5  5.3 in homes that kept only handguns, a condition more
6  than likely to be the case for gun owners in urban
7  settings, such as Chicago.
8      A    Yes, now I can answer your question.  It's the
9  study that he cites in footnote 42 on page 19.
10     Q    Okay.  Did you say that that comes the closest
11 to being relevant?  Why do you say that?
12     A    Yes, closest.
13     Q    Why do you say that?
14     A    Well, because it, at least, looked at the
15 association between some kind of gun ownership measure
16 and fatal gun accidents.
17     Q    And was it a valid measure of gun ownership in
18 that state?
19     A    Well, it was -- it was self-report data.  So it
20 has as much validity as there is honesty among the gun
21 owners.  So, I mean, this isn't something where we've
22 checked the validity in a way that's analogous to that
23 Kleck 2004 article, which was the validity of macro-level
24 measures.  These are individual-level measures.
25          So validity would be a function of whether



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

315

1    gun owners were correctly identifying themselves as gun

2    owners and whether non-gun owners were correctly

3    identifying themselves as non-gun owners.

4         Q    Now, one of your criticisms here, the reason

5    it's not perfectly relevant is he didn't look just at

6    operable guns; he just looked at number of guns; right?

7         A    Yes, that's correct.

8         Q    But that doesn't make the study completely

9    irrelevant?

10        A    No, it does not.  That's why I said it comes

11   closest to being relevant.  It's certainly closer to

12   being relevant than studies that made no distinction

13   between numbers of guns.

14        Q    So at the top of page 16, where you say:  These

15   studies are irrelevant because the Chicago handgun

16   ordinance does not ban gun ownership (or handgun

17   ownership) -- okay -- and thus does not prevent anyone

18   from having a gun in their household -- you're talking

19   about other studies, I apologize.  Strike that.

20             At the bottom of page 16, you say that:

21   Committing serious crime is a highly risky activity and

22   that this is a -- this is an indication of greater

23   willingness of handgun owners to take risks?

24        A    Yes, since a component of handgun owners would

25   be those who commit crimes with handguns.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

316

1       Q    All right.  And what is your basis for saying

2   that committing serious crimes -- that people who are

3   willing to take higher risks are the ones that commit

4   serious crimes?

5       A    Well, it's a byproduct of the fact that

6   committing serious crimes have serious legal penalties

7   among other things.  I mean, even if they had no other

8   risks, they would have the risk of possibly going to

9   prison or even suffering the death penalty in the case of

10  murders.

11          So, yes, it's highly risky solely on that

12  basis alone.  But it can also be risky because a person

13  could be killed by a victim; a person could be

14  victimized -- could be injured by the victim and so on.

15  So that would make serious crime risky in other ways as

16  well.

17      Q    Would you expect that the outcome of

18  risk-taking behavior would be worse when the risk-taker

19  has a gun than when he doesn't?

20      A    No.

21      Q    Why not?

22      A    Well, if it's the offender who has the gun,

23  having the gun would inhibit resistance by the victim.

24  So there's less likely to be a violent conflict.

25          Let's say, if it was motivated by robbery,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

317

1    there would be -- it would be more likely that the

2    robber would get the property without anybody fighting

3    because the deadly weapon would inhibit victim

4    resistance.

5            Or if it's an assault and all the offender

6    wanted to do was frighten the victim, he can

7    effectively do that with a gun.  It's very frightening

8    in and of itself, and it doesn't require actually

9    attacking and injuring the person.

10       Q    Are you aware of any study that shows that

11   being a risk-taker is related to firearm accidents?

12       A    Yes.

13       Q    What study?

14       A    Waller and Whorton.

15       Q    Is this what you reference at the bottom of

16   page 16?

17       A    Yes.

18       Q    That study is that on that criminals are more

19   likely than noncriminals to involved in gun accidents?

20       A    Yeah, among other things, but a wide variety of

21   other indicators of risk-taking, which are also

22   correlated with involvement in gun ownership and gun

23   accidents.

24       Q    So does this study actually find that

25   risk-taking is correlated with gun accidents?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                     October 28, 2011

318

1        A     Yes.  For example, arrests for fighting, you

2    know, that's risky activity; traffic violations, drunk

3    driving, clearly risky activities were more common among

4    those involving gun accidents than the rest of the

5    population.

