# EXHIBIT 2

Gary Kleck                                   October 29, 2011

328

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASE NO. 10-CV-4184
Judge Edmond E. Chang

ILLINOIS ASSOCIATION OF
FIREARMS RETAILERS, KENNETH
PACHOLSKI, KATHRYN TYLER, and
MICHAEL HALL,
          Plaintiffs,
vs.                                    Volume 2
                                       Page 328 - 474
THE CITY OF CHICAGO and
RICHARD M. DALEY, Mayor of the
City of Chicago,

          Defendants.
_____
CONT'D
VIDEOTAPED
DEPOSITION OF:          GARY KLECK


TAKEN AT INSTANCE OF:   The Defendants


DATE:                   October 29, 2011


TIME:                   Commenced at  8:17 a.m.
                        Concluded at 11:50 a.m.


LOCATION:               200 North Monroe Street
                        Tallahassee, Florida


REPORTED BY:            L. DANIELLE FREEZE
                        Certified Realtime Reporter
                        Lfreeze37@comcast.net

ACCURATE STENOTYPE REPORTERS, INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL  32308   850.878.2221
asreporters@nettally.com



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

APPEARANCES:


            REPRESENTING PLAINTIFFS:


            CHARLES J. COOPER, ESQUIRE
            ccooper@cooperkirk.com
            COOPER & KIRK
            1523 New Hampshire Ave., N.W.
            Washington, D.C.  20036
            202.220.9660


            REPRESENTING DEFENDANTS:


            CRAIG WOODS, ESQUIRE
            cwoods@mayerbrown.com
            RANJIT J. HAKIM, ESQUIRE
            rhakim@mayerbrown.com
            MAYER BROWN LLP
            71 South Wacker Drive
            Chicago, IL  60606-4637
            312.701.8758


            ALSO PRESENT:

            Barbara Kirkland-Graves, Videographer


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

330

INDEX

WITNESS                                            PAGE

GARY KLECK                                         331
    Cont'd Direct Examination by
Mr. Woods


INDEX OF EXHIBITS

(Exhibits are attached.)

NO.   Description                                  PAGE

    17   NRA Training Publication entitled: Home
         Firearm Safety
    18   Excerpts from the book entitled: Firearms
         and Violence, A Critical Review
    19   Reply entitled: Has the Gun Deterrence
         Hypothesis Been Discredited
    20   Excerpt from book entitled: Evaluating
         Gun Policy
    21   Property Stolen and Recovered             408
    22   Paper entitled: The Social Costs of Gun
         Ownership
    23   Paper entitled: Underground Gun Markets   422


CERTIFICATE OF OATH                               470
CERTIFICATE OF REPORTER                           471
ERRATA SHEET                                      472
READING & SIGNING LETTER                          474



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

331

1                         STIPULATIONS

2           The following cont'd videotaped deposition of

3    GARY KLECK was taken on oral examination, pursuant to

4    notice, for purposes of discovery, and for use as

5    evidence, and for other uses and purposes as may be

6    permitted by the applicable and governing rules.

7    Reading and signing is not waived.

8                            * * *

9    Thereupon,

10   was recalled as a witness, having been first previously

11   and duly sworn, was examined and testified as follows:

12                  CONT'D DIRECT EXAMINATION

13          THE VIDEOGRAPHER:  We're back on the record.

14      This is the continuation of the deposition of

15      Dr. Gleck (sic).  Today is Saturday, October 29th,

16      2011.  The time is 8:18.  Dr. Gleck, I want to

17      remind you you are still under oath, so you may

18      proceed.

19   BY MR. WOODS:

20      Q    Good morning, Dr. Gleck.

21      A    Good morning.  It's Kleck with a K at the

22   beginning.

