# Exhibit A

# Part 1 of 3

COMPRESSED COPY

Page 1

          IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
               EASTERN DIVISION
        CIVIL ACTION NO.:  10-CV-04184
     X - - - - - - - - - - - - - - - - - - - - - X

     ILLINOIS ASSOCIATION OF FIREARMS RETAILERS,   :

     KENNETH PACHOLSKI, KATHRYN TYLER AND          :

     MICHAEL HALL,                                 :

                    Plaintiffs,                    :

          vs.                                      :

     THE CITY OF CHICAGO AND RAHM EMANUEL,         :

     MAYOR OF THE CITY OF CHICAGO,                 :

                    Defendants.                    :

     X - - - - - - - - - - - - - - - - - - - - - X

                         Durham, North Carolina

                         Wednesday, September 28, 2011

          Videotaped Deposition of PHILIP J. COOK, Ph.D.,

     a witness herein, called for examination by counsel

     for the Plaintiffs in the above-entitled matter,

     pursuant to notice, the witness being duly sworn by

     Lisa A. DeGroat, RPR and Notary Public in and for

     the State of North Carolina, taken at the law office

     of Thomas, Ferguson & Mullins, L.L.P., 119 East Main

     Street, Durham, North Carolina, at 8:07 a.m., on

     Wednesday, September 28, 2011, and the proceedings

     being taken down by Stenotype by Lisa A. DeGroat,

     and transcribed under her direction.

COMPRESSED COPY

Page 2

```
 1   APPEARANCES:

 2

 3     On behalf of the Plaintiffs:

 4         DAVID H. THOMPSON, ESQ.

 5         Cooper & Kirk, P.L.L.C.

 6         1523 New Hampshire Avenue, NW

 7         Washington, D.C.  20036

 8         (202) 220-9600

 9         dthompson@cooperkirk.com

10

11     On behalf of the Defendants:

12         CRAIG A. WOODS, ESQ.

13         Mayer Brown, L.L.P.

14         71 South Wacker Drive

15         Chicago, Illinois  60606

16         (312) 701-8536

17         cwoods@mayerbrown.com

18           -and-

19         RANJIT J. HAKIM, ESQ.

20         Mayer Brown, L.L.P.

21         71 South Wacker Drive

22         Chicago, Illinois  60606

23         (312) 701-8758

24         rhakim@mayerbrown.com

25
```

COMPRESSED COPY

Page 3

```
1    APPEARANCES (Continued):

2

3       On behalf of the Defendants:

4            ANDREW WORSECK, ESQ.

5            Department of Law

6            Constitutional and Commercial Litigation

7            Suite 1230

8            30 North LaSalle Street

9            Chicago, Illinois   60602

10           (312) 744-7129

11           aworseck@cityofchicago.com

12

13

14

15

16

17      THE VIDEOGRAPHER:

18           MR. CARL J. REHL

19

20

21

22

23

24

25
```

COMPRESSED COPY

1                     C O N T E N T S

2     The Witness:  Philip J. Cook, Ph.D.     Examination

3     By Mr. Thompson . . . . . . . . . . . . . . .     7

4

5                     *          *          *

6

7          I N D E X   O F   T H E   E X H I B I T S

8     Plaintiffs'                     For Identification

9     Deposition Exhibit No.  1 . . . . . . . . . .     13

10    Deposition Exhibit No.  2 . . . . . . . . . .     24

11    Deposition Exhibit No.  3 . . . . . . . . . .     31

12    Deposition Exhibit No.  4 . . . . . . . . . .     48

13    Deposition Exhibit No.  5 . . . . . . . . . .     74

14    Deposition Exhibit No.  6 . . . . . . . . . .    100

15    Deposition Exhibit No.  7 . . . . . . . . . .    102

16    Deposition Exhibit No.  8 . . . . . . . . . .    105

17    Deposition Exhibit No.  9 . . . . . . . . . .    108

18    Deposition Exhibit No. 10 . . . . . . . . . .    111

19    Deposition Exhibit No. 11 . . . . . . . . . .    112

20    Deposition Exhibit No. 12 . . . . . . . . . .    141

21    Deposition Exhibit No. 13 . . . . . . . . . .    149

22    Deposition Exhibit No. 14 . . . . . . . . . .    152

23    Deposition Exhibit No. 15 . . . . . . . . . .    225

24    Deposition Exhibit No. 16 . . . . . . . . . .    229

25    Deposition Exhibit No. 17 . . . . . . . . . .    231

COMPRESSED COPY

Page 5

1      I N D E X   O F   T H E   E X H I B I T S

2   Plaintiffs'            For Identification

3   Deposition Exhibit No. 18 . . . . . . . . . . 234

4   Deposition Exhibit No. 19 . . . . . . . . . . 241

5   Deposition Exhibit No. 20 . . . . . . . . . . 242

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPRESSED COPY

Page 6

1                    S T I P U L A T I O N S
2          Before testimony was taken, it was stipulated
    by and between counsel representing the respective
3   parties as follows:
4          1.  That any defect in the notice of the
    taking of this deposition, either as to time or
5   place, or otherwise as required by statute is
    expressly waived, and this deposition shall have the
6   same effect as if formal notice in all respects as
    required by statute had been given and served upon
7   the counsel in the manner prescribed by law.
8          2.  That this deposition shall be taken for
    the purpose of discovery or for use as evidence in
9   the above-entitled action, or for both purposes.
10         3.  That this deposition is deemed opened and
    all formalities and requirements with respect to the
11  opening of the same, expressly including notice of
    the opening of this deposition, are hereby waived,
12  and this deposition shall have the same effect as if
    all formalities in respect to the opening of the
13  same had been complied with in detail.
14         4.  That the undersigned, Lisa A. DeGroat,
    Registered Professional Reporter and Notary Public,
15  is duly qualified and constituted to take this
    deposition.
16
           5.  Objections to questions, except as to the
17  form thereof, and motions to strike answers need not
    be made during the taking of this deposition, but
18  before any judge or any court of competent
    jurisdiction for the purpose of ruling thereon, or
19  at any other hearing or trial of said case at which
    said deposition might be used, except that an
20  objection as to the form of a question must be made
    at the time such a question is asked or objection is
21  waived as to the form of the question.
22         6.  That the signature of the witness to the
    deposition is hereby reserved.
23
           7.  That the Federal Rules of Civil Procedure
24  shall control concerning the use of the deposition
    in court.
25

COMPRESSED COPY

1          THE VIDEOGRAPHER:  This is the videotaped

2    deposition of Philip J. Cook.  Today's date is

3    September 28th, 2011.  The time is 8:07.

4          Would the counsel now, please, introduce

5    yourselves.

6          MR. THOMPSON:  David Thompson, of Cooper &

7    Kirk, for the plaintiffs.

8          MR. WOODS:  Craig Woods, of Mayer Brown,

9    L.L.P., for defendants.

10          MR. HAKIM:  Ranjit Hakim, with Mayer Brown,

11    L.L.P., for defendants.

12          MR. WORSECK:  Andrew Worseck, from the City

13    of Chicago Law Department, for defendants.

14          THE VIDEOGRAPHER:  And would the court

15    reporter, please, swear in the witness.

16                    *         *         *

17               P R O C E E D I N G S

18    Whereupon,

19          PHILIP J. COOK, Ph.D.,

20    was called as a witness by counsel for the

21    Plaintiffs and, having been duly sworn by the Notary

22    Public, was examined and testified as follows:

23      DIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

24          BY MR. THOMPSON:

25      Q.  Good morning, Professor.  Will you, please,

COMPRESSED COPY

Page 8

1    state your name for the record.

2         A.   My name is Philip Cook.

3         Q.   All right.  Very good.

4              And you work at Duke University; is that

5    correct?

6         A.   I do.

7         Q.   And your background is in economics; is

8    that right?

9         A.   That's right.  I have a Ph.D. in

10   economics.

11        Q.   All right.  How did you come to research

12   guns so heavily?

13        A.   My dissertation, when I was finishing my

14   Ph.D., was on criminal justice and about the

15   effect of job opportunities on parolee

16   recidivism.  And when I came to Duke, one of my

17   first teaching assignments was to teach criminal

18   justice.

19              And one thing led to another, so that I

20   was given the opportunity to do some work with

21   the -- the Department of Justice and especially

22   a visiting scholar at the National Institute of

23   Justice that had the first access to the

24   victimization survey data.  And so that we

25   worked out a plan where I would do research on

COMPRESSED COPY

Page 9

1    robbery and the technology of robbery, and that

2    was the beginning.

3         Q.   And what year did you work with the

4    Department of Justice?

5         A.   I was -- at that time it was 1975, give

6    or take a year.

7         Q.   Okay.  And you've been deposed before; is

8    that correct? .

9         A.   I have.

10         Q.   In which cases?

11         A.   I was deposed in a case -- so twice, to

12    the best of my recollection.  There was a case

13    in Dallas that was long ago -- probably about

14    1980 -- that involved a plaintiff named -- an

15    attorney named Wendell Turley, who -- and that

16    was a gun case.

17              And then more recently, perhaps eight

18    years ago, I was involved with the State of New

19    York, when they were defending against a lawsuit

20    against their alcohol regulations.

21         Q.   And what was the subject -- what was the

22    thrust of your testimony and opinion that you

23    offered in the New York case?

24         A.   The New York case was that the -- in my

25    opinion, based on the extensive research that

COMPRESSED COPY

Page 10

```
 1   I've done on alcohol control policies, that any
 2   regulation that increases the price of alcoholic
 3   beverages has the effect of reducing alcohol
 4   abuse.
 5           And so that -- that was the issue.  And
 6   this case was about particular regulations
 7   concerning the distribution of alcohol within
 8   the state, which apparently had the affect of
 9   raising the price.  And so that my testimony was
10   limited just to the effect it would have on
11   alcohol abuse and the consequences of alcohol
12   abuse.
13       Q.   And in the Dallas case, what was the thrust
14   of your testimony?
15       A.   The thrust of my testimony there was on
16   the effects of gun use on the outcome of violent
17   encounters.  So that this -- this was early on
18   in my research program, but there was some
19   overlap.
20       Q.   And what did you testify about those
21   effects?
22       A.   That the presence of a gun increased the
23   lethality of a violent encounter.
24       Q.   Okay.  And how was that case resolved; do
25   you recall?
```

COMPRESSED COPY

Page 11

1       A.   That case, as I recall, was -- went to

2   trial, but was ultimately thrown out by the

3   judge, on the grounds that I did not understand

4   and had no -- no input into --

5       Q.   Okay.

6       A.   So I would say my testimony turned out

7   to be irrelevant.

8       Q.   All right.  Do you recall the name of that

9   case?

10      A.   I'm sorry.  I don't.  No.  I remember

11  the defendant was Zales stores.  So --

12      Q.   Okay.  All right.  Thank you.

13           So you know the rules of the road, having

14  been deposed a couple of times before, but

15  basically, since we have a court reporter here

16  today, we should try to talk one at a time.

