# Exhibit A

# Part 2 of 3

COMPRESSED COPY

Page 86

1    directed against helping with the crime control

2    effort, either directly or by improved

3    cooperation with the police.

4         Q.    Okay.  Now, let's turn to page 19 of the

5    report.

6         A.    Of the --

7         Q.    Oh, sorry.  Not of the report.  Of

8    Exhibit 5.

9         A.    Okay.

10        Q.    Okay.  And you'll want 22, because I want

11   to look at the carryover sentence.  You're talking

12   about, at the bottom of the page, research on

13   robbery, and you say in the third sentence of this

14   paragraph, "If the threat is sufficiently

15   convincing, physical force is not necessary.  For

16   this reason" -- "reason, it is hardly surprising

17   that the use of force is closely related to the

18   weapon type in robbery being very uncommon in

19   unarmed robbery and relatively rare in gun robbery."

20             Can you explain the phenomenon you're

21   talking about here?

22             MR. WOODS:  You know, he's been handed a

23   400 page document here.  Feel free to take time to

24   review whatever you need to review to refresh your

25   memory on it.

COMPRESSED COPY

Page 87

1            THE WITNESS:  This phenomenon is -- is

2      something that I'm familiar with, of course.  It has

3      to do with difference -- different techniques of

4      robbery.  And a robber's technique about how they

5      approach a victim is going to be different or is

6      different and observed to be different, depending on

7      what type of weapon they are carrying and -- and

8      deploying.

9            And -- so in the case of a gun robbery it

10     is usually sufficient for -- to gain control of the

11     situation for the robber to simply point the gun and

12     use it as a threat, without necessarily attacking

13     the victim.

14            In the case of a strong arm robbery, then

15     it is much more common for the encounter to be

16     initiated by an attack, where the victim is knocked

17     down or struck in some fashion.

18            So that this is, again, a result of the

19     purpose of the robber in this kind of situation,

20     which is to gain control of the victim and to make

21     the victim compliant.

22            BY MR. THOMPSON:

23        Q.  Do you have an opinion as to whether

24     handguns or long guns are more lethal?

25        A.  I'm sorry.  In -- you're talking about

COMPRESSED COPY

Page 88

1    in robbery situations?

2        Q.   Well, I guess any situation, but if you

3    want to break it down into different categories,

4    that's fine.

5            MR. WOODS:  And I'll object to the

6    question; incomplete hypothetical, vague, ambiguous.

7            BY MR. THOMPSON:

8        Q.   Well, let's start with robberies.  Do you

9    have an opinion as to whether a long gun is more

10   lethal in a robbery than a handgun?

11           MR. WOODS:  And the same objections.

12           THE WITNESS:  Well, I think that it's

13   important to -- again, to define the details of the

14   encounter, but if what we're talking about is a

15   situation where the gun is actually being used to

16   shoot somebody, then it is true that since the

17   lethality of the weapon is to some extent influenced

18   by the size of the round and by the velocity of the

19   round that is fired, that other things equal, the

20   long guns or shotguns when fired at the victim may

21   be more likely to kill the victim than would be true

22   for a small handgun.

23           BY MR. THOMPSON:

24       Q.   Okay.  Now, let's look at page 17 of this

25   Exhibit 5.  So that would be here.  And in the only

COMPRESSED COPY

Page 89

1    full paragraph on this page you're talking about, at

2    the end of the paragraph, possible differences among

3    cities.

4              And you say, at the end of the paragraph,

5    "It's certainly possible that one or more of these

6    differences among cities might affect both robbery

7    rates and the robbery murder rate, thus creating a

8    spurious association between the two.  While in

9    principle these third-cause variables could be

10   controlled for in a multiple regression format, in

11   practice the correct choice of a specification for

12   the regression is not obvious and adds a great deal

13   of uncertainty to the estimates."

14             How do you measure the uncertainty added to

15   the estimates?

16             MR. WOODS:  Object to the form of the

17   question as being vague and ambiguous.

18             THE WITNESS:  Could -- I'd like to have a

19   minute just to --

20             BY MR. THOMPSON:

21        Q.   Sure.

22        A.   -- look at the rest of this paragraph.

23        Q.   That's fine.

24        A.   Okay.

25        Q.   Okay.  So what are the differences among

COMPRESSED COPY

Page 90

1  cities that might have created a spurious

2  association?

3     A.    The first thing is I need to be clear

4  about what I meant in that sentence.  I was

5  contrasting the approach that I was reporting

6  on, which looked at the changes in robbery,

7  murder, and connected those -- or correlated

8  those with the changes in the robbery rate.

9        I contrasted that approach to a simple

10 cross-section approach, which would say, okay,

11 we have 43 cities.  Some cities have more

12 robberies than others.  They also at -- in any

13 one year or any one period.  And the same thing

14 is true for robbery murders.

15        And so we could correlate in that

16 cross-section the robbery murder against the

17 robbery rate.  I would find the result of that

18 exercise to be uninformative, because I know

19 that there are very large differences among

20 cities, and there's typical robbery rate.

21        Some cities are routinely higher than

22 others for all kinds of reasons.  And the

23 controlling for all of those reasons turns out

24 to be something that is -- you can never be

25 confident of statistically.

COMPRESSED COPY

Page 91

1          So the technique that I use said, given
2    that I do not want to attempt to control for all
3    of the reason cities -- some cities have higher
4    robbery rates than others, I don't know how to
5    do that convincingly.
6          Instead, I'm going to take whatever the
7    robbery rate is in a baseline period and look
8    only at the changes that occur relative to that
9    baseline.  So I looked at two periods.
10          The second period, the cities that are
11   high are -- on robbery are likely to be the same
12   cities that were high in the first period.
13   Again, for reasons that I did not explore.
14          But the changes give us a chance to
15   abstract from all of that variation and just
16   focus on the issue at hand.  And the issue at
17   hand is given the setting of that city, would
18   more gun robberies produce more murders?  Would
19   more non-gun robberies produce more murders
20   relative to baseline?  And which one would
21   produce more extra murders?
22          So that's exactly what I did.  And what
23   I found was that cities that had an extra
24   thousand gun robberies from the first period to
25   the second had about four extra gun robbery

COMPRESSED COPY

Page 92

1    murders.  And that figure was about three times

2    as high or -- and close to four times as high as

3    what we observed for non-gun robberies and when

4    they increased.

5        Q.    All right.  Now, let's look at page 19 of

6    this study.  And the first full paragraph reads,

7    "Whatever the mix of mechanisms that account for it,

8    the instrumentality effect is not a complete

9    explanation for observed weapon specific differences

10   in fatality rates."

11          "The death rate for assault may vary for

12   reasons unrelated to weapon choice.  For example,

13   Swersey," S-w-e-r-s-e-y, "documented a large

14   increase in the homicide rate in Harlem between 1968

15   and 1973, which was accompanied by a more than

16   doubling of the fraction of gun attacks resulting in

17   death."

18          "Swersey concluded that much of the change

19   was due to an increase in intentional killings

20   resulting from disputes involving narcotics

21   activities."

22          What is your understanding of the term

23   intentional killings?

24          MR. WOODS:  As used in this paper?

25          MR. THOMPSON:  As used in this paper.

COMPRESSED COPY

Page 93

1          THE WITNESS:  My understanding about what

2     Swersey meant was that unlike in many, and perhaps

3     most, assaults, these were cases where the

4     perpetrator had a clear and sustained intent to kill

5     the victim, which makes them very unusual.

6          Ordinarily attacks with a gun inflict one

7     or perhaps two wounds, but that the assailant does

8     not in effect finish off the victim.  There is not

9     this kind of sustained effort that would be -- make

10    it clear that that was the goal.

11         In the case that Swersey was looking at it

12    appeared that some of these were closer to

13    execution-style killings, where there was a very

14    clear intent.  And, as I say, that -- that makes

15    this an exceptional situation.

16         Q.   Now, it's true that Chicago's murder rate

17    went up significantly at the end of the 1980's; is

18    that correct?

19         A.   Yes.  I believe that is true.

20         Q.   And that was attributable, at least in

21    large part, to the crack cocaine epidemic; is that

22    correct?

23         A.   Yes.

24         MR. WOODS:  Objection.  That's beyond the

25    scope of this report and vague and ambiguous.

COMPRESSED COPY

Page 94

1           BY MR. THOMPSON:

2      Q.    Okay.   And was part of the crack cocaine

3    epidemic an increase in intentional killings among

4    drug dealers?

5           MR. WOODS:   I'm going to object to the form

6    of the question.   It's beyond the scope of what

7    we've offered him to opine on in this case.   It's

8    vague and ambiguous.

9           THE WITNESS:   I have never seen a study on

10    that subject, and I don't know the answer.   I

11    don't -- I don't know -- to the best of my

12    knowledge, the study has not been done.

13           BY MR. THOMPSON:

14      Q.    All right.   Now, let's look at page 25 of

15    this document, Exhibit 5.   Okay.   If we look in this

16    first full paragraph, two-thirds of the way down, it

17    says, "It is noteworthy in this regard that Japan

18    and some European countries have far" -- "far higher

19    suicide rates than the United States, despite the

20    fact that private ownership of guns is relatively

21    rare in those countries and gun suicides make up

22    only a small fraction of the total."

23           Does that reality demonstrate that there is

24    not a straight linear correlation between prevalence

25    of gun ownership and suicide rates?

COMPRESSED COPY

1          MR. WOODS:  Let me object to -- the

2     question is beyond the scope of what we've offered

3     him to opine in this case and also on the grounds

4     it's vague and ambiguous.

5          THE WITNESS:  So if you're asking that if

6     you compare countries and correlate the prevalence

7     of gun ownership with the suicide rate?

8          BY MR. THOMPSON:

9     Q.    Yes.

10    A.    What would you find?

11    Q.    Yes.

12    A.    You -- it probably would depend on which

13    sample of countries you looked at.

14    Q.    Let's look at the ones you looked at.

15    A.    And certainly there are countries that

16    have few guns and very high suicide rates.  And

17    are there -- I'm not sure that there are

18    countries with many guns and low suicide rates,

19    but there are -- Japan, being an example, in

20    summary.

21    Q.    And so does the example of Japan, for

22    example, demonstrate that there is not a straight

23    linear correlation between prevalence of gun

24    ownership and suicide rates?

25         MR. WOODS:  Objection to the form.  It's

COMPRESSED COPY

Page 96

1    vague and ambiguous, overbroad.  It's beyond the

2    scope of what he's been tendered to speak on.

3            THE WITNESS:  I mean so suicide is yet

4    another example of a social phenomenon that has many

5    different causes, and the type of weapons that are

6    readily available to people who are inclined to

7    suicide is just one of those possible causes.

8            (DISCUSSION HELD OFF THE RECORD.)

9            THE VIDEOGRAPHER:  Five minutes.

10           MR. THOMPSON:  Why don't we take a break?

11           MR. WOODS:  I mean I don't think he's done

12   with his answer.

13           MR. THOMPSON:  Oh.

14           MR. WOODS:  So --

15           MR. THOMPSON:  Oh, I'm sorry.  Well,

16   then -- then, please, continue.

