# Exhibit B

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   ILLINOIS ASSOCIATION OF      )
     FIREARMS RETAILERS, KENNETH  )
 4   PACHOLSKI, KATHRYN TYLER,    )
     and MICHAEL HALL,            )
 5                                )
                  Plaintiffs,     )
 6                                )   Civil Action
          vs.                     )   10-cv-04184
 7                                )
     THE CITY OF CHICAGO and RAHM )
 8   EMANUEL, Mayor of the City   )
     of Chicago,                  )
 9                                )
                  Defendants.     )
10

11

12          The deposition of JOSEPH GORMAN, called

13   by the Plaintiffs for examination, taken

14   pursuant to the Federal Rules of Civil Procedure

15   of the United States District Courts pertaining

16   to the taking of depositions, taken before

17   Marianne Nee, a Certified Shorthand Reporter of

18   the State of Illinois, CSR License No. 84-2341,

19   taken at 33 North Dearborn Street, Suite 300,

20   Chicago, Illinois, on October 6, 2011, at 9:03

21   a.m.

22

23                    # # # # #

24

25
```

Page 2

```
 1    APPEARANCES:

 2         COOPER & KIRK

 3         1523 New Hampshire Avenue, N.W.

 4         Washington, D.C.  20036

 5         BY:  MR. PETER A. PATTERSON

 6         (202) 470-5580

 7         ppatterson@cooperkirk.com

 8

 9              On behalf of the Plaintiffs,

10

11         ASSISTANT CORPORATION COUNSEL

12         CITY OF CHICAGO, DEPARTMENT OF LAW

13         30 North LaSalle Street

14         Suite 1230

15         Chicago, Illinois  60602-2580

16         BY:  MR. WILLIAM MACY AGUIAR

17         (312) 744-4216

18         waguiar@cityofchicago.org

19              On behalf of the Defendants.

20

21

22

23

24    REPORTED BY:  MARIANNE NEE, CSR, CRR, RDR

25              Illinois CSR No. 84-2341
```

Joseph Gorman

Chicago, IL

October 6, 2011

1             T A B L E   O F   C O N T E N T S

2     WITNESS                                    PAGE

3     JOSEPH GORMAN

4      By Mr. Patterson                      4, 77

5      By Mr. Aguiar                            74

6

7

8                 E X H I B I T S

9     NUMBER              DESCRIPTION           MARKED

10           Gorman Deposition Exhibits

11

12

13      (No exhibits were marked or attached.)

14

15

16

17

18

19

20

21

22

23

24

25

Joseph Gorman
Chicago, IL
October 6, 2011

1              P R O C E E D I N G S:

2              (Witness sworn.)

3              JOSEPH GORMAN,

4     called as a witness herein, having been first

5     duly sworn, was examined and testified as

6     follows:

7                   EXAMINATION

8     BY MR. PATTERSON:

9         Q    If you would, please state your name

10    for the record.

11        A    My name is Joseph Gorman, G-o-r-m-a-n.

12        Q    Commander Gorman, have you ever been

13    deposed before?

14        A    Yes, I have.

15        Q    So you're probably familiar with the

16    basic ground rules which are mainly just that we

17    try not to speak over one another, so I'll try

18    to let you answer your questions completely

19    before I start in again, and if you could do the

20    same, that would be great.  And just if you need

21    a break, let me know, and I would be happy to

22    oblige.  Just if a question is pending, I would

23    request that you answer the question first.

24              So what -- in the cases that you were

25    deposed before, have you ever been put forward

Joseph Gorman

Chicago, IL

October 6, 2011

1    as a potential expert witness?

2        A    On the cases I was deposed on?

3        Q    Yes.

4        A    No, not to my recollection.

5        Q    And in any other cases have you ever

6    been put forward as an expert witness?

7        A    Any other?

8        Q    Any other cases.

9        A    Yes.

10        Q    And what was the subject of your

11    testimony in those cases?

12        A    The subject was in the field of gangs.

13        Q    And how many of those cases have there

14    been?

15        A    Numerous times in Cook County.  I don't

16    know the exact amount, but I've testified in

17    federal court also.

18        Q    Okay.  And if you could just for the

19    ones that you remember, could you explain

20    basically what the substance of your testimony

21    was?  So just if you could go through each case

22    that you can remember and just explain what the

23    basic substance of your testimony was in those

24    cases.

25        A    The majority of cases were involving

Joseph Gorman                                                    October 6, 2011
                            Chicago, IL

Page 6

1    the Gangster Disciples street gang, and I

2    testified as to the organization of the Gangster

3    disciples.

4        Q    So other than the Gangster Disciples

5    street gang, are there any other subjects in

6    which you've provided expert testimony?

7        A    Yes.

8        Q    And what would those be?

9        A    New Breed Black Gangsters which are now

10   the New Breeds.

11       Q    Any other subject?

12       A    It's been awhile.  I don't recall

13   exactly what I've testified to, but I've

14   testified numerous times at Cook County, at the

15   Cook County Criminal Building at 26th and Cal.

16       Q    Okay.  And even if you don't remember

17   the specifics, have those all involved gang

18   activity in Chicago?

19       A    Yes.

20       Q    So you consider yourself an expert in

21   gang activity in Chicago?

22            MR. AGUIAR:  Let me object to the form

23   of the question.

24   BY THE WITNESS:

25       A    I consider that through the experience

Joseph Gorman                                                                October 6, 2011
                                    Chicago, IL

Page 7

1    that I've gained through the Chicago Police

2    Department that I have knowledge of inner

3    workings of the street gangs within the City of

4    Chicago, and I've been called before by

5    prosecutors based on my experience with the

6    gangs and my working relationship with the Gang

7    Prosecution Unit in the Cook County State's

8    Attorney's Office as well as U.S. Attorney's

9    Office which I've been working with since 1995.

10   BY MR. PATTERSON:

11      Q    Okay.  And does your expertise or

12   knowledge extend -- about gangs extend beyond

13   Chicago or is it primarily limited to gang

14   activity in Chicago?

15      A    Chicago is unique.  The problems, gang

16   problems in Chicago not only affect the City of

17   Chicago but they directly affect the surrounding

18   suburbs, they affect the different states within

19   our country.

20           And in numerous instances during the

21   course of investigations which I've participated

22   in, a lot of our investigations took place

23   outside of the City of Chicago.  However, it was

24   the gang members living outside the City of

25   Chicago that were part of the problem in the

Joseph Gorman
October 6, 2011

Chicago, IL

1    City of Chicago and that's why we would extend

2    our boundaries because gangs have no boundaries.

3         The city has its limits, but in order

4    to attack and combat our gang problem, which is

5    unique to other cities, we have to extend beyond

6    the boundaries of our city.

7    Q    Okay.

8         MR. AGUIAR:  May I just make a

9    statement for the record?  Is that okay with

10   you, Mr. Patterson?

11        MR. PATTERSON:  Yes.

12        MR. AGUIAR:  The City has disclosed

13   Commander Gorman pursuant to Rule 26 (a)(2)(C)

14   on the schedule for the disclosure of expert

15   witnesses.  To the extent that the testimony

16   that Commander Gorman may provide could fall

17   under Rules 702, 703 or 705 of the Federal Rules

18   of Evidence, I just want to make it clear as to

19   why he was disclosed in the manner he was

20   disclosed and why he's here today.

21        MR. PATTERSON:  Okay.

22   BY MR. PATTERSON:

23   Q    And so I understand you're saying

24   Chicago has a unique problem with gangs and

25   other cities, so would you agree that your

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1    knowledge about any unique problems that other

2    cities have with gangs is not relevant here?

3          MR. AGUIAR:  Object to the form of the

4    question.

5    BY THE WITNESS:

6      A    I don't understand the question.

7    BY MR. PATTERSON:

8      Q    Let me rephrase it.  Do you have any --

9    do you have knowledge about the problems that

10   other cities other than Chicago have with gangs?

11     A    I have knowledge that our gangs extend

12   beyond the city limits.

13     Q    Okay.  But in terms of the specific

14   problems that other cities face with gangs, your

15   knowledge is based on Chicago gangs whose

16   activities extend to those other cities, is that

17   what you're saying?

18     A    My knowledge is not only on Chicago

19   gangs extending through -- to other cities, it

20   is through communication with people in law

21   enforcement and other agencies within the State

22   of Illinois.

23          In addition to that, I've spoken to

24   peers from Los Angeles, talking to peers from

25   New York, and Chicago is very unique in its gang

Joseph Gorman                                                    October 6, 2011
                          Chicago, IL

1    environment.

2        Q    And you said your expertise or your

3    knowledge is based on your experience.  Have you

4    ever done any review of social science research

5    about gangs and firearms?

6            MR. AGUIAR:  Object to the form.  You

7    may answer.

8    BY THE WITNESS:

9        A    No.  In my experience, I've got 25

10   years of experience, and in every facet of my

11   career I've worked on the street and I've worked

12   combatting gangs in the City of Chicago.

13   BY MR. PATTERSON:

14       Q    Okay.  So in that time on the street

15   you haven't also supplemented that with any

16   study of social science research?

17           MR. AGUIAR:  Object to the form.  You

18   may answer.

19   BY THE WITNESS:

20       A    No, I haven't.

21   BY MR. PATTERSON:

22       Q    Okay.  And to step back, you mentioned

23   your 25 years of experience.  I want to ask

24   about that a little bit.  First, what education

25   have you had post-high school?

```
 1      A     Post-high school I got a bachelor of
 2   arts degree from Northern Illinois.
 3      Q     And what is that degree in?
 4      A     Social studies.
 5      Q     And within social studies did you have
 6   any particular concentration?
 7      A     Criminal justice.
 8      Q     And when did you complete that degree?
 9      A     1985.
10      Q     Have you had any other education beyond
11   that?
12      A     Training within the department.  I've
13   gone to seminars within the Chicago Police
14   Department.
15      Q     Okay.  And have those seminars
16   addressed handguns or gun violence in any way?
17      A     Yes.  I just returned from a seminar in
18   Washington with the FBI and numerous other
19   cities throughout the country, and the topic was
20   gangs and violence.
21      Q     Okay.  And were you an attendee at that
22   seminar?
23      A     I was an attendee as a representative
24   from the City of Chicago and our gang situation.
25      Q     Okay.  Were you a presenter in any way
```

Page 12

1    at that seminar?

2        A    I was requested and sent by the

3    superintendent as an expert from the field of

4    gangs.

5        Q    Okay.  And how did you participate in

6    the seminar?

7        A    It was a seminar which addressed

8    problems around the country that different

9    cities had with gang violence.  There was --

10   great discussion was on the problem that Chicago

11   has with the violence and guns within the City

12   of Chicago, and it was an all-day seminar held

13   at the Hoover Building which was attended by

14   approximately 25 people around the country.

15       Q    Okay.  In the discussion of the problem

16   with gangs and guns in Chicago at that seminar,

17   was there any discussion of Chicago's firearms

18   laws?

19       A    Not to my recollection, not to my

20   recollection.

21       Q    Okay.  What is your opinion about the

22   problem of gang violence in Chicago?  Is it a

23   serious problem?

24       A    I think it's a monumental problem.  I

25   think that our gang structure is third

Joseph Gorman                                                    October 6, 2011

Chicago, IL

Page 13

1    generation to say the least.  Gangs that are

2    entrenched in the City of Chicago, in my

3    opinion, it's detrimental and it's what

4    spearheads the violence in the City of Chicago.

5          There is approximately 80 gangs within

6    the City of Chicago.  There is approximately

7    80,000 recognized gang members in the City of

8    Chicago and I look at gangs as a form of urban

9    terrorism.

10     Q    And how do firearms relate to, as you

11   described it, the monumental gang problem the

12   city is facing?

13     A    I think at this time we are at 318

14   murders in the City of Chicago.  I can say that

15   roughly 90 percent of those murders are

16   committed by firearms.  We're at approximately

17   1,228 aggravated batteries where a person is

18   shot by a firearm, and that's 100 percent of the

19   1,228 approximately that are attributed to

20   firearms, and that's in the City of Chicago.

21          I would say 50 to 60 percent of that,

22   of the violence is perpetrated by gang members,

23   and I would say roughly that approximately 80 to

24   85 percent of the people that are either shot or

25   are the shooters are members of a gang.

Joseph Gorman                                        October 6, 2011
                        Chicago, IL

1      Q     So 80 to 85 percent of the 1,228

2   aggravated batteries, the victims of those

3   batteries and the perpetrators of those

4   batteries would be gang members?

5      A     Approximately, either victims or

6   offenders, and it may not be attributed to a

7   gang conflict.  It may be attributed to as

8   simple as I didn't like the way you looked at my

9   girlfriend and it posed a threat where a guy

10  would immediately pull out a gun and shoot

11  somebody because they didn't like the way that

12  he looked at his girlfriend.

13     Q     So it may not be gang related but there

14  are gang members involved in the incident?

15     A     Correct.

16     Q     How do gang members in Chicago in your

17  experience acquire firearms?

18     A     There is a variety of ways that they

19  acquire firearms.  Through burglaries.  There

20  was -- in my experience there have been

21  situations where gangs targeted people and

22  particular police officers that they knew had

23  weapons in their residence, and as an initiation

24  into, in order to get into that particular gang,

25  they would have to break into a police officer's

Joseph Gorman                                          October 6, 2011
                        Chicago, IL

Page 15

1    house and steal his firearm.

2              There is straw purchasing.  In my

3    experience I participated in investigations of

4    straw purchasing.  I participated in

5    investigations where gang leaders purchased

6    firearms from the surrounding suburbs which have

7    gun shops in particular.  In 1995 a board member

8    for the Gangster Disciples which we were

9    investigating, Darryl Johnson, whose nickname

10   was Pops, utilized somebody with an FOID card to

11   purchase weapons out in Sauk Village on Sauk

12   Trail.  Those weapons immediately came into the

13   City of Chicago.

14             We intercepted them and subsequently at

15   the conclusion of the investigation Darryl

16   Johnson got the death penalty, the first .death·

17   penalty in District 7 in the United States

18   court, government court.  There has been

19   numerous instances in my experience and now in

20   my supervision of the CAGE unit, guns come

21   through straw purchasing, through persons that

22   have firearm cards that sell illegally to

23   members of gangs within the City of Chicago.

24             There is a variety of means and I may

25   have not touched on all of them, but there is a

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

                                                              Page 16

1    variety of means.  Gangs are innovative on their

2    ability to get firearms.

3        Q    And in your experience is it difficult

4    for gang members in Chicago to acquire firearms?

5        A    I think with the laws that we have in

6    place that it makes it more difficult, and

7    through my experience in being in the field and

8    attempting to purchase firearms, I've learned

9    that they've had to go through obstacles in

10   order to obtain firearms because, what I

11   believe, of the laws that we have in place in

12   the City of Chicago.

13            So I think it's a deterrent.  However,

14   gang members do come in possession of firearms

15   which end up in the City of Chicago.

16       Q    In your experience are there any -- is

17   is there any indication to believe there are

18   gang members in Chicago that would desire to

19   possess a firearm but because of the city's laws

20   are not able to obtain one?

21       A    Can you repeat that?

22       Q    Yes.  In your experience --

23            MR. PATTERSON:  Well, can you read the

24   question back?

25                    (Record read.)

Joseph Gorman                                                    October 6, 2011

Chicago, IL

1         MR. AGUIAR:   I'm going to object to the

2    form.   You may answer.

3    BY THE WITNESS:

4       A    I believe that the laws that we have in

5    place, similar to that of a traffic signal,

6    gangs will violate the laws to get firearms

7    within the City of Chicago, just like, you know,

8    there is instances when law-abiding citizens may

9    violate a red light or a stop sign, but I think

10   it's a deterrent to get firearms in the City of

11   Chicago by gang members, what we have in place.

12   BY MR. PATTERSON:

13      Q    So my question is, does that deterrent

14   actually work to prevent any gang members from

15   acquiring firearms, that it is harder to acquire

16   one?

17      A    Absolutely.

18      Q    And what instances are you aware where

19   that has happened?

20      A    There has been numerous instances when

21   we've attempted to buy firearms and the gang

22   members that were attempting to buy firearms had

23   a hard time contacting somebody that may

24   lawfully with an FOID card be able to go and buy

25   a firearm for them, so it would be difficult for

Joseph Gorman                                          October 6, 2011
                        Chicago, IL

1      them, unless they were able to facilitate buying

2      a firearm by getting somebody with an FOID card.

3           There has been instances where I've

4      been privy to on the street where somebody with

5      an FOID card would refuse to purchase a firearm

6      for a gang because they knew that the guy was a

7      convicted felon or that it was illegal, so it

8      would -- it prevented a person who had a lawful

9      FOID card from buying a gun for a gang member.

10     Q    And in those instances if the gang

11     member was unable to find someone to essentially

12     I guess do a straw purchase for him -- is that

13     what you're describing basically?

14     A    That's what I described.

15     Q    (Continuing) -- is there any indication

16     that a gang member couldn't obtain a gun either

17     by -- through burglary or through an illegal

18     transaction with someone else?

19          MR. AGUIAR:  I'm going to object to the

20     form.  You may answer.

21     BY THE WITNESS:

22     A    They could, but the laws in place -- if

23     they are going to go commit a burglary, in the

24     back of their mind they are going to commit a

25     crime, so I think that is a deterrent to the

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1    majority and that's why we don't have as many

2    firearms on the street as, you know.

3    BY MR. PATTERSON:

4        Q    Okay.  And have you ever done any --

5    looked into -- strike that question.

6            Have you ever looked into the price

7    that gang members and other criminals in Chicago

8    pay for firearms in illegal firearms

9    transactions?

10           MR. AGUIAR:  I'm going to object to the

11   form of the question.  I don't know what you

12   mean by looked into.

13           You may answer.

14   BY THE WITNESS:

15       A    In my experience -- I've participated

16   in the purchase of firearms and in my experience

17   the gangs would pay a higher price than what the

18   firearm is actually worth.

19   BY MR. PATTERSON:

20       Q    And how much of a higher price would

21   gang members pay?

22       A    It fluctuates.  Depending on the

23   different investigations that we had, it

24   fluctuates.  I couldn't put a pinpoint, you

25   know, whether it's double, whether it's $100

Joseph Gorman                                             October 6, 2011
                          Chicago, IL

1    more, but it fluctuates.

2        Q    And how do you assess the value of what

3    the firearm is worth?

4        A    How do I assess?

5        Q    Yeah.  In saying that the gang members

6    pay more than the firearm is worth, what do you

7    base your assessment on for the worth of the

8    firearm?

9        A    I don't understand the question.

10       Q    I'm just trying to get at the basis for

11   your statement that gang members, in these

12   transactions you've been involved in, the price

13   that's been paid is higher than what the firearm

14   is worth.  So what is your basis for assessing

15   the underlying value of the firearm that you're

16   using to make that comparison?

17       A    We look at the retail sale value and

18   then there is instances where, you know, markup

19   would be minimal and there has been instances

20   where the markup would be remarkable, and it

21   would -- it was almost unrealistic, the price

22   that they would be asking --

23       Q    Okay.

24       A    -- in the process of us purchasing

25   firearms.

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1      Q     Okay.  And have you -- you've never

2   reviewed any research, empirical research on the

3   price that gang members in Chicago pay for

4   firearms?

5      A     Have I reviewed research?

6      Q     Any empirical research.

7      A     I don't understand the question.

8      Q     Have you reviewed any type of study

9   that has attempted to determine, say, the

10  average amount that a gang member in Chicago

11  pays for a firearm?

12     A     No.  My answer is based on my

13  experience of working with gangs.

14     Q     And I believe you said that Chicago's

15  laws have decreased the number of guns on the

16  street or something of that nature, is that what

17  you --

18     A     In my opinion.

19     Q     Okay.  You said you've talked to some

20  of your peers in cities such as Los Angeles and

21  New York, possibly other cities.  Do you have

22  any basis to believe that Chicago's laws --

23  strike that question.

24           Have you ever talked to your peers in

25  cities that permit sales of firearms within the

Joseph Gorman                                              October 6, 2011
                           Chicago, IL

1      city about how that contributes to a criminal's

2      ability to obtain firearms?

3             MR. AGUIAR:  Object to the form and the

4      foundation.  You may answer.

5      BY THE WITNESS:

6         A      Pertaining to that subject, no.

7      BY MR. PATTERSON:

8         Q      Okay.  And what are Chicago's laws that

9      are in place that, in your opinion, deter

10     criminals from obtaining firearms?

11        A      The registration of firearms, that we

12     have stringent laws on registration of firearms.

13     Prior to the recent decision by the Supreme

14     Court, firearms weren't allowed to be purchased

15     within the City of Chicago.

16        Q      So other than the registration of

17     firearms, what other laws does Chicago have in

18     place that deter criminals from obtaining

19     firearms?

20            MR. AGUIAR:  I'm going to object.  Do

21     you mean criminals in general or do you mean

22     gang members?

23            MR. PATTERSON:  Well, let's start with

24     --

25            MR. AGUIAR:  I just want a

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1    clarification.

2            MR. PATTERSON:  Right.  Let's start

3    with gang members.

4    BY THE WITNESS:

5        A    What was the question again?

6    BY MR. PATTERSON:

7        Q    What laws other than the -- does the

8    registration of firearms in your opinion

9    deter -- Chicago's registration requirements

10   deter gang members from obtaining firearms?

11       A    If a gang member has a lawful FOID

12   card, he can purchase a firearm.

13       Q    Right.  So would you -- go ahead.

14       A    And that gang member, because there are

15   a number of gang members, gang leaders that have

16   FOID cards or have the ability to obtain an FOID

17   card, I think there is a deterrent in that they

18   have to register it because now that puts that

19   particular person on the radar potentially of

20   having a weapon.

21       Q    So the registration --

22       A    I think there is a deterrent among gang

23   members to do that.

24       Q    So gang members don't want to register

25   with the authorities that they have firearms, is

Joseph Gorman                                      October 6, 2011
                        Chicago, IL

                                                    Page 24

1    that what you're saying?

2        A    That would potentially be a deterrent

3    because they wouldn't want law enforcement to

4    know, you know, what they're doing or what their

5    involvement is.  They try to stay away from the

6    criminal element.  Some of the gang leaders

7    don't have backgrounds.

8        Q    Right.  So in your experience is it

9    fair to say that even gang leaders that don't

10   have backgrounds and could potentially qualify

11   for a Chicago firearm registration license

12   nevertheless don't obtain those or go through

13   the registration process?

14       A    There is probably a great number that

15   don't.

16       Q    Would you say that it's a majority that

17   don't?

18       A    Based on my experience, I would say

19   that -- I couldn't quantify if it's a majority

20   but I would think that it would be a deterrent

21   for gang leaders to lawfully register a firearm.

22       Q    And other than the registration

23   requirements, are there any other laws that

24   Chicago has in place that deter gang members

25   from obtaining firearms?

Page 25

