# Exhibit C

# Part 1 of 2

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


ILLINOIS ASSOCIATION OF     )

FIREARMS RETAILERS,        )

KENNETH PACHOLSKI,        )

KATHRYN TYLER, and         )

MICHAEL HALL            )

      Plaintiffs,     )

  vs.                 )  No. 10 CV 04184

THE CITY OF CHICAGO and    )

RICHARD M. DALEY, Mayor    )

of the City of Chicago,    )

      Defendants.     )

    The deposition of KEVIN JOHNSON, called

for examination pursuant to the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before JENNIE MODI, a notary public within and for

the County of Cook and State of Illinois, at 33

North Dearborn Street, Suite 300, Illinois, on the

19th day of April, 2011, at the hour of 9:12

o'clock a.m.



2

1    APPEARANCES:

2

3        COOPER & KIRK, by

4        MR. PETER A. PATTERSON,

5         1523 New Hampshire Avenue Northwest,

6         Washington, D.C.  20036,

7         202-220-9600,

8            Representing the Plaintiffs;

9

10       MR. WILLIAM MACY AGUIAR,

11       ASSISTANT CORPORATION COUNSEL,

12       DEPARTMENT OF LAW,

13        30 North LaSalle Street, Suite 1230,

14        Chicago, Illinois  60602,

15        312-744-4216,

16           Representing the Defendants.

17

18

19

20

21

22

23

24

3

1                I N D E X

2    WITNESS                    EXAMINATION

3    KEVIN JOHNSON

4      By MR. PATTERSON              4,    120

5      By MR. AGUIAR            117

6

7

8

9

10

11            E X H I B I T S

12    NUMBER                   MARKED FOR ID

13    JOHNSON Deposition Exhibit

14      Nos. 1 and 2             35

15      No. 3            48

16      No. 4            56

17      No. 5            60

18      No. 6            103

19      No. 7            107

20

21

22

23

24

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

4

1          (Whereupon, the witness was

2          duly sworn.)

3          KEVIN JOHNSON,

4    having been first duly sworn, was examined and

5    testified as follows:

6                    EXAMINATION

7    BY MR. PATTERSON:

8       Q.   Would you like to state your name for the

9    record?

10      A.   Sergeant Kevin Johnson.

11      Q.   Sergeant Johnson, I'm Pete Patterson.  I'm

12   going to be asking you some questions today about

13   the case, Illinois Association of Firearms

14   Retailers v. The City of Chicago.

15          And first of all, have you been deposed

16   before?

17      A.   Yes.

18      Q.   How many times have you been deposed?

19      A.   Once.

20      Q.   And when was -- what was the occasion of

21   that deposition?

22      A.   It was about a year ago, and it was a

23   personal injury lawsuit.

24      Q.   Okay.  And so that was in your -- was that

5

1    in your personal capacity or your capacity as a

2    police officer with Chicago?

3        A.   Personal capacity.

4        Q.   Okay.  And so you're probably somewhat

5    familiar, but just to go over a few ground rules,

6    there aren't many really.  The main thing is just,

7    you know, I'll ask questions, and for the sake of

8    the court reporter if you try to wait until I

9    finish to answer, and I'll try to do the same.  I'm

10   not always the best at that, but just so we're not

11   talking over each other.

12           And also if at any time you don't

13   understand a question or need it to be clarified,

14   just let me know.  And if you need a break at any

15   time, I'm happy to accommodate you.  But just if

16   there's a question pending, I just ask that we

17   finish that question before taking a break.

18       A.   Understood.

19       Q.   All right.  So to begin, I understand you

20   are a -- with the Chicago Anti-Gun Enforcement

21   Program; is that correct?

22       A.   That is correct.

23       Q.   Okay.  And could you just describe a

24   little bit more about your position?

6

1      A.  I am sergeant of the Chicago Anti-Gun

2   Enforcement team, the CAGE team.  It is assigned to

3   the Gang Investigations Unit of the Chicago Police

4   Department.

5      Q.  Okay.  Okay.  And so if we refer to that

6   as the CAGE team throughout this deposition, we'll

7   understand that to mean the Chicago Anti-Gun

8   Enforcement Program.  Is that okay?

9      A.  Yes.

10      Q.  So how long have you been with the CAGE

11   team?

12      A.  I've been with the CAGE team since April

13   of 2008.

14      Q.  Okay.  And before that, were you with the

15   police department in another capacity?

16      A.  Yes.

17      Q.  And what was that?

18      A.  I was a sergeant in the narcotics section

19   of the organized crime division.

20      Q.  Okay.  And how long were you -- did you

21   have that role?

22      A.  Approximately four years.

23      Q.  Four years, so back until 2004?

24      A.  Yes.

7

1    Q.   Okay.  And then before 2004, what job did

2    you have previously to that?

3    A.   I was assigned to patrol division of the

4    Chicago Police Department as a sergeant in the 15th

5    district and with the PSN gun team.

6    Q.   And what is the PSN gun team?

7    A.   Project Safe Neighborhoods.

8    Q.   Okay.

9    A.   It's a federal program to combat gun

10   violence in the inner cities.

11   Q.   Okay.  And what type of activities would

12   you do to combat gun violence?

13   A.   Search warrants, gun investigations.

14   Q.   Okay.  And when did you begin in that

15   position?

16   A.   In 2002.

17   Q.   And before that?

18   A.   I was a sergeant in the 15th district in

19   neighborhood relations.

20   Q.   Okay.  And was that your first position in

21   the police department or --

22   A.   No.

23   Q.   Okay.  So instead of doing it this way,

24   let's just go through from the beginning if you

8

1    could just say all the different -- when you

2    started with the police department and what

3    different positions you had?

4        A.   Okay.  I started with the Chicago Police

5    Department in 1991 as a patrolman.  I was assigned

6    to the 7th district, which is known as the

7    Englewood district.  In 1998 I was promoted to the

8    rank of sergeant and assigned to the 15th district.

9        Q.   Okay.  Okay.  And so then after 1998 and

10   2002, you went to the narcotics program, is that

11   correct, or did I mess that up?

12       A.   It's a little bit off.

13       Q.   Okay.

14       A.   In 1998 I was assigned to the 15th

15   district as a sergeant.  And then approximately

16   2002, I was with the PSN team.  And then beyond

17   that, went to narcotics.

18       Q.   Right.  Okay.  And then before joining the

19   police department, what sort of work did you do

20   before that?

21       A.   I was a adult probation officer with Cook

22   County.

23       Q.   Okay.  And how about before that time, did

24   you have any jobs before then?

9

1     A.   Prior to that I was with MCI

2   Telecommunications as a customer service

3   representative.

4     Q.   Okay.  Okay.  And how about your

5   education, did you have any college education?

6     A.   Yes.

7     Q.   Okay.  And where did you attend school?

8     A.   I attended Loyola University of Chicago,

9   graduated in 1989.

10    Q.   Any graduate level education?

11    A.   I'm currently working on my masters in

12  public policy administration at Northwestern

13  University.

14    Q.   Okay.  And are you from Chicago

15  originally?

16    A.   Yes, I am.

17    Q.   Okay.  And going back to your current

18  position, what -- what was the circumstance of you

19  taking a position with the Anti-Gun Enforcement

20  team or the CAGE team?

21    A.   I don't understand the question.

22    Q.   You joined the CAGE team, you said, in

23  2008?

24    A.   Yes.

10

1    Q.   How did that come about?

2    MR. AGUIAR:  Do you understand the question?

3    THE WITNESS:  No, I don't understand the

4    question.

5    BY MR. PATTERSON:

6    Q.   Okay.  So in 2008 you took a position with

7    the CAGE team; is that correct?

8    A.   Yes.

9    Q.   And were you assigned to that position?

10   A.   Yes, I was assigned to that position.

11   Q.   And how did that assignment come about, if

12   you know?

13   A.   I was directed by my superiors in the

14   Chicago Police Department to take on the position

15   of sergeant with the CAGE steam.

16   Q.   Okay.  And so is that something you sought

17   out, or was that something that, like you said, was

18   just suggested that you take?

19   MR. AGUIAR:  Do you understand the question?

20   THE WITNESS:  No, I don't understand the

21   question.

