# Exhibit D

# Part 1 of 2

Joseph J. Vince, Jr.                                                                September 16, 2011
                                    Washington, D.C.

```
                                                                                        1

 1                  IN  THE  UNITED  STATES  DISTRICT  COURT

 2             FOR  THE  NORTHERN  DISTRICT  OF  ILLINOIS

 3                          EASTERN  DIVISION

 4      --------------------------------)

 5    ILLINOIS  ASSOCIATION  OF  FIREARMS  )

 6    RETAILERS,  KENNETH  PACHOLSKI,      )

 7    KATHRYN  TYLER,  and  MICHAEL  HALL,  )

 8              Plaintiffs,               )  Civil  Action  No.:

 9    vs.                                 )  10-cv-04184

10    THE  CITY  OF  CHICAGO  and          )

11    RAHM  EMANUEL,  Mayor  of  the        )

12    City  of  Chicago,                   )  `

13              Defendants.                )

14      --------------------------------)

15              Videotaped  Deposition  of  JOSEPH  J.  VINCE,

16    JR.,  a  Witness,  herein,  called  for  examination  by

17    Counsel  for  Plaintiffs,  in  the  above-entitled  matter,

18    the  witness  being  duly  sworn  by  MELISSA  GILCREST,

19    RDR,  CRR,  a  Notary  Public  in  and  for  the  District  of

20    Columbia,  taken  at  the  offices  of  Cooper  &  Kirk,

21    PLLC,  1523  New  Hampshire  Avenue,  NW,  Washington,  DC,

22    at  9:06  a.m.,  on  Friday,  September  16,  2011,  and  the
```

Joseph J. Vince, Jr.        September 16, 2011
Washington, D.C.

2

```
 1    proceedings being taken down by Stenotype by MELISSA

 2    GILCREST, RDR, CRR, and transcribed under her

 3    direction.

 4

 5

 6

 7

 8    APPEARANCES:

 9

10    On behalf of Plaintiffs:

11            DAVID H. THOMPSON, ATTORNEY AT LAW

12            CHARLES J. COOPER, ATTORNEY AT LAW

13            1523 New Hampshire Avenue, NW

14            Washington, DC 20036

15            (202) 220-9600

16            dthompson@cooperkirk.com

17            ccooper@cooperkirk.com

18

19

20

21    (Appearances Continued.)

22
```

Joseph J. Vince, Jr.                                          September 16, 2011
                              Washington, D.C.

                                                                            3

    1    APPEARANCES CONTINUED:

    2

    3              On behalf of Defendants:

    4              CRAIG A. WOODS, ATTORNEY AT LAW

    5              RANJIT J. HAKIM, ATTORNEY AT LAW

    6              Mayer Brown LLP

    7              71 South Wacker Drive

    8              Chicago, Illinois 60606-4637

    9              (312) 782-0600

   10              cwoods@mayerbrown.com

   11              rhakim@mayerbrown.com

   12                    and

   13              ANDREW WORSECK, ATTORNEY AT LAW

   14              Assistant Corporation Counsel

   15              Department of Law

   16              Constitutional and Commercial Litigation

   17              30 North LaSalle Street, Suite 1230

   18              Chicago, Illinois 60606-2580

   19              (312) 744-7129

   20              aworseck@cityofchicago.org

   21

   22    ALSO PRESENT:  Dan Reidy, Videographer

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

4

```
1                    C O N T E N T S

2     EXAMINATION BY:                              PAGE

3     Mr. Thompson                                    7

4

5     VINCE DEPOSITION EXHIBITS                    PAGE

6     1:    Expert Report of J. Vince, Jr.           19

7     2:    Transcript of Trial, Freddie Hamilton,  142

8           Et Al. vs. Accu-Tek, Et Al.

9     3:    Deposition Transcript of J. Vince,      145

10          Niles Gun Show, Inc. vs. Cuyahoga County

11          Agricultural Society, Et Al.

12    4:    On Target, The Impact of the 1994 Federal 147

13          Assault Weapon Act

14    5:    The Washington Post Article, New Pro-Gun 149

15          Group Hopes to Draw From NRA

16    6:    Supreme Court Brief                      151

17    7:    Fact Sheet:  American Hunters and        153

18          Shooters Association

19    8:    Printout of Website From Mount St. Mary's 156

20    9:    International Association of Chiefs of    158

21          Police Global Leadership in Policing,

22          Action Needed
```

Joseph J. Vince, Jr.                                    September 16, 2011
                          Washington, D.C.

5

1    VINCE DEPOSITION EXHIBITS                        PAGE

2    10:   5/6/95, Washington Times Article, Bombing   189

3          Case May Be Hurt By Agent ATF Supervisor

4          Probed For Fraud

5    11:   2/17/93 Chicago Tribune Article, U.S.       190

6          Reassigns Official Who is a Probe Target

7    12:   Time Magazine Article, ATF Under Siege      191

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Joseph J. Vince, Jr.                                                        September 16, 2011
                              Washington, D.C.

                                                                                        6

1                    P R O C E E D I N G S

2                    -    -    -    -    -

3              THE VIDEO OPERATOR:  This begins tape

4     number one in the video deposition of Joseph Vince.

5     This is taken by the Plaintiff in the matter of the

6     ILAFR versus the City of Chicago.  This is filed in

7     the U.S. District Court, the Northern District of

8     Illinois, Eastern Division, Civil Case Number

9     10-CV-04184.

10             Today's deposition is being held at the

11    law offices of Cooper & Kirk, PLLC, 1523 New

12    Hampshire Avenue, Northwest, Washington, DC, 20036.

13             For identification purposes, my name is

14    Dan Reidy, the videographer.  The court reporter is

15    Melissa Gilcrest.  We are both representing Alderson

16    Court Reporting.

17             Today's date is September 16th, 2011.  The

18    time on the video is 9:06 a.m.  We are on the record.

19             At this time will all counsel introduce

20    yourself and who you represent starting with the

21    Plaintiffs' counsel, please.

22             MR. THOMPSON:  David Thompson of Cooper &

Joseph J. Vince, Jr.                                              September 16, 2011
                          Washington, D.C.

                                                                          7

1     Kirk for the Plaintiffs.

2              MR. COOPER:  Charles Cooper also with

3     Cooper & Kirk.

4              MR. WOODS:  Craig Woods for the City of

5     Chicago.

6              MR. HAKIM:  Ranjit Hakim for the City of

7     Chicago and the Mayor.

8              MR. WORSECK:  Andrew Worseck with the City

9     of Chicago Law Department for the City Council and

10    the Mayor.

11             THE VIDEO OPERATOR:  Will the court

12    reporter please swear in the witness.

13    Whereupon  --

14                  JOSEPH J. VINCE, JR.

15    a Witness, called for examination, having been duly

16    sworn, was examined and testified as follows:

17                       EXAMINATION

18    BY MR. THOMPSON:

19        Q.    Please state your full name for the

20    record.

21        A.    It's Joseph J. Vince, Jr.

22        Q.    Good morning, Mr. Vince.  Welcome to our

Joseph J. Vince, Jr.
September 16, 2011

Washington, D.C.

8

1  offices.  You've been deposed before, I take it?

2      A.    Yes, sir.

3      Q.    You know the rules of the road, but just

4  to make sure we're on the same page, we have a court

5  reporter here today who will be transcribing this, so

6  let's try to speak one at a time.  If I interrupt you

7  at any point today, please just let me know.  And if

8  you want to take a break at any point today, I would

9  just ask that you answer whatever question is

10  pending.

11      MR. THOMPSON:  Counsel, one issue that I

12  believe came up during the fact depositions is

13  whether the attorneys are permitted to speak to the

14  witnesses about the substance of their testimony

15  during the pendency of the deposition.  We don't have

16  a strong feeling about that.  There does seem to be

17  some precedent in the Northern District of Illinois

18  that suggests that's not permissible.  We just want

19  to make sure whatever rule we have obtains for both

20  of us, since we'll have our experts.  So do you have

21  a position on that?

22      MR. WOODS:  I don't think we necessarily

9

1    care one way or the other.

2           MR. WORSECK:  David, you and I have had

3    this colloquy before, and we have set forth our

4    position on the precedent that you cited for us, and

5    that's all on the record.

6           MR. THOMPSON:  I just want to make it

7    crystal clear, that we have experts now, if it's your

8    position -- I'm willing for purposes of this case and

9    this expert that these expert depositions to have

10   whatever rule we agree on.  But you're saying that

11   you do want the right to be able to speak to Mr.

12   Vince about the substance of his testimony during

13   today's deposition?

14          MR. WORSECK:  Why don't we go off the

15   record and let me confer with my colleagues here.

16          THE VIDEO OPERATOR:  We're going off the

17   record and the time on the video is 9:08 a.m.

18          (Recess taken.)

19          THE VIDEO OPERATOR:  We're back on the

20   record.  The time on the video is 9:13 a.m.

21          MR. THOMPSON:  And I think we have now an

22   agreement between the Plaintiffs and the Defendants

Joseph J. Vince, Jr.                                        September 16, 2011
                        Washington, D.C.

                                                                    10

1    that counsel is permitted to speak to an expert

2    witness during the breaks in this deposition.  That

3    same rule will apply to the Plaintiffs with our

4    rebuttal expert.  And in terms of what is said during

5    those conversations, it won't be privileged and it

6    would be fair game for questioning, is that right?

7              MR. WOODS:  That's correct.

8              MR. THOMPSON:  Okay.  Great.

9    BY MR. THOMPSON:

10        Q.    So Mr. Vince, you graduated from

11   Youngstown State in 1970, is that correct?

12        A.    Yes, sir, that is correct.

13        Q.    And you majored in criminal justice?

14        A.    Correct.

15        Q.    And then you attended graduate school at

16   the University of Detroit?

17        A.    That is correct.

18        Q.    And you graduated from that program in

19   1979?

20        A.    Correct.

21        Q.    Okay.  And the degree you received was in

22   criminal justice, is that right?

Joseph J. Vince, Jr.                                    September 16, 2011
                         Washington, D.C.

                                                                    11

1        A.     Yes, sir, that is correct.

2        Q.     All right.  And in terms of your

3    employment history, your first law enforcement

4    position was as a deputy sheriff with the Trumbull

5    County Sheriff's Department, is that right?

6        A.     In Warren, Ohio, yes, sir.

7        Q.     That was from 1969 to 1971, is that

8    correct?

9        A.     Yes, sir, that is correct.

10       Q.     Now, in that capacity, your job was as a

11   road deputy?

12       A.     Yes, sir.

13       Q.     What were your responsibilities as a road

14   deputy?

15       A.     As a road deputy, you had responsibility

16   of patrolling, responding to calls from the

17   dispatcher.  You also -- we had warrants that we

18   executed for the court, we transported prisoners to

19   the state penitentiary.  The normal duties that

20   patrol officers have.

21       Q.     Okay.  And did you carry a firearm as a

22   road deputy?

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

                                                                        12

1         A.     Yes, sir, I did.

2         Q.     Did you have a trigger lock on your

3    firearm?

4         A.     When I was on duty?

5         Q.     Yes.

6         A.     No, sir, I did not.

7         Q.     You worked there until you joined the

8    Bureau of Alcohol, Tobacco and Firearms in 1971, is

9    that right?

10        A.     Yes, sir, that is correct.

11        Q.     And your first job at the ATF was as a

12   special agent and field investigator in Detroit, is

13   that right?

14        A.     Yes, sir, that is correct.

15        Q.     And that lasted from 1971 to 1979, is that

16   right?

17        A.     Yes, sir.  I was transferred to another

18   post of duty in 1979.

19        Q.     And what were your responsibilities as a

20   field agent?

