# Exhibit D

# Part 2 of 2

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

98

1    3 -- "can be prevented simply by making sure that

2    guns are kept unloaded and locked up with ammunition

3    secured in a separate location." All firearms

4    incidents, whether they're children or not. So I

5    would have to say if that's the case, 1530 children,

6    their lives would have been saved if people had

7    followed that.

8         Q.    Now, is it fair to say there are

9    approximately 300 million guns in the United States?

10        A.    That's probably a good guesstimate, yes,

11   sir.

12        Q.    And so if we have 250 children dying a

13   year, at least during this time period, is it fair to

14   say that any -- there was less than a one in a

15   million chance that any particular gun would kill a

16   child in a year?

17             MR. WOODS:  Objection, it assumes facts,

18   it calls for speculation.

19        A.    That's a question I think I really have a

20   lot of problem with, because I think when we start

21   looking at numbers like this, we forget who these

22   children are.  These children are somebody's

99

1    parents.  And I love my child -- children, I have

2    three of them.  And I can't imagine what it would

3    feel like to have a child shot and killed.

4              But I can tell you this.  On the second

5    day that I was a deputy sheriff, I went to the scene

6    of a father and son who were building a dwelling, an

7    unattached dwelling, and the father got mad at the

8    son and went in and got the shot -- the rifle,

9    unloaded rifle, and came back and killed his son and

10   shot him in the temple.  So when we talk about

11   numbers, let's talk about people.  And I think that's

12   where we have to go here.  So I look at lives, I

13   don't look at is this ratio different than others.

14       Q.    That example you just gave of that

15   terrible situation, that wouldn't have been precluded

16   if it had been in a gun safe unloaded, he could have

17   gone in his deranged state --

18       A.    I absolutely disagree with you, because

19   my experience looking at violent crime, especially

20   when we're talking about intimate violence, domestic

21   violence, is that if there is any chance that it's

22   more difficult to obtain a firearm and any other

Joseph J. Vince, Jr.                                          September 16, 2011
                          Washington, D.C.

100

1    weapon is used, as we know, like a stabbing, the

2    less likely the person is going to die.  You only

3    have one try with the gun and they leave big holes.

4           All you have to do is talk to, which I

5    have, to emergency room physicians, they will tell

6    you they would much rather treat somebody that has

7    been stabbed than shot.  The idea is that if you have

8    that second to think, to cool down, to assess the

9    situation, that you're more likely not to do

10   something in the rash reality.

11          If you are going to use a gun, if you

12   point a gun at someone, then you better know what the

13   target is and you better make sure it's the right

14   target.  That's what happens too frequently is that

15   either people inadvertently shoot somebody else, or

16   just like the guy two days ago, he wanted to shoot a

17   snake, he ended up shooting his hand.  This happens

18   for more.  And I think this 1530 is a real good

19   example of that.

20      Q.   This incident that you referenced, that

21   happened in 1969?

22      A.   Yes, it would have been right there, yes,

101

1    sir.

2        Q.    Now, isn't it true that accident rates

3    have come down dramatically over the ensuing four

4    decades?

5            MR. WOODS:  Objection to the form of the

6    question, vague.

7        A.    I don't know, sir.  I couldn't say.  I

8    would hope that with the recommendations from the

9    NSSF and other people and law enforcement getting

10   out and trying to tell people to be careful with

11   firearms, that it's helped.  I would hope that.

12   Again, there is an awesome responsibility that goes

13   with the handling of a deadly weapon.

14       Q.    Do you know whether accident rates have

15   declined from 2001, which is the data you provide in

16   this report?

17       A.    I wasn't asked to look at that, sir.  I

18   don't know.

19       Q.    Now, it says in the next sentence that you

20   quote in your report, "Guns are present in 40 percent

21   of U.S. households with children."  Do you have any

22   reason to doubt the validity of that statistic?

Joseph J. Vince, Jr.                                                September 16, 2011
                              Washington, D.C.

                                                                              102

1       A.      I'm trying to -- I know RAND did this

2    study, I am somewhat familiar with it.  This is from

3    2003.  I have no reason to dispute that.  I don't

4    know if it's increased or decreased.  I don't know

5    for sure.

6       Q.      Okay.  And the next sentence, it says,

7    "And in households with children and firearms, 40

8    percent had least one unlocked firearm and 13 percent

9    kept their unlocked firearm loaded or stored with

10   ammunition."  Do you have any reason to doubt that

11   those numbers were accurate at the time of the RAND

12   study report?

13      A.      No, I don't know one way or the other.

14      Q.      Do you know whether those numbers are

15   accurate today?

16      A.      No, I don't.

17              MR. WOODS:  David, would you mind if we

18   take a short break?

19              MR. THOMPSON:  So let it be said, so let

20   it be done.

21              THE VIDEO OPERATOR:  We're going off the

22   record.  The time on the video is 11:11 a.m.

Joseph J. Vince, Jr.                                September 16, 2011
                        Washington, D.C.

                                                                103

 1              (Recess taken.)

 2              THE VIDEO OPERATOR:  This begins tape

 3    number three in the video deposition of Joseph Vince.

 4    The time on the video is 11:25 a.m.  We are on the

 5    record.

 6    BY MR. THOMPSON:

 7         Q.    Mr. Vince.

 8         A.    Yes, sir.

 9         Q.    Now, let's turn to page 10 of your report.

10    And right underneath the block quote, you have a

11    sentence that reads, "The Chicago firearms ordinance

12    closely follows the recommendations of the NSSF with

13    regard to safe handling and storage of firearms."

14    Which provision of the Chicago firearms ordinance are

15    you referring to?

16         A.    In particular, I'm talking about the

17    8-20-040, which I have placed on page 5.

18         Q.    All right.  Now, isn't it true that the

19    Chicago ordinance, however, permits a

20    properly-licensed individual to keep a loaded gun

21    lying on his sofa, provided there are no children in

22    the house, isn't that right?

Joseph J. Vince, Jr.                                    September 16, 2011
                      Washington, D.C.

                                                              104

1        A.     That is correct.

2        Q.     So that's a pretty significant departure

3    from the standards you're setting forth here,

4    correct?

5        A.     If you're saying that the difference

6    between what NSSF and the Chicago ordinance say that

7    it's -- you know, you don't want it carelessly left

8    out in the open, I don't think really the Chicago

9    ordinance addresses that, but I would hope that gun

10   owners would be responsible and not to leave

11   something carelessly that out in the open.

12            Granted, you said without children.  And I

13   know that the ordinance does provide, have a

14   provision in there which makes sense to make sure you

15   have full control of it, so children can't get the

16   access.

17            But I'm hoping that even if you're saying

18   left on the sofa that you're sitting right there,

19   that you're not leaving it carelessly left out in the

20   open and other people there could get ahold of it.

21       Q.     You're permitted to, though, under the

22   Chicago ordinance, aren't you?

105

1       A.      I don't think -- there is nothing in the

2    Chicago ordinance that says to be careless.

3       Q.      It permits carelessness of one operable

4    firearm per license holder?

5               MR. WOODS:  Let me object to the question

6    to the extent it's asking for a legal conclusion

7    about the meaning of the statute.

8       A.      It doesn't specifically address that.

9    All I'm saying is I don't know of any law, whether

10   it's this Chicago ordinance at all, that says you

11   should be stupid and leave a gun carelessly out

12   where anybody else could get that firearm, even use

13   it on their self.  That's not very smart.

14              The smart thing to do I think is to follow

15   what we have in here, which the NSSF is more poignant

16   on than the Chicago ordinance.  But I see that the

17   very -- very much a parallel with the ordinance and

18   this.

19      Q.      Isn't the reason the ordinance has the

20   exception that allows you to have an operable firearm

21   on your person is because sometimes you need

22   immediate access to a firearm for self-defense?

106

1              MR. WOODS:  I'm going to object to the

2     question to the extent it calls for a legal

3     conclusion.  It's also beyond the scope of his -- the

4     opinions we've tendered him to address in his expert

5     capacity.  And I'll object on foundation grounds,

6     too.  You may answer.

7        A.    Go ahead, David.

8        Q.    So isn't it true that the reason that

9     Chicago deviates from these safety guidelines for

10    storage is that the city is recognizing that in some

11    instances individuals need immediate access to an

12    operable firearm for their self-defense?

13             MR. WOODS:  I'm -- the same objection.

14             MR. THOMPSON:  The same objections.

15             THE WITNESS:  I can't say exactly, because

16    I wasn't there when they wrote the ordinance or I

17    don't know anything beyond that.

18             I can't respond to that on what their

19    thinking was.  Obviously again, we want people to not

20    be careless and do the right things.  That's why we

21    have experts that point out, you know, people that

22    are in the industry, that are sporting enthusiasts,

107

1    that are in law enforcement, that are in the

2    military, to say these are the best practices.  You

3    know, it may not be that having a gun at all is the

4    best practice for you.  You have to decide that.  And

5    I think the NSSF says that.

6         Q.    And the National Shooting Sports

7    Foundation, their guidelines are for storage of

8    firearms, is that correct?

9         A.    I don't think so, sir.  I think if you

10   really look at this, the first one right off the bat

11   says it's the responsibility of a firearms owner to

12   know how to properly handle your own and to know how

13   to secure your firearms in a safe manner at home.

14   So it goes far beyond that.

15        Q.    It's about securing them safely?

16        MR. WOODS:  Objection, it

17   mischaracterizes.

18        A.    That's part of it, but I think they go

19   into much more depth than that.

20        Q.    Now, you reference the fact that you and

21   your partner went to a Gander Mountain store and a

22   Dick's Sporting Goods.  How do you pick these stores?

Joseph J. Vince, Jr.                                              September 16, 2011
                          Washington, D.C.

108

1        A.     Well, they were choosing -- excuse me.

2    They were chosen because both of those businesses

3    operate in the State of Illinois, both Gander

4    Mountain and Dick's.  And so they're people that

5    have been selling firearms in the State of Illinois

6    for a long time.

7               And I think they're representative -- they

8    represent large gun dealers who have a lot of volume

9    of firearms of various types that sell to the public,

10   as well as all the other equipment and safety

11   equipment and others that firearms owners and users

12   buy and deal in.

13       Q.     Now, the clerks that you approached in

14   these stores, do you know how old they were?

15       A.     I don't specifically know how old, but I

16   would say that the gentleman in Gander Mountain was

17   probably in his 50s and the gentleman, the clerk at

18   Dick's Sporting Goods was probably in his late 20s

19   or early 30s.

20       Q.     Now, turning to page 11 of your report, in

21   the first full paragraph in the second sentence you

22   say, "In both Gander Mountain and Dick's Sporting

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

109

1   Goods, we found that every firearm racked or in a

2   display case had a trigger lock affixed."  And then

3   you report that you asked why this was so he, and

4   "The simple answer by each clerk was a resounding,

5   quote, it works."  And what it works for is ensuring

6   that those guns were not stolen or used by a deranged

7   customer, as in the next paragraph, isn't that right?

8        A.    Well, I think you should add, too, on

9   that, that because it has happened before where --

10  this is one of the things in our safety manual that

11  we put.  Is to keep the ammunition and the ability

12  of people to come in the store, get a box of

13  ammunition, and load a gun there and use it against

14  you to rob you.  So any -- it's there because we

15  want to keep unauthorized, unintended people from

16  acquiring the firearm.

17        Q.    All right.  Now, let's turn to page 13.

18  Now, in the first sentence and really the only

19  sentence in the first full paragraph on page 13, you

20  state, "My opinion that being able to possess a

21  single loaded firearm in the home provides sufficient

22  protection for self-defense against an attack by an

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

110

1    intruder is also based in part on my law enforcement

2    experience and training."  Is it your opinion that no

3    matter how large an individual's house is, that

4    access to one operable firearm is sufficient for

5    self-defense?

6        A.    Well, let's take a look at it in several

7    ways.  Having loaded accessible weapons throughout

8    the house causes a myriad of problems.  If you're in

9    one location of the house and an intruder comes into

10   the house, now they have access to a firearm that

11   they can use against you.  That's a dangerous

12   situation.

13           The other thing is if you do have

14   visitors, now you can't be assured that somebody

15   going to the bathroom or kids inadvertently seeing

16   something won't pick it up and use it.  Again, you

17   can't be assured that a person not intended to have

18   it has access to it.

19           The other thing in my law enforcement

20   experience is that people that have firearms

21   throughout a residence fully loaded and ready to go,

22   I've really seen three drastic incidents like that.

Joseph J. Vince, Jr.                                          September 16, 2011

Washington, D.C.

111

1    Because I have been around in my law enforcement

2    career people that use guns for hunting and sporting

3    purposes.  I don't see them laying guns, loaded guns

4    around.

5              But what I have found is narcotics dealers

6    do that, because they're worried about being robbed

7    of their dope and guns.  And because that they're

8    doing illegal activity with the drugs, they may have

9    one part that they're packaging it in and they have

10   another part where they let people in, et cetera et

11   cetera.

12             I've also seen gangs, motorcycle groups

13   that have guns laying around like that, because

14   they're always worried about retaliation from other

15   gangs and like criminal activity.

16             And the third one that I have seen of

17   people that do that are people that for better, or

18   lack of a better term, are delusional.  Such as I

19   remember executing a search warrant on an individual

20   who was concerned that aliens and communist Chinese

21   were amassing armies on our borders and this was the

22   way to stop their tanks from coming in there.  And so

112

1    every place, every room in their house had a gun

2    loaded and ready to go easily accessible.

3              So based on that, I would have to say I

4    think it's not reasonable to do something like that.

5    I think you place more harm on yourself than you do

6    good by doing that.

7         Q.    And so I think at the very end, you came

8    to this, you're essentially weighing, on the one hand

9    you're saying look, there are costs and dangers

10   associated with having multiple loaded firearms all

11   over your house, and that's on one side of the

12   ledger.  But you would concede on the other side of

13   the ledger, there could be circumstances, where if

14   you only have one, you might be separated -- the

15   intruder might come between you and your operable

16   firearm and you're not going to be able to defend

17   yourself with that firearm?

18             MR. WOODS:  I'm going to object to the

19   extent you're characterizing his prior testimony and

20   his report.

21        A.    I think my law enforcement experience and

22   training, as well as all these other experts, go to

113

1    the fact that -- and if we deal in facts and

2    evidence, that people, reasonable people with good

3    common sense wouldn't do such a foolish thing.  That

4    would be an absolute foolish thing to keep guns

5    laying around in places that are totally unattended.

6         Q.    All right.  So let's say instead that

7    there was an elderly individual who lacked mobility

8    in a high crime area and they wanted to have two

9    operable firearms, each in a biometric lockbox, so

10   that the intruder would not have access to it.

11   That's not unreasonable, is it?

12              MR. WOODS:  I'll object to the form of the

13   question.

14        A.    Let's see.  Let's go over this.  You have

15   an elderly person who has limited mobility.

16        Q.    Yes.

17        A.    And they want to keep them in a lockbox.

18   Well, first of all, we have to go back to -- let's

19   go back to the basics.  Okay.  Because you can come

20   up with all kinds of scenarios.  We have to go back

21   to the basics.

22              Is this person going to be even capable of

Joseph J. Vince, Jr.                                         September 16, 2011
                        Washington, D.C.

114

1    using the firearm properly?  That's the first

2    element.  And without knowing that, how can we ever

3    make any assumptions on what you're saying?  So there

4    is too many parameters to come up with these -- you

5    know, if this or if that.

6         Q.    We're going to nail this down.  Okay?  So

7    let's say this is someone who is highly proficient

8    with firearms, okay, they know how to use it, they're

9    properly trained, they're properly licensed, they go

10   to the range frequently, there is no question about

11   their proficiency, they just are not as nimble as we

12   used to be, and they live in a high crime area, so

13   they want to have one gun secured in a biometric

14   locks box in their living room and a second one in

15   their bedroom.  As an expert in firearm safety, would

16   you agree that's a prudent, there is nothing per se

17   unreasonable about that?

18        A.    I think the reasonableness of what you're

19   saying, if somebody is that afraid of something

20   happening, then why don't they do what the City of

21   Chicago ordinance says, and that's just wear a

22   holster with the firearm.  Then you have it with you

Joseph J. Vince, Jr.                                            September 16, 2011
                            Washington, D.C.

                                                                          115

1    at all times.  You don't to have to reach for it,

2    you don't have to fall for it, you have it.  The

3    ordinance allows you to do that.  I think whether

4    you're nimble or not, to run somewhere, the

5    ordinance allows you, if you fear that much.

6              On the other hand, what I teach not only

7    to students, law enforcement personnel and citizens

8    alike is don't make yourself a victim.  That's the

9    first safety in security.  You know, there is other

10   means besides firearms to look at that can really

11   help you not to be a victim.  And I think people such

12   as what you're saying should avail themselves.  Look

13   around, how do I secure my residence as well.  That's

14   the first thing to do.

15             But again, in the Chicago ordinance, if

16   you want to use a firearm, you're perfectly legal to

17   do that, so holster it and carry the gun wherever you

18   are.  You don't have to worry about going out and

19   doing something.

20        Q.   Wouldn't that be more unsafe, always

21   having the loaded firearm on your person, than having

22   two biometrically secure firearms in your house?

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                              116

1       A.    I don't know.  There is probably -- you

2    know, you have to weigh individuals and

3    circumstances.  You know, this is a what-if

4    question.  You know, we could go on and list all

5    afternoon scenarios, what if this and what if that,

6    and I don't think we're going to get down to the

7    real -- the real answer to your question is the

8    Chicago ordinance certainly allows individuals the

9    right to an operable weapon on their person and

10   anywhere -- however it suits them, they can have an

11   operational weapon.

12           Now, are people going to do what it shows

13   on movies and TV shows and in comic books, where

14   somebody is firing two guns at once?  No.  Experts

15   don't do that.  That would be a foolish thing to do.

16   You're not going to be accurate, the chance of

17   hurting yourself and other is great.  So what's the

18   point here?

19           The point is you have access to one

20   operable weapon.  And in my experience and studies,

21   what we've seen in police shootings is that shootouts

22   occur at a close range in a short period of time.  So

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

117

1    that being the case, having that operable weapon

2    is -- I don't know what else you would need.

3         Q.    I want to go back to my question.  I'm not

4    asking what the Chicago ordinance allows.  I'm asking

5    for your expert opinion, and if you don't have one,

6    that's fine.

7             But my question is do you have an expert

8    opinion on whether between one scenario in which an

9    individual is carrying a loaded operable firearm on

10   their person at all times as compared to a second

11   scenario where that individual has two loaded

12   firearms each biometrically secured in a lockbox, as

13   to one of those is safer than the other in terms of

14   less likelihood of an accident?

15            MR. WOODS:  Let me just say a couple

16   things.  One is I am objecting to the form, it's a

17   hypothetical.  And I'm also objecting because it's

18   beyond the scope of his expert report and what he's

19   been tendered to address.

20        A.    What I said is there are too many

21   variables to make a comment on.  You're using such a

22   wide scenario.  We have to judge who that individual

Joseph J. Vince, Jr.                                    September 16, 2011
                      Washington, D.C.

                                                                    118

1   is, what's happening.  So I don't think anybody, no

2   matter me or anybody other expert in law

3   enforcement, can say, yeah, that's exactly right or

4   that is exactly wrong, because there are too many

5   variables in what you say.  You're dealing with

6   individuals.  It's not we're dealing with an

7   automobile or something that, you know, science of

8   mechanics, we're dealing with individuals here.

9       Q.    Would you agree that the more frequently

10  an individual carries a loaded firearm on themselves,

11  the higher likelihood there is of an accidental

12  discharge, all other things being equal?

13            MR. WOODS:  The same objections.

14      A.    All other things being equal.  What do

15  you mean by all other things being equal?

16      Q.    I mean that it's the same person, so you

17  don't have to -- it's the same person, the only

18  difference is wouldn't you expect to see that for any

19  particular individual, the more they carry a loaded

20  firearm on themselves, the higher the rate of

21  discharge -- of accident?

22            MR. WOODS:  The same objections.

Joseph J. Vince, Jr.                                                September 16, 2011
Washington, D.C.

119

1       A.      I think you make the case for the Chicago

2   ordinance, because that's exactly why the ordinance

3   says keep your guns locked and secure.  That's why

4   the National Shooting Sports Foundation says unless

5   you're going to use this gun, keep it locked, keep

6   the ammunition in a separate place and secure it.

7   That's your best bet for home safety.

8           And you talk about home safety, let's go

9   back, and it says exactly what the NSSF says, "Nearly

10  all firearms accidents in the home can be prevented

11  simply by making sure that guns are kept unloaded and

12  locked with the ammunition secured in a separate

13  location."  So if we're talking about gun safety,

14  that's the best way to do it.  End of discussion.

15  That he was the best way to do it.

16          If you are worried about accidental

17  discharges, then you shouldn't be carrying a gun,

18  maybe you shouldn't have a loaded gun.  Maybe you

19  should do what NSSF says.  That's the best, safest

20  way.

21      Q.      As between -- but let's say there is a

22  third way, because you've talked about the safety of

Joseph J. Vince, Jr.                                September 16, 2011
                        Washington, D.C.

                                                              120

1    carrying a firearm.

2         A.    Yes, sir.

3         Q.    But if you have a loaded gun in a safe

4    that is biometrically secure, isn't that a reasonably

5    prudent method of securing a firearm?

6         A.    Well, what I'm saying -- what I said is

7    that the City of Chicago ordinance allows an

8    individual, they make that decision, not the city,

9    not you or not I or not some hypothetical, you make

10   that decision what you're comfortable for.

11        I'm saying what the experts say, if you

12   want to make sure you don't have accidents in your

13   home, if you want to make sure that your family is

14   protected, then don't have people that can get to

15   unauthorized operable weapons.  And if you are

16   worried about accidents, they all could be prevented

17   if people locked them up with the ammunition

18   separately.

19        So that's the answer to your question.

20   Not can we come out with something off the wall, no,

21   that's not it.  The answer to the question is you

22   make the decision, the city allows you to do that.

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

                                                              121

1    If you choose to do that, then do it the best way

2    that you think works for you.  But the experts are

3    saying the best way is to keep it locked up.

4         Q.    You will concede that there will be

5    certain instances under the Chicago ordinance where

6    an individual is separated from their one operable

7    firearm because an intruder will come between that

8    individual and their firearm, that's possible, isn't

9    it?

10            MR. WOODS:  Objection, incomplete

11   hypothetical, it calls for speculation.

12        A.    You know, I don't know of any instance

13   that that has occurred.  But anything is possible.

14            However, again, the ordinance allows an

15   individual to go into the bedroom and take that

16   firearm into the bedroom with them at night.  If they

17   get up in the morning and they want to have a cup of

18   coffee, they can take that firearm with them.  If

19   they want to go to the bathroom, they can take that

20   firearm with them.  But to leave guns, loaded guns

21   laying around so if an intruder gets into your home

22   and has access to one of your guns -- I mean, we just

122

1    brought up and talked about how law enforcement is

2    alarmed at the number of officers who have their guns

3    used on them that they worked very hard in training

4    scenarios and having equipment to make sure that

5    doesn't occur, because of the numbers of it

6    happening.  Why wouldn't we not -- why would we want

7    citizens to do something that would harm them more

8    seriously and more times than, you know, the scenario

9    you gave?

10        Q.    You keep coming back to the potential harm

11   of an intruder getting access to a loaded firearm and

12   using it against the homeowner.

13        A.    Or a child or a visitor.

14        Q.    Right.  And so I've tried to address that

15   concern by using the biometric safe option.  Let me

16   ask it this way.

17             What safety concern, if any, is there of

18   allowing properly-trained, law-abiding citizens to

19   have multiple loaded guns in biometric lockboxes?

20        A.    The only thing I can say is I have not

21   studied that.  The experts who have say that's not a

22   good thing to do.  That's not the way you want to

Joseph J. Vince, Jr.                                         September 16, 2011
                        Washington, D.C.

123

```
 1   secure your firearms.  If that was the case, then

 2   these experts could come out or the military would

 3   come out, instead of saying you know what, your

 4   M-16, instead of keeping it right here on the base

 5   locking it up, we're going to let you keep it in a

 6   biometric box right next to your bunk.  We don't do

 7   that, they don't do that.  So there has got to be a

 8   reason why they don't do that.  The reason they

 9   don't do it, it's not the safest way for doing it,

10   for everybody concerned.

11        Q.    They say gun safes are the best.

12        A.    Well, they're saying for home storage,

13   correct.

14        Q.    Let me ask you this.  What safety concern

15   would there be of allowing a law-abiding,

16   properly-trained citizen to have multiple loaded

17   firearms within either the same gun safe or different

18   gun safes around the house?  What's the safety

19   concern?

20             MR. WOODS:  Let me just say that you're

21   asking the witness to speculate, it's beyond the

22   opinions that he's given in his report.  Go ahead, if
```

Joseph J. Vince, Jr.　　　　　　　　　　　　　　　　September 16, 2011
　　　　　　　　　　　Washington, D.C.

124

```
1    you can answer.
2        A.    Well, again, I didn't look at the safety
3    concern, although I know of biometric cases, I'm
4    certainly aware of what they can do.  Again, all I
5    can say is the ordinance allows people to have a
6    gun, to have -- to try to shoot two guns at one time
7    doesn't make any sense at all.  If somebody is that
8    afraid, they can take their operable gun anywhere
9    they want.
10           And I just do think it's irresponsible, I
11   think the experts say it's irresponsible to have
12   loaded guns laying around.  Having guns in other
13   places, if you want to have a gun that's trigger
14   locked somewhere else and you're somewhere, it
15   doesn't say you can't open it and load it, either.
16   The ordinance allows for that.
17       Q.    Can you identify any safety concern of
18   allowing an individual to have a loaded firearm in
19   one gun safe and a second loaded firearm in a second
20   gun safe?
21           MR. WOODS:  The same objections.  Go
22   ahead.
```

Joseph J. Vince, Jr.                                    September 16, 2011
                          Washington, D.C.

                                                                    125

1        A.     I don't know what you mean by safety

2    concern.  I don't see it one way or the other.

3        Q.     What do you mean, you don't know what I

4    mean by safety concern?

5        A.     Yeah, what's a safety concern?

6        Q.     Don't you reference safety concerns in

7    your report?

8        A.     Right.

9        Q.     I'm using it the way you're using it.

10       A.     All I'm saying is do what the experts

11   say.  Keep those two biometric boxes, but keep them

12   secured and unloaded and the ammunition in a

13   separate location.

14       Q.     Let me ask you this.  Are you an expert in

15   this area or are you just relying on the other

16   experts?

17       A.     I think my expertise is in criminal use

18   of firearms and safety and storage and whatnot, I

19   think just what we've laid out here.  But what's the

20   safety concern with somebody having guns locked up?

21       Q.     Yes, in two separate safes.

22       A.     All I'm saying is if you live in the City

Joseph J. Vince, Jr.                                                September 16, 2011
                            Washington, D.C.

126

1    of Chicago, that's what the ordinance says, that's

2    what you should abide by.

3         Q.    I'm not asking for a legal opinion.  Okay.

4    Obviously people don't want to go to prison.  I'm

5    asking for your expert opinion on safety matters.

6    And if you don't have an opinion on this, you can

7    just tell me that and we'll move on.  But if you do,

8    I'm entitled to know now so I don't get it at trial.

9         A.    No, I haven't looked at it.  At this

10   point in time, I have no opinion on it.

11        Q.    Just so, because we've had a long

12   colloquy, the "that" that you haven't looked at is

13   what the safety concerns would be on having operable

14   firearms in two different safes, gun safes?

15        A.    I think you brought up a lot more than

16   that.

17             MR. WOODS:  Hold on.  Excuse me.  It

18   mischaracterizes his testimony.

