# Exhibit E

# Part 2 of 3

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                           81

1    environment may have increased the risk for both

2    gun-related and other homicide death regardless of

3    exposure to handgun purchase.  If this theory is

4    true, then the apparent association between handgun

5    purchase and all homicide deaths may be due to

6    uncontrolled confounding."  Do you agree with that

7    statement?

8         A.    Yes, that it may be due to uncontrolled

9    confounding.

10        Q.    This study did not look at alcohol

11   utilization rates, did it?

12        A.    No.

13        Q.    It didn't look at illicit drug use, did

14   it?

15        A.    No.

16        Q.    And it didn't try to measure for suicidal

17   intent, did it?

18        A.    No.

19        MR. THOMPSON:  All right.  I would like to

20   ask the court reporter to mark as Webster Exhibit 5

21   the following document.

22                        (Webster Deposition Exhibit No. 5

Daniel W. Webster, Sc.D., MPH                                      September 21, 2011
                          Washington, D.C.

                                                                              82

 1                      was marked for identification.)

 2     BY MR. THOMPSON:

 3          Q.    And sir, would you please identify what's

 4     been marked as Webster 5 for the record?

 5          A.    Sure.  This is an article entitled

 6     Homicide and Suicide Risk Associated With Firearms

 7     in the Home:  A National Case-Control Study.  This

 8     is an article appearing in the journal Injury

 9     Prevention by Douglas Wiebe.

10          Q.    Okay.  And let's turn to page 777.  Under

11     Discussion, if we look at the right-hand column, the

12     last complete sentence in this -- on that page, it

13     says, "Nevertheless, it would be unwanted to infer

14     that such a limited body of research conclusively

15     linked gun availability to gun-related mortality."

16     Do you agree with that statement?

17          A.    I'm sorry, I was trying to find the

18     sentence and I'm not finding it.

19          Q.    That's fine.

20          A.    Oh, got it.  Okay, sorry.

21                No.

22          Q.    So you disagree with what -- with the

83

1    caveat that the authors of this study are placing on

2    their own study?

3        A.    They're talking much more broadly.  They

4    say the main contribution of the present findings

5    might simply be their consistency with past results.

6    So I draw conclusions upon a broader set of

7    research, some of which actually is published well

8    after this article.

9            So I just answered your question, would I

10   agree with the statement that you identified?  I

11   would say no.

12       Q.    Is Mr. or Dr. Wiebe, is he a

13   well-respected academic in this area?

14       A.    I guess so.  Yeah.

15       Q.    And if we turn to page 780, we see in the

16   left-hand column in the last full paragraph, the last

17   sentence -- actually let's back up.

18           He says in that same paragraph but in the

19   second sentence, "The greatest source of potential

20   bias might be confounding from risk factors that were

21   not measured or were controlled only partially."  Do

22   you agree with that statement?

84

1          A.     Yes.

2          Q.     Okay.   And then he lists the confounders

3     at the end of the paragraph that were not measured.

4     He said they didn't control for mental illness among

5     subjects or family members, histories of violence,

6     illicit drug use, alcohol use, time spent at home,

7     lifestyle factors like gang membership and drug

8     dealing.

9                 Is a history of violence positively

10    correlated with suicide rates?

11         A.     Yes.

12         Q.     Is mental illness among family members

13    positively correlated with suicide rates?

14         A.     Yes.

15         Q.     And this study did not attempt to measure

16    or control for suicidal intent, correct?

17         A.     Correct.

18         Q.     All right.   We can put that study to the

19    side.

20                MR. WOODS:   Can we take a very short

21    break?

22                MR. THOMPSON:   Yes.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

85

1            THE VIDEOGRAPHER:   We're going off the

2    record.   The time on the video is 10:59 a.m.

3            (Recess.)

4            THE VIDEOGRAPHER:   We're back on the

5    record.   The time on the video is 11:04 a.m.

6    BY MR. THOMPSON:

7       Q.    All right.   Professor, let's turn to page

8    5 of your report.

9            The first full paragraph, the last

10   sentence, you state, quote, "Local studies have found

11   that about two-thirds of adolescents who commit

12   suicide with a firearm obtained the gun from within

13   their own homes or the home of a relative or friend

14   and where the gun was typically left unlocked."

15           Is locking a gun an effective strategy for

16   reducing the risk of adolescent suicide?

17           MR. HAKIM:   I'm just going to object to

18   the vagueness of effective strategy.   You're free to

19   answer.

20           THE WITNESS:   If you mean by effective,

21   does it lower risk, I would say yes.

22   BY MR. THOMPSON:

86

1          Q.     Would it actually lower the suicide rate,

2     all other things being equal, if individuals locked

3     their firearms in a gun safe, for example?

4          A.     Yes.

5          Q.     Do you have an expert opinion as to

6     whether you would have a lower suicide rate if an

7     individual kept multiple operable firearms locked in

8     a gun safe in their house as opposed to carried one

9     firearm on their person at all times?

10          MR. HAKIM:  I'm just going to object in

11     general to the incomplete hypothetical and calling

12     for a degree of speculation.  There may be more

13     details you could give that would put a finer grain

14     on that.

15          THE WITNESS:  So, there is a lot to

16     speculate on there.  You know, who is the individual

17     and how frequently they would carry the gun with

18     them, and --

19     BY MR. THOMPSON:

20          Q.     Well, but all other things being equal, so

21     it's -- you know, other variables aren't affected,

22     would you expect a higher suicide rate for someone

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

87

1    who carries their gun on their person when they're

2    awake and in their home as opposed to someone who

3    keeps two loaded operable firearms in a gun safe in

4    their house?

5        A.    What I would expect would be that the

6    individual in very frequent contact -- carriage of

7    their firearm might be at higher risk.  However,

8    someone else in the household might be at lower

9    risk.

10       Q.    Okay.  Now, in your report, you reference

11   a study entitled Youth Suicide Insights From Five

12   Years if Arizona.  Do you recall that study?

13       A.    I do.

14       Q.    Why did you cite that study?

15             MR. HAKIM:  I'm going to object there just

16   to foundation.  You may want to point him to where

17   he's cited it and in what context?

18             THE WITNESS:  Yes, tell me where --

19   BY MR. THOMPSON:

20       Q.    Oh, sure.  Yeah.  It's -- I believe

21   footnote 5 of your -- let's see.

22       A.    The principal reason for citing that

Daniel W. Webster, Sc.D., MPH                                     September 21, 2011
                              Washington, D.C.

88

1    particular study has to do with it demonstrating how

2    impulsive many of these suicides were, no notes

3    given, the act appearing to be a very impulsive type

4    of act.

5         Q.    Do you think the results of that study and

6    the behaviors that were observed have any relevance

7    to Chicago?

8              MR. HAKIM:   I'm going to object again,

9    just speculation of relevance in what context,

10   relevance regarding to what topic.

11             THE WITNESS:   Yeah.   If you clarify that?

12   BY MR. THOMPSON:

13        Q.    Yes.   Any relevance whatsoever to the

14   topics that you're opining on in this case.

15        A.    Yes.

16        Q.    What is it?

17        A.    Adolescents, whether -- and many young

18   adults as well -- whether they live in Arizona,

19   Alaska, Kentucky or Chicago, developmentally tend to

20   be more impulsive in their decision-making, and that

21   is something that is noted in a very broad range of

22   studies of child and adolescent development of

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

89

1    countries around the world.  So I would not expect

2    that the impulsivity observed in the research in

3    Arizona would be notably different from impulsivity

4    of adolescents in Chicago.

5         Q.    Okay.

6               MR. THOMPSON:  Let's mark the following

7    document as Webster 6.

8                    (Webster Deposition Exhibit No. 6

9                    Was marked for identification.)

10   BY MR. THOMPSON:

11        Q.    And sir, would you please identify this

12   document for the record?

13        A.    It's an article published in Suicide and

14   Life-Threatening Behaviors, spring of 2004, entitled

15   Youth Suicide, Insights From Five Years of Arizona

16   Child Mortality Review Team Data; authors Deborah

17   Azrael, David Hemenway, Matthew Miller, Catherine

18   Barber and Robert Schackner.

19        Q.    Okay, and if we look at the third sentence

20   of this study, we can see it says, quote, "The number

21   of youth who attempt suicide each year is as much as

22   25 to 30 times higher, with poisonings representing

Daniel W. Webster, Sc.D., MPH                                      September 21, 2011
                        Washington, D.C.

90

1    the vast majority, 89 percent, and firearms a small

2    minority, 1 percent of youth suicide attempts."

3              Do you have any reason to doubt that the

4    numbers in Chicago are any different than the numbers

5    in Arizona?

6        A.    I'm not sure how you're connecting this

7    sentence to that statement.  So I'm sorry, I'm a

8    little bit puzzled.

9        Q.    Okay.  Well, because these are national

10   numbers; is that your point?

11       A.    Yes.  Yes.

12       Q.    Do you have any reason to doubt that these

13   national numbers are equally applicable to Chicago?

14       A.    With -- the very precise percentages may

15   not be, but certainly you're going to see a similar

16   ordering of methods.

17       Q.    Okay.  So should Chicago, if it's really

18   concerned about youth suicide, take measures to

19   require parents to lock up poison?