6        Q     Would an infant or child who accidentally shot

7    himself with a gun, would they be characterized as more

8    of a risk-taker?

9        A     If such events had occurred, but they don't

10   occur.  It's a purely -- it's an empty category.

11       Q     You're saying children don't get involved in

12   gun accidents?

13       A     I thought you said infants.  Did I

14   misunderstand that?

15       Q     I said infants or children.

16       A     Infants or children?

17             Yes, probably, if instead of infants you were

18   talking about older children, yes, very likely.

19       Q     What about under four?

20       A     It's just that the ways that risky activity

21   would manifest itself wouldn't be drunk driving,

22   obviously; but it might well be fighting with other kids

23   and so on.

24       Q     Are criminals more likely to own guns than

25   noncriminals?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

319

1       A     A little bit more likely, yeah.

2       Q     So if criminals are more likely to have gun

3    accidents than noncriminals, isn't it true that in

4    general, gun owners are more likely to have gun accidents

5    than non-gun owners with guns?

6       A     Certainly, yes.

7       Q     Yeah, now, in your -- I believe on page 17,

8    you're discussing the Weibe paper, and you suggest that

9    Weibe 2003 should have found greater association for long

10   gun firearm accidents than handgun accidents.

11      A     Yes, I do say that.

12      Q     And that's based on your belief that it's

13   easier to have an accident with a long gun than a

14   handgun?

15      A     Yes.

16      Q     Are there other factors that affect -- well,

17   what -- why is it easier?  Let's start there.

18      A     It's easier to have the accident, an accidental

19   discharge of a long gun because it requires less trigger

20   pressure; and there's less likely to be some kind of a

21   safety controlling the trigger.  But if you're talking

22   specifically about fatal gun accidents, then that's more

23   likely with a long -- and that's, I think, what was

24   involved in the Weibe study, that's what the FGA stands

25   for, fatal gun accidents.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

320

1          It's also more likely with a long gun because

2    long guns are more lethal firearms than handguns, and

3    that's because they fire bullets at higher velocity or

4    in the case of a shotgun, they fire a much larger

5    number of projectiles.

6          Q    Are there relatively more accidents with long

7    guns than short guns in the United States?

8          A    No.

9          Q    There's more accidents with short guns;

10   correct?

11         A    Correct.

12         Q    So doesn't that undermine your principle here?

13         A    No.

14         Q    Why not?

15         A    Well, because the only kind of gun that can

16   result in a fatal gun accident is a loaded one.  And

17   relative to the rate at which they're kept loaded,

18   handguns are less likely to be involved in accidents.

19          But mechanically speaking, if you had a long

20   gun and a handgun load -- both loaded, it would be the

21   long gun that would be easier to accidentally

22   discharge.  It's just that we don't often have long

23   guns loaded except when they are, you know, being used

24   for recreational purposes and so on.  Handguns are much

25   more likely to be kept loaded and thus at risk of a gun



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

321

1   accident.

2       Q    Aren't there other factors that affect whether

3   a gun is likely to be involved in an accident other than

4   the ease of trigger pull and the lethality?

5       A    Yes.

6       Q    Like caliber of the gun?

7       A    That would be related to the occurrence of a

8   fatal gun accident, yes.

9       Q    Right.  Fatal gun accident, like the number of

10  rounds discharged?

11      A    Probably not, no.  It's highly unlikely that

12  would have any relevance.

13      Q    The carriage practice, would that affect it,

14  like how you would carry a long gun versus how you would

15  carry a handgun?

16      A    I haven't given that any thought.  I really

17  don't have a position that.

18      Q    Would it be -- would it be easier to drop a

19  handgun than a long gun?

20      A    Again, I really have no opinion on that one way

21  or another.

22      Q    More likely to be a long gun -- or a handgun

23  more likely to be jostled than a short gun?  I'm sorry, a

24  long gun.

25      A    No, I really don't have any basis for answering



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

322

1    that either.

2         Q    But you had mentioned that, for instance,

3    storage practices affect this question significantly,

4    fatal gun accidents, because as you said, long guns

5    typically aren't kept loaded, but handguns are kept

6    loaded; and that's why they are involved in so many more

7    accidents?