23      Q    I -- I apologize.

24      A    For the record.

25      Q    For the record, it's Dr. Kleck. I apologize.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

332

```
1              MR. HAKIM:  It's as if you guys never met.

2              MR. WOODS:  I guess.

3    BY MR. WOODS:

4        Q    I did get more sleep last night, so that's

5    good.  I hope -- I hope you are well rested this morning.

6        A    I'm delighted to hear it.

7        Q    Yes.  We talked yesterday about a -- a paper

8    that you said is recently coming out that was authored

9    between you and a Dr. Kovandzic?

10       A    Yes.

11       Q    And you --

12       A    And Mark Schaffer.

13       Q    And Mark Schaffer.  And you mentioned that this

14   paper is a superior methodology to the current papers

15   that are currently published relating to the effects of

16   gun availability on various crime end points?

17       A    Yes, in particular in connection with homicide.

18       Q    Okay.  But you're not publishing that paper in

19   a peer-reviewed journal; correct?

20       A    Could ask you that again?

21       Q    You are not publishing that paper in a -- or

22   submitting it for publication in a peer reviewed --

23       A    No.

24       Q    Have you ever submitted that publication to a

25   peer-reviewed journal?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

333

1      A      I think we submitted a version of it, an early

2      version to the Journal of Political Economy.

3      Q      And they didn't accept the publication;

4      correct?

5      A      No, they apparently didn't even read it.

6      Q      And what is your basis for saying that they

7      didn't read it?

8      A      Because we got one review back from a reviewer

9      who was describing a different paper, a paper that had

10     been published years before and used a basic methodology.

11     He was clearly describing a different paper, so he had

12     not read our paper and yet recommended it be rejected.

13     Q      But you didn't submit your paper to any other

14     journal after that; correct?

15     A      I don't think so.  Actually, I stand corrected.

16     It's -- it's possible.  I'm not sure, though.

17     Q      If you did submit it to another peer-reviewed

18     journal, can we assume that it was rejected by that

19     journal too?

20     A      Well, it hasn't been published in any review --

21     any -- any journal of any kind, whether peer reviewed or

22     not.

23     Q      Okay.  So we can assume that if you did submit

24     it to another journal, it was rejected?

25     A      If -- yes, with a big if there.  I don't recall



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                334

1    if we did.

2         Q    Now, are you suggesting that --

3         A    Let me actually expand on that answer because

4    there's a version of that that's being -- that's under

5    review now, and it has what's called a revise and

6    resubmit, which means in this case, it's probably going

7    to be published, but I can't say it has been accepted for

8    publication.  It hasn't gotten to that point yet, so

9    that's sort of a qualifier.

10        Q    Maybe I misunder -- the Kovandzic paper we're

11   discussing about, I thought you told me that it was being

12   published as part of a handbook; is that right?

13        A    It is.  There's one version that's basically an

14   expository piece, which means it's explaining to people

15   already unfamiliar with the methodology what might be

16   used in their field.  So that's the one that's a chapter

17   in a book coming out next month.

18             And then there's the other one, which

19   basically emphasizes the substantive findings.  And

20   that was submitted to another professional journal.

21   That's where it has a revise and resubmit.  That is a

22   referee journal, and best assessment at this point is

23   it probably will be published there.

24        Q    And which journal is that?

25        A    It's the Journal of Quantitative Criminology.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

335

1       Q    I assume you're not suggesting that post

2   publication of the Kovandzic paper in either the Journal

3   of Quantitative Criminology or in the handbook that you

4   mentioned that we throw out all the previous papers that

5   have looked at the links between gun availability in

6   homicide because they are all invalid; correct?

7       A    I'm not sure what throw out would mean, but you

8   would certainly give them way less weight.  You wouldn't

9   give them much weight because one thing we demonstrate in

10  that paper is that if you do the result -- do the

11  analysis in exactly identical ways with the same body of

12  data, but you properly take account of causal order, all

13  of the results that suggested that more guns lead to more

14  homicide disappear.

15          It was entirely dependent on that one defect

16  in prior research.  And since virtually all of the

17  prior research had that defect, we have a decisive

18  reason to give virtually no weight to those other

19  studies.  So that's the way I would phrase it.  The

20  body of research that didn't properly take account of

21  causal order has very little value in telling us

22  whether more guns lead to more violence as opposed to

23  the reverse.

24      Q    Well, every study -- every study has

25  strength -- and weak -- strength and weaknesses; correct?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

336

1       A     Yes, but some weaknesses are utterly critical.
2    And in this case, that happens to be an utterly critical
3    one in the sense that you get radically different results
4    depending on whether you fix that problem.
5       Q     Right.  And I'm not -- I understand that you
6    believe the causal order is a very important point for
7    that literature, and that's certainly one of the
8    weaknesses that you believe you should take into
9    consideration.  But just as a general principle, every
10   study has strengths and weakness and in evaluating a
11   study, you should take into consideration the strengths
12   and weaknesses of the article; correct, or the study?
13      A     Yes.
14      Q     And you need to look at the body of literature
15   as a whole in coming to a conclusion about whether the
16   studies do or do not suggest causality; correct?
17      A     Yes, you do have to take account of the full
18   body of relevant evidence, but you also have to weight
19   the evidence by how reliable the methods were used and
20   there's huge a chasm between a few studies that solve the
21   principal problems facing researchers in this area and
22   the vast majority of studies that did not.
23      Q     Well, I mean, you would agree with me that in
24   the field of gun control in general, respected
25   researchers have come to varying conclusions relating to



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

337

1    various issues of the effects of the availability of guns

2    on crime end points; correct?

3         A    In this area, researchers have come to

4    conclusions that didn't follow from the evidence, and

5    that's the problem.

6         Q    Yeah.  Yeah, but they have come to different

7    conclusions than you have, for instance?

8         A    They -- they certainly have, not based on the

9    evidence, but based on other considerations, apparently.

10        Q    So -- so, for instance, on the effect of gun

11   availability on suicide, researchers have come to

12   different conclusions than you have; correct?

13        A    Yes.  Those who have reviewed only a small

14   portion of the research have come to different

15   conclusions than I did based on the full body of

16   evidence.

17        Q    I mean, respected researchers have come to

18   different conclusions than you have; correct?

19        A    Not researchers respected by me.

20        Q    I understand that.

21        A    But especially not respected with regard to

22   this body of research.

23        Q    That's right.  But in general, these people are

24   respected in their fields; correct?

25        A    They must be respected for some broad area of



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                           338

1    research they do, but I don't think it's in connection

2    with the guns and violence issue.

3        Q    Same thing with the issue of the effect of gun

4    availability on homicides, researchers have come to

5    different views than you have; correct?

6        A    The exact same thing would be true in

7    connection with the suicide literature.

8        Q    And same thing is true with gun accidents --

9        A    Yes.

10        Q    -- the effect of the availability of guns on

11    accidents.  Respected researchers have come to different

12    conclusions than you have?

13        A    On that one, I'm not so sure.  There's very

14    little research on that, and I'm not so sure the

15    researchers who have come to different conclusions are

16    very well respected.

17        Q    Who is it that you're thinking of that is not

18    very well respected?

19        A    David Hemenway.

20        Q    Okay.  Anyone else?

21        A    No, I can't think of anyone else besides that.

22        Q    Another issue that we're going to talk about in

23    a little bit is the number of defensive gun uses per year

24    in the United States, researchers have come to different

25    conclusions on that issue; correct?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

339

1        A     Not so much so.  Actually, what other

2   researchers do is they are somewhat evasive.  They don't

3   actually say what they think the number of defensive gun

4   uses is.  So they haven't exactly come to different

5   conclusions.  They simply hint that they don't believe

6   the estimates I come up with.

7        Q     That's right.  So researchers, some researchers

8   don't agree with your assessment; some well-respected

9   researchers don't agree with your assessment on the

10  number of defensive gun uses per year; correct?

11       A     Yes.

12       Q     And the same thing is true with respect to

13  whether defensive gun uses present injuries; some well

14  respected researchers disagree with your point on that.

15       A     I'm not so sure about that.  I don't know of

16  anybody who has actually explicitly said they don't think

17  defensive gun use is effective in preventing injuries,

18  not in published literature anyway.  That seems to be an

19  area of consensus; that is, either people explicitly

20  agree that defensive gun use is effective or they don't

21  overtly and in print disagree.

22       Q     What about the area of whether defensive gun

23  uses deter or prevent crime?

24       A     That, I think everybody agrees that it's

25  difficult to determine that, that it's probably always



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

 1    going to remain an open question.

 2        Q    So there isn't a wealth of research that

 3    supports that position; correct?

 4        A    Well, there is a wealth of evidence that

 5    supports it, but the evidence is more tentative and

 6    probably inevitably has to be more tentative.  It's the

 7    nature of the beast.

 8        Q    So there's a wealth of evidence that supports

 9    it, but there isn't strong evidence that there is, in

10    fact, an effect?

11        A    I would say that's a fair assessment.  It's not

12    strong evidence.

13        Q    Now, we talked yesterday about whether there

14    was some safety benefit to using trigger locks.  Is there

15    any way that we could quantify the safety benefit from

16    using trigger locks?

17        A    With the knowledge we have now, no.  In

18    principle, sure.

19        Q    What would you do to try to quantify that

20    safety?

21        A    If you could randomly assign gun owners to

22    either keep their guns with trigger locks or not and then

23    have a long follow-up period to see how many suffered

24    accidents later on, that would be a very good study that

25    could be done in principle.  It hasn't been done, and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                341

1    it's not likely to be done in the future, but nothing

2    that would make it impossible.

3         Q    Okay.  I want you to turn, if you would, you

4    can pull out Exhibit 1, which is your expert report.  And

5    if we could go over to page 18.

6         A    (Views document.)

7         Q    Okay.  And you say at the bottom paragraph:

8    Webster misleadingly hints (page 13) that the National

9    Rifle Association supports keeping all guns locked up and

10   unloaded?

11        A    Yes.

12        Q    Dr. Webster didn't actually say that he thinks

13   the NRA supports keeping all guns locked up and unloaded,

14   did he?

15        A    I would have to review his report.

16             (Views document.)

17             MR. WOODS:  I don't know which exhibit it is.

18        A    Yeah, the statement I was alluding to on

19   page 13 of Webster's report is, quote:  Groups as diverse

20   as the National Rifle Association and the American

21   Academy of Pediatrics recommend that gun owners store

22   their guns so that they are inaccessible to unauthorized

23   persons including children and teens, unquote.

24             And the reason I said he hints that the NRA

25   recommends that all guns be kept locked up is because



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

342

1    he doesn't have any qualifiers there.  So an unwary

2    reader would assume that that means all guns without it

3    being explicitly stated.  Had he explicitly stated,

4    then I wouldn't have used the word "hints."

5    BY MR. WOODS:

6         Q    Right.

7         A    But, in fact, it's -- it's a phrasing that's

8    likely to strongly suggest that to an unwary reader.

9         Q    And -- and then going back to your expert

10   report, you say:  In fact, the NRA specifically exempts

11   guns kept for self-defense from this general

12   recommendation.  And then you quote the NRA publication

13   from 1990, quote:  A gun stored primarily for personal

14   protection must be ready for immediate use.  It may be

15   kept loaded as long as local laws permit and then...

16             There's some ellipses after that; correct?

17   A    Correct.

18   Q    Now, did you read the 1990 publication?

19   A    Yes.

20   Q    Why don't we go ahead and mark that as the next

21   exhibit.

22   A    (Views document.)

23        (Exhibit No. 17 was marked for

24        identification.)

25



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

343

1    BY MR. WOODS:

2        Q    Now, if you would, I -- I'll direct your

3    attention -- okay, before we do that, let's just identify

4    that document.  So Exhibit No. 17, can you identify that

5    for the record?

6        A    Home Firearm Safety, an Education and Training

7    Publication of the National Rifle Association.

8        Q    And this is the publication that you were

9    referencing in your report on page 18?

10       A    Yes.

11       Q    And if you'll go over to page 37.  This is

12   where you took the quote from?

13       A    Yes.

14       Q    And if you look at the bottom of the page, it

15   says:  What is the gun used for?  And then it says,

16   quote:  A gun stored primarily for personal protection

17   must be ready for immediate use.  It may be kept loaded

18   as long as local laws permit.

19            That's what you put in your expert report?

20       A    That's correct.

21       Q    Then the quote goes on to say:  And every

22   precaution is taken to prevent careless and unauthorized

23   individual -- individuals from gaining access; correct?

24       A    That's correct.

25       Q    And so basically the NRA is contemplating some



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    type of scheme that's similar to the -- to the Chicago

2    one operable weapon gun ordinance; correct?

3         A    No.

4         Q    You are saying they aren't authorizing or they

5    aren't suggesting that you should take steps to prevent

6    careless and unauthorized individuals from gaining

7    access?

8         A    That's correct.  I'm saying they did not say

9    that.  They were silent on what precautions would be

10   taken.  They leave that up to the individual gun owner to

11   decide.

12        Q    Right.  But one precaution you could take is

13   you could put trigger locks on all but one operable

14   weapon; right?

15        A    Yes, but there's no evidence in this material

16   that's one of the things they had in mind when they wrote

17   that.

18        Q    Well, why don't you flip over to page 4.

19        A    (Views document.)

20        Q    And what -- what the NRA was talking about in

21   the quote that we just read was a gun stored -- this is:

22   A gun that's stored for personal protection must be ready

23   for immediate use.  And the NRA actually defines what

24   they mean by ready for use; correct?

25        A    (Views document.)



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                   345

1          Yes.

2     Q    And they say the phrase "ready for use" needs

3   some explanation.  A gun kept in the home for protection

4   is essentially always in use and may be kept loaded if

5   special care is taken; correct?

6     A    Correct.

7     Q    That's what they say.

8          And then they say:  The gun must be stored in

9   a secure place, inaccessible to unauthorized users,

10  children or adults, and in accordance with local laws;

11  correct?

12    A    Correct.

13    Q    So he's talking about guns that are ready for

14  use.  They must be stored in a secure place inaccessible

15  to unauthorized users; correct?

16    A    Correct.

17    Q    Now, Dr. Kleck, you don't have a study that

18  says that trigger locking the second, third or fourth

19  weapon in a home but keeping one operable will reduce a

20  person's ability to effectively resist crime versus not

21  having a requirement that the second, third and fourth

22  gun be secured with trigger locks; correct?

23    A    That's correct.  To my knowledge, that's never

24  been studied.

25    Q    All right.  I want to talk to you a little bit



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

346

1    about your studies relating to defensive gun use.  Can

2    you tell me how you define defensive gun use?

3         A    If a person threatens or attacks a person

4    making a criminal attempt against them.

5         Q    Do you believe that the crime must be committed

6    first before the gun is used in defense?

7         A    There must be an attempt in progress at

8    minimum.

9         Q    If the attempt isn't occurring and a gun is

10   used, would you agree that's an offensive use of the gun?

11        A    I wouldn't characterize it as defensive or

12   offensive.  It's intended as defensive but based on a

13   mistaken belief.

14        Q    Is there any disagreement among researchers of

15   this question as to what the term "defensive gun use"

16   actually means?

17        A    Hard to say.  Besides me, they often don't

18   offer an explicit alternate definition.  So I wouldn't be

19   able to tell you what conflicts there are.

20             They -- they kind of indirectly hinted

21   differences because they'll suggest -- and it's not

22   stated explicitly -- that if somebody uses a gun

23   defensively after the attempt has been initiated before

24   it becomes certain that it is a crime, then we know for

25   sure that's not a defensive gun use.  So there's a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

347

1     definition implicit in that assessment, but the -- that

2     definition is not explicitly stated.

3          So I'm kind of reading into that that they --

4     that some scholars would not -- would regard that as

5     clearly not a defensive gun use, as falling outside of

6     the definition.  And that would conflict with my

7     definition.

8          Q    Right.  Okay.  So there is some conflict in

9     the -- among scholars as to, at least, implicit conflict

10    as to how people define defensive gun use; correct?

11         A    Yes.

12         Q    Now, the issue of how many defensive gun uses

13    per year there are was evaluated by the National Research

14    Council in -- in its assessment of firearms and violence;

15    correct?

16         A    Yes.

17         Q    That was done in about 2005 is when they

18    published it?

19         A    Somewhere around there.

20         Q    Actually the review occurred over a number of

21    years before that; correct?

22         A    Yes.

23         Q    All right.  I'm going to go ahead and mark as

24    the next exhibit a -- excerpts from the book Firearms and

25    Violence, a Critical Review.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

348

1        A     (Views document.)

2              (Exhibit No. 18 was marked for

3        identification.)

4   BY MR. WOODS:

5        Q     Okay.  And if you could identify for the record

6   Exhibit No. 18, please.

7        A     Firearms and violence, a Critical Review.

8        Q     And this was published by the National Research

9   Council?

10       A     Yes.

11       Q     What is the National Research Council?

12       A     It's kind of a quasi governmental body financed

13  by the federal government; and they, among other things,

14  do reviews of research in a particular area of interest.

15       Q     And did they constitute a blue ribbon panel of

16  researchers to look at the body of literature on firearms

17  and violence for this review?

18       A     Yes and no.  They were people who were

19  distinguished in their fields; but for some reason or

20  another, they deliberately avoided having experts in this

21  area on the panel.

22       Q     One reason for avoiding that is there was a lot

23  of partisanship among the people who had previously done

24  research on firearms and violence?

25       A     Possibly, but that wasn't really a plausible



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

349

1    explanation because the simple response to that is you

2    just have partisans of both sides, and they chose to not

3    have any experts at all or specialists in this area.  So

4    it was somewhat puzzling.

5        Q    Is -- the National Research Council is a part

6    of the National Academies?

7        A    Yes.

8        Q    And that's a pretty prestigious organization?

9        A    Yes.

10       Q    Are you a member of the National Academies of

11   Science?

12       A    No.

13       Q    Is that a prestigious recognition to be a

14   member of the National Academies of Science?

15       A    In my field, I -- I think it's irrelevant.  I

16   don't know that there are any criminologists who are -- I

17   don't think they draw their membership from my

18   discipline.

19       Q    How do you become a member of the National

20   Academies of Science?

21       A    I don't know.

22       Q    Okay.  All right.  One of the things that the

23   panel of the National Academies or the National Research

24   Council did is they looked at the issue of whether --

25   well, let me step back.  So your opinion on the numbers



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

350

1    of defensive gun uses is based on survey data; correct?

2         A    Correct.

3         Q    And which survey data do you rely on?

4         A    There are about 18 national surveys based on

5    probability samples of the adult population that have

6    asked defensive gun use questions.  The two best surveys,

7    the technically soundest surveys, are the one I did

8    published in 1993 with Marc Gertz and then a follow-up

9    survey that was based on that one that was sponsored by

10   the U.S. Justice Department done the following year in

11   1994.  That's the national survey of the private

12   ownership of firearms, NSPOF.

13        Q    Okay.  And I think you -- a list of those

14   studies was contained in your expert report under Exhibit

15   No. 4; is that correct?

16        A    Yes.

17        Q    Or I'm sorry, Table No. 4?

18        A    Yes.

19        Q    Okay.  And -- and you gave us an update of

20   that, I think, two days ago; correct?

21        A    Yes.

22        Q    Why was that updated?  What did you change on

23   the table?

24        A    Oh, I was just compulsively trying to improve

25   it to the last minute.  The changes are basically in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 29, 2011

351

1    doing additional adjustments to make the estimates across

2    different surveys comparable.  There are adjustments for

3    technical differences between surveys.

4        Q    And there's been some criticism labeled -- or

5    leveled with respect to those surveys that they

6    overinflate the numbers of defensive gun uses based on

7    the way the surveys are conducted; correct?

8        A    Certainly there are people who have made that

9    assertion.

10       Q    Okay.  And that's -- and that's one of the

11   things the National Research Council evaluated; correct?

12       A    Yes.  They -- well, they -- they commented on

13   it.  I don't know if you could say they evaluated it, but

14   they certainly made comments on it.  They pointed out

15   that was a possibility.

16       Q    And they basically came to the conclusion that

17   we can't say one way or the other whether these surveys

18   are accurate; correct?

19       A    Something like that; yeah.

20       Q    Okay.  Would you turn over to page 108?

21       A    (Views document.)

22       Q    And if you see under Response Problems in

23   Firearm Surveys, Firearm Use Surveys; do you see that?

24       A    Yes.

25       Q    And that's one of the issues that's been raised



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

352

1     with respect to these surveys is there are problems with

2     the responses to the surveys; correct?

3         A    Yes.

4         Q    Okay.  And they say:  Questions about the

5     quality of self-reports of firearms use are inevitable.

6     Response problems occur to some degree in nearly all

7     surveys but are arguably more severe in surveys of

8     firearm-related activities in which some individuals may

9     be reluctant to admit that they use a firearm.

10            That's one of your contentions; right?

11        A    Yes.

12        Q    And others may brag about or exaggerate such

13    behavior.  So they're suggesting that it could go both

14    ways, people might overstate firearm use or they might

15    understate firearm use; correct?

16        A    Yes.

17        Q    And if some sample individuals give incorrect

18    answers, in -- inaccurate response; and others fail to

19    answer the survey at all, non-response; investigators may

20    draw incorrect conclusions from the data provided by a

21    survey; do you agree with that last sentence there?

22        A    Yes.

23        Q    And then if you'll flip over to page 110.

24        A    (Views document.)

25        Q    Right above the heading Non-response, that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

353

1    paragraph, it says:  Although theories abound, it is not

2    possible to identify the prevalence of defensive gun use

3    without knowledge on inaccurate reporting; do you agree

4    with that?

5         A    Not exactly.  The statement is a little vague.

6    It's not possible to precisely identify the prevalence.

7    But as always, you draw your conclusions on the best

8    available evidence, not based on perfect evidence; and

9    the way they phrase it, it seems to be implying that

10   nothing short of error-free surveys would allow to us say

11   anything at all about the prevalence of defensive gun

12   use.  And I certainly would not phrase it that way.

13        Q    Well, certainly, if the errors are significant,

14   you wouldn't be able to say much about defensive gun use;

15   correct?

16        A    No, I would disagree with that.

17        Q    Well, National Research Council panel goes on

18   to say:  Kleck and Gertz 1995 and others suggest that

19   estimates from the NCVS are biased downward, arguing that

20   respondents are reluctant to reveal information to

21   government officials and that indirect questions may

22   yield inaccurate reports.  That's your position; correct?

23        A    Yes, among others, among other people who hold

24   that position.

25        Q    Now, Hemenway 1997a and others suggest that



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

354

1    estimates from the NSDS are biased upward.  NSDS is your

2    survey; correct?

3        A    Yes.

4        Q    Arguing that memory telescoping,

5    self-presentation biases and the rare events problem more

6    generally lead the numbers of false positive results to

7    substantially exceed the numbers of false negative

8    reports.  And that's Dr. Hemenway's position; correct?

9        A    That is his position.

10       Q    And then it says:  It is not known, however,

11   whether Kleck's, Hemenway's or some other assumptions are

12   correct.  The committee is not aware of any factual basis

13   for drawing conclusions one way or the other about

14   reporting errors.

15            So the committee is taking the position that

16   we don't know who's right; and, therefore, at least at

17   this point, we can't say that any of the data is

18   accurate enough to support the results; correct?

19       A    No, actually, if you read it a little more

20   carefully, they're not quite saying we don't know.  Look

21   at the key phrase, "the committee is not aware of any

22   factual basis."  Well, here is where their lack of

23   expertise comes in.

24            There's lots of things they're apparently not

25   aware of, certainly lots of things they didn't mention



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

355

1    in this discussion.  And so there is a factual basis

2    for drawing conclusions.  There's just not a factual

3    basis for being certain about it.  But, then, that's an

4    unreasonable standard.

5           You're never certain about anything in

6    science.  But is there a factual basis for drawing

7    conclusions one way or another?  Yes, there's, in fact,

8    a wealth of information on the kinds of errors that

9    made -- are made in surveys on crime-related phenomena.

10          It will not lead you to an answer about which

11   you can be 100 percent certain, but, again, that's not

12   a reasonable standard.  And the evidence that does

13   exist leads one to draw conclusions that false

14   positives are rare and much less common than false

15   negatives, but it was evidence that either the

16   committee was not aware of or chose not to incorporate

17   into their report.

18      Q    Well, I understand that you think you can draw

19   reliable conclusions from the data, but the committee did

20   not think they could draw reliable conclusions from the

21   existing data.

22      A    They didn't actually say that because again and

23   again throughout this report on virtually every

24   significant issue they address, they end up drawing a

25   no-decision conclusion.  But it's not necessarily based



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

356

1   on a systematic review of all the relevant evidence.

2   It's just that it seemed to be their broad general

3   inclination throughout the entire report to draw a

4   no-conclusion conclusion, even when a conclusion might

5   have been warranted.

6        Q    Well, if you flip over to page 113.  If you see

7   under Replication and Recommendations?

8        A    (Views document.)

9        Q    Starting where it says:  Certainly; do you see

10  that?

11       A    Yes.

12       Q    About in the middle of the page, it says:

13  Certainly the numerous surveys reveal some phenomena.  In

14  light of the difficulties in coverage and potential

15  response errors, however, what exactly these surveys

16  measure remains uncertain.  The committee thought it was

17  uncertain what the results -- what the results mean;

18  correct?

19       A    Well, they -- they say it remains uncertain,

20  and that's characteristic phrasing in this report as if

21  somehow under some other set of circumstances, it could

22  be certain.  That's a -- that's a meaningless standard.

23  Everything --

24       Q    But that's what they found.

25       A    Everything is uncertain in science.  So it's



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 29, 2011

357

1    not informative for them to say it's uncertain.   It

2    really doesn't mean much of anything because you knew

3    that before they wrote anything.

4         Q     And then it says:  Ultimately, the committee

5    found no comfort in the numbers.   The existing surveys do

6    not resolve the ongoing questions about response problems

7    and do not change the fact that different sub populations

8    are queried.   Mere repetition did does not eliminate

9    bias.

10         Do you agree with that last sentence, the

11   fact that there are lots of studies out there that have

12   come to similar conclusions doesn't mean that they

13   aren't -- all those studies aren't biased in and of

14   itself; correct?

15        A     I disagree with the -- the intent of that

16   question because the diversity of the surveys is a

17   strength, not a weakness.   In fact, one of the purposes

18   of my applying adjustments to defensive gun uses

19   estimates across different surveys was basically to

20   adjust for those different sub populations that are

21   queried.   But even without those adjustments, most of the

22   surveys did query the same populations.

23         So for most of the surveys, this claim that

24   the different -- that different populations are queried

25   is -- is wrong.   The fact that existing surveys all



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

358

1    yield large estimates by itself doesn't, you know,

2    prove anything; but the fact that so many independent

3    surveys have been done under different circumstances by

4    different organizations with different biases actually

5    does strengthen our confidence in the findings.  And

6    no, the fact that numerous surveys have been done by

7    itself doesn't eliminate the problem of biases that

8    exist in all the surveys, but it does eliminate a lot

9    of problems.

10           It does tell us no, it's not the

11   characteristics or flaws of any one survey that are

12   yielding these high defensive gun use estimates.  So it

13   certainly does contribute to our confidence that

14   there's a lot of defensive gun uses.

15        Q    And I'm going to move to strike the answer as

16   nonresponsive.

17           My question was simply mere repetition alone

18   does not eliminate bias.  And I think you agreed with

19   that, alone, the fact that you repeat a study doesn't

20   mean that you're eliminating a bias that was present in

21   the study.

22        A    Yes, I do agree with that narrow issue.

23        Q    If you could turn back to Exhibit No. 2, and

24   this is a book by William J. Vizzard.