17           If I interrupt you, please, let me know.

18  And you can take a break whenever you'd like.  If

19  there's a question that's pending, I'd ask that you

20  go ahead and answer it.

21      A.   Okay.

22      Q.   All right.  Very good.

23           Now, do you own a firearm?

24      A.   Yes, I do.

25      Q.   What type of firearm?

COMPRESSED COPY

Page 12

1    A.    It's a .22 rifle.

2    Q.    And do you keep that secured in your house?

3    A.    I keep it in my closet and -- and keep

4    it unloaded, with the clip kept in a separate

5    location.

6    Q.    Okay.  But you don't have a trigger lock,

7    for example?

8    A.    I do not have a trigger lock.  No.

9    Q.    Okay.  Have you ever shot a handgun?

10   A.    I have.

11   Q.    Okay.  And have you ever shot a shotgun?

12   A.    Yes.

13   Q.    Okay.

14   A.    On -- yeah.  I'm digging deep into my

15   personal history.  Yeah.

16   Q.    All right.  What -- when do you recall

17   having shot a shotgun?

18   A.    I was a teenager at the time.  Yeah.

19   Q.    Okay.  Do you have an opinion as to whether

20   it's easier to pull a trigger of a handgun or a

21   shotgun?

22        MR. WOODS:  Let me just object that this is

23   beyond the scope of what he's been offered to opine

24   on in this case.

25        THE WITNESS:  I have no opinion.

BRYANT COURT REPORTING SERVICES, INC.  (919)387-5853

COMPRESSED COPY

Page 13

```
 1           MR. THOMPSON:  Okay.  Let's go ahead and
 2    mark as Cook Exhibit 1 the following document.
 3           (PLAINTIFFS' EXHIBIT 1 WAS MARKED FOR
 4    IDENTIFICATION.)
 5           (DISCUSSION HELD OFF THE RECORD.)
 6           BY MR. THOMPSON:
 7      Q.   Okay.  Sir, will you, please, go ahead and
 8    identify this document for the record?
 9      A.   This is my expert report and also my CV.
10      Q.   Okay.  And, please, turn your attention to
11    page three of your report.
12      A.   Okay.
13      Q.   And under Roman numeral IV, A-1, the first
14    sentence says, "Approximately one million Americans
15    have died from gunshot wounds in homicides,
16    accidents and suicides during the last three
17    decades."
18           Do you have even a ballpark approximation
19    as to how many of those individuals were gang
20    members?
21      A.   I don't.  No.
22      Q.   Do you know how many of those individuals
23    were killed while engaged in criminal conduct?
24           MR. WOODS:  Let me object to the question
25    on the grounds it's vague and ambiguous.
```

COMPRESSED COPY

1          THE WITNESS:  So the data referenced here

2     are from the National Center for Vital Statistics,

3     and they do not make those kinds of distinctions.

4     So that they -- they do distinguish between suicide,

5     which would be the majority of these cases.  And

6     presumably there's no criminal behavior involved

7     there, unless the -- it was in a state at a time

8     when suicide was illegal.

9          BY MR. THOMPSON:

10         Q.   Well, do you have a rough understanding of

11    these one million individuals how many of them were

12    the victims of homicide?

13         A.   Yeah.  The -- the current counts would

14    say, as reported here, that of the 31,000 some

15    firearms deaths, a majority, 17,352, are the

16    result of suicides, and 12,632 of homicides, and

17    the remainder due to unintentional or accidental

18    circumstances.

19         Q.   So for the 12,000 plus firearms homicides,

20    do you have a rough sense as to how many of those

21    individuals were engaged in criminal conduct at the

22    time they were shot and killed?

23         MR. WOODS:  I'm going to object on the

24    grounds that the question is vague and ambiguous.

25         THE WITNESS:  As I say, the source of the

COMPRESSED COPY

Page 15

1    data would have no information whatsoever on that

2    subject.  That these were judged by a police

3    investigation, typically a coroner or a medical

4    examiner, to have been criminal homicides.

5           Now, whether or what the victim was doing

6    at the time was not part of the tabulation and is

7    not kept by the -- the vital statistics program in

8    the United States.

9           BY MR. THOMPSON:

10    Q.   Okay.  But based on wholly apart from

11   whether this particular data tabulated it -- I

12   understand that it did not.

13    A.   Uh-huh.

14    Q.   -- do you have a rough estimate, based on

15   your years of study in this field, as to what

16   percentage of these individuals would have been

17   engaged in criminal conduct at the time they were

18   killed?

19           MR. WOODS:  Object on the grounds the

20   question is vague and ambiguous.

21           When you say, "these individuals," are you

22   talking about the 12,632 individuals --

23           MR. THOMPSON:  Yes, sir.

24           MR. WOODS:  -- or any -- okay --

25   individuals.

COMPRESSED COPY

Page 16

1           THE WITNESS:  I have no basis for making

2    that judgment.

3           BY MR. THOMPSON:

4      Q.   Okay.  Now, let's turn to the next

5    paragraph.  In the second sentence you say, "Of the

6    criminal homicides in 2007" -- and what do you mean

7    by, "criminal homicides"?

8      A.   These are homicides that were judged by

9    the police investigation and the coroner or the

10   medical examiner to have occurred in criminal --

11   that the shooter was criminally liable, given

12   the circumstances at the time that they made the

13   classification.  It's not based on the actual

14   disposition of some criminal case, but on the

15   basis of an investigation.

16     Q.   And do you know what percent of the 12,632

17   were deemed to be criminal?

18     A.   The -- I'm sorry.  The question is how

19   many of the victims were deemed criminal?

20     Q.   Of the homicides were deemed criminal.  You

21   say, if I'm --

22     A.   They were deemed criminal by the -- as a

23   result of the investigation.  That there were

24   criminal circumstances that -- yes.

25     Q.   What I'm asking is this -- sorry.  We're

COMPRESSED COPY

1    speaking past each other.

2        A.    Yeah.

3        Q.    You report that there are 12,632

4    homicides --

5        A.    Right.

6        Q.    -- in the prior paragraph.  And then in

7    this paragraph you reference criminal homicides.

8        A.    Right, right.

9        Q.    So my question is:  How many criminal

10   homicides were there, according to this report in

11   2007?

12       MR. WOODS:  Object on the grounds it's

13   mischaracterizing the document and his prior

14   testimony.

15       THE WITNESS:  These statistics, as I

16   recall, exclude a category of excusable or

17   justifiable homicide.  I think that they represent

18   cases, which were not deemed accidental, and,

19   therefore, that there was criminal liability

20   involved in these cases.

21       BY MR. THOMPSON:

22       Q.    In all 12,632; is that your understanding?

23       MR. WOODS:  Object -- objection;

24   mischaracterizes the testimony.

25       THE WITNESS:  In all of the cases, in terms

COMPRESSED COPY

Page 18

 1   of the investigation.  Not in terms of the

 2   disposition, which is not included in there.

 3              BY MR. THOMPSON:

 4        Q.   Yes.  I understand.

 5              All right.  Now, you say in that same

 6   sentence, "Of the criminal homicides in 2007, 69

 7   percent were by gunshot."

 8              Of that 69 percent, what percentage were by

 9   handgun?

10        A.   As I recall, it's about 80 percent.

11        Q.   Okay.  And what percentage is by shotgun?

12        A.   The remaining 20 percent would be

13   divided between shotgun and rifle, but I don't

14   know what the breakdown is.

15        Q.   Have you ever heard the term assault

16   weapon?

17        A.   Yes, yeah.

18        Q.   What does that term mean to you?

19        A.   That -- an assault weapon can mean

20   different things, but it is often a reference to

21   a rifle that has a folding stock on it.  It

22   might have other kinds of special attachments

23   associated with it that are the -- what you

24   might expect to find in a military weapon.

25        Q.   In terms of the way it looks or in terms of

COMPRESSED COPY

Page 19

```
 1   its functionality?

 2        A.    Both.  I think that partly would be a

 3   matter of -- of the -- of the -- of the

 4   functionality.

 5        Q.    And partly the looks?

 6        A.    Yeah.

 7        Q.    Okay.  And do you know what percent of

 8   these criminal homicides were performed with an

 9   assault weapon?

10        A.    No, and no one does.

11        Q.    Why does nobody know?

12        A.    Because often in a homicide

13   investigation the weapon is never uncovered and

14   the -- the rounds fired by what might be called

15   an assault weapon are not necessarily

16   distinctively different than what you would find

17   for another weapon.

18        Q.    Do you have an opinion on approximately how

19   many crimes occur a year in the United States in

20   which a gun is used?

21        A.    Yes.

22        Q.    Okay.

23        A.    So there were in the nation -- the last

24   available data from the national crime

25   victimization survey, there were over 300,000
```

COMPRESSED COPY

Page 20

1    assaults and robberies in which the perpetrators

2    used a gun.

3         Q.    And what about other types of crimes?

4         A.    And so to that you would add the 12,000

5    some homicides that occurred in that year that

6    occurred with a gun.  And you would also want to

7    include some rapes, which are not included here.

8    But the total figure is still going to be less

9    than 350,000.

10        Q.    So even if we add the number of rapes

11   utilizing a handgun, your understanding is that

12   would be less than 38,000?

13             MR. WOODS:  Objection; mischaracterizes

14   testimony.

15             THE WITNESS:  I'm sorry.  Yeah.

16             BY MR. THOMPSON:

17        Q.    300, plus 12?

18        A.    Right.  So it's 300 --

19        Q.    -- and 12.  And then you said it's less

20   than 350.  So then the rapes have -- with a

21   handgun have -- with a gun have to be less than

22   38,000?

23        A.    I see.  I see.

24        Q.    Sorry.

25        A.    It's a reference to --

COMPRESSED COPY

1      Q.    It's early.  I should have spelled that

2   out.

3      A.    Yeah, yeah.  I believe that's correct.

4      Q.    Okay.  All right.  Is there a positive

5   correlation between the homicide rate and the

6   poverty rate?

7      A.    You'd have to give me more detail about

8   what kind of correlation you want to run to --

9   for me to be able to answer.  So I mean a

10  correlation across states?  A correlation across

11  neighborhoods in a city?  A correlation over

12  time?

13     Q.    Well, why don't we start with a correlation

14  between states.

15          MR. WOODS:  I'm going to object on the

16  grounds it's an incomplete hypothetical and calls

17  for speculation and it's vague and ambiguous.

18          THE WITNESS:  I don't know the answer.

19  I -- it would be an easy study to do, but it's not

20  one that I've done.  So I don't have the -- the

21  answer, whether poorer states are systematically --

22  or lower income states systematically have higher

23  homicide rates than richer states.

24          BY MR. THOMPSON:

25     Q.    Okay.  Well, then let's take the next

COMPRESSED COPY

1   possible way to do the study.

2           Do you know whether there is a positive

3   correlation between homicide rates and poverty rates

4   within a particular city?