17           MR. WOODS:  Yeah.  If you -- I mean it's --

18           THE WITNESS:  Yeah.

19           MR. WOODS:  I didn't think he was done.  If

20   he is done, he's done.

21           THE WITNESS:  Right, right.

22           MR. WOODS:  You can ask the witness.

23           BY MR. THOMPSON:

24       Q.  I'm sorry.

25       A.  So all I'm -- all I'm saying is that,

COMPRESSED COPY

Page 97

1    given that there are other important influences

2    on -- on suicide behavior, besides weapon type,

3    it's not surprising that weapon type or weapon

4    availability by itself does not strictly predict

5    the suicide rate.

6              MR. THOMPSON:  Okay.

7              THE VIDEOGRAPHER:  This is the end of tape

8    number two.  The time is 10:29.

9              (RECESS FROM 10:29 A.M. TO 10:41 A.M.)

10             THE VIDEOGRAPHER:  This is tape number

11   three in the deposition of Philip J. Cook.  The time

12   is 10:41.

13             BY MR. THOMPSON:

14       Q.    All right.  Now, let's turn to page 52,

15   sir.  And you say at the end of the carryover

16   paragraph, "It is perhaps not surprising that the

17   District's" -- and you're talking about the District

18   of Columbia -- "restrictions on handgun transfers

19   have proven ineffective in stopping the tide of

20   drug-related lethal violence."

21             Why was that perhaps not surprising?

22             MR. WOODS:  And let me just, again, object

23   to beyond the scope of his opinions in this case.

24             THE WITNESS:  When -- when the District

25   first imposed its handgun ban in 1977, it was

COMPRESSED COPY

Page 98

1    followed by a drop in violence, and there was some

2    indication that it was somewhat effective in

3    reducing gun use in violent crime.

4            And, of course, what happened during the

5    late 1980's was that there was the crack epidemic

6    that swept over the District of Columbia, and so

7    that -- that city, like all of the large cities in

8    the country, experienced a surge in youth -- the

9    violence, including homicide, which was mostly

10   committed with guns.  That is, the -- the homicides

11   were mostly committed with guns.

12           So that the explanation for why it's not

13   surprising is that we're talking about a situation

14   where there was a city that was attempting to

15   control the distribution of handguns, but surrounded

16   by other jurisdictions very much nearby that did not

17   have those restrictions, that you had a -- the

18   epidemic that was coupled with the increase in gang

19   activity for drug-dealing purposes.

20           And under those circumstances it was hard

21   for the law enforcement authorities to prevent the

22   influx of guns.  It is possible, it is plausible

23   that for more routine violence that it was making a

24   difference, but for that particular area it would be

25   hard to say that -- that it was successful.

COMPRESSED COPY

Page 99

1          BY MR. THOMPSON:

2      Q.    Does Chicago have the same problem as D.C.,

3  of having surrounding jurisdictions that don't have

4  the same restrictions on purchases of firearms?

5          MR. WOODS:   Objection to the form; vague,

6  ambiguous.

7          THE WITNESS:   Chicago certainly has the

8  suburbs.   The Illinois suburbs are subject to

9  Illinois' regulations, which are some of the most

10  stringent in the country.

11          That anybody buying a gun from is required

12  to have a firearm owner's ID card, and there is a

13  background check that is done, and there's record

14  keeping associated with that.

15          So that there is some contrast between the

16  two situations.   Virginia is a more open state, with

17  lax of regulations than -- than would be true for

18  Illinois, outside of -- outside of Chicago.

19          But, on the other hand, it is true that it

20  is possible for a motivated person, of course, to

21  drive to the suburbs or get to the suburbs.   And if

22  they are -- have the proper identification, to

23  acquire a gun and even to do so legally.

24          MR. THOMPSON:   All right.   Now, let's put

25  this exhibit to the side and move on to Cook Exhibit

COMPRESSED COPY

Page 100

1    Number 6.

2              (PLAINTIFFS' EXHIBIT 6 WAS MARKED FOR

3    IDENTIFICATION.)

4              BY MR. THOMPSON:

5        Q.   And, sir, would you, please, identify Cook

6    Exhibit -- Exhibit 6 for the record?

7        A.   This is an article called, "Is Gun

8    Control Likely to Reduce Violent Killings?"  It

9    is by Franklin Zimring, and I believe this was

10   published in 1972.  Although, it -- I'm sorry.

11   This is 1968, it says.  Okay.

12       Q.   How relevant are the results of something

13   from 1968 for Chicago in 2011?

14             MR. WOODS:  I'm sorry.  Can you read the

15   question back.

16             (THE PREVIOUS QUESTION WAS THEN READ.)

17             MR. WOODS:  Objection to the form of the

18   question; vague, ambiguous.  For what purpose?

19             THE WITNESS:  Well, in my opinion there are

20   certain fundamental issues that have -- are not

21   likely to change very much over time.  And in terms

22   of the types of weapons that are being used in

23   violent crime and what effect they have on the human

24   body, I don't think that that has changed during

25   this period to any great extent.  Maybe in detail,

COMPRESSED COPY

Page 101

```
 1    but not in the generality of things.
 2             The circumstances -- or the various kinds
 3    of circumstances that produce violence, I think, are
 4    very familiar when we look at the 1960's compared
 5    with what we have today.  So I would say there's
 6    some continuity now, but I'd have to know more about
 7    the -- what aspect of that you're interested in.
 8             BY MR. THOMPSON:
 9        Q.  All right.  Let's turn to page 731.  And in
10    the last sentence before the chart it says, "Of
11    every 100 reported firearm attacks, 12 resulted in
12    no wound, while there was only one reported knife
13    attack during the period which resulted in no
14    wound."
15             Do you believe that same pattern would hold
16    true in Chicago today?
17             MR. WOODS:  And I'm just going to object to
18    the question on the grounds that it's vague and
19    ambiguous, as to what he means by, "pattern."
20             THE WITNESS:  First of all, let me say that
21    I don't have any idea what police statistics for
22    2010 or 2011 would say in this matter.  I think what
23    we're looking at is going to be sensitive to the
24    police classification system, and what would be
25    included in any particular category of, say,
```

COMPRESSED COPY

Page 102

1    aggravated assault would depend on police practice

2    when it comes to recording crimes and assigning them

3    to different categories.  So it is possible.  It is

4    also possible that it would look much different, and

5    I don't know.

6              MR. THOMPSON:  All right.  Now let's turn

7    to Cook Exhibit 7.

8              (PLAINTIFFS' EXHIBIT 7 WAS MARKED FOR

9    IDENTIFICATION.)

10             THE WITNESS:  This is an article by

11   Franklin Zimring, entitled, "The Medium is the

12   Message:  Firearm Caliber as a Determinant of Death

13   From Assault," published in 1972.

14        Q.  All right.  Then let's turn to page 98.

15   The last paragraph on the page, the first sentence

16   says, "The basic data for the caliber comparison

17   come from an analysis of fatal and nonfatal firearm

18   attacks reported to the Chicago police between

19   March 5 and July 22, 1970.  In all 1,115 gun attacks

20   resulting in 156 fatalities were reported to the

21   police."

22             Is that -- would that -- does this indicate

23   that 85 percent of gun attacks did not result in

24   fatalities?

25        A.  I -- that -- that's close.  I don't have

COMPRESSED COPY

Page 103

1    my calculator with me, but in the sample that he

2    was looking at, apparently that's correct.

3         Q.   And do you believe that today in Chicago

4    that 85 percent of gun attacks do not result in

5    fatalities?

6              MR. WOODS:  I'm just going to object to the

7    form of the question as being vague, ambiguous.

8              THE WITNESS:  I did a study some years ago

9    that looked at the case fatality rate in cases where

10   there was a gunshot wound in an assault situation.

11             It was also a study from -- that's quite

12   old now.  Where I found that nationwide about one in

13   six gunshot woundings in assault situations resulted

14   in death.  This result is similar to that from an

15   earlier era.

16             I can't tell you with confidence that it is

17   true today in Chicago.  I can say there is a ratio

18   like that that historically seemed to apply

19   generally.

20             BY MR. THOMPSON:

21        Q.   Okay.  And, now, did this study attempt to

22   hold constant for intent to kill?

23             MR. WOODS:  You're talking about the

24   Zimring study?

25             MR. THOMPSON:  Yes, sir.

COMPRESSED COPY

Page 104

1          THE WITNESS:  What this study did in part

2   was to analyze the fatal and nonfatal cases, in

3   terms of the circumstances in which they occurred.

4          And that tells you something perhaps about

5   the intent.  The conclusion was that in several

6   respects the circumstances were similar, suggesting

7   that the fatal cases were a representative sample of

8   all attacks.

9          The question about did it control for

10  intent is that since intent is nebulous and it's

11  very difficult to -- especially after the fact to

12  determine what the assailant's intent was, the

13  answer is, no.

14         But there was certainly attention to the

15  question about whether there had been one wound or

16  several, and that is operationally relevant to the

17  question of intent, and certainly is relevant to the

18  question of whether the victim lives or dies.

19         BY MR. THOMPSON:

20     Q.  If somebody read this article and then

21  wanted to go kill someone, would they use a larger

22  caliber bullet?

23         MR. WOODS:  Objection; calls for

24  speculation.

25         THE WITNESS:  I think what they --

COMPRESSED COPY

1        MR. WOODS:  Vague, ambiguous, incomplete

2    hypothetical.

3        THE WITNESS:  What they would learn from

4    this article is that a larger caliber -- a wound

5    inflicted by a larger caliber gun is more likely to

6    cause death if it is -- especially if it is

7    generally in the same location as with the smaller

8    caliber.  So, for whatever use that is, there's no

9    doubt other things that the killer would want to

10   take into account.

11       MR. THOMPSON:  Let's mark this as Cook

12   Exhibit 8.

13       (PLAINTIFFS' EXHIBIT 8 WAS MARKED FOR

14   IDENTIFICATION.)

15       BY MR. THOMPSON:

16   Q.   And would you, please, identify this

17   document for the record?

18   A.   This is an article called, "Robbery

19   Violence," and I am the author of this article.

20   It was published in 1987.

21   Q.   All right.  And let's turn to page 359,

22   sir.  In the first full paragraph it says, quote,

23   "Developing a comprehensive description of robbery

24   violence patterns is hampered by a lack of data.

25   The Uniform Crime Reports' data on robbery lack much

BRYANT COURT REPORTING SERVICES, INC.  (919)387-5853

COMPRESSED COPY

 1   detail.  In particular, these reports do not contain

 2   information regarding the prevalence of injury to

 3   the robbery victims."

 4          Why did you use this data?

 5          MR. WOODS:  Objection to the form; vague,

 6   ambiguous, also assumes facts.

 7          THE WITNESS:  So one of my purposes in

 8   writing this article was to develop a description of

 9   robbery and compare it with a description of robbery

10   murder, and to see as -- as much as I could about

11   what is the relationship between those robberies

12   that result in the death of a victim and those

13   robberies that do not.  So that that was within the

14   scope of the data that I used.