```
 1      A     Ordinances, I believe the ordinances

 2   that -- about weapons outside the residence, the

 3   sale of firearms within the City of Chicago.

 4      Q     How do the ordinances dealing with

 5   weapons outside the residence deter gang members

 6   from obtaining firearms?

 7      A     I don't understand the question.

 8      Q     You said Chicago's ordinances -- my

 9   understanding of what you said was that

10   Chicago's ordinances dealing with the possession

11   of weapons outside the residence deter gang

12   members from obtaining firearms.  My question is

13   just how do those ordinances do that?

14      A     Well, the gang members that may

15   lawfully be able to purchase firearms, in

16   numerous instances their associates would have

17   criminal backgrounds, and the gang member and

18   the associates with criminal backgrounds which

19   -- gangs are territorial.  If a gang leader,

20   gang member lives in a particular area and there

21   is instances where gangs potentially sell drugs

22   on the street or congregate in particular areas,

23   and it would be a deterrent because the -- it

24   may deter a gang member from purchasing a weapon

25   and registering a weapon because of whom that
```

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1     particular person associates with that he

2     wouldn't want -- he or she wouldn't want

3     attention drawn to them through their

4     association with other persons that are

5     convicted or have backgrounds that would not

6     allow them to possess firearms.

7         Q     And how does the limitation on -- I

8     still don't understand how the limitation on

9     possessing weapons outside the residence affects

10    that process you just described.

11        A     How that affects the process?

12        Q     How it -- yeah, how that limitation

13    deters gang members from obtaining firearms if

14    they can't possess it outside the residence.

15            MR. AGUIAR:  Do you understand the

16    question?

17            THE WITNESS:  No.

18    BY MR. PATTERSON:

19        Q     Okay.  My question again, sorry if it

20    was unclear, but you said that one of the -- let

21    me make sure I understand what you said.

22            I thought you said that Chicago's

23    limitation on possessing weapons outside the

24    residence deterred gang members from obtaining

25    firearms, is that correct?

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1       A     It may deter I said.

2       Q     Okay.  And how may it do that?

3       A     As I said earlier, as far as bringing

4    attention to themselves, their associations.

5       Q     Right.

6       A     Gangs are territorial.  If they're

7    living within the city boundaries, having a

8    firearm outside the residence is dangerous for

9    first responders.  It poses the problem, a gang

10   member possessing a firearm outside his

11   residence with potentially domestic disputes

12   amongst other neighbors.  It poses a threat of a

13   gang member that may lawfully possess a firearm

14   outside his residence, that they may utilize

15   that as a form of intimidation on opposing gangs

16   or on residents in the community.

17      Q     So I understand that your position is

18   the limitation on weapons outside the residence

19   may promote public safety for various reasons.

20   But how does -- how may it deter gang members

21   from actually acquiring a firearm in the first

22   place?

23      A     It may not deter them, but in the back

24   of their mind, as far as possession of firearm

25   outside their residence and, like I said

Joseph Gorman                                                    October 6, 2011
                            Chicago, IL

                                                              Page 28

1    earlier, because of their acquaintance and

2    associations, that potentially it will possibly

3    deter them not to bring attention from the

4    police to them.

5        Q    Okay.  And so you're assuming that if

6    Chicago permitted possession of weapons outside

7    the residence, it would require some sort of

8    permit or license to do that?  Is that how

9    possessing firearms outside the home would bring

10   attention to the public authorities or is there

11   some -- I'm just not understanding how

12   possessing outside the home would draw attention

13   to someone, so if you could just explain that a

14   little more.

15           MR. AGUIAR:  I'll object to the form.

16   I'm confused as well.

17   BY THE WITNESS:

18       A    As I indicated earlier, it may draw

19   unnecessary attention to them because of their

20   associations, and a gang member may not possess

21   a gun if he desires because -- or register a gun

22   because of unnecessary attention that would be

23   drawn because of his association with

24   potentially people convicted of felonies.

25

Joseph Gorman                                          October 6, 2011
                            Chicago, IL

                                                        Page 29

1    BY MR. PATTERSON:

2        Q    So I understand that may be why he

3    wouldn't register a gun.  But why would he not

4    possess a gun because of that without

5    registering?

6             MR. AGUIAR:  I'm going to object to the

7    form.  I think you went in a different

8    direction.

9    BY THE WITNESS:

10       A    I don't understand the question.

11   BY MR. PATTERSON:

12       Q    What I'm trying to get at here and what

13   I've been asking is how does Chicago's

14   limitation on weapons outside of the residence,

15   how may it deter gang members from obtaining

16   firearms in the first place, and you've

17   responded about bringing attention to themselves

18   and their associations.

19            So I'm just trying to understand how

20   possessing a weapon outside of the home or, you

21   know, possessing a weapon at all would bring

22   attention to a gang member and/or his

23   associations.

24       A    That's about three questions in one.

25       Q    Okay.

Joseph Gorman                                          October 6, 2011
                    Chicago, IL

                                                        Page 30

 1      A    I apologize.  I'm trying to --

 2      Q    No.  We're obviously not -- we're

 3    speaking past each other some here.

 4           MR. AGUIAR:  If I may, with your

 5    permission.

 6           MR. PATTERSON:  Sure.

 7           MR. AGUIAR:  I think what he is trying

 8    to get at is does the city's limitation on the

 9    possession of firearms outside the home keep

10    gang members from getting guns?  In other words,

11    if guns were allowed outside the home in areas

12    such as the yard or the garage or the porch,

13    would that lead to gang members acquiring

14    weapons improperly?  I think that's what he's

15    getting at.

16           MR. PATTERSON:  Yes.

17           THE WITNESS:  Would that lead to gang

18    members --

19           MR. AGUIAR:  If guns were allowed in

20    areas such as yards, porches and garages, would

21    that lead to gang members potentially getting

22    their hands on weapons illegally?

23           THE WITNESS:  Yes.

24    BY MR. PATTERSON:

25      Q    And how would it do that?

Joseph Gorman                                    October 6, 2011
                        Chicago, IL

                                                      Page 31

1        A     As far as weapons that are outside the

2   residence?

3        Q     Hm-hm.

4        A     Through my experience there has been

5   instances where guns have been stored in garages

6   outside the residence.  We have purchased guns

7   from people that have stored guns in garages.

8             We've conducted investigations where

9   guns may be hidden on porches or hidden in

10  somebody's yards and potentially the gang

11  members that were associated with that residence

12  have the potential to attain that firearm.

13       Q     Okay.  So your position then is that

14  Chicago's limitation on possessing weapons in

15  those locations limits the ability of gang

16  members to acquire those firearms?

17       A     Yes.

18       Q     Do you have any evidence to believe

19  that -- let me strike that question.

20            How would gang members acquire those

21  firearms that are stored in those locations?

22       A     Numerous ways.  Burglaries.  Keeping

23  firearms in a garage is more easily burglarized

24  as opposed to a residence, an occupied residence

25  or an unoccupied residence.  Garages are

Joseph Gorman                                              October 6, 2011
                          Chicago, IL

1    normally not occupied so you wouldn't have or

2    neighbors wouldn't have the ability to recognize

3    that a garage is getting burglarized.

4            Having guns outside a residence

5    potentially could be accessible to, for

6    instance, gang members that are on the street

7    that are plying an illegal trade, say selling

8    dope, they may have access, not only one gang

9    member but many gang members may have access to

10   firearms that are outside a residence.

11           On numerous instances during the

12   courses of surveillances we've observed firearms

13   being concealed on people's property; in the

14   siding of garages, in backyards.  And in a

15   number of instances it's been multiple firearms

16   with multiple people that are out there which

17   poses a big problem because now you've got it

18   strewn about a residence, distributed about a

19   residence and you've got accessibility

20   potentially to more than, you know, one person.

21      Q    And in all these instances you've

22   described in your experience where guns have

23   been stored in garages or porches or other

24   locations outside a residence, that activity has

25   been illegal, correct?

Joseph Gorman                                              October 6, 2011
                        Chicago, IL

Page 33

1        A      Yes.

2        Q      So Chicago's laws did not deter that

3   activity in those instances, did it?

4        A      I believe it did.

5        Q      How did it?

6        A      Because the law-abiding citizens that

7   abide by the law would call the police if gang

8   members stored firearms on their property, and

9   it's a deterrent because it would deter gang

10  members from storing weapons on people's

11  property.

12       Q      So in your opinion gang members are

13  deterred by the laws that limit where firearms

14  may be stored?

15       A      Not all, but it's a deterrent for a

16  good majority, but there is instances where

17  there is firearms that are concealed on

18  residences.

19       Q      And why are gang members deterred by

20  laws limiting where firearms can be stored, in

21  your experience?

22       A      They don't want to attract law

23  enforcement attention.  Firearms are an

24  attraction.  Firearms cause violence and

25  firearms attract the police.

1          It may deter a gang member because he

2    may not want to be arrested with a firearm so he

3    may choose -- he or she may choose not to

4    partake in that particular illegal activity

5    because firearms are what is attracting the

6    police, investigative agencies, to deter

7    violence.

8       Q    So now you've mentioned the

9    registration of firearms and limitation on

10   weapons outside the residence.  A third thing

11   you said potentially deters gang members'

12   ability to get firearms is the limitation on

13   sales of firearms.

14          So how does limiting sales of firearms

15   make it harder for gang members to obtain

16   firearms?

17      A    Accessibility.  If there is

18   establishments which sells firearms within the

19   City of Chicago, easily accessible.  In addition

20   to that, accessibility in the fact that gang --

21   excuse me -- an establishment which sells

22   firearms potentially can be burglarized.

23          There has been instances where my case

24   team has done follow-up investigations on

25   weapons that have been recovered within the City

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1    of Chicago that have been burglarized from a

2    weapon -- an establishment that sells weapons.

3           In February there was a burglary in Oak

4    Forest at 172nd and Oak Park Avenue, and three

5    gang members stole 26 firearms from a Freddie

6    Bear sporting goods.  In addition to that, there

7    is the potential for gang members staking out

8    establishments which sell firearms and if they

9    see a large cache of firearms, potentially those

10   people can be targets.  There has been instances

11   that we're aware of that houses that are known

12   to have firearms have been targeted.

13       Q    Are you aware of any instances where --

14   let me strike that question.  So we've talked

15   about the sale of firearms, weapons outside the

16   residence, registration of firearms.

17          Are there any other provisions of

18   Chicago law that may deter gang members from

19   obtaining firearms in your opinion?

20       A    I'm not -- not to my recollection.

21       Q    Okay.  You said that the sale of

22   firearms, limiting the sale of firearms inside

23   the city decreases the accessibility of firearms

24   to gang members.

25          Would you also agree that it decreases

Joseph Gorman                                          October 6, 2011
                    Chicago, IL

1    the accessibility of firearms to law-abiding

2    citizens?

3           MR. AGUIAR:  Object to the form of the

4    question.

5    BY THE WITNESS:

6       A    No.

7    BY MR. PATTERSON:

8       Q    Why not?

9       A    A law-abiding citizen could purchase a

10   firearm outside the City of Chicago.

11      Q    Isn't it also the case that a gang

12   member or a gang member through a straw

13   purchaser could purchase a firearm outside the

14   City of Chicago?

15      A    Absolutely, but the accessibility of a

16   gun shop within the City of Chicago would be --

17   I believe it would be detrimental to the City of

18   Chicago because it would be -- because of having

19   the accessibility as opposed to traveling great

20   lengths to a suburban gun shop.  Additionally,

21   having gun shops within the City of Chicago I

22   think poses a danger for law-abiding citizens

23   that are purchasing firearms being targeted.

24           In addition to that, the gun shops in

25   the surrounding area have been monitored and

Joseph Gorman                                          October 6, 2011
                        Chicago, IL

1    it's been a deterrent for illegal straw

2    purchasing based on previous investigations

3    which have been conducted by the Organized Crime

4    Division of the Chicago Police Department.

5        Q    Okay.  So if firearms are more

6    accessible to gang members if they're being sold

7    in the City of Chicago, wouldn't they also be

8    more accessible to law-abiding citizens if they

9    were being sold in the City of Chicago?

10       A    Would they be equally accessible?

11       Q    No.  Would they be more accessible than

12   they are now if firearms are being sold within

13   the City of Chicago to law-abiding citizens?

14           MR. AGUIAR:  I'll object to the form of

15   the question.

16   BY THE WITNESS:

17       A    Can you -- I don't understand the

18   question.

19   BY MR. PATTERSON:

20       Q    Does banning the sale of firearms

21   inside the City of Chicago make it harder for

22   law-abiding citizens to obtain firearms?

23       A    A law-abiding citizen, no.  I think it

24   poses a danger to have gun shops within the City

25   of Chicago based on what I expressed in the

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1   previous testimony.  I think law-abiding

2   citizens would be able to go to the surrounding

3   suburbs to purchase firearms and it wouldn't not

4   allow a law-abiding citizen to purchase a

5   firearm.

6      Q    But it would place a greater burden on

7   purchasing a firearm, is that correct, to travel

8   to the suburbs versus staying in the city?

9         MR. AGUIAR:  I'm going to object to the

10  form of the question.  The use of the word

11  burden is vague.  You may answer.

12  BY THE WITNESS:

13     A    Would it place a burden on somebody --

14  I don't understand the question.

15  BY MR. PATTERSON:

16     Q    You've said that with respect to gang

17  members not having firearm stores within the

18  City of Chicago reduces their accessibility of

19  firearms because they have to travel I think you

20  put it great lengths to go outside the city to

21  the suburbs.

22        Doesn't that same reasoning also apply

23  to law-abiding citizens attempting to --

24     A    No.

25     Q    Why not?

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1      A     Because in my experience law-abiding

2    citizens, they have accessibility to the suburbs

3    and they -- in the event that they want a

4    firearm, they have in the past gone to the

5    suburbs.  I think the risk outweighs the benefit

6    to have a gun store in the City of Chicago based

7    on my experience and based on the accessibility,

8    it being the accessibility for gangs and guns.

9      Q     Okay.  So I understand your testimony

10   that the risk in your opinion outweighs the

11   benefit, but you would agree that ignoring the

12   risk, there would be some benefit to law-abiding

13   citizens desiring to own a firearm to having the

14   gun stores in the City of Chicago?

15           MR. AGUIAR:  Object to the form.  You

16   may answer.

17   BY THE WITNESS:

18     A     I'm in law enforcement, so I'm

19   concerned for the risk.

20   BY MR. PATTERSON:

21     Q     Right.

22     A     And that's my major concern is risk,

23   and I think the risk outweighs the benefit, and

24   I think that's a deterrent for gang members

25   possessing firearms.

Joseph Gorman                                    October 6, 2011
                          Chicago, IL

                                                      Page 40

1       Q     Okay.  And you've said that people,

2   patrons of -- or firearm stores within the City

3   of Chicago may be targets of criminals or gang

4   members.  In your experience, do gang members

5   target individuals who they know or have reason

6   to believe are possessing firearms?

7       A     Yes.

8       Q     And in what types of situations in your

9   experience do they do that?

10      A     There was a gang on the south side of

11  Chicago, the Insane Popes.  They are in the

12  Bridgeport and Brighton Park area, and they

13  targeted -- in order to be initiated in the

14  gang, they targeted Chicago police officers for

15  burglaries in their residence and they had to

16  steal a firearm to get into that gang, and there

17  is numerous instances where police residences

18  were burglarized.

19           Also in my experience there has been a

20  number of instances where Chicago police

21  officers' houses have been burglarized, and

22  based on interviews of some of the offenders in

23  these instances, they were targeted because the

24  gang members knew that they possessed firearms.

25           So in my opinion through my experience

Joseph Gorman                                                          October 6, 2011
                              Chicago, IL

Page 41

1    I believe that it's a risk to -- with the

2    firearms that gang members may burglarize

3    residences other than Chicago police officers.