22   BY MR. PATTERSON:

23   Q.   Okay.  Was that a position that you

24   actively sought out with the CAGE team?  Was it

11

1    your desire to join the CAGE team?

2        A.   I was given an assignment by my superiors

3    to.

4        Q.   So the assignment came from your

5    superiors, it wasn't something that you had

6    expressed interest in beforehand?

7        MR. AGUIAR:  You can answer the question if you

8    understand it.

9        THE WITNESS:  No, I did not seek.

10   BY MR. PATTERSON:

11       Q.   Okay.  So what are your responsibilities

12   with the CAGE team?

13       A.   The primary function of the CAGE team is

14   to investigate illegal firearms trafficking in the

15   City of Chicago.

16       Q.   Okay.  And how about you personally, what

17   sorts of things do you do with the CAGE team?

18       A.   I supervise men and women under my

19   command, direct them in their investigations, give

20   advice and handled administrative paperwork for

21   them.

22       Q.   Okay.  And how many people are under your

23   supervision?

24       A.   There are eight assigned directly, and

1    16 -- I'm sorry -- eight assigned directly, six are

2    detailed to ATF as part of a taskforce.

3       Q.   Okay.  So those eight that are directly

4    CPD, Chicago Police Department members; is that

5    correct?

6       A.   Yes.

7       Q.   And the other six are ATF, did you say?

8       A.   They are Chicago Police Officers as well

9    who are deputized --

10      Q.   Okay.

11      A.   -- with ATF as taskforce officers.

12      Q.   Okay.  And are there -- so there's no

13   involvement by any State of Illinois Police

14   Officers or law enforcement officials?

15      MR. AGUIAR:  If you know.

16      THE WITNESS:  Yes.  There's -- there are two

17   officers that are detailed to us, as well, from the

18   Illinois State Police.

19   BY MR. PATTERSON:

20      Q.   Okay.  And are they not under your

21   supervision then or --

22      A.   We have an arrangement with them.  They

23   are under my supervision as well as Illinois State

24   Police.  The primary supervision relies with

13

1    Illinois State Police for them.

2        Q.   Okay.  And then who do you report to?

3        A.   I report to my immediate supervisor,

4    Lieutenant James Sanchez.

5        Q.   Okay.  And what is his position?

6        A.   He's lieutenant in the Gang Investigations

7    Unit.

8        Q.   Okay.  And so being located in the Gang

9    Investigations Unit, is the CAGE program -- does it

10   focus on gang firearm problems or -- or does it

11   have a broader focus?

12       A.   It focuses on gang problems as well as the

13   larger focus.

14       Q.   Okay.  Okay.  So if you could be a little

15   more specific about what types of activities the

16   CAGE Program would engage in to -- you know, to

17   combat legal gun trafficking?

18       MR. AGUIAR:  I'm going to object to the form.

19   You can answer.

20       THE WITNESS:  Could you repeat the question,

21   please.

22       MR. PATTERSON:  Could you read back the

23   question.

24

14

1          (Whereupon, the record was

2          read as requested.)

3     THE WITNESS:  Okay.  We would conduct

4  investigations of firearms that were recovered in

5  the City of Chicago.

6  BY MR. PATTERSON:

7     Q.   Okay.  So is that where your first

8  involvement in any particular matter would come,

9  when a firearm is recovered?

10    A.   Yes.

11    Q.   And what do you do when a firearm is

12  recovered?

13    A.   We will pull the inventory report of that

14  firearm and take the information of that firearm

15  and submit it into ATF's eTrace database.

16    Q.   Okay.  And then what happens when you

17  submit it into that database?

18    A.   Once we received the results back, we look

19  at that information and make a determination to

20  conduct a investigation to find out if this firearm

21  was illegally trafficked in the City of Chicago.

22    Q.   Okay.  And what kind of information do you

23  get back with that ATF report?

24    A.   That report would give you most likely the

15

1    original purchaser of the weapon, the possessor of

2    the weapon and the time of the crime between -- the

3    purchase point of the weapon and the time it's

4    recovered by the Chicago Police Department.

5        Q.   Okay.  And is there any Illinois database

6    or source of information that you could also

7    access?

8        MR. AGUIAR:  If you know.

9        THE WITNESS:  Yes.

10   BY MR. PATTERSON:

11       Q.   Okay.  And what is that?

12       A.   We consult with Illinois State Police FOID

13   section and FTIP Program.

14       Q.   Okay.  And what is the FTIP Program?

15       A.   Firearms -- I can't recall the exact

16   acronym for FTIP right now.

17       Q.   Just basically what it is?

18       A.   Basically it provides information of

19   persons owning or possessing FOID cards and how

20   many weapons or activations they may have made on

21   that FOID card.

22       Q.   Okay.

23       A.   It may give us a slight indication if that

24   person possesses any weapons in Illinois.

16

1    Q.   Okay.  And so when would you seek to

2  access that source of information?

3    A.   During the course of the investigation to

4  find out if the gun was illegally trafficked, and

5  we attain records.

6    Q.   Okay.  And so do you do an ATF database

7  query, I'll call it, on all of the firearms that

8  are recovered in the City of Chicago?

9    A.   If we have enough information, yes, we

10  will.

11    Q.   Okay.  And what information do you need in

12  order to do one of those?

13    A.   Some of the primary information required

14  is make, model, serial of the weapon, caliber and

15  the importer if the weapon is of a foreign

16  manufacturer.

17    Q.   And what would be the circumstances in

18  which you wouldn't have that information?

19    A.   If the firearm serial number is

20  obliterated or defaced somehow, or if the gun was

21  manufactured prior to 1968, there was no

22  requirement to have a serial number on a weapon.

23    Q.   Okay.

24    A.   Or if the weapon is of foreign make,

17

1    foreign governments and not required to abide by

2    placing serial numbers on weapons.

3        Q.   Okay.  Do you have any rough estimate of

4    what percentage of firearms you're able to make

5    that sort of inquiry into the ATF program about?

6        A.   You're asking for a percentage of the

7    weapons that are successfully --

8        Q.   Yes.  The percentage of the weapons that

9    you recover that are successfully -- you're able to

10   make a query into the ATF database?

11       A.   I can't answer that question right now.

12       Q.   Okay.  Do you know if it's more than half?

13       A.   I really can't answer your question.

14       Q.   You can't answer the question?

15       A.   No.

16       Q.   That's fine.  And how about the FTIP, is

17   it a database?

18       A.   I believe so.

19       Q.   Okay.  How -- how often do you make a

20   query into that database?

21       A.   If there's a successful trace and we find

22   that there's reason to further an investigation, we

23   contact the Illinois State Police.  They maintain

24   and access that database.  We have no direct access

18

1      to the database.  We only make a request, and

2      results are provided to us by the Illinois State

3      Police.

4          Q.   Okay.  So it's fair to say that first you

5      make an inquiry into the ATF database and then you

6      make a decision about whether to make further

7      inquiries into the FTIP database?

8          A.   Yes.

9          Q.   And when you get that information back,

10     what form does that come to you in?

11         A.   It comes on a report.

12         Q.   Okay.  And are those reports maintained by

13     the city or the police department?

14     MR. AGUIAR:  You can answer the question.

15     THE WITNESS:  No, they're not.  They're within

16     the database.  If we need to pull them out, there's

17     a printer friendly version of the report that's

18     available on the ATF database.

19     BY MR. PATTERSON:

20         Q.   Okay.  So do you print those out when they

21     are provided to you?

22         A.   If necessary, if needed, we will.

23         Q.   And so if you don't print it out, does

24     that mean, you know, once you turn your focus away

19

1    from that, you don't have access to it anymore

2    or --

3        MR. AGUIAR:  Objection to the form.  You can

4    answer.

5        THE WITNESS:  We can get access to it if we

6    need it again.

7    BY MR. PATTERSON:

8        Q.   Okay.  So do you have some sort of

9    dedicated account with the ATF that you can look up

10   this sort of information?

11       A.   Yes.  We're authorized user -- the Chicago

12   Police Department is a authorized user of the ATF

13   eTrace account.