21        A.     As a field agent, I would be responsible

22   for investigating crimes within the jurisdiction

13

1    that ATF has, as well as testifying in court,

2    collecting evidence, effectuating arrests, executing

3    search warrants, et cetera.

4         Q.    What sort of crimes were within the

5    jurisdiction of your department at that time?

6         A.    Well, ATF regulates the firearms and

7    explosives industry, they also are responsible for

8    enforcing federal firearms and explosive laws,

9    alcohol laws, tobacco laws and arson.

10        Q.    And in 1979, you were transferred to

11   Nebraska and promoted to special agent in charge of

12   the Omaha office, is that right?

13        A.    Yes, sir, resident agent in charge, yes,

14   sir.

15        Q.    And you remained in that position until

16   1983, is that correct?

17        A.    Yes, sir.

18        Q.    And what were your responsibilities as the

19   special agent in charge of the Omaha office?

20        A.    Well, again, you have the same

21   responsibilities as special agent, but you're

22   supervising a group of agents to ensure not only

14

1    administrative, but that the investigative

2    activities are performed.

3        Q.    In 1983, you were made a project officer

4    in the Firearms Division, is that correct?

5        A.    Yes, sir, I was transferred to our

6    headquarters.

7        Q.    Okay.  And what were your responsibilities

8    in that position?

9        A.    In that position, I was in the Firearms

10   Division and we would monitor investigations ongoing

11   in the field and report them through channels up to

12   the assistant director and the director for ATF.

13       Q.    And then in 1984, you were chosen to be a

14   special agent in charge of the National Tracing

15   Center in Washington, is that right?

16       A.    Yes, sir, that is correct.

17       Q.    And what role did you play at the National

18   Tracing Center, what were your responsibilities?

19       A.    I was a supervisor, the main supervisor

20   there for the Firearms Tracing Center.

21       Q.    And what does the Tracing Center do?

22       A.    The National Firearms Tracing Center for

Joseph J. Vince, Jr.                                     September 16, 2011
                        Washington, D.C.

15

1    ATF traces the origin of guns that are utilized in

2    crime, from the manufacturer to the distributor to

3    the retail dealer and to the first retail purchaser.

4    Sometimes beyond that, they go through agents to do

5    a further investigation, but we're tracing the sale

6    and possession of firearms.

7         Q.    And then the next year you were

8    transferred to the Intelligence Branch, is that

9    right?

10        A.    Yes, sir, I was in charge of the ATF

11   Intelligence Branch.

12        Q.    What were your -- what does the

13   Intelligence Branch do?

14        A.    We're to support law enforcement efforts

15   of bureau special agents.

16        Q.    In 1986, you moved to Miami, is that

17   right?

18        A.    Yes, sir, that is correct.

19        Q.    What was your position there?

20        A.    Assistant special agent in charge.

21        Q.    What were your responsibilities?

22        A.    Again, we were assisting the special

                                                                           16

1    agent in charge in the administrative --

2    administration of the office, supervising the

3    enforcement activities.

4        Q.    In that role, you were also the team

5    supervisor of the National Response Team tasked with

6    investigating arson and explosives, is that right?

7        A.    Yes, sir, that is correct.

8        Q.    Okay.  And when you say investigating

9    explosives --

10       A.    Explosive incidents.  In other words, the

11   National Response Team was set up and we had several

12   teams across the United States.  I supervised the

13   southeastern -- one of the supervisors for the

14   southeast team.  When there was a major arson or

15   explosion, we would activate the team.  As an

16   example, the team was -- I was not the supervisor

17   there, but the team was activated for the 1993 World

18   Trade Center bombing.

19       Q.    And then you were transferred to Chicago,

20   is that right?

21       A.    Yes, sir, that is correct.

22       Q.    And you were a special agent in charge of

Joseph J. Vince, Jr.                                          September 16, 2011
                         Washington, D.C.

                                                                        17

1     the Chicago Field Office?

2          A.     Yes, sir, that is correct.

3          Q.     And what were your responsibilities as the

4     special agent in charge of the Chicago office?

5          A.     It was the supervisory administration of

6     that divisional office.

7          Q.     Okay.  Did your officers carry firearms in

8     the field when you were the special agent in charge

9     of the Chicago Field Office?

10         A.     Yes, sir, they did.

11         Q.     Did they utilize the trigger lock when

12    they were carrying their firearms while they were on

13    duty?

14         A.     No, sir, they did not.

15         Q.     Okay.  In 1993, you were made the deputy

16    chief of the Firearms Division, is that correct?

17         A.     Yes, sir, that is correct.

18         Q.     And what were your responsibilities in

19    that capacity?

20         A.     I worked with the chief of the Firearms

21    Division to oversee and monitor investigations in

22    the field and to as well look at what the policies

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                              18

1    the bureau should have.  You also worked with -- at

2    the time ATF was under the Treasury Department, with

3    the treasurer enforcement, head of the treasury

4    enforcement, and looking at policies and making sure

5    that whatever administration was in there, that we

6    were following the strategies that they wanted

7    pursued.

8         Q.    And your final position at the ATF was as

9    chief of the Firearms Division, is that right?

10        A.    Yes, sir, that is correct.

11        Q.    And what were your responsibilities in

12   that role?

13        A.    Well, I was the chief of firearms, I had

14   that position.  My final position was chief of the

15   Crime Gun Analysis Branch.  That's something I

16   wanted to do before I left was to set up that

17   branch, which was the analysis of crime gun

18   information.  And the idea to that was we could look

19   at this information and be able to identify sources

20   and problems concerning firearms violations, so we

21   could target or focus on enforcement and get the

22   best bang for the buck.

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

                                                                      19

1              MR. THOMPSON:   At this point I would like

2    to ask the court reporter to mark as Vince Exhibit 1

3    the following document.

4              (Vince Deposition Exhibit 1 marked for

5    identification.)

6    BY MR. THOMPSON:

7        Q.    And Mr. Vince, would you just identify

8    that document for the record, please?

9        A.    Well, without obviously going through it

10   all, because it's quite lengthy, but this appears to

11   be my expert report that was prepared for this case.

12       Q.    Okay.  Very good.  And let's turn to the

13   first paragraph of this report.  And it says under

14   Roman 2 that you've had "a review of published

15   studies and other materials relating to firearms,

16   security and safety use, and the diversion of guns to

17   criminals."  Why did you focus on the diversion of

18   guns to criminals?

19       A.    Well, that's I think a responsibility

20   that ATF has.  But it's also very important, as I

21   pointed out in this report, that if we're really

22   going to have an impact on reducing violent crime,

Joseph J. Vince, Jr.                                   September 16, 2011
                        Washington, D.C.

20

1    we have to have three strategies, prevention,

2    intervention, as well as enforcement, so preventing

3    the access of firearms to criminals or the diversion

4    of the legal market where all firearms come from is

5    very essential.

6          Q.    Is that what you mean by prevention,

7    trying to prohibit criminals from getting their hands

8    on guns?

9          A.    Yes.  I think law enforcement, public

10   safety would always want to do that, and I think

11   some of the legislation we have has pointed in that

12   direction.

13         Q.    Now, you also referenced intervention as

14   part of the strategy.

15         A.    Yes.

16         Q.    What do you mean by that?

17         A.    Well, it allows law enforcement to

18   intervene before the crime occurs, to be able to

19   recognize that something is going to occur and then

20   take some kind of action to prevent it from -- a

21   crime from occurring.

22         Q.    So if you don't mind, give me an example

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

21

1      of what you mean by an intervention.

2          A.     Well, there could be a myriad that we

3      could go to, but a good example would be law

4      enforcement was using intelligence or received

5      information that a bank robbery was going to occur

6      and they were able to stop it while the bank robbers

7      were en route.

8          Q.     You also referenced enforcement.  Does

9      that mean catching people and subjecting people to

10     the criminal justice system if they engage in

11     criminal conduct?

12         A.     Yes.  In other words, you always want to

13     have the ability to apprehend people, swiftly

14     identify who they are, collect sufficient evidence

15     to get successful prosecution, because that's part

16     of also a deterrent effect.  But without having all

17     three strategies, if you only have enforcement, then

18     you're just following the trail of blood.  You want

19     to make the blood not occur.

20         Q.     Okay.  Now, are all of the published

21     studies and other materials that you reference in

22     this first paragraph that you relied on contained in

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

22

1    your list of materials relied on that is attached to

2    this report?

3         A.    Well, certainly, you know, being over 30

4    years in this business and reading a lot of

5    different literature and studies, there may be

6    additional things that I have read or that haven't

7    been referenced in here, but I think the key

8    references that I have put in here are the basis for

9    the report.  But there may be others.

10        Q.    Okay.  But as you sit here today, you

11   can't think of any other specific study that supports

12   the points you make in your report that you haven't

13   listed as a material relied upon, can you?

14             MR. WOODS:  Objection to the form.

15        A.    Well, as I sit here, I would have to

16   really think about it.  I hate to give you a flip

17   question -- answer like that, but there may be

18   others that aren't in this report.  But I think what

19   I have in here pretty well substantiates what I've

20   mentioned in the report.

21        Q.    And nothing comes to mind off the top of

22   your head of a report that you think supports what

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                                    23

1     you're saying but that you chose not to put in as a

2     material relied upon?

3                 MR. WOODS:  Objection, asked and answered.

4        A.      Well, if you wish me to sit here and

5     think about it for a while, I can do that, or I can

6     come back after researching it.  But again, there is

7     a lot of material, this is an area that I focused

8     in, in my career, so there may be some other aspects

9     of this.

10                When I was with ATF, with the Crime Gun

11    Analysis Branch, I had a team of academics that we

12    worked together, law enforcement people, so we've

13    done a lot of work on this.  So to specifically say

14    is this every report or anything I could rely on, I

15    don't think that's -- you know, I don't think I can

16    say for sure.

17       Q.      Let me ask it this way.  When you were

18    putting together your materials relied upon, did you

19    intentionally omit a study that you thought was

20    important and supportive of the propositions you

21    advance in your report?

22       A.      No, sir, I would never do that for a

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

24

1    report.  I put out the report to the best of my

2    knowledge.  And when I write a report, it's based on

3    facts and evidence.  That's what I teach in school.

4    And if the facts and evidence did not support what I

5    think, then I would tell you that.

6         Q.    Now, in this same sentence of the report

7    that we've been looking at under Roman 3, you talk

8    about your "training, study and experience in working

9    with the firearms industry."  Which entities, maybe

10   at a broad level of generalization, have you worked

11   with within the firearms industry?  Is it

12   manufacturers, retailers, wholesalers?

13        A.    I'm sorry, would you repeat that again?

14        Q.    Well, you make reference to the firearms

15   industry.

16        A.    Yes, sir.

17        Q.    And that you have experience in working

18   with the firearms industry.  So which components of

19   the firearms industry do you have experience with?

20        A.    I believe, sir, I've worked with every

21   component.  I've worked with firearms manufacturers,

22   firearms wholesalers and retail dealers as well.

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

25

1        Q.      And is that -- was that in your capacity

2    as an ATF employee?

3        A.      Yes, sir.  But I've also been involved

4    with those individuals in the business after that

5    with my involvement with the International

6    Association of Chiefs of Police, being a member of

7    the firearms committee, we have people that are on

8    the board that are affiliated or members of the

9    firearms industry.  We also on that committee hear

10   from the firearms industry, we have people come in

11   and give presentations at our meetings.  So I've

12   dealt with them probably for all of my career, even

13   as a consultant.

14       Q.      Under Roman 4, you reference

15   "self-protection with firearms."  What do you mean by

16   that term?