19   BY MR. THOMPSON:

20        Q.    Let me just ask it so the record is clear.

21   Do you have an expert opinion on what the safety

22   concerns would be of allowing law-abiding,

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                              127

1      properly-trained citizens to have two operable

2      firearms in two separate safes?

3                MR. WOODS:   The same objections.

4        A.     The problem I would have is now you have

5      another operable firearm in another location that

6      can be unattended and can even be stolen or broken

7      into like that.  Again, it's not -- the operable

8      firearm that a person has, what I'm saying is if you

9      have an operable firearm, you better have control of

10     it, you better know where it's at and make sure

11     unintended people can't get it.  So having more than

12     that, that is a problem.

13       Q.     Doesn't a gun safe ensure that someone

14     can't get access to it?  That's why the NSSF said gun

15     safes are the best?

16       A.     Right.

17                MR. WOODS:   Objection to the form --

18     excuse me, hold on.  I'm sorry.  I'm objecting to the

19     form of the question, a vague term, it's kind of --

20     by safe, you mean a biometric safe or are you talking

21     about --

22                MR. THOMPSON:   I'm not talking about --

Joseph J. Vince, Jr.                                      September 16, 2011
                        Washington, D.C.

128

1    I'm saying any safe.

2                MR. WOODS:  The objection stands.  Go

3    ahead.

4    BY MR. THOMPSON:

5        Q.    And so just so that the record is clear,

6    you're saying your concern about allowing an

7    individual to have an operable firearm in a gun safe

8    is that the criminal might run away with a

9    thousand-pound safe or break into the thousand-pound

10   safe, what's the safety concern?

11       A.    I'm saying that nearly all firearms

12   accidents in the home can be prevented simply by

13   making sure that guns are kept unloaded, locked up,

14   with the ammunition secured in a separate location.

15   And the reason that that's the best practice is

16   because it works.

17               Now, why would you want to go against

18   something that, a recommendation by people who are in

19   the industry, who are firearms dealers, who are the

20   experts, why would you want to go against what they

21   think is the best way to go to prevent accidents?  Or

22   do you want to up and increase the chance of you

Joseph J. Vince, Jr.                                          September 16, 2011
                          Washington, D.C.

                                                                    129

1    having an accident or seriously injuring someone or

2    somebody else getting your gun and injuring somebody

3    else?  That gives you the parameters to go by.

4         Q.    So the safety concern, just so the record

5    is clear, the safety concern you're identifying of

6    allowing multiple firearms in multiple safes is that

7    an intruder might what?

8              MR. WOODS:  Objection to the form, it

9    mischaracterizes his testimony.

10        A.    Again, there is too many parameters on

11   that.  I'm saying the best practice is to have your

12   firearm, making sure that the guns are kept unloaded

13   and locked up with ammunition secured in a separate

14   location.  I think if you follow that, that's the

15   best safety concern that you can have by not having

16   something happen.  It's too late after it happens.

17             So the experts are saying, nearly all

18   firearms accidents would be eliminated, prevented by

19   simply making sure that guns are kept unloaded and

20   locked up with the ammunition secured in a separate

21   location.  That's my testimony, that this is the best

22   practice.

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                                130

1              Now, if you want to add something else and

2    up it -- don't you think the Chicago ordinance is

3    best, because it follows exactly when the experts

4    say?

5        Q.    It does not.  It allows people to go

6    around with an operable firearm.  It does not follow

7    these, does it?

8        A.    And all others are secured.  And I'm

9    saying if you want to even do better than that at

10   home, if you want to be at the best, follow this

11   practice.

12       Q.    So your testimony is clear you think this

13   is the best.  Now, I want to go to a different

14   alternative and I want you to tell me why this is not

15   as good.  Which is two safes, each with an operable

16   firearm in them.

17       A.    Why is that not as good as what?

18       Q.    As what you said is the best.

19       A.    Well, again, if you have operable

20   firearms, you are upping the chance of somebody

21   inadvertently getting ahold of the firearm.  If you

22   have one to take care of, which the city ordinance

Joseph J. Vince, Jr.                                    September 16, 2011
Washington, D.C.

131

1     allows you.  But again, that's what the law says

2     that you should have and it allows a citizen to have

3     all the means they want to protect themselves as

4     well.

5          Q.    All right.  Now, let's turn to page 14.

6     You say that in the last sentence of the first full

7     paragraph, "Preventing intruders and criminals from

8     access to loaded firearms is the best protection from

9     serious injury or death during a crime."  Now, one

10    way to be absolutely sure that a criminal or intruder

11    will not gain access to a loaded firearm is not to

12    allow any firearms at all, is that correct?

13         A.    Well, I think we go back to what NSSF

14    says, "If you must have quick access to a loaded

15    firearm in your home, you need to take special

16    safety measures.  Keeping a gun to defend your

17    family makes no sense if that same gun puts your

18    family members or visitors in your home at risk.

19    Many home firearm accidents occur when unauthorized

20    visitors, individuals, discover loaded firearms that

21    were carelessly left out in the open."

22              Now, the other thing is if a firearm is

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                              132

1    left for an intruder to use on you, your own firearm,

2    then you're putting yourself at risk.

3         Q.    Do you think individuals in Chicago would

4    be safer if they were allowed to have one operable

5    firearm or zero operable firearms?

6              MR. WOODS:   Objection to the form of the

7    question.

8         A.    All I'm saying is that the city ordinance

9    allows a person to make a decision whether they want

10   to have an operable firearm or not.  I don't think

11   there is any studies been done that says if you have

12   one or 25, what -- so we didn't -- there is no way

13   for us to look at that.

14        Q.    Now, you say, "Preventing intruders and

15   criminals from access to loaded firearms is the best

16   protection from serious injury or death."  Another

17   way is to try to deter the crime from taking place at

18   all?

19        A.    Absolutely.

20        Q.    Yes.  And are you aware of any instances

21   in which individuals have been able to deter an

22   attack by, for example, brandishing a weapon?

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

                                                                      133

1        A.      That has happened, yes, sir.

2        Q.      Sometimes they're able to deter an attack

3    by brandishing a weapon even without discharging a

4    weapon, is that correct?

5        A.      Yes, sir, that's occurred.

6        Q.      Okay.  Now, on page 14 you report the

7    number of times measured in seconds that your

8    colleague, I apologize, Mr. Nunziato.

9        A.      Yes, Nunziato, yes, sir.

10       Q.      That he performed in unlocking these

11   various mechanisms.  Now, what is your colleague's

12   background?

13       A.      Mr. Nunziato was a special agent with

14   ATF, probably for a little longer than I was.  I

15   can't remember the exact years he had on the job.

16   He performed duties as a technician as well in

17   our -- I'm trying to remember the name of the

18   branch, technical branch, which had a lot to do with

19   procurement of firearms and other devices that

20   agents use.  He also was the special agent in charge

21   of the National Tracing Center for about ten years.

22       Q.      Do you consider him to be proficient in

Joseph J. Vince, Jr.                                        September 16, 2011
                        Washington, D.C.

134

1     the handling of firearms?

2          A.    You know, as much as a special agent

3     was -- I don't remember Mr. Nunziato being a hunter

4     or a sports shooter, but he carried a gun as an

5     agent and was trained as an agent.  And he retired

6     at the same time I did, so I would think that he

7     would be rusty, as I would, because we haven't

8     trained like we used to as agents.

9          Q.    Now, how old is he, approximately?

10         A.    I hope I'm not embarrassing him.  I think

11    it's 65.

12         Q.    Is it true that people's reaction time

13    becomes slower as they become older?

14         A.    Do you really want an old guy like me to

15    admit that?  I think what happens is that if you

16    don't perform repetition actions that you need to,

17    you become unskilled at any age.

18         Q.    Mr. Nunziato was performing this exercise

19    in a well-lit room, is that right?

20         A.    I assume so.  I don't think he did it in

21    the dark.

22         Q.    Okay.  And he wasn't woken out of a deep

Joseph J. Vince, Jr.                                         September 16, 2011
                        Washington, D.C.

                                                                    135

1    sleep right before he performed this, was he?

2         A.    No, sir, he was not.

3         Q.    Okay.  And in fact, the test was taken

4    during the daytime, is that right?

5         A.    I'm not sure if it was or was at night,

6    but it was done indoors.

7         Q.    Does your colleague wear glasses?

8         A.    Yes, sir, he does.

9         Q.    Did he have his glasses on when he

10   performed the test?

11        A.    I assume.

12        Q.    Okay.  He didn't have to take time to

13   reach for his glasses, let alone find his glasses

14   case, did he?

15        A.    No, sir, I don't believe so.

16        Q.    Was he in a life-threatening situation

17   when he took the test?

18        A.    No, sir, he was not.

19        Q.    When some people are in a life-threatening

20   situation, do they perspire?

21        A.    Yes, sir.

22        Q.    Would you expect that to degrade

136

1     somebody's performance if they are sweating and

2     trembling while they're doing this?

3          A.     I wouldn't know that, sir.  We didn't

4     test for that.

5          Q.     Where was the ammunition during these

6     tests?  Was there ammunition in the guns?

7          A.     No, sir.  He took the trigger lock off

8     and we did the tests according to what the

9     manufacturers say to do, which is not -- put a

10    trigger lock on a loaded weapon, and then he loaded

11    the weapon as well.

12         Q.     Is the loading of the weapon included in

13    this time?

14         A.     Yes, sir.

15         Q.     And was the ammunition right next to him

16    or did he have to go to a different room or a

17    different safe to get the ammunition?

18         A.     No, sir, it was right there.

19         Q.     Is that best practices, in your opinion,

20    to have the ammunition right next to the firearm?

21         A.     If you're securing your weapon in your

22    house, that would be best practices to make sure

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

137

1    there aren't any inadvertent acquisition of a

2    firearm or accidents with the firearm.

3        Q.    I thought the best practices, according to

4    you, was to keep the ammunition separate from the

5    firearm?

6        A.    Well, you are saying this is what we did

7    for the test.  That's all I'm saying.  That's what

8    we did for the test, to time it.

9        Q.    Okay.  So now I'm switching gears.  I'm

10   saying to try to figure out how applicable this test

11   would be for a law-abiding citizen who read your

12   report, took it to heart and said that's what I'm

13   going to do.  You would tell that law-abiding citizen

14   don't keep that ammunition right next to the gun,

15   wouldn't you?

16       A.    That's what I do in my own house, sir, I

17   don't have ammunition next to my guns.

18       Q.    That's right.  Now, does your colleague

19   suffer from arthritis?

20       A.    I don't know.

21       Q.    Okay.  Does he suffer from Parkinson's

22   disease?

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

138

1       A.      Not that I'm aware of.

2       Q.      Are you aware some people with when they

3   have Parkinson's disease, they tremor?

4       A.      I'm aware of that.

5       Q.      Do you think someone with Parkinson's

6   disease could open these trigger locks as quickly as

7   your colleague did?

8       A.      I wonder if somebody that has problems

9   manipulating should have a loaded gun.

10      Q.      You don't think they should have a loaded

11  gun?

12      A.      I think at a certain age, myself, I know

13  I'm going to have to make a decision on whether I

14  should drive or not.  We all have to do that.  So I

15  don't know that particular circumstance.  Maybe

16  that's something we should look at.

17      Q.      Now, when you say he dropped the key for

18  one of the tests, was -- it was he could see where

19  the key went, right, he wasn't searching in the dark

20  for the key?

21      A.      I don't know one way or the other.  I

22  would assume that.

Joseph J. Vince, Jr.                                                September 16, 2011
                              Washington, D.C.

139

1       Q.    You say on page 14 that, "The safe storage

2    requirements" -- I'm looking at the last paragraph,

3    sir, and it's the third sentence.  And it reads in

4    part, "The safe storage requirements are in accord

5    with the guidelines, practices and recommendations of

6    firearm experts, the United States military, law

7    enforcement agencies, court safety rules and the gun

8    industry itself."  And you're only speaking about the

9    storage requirements, is that right?

10          And I ask it that way, because Chicago

11   allows individuals to have an operable firearm and

12   you're not allowed to have an operable firearm in

13   most courthouses, isn't that right?

14      A.    Yes, you're not in a courtroom, that's

15   correct.  Other than there is loaded firearms by

16   people that are trained to do that.  The same on a

17   military base.

18      Q.    And the reason there are these differences

19   between what Chicago permits and what courtrooms and

20   military bases permit is that there is a different --

21   there is a difference in the purpose?  What the

22   military and the courtrooms are looking at is storage

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

                                                              140

1    and what an individual in a home is looking at is

2    self-defense?

3              MR. WOODS:  I object to the form of the

4    question.

5    BY MR. THOMPSON:

6        Q.    Let me ask it this way.  Aren't there

7    different purposes that serve the ban on guns in

8    courtrooms than the limit to one operable gun in a

9    house, aren't there different purposes at work?

10       A.    I would hope we have all the same objects

11   here -- objectives.  And that is the fact that the

12   protocols are in there to keep people safe from

13   firearms accidents and from people unauthorized to

14   get ahold of firearms, whatever, that's the

15   objective.

16             Now, how is there a difference between

17   what the court and the home, shouldn't that be the

18   same objective?

19       Q.    Isn't there at least one difference in

20   objectives, though?  Because Chicago is trying to

21   empower its citizens, if they choose, they go through

22   the licensing, to defend themselves with a firearm,

Joseph J. Vince, Jr.                                           September 16, 2011
                           Washington, D.C.

141

1    and the court is saying no, you can't do that?

2        A.    Again, I think the court says we will do

3    that, because we'll have that operable gun in there

4    by a trained expert.

5        Q.    Yes.  So that's a difference in the

6    regimes that you're talking about?

7              MR. WOODS:  Objection, mischaracterizes.

8        A.    And the person that is responsible for

9    making the responsibility is making that choice.

10   The city ordinance allows a person to make that

11   choice.

12             MR. THOMPSON:  I see, are we getting close

13   to lunch?

14             MR. WOODS:  Sure.

15             MR. THOMPSON:  I'm happy to go on, but I'm

16   sort of at a natural stopping point.  Let's go off

17   the record.

18             THE VIDEO OPERATOR:  We're going off the

19   record.  The time on the video is 12:11 p.m.

20             (Recess taken.)

21             THE VIDEO OPERATOR:  We're back on the

22   record.  The time on the video is 1:26 p.m.

142

1          MR. THOMPSON:  Mr. Vince, welcome back.

2    I'm going to ask the court reporter actually to mark

3    that as Vince Exhibit 2.

4          (Vince Deposition Exhibit 2 marked for

5    identification.)

6    BY MR. THOMPSON:

7      Q.    Let's turn to page -- this is a transcript

8    of a trial before Judge Weinstein in the Eastern

9    District of New York back in 1999, Hamilton V.

10   Accu-Tek.  Do you recall testifying in this trial,

11   sir?

12     A.    Yes, sir, I do.

13     Q.    Okay.  Let's turn to page 1610, which is

14   about halfway through.  And there was a Mr. Dorr, who

15   was asking you about an Exhibit 574 on line 9.  And

16   he asked you to identify the document.  You said,

17   "These are two copies of the summary and conclusion

18   from the Northeastern study."

19          And then he said, "I think to save time,

20   the jury heard the last paragraph, but that's the

21   paragraph which begins by saying the legal firearms

22   industry in the United States conducts business in

Joseph J. Vince, Jr.                                September 16, 2011
                    Washington, D.C.

143

1    overwhelming compliance with federal rules and

2    regulations."  Actually that was the question.  "Is

3    that correct?"  And you answered, "That's correct."

4             Do you still agree with that sentiment?

5        A.    Well, I think I've already talked about

6    it and I have included that study in my references

7    here in this report.  And what I said earlier, and

8    I'll repeat again, is that 1 percent, really less

9    than 1 percent of the federal firearms dealers

10   account for 60 percent of all the crime guns.  And

11   however, that retail dealers are by far the biggest

12   source for crime guns.  And whether it's through

13   being -- having poor business practices or doing

14   things illegally, that's an issue.  So looking at

15   that percentage, yeah, the majority do, but it's

16   still a really big concern.

17       Q.    And now I want to go back and just clean

18   up a few of the background issues before we polish

19   off going through the report.

20             What year did you found Crime Gun

21   Solutions?

22       A.    I believe it was 1999, sir.

Joseph J. Vince, Jr.                                September 16, 2011
                    Washington, D.C.

                                                              144

1        Q.     Okay.  And who are your largest clients,

2    or who have been since your founding?

3        A.     Well, I would say primarily, if I looked

4    at, you know, it would be victims of crime guns,

5    crime -- gun crimes.

6        Q.     And what services do you provide to them?

7        A.     We provide support, consulting, expert

8    reporting, expert witness for them.

9        Q.     In litigation?

10       A.     Yes, yes, sir.

11       Q.     Okay.  I see.  And have you --

12       A.     Now, let me just finish, though.  We also

13   have had clients, as cities such as Chicago and New

14   York, where we help law enforcement.  We also have

15   worked as expert consultants to the International

16   Association of Chiefs of Police and were considered

17   expert trainers, instructors for them.  We've done

18   that on and off.  I was looking at numbers.  But

19   overall, it's both law enforcement as well as

20   litigation.

21       Q.     Okay.  And has Crime Gun Solutions ever

22   done work for any entity you would consider part of

145

1     the anti-gun lobby?

2          A.     What do you mean by the anti-gun lobby?

3          Q.     All right.

4               MR. THOMPSON:  Let's mark as Vince Exhibit

5     3 this document.

6               (Vince Deposition Exhibit 3 marked for

7     identification.)

8     BY MR. THOMPSON:

9          Q.     And sir, this is a deposition from a case

10    called Niles Gun Show versus, I apologize for

11    mispronouncing this, Cuyahoga County.

12         A.     Cuyahoga.

13         Q.     Cuyahoga County, and in the Northern

14    District of Ohio.  It looks like this deposition took

15    place in Frederick back in 2001.  And directing your

16    attention to page 91 of the document, which again

17    would be about a third of the way through.

18               MR. WORSECK:  It's 91 of the mini?

19               MR. THOMPSON:  Yes, 91 of the mini, that's

20    correct, yes:

21    BY MR. THOMPSON:

22         Q.     Are you there, sir?

Joseph J. Vince, Jr.                                      September 16, 2011
                          Washington, D.C.

                                                                    146

1        A.    Yes.

2        Q.    About line 9, there is a question:

3              "Question:  You had no -- I take it you

4    had no particular conversations with Handgun Control,

5    Inc.?

6              "Answer:  No, sir.

7              "Question:  Or with any other -- we will

8    call them anti-gun lobby?

9              "Answer:  No, sir.

10             "Question:  When I use that phrase, what

11   would you include within that phrase?"

12             Then the lawyers say, "What phrase?"

13   "Anti-gun lobby."  "If you know."  And then you said:

14             "Answer:  I guess it would be anyone of

15   the ilk of handgun control."

16             Handgun Control, Inc. is the predecessor

17   to the Brady Center, is that right?

18       A.    I believe that's correct, sir, yes.

19       Q.    And would you still consider Handgun

20   Control, Inc. and of the Brady Center to be part of

21   the anti-gun lobby?

22       A.    Well, I say that, because I know that the

Joseph J. Vince, Jr.                                    September 16, 2011
                     Washington, D.C.

147

1    mission of the Brady Center is not prohibition of

2    firearms, so we can't say they're against gun

3    ownership, because that's not what they purport to

4    be.  I am not a member of the Brady Center, nor

5    Handgun Control.  And that I am aware of, and I

6    don't handle billing or anything like that, we've

7    never had a contract or never gotten any funds from

8    Handgun Control or the Brady Center or anybody like

9    that.  We've never had a contract with them.

10            MR. THOMPSON:  I would like to ask the

11    court reporter to mark as Vince Exhibit 4 the

12    following document.

13            (Vince Deposition Exhibit 4 marked for

14    identification.)

15    BY MR. THOMPSON:

16        Q.    Sir, this is a doctor that says On Target.

17    And then it says The Impact of the 1994 Federal

18    Assault Weapon Act, it says Brady Center To Prevent

19    Gun Violence, and then it says Data Analysis by Crime

20    Gun Solutions, LLC.  Is that your company?

21        A.    Yes, it is.

22        Q.    And does this refresh your recollection

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

148

1    that you've done work for the Brady Center?

2        A.    Well, when you say done work.  I

3    mentioned a contract.  I don't think we've done a

4    contract.  We've analyzed data without -- free of

5    charge, trying to give them the most accurate and

6    useful information.  Whether it's the new media, law

7    enforcement agencies, we've done data analysis for,

8    where we haven't been paid for.  That I'm aware of,

9    and I can certainly double-check with my partners on

10   this, we were not reimbursed for this.

11       Q.    Okay.  So your recollection was this was

12   done pro bono, essentially?

13       A.    I believe so, yes, sir.

14       Q.    Have you ever done any pro bono work for

15   the NRA?

16       A.    You know, we asked the NRA about -- well,

17   the gun industry themselves about doing work for

18   them and they declined to have us do any work for

19   them.

20       Q.    Yes.  Okay.  Now, you were a founding

21   board member of the American Hunters and Shooters

22   Association, is that right?

Joseph J. Vince, Jr.                                         September 16, 2011

Washington, D.C.

149

1       A.      Yes, sir, that is correct.

2       Q.      And that was from 2005 until 2008, is that

3  right?

4       A.      I believe so, sir.

5       Q.      And that organization was founded to

6  protect the rights and privileges of gun owners, is

7  that right?

8       A.      Yes, sir.

9               MR. THOMPSON:  I would like to ask the

10  court reporter to mark as Vince Exhibit 5 the

11  following document.

12              (Vince Deposition Exhibit 5 marked for

13  identification.)

14  BY MR. THOMPSON:

15      Q.      Okay.  Sir, this is a Washington Post

16  article entitled New Pro-Gun Group Hopes to Draw From

17  the NRA.  It's dated March 18, 2008.  And I would

18  like to direct your attention to the second page

19  where it says, at the top, "The NRA also asserts that

20  Schoenke --

21      A.      Schoenke, Ray Schoenke.

22      Q.      "Schoenke's association is a thinly-veiled

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

                                                                        150

1    front for gun control advocates and offers as proof

2    Schoenke's $5,000 donation to Handgun Control, Inc.,

3    predecessor to the main anti-gun lobby, the Brady

4    Campaign to Prevent Gun Violence."  And then he

5    rejected that assertion, saying he was just giving

6    money that was to a cause important to his wife.

7            Do you recall this controversy?

8        A.    No, sir, I don't.

9        Q.    The next sentence says, "Unfortunately for

10   Schoenke, the Brady Campaign basically agrees with

11   the NRA, quote, I see our issues at complementary to

12   theirs, Paul Helmke, president of the Brady Campaign

13   says about Schoenke's association."

14           How was the American Hunters and Shooters

15   Association, how was their agenda complementary to

16   the Brady Center's?

17           MR. WOODS:  Objection, foundation.

18   BY MR. THOMPSON:

19       Q.    If it was.

20       A.    Well, would you define what you think the

21   Brady Campaign's definition is or mission, and then

22   define what you think the Hunters and Shooters

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                            151

1    definition is?

2       Q.    Well, let me ask you this.  Do you agree

3    with Mr. Helmke, that the two organizations had

4    complementary missions?

5       A.    If everybody has public safety in mind,

6    then I guess that would be complementary.

7       Q.    All right.

8             MR. THOMPSON:  I would like to ask the

9    court reporter to mark the next document as Vince

10   Exhibit 6.

11            (Vince Deposition Exhibit 6 marked for

12   identification.)

13   BY MR. THOMPSON:

14      Q.    And this is an amicus brief that was put

15   in in the Heller case in the Supreme Court on behalf

16   of a variety of organizations, including the American

17   Hunters and Shooters Association.

18            And directing your attention to the very

19   last page --

20      A.    Excuse me, sir, could I just ask, what's

21   the date of this brief?

22      Q.    That is a good question.  We can tell from

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

                                                                    152

 1    the docket number that it was either late 2007 or

 2    early 2008.

 3         A.    Okay.

 4               MR. WOODS:  We know the case was filed in

 5    2007.

 6               MR. THOMPSON:  We know the opinion came

 7    out in June of 2008.  So it's in that time frame.

 8    BY MR. THOMPSON:

 9         Q.    And then turning to the very last page, it

10    says --

11         A.    That's page 24?

12         Q.    Yes, sir.  It says in the second sentence,

13    full sentence, "Amici believe that the District" --

14    that's Washington, DC -- "gun law was a laudable

15    effort."  Do you agree that Washington, DC's ban on

16    handguns was a laudable effort?

17               MR. WOODS:  Objection to form.  Also

18    beyond the scope of what he's been offered for as an

19    expert in this litigation.

20         A.    Although I think that's an interesting

21    question, I haven't seen any studies on it and I

22    haven't studied it myself.

Joseph J. Vince, Jr.
Washington, D.C.
September 16, 2011

153

1      Q.    So you don't have an opinion?

2      A.    No, I just said I haven't looked at it to

3  have an opinion of it.  You know, I have been able

4  to trace guns in Washington, DC, and crime guns at

5  the time didn't come from Washington, DC, they came

6  from Virginia and Maryland, primarily.

7             MR. THOMPSON:  I would like to ask the

8  court reporter to mark the following document as

9  Vince Exhibit 7.

10            (Vince Deposition Exhibit 7 marked for

11  identification.)

12  BY MR. THOMPSON:

13     Q.    And sir, this is a document from the

14  National Shooting Sports Foundation.  And it's

15  discussing -- it's a fact sheet about the American

16  Hunters and Shooters Association.  And if we turn to

17  the second page, there is a header for Ray Schoenke,

18  president of the American Hunters and Shooters

19  Association.  And it talks about how he and his wife

20  and his daughter and son have been generous donors of

21  Al Gore, Barbara Boxer, Bill Clinton, Dianne

22  Feinstein, Ted Kennedy, Carolyn McCarthy and John

Joseph J. Vince, Jr.                                                September 16, 2011
                              Washington, D.C.

                                                                          154

1    Kerry.  The NSSF characterizes those politicians as

2    anti-gun candidates.

3               Would you agree that they are anti-gun

4    officials?

5               MR. WOODS:  Objection, foundation.

6        A.    I have no --

7               MR. WOODS:  Irrelevant.

8        A.    I have no idea.  And because somebody

9    says something, I don't know what that would mean,

10   so.

11       Q.    Okay.  Now, it says under your name in the

12   second bullet point, it says his, that's yours, your

13   company, "Crime Gun Solutions, employs a number of

14   other ex-ATF officials, including Gerard Nunziato,

15   who told the Houston Chronicle that, quote, if it

16   wasn't for criminals, there wouldn't be a gun

17   industry in this country."

18       A.    I'm sorry, will you tell where that is

19   again?

20       Q.    Sure, it's on page 2, and at the bottom of

21   the page there is -- your name appears.

22       A.    Okay.

155

1        Q.      And then there is a second bullet point.

2        A.      I see what you're saying, yes.

3        Q.      Just take a moment to review that.

4                THE VIDEO OPERATOR:   This concludes tape

5    number three in the video deposition of Joseph Vince.

6    The time on the video is 1:43 p.m.  We are off the

7    record.

8                (Recess taken.)

9                THE VIDEO OPERATOR:   This begins tape

10   number four from the video deposition of Joseph

11   Vince.  The time on the video is 1:44 p.m.  We are on

12   the record.

13   BY MR. THOMPSON:

14       Q.      Do you know whether your partner ever made

15   this statement, if it wasn't for criminals there

16   wouldn't be a gun industry in this country?

17       A.      First of all, I've never seen this from

18   the National Shooting Sports Foundation prior, at

19   least to the best of my recollection.  And I think

20   some of this is outlandish, "the architect of the

21   Clinton/Gore regulatory assault on the Second

22   Amendment."  That would be really -- that would be

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

                                                                      156

1    really something, if that would be the case, which

2    it isn't.  And I don't know that Mr. Nunziato ever

3    said that.  I'm not aware of it.  He's certainly

4    never said that to me.