20             MR. HAKIM:  I'm going to object to being

21   outside of the scope of his expert report.

22   Mischaracterizes the evidence and it calls for

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
                    Washington, D.C.

91

1    speculation.

2        A.    Your statement does not connect to the

3    data presented here.  What is actually in italics in

4    that sentence is "attempt."  And the lethality of

5    those attempts are far, far, far, far less than

6    lethality attempts with firearms.

7              So if you look at suicides that have been

8    completed, you do not see the disparity with the

9    vast majority being from poisonings and a tiny

10   fraction being with firearms.  It's exactly the

11   reverse.  And that is what prompts many individuals,

12   including myself, to be concerned with the

13   availability of firearms to youth.

14       Q.    But aren't you concerned with other

15   substances that they use to attempt suicide?

16       A.    Of course.

17             MR. HAKIM:  I'm going to object, that's

18   mischaracterizing the testimony of the witness.

19   BY MR. THOMPSON:

20       Q.    Now, let us turn to page 38, under

21   Results.

22             It says in the second sentence, "Overall

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                        Washington, D.C.

92

1    youths who committed suicide were predominantly male,

2    84 percent white," 84 percent.  This sample is not

3    generalizable to the United States, correct?

4         A.    Is it dissimilar in its racial profile?

5    Yes.

6         Q.    And its gender profile.

7         A.    Actually no.  What we're looking at here

8    -- they're looking at suicide cases.  Suicide cases

9    nationally as well as in Arizona are predominantly

10   male, in terms of completion.  If you look at

11   attempts, the reverse is true.

12        Q.    And is it your understanding that

13   approximately 84 percent of completed suicide

14   attempts in the United States are committed by males?

15        A.    It's slightly less, but it's the

16   predominant --

17        Q.    Do you have a rough estimate as to what

18   the percentage is of suicides?

19        A.    I'm going to say about 70-75.

20        Q.    Okay.  All right.  Now, let's turn to page

21   38.  The next sentence says, "Of those for whom we

22   have data, the large majority, 75 percent, had

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                        Washington, D.C.

93

1     experienced a life crisis and most had expressed

2     suicidal thoughts, 51 percent, or had mental health

3     problems in the past."

4               What is a life crisis?

5          A.    A life crisis could be your parents get

6     divorced; a life crisis could be your girlfriend

7     broke up with you.  There's a lot of different kinds

8     of crises that adolescents at least view as crises.

9          Q.    What other types of events do you think

10    would qualify as life crises?  You mentioned a

11    breakup of a relationship or a divorce, anything else

12    come to mind?

13              MR. HAKIM:  I'm going to object as to

14    vagueness.  Life crisis in terms of this article or

15    life crisis in general?

16    BY MR. THOMPSON:

17         Q.    You can answer the question.  The record's

18    clear.

19         A.    Life crisis as it relates to adolescent

20    suicide, again, could mean a death in the family, it

21    could be an illness.  It could be anything that sort

22    of threatens sort of the foundation of the youth.

Daniel W. Webster, Sc.D., MPH                                      September 21, 2011
Washington, D.C.

94

1   Q.  Is this finding in this study that 75

2 percent of those for whom they had data had a life

3 crisis consistent with your understanding of the

4 overall literature that there is a strong positive

5 correlation between having a life crisis and suicide

6 rates?

7   A.  For adolescents.

8   Q.  And is there in fact a causal connection

9 in your opinion between enduring a life crisis for

10 adolescents and suicide rates?

11   A.  It seems quite possible.

12   Q.  Do you think it is more likely that there

13 is a causal connection between an adolescent having a

14 life crisis and committing suicide as opposed to

15 there being a causal connection between an adolescent

16 having access to a firearm and committing suicide?

17   A.  I really don't know.

18   Q.  Okay.  Now, you say that -- did this study

19 try to hold constant for life crisis?

20   A.  This study was not designed to directly

21 examine the association between availability of

22 firearms and adolescent suicide.  This study was

Daniel W. Webster, Sc.D., MPH                              September 21, 2011
                        Washington, D.C.

95

1    principally designed to provide researchers or other

2    interested individuals with a better understanding

3    of the nature of these events and the things that

4    prompt, sometimes prompt those events.

5        Q.    Is having a life crisis even for adults,

6    leave aside adolescents, positively correlated with

7    suicide rates?

8        A.    I'm sorry?

9        Q.    Is enduring a life crisis for adults

10   positively correlated with suicide rates?

11            MR. HAKIM:  I'm going to object to the

12   vagueness.  Just in what context, under what

13   conditions.

14            THE WITNESS:  So if you're just asking can

15   a life crisis prompt a youth suicide?  Is that --

16   BY MR. THOMPSON:

17       Q.    I'm saying is there a positive correlation

18   between adults enduring a life crisis and suicide

19   rates in the United States?

20       A.    I'm not sure.

21       Q.    Okay.  Now, let's turn to page 39 to the

22   first full paragraph, and it talks about demographic

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                            Washington, D.C.

                                                                          96
1     characteristics.

2              It says, quote, "Comparing demographic

3     characteristics of youth who committed suicide using

4     firearms with those who committed suicide using other

5     means, boys, 73 percent, were more likely than girls,

6     60 percent, to use a firearm to kill themselves, as

7     were whites, 77 percent versus 44 percent of

8     nonwhite, and older youths, 76 percent versus 53

9     percent."

10        A.    Right.

11        Q.    Are the findings reported that I've just

12    read into the record consistent with your overall

13    understanding of the literature and what the

14    literature reflects?

15        A.    Yes.

16        Q.    Did this study have a control group?

17        A.    What they were comparing were individuals

18    who committed suicide with a firearm versus those

19    who did not, in order to understand whether -- the

20    relative uniqueness of firearms-related versus

21    non-firearm-related.

22              MR. THOMPSON:  All right.  Let's turn to

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

97

1    what I would like the court reporter to mark as

2    Webster Exhibit 7.

3                        (Webster Deposition Exhibit No. 7

4                        was marked for identification.)

.5   BY MR. THOMPSON:

6         Q.    Sir, would you please identify this

7    document for the record?

8         A.    Yes.  It's an article by David Grossman,

9    Donald Reay and Stephanie Baker, entitled

10   Self-Inflicted and Unintentional Firearm Injuries

11   Among Children and Adolescents, the Source of the

12   Firearm, appearing in Archives of Pediatric and

13   Adolescent Medicine in August of 1999.

14        Q.    Okay.  And if we look at the second page

15   of the exhibit, which is page 876, it says under

16   Subjects and Methods, "This was a retrospective case

17   series conducted in King County, the largest

18   metropolitan county in the State of Washington."  Do

19   you see that?

20        A.    Yes.

21        Q.    Is King County generalizable to Chicago?

22              MR. HAKIM:  I'm going to object,

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                           Washington, D.C.

                                                                            98

1    generalizable for what purposes.

2              THE WITNESS:  Yeah, I sort of made the

3    point earlier that generalizability is very

4    context-specific, in what it is you're studying.

5    There are differences between King County, Washington

6    and Chicago; whether they are relevant to how youth

7    might access firearms to harm themselves or someone

8    else, I'm not sure.

9    BY MR. THOMPSON:

10      Q.    You're not sure whether it's

11   generalizable.  Okay.

12             Now, it says in the right-hand column at

13   the very bottom -- actually, sorry, let's look at

14   table 1 at the top.

15             It says suicide-related and we have

16   fatalities 46 and then nonfatal injuries 13 for a

17   total of 59.  And then at the bottom of this page, it

18   says, "Just over half of the weapons used in

19   self-inflicted deaths and injuries were handguns, N

20   33."  Is that a small sample?

21             MR. HAKIM:  I'm going to object, small for

22   what purposes?

99

1          THE WITNESS:  Yeah.  That's exactly what I

2     was going to ask, what do you mean small?

3     BY MR. THOMPSON:

4          Q.    Well, are you able to -- from a sample of

5     30 individuals, do you believe you can infer how

6     adolescents in Chicago will behave?

7          A.    Ideally, you would want a larger sample.

8          Q.    All right.  Now, if we turn to page 877

9     under the comments, in the second full paragraph, it

10    says, "One potential limitation of the study is that

11    we could not validate the information regarding

12    ownership and location of the gun."`

13          Why would that -- do you agree that that's

14    a potential limit of the study?

15          A.    Yes.

16          Q.    Why is it a limitation on the study?

17          A.    If there is a large error in the

18    measurement, it would give you the wrong idea of

19    what the real situation is.

20          Q.    If we look at table 2, the second line, it

21    says relative, friends or home, do you know whether

22    that term as it's used in this study is broad enough

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

100

1    to include the home of a friend who is a drug dealer?

2        A.    I don't believe they measured or took

3    into consideration whether that person was a drug

4    dealer.

5            THE VIDEOGRAPHER:  This concludes tape

6    number two in the video deposition of Daniel Webster.

7    The time on the video is 11:26 a.m.  We are off the

8    record.

9            (Recess.)

10           THE VIDEOGRAPHER:  This begins tape number

11   three in the video deposition of Daniel Webster.  The

12   time on the video is 11:29 a.m.  We are on the

13   record.