8         A    They -- they are kept -- they are more likely

9    to be kept loaded than long guns, yes, that's true.  But

10   they are not more likely to be involved in accidents

11   relative to long guns if you control for whether they are

12   kept loaded or not.  They're actually less likely to

13   result in a fatal gun accident, loaded handguns compared

14   to compared to loaded long guns.

15        Q    And guns with trigger locks are much less

16   likely to be involved in accidents than guns without

17   trigger locks; correct?

18        A    Yes, they're virtually not involved in

19   accidents at all if there's trigger lock on them.

20             MR. WOODS:  Can we take a short break?

21             MR. COOPER:  That might be a good idea.

22             THE VIDEOGRAPHER:  Are we off the record?

23             MR. WOODS:  Yes.

24             (Brief recess was taken.)

25             (The proceedings adjourned at 6:09 p.m.)



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1                  CERTIFICATE OF OATH

2

3

4

5    STATE OF FLORIDA            )

6    COUNTY OF LEON              )

7

8

9

10

11        I, the undersigned authority, certify that

12   said designated witness personally appeared before me

13   and was duly sworn.

14

15

16        WITNESS my hand and official seal this 10th

17   day of November, 2011.

18

19

20

21   _____

22   LISA D. FREEZE, CRR, NOTARY PUBLIC
     1-800-934-9090
23   850-878-2221

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

324

                    CERTIFICATE OF REPORTER


STATE OF FLORIDA      )

COUNTY OF LEON        )


          I, LISA D. FREEZE, RPR, NOTARY PUBLIC,

certify that the foregoing proceedings were taken

before me at the time and place therein designated;

that my shorthand notes were thereafter translated

under my supervision; and the foregoing pages numbered

1 through 322  are a true and correct record of the

aforesaid proceedings.


          I further certify that I am not a relative,

employee, attorney or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am I

financially interested in the action.

          DATED this 10th day of November, 2011.

                         _____

                         LISA D. FREEZE, RPR, CRR
                         Notary Public
                         1-800-934-9090
                         850-878-2221



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                              325

1                          ERRATA SHEET

2    (ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL. vs.

3    THE CITY OF CHICAGO, ET AL.)  JOB ASSIGNMENT NO. 282245

4               DECLARATION UNDER PENALTY OF PERJURY

5        I declare under penalty of perjury that I have read

6    the entire transcript of my Deposition taken in the

7    captioned matter or the same has been read to me, and

8    the same is true and accurate, save and except for

9    changes and/or corrections, if any, as indicated by me

10   on the DEPOSITION ERRATA SHEET hereof, with the

11   understanding that I offer these changes as if still

12   under oath.

13       Signed on the _____ day of

14   _____, 20____.

15   _____

16           Witness Name

17           GARY KLECK

18   PAGE/LINE  CORRECTION or AMENDMENT  REASON FOR CHANGE

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____

25   _____  _____  _____



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

326

1  _____  _____  _____

2  _____  _____  _____

3  _____  _____  _____

4  _____  _____  _____

5  _____  _____  _____

6  _____  _____  _____

7  _____  _____  _____

8  _____  _____  _____

9  _____  _____  _____

10  DATE OF DEPOSITION: 10.28.11     REPORTER:  D. Freeze

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                327
1    November 10, 2011

2

3    TO: CHARLES J. COOPER, ESQUIRE

4    re: ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL.

5    vs. THE CITY OF CHICAGO, ET AL.

6    Dear Mr. Cooper:

7    Enclosed please find your copy of the deposition of GARY
     KLECK taken on October 28, 2011, in the above-styled
8    case.

9    As the witness did not waive reading and signing, I am
     also attaching the errata sheet as the last page of the
10   transcript and request that your office make the
     necessary arrangements with your witness to read your
11   copy of the deposition, noting any corrections on the
     errata sheet, then dating and signing the errata sheet,
12   within 30 days or before commencement of trial,
     whichever is first.
13
     PLEASE FORWARD THE ORIGINAL, SIGNED AND DATED ERRATA
14   SHEET  to CRAIG WOODS, ESQUIRE.  If the errata sheet or
     a request for an extension is not received within 30
15   days, Counsel may assume that the signature has been

16   waived.

17   It was a pleasure working with you on this matter.

18

19   Sincerely yours,

20

21

22

23   LISA D. FREEZE, RPR, CRR, NOTARY PUBLIC

24   Enclosures (Errata sheet and transcript.)

25   cc CRAIG WOODS, ESQUIRE



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com