25        A    (Views document.)



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

                                                                 359

1       Q       And if you could turn to page 17.

2               Now, you're aware that Dr. Vizzard is also

3       skeptical of the defensive gun use numbers that you've

4       been advocating; correct?

5       A       Yeah, I'd describe him as mildly skeptical.

6       Q       Okay.

7       A       That is, he recognizes the possibility that the

8       estimates are wrong.

9       Q       Right.  I mean, if you -- if you go over to --

10      let me direct you actually to page 18.

11      A       (Views document.)

12      Q       And Dr. Vizzard is talking about the -- the

13      debate in the scientific arena about whether the

14      defensive gun use numbers are accurate or not and he

15      says, quote:  I can offer no new scientific data to

16      resolve this conflict, but I will offer an intuitive

17      critique.

18              I spent 30 years of my life carrying a gun

19      almost daily.  I also associated with hundreds of

20      others who did the same.  We spent countless days in

21      high crime areas and on surveillance.  I never had an

22      occasion to prevent a crime from occurring; although, I

23      did make some arrests after crimes occurred.  Based on

24      my conversations with many others in law enforcement, I

25      conclude that my experience was not atypical.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

360

1          So what Dr. Vizzard is saying here is:  Your

2     numbers relating to the number -- to the extent of

3     defensive gun use don't seem to square with my personal

4     experience; that is what Dr. Vizzard is suggesting;

5     correct?

6          A    He's suggesting that, yes.

7          Q    He also states on page 18, in the next

8     paragraph:  I suspect -- and this is the start of the

9     paragraph -- I suspect that in any population, an unknown

10    number of respondents will inflate the number of

11    defensive gun uses for three reasons; correct?

12         A    He does say that, yes.

13         Q    So he believes that in his mind, at least, that

14    the defensive gun use numbers are likely inflated;

15    correct?

16         A    No, I wouldn't draw that conclusion.  He just

17    offers reasons why some people would inflate the number

18    of DGUs.

19         Q    Right.  But he agrees that there's -- remains a

20    lot of controversy surrounding around exactly how many

21    defensive gun uses occur; correct?

22         A    He -- he recognizes disagreement, yes.

23         Q    Right.  I mean, if you look at page 19 right

24    before policy implication of impacts; do you see where he

25    wrote:  For a variety of reasons, therefore, the


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 29, 2011

361

1    frequency and nature of defensive gun uses, DGUs, remains

2    controversial?

3         A    That's what he writes.

4         Q    Right.  Now, your results on defensive gun

5    uses, they haven't been externally validated; correct?

6         A    Could you ask that again, please.

7         Q    Your results on defensive gun uses -- well, let

8    me ask it this way.

9              Your results on defensive gun use have been

10   criticized for failing external validity checks;

11   correct?

12        A    You're asking about the frequency of defense?

13        Q    Yes, the frequency.

14        A    Yes.  Have they been criticized?

15        Q    Yes.

16        A    Have people made those claims --

17        Q    Yes.

18        A    -- the answer is yes.

19        Q    Yeah.  And are you aware of any study that has

20   externally validated your assessment of defensive gun

21   use?

22        A    Yes.

23        Q    Which study?

24        A    The National Survey of the Private Ownership of

25   Firearm Use.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      Q      And what is that --

2      A      And many other surveys, but that's the

3    strongest one.

4      Q      Is that an external validity of the survey?

5      A      Yes.

6      Q      And what is the -- what is that survey?

7      A      That was a completely independent survey of the

8    U.S. adult population done at a later point in time.  So

9    it was basically a completely non-overlapping set of

10   persons who were asked the question and thus is an

11   external validity check.

12     Q      Yeah.  Okay.  That second study that you

13   mention, is this the study that was performed by the DOJ?

14     A      It was sponsored by the Department of Justice.

15     Q      Okay.  And they performed the survey in a

16   similar way to the way you performed the survey --

17     A      Yes.

18     Q      -- correct, in asking about defensive gun uses?

19     A      The private survey organization that was hired

20   but doing it under the direction of the researchers was

21   doing it in many ways modeled after the survey that I had

22   done, the NSDS.

23     Q      So it managed to replicate the results of your

24   survey; correct?

25     A      Correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

363

1      Q     But as we've said before, holding all other

2    things equal, just replicating another survey doesn't

3    necessarily remove bias from the original survey;

4    correct?

5      A     Correct.

6      Q     Let me shift topics to the effectiveness of

7    defensive gun uses at reducing injury.

8            Now, I think you mentioned before that, at

9    least, your position is there's no controversy as to

10   whether defensive gun uses reduce injury.  Is that your

11   position?

12     A     Let's say virtually none in the published

13   literature, that is, the published scholarly literature.

14     Q     The studies.  So every study that has looked at

15   whether defensive gun uses prevent injury has concluded

16   they net do; correct?

17     A     I believe so, yes.

18     Q     Okay.  And what -- what studies are you

19   referring to specifically that show that?

20     A     There are a series of studies based on the

21   National Crime Victimization Surveys or the earlier

22   version of that, the National Crime Surveys.

23     Q     And who were they published by?

24     A     They're published by...

25           (Views document.)



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                    364

1          Gary Kleck, Miriam DeLone, Lawrence

2     Southwick, Jongyeon Tark.

3          Q    I want to make sure I understand which studies

4     you are referring to.  Could you tell me the titles of

5     the studies and the publication, the year, for each of

6     those?

7          A    In my rebuttal report, if you looked at Kleck

8     1988 on page -- cited on page 49.  That is "Crime control

9     for the private use of armed force."  Social problems;

10    Kleck 2001c:  "The nature and effectiveness of owning,

11    carrying and using guns for self-protection, Chapter 7 in

12    Armed."  Kleck and Delone 1993.  On the following page,

13    page 50, "Victim resistance and offender weapon effects

14    in robbery", Journal of Quantitative Criminology.

15              On page 52, Lawrence Southwick 2000.

16    "Self-defense with guns:  The consequences."  Journal

17    of Criminal Justice.  Tark and Kleck 2004.  "Resisting

18    crime in criminology."  That's it.

19         Q    Now, were you an author in all of those

20    studies?

21         A    No.

22         Q    Which -- you were an author -- you were an

23    author in all of them but the Lawrence Southwick study?

24         A    Yes.

25         Q    And that was in 2000?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

365

1      A    Yes.

2      Q    This was another area that the National

3  Research Council disagreed with you on; correct?

4      A    I -- I don't recall.  I'd have to review the

5  relevant parts of the report.

6      Q    If I could direct your attention to page 116 of

7  the report.  The first paragraph, first full paragraph on

8  that page, the National Research Council I was talking

9  about, the effect of DGUs on injuries to victims.

10          And it says, quote:  The results suggest

11  interesting associations:  Victims who use guns

12  defensively are less likely to be harmed than those

13  using other forms of self-protection.  Whether these

14  findings reflect underlying causal relationships or

15  spurious correlations remains uncertain.

16          So the National Research Council said it was

17  uncertain whether the defensive gun use is actually

18  preventing injuries or not; correct?

19      A    Not -- not the National Research Council.  This

20  particular body of nonexperts offered that as their

21  opinion.

22      Q    Okay.  This panel that was sponsored by the

23  National Research Council?

24      A    That's correct.

25      Q    I mean, this is published by the National



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

366

1    Research Council; right?

2         A    That's correct.

3         Q    You're not -- you are suggesting that this

4    isn't a position of the National Research Council?

5         A    That's exactly what I'm suggesting.  And, in

6    fact, I think they probably explicitly state that

7    somewhere.

8         Q    If you go down to the bottom of the page, the

9    paragraph at the bottom where it says:  The most obvious

10   and fundamental limitations, however, is that the data on

11   defensive gun uses are, as described above, potentially

12   error ridden.  And there they're talking about --

13        A    Wait a minute.  I can't see where you are

14   talking about.

15        Q    Okay.  I'm sorry.  If go down to the bottom of

16   page 116, the last paragraph.

17        A    Yes.

18        Q    The first sentence:  The most obvious and

19   fundamental limitation, however, is that the data on

20   defensive gun uses are, as described above, potentially

21   error ridden.  And they're talking about the data on the

22   numbers of defensive gun uses is potentially error

23   ridden; correct?

24        A    Yes, that's the way I read that.

25        Q    And then it says:  Without reliable information



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 29, 2011

367

1      on the prevalence of defensive gun use, researchers are

2      forced to make implausible and unsubstantiated

3      assumptions about the accuracy of self-reported measures

4      of resistance; do you see that?

5            A     They do say that, yes.

6            Q     Yeah.  So the -- this panel of the National

7      Research Council is raising serious questions about the

8      numbers of defensive gun uses and whether that's

9      reliable; correct?

10           A     (Views document.)

11                 I think they're expressing their uncertainty

12     about it.  That's the way I would read that.

13           Q     Right.  Now, in determining the benefits of

14     defensive gun use, you're actually relying on the data

15     from the NCVS survey; correct?

16           A     Correct.

17           Q     And what is the NCVS survey?

18           A     The National Crime Victimization Survey is a

19     survey of a large probability sample of the U.S.

20     population age 12 and above that's conducted by the U.S.

21     Census Bureau in which they ask people questions about

22     whether they have been a victim of a crime and then ask

23     detailed questions about what kind of crime and what

24     happened, including questions about what people did for

25     self-protection, whether they were injured, whether they



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

368

1    lost property and so forth.

2         Q    All right.  And data from the NCVS on the

3    numbers of defensive gun use suggests that there are far

4    fewer defensive gun uses than you found in your surveys;

5    correct?

6         A    No.

7         Q    So --

8         A    That's not correct.

9         Q    So the NCVS data shows as many defensive gun

10   uses as the surveys you did on defensive gun use?

11        A    No, neither.  It doesn't say anything about it

12   at all.

13        Q    So the NCVS doesn't say anything about

14   defensive gun use; that's your contention?

15        A    That's correct.  They never asked anyone

16   whether they used a gun for self-protection.

17        Q    They ask an open-ended question of:  How did

18   you respond to a crime; correct?

19        A    That's correct.  They do.

20        Q    And there's nothing preventing the survey --

21   person being surveyed from indicating that I used a gun

22   in self-defense in response to that question; correct?

23        A    Incorrect.  I disagree with that.  There's

24   plenty of reasons, plenty of forces or factors that would

25   prevent them from saying as much.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

369

1      Q      Well, some people did say they used a gun in

2   self-defense.

3      A      Some did, yes.

4      Q      So clearly nothing --

5      A      So those factors did not prevent some people

6   from saying yes.

7      Q      That's correct.

8      A      But may have prevented many others from saying

9   yes.

10      Q      So, but you think -- so you believe the NCVS

11   can't be used to estimate the numbers of defensive gun

12   use; correct?

13      A      That's correct.

14      Q      But you believe that the NCVS can be used to

15   determine the number of crimes in which injury could be

16   prevented from defensive gun use; is that correct?

17      A      Yes.

18      Q      Okay.  And -- and the National Research Council

19   is addressing that issue here in this last sentence where

20   it says:  For example, Kleck, one of the most vocal

21   critics of DGU estimates derived from NCVS, assumes these

22   data are fully accurate when measuring the efficacy of

23   resistance; correct, that's what it says?

24      A      That's what they say, but it's an incorrect

25   description of my position.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 29, 2011

370

1       Q      Okay.  And what is your position, then?

2       A      My position is that these are the best

3   available data on the question of the efficacy of

4   resistance.  This is characteristic of the report,

5   they -- they act as if there's sort of a binary

6   distinction between certain and uncertain, totally

7   reliable and error free versus totally error filled.  And

8   that's not the way science works.

9          There's just evidence that's more reliable

10  than other evidence.  And that's what you give more

11  weight to.  So I certainly don't think the data are

12  fully accurate, no data are fully accurate.  I just

13  believe that they are better for addressing this

14  question than any other body of data.

15      Q      If you turn over to page 117 and look at the

16  top paragraph.  I'm going to direct your attention to the

17  second sentence from the bottom:  Without better

18  information on the nature and extent of response

19  problems, it is impossible to know whether and how the

20  estimated associations between defensive gun use, crime

21  and injury are biased.

22          So the -- the -- this panel of the National

23  Research Council doesn't think that we can draw the

24  conclusions that you draw from the defensive gun use

25  data because it's unknown the extent to which that data



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    may be biased; correct?

2         A    That's what they say.

3         Q    The NCVS panel survey -- why -- why don't we

4    flip over to page 104 --

5         A    (Views document.)

6         Q    -- in that document.

7              When we were talking a second ago, you said

8    that the -- the survey conducted by the NCVS never

9    asked people about their defensive gun uses; correct?

10        A    Correct.

11        Q    And these are actually the questions listed

12   here on page 104 that is -- that are asked in the -- by

13   the NCVS survey; correct?

14        A    Correct.

15        Q    And the first question they asked is:  Was

16   there anything you did or tried to do about the incident

17   while it was going on; that's one question that they

18   asked?

19        A    Correct.

20        Q    And then they asked:  Did you do anything else

21   with the idea of protecting yourself or your property

22   while the incident was going on; do you see that

23   question?

24        A    Yes.

25        Q    So your -- it's your position that question



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

372

1    would not elicit a response that would include defensive

2    gun use?

3         A    It would be my position it would rarely do so.

4         Q    So you don't think this question would invite

5    people to tell the surveyor whether they used a gun as --

6    in defense of the incident?

7         A    Certainly some people would interpret it as an

8    invitation to do so, but the issue is whether they would

9    respond to that invitation.

10        Q    Now, the NCVS data that you rely on to

11   determine the benefits of defensive gun use in terms of

12   preventing injuries, does that NCVS data actually capture

13   injuries that result in death?

14        A    No.

15        Q    And did you do anything to capture that in your

16   analysis?

17        A    I wouldn't say in the analysis because you

18   can't analyze data that aren't there, but I -- I have

19   taken account of that in interpreting the results so

20   that, for example, I did an exercise in which I took the

21   number of known gun homicides, added it in with the

22   number of nonfatal injuries and so forth, and then said:

23   Well, how would this alter our conclusions if we took

24   account of fatal results as well as nonfatal ones?  And

25   it makes virtually no difference in the conclusions.  The



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

373

1    conclusions would be identical.

2         Q    Well, if a defensive gun use resulted in death,

3    that wouldn't be a benefit to the person who was using

4    the gun defensively; right?

5         A    Are you describing the death of the defender?

6         Q    No, I'm talking about the death of the victim?

7         A    Well, that's what I mean.

8         Q    Right.  The death of the victim; correct?

9         A    Okay.  So can you give me the whole question,

10   again, please?

11              MR. WOODS:  Yeah, why don't we -- why don't

12        we switch a tape because we're getting close and

13        then we'll come back.

14              THE VIDEOGRAPHER:  Off the record, please.

15              THE WITNESS:  Okay.

16              (Discussion off the record.)

17              (Brief recess was taken.)

18              THE VIDEOGRAPHER:  We're back on the record

19        with tape No. 2.  The time is 9:22.

20   BY MR. WOODS:

21        Q    And, Dr. Kleck, before we broke, we were

22   talking about the benefits of defensive gun use.

23              If defensive gun use, while decreasing the

24   risk of injury, also increased the risk of death to the

25   victim by a greater amount, you would agree with me



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

374

1     there would be no net benefit to defensive gun use;

2     correct?

3         A    If the death-elevating effects were

4     sufficiently large, yes.

5         Q    They would have to be larger than the

6     injury-preventing effects?

7         A    Right.  Because nobody really regards in

8     practice the value of a human life as infinitely

9     valuable.  There's limits to the valuation everybody

10    places on life.  And so one could certainly imagine a

11    large number of crippling injuries, for example, as

12    exceeding the value of a human life.  So it's dependent

13    on the magnitude of the effect.

14        Q    And you can't use the NCVS data itself to

15    determine whether a defensive gun use resulted in death;

16    correct?

17        A    Not directly, no.

18        Q    Can you turn to page 45 of your expert report?

19        A    (Views document.)

20             MR. COOPER:  Now you're talking.

21             MR. WOODS:  We're getting closer to the end,

22        but I'm going -- I'm going to go back.  I

23        apologize.  I just think that this...

24             MR. COOPER:  You gave me renewed sense of

25        hope.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

375

1        MR. WOODS:  That's right.

2        MR. HAKIM:  We're going to ask about your

3    signature.

4    BY MR. WOODS:

5        Q    If you'll look down in the second paragraph

6    from the bottom where it starts:  Cook's discussion.

7    About in the middle of the paragraph, you say:

8    Nevertheless, there is a wealth of evidence suggesting

9    that widespread ownership, carrying and defensive use of

10   guns by potential and actual crime victims has a

11   deterrent effect on crime; do you see that?

12       A    Yes.

13       Q    Now, what is this wealth of evidence that you

14   are talking about?

15       A    That's the evidence that's reviewed on pages

16   318 through 330 of Kleck 2001c, which is a chapter in

17   Armed.

18       Q    Okay.  And what is that; do you know?

19       A    That reviews what happens to crime rates after

20   either highly publicized incidents of defensive gun use

21   or highly publicized incidents in which potential crime

22   victims are trained in the safe use of firearms and even

23   in one case, after what -- what happened after a town

24   required home gun ownership.

25       Q    And are these scientific studies?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

376

1      A     Yes.

2      Q     They aren't anecdotal reports?

3      A     No, you could call them statistical anecdotes,

4  which is sort of a cross between anecdotes about

5  individuals, but these aren't anecdotes about

6  individuals, but they're statistical in the sense that

7  they concern large populations.

8            So that's what I've -- I've coined the term

9  "statistical anecdote," but I don't think that has any

10  standardized meaning in the field.

11     Q     How about illustrative anecdote, is that a good

12  way to describe the studies?

13     A     Well, again, the word "anecdote" to most people

14  suggests a story about an individual person.  And that's

15  not descriptive of these studies.

16     Q     You wouldn't describe it as illustrative

17  anecdotes?

18     A     Illustrative yes; anecdotes, no.

19     Q     Why don't we mark this document as the next

20  exhibit.

21          (Exhibit No. 19 was marked for

22          identification.)

23  BY MR. WOODS:

24     Q     Dr. Kleck, the court reporter has handed you

25  what has been marked as Exhibit No. 19.  Can you identify



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

377

1    that document?

2         A    Has the Gun Deterrence Hypothesis Been

3    Discredited?  A Reply to McDowall, et al. Criminology,

4    November 1999.

5              MR. COOPER:  What's the date again?

6              THE WITNESS:  Sorry, 1991.  Sorry.

7    BY MR. WOODS:

8         Q    And if you'll turn to page 66 of this document

9    at the top.

10        A    (Views document.)

11        Q    The top paragraph says:  In a 1988 article

12   published in Social Problems, I offered some anecdotes in

13   which I noted decreases in rape following implementation

14   of a highly publicized Orlando gun training program for

15   women, a dampening of robbery increases in Kansas City

16   after implementation of a gun training program for

17   grocers and decreases in residential burglaries after

18   Kennesaw, Georgia, required its citizens to keep guns in

19   their homes; do you see that?

20        A    Yes.

21        Q    So these three issues that you're talking about

22   here in page 66 of Exhibit No. 19, those are the same

23   issues that you're referring to on page 45 of your expert

24   report; correct?

25        A    Some of them, yes.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                    378

1       Q     And you describe those in your 1988 paper

2    submitted to Criminology as anecdotes; correct?

3            MR. COOPER:  I'm sorry, what was the date

4       again?

5            MR. WOODS:  I'm sorry, the actual date of the

6       article is 1991.

7    BY MR. WOODS:

8       Q     You describe them as anecdotes; correct?

9       A     In the article we're discussing now, Exhibit 19

10   --

11      Q     Yes.

12      A     -- I'm not sure what the date of this article

13   is; but yes, in this article, Exhibit -- Exhibit 19, I

14   did describe them as anecdotes, somewhat carelessly, but

15   yes, I did.

16      Q     And if you look down at the bottom of page 66,

17   in the middle of the paragraph, of the last paragraph, it

18   says:  The data were not offered as part of an attempt to

19   formally test a deterrence hypothesis, but rather as

20   illustrative anecdotes, albeit statistical ones; do you

21   see that?

22      A     Yes, I do.

23      Q     So this wealth of evidence you are talking

24   about on page 45 includes data that was not offered as

25   part of an attempt to formally test a deterrence



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

379

 1   hypothesis?

 2        A    Yes.

 3        Q    And it includes illustrative anecdotes;

 4   correct?

 5        A    Statistical anecdotes, yes.

 6        Q    And if you go over to page No. 67, the bottom

 7   paragraph, in the middle, it says:  Since neither

 8   McDowall, et al. nor I have presented or cited any strong

 9   evidence one way or the other on the deterrence

10   hypothesis, it remains an open question whether the point

11   is false, i.e., whether there are deterrent effects of

12   civilian gun ownership.  Do you see that?

13        A    Yes.

14        Q    So in 19 -- when you wrote this response to the

15   McDowall 1991 article, you characterized whether there's

16   a deterrence effect from defensive gun use is an open

17   question; correct?

18        A    Yes.

19        Q    And you agree that that's true even today;

20   correct?

21        A    Correct.

22        Q    So even though on page 45 you say there's a

23   wealth of evidence suggesting a deterrence effect, you

24   agree that it's still an open question?

25        A    Correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

380

1    Q    Do you say anywhere on page 45 that it's still

2  an open question?

3    A    Not phrased that way, but that's certainly

4  the -- the meaning of the way I did phrase it.

5    Q    I mean, don't you think that's an important

6  caveat, that it hasn't been proven one way or the other?

7    A    I don't think it had to be -- the point had to

8  be belabored.  When you use the word "suggestive," that

9  pretty much resolves that issue.

10   Q    So any time you --

11   A    It's suggested rather than definitive.

12   Q    Okay.  So any time you use the word

13  "suggestive," you're meaning it's still an open question?

14   A    In this context, that was the meaning.

15   Q    Okay.  Do you agree that knowing whether a

16  victim might or might not be armed would influence a

17  criminal to change his behavior on gun carrying?

18   A    Could you repeat that, please.

19   Q    Do you agree that knowing or not knowing

20  whether a victim might be armed would influence a

21  criminal to change his behavior on gun carrying?

22   A    I believe the evidence supports that, yes.

23   Q    That being that if criminals think that their

24  victims may be carrying a gun, they are more likely to

25  carry a gun; correct?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 29, 2011

381

1      A    No, I guess I didn't understand the question,

2    then.  No, I don't believe knowing that a victim is

3    likely to be armed with a gun is generally likely to

4    motivate the offender to obtain a gun.

5      Q    Are you familiar with research performed by

6    Wright and Rossi?

7      A    Yes.

8      Q    And you rely on that research in a number of

9    places in your expert report?

10     A    Yes.

11     Q    Are you aware that they have published data

12   supporting the position that criminals who believe that

13   their victims are armed --

14     A    I am not aware --

15     Q    -- are very likely to be carrying guns, that

16   are very likely, in response, to carry a gun themselves?

17     A    I am not aware.  In fact, I think I believe

18   that's not what they found.

19     Q    Okay.  Do you think that carrying a gun for

20   self-defense might cause a person to become overconfident

21   or overaggressive?

22     A    It might.

23     Q    Are you aware of any research that suggests

24   that defensive gun uses may, in fact, be unlawful and

25   overaggressive?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 29, 2011

382

1      A     While I'm not aware of any research that
2   reliably establishes that, I'd -- I'd certainly
3   acknowledge the point even in the absence of any
4   empirical evidence.  It's almost certainly true that at
5   least occasionally, that's true.
6      Q     If you turn to page 44 of your expert report.
7      A     (Views document.)
8      Q     And this is the first full paragraph or sec --
9   I'm sorry, second paragraph on the page.  It says:  Cook
10  also cites a study (Hemenway, et al. 2000, cited in
11  Cook's footnote 51) that purported to have established
12  that many alleged DGUs were actually criminal assaults.
13         So when you referred to there were no
14  reliable research that was done, but you were aware of
15  the issue, you were referring to this paper here by
16  Hemenway; correct?
17     A     That, among other things.  I mean, this is the
18  closest thing to something that's on point, and it's not
19  reliable on that point.
20     Q     And what Hemenway did is he took instances of
21  defensive gun use as reported in these surveys and gave
22  them to several criminal court judges to evaluate whether
23  those uses were consistent with self-defense or not in
24  terms of legal self-defense; correct?
25     A     Correct.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

383

1     Q     And what they found was that in many, many
2   cases, it wasn't consistent with self-defense; correct?
3     A     That's not what they found.  That's what they
4   said.  That's the opinion they offered.
5     Q     Now, you say in response, that:  The
6   willingness of judges to assess violent acts as defensive
7   in nature varies radically across different areas of the
8   country, with judges in some northeast parts of the
9   nation being almost entirely unwilling to assess any
10  homicides as justifiable, while judges elsewhere assess
11  over twenty percent of homicides to be justifiable.
12          So I assume by that, you are suggesting that
13  the judges that Hemenway chose were biased against
14  finding gun uses as defensive; correct?
15    A     I'm saying that's a possible explanation of why
16  they made the judgments that they made.
17    Q     But you don't know whether they were biased
18  against finding defensive gun uses; correct?
19    A     No, Hemenway did not provide us any information
20  about who the judges were so...
21    Q     And, in fact, the judges weren't evaluating
22  homicides; right?  They were just evaluating defensive
23  gun uses, like assaults; correct?
24    A     Correct.
25    Q     And do you even know whether the judges were



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

384

1   from the locations that you indicate where the judges are

2   unwilling to assess homicides as justifiable?

3       A    Yes.

4       Q    All of them were from those areas?

5       A    He identified the states the judges were from.

6            I think there were five of them, and he

7   didn't say how many in each of the states that he

8   listed.  But I would have characterized the states as

9   places that are not supportive of gun ownership, that

10  have very strict gun laws and so forth.

11      Q    But you don't know --

12      A    Massachusetts and California are two of the

13  states that I recall he explicitly listed, and they have

14  unusually strict gun laws.

15      Q    But you don't know if he used judges that

16  actually held those views; correct?

17      A    No, he provided absolutely no details about the

18  judges other than the states they were from.

19      Q    All right.  I'd like to now have you flip back

20  over to page 25 of your expert report.

21      A    (Views document.)

22      Q    And this is just for context.

23           You -- on page 25 and going over to page 26,

24  you raise a number of criticisms of Dr. Cook's

25  valuation of the consequences of gun violence using



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      contingent valuation analysis principles; correct?

2            A     Correct.

3            Q     Have you ever conducted a contingent valuation

4      study?

5            A     No.

6            Q     Have you ever attempted to measure the intangi

7      -- intangible desire for security and self-protection

8      produced by carrying a firearm?

9            A     No.

10           Q     Why haven't you done that?

11           A     It's not an area of expertise that I have.

12           Q     Do you have any basis for believing that the

13     benefits from gun carrying in terms of their contingent

14     value outweigh the costs that Dr. Cook has identified?

15           A     No.

16           Q     Now, you point out -- I was going to try to

17     find it here.

18                 All right.  I'm sorry.  If you'll look at the

19     bottom of page 25, a paragraph you reference a study by

20     Ken Arrow.

21           A     (Views document.)

22           Q     And what's your point of mentioning that study?

23           A     They assessed what they thought of the utility

24     of contingent valuation methods and came to extremely

25     negative conclusions that they just thought this just



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

386

1    shouldn't even be used as a public policy tool.

2         Q    Now, that particular evaluation involved the Ex

3    -- Exxon Valdez?

4         A    Among other things, yes.  It was broadly

5    concerned with environmental damage.

6         Q    Do you know if Ken Arrow has ever criticized

7    the use of continued valuation studies in the area of gun

8    control and gun violence?

9         A    No.

10        Q    Do you know if -- I assume that Dr. Arrow laid

11   out what he felt his criticisms were with the use of

12   contingent value studies in the environmental areas in

13   his paper?

14        A    Yes.

15        Q    Do you know if Dr. Cook, in conducting his

16   contingent valuation study in the area of firearms,

17   whether he addressed the concerns of Ken Arrow that Ken

18   Arrow had raised in his paper relating to the use in the

19   environmental area?

20        A    Yes.

21        Q    He did address those concerns?

22        A    No, I --

23        Q    Dr. Cook.

24        A    No, I don't know whether or not he addressed

25   them.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

387

1        Q     Oh, you don't know whether or not?

2        A     No, no, you asked me do I know whether or not