5           MR. WOODS:  I don't -- let me object on the

6   grounds it's vague and ambiguous, as to what poverty

7   rates are.  It calls for speculation.

8           THE WITNESS:  So I think that this is a

9   traditional finding in urban studies in sociology,

10  that poorer areas of most cities have higher crime

11  rates and higher violence rates than areas that are

12  better off.

13          BY MR. THOMPSON:

14      Q.   Okay.  Do you have an expert opinion on

15  whether there's a positive correlation between

16  murder rates and divorce rates?

17          MR. WOODS:  Now, again, I'll object on the

18  grounds it's vague and ambiguous and incomplete.

19          THE WITNESS:  Yeah.  I -- I have no

20  opinion, expert or otherwise, on that -- on that

21  subject.

22          BY MR. THOMPSON:

23      Q.   Okay.  Do you have an opinion on whether

24  there's a positive correlation between murder rates

25  and being born in the south?

COMPRESSED COPY

Page 23

1          MR. WOODS:  Same objections.

2          THE WITNESS:  So -- I'm sorry.  The

3     question is, if you are born in the south, are you

4     more likely to die by being killed than if you're

5     born in the north?

6          BY MR. THOMPSON:

7     Q.   No.  More likely to commit a murder.

8     A.   More likely to commit a murder if you're

9     born in the south.

10         And making any kind of adjustment for

11    anything else?

12    Q.   No.

13    A.   I have an opinion about that.  I would

14    not say it's an expert opinion or an opinion

15    based on my own research.  It's not something

16    that I've studied.

17    Q.   Well, what's your nonexpert opinion?

18    A.   So my nonexpert opinion, from doing some

19    reading, is that -- that people born in the

20    south are, as a group, and without adjusting for

21    anything else, more likely to be involved in

22    violence than people born in the north, if we

23    are referencing the eastern part of the country.

24    Q.   And if we hold constant for race and

25    poverty levels and age and sex, then is there still

Page 24

1    a positive correlation between being born in the

2    south and the murder rates?

3            MR. WOODS:  Objection; calls for

4    speculation.

5            MR. THOMPSON:  If -- if you know.

6            MR. WOODS:  It's incomplete.  It's vague

7    and ambiguous.

8            THE WITNESS:  So I don't know.

9            MR. THOMPSON:  Okay.  At this point I'd

10   like to ask the court reporter to mark as Cook 2 the

11   following document.

12           (PLAINTIFFS' EXHIBIT 2 WAS MARKED FOR

13   IDENTIFICATION.)

14           BY MR. THOMPSON:

15       Q.  And would you, please, identify this

16   document for the record?

17       A.  Let's see.  It says that it is the,

18   "Number of crimes per 100,000 inhabitants," and

19   there is no identification as to the source.

20           MR. WOODS:  David, do you have this -- I

21   assume this came out of some other publication.  Do

22   you have the whole publication?

23           MR. THOMPSON:  This, I believe, is what's

24   referenced in footnote two of the report.  And why

25   don't we turn to footnote two on page four of your

COMPRESSED COPY

Page 25

```
 1   report, sir.
 2            THE WITNESS:  So that is from the U.S.
 3   Department of Justice, Federal Bureau of
 4   Investigation, and would refer to results from
 5   uniform crime reports that are compiled by the FBI.
 6            BY MR. THOMPSON:
 7       Q.   Yes.  And my understanding is that this
 8   exhibit comes from the URL that you provided.
 9            Does this look like the document you were
10   referencing in your footnote two, what's been marked
11   as Exhibit 2?
12            MR. WOODS:  I assume, David, you don't have
13   the rest of the reference here.
14            MR. THOMPSON:  I don't.
15            MR. WOODS:  Okay.  Well, if you recall.
16            MR. THOMPSON:  If you want to pull it up on
17   your -- yeah.  If you don't recall whether this
18   is --
19            MR. WOODS:  I mean we can go get it
20   probably.  I don't know.  It might take a little
21   bit, but --
22            MR. THOMPSON:  Yeah.
23            THE WITNESS:  I'm sorry.  Could you repeat
24   the question.
25            BY MR. THOMPSON:
```

COMPRESSED COPY

Page 26

1      Q.    Yes.  In your footnote two --

2      A.    Uh-huh.

3      Q.    -- you reference a table 19 --

4      A.    Right.

5      Q.    -- from a Department of Justice study.  Is

6  that what's been marked as Cook Exhibit 2?

7      A.    Yes, uh-huh.

8      Q.    Okay.  And then looking -- where do you

9  derive -- in the text of your report, to which

10  footnote two is attached, you reference 300,000

11  assaults and robberies in 2009.  Where are you

12  getting that number from?

13      A.    So this would be the total for all

14  agencies where you add the firearm robberies,

15  149,335, the aggravated assaults, 146,773.  And

16  if you put that together, it comes up just short

17  of 300,000.

18          But we noticed that the number of

19  agencies only covers 267 million people in the

20  U.S. population, and so it would -- if we added

21  the additional -- what is it?  Twelve or 13

22  percent of the population, then that would

23  increase the total to over 300,000.

24      Q.    Okay.  Do you know anything about the ten

25  or 12 percent of the population that's missing from

COMPRESSED COPY

Page 27

```
1    the estimated population column?

2         A.    That they did not report in 2009 to the

3    FBI.

4         Q.    Right.  But do you know anything else about

5    them?

6         A.    No, but that they do have robberies and

7    aggravated assaults, because those are

8    universal.

9         Q.    All right.  Now, let's continue on in your

10   report.  You say in the first full paragraph on page

11   four, the first sentence.  "The City of Chicago has

12   more than its share of criminal homicides."

13              Now, what comparison are you making?  More

14   than its fair share as compared to what?

15              MR. WOODS:  Objection to the

16   characterization of the question.

17              Go ahead.

18              THE WITNESS:  Right.  I did not use the

19   word fair, but it has more than its share in the

20   sense that its per capita rate of homicide is higher

21   than for the United States as a whole.

22              BY MR. THOMPSON:

23        Q.    Okay.  And if we go down to the next

24   paragraph, you say, "Focusing just on males age 15

25   to 34, homicide victimization rates in 2007,
```

COMPRESSED COPY

1    consistent with earlier years, were 15 times as high

2    for blacks as for whites."

3            Does this statistic pertain to the City of

4    Chicago, or is it a national statistic?

5        A.    That is a national statistic based on

6    the vital statistics.

7        Q.    Do you believe that it obtains in Chicago?

8        A.    I don't know.  I didn't have a chance to

9    look specifically at Chicago in this breakdown.

10        Q.    You don't have any footnotes in this

11    paragraph.  What is your source for that statement?

12        A.    The source is the Centers for Disease

13    Control Web site, the -- known as WISQARS, which

14    is an interactive Web site that allows you to

15    access and do special extracts of injury death

16    statistics.

17        Q.    And do you do a special extract to

18    calculate this number?

19        A.    Yes, uh-huh.

20        Q.    All right.  And what were the steps that

21    you took to calculate this number?

22        A.    The steps are that you -- I got on the

23    WISQARS Web site, indicated that I was

24    interested in the deaths for 2007, which is the

25    most recent year that they have data for.

COMPRESSED COPY

1     And specified as gender that I was

2   looking for males, as age, for the age range, 15

3   to 34, and then for race, black, and then as a

4   separate calculation for race, white.

5     Q.   Why is this statistic relevant for any

6   opinion you're offering in this case?

7     A.   The general opinion includes a statement

8   that there -- the widespread availability of

9   guns and the use of guns in violence imposes

10   grave social costs on the country, and this is

11   providing some more detail about the nature of

12   those costs and particularly the groups that are

13   most affected by gun violence.

14     Q.   Do you have an opinion as to why there is

15   this differential that you've identified?

16     MR. WOODS:   Yeah, that's beyond the scope

17   of what we've offered him for, but --

18     THE WITNESS:   I mean I think that there's

19   no simple answer to that question.  I think that

20   it's an -- an important fact about public health in

21   the U.S., that this is the leading cause of death

22   for young black men.  Why that is would require more

23   than one book to explain.

24     BY MR. THOMPSON:

25     Q.   Now, if you were looking at not homicide

COMPRESSED COPY

Page 30

1    victimization rates, but the rate of committing a

2    homicide, would you find a similar racial

3    differential?

4             MR. WOODS:  I'm going to object that it is

5    beyond the scope of what we've offered him for and

6    to the extent it calls for speculation.

7             THE WITNESS:  My own research and research

8    done by others has found a large differential

9    between arrest rates for homicide for blacks and for

10   whites when you're talking about youthful men in the

11   same direction.

12            BY MR. THOMPSON:

13       Q.   Do you have any reason to believe that

14   those arrest rates don't accurately reflect actual

15   committing homicide?

16       A.   I'm sure that in many cases the arrests

17   are faulty, but I think that the overall pattern

18   is accurate.

19       Q.   Okay.  And then if -- you say in the last

20   sentence of this paragraph, "For all men in this age

21   range most all, 85 percent, homicides are committed

22   with guns."

23            Is your source for that statement the same

24   CDC Web site?

25       A.   It is, yeah.

COMPRESSED COPY

Page 31

1      Q.   All right.  And do you have an opinion as

2   to how many of those homicides would have occurred

3   if the perpetrator had not had access to a gun?

4      A.   There is a large differential in the

5   case fatality rate between attacks with a gun

6   and attacks with other commonly available

7   weapons.  And so in your hypothetical situation

8   suppose that instead of a gun the perpetrator

9   had used a knife.

10          Then we would expect that the case

11   fatality rate would have been substantially

12   less, perhaps a third of what we actually saw.

13   But that's -- it should be said, a series of

14   assumptions.

15          We would have to specify what the

16   alternative was, what the counterfactual is in

17   that case exactly.  And in some cases it's

18   possible that -- that there would have been no

19   attack at all.  So --

20          MR. THOMPSON:  All right.  Now, let's mark

21   as Cook Exhibit 3 the following document.

22          (PLAINTIFFS' EXHIBIT 3 WAS MARKED FOR

23   IDENTIFICATION.)

24          BY MR. THOMPSON:

25      Q.   And, sir, will you, please, identify this

COMPRESSED COPY

Page 32

1    document for the record?

2        A.    This is a copy of an article that is

3    called, "The Medical Costs of Gunshot Injuries

4    in the United States."  I am one of four

5    authors.  It was published in the Journal of the

6    American Medical Association in 1999.

7        Q.    Is there anything in this report indicating

8    that the medical costs would be lower if these

9    attacks had been committed with a knife?

10            MR. WOODS:  Are you asking if that

11   statement appears in the document?

12            MR. THOMPSON:  Or anything that would

13   support that statement.

14            THE WITNESS:  This study was limited to

15   medical cases where the victim had been shot -- or

16   the patient had been shot, and we did not do a

17   comparison with other types of wounds.