15          BY MR. THOMPSON:

16     Q.   Okay.  Now, let's turn to page 364.  And

17   you reference in the second full paragraph problems

18   introduced by collinearity.  What is that problem?

19          MR. WOODS:  Objection to the form of the

20   question; vague, ambiguous.

21          THE WITNESS:  I'm sorry.  This is the

22   paragraph beginning, "Although, the data" --

23          MR. THOMPSON:  Yes, sir.  In the second

24   sentence you say, "Hence, there are possible

25   problems in attribution introduced by collinearity

COMPRESSED COPY

1    among the dimension."

2              (WHEREUPON, THERE WAS AN INTERRUPTION IN

3    THE PROCEEDINGS.)

4              (DISCUSSION HELD OFF THE RECORD.)

5              MR. WOODS:  Your question is:  What does he

6    mean by that sentence?

7              MR. THOMPSON:  Yes, sir.

8              MR. WOODS:  The second sentence?

9              MR. THOMPSON:  Yes, sir.

10             THE WITNESS:  So what I was referring to

11   was that in table two I report the distributions

12   across different dimensions for robbery and for

13   robbery and murder without making any adjustment for

14   other features.

15             So in each case I'm looking at the

16   dimension by itself.  What is the distribution for

17   victim age, regardless of sex?  What is the

18   distribution of sex, regardless of age?

19             And -- so what we can conclude from that is

20   certainly that there is an association, for example,

21   between the -- the dimension of age and -- and the

22   involvement in robbery or robbery and murder, but it

23   is difficult from that -- or unreliable from that

24   observation to make a conclusion about the causal

25   importance of that factor.

COMPRESSED COPY

1          And the reason is because any one of these

2     factors might also be associated with another.  So

3     that we, by -- by looking at one factor, are seeing

4     the effects of several factors at once.

5          MR. THOMPSON:  All right.  Let's turn to

6     Cook 9.

7          (PLAINTIFFS' EXHIBIT 9 WAS MARKED FOR

8     IDENTIFICATION.)

9          BY MR. THOMPSON:

10         Q.   And, please, identify this document for the

11    record, sir?

12         A.   This is an article by William Wells and

13    Julie Horney, called, "Weapon Effects and

14    Individual Intent to do Harm:  Influences on the

15    Escalation of Violence."

16         Q.   Okay.  And why do you cite this document?

17    What -- for what proposition?

18         MR. WOODS:  You're referring to in his

19    report?

20         MR. THOMPSON:  Yes, sir.

21         MR. WOODS:  Okay.

22         THE WITNESS:  Okay.

23         MR. WOODS:  Is that footnote 13?  Is that

24    what you're talking about, footnote 13?

25         MR. THOMPSON:  I --

COMPRESSED COPY

Page 109

1           MR. WOODS:  Okay.  You're not referring to
2    any specific place?
3           MR. THOMPSON:  It's in his report.  I mean
4    I --
5           MR. WOODS:  Okay.
6           MR. THOMPSON:  He's welcome -- or I'm happy
7    to have you direct his attention.  It's not a memory
8    test.
9           MR. WOODS:  Okay.
10          THE WITNESS:  This study provides support
11   for the general statement that I made that says that
12   there is an instrumentality effect, and that -- in
13   particular that guns when they are used in a violent
14   crime are more lethal than -- than other types of
15   readily-available weapons and are more likely to
16   result in -- in death than would be true for other
17   types of weapons.
18          BY MR. THOMPSON:
19      Q.   Where did the authors get their data?
20      A.   (NO AUDIBLE RESPONSE WAS GIVEN.)
21      Q.   You might look at 272.
22      A.   The authors interviewed 704 men, who
23   were newly convicted of felonies and
24   incarcerated in what they call a midwestern
25   state correctional system.  So they took a

COMPRESSED COPY

Page 110

1    sample from an intake cohort, a voluntary

2    sample, that stretched out over a year, starting

3    in November 1997, and asked a series of

4    questions that lasted between one and five

5    hours.

6         Q.   Do you think this is a legitimate sampling

7    technique?

8              MR. WOODS:  Objection to form; vague,

9    ambiguous, overbroad.

10             THE WITNESS:  I think that it is certainly

11   legitimate sampling techniques for getting a

12   representative sample of men newly convicted in this

13   particular jurisdiction of a felony.

14             BY MR. THOMPSON:

15        Q.   Do you think that men newly convicted of

16   felonies in this particular jurisdiction is a sample

17   that provides any meaningful information for Chicago

18   today?

19             MR. WOODS:  Objection to the form;

20   overbroad, vague, ambiguous.

21             THE WITNESS:  Well, I think that there are

22   several issues.  First of all, the interviews were

23   conducted 13 years ago, and so you might ask whether

24   the world has changed so fundamentally now that

25   anything from 13 years ago is irrelevant.

COMPRESSED COPY

Page 111

1        I -- I would certainly say, no.  That the

2   patterns of violent interaction, the use of weapons,

3   the outcomes of assaults are likely to have a great

4   deal of similarity over that period of time.

5        You might ask whether this particular

6   correctional system is bringing in prisoners and

7   convicts who are very different than those who are

8   in Chicago or are going to be arrested and convicted

9   in Chicago in the near future.

10       And I -- I don't have enough information to

11  be able to make a judgment about that in any kind of

12  precise sense, but, again, I -- I thought that it

13  was an interesting article for learning generally

14  about interactions during assault cases and about

15  the use of weapons and what the consequences were

16  that we can generalize from these kinds of

17  statements.

18       MR. THOMPSON:  Okay.  Let's move to our

19  next exhibit, which will be Cook 10.

20       (PLAINTIFFS' EXHIBIT 10 WAS MARKED FOR

21  IDENTIFICATION.)

22       THE WITNESS:  This is an article entitled,

23  "State and Local Prevalence of Firearms Ownership:

24  Measurement, Structure and Trends."  I am one of

25  three authors.  It was published in 2004.

COMPRESSED COPY

Page 112

1      Q.    Okay.  And what was the purpose of -- that

2   you were citing this document for in your report?

3      A.    Let's see.  I'm sorry.  Let me just

4   check.  Do you happen to know what footnote this

5   would be?

6           MR. WOODS:  It's in 15, but I'm not trying

7   to suggest that's the only place it is.  So --

8           THE WITNESS:  Right, right.  So in the

9   first instance I was using it to establish the

10  validity of the approach that I was using to measure

11  the variability in the prevalence of gun ownership

12  across jurisdictions in the United States.  This is

13  an article which validates a particular measure as

14  being valid and reliable as a proxy for the

15  prevalence of gun ownership.

16          MR. THOMPSON:  All right.  That's fine.

17          Let's move on to Cook 11.

18          (PLAINTIFFS' EXHIBIT 11 WAS MARKED FOR

19  IDENTIFICATION.)

20          BY MR. THOMPSON:

21     Q.    And would you, please, identify this

22  document for the record?

23     A.    Most of this document is a chapter

24  entitled, "Guns and Burglary," that I was a

25  coauthor with Jens Ludwig, and it was published

COMPRESSED COPY

Page 113

```
 1    in a collection through Brookings Institution

 2    Press in 2003.

 3         Q.   Okay.  And did the Joyce Foundation provide

 4    some of the funding for this study?

 5         A.   Yes, it did.

 6         Q.   And the Joyce Foundation is a pro gun

 7    control organization; correct?

 8              MR. WOODS:  Objection to the form of the

 9    question.

10              THE WITNESS:  At the time the Joyce

11    Foundation was one of the few foundations, and

12    perhaps the only foundation, that was supporting

13    research on gun violence.

14              And the president and the board of the

15    Joyce Foundation were very respectful of the normal

16    academic boundaries, that they were interested in

17    finding out what they could about gun violence, the

18    cost of gun violence, what might work to reduce the

19    cost of gun violence.

20              And in my relationship to the Joyce

21    Foundation, of course, I benefited from support and

22    benefited from the fact that no staff member or --

23    or the president ever placed any pressure on me to

24    produce any particular finding.

25              BY MR. THOMPSON:
```

COMPRESSED COPY

Page 114

1      Q.    Do you think there's any relevance to the

2    validity of your conclusions in this paper that

3    stems from the fact that the Joyce Foundation

4    provided funding?

5      A.    The only relevance is that the study

6    would not have been done without their support,

7    but after that, as I say, it was entirely up to

8    me and to my coauthor, Jens Ludwig, to do the

9    research.  And, as always, we had reported the

10   results as we found them.

11     Q.    And were you looking to try to quantify any

12   positive externalities associated with gun

13   ownership?

14          MR. WOODS:  Objection to the form of the

15   question; vague, ambiguous.

16          THE WITNESS:  We were looking to explore

17   and investigate the effect of gun ownership on

18   burglary rates and on the rate of hot burglaries, or

19   home invasion burglaries.

20          The reason we were motivated to do that was

21   because there was very little -- or essentially no

22   systematic research on that issue, but many people

23   seemed to have an opinion about it and were offering

24   that opinion.

25          And so we decided to find out the truth

COMPRESSED COPY

Page 115

1    about that relationship.  So we thought that we had

2    a topic that would provide -- be of interest to, not

3    only scholars, but also to everyone else, regardless

4    of what our findings turned out to be.

5              BY MR. THOMPSON:

6        Q.    What were the challenges you faced in

7    trying to draw causal conclusions as you did this

8    study?

9              MR. WOODS:  Objection to the form of the

10   question; assumes facts, vague, ambiguous.

11             THE WITNESS:  Let me say the greatest

12   challenge that we faced in doing this study was to

13   obtain abscess to the geo-coded national crime

14   victimization survey data.

15             And, as far as I know, we were the first

16   team ever to have access to those data that would

17   allow us actually to identify the county in which a

18   burglary occurred, which in turn allowed us to

19   associate burglaries and burglary rates and burglary

20   patterns with the prevalence of gun ownership in

21   that county.

22             So this study was unique at the time.  I

23   think it remains unique.  And I can only tell you

24   there was an enormous amount of red tape in getting

25   access to those data, but I think that the results

COMPRESSED COPY

Page 116

1    are worth it.

2            BY MR. THOMPSON:

3        Q.    Well, let's turn to page 76, first full

4    paragraph.  And in the third sentence you say,

5    quote, "The challenge to establishing a causal

6    interpretation to these results comes from the

7    possibility that gun ownership may be both cause and

8    effect of local burglary patterns."

9            Please, explain what you meant by that

10   statement?

11       A.    What I meant by the statement was that

12   there is a possibility that households might be

13   more likely to acquire a firearm if the burglary

14   rate in their neighborhood went up or was high

15   than if the reverse were true.

16            So that it is certainly possible that

17   people would believe that having a gun would be

18   more useful if they saw the likelihood of

19   burglary to be high than if they did not.  And I

20   say that without making any judgment about

21   whether it's true or not.

22            So if you observe an -- an association

23   between the rate of gun ownership in a

24   jurisdiction and the burglary rate in the

25   jurisdiction, then it can be perhaps the result

COMPRESSED COPY

Page 117

1    of the influence of gun ownership on burglars or

2    it could be the result of the influence of

3    burglars on gun ownership.