4        Q    So gang members may target places where

5    they think firearms are likely to be stored, is

6    that what you're saying?

7        A    Correct.

8        Q    Are you aware of any instances where

9    gang members have targeted people for crimes

10   they know possess firearms on their person?

11       A    Yes.

12       Q    Okay.  And what are those instances?

13       A    During the course of some

14   investigations, we've had gang members that have

15   targeted persons that possess firearms.  In

16   addition to that, persons that have possessed

17   narcotics go hand in hand, and gang members have

18   through my experience put GPS tracking devices

19   on potential victims' vehicles and tracked those

20   cars, and then at times have burglarized

21   residences of people that were either in

22   possession of guns or possession of narcotics.

23            So yes, the question is in my

24   experience people that have possessed firearms

25   have been a target.

Joseph Gorman
Chicago, IL
October 6, 2011

1      Q      And with the GPS tracking devices, let

2      me see if I understand this.  So the tracking

3      device would then lead the gang members to the

4      person's home, is that what they were using that

5      tracking device for?

6      A      Utilizing the tracking device to bring

7      them to the location that they had firearms and

8      weapons, and it would be based on surveillance

9      of gang members, of people, and that's why I

10     think there is a great risk to have firearm

11     sales within the City of Chicago because I think

12     gang members will go to great lengths to acquire

13     weapons.

14     Q      Okay.  Have you ever in your experience

15     with gang members had any understanding about

16     whether they target -- when they target

17     individuals with firearms, whether they attempt

18     to conduct those activities when the person is

19     not home at the residence with the firearms?

20            MR. AGUIAR:  I'll object to the form of

21     the question.  You can answer.

22     BY THE WITNESS:

23     A      There has been instances of both when

24     they were home and when they weren't home.

25

Joseph Gorman                                         October 6, 2011
                        Chicago, IL

                                                        Page 43

1    BY MR. PATTERSON:

2         Q     In your experience do gang members have

3    a preference either way?

4         A     Do they have a preference?

5         Q     Yeah.

6               MR. AGUIAR:  Object to the form.

7               You may answer.

8    BY THE WITNESS:

9         A     I think they're opportunists.  I think

10   not having the sale of guns in the City of

11   Chicago I think is a deterrent to crime because

12   it takes away their opportunity.

13   BY MR. PATTERSON:

14        Q     So in your experience if a gang member

15   in a hypothetical situation knew that there were

16   identical guns stored at two homes and at one of

17   the homes the resident was there, the other home

18   the resident was not there, in your experience

19   would the gang member target one of those homes

20   over the other home?

21              MR. AGUIAR:  Objection to the form.

22              You may answer.

23   BY THE WITNESS:

24        A     In my experience I think the majority

25   of times it would be when the people weren't

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1      home.

2      BY MR. PATTERSON:

3          Q      Okay.

4          A      And it may have been based on their

5      surveillance of the targeted individuals.

6          Q      Right.  In your experience if a gang

7      member was targeting someone for assault and

8      they could assault that person either with a

9      person armed with a firearm or a person not

10     armed with a firearm, which scenario would the

11     gang member prefer?

12             MR. AGUIAR:  Object to the form; calls

13     for speculation.  You may answer.

14     BY THE WITNESS:

15         A      Could you rephrase the question?

16     BY MR. PATTERSON:

17         Q      Yes.  If a gang member had a choice of

18     assaulting someone either possessing a firearm

19     or not possessing a firearm, which scenario

20     would they prefer?

21             MR. AGUIAR:  Are you asking him based

22     on his experience?

23             MR. PATTERSON:  Based on his

24     experience.

25             MR. AGUIAR:  Based on your experience.

Joseph Gorman                                              October 6, 2011
                        Chicago, IL

Page 45

1   BY THE WITNESS:

2       A    Based on my experience, they are

3   opportunists, and potentially if they didn't

4   have the ability -- if they knew somebody was

5   armed and if they did not have the ability to,

6   as I would call it, put that person down at a

7   residence so they could surveil it, I think

8   they're opportunists and they wouldn't care one

9   way or the other whether that person was armed

10  or not.

11  BY MR. PATTERSON:

12      Q    Okay.  So in your experience gang

13  members don't care whether persons that they

14  criminally assault have -- are armed or not

15  armed?

16      A    I think there is an unknown factor and

17  I don't -- you know, we talked about the gang

18  members breaking into the residence of somebody

19  that they knew that there was firearms in the

20  residence.  I don't understand the line of

21  questioning on this one.  I'm sorry.

22      Q    So --

23      A    It's an unknown factor.  A gang member

24  to assault somebody, he may not know if that

25  person has a firearm or not.

Joseph Gorman                                          October 6, 2011
                        Chicago, IL

1      Q    Right, right.  In your experience if a

2   gang member knows that a person has a firearm,

3   is that ever a deterrent from a gang member

4   assaulting that person?

5      A    Oh, yes, it is.  Yes.

6      Q    And why is that?

7      A    Just from personal experience and in my

8   capacity as a law enforcement officer, I carry a

9   firearm.  It's concealed and potentially -- I

10  don't know.  You're calling for speculation.  I

11  don't know if that has deterred anything.  It's

12  a speculative question so I really can't give a

13  definitive answer, but I can -- just from

14  personal experience I don't know if it has

15  deterred a crime, and I don't know what's in the

16  back of the mind of a gang member.

17     Q    Right.  In your experience does

18  carrying a firearm increase your sense of safety

19  and security?

20          MR. AGUIAR:  Objection to the form and

21  to the relevance of the question.

22  BY THE WITNESS:

23     A    That calls for speculation because

24  there is numerous times where I don't carry a

25  firearm and I feel the same sense of security as

Joseph Gorman                                                    October 6, 2011
                          Chicago, IL

 1    if I had my firearm.  There is numerous

 2    occasions that I don't carry my firearm.

 3    BY MR. PATTERSON:

 4        Q    Okay.  Why do you carry a firearm on

 5    some occasions?

 6            MR. AGUIAR:  I'll object to the form of

 7    the question as relevancy.  Why he carries a

 8    firearm is irrelevant to this case.

 9            MR. PATTERSON:  He brought up his

10    firearm carrying practices.  I'm just trying to

11    follow up on it.

12            MR. AGUIAR:  That does not make it

13    relevant to the case.  However, you may answer

14    his question.

15    BY THE WITNESS:

16        A    I carry a firearm because I'm a law

17    enforcement officer, and if I see a crime, I'm

18    required to take action, and that's the reason I

19    carry my firearm.

20    BY MR. PATTERSON:

21        Q    In your experience as a --

22        A    I'm on call 24 hours a day, and that's

23    the reason I carry my firearm.

24        Q    In your experience is using a firearm

25    sometimes more effective than other methods of

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

Page 48

1    potentially responding to criminal activity?

2              MR. AGUIAR:  Are you asking him as a

3    police officer?

4              MR. PATTERSON:  I'm asking in his

5    experience.

6              MR. AGUIAR:  As a police officer?

7              MR. PATTERSON:  Yes.

8              MR. AGUIAR:  Okay.

9    BY THE WITNESS:

10       A    As a police officer using a firearm?

11   BY MR. PATTERSON:

12       Q    Hm-hm.

13       A    I think a firearm is a last resort.

14   Verbal command, you know, there is -- firearms

15   is a last resort.

16       Q    But would you agree that in some

17   situations as a police officer in your

18   experience use of a firearm is necessary?

19       A    Like I said, it's a last resort.  It's

20   protection of life, protection of self and other

21   people's lives.

22       Q    And in some instances it's necessary to

23   use a firearm to protect life or other people's

24   lives, is that correct?

25              MR. AGUIAR:  You're asking him as a

Page 49

1    police officer?

2          MR. PATTERSON:   In his experience as a

3    police officer.

4    BY THE WITNESS:

5       A    In my experience as a police officer,

6    it's a last resort.

7    BY MR. PATTERSON:

8       Q    What do you mean by last resort?

9       A    Protection of life, the protection of

10   life policy with the Chicago Police Department.

11      Q    Right.  So in your experience as a

12   police officer, as a last resort, is it

13   sometimes necessary to use a firearm to protect

14   life?

15      A    We've been trained in the use of

16   firearms.  Like I said, it's a last resort.

17      Q    Okay.  In your experience as a police

18   officer, do you think it's ever appropriate for

19   a civilian to use a firearm to protect their

20   life?

21         MR. AGUIAR:  Object to the form of the

22   question and the relevancy of this question.  I

23   don't get, Pete, where we're going with this.

24   BY MR. PATTERSON:

25      Q    I'd still like an answer to the

Joseph Gorman                                          October 6, 2011
                          Chicago, IL

 1    question.

 2        A    Repeat the question.

 3        Q    In your experience as a Chicago police

 4    officer, is it ever appropriate for civilians to

 5    use firearms to protect life?

 6             MR. AGUIAR:  I'm going to again object

 7    to the form of the question, to the relevancy of

 8    the question and to the extent that it calls for

 9    a legal conclusion.  The law establishes whether

10    it is okay for a citizen to use a firearm in

11    defense of him or herself.

12             What Commander Gorman may think about

13    that is wholly irrelevant to this case.  I

14    strenuously object to this line of questioning.

15             That said, you may answer the question.

16    BY THE WITNESS:

17        A    In my opinion, there is provisions of

18    the law that allow a citizen at times to use

19    deadly force.

20    BY MR. PATTERSON:

21        Q    Okay.  In your opinion, those are the

22    only occasions where it's appropriate for a

23    citizen to use deadly force?

24        A    Under the provisions in the law.

25        Q    Now, earlier in your testimony you

1    referred to a change in the Chicago law in 2010

2    on the basis of a court decision, is that

3    correct?

4        A    Yes.

5        Q    And that law happened -- that change of

6    law occurred in July of 2010, is that your

7    understanding?

8        A    I don't recall exactly when that was.

9        Q    I'll represent to you that was in July

10   of 2010.  Since July of 2010 have you seen any

11   -- in your experience, any change in the ability

12   of gang members to acquire firearms in Chicago?

13       A    Since -- it calls for speculation and I

14   think --

15       Q    Right.

16       A    It calls for speculation and I'm -- can

17   you repeat the question?

18       Q    Yeah.  I'm not asking you to speculate.

19            I'm just saying in your experience has

20   there been any change in the ability of gang

21   members to acquire firearms since July of 2010

22   in the City of Chicago?

23       A    Not to my knowledge.  It's been

24   consistent.

25       Q    Okay.

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

                                                                    Page 52

1           MR. AGUIAR:   Pete, we've been going for

2    a little over an hour.   Can we take a break?

3           MR. PATTERSON:   Yes.

4                       (Recess had from 10:12 to

5                       10:16 a.m.)

6           MR. PATTERSON:   Back on the record.

7    BY MR. PATTERSON:

8       Q    Commander, you've said that your

9    testimony in this case is based on your

10   experience as a Chicago police officer.

11          Do you have any experience in a

12   jurisdiction that permitted the sale of firearms

13   within that jurisdiction?

14      A    Any jurisdictional, no.

15      Q    And do you have any experience working

16   in a jurisdiction that allowed persons to

17   possess firearms outside of their home?

18      A    Working in jurisdictions, no.

19      Q    And we've talked about provisions of

20   Chicago law that limit the ability --

21   potentially limit the ability of gang members to

22   acquire firearms and in particular the

23   limitation on weapons outside of a residence and

24   the sale of firearms within the city.

25          You also touched briefly on some in

Joseph Gorman                                        October 6, 2011
                        Chicago, IL

1    your mind benefits of the limitation on weapons

2    to residents including protecting first

3    responders, addressing domestic disputes and

4    reducing intimidation through firearms, is that

5    correct?

6        A    Yes.

7        Q    Are there any other in your experience

8    benefits of Chicago's limitation on having

9    weapons outside the home?

10       A    Well, people being burglarized, being

11   observed with weapons, potential targets.

12       Q    Okay.  Anything else?

13       A    Not to my recollection right now.

14       Q    So with first responders, how does

15   limiting possession of weapons outside the home

16   protect first responders?

17       A    I think first responders on scenes,

18   it's an officer safety issue.  The fear of the

19   unknown going into -- you know, not knowing who

20   has a firearm, who has a valid FOID card, who is

21   legally able to possess a firearm, and if guns

22   were allowed outside of residences, the

23   potential escalates in the chance for first

24   responders to encounter people with firearms,

25   and it could be an officer safety issue as well

Joseph Gorman                                          October 6, 2011
                        Chicago, IL

Page 54

1    as potentially it could be a safety issue for

2    those lawfully in possession of firearms outside

3    their residences, and if exposed in a manner

4    that it could be a safety issue for that person

5    too.  So there is numerous -- there is safety

6    issues.  First responders arriving on the scene,

7    it's -- they don't know what they're getting

8    into, they don't have the ability to know all

9    the people that are involved, whether they are

10   people that have FOID cards or people that

11   don't, so it's a big, big, huge safety issue for

12   first responders.

13      Q    Okay.  And you mentioned that it could

14   be a safety issue for people that lawfully are

15   carrying firearms.  Could that safety issue be

16   addressed by requirements that firearms be

17   carried in a certain manner such as concealed?

18          MR. AGUIAR:  Objection as to form;

19   calls for speculation.  You may answer.

20   BY THE WITNESS:

21      A    In my experience I just believe that

22   the risk outweighs the benefit of people

23   possessing firearms for first responders outside

24   their home as well as first responders into

25   residences where there is potentially multiple

Joseph Gorman                                                    October 6, 2011
                          Chicago, IL

1    firearms.  I think that poses big problems --

2    BY MR. PATTERSON:

3       Q    Okay.

4       A    -- whether there are restrictions in

5    place or not.

6       Q    Okay.  What is your opinion of the risk

7    versus benefit of allowing individuals to

8    possess a single firearm within their home to

9    first responders?

10      A    What is the risk to have it within

11   their home?

12      Q    Yeah.  The risk -- you've talked about

13   the risks outweighing the benefit.  I just want

14   to get your assessment on the risks versus the

15   benefits of possession of a single firearm

16   within the home.

17           MR. AGUIAR:  Do you mean possession of

18   more than one operable firearm in the home?

19           MR. PATTERSON:  A single operable

20   firearm within the home.

21           MR. AGUIAR:  Okay.  What about other

22   firearms in the home that are not operable?

23           MR. PATTERSON:  There could be but I'm

24   just focusing on the operable firearm.

25

Joseph Gorman                                          October 6, 2011
Chicago, IL

1   BY THE WITNESS:

2       A    There is always a risk for first

3   responders if there is a firearm in the

4   residence with instances, for instance, of

5   domestic disturbance.  A firearm in the home

6   poses a potential threat.

7   BY MR. PATTERSON:

8       Q    Right.  You testified that for multiple

9   firearms the risk to first responders outweigh

10  the benefits, and my question is do you have an

11  opinion with respect to the balance of the risks

12  and benefits of a single operable firearm within

13  the home to first responders?

14      A    Of a single?

15      Q    Yes.

16      A    I think there is always a risk of a

17  firearm in the house.

18      Q    What is your opinion with respect to

19  the risks versus the benefits, the weighing, not

20  just the risk side?

21      A    I think any time you have a firearm

22  present there is a risk for potential violence,

23  for somebody acquiring that firearm that may not

24  be authorized because in instances where you

25  respond to a scene, there could be potentially

Joseph Gorman                                          October 6, 2011
                        Chicago, IL

1    multiple people in that residence, not just the

2    person who lawfully possesses it, so there is

3    always a risk.

4        Q    Okay.  So again, in your experience, is

5    it your opinion that those risks outweigh the

6    benefit of permitting persons to possess an

7    operable firearm within the home?

8        A    For first responders?

9        Q    Yes.

10       A    For first responders, yes.

11       Q    Okay.  And in your experience are the

12   risks to first responders greater if more than

13   one operable firearm is permitted within the

14   home?

15       A    Absolutely.  More than one firearm, now

16   you have an accessibility of multiple firearms

17   to people within the residence.

18       Q    And, to your knowledge, does Chicago --

19   the City of Chicago ever lawfully permit a

20   single residence to have more than one operable

21   firearm?

22           MR. AGUIAR:  Objection; calls for a

23   legal conclusion.

24           You may answer if you know.

25

Joseph Gorman                  October 6, 2011
Chicago, IL

Page 58

```
 1    BY THE WITNESS:

 2        A    Not to my recollection more than one,

 3    no.