14       Q.   And if you do choose to print out a

15   report, does that go into a case file or is it

16   otherwise maintained by the police department?

17       A.   If it's used by a -- if the investigation

18   goes further, we will maintain it in the file of

19   the actual investigation.

20       Q.   So it would just be in the individual case

21   file or investigation file?

22       A.   That is correct.

23       Q.   Okay.  And how about the information from

24   the State of Illinois, what form does that come to

20

1    you in?

2        A.   It usually comes back as a fax document.

3        Q.   Okay.  And are those faxes maintained?

4        A.   Only if the investigation goes further,

5    we'll keep that in the individual case file.

6        Q.   And otherwise you would discard it?

7        A.   Yes.

8        Q.   Okay.  So what -- what sort of factors go

9    into when you -- when you get this information

10   back, what is it that you're looking for to

11   determine that this is, you know, potentially a gun

12   that's been trafficked?

13       A.   Some of the basis relies on the time of

14   the crime.

15       Q.   Okay.

16       A.   Whereas if you have a weapon that was

17   purchased 19 days ago in Florida, and now it's

18   recovered in Chicago within 19 days, we will make

19   inquiries to find out how that weapon made it from

20   a point of purchase in Florida 19 days ago and used

21   in a crime in Chicago 19 days later.

22       Q.   So if it's a shorter period of time,

23   that's an indication that it likely was trafficked?

24       A.   Yes.

21

1      Q.   Okay.  Are there any other things that you

2   looked for?

3      A.   That's primarily it.  I mean, gang

4   affiliations, we look at locations of gang

5   conflicts.

6      Q.   And you said it comes -- the ATF report

7   comes back with the original purchaser of the

8   weapon; is that correct?

9      A.   That is correct.

10      Q.   So do you maintain any records about, you

11   know, individuals who have been reported to you to

12   be the original purchaser of guns that have been

13   recovered by the police department?

14      A.   No, we do not.

15      Q.   Okay.  So you don't have any way to tell

16   if one particular person is the source of multiple

17   guns that have been traced?

18      A.   No, we do not.

19      Q.   Is there a reason that you don't do that?

20      A.   The ATF maintains that database and that

21   information.

22      Q.   Okay.  But you don't -- once you get that

23   information from them, you don't put it in any sort

24   of database yourself?

22

1      A.   No, we do not.

2      Q.   Okay.  So is that ever a question, you

3   know, if you see a name -- is there ever a

4   situation when a name comes up, and you recognize

5   it as a name that you've seen before or that has

6   been associated with other guns that have been

7   recovered?

8      A.   There have been situations that have led

9   to firearm investigations, yes.

10     Q.   Okay.  What do you mean that have led to

11  firearms investigations?

12     A.   To see if I can understand the question --

13     Q.   Yes.

14     A.   You're asking if a name comes up a couple

15  of times --

16     Q.   Yes.

17     A.   -- where does that lead to or --

18     Q.   Well, I'm just -- you say -- actually,

19  what I'm asking, I think, is that you -- you say

20  you don't maintain kind of any information that

21  would connect different guns that you have

22  recovered by virtue of their original purchaser.

23          And so I'm just wondering how it would

24  come about that you could connect the dots between?

23

1      A.   We could connect the dots -- on the ATF

2    report it might state that this gun might have been

3    part of a multiple purchase, and it will say that

4    on the ATF generated report.

5      Q.   Okay.  Okay.  So it will tell you, it will

6    just say this was part of a multiple purchase, or

7    it will list all the guns that were purchased?

8      A.   It will just say that it's part of a

9    multiple purchase.  It will not tell you the rest

10   of the weapons that were part of this purchase.  It

11   will just say this gun was part of a multiple

12   purchase.

13     Q.   Okay.  And then what would you do to

14   figure out the other guns that were part of the

15   purchase?

16     A.   We will contact ATF.

17     Q.   Okay.

18     A.   And see what they have on it, or if

19   they're working on an investigation on that and

20   then consult with them.

21     Q.   Okay.  So then once you decide to go

22   forward with an investigation, what -- what are the

23   facets of that investigation?

24     A.   Some of the facets are we will -- if the

24

1    gun was recovered locally in Chicago and the person

2    is outside -- I mean -- let me rephrase that.

3        Q.   Yes.

4        A.   Some of the things we look at, we consult

5    with other police departments, and they just need

6    to find out if the weapon has been reported stolen.

7    We try and determine that information.  We try to

8    determine if there's a link between the purchaser

9    and the possessor.  We try to locate areas that the

10   other guns might have been recovered in those

11   areas, along those sort of lines.

12       We look at police reports, police

13   documents to see if the gun is reported stolen,

14   guns reported lost.  And we get enough information

15   based on the time of the crime to go talk to the

16   purchaser of the weapon to ask them what was the

17   disposition of your gun.

18       Q.   Okay.  And I assume that to -- you know,

19   most of the guns are purchased outside of Chicago;

20   is that correct?

21       A.   I can't say that for sure.

22       Q.   You can't say that.  Okay.  And what --

23   you know, after you've gone forward with this

24   investigation, is there a time -- you know,

25

1    eventually comes a determination whether to

2    prosecute or not; is that correct?

3        A.   To prosecute?

4        Q.   Whether to prosecute or not --

5        A.   We don't prosecute.

6        Q.   Right.  So how would a prosecution come

7    about from an investigation that your team

8    initiated?

9        MR. AGUIAR:  Objection, foundation.  You can

10   answer.

11       THE WITNESS:  Okay.  We would interview the

12   person, advise them of their rights and ask them --

13   conduct an interview.  The person is not in

14   handcuffs or anything, conduct a knock and talk

15   sort of interview with them and ask them the

16   circumstances of how their gun came out of their

17   possession, how did their gun end up wherever it

18   was recovered.

19   BY MR. PATTERSON:

20       Q.   Right.

21       A.   And based on the statements that they

22   voluntarily make, we make a determination.

23       Q.   Okay.  And once you've made that

24   determination, then what would happen if you

26

1    decided to go forward?

2        A.   Well, if there's criminal -- if it's found

3    that they're in violation of Cook County or state

4    law, they're subject to arrest.

5        Q.   Okay.  So would your team perform that

6    arrest?

7        A.   Yes.

8        Q.   And then once they're arrested, what would

9    happen?

10       A.   They're sent to the courts for further

11   prosecution.

12       Q.   Okay.  And so then do you turn it over to

13   the either Cook County or state prosecutors at that

14   time?

15       A.   Yes.

16       Q.   Okay.  How many, if you know, gun

17   trafficking prosecutions are initiated on the basis

18   of your investigations in a typical year?

19       MR. AGUIAR:  Objection, foundation.  If you

20   know, you can answer.

21       THE WITNESS:  Locally or state or federal?

22   BY MR. PATTERSON:

23       Q.   Well, I mean, if you could break it down

24   in both.

27

1      A.   Federal, I cannot speak on due to the

2   nature of ongoing investigations and that agency's

3   investigations.  Statewide, we work with the

4   Illinois State Police.  I say we initiate -- on a

5   monthly basis, I would say five to six monthly on

6   average.

7      Q.   Okay.

8      A.   That we go forward on.

9      Q.   Okay.  So just to step back more

10   generally, you've been identified as someone who

11   has information on the introduction of firearms

12   into illegal markets.

13         So I guess my first question is, you know:

14   What are the various ways in which firearms can get

15   introduced into illegal markets in Chicago?

16      A.   In Chicago various ways are either by

17   theft or burglary or robbery.  Those are primary

18   ways that firearms are introduced into Chicago.

19      Q.   And theft or burglary of individuals that

20   have firearms in their homes, or what sorts of

21   thefts or burglaries?

22      A.   I would say primarily burglaries from the

23   home.

24      Q.   Okay.

28

1    A.   And the other ways the firearms are

2    introduced into the Chicago market are by straw

3    purchasing, illegal transfer and gun running.

4    Q.   Okay.

5    A.   Whereas you have persons who are not

6    authorized to possess weapons engage the assistance

7    of others who are authorized to have guns to obtain

8    firearms for them.

9    Q.   Okay.  So I think you mentioned

10   theft/robbery, burglary, gun running, straw

11   purchases?