17       A.      Well, I think what we're talking about

18   here is in the report, as we stated in there, we

19   looked at -- when I say we, it would be myself and

20   my partners at Crime Gun Solutions, who were also

21   former ATF employees.  We looked at what experts,

22   shooting enthusiasts, people in the firearms

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

                                                              26

1    industry, law enforcement, the military look for

2    firearms protection.  So when we're talking about

3    what did they do to keep accidental shootings or the

4    wrongful use of firearms from occurring.

5         Q.    Now, you state that you will testify that,

6    "A, firearms-related violence is a systemic and

7    epidemic problem in the City of Chicago."  What do

8    you mean by firearms-related violence?

9         A.    Well, when a firearm is used in a crime,

10   or a criminal act or suicides or anything, I think

11   that is firearms-related violence, even accidental

12   shootings.  And I think by someone just -- the few

13   reports, the media reports that I put in here and as

14   well as the charts, you can see over a period of

15   time this problem continues to plague the City of

16   Chicago, and that it is probably a problem that's

17   worse for the City of Chicago than many other

18   cities.  Especially when you see in the number of

19   700 children that have been injured with firearms,

20   that's a huge number.  And I think it very well

21   supports the statement that I made there.

22        Q.    All right.  Now, when you -- what do you

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

                                                                      27

 1    mean by epidemic problem, is it a growing problem?

 2         A.    Well, I think over time what we've seen,

 3    which parallels the rise and fall of crime -- crimes

 4    that occur all across the country, but over time, it

 5    is still a problem.  So it is epidemic, we have it,

 6    it continues.  Something that is epidemic continues

 7    to plague in a large pattern.  We may be bringing it

 8    down, but it's still not at an acceptable area.  And

 9    I can't count any homicide as being acceptable.

10         Q.    And just so your testimony is clear, are

11    you saying that the crime trends that we see in

12    Chicago and that are reflected in the chart in your

13    report are -- there may -- it may have come down, but

14    that that's a manifestation of a national trend?

15         A.    No, I'm saying that crime data will

16    fluctuate, it's not going to stay static, although

17    that can occur.  And that we have seen this as a

18    national trend, but we see anomalies in there.  We

19    see a lot of cities where we're seeing a national

20    trend where violent crime has gone down and yet some

21    of those have stayed substantially up or even

22    increased.  Right now we're seeing middle-sized

Joseph J. Vince, Jr.                                September 16, 2011
                    Washington, D.C.

28

1    cities seeing an increase in firearms-related

2    violent crime.  So I'm just saying that it does

3    change over time.  But it's still at an unacceptable

4    level in Chicago.

5         Q.    Now, when you said that Chicago has a

6    firearms-related violence problem that is worse than

7    many other cities, are you measuring that in terms of

8    the absolute number of homicides or are you measuring

9    that in terms of the rate of homicides and other

10   firearms-related violence?

11        A.    I think if you just compare to what other

12   cities have, Chicago always ranks up there extremely

13   high.  The other thing is the large numbers.

14   Looking at homicides alone is not really showing you

15   the picture.  And it's to the benefit to our

16   excellent people that we have in emergency medicine

17   that we're able to, a lot of people survive

18   shootings now that they didn't before.  So you

19   really have to look at the amount of shootings that

20   occur where people aren't killed and as well as

21   shootings where no one is -- no one is hit.

22        Q.    Okay.  But when you're making the

29

1    comparison, do you look at the absolute number of

2    homicides or are you looking at -- or other

3    firearms-related violence, or do you look at the rate

4    of firearms-related violence?

5         A.    I don't understand what you mean by rate

6    and overall.  I mean, every homicide that occurs

7    across the country --

8         Q.    No, by rate I mean as measured against the

9    population.  So New York may have a lot more

10   homicides than a small hamlet.  So I'm just

11   wondering, you made the statement it's worse.  And

12   I'm asking you, when you're making that comparative

13   statement, are you focusing purely on absolute

14   numbers or are you focusing on a rate as defined as a

15   percentage of the population?

16        A.    Well, you know --

17              MR. WOODS:  Objection to form of the

18   question as being vague.

19        A.    Chicago is a very large city and we don't

20   have as many cities.  So there is a lot of different

21   ways you could look at it.  But I think if you look

22   at the charts that we have, Chicago's rate is or the

Joseph J. Vince, Jr.                                    September 16, 2011

Washington, D.C.

30

1    amount of homicides and the shooting incidents that

2    they have is worse than many other cities that we

3    have, including New York City.

4         Q.    On an absolute basis or on a percentage of

5    the population basis?

6         A.    I think just looking at the problem

7    itself.  Just if you -- let's take a look at the

8    articles that we have in here.  What other cities do

9    you know that have 700 children hit by gunfire in a

10   year?  I don't know of very many other places that

11   have that.  That's almost an average of two a day.

12   So if that's the case, then we mean `66 children

13   died.  I just don't know off the top of my head to

14   tell you that there is a lot of other cities that

15   have that same type of problem.  So I think that

16   puts Chicago in a unique position as far as firearm

17   violence is concerned.

18        Q.    So you're looking at the absolute number

19   and saying that number is unacceptable and that is

20   what makes Chicago worse?

21        A.    As I said, I think one is not acceptable.

22   So there is no acceptable number.  Law enforcement

31

1   is different than the military.  In law enforcement,

2   we don't accept any casualties.  Law enforcement

3   people are going to go on a raid, we don't want

4   anybody to get hurt, including violators.  Where in

5   the military, it's acceptable, we know we have to

6   take this hill, we may have casualties.  That's

7   unacceptable.  And I think it should be unacceptable

8   in civilian life as well.

9        Q.    Just so the record is clear on this, when

10  you say Chicago is worse, you're pointing to the

11  absolute number of child accidents, 700?

12          MR. WOODS:  Objection to the form of the

13  question.  It mischaracterizes.

14       A.    Let's make this absolutely clear.

15  Chicago has a serious firearms-related violent crime

16  problem, it's obvious from the numbers we have here.

17  Whether you mean absolute or full numbers, it's a

18  bad problem.  I don't think there is anybody, and I

19  put that in the report, anybody that couldn't say

20  that Chicago doesn't have a bad problem, it just

21  would be beyond belief for somebody to say that's

22  not an issue.

32

1      Q.    Mr. Vince, I'm just exploring what you

2  said when you said that it's worse.  And I just need

3  the record to be clear.  Are you saying worse because

4  there are more children or others being subjected to

5  firearms violence on an absolute basis or are you

6  saying that there is a different metric you're using?

7           MR. WOODS:  Objection to the form of the

8  question.

9      A.    I'm saying, when I say worse, I'm saying

10 that there are a lot of other communities that have

11 less firearms-related violent crime than the City of

12 Chicago.  There may be some that have more.

13 Certainly we could look at Newark, New Jersey or

14 something.  I would have to look at the numbers.  I

15 don't want to take that off the top of my head.

16          What I am saying, and I want it to be

17 absolutely clear, is that the City of Chicago has a

18 serious firearms-related violent crime problem and it

19 crosses all the lines of class, gender, race, it's a

20 serious problem.  And it's indicative not only by the

21 reports that I have given here but by the simple

22 charts.  I don't think you have to go into length to

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

                                                                    33

1    see that it's a series problem.

2         Q.    Is the problem of firearms-related

3    violence in Chicago the same problem we see in other

4    large urban areas in the United States or is it

5    qualitatively different?

6              MR. WOODS:  Objection to the form of the

7    question, vague.

8         A.    When you're saying that it's different,

9    you mean that it's different in that people are

10   dying in one place and not dying -- I don't

11   understand.  What do you mean by different?

12        Q.    I'm just wondering.  You`said there is a

13   big problem in Chicago.  I'm wondering if that

14   problem that you're identifying is different in

15   Chicago than it is in New York, Los Angeles, the

16   other major metropolitan areas in the United States?

17             MR. WOODS:  The same objection.

18        A.    Many areas in the United States are

19   plagued with crime problems, including

20   firearms-related violent crime problems.  They may

21   have different types of perpetrators, but they still

22   have firearms-related problems.  So whether it's a

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                              34

1    gang homicide, it's an organized crime homicide,

2    somebody accidentally shoots themselves, it's, you

3    know, a myriad of things, it's still a

4    firearms-related violent crime problem.  It may be

5    different in that regard, but it's still a problem.

6              I think when we start to look at the

7    charts that we put in here and we look at the

8    homicide figures that the city puts out, when we're

9    talking about murder by weapons and we see across the

10   board anywhere from a low of 327 to a high of 514,

11   and the vast majority are committed with firearms,

12   that's a firearms-related violent crime problem

13   there, obviously.

14        Q.    Why did you pick homicide as the one

15   city-wide statistic to report in your document?

16        A.    Well, I chose that because it's one that

17   most police departments put out there.  It's one

18   that the media utilizes.  And that's what was in the

19   report that Chicago had.  And I think for the

20   purpose of this report, it really illustrates my

21   point.  I mean, here is 514 people that are dead

22   because of firearms.  That's a problem.  And I think

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                              35

1    by anybody's measure, that's a problem.

2            And then the news articles, when you start

3    to see that, okay, we had that many homicides, but

4    we've had that many kids that were shot and not

5    killed, so I think that's a good comparison how

6    drastic the problem is and how it affects a

7    community.

8        Q.    Do you have an opinion -- let's say that

9    there were no guns in the City of Chicago whatsoever.

10   You reference the fact that in 2002, there were 514

11   people who were homicides, died as a result of a

12   firearm, being shot with a firearm. ` Do you have an

13   opinion as to how many of those people would have

14   died, even if there were no guns, whether someone

15   would have stabbed them with a knife or bludgeoned

16   them or otherwise killed them?

17       A.    Well, I don't think it's my opinion.   I

18   think we have to look at facts and evidence.   The

19   reports that I have seen is that if a firearm is

20   used in a crime, the chance of a victim being

21   seriously injured or killed is very high.   Any other

22   weapon used, any other weapon, it's drastically

36

1    decreased.

2              And if you start to think about it, a

3    firearm, you don't have to get close to a person,

4    with a knife or a bat, you have to do that.  You just

5    can't go out and do mass murders as easily.  A

6    firearm allows you to do that.  So in that regard,

7    that's a fact, that a firearm produces victims that

8    are far more seriously injured or killed than any

9    other weapon.

10        Q.    Do you have an opinion as to which cities

11   or cities in the United States are most similar to

12   Chicago in terms of the factors that influence the

13   overall level of criminal violence within a city?

14             MR. WOODS:  Let me just say this question

15   goes beyond the scope of what he's been asked to

16   opine on.

17        A.    I really think that's a very interesting

18   question, but I haven't been asked to look at that,

19   so I haven't examined it, and I would just give you

20   a flip answer, and I certainly don't want to do that

21   here.

22        Q.    When you talk about the systemic and

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

                                                              37

1    epidemic problem in the City of Chicago concerning

2    firearms-related violence, do you have an opinion as

3    to what the causes of this problem are?

4         A.    Well, that's not something we really

5    looked at, but obviously it's firearms-related, so

6    the firearm is a problem.  And having criminals have

7    access to firearms has got to be part that.  We want

8    to keep criminals from acquiring firearms.

9              I'm a believer in the Second Amendment.  I

10   hunted with my father and enjoyed that very much.  I

11   don't oppose citizens having firearms.  I just think

12   we happen to do a very poor job of keeping firearms

13   away from the hands of criminals and other people,

14   terrorists, the mentally deranged, and that makes our

15   families unsafe.

16        Q.    In your opinion, does the level of drug

17   utilization in a city impact the level of

18   firearms-related violence?

19             MR. WOODS:  I object as being beyond the

20   scope of what he's been asked to offer in this case

21   in his opinions.