5         Q.    Regardless of whether he said it or not,

6    do you agree with the statement that if it wasn't for

7    criminals, there wouldn't be a gun industry in this

8    country?

9         A.    No, I don't agree with that statement.

10             MR. THOMPSON:  Now, I would like to ask

11   the court reporter to mark as Vince Exhibit 8 the

12   following document.

13             (Vince Deposition Exhibit 8 marked for

14   identification.)

15   BY MR. THOMPSON:

16        Q.    Now, Mr. Vince, remind me, what is your

17   position or affiliation with Mount St. Mary's

18   University?

19        A.    I'm the director of the criminal justice

20   program.

21        Q.    And this is something that we found on the

22   website of the university under the criminal justice

Joseph J. Vince, Jr.                                          September 16, 2011
                           Washington, D.C.

                                                                    157

1    section.  And the very first point is, "There can be

2    no criminal justice without a commitment to the

3    practices of social justice."  Do you know what is

4    meant by social justice?

5              MR. WOODS:  Let me just object on

6    foundation grounds.

7         A.    Well, I think being fair, just and

8    ethical to all.  I think it also means very much

9    what our country stands for and our Constitution.

10   And we have to have -- you know, we have to go by

11   those values that we hold dear in the Constitution.

12        Q.    Do you consider yourself an advocate for

13   social justice, as you've defined it?

14        A.    I consider myself a proud, loyal

15   American.

16        Q.    Now, you're a member of the IACP?

17        A.    That is correct.

18        Q.    And remind me what the AICP is?

19        A.    International Association of Chiefs of

20   Police.

21             MR. THOMPSON:  I would like to ask the

22   court reporter to mark as Exhibit 9 the following

                                                              158

1    document.

2              (Vince Deposition Exhibit 9 marked for

3    identification.)

4    BY MR. THOMPSON:

5        Q.    So this is a press release from the IACP

6    dated July 21, 2009.  In the second full paragraph,

7    it says, "The IACP is strongly opposed to" -- there

8    has been legislation.  Then it continues, "It is the

9    IACP's belief that states and localities should have

10   the right to determine who is eligible to carry

11   firearms in their communities."

12             Do you agree with that statement?

13             MR. WOODS:  I'm going to object on

14   foundation grounds.

15       A.    As far as exactly what they're saying on

16   the eligibility to carry firearms, I think people

17   should, as they're saying here, legally carry

18   firearms based on what the locality prescribes by

19   that.

20       Q.    Okay.  Now, let's go back to the report to

21   page 15, I think we were at.

22             And under heading C, in let's see, the

159

```
 1   first sentence of text after you've quoted the

 2   ordinance, you say, "We have been asked to comment on

 3   why it may not be in the best interests for firearms

 4   to be sold within the Chicago city limits."  Whose

 5   best interests are you talking about, first

 6   responders, the public?

 7        A.    Well, I think any law has to cover all

 8   citizens, regardless of age, gender, race and

 9   certainly public -- first responders are citizens,

10   just like everyone else.

11        Q.    Well, it covers everyone.  But sometimes

12   when you pass a law, you are going to help one group

13   and you're going to hurt another group, right?

14             MR. WOODS:  Objection, broad.

15        A.    I don't think when we're talking public

16   safety, that is the case at all.

17        Q.    Well, so just to make sure the record is

18   clear, whose interests were you considering when you

19   considered the best interests?

20        A.    Well, you asked one law helps one and

21   hurts the other.  I don't see that.  I mention in

22   the report about the use of seat belts and other
```

Joseph J. Vince, Jr.                                    September 16, 2011
                    Washington, D.C.

                                                              160

1    safety equipment in a vehicle and that the industry,

2    certain manufacturers were very upset about that and

3    complained at the time.  And those are the same

4    manufacturers now that tout that we have five-star

5    ratings on our vehicles.  So I don't see it that

6    way.

7         Q.    Now, you say in the -- the paragraph that

8    starts Chicago's restriction.  Do you see that?

9         A.    Yes, sir.

10        Q.    And then if you go down to the next

11   sentence, about halfway through it, it says, "It has

12   repeatedly become apparent that only those firearm

13   policies that include a strong prevention element,

14   along with intervention and enforcement, can truly

15   have success in reducing firearms violence for all

16   citizens."  Have you been involved in the formulation

17   of any policies that have had some degree of success

18   in reducing firearms violence?

19        A.    I want to make sure I'm responding

20   properly.  But I would say that in working with the

21   Boston Police Department in the Boston project in

22   the '90s, which had an enforcement policy of

Joseph J. Vince, Jr.                                                    September 16, 2011
                          Washington, D.C.

161

1    enforcing the law as well as preventing and

2    intervening the access of firearms for criminals,

3    especially in this case, the emphasis on juveniles

4    and adolescents, and I think it absolutely had a

5    huge success.  When you go down from the amount of

6    shootings that they had to zero for 26 months, I

7    think that's a huge success.

8         Q.    What were the building blocks or the

9    cornerstones of that program?

10        A.    Well, the cornerstones were that

11   certainly if individuals were caught with guns that

12   they had illegally, that they were prosecuted, and

13   even their prosecution was publicized.  But on the

14   other hand, an effort was made to trace every

15   firearm that was recovered and find where the

16   sources of the firearms were and to interdict

17   those -- or cut those sources off from supplying the

18   guns.  So again, I think we see this in other

19   enforcement activities that have been successful,

20   too.

21        Q.    And what was the rate of -- ballpark, if

22   you recall, how many homicides in a year were there?

Joseph J. Vince, Jr.                                          September 16, 2011
                      Washington, D.C.

162

1    You know, you said it went to zero over a 26-month

2    period.

3         A.    Obviously I can remember zero, because

4    zero is zero.

5              MR. WOODS:    Let me just object to the

6    question, because I think it mischaracterizes his

7    testimony.

8         A.    What they had before, I don't recall.

9         Q.    It was significant?

10        A.    It was alarming to that community.

11        Q.    Do you know of any other communities that

12   have taken that same approach that Boston had in the

13   '90s and deployed it and whether they were

14   successful?

15        A.    I know of people that were very

16   interested in it.   Whether they employed it in the

17   same fashion or what the results were, I don't know.

18        Q.    Have you ever heard of something called

19   Project Exile in Richmond?

20        A.    Yes.  As a matter of fact, I'm looking at

21   that right now.

22        Q.    All right.  So what's your understanding

163

1   of that right now?

2       A.   Well, again, that's a strict enforcement

3   of people that utilize firearms.

4       Q.   Is that an effective strategy?

5       MR. WOODS:  Object to the question.  It's

6   also beyond the scope of his testimony in this case.

7       A.   I just started to look at it.

8       Q.   Let's turn to page 16.  You say in the

9   first full paragraph, second sentence, "I know from

10  my experience that when firearms sales are allowed to

11  occur, firearms frequently fall into the hands of

12  criminals or others who are not lawfully qualified to

13  possess them."  Isn't it possible that same thing

14  will happen even if you have a ban on handgun sales?

15      A.   Okay.  Try that one more time.

16      Q.   Sure.  Isn't it possible that even if you

17  have a ban on sales of firearms, that criminals would

18  be able to gain access to firearms?

19      MR. WOODS:  I just want to object to the

20  question as it calls for speculation.  It's an

21  incomplete hypothetical.  It's beyond the opinions

22  he's been asked to render in this case.  But go

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                                    164

1    ahead.

2        A.    I want to make sure I understand what

3    you're saying.  So you're saying that since we're

4    always going to have bank robberies, then we really

5    shouldn't take action about putting cameras in

6    banks, training the employees to look at, having

7    money that explodes, because we're always going to

8    have bank robberies, so why put all that effort into

9    it and why have bank robbery laws?

10       Q.    Can you point to a single jurisdiction in

11   the United States that has banned the sale of

12   firearms and where it has had a positive effect on

13   firearms-related violence?

14           MR. WOODS:  And again, that's beyond the

15   scope of his retention in this case.

16       A.    I have not looked at that, sir.  I've

17   never looked at that.

18       Q.    Okay.  Now, let's look down this paragraph

19   where in the last sentence you say, "Along with this,

20   my years of experience in tracing and researching

21   crime guns has made me well aware of corrupt or bad

22   business practices of firearm dealers that result in

165

1   large numbers of firearms entering the illegal

2   market." What are the corrupt, bad business

3   practices that you're referring to here?

4      A.    Well, again in the report, we refer to

5   the New York investigation. I think we can also

6   refer to Operation Gunsmoke that the Chicago police

7   department had. Some of those are on -- to me,

8   they're tantamount to corruption, as well. But

9   because a dealer has to be very, very sure when he

10  sells a firearm.

11      In the Chicago incidence, officers went in

12  there and portrayed themselves as being criminals

13  that were going to perform criminal activities and

14  needed guns and they were sold the weapons. Again,

15  that's obviously against the Gun Control Act. I

16  think they should be prosecuted for that.

17      I've also seen, and it's been on

18  well-documented videotapes, both audio and visual,

19  when New York went down and two people walked in the

20  store, one person approached the counter, the other

21  person so divested of it, could have been outside.

22  And when the sale was going to be consummated and the

166

1    individual paper work for the particular firearm was

2    going to be completed and a background check done,

3    they said stop, bring the other person over to do

4    that aspect of it, obviously straw purchase, that's

5    an illegal sale and that shouldn't be made.

6               Because we had so many of those sales,

7    that puts the public at danger, because in fact

8    again, we're making access to criminals or people

9    that are prohibited from having those.

10        Q.    That almost sounds like just illegal

11   conduct maybe as opposed to a bad business practice.

12   If someone comes in and says I'm a criminal, I want a

13   gun to commit a crime, isn't that illegal to sell

14   them a gun?

15              MR. WOODS:  Objection to the form of the

16   question.

17        A.    I think it's more than that.  I think the

18   don't lie for the other guy, which the NSSF and ATF

19   put out.  Again, the industry has said that it's up

20   to the responsibility of the dealer to do everything

21   you can to ensure that the person doesn't get it.

22   So even if you're not knowledgeable, if crime guns

167

1    are spewing from your store, the same as if we had

2    guns spewing from -- or drugs spewing from a

3    drugstore, we have to find the reason that's

4    happening and stop it.

5         Q.    You've identified I guess two reasons I

6    think.  Number one, some materials are just selling

7    to essentially self-avowed criminals.  Two, straw

8    purchases.  Any other bad business practice or

9    corrupt practice that you're referring to in this

10   paragraph?

11        A.    Well, we could talk about a lot of bad

12   business practices.  I didn't -- we know this is out

13   there.  I think all the reports that I put in here

14   outline those.  All the Youth Crime Interdiction

15   reports, Following the Gun, all the ones that are in

16   there outline the various techniques or practices

17   that we've seen do this.  So I mean, we can go in

18   there and we can take a look at all those and talk

19   about them, but there is a myriad of them.

20        Q.    Do you recall what any of the others are

21   other than the two we've discussed?

22        A.    Well, if we want to talk about not

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

168

1    reporting multiple sales, when multiple sales of

2    handguns are made.  When we're talking about selling

3    guns under the table.  When we talk about not

4    adequately taking care of them, doing inventories.

5    So that if an employee is stealing guns, you're

6    not -- you're not aware of it and can report that in

7    a timely fashion.  Not securing your store so that

8    it's easy for somebody to break in and steal or come

9    in the store and easily take a firearm away.  All

10   those are bad business practices.  And again, the

11   public suffers because guns are getting into

12   criminal hands.

13        Q.    If the ATF had adequate resources, so

14   let's say they could audit a bad actor as much as

15   they needed to, would they be able to really cut down

16   on these problems?

17             MR. WOODS:  Objection to the form,

18   overbroad, incomplete hypothetical.

19        A.    I think there is much more involved in

20   it.  Not only do I think resources are involved, I

21   think that the firearms laws have been gutted, so

22   that they have been weakened to the point that some

Joseph J. Vince, Jr.                                          September 16, 2011
                          Washington, D.C.

169

1    of them, especially with the regulations to dealers,

2    are not effective.

3                And I can just simply point to the fact

4    that ATF is only allowed to audit a dealer once a

5    year and they have to notify him to do it.  That's

6    not even common sense, when officers from every city

7    in the United States who investigates the sale to

8    underage, or to minors, the sale of liquor to

9    underage individuals can go in and do undercover

10   operations to make sure that in fact the law is

11   being -- being followed, ATF doesn't even have the

12   opportunity to do that.

13               So there is a lot of other issues in here.

14   I think as well as you can see how complex it is by

15   what the IG put in their report, so there is no easy

16   fixes here.

17               Here you have an agency that's been

18   issuing licenses, auditing dealers and putting out

19   regulations, and you can see the extent of report

20   that the IG gave in 2004 for ATF to improve.  So it's

21   not a trivial task, it's not a trivial answer to your

22   question.

Joseph J. Vince, Jr.                                                September 16, 2011
                        Washington, D.C.

                                                                              170

1        Q.      You noted just now that audits can only

2    occur once a year.   How frequently do you think they

3    would need to occur in order for them to be an

4    effective tool, prevention tool?

5        A.      Well, there would be a myriad of things

6    that you would have to take a look at.   Obviously if

7    you have a dealer that's pumping out a lot of crime

8    guns, then they should be audited very frequently.

9    So there is a lot of things that have to be there.

10   But more than once a year, or at least once a year.

11   Where the audit report, I said that on average they

12   would be able to audit everybody once every 22

13   years, that's totally unacceptable.

14       Q.      But when you say very frequently, how many

15   times a year?

16           MR. WOODS:   Let me just say this is beyond

17   the scope of his opinions in this case.

18       A.      Again, there is a lot of variables that

19   you have to look at in this.   You have to look at

20   when people go in and out of business, so they can

21   just change their address, we picked that up on

22   tracing.   I mean, this is an enormous task to

Joseph J. Vince, Jr.                                September 16, 2011
                    Washington, D.C.

                                                            171

1     monitor people that are doing this.

2              I think if we, you know, looked at some of

3     the other kinds of regulations and inspections that

4     we do on construction and food, you can see that, you

5     know, it's more than once every so often.  I think we

6     do elevators every three months.  So is that a deadly

7     weapon or is a gun a deadly weapon?

8         Q.    Now, you say in the next sentence, "It is

9     no secret that this is a problem that plagues

10    Chicago."  And then you point to the number of

11    weapons seized by the Chicago Police Department.

12    What do you infer from these numbers, if anything?

13        A.    Well, the chart, Exhibit 9A, are firearms

14    recovery, and here they did put the date at the

15    bottom, or the year.

16        Q.    Yes.

17        A.    From 2000 to 2009.  And so you are seeing

18    what the police department is picking up as far as

19    firearms recoveries.  And obviously, if an officer

20    is responding, he's responding from a criminal

21    incident and picking these up.  So these are huge

22    numbers.  Quite frankly, I think they were larger

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

172

1    even before this.

2            So that being the case, obviously we have

3    a problem with firearms going in there.  And from all

4    our trace studies that we've seen in this area from

5    the Youth Crime Gun Interdiction Initiative, when all

6    guns are traced, the majority of those of crime guns

7    come from retail dealers.

8        Q.    When did this problem that is plaguing

9    Chicago start?

10       A.    Well, let's go back to the Youth Crime

11   Gun Interdiction Initiative.  What I'm saying is our

12   reports there started, I would have to go back and

13   look at that, 1995, somewhere in there, to be exact.

14   But that's when we're doing the studies on it.

15           Now, how long Chicago has -- excuse me --

16   has had violent crime with firearms, we have to go

17   back quite a few years.  When we're talking about Al

18   Capone and Frank Nitti in those days, it was a

19   problem then with those people.

20       Q.    The problem that you're identifying that

21   is plaguing Chicago, do you have an opinion as to

22   when it started to plague Chicago?

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

173

1      A.      I think any time you have high crime

2   rates, it's plaguing Chicago.  I can't give you a

3   time when it started.  I didn't look at that.  I'm

4   saying I studied Chicago from '95, '96, '97, those

5   years and beyond after that, I'm not an historian on

6   this.

7      Q.      Well, at the present time in the last two

8   years, has the problem that's plaguing Chicago gotten

9   better, stayed the same or gotten worse or you don't

10  know?

11             MR. WOODS:  Objection to the form of the

12  question.

13     A.      The only thing I placed in the report are

14  these two charts, which I looked at, and you're

15  obviously seeing recoveries are up.  You can look

16  back at the chart on the homicides --

17     Q.      Wait a minute.  You say recoveries are up.

18  I think you're misreading this.

19     A.      Excuse me, no.  Recoveries are down or

20  pretty well they've gone down.

21     Q.      They're down.

22     A.      Up top 9,000, 9856.

Joseph J. Vince, Jr.
September 16, 2011
Washington, D.C.

174

1     Q.    Let's just stick with this chart for a

2  second.  So recoveries have fallen from 13,000 to

3  approximately 10,000 a year.  What do you infer from

4  that fact?  Is it that there are fewer guns coming

5  into Chicago from the suburbs or what?

6          MR. WOODS:  Objection to the form of the

7  question.

8     A.    Without examining it, you can't infer

9  anything, because you really have to examine the

10  facts.  The same thing I said with homicides.  Let's

11  look at nonfatal shootings, where do they stand,

12  let's look at shootings where no one is hit.  So you

13  can't make determinations without doing really

14  large -- an overall look at it.

15     Q.    Have you done that, have you examined the

16  facts?

17     A.    No, I was not asked to do that, sir.

18     Q.    Okay.  So you don't know whether in the

19  last two years the number -- the problem that you say

20  is plaguing Chicago has gotten better or worse or

21  stayed the same?

22     A.    Well, the other chart shows firearm

Joseph J. Vince, Jr.                                                September 16, 2011
                                    Washington, D.C.

                                                                              175

1    homicide 376.  I don't think that's a good number.

2        Q.    I'm not asking whether that's a good

3    number.  I'm saying the problem that you're

4    identifying here as plaguing Chicago, do you have an

5    expert opinion as to whether that problem has gotten

6    better, worse or stayed the same in the last two

7    years?

8        A.    I'm saying that 376 homicides is an

9    unacceptable number, and it's a high number in any

10   city.  It's nothing that Chicago needs to be proud

11   about, it's something that public safety officials

12   and government officials need to work on to make it

13   safer for the people in the City of Chicago.

14       Q.    Are you saying that the problem isn't

15   getting better?

16       A.    I'm saying that it's an unacceptable

17   number, that that's plaguing the city.

18       Q.    Do you have an opinion on whether it's

19   getting better or worse?

20       A.    What do you mean by getting better?  If

21   it goes down to zero, then it's better.  If it's not

22   down to zero, we got work to do.

Joseph J. Vince, Jr.                                          September 16, 2011
                           Washington, D.C.

176

1      Q.    I know we have work to do, but if it's at

2  one down from where it is now, would that be better?

3      A.    Is that acceptable?

4      Q.    Would it be better?

5      A.    Better than what?  Better than having

6  376, yes.

7      Q.    Okay.  There we go.  Now, how many FFLs

8  are there in the City of Chicago?

9      A.    I'm sorry, sir, I don't know.

10     Q.    Have you compared the incidence of

11  firearms getting into the hands of criminals in

12  Chicago to the incidence of criminals gaining access

13  to firearms in other American cities?

14     A.    In the Youth Crime Gun Interdiction

15  report, we examined -- and the first one was 17

16  cities collectively, then I think it was 37 cities

17  after that, and then the last study I'm aware of,

18  it's either 72 or 75, something like that.  So we're

19  looking at large amounts.  And I know that ATF now

20  does probably, if my recollection is correct, over

21  400,000 traces nationwide of crime guns.

22     Q.    Well, do you know how Chicago fits in --

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                                    177

1    I'm sorry if I wasn't clear.  Maybe you answered and

2    I just didn't get it.  Chicago has guns flowing in

3    illegally into the hands of criminals.  Do you know

4    how that flow in Chicago compares to other major

5    metropolitan areas?

6         A.    Off the top of my head, I don't know of

7    any other city that has -- the police department

8    that seizes as many guns as Chicago.  I just don't

9    know of that.  I'm not saying there isn't, I just

10   can't think of any right now that I'm aware of.

11        Q.    Well, of course, in most other cities, it

12   was lawful to possess a firearm?

13        A.    I think if you look at the City of New

14   York, that's probably the strictest law going, the

15   Sullivan Law, the Sullivan Act, that's been around

16   since 1917.

17        Q.    Do you have even a rough estimate of how

18   many guns are illegally possessed in the City of

19   Chicago?

20        A.    No, sir, I do not.

21        Q.    Now, let's look at page 17 in the last

22   paragraph.  And you're talking about what happens

Joseph J. Vince, Jr.                                           September 16, 2011
                            Washington, D.C.

178

 1    when a city steps in to try to fill what you call the

 2    enforcement gap from ATF.  And you talk about New

 3    York's experience.  And we'll turn to New York in a

 4    second, but leaving New York to the side.

 5              Have any other jurisdictions tried to fill

 6    that gap, to your knowledge?

 7              MR. WOODS:  I'll object to the form of the

 8    question as being vague.

 9    BY MR. THOMPSON:

10         Q.    The ATF's enforcement gap.

11         A.    What do you mean by enforcement?

12    Agents --

13         Q.    It's your phrase, sir.  You say in the

14    prior -- in the sentence we just looked at, this is

15    the bottom paragraph, the sentence starts moreover,

16    it's about seven or eight lines down.  "Moreover,

17    even when a city tries to step into the ATF's

18    enforcement gap to take action on its own, those

19    efforts fail to cure the problem."

20              What I'm asking you is are there other

21    cities or metropolitan areas that have tried to fill

22    what you call the ATF's enforcement gap?

Joseph J. Vince, Jr.                                    September 16, 2011
                         Washington, D.C.

179

1      A.     That's a very good question, because

2   there is an organization, the Mayors Against Illegal

3   Guns, and I think there are seven or 800 mayors

4   involved in that, it's chaired by Mayor Bloomberg

5   and Mayor Menino, Mayor Bloomberg from New York and

6   Mayor Menino from Boston.  And very well, those 800

7   and some mayors got together in order to fill that

8   gap, that's the reason for the organization.

9      Q.     Okay.  Do you know if any of them have had

10  any measure of success?

11     A.     I have no idea.  I know the Boston

12  project, but I haven't followed Boston after that,

13  and I wasn't asked to look at that for this study.

14     Q.     You referenced New York and New York's

15  limitations.  Is one of the limitations that a place

16  like New York has is that it doesn't have

17  jurisdiction over the suburbs where the guns are

18  coming from?

19     A.     Well, in New York, that's not where the

20  guns are coming from.

21     Q.     Where are they coming from?

22     A.     In New York and Boston, their guns come

Joseph J. Vince, Jr.                                              September 16, 2011
Washington, D.C.

180

1    from more than a hundred miles away, which is

2    different, it's because of both their state laws as

3    well.

4         Q.    Okay.  So let me rephrase.  Is one of the

5    problems that New York faces in trying to fill the

6    ATF enforcement gap that they don't have

7    jurisdiction, New York City doesn't, over some dealer

8    in another state?

9         A.    You know, I can't say all of these

10   cities, because there are cities like Flint,

11   Michigan in there who probably have numbers-wise --

12   as a matter of fact they do, their crime rate is a

13   lot worse, especially with firearms, than the City

14   of Chicago.  And so there is a lot of different

15   reasons, but that may be one for them that they're

16   having a problem with.

17        Q.    Now, you say further up the page on 17, in

18   the second full paragraph, first sentence, you say,

19   "One significant reason that dealers persist in

20   operating this way is, as shown by ATF information,

21   media reports and academic studies, federal firearm

22   laws are too weak and/or ineffective to adequately

Joseph J. Vince, Jr.                                           September 16, 2011
                          Washington, D.C.

181

1    and timely police firearms transactions."  Are you

2    familiar at all with the laws of Illinois?

3         A.    As regard to what?

4         Q.    As regard to purchase and sale and

5    regulation of firearms.

6         A.    No, sir, I'm not.

7         Q.    Let's say we win this lawsuit and the

8    sales ban is struck down and the City of Chicago

9    retains you to advise them on how to come up with a

10   sensible regulatory regime.  What would you -- what

11   would be the cornerstones of the regulatory regime

12   you would put in place?

13        MR. WOODS:  I object to the question on

14   the grounds that whether you win the lawsuit is

15   speculative at this point, and on the grounds that it

16   goes beyond the scope of what he's been offered for

17   in this case.

18        A.    That would be -- that would be something

19   that if we were asked to do, we would look long and

20   hard at doing that.  That wouldn't be something that

21   I would shoot from the hip to say what it would be.

22             However, in the report, I do put

Joseph J. Vince, Jr.                                                September 16, 2011
Washington, D.C.

182

1    recommendations in here, or suggestions of some of

2    the steps that would need to be taken.  Enact

3    firearms licensing and regulatory authority

4    legislation, establish a government entity to prepare

5    regulations, enforce regulations, monitor and inspect

6    dealers, as well as refer criminal activity uncovered

7    to the appropriate law enforcement authority, hire

8    and train employees to man the governmental entity

9    established, and publicly disseminate regulations to

10   citizens and dealers alike, provide training and

11   publications to licensed firearms dealers.

12           Now, that's just a cursory of what you

13   would have to do.  Although we're giving bullets, you

14   could just look at what it would take to do any one

15   of those steps would take, first of all, a huge

16   amount of research, a huge amount of planning,

17   coordination, funding, resources to do just this, and

18   that just doesn't -- that only skims the surface of

19   what would be required.

20       Q.    Can you think of anything else that would

21   be required?

22       A.    Well, again, I mean, this is so broad

183

```
 1    itself that -- first of all, what I teach is what I

 2    would do in this.  You have your mission, your

 3    objectives, your projects and your due dates,

 4    because you need an overall plan.  That's the

 5    beginning of any task like this.  Just to come up

 6    with the right plan to do this is an enormous task

 7    that would take probably over a year to do in itself

 8    to do it adequately.

 9        Q.    Is there -- if you were advising the city

10    and thinking about the sorts of issues that are

11    reflected in these five bullet points, is there a

12    model jurisdiction that you would turn to where you

13    would think this city is doing it well?

14        A.    No, that's something I have not looked

15    at.  I am familiar with some of the things that New

16    York does, but I really haven't looked at their

17    regulatory scheme on it, and I couldn't say, nor

18    could I say one glove fits all.

19            MR. THOMPSON:  What I would like to do, if

20    it's acceptable, is take about a five-minute break.

21    I have a short video I want to play and I think I'm

22    probably about a half an hour away from being
```

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                                    184

1     finished.

2                    MR. WOODS:   Okay.

3                    THE VIDEO OPERATOR:   We're going off the

4     record.   The time on the video is 2:20 p.m.

5                    (Recess taken.)

6                    THE VIDEO OPERATOR:   We're back on the

7     record.   The time on the video is 2:31 p.m.

8     BY MR. THOMPSON:

9         Q.    Now, Mr. Vince, do you recall having

10    worked on a project called Disarming the Criminal?

11        A.    Yes.   I think that's a term that we used

12    in some publication at ATF, but --

13        Q.    And I think it's in fact referenced in

14    your report that maybe in 1997 you did it as part of

15    something with the Kennedy School.

16        A.    If you're referring to what we

17    participated in at the time was what we participated

18    in was a competition, so to speak, of the various

19    ways of tracing guns and using a technology software

20    at the time called Project Lead.   And the Kennedy

21    school at Harvard and the Ford Foundation put this

22    on for government about best practices, and we were

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

185

1    finalists in that competition, so to speak.

2        Q.    Okay.  Now, I would like to play a little

3    clip that we found on YouTube, I think this is you.

4    I will read you what you say afterwards, so if you

5    want hear it, it's okay.

6             (Playing YouTube Video.)