14           MR. THOMPSON:  All right, I would like to

15   ask the court reporter to mark as Webster 8 the

16   following document.

17                   (Webster Deposition Exhibit No. 8

18                   was marked for identification.)

19   BY MR. THOMPSON:

20       Q.    And sir, would you please identify this

21   document for the record?

22       A.    Yes.  It's an article entitled Adolescent

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

101

1    Suicide and Household Access to Firearms in

2    Colorado:  Results of a Case-Control Study,

3    published in Journal of Adolescent Health in 2000,

4    lead author is Seema Shah.

5        Q.    All right.  And did this study find that

6    more than half of those who committed suicide with a

7    gun in their home used a long gun?

8        A.    I have to refamiliarize myself.

9        Q.    Let me direct your attention to page 159.

10       A.    Sure.

11       Q.    Under Results, if you look in the

12   right-hand column of the carryover paragraph, the

13   last sentence says, "More than half of the 24

14   firearms suicide case subjects who used a gun within

15   the home to commit suicide used a long gun, i.e.,

16   rifle or shotgun, and the majority used a gun which

17   was stored, unlocked."  Closed quote.  Does that

18   refresh your recollection?

19       A.    Yes.

20       Q.    Do you think the result was this study are

21   generalizable for Chicago in terms of assessing how

22   adolescents are going to handle firearms in Chicago?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                        102

1              MR. HAKIM:  I'm going to object again,

2     again, handle firearms for what purposes.

3              THE WITNESS:  So could you say the

4     question again, please?

5     BY MR. THOMPSON:

6         Q.    Sure.  Do you have an opinion as to

7     whether the results of this study are relevant to the

8     issue of teen suicide in Chicago?

9         A.    Are they relevant to teen suicide in

10    Chicago?  Potentially so.

11        Q.    Do you expect that half of the teenagers

12    in Chicago who commit suicide use a long gun?

13        A.    No.

14        Q.    Why do you think there would be that

15    difference?

16        A.    Difference from Colorado to Chicago?

17        Q.    Yes, sir.

18        A.    You're going to have far more households

19    that keep firearms principally for shooting sports

20    purposes, hunting and such things; I suspect far

21    less likely for Chicago residents to keep firearms

22    for that primary purpose.

103

1      Q.    Okay.  And then let's look at the next

2  page, table 3, if we look under Conduct Disorder, the

3  cases had a 64 percent rate of conduct disorder, the

4  controls had a 25 percent rate of conduct disorder.

5  Would you expect there to be a positive correlation

6  between conduct disorder and suicide rates?

7      A.    Yes.

8      Q.    Running away from home for more than two

9  nights, would you expect there to be a positive

10 correlation between that variable and suicide rates?

11     A.    Yes.

12     Q.    Reckless behavior resulting in injuries

13 requiring medical help in the past two years.  Would

14 you expect there to be a positive correlation between

15 that variable and suicide rates?

16     A.    Yes.

17     Q.    Behaving disruptively at school, requiring

18 parent to be called in.  Would you expect there to be

19 a positive correlation between that variable and

20 suicide rates?

21     A.    Yes.

22     Q.    Expelled or suspended from school.  Would

Daniel W. Webster, Sc.D., MPH                                         September 21, 2011
                                    Washington, D.C.

104

1      you expect there to be a positive correlation between

2      that variable and suicide rates?

3          A.    Yes.

4          Q.    Involved in criminal or delinquent acts.

5      Would you expect there to be a positive correlation

6      between that variable and suicide rates?

7          A.    Yes.

8          Q.    Been arrested or charged with a crime.

9      Would you expect there to be a positive correlation

10     between that variable and suicide rates?

11         A.    Yes.

12         Q.    All right.  Now, let's turn back to the

13     prior page, page 159.  It shows that of the case

14     studies, that 31 percent were only children and none

15     of the controls were only children.  Are you familiar

16     with the psychological literature addressing the

17     positive benefits to mental health of having one

18     sibling?

19         A.    No.

20         Q.    And then let's turn to page 161 of this

21     document.  In the right-hand column, second full

22     paragraph, it says, "There are several limitations to

105

1    this study which should be noted.  First, considering

2    the fact that the refusal rate was 28 percent, the

3    effective response bias must be considered when

4    interpreting the results of this study."  Do you

5    agree with that?

6          A.    Yes.

7          Q.    Okay.  And why is it necessary to consider

8    the effects of response bias for this study?

9          A.    Again, as I mentioned previously, the

10   concern has to do with the possibility that those

11   who refuse to participate in the study are different

12   in important ways than those who participate in the

13   study, and the more of such individuals who are not

14   included in your study, the greater potential for

15   bias.

16         Q.    All right.

17               MR. THOMPSON:  I would like to ask the

18   court reporter to mark as Webster Exhibit 9 the

19   following document.

20                        (Webster Deposition Exhibit No. 9

21                        was marked for identification.)

22   BY MR. THOMPSON:

Daniel W. Webster, Sc.D., MPH                                            September 21, 2011
                                     Washington, D.C.

                                                                                    106

1          Q.     And sir, would you please identify this

2    document for the record?

3          A.     Yes.   It's an article entitled Risk

4    Factors For Adolescent Suicide:   A Comparison of

5    Adolescent Suicide Victims With Suicidal Inpatients.

6    Lead author is David A. Brent.   It is published in

7    Archives of General Psychiatry in 1988.

8          Q.     Okay.  Then if we turn to page 583 in the

9    right-hand column, under suicidal intent, there is

10   reference to the Beck suicidal intent scale.  Do you

11   know what that is?

12         A.     I -- You know, it's presumably a scale to

13   measure intent of suicide.

14         Q.     Okay.  Do you have an opinion on whether

15   it's a valid measure of suicidal intent?

16         A.     That particular one, I'm not so sure.  I

17   generally have a great skepticism about the ability

18   to truly know one's intent.  I have not been

19   convinced that measures of -- the types of questions

20   that go into suicide intent have been shown to be

21   the same thing as, you know, actual willingness to

22   go through with something.

Daniel W. Webster, Sc.D., MPH                                        September 21, 2011
                              Washington, D.C.

                                                                        107

1          Q.     In your opinion would greater evidence of
2     planning be positively correlated with suicidal
3     intent?
4          A.     Greater evidence of planning?
5          Q.     Yes.
6          A.     It could be.
7          Q.     Okay.  In your opinion, would greater
8     precautions against discovery be positively
9     correlated with suicidal intent?
10         A.     I'm not sure.
11         Q.     In your opinion, would communication of a
12    prior intent and commitment to killing oneself be
13    positively correlated with suicidal intent?
14         A.     I'm not sure what you mean by commitment.
15    But communication about it, no.
16         Q.     Are you aware of any published articles
17    that suggest that communication of prior intent is
18    not correlated with suicidal intent?
19         A.     Is not correlated -- I'm not, no.
20         Q.     Okay.  Then what's your basis for thinking
21    that communication of prior intent would not be
22    positively correlated with suicidal intent?

108

1        A.      Somewhat from what we know about, from

2    the case studies of adolescent suicide and how

3    impulsive a very large proportion of those acts are,

4    that they don't convey a great deal of -- at least

5    for a notable subset, convey a great deal of

6    planning beforehand.

7                Many nonlethal acts of suicide might

8    accompany some of these behaviors, but that may have

9    more to do with, in essence, calls for help than it

10   has to do with truly wanting to end one's life.

11       Q.      Do you know what this study means when it

12   refers to purpose of attempt to die?

13       A.      You want to tell me where you are?

14       Q.      Sure.  Yeah.  It's under Suicidal Intent,

15   four lines from the bottom.

16       A.      I don't know for sure what that means.

17       Q.      And therefore, you don't have an opinion

18   on whether purpose of attempt to die, as that phrase

19   is used in this report, is positively correlated with

20   suicide rates?

21       A.      That's correct.

22       Q.      Now, when it says greater evidence of

Daniel W. Webster, Sc.D., MPH                                        September 21, 2011
                          Washington, D.C.

                                                                      109

1      planning, 59.3 percent, does that mean that 59.3

2      percent of the people who killed themselves who were

3      studied in this report had planned to some degree?

4          A.    Yes.

5          Q.    Isn't that inconsistent with your

6      statements that most teens who kill themselves are

7      doing so impulsively?

8                MR. HAKIM:  I'm going to object to

9      mischaracterizing the expert's testimony.

10               THE WITNESS:  Yes, could you just

11     rephrase, please?

12     BY MR. THOMPSON:

13         Q.    Yes.  Isn't the finding in this study that

14     59.3 percent of the teens who killed themselves had

15     engaged in at least some level of planning

16     inconsistent with the notion that most teens who kill

17     themselves do so impulsively?

18         A.    Yes, but it depends on what is meant by

19     planning.  You know, do you plan over a course of

20     minutes, hours, days, weeks, whatever?

21         Q.    Do you know how the authors use the --

22     mean the term planning here?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

110

1       A.      No.

2       Q.      Okay.  Now, are you aware that there was

3   an expert report put in in this case by Mr. Vince?

4       A.      I heard that Joe Vince was an expert on

5   this, yeah.