3    he addressed them.  And I said yes, I know whether or not

4    he addressed them.

5        Q     And, in fact, he did address those criticisms;

6    correct?

7        A     No.

8        Q     Which criticisms did he not address?

9        A     Well, he didn't address the issue of yielding

10   internally inconsistent estimates, for example.  He

11   didn't have any tests one way or another on that.

12       Q     Anything else?

13       A     He did not address whether there would be

14   results that are inconsistent across studies because he

15   only did one study.  And so he wasn't in a position to

16   discover the problems that the Arrow panel had discovered

17   with the use of contingent valuation methods in other

18   areas.

19       Q     Anything else?

20       A     Not that occurs to me right now.

21       Q     And doing contingent value studies is not an

22   area within your expertise; correct?

23       A     Correct.  I'm relying on the expertise of the

24   Arrow panel.

25       Q     If you control for intent of the user of a gun,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

388

1    would you -- or other weapon, would you agree that guns

2    are more lethal than other weapons?

3           A     Intent to do what?

4           Q     The intent -- whatever the intent is, whether

5    it's lethality or not, the intent of -- to harm.

6           A     Okay.  Well, then, lethality intent?

7           Q     Yes.

8           A     Discuss that?  Probably.  Although, I suspect

9    it's an issue we'll never really have solid evidence on.

10   But based on the weak evidence we're going always to be

11   stuck with, my -- my view is yes, probably.

12          Q     So just to make sure I understand, if you

13   control for the intent of the user for lethality, you

14   would agree, all other things being equal, guns would be

15   more lethal than other weapons?

16          A     I would tentatively say yes.

17          Q     And are you aware of any studies that have

18   actually attempted to control for the intent of the

19   attacker and found that weapon choice affected lethality?

20          A     Attempted, yes.  Unsuccessfully attempted, yes.

21          Q     Do you agree that controlling for lethality for

22   intent of lethality, that some guns are more lethal than

23   others?

24          A     Yes.

25          Q     So doesn't it also hold that controlling for



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

389

1    intent of lethality, guns are more lethal than other

2    types of weapons?

3         A    Not necessarily.  The problem is that

4    comparisons between guns and, say, knives as an

5    alternative weapon involves an apples and oranges

6    comparison.

7              They are fundamentally different in how they

8    produce harm to the human body, whereas if you compare

9    one gun type with another, they are extremely similar

10   in how they inflict injury and harm on the human body

11   and they are more much comparable.

12        Q    Are you suggesting that controlling for intent

13   of lethality that knives are more lethal than guns?

14        A    No.

15        Q    Why don't you turn, if you would, to page 27.

16             And I want to talk to you about your critique

17   here on 27, going on to page 28 of a study by Cook and

18   Ludwig from 2003.  And I'm going to go ahead and pull

19   the study so we can refer to the specifics.

20             (Exhibit No. 20 was marked for

21        identification.)

22   BY MR. WOODS:

23        Q    All right.  Dr. Cook, we're handing you what

24   has been marked as Exhibit No. 20.

25        A    Kleck, you mean?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

390

1     Q     You are going to have to correct me all

2  morning.   I apologize.   I've got Cook on my mind because

3  of the study.

4        Dr. Kleck, we're handing you what has been

5  marked as Exhibit No. 20; can you identify this

6  document?

7     A     Evaluating Gun Policy, which I believe is the

8  title of the book and then within that, there is a

9  chapter titled:   Guns and Burglary by Cook and Ludwig.

10    Q     Okay.   And the chapter on guns and burglary,

11  that's what you are referring to in your critique on

12  page 27 and 28 of your expert report?

13    A     Yes.

14    Q     Okay.   And in this study, Cook and Ludwig

15  looked at the effect of guns on burglary rates using

16  various different data sources and study designs;

17  correct?

18    A     (Views document.)

19        You mean internally different, a diverse set

20  within this study, yes.

21    Q     Yes.   They did the study a number of different

22  ways and used multiple data sets to do the study;

23  correct?

24    A     Correct.

25    Q     Okay.   And one of the ways that they did the



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

1    study was they used -- when you talk about here in the

2    first paragraph a way of comparing burglary rates to gun

3    prevalence by lagging gun prevalence to the previous year

4    to the -- to the burglary rates in the next year;

5    correct?

6        A    Yes.

7        Q    And that's one of your criticisms is that that

8    method does not properly address causal order; correct?

9        A    Correct.

10       Q    That was the reason they did the lagging was

11   that they were trying to show that it was the gun

12   prevalence rates or try to test whether it was the gun

13   prevalence rates that affected the burglary rates -- as

14   rates opposed to the other way around, the burglary rates

15   affecting the gun prevalence rates; correct?

16       A    Yes, that is their ostensible purpose.

17       Q    And you say on page 27 here in the middle of

18   the paragraph:  They used an unsuitable and

19   professionally unacceptable method for determining causal

20   oiler -- order, merely relating burglary -- burglary

21   rates in a given year (the dependent variable or effect)

22   to gun prevalence rates in the previous year (the

23   independent variable or purported cause).

24            So you're talking about the -- you're

25   criticizing the lagging part of the study here in this



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

392

1   first paragraph?

2       A    Yes.

3       Q    And then you go on to state in this paragraph

4   at the bottom:  In any case, this analysis found no

5   significant effect of gun ownership levels on burglary --

6   burglary rates.  And you cite to Table 3.4.

7            Now, you're talking about that particular

8   analysis where they did the lagging found no

9   significant effect on gun ownership rates?

10      A    Can you go back tell me what page and paragraph

11  you're talking about here now.  I'm lost.

12      Q    In your expert report?

13      A    Right.

14      Q    Yeah, I'm looking at the top paragraph on

15  page 27.

16      A    Okay.

17      Q    So I was reading in the middle.  Where you see

18  --

19      A    Oh, yes, I see now.  I got it.

20      Q    -- they used an unsuitable and unprofessional

21  -- and professionally unacceptable method for determining

22  causal order; you see that?

23      A    Yes.

24      Q    And you are talking about the part of the study

25  that involved lagging gun prevalence and comparing that



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

393

1    with burglary -- burglary rates; correct?

2        A    Yes.

3        Q    And then you say in the last sentence of that

4    paragraph:  In any case, this analysis found no

5    significant effect on gun ownership levels -- of gun

6    ownership levels on burglary -- burglary rates; you see

7    that; correct?

8        A    Yes.

9        Q    Are you talking about the analysis, the lagging

10   analysis had no significant effect, found no significant

11   effect on gun ownership?

12       A    I believe that was my intent, yes.  I would

13   have to consult the table in question here to be sure.

14       Q    Okay.  And that's -- that's on page 92 of the

15   study, which is Exhibit 20.

16       A    (Views document.)

17            Actually, I think that's probably a typo on

18   the table number.  I think it's a different table that

19   reports the use of the lag measure.  I think it should

20   have been Table 3-3, if I can correct it at this late

21   date.

22       Q    Yeah.  So, in fact, what you meant there to say

23   is not on page 27 of your expert report.  You meant to

24   say table 3 --

25       A    3-3.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                           394

1        Q      -- dash 3, they didn't find a significant

2    effect of gun --

3        A      Right.

4        Q      -- ownership levels?

5        A      Right.  And page 92 should read page 90.

6        Q      But, in fact, if you look on Table 3-3, they

7    did find a significant effect of gun prevalence on

8    burglary rates; correct?

9        A      It was am -- well, let's see.

10              (Views document.)

11              Yeah, I couldn't tell if they were doing a

12   one-tailed or two-tailed test there.  So if it's a --

13   if it's a one-tailed test, then they failed at the

14   conventional 5 percent level to find a significant

15   effect of gun prevalence on logged burglary rates.

16       Q      If it -- if it's a two-tailed test, they showed

17   a significant level -- a significant effect of gun

18   prevalence on burglary rates; correct?

19       A      Yes, and if it's a one-tailed test, it fails.

20       Q      But that's not what you say on page 27 of your

21   expert report.  You said they found no significant

22   effect.  That's not true; correct?

23       A      Well, again, it's a matter of phrasing

24   subtleties.  If you consider significance a binary issue,

25   yes, no.  It's -- it's not meaningful to say there's a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

395

1    complete absence of significance.  There's just level of

2    significance, which can be anything from zero to 1.0.

3    And so it may have been less than the conventionally

4    accepted customary cutoff of 5 percent, depending on

5    whether or not that's a one-tailed test or a two-tailed

6    test.

7         Q    Or it may be if it's two-tailed test, it is

8    at -- significant at the customary cutoff for

9    significance; correct?

10        A    Possibly.

11        Q    Okay.  So this statement that you make on page

12   27, the last sentence, is actually wrong; correct?

13        A    No.

14        Q    Well, it's wrong, first of all, because you

15   referred to the wrong table; correct?

16        A    Well, yes, there is a typo.

17        Q    But we've corrected that.  But it's also wrong

18   because their data actually does show significant -- a

19   significant effect of gun ownership on burglary rates;

20   correct?

21        A    No, not necessarily, not if you use the

22   customary 5 percent level.

23        Q    So this -- this sentence should say:  This

24   analysis might show no significant effect of gun

25   ownership levels on burglary rates, depending on whether



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

396

1    they used a one-tailed or two-tailed test?

2        A    Yeah, if I had been devoting that much time to

3    an analysis I thought was meaningless, I probably would

4    have elaborated that more.

5        Q    So is your critique of Dr. Cook's study

6    meaningless; is that what you are saying?

7        A    No, I'm saying my critique is meaningful about

8    a test that was meaningless.  Their test was meaningless

9    because that's not a suitable way to resolve the causal

10   order issue.  It doesn't give us any insight at all into

11   the issue.

12       Q    All right.  Why don't we go down to the bottom

13   of page 27.

14       A    (Views document.)

15       Q    Another critique you make of this study relates

16   to a different analysis they performed which involved

17   using instrumental variables at the individual level;

18   correct?

19       A    Okay.  We're on the middle paragraph of

20   page 27?

21       Q    I'm actually at the bottom paragraph of

22   page 27.

23       A    Okay.  I see, yes.

24       Q    And you say:  Cook also fails to mention,

25   still, other unsupportive findings in this study,



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    findings that indicated that gun ownership rates do not

2    increase burglary; do you see that?

3        A    Yes.

4        Q    And then you say when Cook and Ludwig applied

5    instrumental variable analysis to individual level data

6    from the National Crime Victimization Survey on whether

7    the households in which the individuals lived have been

8    burglarized, they found no significant effect of the gun

9    ownership rates in an individual's area on whether they

10   were burglarized contrary to the author's incentive

11   theory; do you see that?

12       A    Yes.

13       Q    And you reference Table 3-7 on page 101?

14       A    (Views document.)

15            Yes.

16       Q    Would you agree with me that Table 3-7 does

17   present data that is not significant to the 1 percent

18   level; correct?

19       A    (Views document.)

20            You're referring to the estimated effect of

21   gun prevalence?

22       Q    Right.

23       A    Yes.

24       Q    But it does show that the effects are positive;

25   correct?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      A    Well, you don't describe them as effects if

2  they're not significantly different from zero.

3      Q    Well --

4      A    There's an estimate produced, which is

5  positive, but if it's not significantly different from

6  zero, it can't legitimately be interpreted as an effect.

7      Q    Okay.  If you look at -- under results of

8  Instrumental Variable Regressions on that page, there's

9  some text; do you see that?

10     A    Yes.

11     Q    And the authors say:  Table 3-7 presents the

12  results of two-stage least squares regression that they

13  rely on -- that rely on the same instrument as in the UCR

14  analysis, namely the percentage of state population that

15  lived in a rural area in 1950.  The instrument performs

16  very well in the first stage and is positively related to

17  burglary in the second stage; is that a true statement?

18     A    There's nothing -- you mean is it a true

19  statement that that's what they said, yes.

20     Q    Is the -- what they say about the data correct,

21  the instrument performs very well --

22     A    You can't tell because they don't describe what

23  they meant by performs very well.  Customarily, that

24  would mean it had passed specific tests for relevance and

25  validity, and they don't really say what they mean by



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

399

1    that.  So it's impossible to say.  It's essentially a

2    meaningless statement.

3         Q    Well, this study involved -- the whole paper

4    involved looking at data from both the UCR; correct?

5         A    Yes.

6         Q    That's one of the things they looked at?

7         A    Yes.

8         Q    What is UCR?

9         A    Uniform Crime Reports.  It's a compilation of

10   crime statistics and arrest statistics.

11        Q    And they looked at whether data from the UCR

12   supported the hypothesis that increased gun prevalence

13   had an effect on burglaries?

14        A    Yes.

15        Q    And they did this lagged analysis that we

16   talked about previously to try to ferret that out;

17   correct?

18        A    Yes, that's what they did in the state level

19   analysis.

20        Q    Right.  And then they also did an instrumental

21   variable analysis on the UCR data at the state level and

22   the city level to try to ferret that out; correct?

23        A    The state level, yes.  I'm not sure about the

24   city level but...

25        Q    Table 3.7 is talking about the instrumental



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

400

1    variable analysis; is that correct?  Am I right?

2        A    Yes.

3        Q    Okay.  And that's the analysis where you say

4    they didn't find a significant effect?

5        A    Yes.

6        Q    And then they also did a similar analysis with

7    the NCVS data too; correct?

8        A    Yeah, similar in some ways, yes.

9        Q    And they looked at the household level for

10   that; correct?

11       A    Yes.

12       Q    Did any of their data show a negative effect

13   between gun prevalence and burglaries?

14       A    No.

15       Q    And some of their data showed a statistically

16   significantly positive effect; correct, some of the

17   analysis that they did?

18       A    Yes.  Well, let me modify that.  That's the way

19   they interpreted the results.

20       Q    And in Table 3-7, this was an analysis that

21   showed positive numbers, but they weren't statistically

22   significant; correct?

23       A    Correct.

24       Q    Now, if you go over to page 28 of your expert

25   report at the first -- the top paragraph, it says:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                              October 29, 2011

401

1    Likewise, in another individual level analysis using the

2    NCVS data, Cook and Ludwig focused their analysis just on

3    burglaries committed while a resident was at home ("hot

4    burglaries"), and found that such burglaries were less

5    likely for people who lived in areas with higher gun

6    ownership rates, though the bivariate association was not

7    quite statistically significant.  (one-tailed

8    significance equals .0548; see top of Table 3-8).  So why

9    don't we take a look at Table 3-8.

10        A    (Views document.)

11        Q    What are you referring to with respect to the

12   one-tailed test in -- in Table 3-8?

13        A    I think in that case, I took the numbers from

14   Table 3.8, and I computed a statistic based on the

15   information they had provided and devised and computed my

16   own one-tailed significance estimate.

17        Q    And if you used a two-tailed significance test,

18   would it have been significant?

19        A    I don't know.  I can't recall.

20        Q    Why did you use a one-tailed significance test?

21        A    I'm not sure I did use a one-tailed.  Did I say

22   I used a one-tailed?  I -- yeah, I used a one-tailed.

23   And I don't recall why I used one-tailed.

24        Q    Well, if you're trying to show whether an

25   effect could go one way or the other, you would typically



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                          402

1   use a two-tailed significance test; right?

2       A    Yes, if you were in -- open as to the

3   direction.

4       Q    So were you trying to be open as to the

5   direction when you chose the one-tailed test?

6       A    I don't recall why I chose the one-tailed test.

7       Q    And you don't know if you -- if you would have

8   chosen a two-tailed test whether you would have found a

9   significant decrease in hot burglaries or not; correct?

10      A    Let's see.

11           No, I do know.

12      Q    How do you know?  Well, what -- what would be

13  the answer?

14      A    Because the two-tailed significance would be

15  half of the one-tailed significance.

16      Q    So it wouldn't be significant, correct, if you

17  used the two-tailed test?

18      A    I'm really not sure.  I can't say at this

19  point.  Sorry.

20      Q    If you look at Table 3.8, the authors didn't

21  find a significant decrease in hot burglaries in cases as

22  opposed to burglaries where the person was not at home;

23  correct?

24      A    I interpreted that first column as referring to

25  hot burglaries.  Wait a minute, yeah.  Let's see.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1          Yeah, I think that my recollection is that

2     the first column does refer to hot burglaries.

3          Q     But it doesn't show a significant decrease in

4     hot burglaries; correct?

5          A     That's correct.

6          Q     So the authors didn't reach a conclusion there

7     was -- that there was a significantly less like -- it is

8     significantly less likely for people who lived in areas

9     with higher gun ownership rates to experience hot

10    burglaries; correct?

11         A     That's correct.  I think they just conceded it

12    didn't support their hypothesis.  That's all.

13         Q     Well, actually, weren't what the authors doing,

14    seeing whether -- well, first of all, the authors came to

15    the conclusion that gun prevalence does increase the

16    burglary rate significantly; correct?

17         A     They -- they did, indeed, say that, yes.

18         Q     And then they went back to the analysis of if a

19    burglary occurs, is it less likely to occur if it's a hot

20    burglary as opposed to if someone was not at home.  And

21    that's what Table 3.8 is; correct?

22         A     I didn't understand it the way you phrased it,

23    so I don't know.  Can you rephrase that?

24         Q     I'm not sure I can.

25               Aft -- after they established that all



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

404

1    burglaries are significantly increased in relationship

2    to gun prevalence, they went back and analyzed whether

3    it matters whether there's -- it matters whether it's a

4    hot burglary or a burglary where someone isn't at home.

5             So that is there any difference in the

6    burglary rate between hot burglaries and burglaries

7    where someone isn't at home?

8        A    Well, to rephrase it, they analyzed whether a

9    burglary was a hot burglary or not.  That was the outcome

10   they were interested in.

11       Q    And what they found was there was no

12   statistically significant difference regarding whether it

13   was a hot burglary or not; correct?

14       A    They -- they found that there was -- yeah, that

15   the gun prevalence has no effect on the likelihood that

16   if it's a bur -- that given it's a burglary, whether it

17   will be a hot burglary or not a hot burglary.

18       Q    Right.  And so what they found was the fact

19   that as gun prevalence goes up, it doesn't deter hot

20   burglaries; correct?

21       A    That was their reading; that was their

22   interpretation.

23       Q    With respect to the first paragraph of page 28,

24   where you list the one-tailed significance test, did you

25   actually calculate a two-tailed significance test in



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

405

1    connection with your work on this case, in this matter?

2        A    I don't recall one way or the other.  I mean,

3    it wouldn't -- it wouldn't really be a separate

4    calculation because, you know, it's just a matter of

5    dividing one number by two.

6        Q    When you say you -- you don't recall, you may

7    have done it?

8        A    I just mean I don't recall one way or another

9    whether I did.

10       Q    If you would have done it, would it have been

11   produced in the documents that were provided in response

12   to the subpoena in this case; do you know?

13       A    If it occurred to me that it was relevant to

14   what I was writing about in the rebuttal report.

15       Q    You're aware that there was a subpoena that

16   asked for certain documents in connection with your

17   deposition today?

18       A    Yes.

19       Q    And did you attempt to provide all documents

20   you had that were responsive to the subpoena?

21       A    Yes.

22       Q    Are there any documents that you had that were

23   responsive to the subpoena that you didn't provide to

24   counsel in this case?

25       A    None that occurs to me.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

406

1     Q     The calculation that you did for one-tailed

2    significance at the top of page 28, did you actually

3    write down those calculations?

4     A     Possibly, but something that simple, it's more

5    likely I just would have typed it into the -- directly

6    into the report, so...

7     Q     Okay.  If you would have written it down, would

8    that have been a document you would have turned over to

9    counsel in this case in response to the subpoena?

10     A     Possibly, if I thought it was relevant to the

11    inquiry.  But, you know, when you --

12     Q     This is your -- your --

13     A     When you do some simple division, that's just a

14    function of arithmetic, then it probably wouldn't have

15    occurred to me that --

16     Q     Can you --

17     A     -- it was a document I needed to provide.

18     Q     If I -- if I provide you with a pad of paper

19    and a pencil, could you do the simple division that you

20    used to calculate that one-tailed significance right

21    here?

22     A     Well, no, because that level of significance is

23    derived from dividing the coefficient by the standard

24    error.  That's the simple division I'm referring to.  And

25    then you look that number up in standard published tables



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Case: 1:10-cv-04184 Document #: 214-2 Filed: 02/12/13 Page 81 of 148 PageID #:9736

1    of statistics and then that will have an associated

2    significance level.

3        Q    Okay.  Let's go back to Exhibit No. 20 on

4    page 103.

5            And if you look down at the bottom under NCVS

6    Results, the authors discuss what's presented up in

7    Table 3.8:  The results from a cross-sectional study

8    analysis of NCVS data in the period 1994-1998 are

9    presented in Table 3.8 -- or 3-8.

10           The first column of estimates are of the

11   effect of gun prevalence on the likelihood that someone

12   is at home when there is a burglary.  It says

13   22 percent on average.  Although the coefficient

14   estimates are negative in every case, suggesting a

15   deterrent effect, they are not discernibly different

16   from zero and in all but the simple regression, have

17   t-statistics less than one.  While null statis -- null

18   findings may sometimes simply reflect a lack of

19   statistical power, in this case, NCVS data support a

20   quite precise estimate with the standard errors all

21   less than one -- 1/10 of 1 percent.

22           Then it says:  If as suggested by these

23   results, more guns lead to more burglaries but not --

24   but do not change the proportion of burglaries that are

25   hot, we would expect an increase in gun prevalence to



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    be associated with higher rates of hot burglary.

2          And based on this data, you agree with that

3    assessment, if as suggested by the results, more guns

4    lead to more burglaries but don't change the proportion

5    of burglaries that are hot, we would expect that more

6    guns would lead to more hot burglaries; correct?

7          A    If those premises were correct, that would be a

8    correct conclusion.

9          Q    Okay.  On page 28 of your expert report, you

10   can refer back to that, if you go two more paragraphs

11   down, the second sentence, you say:  First, guns claim

12   less than one percent of the dollar value of stolen

13   property in the U.S., an amount so small that it is not

14   likely to even be perceptible to an average burglar.

15         Now, your point here is that gun theft

16   doesn't drive burglary rates; is that what you are

17   trying to say?

18         A    Yes.

19         Q    And you cite some data from the FBI 2010

20   Table 24; correct?

21         A    Yes.

22         Q    I'd like to pull that out and show it to you.

23         A    (Views document.)

24              (Exhibit No. 21 was marked for

25         identification.)



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

409

1    BY MR. WOODS:

2         Q    Okay.  Dr. Kleck, the court reporter has handed

3    you what has been marked as Exhibit No. 21, and is this

4    Table 24 from the FBI publication that you are citing on

5    Exhibit (sic) 28 of your expert report?

6         A    Yes.

7         Q    And to determine this 2 percent level, what you

8    did is you took the stolen value of firearms, which is

9    about 132 million and you divided it by the total stolen

10   property, which was about 13 billion; correct?

11        A    Yes.

12        Q    Okay.  Do you know if that total 13 billion,

13   does it include properties only stolen from homes?

14        A    Yes, I know that it does not only cover

15   property stolen from homes.

16        Q    It -- it covers all property stolen from any

17   source; correct?

18        A    Correct.  Well, within the realm of the kinds

19   of crimes that the FBI covers.

20        Q    So, I guess, then, it's true that this figure,

21   this 2 percent figure that you report, that doesn't

22   represent the dollar value of firearms relative to what

23   else is taken from a home where a firearm is stolen;

24   correct?

25        A    Right.  In this case, neither the numerator nor



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

410

1    the denominator are limited to thefts from homes.

2         Q    And are you aware that, in fact, firearms are

3    many times the only items stolen from homes?

4         A    No, I'm not.

5         Q    Why don't you turn back to Exhibit No. 20,

6    which is the Cook and Ludwig study -- about evaluate --

7    from Evaluating Gun Policy.

8         A    (Views document.)

9         Q    And if you'll turn over to page 99.  And at the

10   top of the page, it says, the last sentence of the first

11   paragraph, it says:  In any event, it seems relevant that

12   in 14 percent of the NCVS cases -- and they're talking

13   about burglary -- in which a gun was stolen, it was the

14   only item stolen; do you see that?

15        A    Yes.

16        Q    Do you have any reason to dispute that that's

17   true?

18        A    I don't have any reason to know whether it's

19   true or not.  I haven't done that analysis myself.

20        Q    But this suggests that in many burglaries, the

21   focus of the burglary is taking guns; correct?

22        A    No, it does not.

23        Q    It says at least in 14 cases, the only thing

24   stolen is a gun.

25        A    Well, there's two things wrong with your



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

411

1    interpretation.  One is that one out of seven is not very

2    much.  And, secondly, the term that "the focus was"

3    implies that that's what the burglar was going after,

4    that's what he was looking for, that was the purpose of

5    the burglary and so on.

6              And we know that that's not the case in gun

7    thefts.  It's quite the contrary.  It's just incidental

8    if they happen to come across a gun simply because gun

9    ownership is so common in this country, such a large

10   fraction of residences have guns in them.

11        Q    But at least in 14 percent of the cases, that's

12   the only thing they took?

13        A    If this analysis was valid, yes.

14        Q    Well, what --

15        A    I can't independently confirm it.

16        Q    Well, what -- I think we talked about earlier

17   that the primary source of crime guns is theft; correct?

18        A    Correct.

19        Q    What are the other sources of crime guns?

20        A    Sometimes criminals who don't have an official

21   criminal conviction can simply legally buy guns in gun

22   stores or pretty much anywhere else.

23              In other cases, they acquire them from

24   friends and relatives who are not gun traffickers but

25   just friends and relatives who happen to have a gun



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

412

1    they are willing to sell.

2        Q    So any other sources?

3        A    Those would be the most common sources or the

4    only ones that would be very large sources of guns for

5    criminals.

6        Q    Now, at the bottom of page 28, you discuss

7    Cook's arguments for how criminals get guns; do you see

8    that?

9        A    What part of page 28?

10       Q    At the bottom of page 28.

11       A    Okay.

12       Q    Last paragraph.

13       A    Got you.

14       Q    And what is your criticism of Dr. Cook?

15       A    He's relying on inappropriate sources of data.

16           He's, for example, citing evidence from a

17   document that basically pertain to guns that were

18   involved in ATF investigations, criminal

19   investigations.  And this will not be representative of

20   crime guns or how crime guns are obtained.

21           And, indeed, ATF explicitly says that you

22   should not regard these as guns that are representative

23   of gun crimes.  They're the guns that were involved in

24   sources that the ATF chose to investigate.

25       Q    Right.  And you -- you actually say in the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

413

1    middle of the paragraph that:  ATF investigates the

2    "diversion" of guns from legal to illegal channels.

3    That's their investigation; right?

4         A    Yes.

5         Q    So they don't typically investigate home

6    burglaries, thefts and things like that; correct?

7         A    Correct.  Unless the theft is from a licensed

8    gun dealer.

9         Q    So there are a lot of channels of gun movement

10   that ATF does not investigate; correct?

11        A    Correct.

12        Q    ATF isn't able to address small-level theft

13   that doesn't involve FFLs?

14        A    Whether they're able or not, I don't know, but

15   they certainly don't.  They don't consider it part of

16   their responsibilities.

17        Q    But you don't dispute the basic premise of

18   Dr. Cook that there are a variety of sources of crime

19   guns?

20        A    That premise, no, I don't disagree with that.

21        Q    If you'll turn over to page 29.

22        A    (Views document.)

23        Q    And I'm going to refer you down to the bottom

24   of the page.  And in the bottom of the page here, you are

25   critiquing Dr. Cook's claims that higher gun ownership



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

414

1    rates cause higher rates of criminal homicide; correct?

2        A    Yes.

3        Q    Okay.  And then you say at the last paragraph

4    that Cook's logic -- or you assert that his logic is

5    flawed and you lay out two premises on which his argument

6    is based; correct?

7        A    Correct.

8        Q    And the first one is that the prevalence of

9    firearms has a positive effect on gun use by which Cook

10   meant the present of violent crimes in which guns are

11   used.

12            That's the first premise on which Dr. Cook's

13   argument is based; right?

14       A    I assume you meant percent rather than present?

15       Q    Yes.

16       A    Yes.

17       Q    And two, that gun use affects the death rate in

18   assault and robbery.  That's the second premise on which

19   Dr. Cook's argument is based; correct?

20       A    Yes.

21       Q    And you agree with the first premise?

22       A    I say it's probably correct.

23       Q    Do you have any reason to dispute it?

24       A    No strong reason.

25            MR. WOODS:  Well, why don't we stop and you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

415