18            BY MR. THOMPSON:

19       Q.    All right.  Now, let's turn to the first

20   page.  The right-hand column, the first full

21   sentence in the right-hand column.  You say, "As a

22   rule, we were able to quantify the uncertainty about

23   the number of cases, but had no way to quantify the

24   uncertainty about the average cost."

25            What was the uncertainty about the average

COMPRESSED COPY

Page 33

1  cost that you're referencing there?

2      A.    We were using available data to do the

3  best job that we could in making estimates of

4  the cost of treating gunshot victims, and -- so

5  that it turned out that the best data that were

6  available, for example, on acute care costs came

7  from a limited number of jurisdictions.

8          And we were then using that information

9  from those jurisdictions to approximate the

10  costs for the United States as a whole.  And it

11  is possible that the costs in the State of

12  Maryland, for example, in fact, are somewhat

13  different than what we would expect in -- in

14  other states.

15          And it just -- it was not possible at

16  that time to obtain data for -- of a -- of a

17  representative sample of cases for the entire

18  nation.

19      Q.    Okay.  Now, if we turn to page 450, and we

20  look at the middle column, which there's a heading,

21  "Costs for ED-only injuries."  Do you see that, sir?

22      A.    This is table two?

23      Q.    Well, above table two.

24      A.    Oh, oh, I see.  "Estimated medical

25  charges for gunshot survivors."

COMPRESSED COPY

Page 34

```
 1        Q.    Then if we look in the third sentence under

 2    that heading, it says, "While these data are not

 3    from our reference year, 1994, and have charge

 4    rather than cost data, they are the best available

 5    data on this subject."

 6              What do you mean by, "charge rather than

 7    cost data"?

 8        A.    The distinction is between what the

 9    accountants and the hospital are actually

10    billing versus the -- some calculation that

11    might be done by the analysts for the marginal

12    costs or the additional costs associated with

13    treating a case of this sort.  And so that

14    sometimes there is a disparity between the two

15    of them, and -- so that it's important to know

16    which one we're talking about.

17        Q.    Is there also sometimes a disparity between

18    charge and cost because sometimes the hospital

19    submits an invoice, and the insurer doesn't pay the

20    full invoice?

21              MR. WOODS:  Objection.  It calls for

22    speculation.  It's vague and ambiguous.

23              THE WITNESS:  I'm sorry.  I actually do not

24    know the answer to that question.

25              BY MR. THOMPSON:
```

COMPRESSED COPY

Page 35

1     Q.   Well, when you did this report, did you

2   assume that all the charges that were submitted were

3   paid in full?

4          MR. WOODS:  Objection to the question;

5   vague, ambiguous.

6          THE WITNESS:  Let me say this, that the

7   purpose of this study was to estimate the cost to

8   the medical system of providing this care,

9   regardless of who was going to ultimately pay for

10  it.

11         And we did the best that we could about

12  determining the extent to which the payments were

13  received from the insurance company or from the

14  victim or were, in fact, borne by the provider,

15  which in some cases happens with an indigent --

16  indigent patient, but our -- our goal was twofold.

17  It was partly to estimate the cost and then partly

18  to estimate the distribution of payments.

19         BY MR. THOMPSON:

20    Q.   But, just to be clear, do you know whether

21  you assumed whether the charges were, in fact, paid

22  in full?

23         MR. WOODS:  Yeah, objection to the form of

24  the question; vague, ambiguous, asked and answered.

25         THE WITNESS:  I -- I'm -- I do not recall

COMPRESSED COPY

Page 36

 1    what the status of the charges were for the

 2    South Carolina data that we looked at.

 3            Of course, this was a study done from many

 4    different data sources, and we went on then to do an

 5    overall approximation about the distribution about

 6    who actually bore the costs, and -- and, as I say,

 7    some of -- some of those costs were borne by the

 8    hospitals and the providers and some by the

 9    insurance companies and some by others.

10            BY MR. THOMPSON:

11       Q.   And does the charge item that you utilized

12    include a profit component?

13            MR. WOODS:  I'm going to object to the form

14    of the question; vague and ambiguous.

15            THE WITNESS:  So there may in some cases

16    have been treatment provided by a for-profit

17    hospital.  Most hospitals are either government or

18    nonprofit, and so that there is no meaningful

19    concept of profit in that case.

20            BY MR. THOMPSON:

21       Q.   But for the for-profit hospitals, like

22    Columbia, HCA, for example, there would be a

23    component of profit in the charge; is that right?

24            MR. WOODS:  Objection to the form;

25    foundation.

COMPRESSED COPY

Page 37

```
 1              THE WITNESS:  So --
 2              MR. WOODS:  And as well as vague and
 3    ambiguous.
 4              Go ahead.
 5              THE WITNESS:  I -- I have no direct
 6    knowledge of Columbia, HCA and how they bill gunshot
 7    cases.
 8              BY MR. THOMPSON:
 9         Q.   Do you know what percentage of the
10    hospitals whose data you used were for-profit
11    hospitals?
12              MR. WOODS:  I'll object to the form of the
13    question; vague and ambiguous.
14              THE WITNESS:  I -- I do not know the answer
15    to that.
16              BY MR. THOMPSON:
17         Q.   For those hospitals that were for profit,
18    is it reasonable to assume that they had a component
19    of profit margin in their charges?
20              MR. WOODS:  Objection to form; calls for
21    speculation, assumes facts not in evidence.
22              THE WITNESS:  I could only answer in the
23    most general level.  So I have, as I say, no -- no
24    specific knowledge of the for-profit hospital
25    industry.
```

COMPRESSED COPY

```
 1              BY MR. THOMPSON:

 2       Q.    Do you have any general knowledge?

 3       A.    General knowledge --

 4              MR. WOODS:  Objection to the form.

 5              THE WITNESS:  -- is that for-profit

 6   companies are generally in the interest of earning

 7   some kind of return to their owners.

 8              BY MR. THOMPSON:

 9       Q.    Okay.  Now, let's look at page five of your

10   report, in the first full paragraph on page five.

11   At the end of that first full paragraph you have an

12   estimate of medical costs amounting to $63,000,000.

13   Do you see that?

14       A.    Yes.

15       Q.    Does that include costs -- medical costs

16   associated with gun homicide victims?

17       A.    Yes.  So the gun homicide victims,

18   the -- the bulk of the cost is from the

19   treatment of those being treated in the

20   emergency department or who were admitted to the

21   hospital.

22       Q.    Do you know of the 354 gun homicides how

23   many of those people died on the street?

24       A.    My calculations were based on the

25   assumption that the ratios involved were the
```

COMPRESSED COPY

Page 39

1   same for what we had computed from the study

2   that was published in the Journal of the

3   American Medical Association.

4           So in terms of the number who were

5   treated in the hospital and then died or treated

6   in the emergency department and then died or

7   were dead on the scene.

8           So in that study, for example, that --

9   it was true that about half of those were dead

10  on the scene.  I did not have that information

11  specifically for Chicago for that year.

12      Q.   Well, so when you say that they were -- you

13  were assuming that approximately half were dead on

14  the scene, did you subtract half of the 354 in

15  calculating the 63 million or not?

16      A.   Right, for -- for the medical costs

17  that --

18      Q.   Yeah.

19      A.   -- are associated with it.  And then

20  the -- of course, the number of nonfatal

21  injuries then is based on the entire figure for

22  the number of victims.

23      Q.   Do you have an opinion as to if all of

24  these homicides and assaults had occurred with a

25  knife what the medical cost to the City of Chicago

COMPRESSED COPY

Page 40

```
 1    would be as compared to your $63,000,000 number?

 2              MR. WOODS:  Objection; incomplete

 3    hypothetical.

 4              THE WITNESS:  I -- I have not done that

 5    study, and I don't have an opinion, sir.

 6              BY MR. THOMPSON:

 7        Q.   Do you have an opinion on how many of the

 8    354 gun homicide victims were engaged in criminal

 9    conduct at the time they were killed?

10              MR. WOODS:  Object to the form of the

11    question; vague, ambiguous.

12              THE WITNESS:  I have no opinion on that

13    subject.  No.

14              BY MR. THOMPSON:

15        Q.   Have you tried to net out the savings and

16    cost from incarceration of those who were killed

17    while committing a felony?

18        A.   No, I did not do that.

19        Q.   Do you know what the cost to the City of

20    Chicago is on an annual basis for incarcerating a

21    prisoner?

22        A.   I mean I -- I have no reason to believe

23    that any of the victims would have been put in

24    prison as an alternative.  That maybe some of

25    them would have.  Maybe some -- some of them
```

COMPRESSED COPY

1    not.  If they went to prison, I assume that the

2    costs would fall primarily on the State of

3    Illinois, not on the City of Chicago.  So --

4        Q.   You're saying that you don't -- do you have

5    an opinion that none of these individuals would have

6    been incarcerated?

7        A.   I said --

8             MR. WOODS:  Objection; mis --

9             THE WITNESS:  -- I had --

10            MR. WOODS:  Excuse me.

11            THE WITNESS:  Yeah.

12            MR. WOODS:  Objection; mischaracterizes his

13   testimony.

14            THE WITNESS:  Right.  No.  What I'm --

15            MR. WOODS:  And it's ambiguous and vague.

16            Go ahead.

17            THE WITNESS:  And I -- all I'm saying is I

18   have no reason to think any of them would have been

19   put into prison if they had not died, and that this

20   is not an issue that I've studied or analyzed.  And

21   I -- so I have no opinion about it.  But my opinion

22   is that the cost of state prisons in Illinois are

23   not borne directly by the city, but by the state.

24            BY MR. THOMPSON:

25        Q.   Okay.  Now, the $63,000,000 number that you

BRYANT COURT REPORTING SERVICES, INC.   (919)387-5853

COMPRESSED COPY

Page 42

```
 1    calculate, those are costs that were incurred in the
 2    face of a complete ban on public carriage in the
 3    City of Chicago and a ban on sales of firearms in
 4    the City of Chicago; correct?
 5        A.    There at the time was a partial ban on
 6    carriage, with a number of exemptions that were
 7    included, and a partial ban on handguns that
 8    exempted people who had been -- had a city
 9    permit in 1982, as well as people that were in
10    the law enforcement status and other groups.
11        Q.    Well, my question wasn't about possession.
12    My question was about, number one, there was a ban
13    on the sale of firearms at the time these
14    $63,000,000 in cost were incurred; correct?
15            MR. WOODS:  Objection; vague, ambiguous.
16            THE WITNESS:  There -- there was a ban that
17    would apply to ordinary citizens.  Yes.
18            BY MR. THOMPSON:
19        Q.    All right.  And was there a ban on public
20    carriage by ordinary citizens --
21            MR. WOODS:  Same objection.
22    BY MR. THOMPSON:
23        Q.    -- at the time these $63,000,000 in costs
24    were incurred?
25            MR. WOODS:  Same objection.
```

COMPRESSED COPY

Page 43

```
 1          THE WITNESS:  Yeah, my understanding was
 2    that the -- which may be imperfect -- is that the
 3    city ordinance at the time on carriage would have
 4    been similar to the state law.
 5          BY MR. THOMPSON:
 6      Q.   And so that would be a ban on carriage by
 7    ordinary citizens in public?
 8      A.   By people who were not deputy sheriffs
 9    or in some other fashion, and -- and the --
10    the -- the ban would be qualified by saying that
11    under some circumstances you could carry a gun
12    that -- that was locked up.
13      Q.   If it was disassembled and inoperable?
14      A.   I believe that's right, but this is not
15    an area that I am expert.  So --
16      Q.   Okay.  Now, let's go to the next paragraph,
17    where you say, "The medical costs are only a
18    fraction of the total cost of firearms violence to
19    the community."
20          Do you have an estimate as to what fraction
21    they are to the overall cost?
22      A.   For the United States as a whole our
23    estimate was that the medical costs were
24    approximately two percent of the total social
25    cost of gun violence.
```

COMPRESSED COPY

Page 44

1       Q.    And you say -- in the next paragraph you

2   reference social costs, and you say, "much of the

3   cost is subjective."