4            And so that became the statistical

5    challenge that we were faced with in doing this

6    analysis.  We were very much aware of it, and we

7    then proceeded to design the analysis with that

8    in mind.

9        Q.   But there's no entirely persuasive way to

10   rule out such competing explanations; correct?

11           MR. WOODS:  Objection to the form; vague,

12   ambiguous.

13           THE WITNESS:  The gold standard in this

14   area would be to conduct a randomized control field

15   trial, where guns were passed out in some

16   neighborhoods and not others by an experimenter.

17           And, no, that -- that is not available.

18   That would have probably provided them potentially

19   the most persuasive results, but certainly we could

20   not do that.  So that what we did do is use well

21   established statistical techniques to identify the

22   effect of gun ownership on burglary as opposed to

23   the reverse.

24           For example, for some of -- one analysis

25   that we did looked at the effect of the gun

COMPRESSED COPY

Page 118

1   ownership rate in a year on the burglary rate in the

2   following year, with the belief that the causality

3   only flows in one direction with respect to time.

4           BY MR. THOMPSON:

5       Q.   Is that -- I don't want to cut you off.

6       A.   No.

7       Q.   Okay.  Now, let's turn to page 77 of this

8   document.  And you say in the last sentence on this

9   page, "Based on a special tabulation of NCVS data by

10  the Bureau of Justice Statistics, Philip Cook

11  estimated that there were an annual average of just

12  32,000 instances a year for the period 1979 to 1987

13  in which a householder used a gun against someone

14  who broke into the house or attempted to do so."

15          Did your number of 32,000 a year take into

16  account crimes that were deterred outside of the

17  home as a result of an individual carrying a

18  firearm?

19          MR. WOODS:  Object to the form of the

20  question; vague, ambiguous.

21          THE WITNESS:  The 32,000 was a very

22  specific measure that came out of the national crime

23  victimization survey, which interviews respondents

24  every six months for three years and asks them a

25  series of questions about victimization in the

COMPRESSED COPY

Page 119

```
1   preceding six months.
2           If they indicate that they were the victim
3   of a residential break-in or an attempted break-in,
4   then they are given the chance to say what did you
5   do in response, if anything.
6           And one of their answers could be that they
7   obtained a gun and used it.  And so it is exactly in
8   that circumstance that we have the -- defensive gun
9   use against burglary or attempted burglary, and
10  that's all that is included in the 32,000.
11          BY MR. THOMPSON:
12      Q.   The 32,000 is confined to the home; is that
13  correct?
14      A.   It is confined to the home.  Yes.
15      Q.   Okay.  And this data was gathered by an arm
16  of the federal government; is that correct?
17      A.   The national crime victimization survey
18  data are gathered by the Bureau of Justice
19  Statistics for the U.S. Department of Justice.
20      Q.   Do you think it's appropriate to look at
21  burglary rates in the United States and gun
22  ownership rates and compare them to other countries?
23          MR. WOODS:  Objection to the form; vague,
24  ambiguous.  For what purpose?
25          THE WITNESS:  What we noticed in reading
```

COMPRESSED COPY

Page 120

1    the discussions about, especially home invasion

2    burglaries and how gun ownership influenced that

3    possibility, was that some of the commentators were

4    making international comparisons.

5            And so that we thought that since that was

6    part of the discussion it was useful for us to

7    actually look carefully and see what was going on

8    with that.  Rather than have just a quick glance at

9    the data, we looked at it more carefully.

10           BY MR. THOMPSON:

11       Q.   But if you were designing a study to try to

12   assess whether there was a connection between gun

13   prevalence and burglary rates, would you look --

14   would you confine your analysis to the

15   United States, or would you also find it useful to

16   look to other jurisdictions outside of the

17   United States?

18           MR. WOODS:  Objection to the form; vague,

19   overbroad, ambiguous.

20           THE WITNESS:  I mean I don't --

21           MR. WOODS:  Incomplete hypothetical.

22           THE WITNESS:  I don't have to speculate,

23   since I did both in this article when given a

24   chance.  I think it's -- by far the stronger

25   evidence that we have in this study comes from

COMPRESSED COPY

Page 121

1    looking at data for the United States, but I think

2    there's some interest in making these international

3    comparisons in this case.

4              BY MR. THOMPSON:

5        Q.   Now, in the United Kingdom they have a

6    higher rate of burglary, but a lower rate of gun

7    ownership; is that correct?

8        A.   At the time that --

9              MR. WOODS:  Yeah, I'm going to object.

10             THE WITNESS:  Oh, yes.  I didn't --

11             MR. WOODS:  Vagueness as to time and --

12             BY MR. THOMPSON:

13       Q.   Yeah, at the time you did this study.

14       A.   Uh-huh.  The comparison that we were

15   doing in this study was based on the percentage

16   of burglaries that -- where there was somebody

17   in the residence at the time when there was a

18   break-in.

19             And we were using the victimization

20   survey from the United Kingdom and comparing it

21   with the U.S., for example.  So that that was --

22   the important comparison was not the overall

23   rate of burglary, but the percentage of

24   burglaries that involved somebody at home at --

25   at the time.

COMPRESSED COPY

Page 122

1          Q.    Is that referred to as a hot burglary?

2          A.    It was a hot -- yeah.  We called it a

3     hot -- a hot burglary.  Yeah.

4          Q.    In the United Kingdom is there a higher

5     percentage of hot burglaries than there is in the

6     United States?

7                MR. WOODS:  Objection; vagueness as to

8     time.

9                THE WITNESS:  So in -- in the period that

10    we were looking at, the question was about comparing

11    two different surveys that had different sequences

12    of questions.  And both of which had -- had what

13    might be a surprising problem, and that is in many

14    cases there's a break-in, something is stolen

15    perhaps.

16               The individual who is responding to the

17    surveyor does not actually know whether they were

18    home at the time.  And so that the -- in terms of

19    the U.S. data, what we have is that either the

20    resident says, yes, I was at home, or that this fact

21    about whether the resident was home is simply not

22    known or unspecified.

23               The survey in Britain handles it somewhat

24    differently, where the question is whether they were

25    aware of the burglary or not aware of the burglary,

COMPRESSED COPY

Page 123

1    given that they think they were at home.

2            But if you add the two together, it turns

3    out that the hot burglary rates might be very

4    similar.  So that is the surprising result, is that

5    you have this group that in the U.S. amounted at the

6    time to 28 percent of all burglaries; in the U.K.

7    about 21 percent, where the respondent/resident was

8    not sure or not clear or did not answer about

9    whether they were home at the time.

10           So when you tried to adjust for that, then

11   it ends up being possibly a quite similar rate of

12   hot burglary.  The -- the other thing that should be

13   said, of course -- I mean that, yes, there is a

14   difference in the prevalence of gun ownership

15   between Britain and the United States.

16           There also are a number of other

17   differences between the two countries, in how people

18   live and the likelihood somebody will be home.  The

19   prevalence of dogs is substantially higher in the

20   U.S. than it is in Britain.  That might be a

21   deterrent to burglars, breaking in.

22           There is also the simple fact that a hot

23   burglary is more likely to result in an arrest and a

24   conviction and the punishment in Britain is a good

25   deal less than it is in the United States for that.

COMPRESSED COPY

Page 124

```
 1    So there might be less of a deterrent effect from

 2    the criminal justice system to a hot burglary there

 3    than in the U.S.

 4            So the point of this international

 5    comparison was that people were making very

 6    confident statements comparing Britain and the

 7    United States, but they had not looked carefully at

 8    the data.

 9            And when we looked carefully at the data,

10    we were able to conclude that the difference is not

11    as great as it might appear.  There might be no

12    difference or little difference, and, by the way,

13    there are a number of other ways in which Britain

14    and the U.S. differ from each other.

15            BY MR. THOMPSON:

16        Q.  Do you have -- you said the rates are

17    possibly the same or similar.  Do you have an

18    opinion as to whether, in fact, the rate of hot

19    burglary in the United States is lower than in the

20    United Kingdom?

21            MR. WOODS:  I'm going to object to

22    mischaracterizing his testimony.

23            THE WITNESS:  So --

24            MR. WOODS:  And vague as to time,

25    ambiguous.
```

COMPRESSED COPY

Page 125

1      THE WITNESS:  Again, so in the context of

2  this study, what we were looking at was residential

3  burglaries and not the overall frequency of

4  residential burglaries, but, rather, the percentage

5  of residential burglaries that could be considered

6  hot.  And in that comparison it is not clear to us

7  which country has the higher hot burglary rate.

8      BY MR. THOMPSON:

9      Q.  All right.  Now, you later in this document

10 reference Prince George's County and burglary takes

11 in Prince George's County.  It's on page 98.

12     Are you of the opinion that Prince George's

13 County is generalizable to Chicago?

14     MR. WOODS:  Objection to the form; vague,

15 overbroad.  For what purpose?

16     THE WITNESS:  That's certainly --

17 generalizing from Prince George's County to Chicago

18 is not our purpose in doing this special study of

19 Prince George's County.

20     We would not argue that the number that we

21 estimated for Prince George's County in terms of the

22 value to burglars of occasionally being able to

23 steal a gun is the same as would apply to Chicago

24 then or now.

25     BY MR. THOMPSON:

COMPRESSED COPY

Page 126

1    Q.   Now, the value on a percentage basis of

2  these guns as compared to the value of the property

3  stolen was two to five percent; is that right?

4    A.   The -- the frequency of -- that a gun

5  was stolen was something like five percent.

6  The -- the -- the value, as we say here, is

7  from -- from -- for example, the national crime

8  victimization survey data for the period that we

9  were looking at in the mid 1990's, that the

10  value that -- of occasionally stealing a gun was

11  about five percent of the average take and 20

12  percent of the median.

13    Q.   And shouldn't, though -- you're comparing

14  it to the take.  Wouldn't the proper analysis to

15  have, yes, the numerator be the $30 or the $70 that

16  you found, and the denominator be the overall

17  household wealth available to be stolen?

18        MR. WOODS:  Objection to the form; vague,

19  ambiguous, overbroad.  For what purpose?

20        THE WITNESS:  So our interest in this case

21  was in the profitability of burglary from the point

22  of view of the burglar.

23        The question is, if you have a neighborhood

24  with lots of guns, does that make it more attractive

25  for a burglar, because that could be part of the

COMPRESSED COPY

1  loot that they take away if they break in

2  successfully.

3        So knowing that the household includes some

4  very expensive carpets, for example, is really of no

5  interest in making that judgment, because very few

6  burglars are going to spend the time to roll up

7  carpet and take it with them or know what to do with

8  it after they get it.

9        The special feature of a gun as loot is

10  that it is readily sold.  It's light and small and

11  can be carried away quickly, and for all of those

12  reasons is especially attractive.

13        BY MR. THOMPSON:

14    Q.  Now, with neighborhoods with lots of guns,

15  to use your phrase, there would be less demand for

16  guns, because more people own them; correct?

17        MR. WOODS:  Objection to the form; vague,

18  ambiguous, incomplete hypothetical.