 4    BY MR. PATTERSON:

 5        Q    Okay.  Chicago does permit each

 6    individual living within a residence to have one

 7    operable firearm, so that, you know, in certain

 8    instances multiple operable firearms could be

 9    present within a home.  So in your opinion that

10    situation would present more risk than allowing

11    just a single operable firearm within the home,

12    is that correct?

13        A    In my experience as a law enforcement

14    officer, yes.

15        Q    Okay.  In your experience as a law

16    enforcement officer does having a firearm

17    operable versus having it inoperable by virtue

18    of a trigger lock or similar device present a

19    greater risk to first responders?

20        A    I don't understand the question.

21        Q    Does having -- does a firearm with a

22    trigger lock on it pose less of a risk to a

23    first responder than a firearm that's operable?

24        A    Yes.

25        Q    Why is that?
```

Joseph Gorman                                                    October 6, 2011
                            Chicago, IL

                                                              Page 59

1        A     Because the gun does not function

2     properly.  However, there is still a risk

3     because first responders may not know the gun is

4     inoperable.

5        Q     Right.  And in your experience do first

6     responders have access to information that would

7     tell them whether a residence to which they are

8     responding has registered firearms?

9        A     That would be dependent on the

10    information that they were given prior to their

11    arrival on the scene.  In addition to that,

12    there is timeliness in responding to situations

13    which require immediate attention where there is

14    instances where law enforcement won't know

15    what's beyond those doors.

16       Q     Right.

17       A     Because for public safety issues and

18    for protection of life, it's imperative that the

19    police get there as quickly as possible.

20       Q     Okay.  In your experience, how

21    frequently do first responders get information

22    about whether there is a firearm registered to a

23    residence to which they are responding?

24       A     In my experience?

25       Q     Hm-hm.

Page 60

```
 1      A    In my experience I don't recall getting

 2   information that the people were in possession

 3   of a firearm.

 4      Q    Okay.  And in your experience do police

 5   officers perceive there to be a risk of firearms

 6   being present regardless of whether there is a

 7   firearm registered to that location?

 8      A    There is always a risk, but the firearm

 9   present at the location elevates that risk.

10      Q    Right.  And do first responders assume

11   that if a residence does not have a firearm

12   registered, there will not be a firearm at that

13   location?

14      A    It depends.  I believe that in the back

15   of your mind, for safety issues you're going to

16   infer that there potentially could be a firearm.

17      Q    In pretty much every situation to which

18   a first responder would respond there is a

19   potential that firearms could be there, correct?

20      A    There is a potential, but if there are

21   firearms present, it elevates the risk.

22      Q    Since July of 2010, in your experience

23   have first responders responding to residences

24   have any greater risks than before July of 2010

25   with respect to firearms?
```

Joseph Gorman                                          October 6, 2011
                        Chicago, IL

1       A       That calls for speculation and I'm in

2    an investigative unit that has -- we do mid to

3    long-term investigations.  We do have boots on

4    the ground but not as much as other entities in

5    the department, so I couldn't give a -- I can't

6    give you -- I don't think I can give you, you

7    know, a valid answer one way or another on that.

8       Q       Okay.  And you said in your experience

9    having multiple firearms or even a single

10   firearm in the home, the risks outweigh the

11   benefits with respect to first responders.  What

12   have you done to assess those risks and

13   benefits?

14      A       What have I done?

15      Q       Yeah.

16      A       In my experience, whenever I've been on

17   the scene, you've got to take control of the

18   scene to eliminate the potential for a firearm

19   present or multiple firearms present being

20   potentially a danger.

21           However, that being said, at times it

22   may take a period of time to quell a situation.

23   In that time period there is an opportunity if

24   firearms are present that first responders could

25   become in harm's way.

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

                                                              Page 62

1       Q     In your experience how long does it
2   take first responders on average to respond to
3   an emergency call?
4       A     In my experience as an officer, as a
5   gang specialist, as a sergeant in the detective
6   division, as a detective in the gang
7   investigation unit, as a commander in the gang
8   investigation unit, I applaud the response of
9   the patrolmen and I think they are there
10  instantaneously and the bravery of the calls.
11  As opposed to John Q. Citizen running away from
12  danger, they are going into the fire so...
13      Q     You know, I don't have any quarrel with
14  that.  I guess my question is how -- you know,
15  presumably it takes them some period of time to
16  arrive at an emergency scene, and I'm just
17  wondering in your experience what is the typical
18  response time?
19      A     I don't think there is a typical.
20          MR. AGUIAR:  I'm going to object to
21  foundation and to the form.
22          You may answer if you can.
23  BY THE WITNESS:
24      A     Depending on the distance that the
25  officer, the closest officer to the scene is.

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

                                                                    Page 63

1     It could be a block away.  It could be a matter

2     of ten seconds.  It could be a minute.  It

3     fluctuates.  It's not a science.

4     BY MR. PATTERSON:

5         Q    There are some instances where first

6     responders aren't able to arrive quickly enough

7     to avert a violent attack, is that correct?

8              MR. AGUIAR:  I'm going to object to the

9     form and the foundation and the relevance of the

10    question.

11    BY THE WITNESS:

12        A    Yes.

13    BY MR. PATTERSON:

14        Q    Okay.  And do you have any opinion with

15    respect to whether the costs of having firearms

16    outside of the home outweigh the benefits of

17    having a firearm outside the home to the person

18    carrying that firearm for civilians?

19        A    I think there is a risk.  I think the

20    risk is that they may become a target

21    potentially because someone possibly could see

22    that they possess firearms.  They could be at

23    risk for a burglary.  They could be at a risk

24    for a first responder, and I think there is a

25    risk for -- in the event there was a neighborly

Joseph Gorman                                                  October 6, 2011
                              Chicago, IL

Page 64

1    domestic-type dispute potentially, if a person

2    possessed a firearm outside his residence, there

3    could be a possibility that that person could

4    pull that firearm and utilize it to cause

5    violence as opposed to having to run into his

6    residence and getting it.

7              I think there would be a cooling off

8    period.  I think definitely the risks outweigh

9    the benefit of having a firearm outside the

10   residence.

11      Q    And have you ever considered whether

12   there are any benefits to a civilian to carrying

13   a firearm outside the home?  Acknowledging that

14   you think there are some risks, have you

15   considered whether there are any benefits?

16      A    I don't believe there is any benefits

17   that would -- I don't believe there are

18   benefits, no.

19      Q    And what have you done to assess

20   whether there are benefits to civilians to

21   carrying a firearm outside the home, if

22   anything?

23      A    I think just from personal experience.

24   I think the risk far outweighs the benefit.

25      Q    Right.

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1       A       Any benefit.

2       Q       So it's your testimony, if I understand

3    it, that there is no benefit, no potential

4    benefit for a civilian carrying a firearm

5    outside the home?

6       A       Nothing that would outweigh the risk.

7       Q       But you never looked at any research

8    that looks at how often individuals use firearms

9    defensively outside the home, have you?

10      A       No, I haven't.

11      Q       And you've never looked at any research

12   that compares the frequency with which civilians

13   use firearms outside the home with the frequency

14   with which they're victimized by individuals

15   with weapons outside the home, have you?

16      A       No, I haven't.

17      Q       And you've never looked at any research

18   that considers whether locations where firearms

19   are sold and the areas around those locations

20   have greater problems with gun violence than

21   other locations, have you?

22      A       I can say with personal experience that

23   there is a risk.

24      Q       But you never looked at research that

25   attempts to evaluate or quantify that risk?

Joseph Gorman                                              October 6, 2011
                            Chicago, IL

1      A     Only in the form of my experience as a

2  law enforcement officer looking at data, looking

3  at reports that my CAGE unit prepares and

4  looking at several instances where gun stores

5  have been burglarized.

6      Q     But you've never looked at anything

7  that attempts to compare gun stores and the

8  areas around gun stores to areas where they are

9  not present to determine which one has greater

10 problems with firearm violence, have you?

11     A     No, sir, I haven't.

12     Q     And you've never looked at whether

13 cities that prevent sales of firearms have

14 greater problems with gun violence than cities

15 that do not permit the sale of firearms?

16         MR. AGUIAR:  Objection; I believe asked

17 and answered.  You may answer.

18 BY THE WITNESS:

19     A     No, sir.

20 BY MR. PATTERSON:

21     Q     Okay.  You've been identified by the

22 city as someone who may testify in this

23 litigation.  Other than what we've discussed

24 today, at this time do you have any -- are there

25 any subjects that you anticipate your testimony

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1    will address?

2        A    Other than what we discussed?

3        Q    Yeah.

4        A    I don't -- I know I was called to a

5    deposition here.  I don't know what the intent

6    is in the future.

7        Q    Okay.  So you don't know what your

8    testimony at trial is going to be?

9        A    No.

10       Q    And we started talking about your

11   employment history with the city and then got

12   sidetracked.  So if you could -- you said you

13   graduated from college in 1985.

14           Did you go directly to the Chicago

15   Police Department after that?

16       A    No.  I joined the police department in

17   August of 1986.

18       Q    And what did you do between that time?

19       A    When I got out of college I applied to

20   numerous agencies, took tests.  I actually

21   graduated in the summer of '85 from Northern

22   Illinois and roughly for a year I roofed to

23   supplement my income and while applying for

24   agencies, and sometime in the three months prior

25   to joining the police department in August I was

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1    called by Cook County.

2         I was in their academy, and August 11th

3    -- early August I received a letter and I

4    started the police academy.

5         Q    Okay.  And since you -- and you started

6    with the Chicago Police Department in 1986?

7         A    Yes, sir.

8         Q    And since that time have you been

9    employed by anyone other than the Chicago Police

10   Department?

11        A    No.  Secondary employment.

12        Q    Okay.  What secondary employment have

13   you had?

14        A    From 1992 to 1999 I worked for

15   subsidized housing.  I worked for Pyramid West.

16   Section 8, I worked for Jerry Vaughn as a

17   lieutenant, and then somebody took over,

18   somebody else took over that Pyramid West.

19        Currently in addition to the job I have

20   now, I work every morning from 5:30 to 8:30 in

21   the morning a secondary job, secondary

22   employment for Evergreen Park, Oak Lawn and Oak

23   Forest.  I work for their school districts as an

24   investigator, and I've done numerous other side

25   jobs.

Joseph Gorman                                           October 6, 2011
                        Chicago, IL

```
 1      Q      Okay.  What does your work as an
 2  investigator entail?
 3      A      I do school residency investigations.
 4      Q      Does that determine whether people live
 5  in and out of the district?
 6      A      Correct.
 7      Q      Are you licensed by the State of
 8  Illinois as a firearms instructor?
 9      A      Am I?
10      Q      Yes.
11      A      No.
12      Q      You're currently a commander in the
13  Chicago Police Department, is that correct?
14      A      Correct.
15      Q      How long have you held that position?
16      A      Since December of 2008.
17      Q      And what are your responsibilities,
18  Commander?
19      A      I have 157 people in my unit.  I have
20  -- of the 157, I have a team of 19 people, three
21  sergeants and 16 officers, that are detailed to
22  the FBI.  I have seven officers that are
23  detailed to the ATF.  I have two officers that
24  are detailed to the DEA.  I have 16 officers
25  that work in the technical lab.
```

Joseph Gorman                                                        October 6, 2011
                              Chicago, IL

```
1              We do all the technical, electronics.
2    We do all the -- they do all the workup for the
3    areas on pulling video, restoring video.   In
4    addition to that, they are responsible for doing
5    -- maintaining numerous electronic surveillance
6    equipment which is under my control.
7              I have five area teams, Area 1, 2, 3,
8    4, 5, with five sergeants attached to that.   I
9    have two violent crime teams, the north and the
10   south.  I have a CAGE team, Chicago Anti-Gang
11   Enforcement unit falls under my purview.
12             In addition to that, I have an incident
13   team north and an incident team south.   In
14   addition to that, I have an animal crimes team
15   which is a small group that investigates
16   complaints of animal abuse, and I have two
17   officers that are assigned at the Cook County
18   jail, intelligence officers, and our group works
19   with all the different federal agencies; FBI,
20   DEA, ATF, IRS, ICE, Immigration and Customs, and
21   we do long and short-term investigations
22   targeting gang leaders, gang conflicts.
23   Q     Okay.  In your position as commander,
24   you're focused on combatting gang activity in
25   Chicago, is that correct?
```

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1      A      Gang activity and we have a CAGE team

2    that looks at the gun violence and we have an

3    animal crime team that conducts investigations

4    on animal abuse and at times that goes towards

5    gangs because gangs at times use it as a tool of

6    dogfighting and what have you.

7      Q      What tools do you have in the

8    organization that you would have at your

9    disposal to combat gang activity in Chicago?

10     A      As far as operational?

11     Q      Yeah.

12     A      I have -- as I said, I have a technical

13   lab that handles all the -- our electronic

14   surveillance equipment.  We have numerous

15   monitoring rooms, and some of this due to the

16   confidentiality I can't go into.

17            MR. PATTERSON:  And would it be okay if

18   we took a break for a few minutes?  I think I'm

19   close to wrapping up.

20            MR. AGUIAR:  Sure.

21                      (Recess had from 10:47 to

22                       11:06 a.m.)

23   BY MR. PATTERSON:

24     Q      Commander Gorman, in your experience

25   are licensed firearms dealers knowingly engaging

Joseph Gorman                                             October 6, 2011
                         Chicago, IL

1      in illegal transactions a significant source of

2      guns for criminals in Chicago?

3           MR. AGUIAR:  I'll object to the form of

4      the question.  You may answer.  And the

5      foundation.  You may answer.

6      BY THE WITNESS:

7           A    Licensed dealers?

8      BY MR. PATTERSON:

9           Q    Yes.

10          A    No.

11          Q    Do you have any opinion based on your

12     experience with respect to whether Chicago has

13     relatively more illegal guns than other cities

14     such as Los Angeles and New York?

15          MR. AGUIAR:  Objection; foundation.

16     You can answer if you can.

17     BY THE WITNESS:

18          A    Yes.  Chicago exceeds 10,000 gun

19     recoveries every year, well above New York and

20     well above Los Angeles.  In my experience, I

21     believe that's attributed to the gang situation

22     that we have in the Chicago area.

23     BY MR. PATTERSON:

24          Q    Okay.  And the illegal gun activity in

25     your experience is driven by gang activity, is

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

Page 73

1    that correct?

2        A    Did you say legal or --

3        Q    Illegal.

4        A    I would say that the majority of crime,

5    of violent crime in the City of Chicago is

6    attributed to gang organizations.

7        Q    Okay.  And in your experience as a City

8    of Chicago law enforcement officer, are you

9    aware of any instances in which a person has

10   committed a crime with a firearm while lawfully

11   possessing that firearm?

12       A    Nothing comes off the top of my head,

13   but then again, you know, there may have been,

14   but at this moment nothing comes off the top of

15   my head.

16       Q    Okay.  And would you agree that there

17   is a greater risk to public safety from

18   unlawfully possessed firearms than lawfully

19   possessed firearms based on your experience?

20            MR. AGUIAR:  Objection to the form and

21   the foundation and the relevance of the

22   question.

23   BY THE WITNESS:

24       A    I think there is a greater risk for

25   unlawfully possessed firearms.  However, there

Joseph Gorman                                                    October 6, 2011
                            Chicago, IL

1      is a potential for legally possessed firearm

2      people to commit a crime.

3                 MR. PATTERSON:  That's all I have.

4                 MR. AGUIAR:  Give me a few seconds.

5                 MR. PATTERSON:  Sure.

6                 MR. AGUIAR:  A couple quick follow-up

7      questions.

8                        EXAMINATION

9      BY MR. AGUIAR:

10       Q    Commander Gorman, you first testified

11     that there are approximately 80,000 known gang

12     members in the City of Chicago, is that correct?

13       A    Yes, sir.

14       Q    Is it possible there are more unknown

15     gang members in the City of Chicago?

16       A    Absolutely.  There is 80 --

17     approximately 80,000 that have been identified

18     through self-admission, through investigation,

19     and that's documented within the Chicago Police

20     Department.

21       Q    But your department suspects there are

22     more that are unknown?

23       A    Absolutely.

24       Q    And your 80,000 number does not include

25     the associates of gang members?

Joseph Gorman

October 6, 2011

Chicago, IL

Page 75

1      A      No, it does not.

2      Q      Okay.  And in your experience do

3  associates of gang members assist gang members

4  in conducting illegal activities?

5      A      Absolutely.  On numerous instances

6  associates have participated in assisting gang

7  members in coming into control of firearms.

8      Q      So is it fair to say that the 80,000

9  number you gave earlier is just the known

10  numbers but the problem is much greater than

11  80,000?

12      A      Yes, sir, absolutely.

13      Q      Commander Gorman, as of right now, if

14  you were to see a gang member on a street with a

15  firearm, would you be able to arrest that gang

16  member?

17      A      Yes, sir.

18      Q      And that would be for possessing the

19  firearm?

20      A      Yes, sir.

21      Q      Okay.  And in your experience would

22  that arrest potentially stop that gang member

23  from committing other crimes?

24      A      Absolutely.

25      Q      And without the city's ban on carry,

Joseph Gorman                                          October 6, 2011
                        Chicago, IL

1    you wouldn't be able to stop that gang member

2    from -- you wouldn't be able to make that arrest

3    unless that gang member unlawfully possessed a

4    firearm, is that correct?

5          MR. PATTERSON:  Objection; leading

6    question.

7          MR. AGUIAR:  It's cross.

8    BY MR. AGUIAR:

9       Q    You may answer.

10      A    That's correct.

11      Q    And Mr. Patterson asked you today a

12   number of questions about your experiences and

13   you've testified based on those experiences

14   today, haven't you?

15      A    Yes, I have.

16      Q    And those experiences are the best you

17   can recall as you sit here today?

18      A    As I sit here today, yes.

19      Q    There may be other experiences you've

20   had which inform your opinions but those you

21   just can't recall as you sit here today?

22      A    Yes, sir.

23          MR. AGUIAR:  I have nothing further.

24

25

Page 77