12   A.   Yes.

13   Q.   Were there any others?

14   A.   And illegal transfer.

15   Q.   Illegal transfer.  Okay.  Do you have any

16   sense as to, you know, kind of what proportion of

17   the market comes from -- the illegal market comes

18   from the theft/robbery category?

19   MR. AGUIAR:  You can answer.

20   THE WITNESS:  I couldn't put -- you want an

21   actual number or percentage of that or --

22   BY MR. PATTERSON:

23   Q.   Whatever -- yes.  If you have a number and

24   a percentage would be great.

29

1    A.  I can't say offhand.

2    Q.  Okay.

3    A.  I --

4    Q.  Do you have a ballpark kind of percentage

5    of -- out of those four that you identified, you

6    know, would it be more than 50 percent come from

7    theft/robbery?

8    A.  I would have to look at the stats to see

9    that.

10    Q.  Okay.

11    A.  I don't have access to those statistics

12    right now.

13    Q.  But you do maintain statistics as to what

14    was -- you know, where these guns came from?

15    A.  I wouldn't personally have them, nor would

16    I have access to that information.  I would have to

17    consult with ATF on that.

18    Q.  So ATF has information about whether a gun

19    in illegal market was acquired by theft or gun

20    running or straw purchasing or an illegal transfer?

21    A.  They might.

22    Q.  They may?

23    A.  They may.

24    Q.  Okay.

30

1      A.   We have never made that inquiry with them.

2      I haven't personally made that inquiry with them.

3      Q.   Right.  Okay.  So the city doesn't

4      maintain any of that sort of information?

5      A.   Not to my direct knowledge.

6      Q.   Okay.  Is there anyone with the city that

7      would be able to give a definitive statement on

8      that?

9      A.   I can't really say.

10     Q.   You don't know?

11     A.   I don't know.

12     Q.   Okay.  So what is -- one thing you

13     mentioned is gun running.  What is gun running?

14     A.   Gun running is the sale of three or more

15     firearms during a period of time to a person that

16     is not authorized to have firearms.

17     Q.   Okay.  So is the only thing then

18     distinguishing gun running from an illegal transfer

19     just the number of firearms?

20     A.   Yes.

21     Q.   Okay.  And is -- how do you -- what is the

22     definition of the illegal firearms market?

23     MR. AGUIAR:  Object to the form of the

24     question.  You can answer.

31

1       THE WITNESS:  Could you repeat the question.

2     BY MR. PATTERSON:

3       Q.   Okay.  Well, I guess just my question is

4     what -- when you say the illegal firearms market,

5     what do you mean by that?

6       A.   It's a market in which persons who -- say

7     a convicted -- previously convicted felon or a

8     person who is unable to obtain firearms legally in

9     Illinois --

10       Q.   Right.

11       A.   -- would seek out and recruit others to

12     obtain weapons legally for them and then provide

13     those weapons to them outside of the legitimate

14     firearm -- licensed firearm dealers.

15       Q.   Right.  So is the person not entitled to

16     possess a firearm, do you mean that to be someone

17     who under state or federal law is not entitled to

18     possess a firearm?

19       A.   Yes.

20       Q.   Okay.  So before, you know, last year in

21     Chicago pretty much nobody was entitled to possess

22     a handgun; is that correct?

23       MR. AGUIAR:  Objection to the form of the

24     question.

32

1     BY MR. PATTERSON:

2         Q.   Well, before -- before last year, isn't it

3     correct that Chicago banned handgun possession

4     generally?

5         A.   They didn't ban it.  There was a

6     registration process.  Some handguns were allowed,

7     but there was a registration.

8         Q.   Okay.  So if it was someone that was not

9     entitled to possess a handgun under that previous

10    system, would their acquiring a handgun be part of

11    the illegal market?

12        A.   Are you speaking of citizens or --

13        Q.   So a Chicago resident obtained a handgun,

14    you know, in 2009 without -- or even today without

15    going through the registration process, but was not

16    a felon or a mis -- domestic violence misdemeanant

17    or one of the other state or federal categories of

18    people who are prohibited, would that person's

19    acquisition be considered part of the illegal

20    market?

21        A.   I can't say.

22        Q.   You can't say?

23        A.   No.

24        Q.   Okay.  But from what you said before, when

33

1    you're -- when you're talking about the illegal

2    market, you primarily mean people are not entitled

3    to possess weapons under state and federal law; is

4    that correct?

5    A.  No, that's not correct.  I was more

6    speaking along the lines of convicted felons.

7    Q.  Okay.

8    A.  And people with criminal -- persons with

9    violent criminal backgrounds.

10    Q.  Okay.

11    A.  Who would be prohibited from possessing

12    any weapons.

13    Q.  Okay.  How about a person who was, for

14    example, you know, mentally ill, and thus

15    prohibited from possessing a firearm under state or

16    federal law, would that be someone who you would

17    also, you know, mean to come into the -- a person

18    not entitled to possess firearms?

19    MR. AGUIAR:  Objection to the form.  I don't --

20    you could answer the question.

21    THE WITNESS:  Let me see.

22    MR. AGUIAR:  Do you understand the question?

23    THE WITNESS:  No, I don't understand the

24    question.

34

1    BY MR. PATTERSON:

2        Q.   Okay.  So I guess my question is:  There

3    are various categories of people who under state or

4    federal law are not entitled to possess firearms?

5        A.   Yes.

6        Q.   Okay.  So are -- so does your -- the CAGE

7    unit, does it focus primarily on felons and other

8    violent persons; is that correct?

9        A.   Yes, that's correct.

10       Q.   Okay.  Okay.  Now, is there a way that --

11   so is the CAGE unit concerned with legitimate law

12   abiding citizens purchasing firearms for, you know,

13   lawful reasons?

14       A.   Not at all.

15       Q.   Okay.  And is it concerned with firearms

16   dealers, law abiding firearms dealers selling them

17   for lawful purposes?

18       A.   Not at all.

19       Q.   And what is the city's -- you know, what

20   is the CAGE team's strategy for combatting firearms

21   getting into illegal markets?

22       MR. AGUIAR:  Objection, foundation.  You can

23   answer.

24       THE WITNESS:  We coordinate with state and

35

1    federal law enforcement agencies.  We conduct

2    investigations to combat illegal firearms

3    trafficking.

4    BY MR. PATTERSON:

5        Q.   Okay.  And do you know whether or not the

6    CAGE team -- does it receive any funding from

7    federal sources?

8        A.   Not that I'm aware of, no.

9        Q.   Okay.  From state sources?

10       A.   No.

11       MR. PATTERSON:  Okay.  I want to introduce

12   actually two exhibits.

13               (Whereupon, JOHNSON Deposition

14               Exhibit Nos. 1 and 2 were

15               marked for identification.)

16   BY MR. PATTERSON:

17       Q.   So we've marked Johnson Exhibit 1 as a

18   page from the Chicago Police Department 2009 Annual

19   Report, and Exhibit 2 is a copy of a page from the

20   Chicago Police Department 1999 to 2000 Biennial

21   Report.

22       So if we take a look -- and these pages on

23   both of these basically detail the number of

24   firearms recoveries.  In Exhibit 2, it goes from

36

1    1991 to 2000.  And Exhibit 1 goes from 2000 until

2    2009.

3        MR. AGUIAR:  May I just ask we do one at a time

4    if you don't mind.

5        MR. PATTERSON:  Okay.  Okay.  Some of my

6    questions may span both of them.

7        MR. AGUIAR:  That's fine.

8    BY MR. PATTERSON:

9        Q.   We'll start with Exhibit 2.

10       A.   Okay.

11       Q.   Which starts in 1991, it shows that in

12   1991, 22,660 firearms were recovered, and then goes

13   to -- remains pretty much steady, from 1991 through

14   1994, around between 20,000 and 23,000, and then

15   drops to 16,232 in 1995.

16           Are you aware of any explanation for that

17   drop between 1994 and 1995 and the number of

18   firearms recovered?

19       A.   No, I'm not.

20       MR. AGUIAR:  Objection.  You may answer.

21       THE WITNESS:  No, I'm not.

22   BY MR. PATTERSON:

23       Q.   And then there's a, you know, downward

24   trend from 1995 through 2000.  In 2000 the number

37

1    is 10,007.