22        A.    I'm even trying to think, sir, of a study

Joseph J. Vince, Jr.                                                                    September 16, 2011
                                        Washington, D.C.

                                                                                              38

1     that I know that that -- but I can't -- I didn't

2     look into that.  I don't know about that.  But

3     obviously people that are under the influence of

4     drugs and alcohol can be a problem.  Whether it has

5     an interlocking relationship, I can't tell you at

6     this time.

7          Q.    Do you have an opinion on whether overall

8     levels of criminal activity have an impact on the

9     amount of firearms-related violence in the community?

10             MR. WOODS:  The same objection.

11        A.    You're going to have to explain that.  I

12    don't understand that question.

13        Q.    Well, if you have a community where people

14    obey the laws, isn't it likely that there will be

15    less firearms-related violence --

16             MR. WOODS:  Objection.

17    BY MR. THOMPSON:

18        Q.    -- than if you have a gang-infested

19    community that you're comparing it to?

20             MR. WOODS:  Objection, it's beyond the

21    scope of the opinion he's been tendered to speak to

22    today.

Joseph J. Vince, Jr.                                          September 16, 2011
                          Washington, D.C.

39

1        A.     The only thing I can say is what I put in

2    the report.  We make laws for all citizens and all

3    citizen safety, and I think that most people by and

4    large are law-abiding citizens, but we make laws for

5    everybody because of the people that aren't.

6               You look at the seat belt law.  Most

7    people would have common sense to know that if a race

8    car driver puts a harness on and he drives 240 miles

9    an hour, when I'm driving 55, I should have a seat

10   belt on.  But there are those other people that the

11   law has to be enforced and the only reason they put

12   it on is because that they're afraid that they might

13   get a ticket.  So we still have that element in

14   there, but we have to have laws for that.

15       Q.     I just want the record to be clear,

16   because we don't want to be surprised at trial.

17       A.     Sure.

18       Q.     When you come and testify.  Do you have an

19   opinion on what causes the systemic and epidemic

20   problem of firearms-related violence in Chicago?

21              MR. WOODS:  That same objection.

22       A.     Well, I would have to really look at

Joseph J. Vince, Jr.                                               September 16, 2011
                        Washington, D.C.

                                                                              40

1     Chicago.  But again, a problem is criminals

2     acquiring firearms, that's a problem.

3          Q.    Any other causes that you've examined in

4     connection with this case to see whether they

5     contribute to the epidemic problem of

6     firearms-related violence in Chicago?

7               MR. WOODS:  The same objection.

8          A.    Just to repeat what I said.  If we know

9     that a firearm causes serious injury or death to

10    victims, more than any other firearm, and it is

11    criminals that cause this and as well as people in

12    the heat of passion causing problems, we want to be

13    able to stop that.

14         Q.    I know.  And I understand that, that

15    you've testified along those lines.  What I'm asking

16    you is whether you've looked at whether there are any

17    other causes that contribute to this epidemic problem

18    of firearms-related violence in Chicago?

19         A.    No, sir, I wasn't asked to do that.

20         Q.    Okay.  In your opinion, has the epidemic

21    of firearms-related violence changed for the better

22    or worse in Chicago over the last two years?

Joseph J. Vince, Jr.                                                September 16, 2011
                                    Washington, D.C.

                                                                              41

    1            MR. WOODS:   Objection.

    2      A.    I wasn't asked to look at that, either,

    3    sir.

    4      Q.    So you don't have an opinion on that?

    5      A.    I wasn't asked to examine that.

    6      Q.    All right.  Now, let's turn to page 2 of

    7    your report.

    8            MR. WOODS:   We're moving along.

    9    BY MR. THOMPSON:

   10      Q.    Where you say at the bottom of the page,

   11    "I am a strong proponent of citizens' rights to own

   12    firearms for the purpose of self-defense, hunting and

   13    sports shooting."  Why are you a strong proponent of

   14    citizens owning firearms for the purpose of

   15    self-defense?

   16      A.    Well, I think it's a person's right under

   17    our Constitution to legally own firearms.

   18      Q.    Let me ask you, because you're an expert

   19    in firearms.  Leaving aside the Constitution for the

   20    moment, just as a matter of public policy, are you a

   21    strong proponent of the right of individuals to own

   22    firearms for self-defense?

42

1　　A.　　How can you separate the Constitution and

2　public policy?　The Constitution is the basis for

3　all our public policy in this nation.　That is our

4　guide book.

5　　Q.　　Well, and certainly I agree with what

6　you're saying.　I'm just asking you sometimes the

7　Constitution will say one thing and people say, well,

8　that's a bad idea as a matter of public policy.　And

9　so I'm just wondering whether as a matter of public

10　policy you've considered whether it makes sense for

11　individuals to own firearms for self-defense?

12　　　　MR. WOODS:　Objection to the form of the

13　question.

14　　A.　　Well, I think in my report, I think I

15　have laid out the responsible way.　And it's like

16　any right that you have, you have to use it

17　responsibly.　We have a lot of rights in this

18　country.　And just like we have the freedom of

19　speech, but you can't yell fire in a theater.

20　That's irresponsible behavior.　And I think I laid

21　out there and I think it's supported by the National

22　Shooters Sports Foundation of what responsible

Joseph J. Vince, Jr.                                                  September 16, 2011
                            Washington, D.C.

                                                                           43

1       ownership and use of a firearm in self-defense is.

2           Q.    Are you a strong supporter of a citizen's

3       right to defend him or herself with a firearm outside

4       of the home?

5               MR. WOODS:  This is beyond the scope of

6       what we've offered him to speak on as an expert

7       witness in this case.

8               THE WITNESS:  Would you repeat the

9       question, sir?

10      BY MR. THOMPSON:

11          Q.    Yes.  You say you're a strong proponent of

12      a citizen's right to own firearms for the purpose of

13      self-defense.  When you made that statement, does it

14      include self-defense outside of the home?

15              MR. WOODS:  The same objection.

16          A.    Again, I look at what the experts say in

17      this, and it has to be done responsibly.  I wasn't

18      asked to really look at outside the home, so I

19      didn't do an examination of that.  But I think I

20      would have to go along with what NSSF here proposes

21      about people that use firearms.

22              There is a lot of responsibility that goes

44

```
 1    with carrying a firearm.  I've done it for 30 years.

 2    And I see a lot of pitfalls in that.  So again, it's

 3    responsibility.

 4         Q.    How can it be done responsibly, in your

 5    opinion, people defending themselves with a firearm

 6    outside the home?

 7         A.    Well, that's a whole --

 8               MR. WOODS:  Objection to form.

 9         A.    That's a whole other matter, and we

10    really didn't look into it and I don't have anything

11    in my report on that.

12         Q.    Well, you made the statement, so I'm

13    probing -- you said that you're a strong proponent of

14    a citizen's right to own firearms for the purpose of

15    self-defense.  So I want to know what you mean by

16    that.  You put that statement if in there.

17         A.    I mean exactly what I said about the

18    National Shooting Sports Foundation.  Let's go down

19    there and look at that, what they recommended.  The

20    responsibility of the firearms owner to know how to

21    properly handle any firearm you own and how to

22    secure your firearm in a safe manner at home.
```

45

1   Absolutely believe in that.  I mean, if you can't

2   properly hire a firearm -- handle a firearm, then

3   you really ought to take a look at not using it,

4   because that's not responsible.

5        Q.    And I understand that that's what you're

6   saying about within the home.  And what I'm asking

7   you is the scope of this statement that you made on

8   page 2, if it extends beyond the home, and you said

9   that well, if it's done responsibly, and so I want to

10  know what you mean by that.

11             MR. WOODS:  Objection to the form.  It

12  mischaracterizes his testimony.

13       A.    Go ahead, sir.

14       Q.    Right.  So when you're a strong proponent

15  of citizens' rights to own firearms for the purpose

16  of self-defense outside of the home if it's done

17  responsibly, is that right?

18             MR. WOODS:  Objection to the form,

19  mischaracterizes his testimony.

20       A.    No, you're -- what I said is that I

21  believe in people having firearms responsibly for

22  self-defense.  And that's not really something that

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                                46

1    we looked at outside of the home.  We looked at it

2    in the home, and I'm going down this.

3            But I believe in what they have here as

4    far as just plain out gun ownership responsibility,

5    and I think it goes with this.  Using a firearm for

6    home defense or self-defense requires the owner to

7    have appropriate training and a clear understanding

8    of safe handling and storage of firearms.  So that

9    goes no matter where we're talking about.

10       Q.    And you're referencing there, the NSS --

11   the National Sporting and Shooting Foundation?

12       A.    Shooting Sports Foundation, yes.

13       Q.    Their guidelines.  And to the extent those

14   apply outside the home, you support them?

15           MR. WOODS:  Objection to the form.  This

16   is beyond the scope of what we've offered him to

17   testify about.  He's not here to talk about use of

18   guns outside the home.  He hasn't offered any

19   opinions on that in his report.

20       A.    I do believe that we want to make sure

21   there is apples and apples and not apples and

22   oranges here.  So that's a whole other area that if

47

1    you would like me to explore it, I certainly can do

2    it, but I didn't do it for this report, we didn't

3    look at that.

4        Q.    I'm trying to -- you've given this

5    background here and you've said that you think it's

6    relevant for us to know that you're a strong

7    proponent of the right to self-defense.  And just so

8    the record is clear, are you a strong proponent only

9    in the home of the right to self-defense with a

10   firearm or are you a strong proponent of the right to

11   self-defense with a firearm also outside the home?

12       A.    I'm a strong proponent for people doing

13   things that are legally and doing it responsibly

14   when it is.  So -- but you asked me how people would

15   go about doing this.  And I think that takes -- it

16   takes some examination of it.  We shouldn't take

17   going into looking at people using guns, selling

18   guns or anything without a real good examination of

19   doing that.  And I haven't done it for this report.

20       Q.    Well, but you're talking about your

21   background here, so I'm just asking you, how in your

22   career have you been a strong proponent of the right

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

                                                              48

1    of individuals to defend themselves with a firearm

2    within the home?  You say you've been a strong

3    proponent.  What would you point to?

4        A.    And what I'm saying is I'm a strong

5    proponent for the citizen's right under our

6    Constitution to own and bear firearms.

7        Q.    And --

8        A.    Within the legal parameters that there

9    are.

10       Q.    And when you say their bear firearms, do

11   you mean carry?

12       A.    It could be.  You carry a gun when you

13   hunt, obviously.

14       Q.    Okay.  All right.  And what about do you

15   support the rights let's say of a woman in a city

16   where there is a lot of rape being able to carry a

17   firearm for self-defense outside the home?

18            MR. WOODS:  Objection to the form.  It's

19   outside of scope of what he's been tendered to speak

20   on.

21       A.    You know, again, that's not a trite

22   example where you can say one and one is two, it's

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

49

1    not.  Would I propose that a woman who can't handle

2    a gun be able to do this or does a woman have to

3    have so much?  You've talking a wide parameter here

4    to look at.  It's not a simple task.  Preparing this

5    report wasn't a simple task.  So again, if you want

6    me to look at that and give you an answer, then I'll

7    need some time and I can report back on it.

8         Q.    I just want to look at what you've done

9    historically.  What can you point to to support the

10   notion that you've been a strong proponent of people

11   defending themselves with firearms?

12        A.    Well, I think the fact that in my career

13   one of the main things that we did was when citizens

14   have their firearms stolen, returning their firearms

15   to them.  You know, looking at citizens' rights to

16   bear firearms, I think that is being a strong

17   proponent.  Finding ways to help citizens maintain,

18   properly secure and maintain their firearms, whether

19   it's in the home or not.  There are areas that we

20   can educate citizens, when they do carry firearms,

21   how to protect them better, which is a problem.  So

22   all those ways I think I've done that in my career.