7             MR. THOMPSON:  Maybe I can do it this way

8    to speed things along.

9    BY MR. THOMPSON:

10       Q.    Is that a picture of you on the screen?

11       A.    Yes, sir, that's myself and that is

12   Special Agent Dale Armstrong.

13       Q.    Okay.  This is from 1997.  I can read the

14   HTML link into the record, if that is useful.

15            MR. WOODS:  Okay.

16   BY MR. THOMPSON:

17       Q.    In any event, it can be found on the

18   innovations dot Harvard dot EDU.

19       A.    Yes, sir.

20       Q.    It was working in my office a moment ago.

21            MR. WOODS:  Is that the URL for that

22   particular web page?

186

1           MR. THOMPSON:  Then you get, sorry, slash

2    M media, underline, preview dot HTML, question mark,

3    ID equals 1722364.  If you type that in, you will get

4    this.  Hopefully yours will work.

5           MR. WOODS:  Okay.

6           (Playing YouTube Video.)

7    BY MR. THOMPSON:

8        Q.    Okay.  So you said there that, "Any city

9    can work with ATF.  And if they reduce the amount of

10   illegally trafficked guns in their community, they

11   will bring down violent crime."  Do you still agree

12   with that statement?

13       A.    That if you reduce the illegal amount of

14   firearms to criminals, you will bring down violent

15   crime, yes, I believe that, because as I said

16   earlier, that using any other weapon, the criminal

17   can't be as destructive to the community.

18          THE VIDEO OPERATOR:  Mr. Vince, your

19   microphone, please.

20          THE WITNESS:  I apologize.  Would you like

21   me to repeat that?

22          THE VIDEO OPERATOR:  No, I got it.

187

```
 1              THE WITNESS:  Excuse me.

 2    BY MR. THOMPSON:

 3         Q.    Mr. Vince, do you also agree with the fact

 4    that what you said at the beginning of that quote,

 5    where you said any city can work with the ATF?

 6         A.    Well, let's play the whole video and see

 7    what exactly I said, instead of taking it out of

 8    context, and seeing exactly what I'm saying about

 9    working with ATF.

10         Q.    You want to watch the whole ten minutes?

11    I have plenty of time, I don't have a flight.

12              I'm less concerned with what you said in

13    1997, in any event, than what you believe today.  So

14    let me ask you this.

15              Do you believe that any city can work with

16    ATF and be effective at reducing the number of guns

17    going to criminals?

18         A.    I believe in law enforcement partnerships

19    and I believe that reducing the accessibility of

20    firearms to criminals is key.  And so what we're

21    talking about here at the time is looking at where

22    firearms were originating from and having the
```

188

1    ability to cut that off.  So we're saying if you

2    trace those firearms and you work with ATF and if

3    you're able to reduce the amount of guns going to

4    the criminal, you will reduce violent crime.  Yes, I

5    believe that.

6         Q.    Now, I would like to ask you a few

7    questions, Mr. Vince, about your deposition in the

8    Niles Gun Show, and that's been marked as an Exhibit

9    2.

10        A.    3.

11        Q.    3.  Yes, sir, thank you.  I'm going to

12   have a couple of questions about pages 69 and 70, but

13   you may want to take as much time as you need and you

14   might want to start on page 68.

15        A.    Yes, sir.

16        Q.    Okay.  So you were asked some questions

17   whether you had an unblemished record at the ATF.

18   And at least on page 70, you said, "Right, very good

19   record."  Do you stand by that statement that you

20   have an unblemished record at the ATF?

21        A.    Sir, at the end --

22              MR. WOODS:  Objection, it mischaracterizes

189

1    his testimony.

2        A.    At the end of my career, I received the

3    Albert Gallatin Award for Meritorious Service to the

4    government.  In order to receive that award, you

5    have to have an unblemished record.

6              MR. THOMPSON:  I would like to ask the

7    court reporter to mark as Exhibit 10 the following

8    document.

9              (Vince Deposition Exhibit 10 marked for

10   identification.)

11   BY MR. THOMPSON:

12       Q.    This is a Washington Times article dated

13   May 6th, 1995.  It says the Treasury -- and I'm

14   reading from about two-thirds of the way down.  You

15   are free to review the whole thing if you like.  But

16   is says, "The Treasury's Inspector General conducted

17   a long investigation of Mr. Adamcik and Joseph J.

18   Vince, Jr., Chicago special agent in charge.  They

19   are accused of accepting favors from corrupt police

20   officers, ignoring the theft of money seized from

21   drug dealers by Chicago officers working with the

22   ATF, and steering ATF contract work on vehicles to a

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

190

1    friend who is a convicted felon."  Is it accurate

2    that those accusations were made against you?

3         A.    Sir, I have no accusations remaining

4    against me, that I was promoted after this, I have

5    received the Albert Gallatin award, and I stand on

6    my reputation.

7         Q.    I'm just asking, though, was there a time

8    in the early '90s where these accusations were made?

9         A.    There were some people that did make some

10   accusations, that is correct, not only about me or

11   the agents here, but all over the country, and I

12   think if you read on, you'll see that.

13             MR. THOMPSON:  Now, then I would like to

14   ask the court reporter to mark as Exhibit 11 the

15   following document.

16             (Vince Deposition Exhibit 11 marked for

17   identification.)

18   BY MR. THOMPSON:

19        Q.    This is dated February 17th, 1993, it's a

20   Chicago Tribune article entitled U.S. Reassigns

21   Official Who Was a Probe Target.  It says that, "The

22   head of the Oak Brook-based office of the Bureau of

Joseph J. Vince, Jr.                                                          September 16, 2011
                              Washington, D.C.

191

1    Alcohol, Tobacco and Firearms is being reassigned to

2    Washington amid allegations that he ignored

3    complaints of sexual misconduct and failed to act on

4    other possible legal violations.  The removal of

5    Joseph J. Vince, Jr. as head of the agency's largest

6    Midwest office for enforcement of gun laws against

7    Chicago gangs and other violent criminals comes in

8    the wake of internal allegations involving ATF

9    special agents."

10           Is it true that you were removed as head

11   of the Chicago office?

12       A.   Sir, I was transferred, I was reassigned

13   to headquarters.  And as you can see, this is from

14   February, I don't believe I arrived at headquarters

15   until April, so if I was removed, it wasn't

16   immediately, and I kept on being the special agent

17   in charge there.

18           MR. THOMPSON:  I would like to ask the

19   court reporter to mark as Vince Exhibit 12 the

20   following document.

21           (Vince Deposition Exhibit 12 marked for

22   identification.)

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

192

1      BY MR. THOMPSON:

2          Q.    This is an article from Time Magazine

3      dated July 24, 1995.  It's entitled ATF Under Siege.

4      And it's a long article.  You're of course free to

5      read the whole thing, if you would like.  But I would

6      like to direct your attention to page 5.  The first,

7      I think it is the first full paragraph, the paragraph

8      that starts the tempest, and maybe if you could just

9      take a moment to review that paragraph.

10             Sir, my question, it says in the second

11     sentence, "The division," referring to the ATF

12     Chicago Field Division, "One of ATF's largest, has

13     been riven with charges of corruption, sexual

14     harassment, racial discrimination and management

15     retaliation."  Do you recall such charges being

16     levied against the Chicago Field Division while you

17     were in charge of it?

18         A.    At the time I think this was a whole suit

19     against the bureau.  It got a 60 Minutes story about

20     it, it had about female agents all over the United

21     States.  There were other allegations in the Chicago

22     Field Division.  Some agents were reprimanded.  I

Joseph J. Vince, Jr.                                    September 16, 2011
                          Washington, D.C.

                                                            193

1    don't know what else you want me to say to that.  I

2    was not.

3        Q.    Then it also makes reference to an

4    unprecedented raid on the Chicago office to seize

5    financial documents.  Were any of your financial

6    documents seized as part of that raid?

7        A.    No, it was not a raid.  The Inspector

8    General came in, I gave him full -- you know, they

9    could go in and look at all the documents.  They

10   did.  And I received a report, as a matter of fact,

11   a direct report called to me that everything was in

12   perfect order in that office from the Inspector

13   General.

14            MR. THOMPSON:  I have no further

15   questions, and I thank you for your time today, Mr.

16   Vince.

17            MR. WOODS:  Let me just talk to you for a

18   second.

19            THE VIDEO OPERATOR:  We're going off the

20   record.  The time on the video is 2:45 p.m.

21            (Recess taken.)

22            THE VIDEO OPERATOR:  We're back on the

Joseph J. Vince, Jr.                                          September 16, 2011
                        Washington, D.C.

                                                                      194

1    record.   The time on the video is 2:48 p.m.

2            MR. THOMPSON:  Mr. Woods, do you have any

3    questions?

4            MR. WOODS:  No, I do not.

5            THE VIDEO OPERATOR:   This concludes the

6    video deposition of Joseph Vince.   The time on the

7    video is 2:48 p.m.   We are off the record.

8            (Thereupon at 2:48 p.m. the videotaped

9    deposition was concluded.)

10                   -     -     -     -     -

11

12

13

14

15

16

17

18

19

20

21

22

Joseph J. Vince, Jr.                                         September 16, 2011
                           Washington, D.C.

```
 1              CERTIFICATE OF DEPONENT

 2   I hereby certify that I have read and examined the

 3   foregoing transcript, and the same is a true and

 4   accurate record of the testimony given by me.

 5   Any additions or corrections that I feel are

 6   necessary, I will attach on a separate sheet of

 7   paper to the original transcript.

 8

 9                        _____

10                           Signature of Deponent

11

12   I hereby certify that the individual representing

13   himself/herself to be the above-named individual,

14   appeared before me this _____ day of _____,

15   2011, and executed the above certificate in my

16   presence.

17                        _____

18                           NOTARY PUBLIC IN AND FOR

19

20                        _____

21                           County Name

22   MY COMMISSION EXPIRES:
```

Joseph J. Vince, Jr.                                        September 16, 2011
                          Washington, D.C.

                                                                    196

1                CERTIFICATE OF NOTARY PUBLIC

2

3          I, Melissa Gilcrest, a Notary Public of the

4     District of Columbia, do hereby certify that the

5     within-named witness personally appeared before me at

6     the time and place herein set out, and after having

7     been duly sworn by me, was examined by counsel.

8          I further certify that the examination was

9     recorded stenographically by me and this transcript

10    is a true record of the proceedings.

11         I further certify that I am not of counsel to

12    any of the parties, nor related to any of the

13    parties, nor in any way interested in the outcome of

14    this action.

15

16                    _____

17                    Melissa J. Gilcrest

18                    Notary Public

19                    District of Columbia

20                    My commission expires: 10/14/2014

21

22

Joseph J. Vince, Jr.

September 16, 2011

Washington, D.C.

197

**A**

abide 126:2
ability 21:13
109:11 188:1
able 9:11 18:19
20:18 21:6
28:17 40:13
48:16 49:2 57:4
66:8,8,11 68:8
71:19 82:9
83:21 109:20
112:16 132:21
133:2 153:3
163:18 168:15
170:12 188:3
above-entitled
1:17
above-named
195:13
absolute 28:8
29:1,13 30:4,18
31:11,17 32:5
113:4
absolutely 31:14
32:17 45:1
99:18 131:10
132:19 161:4
academic 180:21
academics 23:11
accept 31:2
acceptable 27:8
27:9 30:21,22
31:5 176:3
183:20
accepting 189:19
access 20:3 37:7
79:21 80:15
85:7 87:14 96:4
104:16 105:22
106:11 110:4
110:10,18
113:10 116:19
121:22 122:11

127:14 131:8
131:11,14
132:15 161:2
163:18 166:8
176:12
accessibility
187:19
accessible 110:7
112:2
accident 101:2
101:14 117:14
118:21 129:1
accidental 26:3
26:11 52:7
86:16 87:14
118:11 119:16
accidentally 34:2
accidents 31:11
81:22 97:13,15
97:22 119:10
120:12,16
128:12,21
129:18 131:19
137:2 140:13
accompanying
87:8
accord 139:4
account 143:10
accurate 102:11
102:15 116:16
148:5 190:1
195:4
accusations
190:2,3,8,10
accused 189:19
Accu-Tek 4:8
142:10
acquire 50:11
82:3
acquired 73:11
acquiring 37:8
40:2 109:16
acquisition 54:14

55:2,12 137:1
act 4:13 26:10
74:15 147:18
165:15 177:15
191:3
action 1:8 4:22
20:20 164:5
178:18 196:14
actions 134:16
activate 16:15
activated 16:17
activities 14:2
16:3 52:21
90:13 161:19
165:13
activity 38:8
51:17 111:8,15
182:6
actor 168:14
acts 73:6,10
Adamcik 189:17
add 109:8 130:1
additional 22:6
additions 195:5
address 105:8
106:4 117:19
122:14 170:21
addresses 104:9
adequate 168:13
adequately
168:4 180:22
183:8
administration
16:2 17:5 18:5
administrative
14:1 16:1
admit 134:15
adolescence
58:8
adolescents
161:4
adults 96:4
advance 23:21

advise 181:9
advising 183:9
advocate 157:12
advocates 150:1
affiliated 25:8
affiliation 156:17
affixed 109:2
affords 51:4
afraid 39:12
114:19 124:8
afternoon 116:5
age 58:20 134:17
138:12 159:8
agencies 52:13
64:14 73:15
84:8 86:14
139:7 148:7
agency 169:17
agency's 191:5
agenda 150:15
agent 5:3 12:12
12:20,21 13:11
13:13,19,21
14:14 15:20
16:1,22 17:4,8
133:13,20
134:2,5,5
185:12 189:18
191:16
agents 13:22
15:4,15 71:16
78:15,17
133:20 134:8
178:12 190:11
191:9 192:20
192:22
ago 100:16
185:20
agree 9:10 42:5
84:18 86:6 95:5
97:1 114:16
118:9 143:4
151:2 152:15

154:3 156:6,9
158:12 186:11
187:3
agreement 9:22
agrees 150:10
Agricultural 4:11
ahead 45:13 53:8
79:2 106:7
123:22 124:22
128:3 164:1
ahold 93:7
104:20 130:21
140:14
AICP 157:18
AI 4:8,8,11
153:21 172:17
alarmed 122:2
alarming 162:10
Albert 189:3
190:5
alcohol 12:8 13:9
38:4 191:1
Alderson 6:15
aliens 111:20
alike 115:8
182:10
allegations 191:2
191:8 192:21
allow 131:12
allowed 63:22
64:17 68:6
85:16 86:9
132:4 139:12
163:10 169:4
allowing 122:18
123:15 124:18
126:22 128:6
129:6
allows 20:17 36:6
51:14 93:11
105:20 115:3,5
116:8 117:4
120:7,22

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

121:14 124:5
124:16 130:5
131:1,2 132:9
139:11 141:10
**all-inclusive**
89:12
**alternative**
130:14
**amassing** 111:21
**amazing** 94:22
**Amendment** 37:9
155:22
**America** 51:3
71:15,22 78:16
**American** 4:17
54:12 148:21
150:14 151:16
153:15,18
157:15 176:13
**Amici** 152:13
**amicus** 151:14
**amid** 191:2
**ammunition** 54:7
82:10 86:4 98:2
102:10 109:11
109:13 119:6
119:12 120:17
125:12 128:14
129:13,20
136:5,6,15,17
136:20 137:4
137:14,17
**amount** 28:19
30:1 38:9 161:5
182:16,16
186:9,13 188:3
**amounts** 176:19
**analysis** 18:15
18:17 23:11
147:19 148:7
**analyzed** 148:4
**Andrew** 3:13 7:8
**and/or** 82:18

85:22 180:22
**Angeles** 33:15
**anomalies** 27:18
**answer** 8:9 22:17
36:20 49:6 56:3
95:9 106:6
109:4 116:7
120:19,21
124:1 146:6,9
146:14 169:21
**answered** 23:3
50:18 76:4
143:3 177:1
**answering** 95:11
**anti-gun** 145:1,2
146:8,13,21
150:3 154:2,3
**anybody** 31:4,18
31:19 105:12
118:1,2 147:8
**anybody's** 35:1
**anymore** 81:4
**apart** 64:21 66:9
**apologize** 133:8
145:10 186:20
**apparent** 160:12
**Appearances** 2:8
2:21 3:1
**appeared** 195:14
196:5
**appears** 19:10
154:21
**apples** 46:21,21
46:21 91:11,11
**applicable** 64:10
93:3 137:10
**applies** 64:19
**apply** 10:3 46:14
63:3 64:3 65:2
**apprehend** 21:13
**approach** 162:12
**approached**
108:13 165:20

**appropriate** 46:7
80:8 182:7
**approximately**
72:5 98:9 134:9
174:3
**April** 191:15
**architect** 155:20
**area** 23:7 27:8
46:22 75:16
113:8 114:12
125:15 172:4
**areas** 33:4,16,18
49:19 177:5
178:21
**arm** 94:18 97:6
**armies** 111:21
**Armstrong**
185:12
**arrest** 72:10
**arrested** 71:19
**arrests** 13:2
**arrived** 191:14
**arson** 13:9 16:6
16:14
**arthritis** 137:19
**article** 4:14 5:2,5
5:7 57:20 58:3
59:1 97:9,17
149:16 189:12
190:20 192:2,4
**articles** 30:8 35:2
56:7,8,18
**aside** 41:19
**asked** 23:3 36:15
36:18 37:20
40:19 41:2,5
43:18 47:14
50:18 59:1 62:1
69:16 76:4
95:15 101:17
109:3 142:16
148:16 159:2
159:20 163:22

174:17 179:13
181:19 188:16
**asking** 29:12
40:15 42:6 45:6
47:21 64:22
105:6 117:4,4
123:21 126:3,5
142:15 175:2
178:20 190:7
**aspect** 166:4
**aspects** 23:8
**assault** 4:13
147:18 155:21
**assertion** 150:5
**asserts** 149:19
**assess** 100:8
**assistant** 3:14
14:12 15:20
**assisting** 15:22
**associate** 95:2
**associated**
112:10
**association** 1:5
4:18,20 25:6
54:12 95:3,6
144:16 148:22
149:22 150:13
150:15 151:17
153:16,19
157:19
**assume** 134:20
135:11 138:22
**assumes** 98:17
**assuming** 77:5
**assumptions**
114:3
**assured** 110:14
110:17
**ATF** 5:3,7 12:11
13:1,6 14:12
15:1,10 18:2,8
19:20 23:10
25:2,21 53:18

53:22 66:6,20
71:15 72:19,22
78:20 91:12
133:14 166:18
168:13 169:4
169:11,20
176:19 178:2
180:6,20
184:12 186:9
187:5,9,16
188:2,17,20
189:22,22
191:8 192:3,11
**ATF's** 178:10,17
178:22 192:12
**attach** 195:6
**attached** 22:1
97:4
**attack** 109:22
132:22 133:2
**attended** 10:15
**attention** 145:16
149:18 151:18
192:6
**ATTORNEY**
2:11,12 3:4,5
3:13
**attorneys** 8:13
**audio** 165:18
**audit** 168:14
169:4 170:11
170:12
**audited** 170:8
**auditing** 169:18
**audits** 170:1
**author** 58:11
**authority** 182:3,7
**authorized** 68:4
68:6,8
**automobile**
118:7
**avail** 115:12
**Avenue** 1:21

Joseph J. Vince, Jr.

September 16, 2011

Washington, D.C.

199

| | | | | |
|---|---|---|---|---|
| 2:13 6:12 | 167:11 168:10 | **belief** 31:21 | 111:17,18 | 35:15 |
| **average** 30:11 | 168:14 | 158:9 | 127:9,10 130:9 | **board** 25:8 34:10 |
| 170:11 | **bailiff** 87:6,9 | **believe** 8:12 | 173:9 174:20 | 148:21 |
| **avoid** 74:7,12,13 | **bailiffs** 88:17 | 24:20 45:1,21 | 175:6,15,19,20 | **bombing** 5:2 |
| **award** 189:3,4 | **ballpark** 72:4,9 | 46:3,20 51:2,13 | 175:21 176:2,4 | 16:18 |
| 190:5 | 161:21 | 54:17 55:11 | 176:5,5 | **bono** 148:12,14 |
| **aware** 61:20 88:4 | **ban** 140:7 152:15 | 64:8 65:10,12 | **beyond** 15:4 | **book** 42:4 |
| 93:18 124:4 | 163:14,17 | 83:9 89:5 90:2 | 31:21 36:15 | **books** 116:13 |
| 132:20 138:1,2 | 181:8 | 90:5 91:13 95:4 | 37:19 38:20 | **borders** 111:21 |
| 138:4 147:5 | **bang** 18:22 | 135:15 143:22 | 43:5 45:8 46:16 | **Boston** 160:21 |
| 148:8 156:3 | **bank** 21:5,6 | 146:18 148:13 | 51:7 52:1,9 | 160:21 162:12 |
| 164:21 168:6 | 164:4,8,9 | 149:4 152:13 | 55:5 62:9 65:6 | 179:6,11,12,22 |
| 176:17 177:10 | **banks** 164:6 | 186:15 187:13 | 76:4 90:22 | **bottom** 41:10 |
| **awesome** 84:3 | **banned** 164:11 | 187:15,18,19 | 95:14 106:3,17 | 57:17 59:11 |
| 101:12 | **Barbara** 153:21 | 188:5 191:14 | 107:14 117:18 | 62:20 86:12 |
| **aworseck@cit...** | **barrels** 91:6 | **believer** 37:9 | 123:21 152:18 | 154:20 171:15 |
| 3:20 | **base** 85:6,8,15 | **believes** 54:13 | 163:6,21 | 178:15 |
| **axis** 59:11,11 | 85:18 123:4 | 95:7 | 164:14 170:16 | **box** 67:19 82:6 |
| **a.m** 1:22 6:18 | 139:17 | **belt** 39:6,10 | 173:5 181:16 | 109:12 114:14 |
| 9:17,20 60:21 | **based** 24:2 77:10 | **belts** 159:22 | **big** 33:13 94:6 | 123:6 |
| 61:4 102:22 | 91:18 110:1 | **benefit** 28:15 | 100:3 143:16 | **Boxer** 153:21 |
| 103:4 | 112:3 158:18 | **benefits** 51:19 | **biggest** 143:11 | **boxes** 125:11 |
| | **bases** 85:11,22 | **best** 18:22 24:1 | **Bill** 153:21 | **Brady** 146:17,20 |
| ___B___ | 86:7 139:20 | 71:8 85:10 | **billing** 147:6 | 147:1,4,8,18 |
| **back** 9:19 23:6 | **basically** 150:10 | 91:15,18,20 | **biometric** 67:8,9 | 148:1 150:3,10 |
| 49:7 71:6 78:4 | **basics** 113:19,21 | 107:2,4 119:7 | 67:10,18 68:7 | 150:12,16,21 |
| 97:20 99:9 | **basis** 22:8 30:4,5 | 119:14,15,19 | 68:11 96:3 | **branch** 15:8,11 |
| 113:18,19,20 | 32:5 42:2 | 121:1,3 123:11 | 113:9 114:13 | 15:13 18:15,17 |
| 117:3 119:9 | **bat** 36:4 107:10 | 127:15 128:15 | 122:15,19 | 23:11 133:18 |
| 122:10 131:13 | **bathroom** 110:15 | 128:21 129:11 | 123:6 124:3 | 133:18 |
| 141:21 142:1,9 | 121:19 | 129:15,21 | 125:11 127:20 | **brandishing** |
| 143:17 145:15 | **bear** 48:6,10 | 130:3,10,13,18 | **biometrically** | 132:22 133:3 |
| 158:20 172:10 | 49:16 | 131:8 132:15 | 115:22 117:12 | **break** 8:8 60:18 |
| 172:12,17 | **bedroom** 114:15 | 136:19,22 | 120:4 | 61:11 102:18 |
| 173:16 184:6 | 121:15,16 | 137:3 155:19 | **biometrics** 67:14 | 128:9 168:8 |
| 193:22 | **beginning** 183:5 | 159:3,5,19 | **bites** 95:13 | 183:20 |
| **background** 47:5 | 187:4 | 184:22 | **black** 76:20 | **breaks** 10:2 |
| 47:21 133:12 | **begins** 6:3 61:2 | **bet** 119:7 | **block** 103:10 | **brief** 4:16 151:14 |
| 143:18 166:2 | 103:2 142:21 | **better** 40:21 | **blocks** 161:8 | 151:21 |
| **bad** 31:18,20 | 155:9 | 49:21 52:4 | **blood** 21:18,19 | **bring** 66:12 |
| 42:8 91:11 | **behalf** 2:10 3:3 | 63:18 70:8 | **Bloomberg** | 166:3 186:11 |
| 164:21 165:2 | 151:15 | 82:14 96:18,22 | 179:4,5 | 186:14 |
| 166:11 167:8 | **behavior** 42:20 | 100:12,13 | **bludgeoned** | **bringing** 27:7 |

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

200

**broad** 24:10 70:17 159:14 182:22
**broken** 127:6
**Brook-based** 190:22
**brought** 87:1 122:1 126:15
**Brown** 3:6
**buck** 18:22
**building** 66:13 99:6 161:8
**bullet** 95:18,21 154:12 155:1 183:11
**bullets** 182:13
**bunk** 123:6
**bureau** 12:8 15:15 18:1 190:22 192:19
**burglar** 74:15 75:17
**burglaries** 74:18
**burglarize** 74:21
**burglarized** 82:6
**burglars** 71:8,11 73:1,3 74:11 76:12 77:14
**business** 22:4 25:4 90:12,18 142:22 143:13 164:22 165:2 166:11 167:8 167:12 168:10 170:20
**businesses** 108:2
**buy** 50:9 108:12
**bystander** 53:13

**C**
**C** 4:1 6:1 158:22
**cable** 70:5 81:9 81:10,14 82:18

**calendar** 61:13
**call** 61:12 146:8 178:1,22
**called** 1:16 7:15 71:15 91:13 145:10 162:18 184:10,20 193:11
**calls** 11:16 51:7 55:4 63:6 98:18 106:2 121:11 163:20
**cameras** 164:5
**Campaign** 150:4 150:10,12
**Campaign's** 150:21
**candidates** 154:2
**capable** 113:22
**capacity** 11:10 17:19 25:1 72:6 106:5
**Capone** 172:18
**car** 39:8 68:16,16 79:17
**care** 9:1 130:22 168:4
**career** 23:8 25:12 47:22 49:12,22 50:13 71:17 78:18 111:2 189:2
**careers** 71:14
**careful** 101:10
**careless** 105:2 106:20
**carelessly** 104:7 104:11,19 105:11 131:21
**carelessness** 105:3
**Carolyn** 153:22
**carried** 134:4

**carries** 62:22 79:3 118:10
**carry** 11:21 17:7 48:11,12,16 49:20 50:2 53:18 64:17 83:21 115:17 118:19 158:10 158:16,17
**carrying** 17:12 44:1 56:6 78:22 79:15 117:9 119:17 120:1
**carve** 65:4
**case** 5:3 6:8 9:8 19:11 30:12 37:20 40:4 43:7 55:6 65:8 76:6 85:1,13 90:11 91:2 95:2,15 98:5 109:2 117:1 119:1 123:1 135:14 145:9 151:15 152:4 156:1 159:16 161:3 163:6,22 164:15 170:17 172:2 181:17
**cases** 92:13,15 93:14,15 94:11 124:3
**casualties** 31:2,6
**catching** 21:9
**caught** 161:11
**cause** 40:11 62:13 150:6
**causes** 37:3 39:19 40:3,9,17 110:8
**causing** 40:12
**cautious** 81:22
**ccooper@coop...**

2:17
**Center** 14:15,18 14:20,21,22 16:18 133:21 146:17,20 147:1,4,8,18 148:1
**Centers** 97:17
**Center's** 150:16
**certain** 51:17 85:21 121:5 138:12 160:2
**certainly** 22:3 32:13 36:20 42:5 47:1 55:20 68:15 74:1 75:11 79:6 88:9 90:3 96:11 116:8 124:4 148:9 156:3 159:9 161:11
**certificate** 195:1 195:15 196:1
**certify** 195:2,12 196:4,8,11
**cetera** 13:3 59:12,13 66:15 66:15 111:10 111:11
**chain** 96:12
**chaired** 179:4
**chance** 35:20 87:22 98:15 99:21 116:16 128:22 130:20
**change** 28:3 59:17 170:21
**changed** 40:21
**changes** 61:20 62:2
**channels** 14:11
**characterizes** 154:1

**characterizing** 112:19
**charge** 13:11,13 13:19 14:14 15:10,20 16:1 16:22 17:4,8 133:20 148:5 189:18 191:17 192:17
**charges** 192:13 192:15
**Charles** 2:12 7:2
**chart** 27:12 59:9 59:18 61:8 62:7 171:13 173:16 174:1,22
**charts** 26:14 29:22 32:22 34:7 173:14
**check** 166:2
**Chicago's** 29:22 54:22 61:20 160:8
**chief** 17:16,20 18:9,13,14
**chiefs** 4:20 25:6 73:19 144:16 157:19
**child** 31:11 98:16 99:1,3 122:13
**children** 26:19 30:9,12 32:4 57:18 58:1,5,9 58:10,18,18 59:7 64:11 82:1 97:12,14 98:4,5 98:12,22,22 99:1 101:21 102:7 103:21 104:12,15
**Chinese** 111:20
**choice** 75:18,20 141:9,11

Joseph J. Vince, Jr.