6       Q.      Okay.  Were you aware that he and I guess

7   one of his partners at Crime Gun Solutions, did tests

8   on trigger locks and determined that in less than ten

9   seconds, even dropping a key, they could undo a

10  trigger lock?  Does that surprise you that you can

11  undo a trigger lock that quickly?

12      A.      With a key?

13      Q.      Yes.

14      A.      No.

15      Q.      Okay.  And so how does -- and Chicago, is

16  it your understanding of Chicago law that it is

17  permissible to leave a gun out in an operable state

18  if there aren't children under the age of 18 living

19  there?

20              MR. HAKIM:  I'm going to object just to

21  the extent that you're asking him to draw a legal

22  conclusion.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                        111

1            THE WITNESS:  Could you state the question

2     again, please?

3     BY MR. THOMPSON:

4        Q.    Yes.  Do you have an understanding -- and

5     if you don't know, that's fine, you can just say, I

6     don't know.  That's fine.

7            But do you know whether Chicago law has

8     provision that allows individuals to leave an

9     operable firearm out unsecured in the house provided

10    there aren't children under the age of 18 living

11    there?

12       A.    If there are children in the home or --

13    whether they reside or are in it, then they're

14    supposed to be stored safely.

15       Q.    But if there aren't, then individuals

16    don't have to store their firearms, is that correct?

17       A.    Well, the provisions have to do with the

18    section that my report talks about, as far as

19    keeping -- you know, that someone with a firearm

20    permit can have one gun, but the rest have to be

21    stored and kept in an inoperable manner.

22       Q.    Now, if we look at page 584 of this

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                        Washington, D.C.

                                                                         112

1      document, table 3, which is in the right-hand column,

2      it has a line for bipolar 1 and 2.

3              A.      Table 3.  Say again?

4              Q.      It has a line for bipolar 1 and 2?

5              A.      Yeah.  Okay.

6              Q.      And the completed suicides, 22 percent of

7      them --

8              A.      Right.  Yeah.

9              Q.      -- had bipolarity, and only 1.8 percent of

10     the suicidal inpatients had bipolarity.  In your

11     expert opinion, is there a positive correlation

12     between bipolarity and suicide rates for all

13     individuals, including adults?

14             A.      Yes.

15             Q.      Then let's turn to page 586.

16                     And turning to the right-hand column, the

17     second sentence down, it says, "The data from the

18     present study emphasized that almost all suicide

19     completers and suicidal inpatients exhibited serious

20     psychopathology in addition to having been under

21     substantial stress."

22                     Do you agree that that statement is valid,

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                            Washington, D.C.

                                                                        113

1     not just for this study, but for the body of

2     literature as a whole?

3               MR. HAKIM:  I'm going to be object to

4     breadth, context, to -- purposes.

5               THE WITNESS:  Do I agree that

6     psychopathology is prevalent, highly prevalent among

7     adolescent suicide?

8     BY MR. THOMPSON:

9          Q.    Well, all individuals.

10         A.    Among all individuals, no, not among all

11    individuals, but --

12         Q.    Who commit suicide?

13         A.    Oh, those who commit suicide.  A high

14    proportion do, yes.

15         Q.    Okay.  And then if we go under Suicidal

16    Intent, it says in the second to the last sentence,

17    "Therefore, our findings are consistent with the view

18    that suicidal intent is one of the most potent,

19    discriminative and predictive variables for completed

20    suicide."

21              Do you agree that their findings are --

22    demonstrate this?

Daniel W. Webster, Sc.D., MPH                               September 21, 2011
                        Washington, D.C.

114

1       A.    I think they demonstrate it for the

2   comparison group that they are noting.  The

3   comparison group -- I mean, the study does not

4   address individuals so much that did not have the

5   condition, because they're looking at suicidal

6   inpatients.

7       Q.    Well, when you say the condition, what are

8   you referring to?

9       A.    Having to do with highly planned

10  activity.  I mean, generally the idea is, and what

11  the data suggests is, that those with very serious

12  and lasting depression are the ones who more

13  commonly will have been planning, okay?  Whereas

14  other individuals who don't necessarily suffer from

15  that kind of condition, sometimes those acts are

16  more impulsive than planned.

17      Q.    And what study would you point to to

18  support what you've just said?

19      A.    Well, one of the studies would be one we

20  just covered in Arizona.

21      Q.    Anything else?

22      A.    Not that I can cite off the top of my

115

```
 1    head.

 2         Q.    All right.

 3              MR. THOMPSON:   I would like to ask the

 4    court reporter to mark as Webster 10 the following

 5    document.

 6                   (Webster Deposition Exhibit No. 10

 7                    was marked for identification.)

 8    BY MR. THOMPSON:

 9         Q.    And sir, would you please identify this

10    document for the record?

11         A.    It's an article entitled Presence and

12    Accessibility of Firearms in the Homes of Adolescent

13    Suicides:   Case-Control Study, lead author David

14    Brent and colleagues, published in the Journal of

15    the American Medical Association in 1991.

16         Q.    All right.  And let's turn to page 2992.

17    It says in that first left-hand column about halfway

18    down, there is a sentence that says, "Also, as has

19    been previously noted, suicidal intent was higher in

20    completers than in attempters."  Do you see that,

21    sir?

22         A.    Yes.
```

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                          116

1        Q.    Do you know how the authors measured

2    suicide -- suicidal intent in this article?

3        A.    I'll have to look to see which is

4    referenced here.  The study we were just talking

5    about, so they used the Beck inventory that was just

6    discussed.

7        Q.    Okay.  And so these authors attempted to

8    measure suicidal intent, correct?

9        A.    Yes.

10       Q.    And was this a peer-reviewed publication?

11       A.    Yes.

12       Q.    What does that mean that it's peer

13   reviewed?

14       A.    That means scientific peers reviewed the

15   article and studied the methodology and gave

16   recommendations to the journal about whether to

17   accept or reject, or whether revisions are needed or

18   recommended.

19       Q.    And the fact that this article was

20   published in a peer-reviewed journal indicates that

21   the editors of that journal thought it was a

22   scientifically valid exercise to try to measure

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
                          Washington, D.C.

117

1    suicidal intent, is that correct?

2       A.    I don't think that you can make that

3    inference on any single thing that's in here.  I

4    think in its totality, the journal editors

5    determined that this study made a significant

6    contribution to the -- to the literature on this

7    topic.

8       Q.    When, in the course of peer review, if an

9    editor or a referee sees something that they think is

10   scientifically unsound, will they flag that and ask

11   that it be removed?

12      A.    Sometimes.

13      Q.    Okay.

14           MR. THOMPSON:  I would like to ask the

15   court reporter to mark as Webster 11 the following

16   document.

17               (Webster Deposition Exhibit No. 11

18                was marked for identification.)

19           MR. WORSECK:  David, is it safe to say

20   you're going to have at least 57 exhibits?

21           MR. THOMPSON:  A couple of the charts --

22   BY MR. THOMPSON:

Daniel W. Webster, Sc.D., MPH                                      September 21, 2011
                              Washington, D.C.

                                                                          118

1       Q.      All right.  So would you please identify

2   this document for the record?

3       A.      It's an article entitled Suicide in

4   Affectively Ill Adolescents:  A Case-Control Study

5   by David Brent, Joshua Perper, Grace Moritz and so

6   on, published in the Journal of Affective Disorders

7   in 1994.

8       Q.      All right.  And let's turn to table 2 on

9   the top of page 196.  It says in the first line that

10  they're "any affective disorder," and it shows that

11  95 percent of the completers have an affective

12  disorder.  Do you know what is meant by that term,

13  affective disorder?

14      A.      Affective disorder are having to do with

15  emotional problems.

16      Q.      And then if we look at table 1, the last

17  line that says, family constellation, percentage

18  lives with both biological parents; 52 percent of the

19  controls lived with their biological parents, 38

20  percent of the completers did.

21              Are you aware of any literature indicating

22  that there are benefits to being raised by both

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

119

1      biological parents?

2          A.    Yes.

3          Q.    And if we turn to the next page, page 197,

4      if we look under Past Suicidality and we look in the

5      second sentence it says, "Also completers were much

6      more likely to have been suicidal in the week prior

7      to death versus the week prior to interview and

8      controls, 77 percent versus zero percent."

9               So is this -- am I reading this right that

10     this is saying that 77 percent of those who completed

11     their suicide were suicidal in the week prior to

12     death?

13         A.    Yes.

14         Q.    Does that indicate at least for those 77

15     percent, they were not acting impulsively in the

16     sense of killing themselves unthinkingly within a

17     matter of minutes or hours?

18         A.    Yes.

19         Q.    Okay.

20               MR. THOMPSON:   I would like to ask the

21     court reporter to mark as Webster Exhibit 12 the

22     following document.

Daniel W. Webster, Sc.D., MPH                                September 21, 2011
                        Washington, D.C.

                                                                    120

1                    (Webster Deposition Exhibit No. 12

2                    was marked for identification.)

3    BY MR. THOMPSON:

4        Q.    And would you please identify this

5    document for the record, sir?

6        A.    Yes.  The article is entitled Suicide in

7    Adolescents With No Apparent Psychopathology, lead

8    author David Brent, published in the Journal of

9    American Academy of Child and Adolescent Psychiatry

10   in 1993.