```
 1       can change the tape.

 2            THE VIDEOGRAPHER:  Off the record, please.

 3            (Brief recess was taken.)

 4            THE VIDEOGRAPHER:  We're back on the record

 5       with tape No. 3.  The time is 10:27.

 6   BY MR. WOODS:

 7       Q    One second, Doctor.  We're getting a document

 8   we're going to mark as an exhibit.

 9            While we're waiting for that, are there any

10   answers that you'd like to change that you've given so

11   far?

12       A    No.

13            (Exhibit No. 22 was marked for

14       identification.)

15   BY MR. WOODS:

16       Q    Dr. Kleck, the court reporter is handing you

17   what has been marked as Exhibit No. 22; can you identify

18   that document, please?

19       A    Social Costs of Gun Ownership by Cook and

20   Ludwig.

21       Q    And this is published in the Journal of Public

22   Economics; correct?

23       A    Yes.

24       Q    And you recognize that as one of the leading

25   journals of economics?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

416

1        A    No.

2        Q    No.

3             Okay.  And I think we established before you

4     aren't familiar with what the leading economic journals

5     are?

6        A    I'm familiar with some of the leading ones.

7     I'm not familiar with this being among the leading ones.

8        Q    Okay.  If you'll turn to page 31 of your expert

9     report.

10       A    (Views document.)

11       Q    And on page 31 and then continuing to the end

12    of the page, you offer your critique of Dr. Cook's

13    reliance on this study; right?

14       A    Yes.

15       Q    And you -- you note that this is the -- the

16    study that Cook relies on to support his claim that

17    higher gun prevalence rates cause higher homicide rates;

18    correct?

19       A    Yes.

20       Q    And you have laid out your criteria for

21    evaluating a study which include three parts, that they

22    must measure gun levels, in a valid way; that they must

23    have a methodology for addressing causal order; and that

24    they must control for confounding variables.  Those are

25    your three criteria; correct?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

417

1      A      Well, I would rephrase it as "the more they do

2  that, the better the study is."

3      Q      Okay.   Not every study does these things

4  perfectly, but you evaluate the strength of the study by

5  how well it does these three things?

6      A      Correct.

7      Q      Okay.   And you actually published a critique of

8  Cook and Ludwig's study in 2009 which you call:   How Not

9  to Study the Effects of Gun Levels on Violence Rates;

10  correct?

11      A      Yes.

12      Q      That's kind of a provocative title; correct?

13      A      Yes, I would agree with that.

14      Q      Is there a reason why you chose a provocative

15  title for that paper?

16      A      This article just struck me as it's almost like

17  it was designed to show how not to do it because it was

18  -- you know, they perfectly illustrated all three of the

19  most serious flaws, which I had already identified as --

20  as being, you know, serious problems in the literature,

21  and then this article comes along that's -- it's as if I

22  had crafted it for the purpose of showing how not to do

23  it.

24      Q      And where did you publish your study on How Not

25  to Study the Effect of Gun Levels on Violence Rates?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

418

 1      A      (Views document.)

 2             The Journal on Firearms and Public Policy.

 3      Q      And is that a peer-reviewed journal?

 4      A      No.

 5      Q      Who sponsors that now?

 6      A      I don't know.

 7      Q      Would you classify that journal as being progun

 8   possession?

 9      A      Probably.  I -- I'd think from the content of

10   the articles, I would say that.

11      Q      Did you ever attempt to publish your study on

12   your critique of Cook and Ludwig in the peer-reviewed

13   literature?

14      A      No.

15      Q      So it wasn't submitted and rejected by a

16   journal, a peer-reviewed journal; correct?