4             Why would it be appropriate to try to

5   consider subjective costs?

6       A.    Well, as I say in my statement, that

7   subjective costs are still real.  They affect

8   the quality of life.  People would be willing to

9   pay real money to reduce those costs, and that

10  is exactly what we were attempting to determine,

11  is how much they would be willing to pay.

12      Q.    Well, when you say that the medical costs

13  are only two percent of the total social cost, what

14  percent are the subjective cost of the total social

15  cost?

16      A.    We had a detailed study of the medical

17  costs, that is Exhibit 3, and so we had a -- a

18  good estimate of that.  And we had what we

19  considered to be a reasonable estimate of the

20  total social cost based on a contingent

21  valuation survey.

22            Now, what we did not have was the

23  ability to break down the total social costs by

24  which parts of it might be considered tangible,

25  out-of-pocket expenses that are associated with

COMPRESSED COPY

Page 45

1    avoiding gun violence and which part were

2    associated with the anxiety and pressures that

3    are associated with worrying about whether, for

4    example, your children are going to be shot if

5    they play outdoors.

6        Q.   Do you think these anxieties and pressures

7    are more than half of the total social cost?

8        A.   I do.

9        Q.   Do you think they're more than 75 percent

10   of the total social cost?

11       A.   Yes.

12       Q.   Do you think they're more than 90 percent

13   of the total social cost?

14       A.   I don't know on that one.

15       Q.   Okay.  Now, what are these subjective

16   costs?

17       A.   The subjective cost is the -- quite

18   literally is the amount people would be willing

19   to pay to eliminate the threat of gun violence

20   or to reduce the threat of gun violence for

21   themselves and their families.  And so that that

22   is the line of questioning that we used in the

23   national survey that we conducted, and that's

24   the basis for our estimate.

25       Q.   You referenced a moment ago anxieties and

COMPRESSED COPY

Page 46

1    pressures.  What were you referring to?

2         A.    That people who live in neighborhoods

3    where gun violence is a real threat and are

4    naturally worried about it, and they will often

5    attempt to move to a less desirable location in

6    other respects in order to have greater safety

7    for themselves and their children.

8              If they can't move for some reason, then

9    they may distort their lives in a variety of

10   ways to try to stay safe, including not going

11   out, keeping the children in, and, in extreme

12   cases, of course, there are accounts of mothers

13   who have their children sleep in bathtubs to cut

14   down on the crossfire.

15             There is also just the mental health

16   cost associated with the -- feeling under threat

17   of gun violence, trauma associated with knowing

18   people who have been shot in the neighborhood,

19   and -- so that there's a series of consequences,

20   which are real, and -- and, of course, increased

21   depending on the level of gun violence in the

22   neighborhood.

23        Q.    Other than the study that you cite in

24   footnote seven, is there any support in the academic

25   literature for this notion that social costs

COMPRESSED COPY

1    associated with gun violence are real?

2              MR. WOODS:  Objection to the form of the

3    question; vague, ambiguous.

4              THE WITNESS:  We are the first to apply

5    this method to this particular problem, and -- but

6    the method that we used has been widely used in

7    other areas, in terms of efforts, for example, to

8    assess the subjective costs of environmental damage.

9              After we published our report, there have

10   been studies using the same approach to assess the

11   subjective costs of different types of crime.  And

12   both our study and the subsequent studies that have

13   been done in this area have been widely cited in the

14   literature by social scientists and policy

15   scientists as the basis for an accurate assessment

16   of the problem.

17             MR. WOODS:  We've been going for about an

18   hour.

19             MR. THOMPSON:  Oh, okay.

20             MR. WOODS:  Could we take a short break.

21             MR. THOMPSON:  Yeah.

22             THE VIDEOGRAPHER:  This is the end of tape

23   number one.  The time is 9:05.

24             (RECESS FROM 9:05 A.M. TO 9:14 A.M.)

25             THE VIDEOGRAPHER:  This is tape number two

COMPRESSED COPY

```
 1    in the deposition of Philip J. Cook.  The time is

 2    9:14.

 3                MR. THOMPSON:  All right, sir, and I'd like

 4    to ask the court reporter to mark as Cook 4 the

 5    following document.

 6                (PLAINTIFFS' EXHIBIT 4 WAS MARKED FOR

 7    IDENTIFICATION.)

 8                BY MR. THOMPSON:

 9        Q.   And will you, please, identify that

10    document for the record, sir?

11        A.    This is an article called, "The Benefits

12    of Reducing Gun Violence:  Evidence From

13    Contingent-Valuation Survey Data."  I was a

14    coauthor of this article, and it was published

15    in 2001.

16        Q.   All right.  Now, the data you utilized come

17    from 1998; is that right?  If you'd turn to page

18    208, the last full paragraph, first sentence.

19        A.   Yes.  That -- that is correct.

20        Q.   Okay.  Now, when crime goes down, fear goes

21    down; is that correct?

22                MR. WOODS:  Objection to the form;

23    overbroad, vague, ambiguous.

24                THE WITNESS:  There have been a variety of

25    studies of the connection of -- of fear or concern
```

COMPRESSED COPY

Page 49

1   and -- and the objective crime rate with mixed

2   results.  So I don't think that there is a strong

3   conclusion from that literature.

4            BY MR. THOMPSON:

5       Q.   Do you have an opinion one way or the other

6   as to whether when crime goes down the fear of crime

7   goes down?

8            MR. WOODS:  Objection to -- same objection;

9   vague, ambiguous, overbroad.

10           THE WITNESS:  I do not have an opinion.  I

11  think it would depend on how the questions were

12  asked.

13           BY MR. THOMPSON:

14      Q.   Why would that make a difference?

15      A.   The people -- when -- people's responses

16  to a question about their mental state are going

17  to respond perhaps differently, depending

18  exactly what the sequence of questions is.  So

19  the -- the literature on -- on fear has, as I

20  say, produced mixed results about the

21  association with crime, as measured by the

22  police.

23      Q.   And if you were putting together a study

24  that was intending to analyze that question, and you

25  asked the questions in a sequence and phraseology

COMPRESSED COPY

Page 50

1    that was least subject to bias or misinterpretation,

2    what do you think your study would find as to

3    whether when crime rates go down the fear of crime

4    goes down?

5          MR. WOODS:  Objection to the form of the

6    question; as vague, ambiguous, incomplete

7    hypothetical and calls for speculation, beyond the

8    scope of his report.

9          THE WITNESS:  All I can say is I would like

10   to do that study, but I haven't, and I can't predict

11   with any confidence.

12         BY MR. THOMPSON:

13     Q.    Okay.  Do you know whether crime rates have

14   come down since 1998?

15         MR. WOODS:  Objection to the form;

16   overbroad, vague.

17         THE WITNESS:  Between 1998 and 2010, some

18   of the indicators that we have for crime have come

19   down.  Yes.

20         BY MR. THOMPSON:

21     Q.    And do you know whether the fear of crime

22   has come down since 1998?

23     A.    I --

24         MR. WOODS:  Same objections.

25         THE WITNESS:  I -- I do not know and can't

COMPRESSED COPY

```
 1   say.

 2            BY MR. THOMPSON:

 3       Q.   Okay.  All right.  Now, let's turn to page

 4   211 of your study.  And in the second full

 5   paragraph, first sentence, you state, "Whether even

 6   high quality CV" -- and, "CV," is contingent

 7   valuation; is that right?

 8       A.   Yes.

 9       Q.   "Whether even high-quality,

10   contingent-valuation studies produce reliable

11   estimates of willingness to pay" --

12       A.   Yes, right.

13       Q.   -- "remains the topic of ongoing debate.

14   One concern is that individuals will have limited

15   information about the nature of the risk that is

16   being asked about."

17            Why is that a concern?

18       A.   I go on in the same paragraph to

19   indicate that that should not pose a problem for

20   this particular study, because whatever

21   information people have, they certainly have an

22   impression, and they are acting on that

23   impression.

24            So that they make decisions on a

25   day-by-day basis about how much they need to do
```

BRYANT COURT REPORTING SERVICES, INC.  (919)387-5853

COMPRESSED COPY

Page 52

1  to protect their families, how much they need to

2  do to protect themselves, where they should

3  drive, where they should go out to dinner or the

4  movies, and those decisions are being influenced

5  by their impression about gun violence.

6      Q.   Is there a multiplier effect to these

7  social costs, in that if you're too afraid to go

8  out, and you don't go to dinner, then that has an

9  impact on the real economy?

10      MR. WOODS:  Well, object on the grounds

11  that it's vague and ambiguous, incomplete

12  hypothetical.

13      THE WITNESS:  That -- that is not a subject

14  that I've studied.

15      BY MR. THOMPSON:

16      Q.   So you don't have an opinion on it?

17      A.   Not as an expert.  No.

18      Q.   Okay.  Do you have a nonexpert opinion on

19  it?

20      MR. WOODS:  Objection to the question;

21  calls for speculation.

22      THE WITNESS:  I will say that I know that

23  mayors often are concerned about gun violence,

24  because they think that it keeps people from coming

25  in to downtown areas and shopping and going to

COMPRESSED COPY

Page 53

1   restaurants and generally making those downtown

2   areas thrive.

3          BY MR. THOMPSON:

4      Q.   Now, if we look at the next paragraph, that

5   says, "Another concern stems from the tendency of

6   survey respondents to present themselves favorably

7   to interviewers."

8          What are you referring to there?

9      A.   Well, to some extent a survey is a

10  conversation between the questioner and the

11  respondent, and -- so that there has been a

12  well-documented tendency for respondents to

13  present themselves in a favorable light in the

14  course of that conversation to -- yeah.