19        THE WITNESS:  I am sorry.  I don't

20  understand the --

21        BY MR. THOMPSON:

22    Q.  Yeah, all other things being equal, if you

23  have two communities, but one of them has lots of

24  guns, and the other one has -- and a high level of

25  gun ownership.

COMPRESSED COPY

Page 128

1    A.    Uh-huh.

2    Q.    And then the other one has a lower level of

3  gun ownership.  There's -- there's less demand for

4  guns in the community where more people already own

5  them; right?

6         MR. WOODS:  Same objections.

7         THE WITNESS:  I mean I guess the demand for

8  guns is reflected in how many guns people own.

9         BY MR. THOMPSON:

10   Q.    Yes.

11   A.    I'm not sure I understand.

12   Q.    Right.  Well, if everyone --

13   A.    So if people have lots of guns, they

14  must place a high value on guns.

15   Q.    Well, they -- but they don't -- do they

16  place a high value on another marginal gun, as

17  opposed to the community where they don't own the

18  guns?

19         MR. WOODS:  Objection to the form of the

20  question; incomplete hypothetical.  It calls for

21  speculation.

22         THE WITNESS:  I mean what -- what we have

23  seen over at least the last 30 years in the U.S. is

24  that the same time that the prevalence of gun

25  ownership by household has been going down, the

COMPRESSED COPY

Page 129

1    number of guns owned by gun-owning households is

2    going up.

3              And so that -- that -- to the extent that

4    we have any evidence on that subject, that appears

5    to be the pattern, that you see people who like

6    guns, as indicated by the fact that they have them,

7    increasing their personal stock.

8              So I would make no judgment about the issue

9    that you're interested in.  I -- I can see that

10   people who already have ten guns in the home may be

11   the most likely people to be the next customer at

12   the gun store, because they have demonstrated their

13   great interest in guns, as opposed to their

14   neighbor, who has no guns.

15       Q.   Are they going to be the next customer in

16   an illegal transaction that's fenced?

17            MR. WOODS:  Objection to the form;

18   incomplete hypothetical, vague, ambiguous.

19            BY MR. THOMPSON:

20       Q.   You're talking about a fencing transaction;

21   right?

22            Not going to a gun store, is that right, in

23   your analysis?

24       A.   Oh.

25            MR. WOODS:  Same objections.

COMPRESSED COPY

Page 130

```
 1              THE WITNESS:  So I thought you were talking
 2      about the demand by householders for buying a gun,
 3      which -- and you said it's going to be higher for
 4      people that don't have guns than for people who do.
 5      And I would say most likely the reverse is true.
 6              In terms of fencing, I mean the issue about
 7      what does a burglar do who succeeds in stealing a
 8      gun from a home, in some cases they will sell them
 9      directly to somebody else.  In some cases they'll
10      sell them to a fence, who -- a broker of some kind.
11      In some cases they'll keep them.
12              And that is unlikely to be the same
13      neighborhood that they stole it from.  I mean I --
14      it would be a -- whatever that underground market
15      function says is where they would go, I assume.
16              BY MR. THOMPSON:
17          Q.   And would -- on the supply side if you had
18      a community with a higher level of gun prevalence,
19      would you agree that there's more supply of guns in
20      this illegal secondary market?
21          A.   I think it's likely that there will be a
22      greater flow of guns into the illegal secondary
23      market from a jurisdiction that has lots of
24      guns, simply because there will be more theft,
25      and there will be more possibility of secondary
```

COMPRESSED COPY

Page 131

1    transfers between neighbors and -- and other

2    casual arrangements.

3         Q.   Now, you would agree that in areas where

4    there is a rising burglary rate some individuals

5    will go out and purchase a firearm for

6    self-protection; correct?

7              MR. WOODS:  Objection to the form;

8    incomplete hypothetical, vague, ambiguous.

9              THE WITNESS:  So I would say that we know

10   that some of the demand for residential ownership of

11   handguns is stimulated by a fear of crime or a

12   concern about crime, and that what you say is kind

13   of a sensible prediction, but it requires that there

14   is an awareness of that rising crime rate on the

15   part of the people who live there, and that that is,

16   in fact, what that particular community thinks is

17   the appropriate response.  There's a lot of

18   variation from jurisdiction to jurisdiction.  So I

19   certainly can't say, no, but I would want to qualify

20   it.

21             BY MR. THOMPSON:

22        Q.   Would you agree that in areas where there

23   is a rising burglary rate some individuals will wait

24   less than a year from the time of the increase in

25   criminal activity to purchase a firearm for

COMPRESSED COPY

```
 1   self-protection?

 2              MR. WOODS:  Can I have that question read

 3   back, please.

 4              (THE PREVIOUS QUESTION WAS THEN READ.)

 5              MR. WOODS:  I'm going to object; incomplete

 6   hypothetical, vague and ambiguous.

 7              THE WITNESS:  So I think that it is

 8   possible that people will wait less than a year to

 9   act on a new urge, and that what we're talking about

10   in most cases perhaps is people who already have

11   guns in the home.  And that they are comfortable

12   with guns, they know about guns, and so they respond

13   in a way that is comfortable to them, which is

14   getting another gun.

15              BY MR. THOMPSON:

16       Q.   Now --

17       A.   So it is not at all clear that that

18   affects the prevalence of guns.  It might affect

19   the total number of guns.

20       Q.   But there are some people who don't have a

21   gun, and who will go out and purchase a gun within a

22   year of an increase in the rate of burglary in their

23   neighborhood; is that correct?

24              MR. WOODS:  Objection.  Same objections.

25              THE WITNESS:  I think it's a logical
```

COMPRESSED COPY

Page 133

1   possibility.  I think those kinds of conversions,

2   from being a nonowner, to an owner, are -- are rare,

3   and especially rare compared to the other sort of

4   buildup of people's existing inventory.

5              BY MR. THOMPSON:

6       Q.   What's your empirical basis for saying that

7   it's a rare conversion rate?

8       A.   Well, overall is -- what we're seeing

9   right now is that gun sales, for example,

10  apparently are quite high, but there's no

11  indication that the prevalence of gun ownership

12  is going up.

13             And so if we look at the national

14  prevalence, as measured by the general social

15  survey, for example, that -- that that's --

16  that's not increasing.  So it appears that we

17  are going through a period now when there's kind

18  of a deepening of existing stock by people who

19  like guns rather than a broadening.

20      Q.   Do you have any other basis for making the

21  statement you did about conversion rates?

22      A.   Not readily at hand.  No.

23      Q.   Okay.  Let's look at Table 3-8 on page 103

24  of this document.

25      A.   Uh-huh.

COMPRESSED COPY

Page 134

1     Q.   And what does this chart show us?

2     A.   So this is a chart that has the results

3 of ten different regressions that we ran.  In

4 each case the dependent variable of the

5 regression was whether or not a gun was stolen

6 in a residential burglary.

7         And in each case one of the independent

8 variables was our measure of the prevalence of

9 gun ownership in the county in which the

10 residence was located.

11        And so what we find here is that the

12 estimate about how gun prevalence affects the

13 likelihood of a gun being stolen depends on --

14 or is influenced by the prevalence of gun

15 ownership in the county.

16        And when we look at the burglary cases,

17 that none of these are statistically, in a

18 statistical sense, different from zero,

19 suggesting that when -- but in the complete

20 sample of cases, that is all reports by all

21 respondents to the national crime victimization

22 survey for a five-year period, that as the

23 county prevalence of gun ownership goes up, the

24 likelihood of a gun being stolen in a

25 residential burglary goes up with it.  And that

COMPRESSED COPY

Page 135

1   that connection, that relationship, is

2   statistically different from zero, and we can

3   say that with great confidence.

4       Q.   When you talk about statistically different

5   from zero, is that synonymous with statistically

6   significant?

7           MR. WOODS:  Objection to the form of the

8   question.

9           THE WITNESS:  Yeah.  Statistically

10  significant is a casual way of saying statistically

11  significantly different from zero.

12          BY MR. THOMPSON:

13      Q.   Okay.  And at what level -- when you made

14  the statement it's no different than zero, at what

15  level of statistical significance were you using?

16          MR. WOODS:  And I'm going to object to the

17  form of the question as being vague and ambiguous.

18          THE WITNESS:  In Table 3-8 we find that we

19  were using two standards and identifying two

20  standards.  One is where the significance was at the

21  one percent level, and the other, the significance

22  was at the ten percent level.

23          So the one percent level is very stringent,

24  and that would say there's less than one in a

25  hundred chance that this result could have occurred

COMPRESSED COPY

1    just by random variation and chance.

2              Ten percent is a somewhat looser standard,

3    but still saying less than one in ten chance that

4    this result that we observed could reflect simply

5    the workings of chance.

6              BY MR. THOMPSON:

7         Q.   Do you hold constant for whether these

8    counties were in jurisdictions with a child access

9    prevention law?

10             MR. WOODS:  Objection to the form of the

11   question; vague and ambiguous.

12             THE WITNESS:  So in -- we ran different

13   versions of this, and let me refresh my memory about

14   the characteristics of the county that we controlled

15   for in one version.  And the answer is that we

16   controlled for race, ethnicity, poverty status,

17   labor force participation and population density,

18   but not child access.

19             BY MR. THOMPSON:

20        Q.   Don't you think that would have an impact

21   on whether guns were actually stolen, if they were

22   required by law to be locked up?

23             MR. WOODS:  Objection to the form of the

24   question; vague, ambiguous.

25             THE WITNESS:  It certainly is possible that

COMPRESSED COPY

Page 137

1    that would have an effect.  Yeah.

2              BY MR. THOMPSON:

3        Q.    Then why didn't you include it in your

4    study?

5        A.    Well, let me say that there are other

6    variables as well that we could have controlled

7    for.  And in doing this kind of study you -- you

8    have a limitation about how many variables you

9    can control for simultaneously that might differ

10   systematically, but the problem -- or the issue

11   is, remember, not just that there are variables

12   out there that might affect the result that

13   you're interested in, but -- because there

14   always are going to be some of those that you

15   omit.

16              The question is whether those variables

17   that are omitted are correlated with the

18   independent variable that you're concerned

19   about.  And that independent variable in this

20   case is the prevalence of gun ownership.

21              So unless -- if you believe, for

22   example, that child access laws are both

23   effective in reducing gun theft and also that

24   they're correlated with the prevalence of gun

25   ownership in a county, then leaving that

COMPRESSED COPY

Page 138

1  variable out would have no effect on the result.

2  And that that would be true of a thousand other

3  variables that you might have put in.

4       Q.   Do you think a child access prevention law

5  would be effective in reducing the number of thefts

6  of guns?

7            MR. WOODS:   Objection to the form; vague,

8  ambiguous.   It's also beyond the scope of the

9  opinions we've offered him to speak on in this case.

10           THE WITNESS:   I -- I don't have an opinion

11  about that.

12           BY MR. THOMPSON:

13      Q.   Does the ATF routinely investigate

14  burglaries of private residences?

15      A.   No, not that I know of.

16      Q.   Does the ATF routinely investigate private

17  transfers between friends and family members of

18  firearms?