```
 1                    EXAMINATION

 2   BY MR. PATTERSON:

 3      Q    Okay.  Just one or two questions.

 4           You testified earlier that gang members

 5   may not register their firearms because they

 6   don't want to come -- they don't want the police

 7   to know that they have possession of firearms,

 8   is that correct?

 9      A    That's correct.

10      Q    Does that same logic and reasoning

11   apply to associates of gang members?

12      A    Yes, it does.  There are instances

13   where, through experience and through

14   investigations, that the associates tend not to

15   register a firearm.

16           MR. PATTERSON:  Okay.  That's all I

17   have.

18           MR. AGUIAR:  We reserve signature.

19           THE COURT REPORTER:  And do you want to

20   order this written?

21           MR. PATTERSON:  Yes.

22           THE COURT REPORTER:  Is two weeks okay?

23           MR. PATTERSON:  Yes, that's fine.

24           THE COURT REPORTER:  And full sized or

25   mini?
```

Joseph Gorman                                          October 6, 2011
                          Chicago, IL

1            MR. PATTERSON:  I'll do a full sized.

2       THE COURT REPORTER:  And Bill?

3       MR. AGUIAR:  A full and a mini.

4            (Proceedings adjourned at

5            11:16 a.m.)

6

7            FURTHER DEPONENT SAITH NOT.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

                                                          Page 79

1                    CERTIFICATE OF DEPONENT

2

3       I hereby certify that I have read and examined the

4       foregoing transcript, and the same is a true and

5       accurate record of the testimony given by me.

6       Any additions or corrections that I feel are

7       necessary, I will attach on a separate sheet of

8       paper to the original transcript.

9

10                          _____

11                          Signature of Deponent

12

13      I hereby certify that the individual representing

14      himself/herself to be the above-named individual,

15      appeared before me this _____ day of _____,

16      2011, and executed the above certificate in my

17      presence.

18

19                          _____

20                          NOTARY PUBLIC IN AND FOR

21

22                          _____

23                          County Name

24

25      MY COMMISSION EXPIRES:

```
 1    STATE OF ILLINOIS   )

 2                        )SS:

 3    COUNTY OF C O O K   )

 4              I, MARIANNE NEE, a Certified Shorthand

 5    Reporter of the State of Illinois, C.S.R. No.

 6    84-2341, do hereby certify:

 7              That previous to the commencement of

 8    the examination of the witness, the witness was

 9    duly sworn to testify to the whole truth

10    concerning the matters herein;

11              That the foregoing deposition

12    transcript was reported stenographically by me,

13    was thereafter reduced to typewriting under my

14    personal direction and constitutes a true record

15    of the testimony given and the proceedings had;

16              That the said deposition was taken

17    before me at the time and place specified and

18    was recessed/adjourned as stated herein;

19              That the reading and signing by the

20    witness of the deposition transcript, if

21    applicable, was agreed upon as stated herein;