2        So, you know, are you aware of any reason

3    for that downward trend in firearms recovery?

4        MR. AGUIAR:  Objection, foundation.  You may

5    answer.

6        THE WITNESS:  No, I'm not.

7    BY MR. PATTERSON:

8        Q.   Okay.  And do you know of the -- or is --

9    strike that.  Let's start over.

10       What is the relationship, if you know of

11   one, between the number of firearms recovered and

12   the -- and the size of the illegal firearms market

13   as a whole?

14       MR. AGUIAR:  Objection, foundation.  You may

15   answer.

16       THE WITNESS:  Could you repeat the question

17   again, please.

18   BY MR. PATTERSON:

19       Q.   Yeah.  My question is what -- what

20   relationship is there, if you know of any, between

21   the number of firearms recovered and the size of

22   the firearms -- illegal firearms market as a whole?

23       A.   Are you asking me as a direct relationship

24   between the two?

38

1      Q.   If you know of any, yes.

2      A.   I can't speak on these statistics.  I

3    mean, I --

4      Q.   I'm not -- you know, I'm not asking

5    specifically about these statistics.

6           I'm just asking in general, you know, is

7    there a relationship between the number of firearms

8    recovered in any particular year and, you know, the

9    size of the illegal market as a whole for that

10   particular year?

11     A.   No.

12     Q.   No.  Okay.  And of the firearms recovered,

13   do you know how many of them -- or does the city

14   keep records of how many were lawfully possessed

15   versus --

16     A.   I don't understand what you mean by

17   lawfully possessed.

18     Q.   For the firearms that are recovered, are

19   there some number of them that were possessed

20   legally by the person who they were recovered from

21   and some number that were possessed illegally?

22     A.   I think that -- I don't have those stats.

23   I wouldn't know those statistic offhand, not a

24   number.

39

1      Q.   But do you know, are there some that were

2   legally possessed by the person from whom they were

3   recovered?

4      A.   Yes.

5      Q.   Do you know just as a ballpark figure how

6   many of them are legally possessed?

7      MR. AGUIAR:  Objection, asked and answered.

8   You can answer.

9      THE WITNESS:  I would say a low percentage.

10  BY MR. PATTERSON:

11     Q.   A low percentage, so less than 10 percent?

12     A.   Yes.

13     Q.   Okay.  And do you have any sense of what

14  the total size of the illegal firearms market in

15  the City of Chicago is?

16     MR. AGUIAR:  Objection, foundation.  You can

17  answer.

18     THE WITNESS:  In terms of the number of guns

19  or --

20  BY MR. PATTERSON:

21     Q.   Yes.  Just a rough estimate of the number

22  of guns that are, you know, exchanged in the

23  illegal market on, let's say, an annual basis in

24  Chicago?

40

1      MR. AGUIAR:  Again, objection, foundation.

2    This witness doesn't have information as to the

3    size of the market.  He can only testify as to what

4    has been recovered.

5      MR. PATTERSON:  Okay.

6      MR. AGUIAR:  You can answer if you can.

7      THE WITNESS:  I can't answer.

8    BY MR. PATTERSON:

9      Q.   Would it be larger than the number of

10   firearms that are recovered would you think?

11     A.   I can't say for sure.

12     Q.   You can't say for sure?

13     A.   No.

14     Q.   So it's possible that the department

15   seizes every firearm that's in the illegal market

16   in a particular year?

17     A.   No.

18     Q.   It's not possible?

19     A.   What do you consider to be illegal

20   firearm?

21     Q.   Any firearm that is -- I think I asked

22   earlier what you meant by the illegal firearms

23   market.  You said -- I'm paraphrasing, but the

24   acquisition of a firearm by someone who is not

41

1    entitled to possess one.

2        A.   Okay.

3        Q.   So I mean, you know, that's what I mean

4    when I say the illegal firearms market.

5            So, you know, is it possible that the

6    department recovers every firearm that is part of

7    the illegal firearms market in a particular year?

8        A.   Are you asking me does the department

9    recover every --

10       Q.   Yes.

11       A.   -- firearm in the illegal market?

12       Q.   Yes.

13       A.   The Chicago Police Department recovers

14   firearms that are used in crimes and some that are

15   not used in crime.

16       Q.   Right.

17       A.   So not every firearm recovered by the

18   Chicago Police Department is an illegal gun.

19       Q.   Right.  I understand that.  I'm just

20   asking of the ones that are recovered that are

21   illegal guns, are there other illegal guns out

22   there that the department does not recover?

23       A.   Yes.

24       Q.   Okay.  Do you have any sense of how -- how

42

1    many there are, other illegal guns there are out

2    there?

3        MR. AGUIAR:  Objection, foundation.  You can

4    answer if you can.

5        THE WITNESS:  I can't answer.

6    BY MR. PATTERSON:

7        Q.   Okay.  You can't answer.  If you look on

8    this -- there's some text on the side of this chart

9    here on Exhibit 2.  And let's see, the third

10   sentence, it says:  The continued decline in

11   firearms recoveries is consistent with the decline

12   in violent crimes and may indicate that fewer

13   illegal guns are being carried on the city's

14   streets.

15        In your opinion, does the lower number of

16   guns recovered indicate that there are fewer

17   illegal guns being carried on the city streets?

18       MR. AGUIAR:  Objection, foundation.  You've not

19   established the witness wrote this or contributed

20   to this.  And with respect to his personal opinion,

21   I don't think it's really relevant to this case.

22       MR. PATTERSON:  It's about his understanding as

23   a member of the CAGE unit, so you can answer.

24       MR. AGUIAR:  If your question is limited to his

43

1    experience as a member of the CAGE team, if this

2    statement is true, that's fine with the

3    understanding that you have not established that he

4    wrote this or was consulted in writing this at any

5    time.  In fact, I think he testified that he had

6    not seen this before.  You could answer.

7        THE WITNESS:  This is a Chicago Police

8    Department document.

9    BY MR. PATTERSON:

10    Q.  Right.

11    A.  Therefore if it is -- I stand by my

12    organization in drafting this document.

13    Q.  Okay.  Okay.  Have you seen this document

14    before?

15    A.  No, I haven't.

16    Q.  And I appreciate you wanting to stand by

17    your department.

18        But in your personal experience as a

19    member of the CAGE team, to the extent that

20    experience sheds any light on this, would a decline

21    in firearms recoveries indicate that fewer illegal

22    guns are being carried on Chicago's streets?

23        MR. AGUIAR:  Objection, foundation.  You can

24    answer.

44

1      THE WITNESS:  I believe what it's showing is

2    that that's showing that fewer firearms have been

3    recovered.

4    BY MR. PATTERSON:

5      Q.   Okay.  So that's all that's showing?

6      A.   Yes.

7      Q.   Okay.  If you'll turn to Exhibit 1, this

8    goes -- you'll see Exhibit 9A on Exhibit 1 has

9    firearm recoveries from 2000 through 2009.

10       First of all, do you know if the

11   department has compiled statistics for 2010?

12     A.   Not that I'm directly aware of.

13     Q.   Not that you're directly aware of.  Okay.

14   So would those statistics be with the CAGE team or

15   would they be somewhere else?

16     A.   They would be somewhere else.

17     Q.   Where would they be, if you know?

18     MR. AGUIAR:  If you know.

19     THE WITNESS:  Our Research and Development

20   Division.

21   BY MR. PATTERSON:

22     Q.   Okay.  And is there any particular person

23   at the Research and Development who would know the

24   answer to that?

45

1    A.   I don't know the direct person involved.

2    MR. PATTERSON:  Okay.  I would like to put a

3  request on the record for statistics on firearms

4  recoveries for 2010, and to the extent that the

5  city has them for 2011.

6    MR. AGUIAR:  Your request is noted.  I would

7  suggest that you formalize that in a document

8  request.

9    MR. PATTERSON:  Okay.

10    MR. AGUIAR:  Just so that we have a proper

11  record of the request.