Joseph J. Vince, Jr.                                          September 16, 2011
                              Washington, D.C.

                                                                        50

1        Q.     How have you educated people in the ways

2    to responsibly carry firearms outside the home?

3        A.     Well, I think --

4               MR. WOODS:   I'll object, it

5    mischaracterizes his testimony.

6        A.     I don't think it's something that I did.

7    It's part of what my law enforcement duties were

8    that we did this, working with the industry to tell

9    citizens, when they buy guns, how to properly store

10   them and everything.   I think you've seen Don't Lie

11   For the Other Guy vignettes, how people acquire

12   firearms illegally and things like that.   So I think

13   all through my career I've done that.

14       Q.     Can you point to anything specific that

15   you've done to further -- you reference returning

16   guns to individuals.   Anything else specific --

17       A.     Well, I think I did.   I think I gave --

18              MR. WOODS:   Objection, asked and answered,

19   mischaracterizes his testimony.

20   BY MR. THOMPSON:

21       Q.     Why are you a strong proponent of a

22   citizen's right to own firearms for the purposes of

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

51

1    hunting?

2         A.    Because I believe in the Constitution of

3    the United States of America.

4         Q.    And so you think the Constitution affords

5    individuals a right to hunt?

6              MR. WOODS:  Let me just interject here

7    that that calls for a legal conclusion, it's beyond

8    the scope of his report.

9    BY MR. THOMPSON:

10        Q.    Let me ask you this.  Why are you a strong

11   proponent of a citizen's right to own firearms for

12   the purposes of sport shooting?

13        A.    Because I believe that the Constitution

14   allows citizens that aren't at a disability, in

15   other words, a convicted felon or something, have a

16   right to do sport shooting.  I think it's a good

17   sporting activity for certain people that like to do

18   that.

19        Q.    Is one of the benefits of sport shooting

20   that it increases an individual's proficiency with a

21   firearm so that if they needed to defend themselves,

22   they can?

Joseph J. Vince, Jr.                                        September 16, 2011
                        Washington, D.C.

                                                                    52

1           MR. WOODS:  Objection, it's beyond the

2    scope of his report.

3      A.    I think that people that engage in sport

4    shooting and practice that become better sport

5    shooters.

6      Q.    And is it true that those who regularly

7    use firearms are less likely to have an accidental

8    discharge?

9           MR. WOODS:  The same objection, beyond the

10   scope of his report.

11     A.    I've never heard of that before, sir.

12     Q.    Well, isn't it true that most law

13   enforcement agencies require their officers to

14   regularly practice?

15     A.    It's a lot more than practice, sir.

16     Q.    Well, practice and other things.

17     A.    I think I put in my report that what law

18   enforcement does, they not only train periodically,

19   they have to qualify with the firearm under

20   stressful situations, they have to learn shoot/don't

21   shoot activities, it's a lot more than firing at a

22   target or hitting a rabbit.  It's a lot more

Joseph J. Vince, Jr.                                    September 16, 2011
                          Washington, D.C.

                                                                    53

1    difficult than that.  And it's very similar to what

2    we do for our military, a lot different than that.

3         Q.    You mention under stressful circumstances.

4    Why do you mention that?

5         A.    Because that's how law enforcement train.

6    We don't train just to shoot at a target.  There is

7    a lot more involved than shooting at a target.  Go

8    ahead.

9         Q.    Why do they train under stressful

10   conditions?

11        A.    Well, because the last thing a law

12   enforcement officer wants to do is hit an innocent

13   bystander or to hit somebody that is not really a

14   threat to them and make a mistake and not handle the

15   situation right.  And so we train to ensure that it

16   doesn't occur.  The same way the military trains not

17   to injure one of their own people in friendly fire.

18        Q.    Now, when you were at ATF, did you carry a

19   firearm?

20        A.    Yes, sir, I did.

21        Q.    And did you ever use a trigger lock on

22   your firearm when you were at ATF in the field?

54

1        A.    We -- we didn't use trigger locks on

2    firearms as such.  We used flex cuffs to enable the

3    firearms not to fire.  When we were going to court,

4    every firearm that we kept in evidence had -- so the

5    gun could not be engaged, it could not be fired.  We

6    would mandate to do that for safety reasons,

7    obviously.  And keeping ammunition away from where

8    we stored the firearms.

9        Q.    All right.  Now, turning to page 3 of your

10   report, to the top first full sentence.  And you say,

11   this organization, and you're referring there to the

12   American Hunters and Shooters Association.  You say,

13   "This organization strongly believes, as do I, that

14   criminal acquisition and illegal use of firearms

15   diminishes the reputation of true hunters and

16   shooters as well as places our communities in

17   danger."  Why do you believe that's true?

18       A.    Well, we think that criminals and, you

19   know, and people that don't use firearms properly,

20   again, don't shed light on people that are using

21   firearms correctly for the intended purpose.

22       Q.    Now, Chicago's firearm ordinance, in your

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                            55

1    opinion, does it promote public safety by limiting

2    lawful acquisition of firearms?

3              MR. WOODS:  Objection to the form of the

4    question and it calls for a legal conclusion and also

5    it's beyond the scope of his report and testimony

6    we've tendered him for in this case.

7         A.    Sir, would you identify what part of that

8    statute you're talking about?

9         Q.    The portion that prohibits private sale --

10   that prohibits sales of firearms within the City of

11   Chicago.  Do you believe that promotes the public

12   safety by reducing lawful acquisition of firearms?

13             MR. WOODS:  The same objection.

14        A.    Well, what I can tell you, because we

15   didn't -- we didn't examine that per se.  But what I

16   can tell you from the studies that I've entered in

17   here is that most crime guns originate from retail

18   dealers and that less than 1 percent of the dealers

19   contribute to 60 percent of the crime guns.  So

20   obviously dealers, certainly not regulating firearms

21   dealers properly is a problem, that's how criminals

22   get guns.

56

1           So do I think that for public safety -- we

2      would have to look at that.  I can't give you an

3      answer.  I can only give you those facts that I know

4      are true.

5           Q.    Okay.  Now, starting on page 3, and then

6      carrying over to page 4, you quote from and cite to

7      several newspaper articles.  How do you select these

8      articles?

9           A.    I selected these simply because there

10     were so many and we just took these out that I could

11     take down and cut and paste that really show what --

12     the seriousness of the problem.  I think without

13     going into depth, or I shouldn't say depth, there

14     are probably a multitude of incidents, I just picked

15     these, because I think they illustrate the point

16     very well.

17          Q.    Are you claiming these are a statistically

18     significant representative sample of the articles

19     relating to firearms violence in Chicago?

20               MR. WOODS:  Objection to the form.

21          A.    I don't think I said that at all, sir,

22     that's not even close to what I said.

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

57

1        Q.    I'm not saying you said it.  It's a
2    question.
3        A.    I just said these were incidents we were
4    able to pick up and use to the report to illustrate
5    what we said is the problem.  Obviously there was a
6    lot more just by the shear numbers that we see here.
7    And I just think it makes the point we're trying to
8    make here in the report.
9        Q.    Now, for the people who were doing the
10   shooting in these stories that you collect here, do
11   you know whether they were in lawful possession of a
12   firearm?
13       A.    I would only know of what this report
14   here, I don't have police reports, I don't have
15   other knowledge.  I would only know what is said
16   here in the report.
17       Q.    Okay.  Now, on the bottom of page 4, it
18   says, "In Chicago nearly 700 children were hit by
19   gunfire last year."  That is 2010, presumably?
20       A.    The article is dated March 21st, 2011, so
21   I would say that's probably correct.
22       Q.    66 of them died.  Do you know whether it's

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                              58

1    including teenagers as children in that statistic?

2         A.    You know, you would have to know exactly

3    what the definition is on that article.  I know in

4    our Youth Crime Gun Interdiction report, we used --

5    we didn't use the term of children, we used the term

6    of being a juvenile from the legal term going to 18,

7    and then after that, 18 to 24 I think was

8    adolescence or something like that, I forget, so

9    without knowing the term.  But children to mean

10   means the word children.

11        Q.    But you don't know whether the author was

12   including in that 700 number teenagers, do you?

13        A.    Well, it all depends what you mean by

14   teenagers.  Some people say 13.  And yet teen would

15   still be in the teens.

16        Q.    13 to 19 is what I mean by being

17   teenagers.

18        A.    Children I take as being children.

19        Q.    Are you saying that that's a premise of

20   your opinion that these are individuals under the age

21   of 13?

22        A.    I'm not saying any premise.  I'm just

59

1    saying this is what the article says, and you asked

2    me what that means.

3         Q.    Do you know what that means or you're not

4    sure?

5         A.    No, I don't.

6         Q.    Is it possible that some of these 700

7    children were actually gang members?

8         A.    I don't know.

9         Q.    Okay.  Now, let's look at your chart on

10   page 5.  Do you have -- and let's first clarify.  On

11   I think it's the X axis, the axis on the bottom that

12   goes across, there are numbers 1, 2; 3, 4, et cetera.

13   Is that 2001, 2002, et cetera?  What do the 1, 2, 3,

14   4's refer to?

15        A.    As you can see from the report, this is

16   exactly -- I took this exactly.  I didn't want to

17   change anything that the Chicago Police Department

18   utilized, this is the way they had the chart.  And I

19   would take it that they're talking about murder

20   offenses, weapon offenses, 2000 to 2009.  So that's

21   how they rated it, that's how they put it in there.

22              I don't think knowing the exact years is

Joseph J. Vince, Jr.                                              September 16, 2011
                              Washington, D.C.

60

1    as important as looking at the figures, and that's

2    what that dramatizes.  Over a period of time, that's

3    their homicide rate from 2000 to 2009.  But in there,

4    they've marked it down 1, 2, 3, 4, 5, 6, 7, 8, 9, 10.

5         Q.    I see.  So 10 is actually 2009, is that

6    right?

7         A.    I am taking it as that, but I'm not

8    saying that's for sure the way they put it.  I

9    personally don't think it should have been done that

10   way.  But I didn't do the report, the Chicago Police

11   Department did, and I took it out exactly as they

12   had it there.

13           I think regardless, it looks like we're

14   still talking a decade and it demonstrates the extent

15   of the firearm violence in the City of Chicago.

16           MR. THOMPSON:  We're getting close to the

17   end of this tape.  If no one has an objection, could

18   we take a five-minute break.

19           THE VIDEO OPERATOR:  This conclusion tape

20   number one in the video deposition of Joseph Vince.

21   The time on the video is 10:09 a.m.  We are off the

22   video record.

Joseph J. Vince, Jr.                                      September 16, 2011
                        Washington, D.C.

                                                              61

1              (Recess taken.)

2              THE VIDEO OPERATOR:  This begins tape

3    number two in the video deposition of Joseph Vince.

4    The time on the video is 10:2 0 a.m.  We are on the

5    record.

6    BY MR. THOMPSON:

7        Q.    All right.  Mr. Vince, let's look at the

8    chart on page 5.

9        A.    Yes.

10       Q.    And this is the one we were discussing

11   before the break.  You can see, and I'm going to just

12   call it year 4 and 5, rather than trying to convert

13   it into calendar years.

14       A.    Thank you.

15       Q.    So in year 4, there are 488 murders by

16   firearms, and then in year 5, it goes down to 338.

17   And more generally over the course of this decade, it

18   starts at 471 and even as high as 514 and then it

19   comes down to 376 over the course of the decade.

20             Are you aware of any changes in Chicago's

21   laws that contributed to this decline in

22   firearms-related homicides?