September 16, 2011

Washington, D.C.

choose 121:1 140:21
choosing 108:1
chose 23:1 34:16
chosen 14:13 108:2
Chronicle 154:15
circumstance 138:15
circumstances 53:3 83:19 112:13 116:3
cite 56:6
cited 9:4
cities 26:18 27:19 28:1,7,12 29:20 30:2,8,14 36:10,11 144:13 176:13 176:16,16 177:11 178:21 180:10,10
citizen 39:3 123:16 131:2 137:11,13
citizens 37:11 39:2,4 41:11,14 45:15 49:13,15 49:17,20 50:9 51:14 115:7 122:7,18 127:1 140:21 159:8,9 160:16 182:10
citizen's 43:2,12 44:14 48:5 50:22 51:11
city-wide 34:15
Civil 1:8 6:8
civilian 31:8
claiming 56:17
clarify 59:10
class 32:19
clean 66:9

143:17
clear 9:7 27:10 31:9,14 32:3,17 39:15 46:7 47:8 62:8 77:7 126:20 128:5 129:5 130:12 159:18 177:1
clerk 108:17 109:4
clerks 69:2 94:2 108:13
client 66:16
clients 90:4 144:1,13
Clinton 153:21
Clinton/Gore 155:21
clip 185:3
close 36:3 56:22 60:16 116:22 141:12
closely 103:12
clothes 87:22
coffee 121:18
cohorts 78:10
colleague 133:8 135:7 137:18 138:7
colleagues 9:15
colleague's 133:11
collect 21:14 57:10
collecting 13:2
collectively 176:16
college 77:1
colloquy 9:3 126:12
Columbia 1:20 196:4,19
combat 84:17

come 20:4 23:6 25:10 27:13 39:18 66:16,20 67:5 92:19,20 101:3 109:12 112:15 113:19 114:4 120:20 121:7 123:2,3 153:5 168:8 172:7 179:22 181:9 183:5
comes 22:21 61:19 89:22 110:9 166:12 191:7
comfortable 120:10
comic 116:13
coming 93:2 111:22 122:10 174:4 179:18 179:20,21
commemorative 83:4
comment 64:18 117:21 159:2
Commercial 3:16
commission 195:22 196:20
commit 74:14 166:13
commitment 157:2
committed 34:11 78:7
committee 25:7 25:9 73:16,17 73:18
committing 73:9
common 39:7 84:19 92:1 97:8 113:3 169:6
communist

111:20
communities 32:10 54:16 158:11 162:11
community 35:7 38:9,13,19 162:10 186:10 186:17
company 147:20 154:13
comparative 29:12
compare 28:11
compared 117:10 176:10
compares 177:4
comparing 38:19
comparison 29:1 35:5
competition 184:18 185:1
complained 160:3
complaints 191:3
complementary 150:11,15 151:4,6
completed 166:2
complex 169:14
compliance 143:1
component 24:21
components 24:18 89:9
compound 81:18
concede 112:12 121:4
concern 122:15 122:17 123:14 123:19 124:3 124:17 125:2,4 125:5,20 128:6 128:10 129:4,5

129:15 143:16
concerned 30:17 111:20 123:10 187:12
concerning 18:20 37:1
concerns 64:7 96:8 125:6 126:13,22
concluded 194:9
concludes 155:4 194:5
conclusion 51:7 55:4 60:19 105:6 106:3 142:17
condition 80:9
conditions 53:10
conduct 21:11 88:20 166:11
conducted 71:10 71:15 73:2 78:18 189:16
conducting 71:17
conducts 142:22
confer 9:15
confrontation 74:13
connection 40:4 77:8
consider 133:22 144:22 146:19 157:12,14
considered 42:10 144:16 159:19
considering 159:18
constant 83:15 83:16 84:1
Constitution 41:17,19 42:1,2 42:7 48:6 51:2 51:4,13 157:9

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

202

157:11
Constitutional 3:16
construction 171:4
consultant 25:13
consultants 144:15
consulting 67:16 144:7
consumers 70:7
consummated 165:22
contained 21:22
context 187:8
continued 2:21 3:1 73:12
continues 26:15 27:6,6 158:8
contract 147:7,9 148:3,4 189:22
contribute 40:5 40:17 55:19
contributed 61:21
control 80:1 93:22 97:17 104:15 127:9 146:4,15,16,20 147:5,8 150:1,2 165:15
controversy 150:7
conversations 10:5 146:4
convert 61:12
convicted 51:15 190:1
cool 100:8
Cooper 1:20 2:12 6:11,22 7:2,2,3
coordination 182:17

copied 63:19
copies 142:17
cornerstones 161:9,10 181:11
Corporation 3:14
correct 10:7,11 10:12,14,17,20 11:1,8,9 12:10 12:14 13:16 14:4,16 15:18 16:7,21 17:2,16 17:17 18:10 57:21 68:9,10 72:3,21 77:9 78:21 80:22 87:3 88:17,18 91:21 94:12 95:8 104:1,4 107:8 123:13 131:12 133:4 139:15 143:3,3 145:20 146:18 149:1 157:17 176:20 190:10
correction 87:19
correctional 64:16
corrections 195:5
correctly 54:21
corrupt 164:21 165:2 167:9 189:19
corruption 165:8 192:13
costs 112:9
council 7:9 63:10
counsel 1:17 3:14 6:19,21 8:11 10:1 196:7 196:11
count 27:9 89:19

counter 165:20
country 27:4 29:7 42:18 154:17 155:16 156:8 157:9 190:11
County 4:10 11:5 145:11,13 195:21
couple 81:6 117:15 188:12
course 61:17,19 177:11 192:4
court 1:1 4:16 6:7 6:14,16 7:11 8:4 11:18 13:1 19:2 54:3 87:1 87:10 139:7 140:17 141:1,2 142:2 147:11 149:10 151:9 151:15 153:8 156:11 157:22 189:7 190:14 191:19
courthouses 88:14,20 139:13
courtroom 87:5 139:14
courtrooms 139:19,22 140:8
courts 88:5,7,11 88:12
cover 159:7
covers 159:11
Craig 3:4 7:4
crap 74:21
crimes 12:22 13:4 27:3 73:9 144:5
criminal 10:13

10:22 21:10,11 26:10 36:13 38:8 54:14 73:6 73:10 74:14 76:8 87:16 88:3 88:20 111:15 125:17 128:8 131:10 156:19 156:22 157:2 165:13 166:12 168:12 171:20 182:6 184:10 186:16 188:4
criminals 19:17 19:18 20:3,7 37:6,8,13 40:1 40:11 54:18 55:21 71:17 72:11,12,13,15 74:4,6 76:11 77:21 78:14,18 131:7 132:15 154:16 155:15 156:7 161:2 163:12,17 165:12 166:8 167:7 176:11 176:12 177:3 186:14 187:17 187:20 191:7
crosses 32:19
CRR 1:19 2:2
crystal 9:7
cuffs 54:2
cup 121:17
cure 178:19
currently 80:21
cursory 182:12
custody 66:12
customer 109:7
customers 93:3
cut 56:11 161:17 168:15 188:1

Cuyahoga 4:10 145:11,12,13
cwoods@may... 3:10

———————
D

D 6:1
Dale 185:12
Dan 3:22 6:14
danger 54:17 166:7
dangerous 87:7 110:11
dangers 112:9
dark 134:21 138:19
data 27:15 78:3 101:15 147:19 148:4,7
date 6:17 151:21 171:14
dated 57:20 149:17 158:6 189:12 190:19 192:3
dates 183:3
daughter 153:20
David 2:11 6:22 9:2 102:17 106:7
day 30:11 99:5 195:14
days 100:16 172:18
daytime 135:4
DC 1:21 2:14 6:12 152:14 153:4,5
DC's 152:15
dead 34:21
deadly 85:5 101:13 171:6,7
deal 77:20,20

Joseph J. Vince, Jr.
Washington, D.C.
September 16, 2011

108:12 113:1
**dealer** 15:3 92:9
165:9 166:20
169:4 170:7
180:7
**dealers** 24:22
55:18,18,20,21
74:20 89:9 90:6
90:7,9 91:16,21
92:5,12 93:17
93:19,19 94:8
95:3 108:8
111:5 128:19
143:9,11
164:22 169:1
169:18 172:7
180:19 182:6
182:10,11
189:21
**dealing** 73:16
118:5,6,8
**dealt** 25:12
**dear** 157:11
**death** 40:9 83:14
131:9 132:16
**decade** 60:14
61:17,19
**decades** 101:4
**decide** 107:4
**decision** 120:8
120:10,22
132:9 138:13
**decline** 61:21
**declined** 101:15
148:18
**deconfigure** 91:6
**decrease** 62:13
**decreased** 36:1
102:4
**deemed** 68:11
**deep** 134:22
**defend** 43:3 48:1
51:21 112:16

131:16 140:22
**Defendants** 1:13
3:3 9:22
**defending** 44:5
49:11
**defense** 46:6
**define** 63:18
150:20,22
**defined** 29:14
157:13
**definition** 58:3
63:13 150:21
151:1
**degrade** 135:22
**degree** 10:21
77:1 160:17
**delusional**
111:18
**demonstrates**
60:14
**department** 3:15
7:9 11:5 13:5
18:2 59:17
60:11 160:21
165:7 171:11
171:18 177:7
**departments**
34:17
**departure** 104:2
**depends** 58:13
68:13
**deployed** 162:13
**Deponent** 195:1
195:10
**deposed** 8:1
**deposit** 82:6
**deposition** 1:15
4:5,9 5:1 6:4,10
8:15 9:13 10:2
19:4 60:20 61:3
103:3 142:4
145:6,9,14
147:13 149:12

151:11 153:10
155:5,10
156:13 158:2
188:7 189:9
190:16 191:21
194:6,9
**depositions** 8:12
9:9
**depth** 56:13,13
107:19
**deputies** 87:20
**deputy** 11:4,11
11:14,15,22
17:15 99:5
**deranged** 37:14
99:17 109:6
**description** 82:5
**destructive**
186:17
**detectors** 88:5
88:15
**deter** 132:17,21
133:2
**determinations**
71:9 174:13
**determine** 68:8
158:10
**deterrent** 21:16
**Detroit** 10:16
12:12
**deviates** 106:9
**devices** 79:11
82:18 94:19
96:11 133:19
**devised** 79:8
**Dianne** 153:21
**Dick's** 107:22
108:4,18,22
**dictate** 84:8
**die** 100:2
**died** 30:13 35:11
35:14 57:22
97:14

**difference** 93:4
104:5 118:18
139:21 140:16
140:19 141:5
**differences**
139:18
**different** 22:5
29:20 31:1 32:6
33:5,8,9,11,14
33:21 34:5 53:2
67:5 70:4 99:13
123:17 126:14
130:13 136:16
136:17 139:20
140:7,9 180:2
180:14
**difficult** 53:1
74:14 79:8 97:5
99:22
**diminished** 88:1
**diminishes** 54:15
**direct** 149:18
192:6 193:11
**directing** 145:15
151:18
**direction** 2:3
20:12 73:19
**directly** 74:10
**director** 14:12,12
156:19
**disability** 51:14
**disagree** 99:18
**Disarming**
184:10
**disassembled**
85:19 86:1
**discharge** 52:8
118:12,21
**discharges** 87:15
119:17
**discharging**
133:3
**discover** 131:20

**discrimination**
192:14
**discussed** 167:21
**discussing** 61:10
153:15
**discussion**
119:14
**disease** 97:17
137:22 138:3,6
**dispatcher** 11:17
**display** 92:13,15
93:14,15 94:11
109:2
**dispute** 102:3
**disseminate**
182:9
**distributor** 15:2
**District** 1:1,2,19
6:7,7 8:17
142:9 145:12
152:13 196:4
196:19
**diversion** 19:16
19:17 20:3
**divested** 165:21
**division** 1:3 6:8
14:4,10 17:16
17:21 18:9
66:20 192:11
192:12,16,22
**divisional** 17:6
**docket** 152:1
**doctor** 147:16
**document** 19:3,8
34:15 142:16
145:5,16
147:12 149:11
151:9 153:8,13
156:12 158:1
189:8 190:15
191:20
**documents** 193:5
193:6,9

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

204

dog 74:16 75:18
75:19,19 95:13
doing 47:12,13
47:15,19 57:9
70:7 78:14
81:21 90:5
96:10 111:8
112:6 115:19
123:9 136:2
143:13 148:17
168:4 171:1
172:14 174:13
181:20 183:13
domestic 99:20
donation 150:2
donors 153:20
dope 111:7
Dorr 142:14
dot 185:18,18
186:2
double-check
148:9
doubt 101:22
102:10
downward 62:5
dramatically
101:3
dramatizes 60:2
drastic 35:6
110:22
drastically 35:22
Draw 4:15
149:16
drive 3:7 138:14
driver 39:8
drives 39:8
driving 39:9
dropped 138:17
drug 37:16
189:21
drugs 38:4 111:8
167:2
drugstore 167:3

dthompson@c...
2:16
due 183:3
duly 1:18 7:15
196:7
duties 11:19 50:7
133:16
duty 12:4,18
17:13
dwelling 99:6,7
dying 33:10,10
98:12

——————
E
E 4:1 6:1,1
earlier 143:7
186:16
early 108:19
152:2 190:8
easily 36:5 97:5
112:2 168:9
Eastern 1:3 6:8
142:8
easy 168:8
169:15
EDU 185:18
educate 49:20
educated 50:1
effect 21:16
164:12
effective 163:4
169:2 170:4
187:16
effectuating 13:2
effort 152:15,16
161:14 164:8
efforts 15:14
62:2 178:19
eight 178:16
either 41:2 83:19
92:19 100:15
123:17 124:15
152:1 176:18

elderly 113:7,15
element 39:13
114:2 160:13
elevators 171:6
eligibility 158:16
eligible 158:10
eliminated
129:18
EMANUEL 1:11
embarrassing
134:10
emergency
28:16 100:5
emphasis 90:12
161:3
employed 162:16
employee 25:2
168:5
employees 25:21
164:6 182:8
employment
11:3
employs 154:13
empower 140:21
en 21:7
enable 54:2
Enact 182:2
ended 100:17
enforce 73:21
182:5
enforced 39:11
enforcing 13:8
161:1
engage 21:10
52:3
engaged 54:5
enjoyed 37:10
enormous
170:22 183:6
ensuing 101:3
ensure 13:22
53:15 87:16
127:13 166:21

ensuring 109:5
entered 55:16
entering 87:12
165:1
enthusiasts
25:22 106:22
entirely 77:15
entities 24:9
entitled 126:8
149:16 190:20
192:3
entity 144:22
182:4,8
epidemic 26:7
27:1,5,6 37:1
39:19 40:5,17
40:20
equal 118:12,14
118:15
equals 186:3
equipment
108:10,11
122:4 160:1
err 65:14
especially 26:18
74:11 99:19
161:3 169:1
180:13
essence 80:14
essential 20:5
essentially 112:8
148:12 167:7
establish 182:4
established
182:9
estimate 177:17
et 4:8,8,11 13:3
59:12,13 66:15
66:15 111:10
111:10
ethical 157:8
event 185:17
187:13

everybody 39:5
64:13 84:4 92:1
123:10 151:5
170:12
evidence 13:2
21:14 24:3,4
35:18 54:4
66:12 87:1,4
113:2
exact 59:22
73:13 133:15
172:13
exactly 44:17
58:2 59:16,16
60:11 63:11
68:1 80:19 93:8
93:8 95:16
106:15 118:3,4
119:2,9 130:3
158:15 187:7,8
examination
1:16 4:2 7:15
7:17 43:19
47:16,18 196:8
examine 41:5
55:15 70:6
92:16 174:9
examined 7:16
36:19 40:3 73:7
174:15 176:15
195:2 196:7
examining 174:8
example 16:16
20:22 21:3
48:22 67:18
80:18 84:16
99:14 100:19
132:22
excellent 28:16
exception 105:20
excuse 90:8
108:1 126:17
127:18 151:20

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

172:15 173:19
187:1
**executed** 11:18
195:15
**executing** 13:2
111:19
**executive** 73:18
**exercise** 84:21
134:18
**Exhibit** 19:2,4
142:3,4,15
145:4,6 147:11
147:13 149:10
149:12 151:10
151:11 153:9
153:10 156:11
156:13 157:22
158:2 171:13
188:8 189:7,9
190:14,16
191:19,21
**EXHIBITS** 4:5
5:1
**Exile** 162:19
**expect** 118:18
135:22
**experience** 24:8
24:17,19 66:4
72:1 75:8 77:11
99:19 110:2,20
112:21 116:20
163:10 164:20
178:3
**experienced**
78:15
**expert** 4:6 9:9,9
10:1,4 19:11
41:18 43:6
106:4 114:15
117:5,7,18
118:2 125:14
126:5,21 141:4
144:7,8,15,17

152:19 175:5
**expertise** 125:17
**experts** 8:20 9:7
25:21 43:16
70:13 82:15
106:21 112:22
116:14 120:11
121:2 122:21
123:2 124:11
125:10,16
128:20 129:17
130:3 139:6
**expires** 195:22
196:20
**explain** 38:11
**explodes** 164:7
**explore** 47:1
**exploring** 32:1
**explosion** 16:15
**explosive** 13:8
16:10
**explosives** 13:7
16:6,9
**extends** 45:8
**extensive** 70:18
**extent** 46:13
60:14 105:6
106:2 112:19
169:19
**extremely** 28:12
70:17
**ex-ATF** 154:14

**F**

**faced** 79:6
**faces** 180:5
**facilities** 64:16
**fact** 4:17 8:12
35:10 36:7
49:12 71:1,14
76:7 85:20
87:19 107:20
113:1 135:3

140:11 153:15
162:20 166:7
169:3,10 174:4
180:12 184:13
187:3 193:10
**factors** 36:12
68:14
**facts** 24:3,4
35:18 56:3
98:17 113:1
174:10,16
**fail** 83:19,20
178:19
**failed** 191:3
**fair** 10:6 98:8,13
157:7
**faith** 90:5
**fall** 27:3 91:8
115:2 163:11
**fallen** 174:2
**familiar** 63:10
88:11 102:2
181:2 183:15
**families** 37:15
**family** 87:8
120:13 131:17
131:18
**far** 30:16 36:8
46:4 96:7
107:14 143:11
158:15 171:18
**fashion** 84:12
85:5 162:17
168:7
**father** 37:10 81:5
83:3 99:6,7
**favors** 189:19
**fear** 115:5
**February** 190:19
191:14
**federal** 4:12 13:8
63:16 66:21
84:7 87:10

88:11 91:14
143:1,9 147:17
180:21
**feel** 85:10,14
99:3 195:5
**feeling** 8:16
**Feinstein** 153:22
**felon** 51:15 190:1
**female** 78:17
192:20
**fence** 97:7
**fewer** 174:4
**FFL** 92:6
**FFLs** 176:7
**field** 12:12,20,21
14:11 17:1,8,9
17:22 53:22
78:20 80:14
84:16 192:12
192:16,22
**fighters** 82:12
**figure** 137:10
**figures** 34:8 60:1
**filed** 6:6 152:4
**fill** 178:1,5,21
179:7 180:5
**filling** 78:8
**final** 18:8,14
86:11
**finalists** 185:1
**financial** 193:5,5
**find** 74:12,22
75:1,2 78:10
135:13 161:15
167:3
**Finding** 49:17
**fine** 117:6
**fingerprint** 68:22
**fingerprints**
67:13
**finish** 144:12
**finished** 184:1
**fire** 42:19 53:17

54:3 82:9,12,12
**firearms-related**
26:6,8,11 28:1
28:6,10 29:3,4
31:15 32:11,18
33:2,20,22 34:4
34:12 37:2,5,18
38:9,15 39:20
40:6,18,21
61:22 62:6
77:12 164:13
**fired** 54:5
**firing** 52:21
66:10 86:3
116:14
**first** 11:3 12:11
15:3 19:13
21:22 54:10
59:10 65:17
94:16 95:21
107:10 108:21
109:18,19
113:18 114:1
115:9,14 131:6
155:17 157:1
159:1,5,9 163:9
176:15 180:18
182:15 183:1
192:6,7
**fits** 176:22
183:18
**five** 81:4 183:11
**five-minute**
60:18 183:20
**five-star** 160:4
**fixes** 169:16
**flex** 54:2
**flight** 187:11
**Flint** 180:10
**flip** 22:16 36:20
**flow** 177:4
**flowing** 177:2
**fluctuate** 27:16

Joseph J. Vince, Jr.
Washington, D.C.
September 16, 2011

focus 18:21 19:17
focused 23:7
focusing 29:13 29:14
follow 64:13 65:13,16 67:4 92:11 94:8 105:14 129:14 130:6,10
followed 94:5 95:8 98:7 169:11 179:12
following 18:6 19:3 21:18 147:12 149:11 153:8 156:12 157:22 167:15 189:7 190:15 191:20
follows 7:16 70:13 103:12 130:3
food 171:4
foolish 113:3,4 116:15
Ford 184:21
foregoing 195:3
forget 58:8 98:21
form 22:14 29:17 31:12 32:7 33:6 42:12 44:8 45:11,18 46:15 48:18 55:3 56:20 72:7 77:16 101:5 113:12 117:16 127:17,19 129:8 132:6 140:3 152:17 166:15 168:17 173:11 174:6 178:7

former 25:21
forms 91:17
formulation 160:16
forth 9:3 104:3
found 70:12 85:2 109:1 111:5 143:20 156:21 185:3,17
foundation 42:22 44:18 46:11,12 65:12 71:3 80:17 94:17 95:1 96:18 106:5 107:7 119:4 150:17 153:14 154:5 155:18 157:6 158:14 184:21
founded 149:5
founding 144:2 148:20
four 66:7 101:3 155:10
frame 152:7
Frank 172:18
frankly 96:9 171:22
Fraud 5:4
Freddie 4:7
Frederick 145:15
free 148:4 189:15 192:4
freedom 42:18
frequently 100:14 114:10 118:9 163:11 170:2,8,14
Friday 1:22
friend 190:1
friendly 53:17
front 79:10 150:1

full 7:19 31:17 54:10 69:8,14 82:5 83:6 89:2 94:15 97:11 104:15 108:21 109:19 131:6 152:13 158:6 163:9 180:18 192:7 193:8
fully 66:8 110:21
funding 182:17
funds 89:18 147:7
funny 89:17
further 15:5 50:15 82:2 180:17 193:14 196:8,11

─── G ───
G 6:1
gain 131:11 163:18
gaining 176:12
Gallatin 189:3 190:5
game 10:6
Gander 107:21 108:3,16,22
gang 34:1 59:7 75:3,5
gangs 111:12,15 191:7
gang-infested 38:18
gap 178:2,6,10 178:18,22 179:8 180:6
gather 74:5
gears 137:9
gender 32:19 159:8
General 189:16

193:8,13
generalizable 76:12
generalization 24:10
generally 61:17
generous 153:20
gentleman 108:16,17
Gerard 154:14
getting 20:7 60:16 73:14 82:21 101:9 122:11 129:2 130:21 141:12 168:11 175:15 175:19,20 176:11
Gilcrest 1:18 2:2 6:15 196:3,17
give 20:22 22:16 25:11 36:19 49:6 56:2,3 66:17 72:17 82:19 148:5 173:2
given 32:21 47:4 67:1 123:22 195:4
gives 78:3 129:3
giving 150:5 182:13
glasses 135:7,9 135:13,13
Global 4:21
glove 183:18
goes 36:15 43:22 46:5,9 59:12 61:16 80:2 101:12 107:14 175:21 181:16
good 7:22 19:12 21:3 35:5 47:18

51:16 64:9,12 65:12,16 69:4 70:10 77:19 78:3 81:3 90:5 91:10,16 92:10 96:22 98:10 100:18 112:6 113:2 122:22 130:15,17 151:22 175:1,2 179:1 188:18
Goods 107:22 108:18 109:1
Gore 153:21
gotten 147:7 173:8,9 174:20 175:5
government 90:17 175:12 182:4 184:22 189:4
governmental 182:8
graduate 10:15 78:13
graduated 10:10 10:18
grandpa's 75:1,3
Granted 104:12
great 10:8 116:17
grounds 106:5 157:6 158:14 181:14,15
group 4:15 13:22 149:16 159:12 159:13
groups 71:3 111:12
growing 27:1
guards 88:15
guess 89:20 146:14 151:6

Joseph J. Vince, Jr.

September 16, 2011

Washington, D.C.