11       Q.    All right.  And were there only seven

12   individuals who killed themselves who were examined

13   in this case?

14       A.    Yes.

15       Q.    Okay.  And if we look at table 5 on page

16   498, we'll see that it has number of guns available,

17   and then it has the letter M, as in Mary.  Is that

18   short for mean?

19       A.    Yes.

20       Q.    Okay.  And is the SD for standard

21   deviation?

22       A.    Yes.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                        121

1        Q.      Okay.  And it shows for the number of guns

2    available for the community controls with no

3    disorder, there were 4.6, is that right?

4        A.      Yes.

5        Q.      So is it fair to say that having guns in

6    the house doesn't always increase suicide risk?

7        A.      It doesn't always, yes.

8        Q.      Okay.  And this study did not look at the

9    impact of locking guns up, did it?

10       A.      I don't believe they examined that.  I

11   will say that there was a difference in the number

12   of handguns available between the suicide victims

13   and the community control.

14       Q.      And where do we see that?

15       A.      That's in table 5, in the row that says

16   Number of Handguns Available, and in the far right

17   column, the comparison between suicide victims with

18   no disorder and the community controls with no

19   disorder, P value .003.

20       Q.      And so, just to make sure I'm reading this

21   right, when it says handgun availability, if we look

22   under community controls, it says 34 percent, is that

122

1    right?

2        A.    Yes.

3        Q.    And if there are 4.6 guns on average in

4    those houses, you are talking about slightly more

5    than one handgun per household, even for the

6    community controls, correct?

7        A.    Right.

8            MR. THOMPSON:  All right.  I would like to

9    ask the court reporter to mark the following document

10   as Webster 13.

11               (Webster Deposition Exhibit No. 13

12               was marked for identification.)

13   BY MR. THOMPSON:

14       Q.    Sir, will you please identify this

15   document for the record?

16       A.    It's an article entitled Firearms in

17   Adolescent Suicide:  Community Case-Control Study,

18   lead author, David A. Brent, published in American

19   Journal of Diseases of Children in October 1993.

20       Q.    And why did you pick this study to include

21   in your report?

22               MR. HAKIM:  I object.  Just the context of

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                        123

1      the question; used where, for what purpose?

2      BY MR. THOMPSON:

3          Q.     You can answer.

4          A.     I guess if you could restate the

5      question.

6          Q.     Yeah, why do you cite to it?  You had a

7      wealth of literature, you picked this one, why did

8      you pick it?

9          A.     It's a study that examined the

10     association between availability of firearms and the

11     risk of adolescent suicide after controlling for

12     other factors.

13         Q.     Do you think the methodology was sound?

14         A.     What specifically do you mean by that?

15         Q.     Well, as you sit here, are there any

16     methodological flaws that you identified in this

17     study when you were preparing your report?

18         A.     No.

19         Q.     Okay.  And if we look at the bottom of

20     page 1069, the very last sentence says, "Limitations

21     include the small sample size, which makes it

22     difficult to examine risk factors among subgroups

Daniel W. Webster, Sc.D., MPH                                September 21, 2011
                        Washington, D.C.

                                                                      124

1    with a great deal of precision."  Do you agree with

2    that assessment of the authors?

3         A.    Sure.  Almost any study you're going to

4    prefer having more people.

5         Q.    Then if you'll turn to page 1068, please.

6    It says, "Having access to long guns" -- oh, I'm

7    sorry, I should tell you where I am.

8         A.    Yeah, if you would.

9         Q.    I'm sorry.  So it's comparison of suicide

10   victims and controls, that subsection.

11        A.    Got it.

12        Q.    The last sentence, "Having access to long

13   guns was not associated with suicide in the total

14   sample.  And the association of suicide with having a

15   loaded gun in the home also escaped statistical

16   significance."

17              First of all, do you agree that that

18   accurately reports the findings in this study?

19        A.    Yes.

20        Q.    And do you also agree that having access

21   to long guns is not positively correlated with

22   suicide in the general population?

125

1    A.    It's not statistically significant.  If

2    you look at the odds ratio, it is 2.5, and again,

3    due to small sample size, it's not statistically

4    significant, but I don't completely dismiss the

5    elevated risk inferred there.

6         I also want to note that it relates to

7    gun -- loaded gun.  The fact that there were no

8    individuals in this group in the other column where

9    there was a loaded gun made it impossible to

10   calculate an odds ratio.  So it's impossible for it

11   to be significant or not significant.  So --

12   Q.    Is that a methodological flaw to have a

13   control group that doesn't even manifest the

14   phenomenon you're trying to study?

15   A.    It's a flaw to report statistical

16   significance of it.  I think it's relevant to report

17   the data as they are.  I think it's a flaw to

18   suggest that there is meaning to no significance for

19   this particular test.

20   Q.    Now, if we look at the bottom of this

21   page, it says in the last sentence, quote -- well,

22   actually let's start with the second to the last

126

1    sentence.

2            It says, "No increased risk of suicide was

3    associated with having more than one long gun in the

4    home."  Is that consistent with your understanding

5    that as a general matter, there is not a positive

6    correlation between suicide rates and having more

7    than one long gun in the home?

8        A.    That's correct.

9        Q.    Okay.  And then it says in the next

10   sentence, it says, "The odds of suicide with more

11   than one handgun in the home were greatly increased

12   relative to having just one handgun in the home."

13   This study did not look at whether these handguns

14   were operable, correct?

15       A.    That's correct.

16       Q.    Okay.  And it also didn't try to measure

17   the incremental increase in suicide rate from having

18   one handgun in a house as opposed to two, is that

19   correct?

20       A.    It compared one versus multiple.

21       Q.    Okay.

22       A.    So that to be two to a hundred.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                        Washington, D.C.

                                                                    127

 1          Q.    All right.  Now, if you could turn your

 2    attention to page 1067.

 3              And then under the section called

 4    Psychiatric Symptoms and Diagnoses, it says -- and

 5    this is maybe two-thirds of the way down right after

 6    footnotes 21 and 22.

 7              It says, "As would be expected suicide

 8    completers compared with matched controls showed much

 9    higher current rates of probable or definite major

10    depression, substance abuse, conduct disorder and

11    previous suicide attempt."  Does it surprise you that

12    they found a strong positive correlation between

13    major depression and suicide rates?

14          A.    No.

15              MR. THOMPSON:  I am happy to keep going.

16    I know we've gotten to the noon hour.  So if you guys

17    want to break for lunch, we can, or we can --

18              THE WITNESS:  Well, before we break, can

19    -- just on the matter here that we're discussing.

20    BY MR. THOMPSON:

21          Q.    Please, yes.

22          A.    Just so we can --

128

1          Q.     Put this to the side?

2          A.     Yes.  So it's clearly evident in this

3     study and others that the conditions listed here,

4     major depression, substance abuse, conduct disorder

5     and suicide attempt, are all associated with risks

6     for suicide.  What's particularly relevant -- and,

7     yes, there are differences between those who

8     committed suicide and the community controls, as

9     would be expected.

10              The authors of this study statistically

11     control for the effects of these other predictors or

12     risk factors for suicide in order to give an

13     independent association between availability of

14     firearms in the home and suicide risk.

15              MR. THOMPSON:  All right.  Thank you.  And

16     with that, we'll go off the record.

17              THE VIDEOGRAPHER:  We're going off the

18     record.  The time on the video is 12:10 p.m.

19              (Whereupon, at 12:10 p.m., the deposition

20     in the above-entitled matter adjourned, to resume at

21     1:27 p.m. this same day.)

22

                                                              129

 1                        AFTERNOON SESSION

 2                            (1:26 p.m.)

 3            THE VIDEOGRAPHER:  We're back on the

 4    record.  The time on the video is 1:26 p.m.

 5    Whereupon,

 6               DANIEL W. WEBSTER, Sc.D., MPH,

 7    the witness testifying at the time of recess, having

 8    been previously duly sworn, was further examined and

 9    testified further as follows:

10                      (Webster Deposition Exhibit 14

11                       was marked for identification.)

12                 EXAMINATION BY COUNSEL

13                 FOR DEFENDANTS (RESUMED)

14    BY MR. THOMPSON:

15       Q.    Welcome back, professor.  The court

16    reporter has handed you what's been marketed as

17    Webster Exhibit 14.  And if you would please identify

18    this document for the record?

19       A.    It's an article entitled Mortality Among

20    Recent Purchasers of Handguns, by Garen Wintemute

21    and colleagues, published in the New England Journal

22    of Medicine in 1999.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011

Washington, D.C.

130

1      Q.    All right.  And if you would please turn

2    your attention to page 1585.

3            It says in the right-hand column, first

4    full paragraph, the first sentence, "Among men who

5    purchased a handgun, there were fewer deaths than

6    expected from heart disease, cancer, unintentional

7    injury and all causes in the first year after the

8    purchase of a handgun."  How do you explain that, as

9    a public health professional?

10     A.    I would -- this is clearly from

11   speculation, there is not a lot to go on here.  My

12   best guess would be that handgun purchasers are

13   generally more healthy than those who do not

14   purchase a handgun.