17      A      No.

18      Q      Do you know to what degree criminals would obey

19   a restrictive carry law or a restrictive sale law?

20      A      Such as?

21      Q      Such as the Chicago ordinance.

22      A      No.

23      Q      Do you know to what degree they would face

24   impediments to carrying or obtaining weapons as a result

25   of a law such as the Chicago ordinance?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

419

1    A    So you're describing the current ordinance --

2    well, because it's -- it's just been in -- put into

3    place, no, I -- there hasn't been any follow-up so far on

4    this ordinance as distinct from its predecessors.

5    Q    Would you agree that there's a violence

6    increasing effect to criminals having guns?

7    A    In some ways, violence elevating and in some

8    ways, violence decreasing.

9    Q    So the more guns criminals have, the less

10   violence occurs?

11   A    In some respects.

12       When guns -- when offenders have guns and

13   they're in a hostile situation, they are less likely to

14   actually physically attack the victim if the offender

15   has a gun.

16       Once they do attack, meaning they try to hurt

17   the victim, they're less likely to injure the victim if

18   they use the gun than if they used other weapons.  But

19   then once an injury is inflicted, if a gun was used by

20   the offender, it's more likely to result in the

21   victim's death.  So that would be the violence

22   elevating effect.

23       So it's a combination of both violence

24   elevating and violence decreasing effects.

25   Q    And have you done anything to -- to determine



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                    October 29, 2011

420

1    the net effect?

2        A    Yes.

3        Q    And you believe the net effect is the more guns

4    criminals have, the less violence?

5        A    No.

6        Q    What do you believe?

7        A    I believe there's a small positive effect.

8        Q    Okay.  How much is a small positive effect?

9        A    I wouldn't have the information at hand here

10   because it wasn't a topic I addressed in the report.

11       Q    Okay.

12       A    It's -- it can be found in Targeting Guns, for

13   example.

14       Q    Okay.  And that's one of the publications that

15   you've -- you've been an author in?

16       A    (No response.)

17       Q    Is that -- is that a publication that you

18   authored?

19       A    Yes.

20       Q    And what year was that?

21       A    1997.

22       Q    Okay.  Would the crime rate be lower if

23   criminals did not have guns?

24       A    No guns at all, I really don't have an opinion

25   on it.  I -- it's just such a hypothetical scenario, I



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

421

1    really -- I really have no opinion one way or another.

2         Q    All right.  Let's go to page 32 of your expert

3    report.

4         A    (Views document.)

5         Q    And this section is dealing with the purported

6    public safety rationales for Chicago's sales ban and

7    addressing Dr. Cook's analysis of that issue; correct?

8         A    Yes.

9         Q    Now, one of the things that Dr. Cook says is

10   that handguns purchased on the street are -- can be very

11   expensive, between 250 and $400; correct?

12        A    He describes them as expensive, but the 250 to

13   $400 figure is accurate.

14        Q    Right.  And your -- your premise is that guns

15   in the illegal market are no more expensive than guns in

16   the legal market; correct?

17        A    Correct.

18        Q    And you base that on?

19        A    Or I -- to modify it a bit.

20        Q    Okay.

21        A    It's a minor point, but not substantially

22   higher or significantly higher or whatever.

23        Q    Right.

24        A    The figures he has are such broad ranges that

25   you can't make real precise statements, but yeah, that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

422

1    would be substantially my position.

2        Q    And so, for instance, it's your contention that

3    because the average retail price for a gun is $316, that

4    that's really not significantly different from a price of

5    handguns in the illegal market of between 250 and $400;

6    right?

7        A    That's my position, yes.

8        Q    And you get that figure of the average price of

9    -- retail price of guns of 316, you get that from a Cook

10   and Ludwig publication called Underground Gun Markets; is

11   that right?

12       A    (Views document.)

13            The -- some of the data, yes, right.

14       Q    So, for instance, the retail price of $316,

15   that comes from the underground markets paper; correct?

16       A    Yes.

17       Q    And why don't we go ahead and mark that as the

18   next exhibit, that publication.

19       A    (Views document.)

20            (Exhibit No. 23 was marked for

21       identification.)

22   BY MR. WOODS:

23       Q    Okay.  Doctor, the court reporter has handed

24   you what has been marked as Exhibit No. 23; can you

25   identify that document for the record?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

423

1      A     Underground Gun Markets by Cook, et al.

2      Q     Okay.  And this is the article from which you

3   derived the price of a -- retail price of a handgun of

4   $316 --

5      A     Yes.

6      Q     -- that you reference in your expert report?

7      A     Yes.

8      Q     And if you go over to page F-586, there's a

9   Table A4?

10     A     Yes.

11     Q     And in this table, if you look under youth, 18

12   to 24?

13     A     Yes.

14     Q     And under the mean price for the guns

15   confiscated from youth age 18 to 24 is $316; correct?

16     A     Correct.

17     Q     And do you see down at the bottom of the table

18   where it says:  Retail price is estimated price of guns

19   sold new at retail from Blue Book figures and does not

20   account for actual conditions of guns, which is not

21   available in the ATF data; correct?

22     A     Correct.

23     Q     So when you say that the price of sale of

24   handguns on the street in the illegal market is similar

25   to the re -- to the retail price, what you mean is it's



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

424

 1    similar to new gun sales; correct?

 2         A    Yes.

 3         Q    Is there any reason to believe that the guns in

 4    the illegal market are all new?

 5         A    That they're all new?  No.

 6         Q    Yeah.

 7              Is there any reason to believe that the

 8    316-dollar figure applies to any guns in the illegal

 9    market?

10         A    Yes.

11         Q    Why do you say that?

12         A    Because some would have been purchased new.

13         Q    Do you know how many would have been -- in the

14    illegal market were new as opposed to used?

15         A    In this -- no, in this particular market, no.

16              But we know from surveys of prison inmates

17    that maybe 1/6 of gun purchases they make are from gun

18    dealers, and we know that roughly 2/3 of the sales made

19    by gun dealers are of new guns, so you can kind of

20    indirectly infer it.  But there's no direct information

21    within this study to establish that.

22         Q    Right.  And so there's nothing to say that the

23    guns that -- the guns that are in the illegal market on

24    the street are actually in new condition when they're

25    being sold and, therefore, comparable to new gun prices;



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    correct?

2         A    No.

3         Q    Why not?

4         A    Well, partly relying on Cook's own writings, he

5    asserts that guns are relatively new in criminal's hands.

6    Then he bases this on primarily gun trace data, and so

7    the guns are relatively new, sometimes absolutely new.

8    Sometimes simply young enough, so to speak, to -- not to

9    have had any significant wear and tear so, you know.

10        Q    Well, in order to do this comparison between

11   the guns in the illegal market and these new gun retail

12   prices, you would have to know what percentage of guns on

13   the illegal market are new versus used and what their

14   conditions are; correct?

15        A    If you wanted very precise price figures on the

16   guns.  In fact, the only way to get absolutely precise

17   figures is to somehow know exactly what a gun of that

18   exact character and wear level was selling for in a gun

19   store.

20        Q    Would you agree that a new gun would always be

21   in good condition?

22        A    Yes.

23        Q    Do you know what percentage of these illegal

24   guns are in good condition?

25        A    No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

426

1      Q    Do you know what the price guns would be on the

2  street if there were no gun control laws?

3      A    No.

4      Q    Would you expect the gun -- the price to be

5  higher or lower than it would be, say, under the Chicago

6  ordinance?

7      A    I would expect it to be fairly similar.

8      Q    So you don't think that would have any effect

9  on the price of weapons?

10     A    Not given the kinds of gun control we've --

11 we've actually tried out.

12     Q    Would it have any effect on the number of

13 criminals who acquired weapons on the street?

14     A    It could if -- if the restrictions were strict

15 enough.

16     Q    Some -- some criminals are not able to purchase

17 a weapon at a retail given their prior record; right?

18     A    Yes.

19     Q    Now, I want to direct your attention to

20 page 33.

21     A    (Views document.)

22     Q    At the top.  This is page 33 of your expert

23 report.  You're referencing Cook's reference to survey of

24 Chicago arrestees done by the Justice Department.

25          And Dr. Cook, as you say, claimed that these



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

427

1    data indicated that the city's criminals take a long

2    time to acquire handguns, implying that it is hard for

3    criminals to get them; do you see that?

4        A    Yes.

5        Q    But you disagree with that statement; right?

6        A    Yes.

7        Q    And one of the reasons you disagree with that

8    statement is that the people who were asked how long it

9    would take to get a gun hadn't previously gotten a gun;

10   right?

11       A    Yes.

12       Q    But you're assuming that these people, even

13   though they asked or even though they hadn't previously

14   gotten a gun, wouldn't have an idea of how to get the

15   guns; right?

16       A    I'm assuming they have no idea based on

17   personal experience.

18       Q    Right.  Just on personal experience, their own

19   personal experience.  But they may actually know from

20   their affiliation with a gang how long it takes to get a

21   gun; correct?

22       A    It's a logical possibility, but there's no

23   evidence that's true.

24       Q    But it's -- it's just as likely that that

25   happens as if they -- these people have no idea and have



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

428

1    no experience at all as to how one would go to get a gun;

2    correct?

3         A    No.

4         Q    Why do you say that?

5         A    Because people always know their own personal

6    experiences much better than they know the experiences of

7    other people.

8         Q    But even though they haven't gotten a gun

9    before, that doesn't mean they don't know how to get a

10   gun or how long it would take?

11        A    No, it doesn't mean they necessarily have no

12   knowledge at all.  It means they don't have any knowledge

13   of the sort that's most reliable.

14        Q    Would you agree with me that people who --

15   criminals who live in a high crime area would know who to

16   talk to to get a gun; right?

17        A    Many of them would not.

18        Q    So you're saying criminals -- many criminals

19   would not --

20        A    Correct.

21        Q    -- know how to get a gun?

22        A    Well, I don't know if it's many or not.  I

23   wouldn't have an opinion on that, but certainly some

24   would not, how to illegally obtain one, I mean.

25        Q    Now, have you ever actually studied the issue



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

429

1    of corrupt dealers in Chicago itself?

2        A    Only by reviewing other people's research.

3        Q    And have you conducted any studies of the

4    aggregate or national level?

5        A    Of what?

6        Q    Of corrupt FFL dealers --

7        A    Only in --

8        Q    -- or the extent to which they are corrupt?

9        A    Only in the sense of reviewing Bureau of

10   Alcohol, Tobacco & Firearms reports.

11       Q    Now, have you ever -- okay.

12            So you yourself haven't ever done any

13   research to see the effects, for instance, of having a

14   FFL in the city of Chicago that is a scofflaw?

15       A    No -- I mean correct; I have not.

16       Q    Right.  Yeah, we're -- lawyers are very good at

17   being ambiguous, as maybe you've figured out.  Thank you

18   for the clarification.

19            If you go to page 34 of your report.

20       A    (Views document.)

21       Q    If you look at the first full paragraph down,

22   you say:  Cook cites (page 11) the cases of "several"

23   FFLs in the suburbs of Chicago who are found, as a result

24   of police "sting" operations, to be willing to make

25   illegal gun sales.  And then you refer to these as



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

430

1    "several" anecdotal cases; right?

2        A    Yes.

3        Q    That don't support a general inference that

4    there are scofflaw FFL dealers; correct?

5        A    Well, it supports the notion that there are

6    some, but it doesn't support the notion that they're

7    common.

8        Q    What would be necessary to test whether this is

9    common or not?

10       A    Well, imagine that the sting operations were

11   done in a very different way.  This is something in

12   principle possible but not, in practice, likely to be law

13   enforcement practice.

14           But if you could somehow gain police

15   cooperation, you would have them select a random sample

16   of FFLs and then, you know, test their credibility,

17   their -- their law-abiding character or whatever with

18   these sting operations.  Instead of what they did,

19   which was, of course, highly selective, as is

20   appropriate from a law enforcement standpoint.  But

21   it's poor practice were it regarded as a research

22   effort.

23       Q    What if a researcher went to a random

24   representative sample of dealers and solicited various

25   legal and illegal purchases; would that be a better way



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

431

1    to evaluate the extent to which FFLs are willing to

2    violate laws in selling guns?

3        A    Yes.

4        Q    Do you know any of study according to that

5    design has been done?

6        A    No, I don't not -- I do not know of any such

7    study.

8        Q    Do you have any opinion as to what you think

9    the city of Chicago should do to effectively regulate

10   sales of gun transactions within the city of Chicago?

11       A    I've expressed views about what I think are

12   good con -- gun control practices in general, not in

13   reference to Chicago in particular; but I think they

14   would apply in Chicago as well as anywhere else.

15       Q    And what would those be?

16       A    Support a national background check that's

17   imposed on all gun transfers, including private transfers

18   which are not currently covered by the Brady law.  I

19   support enforced -- increased enforcement of carry laws

20   to detect and punish unlicensed gun carrying.

21            I support expanding the -- the

22   comprehensiveness of criminal history files so that you

23   have more effective background checks prior to guns

24   being acquired.  And those would be good practices in

25   either Chicago or anywhere else.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

432

1       Q    And those would require a lot of resources to

2   accomplish; correct?

3       A    The -- the extra carry effort would in

4   particular because it means diverting police activities

5   and resources from some other activity into enforcement

6   of carry laws.

7       Q    Have you done -- have you made any attempt to

8   determine exactly how much it would cost to implement

9   your recommendations?

10      A    No.

11      Q    Let me refer you now to page 35 of your expert

12  report.

13      A    (Views document.)

14      Q    Okay.  Are you on page 35?

15      A    Yes.

16      Q    Oh, okay.  I'm sorry.  And if you look at the

17  second page -- second paragraph down, where you say:

18  Cook never -- nevertheless argues that banning gun sales

19  in Chicago can make it "more difficult" (to an unstated

20  degree) for criminals and youth in Chicago to obtain

21  guns, despite the fact that gun dealers continue to

22  legally operate in the suburbs just outside the city.

23          Do you disagree with that statement, that a

24  banning on handgun sales in Chicago will make it more

25  difficult for criminals and youth in Chicago to obtain



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

433

1    guns?

2        A    My dispute there was with the -- the issue of

3    degree.  My position would be that it would make it only

4    slightly more difficult.  And so Cook was vague about how

5    much more difficult it would make it:  Well, you know,

6    it's -- it's somewhat more difficult, but...

7        Q    Okay.  And have you done anything to try to

8    quantify or -- or classify how much more difficult it

9    would be?

10       A    Well, I was a resident of the Chicago area for

11   a long time, so I have a sense of how long a distance

12   we're talking about, and you can judge how long it would

13   take to drive from, let's say, the middle of Chicago to

14   the -- the nearest suburb where gun sales are legal.  So

15   that's a quantification.

16       Q    Okay.  And about how long is that?

17       A    It's probably 30 minutes, if you were driving;

18   maybe two hours if you were using public transportation,

19   something like that.

20       Q    Did you attempt to -- okay.  And -- and is that

21   your only basis for saying that it would be more

22   difficult for criminals and youths to obtain handguns if

23   the sale was banned in Chicago versus not?

24       A    Well, it's my only basis for why getting a gun

25   from a suburb, suburban gun store would be more difficult



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

434

1    or the degree to which it would be more difficult.

2         Q    Okay.  If they actually went to a suburban gun

3    store to get the gun?

4         A    Yes.

5         Q    Now, you say in the last sentence there of that

6    paragraph:  Of course, if Cook's assertion is true --

7    well, let's look at the sentence before that first.

8              He says -- you say:  He claims that the

9    Chicago criminals he studied rarely obtained guns from

10   these stores because they "rarely left their own

11   neighborhood"; do you see that?

12        A    Yes.

13        Q    And you say:  Of course, if Cook's assertion is

14   true of low-income Chicago residents in general, he would

15   have noted that the city's ban on gun sales places an

16   especially significant burden on law-abiding low-income

17   residents who want a gun for purposes of law -- lawful

18   self-defense.

19             Now, you don't believe that the ban places an

20   especially significant burden on law-abiding low-income

21   residents; correct?

22        A    Not correct.  I -- I do believe it does produce

23   -- it does impose a more significant burden, in

24   particular, on law-abiding low-income residents.

25        Q    And your burden is based on what you just told



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

435

1     me before, that they have to drive 30 minutes in a car or

2     take two hours of transportation; is that right?

3         A    Right.  And there's probably other factors,

4     like you'd have to know how to do that as a -- in

5     addition to the time you'd spend.  Public transportation

6     can be pretty complicated.

7         Q    How of -- how frequent --

8         A    I can't figure a lot of it out, so I suspect --

9         Q    How frequently does a civilian, law abiding

10    civilian, need to go to a gun store to have a -- to get a

11    gun for self-defense?

12        A    How frequently?

13        Q    Yeah.

14        A    In all likelihood, once, if they have the kind

15    of gun the person wanted.

16        Q    So the burden placed on Chicago residents to

17    get a gun for self-defense is one trip to the suburbs; is

18    that correct?

19        A    That -- that would be some -- one -- one common

20    burden.  And it would basically be the same for the

21    criminal and noncriminal.