15     Q.   All right.  And if we look at the next

16  sentence, it says, "Perhaps the primary concern that

17  most economists have about contingent valuation

18  research is that respondents have no incentive to

19  take the question seriously since they relate to

20  hypothetical rather than actual market behavior."

21         Why is that the primary concern?

22     A.   This is a concern that has come from

23  the -- out of the literature on designing

24  contingent-valuation surveys in other areas, and

25  not -- not in the gun violence area.

COMPRESSED COPY

Page 54

1        And the people who have studied, for

2    example, the valuation of environmental

3    amenities have been using this method, as I say,

4    in a very -- similar to the way that we ended up

5    using it, but in their judgment, based on their

6    experience, that this is one of the concerns

7    about getting an accurate measure of people's

8    true beliefs is the --

9        Now, whether they're correct on that is

10   something that I can't comment on directly.  I

11   haven't done those studies myself.

12       And I will say this, and that is that we

13   found in our contingent-valuation study that the

14   patterns of responses that we were getting were

15   quite sensible in a variety of ways, and it did

16   appear that people were taking them seriously.

17   Q.    And is the concern here that, for example,

18   you could say to someone, would you be willing to

19   spend $10,000 to reduce gun violence, and they might

20   say, yes, but if they actually went into the ballot

21   box to vote on a referendum, and it was actually

22   going to cost them $10,000, they might be more

23   parsimonious?

24       MR. WOODS:  Objection to the form of the

25   question; incomplete hypothetical.

COMPRESSED COPY

Page 55

1          THE WITNESS:  So, for the record, first of

2     all, we did not ask them to -- about their

3     willingness to spend $10,000, but, rather, $50 or

4     $100.  And so it was a small and credible amount

5     that might be associated with a ballot initiative.

6          And there, of course, as in any survey, is

7     a concern about the accuracy of the responses that

8     you get in this kind of situation, that they might

9     not correspond exactly to what you would get if you

10     observed actual behavior.

11          BY MR. THOMPSON:

12          Q.   All right.  Now, are you aware of any

13     criticism in the academic community about

14     contingent-valuation studies?

15          A.   There has been criticism, certainly.

16     Yes.

17          Q.   Does that criticism include criticism by

18     Kenneth Arrow?

19          A.   There have been a number of economists

20     and -- of whom Kenneth Arrow is an economist, of

21     course, and other scholars who are concerned

22     about it for -- as a basis for making accurate

23     judgments.

24          But I want to say that the basic idea is

25     not contested by economists.  And that basic

COMPRESSED COPY

Page 56

1  idea is that there are subjective valuations,

2  which are real, that they should be assessed as

3  part of an overall evaluation of any kind of

4  program.

5       And then, beyond that, all that we're

6  talking about is what is the best method to

7  determine what those valuations are.

8       Q.   Well, what are the criticisms that

9  Mr. Arrow makes about using contingent valuation

10  methods?

11       MR. WOODS:   Objection to the form; vague,

12  ambiguous, overbroad.

13       THE WITNESS:   I'm not prepared to report on

14  Kenneth Arrow's objection.

15       BY MR. THOMPSON:

16       Q.   Do you know what the objections of others

17  are to this methodology?

18       MR. WOODS:   Same objections.

19       THE WITNESS:   I -- I -- I would say that

20  the objections start with a concern that sometimes

21  there are patterns of responses that you receive

22  from your survey sample that do not appear

23  reasonable by some external judgment, but that is

24  certainly not always the case.  That often they do

25  turn out to be very reasonable.

COMPRESSED COPY

Page 57

1         And that for that reason it is extremely

2    important that questions be carefully crafted and

3    that people be asked to respond in a way that they

4    are familiar with.

5         And for that reason we did not ask them

6    simply how many dollars would you pay someone, in an

7    abstract way, for reducing gun violence, but,

8    rather, we said, here's a concrete situation, in

9    effect, that you're familiar with, and that is

10   voting, and voting on a ballot measure for an

11   initiative that would reduce gun violence by a

12   specified amount.

13        And part of the measure indicates that it's

14   going to cost something to taxpayers, including you.

15   So what we're asking them to do is a task that they

16   are familiar with and can -- can imagine doing and

17   is very -- almost similar in a way, the response --

18   the verbal response is similar to casting the

19   ballot.

20        So we felt that this was the best approach

21   to elicit the true valuations and to get people to

22   respond in a sensible way.  This also is the favored

23   way and -- by many of the scholars, who worked in

24   this area.

25        BY MR. THOMPSON:

COMPRESSED COPY

Page 58

1    Q.   All right.  Now, let's turn back to your

2  expert report.  You can put that study aside.

3         And we're still on page five.  Let's go to

4  the second full paragraph, the second sentence.  You

5  say, "The threat of being shot causes private

6  citizens and public institutions to under stake" --

7  "undertake a variety of costly measures to reduce

8  this risk, such as weapons screenings to schools and

9  public buildings."

10         If there were no private ownership of guns,

11  but people were walking around with switchblades,

12  would there still be weapons screening at schools?

13         MR. WOODS:  Objection; incomplete

14  hypothetical, calls for speculation.

15         THE WITNESS:  It's possible, but the

16  greatest concern I would believe -- and, again, I

17  don't have a survey of school principals readily at

18  hand, but that the greatest concern has been

19  bringing guns into school.

20         That I think it's also the concern

21  certainly which motivates -- primarily motivates the

22  kind of guarding -- the kind of secret service

23  activities that are used to protect public

24  officials, is that somebody is going to take a shot

25  at them and that they have to worry about that.

COMPRESSED COPY

Page 59

1          And if we had a situation where the only

2    thing that we had to worry about was knives, then

3    the objective threat would be greatly reduced.  The

4    ability to launch an effective attack on a public

5    official or on -- within a school would be greatly

6    reduced.

7        Q.    What about if there were -- there's a

8    threat of bombs, isn't that another reason why

9    public buildings have screening mechanisms, to try

10   to prevent people from bringing bombs into those

11   buildings?

12          MR. WOODS:  Objection to the form; calls

13   for speculation, vague and ambiguous, foundation.

14          THE WITNESS:  I -- I don't know how many

15   screening mechanisms that are in place in public

16   buildings and schools actually are designed to

17   detect bombs.  My -- so I don't know the answer.

18          BY MR. THOMPSON:

19       Q.    Well, what about government buildings,

20   let's say a courthouse.  Do you have an opinion on

21   whether those screening mechanisms are designed to

22   ensure that bombs do not come into courthouses?

23          MR. WOODS:  I'm -- same objections.

24          THE WITNESS:  I don't know whether they can

25   detect a bomb or not.  The -- they can detect metal,

COMPRESSED COPY

Page 60

```
 1   but I don't know that they can detect a bomb.
 2              BY MR. THOMPSON:
 3       Q.   Many bombs have metal in them; correct?
 4              MR. WOODS:  Objection to the form; vague,
 5   ambiguous.
 6              THE WITNESS:  I'm sorry.  I'm --
 7              MR. WOODS:  Excuse me.
 8              THE WITNESS:  Yeah.
 9              MR. WOODS:  Objection to form; vague,
10   ambiguous, overbroad.
11              THE WITNESS:  I -- I am not an expert on
12   the construction of bombs.  I'm sorry.
13              BY MR. THOMPSON:
14       Q.   So you don't know whether many bombs have
15   metal in them?
16              MR. WOODS:  Same objections; asked and
17   answered.
18              THE WITNESS:  I don't know.
19              BY MR. THOMPSON:
20       Q.   Is it your opinion that if there were no
21   guns in the City of Chicago that public buildings
22   would not have screening mechanisms to keep weapons
23   and bombs out of them?
24              MR. WOODS:  Objection to form; foundation,
25   calls for speculation.
```

COMPRESSED COPY

Page 61

1          THE WITNESS:  That would be, I think, a

2     safe prediction, but it is not based on direct

3     observation or -- or any kind of survey of the

4     relevant officials.

5          BY MR. THOMPSON:

6          Q.    A safe prediction that there would continue

7     to be screening?

8          A.    I'm sorry.  A safe prediction that the

9     expenditure on security and the nature of the

10    security would be greatly reduced.

11         Q.    But there would still be some screenings to

12    try to keep bombs out of public buildings; correct?

13         A.    I have no idea.

14         Q.    Okay.  Now, you say in the next sentence,

15    "Furthermore, the threat of gun violence is in some

16    neighborhoods an important disamenity."

17              What do you mean by disamenity?

18         A.    A disamenity would be like smoke or

19    noise or heavy traffic or graffiti or the lack

20    of available shopping, poor access to public

21    transportation.

22              So these are a variety of disamenities

23    that might affect a neighborhood.  And to that

24    list I would include the threat of gun violence,

25    the fact that neighbors hear gunshots, that they

Page 62

1    know of people who live nearby who have been

2    victims.  That that would all be part of the

3    burden of living in those -- sort of the

4    disamenity of living in a neighborhood of that

5    sort.

6         Q.   Okay.  Now, you say in the last sentence on

7    paragraph -- on page five that, "Jens Ludwig has

8    testified about the implications of these findings

9    for the City of Chicago, noting that the relatively

10   high homicide rate in Chicago could account for the

11   population decline in the city since 2000."

12        Do you know what the birth rate has been in

13   the City of Chicago since the year 2000?

14        A.   No, I do not.

15        Q.   Are birth rates much more important for the

16   City of Chicago's population growth or decline than

17   homicide rates?

18        A.   The overall population of the City of

19   Chicago will depend on migration into the city,

20   migration out of the city, death rates and birth

21   rates, and all of those are going to be

22   important person by person.

23        Q.   And my question is:  Do you know whether

24   birth rate is more important than homicide rate in

25   determining the population decline or growth of the

COMPRESSED COPY

Page 63

1    City of Chicago?

2         A.   I mean that -- that seems to me to be an

3    answer that would -- or a question that would be

4    difficult to answer.  I'm not sure why we would

5    compare the two of them.

6              We have evidence about the effect of the

7    homicide rate on migration, and that's what we

8    were -- or that's what Ludwig was focusing on in

9    this case.

10             It's not a comparison with anything else

11   that might affect the population during this

12   period.  He simply notes that there has been a

13   reduction in the population in the City of

14   Chicago, and that from what we know about

15   homicide we could say that it is sufficient

16   simply to say that it was homicides and the high

17   homicide rate that can explain that.

18        Q.   Can explain all of the population decline?

19        A.   That it would be sufficient to explain

20   all of the population decline.  Yes.

21        Q.   The homicide rate?

22        A.   Exactly.

23        Q.   Are you saying that the homicide rate is

24   correlated with the birth rate in the City of

25   Chicago?

COMPRESSED COPY

1        A.    No.   The -- the analysis that he was

2    doing, which also is in our book, refers to the

3    fact that homicide is a disamenity.   It makes

4    living in a particular area less attractive when

5    there is a killing nearby.