19      A.   No.

20      Q.   Does --

21      A.   I don't believe so.   I'm sorry.

22      Q.   Does the ATF routinely investigate gun

23  shows?

24           MR. WOODS:   I mean I'll object on

25  foundation.   If he knows.   I don't know if he knows

COMPRESSED COPY

Page 139

1    or not.  So --

2              THE WITNESS:  Does it routinely -- I -- I

3    don't know what you mean by, "routinely."  I think

4    in some cases there are ATF investigations that

5    include gun shows.

6              BY MR. THOMPSON:

7         Q.   Do you have any sense as to how frequently

8    the ATF investigates gun shows?

9         A.   No.  I have no idea.

10        Q.   Will you agree that ATF investigations do

11   not necessarily reflect a random sample of firearms

12   that are illegally trafficked?

13             MR. WOODS:  Objection to the form;

14   foundation.

15             THE WITNESS:  I'm sorry.  Could you say

16   that again?

17             BY MR. THOMPSON:

18        Q.   Do you -- well, let me say it this way:  Do

19   you agree that samples of traced firearms are not a

20   representative sample of the universe of all

21   firearms used by criminals in the United States?

22             MR. WOODS:  I'm going to object to the

23   question; vague, ambiguous, overbroad.  For what

24   purpose?

25             THE WITNESS:  So whether a crime gun is

COMPRESSED COPY

Page 140

1    ultimately successfully traced depends on a series

2    of events that have to take place, starting with the

3    fact that the gun has to be confiscated by the

4    police, the police has to submit it for tracing, and

5    the tracing has to be successful through the

6    national tracing center.

7              And there is then a variety of ways in

8    which those guns which are successfully traced might

9    not be representative.  If -- if they come from

10   jurisdictions where the police always trace the guns

11   that they obtain, then there's a higher chance than

12   if they come from a jurisdiction where the police

13   don't do that.

14             It would be true that if the gun is very

15   old or if it has had the serial number erased, then

16   it would be unlikely to be successfully traced, and

17   so the -- the answer is there's no perfect match

18   between those that are successfully traced and --

19   and the original population that you're talking

20   about, which is all guns used in crime.

21             BY MR. THOMPSON:

22        Q.   Does a trace analysis show whether a

23   firearm has been trafficked?

24             MR. WOODS:  Objection to the form; vague,

25   ambiguous, foundation.

COMPRESSED COPY

Page 141

1           THE WITNESS:  So a standard trace analysis

2    ends at the point where the first retail sale is

3    identified.  Trafficking would typically occur after

4    that event.

5           BY MR. THOMPSON:

6       Q.   So that's a no?

7       A.   That's a no.

8           MR. THOMPSON:  Okay.  All right.  Let's

9    take a break.

10          THE VIDEOGRAPHER:  This is the end of tape

11   number three.  The time is 12:00.

12          (RECESS FROM 12:00 P.M. TO 12:10 P.M.)

13          THE VIDEOGRAPHER:  This is tape number four

14   in the deposition of Philip J. Cook.  Time is 12:10.

15          MR. THOMPSON:  Okay.  Professor, I would

16   like to mark as Cook Exhibit 12 the following

17   document.

18          (PLAINTIFFS' EXHIBIT 12 WAS MARKED FOR

19   IDENTIFICATION.)

20          BY MR. THOMPSON:

21      Q.   And will you, please, identify this

22   document for the record?

23      A.   Exhibit 12 is an article called,

24   "Underground Gun Markets."  I am one of the four

25   authors.  It was published in the Economic

COMPRESSED COPY

Page 142

1   Journal in 2007.

2       Q.   Okay.  And was -- did you make an attempt

3   in connection with this study to gather a

4   representative sample of individuals who

5   participated in the underground gun market in

6   Chicago?

7           MR. WOODS:  Objection to the form of the

8   question; vague, ambiguous.

9           THE WITNESS:  One member of our team is an

10  ethnographer, very well-known sociologist, named

11  Sudhir Venkotesh, who has worked for many years as

12  an ethnographer in a particular neighborhood of

13  South Chicago.

14          And he interviewed a couple of hundred

15  people who were involved in the underground economy.

16  His samples were intended to be broad in terms of

17  covering a number of different kinds of actors in

18  that economy.  He wanted to talk to thieves and to

19  gang members and to people involved in the gun

20  market and to prostitutes, and succeeded in talking

21  to a number of each of them.

22          But I think he cannot say, and would not

23  say, that he had strictly a representative sample.

24  That these are samples of convenience, that were

25  built partly through the ability for him to make

COMPRESSED COPY

Page 143

1    contact with individuals who were willing to talk to

2    him.

3            So that to some extent it was a snowball

4    technique or working with a person who would vouch

5    for him who knew some of these people.  His goal was

6    to have trusting sources, who would be willing to

7    open up to him and talk to him about their

8    activities.

9            BY MR. THOMPSON:

10    Q.   Did these people all come from the same

11    neighborhood?

12    A.   They did.  They all came from one

13    particular neighborhood in Chicago.

14    Q.   Do you believe that neighborhood is

15    representative of the overall market -- underground

16    gun market in Chicago?

17            MR. WOODS:  I'm going to object to the form

18    of the question; vague, ambiguous.  For what

19    purpose?  Overbroad.

20            THE WITNESS:  In the study we were

21    interested in that question, and we compared the

22    neighborhood, which is called Grand Boulevard,

23    Washington Park, with the city as a whole in a

24    number of respects.

25            And what is true about the neighborhood

COMPRESSED COPY

Page 144

1    that he's working in is that it's one of the ones

2    that has a very high rate of homicide and a high

3    rate of poverty, a low rate of labor force

4    participation.

5            It is almost entirely -- unlike the rest of

6    the city, almost entirely black racially.  And so

7    what it is representative of is an area that has one

8    of the highest concentrations of violence in

9    homicide in the city, rather than being average or

10   representative in some way for the city as a whole.

11           On the other hand -- on the other hand, it

12   is true that in terms of the -- what we know about

13   the guns that are being used in crime in Grand

14   Boulevard, Washington Park is that in a number of

15   respects they are very similar to the guns that are

16   being used in the rest of Chicago that were

17   confiscated by the police and used in crime.

18           BY MR. THOMPSON:

19       Q.   Now, let's turn to page 559.

20       A.   Okay.

21       Q.   And you say in the carryover paragraph at

22   the top of the page, it's the second full sentence,

23   quote, "The fact that Chicago has unusually

24   restrictive regulations makes the city an

25   interesting case study of what difference government

COMPRESSED COPY

Page 145

1    regulations can make."

2          And why -- what do you mean, "an

3    interesting case study," and why was it an

4    interesting case study?

5    A.   Chicago at that time actually did have a

6    ban on the private possession of handguns by

7    ordinary people unless they had registered them

8    prior to 1982, and -- so that it represented a

9    jurisdiction, which was probably as -- had as

10   strict regulation as any in the country at that

11   time.

12         And what we point out in the rest of

13   that sentence is that in that respect it's

14   similar to some of the European countries.

15   Something that was especially interesting, since

16   we were -- this article was published by the

17   Royal Economic Society in England.

18   Q.   Now, you say, "It was an interesting case

19   study of what difference government regulations can

20   make."

21         What was the difference that Chicago's

22   regulations made?

23   A.   The problem with the study, it's fair to

24   say, is that it was a study limited to Chicago

25   for the most part, and so that we were not able

COMPRESSED COPY

Page 146

```
 1   to reproduce the ethnographic study for other

 2   cities that had more relaxed regulations on guns

 3   or less stringent regulations.

 4          But we were able to do comparisons using

 5   other kinds of data.  And, in particular, we

 6   were using the data that were being generated by

 7   surveys in a number of cities through the drug

 8   use forecasting program at that time, where

 9   samples of people arrested were interviewed

10   about a variety of subjects, including their

11   relationship to guns.  And we had access to

12   those data and were able to analyze them.

13      Q.   Okay.  But my question was:  What

14   difference did you find that the government

15   Chicago's regulations made?

16          MR. WOODS:  I'm going to object to the form

17   of the question; assumes facts and vague and

18   ambiguous.

19          THE WITNESS:  We were able to demonstrate

20   that Chicago had one of the lowest gun ownership

21   rates by people arrested and one of the higher --

22   highest rates of people who said that they -- that

23   as arrestees, who said that they would like to

24   obtain a gun, but that it would take them a long

25   time to do so, and they didn't know how.
```

COMPRESSED COPY

Page 147

1           So there was evidence in those data, the

2     drug use forecasting data, that Chicago was not an

3     easy place for thieves and other criminals to obtain

4     guns.  And, in fact, relative to -- to other cities

5     it was one of the most difficult.

6           And that -- that fact is possibly related

7     to the regulations that were in place at that time

8     in the City of Chicago.  At the end of the day we

9     could not say with confidence that that was true.

10          BY MR. THOMPSON:

11     Q.   All right.

12     A.   So --

13     Q.   Do you expect that it will become an easier

14     place for criminals to obtain guns now that it is

15     lawful for individuals to own handguns, provided

16     they're properly permitted?

17          MR. WOODS:  Objection to the form; vague,

18     ambiguous.

19          THE WITNESS:  So what has changed in

20     Chicago that might be relevant is that it is

21     possible now again, as it was before 1982, for

22     private citizens to obtain a gun and to register it,

23     keep it in their home.

24          And so that we might, in fact, see that the

25     prevalence of gun ownership increases somewhat.  And

COMPRESSED COPY

Page 148

1  if we did, then that would, generally speaking,

2  increase the availability of guns within the city.

3          So I would say that the answer is, yes, but

4  with the proviso that given that the registration

5  requirement and the requirement about how guns are

6  to be stored in the home, that this is unlikely to

7  be a large change.

8          BY MR. THOMPSON:

9      Q.   Do you know how many individuals now

10  lawfully possess a handgun in the City of Chicago?

11     A.   I do not know the registration

12  statistics in Chicago.

13     Q.   Do you have even a ballpark sense of how

14  many individuals have a registered handgun in

15  Chicago?

16     A.   I'm sorry.  I don't.  No.

17     Q.   Okay.  Do you have any sense as to how many

18  people have -- or strike that.

19          Do you have a sense as to the rate of

20  increase in lawful handgun ownership in the City of

21  Chicago since the passage of the July 2010

22  ordinance?