22              That I am not a relative or employee or

23    attorney or counsel, nor a relative or employee

24    of such attorney or counsel for any of the

25    parties hereto, nor interested directly or
```

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

Page 81

1    indirectly in the outcome of this action.

2            I further certify that this certificate

3    applies to the original signed IN BLUE and

4    certified transcripts only.  I assume no

5    responsibility for the accuracy of any

6    reproduced copies not made under my control or

7    direction.

8            IN WITNESS WHEREOF, I do hereunto set

9    my hand at Chicago, Illinois, this_____day

10   of_____2011.

11

12

13

14                    _____

15                    Marianne Nee

16                    Certified Shorthand Reporter

17

18

19   C.S.R. Certificate No. 84-2341

20

21

22

23

24

25

Joseph Gorman

October 6, 2011

Chicago, IL

| A | | | | |
|---|---|---|---|---|
| **abide** 33:7 | **action** 1:6 47:18 81:1 | 49:21 50:6 52:1 54:18 55:17,21 57:22 62:20 63:8 66:16 71:20 72:3,15 73:20 74:4,6,9 76:7,8 76:23 77:18 78:3 | **applaud** 62:8 | **assist** 75:3 |
| **ability** 16:2 22:2 23:16 31:15 32:2 34:12 45:4,5 51:11 51:20 52:20,21 54:8 | **activities** 9:16 42:18 75:4 | | **applicable** 80:21 | **ASSISTANT** 2:11 |
| | **activity** 6:18,21 7:14 32:24 33:3 34:4 48:1 70:24 71:1,9 72:24,25 | | **applied** 67:19 | **assisting** 75:6 |
| | | | **applies** 81:3 | **associated** 31:11 |
| | | | **apply** 38:22 77:11 | **associates** 25:16 25:18 26:1 74:25 75:3,6 77:11,14 |
| **able** 16:20 17:24 18:1 25:15 38:2 53:21 63:6 75:15 76:1,2 | **addition** 9:23 34:19 35:6 36:24 41:16 59:11 68:19 70:4,12,14 | **ahead** 23:13 | **applying** 67:23 | |
| | | **allow** 26:6 38:4 50:18 | **appropriate** 49:18 50:4,22 | **association** 1:3 26:4 28:23 |
| | | **allowed** 22:14 30:11,19 52:16 53:22 | **approximately** 12:14 13:5,6 13:16,19,23 14:5 74:11,17 | **associations** 27:4 28:2,20 29:18,23 |
| **above-named** 79:14 | **Additionally** 36:20 | **allowing** 55:7 58:10 | **area** 25:20 36:25 40:12 70:7,7 72:22 | **assume** 60:10 81:4 |
| **absolutely** 17:17 36:15 57:15 74:16,23 75:5 75:12,24 | **additions** 79:6 | **all-day** 12:12 | **areas** 25:22 30:11,20 65:19 66:8,8 70:3 | **assuming** 28:5 |
| | **address** 67:1 | **amount** 5:16 21:10 | | **ATF** 69:23 70:20 |
| | **addressed** 11:16 12:7 54:16 | **and/or** 29:22 | **armed** 44:9,10 45:5,9,14,15 | **attach** 79:7 |
| **abuse** 70:16 71:4 | **addressing** 53:3 | **Angeles** 9:24 21:20 72:14,20 | **arrest** 57:15,22 76:2 | **attached** 3:13 70:8 |
| **academy** 68:2,4 | **adjourned** 78:4 | **animal** 70:14,16 71:3,4 | **arrested** 34:2 | **attack** 8:4 63:7 |
| **access** 32:8,9 59:6 | **affect** 7:16,17,18 | **answer** 4:18,23 10:7,18 17:2 18:20 19:13 21:12 22:4 38:11 39:16 42:21 43:7,22 44:13 46:13 47:13 49:25 50:15 54:19 57:24 61:7 62:22 66:17 72:4,5,16 76:9 | **arrival** 59:11 | **attain** 31:12 |
| **accessibility** 32:19 34:17,20 35:23 36:1,15 36:19 38:18 39:2,7,8 57:16 | **agencies** 9:21 34:6 67:20,24 70:19 | | **arrive** 62:16 63:6 | **attempt** 42:17 |
| | **aggravated** 13:17 14:2 | | **arriving** 54:6 | **attempted** 17:21 21:9 |
| | **agree** 8:25 35:25 39:11 48:16 73:16 | | **arts** 11:2 | **attempting** 16:8 17:22 38:23 |
| **accessible** 32:5 34:19 37:6,8 37:10,11 | | | **asked** 66:16 76:11 | **attempts** 65:25 66:7 |
| | **agreed** 80:21 | **answered** 66:17 | **asking** 20:22 29:13 44:21 48:2,4,25 51:18 | **attended** 12:13 |
| **accuracy** 81:5 | **Aguiar** 2:16 3:5 6:22 8:8,12 9:3 10:6,17 17:1 18:19 19:10 22:3,20,25 26:15 28:15 29:6 30:4,7,19 36:3 37:14 38:9 39:15 42:20 43:6,21 44:12,21,25 46:20 47:6,12 48:2,6,8,25 | **anticipate** 66:25 | | **attendee** 11:21 11:23 |
| **accurate** 79:5 | | **Anti-Gang** 70:10 | **assault** 44:7,8 45:14,24 | **attention** 26:3 27:4 28:3,10 28:12,19,22 29:17,22 33:23 59:13 |
| **Acknowledging** 64:13 | | **apologize** 30:1 | **assaulting** 44:18 46:4 | |
| **acquaintance** 28:1 | | **APPEARAN...** 2:1 | **assess** 20:2,4 61:12 64:19 | **attorney** 80:23 80:24 |
| **acquire** 14:17,19 16:4 17:15 31:16,20 42:12 51:12,21 52:22 | | **appeared** 79:15 | **assessing** 20:14 | **Attorney's** 7:8,8 |
| | | | **assessment** 20:7 55:14 | **attract** 33:22,25 |
| **acquiring** 17:15 27:21 30:13 56:23 | | | **assigned** 70:17 | **attracting** 34:5 |
| | | | | **attraction** 33:24 |

Joseph Gorman                                                    October 6, 2011

Chicago, IL

attributed 13:19
  14:6,7 72:21
  73:6
August 67:17,25
  68:2,3
authorities
  23:25 28:10
authorized
  56:24
Avenue 2:3 35:4
average 21:10
  62:2
avert 63:7
aware 17:18
  35:11,13 41:8
  73:9
awhile 6:12
a.m 1:21 52:5
  71:22 78:5

                B
B 3:1,8
bachelor 11:1
back 10:22
  16:24 18:24
  27:23 46:16
  52:6 60:14
backgrounds
  24:7,10 25:17
  25:18 26:5
backyards 32:14
balance 56:11
ban 75:25
banning 37:20
base 20:7
based 7:5 9:15
  10:3 21:12
  24:18 37:2,25
  39:6,7 40:22
  42:8 44:4,21
  44:23,25 45:2
  52:9 72:11
  73:19 76:13
basic 4:16 5:23
basically 5:20

18:13
basis 20:10,14
  21:22 51:2
batteries 13:17
  14:2,3,4
Bear 35:6
behalf 2:9,19
believe 16:11,17
  17:4 21:14,22
  25:1 31:18
  33:4 36:17
  40:6 41:1
  54:21 60:14
  64:16,17 66:16
  72:21
benefit 39:5,11
  39:12,23 54:22
  55:7,13 57:6
  64:9,24 65:1,3
  65:4
benefits 53:1,8
  55:15 56:10,12
  56:19 61:11,13
  63:16 64:12,15
  64:16,18,20
best 76:16
beyond 7:12 8:5
  9:12 11:10
  59:15
big 32:17 54:11
  54:11 55:1
Bill 78:2
bit 10:24
Black 6:9
block 63:1
BLUE 81:3
board 15:7
boots 61:3
boundaries 8:2
  8:2,6 27:7
bravery 62:10
break 4:21
  14:25 52:2
  71:18
breaking 45:18

Breed 6:9
Breeds 6:10
Bridgeport
  40:12
briefly 52:25
Brighton 40:12
bring 28:3,9
  29:21 42:6
bringing 27:3
  29:17
brought 47:9
Building 6:15
  12:13
burden 38:6,11
  38:13
burglaries 14:19
  31:22 40:15
burglarize 41:2
burglarized
  31:23 32:3
  34:22 35:1
  40:18,21 41:20
  53:10 66:5
burglary 18:17
  18:23 35:3
  63:23
buy 17:21,22,24
buying 18:1,9

                C
C 3:1 4:1 8:13
  80:3
cache 35:9
CAGE 15:20
  66:3 70:10
  71:1
Cal 6:15
call 33:7 45:6
  47:22 62:3
called 1:12 4:4
  7:4 67:4 68:1
calling 46:10
calls 44:12 46:23
  50:8 51:13,16
  54:19 57:22

61:1 62:10
capacity 46:8
card 15:10 17:24
  18:2,5,9 23:12
  23:17 53:20
cards 15:22
  23:16 54:10
care 45:8,13
career 10:11
carried 54:17
carries 47:7
carry 46:8,24
  47:2,4,16,19
  47:23 75:25
carrying 46:18
  47:10 54:15
  63:18 64:12,21
  65:4
cars 41:20
case 5:21 34:23
  36:11 47:8,13
  50:13 52:9
cases 4:24 5:2,5
  5:8,11,13,24
  5:25
cause 33:24 64:4
certain 54:17
  58:7
certificate 79:1
  79:16 81:2,19
certified 1:17
  80:4 81:4,16
certify 79:3,13
  80:6 81:2
chance 53:23
change 51:1,5
  51:11,20
Chicago 1:7,8
  1:20 2:12,15
  6:18,21 7:1,4
  7:13,14,15,16
  7:17,23,25 8:1
  8:24 9:10,15
  9:18,25 10:12
  11:13,24 12:10

12:12,16,22
  13:2,4,6,8,14
  13:20 14:16
  15:13,23 16:4
  16:12,15,18
  17:7,11 19:7
  21:3,10 22:15
  22:17 24:11,24
  25:3 28:6
  34:19 35:1,18
  36:10,14,16,18
  36:21 37:4,7,9
  37:13,21,25
  38:18 39:6,14
  40:3,11,14,20
  41:3 42:11
  43:11 49:10
  50:3 51:1,12
  51:22 52:10,20
  57:18,19 58:5
  67:14 68:6,9
  69:13 70:10,25
  71:9 72:2,12
  72:18,22 73:5
  73:8 74:12,15
  74:19 81:9
Chicago's 12:17
  21:14,22 22:8
  23:9 25:8,10
  26:22 29:13
  31:14 33:2
  53:8
choice 44:17
choose 34:3,3
cities 8:5,25 9:2
  9:10,14,16,19
  11:19 12:9
  21:20,21,25
  66:13,14 72:13
citizen 36:9
  37:23 38:4
  50:10,18,23
  62:11
citizens 17:8
  33:6 36:2,22

Joseph Gorman

October 6, 2011

Chicago, IL

37:8,13,22
38:2,23 39:2
39:13
city 1:7,8 2:12
7:3,16,23,24
8:1,3,6,12 9:12
10:12 11:24
12:11 13:2,4,6
13:7,12,14,20
15:13,23 16:12
16:15 17:7,10
22:1,15 25:3
27:7 34:19,25
35:23 36:10,14
36:16,17,21
37:7,9,13,21
37:24 38:8,18
38:20 39:6,14
40:2 42:11
43:10 51:22
52:24 57:19
66:22 67:11
73:5,7 74:12
74:15
city's 16:19 30:8
75:25
Civil 1:6,14
civilian 49:19
64:12 65:4
civilians 50:4
63:18 64:20
65:12
clarification
23:1
clear 8:18
close 71:19
closest 62:25
college 67:13,19
combat 8:4 71:9
combatting
10:12 70:24
come 15:20
16:14 77:6
comes 73:12,14
coming 75:7

command 48:14
commander
4:12 8:13,16
50:12 52:8
62:7 69:12,18
70:23 71:24
74:10 75:13
commencement
80:7
COMMISSION
79:25
commit 18:23,24
74:2
committed
13:16 73:10
committing
75:23
communication
9:20
community
27:16
compare 66:7
compares 65:12
comparison
20:16
complaints
70:16
complete 11:8
completely 4:18
concealed 32:13
33:17 46:9
54:17
concentration
11:6
concern 39:22
concerned 39:19
concerning
80:10
conclusion
15:15 50:9
57:23
conduct 42:18
conducted 31:8
37:3
conducting 75:4

conducts 71:3
confidentiality
71:16
conflict 14:7
conflicts 70:22
confused 28:16
congregate
25:22
consider 6:20,25
considered
64:11,15
considers 65:18
consistent 51:24
constitutes
80:14
contacting 17:23
Continuing
18:15
contributes 22:1
control 61:17
70:6 75:7 81:6
convicted 18:7
26:5 28:24
Cook 5:15 6:14
6:15 7:7 68:1
70:17
cooling 64:7
COOPER 2:2
copies 81:6
CORPORATI...
2:11
correct 14:15
26:25 32:25
38:7 41:7
48:24 51:3
53:5 58:12
60:19 63:7
69:6,13,14
70:25 73:1
74:12 76:4,10
77:8,9
corrections 79:6
costs 63:15
counsel 2:11
80:23,24

country 7:19
11:19 12:8,14
County 5:15
6:14,15 7:7
68:1 70:17
79:23 80:3
couple 74:6
course 7:21
41:13
courses 32:12
court 1:1 5:17
15:18,18 22:14
51:2 77:19,22
77:24 78:2
Courts 1:15
crime 18:25 37:3
43:11 46:15
47:17 70:9
71:3 73:4,5,10
74:2
crimes 41:9
70:14 75:23
criminal 6:15
11:7 24:6
25:17,18 48:1
criminally 45:14
criminals 19:7
22:10,18,21
40:3 72:2
criminal's 22:1
cross 76:7
CRR 2:24
CSR 1:18 2:24
2:25
currently 68:19
69:12
Customs 70:20
C.S.R 80:5
81:19

———————
D
D 4:1
danger 36:22
37:24 61:20
62:12

dangerous 27:8
Darryl 15:9,15
data 66:2
day 47:22 79:15
81:9
DEA 69:24
70:20
deadly 50:19,23
dealers 71:25
72:7
dealing 25:4,10
Dearborn 1:19
death 15:16,16
December 69:16
decision 22:13
51:2
decreased 21:15
decreases 35:23
35:25
Defendants 1:9
2:19
defense 50:11
defensively 65:9
definitely 64:8
definitive 46:13
degree 11:2,3,8
department
2:12 7:2 11:12
11:14 37:4
49:10 61:5
67:15,16,25
68:6,10 69:13
74:20,21
dependent 59:9
Depending
19:22 62:24
depends 60:14
Deponent 78:7
79:1,11
deposed 4:13,25
5:2
deposition 1:12
3:10 67:5
80:11,16,20
depositions 1:16

Joseph Gorman                                                October 6, 2011
                              Chicago, IL

described 13:11
  18:14 26:10
  32:22
describing 18:13
**DESCRIPTION**
  3:9
desire 16:18
desires 28:21
desiring 39:13
detailed 69:21
  69:23,24
detective 62:5,6
deter 22:9,18
  23:9,10 24:24
  25:5,11,24
  27:1,20,23
  28:3 29:15
  33:2,9 34:1,6
  35:18
determine 21:9
  66:9 69:4
deterred 26:24
  33:13,19 46:11
  46:15
deterrent 16:13
  17:10,13 18:25
  23:17,22 24:2
  24:20 25:23
  33:9,15 37:1
  39:24 43:11
  46:3
deters 26:13
  34:11
detrimental 13:3
  36:17
device 42:3,5,6
  58:18
devices 41:18
  42:1
different 7:18
  12:8 19:23
  29:7 70:19
difficult 16:3,6
  17:25
direction 29:8

80:14 81:7
directly 7:17
  67:14 80:25
disciples 6:1,3,4
  15:8
disclosed 8:12
  8:19,20
disclosure 8:14
discussed 66:23
  67:2
discussion 12:10
  12:15,17
disposal 71:9
dispute 64:1
disputes 27:11
  53:3
distance 62:24
distributed
  32:18
district 1:1,1,15
  15:17 69:5
districts 68:23
disturbance
  56:5
division 1:2 37:4
  62:6
documented
  74:19
dogfighting 71:6
doing 24:4 70:4
domestic 27:11
  53:3 56:5
domestic-type
  64:1
doors 59:15
dope 32:8
double 19:25
draw 28:12,18
drawn 26:3
  28:23
driven 72:25
drugs 25:21
due 71:15
duly 4:5 80:9
D.C 2:4

**E**
E 3:1,1,8 4:1,1
earlier 27:3 28:1
  28:18 50:25
  75:9 77:4
early 68:3
easily 31:23
  34:19
**EASTERN** 1:2
education 10:24
  11:10
effective 47:25
either 13:24
  14:5 18:16
  41:21 43:3
  44:8,18
electronic 70:5
  71:11
electronics 70:1
element 24:6
elevates 60:9,21
eliminate 61:18
**EMANUEL** 1:8
emergency 62:3
  62:16
empirical 21:2,6
employed 68:9
employee 80:22
  80:23
employment
  67:11 68:11,12
  68:22
encounter 53:24
enforcement
  9:21 24:3
  33:23 39:18
  46:8 47:17
  58:13,16 59:14
  66:2 70:11
  73:8
engaging 71:25
entail 69:2
entities 61:4
entrenched 13:2
environment

10:1
equally 37:10
equipment 70:6
  71:14
escalates 53:23
essentially 18:11
establishes 50:9
establishment
  34:21 35:2
establishments
  34:18 35:8
evaluate 65:25
event 39:3 63:25
Evergreen 68:22
evidence 8:18
  31:18
exact 5:16
exactly 6:13
  51:8
examination
  1:13 4:7 74:8
  77:1 80:8
examined 4:5
  79:3
exceeds 72:18
excuse 34:21
executed 79:16
exhibits 3:10,13
experience 6:25
  7:5 10:3,9,10
  10:23 14:17,20
  15:3,19 16:3,7
  16:16,22 19:15
  19:16 21:13
  24:8,18 31:4
  32:22 33:21
  39:1,7 40:4,9
  40:19,25 41:18
  41:24 42:14
  43:2,14,18,24
  44:6,22,24,25
  45:2,12 46:1,7
  46:14,17 47:21
  47:24 48:5,18
  49:2,5,11,17

50:3 51:11,19
  52:10,11,15
  53:7 54:21
  57:4,11 58:13
  58:15 59:5,20
  59:24 60:1,4
  60:22 61:8,16
  62:1,4,17
  64:23 65:22
  66:1 71:24
  72:12,20,25
  73:7,19 75:2
  75:21 77:13
experiences
  76:12,13,16,19
expert 5:1,6 6:6
  6:20 8:14 12:3
expertise 7:11
  10:2
**EXPIRES** 79:25
explain 5:19,22
  28:13
exposed 54:3
expressed 37:25
extend 7:12,12
  8:1,5 9:11,16
extending 9:19
extent 8:15 50:8

**F**
F 3:1
face 9:14
facet 10:10
facilitate 18:1
facing 13:12
fact 34:20
factor 45:16,23
fair 24:9 75:8
fall 8:16
falls 70:11
familiar 4:15
far 27:3,24 31:1
  64:24 71:10
**FBI** 11:18 69:22
  70:19

Joseph Gorman

Chicago, IL

October 6, 2011

**fear** 53:18
**February** 35:3
**federal** 1:14
  5:17 8:17
  70:19
**feel** 46:25 79:6
**felon** 18:7
**felonies** 28:24
**field** 5:12 12:3
  16:7
**find** 18:11
**fine** 77:23
**fire** 62:12
**firearm** 13:18
  15:1,22 16:19
  17:25 18:2,5
  19:18 20:3,6,8
  20:13,15 21:11
  23:12 24:11,21
  27:8,10,13,21
  27:24 31:12
  34:2 36:10,13
  38:5,7,17 39:4
  39:13 40:2,16
  42:10 44:9,10
  44:18,19 45:25
  46:2,9,18,25
  47:1,2,4,8,10
  47:16,19,23,24
  48:10,13,18,23
  49:13,19 50:10
  53:20,21 55:8
  55:15,18,20,24
  56:3,5,12,17
  56:21,23 57:7
  57:13,15,21
  58:7,11,16,21
  58:23 59:22
  60:3,7,8,11,12
  60:16 61:10,18
  63:17,18 64:2
  64:4,9,13,21
  65:4 66:10
  73:10,11 74:1
  75:15,19 76:4

77:15
**firearms** 1:3
  10:5 12:17
  13:10,16,20
  14:17,19 15:6
  16:2,4,8,10,14
  17:6,10,15,21
  17:22 19:2,8,8
  19:16 20:25
  21:4,25 22:2
  22:10,11,12,14