12    MR. PATTERSON:  Okay.  And I'll look back.  It

13  may be responsive to another request that we've

14  made.  But if necessary, I'll --

15    MR. AGUIAR:  Okay.

16    MR. PATTERSON:  -- I'll make that formal

17  request.

18    MR. AGUIAR:  I'll try to work with you on that.

19    MR. PATTERSON:  Okay.

20  BY MR. PATTERSON:

21    Q.   And again looking at 2006, 2007 and 2008,

22  there was a bit of a spike in firearms recoveries

23  in those years.  The other years were all right

24  around 10,000, between 9,800, and 10,509.  And

46

1    those years are each between 13,000 and 14,000.

2          Are you aware of anything that would

3    explain that spike in firearms recoveries in 2006,

4    2007 and 2008?

5          MR. AGUIAR:  Objection, foundation, and

6    objection, characterizing the increase in recovered

7    guns as a spike.  You can answer the question if

8    you can.

9          THE WITNESS:  The reason why the numbers might

10   have gone up -- this is pure speculation -- but the

11   numbers might have gone up, these numbers in '06,

12   '07 and '08 may be inclusive of the gun turn-in

13   program.

14   BY MR. PATTERSON:

15      Q.   Okay.  And if you look, there's a little

16   starred footnote in tiny print below the chart that

17   says:  Totals include firearms recovered during

18   annual gun turn-in events, and then shows those

19   numbers for 2006, 2007, 2008 and 2009.

20          So what are the gun turn-in events?

21          MR. AGUIAR:  Objection, foundation.  You can

22   answer if you can.

23          THE WITNESS:  It is a city sponsored event

24   along with the Chicago Police Department in which

47

1    citizens are asked to turn in firearms, and they

2    receive either like a debit card or some type of

3    benefit.

4    BY MR. PATTERSON:

5        Q.   And is the CAGE team involved in those

6    events?

7        A.   Yes, we're a participant in the program.

8        Q.   And what is your role in the program, the

9    CAGE team's role in the program?

10       MR. AGUIAR:  You can answer.

11       THE WITNESS:  Our primary role is basically

12   just assisting with recovering the weapons, making

13   sure they're safe and inventorying the weapons in

14   our evidence and recovered property.

15   BY MR. PATTERSON:

16       Q.   Okay.  And then are ATF checks done on

17   those recovered weapons from the turn-in events?

18       A.   No.

19       Q.   No.  Okay.  And is there a reason why you

20   don't do ATF checks on those?

21       MR. AGUIAR:  You may answer.

22       THE WITNESS:  As part of the overall strategy

23   with the program there's a level of anonymity in

24   the program.  So I believe -- I believe the idea is

48

1    not to have the citizens voluntarily turn in a

2    firearm and then turn around and investigate the

3    citizen or his --

4    BY MR. PATTERSON:

5        Q.   Right, right.

6        A.   -- family for something they voluntarily

7    turned in.  So there's a level of anonymity and

8    protection of the person who turned in the gun.

9        Q.   Okay.

10       A.   And those decisions were made that it

11   wouldn't be pursued or --

12       Q.   Okay.

13       A.   -- prosecuted.

14       Q.   Okay.  What are done with those weapons

15   after they're inventoried by the CAGE?

16       A.   They're eventually destroyed.

17       Q.   Okay.  And is the CAGE team involved in

18   determining when to hold these turn-in events?

19       A.   No.

20       MR. PATTERSON:  Okay.

21               (Whereupon, JOHNSON Deposition

22               Exhibit No. 3 was marked for

23               identification.)

24   BY MR. PATTERSON:

49

1    Q.  I've handed the witness what we've marked

2  as Johnson Exhibit 3.  This is a City of Chicago

3  publication called:  Trafficking:  Case Studies of

4  Five Trafficked Guns in Chicago.

5      Have you seen this document before?

6    A.  I believe I have, yes.

7    Q.  Okay.  And did you play any role in

8  authoring this document?

9    A.  None at all.

10    Q.  None at all.  And when did you see this

11  document?

12    A.  I saw this document in my office in some

13  archive.

14    Q.  Okay.  So if you turn to Page 2, it's

15  called:  Gun Trafficking?  Meet the CAGE Unit is

16  the title on top of Page 2.  And the first sentence

17  says the -- paraphrasing:  The CAGE team was

18  created in 1996.

19    Do you have any knowledge as to why --

20  well, first of all, do you have any knowledge about

21  why the CAGE team was created in 1996?

22    A.  I believe it was -- at that time it was in

23  response to gun violence, violence within the city.

24  The department wanted to take a more active -- I

50

1    mean, proactive role into combatting illegal

2    firearms trafficking in the city; therefore, as

3    part of an overall strategy to reduce crime and

4    violence in the city.

5        Q.   Okay.  Was there any particular reason why

6    it was started in 1996 as opposed to, you know, a

7    different year?  Was there anything particular

8    about 1996 that led to its creation?

9        MR. AGUIAR:  Objection, foundation.  This

10   witness has not testified he was part of the

11   establishment of the CAGE team in 1996 or has any

12   knowledge of that.  You could answer if you can.

13       THE WITNESS:  I don't have any knowledge.

14   BY MR. PATTERSON:

15       Q.   You don't have any knowledge.  Okay.  And

16   in the -- about halfway down the page, I guess it

17   would be the third paragraph, although the

18   paragraphs aren't indented.  But there's a sentence

19   that says:  CAGE initiates a weapon trace on all

20   recovered firearms, including those used in the

21   commission of a crime.

22           From what you've testified earlier, you

23   don't initiate a trace on all recovered firearms,

24   but ones that you're able to initiate a trace on;

51

1    is that correct?

2       A.   That's correct.

3       Q.   Okay.  And in the next column, the first

4    full paragraph, it says:  The CAGE team notices

5    specific patterns amongst recovered firearms in

6    Chicago that are associated with criminal activity.

7           Do you have any knowledge about what those

8    specific patterns are that the CAGE team has

9    noticed?

10      MR. AGUIAR:  I'm just going to object with

11   respect to this particular document.  He's

12   testified he hasn't authored this document.  Are

13   you asking him in general?

14      MR. PATTERSON:  Yes.

15      MR. AGUIAR:  That's fine.  But specifically to

16   this document, I would say that I object to that.

17      MR. PATTERSON:  I'm asking -- I'm using this

18   document as kind of a starting point.

19      MR. AGUIAR:  Based on his experience with the

20   CAGE team?

21      MR. PATTERSON:  Yes, based on his experience

22   with the CAGE team.

23      MR. AGUIAR:  Okay.

24      THE WITNESS:  Could you repeat the question

52

1     again, please.

2     BY MR. PATTERSON:

3         Q.   Yes.  Has the CAGE team noticed specific

4     patterns amongst recovered firearms in Chicago that

5     are associated with criminal activity in your

6     experience?

7         A.   Yes.

8         Q.   What are those patterns?

9         A.   Like I stated earlier, the time of the

10    crime and the location where the gun has been

11    recovered or the type of crime that the gun was

12    recovered -- circumstance of the type of crime that

13    the gun was recovered in.

14        Q.   Okay.  And would you agree in your

15    experience that the majority of recovered firearms

16    were purchased or obtained illegally?

17        MR. AGUIAR:  I'll object to the form.  You can

18    answer.

19        THE WITNESS:  No, I wouldn't say illegally.

20    BY MR. PATTERSON:

21        Q.   Okay.  What would you say?

22        MR. AGUIAR:  Object to the form.  You can

23    answer.

24        THE WITNESS:  I think there's -- each case is

53

1    specific somewhat.

2    BY MR. PATTERSON:

3        Q.   Yes.

4        A.   I mean, for example, if a gun was taken in

5    a burglary, if a gun was -- if someone passed or a

6    family member died who had weapons and some family

7    member took those weapons in, those weapons were

8    taken from them.

9        Q.   Right.

10       A.   I mean, these are -- those aren't exactly

11   illegal guns per se trafficking.   They just ended

12   up on the streets and used in a violent act.

13       Q.   Right.   Okay.   But those -- would you say

14   that those weapons were obtained illegally by the

15   person from whom they were recovered?

16       A.   Yes.

17       Q.   So would you agree that the majority of

18   recovered firearms are obtained illegally by the

19   person from whom they're recovered?