Joseph J. Vince, Jr.                                          September 16, 2011
                         Washington, D.C.

                                                                          62

1        A.      No.   I really wasn't asked to look at any

2    enforcement efforts or changes in the law or

3    anything like that in relationship to that.

4        Q.      Okay.   Do you have an opinion as to why

5    there has been this downward trend of

6    firearms-related homicides in Chicago during the

7    period reflected in this chart?

8                MR. WOODS:   Just to be clear, that's

9    beyond the scope of what we retained him to opine on,

10   as reflected in his report.

11       A.      I really haven't looked at that, sir.

12   Usually there is multiple things to look at that

13   could cause a decrease in crime.   And again you have

14   to judge them, too, about nonfatal -- against

15   nonfatal shootings and other things.   So there is a

16   myriad of research that needs to be done before you

17   can make any statements like that.

18       Q.      You haven't done that in this report?

19       A.      No, sir, I haven't done that.

20       Q.      All right.   Now, let's turn to the bottom

21   of page 5, you've reproduced a portion of the

22   firearms ordinance, and then it carries over to page

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

                                                              63

1    6.   And the last sentence that you quote from the

2    ordinance says, "The provisions of this section shall

3    not apply to peace officers."  So does that mean that

4    a police officer in his home can have more than one

5    operable firearm?

6              MR. WOODS:  Objection, it calls for a

7    legal interpretation of the law.

8         A.   I took the statute verbatim for what it

9    is, and I did put that in there.  Again, I don't

10   know -- I'm not familiar with how the council passed

11   this, so I don't know exactly what it is and I don't

12   know specifically what the term peace officer, that

13   definition is in the State of Illinois or the City

14   of Chicago, so you would have to look into all of

15   that.

16             Usually in federal statutes in particular,

17   we have the law and then you have regulations, and

18   those better define that, and I have not looked at

19   that.  I only looked at and copied what's verbatim

20   here.

21        Q.   Okay.  So you don't know whether police

22   officers are allowed to have more than one operable

Joseph J. Vince, Jr.                                                      September 16, 2011
                                    Washington, D.C.

                                                                              64

1    firearm in their private residence in Chicago?

2         A.   Sir, I honestly didn't look at that.

3    It's saying not to apply to peace officers.  It may

4    mean that.  I don't know specifically.  I just

5    don't, I didn't look into that, sir.

6         Q.   Okay.  As a matter of public safety, the

7    types of concerns that you've identified in this

8    report that lead you to believe that trigger locks

9    are a good safety mechanism, wouldn't they be

10   actually applicable to police officers and their

11   children?

12        A.   Well, sir, I think these are good

13   recommendations for everybody to follow.  And there

14   are police agencies that have their own

15   requirements, some are stricter, some are less.

16   Even going into correctional facilities, officers do

17   not carry firearms, they're not allowed, we have to

18   lock them up.  So, but I can't comment on this,

19   because I don't know what it applies to

20   specifically.

21        Q.   Well, I'm saying wholly apart, I'm not

22   asking for your legal opinion on whether it does or

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                                    65

1    doesn't.  I'm just saying if you were thinking about

2    a safety protocol that made sense, would you apply

3    all of the types of restrictions that Chicago has to

4    all households or would you carve out police

5    officers?

6            MR. WOODS:  Objection, beyond the scope of

7    his -- the subject over which he's been offered to

8    testify about in this case.

9        A.    I think because of what I put in the

10   report and looked at, and I believe that the city

11   ordinance pretty much mirrors the National Shooting

12   Sports Foundation, and I do believe that is a good

13   protocol to follow to have safety.  Whether you're a

14   police officer or not, you always want to err on the

15   side of safety.  And I think the ordinance that the

16   City of Chicago has is a good model to follow.

17       Q.    Now, you say in the first paragraph of

18   text under the ordinance on page 6 in the second

19   sentence, that you've been involved in -- you say we,

20   by that you mean your partners.

21       A.    Yes, sir.

22       Q.    Crime Gun Solutions and you.  "Have been

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

66

1    involved in years of personal training in the use of

2    firearms as well as safety and security measures for

3    their storage and tracking."  What has your personal

4    experience been in terms of personal training?

5         A.    Well, as a law enforcement officer, I'll

6    take ATF, we had to qualify with the use of a

7    firearm four times a year.  That had to do with

8    being able to fully utilize the firearm, to be able

9    to clean it, load it, take it apart, use it in the

10   firing line under stressful situations.  We had to

11   be able to know how to store a firearm that we were

12   taking into custody, how to bring that into evidence

13   vaults into the building.  Other firearms that we

14   used, such as shotguns, rifles, how they should be

15   properly utilized, stored, et cetera, et cetera.

16        Q.    Okay.  Have you ever had a client come to

17   Crime Gun Solutions and ask you to give them a

18   protocol for safety?

19        A.    I'm trying to remember, because we worked

20   on -- when I was at ATF, I had the division come up

21   with a safety and security manual for federal

22   firearms licensees.  And I'm trying to recall if we

Joseph J. Vince, Jr.                                        September 16, 2011
                          Washington, D.C.

67

1     have given that or recommended that to licensees.

2              The only thing I can say is we did make

3     recommendations to people that that's what they would

4     follow.  But I cannot off the top of my head think of

5     if somebody had come up with something different than

6     that.

7          Q.    Now, have you ever heard of the term

8     biometric safe?

9          A.    Biometric safe, yes, sir, I have.

10         Q.    What is a biometric safe?

11         A.    My understanding on that is -- I haven't

12    seen it as much in safes as in lockboxes, and that's

13    where you are using such as your fingerprints.

14    There are other mechanisms of other biometrics used

15    that I have been a part of for security, I did some

16    consulting on.  But again, it's using something that

17    an individual has that recognizes only them.

18         Q.    So would one example of a biometric

19    lockbox be a box that if, let's say it was yours and

20    you had properly programmed it, you could put your

21    thumb on it and it would open, but for nobody else it

22    would open, is that the way they work?

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                               68

    1         A.    Well, not exactly.  Most of them have

    2    multiple users can use them.  So that you could have

    3    a myriad of people.  But yes, they would only --

    4    they would only open for the authorized users.

    5         Q.    Right.

    6         A.    Not authorized wouldn't be allowed.

    7         Q.    You as the owner of the biometric lockbox

    8    would be able to determine who the authorized users

    9    were, is that correct?

   10         A.    Correct.

   11         Q.    Are these biometric lockboxes deemed to be

   12    safe, in your opinion?

   13         A.    I would say it would all depends on

   14    factors.  It would only be as safe as how the person

   15    did it.  If you certainly left it on the seat of

   16    your car, unlocked car, that wouldn't be a safe

   17    thing to do.

   18         Q.    But if they are programmed properly, are

   19    they reliable, in your opinion?

   20         A.    Reliable, meaning to --

   21         Q.    Meaning that someone can't open it unless

   22    they have the fingerprint.

Joseph J. Vince, Jr.                                                September 16, 2011
                        Washington, D.C.

                                                                            69

1       A.      You know, I haven't studied them.  I

2    understand from clerks and other people that

3    utilized those, that they are, but I've never done

4    any studies on those.  It would seem like a good

5    idea, but I can't say for sure.  I haven't studied

6    it.

7       Q.      Okay.  You also say in the next paragraph

8    down, the second full paragraph in the second

9    sentence, "I have specifically studied the issue of

10   firearms kept and maintained in a home."  What have

11   you done as part of your study in that regard?

12      A.      Where is that?  Just so I know sir, what

13   paragraph?

14      Q.      Sure.  So it's the second full paragraph

15   on page 6 under the text of the ordinance, it starts

16   I have been asked, that paragraph.  Then if you go

17   down to the second sentence, it says, "I have

18   specifically studied the issue of firearms kept and

19   maintained in a home."  And so I'm wondering what you

20   did as the study that's referenced there?

21      A.      Okay.  We did several things.  We looked

22   at a lot of protocols that people are recommending

Joseph J. Vince, Jr.                                      September 16, 2011
                        Washington, D.C.

                                                              70

1    for proper home safety and security of firearms.  We

2    also looked at products that people provide for

3    securing your firearm.  And there is a lot of

4    material out there.  There is a lot of different

5    manufacturers of trigger locks and cable locks,

6    things like that.  So we did examine those.  Not

7    looking at doing consumers reports saying that one

8    product is better than the other, but just to see

9    everything that is out there so that we could look

10   at and say what is a good protocol and, you know,

11   does the city ordinance do that.

12          And what we found is that, yeah, the city

13   ordinance really follows along with what the experts

14   are saying should be safe storage of firearms and

15   whether they -- you know, would thwart self-defense.

16   Q.     You say in the next sentence, "The

17   literature on this subject matter is extremely broad

18   and extensive."  Is the literature that you are

19   referring to there included in your list of materials

20   relied upon?

21   A.     No, I don't think all of it is there,

22   because there was so much repetitiveness.  As a

Joseph J. Vince, Jr.                                          September 16, 2011
                         Washington, D.C.

71

1    matter of fact, if you look at even the thing we

2    talked about with the National Shooting Sports

3    Foundation, you see other groups that really mirror

4    those some recommendations, so we wouldn't have

5    repeated that, repetitively put that in there.

6         Q.    Now, going back just to the last sentence

7    of the prior paragraph, you say, "We have researched

8    numerous best practices and interviewed burglars and

9    thieves in order to make sound determinations of our

10   recommendations."  Who conducted the interviews of

11   the burglars and thieves?

12        A.    We didn't do that specifically for this

13   report.  But both Mr. Nunziato and myself have done

14   that in our careers.  As a matter of fact, I

15   conducted a study for ATF called Protecting America

16   in which we -- I had 22 sets of two agents

17   conducting interviews of 104 career criminals.  And

18   so we are talking about over our time.  And people

19   that we've arrested and been able to talk to them

20   about what they do.

21        Q.    All right.  And so there is the Protecting

22   America study that you referenced and then there is

Joseph J. Vince, Jr.                                      September 16, 2011
                          Washington, D.C.

                                                                      72

1    your personal experience as a law enforcement

2    officer, is that what you're saying?

3         A.    Yes, that is correct.

4         Q.    And if you had to ballpark it, how many

5    people approximately have you spoken to in that

6    capacity?

7               MR. WOODS:  Objection to the form of the

8    question.

9         A.    I don't know how you would ballpark that,

10   because there is people you arrest, there is

11   witnesses that you talk to, there is criminals that

12   you use as informants, there is criminals you try to

13   use at informants, there are criminals you are

14   talking to in jails.  You know, there is even

15   criminals that you see other officers interview and

16   they'll talk about things and you learn from that.

17   I couldn't even begin to give you any kind of

18   semblance of what the number would be.

19        Q.    Okay.  Now, since 19 -- you left the ATF

20   in 1999, is that right?

21        A.    Yes, sir, that is correct.

22        Q.    Okay.  And since you left the ATF in 1999,

73

1    have you interviewed any burglars or thieves, are you

2    relying on any interviews you've conducted of

3    burglars or thieves in this report?

4         A.    I know for some litigation that Mr.

5    Nunziato did interview some people that were

6    involved in criminal acts.  I know that I have not

7    personally interviewed them, but examined tapes of

8    persons who have been interviewed by police officers

9    on committing crimes and the information they had

10   related to not only their criminal acts, but how

11   they acquired firearms.  And that's probably ever

12   since I've done that, we've continued to do those

13   exact things.