207

167:5
**guesstimate**
98:10
**guide** 42:4
**guideline** 93:12
**guidelines** 46:13
106:9 107:7
139:5
**gunfire** 30:9
57:19
**Gunsmoke** 165:6
**gutted** 168:21
**guy** 50:11 100:16
134:14 166:18

**H**

**H** 2:11
**Hakim** 3:5 7:6,6
**half** 183:22
**halfway** 83:12
94:16 142:14
160:11
**HALL** 1:7
**Hamilton** 4:7
142:9
**hamlet** 29:10
**Hampshire** 1:21
2:13 6:12
**hand** 100:17
112:8 115:6
161:14
**handgun** 146:4
146:15,16,19
147:5,8 150:2
163:14
**handguns** 152:16
168:2
**handle** 44:21
45:2 49:1 53:14
95:22 107:12
147:6
**handling** 46:8
101:13 103:13

134:1
**hands** 20:7 37:13
163:11 168:12
176:11 177:3
**happen** 37:12
129:16 163:14
**happened** 100:21
109:9 133:1
**happening**
114:20 118:1
122:6 167:4
**happens** 100:14
100:17 129:16
134:15 177:22
**happy** 141:15
**harassment**
192:14
**hard** 122:3
181:20
**harm** 112:5
122:7,10
**harness** 39:8
**Harvard** 184:21
185:18
**hate** 22:16
**head** 18:3 22:22
30:13 32:15
67:4 177:6
190:22 191:5
191:10
**header** 153:17
**heading** 158:22
**headquarters**
14:6 191:13,14
**hear** 25:9 185:5
**heard** 52:11 67:7
74:10 75:14
142:20 162:18
**heart** 137:12
**heat** 40:12
**held** 6:10
**Heller** 151:15
**Helmke** 150:12

151:3
**help** 49:17 75:4
115:11 144:14
159:12
**helped** 101:11
**helps** 159:20
**high** 28:13 34:10
35:21 61:18
88:22 113:8
114:12 173:1
175:9
**higher** 118:11,20
**highly** 80:6 85:3
114:7
**hill** 31:6
**himself/herself**
195:13
**hip** 181:21
**hire** 45:2 182:7
**historian** 173:5
**historically** 49:9
**history** 11:3
**hit** 28:21 30:9
53:12,13 57:18
174:12
**hitting** 52:22
**hold** 126:17
127:18 157:11
**holder** 105:4
**holes** 100:3
**holster** 79:4
114:22 115:17
**holsters** 79:4,8
**home** 43:4,14,18
44:6,22 45:6,8
45:16 46:1,2,6
46:14,18 47:9
47:11 48:2,17
49:19 50:2 63:4
69:10,19 70:1
74:21 75:18,18
75:20 93:2,4
96:2 97:22

107:13 109:21
119:7,8,10
120:13 121:21
123:12 128:12
130:10 131:15
131:18,19
140:1,17
**homeowner**
122:12
**homes** 74:19
**homicide** 27:9
29:6 34:1,1,8
34:14 60:3
175:1
**homicides** 28:8,9
28:14 29:2,10
30:1 35:3,11
61:22 62:6
161:22 173:16
174:10 175:8
**honestly** 64:2
**hope** 101:8,11
104:9 134:10
140:10
**hopefully** 82:14
186:4
**Hopes** 4:15
149:16
**hoping** 104:17
**hour** 39:9 183:22
**house** 74:16,16
76:1 82:6 92:18
103:22 110:3,8
110:9,10 112:1
112:11 115:22
123:18 136:22
137:16 140:9
**households** 65:4
101:21 102:7
**Houston** 154:15
**HTML** 185:14
186:2
**huge** 26:20 89:6

161:5,7 171:21
182:15,16
**humiliate** 75:5
**hundred** 88:13
180:1
**hunt** 48:13 51:5
**hunted** 37:10
**hunter** 134:3
**hunters** 4:17
54:12,15
148:21 150:14
150:22 151:17
153:16,18
**hunting** 41:12
51:1 81:4,6
111:2
**hurt** 5:3 31:4
159:13
**hurting** 116:17
**hurts** 159:21
**hypothetical**
117:17 120:9
121:11 163:21
168:18

**I**

**IACP** 73:17
157:16 158:5,7
**IACP's** 158:9
**ID** 186:3
**idea** 18:18 42:8
69:5 88:22
100:7 154:8
179:11
**identification**
6:13 19:5 142:5
145:7 147:14
149:13 151:12
153:16 156:14
158:3 189:10
190:17 191:22
**identified** 64:7
167:5

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

208

identify 18:19
  19:7 21:14 55:7
  124:17 142:16
identifying 33:14
  129:5 172:20
  175:4
IG 169:15,20
ignored 191:2
ignoring 189:20
ILAFR 6:6
ilk 146:15
illegal 54:14
  90:13 111:8
  165:1 166:5,10
  166:13 179:2
  186:13
illegally 50:12
  143:14 161:12
  177:3,18
  186:10
Illinois 1:2,5 3:8
  3:18 6:8 8:17
  63:13 95:2,6
  108:3,5 181:2
illustrate 56:15
  57:4
illustrates 34:20
imagine 99:2
immediate
  105:22 106:11
immediately
  191:16
impact 4:12
  19:22 37:17
  38:8 147:17
important 19:20
  23:20 60:1
  78:12 83:12
  150:6
impossible 79:9
improve 169:20
inadvertent
  86:15 137:1

inadvertently
  93:7 100:15
  110:15 130:21
incentive 90:20
incidence 88:19
  165:11 176:10
  176:12
incident 100:20
  171:21
incidents 16:10
  30:1 56:14 57:3
  98:4 110:22
include 43:14
  89:15 146:11
  160:13
included 70:19
  136:12 143:6
including 30:3
  31:4 33:19 58:1
  58:12 151:16
  154:14
incomplete
  121:10 163:21
  168:18
increase 28:1
  128:22
increased 27:22
  102:4
increases 51:20
indicative 32:20
individual 67:17
  92:9 103:20
  111:19 113:7
  117:9,11,22
  118:10,19
  120:8 121:6,8
  121:15 124:18
  128:7 140:1
  166:1 195:12
  195:13
individuals 25:4
  41:21 42:11
  48:1 50:16 51:5

58:20 77:8 85:3
  106:11 116:2,8
  118:6,8 131:20
  132:3,21
  139:11 161:11
  169:9
individual's
  51:20 110:3
indoors 135:6
industry 13:7
  24:9,11,15,18
  24:19 25:9,10
  26:1 50:8 89:3
  89:4,5,6,7,8,10
  89:12,13,14,16
  89:19,21 90:2
  90:14,16,19
  91:10,10 94:18
  106:22 128:19
  139:8 142:22
  148:17 154:17
  155:16 156:7
  160:1 166:19
ineffective
  180:22
inefficient 74:19
  75:6
infer 171:12
  174:3,8
influence 36:12
  38:3
informants 72:12
  72:13
information
  18:18,19 21:5
  73:9 74:6 77:19
  78:1,2,3 82:7
  89:22 91:13,17
  148:6 180:20
Initiative 172:5
  172:11
injure 53:17
injured 26:19

35:21 36:8
  81:21
injuring 129:1,2
injury 40:9 131:9
  132:16
innocent 53:12
innovations
  185:18
inoperable 86:2
inside 88:16
inspect 182:5
inspections
  171:3
Inspector 189:16
  193:7,12
instance 121:12
instances 106:11
  121:5 132:20
instructors
  144:17
intelligence 15:8
  15:11,13 21:4
intended 54:21
  87:2 92:5,16,17
  94:11 110:17
intending 92:13
intentionally
  23:19
interdict 161:16
Interdiction 58:4
  167:14 172:5
  172:11 176:14
interested
  162:16 196:13
interesting 36:17
  97:20 152:20
interests 159:3,5
  159:18,19
interject 51:6
interlocking 38:5
internal 191:8
International
  4:20 25:5

144:15 157:19
interpretation
  63:7
interrupt 8:6
intervene 20:18
intervening
  161:2
intervention 20:2
  20:13 21:1
  73:22 160:14
interview 72:15
  73:5
interviewed 71:8
  73:1,7,8 77:8
interviewing
  78:7,14
interviews 71:10
  71:17 73:2 74:4
  77:14 78:18
intimate 99:20
introduce 6:19
intruder 110:1,9
  112:15 113:10
  121:7,21
  122:11 129:7
  131:10 132:1
intruders 131:7
  132:14
inventories
  168:4
investigates
  169:7
investigating
  12:22 16:6,8
investigation
  15:5 86:20
  165:5 189:17
investigations
  14:10 17:21
investigative
  14:1
investigator
  12:12

Joseph J. Vince, Jr.
Washington, D.C.
September 16, 2011

involved 25:3
53:7 65:19 66:1
73:6 160:16
168:19,20
179:4
involvement
25:5
involving 191:8
Irrelevant 154:7
irresponsible
42:20 124:10
124:11
issue 8:11 31:22
69:9,18 94:4
96:8 143:14
issues 143:18
150:11 169:13
183:10
issuing 169:18

_____ J _____

J 1:15 2:12 3:5
4:6,9 7:14,21
189:17 191:5
196:17
jailers 87:19
jails 72:14 87:12
Jersey 32:13
job 11:10 12:11
37:12 82:14
133:15
John 153:22
joined 12:7
Joseph 1:15 6:4
7:14,21 60:20
61:3 103:3
155:5,10
189:17 191:5
194:6
joy 81:6
Jr 1:16 4:6 7:14
7:21 189:18
191:5

judge 62:14
117:22 142:8
July 158:6 192:3
jump 97:7
June 152:7
jurisdiction
12:22 13:5
164:10 179:17
180:7 183:12
jurisdictions
178:5
jury 142:20
justice 10:13,22
21:10 156:19
156:22 157:2,3
157:4,13
juvenile 58:6
juveniles 161:3

_____ K _____

KATHRYN 1:7
keep 26:3 37:8
82:4,10,10
103:20 109:11
109:15 113:4
113:17 119:3,5
119:5 121:3
122:10 123:5
125:11,11
137:4,14
140:12
keeping 37:12
54:7 123:4
131:16
Kennedy 153:22
184:15,20
KENNETH 1:6
kept 54:4 69:10
69:18 74:1
81:12 98:2
102:9 119:11
128:13 129:12
129:19 191:16

Kerry 154:1
key 22:7 138:17
138:19,20
187:20
kids 35:4 110:15
kill 98:15
killed 28:20 35:5
35:16,21 36:8
97:12 99:3,9
killing 79:7
kind 20:20 72:17
127:19
kinds 113:20
171:3
Kirk 1:20 6:11
7:1,3
knife 35:15 36:4
knowing 58:9
59:22 114:2
knowledge 24:2
57:15 77:10
178:6
knowledgeable
166:22
known 74:7

_____ L _____

lack 111:18
lacked 113:7
laid 42:15,20
125:19
large 27:7 28:13
29:19 33:4 39:4
108:8 110:3
165:1 174:14
176:19
larger 171:22
largest 144:1
191:5 192:12
LaSalle 3:17
lasted 12:15
late 108:18
129:16 152:1

laudable 152:14
152:16
lawful 55:2,12
57:11 177:12
lawfully 163:12
laws 13:8,9,9
38:14 39:2,4,14
61:21 73:21
164:9 168:21
180:2,22 181:2
191:6
lawsuit 181:7,14
lawyers 146:12
law-abiding 39:4
122:18 123:15
126:22 137:11
137:13
laying 93:21
111:3,13 113:5
121:21 124:12
lead 64:8 184:20
Leadership 4:21
learn 52:20
72:16 82:14
learned 82:13
leave 100:3
104:10 105:11
121:20
leaves 79:20
leaving 41:19
104:19 178:4
ledger 112:12,13
left 18:16 68:15
72:19,22 104:7
104:18,19
131:21 132:1
legal 20:4 48:8
51:7 55:4 58:6
63:7 64:22
105:6 106:2
115:16 126:3
142:21 191:4
legally 41:17

47:13 158:17
legislation 20:11
158:8 182:4
length 32:22
lengthy 19:10
let's 8:6 19:12
30:7 31:14 35:8
41:6 44:18
48:15 59:9,10
61:7 62:20
67:19 89:1
94:15 99:11
103:9 109:17
110:6 113:6,14
113:14,18
114:7 119:8,21
131:5 141:16
142:7,13 145:4
158:20,22
163:8 164:18
168:14 172:10
174:1,10,12
177:21 181:7
187:6
level 24:10 28:4
36:13 37:16,17
levels 38:8
levied 192:16
license 105:4
licensed 114:9
182:11
licensees 66:22
67:1 91:14
licenses 169:18
licensing 140:22
182:3
lie 50:10 166:18
life 31:8 83:14
life-threatening
135:16,19
light 54:20
likelihood
117:14 118:11

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

210

likewise 86:21
limit 140:8
limitations
  179:15,15
limited 113:15
limiting 55:1
limits 159:4
line 66:10 142:15
  146:2
lines 32:19 40:15
  178:16
link 185:14
liquor 169:8
list 22:1 70:19
  116:4
listed 22:13
  95:20
literally 91:6
literature 22:5
  70:17,18
litigation 3:16
  73:4 144:9,20
  152:19
litigations 91:9
little 82:10
  133:14 185:2
live 114:12
  125:22
lives 98:6 99:12
living 114:14
LLC 147:20
LLP 3:6
load 66:9 109:13
  124:15
loaded 84:4,5
  102:9 103:20
  109:21 110:7
  110:21 111:3
  112:2,10
  115:21 117:9
  117:11 118:10
  118:19 119:18
  120:3 121:20

122:11,19
123:16 124:12
124:18,19
131:8,11,14,20
132:15 136:10
136:10 138:9
138:10 139:15
loading 136:12
lobby 145:1,2
  146:8,13,21
  150:3
lobbying 89:11
  94:18
lobbyists 89:18
  89:19
local 84:7
localities 158:9
locality 158:18
locally 88:11
location 82:11
  86:5 98:3 110:9
  119:13 125:13
  127:5 128:14
  129:14,21
lock 12:2 17:11
  53:21 64:18
  78:21 79:17
  81:8,13 84:17
  84:21 96:18
  97:3 109:2
  136:7,10
lockbox 67:19
  68:7 87:14 96:3
  96:10 97:4
  113:9,17
  117:12
lockboxes 67:12
  68:11 122:19
locked 80:1,4,20
  81:13 93:15
  98:2 119:3,5,12
  120:17 121:3
  124:14 125:20

128:13 129:13
129:20
locking 81:9,10
  81:14 82:18
  84:9 86:15
  94:19 123:5
locks 54:1 64:8
  70:5,5 79:13
  82:18 114:14
  138:6
long 108:6
  126:11 172:15
  181:19 189:17
  192:4
longer 83:20
  133:14
looked 25:19,21
  37:5 40:16 46:1
  46:1 62:11
  63:18,19 65:10
  69:21 70:2
  126:9,12 144:3
  153:2 164:16
  164:17 171:2
  173:14 178:14
  183:14,16
looking 18:4 24:7
  28:14 29:2 30:6
  30:18 47:17
  49:15 60:1 70:7
  73:22 74:19
  81:20,20,21
  82:3 98:21
  99:19 139:2,22
  140:1 143:14
  144:18 162:20
  176:19 187:21
looks 60:13
  145:14
Los 33:15
lot 22:4 23:7,13
  27:19 28:17
  29:9,20 30:14

32:10 42:17
43:22 44:2
48:16 52:15,21
52:22 53:2,7
57:6 69:22 70:3
70:4 78:3 91:16
92:1 93:18
98:20 108:8
126:15 133:18
167:11 169:13
170:7,9,18
180:13,14
love 99:1
low 34:10 88:19
  88:22
loyal 157:14
lunch 141:13
lying 77:15,22
  103:21

**M**

M 186:2
mad 99:7
Magazine 5:7
  192:2
main 14:19 49:13
  150:3
maintain 49:17
  49:18
maintained
  69:10,19
major 16:14
  33:16 91:4,4
  177:4
majored 10:13
majority 34:11
  143:15 172:6
making 18:4
  28:22 29:12
  98:1 119:11
  128:13 129:12
  129:19 141:9,9
  166:8

male 78:17
man 95:13 182:8
management
  192:14
mandate 54:6
mandated 83:15
  87:12
manifestation
  27:14
manipulating
  138:9
manner 44:22
  74:10 80:7
  86:18 96:2,5
  107:13
manual 66:21
  91:15 109:10
manufacturer
  15:2
manufacturers
  24:12,21 70:5
  89:7 136:9
  160:2,4
manufacturing
  89:13
March 57:20
  149:17
mark 19:2 142:2
  145:4 147:11
  149:10 151:9
  153:8 156:11
  157:22 186:2
  189:7 190:14
  191:19
marked 19:4
  60:4 142:4
  145:6 147:13
  149:12 151:11
  153:10 156:13
  158:2 188:8
  189:9 190:16
  191:21
market 20:4

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

211

| | | | | |
|---|---|---|---|---|
| 165:2 | 125:4 127:20 | 148:3 | 141:7 162:6 | **multitude** 56:14 |
| **marketing** 89:11 | 145:2 154:9 | **Meritorious** | 188:22 | **murder** 34:9 |
| **marshal** 87:9 | 167:17 170:22 | 189:3 | **misconduct** | 59:19 |
| **marshals** 87:20 | 175:20 178:11 | **metal** 88:5,15 | 191:3 | **murders** 36:5 |
| **Maryland** 153:6 | 182:22 | **method** 120:5 | **mispronouncing** | 61:15 |
| **Mary's** 4:19 | **meaning** 68:20 | **metric** 32:6 | 145:11 | **myriad** 21:2 34:3 |
| 156:17 | 68:21 105:7 | **metropolitan** | **misreading** | 62:16 68:3 91:7 |
| **mass** 36:5 | **means** 58:10 | 33:16 177:5 | 173:18 | 91:9 96:11 |
| **material** 22:13 | 59:2,3 115:10 | 178:21 | **mission** 147:1 | 110:8 167:19 |
| 23:2,7 70:4 | 131:3 157:8 | **Miami** 15:16 | 150:21 183:2 | 170:5 |
| **materials** 19:15 | **meant** 157:4 | **MICHAEL** 1:7 | **missions** 151:4 | **M-16** 123:4 |
| 21:21 22:1 | **measure** 35:1 | **Michigan** 180:11 | **mistake** 53:14 | |
| 23:18 70:19 | 87:15 179:10 | **microphone** | **mobility** 113:7 | ——————— |
| 167:6 | **measured** 29:8 | 186:19 | 113:15 | **N** |
| **matter** 1:17 6:5 | 133:7 | **middle-sized** | **model** 65:16 | **N** 4:1,1 6:1 |
| 41:20 42:8,9 | **measures** 66:2 | 27:22 | 183:12 | **nail** 114:6 |
| 44:9 46:9 64:6 | 131:16 | **Midwest** 191:6 | **moment** 41:20 | **name** 6:13 7:19 |
| 70:17 71:1,14 | **measuring** 28:7 | **miles** 39:8 180:1 | 155:3 185:20 | 133:17 154:11 |
| 76:7 85:20 | 28:8 | **military** 26:1 | 192:9 | 154:21 195:21 |
| 110:3 118:2 | **mechanics** 118:8 | 31:1,5 53:2,16 | **money** 150:6 | **narcotics** 111:5 |
| 162:20 180:12 | **mechanism** 64:9 | 83:9 84:7,11,15 | 164:7 189:20 | **nation** 42:3 |
| 193:10 | 86:15 96:14 | 85:6,9,11,15 | **monitor** 14:10 | **national** 14:14 |
| **matters** 126:5 | **mechanisms** | 85:17,21,22 | 17:21 171:1 | 14:17,22 16:5 |
| **Mayer** 3:6 | 67:14 84:9 86:3 | 86:7 107:2 | 182:5 | 16:11 27:14,18 |
| **Mayor** 1:11 7:7 | 133:11 | 123:2 139:6,17 | **months** 161:6 | 27:19 42:21 |
| 7:10 179:4,5,5 | **media** 26:13 | 139:20,22 | 171:6 | 44:18 46:11 |
| 179:6 | 34:18 148:6 | **million** 98:9,15 | **morning** 7:22 | 65:11 71:2 |
| **mayors** 179:2,3 | 180:21 186:2 | **mind** 20:22 22:21 | 121:17 | 94:17 95:1 |
| 179:7 | **medicine** 28:16 | 102:17 151:5 | **motorcycle** | 107:6 119:4 |
| **McCarthy** | **meetings** 25:11 | **mini** 145:18,19 | 111:12 | 133:21 153:14 |
| 153:22 | **Melissa** 1:18 2:1 | **minors** 169:8 | **Mount** 4:19 | 155:18 |
| **mean** 20:6,16 | 6:15 196:3,17 | **minute** 173:17 | 156:17 | **nationwide** |
| 21:1,9 25:15 | **member** 25:6 | **minutes** 187:10 | **Mountain** | 176:21 |
| 26:8 27:1 29:5 | 75:3,12 147:4 | 192:19 | 107:21 108:4 | **natural** 141:16 |
| 29:6,8 30:12 | 148:21 157:16 | **mirror** 71:3 | 108:16,22 | **nearly** 57:18 |
| 31:17 33:9,11 | **members** 25:8 | **mirrors** 65:11 | **move** 126:7 | 97:21 119:9 |
| 34:21 44:15,17 | 59:7 75:5 | 80:18 92:2,4 | **moved** 15:16 | 128:11 129:17 |
| 45:1,10 48:11 | 131:18 | **mischaracteriz...** | **movies** 116:13 | **Nebraska** 13:11 |
| 58:9,13,16 63:3 | **Menino** 179:5,6 | 79:1 | **moving** 41:8 | **necessarily** 8:22 |
| 64:4 65:20 | **mentally** 37:14 | **mischaracteriz...** | **multiple** 62:12 | **necessary** 195:6 |
| 83:16 89:3 | **mention** 53:3,4 | 31:13 45:12,19 | 68:2 112:10 | **need** 32:2 49:7 |
| 118:15,16 | 159:21 | 50:5,19 107:17 | 122:19 123:16 | 105:21 106:11 |
| 121:22 125:1,3 | **mentioned** 22:20 | 126:18 129:9 | 129:6,6 168:1,1 | 117:2 131:15 |
| | | | | 134:16 170:3 |

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

212

| | | | | |
|---|---|---|---|---|
| 175:12 182:2 | **Notary** 1:19 | **nuns** 77:20 | 171:19 172:2 | 85:22 86:17 |
| 183:4 188:13 | 195:18 196:1,3 | **Nunziato** 71:13 | 173:15 | 87:12 122:2 |
| **needed** 4:22 | 196:18 | 73:5 75:7 133:8 | **occur** 20:19 21:5 | 165:11 169:6 |
| 51:21 165:14 | **noted** 170:1 | 133:9,13 134:3 | 21:19 27:4,17 | 189:20,21 |
| 168:15 | **notify** 169:5 | 134:18 154:14 | 28:20 53:16 | **offices** 1:20 6:11 |
| **needs** 62:16 | **notion** 49:10 | 156:2 | 116:22 122:5 | 8:1 |
| 175:10 | **NRA** 4:15 75:11 | **NW** 1:21 2:13 | 131:19 163:11 | **Official** 5:6 |
| **never** 23:22 | 89:15 148:15 | | 170:2,3 | 190:21 |
| 52:11 69:3 | 148:16 149:17 | **O** | **occurred** 78:8 | **officials** 154:4,14 |
| 88:21 147:7,7,9 | 149:19 150:11 | **O** 4:1 6:1 | 121:13 133:5 | 175:11,12 |
| 155:17 156:4 | **NSS** 46:10 | **Oak** 190:22 | **occurring** 20:21 | **oh** 93:13 |
| 164:17 | **NSSF** 43:20 92:3 | **obey** 38:14 | 26:4 | **Ohio** 11:6 145:14 |
| **new** 1:21 2:13 | 93:8 101:9 | **object** 37:19 50:4 | **occurs** 20:18 | 108:15 134:9 |
| 4:14 6:11 29:9 | 103:12 104:6 | 76:3 80:17 | 29:6 | 134:14 |
| 30:3 32:13 | 105:15 107:5 | 84:13 90:22 | **offenders** 87:7 | **older** 134:13 |
| 33:15 142:9 | 119:9,19 | 95:11 105:5 | **offender's** 87:8 | **Omaha** 13:12,19 |
| 144:13 148:6 | 127:14 131:13 | 106:1,5 112:18 | **offenses** 59:20 | **omit** 23:19 |
| 149:16 165:5 | 154:1 166:18 | 113:12 140:3 | 59:20 | **once** 116:14 |
| 165:19 177:13 | **number** 6:4,8 | 157:5 158:13 | **offer** 37:20 | 169:4 170:2,10 |
| 178:2,3,4 179:5 | 26:18,20 28:8 | 162:5 163:5,19 | **offered** 43:6 | 170:10,12 |
| 179:14,14,16 | 29:1 30:18,19 | 178:7 181:13 | 46:16,18 65:7 | 171:5 |
| 179:19,22 | 30:22 31:11 | **objecting** 117:16 | 91:1, 152:18 | **ones** 80:1 87:21 |
| 180:5,7 183:15 | 58:12 60:20 | 117:17 127:18 | 181:16 | 88:10 90:4 |
| **Newark** 32:13 | 61:3 72:18 82:5 | **objections** | **offers** 150:1 | 167:15 |
| **news** 35:2 | 103:3 122:2 | 106:14 118:13 | **office** 13:12,19 | **ongoing** 14:10 |
| **newspaper** 56:7 | 133:7 152:1 | 118:22 124:21 | 16:2 17:1,4,6,9 | **open** 67:21,22 |
| **night** 121:16 | 154:13 155:5 | 127:3 | 185:20 190:22 | 68:4,21 104:8 |
| 135:5 | 155:10 167:6 | **objective** 140:15 | 191:6,11 193:4 | 104:11,20 |
| **Niles** 4:10 | 171:10 174:19 | 140:18 | 193:12 | 124:15 131:21 |
| 145:10 188:8 | 175:1,3,9,9,17 | **objectives** | **officer** 14:3 | 138:6 |
| **nimble** 114:11 | 187:16 | 140:11,20 | 53:12 63:4,12 | **operable** 63:5,22 |
| 115:4 | **numbers** 28:13 | 183:3 | 65:14 66:5 72:2 | 79:16,22 80:3 |
| **Nitti** 172:18 | 29:14 31:16,17 | **objects** 140:10 | 78:20 79:3,12 | 80:13,19 84:12 |
| **nonfatal** 62:14 | 32:14 57:6 | **obtain** 99:22 | 79:19 87:17,22 | 93:12,13,13,19 |
| 62:15 174:11 | 59:12 91:17 | **obtains** 8:19 | 171:19 | 105:3,20 |
| **normal** 11:19 | 98:21 99:11 | **obvious** 31:16 | **officers** 11:20 | 106:12 110:4 |
| **normally** 86:14 | 102:11,14 | **obviously** 19:9 | 17:7 52:13 63:3 | 112:15 113:9 |
| **North** 3:17 | 122:5 144:18 | 34:13 37:5 38:3 | 63:22 64:3,10 | 116:9,20 117:1 |
| **Northeastern** | 165:1 171:12 | 48:13 54:7 | 64:16 65:5 | 117:9 120:15 |
| 142:18 | 171:22 | 55:20 57:5 91:3 | 72:15 73:8 | 121:6 124:8 |
| **Northern** 1:2 6:7 | **numbers-wise** | 106:19 126:4 | 77:22 78:15 | 126:13 127:1,5 |
| 8:17 145:13 | 180:11 | 162:3 165:15 | 79:4,7 80:5 | 127:7,9 128:7 |
| **Northwest** 6:12 | **numerous** 71:8 | 166:4 170:6 | 83:8 84:11 | |

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

213

130:6,15,19
132:4,5,10
139:11,12
140:8 141:3
operate 108:3
operating 180:20
Operation 165:6
operational 80:9
116:11
operations
169:10
OPERATOR 6:3
7:11 9:16,19
60:19 61:2
102:21 103:2
141:18,21
155:4,9 184:3,6
186:18,22
193:19,22
194:5
opine 36:16 62:9
opinion 35:8,13
35:17 36:10
37:2,16 38:7,21
39:19 40:20
41:4 44:5 55:1
58:20 62:4
64:22 68:12,19
109:20 110:2
117:5,8 126:3,5
126:6,10,21
136:19 152:6
153:1,3 172:21
175:5,18
opinions 37:21
46:19 76:5 91:1
95:15 106:4
123:22 163:21
170:17
opportunity
169:12
oppose 37:11
opposed 158:7

166:11
option 122:15
oranges 46:22
order 71:9 170:3
179:7 189:4
193:12
ordinance 54:22
62:22 63:2
65:11,15,18
69:15 70:11,13
96:8 103:11,14
103:19 104:6,9
104:13,22
105:2,10,16,17
105:19 106:16
114:21 115:3,5
115:15 116:8
117:4 119:2,2
120:7 121:5,14
124:5,16 126:1
130:2,22 132:8
141:10 159:2
organization
54:11,13 149:5
179:2,8
organizations
151:3,16
organized 34:1
origin 15:1
original 195:7
originate 55:17
originating
187:22
ought 45:3
outcome 196:13
outlandish
155:20
outline 167:14
167:16
outside 43:3,14
43:18 44:6
45:16 46:1,14
46:18 47:11

48:17,19 50:2
76:9 165:21
overall 29:6
36:13 38:7
144:19 174:14
183:4
overbroad
168:18
oversee 17:21
oversight 90:17
overwhelming
143:1
owner 44:20 46:6
68:7 95:22
67:11
owners 104:10
108:11 149:6
ownership 43:1
46:4 147:3
owning 41:14

——————
P
——————
P 6:1
PACHOLSKI
1:6
packaging 111:9
page 4:2,5 5:1
8:4 41:6,10
45:8 54:9 56:5
56:6 57:17
59:10 61:8
62:21,22 65:18
69:15 83:7
86:12 87:11
89:1 94:14
96:18 97:10
103:9,17
108:20 109:17
109:19 131:5
133:6 139:1
142:7,13
145:16 149:18
151:19 152:9

152:11 153:17
154:20,21
158:21 163:8
177:21 180:17
185:22 188:14
188:18 192:6
pages 188:12
paid 89:18 148:8
paper 166:1
195:7
paragraph 19:13
21:22 65:17
69:7,8,13,14
69:16 71:7 83:7
83:9 86:12 89:2
94:15 97:11
108:21 109:7
109:19 131:7
139:2 142:20
142:21 158:6
160:7 163:9
164:18 167:10
177:22 178:15
180:18 192:7,7
192:9
parallel 105:17
parallels 27:3
parameter 49:3
parameters 48:8
114:4 129:3,10
parents 99:1
Parkinson's
137:21 138:3,5
part 20:14 21:15
37:7 50:7 55:7
67:15 69:11
87:18 88:12
89:15 107:18
110:1 111:9,10
139:4 144:22
146:20 184:14
193:6
participated

184:17,17
particular 63:16
92:7 98:15
103:16 118:19
138:15 146:4
166:1 185:22
parties 196:12
196:13
partner 107:21
155:14
partners 25:20
65:20 95:4
148:9
partnerships
187:18
pass 159:12
passed 63:10
81:5
passion 40:12
paste 56:11
patrol 11:20
patrolling 11:16
pattern 27:7
Paul 150:12
peace 63:3,12
64:3
pendency 8:15
pending 8:10
penitentiary
11:19
people's 134:12
percent 55:18,19
88:13 90:7,8,9
90:10 101:20
102:8,8 143:8,9
143:10
percentage
29:15 30:4
76:16,19,22
77:3 143:15
perfect 193:12
perfectly 115:16
perform 134:16

Joseph J. Vince, Jr.                    September 16, 2011

Washington, D.C.