15     Q.    And now --

16     A.    It may be that, for example, if you're

17   quite ill, have a bunch of conditions that might

18   make it -- you at risk for dying, that purchasing a

19   handgun is either not something you care to do, need

20   to do, or maybe in some cases are even able to do,

21   depending on your condition.

22     Q.    Now, let's turn to page 1586, to the

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011

Washington, D.C.

131

1    left-hand column, first full paragraph, the first

2    full sentence, where it says, "Men remained at

3    decreased risk of death from causes other than

4    suicide or homicide and from all causes combined."

5             Now, am I reading this properly to mean

6    that after men purchased a handgun, they are at a

7    decreased risk of death, even including the threat of

8    homicide?

9             MR. HAKIM:  I'm going to object, just the

10   professor can testify to your understanding of the

11   reading.

12            THE WITNESS:  So could you rephrase,

13   please?

14   BY MR. THOMPSON:

15       Q.   Sure.  Yeah.  Is it fair to read this

16   sentence to mean that men have a decreased risk of

17   homicide after purchasing a handgun?

18            MR. HAKIM:  Again, whether or not it's

19   fair might be vague.  The professor will be able to

20   testify to what his reading is.

21            THE WITNESS:  That would not be my

22   interpretation, the way you stated it.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                            Washington, D.C.

                                                                        132

1    BY MR. THOMPSON:

2        Q.    Well, what do you -- how do you understand

3    it?

4        A.    My interpretation is different.  It's not

5    saying that their risk decreased after having

6    purchased one.  The risk -- the standarized

7    mortality ratio is comparing the risk of death for

8    handgun purchasers compared to those demographically

9    similar individuals who did not purchase a gun.

10            So the point of comparison has to do

11   again with legal purchasers of handguns compared to

12   others.  It doesn't necessarily say that their risk

13   went down.  You have to be cognizant of the

14   comparison; it's compared to those who didn't

15   purchase a handgun.

16       Q.    I see.  And so the legal -- excuse me,

17   strike that.

18            So the risk of death for those who own

19   handguns who are men is lower, according to this

20   study, than for those who do not own handguns, is

21   that correct?

22       A.    Yes, overall.

Daniel W. Webster, Sc.D., MPH                                September 21, 2011
                            Washington, D.C.

133

1        Q.    Okay.   Now, let's turn to page 1587.  It

2     says in the right-hand column, top of the page, it

3     says, "The handgun purchasers in our cohort also

4     passed a background check.   None had a conviction for

5     any felony or violent misdemeanor or were known to

6     have been judged mentally ill or to be addicted to

7     controlled substances.   The absence of such potential

8     risk factors for death by homicide means that our

9     estimates may be subject to a 'good boy' bias."   Do

10    you agree that there is a good boy bias in these

11    results?

12            MR. HAKIM:   Objection to vagueness.

13            THE WITNESS:   I'm not one hundred percent

14    sure of the meaning of the good boy bias.

15    BY MR. THOMPSON:

16       Q.    Well, you cited this.   What do you

17    understand it to mean?

18       A.    What this -- I believe this is alluding

19    to the point I was making just a minute ago.   That

20    individuals who purchase handguns legally, met all

21    qualifications, may generally be healthier and

22    otherwise lower risk than, again, a group of

134

1    demographically matched individuals as a whole.

2        Q.    Let me ask you.  Is there a difference

3    between the effects of lawfully purchased guns and

4    illegally obtained guns in terms of violence?

5        A.    Yes.

6        Q.    Okay.  And what is that difference?

7        A.    The risk is greater among individuals who

8    obtain guns illegally.  There is, generally the

9    pattern of results that you see is the greater the

10   risk of the individual, the more guns elevate that

11   risk for the bad outcome.  That's the general

12   pattern in the results.

13       Q.    Do you have a sense as to the degree of

14   difference between those risks, between an illegally

15   obtained gun and a lawfully purchased gun?

16       A.    I would not be able to quantify that.

17       Q.    Okay.  This study refers to a good boy

18   bias.  Is it reasonable to assume that those who go

19   through a background check, who do not have a prior

20   criminal record, who do not have manifestations of

21   mental illness likely to be responsible in the use of

22   their firearm?

Daniel W. Webster, Sc.D., MPH                                September 21, 2011
                          Washington, D.C.

                                                                        135

1            MR. HAKIM:  I'm going to object to the

2    characterization of whether it is reasonable.

3    Vagueness of what that term is for this purpose.

4            THE WITNESS:  My response is that it's

5    compared to what?

6            So what this reference, that Wintemute and

7    co-authors are making, is that in comparison to those

8    who would be disqualified because of some of these

9    other risk factors, yes, their risks are lower.  If

10   that was what you were asking me.  I'm not one

11   hundred percent sure.

12           MR. THOMPSON:  All right.  Let's turn to

13   the next exhibit.  I would like to ask the court

14   reporter to mark this as Webster Exhibit 15.

15                   (Webster Deposition Exhibit No. 15

16                    was marked for identification.)

17   BY MR. THOMPSON:

18      Q.    Sir, will you please identify this

19   document for the record?

20      A.    It's an article entitled Household

21   Firearm Ownership and Rates of Suicide Across 50

22   States.  Authors are Matthew Miller, Steven

Daniel W. Webster, Sc.D., MPH                                          September 21, 2011
Washington, D.C.

136

1    Lippmann, Deborah Azrael, David Hemenway, published

2    in the Journal of Trauma, Injury, Infection and

3    Critical Care, in 2007.

4         Q.    All right.  And if we turn to page 1030

5    and we look on the bottom left -- the left-hand

6    column at the bottom under Independent Variables, it

7    says, "State level data on the percentage of

8    individuals living in households with firearms, gun

9    prevalence, were obtained from the 2001 BRFSS.  The

10   BRFSS, the world's largest telephone survey, more

11   than 200,000 adult respondents annually, is on

12   ongoing data collection program sponsored by the CDC

13   with all 50 states participating."

14             Is the CDC that's referenced there the

15   Centers for Disease Control?

16        A.    Yes.

17        Q.    Is it true that some gun owners are

18   unwilling to provide data about their ownership of

19   firearms to the federal government?

20        A.    I don't know that to be true.

21        Q.    Is there -- do you know whether there is a

22   sensitivity among gun rights advocates about

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

137

1      dissemination of information about ownership?

2                MR. HAKIM:  I object, just to the breadth

3      of sensitivity, what is it about.

4                THE WITNESS:  Right, so if you could just

5      be more specific.

6      BY MR. THOMPSON:

7           Q.    Well, if you don't know what the word

8      sense sensitivity means, that's fine.

9           A.    Just restate your question, please.

10          Q.    Well, I'm going to ask it again, but you

11     know, your counsel can interpose objections, and if

12     you say well, I don't understand the question, then

13     that's fine and we'll -- you know, the reasonableness

14     of that, a court can decide.

15               But my question is, isn't it true that gun

16     rights advocates are protective of information about

17     who owns firearms?

18          A.    Again, I can't say that I know that to be

19     true.  I don't know of anyone who has studied that.

20     I know that there are people who have theorized

21     that, but I don't know of empirical evidence.

22          Q.    Well, do you know that, for example, in

138

1    the 1994 federal legislation, isn't there a

2    requirement that after the background check is run,

3    that that data is deleted?

4              MR. HAKIM:  And again --

5    BY MR. THOMPSON:

6         Q.    If you know.

7              MR. HAKIM:  Obviously not a legal

8    interpretation of it.

9              THE WITNESS:  Yes.

10   BY MR. THOMPSON:

11        Q.    And did the NRA insist on that because of

12   concerns about the government getting access to

13   information about who owned firearms?

14        A.    Yes.

15        Q.    Okay.  And so wouldn't that same concern

16   that motivated the NRA to insist on that provision

17   mean that some individuals are not going to respond

18   to the federal government calling them and saying do

19   you own a firearm?

20        A.    It's possible.  The real question is how

21   many of those individuals, and does the NRA's

22   position reflect the sentiments and desires and

Daniel W. Webster, Sc.D., MPH                                   September 21, 2011
                              Washington, D.C.

                                                                      139

1     whatever of gun owners broadly.

2               There are survey data to show that the

3     NRA typically is not always in concert with how gun

4     owners feel about the government and regulation of

5     firearms.

6          Q.    Do you have any estimate as to what

7     percentage of gun owners in America have reservations

8     about telling the federal government that they own a

9     firearm?

10         A.    I don't.

11         Q.    All right.  Now, let's turn to page 1033.

12               And in the left-hand column, first full

13    paragraph, second sentence, it says, "Firearm

14    prevalence data for this cross-sectional study come

15    from 2001, whereas mortality data come from 2000 to

16    2002."  Is that your understanding of how they

17    gathered their data?

18         A.    Yes.  I trust that they accurately report

19    their data.

20         Q.    So this study doesn't account for people

21    who purchased guns in 2000 and 2002, is that right?

22         A.    New purchasers of guns, someone who newly

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                        140

1    became a gun owner.

2        Q.    Do you believe that guns are most

3    dangerous right after they are purchased?

4        A.    There are some data to suggest that, yes.

5        Q.    Now, if we go down to the next paragraph

6    in the second sentence, it says, "The greatest threat

7    to the validity of our findings in this respect is

8    that we do not know whether firearm suicide victims

9    actually lived in homes with guns, even if they lived

10   in high-gun states."  Do you agree with that

11   assessment?