22        Q    But Cook is asserting -- Cook is asserting that

23    criminals rarely leave their neighborhood and, therefore,

24    would not be traveling to the suburbs to get a gun; is

25    that correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 29, 2011

436

```
 1      A    That is what he's asserting.

 2      Q    Right.  Do you think an individual who did not

 3  have a gang affiliation would have an easier time

 4  crossing through other neighborhoods?

 5      A    Other things being equal, yes, probably he

 6  would have an easier time.

 7      Q    People with gang affiliations would be less

 8  likely to leave their neighborhood for fear of being

 9  killed; right?

10      A    That would be a non sequitur, but that one

11  factor, the fact that they are gang members, would be an

12  obstacle.

13      Q    Would someone looking to arrange multiple

14  weapons purchases, not getting guns for just self-defense

15  but trafficking guns, for instance, would they face more

16  of a burden having to go to the suburbs to get those guns

17  than someone, a law abiding citizen, who only needs to go

18  once to get a gun for self-defense?

19      A    So you're talking about traffickers.

20          So I -- I -- is the premise that this is a

21  trafficker who is located in the middle of Chicago,

22  then?

23      Q    Yes.

24      A    Oh, okay.  And so the comparison is with the

25  trafficker getting multiple guns versus someone getting
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 29, 2011

437

1    one gun?

2         Q     For self-defense.

3         A     Yes, he would have marginally more difficulty.

4         Q     Would you agree with me that someone who needed

5    to a arrange a straw purchaser to get a gun, would that

6    be more difficult doing that arrangement if the gun

7    stores were in the suburbs than they would if the gun

8    stores were within the city, close to the neighborhood?

9         A     Not to any significant degree that I can think

10   of.

11        Q     And why is that?  It's just as easy to get a

12   straw purchaser to go to the suburbs as it is to get a

13   straw purchaser to go into the neighborhood next door?

14        A     Well, it would be no harder for the -- the real

15   purchaser to bring a straw purchaser with than to not

16   bring a straw purchaser with.  It would be essentially

17   the same.

18        Q     You're assuming that they would both travel to

19   the suburbs or both travel to the neighborhood next door?

20        A     I would assume that the straw purchaser would

21   be somebody he knew he already in his own neighborhood

22   within Chicago.  So yes, they would have to -- whether

23   they travel together or not is irrelevant; but yes, they

24   would both have to make, essentially, the same trip.

25        Q     All right.  Why don't you flip over in your



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

438

1    expert report to page 36.

2         A    (Views document.)

3         Q    And you say in the second paragraph from the

4    bottom:  This is why it was singularly one-sided for Cook

5    to conclude?

6         A    Now, which paragraph again?

7         Q    Second paragraph from the bottom on page 36,

8    this is why --

9         A    Okay.

10        Q    This is why it was singularly one-sided for

11   Cook to conclude (page 13) that "where there is more gun

12   carrying, we should expect more of the harms outlined in

13   part IV.A."  Do you see that?

14        A    Yes.

15        Q    And why are you saying that was one-sided of

16   Cook to conclude that?

17        A    Because he made no distinction between gun

18   carrying by offenders and gun carrying by victims,

19   potential victims.

20        Q    But your point is that gun carrying by

21   potential victims has a benefit to it; correct?

22        A    That's part of my point.

23        Q    Yeah.  And that depends on the studies

24   involving defensive gun use that you -- you and others

25   have performed; correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

439

1      A      Partially.

2      Q      Well, your -- your tes -- your statement that

3   there's a benefit from defensive gun use is based on your

4   understanding of how much defensive gun use there is and

5   the effect of the defensive gun use on preventing

6   injuries; right?

7      A      Correct.

8      Q      And to the extent either of those assumptions

9   or analyses in those other studies are wrong, that

10  negates the net benefit from defensive gun use; correct?

11     A      If they were wrong, yes.

12     Q      And if those studies were wrong, then Cook's

13  analysis wouldn't be one-sided; right?

14     A      Under those hypothetical conditions, that's

15  correct.

16            Well, let me modify that.  If -- if there

17  were no benefit whatsoever, I mean, the studies could

18  be incorrect as to the degree of the benefit, but if

19  there were no benefit whatsoever, then Cook's analysis

20  wouldn't have been singularly one-sided.

21     Q      Right.  One of the -- one of the points that

22  Cook makes in his report is that if there was a -- if

23  people in Chicago which were allowed to carry firearms,

24  it would remove from the police a -- a method for

25  investigating crimes because under the current statute,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

440

1      any carrying in public of an operable weapon, at least,

2      is unlawful and that that's a tool that the police use to

3      police uses of guns before they happen?

4           A     (Witness nods head.)

5           Q     That's Cook's premise; correct?

6           A     Correct.

7           Q     You would agree with me, wouldn't you, that if

8      there was -- if the law permitted people to carry in

9      public, the police officer, in order to police illegal

10     use of firearms, would have to approach the individual on

11     the street and determine whether the gun was used legally

12     or illegally before they could seize the gun if it was

13     used illegally or if it was possessed illegally; correct?

14          A     That -- that was a very long question.  Can I

15     hear that one again?

16          Q     Yeah, maybe I should try it again.

17                You would agree with me that if Chicago

18     permitted individuals to carry guns on their person in

19     public that in order for a police officer to determine

20     whether the carrying was legal or illegal, the police

21     would have to approach the person and through some

22     investigative means, determine whether that gun was

23     being carried legally or illegally by that person?

24          A     If the investigative means includes asking them

25     to show a carry permit, yes, because that's probably the



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 29, 2011

441

1    way they would discover it; they would ask them if they

2    had a permit.

3         Q    And would you agree with me that that exposes

4    police officers to more danger than simply stopping and

5    frisking someone when the police officer suspects that

6    they are carrying a gun illegally?

7         A    No.

8         Q    Why not?

9         A    Because merely asking a question doesn't add to

10   their danger.  The approach applies in both

11   circumstances, and it's the approach that might be risky,

12   whether it's an approach for the purpose of a stop and

13   frisk or an approach that's going to involve asking do

14   you have a carry permit.

15        Q    Well, if you have a reason to believe that the

16   individual is carrying illegally --

17        A    Illegally?

18        Q    Illegally.

19        A    Yeah.

20        Q    -- because carrying in public is illegal, you

21   can take -- you can actually arrest the individual and

22   conduct a frisk under more controlled situations than you

23   could if the person may or may not be carrying it

24   illegally, and you have to ask first whether they have a

25   permit and inspect the permit, etc.; correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

442

1       A      No.

2       Q      Why don't you agree with that?

3       A      Because you wouldn't either have to ask about

4    the carry permit first, nor would you have to even make

5    the arrest.  Police officers can make a stop and frisk

6    upon reasonable suspicion that the person is carrying a

7    gun, and whether somewhere along the line you ask whether

8    the permit -- person has a permit is irrelevant.

9       Q      Well, do you think the -- the costs of

10   searching go up for the police in general where they have

11   to determine, first, whether the gun is being carried

12   legally or illegally as opposed to a regime where any

13   carrying is illegal?

14      A      To the extent it takes some extra five seconds

15   to ask:  Do you have a carry permit?  If that's a cost,

16   yes; is it significant, no.

17      Q      And why do you say that's not significant?

18      A      Because it only takes five seconds of time.

19      Q      Are you saying --

20      A      Do you have a carry permit, doesn't even take

21   five seconds.

22      Q      Are you saying that police could -- are you

23   saying that it only adds five seconds of time to police

24   investigation time just to ask whether there's a carry

25   permit?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

443

1      A    Yes.

2      Q    And it doesn't take any additional time to

3   determine -- for the person to pull the carry permit out

4   of their pocket, for the officer to review whatever the

5   individual is showing him to determine whether the carry

6   permit is valid, and to determine whether, in fact, the

7   gun is being carried legally or illegally?

8           You are saying that doesn't take -- that

9   whole process doesn't take longer than five seconds for

10  everyone the police are going to --

11     A    No, I'm not saying that.

12     Q    -- investigate?

13     A    It would probably take a few more seconds for

14  each of those steps.

15     Q    Have you done anything to determine how much

16  additional time, investigatory time, would be required in

17  a permissive carry regime in Chicago versus the current

18  regime where carrying in public is -- is not legal?

19     A    No, except drawing on personal experience as to

20  how long it takes to bring a driver's license out and

21  show it to an officer who stops you for a traffic

22  violation and -- it's virtually the exact same activity.

23  He asks for the requisite permit and then you show him

24  and personal experience says that whole process is a

25  matter of seconds.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 29, 2011

444

1          Q    And you don't have any particular expertise in

2     police investigatory work; correct?

3          A    No.  I mean, correct, I don't.

4          Q    Why don't we take a real quick break and then

5     maybe we can figure out finishing it up.

6               THE VIDEOGRAPHER:  Off the record.

7               MR. WOODS:  Yes.

8               (Brief recess was taken.)

9               THE VIDEOGRAPHER:  We're back on the record

10          with tape No. 4.  The time is 11:14.

11     BY MR. WOODS:

12          Q    Good after -- or we're still morning,

13     Dr. Kleck.  We're hoping to finish up here in our last

14     session.

15               Would you agree with me that a permitting

16     system, carry permitting system is only as good as the

17     ability of it -- its ability to identify criminals in

18     advance?

19          A    That would be one element that affects it, but

20     I wouldn't say it's only effective to the extent it can

21     do that.  It can have other effects besides those due to

22     being able to successfully identify individuals in

23     advance as high risk.

24          Q    And would you agree with me that no permitting

25     system is 100 percent effective at identifying criminals



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

445

1    in advance?

2          A    Yes.

3          Q    And do you know how effective carry permitting

4    systems are at identifying criminals in advance; is there

5    any study that has evaluated that?

6          A    Yes.  We have research on how many people end

7    up doing crimes and, therefore, having their carry

8    permits revoked.

9          Q    And you're referring to data that you've

10   provided in your expert report from Florida?

11         A    I'm not sure if I mention them in this report,

12   but certainly there are such data available.

13         Q    Okay.  Well, one -- certainly one method of

14   policing involves investigating crime after it happens

15   and if a criminal breaks a law, to try to prosecute that

16   criminal for doing so; right?

17         A    Right.

18         Q    You would agree with me, though, that, under a

19   carry regime, some criminals will have the legal right to

20   carry guns; and it will be harder to prevent them from

21   committing crimes than in a noncarry regime; correct?

22         A    No.

23         Q    Well, if you -- I guess the point is that if

24   you could arrest people for simply having a gun, it is

25   easier to prevent people from using the gun criminally



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    than having to wait until after they commit the crime in

2    investigating and prosecuting them.  Obviously, then, you

3    can't prevent the crime; correct?

4         A    Correct.

5         Q    You would agree with me that under a carry

6    permitting system that some criminals will be able to

7    carry guns?

8         A    Yes.

9         Q    And that some people who have permits will

10   commit crimes with those guns?

11        A    Yes.

12        Q    Is it your position that the risk of allowing

13   some criminals to carry guns is outweighed by the benefit

14   of noncriminals carrying guns?

15        A    Yes.

16        Q    How much is it outweighed?

17        A    I can't say.  What I base that on is number of

18   defensive uses by crime victims versus number of

19   carrying-related crimes committed by offenders.

20        Q    But you haven't done any analysis to actually

21   quantify the differences at all?

22        A    Other than comparing the two numbers, no.

23        Q    And what are the different -- what is the

24   difference in numbers?

25        A    The number of defensive gun uses in connection



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                           October 29, 2011

447

1    with gun carrying are -- by crime victims is much

2    larger -- I wouldn't be able to say by how much, but

3    certainly many times higher than the number of crimes

4    committed by offenders with guns who -- that have been

5    carried.

6        Q    Is it your position that criminals won't --

7    it's not your position that criminals won't have carry

8    permits, that people who are going to commit crimes in

9    the future will not go out and get carry permits?

10       A    It is possible that will happen.  That's my

11   position, that it could happen, yes.

12       Q    Well, would you agree with me that it's much

13   harder to prospectively remove a gun from a -- in a

14   criminal's hands if they have a legal means for carrying

15   it up until the time of a commission of a crime than it

16   would be if they didn't have a legal means of carrying

17   that gun?

18       A    Are you talking about a criminal with a

19   conviction or a criminal without a conviction?

20       Q    I'm talking about a criminal without a

21   conviction, someone who is going to commit a crime in the

22   future.

23       A    And -- and you're talking -- you're contrasting

24   if he has a carry permit versus not having a carry

25   permit?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                      448

1        Q      Sure.  If he has a carry permit.

2        A      There's one fewer grounds for arresting him

3    prior to the crime because now you can't arrest him for

4    illegal carrying.

5        Q      And so it's harder to prevent those individuals

6    from committing a crime in the future than it would be

7    under a regime where carrying wasn't permitted?

8        A      Well, I -- I don't really see how that follows.

9    It's -- it's just that one element that's relevant to

10   that wouldn't be there.  You wouldn't have a basis for

11   arresting him on the basis of an illegal carry if he had

12   a permit.

13       Q      Right.  If he had a permit, you couldn't arrest

14   him for -- well, strike that.

15              Well, would you agree with me that the risk

16   that more criminals would not be interdicted because

17   you couldn't arrest them for having a gun if they had a

18   permit, more criminals would not be interdicted until

19   they do some harm with their gun is a cost that has to

20   be compared with the system where the gun can be

21   removed in advance?

22       A      No.

23       Q      So you don't think you should compare the cost

24   associated with not being able to remove some guns from

25   people who have permits but are going to commit a crime



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

449

1    in the future, you don't think you have to assess that

2    cost when evaluating the overall cost benefits of a carry

3    system?

4         A    No, I think that would be a good part of an

5    assessment.

6         Q    You should you include that, I guess.

7         A    Yeah.

8         Q    That's what my question was.

9         A    Yeah.

10        Q    That you should include that kind of

11   assessment.

12        A    It would be preferrable if you could.

13        Q    And have you included that analysis in any of

14   your assessments of the benefits of carrying?

15        A    No.

16        Q    Now, let's talk about -- if you'll turn to

17   page 38.

18        A    (Views document.)

19        Q    If you look at the paragraph in the middle of

20   the page where it says:  Cook cites.

21        A    Yes.

22        Q    Cook cites a body of largely irrelevant

23   research that establishes the obvious fact that not all

24   criminals are recorded in public databases as persons who

25   have been convicted of a crime or specifically convicted



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

450

1   of a felony; do you see that?

2        A    Yes.

3        Q    And Cook's point is that a permitting system

4   will not identify everyone who is going to use a gun to

5   commit a crime; right?

6        A    Correct.

7        Q    And then you say here, going down a few more

8   sentences:  Instead, the evidence indicates that criminal

9   gun violence among carry permit holders is virtually

10  nonexistent; do you see that?

11       A    Yes.

12       Q    Couple of sentences down.  And then you cite

13  their data available from Florida that covered the

14  longest documented period of time in which a lenient

15  "shall-issue" carry state was in operation.

16       A    Correct.

17       Q    Now, so is it your position that permit holders

18  do not commit crimes with guns?

19       A    No.

20       Q    I'm talking about carry permit holders do not

21  commit crimes with guns.

22       A    I understood the question that way.

23       Q    All right.  And you -- it's your position,

24  however, I assume, that they don't do it very often?

25       A    Correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

451

1      Q     Okay.   And you're relying on this data from

2    Florida?

3      A     Yes.

4      Q     And is it your position that the number of

5    licenses revoked from individuals is a proxy for how

6    often the gun is used criminally in that population?

7      A     Yes, it is a proxy as long as you understand

8    proxy doesn't mean, you know, the proxy equals the

9    absolute level of the thing you're trying to measure.

10      Q     And have you done anything to determine what

11    the difference is between the proxy number here, in this

12    case, it would be Florida's revoked 168 licenses is

13    compared to the true number of criminal uses of guns

14    among permit holders?

15      A     Not specifically for the purposes of this

16    report, but on many occasions.

17            For example, you know, for purposes of

18    teaching criminology, I would have reviewed evidence on

19    the ratio of the most generous estimates of the number

20    of crimes committed compared to the number of persons

21    who were arrested or convicted for those crimes.   And

22    that would, of course, then form a judgment of how much

23    of a difference there is between the number of

24    revocations based on a conviction versus the total

25    number of offenses.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                October 29, 2011

452

1      Q    And what did you conclude in that analysis?

2      A    I would say there's roughly four times as many

3  offenses.  This is across all offenses, but roughly four

4  times as many offenses as there are convictions.

5      Q    So it would be about 600 licenses that -- or

6  violations that should have revoke -- resulted in revoked

7  licenses?

8      A    Yeah, if that rough ballpark estimate applies

9  to these particular violations, yeah.  So that would be

10  -- I wouldn't dignify it as anything other than a real

11  back-of-the-envelope sort of estimate.

12      Q    So we don't know the actual --

13      A    There's no way of knowing.

14      Q    -- the under -- under-correlation or

15  under-assessment of violations that a -- just looking at

16  the number of licenses removed would indicate?

17      A    There's no way of knowing that because you

18  can't know the total number of crimes committed,

19  regardless of whether anybody knows about them or not.

20      Q    Okay.

21      A    And in particular, it's -- it's -- some of

22  these are for carry violations; and in a way, unless

23  somebody is looking to find those, they won't discover

24  them.  It's not like there's a victim to report them.

25      Q    Would you agree with me that it is not possible



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

453

1    to distinguish between a criminal and a noncriminal

2    possession in a carry regime prior to any kind of

3    interdiction by the police or the commission of a crime?

4         A    It's not possible to do it with any degree of

5    certainty.  Police have suspicions and they sometimes

6    rise to the status of reasonable suspicions based

7    on ancillary conditions, furtive behavior and that sort

8    of thing, but the judgments they make are not reliable,

9    not very reliable, anyway.

10        Q    Let's go back to page 28.

11        A    (Views document.)

12        Q    Actually, I'm sorry.  It's on page 29, at the

13   bottom of the page.

14             We were talking about Cook's logic and the

15   premises that he raises; do you see where that is?

16        A    Yes.

17        Q    And we talked about the first premise before,

18   that the prevalence of firearms has a positive effect on

19   gun use.  The second premise is that gun use affects the

20   death rate in assault and robbery.

21             Now, I assume from reading this paragraph

22   that you disagree with that second premise?

23        A    No, I said it was more dubious.  It's -- it's

24   one of those issues that can't be re -- very definitively

25   resolved, mainly because you can't measure and control



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

454

1    for the lethality of the attacker's intentions and

2    separate that from the lethality of weapon.

3         Q    So it may be that gun use affects the death

4    rate in assault and robbery, but we don't know one way

5    for sure, is that --

6         A    Correct.

7         Q    -- the right way to phrase that?

8         A    Correct.

9         Q    Well, the defensive gun use benefit that you're

10   talking about is avoiding an injury; right?

11        A    That -- that's one benefit, yes.

12        Q    And the analysis that you did did not look at

13   the extent to which defensive gun uses avoid the death of

14   the victim; correct?

15        A    Sort of.  My answer is basically the same as

16   before.  We -- we looked at, for example, the effects of

17   victim gun -- defensive gun use on serious injury and

18   then we altered the analysis to suppose that we had also

19   included all of the fatal gun uses and how would that

20   change our conclusions.  So that was part of the analysis

21   too.

22        Q    And how -- how did you come up with the

23   estimate of how many fatal -- fatalities would result

24   from a defensive gun use?

25        A    I'm -- fatalities would result from it, no.  We


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

455

1    -- we -- what we did was, we had more or less the

2    complete national figures on the number of homicides, you

3    know.  So it wasn't really an estimate.

4           And even if you assumed that every single one

5    of them had been directly and entirely produced by the

6    victim's defensive actions with their guns, added that

7    into the total of injuries resulting from the defensive

8    gun use, it would have virtually no difference in the

9    risk of fatal or nonfatal injury.  And so none of the

10   conclusions would have been modified.

11        Q    Okay.  You would agree that in responding to a

12   criminal assault, there are a variety of time frames over

13   which that response may be permitted to happen depending

14   on the nature of the crime?

15        A    You are talking about defensive responses of

16   the victim --

17        Q    Defensive responses, correct.

18        A    Yes.

19        Q    So there could be a situation where the victim

20   has absolutely no time to use a gun or defend himself

21   with a gun; right?

22        A    Yes.

23        Q    And there could be a time period over which the

24   victim has ample time to locate a gun and to -- and to

25   attempt to use it in a defensive manner; right?



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

456

1      A     Yes.

2      Q     And there's also a time period over which other

3   responses to crime could be effective or ineffective, for

4   instance, if a person is jumped and he's in a confined

5   space, fleeing may not be an option for avoiding injury

6   in that case; right?

7      A     Correct.

8      Q     And -- but there could be another time where

9   you were in an open space, the assault -- the person

10  assaulting you is far away; and you could flee and avoid

11  an injury in that circumstance; correct?

12     A     Right.

13     Q     And so there's all different scenarios that

14  could arise as to whether guns might result in avoiding

15  injury versus fleeing might result in avoiding an injury?

16     A     Correct.

17     Q     And they occur at different time frames?

18     A     Yes.

19     Q     And fleeing might be effective under some

20  circumstances and not effective under other circumstances

21  in the same way that defensive gun use could be effective

22  under some circumstances and not effective under other

23  circumstances?

24     A     Correct.

25     Q     For the instances in your analysis where you



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 29, 2011

457

1    determine that defensive gun use was effective in

2    avoiding injury, how do you know that under those

3    circumstances fleeing would have also been effective at

4    avoiding injury?

5        A    You can't know because we could only analyze

6    the events as they actually occurred.  We have no way of

7    modeling or simulating alternate set of conditions that

8    didn't occur.

9        Q    Yeah.  So this goes back maybe to our

10   discussion that we had in the beginning, the best type of

11   study would be a randomized control trial where you

12   looked at the same crime occurring 100 times; and in 100

13   times, people used a gun, a gun defensively, to try to

14   avoid injury and then another 100 times, they fled; and

15   then you see how much more or less injury occurs with

16   each scenario.

17       A    Yes.

18       Q    And we can't do that.

19       A    Correct.

20       Q    And so you agree that your analysis of the

21   benefits of defensive gun use, at least, have the

22   limitation that you aren't comparing like scenarios to

23   like scenarios?

24       A    I wouldn't go that far.  They -- they were

25   known to be like with respect to a lot of variables that



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

458

1   we controlled for.

2           So everything that was measured and

3   controlled for, we've taken account of those

4   differences, but are there other circumstances that we

5   did not -- that weren't measured and that we didn't

6   control for, yes, there were others.

7       Q    And that's what I asked.

8           I asked you if there are limitations to your

9   analysis because you can't perfectly compare like

10  scenarios to like scenarios.

11      A    Well, the only thing I was quibbling about was

12  that like to like.  They are pretty similar.  They're

13  just not totally.  We can't negate the influences of all

14  circumstances, but if -- if -- the simple point is:  That

15  there are uncontrolled factors in our analyses,

16  absolutely.

17      Q    And since you have uncontrolled factors, you

18  can't say what effect those uncontrolled factors would

19  have had on your results?

20      A    Correct.

21      Q    And those uncontrolled factors might negate the

22  benefit of gun -- defensive gun use or your analysis;

23  correct?

24      A    It's a logical possibility.

25      Q    What are the things that you couldn't control



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    for in your analysis of the injury-preventing benefits of

2    defensive gun use?

3        A    Well, one I can think of offhand would be I

4    would like to know the physical size and strength of the

5    parties involved, both victim and offenders, so I could

6    tell what their relative power was based on just their --

7    their physical attributes.

8        Q    And -- and how would that affect the analysis?

9        A    Well, the -- the greater the power advantage of

10   the offender over the victim would affect how capable

11   they would be of inflicting injury and also how capable

12   they would be of inflicting serious injury rather than

13   minor injury, which is another distinction we made.

14           And if that physical size is correlated with

15   victim's choices as to self-protective actions like,

16   for example, if people who were physically weaker

17   decided -- were more likely to use guns as a way of

18   compensating for that physical weakness, then that can

19   alter the estimated effects of the defensive gun use

20   because it's a confounder.

21           It's correlated with the choice of defensive

22   method or -- self-protective action and it affects the

23   injury outcome.

24       Q    And without doing that analysis of attempting

25   control for that, we don't know exactly what effect that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

460

1    variable would have?

2         A    Correct.

3         Q    But it's certainly plausible that that could

4    have a confounding effect on your analysis?

5         A    Yes.

6         Q    So is this another example of where, if you had

7    perfect information, it would be great if you can control

8    for all potential confounding variables that are out

9    there; but we have to work with the data that we have?

10        A    Yes.

11        Q    And then try to draw rational and reasonable

12   conclusions from the results, taking into account the

13   fact that there are certain unknowns?

14        A    Correct.

15        Q    No study is perfect?

16        A    Yes.

17        Q    We were talking about earlier how some

18   researchers have criticized your estimate of the number

19   of defensive gun uses, claiming that those estimates

20   haven't been or aren't externally validated.  You are

21   familiar with those criticisms?

22        A    Vaguely.  That term "external validation"

23   hasn't been a -- a wide-spread part of the debate, but

24   I'm pretty sure at least one person has used that term.

25        Q    And is that Dr. Hemenway is who you are



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

461

1    referring to?

2        A    I think so.

3        Q    Okay.  What is your understanding of what the

4    term of "external validation" means?

5        A    I don't really understand what his

6    understanding of it is.

7        Q    Oh, okay.  Do you have an understanding,

8    independently, of what external validation is if you were

9    to use that term?

10       A    My -- my use of the term would mean that you

11   have some body of evidence independent of the original

12   body of evidence on which you based your conclusions that

13   confirms the first one.  That would be independent

14   validation.

15       Q    Okay.  And so one of the things that

16   Dr. Hemenway took a look at is assuming your data on

17   defense -- that you obtained from these survey data is

18   correct, you could use that to predict how many offenders

19   would have been injured by defensive gun uses; right?

20       A    Not really, no.  No, you couldn't do that.  I

21   mean, he said that --

22       Q    Yeah --

23       A    -- but no, you can't.

24       Q    He says that you -- I mean, I'm just trying to

25   put the parameters about what he means by external



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                              462

1    validation.  He asserts that using the survey data that

2    you've collected, you could estimate the number of

3    offenders who were injured by defensive gun uses; right?

4         A    That would be his assertion, yes.

5         Q    Right.  And then he compares that -- or he

6    compares that number to data from hospitals, for

7    instance, on how many people are treated for gun injuries

8    every year?

9         A    Yes.

10        Q    And he asserts that under your survey data,

11   there should be a lot more people going to the hospital

12   for gunshot wounds than we actually see in the hospital

13   data; correct?

14        A    Yes, that's what he asserts.

15        Q    And your -- what is your criticism of that

16   analysis?

17        A    Well, he -- he starts it out, assuming that --

18   he -- he's making an apples and oranges comparison.  At

19   best what we had out of our survey, the national

20   self-defense survey was an estimate of how many criminals

21   -- how many victims thought they had wounded a criminal

22   in connection with a defensive gun use without respect to

23   whether or not that criminal later took, you know, sought

24   medical treatment which, of course, the victim wouldn't

25   be in a position to know.  And then he compares that with



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

463

1    a radically different number, which is the number -- or

2    the esti -- it's an estimate.  It's based on probability

3    samples.  But it's the estimated number of people who

4    were treated for gunshot wounds in hospital emergency

5    departments and similar hospital facilities.

6            So it's an apples and oranges comparison.

7    He's -- his implicit assumption seems to be that those

8    two numbers should be similar, and they shouldn't be

9    similar.  There's no reason to expect that.  But he

10   also misinterprets exactly what you can extrapolate

11   from the National Self-defense Survey.  We didn't

12   establish whether or not the victim was actually

13   wounded.

14           Basically what you have is the victim's

15   beliefs about it, and they may have simply been

16   guessing.  We ask the question, and then they'll

17   provide a response.  So we asked:  What did you do with

18   the gun?  And respondents are trying to be helpful, and

19   they'll provide what information they have.  But we

20   didn't follow up by asking what led them to believe

21   that they had wounded the criminal.

22           And when we later on looked at whether or not

23   the implied success rate in wounding criminals was

24   plausible, if you believe that everybody who thought

25   they had wounded a criminal had, in fact, wounded a



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

464

1    criminal, it would have implied an implausibly high hit

2    rate, meaning the percentage of times when they were

3    trying to shoot the offender that they succeeded in

4    actually wounding them.  And we judge that to be

5    implausible because it was higher than the hit rate of

6    police officers in combat situations.

7              So my interpretation is that in many cases,

8    people were just guessing they had wounded the

9    criminal.  They -- they didn't know one way or another.

10   They didn't, for example, know that there was blood on

11   the carpet or, you know, they saw the guy, you know,

12   limping out because he had been shot in the leg or

13   anything.

14   Q    So as I understand what you've just told me,

15   there are two problems with what Hemenway's analysis is.

16             One is that you believe that not all people

17   that are wounded actually go to the hospital, and that

18   was Hemenway's assumption, that people wounded by

19   gunshots would actually go to the hospital; right?

20   A    No, not all criminals wounded in the course of

21   attempting a crime would seek medical care.

22   Q    Right.  That's one criticism of Hemenway's

23   analysis from you; correct?

24   A    Yes.

25   Q    The other --



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

465

1          MR. COOPER:  Before -- Counsel, before you

2      ask another question, can I ask for a time check?

3          THE VIDEOGRAPHER:  We've got four minutes.

4          MR. COOPER:  Four minutes.

5          MR. WOODS:  Okay.  Thank you.

6   BY MR. WOODS:

7      Q    The other criticism of Hemenway's analysis that

8   you've just articulated is that not all people that the

9   survey -- the victims thought were injured were actually

10  injured by a gunshot; right?

11     A    Yes.

12     Q    And so you agree with me that certainly some of

13  the answers obtained in your survey weren't reliable, at

14  least, to that question of whether the victim -- or

15  sorry, whether the criminal was injured as a result of

16  the defensive gun use?

17     A    Yeah, if you interpret that, those responses as

18  whether or not the -- the offender was actually wounded,

19  yes, I believe many of the responses could have been

20  unreliable.  They were based on guesswork, in other

21  words; that's what I'm saying.

22     Q    Now, do you -- is it your position that

23  criminals who were injured in the course of -- by a

24  victim who was using his gun defensively as a result of

25  getting gunshot are not going to go to the hospital?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

466

1        A      Can I hear that full question again, please?

2               MR. WOODS:  Yeah, go ahead.

3               (The record was read by the reporter.)

4        A      Yes.

5    BY MR. WOODS:

6        Q      And what's that based on?

7        A      It's based on the fact that it is virtually

8    universal that the law requires that if a person is

9    treated for a gunshot wound, it will have to be reported

10   to the police, which means a criminal will have to be

11   questioned as to how they got wounded that way.

12              So, for example, if a man had just committed

13   a robbery in which he got shot by a storekeeper, let's

14   say, and the storekeeper had reported it to the police,

15   he would have to anticipate being asked:  Well, how did

16   you get that gunshot wound by police officer after the

17   police department had just received a report within the

18   last few hours of a criminal of his description having

19   been shot in the course of attempting a robbery.

20       Q      Well, do you -- you're -- you're basing --

21   you're assuming that the criminal actually knows that the

22   fact that he got a gunshot is have -- is going to have to

23   be reported to the police; right --

24       A      Well, I'm assuming --

25       Q      -- before he goes to the hospital?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

467