6              And there is direct evidence that when

7    there are killings in the neighborhood people

8    move out or they don't move in.   And there have

9    been enough extra killings -- killings that were

10   the -- say the national homicide rate in the

11   City of Chicago that if we put that together

12   with the statistics on population decline, we

13   could say that that high homicide rate by itself

14   is sufficient to account.

15             So it's -- the thought experiment would

16   be suppose that the City of Chicago had a lower

17   homicide rate, and had it from 2000 to 2010.

18   Say it had the national homicide rate.   Then

19   what would have happened to the population

20   during that time?

21             And based on the numbers that we have in

22   our book, we ended up -- he ended up saying that

23   the population would not have declined.   It

24   would have increased.   And this -- this is --

25   again, it's his calculation, but I'm simply

COMPRESSED COPY

Page 65

1  telling you.

2        Q.    Do you agree with it?

3        A.    I think the key to doing this kind of

4  calculation is the assumption that each murder

5  causes a reduction of 70 residents.

6             And that assumption is actually based on

7  analysis that was done, looking in a study that

8  was -- the analysis was published in a refereed

9  study, not by Ludwig or myself, but -- but by

10  Steven Levin and an associate.

11             And we read that study and believe that

12  the result is sound, in terms of the method of

13  analysis that they were using.  So we ended up

14  accepting his estimate and using it.

15        Q.    If Chicago had had a murder rate equal to

16  the national average of major American cities, do

17  you have an opinion as to how much larger its

18  population would have been, holding everything else

19  constant?

20        A.    That -- that is the experiment.  It's

21  comparing the actual murder rate in Chicago to

22  another murder rate that they might aspire to,

23  whether it is the average for large cities or

24  whether it's the murder rate for New York City

25  or the murder rate for the nation as a whole.

COMPRESSED COPY

Page 66

1          That you can do the thought experiment

2    in any of those ways.  And that gives you the --

3    the basis for doing the arithmetic.  I can't do

4    the arithmetic while I sit here.  So --

5          Q.   But do you know what baseline Mr. Ludwig

6    used, whether it was the national average or the

7    average for large U.S. cities?

8          A.   My -- I'm sorry.  I'm not clear about

9    that.  I could certainly consult with that

10   testimony.  So --

11         Q.   Well, let me ask it this way:  What do you

12   think the right way analytically is to do that

13   analysis?

14              MR. WOODS:  Objection to the form; vague,

15   ambiguous.

16              BY MR. THOMPSON:

17         Q.   What's the proper benchmark to compare

18   Chicago's homicide rate to?

19              MR. WOODS:  Same objection.

20              THE WITNESS:  I think one benchmark that

21   makes sense, if what we're looking for is a

22   benchmark that is credible, would be to compare

23   Chicago to New York City, for example.

24              And -- so that we could say, suppose that

25   Chicago had achieved the same sort of decline in the

COMPRESSED COPY

Page 67

1   homicide rate that New York City did, and -- and

2   then make that kind of comparison, because they're

3   both large cities, started at one time with high

4   homicide rates, and New York City was somewhat more

5   successful in reducing theirs, and so that seems

6   interesting.

7           BY MR. THOMPSON:

8       Q.   Do you know why New York was more

9   successful in reducing their homicide rate?

10          MR. WOODS:   I'll object on the grounds of

11  beyond the scope.

12          THE WITNESS:   What I -- I know about that

13  is that there is a very lively debate among social

14  scientists over just that question, and I attended a

15  conference on it last week.

16          BY MR. THOMPSON:

17      Q.   And do you have an opinion on why -- you,

18  yourself, have an opinion on why New York has been

19  more successful in lower its murder rate than

20  Chicago?

21          MR. WOODS:   Yeah, and that's beyond the

22  scope of what we're offering for him in this case.

23          THE WITNESS:   So I do not have an opinion.

24          BY MR. THOMPSON:

25      Q.   Okay.  Do you know how much Chicago's

COMPRESSED COPY

Page 68

1    population has declined since 2000?

2        A.   I -- I don't have that fact handy.

3    So --

4        Q.   Do you -- is it true that cost of living

5    would be a factor that influences migration in and

6    out of Chicago?

7            MR. WOODS:  Objection to form; foundation,

8    speculation.

9            THE WITNESS:  I think as a -- as a general

10   issue, of course, the population of the city and the

11   decisions to move in and out will depend on a

12   variety of factors, about how attractive it is to

13   live in the city and how affordable.

14           And -- so that it certainly is true that --

15   or reasonable to think that the crime rate and the

16   threat to people who live there is part of that

17   explanation, and that there are also other factors

18   that would influence it.

19           BY MR. THOMPSON:

20       Q.   And the other factors include cost of

21   living; correct?

22       A.   Let me just say that if you mean the

23   cost of living there, compared with the cost of

24   living in other places that are available

25   nearby, that that seems reasonable, but this is

COMPRESSED COPY

1    not an area on which I'm expert.

2         Q.    Another factor that would affect migration

3    would be taxation, correct, levels of taxation?

4         A.    It's possible.  Yeah.

5         Q.    Another factor that would affect migration

6    in or out of Chicago are employment opportunities;

7    is that correct?

8         A.    Certainly that's possible.

9         Q.    Okay.  Now, let's turn to page six in your

10   report.  You say in the first sentence, "Guns

11   providing means of inflicting a fatal wound quickly

12   from a distance requiring relatively little personal

13   risk, determination, involvement or strength."

14             What is your basis for making this

15   statement?

16        A.    The basis is implicitly a comparison

17   between guns and other readily-available

18   weapons, where the most important of those would

19   be knives of various kinds and clubs, as well as

20   bare hands.

21             So, based on that comparison, a gun -- a

22   functioning gun, a functioning loaded gun, as a

23   matter of common knowledge, would provide all of

24   these attributes.

25        Q.    Is there any other readily-available weapon

COMPRESSED COPY

Page 70

1    that would fit this criteria -- these criteria?

2        A.   I -- I would say the answer is, no.

3    That, you know, in very unusual circumstances

4    there may be an opportunity to use a different

5    method, but, by and large, for the kinds of

6    encounters that result in homicides, this -- the

7    alternative to the gun is going to be a knife or

8    a club or bare hands.

9        Q.   Why do you say, "requiring relatively

10   little personal risk"?

11       A.   So that an attack with another type of

12   weapon that requires personal contact with the

13   victim or with the intended victim provides the

14   victim with an opportunity to fight back and

15   perhaps foil the attempt.

16       Q.   Don't these very attributes of guns make

17   them a preferred weapon of self-defense for many

18   individuals?

19       A.   I think it is -- it is true that guns

20   are sought and possessed for self-defense

21   purposes partly for these reasons.  And whether

22   that is wise or unwise is a different matter,

23   but I think that if you say, why do people say

24   that they have a gun for self-defense, then

25   their preference would reflect their

COMPRESSED COPY

1  understanding of the special attributes of the

2  gun compared with other weapons.

3       Q.   Is there any weapon that is more effective

4  for self-defense than a gun in your opinion?

5            MR. WOODS:  Objection to the form; vague

6  and ambiguous.  It's also outside the scope of what

7  he's been asked to testify on.

8            THE WITNESS:  I think that it would be very

9  important to spell out the circumstances, in that

10  there's not going to be a generic answer to that

11  question.  So that we'd have to talk about specific

12  cases, about what might be done and what would be

13  appropriate or prudent to do.

14            BY MR. THOMPSON:

15       Q.   Are there some circumstances in which a gun

16  is the best method for self-defense?

17            MR. WOODS:  Same objections.

18            THE WITNESS:  I mean I'm -- I'm certainly

19  willing to believe that that's true, that if it's

20  possible for the intended victim to actually have a

21  gun and deploy it, and that it knows what -- how to

22  use it, and that the assailant gives them that

23  opportunity, and that there are -- there's no

24  opportunity to talk their way out of it or to flee

25  or -- or to respond in some other fashion, that

COMPRESSED COPY

Page 72

1    there may be instances in which that is correct.

2          But I -- I think that this is not an area

3    where you would want to make some blanket statement.

4    You'd have to be very careful about the details, and

5    the details matter.

6          BY MR. THOMPSON:

7          Q.   Now, you talk in the next paragraph about,

8    "The goal of separating guns from criminal violence

9    is somewhat distinct from the goal of reducing

10   overall rates of criminal violence."

11         Please, explain?

12         A.   It is my finding from the research I've

13   been doing, going back to the 1970's, that the

14   availability of guns in a jurisdiction does not

15   have an effect on the volume or the rate of

16   robbery or assault.

17         It does have an effect on the likelihood

18   that robberies and assaults involve guns.  That

19   is, that the perpetrator used guns instead of

20   one of the other weapons we've been talking

21   about.

22         So we can then talk about policies that

23   are designed to limit gun availability to

24   criminals and to dangerous people, with the

25   belief that what they will accomplish is

COMPRESSED COPY

Page 73

1    reducing the likelihood that assaults and

2    robberies will be committed with a gun, even if

3    ·we do not believe that they will affect the

4    overall number of robberies and assaults.

5         Q.   All right.  Now, what is an instrumentality

6    effect?

7         A.   The instrumentality effect is the causal

8    effect of using one type of weapon, rather than

9    another, on the likely outcome of an attack.

10   That's -- that's what it means in this context.

11              And so, in particular, the

12   instrumentality effect in connection with gun

13   violence would attribute the higher case

14   fatality rate in gun assaults and gun violence

15   when compared with knives.

16        Q.   What about as compared to ice picks?

17        A.   An ice pick I would put into the same

18   category as knives and other cutting

19   instruments.

20        Q.   Have you seen any empirical data on ice

21   picks and their instrumentality effects?

22        A.   I have never seen any special study of

23   ice picks.  No.

24        Q.   Now, you say later on in page six, in the

25   last full paragraph, second sentence, that victims

COMPRESSED COPY

Page 74

```
 1    were more likely to die in larger caliber shootings.

 2    Why is that true?

 3         A.   Well, the author of the study, Franklin

 4    Zimring, attributed that to the fact that a

 5    larger caliber weapon is going to cause a more

 6    grievous wound when used in the same fashion as

 7    a small caliber weapon.

 8              And that, in fact, that a larger caliber

 9    weapon was more -- intrinsically more lethal.

10    So if it were used in the same fashion as a

11    small caliber weapon, the likelihood the victim

12    will die is going to be higher with a .45

13    caliber than with a .22 caliber, for example.

14              MR. THOMPSON:  All right.  I'd like to mark

15    as Cook Exhibit 5 the following book.

16              (DISCUSSION HELD OFF THE RECORD.)

17              (PLAINTIFFS' EXHIBIT 5 WAS MARKED FOR

18    IDENTIFICATION.)

19              BY MR. THOMPSON:

20         Q.   And would you, please, identify this

21    document for the record, sir?

22         A.   Well, on the top of the document is an

23    article entitled, "The Technology of Personal

24    Violence," which I wrote and published in 1991,

25    in a volume edited by Michael Tonry, called,
```

COMPRESSED COPY

Page 75

1    "Crime and Justice."  And it -- and with a quick

2    reading it looks like you have also copied the

3    rest of that volume.