23     A.   So I have been told that -- that not a

24  great many people have registered guns since it

25  became legal, but I don't know whether that

COMPRESSED COPY

Page 149

```
 1    means ten or 100 or 1,000.

 2         Q.   Okay.  Who told you that?

 3         A.   I believe Ranjit told me that, sir.

 4              MR. THOMPSON:  Okay.  All right.  Now,

 5    let's turn to our next exhibit.  It's going to be

 6    Cook 13.

 7              (PLAINTIFFS' EXHIBIT 13 WAS MARKED FOR

 8    IDENTIFICATION.)

 9              BY MR. THOMPSON:

10         Q.   And, please, identify this document for the

11    record, sir?

12         A.   This is a chapter of a book titled --

13    the chapter is titled, "The Effect of Gun

14    Availability on Robbery and Robbery Murder:  A

15    Cross-Section Study of 50 Cities."  I wrote this

16    article.  It was published in 1979, is my

17    memory.

18         Q.   All right.  Now, let's turn to page 751.

19    It says in the second -- excuse me.  The third full

20    paragraph, second sentence.  "It is no doubt true

21    that anyone who is determined to obtain a gun will

22    be able to do so given enough money and effort."

23              Do you still believe that statement?

24         A.   I'm sorry.  Say -- the third paragraph?

25         Q.   Third full paragraph.
```

COMPRESSED COPY

Page 150

1          MR. WOODS:  And the page is what?

2          MR. THOMPSON:  751.

3          MR. WOODS:  Okay.

4          MR. THOMPSON:  Second sentence.

5          THE WITNESS:  "It is no doubt true" --

6          MR. WOODS:  I -- there it is.

7          THE WITNESS:  I see it.

8          MR. THOMPSON:  Let me read it.

9          MR. WOODS:  I couldn't find it either.

10         BY MR. THOMPSON:

11    Q.   So we have a clean record here, do you --

12    you wrote in this article, quote, "It is no doubt

13    true that anyone who is determined to obtain a gun

14    will be able to do so given enough money and

15    effort," close quote.

16         Do you -- do you continue to believe that?

17    A.   I -- I think that I would say it in more

18    nuanced form 32 years later, but, generally

19    speaking, I think it's correct.

20    Q.   Okay.  Now, let's turn to page 776.  And

21    under your conclusions you state, in the first

22    sentence, "The conclusions reached from the

23    theoretical and empirical analysis in this chapter

24    are, of course, tentative and subject to a variety

25    of possible sources of error."

COMPRESSED COPY

Page 151

1            What are the sources of error that you were

2    referring to here?

3        A.    One contribution that this article made

4    is that it's one of the very first efforts to

5    develop an indicator for the prevalence of gun

6    ownership, so that we could compare different

7    jurisdictions according to the percentage of

8    households that owned at least one gun.

9            The measure that I introduced in this

10   article is for the average of the percentage of

11   suicides and the percentage of homicides with

12   guns.  It had some degree of validity and was

13   used by various investigators after this.

14           But since then, since then, I have

15   discovered that there is a better, more accurate

16   indicator, and that was the one that was

17   developed and published in -- in 2004.

18           So I think one source of error is that

19   the proxy measure for the density of gun

20   ownership I'm using here is not as accurate as

21   it is possible to be, given the data that are

22   available.  Although, it was of some use at the

23   time.  And it turned out that the basic findings

24   that I had are -- are not changed.

25           Beyond that, I would say that because

COMPRESSED COPY

Page 152

1    this is a typical social science study that does

2    not involve a randomized controlled field trial

3    that there is going to be some question about

4    causal inference from this, and that is likely

5    to be true of any study.  And so it's good to be

6    open and honest about that problem.

7        Q.    When you say, "of any study," of any study

8    that doesn't have a random generalizable sample;

9    correct?

10       A.    If there is -- any study that does not

11   have either -- either a well done field

12   experiment or some other basis where there is a

13   -- an intervention or a change that is so

14   clearly exogenous and can be used to investigate

15   a causal effect.

16           In other circumstances where you don't

17   have that, then you are faced with the situation

18   about doing what you can given the data.  And a

19   skilled econometrician or statistician, I think,

20   can make progress on that and be a good judge

21   about the reliability of the results, and that's

22   what I attempted to do.

23           MR. THOMPSON:  All right.  Let's move to

24   Cook 14.

25           (PLAINTIFFS' EXHIBIT 14 WAS MARKED FOR

COMPRESSED COPY

Page 153

```
 1   IDENTIFICATION.)

 2            BY MR. THOMPSON:

 3       Q.   And, please, identify this document for the

 4   record, sir.

 5       A.   This is an article called, "Does Gun

 6   Prevalence Affect Teen Gun Carrying After All?"

 7   I was one of two authors on it, and it was

 8   published in Criminology in 2004.

 9       Q.   Okay.  And let's turn to page 29.  And it

10   says in the second-to-the-last paragraph, in the

11   last sentence, quote, "The propensity to carry a

12   weapon is associated with indicators of the threat

13   facing youthful males and increases with the local

14   robbery rate and with residents in public housing."

15            Do you know whether the propensity to carry

16   a weapon is associated with indicators of the threat

17   facing all members of the general public --

18            MR. WOODS:   Well, object --

19       Q.   -- who are adults?

20            MR. WOODS:   Objection to the form of the

21   question; vague, ambiguous, overbroad.

22            THE WITNESS:   So I would say that we were

23   in a position with this particular survey to relate

24   self-report about gun carrying to the environmental

25   factors that we report here, and that I am not aware
```

COMPRESSED COPY

Page 154

 1   of other studies that have done that for adults.
 2            BY MR. THOMPSON:
 3        Q.   Okay.
 4        A.   This study being limited to adolescent
 5   males.
 6        Q.   Do you have an opinion on whether other
 7   adults who aren't youthful males would be more
 8   likely to carry a weapon if they're faced with an
 9   increase in the local robbery rate?
10            MR. WOODS:  Same objections.
11            THE WITNESS:  I -- I do not have an opinion
12   about that.  I know that there have been some early
13   analyses of the -- who was obtaining the permits for
14   carrying concealed weapons that suggested a large
15   percentage of them were living in rural areas or
16   other areas that seemed to have a low crime rate,
17   and -- so I'm not at all clear what the relationship
18   is or if there is any relationship for people age 21
19   and over.
20            BY MR. THOMPSON:
21        Q.   Okay.  And let's turn to page 33.  And in
22   this table, about two-thirds of the way down, it
23   says, "Percent threatened" -- let's see.  Oh, it may
24   be halfway through.  Sorry.
25            "Percent threatened with beating or weapon

COMPRESSED COPY

Page 155

1    last 12 months," and there's a 32.2 percent number

2    and a 34.1 percent number.

3              Which is the number that, you know, is more

4    representative of the group that you were looking

5    at?

6              MR. WOODS:  Objection to the form of the

7    question; vague, ambiguous.

8              THE WITNESS:  So, first of all, these two

9    numbers are essentially identical.  In a statistical

10   sense there's no way of distinguishing between them.

11   And we looked at both groups.  Both the group that

12   was less than 18 and the full sample.  So -- but

13   our -- our particular interest was in the group that

14   was 15 to 17.  So if you had to choose, I guess it

15   would be the right hand.

16             BY MR. THOMPSON:

17      Q.    Okay.  Do you think that that number, that

18   34 percent of the individuals in this age cohort

19   were threatened with beating or a weapon in the last

20   12 months is -- would be applicable to Chicago today

21   for the youth in that age group who are male?

22      A.    So this is a -- a national survey, and

23   it is supposed to be representative of

24   adolescent males age 15 to 17 at that point in

25   time.  And I don't know about how it relates to

COMPRESSED COPY

Page 156

1    Chicago today.

2            I -- I think it would be useful to

3    compare the national victimization rate, for

4    example, for this group with the current

5    victimization rate in Chicago for this group,

6    and perhaps you could reach an answer.

7        Q.    All right.  Now, let's turn to page 49.

8    And if we look at the last full paragraph,

9    second-to-last sentence, it says, "But there remains

10   a logical possibility that it is a cultural factor

11   that we might call gun appreciation rather than the

12   actual prevalence of guns that is driving our

13   results."

14           Do you see that, sir?

15       A.    Yes, I do.

16       Q.    What do you mean by, "gun appreciation"?

17       A.    That's a term that we made up, and it

18   doesn't have any kind of technical meaning

19   associated with it.  But what we mean is that a

20   -- an interest in guns or a demand for guns or

21   something of that sort.

22       Q.    And how is it possible that that might be

23   driving your results?

24       A.    The possibility that is here, again, is

25   a logical possibility, is that areas with high

COMPRESSED COPY

Page 157

1    prevalence of gun ownership, which we showed

2    also had a high gun carrying rate, were -- that

3    both the prevalence of ownership and the gun

4    carrying rate were being influenced by a third

5    factor, which -- perhaps a cultural factor or

6    something that had to do with the -- the desire

7    and appreciation of guns.

8           We did what we could in this sample to

9    control for that and to -- and the -- probably

10   the most powerful approach that we took was to

11   use an instrumental variables regression

12   analysis along the way.  So that that was an

13   attempt to see -- to -- to get past this

14   possibility that there was a third cause that

15   was related.

16          MR. THOMPSON:  Shall we eat our lunch?

17          MR. WOODS:  Sure.

18          MR. HAKIM:  Sounds good.

19          THE WITNESS:  We're done?

20          MR. HAKIM:  Or do you want to finish with

21   the exhibit?

22          MR. THOMPSON:  Yeah, we're done.

23          THE VIDEOGRAPHER:  We're now off the

24   record.  The time is 12:37.

25          (RECESS FROM 12:37 P.M. TO 1:02 P.M.)

COMPRESSED COPY

Page 158

1           THE VIDEOGRAPHER:  We are now back on the

2    record.  The time is 1:02.

3           BY MR. THOMPSON:

4      Q.   Professor, let's look back to your report,

5    which is page nine.  And to the second full

6    paragraph, last sentence, where it says, "While the

7    prevalence of gun ownership is not the only

8    determinant of the fractions of assaults and

9    robberies in which the perpetrator uses a gun, it is

10   in my opinion" -- "it is my opinion that it is one

11   important causal influence."

12          What are the other important causal

13   influences?

14     A.   So one influence is going to be the mix

15   of robberies and assaults that we see in a

16   particular time and place that the statistics

17   refer to, and -- for example, if the robbery

18   pattern in a particular city is more about

19   commercial robbery, then there may be a higher

20   use of guns than there would be otherwise.

21          And in the case of assaults if the

22   assaults are more about, for example, gang

23   conflicts or organized crime conflicts, then

24   there's going to be quite likely a higher use of

25   guns.

COMPRESSED COPY

Page 159

1      Q.    Why is there a high use of guns for gangs?

2      A.    It's often the case that gangs have a --

3  and I understand this to be the case in Chicago,

4  that they often keep a -- guns and use them to

5  protect territory or to actually engage in

6  conflict with other gangs as part of the general

7  escalation among gangs that occurs when a city

8  has a high participation in -- in this -- in --

9  in gangs as part of their, for example, drug

10  scene.

11          So it is a combination of kind of a

12  professional organization, if that's the

13  appropriate term, and -- that translates into

14  unusual access and incentive to obtain guns and

15  use them.

16      Q.    Okay.  Now, what are the other important

17  causal influences on the fractions of assaults and

18  robberies in which the perpetrator uses a gun?

19      A.    So the -- another potential causal

20  influence would be, as I say, the -- for

21  example, in the case of robberies, it is a mix

22  of perpetrators and targets that you see, and --

23          But it would be hard to sort that out

24  since the availability of guns may influence the

25  mix of targets.  It's easier for a robber who

COMPRESSED COPY

Page 160

1    has a gun to rob commercial targets, rather than

2    individuals on the street, but it is also true

3    that if you look at a jurisdiction where there's

4    more commercial robberies, you'd expect to see

5    more gun use, just because that's a weapon that

6    the gun has a particularly high payoff in a

7    situation like that than -- even more so than on

8    the street, in terms of producing a successful

9    encounter.