  22:17,19 23:8
  23:10,25 24:25
  25:3,6,12,15
  26:6,13,25
  28:9 29:16
  30:9 31:16,21
  31:23 32:10,12
  32:15 33:8,13
  33:17,20,23,24
  33:25 34:5,9
  34:12,13,14,16
  34:18,22 35:5
  35:8,9,12,15
  35:16,19,22,22
  35:23 36:1,23
  37:5,12,20,22
  38:3,19 39:25
  40:6,24 41:2,5
  41:10,15,24
  42:7,17,19
  45:19 48:14
  49:16 50:5
  51:12,21 52:12
  52:17,22,24
  53:4,24 54:2
  54:15,16,23
  55:1,22 56:9
  57:16 58:8
  59:8 60:5,19
  60:21,25 61:9
  61:19,24 63:15
  63:22 65:8,13
  65:18 66:13,15
  69:8 71:25

73:18,19,25
  75:7 77:5,7
**first** 4:4,23
  10:24 15:16
  27:9,21 29:16
  53:2,14,16,17
  53:23 54:6,12
  54:23,24 55:9
  56:2,9,13 57:8
  57:10,12 58:19
  58:23 59:3,5
  59:21 60:10,18
  60:23 61:11,24
  62:2 63:5,24
  74:10
**five** 70:7,8
**fluctuates** 19:22
  19:24 20:1
  63:3
**focused** 70:24
**focusing** 55:24
**FOID** 15:10
  17:24 18:2,5,9
  23:11,16,16
  53:20 54:10
**follow** 47:11
**follows** 4:6
**follow-up** 34:24
  74:6
**force** 50:19,23
**foregoing** 79:4
  80:11
**Forest** 35:4
  68:23
**form** 6:22 9:3
  10:6,17 13:8
  17:2 18:20
  19:11 22:3
  27:15 28:15
  29:7 36:3
  37:14 38:10
  39:15 42:20
  43:6,21 44:12
  46:20 47:6
  49:21 50:7

54:18 62:21
  63:9 66:1 72:3
  73:20
**forward** 4:25
  5:6
**foundation** 22:4
  62:21 63:9
  72:5,15 73:21
**Freddie** 35:5
**frequency** 65:12
  65:13
**frequently** 59:21
**full** 77:24 78:1,3
**function** 59:1
**further** 76:23
  78:7 81:2
**future** 67:6

---
### G

**G** 4:1
**gained** 7:1
**gang** 6:1,5,17,21
  7:6,13,15,24
  8:4 9:25 11:24
  12:9,22,25
  13:7,11,22,25
  14:4,7,13,14
  14:16,24 15:5
  16:4,14,18
  17:11,14,21
  18:6,9,10,16
  19:7,21 20:5
  20:11 21:3,10
  22:22 23:3,10
  23:11,14,15,15
  23:22,24 24:6
  24:9,21,24
  25:5,11,14,17
  25:19,20,24
  26:13,24 27:9
  27:13,20 28:20
  29:15,22 30:10
  30:13,17,21
  31:10,15,20
  32:6,8,9 33:7,9

33:12,19 34:1
  34:11,15,20
  35:5,7,18,24
  36:11,12 37:6
  38:16 39:24
  40:3,4,10,14
  40:16,24 41:2
  41:4,9,14,17
  42:3,9,12,15
  43:2,14,19
  44:6,11,17
  45:12,17,23
  46:2,3,16
  51:12,20 52:21
  62:5,6,7 70:22
  70:22,24 71:1
  71:9 72:21,25
  73:6 74:11,15
  74:25 75:3,3,6
  75:14,15,22
  76:1,3 77:4,11
**gangs** 5:12 7:3,6
  7:12 8:2,24 9:2
  9:10,11,14,15
  9:19 10:5,12
  11:20 12:4,16
  13:1,5,8 14:21
  15:23 16:1
  17:6 19:17
  21:13 25:19,21
  27:6,15 39:8
  71:5,5
**Gangster** 6:1,2,4
  15:8
**Gangsters** 6:9
**garage** 30:12
  31:23 32:3
**garages** 30:20
  31:5,7,25
  32:14,23
**general** 22:21
**generation** 13:1
**getting** 18:2
  30:10,15,21
  32:3 54:7 60:1

Joseph Gorman                                                    October 6, 2011

Chicago, IL

64:6
girlfriend 14:9
  14:12
give 46:12 61:5
  61:6,6 74:4
given 59:10 79:5
  80:15
go 5:21 16:9
  17:24 18:23
  23:13 24:12
  38:2,20 41:17
  42:12 67:14
  71:16
goes 71:4
going 17:1 18:19
  18:23,24 19:10
  22:20 29:6
  38:9 49:23
  50:6 52:1
  53:19 60:15
  62:12,20 63:8
  67:8
good 33:16
goods 35:6
Gorman 1:12
  3:3,10 4:3,11
  4:12 8:13,16
  50:12 71:24
  74:10 75:13
government
  15:18
GPS 41:18 42:1
graduated 67:13
  67:21
great 4:20 12:10
  24:14 36:19
  38:20 42:10,12
greater 38:6
  57:12 58:19
  60:24 65:20
  66:9,14 73:17
  73:24 75:10
ground 4:16
  61:4
group 70:15,18

guess 18:12
  62:14
gun 11:16 14:10
  15:7 18:9,16
  28:21,21 29:3
  29:4 36:16,20
  36:21,24 37:24
  39:6,14 59:1,3
  65:20 66:4,7,8
  66:14 71:2
  72:18,24
guns 12:11,16
  15:20 21:15
  30:10,11,19
  31:5,6,7,9 32:4
  32:22 39:8
  41:22 43:10,16
  53:21 72:2,13
guy 14:9 18:6
G-o-r-m-a-n
  4:11

_____ H _____

H 3:8
HALL 1:4
Hampshire 2:3
hand 41:17,17
  81:9
handguns 11:16
handles 71:13
hands 30:22
happened 17:19
  51:5
happy 4:21
hard 17:23
harder 17:15
  34:15 37:21
harm's 61:25
head 73:12,15
held 12:12 69:15
hereto 80:25
hereunto 81:8
hidden 31:9,9
higher 19:17,20
  20:13

himself/herself
  79:14
history 67:11
Hm-hm 31:3
  48:12 59:25
home 28:9,12
  29:20 30:9,11
  42:4,19,24,24
  43:17,20 44:1
  52:17 53:9,15
  54:24 55:8,11
  55:16,18,20,22
  56:5,13 57:7
  57:14 58:9,11
  61:10 63:16,17
  64:13,21 65:5
  65:9,13,15
homes 43:16,17
  43:19
Hoover 12:13
hour 52:2
hours 47:22
house 15:1
  56:17
houses 35:11
  40:21
housing 68:15
huge 54:11
hypothetical
  43:15

_____ I _____

ICE 70:20
identical 43:16
identified 66:21
  74:17
ignoring 39:11
illegal 18:7,17
  19:8 32:7,25
  34:4 37:1 72:1
  72:13,24 73:3
  75:4
illegally 15:22
  30:22
Illinois 1:1,3,18

1:20 2:15,25
  9:22 11:2
  67:22 69:8
  80:1,5 81:9
immediate
  59:13
immediately
  14:10 15:12
Immigration
  70:20
imperative
  59:18
improperly
  30:14
incident 14:14
  70:12,13
include 74:24
including 53:2
income 67:23
increase 46:18
indicated 28:18
indication 16:17
  18:15
indirectly 81:1
individual 58:6
  79:13,14
individuals 40:5
  42:17 44:5
  55:7 65:8,14
infer 60:16
inform 76:20
information
  59:6,10,21
  60:2
initiated 40:13
initiation 14:23
inner 7:2
innovative 16:1
inoperable
  58:17 59:4
Insane 40:11
inside 35:22
  37:21
instance 32:6
  56:4

instances 7:20
  15:19 17:8,18
  17:20 18:3,10
  20:18,19 25:16
  25:21 31:5
  32:11,15,21
  33:3,16 34:23
  35:10,13 40:17
  40:20,23 41:8
  41:12 42:23
  48:22 56:4,24
  58:8 59:14
  63:5 66:4 73:9
  75:5 77:12
instantaneously
  62:10
instructor 69:8
intelligence
  70:18
intent 67:5
intercepted
  15:14
interested 80:25
interviews 40:22
intimidation
  27:15 53:4
investigates
  70:15
investigating
  15:9
investigation
  15:15 62:7,8
  74:18
investigations
  7:21,22 15:3,5
  19:23 31:8
  34:24 37:2
  41:14 61:3
  69:3 70:21
  71:3 77:14
investigative
  34:6 61:2
investigator
  68:24 69:2
involved 6:17

Joseph Gorman

Chicago, IL

October 6, 2011

14:14 20:12
54:9
**involvement**
24:5
**involving** 5:25
**irrelevant** 47:8
50:13
**IRS** 70:20
**issue** 53:18,25
54:1,4,11,14
54:15
**issues** 54:6 59:17
60:15

_____

**J**

**jail** 70:18
**Jerry** 68:16
**job** 68:19,21
**jobs** 68:25
**John** 62:11
**Johnson** 15:9,16
**joined** 67:16
**joining** 67:25
**Joseph** 1:12 3:3
4:3,11
**July** 51:6,9,10
51:21 60:22,24
**jurisdiction**
52:12,13,16
**jurisdictional**
52:14
**jurisdictions**
52:18
**justice** 11:7

_____

**K**

**K** 80:3
**KATHRYN** 1:4
**keep** 30:9
**Keeping** 31:22
**KENNETH** 1:3
**KIRK** 2:2
**knew** 14:22 18:6
40:24 43:15
45:4,19

**know** 4:21 5:16
17:7 19:2,11
19:25 20:18
24:4,4 29:21
32:20 40:5
41:10 45:17,24
46:10,11,14,15
48:14 53:19
54:7,8 57:24
58:7 59:3,14
61:7 62:13,14
67:4,5,7 73:13
77:7
**knowing** 53:19
**knowingly** 71:25
**knowledge** 7:2
7:12 9:1,9,11
9:15,18 10:3
51:23 57:18
**known** 35:11
74:11 75:9
**knows** 46:2

_____

**L**

**L** 3:1
**lab** 69:25 71:13
**large** 35:9
**LaSalle** 2:13
**law** 2:12 9:20
24:3 33:7,22
35:18 39:18
46:8 47:16
50:9,18,24
51:1,5,6 52:20
58:13,15 59:14
66:2 73:8
**lawful** 18:8
23:11
**lawfully** 17:24
24:21 25:15
27:13 54:2,14
57:2,19 73:10
73:18
**Lawn** 68:22
**laws** 12:18 16:5

16:11,19 17:4
17:6 18:22
21:15,22 22:8
22:12,17 23:7
24:23 33:2,13
33:20
**law-abiding**
17:8 33:6 36:1
36:9,22 37:8
37:13,22,23
38:1,4,23 39:1
39:12
**lead** 30:13,17,21
42:3
**leader** 25:19
**leaders** 15:5
23:15 24:6,9
24:21 70:22
**leading** 76:5
**learned** 16:8
**legal** 50:9 57:23
73:2
**legally** 53:21
74:1
**lengths** 36:20
38:20 42:12
**letter** 68:3
**let's** 22:23 23:2
**license** 1:18
24:11 28:8
**licensed** 69:7
71:25 72:7
**lieutenant** 68:17
**life** 48:20,23
49:9,10,14,20
50:5 59:18
**light** 17:9
**limit** 33:13
52:20,21
**limitation** 26:7,8
26:12,23 27:18
29:14 30:8
31:14 34:9,12
52:23 53:1,8
**limited** 7:13

**limiting** 33:20
34:14 35:22
53:15
**limits** 8:3 9:12
31:15
**line** 45:20 50:14
**litigation** 66:23
**little** 10:24 28:14
52:2
**live** 69:4
**lives** 25:20 48:21
48:24
**living** 7:24 27:7
58:6
**location** 42:7
60:7,9,13
**locations** 31:15
31:21 32:24
65:18,19,21
**lock** 58:18,22
**logic** 77:10
**long** 62:1 69:15
70:21
**long-term** 61:3
**look** 13:8 20:17
19:5,6,12 65:7
65:11,17,24
66:6,12
**looking** 66:2,2,4
**looks** 65:8 71:2
**Los** 9:24 21:20
72:14,20
**lot** 7:22

_____

**M**

**MACY** 2:16
**maintaining**
70:5
**major** 39:22
**majority** 5:25
19:1 24:16,19
33:16 43:24
73:4
**manner** 8:19

54:3,17
**Marianne** 1:17
2:24 80:4
81:15
**marked** 3:9,13
**markup** 20:18
20:20
**matter** 63:1
**matters** 80:10
**Mayor** 1:8
**mean** 19:12
22:21,21 49:8
55:17
**means** 15:24
16:1
**member** 15:7
18:9,11,16
21:10 23:11,14
25:17,20,24
27:10,13 28:20
29:22 32:9
34:1 36:12,12
43:14,19 44:7
44:11,17 45:23
46:2,3,16
75:14,16,22
76:1,3
**members** 7:24
13:7,22,25
14:4,14,16
15:23 16:4,14
16:18 17:11,14
17:22 19:7,21
20:5,11 21:3
22:22 23:3,10
23:15,23,24
24:24 25:5,12
25:14 26:13,24
27:20 29:15
30:10,13,18,21
31:11,16,20
32:6,9 33:8,10
33:12,19 34:11
34:15 35:5,7
35:18,24 37:6

Joseph Gorman

October 6, 2011

Chicago, IL

38:17 39:24
40:4,4,24 41:2
41:4,9,14,17
42:3,9,12,15
43:2 45:13,18
51:12,21 52:21
74:12,15,25
75:3,3,7 77:4
77:11
**mentioned**
10:22 34:8
54:13
**methods** 47:25
**MICHAEL** 1:4
**mid** 61:2
**mind** 18:24
27:24 46:16
53:1 60:15
**mini** 77:25 78:3
**minimal** 20:19
**minute** 63:2
**minutes** 71:18
**moment** 73:14
**monitored** 36:25
**monitoring**
71:15
**months** 67:24
**monumental**
12:24 13:11
**morning** 68:20
68:21
**multiple** 32:15
32:16 54:25
56:8 57:1,16
58:8 61:9,19
**murders** 13:14
13:15

_____
**N**
_____
**N** 3:1,1 4:1
**name** 4:9,11
79:23
**narcotics** 41:17
41:22
**nature** 21:16

**necessary** 48:18
48:22 49:13
79:7
**Nee** 1:17 2:24
80:4 81:15
**need** 4:20
**neighborly**
63:25
**neighbors** 27:12
32:2
**never** 21:1 65:7
65:11,17,24
66:6,12
**nevertheless**
24:12
**New** 2:3 6:9,10
9:25 21:21
72:14,19
**nickname** 15:9
**normally** 32:1
**north** 1:19 2:13
70:9,13
**Northern** 1:1
11:2 67:21
**NOTARY** 79:20
**number** 3:9
21:15 23:15
24:14 32:15
40:20 74:24
75:9 76:12
**numbers** 75:10
**numerous** 5:15
6:14 7:20
11:18 15:19
17:20 25:16
31:22 32:11
40:17 46:24
47:1 54:5
67:20 68:24
70:5 71:14
75:5
**N.W** 2:3

_____
**O**
_____
**O** 3:1,1 4:1 80:3

80:3
**Oak** 35:3,4
68:22,22
**object** 6:22 9:3
10:6,17 17:1
18:19 19:10
22:3,20 28:15
29:6 36:3
37:14 38:9
39:15 42:20
43:6 44:12
47:6 49:21
50:6,14 62:20
63:8 72:3
**Objection** 43:21
46:20 54:18
57:22 66:16
72:15 73:20
76:5
**oblige** 4:22
**observed** 32:12
53:11
**obstacles** 16:9
**obtain** 16:10,20
18:16 22:2
23:16 24:12
34:15 37:22
**obtaining** 22:10
22:18 23:10
24:25 25:6,12
26:13,24 29:15
35:19
**obviously** 30:2
**occasions** 47:2,5
50:22
**occupied** 31:24
32:1
**occurred** 51:6
**October** 1:20
**offenders** 14:6
40:22
**Office** 7:8,9
**officer** 46:8
47:17 48:3,6
48:10,17 49:1

49:3,5,12,18
50:4 52:10
53:18,25 58:14
58:16 62:4,25
62:25 66:2
73:8
**officers** 14:22
40:14,21 41:3
60:5 69:21,22
69:23,24 70:17
70:18
**officer's** 14:25
**Oh** 46:5
**okay** 5:18 6:16
7:11 8:7,9,21
9:13 10:14,22
11:15,21,25
12:5,15,21
19:4 20:23
21:1,19 22:8
26:19 27:2
28:5 29:25
31:13 35:21
37:5 39:9 40:1
41:12 42:14
44:3 45:12
47:4 48:8
49:17 50:10,21
51:25 53:12
54:13 55:3,6
55:21 57:4,11
58:5,15 59:20
60:4 61:8
63:14 66:21
67:7 68:5,12
69:1 70:23
71:17 72:24
73:7,16 75:2
75:21 77:3,16
77:22
**ones** 5:19
**operable** 55:18
55:19,22,24
56:12 57:7,13
57:20 58:7,8

58:11,17,23
**operational**
71:10
**opinion** 12:21
13:3 21:18
22:9 23:8
33:12 35:19
39:10 40:25
50:17,21 55:6
56:11,18 57:5
58:9 63:14
72:11
**opinions** 76:20
**opportunists**
43:9 45:3,8
**opportunity**
43:12 61:23
**opposed** 31:24
36:19 62:11
64:5
**opposing** 27:15
**order** 8:3 14:24
16:10 40:13
77:20
**ordinances** 25:1
25:1,4,8,10,13
**organization** 6:2
71:8
**organizations**
73:6
**Organized** 37:3
**original** 79:8
81:3
**outcome** 81:1
**outside** 7:23,24
25:2,5,11 26:9
26:14,23 27:8
27:10,14,18,25
28:6,9,12
29:14,20 30:9
30:11 31:1,6
32:4,10,24
34:10 35:15
36:10,13 38:20
52:17,23 53:9

Joseph Gorman

October 6, 2011

Chicago, IL

| | | | | |
|---|---|---|---|---|
| 53:15,22 54:2 54:23 63:16,17 64:2,9,13,21 65:5,9,13,15 **outweigh** 56:9 57:5 61:10 63:16 64:8 65:6 **outweighing** 55:13 **outweighs** 39:5 39:10,23 54:22 64:24 ___**P**___ **P** 4:1 **PACHOLSKI** 1:4 **PAGE** 3:2 **paid** 20:13 **paper** 79:8 **Park** 35:4 40:12 68:22 **part** 7:25 **partake** 34:4 **participate** 12:5 **participated** 7:21 15:3,4 19:15 75:6 **particular** 11:6 14:22,24 15:7 23:19 25:20,22 26:1 34:4 52:22 **parties** 80:25 **patrolmen** 62:9 **patrons** 40:2 **Patterson** 2:5 3:4 4:8 7:10 8:10,11,21,22 9:7 10:13,21 16:23 17:12 19:3,19 22:7 22:23 23:2,6 26:18 29:1,11 | 30:6,16,24 36:7 37:19 38:15 39:20 43:1,13 44:2 44:16,23 45:11 47:3,9,20 48:4 48:7,11 49:2,7 49:24 50:20 52:3,6,7 55:2 55:19,23 56:7 58:4 63:4,13 66:20 71:17,23 72:8,23 74:3,5 76:5,11 77:2 77:16,21,23 78:1 **pay** 19:8,17,21 20:6 21:3 **pays** 21:11 **peers** 9:24,24 21:20,24 **penalty** 15:16,17 **pending** 4:22 **people** 9:20 12:14 13:24 14:21 28:24 31:7 32:16 35:10 40:1 41:9,21,24 42:9 43:25 53:10,24 54:9 54:10,10,14,22 57:1,17 60:2 69:4,19,20 74:2 **people's** 32:13 33:10 48:21,23 **perceive** 60:5 **percent** 13:15,18 13:21,24 14:1 **period** 61:22,23 62:15 64:8 **permission** 30:5 **permit** 21:25 28:8 57:19 | 58:5 66:15 **permitted** 28:6 52:12 57:13 **permitting** 57:6 **perpetrated** 13:22 **perpetrators** 14:3 **person** 13:17 18:8 23:19 26:1 32:20 41:10 42:18 44:8,9,9 45:6,9 45:25 46:2,4 54:4 57:2 63:17 64:1,3 73:9 **personal** 46:7,14 64:23 65:22 80:14 **persons** 15:21 26:4 41:15,16 45:13 52:16 57:6 **person's** 42:4 **pertaining** 1:15 22:6 **Pete** 49:23 52:1 **PETER** 2:5 **pinpoint** 19:24 **place** 7:22 16:6 16:11 17:5,11 18:22 22:9,18 24:24 27:22 29:16 38:6,13 55:5 80:17 **places** 41:4 **Plaintiffs** 1:5,13 2:9 **please** 4:9 **plying** 32:7 **police** 7:1 11:13 14:22,25 28:4 33:7,25 34:6 37:4 40:14,17 | 40:20 41:3 48:3,6,10,17 49:1,3,5,10,12 49:17 50:3 52:10 59:19 60:4 67:15,16 67:25 68:4,6,9 69:13 74:19 77:6 **policy** 49:10 **Popes** 40:11 **Pops** 15:10 **porch** 30:12 **porches** 30:20 31:9 32:23 **pose** 58:22 **posed** 14:9 **poses** 27:9,12 32:17 36:22 37:24 55:1 56:6 **position** 27:17 31:13 69:15 70:23 **possess** 16:19 26:6,14 27:13 28:20 29:4 41:10,15 52:17 53:21 55:8 57:6 63:22 **possessed** 40:24 41:16,24 64:2 73:18,19,25 74:1 76:3 **possesses** 57:2 **possessing** 26:9 26:23 27:10 28:9,12 29:20 29:21 31:14 39:25 40:6 44:18,19 54:23 73:11 75:18 **possession** 16:14 25:10 27:24 28:6 30:9 | 41:22,22 53:15 54:2 55:15,17 60:2 77:7 **possibility** 64:3 **possible** 59:19 74:14 **possibly** 21:21 28:2 63:21 **post-high** 10:25 11:1 **potential** 5:1 31:12 35:7 41:19 53:11,23 56:6,22 60:19 60:20 61:18 65:3 74:1 **potentially** 23:19 24:2,10 25:21 27:11 28:2,24 30:21 31:10 32:5,20 34:11,22 35:9 45:3 46:9 48:1 52:21 54:1,25 56:25 60:16 61:20 63:21 64:1 75:22 **ppatterson@c...** 2:7 **practices** 47:10 **prefer** 44:11,20 **preference** 43:3 43:4 **prepares** 66:3 **presence** 79:17 **present** 56:22 58:9,10,18 60:6,9,21 61:19,19,24 66:9 **presenter** 11:25 **presumably** 62:15 **pretty** 60:17 **prevent** 17:14 |