20       A.   Yes.

21       Q.   But as to whether they were purchased

22   illegally, would you agree that the majority are

23   purchased illegally?

24       A.   I don't understand the question.

54

1      Q.   Okay.  You said that you think the

2    majority of recovered firearms are obtained

3    illegally by the person from whom -- I guess I'll

4    start here.

5          So in some cases would it be correct that

6    a firearm is recovered from the person who

7    initially purchased it?

8      A.   Yes.

9      Q.   But in some cases it's coming from a

10   person who did not initially purchase it?

11     A.   That's correct.

12     Q.   Do you have any sense as to, you know, the

13   portion of guns that are recovered are recovered

14   from the person who initially purchased the gun?

15     A.   I can't say -- I can't give you an exact

16   number or percentage.

17     Q.   Okay.  Can you -- is it more than half are

18   recovered from the person that purchased them

19   initially?

20     MR. AGUIAR:  Objection, asked and answered.

21   You can answer.

22     THE WITNESS:  I don't know.

23   BY MR. PATTERSON:

24     Q.   You don't know at all?

55

1    A.   I haven't done that -- conducted that type

2    of research into that issue.

3    Q.   Okay.  Okay.  Do you know if the

4    department has conducted that type of research?

5    A.   Not to my direct knowledge.

6    Q.   Not to your direct knowledge.  Okay.  I

7    think that's all I have on this document.

8         In your experience with the CAGE team,

9    have you seen any changed patterns in the recovery

10   of firearms since the enactment of Chicago's new

11   gun ordinance in 2010?

12        Do you understand what I mean by the new

13   gun ordinance?

14   A.   I don't understand your question.

15   Q.   Do you understand that the City of Chicago

16   enacted a new gun ordinance in 2010?

17   A.   Yes.

18   Q.   Since the time that new ordinance was

19   enacted, have there -- has the CAGE team noticed

20   any changes in the patterns of the firearms that

21   they recover?

22   MR. AGUIAR:  You could answer if you know.

23   THE WITNESS:  I can't give a conclusive answer

24   due to the fact that the ordinance was just

56

1    recently enacted; therefore, we don't have enough

2    time to fully research and look at the impact or

3    pattern.

4    BY MR. PATTERSON:

5        Q.   Okay.  Did the CAGE team do any

6    preparation to prepare for that change in law in

7    2010?

8        A.   No.

9        Q.   So as far as the CAGE team's operation,

10   nothing has changed since that law was enacted in

11   2010?

12       A.   That's correct.

13       Q.   Okay.  I'm going to --

14       MR. AGUIAR:  Could we just take a five-minute

15   break?

16       MR. PATTERSON:  That's fine.

17                (Whereupon, a short recess was

18                taken.)

19       MR. PATTERSON:  I'm going to ask the reporter

20   to mark this as Johnson Exhibit 4.

21                (Whereupon, JOHNSON Deposition

22                Exhibit No. 4 was marked for

23                identification.)

24   BY MR. PATTERSON:

57

1      Q.   I've handed the witness an exhibit.  It's

2   an ATF report on Illinois for the year of January

3   1st, 2009 to December 31st, 2009.

4         Have you seen this document before?

5      A.   Yes, I have.

6      Q.   Okay.  And when have you seen this

7   document?

8      A.   Last year.

9      Q.   So are these reports that the ATF puts out

10   on an annual basis?

11      MR. AGUIAR:  Objection, foundation.

12      THE WITNESS:  I believe they put them out on

13   it.  I couldn't say for sure they put them out --

14   I'm not sure if they put them out annually or not.

15   BY MR. PATTERSON:

16      Q.   Okay.  And why did you look at this

17   document last year when you looked at it?

18      A.   It was part of a gun summit I believe they

19   were doing, and it was developed by ATF.

20      Q.   And so ATF provided it to you?

21      A.   Yes.

22      Q.   Okay.  If you turn to the second to last

23   page of this exhibit -- or third to last actually.

24   I'm sorry.  The pages aren't actually numbered.

1          But the top of the page says:

2     Time-To-Crime Rates for Firearms with an Illinois

3     Recovery for the year of 2009.  And at the bottom

4     it has an Illinois Average Time-To-Crime of 12.69

5     years.

6          In your experience with the CAGE unit, is

7     that similar to the average time-to-crime for guns

8     recovered in Chicago?

9     A.  Yes.

10    Q.  And do you know what that average is for

11    guns recovered in Chicago?

12    MR. AGUIAR:  Objection, time frame.

13    BY MR. PATTERSON:

14    Q.  Well, let's start with 2009.

15    A.  I think it's somewhat accurate.

16    Q.  Okay.  So you think -- and is that, you

17    know, say since -- since you've been working with

18    the CAGE unit, has that stayed relatively constant?

19    A.  Yes.

20    Q.  Okay.  And is there at any -- you

21    mentioned time-to-crime as one of the factors that

22    you look at when determining whether to move

23    forward with an investigation; is that correct?

24    A.  Yes.

59

1      Q.   Is there any particular cut off that you

2   look for?

3      A.   There's a -- we're bound by state statute

4   in terms of statute of limitation with some of our

5   investigations where it's five to ten years that we

6   conduct investigations.

7      Q.   So if it's beyond ten years, you won't

8   conduct an investigation?

9      A.   No.

10      Q.   And beyond five years?

11      A.   We make a determination.  It depends on

12   the type of crime and seriousness of the crime.

13      Q.   Okay.  Okay.  And then if you turn to the

14   next page, it says that Chicago -- there were 7,040

15   firearms recovered in the City of Chicago, for

16   which my understanding is that those are the

17   firearms for which traces -- ATF traces were run.

18      Does that number for 2009 look accurate to

19   you as to the number of traces your department

20   would have initiated with the ATF?

21      MR. AGUIAR:  Objection, foundation.  You can

22   answer.

23      THE WITNESS:  It looks accurate.

24   BY MR. PATTERSON:

60

1      Q.   Okay.  And does your department keep

2    records of how many ATF traces are initiated kind

3    of on an annual basis?

4      A.   No, they do not.

5      Q.   Okay.  Do they keep any records about the

6    number of ATF traces that are initiated?

7      A.   No, they do not.

8      Q.   Does any part of the Chicago Police

9    Department keep those sorts of records?

10     MR. AGUIAR:  Objection, foundation.  You could

11   answer.

12     THE WITNESS:  No, they do not.

13   BY MR. PATTERSON:

14     Q.   Okay.  You could put that aside.  And then

15   the next I'm going to mark as Exhibit No. 5,

16   Johnson Exhibit 5.

17              (Whereupon, JOHNSON Deposition

18              Exhibit No. 5 was marked for

19              identification.)

20   BY MR. PATTERSON:

21     Q.   And Johnson Exhibit 5 is a document that

22   was produced by your counsel to us yesterday.  It's

23   called Preventing Gun Violence Strategies for Safer

24   More Secure Streets.  And it's Bates stamped City

61

1    003434 on the first page.

2         And this is a document that you had seen

3    before?

4       A.  Yes.

5       Q.  Okay.  And when have you seen this

6    document?

7       A.  It was developed for a gun summit that we

8    had last year.

9       Q.  And did you assist in developing this

10   document?

11      A.  Yes.

12      Q.  And what role did you play in developing

13   this document?

14      A.  I was the supervising sergeant of the team

15   and we consulted with Research and Development.

16   And through the Bureau of Investigative Services,

17   this document was developed.

18      Q.  Okay.  And what was -- turning to the Page

19   3435, City 3435, it has the message about the 2009

20   gun summit, which I think you've mentioned a couple

21   of times.

22         What was the 2009 gun summit?

23      A.  It was a summit that was conducted with

24   law enforcement agencies, the Chicago Police

62

1    Department along with members of the ATF and the

2    Secret Service in which to educate law enforcement

3    members on dealing with illegal firearms

4    trafficking and public safety issues and officer

5    safety issues when dealing with firearms.

6        Q.   Okay.  And who attended this summit?  You

7    said law enforcement.  What sorts of law

8    enforcement?