14        Also, again, getting presentations from

15   other law enforcement agencies at the firearms

16   committee.  This is something we're really dealing

17   in, because the firearms committee for the IACP make

18   recommendations to the executive committee on

19   direction and policy that the chiefs of police across

20   the United States -- well, across the world should

21   look at for how they enforce firearms laws and

22   looking at intervention and prevention as well as

74

```
1    enforcement, so along with that, we've certainly kept

2    up on what's going on.  Plus we've done some of our

3    own studies of gun violations as well.

4         Q.   Now, in the interviews of criminals that

5    you reference in your report, did you ever gather

6    information as to whether some of those criminals

7    would avoid potential victims who were known to be in

8    possession of a firearm?

9         A.   You know, I would say this.  I haven't

10   heard that directly in that manner.  Mostly,

11   especially when we're talking about burglars, what I

12   find is that they will try to avoid not only

13   confrontation, but avoid situations where it makes

14   it more difficult for them to commit the criminal

15   act.  In other words, if a burglar can pick between

16   a house that has a dog and a house that doesn't,

17   they're going to pick the one that doesn't.

18             So the other thing is that burglaries of

19   homes looking for firearms is inefficient.  This is

20   why retail dealers are the primary source.  Simply

21   because if you burglarize a home, it's a crap shoot,

22   and you don't know if you're going to find no guns,
```

Joseph J. Vince, Jr.                                            September 16, 2011
                         Washington, D.C.

75

1    if you're going to find grandpa's old shotgun, or if

2    you're going to find a gun that you can really

3    utilize.  So if you're a gang member, grandpa's old

4    shotgun is not going to help you.  It's going to

5    humiliate you with the other gang members.  So that's

6    an inefficient way to do it.

7            All I know is both Mr. Nunziato and I have

8    had the experience where people have told us unless

9    they in some way know somebody has guns and they are

10   going for that, that's not what they look at.  And

11   certainly having a sicker that says you are an NRA

12   member or something like that is something that would

13   tell them that.

14           But I haven't heard -- I can't say one way

15   or another and I haven't done any research in that

16   area to look at that specifically.

17       Q.    You were saying that if a burglar has a

18   choice between a home with a dog and a home without a

19   dog, he's going to go to the one without a dog.  Is

20   the same true if he has a choice of a home with

21   someone who is sitting there with a shotgun and

22   someone who is sitting there without a gun, he's

Joseph J. Vince, Jr.                                              September 16, 2011
                           Washington, D.C.

                                                                        76

1    going to go to the house without someone sitting

2    there with a gun?

3              MR. WOODS:  I'm going to object, the

4    question is asked and answered and it's beyond the

5    scope of his opinions that he's tendered in this

6    case.

7         A.    The fact of the matter is that I don't

8    know how a criminal would know that, unless you want

9    to sit outside, I don't know how they would know

10   that.

11        Q.    Now, are you saying that these criminals

12   represented a random generalizable sample of burglars

13   and thieves in the United States?

14        A.    No, sir, I don't think I put that in the

15   report at all.

16        Q.    Okay.  Do you know what percentage of them

17   were white?

18        A.    No, sir.

19        Q.    Do you know what percentage of them were

20   black?

21        A.    No, we didn't look at that.

22        Q.    Do you know what percentage of them had a

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

                                                                        77

1     college degree?

2          A.     No, sir.

3          Q.     Do you know what percentage of them were

4     recidivists?

5          A.     No, I would only be assuming by saying

6     anything on that.  I don't specifically know that.

7          Q.     Just so the record is clear, none of these

8     individuals who were interviewed in connection with

9     the preparation of this report, is that correct?

10         A.     No.  That would be based on our knowledge

11    and experience in law enforcement and the studying

12    of firearms-related violent crime.  `

13         Q.     Now, why is it even permissible to rely on

14    interviews with burglars and thieves, isn't it

15    entirely possible they were lying to you?

16                MR. WOODS:  Objection to the form of the

17    question.

18         A.     Well, I think law enforcement gets very

19    good information.  And unfortunately law enforcement

20    doesn't deal with priests and nuns, we have to deal

21    with criminals.  And over a period of time I think

22    law enforcement officers know when people are lying

Joseph J. Vince, Jr.                                                September 16, 2011
                            Washington, D.C.

                                                                              78

1    to them.  And you can use other information to

2    validate the information you get, such as the trace

3    data gives us a lot of very good information.  So

4    you can go back and validate what they're trying to

5    say.

6              The other thing is many times you're

7    interviewing them after they've committed a crime,

8    you know what's occurred and you're filling in the

9    pieces.  And you can know also by talking to other of

10   their cohorts to find out and witnesses, is this true

11   or not.

12             So this is why I think it's very important

13   when studies are done, we don't have graduate

14   students doing the interviewing of criminals, we have

15   experienced law enforcement agents and officers that

16   do that.  That's why in the Protecting America study,

17   I had seasoned special agents, male and female, that

18   conducted the interviews of the career criminals.

19        Q.   Now, you've testified that when you were

20   an ATF officer and you were in the field, you did the

21   not use a trigger lock on your firearm, correct?

22        A.   While I was carrying it.

79

1          MR. WOODS:  I think he's mischaracterized

2     the testimony.  But go ahead.

3          A.    When an officer carries a firearm, no,

4     it's in a holster.  The holsters that officers

5     have -- now, one of the problems that law

6     enforcement has faced for sometime certainly is the

7     killing of officers with their own weapon.  And so

8     holsters were devised that it's very difficult, if

9     not impossible, from a person from behind or in

10    front of them to pull a weapon, it has to be from

11    the person, so there is other devices that they do

12    use.  But again, this is for a trained officer.  And

13    no, they don't have trigger locks on their gun.

14         Q.    Why not?  Why don't they?

15         A.    Well, on the gun they are carrying, on

16    the one operable gun, they do, but on other guns,

17    they do.  The shotgun in the car has a trigger lock

18    on it.  It's placed in the vehicle in such a way

19    that the officer can get the gun, but he has to

20    unlock it, so when he leaves the vehicle, somebody

21    else unauthorized can't have access to it.  So he

22    still has an operable firearm on his person that he

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

                                                                        80

1    has in his control, but the other ones are locked.

2         Q.    I understand.  But my question goes to

3    with respect to that one operable firearm, why isn't

4    that trigger locked, too?

5         A.    Well, officers have to respond to

6    situations.  And again, they're highly trained to

7    respond in this manner and in stressful situations,

8    and I think it's very appropriate that they have an

9    operational firearm in a condition that's safe on

10   their person.  Many times there are safeties that

11   are on as well.

12        Q.    And is the reason that they're permitted

13   to have an operable firearm in their possession in

14   the field is because sometimes time is of the essence

15   for them to have access to that firearm?

16        A.    Yeah --

17             MR. WOODS:  I'll object on the foundation.

18        A.    I think the example I gave mirrors the

19   city statute, exactly.  They have that one operable

20   gun and the others are locked, as they should be.

21        Q.    Now, you currently own guns, is that

22   correct?

Joseph J. Vince, Jr.                                          September 16, 2011
                         Washington, D.C.

                                                                          81

1          A.     Yes, sir, I do.

2          Q.     How many guns do you own?

3          A.     That's a good question.  I only have

4     about five firearms.  I don't do hunting anymore.  I

5     used to, but my father has since passed, and my true

6     joy of hunting was with him.  So I have a couple of

7     firearms.

8          Q.     Are they all secured with a trigger lock?

9          A.     The locking cable.

10          Q.     The locking cable?

11          A.     Yes, sir.

12          Q.     Have you always kept the `guns in your

13     private residence locked with a trigger lock or a

14     locking cable?

15          A.     No, sir, I haven't.

16          Q.     When, during what period of time, or why

17     not?

18                 MR. WOODS:  Objection, compound.

19          A.     I think over time, I became smarter about

20     it.  I started looking at, looking at the studies

21     we're doing, looking how so many people are injured

22     in accidents.  You know, I was very cautious,

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

82

1    because I did have children, but I think going to

2    that one step further, seeing how other people

3    acquire firearms, tracing firearms, looking at

4    stolen weapons.  I keep a record of all my firearms

5    with their full description and serial number in a

6    safe deposit box, so if my house is burglarized,

7    I'll have that information for law enforcement.

8            The other thing is even if there is a

9    fire, I want to be able to let people know.  I don't

10   keep ammunition, I have very little of it, but I keep

11   it in a separate location that would make it safer

12   for fire fighters, if there is a fire in there.

13           So I think over time I've learned to do a

14   better job.  And hopefully, as we learn to do things

15   and we see what experts tell us, I think it's a smart

16   person who picks up on that and does the right thing.

17       Q.    Well, when did you start using trigger

18   locks and/or other locking devices like a cable?

19       A.    Probably -- I couldn't give you a

20   specific time.  But it really, when I started

21   researching this, I really started getting into this

22   in the '80s and everything.  Again, I don't have --

Joseph J. Vince, Jr.                                   September 16, 2011
                        Washington, D.C.

                                                                    83

1    I'm not using firearms for -- I don't use them for

2    self-defense, I don't use them -- I have them

3    because, one, my father gave me one, I have one

4    because it's a commemorative weapon, so I don't have

5    them as that purpose.

6         Q.    Now, you reference in the last full

7    paragraph on page 6 that, you say -- you are

8    referring to law enforcement officers and the

9    military in this paragraph, I believe.

10        A.    Yes, sir.

11        Q.    And then you have got a sentence saying,

12   "Just as important" -- this is about halfway

13   through -- "they are trained in the use of a firearm

14   under stressful life or death situations, and are

15   mandated to receive constant remedial training."

16   What do you mean by constant remedial training?

17        A.    Well, in law enforcement, if you aren't

18   qualified to use the firearm under all those

19   circumstances, if you fail either to have the

20   training or you fail the training, you can no longer

21   carry a firearm.  You have to be able to utilize

22   that firearm properly.

84

1        Q.      And why do they have constant remedial

2    training?

3        A.      Because of the awesome responsibility

4    that everybody has who has a loaded firearm or the

5    potential of using a loaded firearm.

6        Q.      You say in the next sentence, "Both law

7    enforcement, federal, state and local, and military

8    agencies, dictate that their personnel use firearm

9    locking mechanisms of various types to secure their

10   weapons when not in use."  But it's true that when

11   military officers are using their weapons, they're

12   permitted to have them in an operable fashion?

13            MR. WOODS:  I'm going to object to the

14   question being vague.

15       A.      Sir, do you refer -- when a military,

16   just for example, a soldier is out in the field in

17   combat, he doesn't have to have a trigger lock?

18       Q.      You would agree with that, wouldn't you?

19       A.      I think that's common sense.

20       Q.      If a soldier is out on a training

21   exercise, does he have to have a trigger lock?

22            MR. WOODS:  If you know.

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

85

1        A.    I don't know that that's the case.  What

2    the research we did say -- found was this.  And

3    that's again, highly trained individuals use

4    firearms as the tool of their trade, and they are

5    trained to use them in a deadly fashion.  Yet when

6    they're on the military base, none of those people

7    have firearms, none.  None of them have access to

8    firearms.  The only people on base who have firearms

9    are the military personnel, period.  Because they

10   feel that's the best safety of everyone there.  Not

11   that they didn't have crime on military bases, not

12   that they don't have problems.  Unfortunately, we've

13   seen that's the case.  However, none of them have

14   them because they feel it's the safest for all

15   military personnel that are on the base.

16       Q.    So they're not allowed to use their

17   firearm for self-defense when they're on the military

18   base, is that right?

19       A.    Their firearms are disassembled.  As a

20   matter of fact, you will see the receivers away

21   from -- certain protocols that I've been on military

22   bases with and/or talked with military officers

Joseph J. Vince, Jr.                                      September 16, 2011
                         Washington, D.C.

86

1    about, are disassembled so that even if they were

2    stolen, they would be inoperable, because the

3    receiver or the firing mechanisms is away from where

4    the rest of the firearm is, and their ammunition is

5    stored in a separate location as well.