214

165:13
performance 136:1
performed 14:2 133:10,16 135:1,10
performing 134:18
period 26:14 60:2 62:7 77:21 81:16 85:9 97:12,13 98:13 116:22 162:2
periodically 52:18
permissible 8:18 77:13
permit 139:20
permits 103:19 105:3 139:19
permitted 8:13 10:1 80:12 84:12 86:7 88:16 104:21
perpetrators 33:21
persist 180:19
person 36:3 68:14 79:9,11 79:22 80:10 82:16 93:21 100:2 105:21 110:17 113:15 113:22 115:21 116:9 117:10 118:16,17 127:8 132:9 141:8,10 165:20,21 166:3,21
personal 66:1,3 66:4 72:1 92:14
personally 60:9

73:7 196:5
personnel 84:8 85:9,15 115:7
persons 73:8
person's 41:16
perspire 135:20
phone 91:17
phrase 146:10 146:11,12 178:13
physicians 100:5
pick 34:14 57:4 74:15,17 107:22 110:16
picked 56:14 170:21
picking 171:18 171:21
picks 82:16
picture 28:15 185:10
pieces 78:9
pitfalls 44:2
place 33:10 87:13 112:1,5 119:6 132:17 145:15 179:15 181:12 196:6
placed 79:18 90:12 103:17 173:13
places 30:10 54:16 113:5 124:13
plague 26:15 27:7 172:22
plagued 33:19
plagues 171:9
plaguing 172:8 172:21 173:2,8 174:20 175:4 175:17
plain 46:4 87:22

Plaintiff 6:5 95:2
Plaintiffs 1:8,17 2:10 6:21 7:1 9:22 10:3
plan 183:4,6
planning 86:17 182:16
play 14:17 183:21 185:2 187:6
Playing 185:6 186:6
please 6:21 7:12 7:19 8:7 19:8 186:19
plenty 187:11
PLLC 1:21 6:11
Plus 74:2
poignant 105:15
point 8:7,8 19:1 34:21 48:3 49:9 50:14 56:15 57:7 94:6 95:21 96:14 97:21,22 100:12 106:21 116:18,19 126:10 141:16 154:12 155:1 157:1 164:10 168:22 169:3 171:10 181:15
pointed 19:21 20:11
pointing 31:10
points 22:12 95:18 183:11
police 4:21 25:6 34:17 57:14 59:17 60:10 63:4,21 64:10 64:14 65:4,14 73:8,19 88:16 116:21 144:16

157:20 160:21 165:6 171:11 171:18 177:7 181:1 189:19
policies 17:22 18:4 160:13,17
Policing 4:21
policy 41:20 42:2 42:3,8,10 73:19 160:22
polish 143:18
politicians 154:1
poor 37:12 90:12 90:18 143:13
population 29:9 29:15 30:5
portion 55:9 62:21
portrayed 165:12
position 8:21 9:4 9:8 11:4 13:15 14:8,9 15:19 18:8,14,14 30:16 156:17
positive 164:12
possess 109:20
possession 15:6 57:11 74:8 80:13
possibility 88:8
possible 59:6 77:15 121:8,13 163:13,16 191:4
post 4:14 12:18 149:15
potential 74:7 84:5 122:10
practice 52:4,14

52:15,16 92:8,8 92:10,10 107:4 128:15 129:11 129:22 130:11 166:11 167:8,9
practices 71:8 90:13,19 91:16 91:18,20 92:1 92:21 107:2 136:19,22 137:3 139:5 143:13 157:3 164:22 165:3 167:12,16 168:10 184:22
precedent 8:17 9:4
precluded 99:15
predecessor 146:16 150:3
premise 58:19 58:22 95:5
premises 93:1
preparation 77:9
prepare 182:4
prepared 19:11
Preparing 49:4
prescribes 158:18
presence 88:16 195:16
present 3:22 101:20 173:7
presentations 25:11 73:14
president 150:12 153:18
press 158:5
presumably 57:19
pretty 22:19 65:11 104:2 173:20

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

215

**prevent** 20:20 86:15 87:14 128:21 147:18 150:4
**prevented** 98:1 119:10 120:16 128:12 129:18
**preventing** 20:2 131:7 132:14 161:1
**prevention** 20:1 20:6 73:22 160:13 170:4
**preview** 186:2
**priests** 77:20
**primarily** 144:3 153:6
**primary** 74:20
**Printout** 4:19
**prior** 71:7 87:11 112:19 155:18 178:14
**prison** 126:4
**prisoners** 11:18
**private** 55:9 64:1 81:13
**privileged** 10:5
**privileges** 149:6
**pro** 148:12,14
**probably** 25:12 26:16 56:14 57:21 73:11 82:19 98:10 108:17,18 116:1 133:14 176:20 177:14 180:11 183:7 183:22
**Probe** 5:6 190:21
**Probed** 5:4
**probing** 44:13
**problems** 18:20 33:19,20,22

40:12 79:5 85:12 91:5 110:8 138:8 168:16 180:5
**proceedings** 2:1 196:10
**procurement** 133:19
**produces** 36:7
**product** 70:8
**products** 70:2 90:20
**proficiency** 51:20 114:11
**proficient** 114:7 133:22
**profit** 90:15
**program** 10:18 94:19 156:20 161:9
**programmed** 67:20 68:18 96:3
**prohibit** 20:7
**prohibitation** 147:1
**prohibited** 166:9
**prohibits** 55:9,10
**project** 14:3 160:21 162:19 179:12 184:10 184:20
**projects** 183:3
**promote** 55:1
**promoted** 13:11 190:4
**promotes** 55:11
**proof** 150:1
**proper** 70:1
**properly** 44:21 45:2 49:18 50:9 54:19 55:21 66:15 67:20

68:18 83:22 90:4 95:22 96:3 96:4 107:12 114:1,9,9 160:20
**properly-licen..** 103:20
**properly-trained** 122:18 123:16 127:1
**proponent** 41:11 41:13,21 43:11 44:13 45:14 47:7,8,10,12 47:22 48:3,5 49:10,17 50:21 51:11
**propose** 49:1
**proposes** 43:20
**propositions** 23:20
**prosecuted** 161:12 165:16
**prosecution** 21:15 161:13
**protect** 49:21 131:3 149:6
**protected** 120:14
**Protecting** 71:15 71:21 78:16
**protection** 26:2 109:22 131:8 132:16
**protocol** 65:2,13 66:18 70:10 94:22 95:7
**protocols** 69:22 85:21 88:10 140:12
**proud** 157:14 175:10
**provide** 70:2 90:20 95:15

101:15 104:13 144:6,7 182:10
**provided** 103:21
**provides** 91:16 109:21
**provision** 103:14 104:14
**provisions** 63:2
**Pro-Gun** 4:14 149:16
**prudent** 114:16 120:5
**public** 1:19 20:9 41:20 42:2,3,8 42:9 55:1,11 56:1 64:6 90:17 108:9 151:5 159:6,9,15 166:7 168:11 175:11 195:18 196:1,3,18
**publication** 92:7 93:10 184:12
**publications** 182:11
**publicized** 161:13
**publicly** 182:9
**published** 19:14 21:20
**pull** 79:10
**pumping** 170:7
**purchase** 166:4 181:4
**purchaser** 15:3
**purchases** 167:8
**purely** 29:13
**purport** 147:3
**purpose** 34:20 41:12,14 43:12 44:14 45:15 54:21 83:5 87:15 94:21

139:21
**purposes** 6:13 9:8 50:22 51:12 87:5 111:3 140:7,9
**pursued** 18:7
**put** 22:8 23:1 24:1 26:13 31:19 34:7,17 39:1,11 44:16 52:17 59:21 60:8 63:9 65:9 67:20 71:5 76:14 92:3,21 96:16 97:6 109:11 136:9 151:14 164:8 166:19 167:13 169:15 171:14 181:12,22 184:21
**puts** 30:16 34:8 39:8 131:17 166:7
**putting** 23:18 132:2 164:5 169:18
**p.m** 141:19,22 155:6,11 184:4 184:7 193:20 194:1,7,8

**Q**

**qualified** 83:18 163:12
**qualify** 52:19 66:6 96:5
**qualitatively** 33:5
**questioning** 10:6
**questions** 95:9 188:7,12,16 193:15 194:3

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

216

| | | | | |
|---|---|---|---|---|
| quick 131:14 | reaction 134:12 | reasonably | 69:22 | 21:8 22:7 69:20 |
| quickly 138:6 | read 22:6 96:21 | 120:4 | record 6:18 7:20 | 71:22 100:20 |
| quite 19:10 96:9 | 137:11 185:4 | reasons 54:6 | 9:5,15,17,20 | 179:14 184:13 |
| 171:22 172:17 | 185:13 190:12 | 167:5 180:15 | 19:8 31:9 32:3 | references 22:8 |
| quote 56:6 63:1 | 192:5 195:2 | reassigned 191:1 | 39:15 47:8 | 143:6 |
| 101:20 103:10 | reading 22:4 | 191:12 | 60:22 61:5 77:7 | referencing |
| 109:5 150:11 | 97:10 189:14 | Reassigns 5:6 | 82:4 102:22 | 46:10 |
| 154:15 187:4 | reads 103:11 | 190:20 | 103:5 126:20 | referring 54:11 |
| quoted 159:1 | 139:3 | rebuttal 10:4 | 128:5 129:4 | 70:19 83:8 |
| quoting 97:17 | ready 110:21 | recall 66:22 | 141:17,19,22 | 86:19 97:21 |
| | 112:2 | 91:14 142:10 | 155:7,12 | 103:15 165:3 |
| **R** | real 47:18 | 150:7 161:22 | 159:17 184:4,7 | 167:9 184:16 |
| R 6:1 | 100:18 116:7,7 | 162:8 167:20 | 185:14 188:17 | 192:11 |
| rabbit 52:22 | reality 100:10 | 184:9 192:15 | 188:19,20 | reflected 27:12 |
| race 32:19 39:7 | really 19:21 | receive 83:15 | 189:5 193:20 | 62:7,10 183:11 |
| 159:8 | 22:16 28:14,19 | 89:18 189:4 | 194:1,7 195:4 | refresh 147:22 |
| racial 192:14 | 34:20 36:17 | received 10:21 | 196:10 | regard 34:5 36:6 |
| racked 109:1 | 37:4 39:22 | 21:4 189:2 | recorded 196:9 | 69:11 97:2 |
| RAHM 1:11 | 43:18 44:10 | 190:5 193:10 | recovered 86:20 | 103:13 181:3,4 |
| raid 31:3 193:4,6 | 45:3,22 53:13 | receiver 86:3 | 161:15 | regardless 60:13 |
| 193:7 | 56:11 62:1,11 | receivers 85:20 | recoveries | 156:5 159:8 |
| RAND 102:1,11 | 70:13 71:3 | Recess 9:18 61:1 | 171:19 173:15 | regime 181:10 |
| random 76:12 | 73:16 75:2 | 103:1 141:20 | 173:17,19 | 181:11 |
| range 114:10 | 82:20,21 93:4 | 155:8 184:5 | 174:2 | regimes 141:6 |
| 116:22 | 98:19 104:8 | 193:21 | recovery 171:14 | regularly 52:6,14 |
| Ranjit 3:5 7:6 | 107:10 109:18 | recidivists 77:4 | reduce 186:9,13 | regulates 13:6 |
| ranks 28:12 | 110:22 115:10 | recognize 20:19 | 188:3,4 | regulating 55:20 |
| rape 48:16 | 134:14 143:8 | recognizes 67:17 | reducing 19:22 | regulation 181:5 |
| rash 100:10 | 143:16 155:22 | recognizing | 55:12 160:15 | regulations |
| rate 28:9 29:3,5 | 156:1 164:4 | 106:10 | 160:18 187:16 | 63:17 143:2 |
| 29:8,14,22 60:3 | 168:15 174:9 | recollection | 187:19 | 169:1,19 171:3 |
| 118:20 161:21 | 174:13 183:16 | 147:22 148:11 | refer 59:14 84:15 | 182:5,5,9 |
| 180:12 | reason 39:11 | 155:19 176:20 | 88:13 165:4,6 | regulatory |
| rated 59:21 | 80:12 101:22 | recommendation | 182:6 | 155:21 181:10 |
| rates 101:2,14 | 102:3,10 | 128:18 | reference 21:21 | 181:11 182:3 |
| 173:2 | 105:19 106:8 | recommendati... | 24:14 25:14 | 183:17 |
| ratings 160:5 | 123:8,8 128:15 | 64:13 67:3 71:4 | 35:10 50:15 | Reidy 3:22 6:14 |
| ratio 99:13 | 139:18 167:3 | 71:10 73:18 | 74:5 83:6 86:22 | reimbursed |
| Ray 149:21 | 179:8 180:19 | 101:8 103:12 | 89:2 91:12 | 148:10 |
| 153:17 | reasonable | 139:5 182:1 | 94:15 97:9 | rejected 150:5 |
| RDR 1:19 2:2 | 112:4 113:2 | recommended | 107:20 125:6 | related 73:10 |
| reach 115:1 | reasonableness | 44:19 67:1 | 193:3 | 196:12 |
| 135:13 | 114:18 | recommending | referenced 20:13 | relating 19:15 |

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

217

| | | | | |
|---|---|---|---|---|
| 56:19 | 157:22 189:7 | 168:13,20 | 24:12 95:6 | **route** 21:7 |
| **relationship** 38:5 | 190:14 191:19 | 182:17 | **retained** 62:9 | **rule** 8:19 9:10 |
| 62:3 | **reporting** 6:16 | **respect** 80:3 94:4 | **retains** 181:9 | 10:3 |
| **release** 158:5 | 144:8 168:1 | **respond** 80:5,7 | **retaliation** | **rules** 8:3 139:7 |
| **relevant** 47:6 | **reports** 26:13,13 | 106:18 | 111:14 192:15 | 143:1 |
| **reliable** 68:19,20 | 32:21 35:19 | **responders** | **retention** 164:15 | **run** 115:4 128:8 |
| 89:22 90:20 | 57:14 70:7 | 159:6,9 | **retired** 134:5 | **rusty** 134:7 |
| **relied** 21:22 22:1 | 167:13,15 | **responding** | **returning** 49:14 | |
| 22:13 23:2,18 | 172:12 180:21 | 11:16 160:19 | 50:15 | **S** |
| 70:20 | **represent** 6:20 | 171:20,20 | **review** 19:14 | **S** 4:1 6:1 |
| **rely** 23:14 77:13 | 108:8 | **Response** 16:5 | 155:3 189:15 | **safe** 44:22 46:8 |
| **relying** 73:2 | **representative** | 16:11 | 192:9 | 67:8,9,10 68:12 |
| 125:15 | 56:18 96:17 | **responsibilities** | **rhakim@maye...** | 68:14,16 70:14 |
| **remained** 13:15 | 108:7 | 11:13 12:19 | 3:11 | 80:9 82:6 90:20 |
| **remaining** 190:3 | **represented** | 13:18,21 14:7 | **Richmond** | 92:3,8,8,10 |
| **remedial** 83:15 | 76:12 | 14:18 15:21 | 162:19 | 93:6 96:2,5,22 |
| 83:16 84:1 | **representing** | 17:3,18 18:11 | **rifle** 99:8,9 | 97:6 99:16 |
| **remember** 66:19 | 6:15 195:12 | **responsibility** | **rifles** 66:14 | 103:13 107:13 |
| 111:19 133:15 | **reprimanded** | 11:15 19:19 | **rights** 41:11 | 120:3 122:15 |
| 133:17 134:3 | 192:22 | 43:22 44:3,20 | 42:17 45:15 | 123:17 124:19 |
| 162:3 | **reproduced** | 46:4 84:3 95:21 | 48:15 49:15 | 124:20 127:13 |
| **remind** 156:16 | 62:21 | 101:12 107:11 | 149:6 | 127:20,20 |
| 157:18 | **reputation** 54:15 | 141:9 166:20 | **rise** 27:3 | 128:1,7,9,10 |
| **removal** 191:4 | 190:6 | **responsible** | **risk** 131:18 | 136:17 139:1,4 |
| **removed** 97:5 | **require** 52:13 | 12:21 13:7 | 132:2 | 140:12 |
| 191:10,15 | **required** 87:1 | 42:15,22 45:4 | **riven** 192:13 | **safely** 107:15 |
| **render** 163:22 | 182:19,21 | 104:10 141:8 | **road** 8:3 11:11 | **safer** 82:11 |
| **repeat** 24:13 | **requirements** | **responsibly** | 11:13,15,22 | 117:13 132:4 |
| 40:8 43:8 143:8 | 64:15 139:2,4,9 | 42:17 43:17 | **rob** 109:14 | 175:13 |
| 186:21 | **requires** 46:6 | 44:4 45:9,17,21 | **robbed** 111:6 | **safes** 67:12 |
| **repeated** 71:5 | **research** 62:16 | 47:13 50:2 | **robberies** 164:4 | 123:11,18 |
| **repeatedly** 94:9 | 75:15 85:2 | **rest** 86:4 93:14 | 164:8 | 125:21 126:14 |
| 160:12 | 182:16 | **restriction** 160:8 | **robbers** 21:6 | 126:14 127:2 |
| **repetition** 134:16 | **researched** 71:7 | **restrictions** 65:3 | **robbery** 21:5 | 127:15 129:6 |
| **repetitively** 71:5 | **researching** 23:6 | **result** 35:11 | 164:9 | 130:15 |
| **repetitiveness** | 82:21 164:20 | 164:22 | **role** 14:17 16:4 | **safest** 85:14 |
| 70:22 | **residence** 64:1 | **results** 162:17 | 18:12 | 119:19 123:9 |
| **rephrase** 180:4 | 81:13 110:21 | **retail** 15:3,3 | **Roman** 19:14 | **safeties** 80:13 |
| **reporter** 6:14 | 115:1 | 24:22 55:17 | 24:7 25:14 | **sale** 15:5 55:9 |
| 7:12 8:5 19:2 | **resident** 13:13 | 74:20 89:9 90:6 | **room** 100:5 | 164:11 165:22 |
| 142:2 147:11 | **resounding** | 93:19 95:3 | 112:1 114:14 | 166:5 169:7,8 |
| 149:10 151:9 | 109:4 | 143:11 172:7 | 134:19 136:16 | 181:4 |
| 153:8 156:11 | **resources** | **retailers** 1:6 | **rough** 177:17 | **sales** 55:10 |

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

218

89:13 163:10 163:14,17 166:6 168:1,1 181:8
**sample** 56:18 76:12
**satisfy** 96:10
**save** 142:19
**saved** 98:6
**says** 19:13 57:18 59:1 63:2 69:17 75:11 93:8 95:20 96:18,20 96:21 101:19 102:6 105:2,10 107:5,11 114:21 119:3,4 119:9,9,19 126:1 131:1,14 132:11 141:2 147:16,17,18 147:19 149:19 150:9,13 152:10,12 154:9,11,12 158:7 160:11 166:12 189:13 189:16 190:21 192:10
**scenario** 117:8 117:11,22 122:8
**scenarios** 113:20 116:5 122:4
**scene** 99:5
**scheme** 183:17
**Schoenke** 149:20,21,21 150:10 153:17
**Schoenke's** 149:22 150:2 150:13
**school** 10:15

24:3 184:15,21
**science** 118:7
**scope** 36:15 37:20 38:21 43:5 45:7 46:16 48:19 51:8 52:2 52:10 55:5 62:9 65:6 76:5 91:1 95:14 106:3 117:18 152:18 163:6 164:15 170:17 181:16
**screen** 185:10
**se** 55:15 114:16 111:19
**searching** 138:19
**seasoned** 78:17
**seat** 39:6,9 68:15 159:22
**second** 37:9 65:18 69:8,8,14 69:17 86:12 89:2 94:15 99:4 100:8 108:21 114:14 117:10 124:19,19 149:18 152:12 153:17 154:12 155:1,21 158:6 163:9 174:2 178:4 180:18 192:10 193:18
**seconds** 133:7
**secret** 171:9
**section** 63:2 157:1
**secure** 44:22 49:18 84:9 96:1 96:15 107:13 115:13,22 119:3,6 120:4 123:1

**secured** 81:8 98:3 114:13 117:12 119:12 125:12 128:14 129:13,20 130:8
**securing** 70:3 96:5 107:15 120:5 136:21 168:7
**security** 19:16 66:2,21 67:15 70:1 88:6 91:13 94:7 115:9
**see** 26:14,18 27:11,18,19 33:1,3 34:9 35:3 40:4 44:2 57:6 59:15 60:5 61:11 70:8 71:3 72:15 82:15 85:20 94:16 105:16 111:3 113:14 118:18 125:2 138:18 141:12 144:11 150:11 155:2 158:22 159:21 160:5,8 161:18 169:14,19 171:4 187:6 190:12 191:13
**seeing** 27:19,22 28:1 82:2 110:15 171:17 173:15 187:8
**seen** 27:2,17 35:19 50:10 67:12 85:13 110:22 111:12 111:16 116:21 152:21 155:17 165:17 167:17

172:4
**seize** 193:4
**seized** 86:13,20 171:11 189:20 193:6
**seizes** 177:8
**select** 56:7
**selected** 56:9
**self** 105:13
**self-avowed** 167:7
**self-defense** 41:12,15,22 42:11 43:1,13 43:14 44:15 45:16,22 46:6 47:7,9,11 48:17 70:15 83:2 85:17 86:8,17 87:3 92:14 94:12 105:22 106:12 109:22 110:5 140:2
**self-protection** 25:15
**sell** 108:9 166:13
**selling** 47:17 108:5 167:6 168:2
**sells** 165:10
**semblance** 72:18
**sense** 39:7 42:10 65:2 84:19 92:1 97:8 104:14 113:3 124:7 131:17 169:6
**sensible** 181:10
**sensitive** 86:18
**sentence** 24:6 54:10 63:1 65:19 69:9,17 70:16 71:6 83:11 84:6

86:13 94:16 96:21 101:19 102:6 103:11 108:21 109:18 109:19 131:6 139:3 150:9 152:12,13 159:1 160:11 163:9 164:19 171:8 178:14 178:15 180:18 192:11
**sentences** 86:22
**sentiment** 143:4
**separate** 42:1 82:11 86:5 98:3 119:6,12 125:13,21 127:2 128:14 129:13,20 137:4 195:6
**separated** 112:14 121:6
**separately** 120:18
**September** 1:22 6:17
**serial** 82:5
**series** 33:1
**serious** 31:15 32:18,20 40:9 131:9 132:16
**seriously** 35:21 36:8 122:8 129:1
**seriousness** 56:12
**serve** 140:7
**Service** 189:3
**services** 144:6
**set** 9:3 16:11 18:16 89:8 196:6

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

sets 71:16
setting 104:3
seven 178:16
  179:3
sexual 191:3
  192:13
shear 57:6
shed 54:20
sheet 4:17
  153:15 195:6
sheriff 11:4 99:5
Sheriff's 11:5
shoot 52:21 53:6
  74:21 100:15
  100:16 124:6
  181:21
shooter 134:4
shooters 4:18
  42:22 52:5
  54:12,16
  148:21 150:14
  150:22 151:17
  153:16,18
shooting 25:22
  30:1 41:13
  44:18 46:11,12
  51:12,16,19
  52:4 53:7 57:10
  65:11 71:2
  87:22 91:7
  94:17 95:1
  96:17 100:17
  107:6 119:4
  153:14 155:18
shootings 26:3
  26:12 28:18,19
  28:21 62:15
  116:21 161:6
  174:11,12
shootouts 116:21
shoots 34:2
shoot/don't
  52:20

short 102:18
  116:22 183:21
shot 35:4,12
  92:22 99:3,8,10
  100:7
shotgun 75:1,4
  75:21 79:17
shotguns 66:14
show 4:10 56:11
  92:22 145:10
  188:8
showing 28:14
  88:2
shown 180:20
shows 93:1
  116:12,13
  174:22
sicker 75:11
side 65:15
  112:11,12
  178:4
Siege 5:7 192:3
Signature 195:10
significant 56:18
  104:2 162:9
  180:19
similar 36:11
  53:1
simple 32:21
  49:4,5 109:4
simply 56:9
  74:20 98:1
  119:11 128:12
  129:19 169:3
single 109:21
  164:10
sit 22:10,15 23:4
  76:9
sitting 75:21,22
  76:1 104:18
situation 53:15
  99:15 100:9
  110:12 135:16

135:20
situations 52:20
  66:10 74:13
  80:6,7 83:14
six-year 97:13
skims 182:18
slash 186:1
sleep 135:1
slower 134:13
small 29:10
smart 82:15
  105:13,14
smarter 81:19
snake 100:17
social 157:3,4,13
Society 4:11
sofa 103:21
  104:18
software 184:19
sold 159:4
  165:14
soldier 84:16,20
soldiers 86:6
Solutions 25:20
  65:22 66:17
  143:21 144:21
  147:20 154:13
somebody 31:21
  34:2 53:13 67:5
  75:9 79:20 88:2
  100:6,15
  110:14 114:19
  116:14 124:7
  125:20 129:2,2
  130:20 138:8
  154:8 168:8
somebody's
  98:22 136:1
somewhat 102:2
son 99:6,8,9
  153:20
sorry 24:13
  127:18 154:18