12       A.    Yes.

13       Q.    All right.  And then let's turn back to

14   1030 for a quick moment under Statistical Analysis,

15   where it says --

16       A.    1030?

17       Q.    Yes, sir.  Bottom right-hand corner,

18   Statistical Analyses, the first sentence under the

19   heading, "Multivariate analysis adjust for the

20   percentage of a state's population with serious

21   mental illness, alcohol dependence or abuse, illicit

22   substance dependence or abuse and the percentage

141

1    unemployed, living below the poverty level and in

2    urban areas."

3              Was this study able to determine if the

4    people who committed suicide had any of the factors

5    associated I've just listed?

6         A.    No, this is an ecological study.  So all

7    measures that they're examining -- excuse me --

8    reflect differences across states.

9         Q.    All right.  Let's turn to the next

10   exhibit.

11             MR. THOMPSON:  And I would like to have

12   this marked as Webster Exhibit 16.  `

13                  (Webster Deposition Exhibit No. 16

14                  was marked for identification.)

15   BY MR. THOMPSON:

16        Q.    Would you please identify this document

17   for the record?

18        A.    Yes.  It's an article entitled State and

19   Local Prevalence of Firearm Ownership:  Measurement,

20   Structure and Trends, published in Journal of

21   Quantitative Criminology, March 2004, authors

22   Deborah Azrael, Philip Cook and Matthew Miller.

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

142

1        Q.    All right.  And then if we turn to page

2   57, under acknowledgments, it indicates that the

3   Joyce Foundation provided partial support for this

4   analysis.  How relevant, if at all, do you think the

5   source of funding for research is?  For scientific

6   research?

7              MR. HAKIM:  Object to the question.  As to

8   vagueness and relevance.

9              THE WITNESS:  Yes, it is rather vague.  I

10  mean, in some cases, it might be quite relevant and

11  others not.  Do you want me to talk about the

12  specific one?  Or do you want me --`

13  BY MR. THOMPSON:

14       Q.    It was a general question, and I'm just

15  wondering, I mean as a scientist, wouldn't you just

16  look at the science and determine whether it is valid

17  or not.  And whether somebody paid for it or not, how

18  is that relevant?

19       A.    I'll tell you what I do as a scientific

20  reviewer --

21       Q.    Yes.

22       A.    -- is I mostly just focus on the methods

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

143

```
 1    and the data and the conclusions and what they say.

 2    Who funded it is of less relevance.

 3         Q.    And I guess my question is why would it be

 4    of any relevance, if you satisfied yourself that the

 5    methods and the data met your scientific criteria?

 6         A.    Yes.

 7         Q.    It wouldn't be then?

 8         A.    I would not be concerned about the

 9    funder, if it is a scientifically sound study.

10              MR. THOMPSON:  I would like to ask the

11    court reporter to mark the next document as Webster

12    17.

13                   (Webster Deposition Exhibit No. 17

14                   was marked for identification.)

15    BY MR. THOMPSON:

16         Q.    And sir, would you please identify this

17    document for the record?

18         A.    Yes.  It's an article entitled

19    Association Between Changes in Household Firearm

20    Ownership and Rates of Suicides in the United

21    States, 1981 through 2002, published in the journal

22    Injury Prevention, authors Matt Miller, Deborah
```

144

```
 1    Azrael, Lisa Hepburn, David Hemenway and S.J.

 2    Lippmann.

 3         Q.    All right, sir, and if we turn to the

 4    second page, which is page 179 and we look at

 5    independent variables, the second full paragraph

 6    starts, "Estimates of regional household firearm

 7    ownership rates are from the General Social Survey,

 8    GSS."  What is the GSS?

 9         A.    This is a large survey that's been

10    conducted by the National Opinion Research Center at

11    the University of Chicago for many decades.  I'm not

12    remembering -- it dates back to the early '70s, if I

13    recall correctly.  It has collected systemic data on

14    a representative sample of adults in the United

15    States.

16         Q.    Is the data that it receives

17    self-reported?

18         A.    Yes.

19         Q.    And is this a private entity or is it

20    affiliated with the government in some way?

21         A.    It's not affiliated with the government.

22    It's university-based.
```

Daniel W. Webster, Sc.D., MPH

September 21, 2011

Washington, D.C.

145

1      Q.     Did this study control for mental illness?

2      A.     Well, bear with me for just a second.

3             MR. THOMPSON:  Okay.  Let's go off the

4      record so the tape can change and you can read it.

5             THE VIDEOGRAPHER:  This concludes tape

6      number three in the video deposition of Dr. Daniel

7      Webster.  The time on the video is 1:48 p.m.  We are

8      on the record.

9             (Recess.)

10            THE VIDEOGRAPHER:  This begins tape number

11     four in the video deposition of Dr. Daniel Webster.

12     The time on the video is 1:49 p.m.  `We are on the

13     record.

14     BY MR. THOMPSON:

15     Q.     Yes, sir.  Did this study -- excuse me --

16     control for mental illness?

17     A.     No.

18     Q.     And did the study control for changes in

19     treatment of the mentally ill over the last 20 years?

20     A.     No.

21     Q.     Have there been advancements in the

22     medical treatment of the mentally ill over the last

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                           Washington, D.C.

                                                                        146

1      20 years?

2               MR. HAKIM:   I'm going to object just to

3      the breadth, vagueness.

4               THE WITNESS:   I would say yes, there have

5      been advances.

6      BY MR. THOMPSON:

7          Q.    Did this study distinguish between guns

8      owned legally or obtained illegally?

9          A.    No.

10         Q.    Did this study look at whether the

11     firearms were locked?

12         A.    No.

13              MR. THOMPSON:   I would like to ask the

14     court reporter to mark as Webster Exhibit 18 the

15     following document.

16                   (Webster Deposition Exhibit No. 18

17                    was marked for identification.)

18     BY MR. THOMPSON:

19         Q.    And sir, will you please identify this

20     document for the record?

21         A.     It's an article entitled Recent

22     Psychopathology, Suicidal Thoughts and Suicide

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

147

1    Attempts in Households With and Without Firearms,

2    Findings From the National Comorbidity Study

3    Replication, authors Matt Miller, Catherine Barber,

4    Deborah Azrael, David Hemenway, Beth Molnar,

5    published in Injury Prevention in 2009.

6        Q.    Now, if we look at table 1, is it fair to

7    say that men with guns in the home have less anxiety

8    disorders than men without guns in the home?

9            MR. HAKIM:  I'm going to object just to

10   the vagueness, of what "fair" is.

11           THE WITNESS:  I would not agree with that

12   statement.

13   BY MR. THOMPSON:

14       Q.    Well, if we look at any of the above

15   anxiety disorders, we see home with a gun, 4.5

16   percent, home without a gun, 5.5 percent.  Do you

17   agree with those numbers?

18       A.    Yes.

19       Q.    So does that show that men with guns in

20   the home have fewer anxiety disorders than those

21   without guns in the home?

22       A.    Well, it's quite relevant that the

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                        Washington, D.C.

                                                                        148

1    difference is not statistically significant.  It's

2    hard to know for sure whether that is due to

3    sampling variation.

4         Q.    Now, when you say it's not statistically

5    significant, is that because it's at the .5 and .6

6    level?

7         A.    That's what these authors used, yes.

8         Q.    Okay.  You think we should defer to what

9    the authors used as the level of statistical

10   significance?

11        A.    Well, that's the only thing you really

12   have to go by, what they show you. `I think it's

13   actually preferable to show the P value, which they

14   don't do.  They simply note whether it meets that

15   threshold.

16        Q.    What does the number in parentheses refer

17   to then?

18        A.    That's the standard errors.

19        Q.    And what does the standard error refer to?

20        A.    It's a unit of variation around a mean.

21        Q.    All right.  And so if we look at this

22   table, we see that, is it only the items with an

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                        Washington, D.C.

149

1    asterisk are statistically significant?

2         A.    Yes, at point --  PO -- point 05, excuse

3    me.

4         Q.    How would you explain the fact that --

5    well, strike that.

6               Isn't it true on -- in terms of mood

7    disorders that men and women with guns in the home

8    have fewer mood disorders than those without guns in

9    the home?

10        A.    The data here show a numerical

11   difference.  They do not note a statistical

12   significance, so it's hard to know, again, whether

13   that's due to chance or not.

14        Q.    In terms of substance use disorder, men

15   and women with guns are less likely, according to

16   this chart, to abuse substances than those without

17   guns, is that right?

18        A.    The same thing applies, where there is a

19   numerical difference, but not a statistically

20   significant difference for men.

21        Q.    All right.  Let's put that aside.

22              MR. THOMPSON:  I would like to ask the

150

1    court reporter to mark as Webster 19 the following

2    document.

3                        (Webster Deposition Exhibit No. 19

4                        was marked for identification.)

5    BY MR. THOMPSON:

6        Q.    And sir, would you please identify this

7    document for the record?