```
 1        A    I'm assuming that's likely, yeah.

 2        Q    And do you have any basis for -- for believing

 3   that, in fact, is the case with criminals?

 4        A    No.

 5        Q    And have you ever seen any studies or analyses

 6   that have looked at the percentage of criminals who were

 7   shot in the course of committing a crime that actually

 8   seek medical care?

 9        A    No.

10        Q    Do you know if any such studies exist?

11        A    No.

12        Q    Have you seen surveys of criminals where they

13   report going to the hospital after being shot in the

14   commission of a crime?

15        A    Yes -- well, they may have been -- I'm not --

16   they may have a hypothetical.  I think they may have

17   asked, would you seek medical care or whatever.  So I'm

18   familiar with a study of that sort, yeah.

19        Q    Yeah.  And -- and that a major majority of them

20   say would seek medical care under those circumstances?

21        A    Yes, that's what they say.

22        Q    And you disagree with their statements?

23        A    Yes.

24        Q    Why is that?

25        A    I think that's implausible.  Probably the
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

468

1   context in which the questions are asked, it was done of

2   jail inmates.  Jail inmates are, for the most part,

3   people who are awaiting trial.

4           So they're a very legally vulnerable group of

5   people.  They're very attuned to wanting to present

6   themselves as respectable citizens who shouldn't be

7   convicted of a crime and sent to prison or whatever.

8           And if you were to say -- if you were to be

9   asked the question:  Well, if you got shot, would you

10  be -- would you seek medical care and you said no, the

11  obvious follow-up would be why not, because from a

12  medical stand -- or a health standpoint, it makes no

13  sense whatsoever.

14          And then, of course, the honest answer would

15  be, well, you know, I don't want to stand up to a

16  police interrogation as to how I got shot.  But the

17  desire for projecting a socially desirable image would

18  be a very powerful one for people in general but in

19  particular for a criminal sitting in jail awaiting

20  trial.

21      Q    All right.

22          MR. WOODS:  Dr. Kleck, I'm told by the

23      videographer that our ten hours is up.  I

24      appreciate your time and patience through your

25      deposition.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

469

1          THE WITNESS:  Time flew by.

2          MR. WOODS:  I'm hoping you can still make

3     your -- your game.

4          THE WITNESS:  I'll only miss a couple of

5     minutes.

6          MR. WOODS:  And let me just say for the

7     record that we're closing the deposition except to

8     the extent that we feel necessary to seek leave of

9     court for further deposition of Dr. Kleck because

10    of the other areas we may want to cover.  But we

11    can address that at a later time if we have to.

12         MR. COOPER:  And I will say for the record,

13    as well, that I have no questions of Dr. Kleck.

14         MR. WOODS:  Thank you.

15         THE VIDEOGRAPHER:  Off the record.

16         (The proceedings concluded at 11:50 a.m.)

17

18

19

20

21

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011
                                                          470
1                     CERTIFICATE OF OATH

2

3

4

5    STATE OF FLORIDA            )

6    COUNTY OF LEON              )

7

8

9

10

11          I, the undersigned authority, certify that

12   said designated witness personally appeared before me

13   and was duly sworn.

14

15

16          WITNESS my hand and official seal this 11th

17   day of November, 2011.

18

19

20

21          _____

22          LISA D. FREEZE, CRR, NOTARY PUBLIC
            1-800-934-9090
23          850-878-2221

24

25



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

471

```
 1                    CERTIFICATE OF REPORTER

 2

 3     STATE OF FLORIDA      )

 4     COUNTY OF LEON        )

 5

 6          I, LISA D. FREEZE, RPR, NOTARY PUBLIC,

 7     certify that the foregoing proceedings were taken

 8     before me at the time and place therein designated;

 9     that my shorthand notes were thereafter translated

10     under my supervision; and the foregoing pages numbered

11     328 through 469  are a true and correct record of the

12     aforesaid proceedings.

13

14          I further certify that I am not a relative,

15     employee, attorney or counsel of any of the parties,

16     nor am I a relative or employee of any of the parties'

17     attorney or counsel connected with the action, nor am I

18     financially interested in the action.

19          DATED this 11th day of November, 2011.

20                              _____

21                              LISA D. FREEZE, RPR, CRR
                                Notary Public
22                              1-800-934-9090
                                850-878-2221
23

24

25
```



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

472

ERRATA SHEET

1

2  (ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL. vs.

3  THE CITY OF CHICAGO, ET AL.)  JOB ASSIGNMENT NO. 282248

4          DECLARATION UNDER PENALTY OF PERJURY

5       I declare under penalty of perjury that I have read

6  the entire transcript of my Deposition taken in the

7  captioned matter or the same has been read to me, and

8  the same is true and accurate, save and except for

9  changes and/or corrections, if any, as indicated by me

10  on the DEPOSITION ERRATA SHEET hereof, with the

11  understanding that I offer these changes as if still

12  under oath.

13       Signed on the _____ day of

14  _____, 20____.

15  _____

16       Witness Name

17       GARY KLECK

18  PAGE/LINE  CORRECTION or AMENDMENT  REASON FOR CHANGE

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23  _____  _____  _____

24  _____  _____  _____

25  _____  _____  _____



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

473

1  _____   _____   _____

2  _____   _____   _____

3  _____   _____   _____

4  _____   _____   _____

5  _____   _____   _____

6  _____   _____   _____

7  _____   _____   _____

8  _____   _____   _____

9  _____   _____   _____

10  DATE OF DEPOSITION: 10.28.11     REPORTER:  D. Freeze

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

474

November 11, 2011


TO: CHARLES J. COOPER, ESQUIRE

re: ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL.

vs. THE CITY OF CHICAGO, ET AL.

Dear Mr. Cooper:

Enclosed please find your copy of the deposition of GARY
KLECK taken on October 29, 2011, in the above-styled
case.

As the witness did not waive reading and signing, I am
also attaching the errata sheet as the last page of the
transcript and request that your office make the
necessary arrangements with your witness to read your
copy of the deposition, noting any corrections on the
errata sheet, then dating and signing the errata sheet,
within 30 days or before commencement of trial,
whichever is first.

PLEASE FORWARD THE ORIGINAL, SIGNED AND DATED ERRATA
SHEET  to CRAIG WOODS, ESQUIRE.  If the errata sheet or
a request for an extension is not received within 30
days, Counsel may assume that the signature has been
waived.
It was a pleasure working with you on this matter.

Sincerely yours,



LISA D. FREEZE, RPR, CRR, NOTARY PUBLIC
Enclosures (Errata sheet and transcript.)
cc CRAIG WOODS, ESQUIRE



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com