4         Q.   Okay.

5         A.   But I can't testify to that.

6         Q.   Okay.  Now, let's turn to page three.  By

7    the way, what year did you publish this study?

8         A.   1991.  Twenty years ago.

9         Q.   Okay.  And you say towards the top of page

10   three, it's the fourth or fifth line down, "Since

11   the early 1970's there has not been much variation

12   in death rates from homicide and suicide.  Although,

13   there are interesting trends in the use of guns and

14   personal violence during this period and a

15   remarkable surge in homicide among black" -- "black

16   youths since 1984."

17           Is it still true, now 20 years later, that

18   there has not been much variation in death rates

19   from homicide since the early 1970's?

20        A.   I'm sorry.  I would have to check the

21   data to be able to provide you an answer with

22   that question.

23        Q.   You don't know whether murder rates in the

24   United States in -- in 1970, how they compare to

25   murder rates today?

COMPRESSED COPY

Page 76

1          MR. WOODS:  Objection; mischaracterizes

2    testimony.

3          Go ahead.

4          THE WITNESS:  I -- I'm sorry.  I

5    misunderstood the question.

6          BY MR. THOMPSON:

7     Q.    Okay.  So --

8     A.    Yeah.

9     Q.    Let me just ask this:  Do you know how

10   murder rates in 1970 compare to murder rates today

11   in the United States?

12    A.    So --

13         MR. WOODS:  Objection to the form; vague,

14   ambiguous, overbroad.

15         THE WITNESS:  I believe it is true that

16   murder rates today are somewhat lower than they were

17   in 1970 and certainly much lower than they were in

18   1991.

19         BY MR. THOMPSON:

20    Q.    Okay.  And do you have a rough estimate as

21   to how many guns were privately owned in the

22   United States in 1970?

23    A.    I -- I don't have that on the top of my

24   head.  I'm sorry.

25    Q.    Do you have a rough estimate of how many

COMPRESSED COPY

1    guns were privately owned in the -- in the

2    United States in 1990?

3        A.   I believe that my estimates at the time

4    were on the order of 200 million guns, and the

5    survey that I conducted -- or that I analyzed a

6    few years later had an estimate of about that.

7        Q.   Okay.  And --

8        A.   A bit -- a bit lower than that.

9        Q.   Okay.  And then today do you have an

10   estimate as to approximately how many guns are

11   privately owned in the United States?

12       A.   I think that in the United States there

13   are most likely between 200 million and 300

14   million guns.

15       Q.   But there are certainly more guns in the

16   United States today than there were in 1990; isn't

17   that right?

18       A.   I don't think there's anything certain

19   about the private ownership of guns in the U.S.

20   We -- we for some periods have statistics on

21   sales of new guns, and we can track those, but

22   we never have statistics on the number of guns

23   that have been discarded or are broken or

24   exported illegally to Mexico or Canada or the

25   Caribbean.

COMPRESSED COPY

Page 78

1       And -- nor do we have ongoing surveys

2   that attempt to determine the number of guns in

3   private hands.  So I think that we have very

4   little basis for making a judgment about how

5   many guns today, how many guns at some previous

6   time and how it's changed, because there is no

7   consistent measure available.

8       Q.   So do you have an opinion on whether there

9   are more guns today privately owned in the

10  United States than there were in 1990?

11      A.   I -- I do not have an opinion about the

12  number of guns in private hands.  I have --

13  certainly we have some statistics on the

14  percentage of households that own at least one

15  gun, but what is lacking is statistics on the

16  number of guns that the gun-owning household has

17  on average.

18      Q.   And do you have an opinion as to whether

19  there are fewer guns in the United States today than

20  there were in 1990?

21      A.   No.  I --

22          MR. WOODS:  Objection; asked and answered.

23          THE WITNESS:  My judgment is that we don't

24  have a basis for making confident assertions on this

25  question one way or another.

COMPRESSED COPY

Page 79

1          BY MR. THOMPSON:

2          Q.   Do you -- is it true that the decrease in

3     murder rates from 1990 to the present is not

4     attributable to a decrease in the number of guns

5     privately owned in the United States?

6               MR. WOODS:   Objection to the form; vague,

7     ambiguous.

8               THE WITNESS:   I -- I do not, again, have a

9     confident conclusion about that.   In the absence of

10    good information on the number of guns in

11    circulation it would be even hard to know how to do

12    the study that would break out this particular piece

13    of the overall puzzle about the murder decline

14    during that last 20 year period.

15              I think everybody understands that there

16    are a number of different causes to murder and to

17    criminal homicide, and -- so what we're talking

18    about is holding everything else constant, does

19    somehow a change in gun availability or the

20    prevalence of guns have something to say -- or

21    have -- has it had some influence in achieving this

22    nice result?

23              And I do not have the statistics on the

24    total number of guns, if that's what the issue is,

25    to be able to explore that issue.   So that what we

COMPRESSED COPY

Page 80

1   were left to look at would be other aspects of gun

2   availability.

3          BY MR. THOMPSON:

4       Q.   Do you have an opinion on whether gun

5   prevalence is a causal factor in the decrease in

6   murder rates in the United States from 1990 to the

7   present?

8          MR. WOODS:   Objection; asked and answered.

9   It's also vague and ambiguous.

10          THE WITNESS:   Well, I do have an opinion.

11   And let me just say again that -- I want to qualify

12   it by saying this has not been the kind of variation

13   that I have looked at myself in a systematic way,

14   but that I think it is a reasonable judgment that

15   the decline in gun prevalence that has occurred over

16   the last 30 years may get part of the credit for the

17   decline in domestic homicide.

18          BY MR. THOMPSON:

19       Q.   When you say, "decline in gun prevalence,"

20   you're -- you're measuring that by reference to the

21   number of households that own a gun?

22       A.   The percentage of households that own a

23   gun.  Yes.

24       Q.   Okay.  And not with respect to how many

25   guns are actually owned by those households;

COMPRESSED COPY

Page 81

1  correct?

2      A.    That's right.   That is the distinction.

3      Q.    Okay.   What percentage in your opinion of

4  the decline in the murder rate is attributable to

5  the decrease in the percentage of households that

6  own guns from 1990 to the present?

7          MR. WOODS:   Objection; vague, ambiguous,

8  asked and answered.

9          THE WITNESS:   As I say, I have not done a

10  systematic study of this issue, and -- so that any

11  number I gave you would be too speculative to be

12  interesting.

13          BY MR. THOMPSON:

14      Q.    What are the other factors that affect the

15  murder rate in the United States from 1990 to the

16  present that would affect the decline?

17      A.    The decline --

18          MR. WOODS:   Objection to the form.

19          THE WITNESS:   -- in the murder rate --

20          MR. WOODS:   Sorry.   Objection to form;

21  vague, ambiguous.

22          THE WITNESS:   The -- I mean it should be

23  said that the decline in the murder rate during that

24  20 year period has been part of a broader decline in

25  violence rates, especially among use, during that

COMPRESSED COPY

Page 82

1    period.

2              And that there are criminologists galore

3    who have speculated about the different possible

4    reasons why this decline has occurred.  They mention

5    a number of different factors that might influence

6    it.

7              And I think that where we are now is that

8    it's pretty clear, for example, that the change in

9    illegal drug markets has had some influence.  And it

10   is possible that the increase in the prison

11   population had some influence, but that does not

12   rule out the contributions of a great many other

13   factors during this same period.

14             BY MR. THOMPSON:

15        Q.   And do you have an opinion as to whether

16   there are, in fact, other factors that had a causal

17   connection to the decline in murder rates in the

18   United States from 1990 to the present?

19             MR. WOODS:  Objection to the form; vague,

20   ambiguous.

21             THE WITNESS:  I think that what we're

22   talking about is the history of -- of homicide,

23   which is as complicated and varied as any other

24   social phenomenon, and in that sense would have many

25   different factors associated with them.

COMPRESSED COPY

Page 83

1          BY MR. THOMPSON:

2     Q.    And my question --

3     A.    Trying to reconstruct that history

4  accurately, in saying which of those factors

5  were going, you know, to pushing the rate down,

6  which ones were neutral during that time, which

7  ones were going up is not an easy task.  That's

8  why I think that there continues to be

9  controversy in the field about what gets credit

10 for this accomplishment.

11          (WHEREUPON, THERE WAS AN INTERRUPTION IN

12 THE PROCEEDINGS.)

13          BY MR. THOMPSON:

14    Q.    Sorry.

15          Well, you say it's not an easy task and

16 that there's controversy, but my question is:  Do

17 you have an opinion as to whether there are other

18 causal factors, other than the change in illegal

19 drug market and the change in prison population,

20 that have, in fact, had an impact on the murder rate

21 in the United States from 1990 to the present?

22          MR. WOODS:  I'm going to object on the

23 grounds it's been asked and answered, as well as

24 being beyond the scope of his report.

25          THE WITNESS:  As a criminologist I could

COMPRESSED COPY

Page 84

1    offer some other factors that I think are plausible

2    and are relevant, including the decline in alcohol

3    consumption that has occurred during this period.

4            Some changes in police practice that have

5    occurred during this period and the general increase

6    in the expenditures on policing.  So I believe

7    that -- that those are plausible candidates for

8    getting part of the credit.

9            BY MR. THOMPSON:

10   Q.   Any other plausible candidates?

11           MR. WOODS:  Same objections.

12           THE WITNESS:  I think that's about as far

13   as I would go.

14           BY MR. THOMPSON:

15   Q.   What are the changes in police practicing

16   that you just referenced?

17   A.   The change in police practice has been

18   led by the order-maintenance policing techniques

19   that were developed by William Bratton in

20   New York City, for example.  And that has

21   included in New York City a fairly aggressive

22   policing of minor crimes, with a large volume of

23   stop-and-frisk encounters between police and

24   suspects on the street.

25           Those encounters in the eyes of the

COMPRESSED COPY

Page 85

1    police in New York City have made it clear to

2    drug dealers and to others who might be carrying

3    a gun, for example, that if they carry a gun

4    they're at a high risk of being detected and

5    being arrested for that.

6            So that that kind of effort of proactive

7    policing has been directed thanks to the

8    computerizing -- computerized mapping of crime,

9    also introduced by William Bratton, to focus on

10   hot spots policing, where the particular areas

11   of the city are seen as having high crime rates

12   and deserve special attention.

13           Again, often with a focus on removing

14   guns from those areas through direct interaction

15   on the part of the police.  There has been some

16   development on community policing, less in

17   New York, but in some others, so that that would

18   be an alternative approach that has been used.

19       Q.    What is community policing?

20       A.    Community policing is the effort on the

21   part of the police to establish better

22   relationships with civilian -- civilians on

23   the -- in their neighborhoods and to encourage

24   the development of neighborhood watches and

25   other kinds of private organizations that are