10            I mean the robbery picture is always one

11   of trying to control the situation and use the

12   weaponry as part of that.  And it is sometimes

13   harder to control a -- say a 7-Eleven store than

14   it would be to control a single individual in an

15   alley somewhere.

16       Q.   Are there any other important causal

17   influences on the fraction of assaults and robberies

18   in which the perpetrator uses a gun?

19       A.   What -- what we found in the study that

20   we referenced earlier about the underground gun

21   market was that the percentage of arrestees who

22   reported that they owned a gun or had a gun

23   differed widely among cities, and that -- that

24   certainly was being influenced by the general

25   prevalence of gun ownership, but that wasn't a

COMPRESSED COPY

Page 161

1    perfect match.

2          And, in particular, the arrestees in

3    New York City and Chicago were below the line,

4    so to speak.  So that they were less likely to

5    own a gun than you would expect, given the gun

6    ownership rate in -- in the city.

7          Now, we can only say, well, that perhaps

8    that is because of the policing in those areas,

9    and the fact that in both New York and Chicago

10   there is a long tradition of gun-oriented

11   policing, which reduces the incentive to carry a

12   gun by creating a deterrent, by creating an

13   enhanced probability that if you're armed in

14   public that you'll end up being detected and

15   arrested, something that would not be true in a

16   city that did not have that kind of targeted

17   policing and stop -- stop-and-frisk policies.

18        Q.   Okay.  So I understand that.

19             Any other important causal influences on

20   the fraction of assaults and robberies in which the

21   perpetrator uses a gun?

22        A.   I would say that if you're talking about

23   police-recorded statistics, that it also is

24   going to be influenced by the police practice in

25   recording, especially assaults.

COMPRESSED COPY

Page 162

1           And -- so that you would have to be

2    careful about your data, because the weapon type

3    influences how the crime is recorded for uniform

4    crime reporting purposes, and that might not be

5    homogenous from one city to the next.

6        Q.   Okay.  Any other important causal

7    influences?

8        A.   I'm sure there are, but I think I've

9    exhausted my ideas at the moment.

10       Q.   Okay.  Now, when you talk about prevalence

11   of gun ownership, how are you measuring that?

12           In other words, do you mean to say the

13   percentage of households that own a gun, or do you

14   mean to say the number of guns in the jurisdiction,

15   or is it some other metric?

16           MR. WOODS:  Objection to the form of the

17   question; vague and ambiguous.

18           THE WITNESS:  The gun prevalence measure

19   that I have used in recent studies is the percentage

20   of suicide with gun in the jurisdiction, and that

21   measure was validated against other kinds of data

22   about the prevalence of gun ownership, namely survey

23   data.

24           BY MR. THOMPSON:

25       Q.   But I'm asking a different question, a more

COMPRESSED COPY

Page 163

1    fundamental question.  Regardless of what proxy you

2    use, I'm asking, what are you trying to measure?

3            Are you trying to measure the percentage of

4    households that own a gun when you talk about gun

5    prevalence, or are you trying to measure the number

6    of guns in the jurisdiction?

7            MR. WOODS:  Same objections.

8            THE WITNESS:  Yeah, and I think I'm trying

9    to give a responsive answer.

10           BY MR. THOMPSON:

11       Q.   Okay.  All right.

12       A.   It is what sounds like maybe too

13   technical an answer, but it is simply that what

14   I know about this measure is that it predicts

15   very accurately the percentage of households

16   that own a gun.

17           So I'm confident in saying that what

18   it's telling us is something about the variation

19   over time and across jurisdictions in the

20   percentage of households that own a gun.

21           I have not been able to explore the

22   question about how it matches against the number

23   of guns that are in circulation.

24       Q.   Do you -- do you have an opinion as to

25   whether the number of guns in circulation in a

COMPRESSED COPY

Page 164

1    particular jurisdiction has an impact on any crime

2    rate?

3         A.   Yes.  I think that the number of guns is

4    going to be an important factor in availability

5    and in the supply of guns flowing to the

6    underground market, and, furthermore, it is my

7    best guess, but I have not confirmed this, that

8    the number of guns in private hands is going to

9    be closely related to the prevalence of gun

10   ownership.  Unfortunately, I can't test that

11   guess directly from the data.

12        Q.   And is it your understanding that the more

13   guns there are in a jurisdiction, and, therefore,

14   the more availability and the more crimes available

15   for criminal -- guns available for criminals there

16   will be an increase in gun-related violence?

17        A.   So my findings have been that, quite

18   consistent, really going back to that article

19   from 1979, and certainly the more recent work,

20   that the effect of gun prevalence and gun

21   availability is to increase the percentage of

22   robberies and the percentage of assaults that

23   involve guns.

24             So, yes, is the answer.  That other

25   things equal, a jurisdiction with a high

COMPRESSED COPY

Page 165

1   prevalence of guns will have a higher percentage

2   of their robberies and assaults committed with a

3   gun.

4        Q.   Other things equal, will a jurisdiction

5   with a larger number of guns, but the same

6   percentage of households that own guns, have a

7   higher murder rate?

8        A.   I --

9             MR. WOODS:  Object on the grounds of

10  incomplete hypothetical.

11            THE WITNESS:  So I am not able to answer

12  that question from the evidence that I've looked at,

13  because in none of the studies that I've done have I

14  been able to distinguish between the number of guns

15  in circulation and the prevalence of gun ownership.

16            It is logically possible that there's some

17  difference, that they're not perfectly correlated

18  with each other, but it is not possible for me to

19  measure the number of guns in circulation.

20            BY MR. THOMPSON:

21       Q.   So you don't have an opinion on the

22  question I asked?

23       A.   That's right.

24       Q.   Okay.

25       A.   Yeah.

COMPRESSED COPY

Page 166

1      Q.   Now, let's -- okay.   Are there some people

2  who feel more secure because they are permitted to

3  carry a firearm lawfully for self-defense?

4          MR. WOODS:   Objection; foundation.

5          THE WITNESS:   I think what we observe is

6  that there are people who are willing to not only go

7  through the trouble of carrying a firearm, but to

8  pay a fee for -- for the permit that allows them to

9  do that.

10          So that we know that they are motivated to

11  carry a firearm.   I suppose that the motivation is

12  about security and self-protection, though in some

13  cases it might be something else, like showing off

14  or having the opportunity to intimidate other

15  people.

16          BY MR. THOMPSON:

17      Q.   Have you made any effort to try to quantify

18  the value of individuals feeling more secure by

19  virtue of their ability to lawfully carry a handgun?

20      A.   No, I have not.

21      Q.   All right.   Now, you say on page ten, on

22  the top of the document -- let's see.   The very

23  first line, quote, "I conclude that an increase in

24  gun ownership has on balance neither a deterrent

25  effect on violent crime, nor does it augment

COMPRESSED COPY

Page 167

```
 1    violence rates."

 2              Are you making that statement as it applies

 3    to Chicago?

 4         A.   I am making the statement on the basis

 5    of the conclusion that follows from research

 6    that I've done, where I look simultaneously at a

 7    large number of jurisdictions and the patterns

 8    that I see there.

 9              Those patterns that have shown up in my

10    research in reliable fashion have been just what

11    it says here, that if you look at either a

12    cross-section or even a panel data study where

13    you're -- you're looking at the effect of

14    changes over time in gun prevalence that there's

15    no indication that the overall rates of robbery

16    or assault are changing or influenced by the

17    prevalence -- the prevalence of gun ownership.

18              So, again, since that's true for the 200

19    counties we looked at and true generally, it was

20    a reasonable inference that would -- it would

21    also apply to Chicago.

22         Q.   And you're making that inference?

23         A.   Yes.

24         Q.   Okay.  And then if we look at the last

25    sentence in that paragraph, you say, "On average a
```

COMPRESSED COPY

Page 168

1    ten percent increase in the prevalence of gun

2    ownership increased the homicide rate by about two

3    percent."

4              Will you expect that to be true for

5    Chicago?

6         A.   That would be my first and best guess

7    about the effect.  Yes.

8         Q.   Do you think that a law requiring that guns

9    kept in houses with minors that those guns be

10   secured would have any impact on the relationship

11   you are positing between gun prevalence and homicide

12   rates?

13             MR. WOODS:  And I'm going to object on the

14   grounds that it's beyond the scope of his expert

15   opinions in the case, as well as being an incomplete

16   hypothetical.

17             THE WITNESS:  So I -- I have no research on

18   that question, and there hasn't been any opportunity

19   to investigate it in the case of Chicago.  So my

20   expert opinion has not been formed.

21             BY MR. THOMPSON:

22        Q.   And are you making a causal claim in this

23   sentence that says, "A ten percent increase in the

24   prevalence of gun ownership" -- "gun ownership

25   increased the homicide rate by about two percent"?

COMPRESSED COPY

Page 169

1          MR. WOODS:  I'm going to object to the form

2    of the question; vague and ambiguous.

3          THE WITNESS:  In effect I am.  I'm saying

4    that if you see an -- a jurisdiction that

5    experiences an increase in the prevalence of gun

6    ownership, then it is a predictable result that its

7    homicide will be higher as a result than it would

8    have been otherwise.

9          BY MR. THOMPSON:

10      Q.   Okay.  Now, when you make the statement,

11   "On average a ten percent increase in the prevalence

12   of gun ownership increased the homicide rate by

13   about two percent," are you including in that

14   measure of gun -- prevalence of gun ownership

15   illegally-possessed guns and lawfully-possessed

16   guns?

17      A.   The -- the measure that I have, again,

18   is the percent suicide with guns.  That's the --

19   the proxy that I've been using for the

20   prevalence of gun ownership, and I would say

21   that that proxy does not make that distinction.

22      Q.   Do you know whether there is a stronger

23   causal relationship between a prevalence of

24   illegally-possessed guns and homicide rates than

25   there is between lawfully-possessed guns and

COMPRESSED COPY

Page 170

1   homicide rates?

2        A.    From -- from my research there's no

3   distinction between those two.  It is really the

4   prevalence of gun ownership in households -- or

5   gun possession, if you want to be technical

6   about it.

7        Q.    What research have you done that bears on

8   that issue, as to whether there's a stronger causal

9   impact of illegally-possessed guns as opposed to

10  lawfully-possessed guns on homicide rates?

11       A.    I have not looked at that specifically.

12  I've looked at the question about how does the

13  prevalence of gun ownership influence outcomes

14  where prevalence is defined in a way that is not

15  going to distinguish between whether the guns

16  are owned legally or illegally.

17       Q.    Right.  And so, I guess, my question is:

18  Do you have an opinion as to if you had a measure

19  that looked and identified prevalence of

20  illegally-possessed guns --

21       A.    Okay.

22       Q.    -- and you had a measure that identified

23  prevalence of lawfully-possessed guns, do you have

24  an opinion as to whether there would be a different

25  causal impact on homicide rates between those two