Joseph Gorman

Chicago, IL

October 6, 2011

66:13
prevented 18:8
previous 37:2
  38:1 80:7
price 19:6,17,20
  20:12,21 21:3
primarily 7:13
prior 22:13
  59:10 67:24
privy 18:4
probably 4:15
  24:14
problem 7:25
  8:4,24 12:10
  12:15,22,23,24
  13:11 27:9
  32:17 75:10
problems 7:15
  7:16 9:1,9,14
  12:8 55:1
  65:20 66:10,14
Procedure 1:14
proceedings
  78:4 80:15
process 20:24
  24:13 26:10,11
promote 27:19
properly 59:2
property 32:13
  33:8,11
Prosecution 7:7
prosecutors 7:5
protect 48:23
  49:13,19 50:5
  53:16
protecting 53:2
protection 48:20
  48:20 49:9,9
  59:18
provide 8:16
provided 6:6
provisions 35:17
  50:17,24 52:19
public 27:19
  28:10 59:17

73:17 79:20
pull 14:10 64:4
pulling 70:3
purchase 15:11
  16:8 18:5,12
  19:16 23:12
  25:15 36:9,13
  38:3,4
purchased 15:5
  22:14 31:6
purchaser 36:13
purchasing 15:2
  15:4,21 20:24
  25:24 36:23
  37:2 38:7
pursuant 1:14
  8:13
purview 70:11
put 4:25 5:6
  19:24 38:20
  41:18 45:6
puts 23:18
Pyramid 68:15
  68:18

**Q**
qualify 24:10
quantify 24:19
  65:25
quarrel 62:13
quell 61:22
question 4:22,23
  6:23 9:4,6
  16:24 17:13
  19:5,11 20:9
  21:7,23 23:5
  25:7,12 26:16
  26:19 29:10
  31:19 35:14
  36:4 37:15,18
  38:10,14 41:23
  42:21 44:15
  46:12,21 47:7
  47:14 49:22,22
  50:1,2,7,8,15

51:17 56:10
  58:20 62:14
  63:10 72:4
  73:22 76:6
questioning
  45:21 50:14
questions 4:18
  29:24 74:7
  76:12 77:3
quick 74:6
quickly 59:19
  63:6

**R**
R 4:1
radar 23:19
RAHM 1:7
RDR 2:24
read 16:23,25
  79:3
reading 80:19
really 46:12
reason 40:5
  47:18,23
reasoning 38:22
  77:10
reasons 27:19
recall 6:12 51:8
  60:1 76:17,21
received 68:3
Recess 52:4
  71:21
recessed/adjo...
  80:18
recognize 32:2
recognized 13:7
recollection 5:4
  12:19,20 35:20
  53:13 58:2
record 4:10 8:9
  16:25 52:6
  79:5 80:14
recovered 34:25
recoveries 72:19
red 17:9

reduced 80:13
reduces 38:18
reducing 53:4
referred 51:1
refuse 18:5
regardless 60:6
register 23:18
  23:24 24:21
  28:21 29:3
  77:5,15
registered 59:8
  59:22 60:7,12
registering
  25:25 29:5
registration
  22:11,12,16
  23:8,9,21
  24:11,13,22
  34:9 35:16
relate 13:10
related 14:13
relationship 7:6
relative 80:22,23
relatively 72:13
relevance 46:21
  63:9 73:21
relevancy 47:7
  49:22 50:7
relevant 9:2
  47:13
remarkable
  20:20
remember 5:19
  5:22 6:16
repeat 16:21
  50:2 51:17
rephrase 9:8
  44:15
reported 2:24
  80:12
Reporter 1:17
  77:19,22,24
  78:2 80:5
  81:16
reports 66:3

represent 51:9
representative
  11:23
representing
  79:13
reproduced 81:6
request 4:23
requested 12:2
require 28:7
  59:13
required 47:18
requirements
  23:9 24:23
  54:16
research 10:4,16
  21:2,2,5,6 65:7
  65:11,17,24
reserve 77:18
residence 14:23
  25:2,5,11 26:9
  26:14,24 27:8
  27:11,14,18,25
  28:7 29:14
  31:2,6,11,24
  31:24,25 32:4
  32:10,18,19,24
  34:10 35:16
  40:15 42:19
  45:7,18,20
  52:23 56:4
  57:1,17,20
  58:6 59:7,23
  60:11 64:2,6
  64:10
residences 33:18
  40:17 41:3,21
  53:22 54:3,25
  60:23
residency 69:3
resident 43:17
  43:18
residents 27:16
  53:2
resort 48:13,15
  48:19 49:6,8

Joseph Gorman

October 6, 2011

Chicago, IL

| | | | | |
|---|---|---|---|---|
| 49:12,16 | 64:25 75:13 | **saying** 8:23 9:17 | **serious** 12:23 | **social** 10:4,16 |
| **respect** 38:16 | **risk** 39:5,10,12 | 20:5 24:1 41:6 | **set** 81:8 | 11:4,5 |
| 56:11,18 60:25 | 39:19,22,23 | 51:19 | **seven** 69:22 | **sold** 37:6,9,12 |
| 61:11 63:15 | 41:1 42:10 | **scenario** 44:10 | **sheet** 79:7 | 65:19 |
| 72:12 | 54:22 55:6,10 | 44:19 | **shoot** 14:10 | **somebody** 14:11 |
| **respond** 56:25 | 55:12 56:2,9 | **scene** 54:6 56:25 | **shooters** 13:25 | 15:10 17:23 |
| 60:18 62:2 | 56:16,20,22 | 59:11 61:17,18 | **shop** 36:16,20 | 18:2,4 38:13 |
| **responded** 29:17 | 57:3 58:10,19 | 62:16,25 | **shops** 15:7 36:21 | 45:4,18,24 |
| **responder** 58:23 | 58:22 59:2 | **scenes** 53:17 | 36:24 37:24 | 56:23 68:17,18 |
| 60:18 63:24 | 60:5,8,9,21 | **schedule** 8:14 | **Shorthand** 1:17 | **somebody's** |
| **responders** 27:9 | 63:19,20,23,23 | **school** 10:25 | 80:4 81:16 | 31:10 |
| 53:3,14,16,17 | 63:25 64:24 | 11:1 68:23 | **short-term** | **sorry** 26:19 |
| 53:24 54:6,12 | 65:6,23,25 | 69:3 | 70:21 | 45:21 |
| 54:23,24 55:9 | 73:17,24 | **science** 10:4,16 | **shot** 13:18,24 | **sort** 28:7 |
| 56:3,9,13 57:8 | **risks** 55:13,14 | 63:3 | **side** 40:10 56:20 | **source** 72:1 |
| 57:10,12 58:19 | 56:11,19 57:5 | **secondary** 68:11 | 68:24 | **south** 40:10 |
| 59:3,6,21 | 57:12 60:24 | 68:12,21,21 | **sidetracked** | 70:10,13 |
| 60:10,23 61:11 | 61:10,12 64:8 | **seconds** 63:2 | 67:12 | **speak** 4:17 |
| 61:24 62:2 | 64:14 | 74:4 | **siding** 32:14 | **speaking** 30:3 |
| 63:6 | **roofed** 67:22 | **Section** 68:16 | **sign** 17:9 | **spearheads** 13:4 |
| **responding** 48:1 | **rooms** 71:15 | **security** 46:19 | **signal** 17:5 | **specialist** 62:5 |
| 59:8,12,23 | **roughly** 13:15 | 46:25 | **signature** 77:18 | **specific** 9:13 |
| 60:23 | 13:23 67:22 | **see** 35:9 42:2 | 79:11 | **specifics** 6:17 |
| **response** 62:8,18 | **Rule** 8:13 | 47:17 63:21 | **signed** 81:3 | **specified** 80:17 |
| **responsibilities** | **rules** 1:14 4:16 | 75:14 | **significant** 72:1 | **speculate** 51:18 |
| 69:17 | 8:17,17 | **seen** 51:10 | **signing** 80:19 | **speculation** |
| **responsibility** | **run** 64:5 | **self** 48:20 | **similar** 17:5 | 44:13 46:10,23 |
| 81:5 | **running** 62:11 | **self-admission** | 58:18 | 51:13,16 54:19 |
| **responsible** 70:4 | | 74:18 | **simple** 14:8 | 61:1 |
| **restoring** 70:3 | **S** | **sell** 15:22 25:21 | **single** 55:8,15,19 | **speculative** |
| **restrictions** 55:4 | **S** 3:1,8 4:1 | 35:8 | 56:12,14 57:20 | 46:12 |
| **retail** 20:17 | **safety** 27:19 | **selling** 32:7 | 58:11 61:9 | **spoken** 9:23 |
| **RETAILERS** | 46:18 53:18,25 | **sells** 34:18,21 | **sir** 66:11,19 68:7 | **sporting** 35:6 |
| 1:3 | 54:1,4,5,11,14 | 35:2 | 74:13 75:12,17 | **SS** 80:2 |
| **returned** 11:17 | 54:15 59:17 | **seminar** 11:17 | 75:20 76:22 | **staking** 35:7 |
| **review** 10:4 | 60:15 73:17 | 11:22 12:1,6,7 | **sit** 76:17,18,21 | **start** 4:19 22:23 |
| **reviewed** 21:2,5 | **SAITH** 78:7 | 12:12,16 | **situation** 11:24 | 23:2 |
| 21:8 | **sale** 20:17 25:3 | **seminars** 11:13 | 43:15 58:10 | **started** 67:10 |
| **right** 23:2,13 | 35:15,21,22 | 11:15 | 60:17 61:22 | 68:4,5 |
| 24:8 27:5 | 37:20 43:10 | **sense** 46:18,25 | 72:21 | **state** 1:18 4:9 |
| 39:21 44:6 | 52:12,24 66:15 | **sent** 12:2 | **situations** 14:21 | 9:21 69:7 80:1 |
| 46:1,1,17 | **sales** 21:25 | **separate** 79:7 | 40:8 48:17 | 80:5 |
| 49:11 51:15 | 34:13,14 42:11 | **sergeant** 62:5 | 59:12 | **stated** 80:18,21 |
| 53:13 56:8 | 66:13 | **sergeants** 69:21 | **sized** 77:24 78:1 | **statement** 8:9 |
| 59:5,16 60:10 | **Sauk** 15:11,11 | 70:8 | **small** 70:15 | 20:11 |

Joseph Gorman

October 6, 2011

Chicago, IL

states 1:1,15
7:18 15:17
State's 7:7
stay 24:5
staying 38:8
steal 15:1 40:16
stenographica...
80:12
step 10:22
stole 35:5
stop 17:9 75:22
76:1
store 39:6
stored 31:5,7,21
32:23 33:8,14
33:20 41:5
43:16
stores 38:17
39:14 40:2
66:4,7,8
storing 33:10
straw 15:2,4,21
18:12 36:12
37:1
street 1:19 2:13
6:1,5 7:3 10:11
10:14 18:4
19:2 21:16
25:22 32:6
75:14
strenuously
50:14
strewn 32:18
strike 19:5 21:23
31:19 35:14
stringent 22:12
structure 12:25
studies 11:4,5
study 10:16 21:8
subject 5:10,12
6:11 22:6
subjects 6:5
66:25
subsequently
15:14

subsidized 68:15
substance 5:20
5:23
suburban 36:20
suburbs 7:18
15:6 38:3,8,21
39:2,5
Suite 1:19 2:14
summer 67:21
superintendent
12:3
supervision
15:20
supplement
67:23
supplemented
10:15
Supreme 22:13
sure 26:21 30:6
71:20 74:5
surrounding
7:17 15:6
36:25 38:2
surveil 45:7
surveillance
42:8 44:5 70:5
71:14
surveillances
32:12
suspects 74:21
sworn 4:2,5 80:9

**T**

T 3:1,1,1,8
take 47:18 52:2
61:17,22 62:2
taken 1:13,16,19
80:16
takes 43:12
62:15
talked 21:19,24
35:14 45:17
52:19 55:12
talking 9:24
67:10

target 40:5 41:4
41:25 42:16,16
43:19 63:20
targeted 14:21
35:12 36:23
40:13,14,23
41:9,15 44:5
targeting 44:7
70:22
targets 35:10
40:3 53:11
team 34:24
69:20 70:10,13
70:13,14 71:1
71:3
teams 70:7,9
technical 69:25
70:1 71:12
tell 59:7
ten 63:2
tend 77:14
terms 9:13
territorial 25:19
27:6
terrorism 13:9
testified 4:5 5:16
6:2,13,14 56:8
74:10 76:13
77:4
testify 66:22
80:9
testimony 5:11
5:20,23 6:6
8:15 38:1 39:9
50:25 52:9
65:2 66:25
67:8 79:5
80:15
tests 67:20
thing 34:10
think 12:24,25
13:13 16:5,13
17:9 18:25
23:17,22 24:20
29:7 30:7,14

36:22 37:23
38:1,19 39:5
39:23,24 41:5
42:10,11 43:9
43:9,11,24
45:7,16 48:13
49:18 50:12
51:14 53:17
55:1 56:16,21
61:6 62:9,19
63:19,19,24
64:7,8,14,23
64:24 71:18
73:24
third 12:25
34:10
thought 26:22
threat 14:9
27:12 56:6
three 29:24 35:4
67:24 69:20
time 10:14 13:13
17:23 56:21
61:22,23 62:15
62:18 66:24
67:18 68:8
80:17
timeliness 59:12
times 5:15 6:14
41:20 43:25
46:24 50:18
61:21 71:4,5
today 8:20 66:24
76:11,14,17,18
76:21
tool 71:5
tools 71:7
top 73:12,14
topic 11:19
touched 15:25
52:25
tracked 41:19
tracking 41:18
42:1,2,5,6
trade 32:7

traffic 17:5
Trail 15:12
trained 49:15
Training 11:12
transaction
18:18
transactions
19:9 20:12
72:1
transcript 79:4
79:8 80:12,20
transcripts 81:4
travel 38:7,19
traveling 36:19
trial 67:8
trigger 58:18,22
true 79:4 80:14
truth 80:9
try 4:17,17 24:5
trying 20:10
29:12,19 30:1
30:7 47:10
two 43:16 69:23
70:9,16 77:3
77:22
TYLER 1:4
type 21:8
types 40:8
typewriting
80:13
typical 62:17,19

**U**

unable 18:11
unclear 26:20
underlying
20:15
understand 8:23
9:6 20:9 21:7
25:7 26:8,15
26:21 27:17
29:2,10,19
37:17 38:14
39:9 42:2
45:20 58:20

Joseph Gorman

October 6, 2011

Chicago, IL

Page 94

| | | | | |
|---|---|---|---|---|
| 65:2 | 55:14 56:19 | 31:14 33:10 | words 30:10 | **10:12** 52:4 |
| **understanding** | 58:17 | 34:10,25 35:2 | **work** 17:14 | **10:16** 52:5 |
| 25:9 28:11 | **victimized** 65:14 | 35:15 42:8,13 | 68:20,23 69:1 | **10:47** 71:21 |
| 42:15 51:7 | **victims** 14:2,5 | 52:23 53:1,9 | 69:25 | **100** 13:18 |
| **unique** 7:15 8:5 | 41:19 | 53:11,15 65:15 | **worked** 10:11,11 | **11th** 68:2 |
| 8:24 9:1,25 | **video** 70:3,3 | **weeks** 77:22 | 68:14,15,16 | **11:06** 71:22 |
| **unit** 7:7 15:20 | **Village** 15:11 | **weighing** 56:19 | **working** 7:6,9 | **11:16** 78:5 |
| 61:2 62:7,8 | **violate** 17:6,9 | **went** 29:7 | 21:13 52:15,18 | **1230** 2:14 |
| 66:3 69:19 | **violence** 11:16 | **weren't** 22:14 | **workings** 7:3 | **1523** 2:3 |
| 70:11 | 11:20 12:9,11 | 42:24 43:25 | **works** 70:18 | **157** 69:19,20 |
| **United** 1:1,15 | 12:22 13:4,22 | **West** 68:15,18 | **workup** 70:2 | **16** 69:21,24 |
| 15:17 | 33:24 34:7 | **we're** 13:16 30:2 | **worth** 19:18 | **172nd** 35:4 |
| **unknown** 45:16 | 56:22 64:5 | 30:2 35:11 | 20:3,6,7,14 | **19** 69:20 |
| 45:23 53:19 | 65:20 66:10,14 | 49:23 | **wouldn't** 24:3 | **1985** 11:9 67:13 |
| 74:14,22 | 71:2 | **we've** 17:21 31:8 | 26:2,2 29:3 | **1986** 67:17 68:6 |
| **unlawfully** | **violent** 63:7 70:9 | 32:12 35:14 | 32:1,2 37:7 | **1992** 68:14 |
| 73:18,25 76:3 | 73:5 | 41:14 49:15 | 38:3 45:8 76:1 | **1995** 7:9 15:7 |
| **unnecessary** | **virtue** 58:17 | 52:1,19 66:23 | 76:2 | **1999** 68:14 |
| 28:19,22 | **vs** 1:6 | **WHEREOF** | **wrapping** 71:19 | ———— |
| **unoccupied** | | 81:8 | **written** 77:20 | **2** |
| 31:25 | **W** | **wholly** 50:13 | | **2** 8:13 70:7 |
| **unrealistic** 20:21 | **waguiar@city...** | **WILLIAM** 2:16 | **X** | **20036** 2:4 |
| **urban** 13:8 | 2:18 | **witness** 3:2 4:2,4 | **X** 3:8 | **2008** 69:16 |
| **use** 38:10 48:18 | **want** 8:18 10:23 | 5:1,6 6:24 9:5 | | **2010** 51:1,6,10 |
| 48:23 49:13,15 | 22:25 23:24 | 10:8,19 17:3 | **Y** | 51:10,21 60:22 |
| 49:19 50:5,10 | 24:3 26:2,2 | 18:21 19:14 | **yard** 30:12 | 60:24 |
| 50:18,23 65:8 | 33:22 34:2 | 22:5 23:4 | **yards** 30:20 | **2011** 1:20 79:16 |
| 65:13 71:5 | 39:3 55:13 | 26:17 28:17 | 31:10 | 81:10 |
| **utilize** 27:14 | 77:6,6,19 | 29:9 30:17,23 | **yeah** 20:5 26:12 | **202** 2:6 |
| 64:4 | **Washington** 2:4 | 36:5 37:16 | 43:5 51:18 | **24** 47:22 |
| **utilized** 15:10 | 11:18 | 38:12 39:17 | 55:12 61:15 | **25** 10:9,23 12:14 |
| **Utilizing** 42:6 | **way** 11:16,25 | 42:22 43:8,23 | 67:3 71:11 | **26** 8:13 35:5 |
| **U.S** 7:8 | 14:8,11 43:3 | 44:14 45:1 | **year** 67:22 72:19 | **26th** 6:15 |
| ———— | 45:9 61:7,25 | 46:22 47:15 | **years** 10:10,23 | ———— |
| **V** | **ways** 14:18 | 48:9 49:4 | **York** 9:25 21:21 | **3** |
| **vague** 38:11 | 31:22 | 50:16 54:20 | 72:14,19 | **3** 70:7 |
| **valid** 53:20 61:7 | **weapon** 23:20 | 56:1 58:1 | | **30** 2:13 |
| **value** 20:2,15,17 | 25:24,25 29:20 | 62:23 63:11 | **$** | **300** 1:19 |
| **variety** 14:18 | 29:21 35:2 | 66:18 72:6,17 | **$100** 19:25 | **312** 2:17 |
| 15:24 16:1 | **weapons** 14:23 | 73:23 80:8,8 | | **318** 13:13 |
| **various** 27:19 | 15:11,12 25:2 | 80:20 81:8 | **1** | **33** 1:19 |
| **Vaughn** 68:16 | 25:5,11 26:9 | **witnesses** 8:15 | **1** 70:7 | ———— |
| **vehicles** 41:19 | 26:23 27:18 | **wondering** | **1,228** 13:17,19 | **4** |
| **Verbal** 48:14 | 28:6 29:14 | 62:17 | 14:1 | **4** 3:4 70:8 |
| **versus** 38:8 55:7 | 30:14,22 31:1 | **word** 38:10 | **10,000** 72:18 | **470-5580** 2:6 |
| | | | **10-cv-04184** 1:6 | |

Joseph Gorman

Chicago, IL

October 6, 2011

Page 95

| **5** |
|---|
| **5** 70:8 |
| **5:30** 68:20 |
| **50** 13:21 |

| **6** |
|---|
| **6** 1:20 |
| **60** 13:21 |
| **60602-2580** 2:15 |

| **7** |
|---|
| **7** 15:17 |
| **702** 8:17 |
| **703** 8:17 |
| **705** 8:17 |
| **74** 3:5 |
| **744-4216** 2:17 |
| **77** 3:4 |

| **8** |
|---|
| **8** 68:16 |
| **8:30** 68:20 |
| **80** 13:5,23 14:1 74:16 |
| **80,000** 13:7 74:11,17,24 75:8,11 |
| **84-2341** 1:18 2:25 80:6 81:19 |
| **85** 13:24 14:1 67:21 |

| **9** |
|---|
| **9:03** 1:20 |
| **90** 13:15 |