9        A.   Members of the Chicago Police Department

10   attended, members of the ATF and the members of --

11   the presentation was conducted by the Secret

12   Service.

13       Q.   Okay.  And does the -- does your -- does

14   the CAGE unit work generally with -- cooperatively

15   with the ATF in developing strategies for

16   combatting the illegal gun market?

17       A.   Yes.

18       Q.   What sorts of activities does the CAGE

19   unit engage in?

20       MR. AGUIAR:  Objection.

21       THE WITNESS:  We conduct illegal firearm

22   investigations with them, whether it be locally,

23   within the state and also outside of the State of

24   Illinois on a national level.

63

1    BY MR. PATTERSON:

2        Q.   Okay.  What kind of -- what percentage of

3    your investigations are locally and what percentage

4    are done on a national level?

5        MR. AGUIAR:  Objection, foundation.  You can

6    answer.

7        THE WITNESS:  I would say a percentage of -- I

8    would say it's almost 50/50.

9    BY MR. PATTERSON:

10       Q.   Okay.

11       A.   But we have a number of cases that are

12   local, local meaning inside the City of Chicago and

13   inside the State of Illinois.  And then outside of

14   the state would be more long-term investigations.

15       Q.   Okay.

16       A.   That would cause us to leave the state and

17   conduct an investigation.

18       Q.   Okay.  And in -- and in your

19   understanding, I mean, what -- how does it come

20   about that the CAGE unit gets involved in an

21   out-of-state investigation?

22       A.   If the eTrace results come back, and it

23   shows on the document that this gun was purchased

24   outside the State of Illinois, and the time of the

64

1    crime was relatively short and this information was

2    given to the ATF joint taskforce with the CAGE team

3    and they conduct an investigation, the ATF conducts

4    that investigation.

5        Q.   Okay.  And are these firearms that are

6    recovered in Chicago that would initiate these

7    investigations?

8        A.   Yes.

9        Q.   So the CAGE team wouldn't be involved in

10   an investigation for a firearm recovered outside of

11   Chicago?

12       A.   Not at all.

13       Q.   Not at all.  Does the CAGE team work with

14   law enforcement officials in other states when

15   conducting these investigations?

16       A.   The taskforce does.

17       Q.   And what's -- the taskforce is

18   distinguished from the CAGE team?

19       A.   Well, there's the CAGE team, that's the

20   eight members that are here in Chicago.  And then

21   you have the six members that are part of the CAGE

22   ATF joint firearm trafficking taskforce, and they

23   conduct the investigations outside of the State of

24   Illinois.

65

1    Q.  And so do those six, do they focus

2    exclusively on outside of Illinois investigations?

3    A.  Yes.

4    Q.  Okay.  And those six, they would work with

5    law enforcement officials in other states?

6    A.  Yes.

7    Q.  And in addition to those investigations,

8    does the CAGE team work with law enforcement

9    officials in other states on developing strategies

10    for combating the illegal gun market?

11    MR. AGUIAR:  You can answer if you can.

12    THE WITNESS:  I think the CAGE team responds to

13    any new strategy, and we work with other agencies

14    when needed.

15    BY MR. PATTERSON:

16    Q.  Okay.  Okay.  On Page 3, it has A National

17    Problem at the top.  In the second paragraph,

18    starting with the second sentence, it says:  With

19    the support of the community, in 2008 alone, the

20    Chicago Police Department recovered 13,065 guns.

21    In the past three years, gun recoveries have

22    increased compared to previous years; an indication

23    that more guns than ever are making their way onto

24    the streets.

66

1      Did you have any role in drafting this

2  particular part of the document here that we just

3  read?

4      MR. AGUIAR:  You could answer.

5      THE WITNESS:  No, I did not.

6  BY MR. PATTERSON:

7      Q.  You did not.  Okay.  So do you know who

8  was responsible for drafting this?

9      MR. AGUIAR:  If you know, you could answer.

10      THE WITNESS:  I couldn't tell you who

11  personally drafted it.  I would say that it

12  probably came on combination between Research and

13  Development and the Bureau of Investigative

14  Services.

15  BY MR. PATTERSON:

16      Q.  Okay.  So in addition to the CAGE team

17  Research and Development and the Bureau of

18  Investigative Services, is there anyone else who

19  worked on drafting this document?

20      A.  Not that I'm directly aware of.

21      Q.  Okay.  And would you agree that in your

22  experience with the CAGE team, that there were more

23  guns as of the time this document was published,

24  which I don't know that we have on the records.  Do

67

1    you know when this document was published?

2        A.   2009.

3        Q.   Okay.  So as of 2009 in your experience

4    were there more guns than ever making their way

5    onto the Chicago city streets?

6        MR. AGUIAR:  Objection, the document speaks for

7    itself.  You can answer.

8        THE WITNESS:  Yes, I agree with the document.

9    BY MR. PATTERSON:

10       Q.   You do agree with the document.  Okay.

11   And was there any change in local law to your

12   knowledge and in your experience with the CAGE team

13   that would have lead to that increase that's

14   reflected in the document?

15       A.   Not that I'm aware of.

16       Q.   Okay.  Are you aware of any particular

17   reason why that increase would have taken place?

18       MR. AGUIAR:  Objection, foundation.  You can

19   answer.

20       THE WITNESS:  No.

21   BY MR. PATTERSON:

22       Q.   Okay.  Now, is it -- in your experience,

23   are the number of guns that are making their way

24   onto the city streets responsive to changes in

68

1   local law?

2      MR. AGUIAR:  Objection to the form of the

3   question.  You could answer.

4      THE WITNESS:  No.

5   BY MR. PATTERSON:

6     Q.   So local law in your experience does not

7   have an impact in the number of guns that are on

8   the city streets?

9     A.   I didn't understand the question.

10     Q.   Okay.  I'll actually move on.  Could you

11   turn to Page 4, the second paragraph.  It says:

12   The Chicago Police Department's focus on illegal

13   gun sales by licensed dealers is another strategy

14   used to address the challenge.  These types of

15   sales have proven to be a primary means for

16   introducing guns to illegal markets through straw

17   purchases.

18       In your experience with the CAGE team, if

19   you know, when licensed dealers make a sale to a

20   straw purchaser, is it typical that the licensed

21   dealer knows that the person is the straw

22   purchaser?

23      MR. AGUIAR:  Objection, foundation.  You can

24   answer if you can.

1      THE WITNESS:  I can't speak for the actual

2    dealer, whether they knew that person or the straw

3    purchaser.

4    BY MR. PATTERSON:

5      Q.  Okay.

6      A.  But Chicago Police Department ATF is very

7    vigilant in educating the firearm licensed dealer

8    what to look for in terms of straw purchasing.

9      Q.  Okay.  Okay.  And how does the CAGE team

10   educate licensed dealers what to look for in straw

11   purchasing?

12     A.  That's in conjunction with ATF, again

13   that's ATF programs.

14     Q.  Okay.  That's a taskforce program or

15   that's an ATF program?

16     A.  That's under ATF's purview, and I can't

17   speak of it

18     Q.  So it's not a taskforce program?

19     A.  No, not directly.

20     Q.  And does the taskforce have a role in that

21   program?

22     A.  If they're participating with ATF, then

23   they have a role with it.

24     Q.  Okay.  And what -- what would their role

70

1   be?

2     A.  Again, that's with ATF.  I can't really

3   speak on that.

4     Q.  Okay.  But do members of the CAGE team

5   participate in educating licensed dealers on what

6   to look for in straw purchasers?

7     MR. AGUIAR:  You can answer if you can.

8     THE WITNESS:  No, not directly.  Again, that's

9   an ATF program.  They would -- ATF was responsible

10   for educating the dealers directly.

11   BY MR. PATTERSON:

12     Q.  Okay.  But I guess I'm asking if any CAGE

13   team officers participate in that directly or

14   indirectly?

15     A.  No.

16     Q.  No.  Okay.  Okay.  On Page 6, it talks

17   about training and the CAGE team conducts certain

18   types of training.

19     And you know, just in general, what is

20   your understanding of the type of training that the

21   CAGE team conducts?

22     A.  We conduct a roll call training at the

23   district level.  We've assisted in developing the

24   daily bulletins to inform officers in the field