6         Q.    And so you would agree that the soldiers

7    on these military bases are not permitted to use

8    those firearms for self-defense?

9         A.    What I said is they're not allowed to

10   have them, they do not have them.

11        Q.    All right.  Now, you say in the final

12   paragraph on the bottom of page 6 in the second

13   sentence, "Firearms that are seized by law

14   enforcement agencies are normally stored with some

15   type of locking mechanism to prevent inadvertent or

16   accidental use."  These aren't weapons that the

17   officers are planning to use for self-defense in a

18   time sensitive manner, are they?

19        A.    No.  I'm referring to all weapons that

20   were seized or recovered in an investigation.

21        Q.    Okay.  And likewise, if we go down two

22   more sentences, you reference, "Firearms that are

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                              87

1    brought to court as evidence are required to be

2    unloaded."  And these firearms aren't intended for

3    use in self-defense, correct?

4        A.    No, sir.  They're used for evidence

5    purposes.  In a courtroom, it is usually only the

6    bailiff that has a firearm, even though we maybe

7    have dangerous offenders in there, we may have the

8    offender's family accompanying him, it's only the

9    bailiff that has the firearm or the marshal in

10   federal court.

11       Q.    You state on the top of page 7, "Prior to

12   entering jails, law enforcement officers are mandated

13   to unload their weapons or place them in a gun

14   lockbox to prevent unauthorized access and accidental

15   discharges."  Is the purpose of that measure to

16   ensure that a criminal doesn't take a gun off of a

17   law enforcement officer and then use it against them?

18       A.    That's part of it, sir.  It's also the

19   fact that the jailers, the correction people, the

20   deputies and marshals, whoever is there, know that

21   they're the only ones that have the gun.  So that

22   the chance of shooting a plain clothes officer is

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

88

1    diminished, because they know they didn't have the

2    firearm out there.  So if somebody is showing a gun,

3    that must be a criminal.

4         Q.    Now, were you aware that there are some

5    state courts that don't have metal detectors and have

6    no security?

7         A.    You know, there are so many courts that

8    that's that possibility.  I just don't know.  I

9    don't know.  I certainly don't know all the

10   protocols that they have.  I know the ones I'm

11   familiar with locally or the federal courts that I

12   have been a part of or the state courts, and that's

13   all I can refer to.  I can't talk a hundred percent.

14        Q.    Okay.  For those courthouses where there

15   are metal detectors and there are guards and firearms

16   are not permitted inside, there is a police presence,

17   bailiffs, with firearms, is that correct?

18        A.    Yes, sir, that is correct.

19        Q.    Is it true there is a very low incidence

20   of violent criminal conduct within courthouses?

21        A.    I've never studied that, sir.  I have no

22   idea if it would be high, low, I just don't know.

Joseph J. Vince, Jr.                                        September 16, 2011
                        Washington, D.C.

                                                                        89

1        Q.      Now, let's look down on page 7, you

2    reference in the second full paragraph, the firearms

3    industry.  What do you mean by that term, the

4    firearms industry?

5        A.      Well, I believe the industry is very --

6    it's a huge industry.  It is just like any other

7    industry, you have manufacturers, wholesalers, which

8    the firearms industry set up their own wholesalers

9    and retail dealers.  But there is other components

10   within the industry, too.  There is people that do

11   lobbying, there is people that do marketing.  So

12   it's all-inclusive of the industry that makes up the

13   firearms industry, the manufacturing and sales

14   industry.

15       Q.      Would you include the NRA as part of the

16   firearms industry?

17       A.      It's funny, because I would say that they

18   are paid lobbyists, they receive funds from the

19   industry, so if you count that as being lobbyists, I

20   guess that would be.

21       Q.      Now, do you think the firearms industry is

22   a reliable source of information when it comes to gun

Joseph J. Vince, Jr.
Washington, D.C.
September 16, 2011

90

1    safety?

2        A.    Well, I believe that as any industry,

3    they certainly I would think want to have their

4    clients utilize the guns properly, at least the ones

5    that I believe are doing it in good faith.  As we

6    said, if you look at the retail dealers, we have 60

7    percent of firearms dealers that are spewing out 1

8    percent of all the crime guns.  So -- excuse me.  1

9    percent of the firearms dealers are spewing out 60

10   percent of all crime guns.

11            So that being the case, why isn't an

12   emphasis placed there, whether it's poor business

13   practices or it's illegal activities, to stop that?

14   So you have to look at this, it's still an industry,

15   it's still in there to make profit, like any

16   industry, and I think that's why we have some or at

17   least some public and government oversight.

18       Q.    And when you talk about poor business

19   practices, is that because the firearms industry has

20   an incentive to provide safe, reliable products?

21       A.    Well --

22            MR. WOODS:  I object, it's beyond the

Joseph J. Vince, Jr.                                            September 16, 2011
                          Washington, D.C.

                                                                        91

1    scope of his opinions that we've offered him for in

2    this case.

3         A.    That's yes and no.  Obviously there has

4    been firearms out there that have been major, major

5    unsafe problems.  I can tell you about firearms that

6    literally have barrels that deconfigure after

7    shooting them a myriad of times.  I can tell you

8    about firearms that fall and go off.  There has been

9    myriad litigations on that.  So the firearms

10   industry is like any other industry, we have good

11   apples and bad apples.

12        Q.    Now, you reference a study done at ATF I

13   believe called Safety and Security Information For

14   Federal Firearm Licensees.  Do you recall that?

15        A.    Yes, sir.  It's a manual for best

16   practices for dealers.  It provides a lot of good

17   information and forms and phone numbers as well, and

18   it was based on a study of what these best practices

19   should be.

20        Q.    All right.  This is best practices for

21   dealers, correct?

22        A.    No.  I think if you look at that, there

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

92

1    is a lot of common sense practices for everybody

2    that has firearms.  And it mirrors some of what I

3    put in here from NSSF, again, on safe storage, it

4    mirrors that.

5         Q.    Well, it was intended for use by dealers,

6    that's why FFL is in the title, right?

7         A.    Yes, that particular publication was.

8    But again, a safe practice is a safe practice.  So

9    if you're a dealer or you're an individual, it's

10   still a safe practice, it's a good practice to

11   follow.

12        Q.    Well, the guns that the dealers have in

13   display cases, they're not intending to use for their

14   own personal self-defense, are they?

15        A.    The guns they have in display cases are

16   intended for people to examine.  They're not

17   intended for unauthorized use.  So it's the same way

18   you would have them in your house.  You have people

19   that either come in there that are unauthorized or

20   you have people that may come in that are visitors.

21   So the practices that are put in there, you know,

22   the store, just like we talked about the shot show

Joseph J. Vince, Jr.                                            September 16, 2011
                          Washington, D.C.

                                                                      93

 1    in here, we talked about gun shows, those premises

 2    become your home and the people coming in as

 3    customers are your visitors.  The same is applicable

 4    to your home.  There really is no difference.

 5             And so you want to make sure your visitors

 6    are safe there and you want to make sure that

 7    visitors don't inadvertently get ahold of a firearm.

 8    Exactly what the NSSF says, I think it's exactly the

 9    same thing that's in our -- that's in this

10    publication.

11        Q.    But at least Chicago allows people to have

12    an operable firearm, and your guideline doesn't say

13    oh, have some operable firearms or even one operable

14    firearm and the rest in display cases.  This is

15    saying all of them should be in display cases locked,

16    right?

17        A.    Well, I will say this.  Of the dealers

18    that I'm aware of, and I have been around a lot of

19    retail dealers, there are dealers that have operable

20    firearms, but I only know of them having them on

21    their person.  They don't have them laying around

22    anywhere, they have them where they have control of

94

1    them at all times.  They don't have 15 or 20 of them

2    like that.  Not even all clerks do that, because

3    some are not trained or they don't want them to have

4    that.  So in that respect, it's not an issue that we

5    went into, but I think it's very much followed.

6              And I think that the big point about

7    what's not only in the safety and security, but what

8    dealers follow, is the same thing that they

9    repeatedly say, why do we do this?  Because it works.

10   Q.    All right.  And those firearms that are in

11   the display cases are not intended for use in that

12   store for self-defense, correct?

13   A.    No, sir.

14   Q.    Now, if we look at page 8 of your report

15   in the second full paragraph, you reference, let's

16   see, say halfway through that first sentence, "And

17   even the National Shooting Sports Foundation, a

18   lobbying arm of the firearms industry, has a safety

19   program utilizing trigger locking devices."  Why do

20   you use the word even, you say even they have it?

21   A.    Well, I think for this purpose I thought

22   it was amazing that here you have a protocol by the

95

 1    National Shooting Sports Foundation and the

 2    Plaintiff in this case is an associate, the Illinois

 3    Association of Firearms Retail Dealers.  I can't

 4    believe it, they're partners in this, but they don't

 5    agree with each other.  So I'm taking the premise

 6    that the Illinois Association of Firearms Retailers

 7    believes that this is the protocol that should be

 8    followed.  Am I correct?

 9         Q.    I don't have to answer your questions.

10         A.    Okay.

11               MR. WOODS:  I object to him not answering

12    a question.

13               MR. THOMPSON:  That is man bites dog.

14               MR. WORSECK:  It's beyond the scope of the

15    opinions you were asked to provide in this case.

16               MR. THOMPSON:  Exactly.

17    BY MR. THOMPSON:

18         Q.    So now if we look at these bullet points.

19         A.    Sure.

20         Q.    That are listed here.  It says under the

21    first bullet point, "It is the responsibility of the

22    firearms owner to know how to properly handle any

Joseph J. Vince, Jr.                                          September 16, 2011
                          Washington, D.C.

96

1    firearm you own and to know how to secure your

2    firearms in a safe manner at home."  Would a

3    biometric lockbox properly programmed with only

4    adults who are properly trained having access to it

5    qualify as securing a firearm in a safe manner?

6         A.    Well, the only thing I can say is that's

7    something that I didn't look into as far as it

8    concerns the city ordinance, that's an issue that

9    I'm not quite frankly sure.

10             Would a lockbox satisfy as doing that?

11   Certainly, there might be a myriad of devices that

12   could do it.  We might even get a 50-pound chain or

13   something.

14             But the point being is that a mechanism in

15   here does secure it.  And I have to -- we have to go

16   up to the next, what I put to go along with this is

17   that what the representative from the Shooting Sports

18   Foundation says on page 9 is trigger lock is better

19   than nothing at all.

20        Q.    And when it says right after that in that

21   same sentence that you just read from, it says, "And

22   a good gun safe is better than just about anything."

Joseph J. Vince, Jr.                                                September 16, 2011
                              Washington, D.C.

                                                                              97

1      Do you agree with that statement?

2           A.    Well, I do in this regard.   And that is

3      that a firearm with a trigger lock or something

4      that's not attached to something, so even a lockbox

5      can be easily removed, it is just more difficult to

6      take a thousand-pound safe and put it under your arm

7      and jump over the fence.   So if we look at it that

8      way, that's common sense.

9           Q.    Okay.  Now, you reference an article on

10     page 9, and it states that from, and I'm reading from

11     the third full paragraph, "From 1996 to 2001, that

12     during that period, 1,530 children were killed in

13     firearm accidents."   So over a six-year period, there

14     were about 250 children a year who died from firearms

15     accidents in the United States, is that right?

16          A.    Well, all I can say is that -- the

17     article is quoting the Centers For Disease Control.

18     I didn't look at that specifically.   But it does say

19     that.

20               I thought it was interesting, going back

21     to the point you were referring to is that "nearly

22     all firearms accidents in home" -- this is the point