176:9 177:1
  186:1
sort 13:4 141:16
sorts 183:10
sound 71:9
sounds 166:10
source 74:20
  89:22 143:12
sources 18:19
  161:16,17
South 3:7
southeast 16:14
southeastern
  16:13
speak 8:6,13
  9:11 10:1 38:21
  43:6 48:19
  184:18 185:1
speaking 139:8
special 12:12
  13:11,19,21
  14:14 15:15,20
  15:22 16:22
  17:4,8 78:17
  131:15 133:13
  133:20 134:2
  185:12 189:18
  191:9,16
specific 22:11
  50:14,16 82:20
specifically
  23:13 63:12
  64:4,20 69:9,18
  71:12 75:16
  77:6 97:18
  105:8 108:15
speculate 123:21
speculation
  98:18 121:11
  163:20
speculative
  181:15
speech 42:19

speed 185:8
spewing 90:7,9
  167:1,2,2
spoken 72:5
sport 51:12,16
  51:19 52:3,4
sporting 46:11
  51:17 106:22
  107:22 108:18
  108:22 111:2
sports 41:13
  42:22 44:18
  46:12 65:12
  71:2 94:17 95:1
  96:17 107:6
  119:4 134:4
  153:14 155:18
St 4:19 156:17
stabbed 35:15
  100:7
stabbing 100:1
stand 174:11
  188:19 190:5
standards 104:3
stands 128:2
  157:9
start 34:6 35:2
  36:2 82:17
  98:20 172:9
  188:14
started 81:20
  82:20,21 163:7
  172:12,22
  173:3
starting 6:20
  56:5
starts 61:18
  69:15 160:8
  178:15 192:8
state 7:19 10:11
  11:19 26:5
  63:13 84:7
  87:11 88:5,12

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

220

99:17 108:3,5
109:20 180:2,8
**stated** 25:18
**statement** 26:21
29:11,13 43:13
44:12,16 45:7
97:1 155:15
156:6,9 158:12
186:12 188:19
**statements**
62:17
**states** 1:1 16:12
33:4,16,18
36:11 51:3
73:20 76:13
97:10,15 98:9
139:6 142:22
158:9 164:11
169:7 192:21
**static** 27:16
**statistic** 34:15
58:1 101:22
**statistically**
56:17
**statute** 55:8 63:8
80:19 105:7
**statutes** 63:16
**stay** 27:16
**stayed** 27:21
173:9 174:21
175:6
**steal** 168:8
**stealing** 168:5
**steering** 189:22
**stenographically**
196:9
**Stenotype** 2:1
**step** 82:2 178:17
**steps** 178:1
182:2,15
**stick** 174:1
**stolen** 49:14 82:4
86:2 109:6

127:6
**stop** 21:6 40:13
90:13 111:22
166:3 167:4
**stopping** 141:16
**storage** 46:8
66:3 70:14 92:3
103:13 106:10
107:7 123:12
125:18 139:1,4
139:9,22
**store** 50:9 66:11
92:22 94:12
107:21 109:12
165:20 167:1
168:7,9
**stored** 54:8
66:15 86:5,14
102:9
**stores** 107:22
108:14
**stories** 57:10
**story** 192:19
**strategies** 18:6
20:1 21:17
**strategy** 20:14
163:4
**straw** 166:4
167:7
**Street** 3:17
**stressful** 52:20
53:3,9 66:10
80:7 83:14
**strict** 163:2
**stricter** 64:15
**strictest** 177:14
**strong** 8:16
41:11,13,21
43:2,11 44:13
45:14 47:6,8,10
47:12,22 48:2,4
49:10,16 50:21
51:10 160:13

**strongly** 54:13
158:7
**struck** 181:8
**students** 78:14
115:7
**studied** 69:1,5,9
69:18 88:21
122:21 152:22
173:4
**studies** 19:15
21:21 22:5
55:16 69:4 74:3
78:13 81:20
116:20 132:11
152:21 172:4
172:14 180:21
**study** 22:11
23:19 24:8
37:22 69:11,20
71:15,22 78:16
91:12,18 102:2
102:12 142:18
143:6 176:17
179:13
**studying** 77:11
**stupid** 105:11
**subject** 65:7
70:17
**subjected** 32:4
**subjecting** 21:9
**substance** 8:14
9:12
**substantially**
27:21
**substantiates**
22:19
**suburbs** 174:5
179:17
**success** 160:15
160:17 161:5,7
179:10
**successful** 21:15
161:19 162:14

**suffer** 137:19,21
**suffers** 168:11
**sufficient** 21:14
109:21 110:4
**suggestions**
182:1
**suggests** 8:18
**suicides** 26:10
**suit** 192:18
**Suite** 3:17
**suits** 116:10
**Sullivan** 177:15
177:15
**summary** 142:17
**supervised** 16:12
**supervising**
13:22 16:2
**supervisor** 5:3
14:19,19 16:5
16:16
**supervisors**
16:13
**supervisory** 17:5
**supplying** 161:17
**support** 15:14
24:4 46:14
48:15 49:9
144:7
**supported** 42:21
**supporter** 43:2
**supportive** 23:20
**supports** 22:11
22:22 26:21
**Supreme** 4:16
151:15
**sure** 8:4,19 18:4
23:16 39:17
46:20 59:4 60:8
69:5,14 93:5,6
95:19 96:9 98:1
100:13 102:5
104:14 119:11
120:12,13

122:4 127:10
128:13 129:12
129:19 131:10
135:5 136:22
141:14 154:20
159:17 160:19
163:16 164:2
165:9 169:10
**surface** 182:18
**surprised** 39:16
**survive** 28:17
**swear** 7:12
**sweating** 136:1
**swiftly** 21:13
**switching** 137:9
**sworn** 1:18 7:16
196:7
**system** 21:10
**systemic** 26:6
36:22 39:19

**T**

**T** 4:1,1
**table** 168:3
**take** 8:1,8 20:20
30:7 31:6 32:15
45:3 47:16
56:11 58:18
59:19 60:18
66:6,9 87:16
97:6 102:18
110:6 121:15
121:18,19
124:8 130:22
131:15 135:12
146:3 155:3
164:5 167:18
168:9 170:6
178:18 182:14
182:15 183:7
183:20 188:13
192:9
**taken** 1:20 2:1

Joseph J. Vince, Jr.

September 16, 2011

Washington, D.C.

6:5 9:18 61:1
103:1 135:3
141:20 155:8
162:12 182:2
184:5 193:21
**takes** 47:15,16
**talk** 24:7 36:22
46:17 71:19
72:11,16 88:13
90:18 99:10,11
100:4 119:8
167:11,18,22
168:3 178:2
193:17
**talked** 71:2
85:22 92:22
93:1 119:22
122:1 143:5
**talking** 25:17
26:2 34:9 46:9
47:20 49:3 55:8
59:19 60:14
71:18 72:14
74:11 78:9
99:20 103:16
119:13 127:20
127:22 141:6
159:5,15 168:2
172:17 177:22
187:21
**talks** 153:19
**tanks** 111:22
**tantamount**
165:8
**tape** 6:3 60:17,19
61:2 103:2
155:4,9
**tapes** 73:7
**target** 4:12 5:6
18:21 52:22
53:6,7 100:13
100:14 147:16
190:21

**task** 49:4,5
169:21 170:22
183:5,6
**tasked** 16:5
**teach** 24:3 115:6
183:1
**team** 16:4,5,11
16:14,15,16,17
23:11
**teams** 16:12
**technical** 133:18
**technician**
133:16
**techniques**
167:16
**technology**
184:19
**Ted** 153:22
**teen** 58:14
**teenagers** 58:1
58:12,14,17
**teens** 58:15
**tell** 24:5 30:14
38:5 50:8 55:14
55:16 75:13
82:15 91:5,7
99:4 100:5
101:10 126:7
130:14 137:13
151:22 154:18
**tempest** 192:8
**temple** 99:10
**ten** 133:21
187:10
**tendered** 38:21
48:19 55:6 76:5
106:4 117:19
**term** 25:16 58:5
58:5,6,9 63:12
67:7 89:3
111:18 127:19
184:11
**terms** 10:4 11:2

28:7,9 36:12
66:4 117:13
**terrible** 99:15
**terrorists** 37:14
**test** 135:3,10,17
136:4 137:7,8
137:10
**testified** 7:16
40:15 78:19
**testify** 26:5
39:18 46:17
65:8
**testifying** 13:1
142:10
**testimony** 8:14
9:12 27:10
45:12,19 50:5
50:19 55:5 79:2
112:19 126:18
129:9,21
130:12 162:7
163:6 189:1
195:4
**tests** 136:6,8
138:18
**text** 65:18 69:15
159:1
**thank** 61:14
188:11 193:15
**theater** 42:19
**theft** 189:20
**theirs** 150:12
**thieves** 71:9,11
73:1,3 76:13
77:14
**thing** 28:13 39:1
42:7 53:11 67:2
68:17 71:1
74:18 78:6 82:8
82:16 93:9 94:8
96:6 105:14
110:13,19
113:3,4 115:14

116:15 122:20
122:22 131:22
163:13 173:13
174:10 189:15
192:5
**things** 22:6 34:3
47:13 49:13
50:12 52:16
62:12,15 69:21
70:6 72:16
73:13 82:14
106:20 109:10
117:16 118:12
118:14,15
143:14 170:5,9
183:15 185:8
**thinking** 65:1
106:19 183:10
**thinly-veiled**
149:22
**third** 97:11
111:16 119:22
139:3 145:17
**thought** 23:19
94:21 97:20
137:3
**thousand-pound**
97:6 128:9,9
**threat** 53:14
**three** 20:1 21:17
99:2 103:3
110:22 155:5
171:6
**thumb** 67:21
**thwart** 70:15
**ticket** 39:13
**timely** 168:7
181:1
**times** 5:2 66:7
78:6 80:10 91:7
94:1 115:1
117:10 122:8
133:7 170:15

189:12
**title** 92:6
**tobacco** 12:8
13:9 191:1
**today** 8:5,7,8
22:10 38:22
102:15 187:13
193:15
**today's** 6:10,17
9:13
**told** 75:8 154:15
**tool** 85:4 170:4,4
**top** 22:21 30:13
32:15 54:10
67:4 87:11
149:19 173:22
177:6
**totally** 113:5
170:13
**tout** 160:4
**trace** 78:2 153:4
161:14 172:4
188:2
**traced** 172:6
**traces** 15:1
176:21
**tracing** 14:14,18
14:20,21,22
15:5 82:3
133:21 164:20
170:22 184:19
**tracking** 66:3
**trade** 16:18 85:4
**trafficked**
186:10
**trail** 21:18
**train** 52:18 53:5
53:6,9,15 182:8
**trained** 79:12
80:6 83:13 85:3
85:5 94:3 96:4
114:9 134:5,8
139:16 141:4

Joseph J. Vince, Jr.

September 16, 2011

Washington, D.C.

222

trainers 144:17
training 24:8
46:7 66:1,4
83:15,16,20,20
84:2,20 110:2
112:22 122:3
164:6 182:10
trains 53:16
transactions
181:1
transcribed 2:2
transcribing 8:5
transcript 4:7,9
142:7 195:3,7
196:9
transferred
12:17 13:10
14:5 15:8 16:19
191:12
transported
11:18
treasurer 18:3
treasury 18:2,3
189:13
Treasury's
189:16
treat 100:6
trembling 136:2
tremor 138:3
trend 27:14,18
27:20 62:5
trends 27:11
trial 4:7 39:16
126:8 142:8,10
Tribune 5:5
190:20
tried 122:14
178:5,21
tries 178:17
trigger 12:2
17:11 53:21
54:1 64:8 70:5
78:21 79:13,17

80:4 81:8,13
82:17 84:17,21
94:19 96:18
97:3 109:2
124:13 136:7
136:10 138:6
trite 48:21
trivial 169:21,21
true 52:6,12
54:15,17 56:4
75:20 78:10
81:5 84:10
88:19 101:2
103:18 106:8
134:12 191:10
195:3 196:10
truly 160:14
Trumbull 11:4
try 8:6 72:12
74:12 100:3
124:6 132:17
137:10 163:15
178:1
trying 20:7 37:22
47:4 57:7 61:12
66:19,22 78:4
101:10 102:1
133:17 140:20
148:5 180:5
turn 19:12 41:6
62:20 103:9
109:17 131:5
142:7,13
153:16 163:8
178:3 183:12
turning 54:9
108:20 152:9
TV 116:13
two 30:11 40:22
48:22 61:3
71:16 86:21
100:16 113:8
115:22 116:14

117:11 124:6
125:11,21
126:14 127:1,2
130:15 142:17
151:3 165:19
167:5,7,21
173:7,14
174:19 175:6
two-thirds
189:14
TYLER 1:7
type 30:15 86:15
186:3
types 33:21 64:7
65:3 84:9 108:9

**U**

unacceptable
28:3 30:19 31:7
31:7 170:13
175:9,16
unattached 99:7
unattended
113:5 127:6
unauthorized
79:21 87:14
92:17,19
109:15 120:15
131:19 140:13
unblemished
188:17,20
189:5
uncovered 182:6
underage 169:8
169:9
undercover
169:9
underline 186:2
underneath
103:10
understand 29:5
33:11 38:12
40:14 45:5 69:2

80:2 164:2
understanding
46:7 67:11
162:22
unfortunately
77:19 85:12
150:9
unintended
109:15 127:11
unique 30:16
United 1:1 16:12
33:4,16,18
36:11 51:3
73:20 76:13
97:15 98:9
139:6 142:22
164:11 169:7
192:20
university 10:16
156:18,22
unload 87:13
unloaded 87:2
98:2 99:9,16
119:11 125:12
128:13 129:12
129:19
unlock 79:20
unlocked 68:16
102:8,9
unlocking 133:10
unprecedented
193:4
unreasonable
113:11 114:17
unsafe 37:15
91:5 115:20
unskilled 134:17
upping 130:20
upset 160:2
urban 33:4
URL 185:21
useful 148:6
185:14

users 68:2,4,8
108:11
usually 62:12
63:16 87:5
utilization 37:17
utilize 17:11 66:8
75:3 83:21 90:4
163:3
utilized 15:1
59:18 66:15
69:3
utilizes 34:18
utilizing 94:19
U.S 5:5 6:7
101:21 190:20

**V**

V 142:9
vague 29:18 33:7
84:14 101:6
127:19 178:8
validate 78:2,4
validity 101:22
values 157:11
variables 117:21
118:5 170:18
variety 151:16
various 84:9
108:9 133:11
167:16 184:18
vast 34:11
vaults 66:13
vehicle 79:18,20
160:1
vehicles 160:5
189:22
verbatim 63:8,19
versus 6:6
145:10
victim 35:20
115:8,11
victims 36:7
40:10 74:7

Joseph J. Vince, Jr.
September 16, 2011

Washington, D.C.

223

| | | | | |
|---|---|---|---|---|
| 144:4 | 186:11,14 | 79:18 92:17 | welcome 7:22 | what-if 116:3 |
| video 6:3,4,18 | 188:4 191:7 | 97:8 102:13 | 142:1 | white 76:17 |
| 7:11 9:16,17,19 | Virginia 153:6 | 111:22 119:14 | well-document... | wholesalers |
| 9:20 60:19,20 | visitor 122:13 | 119:15,20,22 | 165:18 | 24:12,22 89:7,8 |
| 60:21,22 61:2,3 | visitors 92:20 | 121:1,3 122:16 | well-lit 134:19 | wholly 64:21 |
| 61:4 102:21,22 | 93:3,5,7 110:14 | 122:22 123:9 | went 94:5 99:5,8 | wide 49:3 117:22 |
| 103:2,3,4 | 131:18,20 | 125:2,9 128:21 | 107:21 138:19 | wife 150:6 |
| 141:18,19,21 | visual 165:18 | 131:10 132:12 | 162:1 165:11 | 153:19 |
| 141:22 155:4,5 | volume 108:8 | 132:17 138:21 | 165:19 | willing 9:8 |
| 155:6,9,10,11 | vs 1:9 4:8,10 | 139:10 140:6 | we'll 8:20 126:7 | win 181:7,14 |
| 183:21 184:3,4 | | 145:17 160:6 | 141:3 178:3 | wish 23:4 |
| 184:6,7 185:6 | **W** | 180:20 185:7 | we're 8:4 9:16,19 | within-named |
| 186:6,18,22 | Wacker 3:7 | 189:14 196:13 | 15:5,14 19:21 | 196:5 |
| 187:6 193:19 | Wait 173:17 | ways 29:21 49:17 | 25:17 26:2 | witness 1:16,18 |
| 193:20,22 | wake 191:8 | 49:22 50:1 | 27:19,22 28:17 | 7:12,15 10:2 |
| 194:1,5,6,7 | walked 165:19 | 110:7 184:19 | 34:8 41:8 46:9 | 43:7,8 106:15 |
| videographer | wall 120:20 | weak 180:22 | 57:7 60:13,16 | 123:21 144:8 |
| 3:22 6:14 | wanted 18:6,16 | weakened | 73:16 74:11 | 186:20 187:1 |
| videotaped 1:15 | 100:16 113:8 | 168:22 | 81:21 99:20 | 196:5 |
| 194:8 | wants 53:12 | weapon 4:13 | 102:21 114:6 | witnesses 8:14 |
| videotapes | warrant 111:19 | 35:22,22 36:9 | 116:6 118:6,8 | 72:11 78:10 |
| 165:18 | warrants 11:17 | 59:20 79:7,10 | 119:13 123:5 | woken 134:22 |
| vignettes 50:11 | 13:3 | 83:4 100:1 | 141:18,21 | woman 48:15 |
| violations 18:20 | Warren 11:6 | 101:13 116:9 | 159:15 164:3,7 | 49:1,2 |
| 74:3 191:4 | Washington 1:21 | 116:11,20 | 166:8 168:2 | wonder 138:8 |
| violators 31:4 | 2:14 4:14 5:2 | 117:1 132:22 | 172:14,17 | wondering 29:11 |
| violence 26:6,8 | 6:12 14:15 | 133:3,4 136:10 | 176:18 182:13 | 33:12,13 42:9 |
| 26:11 28:6,10 | 149:15 152:14 | 136:11,12,21 | 184:3,6 187:20 | 69:19 |
| 29:3,4 30:17 | 152:15 153:4,5 | 147:18 171:7,7 | 188:1 193:19 | word 58:10 94:20 |
| 32:5 33:3 36:13 | 189:12 191:2 | 186:16 | 193:22 | words 16:10 |
| 37:2,18 38:9,15 | wasn't 40:19 | weapons 34:9 | we've 23:12 24:7 | 21:12 51:15 |
| 39:20 40:6,18 | 41:2,5 43:17 | 82:4 84:10,11 | 27:2 35:4 43:6 | 74:15 |
| 40:21 56:19 | 49:5 62:1 | 86:16,19 87:13 | 46:16 55:6 | work 23:13 67:22 |
| 60:15 99:20,21 | 101:17 106:16 | 110:7 120:15 | 71:19 73:12 | 140:9 144:22 |
| 147:19 150:4 | 134:22 138:19 | 165:14 171:11 | 74:1,2 85:12 | 148:1,2,14,17 |
| 160:15,18 | 154:16 155:15 | wear 114:21 | 91:1 106:4 | 148:18 166:1 |
| 164:13 | 156:6 177:1 | 135:7 | 116:21 125:19 | 175:12,22 |
| violent 19:22 | 179:13 191:15 | web 185:22 | 126:11 144:17 | 176:1 186:4,9 |
| 27:20 28:2 | watch 187:10 | website 4:19 | 147:6,9 148:3,4 | 187:5,15 188:2 |
| 31:15 32:11,18 | way 9:1 23:17 | 156:22 | 148:7 167:17 | 189:22 |
| 33:20 34:4,12 | 42:15 53:16 | weigh 116:2 | 167:21 172:4 | worked 12:7 |
| 77:12 88:20 | 59:18 60:8,10 | weighing 112:8 | whatnot 125:18 | 17:20 18:1 |
| 99:19 172:16 | 67:22 75:6,9,14 | Weinstein 142:8 | whatsoever 35:9 | 23:12 24:10,20 |

Joseph J. Vince, Jr.

Washington, D.C.

September 16, 2011

224

| | | | | |
|---|---|---|---|---|
| 24:21 66:19 | **year** 15:7 30:10 | **0** 61:4 | **1530** 98:5 100:18 | **2:20** 184:4 |
| 122:3 144:15 | 57:19 61:12,15 | | **156** 4:19 | **2:31** 184:7 |
| 184:10 | 61:16 66:7 | **1** | **158** 4:20 | **2:45** 193:20 |
| **working** 24:8,17 | 97:14 98:13,16 | 1 4:6 19:2,4 | **16** 1:22 163:8 | **2:48** 194:1,7,8 |
| 50:8 160:20 | 143:20 161:22 | 55:18 59:12,13 | **16th** 6:17 | **20** 94:1 |
| 185:20 187:9 | 169:5 170:2,10 | 60:4 90:7,8 | **1610** 142:13 | **20s** 108:18 |
| 189:21 | 170:10,15 | 143:8,9 | **17** 176:15 177:21 | **2000** 59:20 60:3 |
| **works** 94:9 109:5 | 171:15 174:3 | **1,530** 97:12 | 180:17 | 171:17 |
| 109:5 121:2 | 183:7 | **1:26** 141:22 | **17th** 190:19 | **2001** 59:13 97:11 |
| 128:16 | **years** 22:4 40:22 | **1:43** 155:6 | **1722364** 186:3 | 101:15 145:15 |
| **world** 16:17 | 44:1 59:22 | **1:44** 155:11 | **18** 58:6,7 149:17 | **2002** 35:10 59:13 |
| 73:20 | 61:13 66:1 | **10** 5:2 60:4,5 | **189** 5:2 | **2003** 102:3 |
| **worried** 111:6,14 | 133:15,21 | 103:9 189:7,9 | **19** 4:6 58:16 | **20036** 2:14 6:12 |
| 119:16 120:16 | 164:20 170:13 | **10,000** 174:3 | 72:19 | **2004** 169:20 |
| **worry** 115:18 | 172:17 173:5,8 | **10-cv-04184** 1:9 | **190** 5:5 | **2005** 149:2 |
| **worse** 26:17 28:6 | 174:19 175:7 | 6:9 | **191** 5:7 | **2007** 152:1,5 |
| 29:11 30:2,20 | **yell** 42:19 | **10/14/2014** | **1917** 177:16 | **2008** 149:2,17 |
| 31:10 32:2,3,9 | **York** 29:9 30:3 | 196:20 | **1969** 11:7 100:21 | 152:2,7 |
| 40:22 173:9 | 33:15 142:9 | **10:09** 60:21 | **1970** 10:11 | **2009** 59:20 60:3 |
| 174:20 175:6 | 144:14 165:5 | **10:2** 61:4 | **1971** 11:7 12:8 | 60:5 158:6 |
| 175:19 180:13 | 165:19 177:14 | **104** 71:17 | 12:15 | 171:17 |
| **Worseck** 3:13 | 178:3,4 179:5 | **11** 5:5 108:20 | **1979** 10:19 12:15 | **2010** 57:19 |
| 7:8,8 9:2,14 | 179:14,16,19 | 190:14,16 | 12:18 13:10 | **2011** 1:22 6:17 |
| 95:14 145:18 | 179:22 180:5,7 | **11:11** 102:22 | **1983** 13:16 14:3 | 57:20 195:15 |
| **wouldn't** 64:9 | 183:16 | **11:25** 103:4 | **1984** 14:13 | **202** 2:15 |
| 68:6,16 71:4 | **York's** 178:3 | 12 5:7 191:19,21 | **1986** 15:16 | **21** 158:6 |
| 84:18 99:15 | 179:14 | **12:11** 141:19 | **1993** 16:17 17:15 | **21st** 57:20 |
| 113:3 115:20 | **Youngstown** | **1230** 3:17 | 190:19 | **22** 71:16 170:12 |
| 118:18 122:6 | 10:11 | 13 58:14,16,21 | **1994** 4:12 147:17 | **220-9600** 2:15 |
| 136:3 137:15 | **Youth** 58:4 | 102:8 109:17 | **1995** 172:13 | **24** 58:7 152:11 |
| 154:16 155:16 | 167:14 172:5 | 109:19 | 189:13 192:3 | 192:3 |
| 156:7 181:20 | 172:10 176:14 | **13,000** 174:2 | **1996** 97:11 | **240** 39:8 |
| **write** 24:2 | **YouTube** 185:3,6 | 14 131:5 133:6 | **1997** 184:14 | **25** 132:12 |
| **wrong** 118:4 | 186:6 | 139:1 | 185:13 187:13 | **250** 97:14 98:12 |
| **wrongful** 26:4 | | **142** 4:7 | **1999** 72:20,22 | **26** 161:6 |
| **wrote** 106:16 | **Z** | **145** 4:9 | 142:9 143:22 | **26-month** 162:1 |
| | **zero** 132:5 161:6 | **147** 4:12 | | |
| **X** | 162:1,3,4,4 | **149** 4:14 | **2** | **3** |
| **X** 59:11 | 175:21,22 | 15 94:1 158:21 | 2 4:7 19:14 41:6 | 3 4:9 24:7 54:9 |
| | | **151** 4:16 | 45:8 59:12,13 | 56:5 59:12,13 |
| **Y** | **$** | **1523** 1:21 2:13 | 60:4 142:3,4 | 60:4 98:1 145:5 |
| **yeah** 70:12 80:16 | **$5,000** 150:2 | 6:11 | 154:20 188:9 | 145:6 188:10 |
| 118:3 125:5 | | **153** 4:17 | **2/17/93** 5:5 | 188:11 |
| 143:15 | **0** | | | |

Alderson Reporting Company
1-800-FOR-DEPO

Joseph J. Vince, Jr.

September 16, 2011

Washington, D.C.

225

| | |
|---|---|
| **30** 3:17 22:3 44:1 | **60606-4637** 3:8 |
| **30s** 108:19 | **65** 134:11 |
| **300** 98:9 | **66** 30:12 57:22 |
| **312** 3:9,19 | **68** 188:14 |
| **327** 34:10 | **69** 188:12 |
| **338** 61:16 | |
| **37** 176:16 | **7** |
| **376** 61:19 175:1 | **7** 4:3,17 60:4 |
| 175:8 176:6 | 87:11 89:1 |
| | 153:9,10 |
| **4** | **70** 188:12,18 |
| **4** 4:12 25:14 56:6 | **700** 26:19 30:9 |
| 57:17 59:12 | 31:11 57:18 |
| 60:4 61:12,15 | 58:12 59:6 |
| 147:11,13 | **71** 3:7 |
| **4's** 59:14 | **72** 176:18 |
| **40** 101:20 102:7 | **744-7129** 3:19 |
| **400,000** 176:21 | **75** 176:18 |
| **471** 61:18 | **782-0600** 3:9 |
| **488** 61:15 | |
| | **8** |
| **5** | **8** 4:19 60:4 94:14 |
| **5** 4:14 59:10 60:4 | 156:11,13 |
| 61:8,12,16 | **8-20-040** 103:17 |
| 62:21 103:17 | **80s** 82:22 |
| 149:10,12 | **800** 179:3,6 |
| 192:6 | |
| **5/6/95** 5:2 | **9** |
| **50s** 108:17 | **9** 4:20 60:4 96:18 |
| **50-pound** 96:12 | 97:10 142:15 |
| **514** 34:10,21 | 146:2 157:22 |
| 35:10 61:18 | 158:2 |
| **55** 39:9 | **9A** 171:13 |
| **574** 142:15 | **9,000** 173:22 |
| | **9:06** 1:22 6:18 |
| **6** | **9:08** 9:17 |
| **6** 4:16 60:4 63:1 | **9:13** 9:20 |
| 65:18 69:15 | **90s** 160:22 |
| 83:7 86:12 | 162:13 190:8 |
| 151:10,11 | **91** 145:16,18,19 |
| **6th** 189:13 | **95** 173:4 |
| **60** 55:19 90:6,9 | **96** 173:4 |
| 143:10 192:19 | **97** 173:4 |
| **60606-2580** 3:18 | **9856** 173:22 |