8        A.    It's an article entitled Association of

9    Rates of Household Handgun Ownership, Lifetime Major

10   Depression, and Serious Suicidal Thoughts With Rates

11   of Suicide Across U.S. Census Regions, authors David

12   Hemenway, Matthew Miller, published in Injury

13   Prevention in 2002.

14       Q.    Okay.  And then if we look at page 314,

15   the last paragraph on the page, the first sentence of

16   that paragraph reads, "The prevalence of major

17   depression and prevalence of suicidal thoughts are

18   positively correlated, but the prevalence of major

19   depression is not correlated with the suicide rate,

20   while the prevalence of suicidal thoughts is

21   correlated with the suicide rate."

22                        When you read this, did it surprise you

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                        151

1    that they found that the prevalence of major

2    depression is not correlated with the suicide rate?

3        A.    Yes.

4        Q.    Does that call into question the sampling

5    techniques that were utilized in this study?

6        A.    I'm not sure what to attribute it to.

7        Q.    But it's inconsistent with the overall

8    scholarly consensus, is that true?

9        A.    That's true.

10             MR. THOMPSON:  I would like to ask the

11   court reporter to mark as Webster 20 the following

12   document.

13                    (Webster Deposition Exhibit No. 20

14                     was marked for identification.)

15   BY MR. THOMPSON:

16       Q.    And if we turn to page -- first identify

17   this for the record, please.

18       A.    Sure.  This is an article entitled Gun

19   Ownership As a Risk Factor For Homicide in the Home

20   by Arthur Kellermann and colleagues published in the

21   New England Journal of Medicine in 1993.

22       Q.    All right.  Now, if we turn to page 1089,

152

1    the last paragraph, it states:  "Four limitations

2    warranty comment.  First, our study was restricted to

3    homicides occurring in the home of the victim, the

4    dynamics of homicides occurring in other locations

5    may be quite different."  Do you agree with that?

6              MR. HAKIM:  Where are you?

7              MR. THOMPSON:  Oh, sure.

8              THE WITNESS:  The bottom.

9              MR. HAKIM:  I'm in the wrong column.

10             MR. THOMPSON:  No, that's fine.

11   BY MR. THOMPSON:

12       Q.    "The dynamics of homicides occurring in

13   other locations such as bars, retail establishments

14   or the street may be quite different."  Would you

15   agree with that?

16       A.    Yes.

17       Q.    Okay.  Second, "our research was conducted

18   in three urban counties that lack a substantial

19   percentage of Hispanic citizens.  Our results may

20   therefore may not be generalizable to more rural

21   communities or to Hispanic households."  Would you

22   agree with that statement?

153

1          MR. HAKIM:  I'm objecting, agreeing for

2     what purpose?

3          THE WITNESS:  I would agree.

4     BY MR. THOMPSON:

5          Q.    Okay.  Third, "It is possible that reverse

6     causation accounted for some of the association we

7     observed between gun ownership and homicide, i.e., in

8     a limited number of cases people may have acquired a

9     gun in response to a specific threat."  Do you agree

10    with that statement?

11         A.    Yes.

12         Q.    Okay.  Do you have any way to quantify the

13    number of people who may have acquired a gun in

14    response to either a specific or a general threat?

15         A.    Do I have an ability to quantify it in

16    this study, is that the question?

17         Q.    Yes, sir.

18         A.    No.

19         Q.    How about in any study, have you seen a

20    study that quantifies to your satisfaction the

21    problem of reverse causation, namely that people who

22    live in really dangerous neighborhoods may feel the

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                        154

1    need to buy a firearm at a higher rate than someone

2    who lives in a safe neighborhood?

3         A.    In this particular study that you're

4    referring to, the cases and controls come from the

5    same neighborhood.

6         Q.    Okay.

7         A.    So it seems unlikely to me that there

8    would be a different perceived neighborhood threat,

9    since they're both in the same neighborhood.

10        Q.    All right.  And is that really the only

11   way to try to control for that problem of reverse

12   causation, to get people who are in the same

13   neighborhood?

14        A.    No.

15             MR. HAKIM:  I'm going to object to that,

16   It mischaracterizes the plaintiff's -- or the

17   witness's testimony.

18             THE WITNESS:  There are other ways.  And

19   the authors attempt to do that.  They gather

20   information about other types of risk factors that

21   are relevant to risk of homicide.

22   BY MR. THOMPSON:

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

155

1      Q.     And what are some of those risks?

2      A.     Alcoholic consumption; drinking problems;

3  there are a number of drinking-related variables

4  examined; illicit drug use, family member required

5  medical attention because of a fight in the home;

6  involved in a physical fight outside the home;

7  household member arrested; case or subject or

8  control arrested -- all of those are relevant risk

9  factors that may make some individuals more inclined

10  to acquire guns than others.

11         And these authors statistically control

12  for those differences in their analysis.

13      Q.     Now, if we look at page 1086, it says

14  comparability of case subjects and controls.  And

15  then in the second paragraph, third sentence, it

16  says:  "The demographic characteristics of the

17  victims and controls were similar except that the

18  case subjects were more likely to have rented their

19  homes and to have lived alone."

20         Is it true that people who rent their

21  homes may have weaker ties to their communities?

22      A.     Yes.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                          156

1              MR. HAKIM:   I'm going to object just to

2    vagueness.

3    BY MR. THOMPSON:

4         Q.    Is it people who rent their homes may move

5    more often?

6         A.    Yes.

7         Q.    Do people who rent their homes on average

8    have a lower income than people who own their homes?

9         A.    Yes.

10        Q.    Do people who rent their homes on average

11   have a lower educational attainment level than those

12   who own their own homes?

13        A.    I'm not certain about that.

14        Q.    Okay.  Is living alone positively

15   correlated with mental illness?

16        A.    Yes.

17        Q.    And if we turn to page 1088 and we look at

18   the last paragraph, first sentence, it says,

19   "Potential misreporting of sensitive information was

20   a serious concern, since we had no way to verify each

21   respondent's statements independently."  Do you agree

22   with that statement?

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
                          Washington, D.C.

157

1          MR. HAKIM:  I object to the foundation, in

2    support of what statement?

3          THE WITNESS:  On almost any study that

4    you've gather data through asking people questions,

5    you worry about whether they're going to accurately

6    report sensitive information, so it's potentially a

7    threat.

8    BY MR. THOMPSON:

9      Q.    And would you agree it's a serious concern

10   the way they label it?

11     A.    I don't know on what basis to say that

12   it's serious.  I'm not sure.

13     Q.    All right.  Then if we look at the table

14   3, Univariate Analysis, does this tell us anything

15   about the incidence of alcoholic drinking in the case

16   homes versus the control homes?

17     A.    Yes.

18     Q.    What does it tell us?

19     A.    There's more drinking problems among the

20   case subject households than among the control

21   subject households.

22     Q.    And did the authors try to control for

158

1    that?

2         A.    I believe they did.

3         Q.    Do you think that was methodologically

4    sound to try to control for that?

5         A.    Yes.  I think that -- I'm just looking at

6    the third --

7         Q.    Take your time.

8         A.    Yeah.  I don't see it controlled for in

9    the analysis reported in table 4.  As I discussed

10   earlier in the deposition, many explanatory

11   variables may be very closely correlated with one

12   another.  And if you try to include every one of

13   those variables, they're so closely correlated, you

14   run into a problem commonly known as multi

15   colinearity and it causes great imprecision in your

16   estimates.

17           So a common way that researchers deal

18   with this problem is to drop from the analysis

19   certain variables that might be correlated with the

20   outcome so long -- because they're so closely

21   correlated with some other variable.

22        Q.    Here, for example, alcohol problems and

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

159

1    illegal drug use might be correlated, correct?

2        A.    Yeah, a number of things here.  We know,

3    there is tons of literature showing that abuse of

4    alcohol goes hand in hand with abuse of illicit

5    drugs, it's also associated with domestic violence,

6    which is also represented among the controls.

7              So that's what I suspect, is that they're

8    very closely tied to those other variables, that

9    they created more precise estimates by leaving

10   alcohol abuse from the models.

11       Q.    In your opinion, is renting a home

12   positively correlated with homicide `rates?

13       A.    Yes.

14       Q.    And your opinion is living alone

15   positively recorded with homicide rates?

16       A.    Positively correlated, sure, yes.

17       Q.    In your opinion is having a household

18   member who was hit or hurt in a fight in the home

19   positively correlated with homicide rates?

20       A.    Yes.

21       Q.    In your opinion is having any member of

22   the household being arrested positively correlated

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                           160

1       with homicide rates?

2            A.    Yes.

3            Q.    In your opinion, is having a member of a

4       house using illicit drugs positively correlated with

5       homicide rates?

6            A.    Yes.  Again, many of these factors are

7       controlled for in their analysis.

8            Q.    Are these adjusted -- these are adjusted

9       odds ratios in table 4 that we were looking at?

10           A.    Yes.

11           Q.    And is it true that renting a home had a

12      higher odds ratio of being associated with homicide

13      than owning a gun?

14           A.    Yes.

15           Q.    And the same is true for living alone?

16           A.    Yes.

17           Q.    And the same is true for having a

18      household member who was hit or hurt in a fight?

19           A.    Yes.

20           Q.    How do you explain that renting a house is

21      more likely to be correlated with a homicide rate

22      than owning a gun?