# Exhibit E

# Part 3 of 3

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
                        Washington, D.C.

161

1       A.      Renting a house is a marker for other

2    things about oneself, some of which I believe you

3    alluded to earlier.  So it may be that there is less

4    stable employment, lower education; it could mean a

5    whole lot of things that cause or result in elevated

6    risk among those households.

7       Q.      You're not suggesting that just -- that

8    renting a house causes someone to commit a homicide,

9    are you?

10          MR. HAKIM:  Objection, mischaracterizing

11   the expert's testimony.

12          THE WITNESS:  I'm not suggesting that the

13   act of renting a house causes someone to commit a

14   homicide, correct.

15   BY MR. THOMPSON:

16      Q.      Did this study try to hold constant for

17   gang membership?

18      A.      No.

19      Q.      Did this study try to hold constant for

20   mental illness?

21      A.      Bear with me for a minute.

22      Q.      Take your time.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                              162

1         A.     No.

2                MR. THOMPSON:   I would like to ask the

3    court reporter to mark as Webster 21 the following

4    document.

5                        (Webster Deposition Exhibit No. 21

6                        was marked for identification.)

7    BY MR. THOMPSON:

8         Q.     And sir, would you please identify this

9    document for the record?

10        A.     An article entitled Risk Categories for

11   Femicide in Abusive Relationships:   Results From a

12   Multisite Case-Control Study, authors Jacqueline

13   Campbell, Daniel Webster, a cast of other authors,

14   published in American Journal of Public Health, July

15   2003.

16        Q.     And if we look under methods, we see that

17   it says an 11-city case study control design was

18   used; femicide victims were cases and randomly

19   identified abused women residing in the same

20   metropolitan area were controlling.   Is that right?

21        A.     That's correct.

22        Q.     And so this study speaks to women in

163

1    abusive relationships, is that right?

2        A.    That's correct.

3        Q.    Is it generalizable to other populations?

4        A.    It's generalizable to women in abusive

5    relationships.

6        Q.    Right.  But not to others?

7        A.    Correct.

8        Q.    All right.  Now, if we look at page 1090,

9    which is the second page of this document, and we

10   look under the middle column results, and we go to

11   the second full paragraph and the penultimate

12   sentence, and it reads, "Although the abuser's access

13   to a firearm increased femicide risk, the victim's

14   risk of being killed by their intimate partner was

15   lower when they lived apart from the abuser and had

16   sole access to a firearm."  Do you see that?

17       A.    Hm-hm.

18       Q.    And do you have an understanding of why it

19   is that when women lived apart from the abuser and

20   had sole access to a firearm they had a reduced risk

21   of being killed?

22       A.    Do I have an understanding why that's the

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

164

1    case?

2        Q.    Yes, sir.

3        A.    No.

4        Q.    Is it possible that one of the reasons why

5    is because they were able to use a firearm to defend

6    themselves, either by brandishing it or their abusive

7    partner knew they've got a gun, I'm not going to go

8    attack her?

9              MR. HAKIM:  I'm going to object, just

10   calling for speculation.

11             THE WITNESS:  Is it possible?  Yes.  It

12   also could reflect differences in sort of

13   resourcefulness among women who had a firearm versus

14   those who did not, and that at least part of the

15   protective effect could be due to resourcefulness.

16       Q.    Did you try to research what the

17   explanation was for the phenomenon we've just

18   identified?

19       A.    Did I -- no.

20       Q.    Does this study look at the impact of

21   keeping a gun locked?

22       A.    No.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                    165

1       Q.      And does this study control for the mental

2    illness of the abuser?

3       A.      We did ask questions about the mental

4    health status of the abuser.  We found that that did

5    not independently predict risk for femicide.

6       Q.      All right.  Then if we turn to page 1092,

7    the first full paragraph, the second sentence, it

8    says, "Our analysis and those of others suggest that

9    increase in employment opportunities, preventing

10   substance abuse and restricting abuser's access to

11   guns can potentially reduce both overall rates of

12   homicide and rates of intimate partner femicide."

13          Why did you use the word potentially?  Why

14   did you have to caveat it that way?

15      A.      Again, this is not an experimental

16   design, there is always uncertainties about causal

17   connections, and I believe we were just using

18   cautious language, given that it's a nonexperimental

19   study.

20      Q.      Now, why did you suggest that increasing

21   employment opportunities might reduce overall

22   homicide rates and femicide rates?

Daniel W. Webster, Sc.D., MPH                              September 21, 2011
                          Washington, D.C.

166

1     A.     Unemployment was one of the strongest

2  independent risk factors for femicide in our study,

3  also shown to be associated with homicide rates more

4  broadly.

5     Q.     Right.  And what about preventing

6  substance abuse?  Why did you indicate that reducing

7  that might reduce homicide rates?

8     A.     Again, there is an association between

9  substance abuse and homicide.

10     Q.     In your opinion, does unemployment cause

11  people to commit homicide?

12     A.     That's very difficult to determine.

13     Q.     Do you have an opinion or not?

14     A.     I think that being unemployed could cause

15  a variety of bad outcomes, that again, obviously not

16  everyone who becomes unemployed commits murder or is

17  victimized, but it could lead -- it could lead to a

18  set of circumstances that could increase risk and

19  that's probably those, you know, not completely

20  studied, what we would call mediating variables,

21  result in a homicide.

22     Q.     All right.  Now, if we look at your table

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

167

1    2 on page 1093, and we look at general violence

2    homicide risk variables, you show that the victims of

3    homicide -- well, let's see, the first thing says

4    partner violent outside home, no.  Or number --

5           A.    That no refers to number.  Excuse me.

6           Q.    Okay.  I see.

7           A.    That's confusing.

8           Q.    I was confused.  Okay.

9                 So the partner was more often -- 55

10   percent of the time was violent outside the home for

11   the woman who was murdered than for the control

12   group, is that right?

13          A.    That's right.

14          Q.    Okay.  There was 35 percent of the time

15   her partner was violent outside of the home?

16          A.    Yes.

17          Q.    The partner threatened to kill the woman

18   73 percent of the time for the actual murderer,

19   whereas the woman who wasn't killed was only

20   threatened 14.6 percent of the time, is that right?

21          A.    Right.

22          Q.    Did you control for these disparities

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
                     Washington, D.C.

                                                              168

1    between the case group and the control group?

2         A.    Yes.   In the next set of analyses that

3    are reported in the article, there is a series of

4    models that control for each of these set of risk

5    factors.

6         Q.    I'm sorry.   Go ahead.

7         A.    The analyses reported in table 3 in this

8    article that begin on page 1095 show the variables

9    that were controlled for in each successive model.

10   It was a -- researchers often start with the

11   broadest type of factors and generally move their

12   way to the most proximal types of conditions being

13   measured.   Proximal to the outcome.

14        Q.    Now, just so the record is clear, you're

15   looking at page 1095, table 3, is that right?

16        A.    Yeah, and it continues onto the following

17   page as well.

18        Q.    I see.   And did you control for all of

19   these variables that are listed in table 3?

20        A.    The table reflects in each model which

21   variable is included in it.   So if there is a blank,

22   that means it was not included.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

169

1          Now, variables that are shown to be not

2    significant in earlier models aren't carried over

3    into the subsequent models as you go from models 1,

4    2, 3, and so on.

5          Again, this gets to the issue that I

6    raised earlier about concerns about multi

7    colinearity, that if you have too many variables

8    that are so closely correlated with each other, you

9    run into problems with multi colinearity and

10   imprecision in your estimates.

11        Q.    Is the reason that you included all of

12   these variables in at least one of your seven models

13   is that you and your co-authors concluded that there

14   was a possibility of association between these

15   variables and homicide rates?

16        A.    Yes.

17        Q.    And if you were going to redo this

18   analysis today, would you again run these variables

19   at least through one of the seven models?

20        A.    Yes.

21        MR. THOMPSON:   I would like to ask the

22   court reporter to mark as Webster 28 the following

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

                                                                        170

1     document -- I'm sorry, Webster 22.

2                      (Webster Deposition Exhibit No. 22

3                      was marked for identification.)

4     BY MR. THOMPSON:

5          Q.    And sir, would you please identify this

6     document for the record?

7          A.    It's an article entitled Firearms in U.S.

8     Homes As a Risk Factor For Unintentional Gunshot

9     Fatality, by Douglas J. Wiebe in the journal called

10    Accident Analysis and Prevention, published in 2003.

11         Q.    All right.  And then if we look at page

12    712, it says in the very last sentence on that page,

13    full sentence:  Data were missing for the variable --

14    maybe I should back up and say, the context of this

15    sentence is it's talking about -- well, this

16    sentence, I'll just read it.

17                 It says, "Data were missing for the

18    variable indicating the presence of a firearm for 3

19    percent of controls and 21 percent of the cases."  Is

20    that a possible problem?

21         A.    Yes.

22         Q.    Okay.  Why might that be a problem?

Daniel W. Webster, Sc.D., MPH                           September 21, 2011
                        Washington, D.C.

171

1        A.     It could be a problem if the cases for

2    which you have missing information are different in

3    important ways from the cases that you do have

4    information on.

5        Q.     All right.  Now, this study looked at

6    family income.  You can see that on page 713 in table

7    1?

8               MR. HAKIM:  I object.  It's not a

9    question.

10              MR. THOMPSON:  I'm just directing him to

11   where it is.

12   BY MR. THOMPSON:

13       Q.     And my question is do you think it was

14   appropriate for the authors to measure family income?

15              MR. HAKIM:  Objection to the vagueness and

16   appropriateness.

17              THE WITNESS: Is it appropriate in a study

18   of this type to study income?

19   BY MR. THOMPSON:

20       Q.     Yes, sir.

21       A.     Or examine income?

22       Q.     Yes.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                        Washington, D.C.

172

1      A.    To be honest, I'm not sure.  I don't -- I

2  don't know of previous data relevant to income and

3  unintentional gunshot fatalities, so I'm not sure.

4      Q.    Okay.  What about with homicide rates, are

5  you familiar with any data suggesting there is a

6  positive correlation or a negative correlation

7  between income levels and homicide rates?

8      A.    There is an association.

9      Q.    Okay.  And what is the association?

10     A.    It's most pronounced at the lowest end of

11 the income continuum.  There is a slight

12 relationship at other levels, but what's really

13 pronounced is that if you're very poor, your risks

14 are relatively higher than people who aren't very

15 poor.

16     Q.    And you say your risk, your risk of

17 killing someone else?

18     A.    On both sides of that, both victimization

19 and --

20     Q.    Yes.  Yeah.

21           MR. THOMPSON:  All right.  Let's turn to

22 Webster Exhibit 23.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                        Washington, D.C.

                                                                    173

1                    (Webster Deposition Exhibit No. 23

2                    was marked for identification.)

3    BY MR. THOMPSON:

4        Q.    All right, sir.  Would you please identify

5    this document for the record?

6        A.    This is an article entitled State Level

7    Homicide Victimization Rates in the U.S. in Relation

8    to Survey Measures Household Firearm Ownership, 2001

9    through 2003, authors Matthew Miller, David

10   Hemenway, Deborah Azrael, published in Social

11   Science and Medicine, 2007.

12       Q.    All right.  Now, if you'll turn to results

13   on page 659.  It says in the second paragraph,

14   "Unadjusted bivariant results showed a significant

15   relationship between household firearm prevalence and

16   rates of firearm homicide victimization for women,

17   but not for men."  Did they then adjust the results?

18       A.    Yes, they do statistical analysis to

19   adjust for differences.

20       Q.    And did they conclude that there was a

21   relationship between firearm prevalence and homicide

22   victimization for men when they controlled?

174

```
1        A.     Yes.

2        Q.     And where do we see that?

3        A.     Give me a minute.  I'm looking at

4    unadjusted.  I'm sorry.

5               Table 2, there is -- categorizes men, two

6    different age strata, and then for all men of all

7    ages, and it shows statistically significant

8    association after adjustments for urbanization,

9    resource deprivation, unemployment, divorce rates,

10   percent of the population, 18 to 34 as well as

11   aggravated assault rates, robbery rates, alcohol

12   assumption and southern region.

13       Q.     Now, they don't hold constant for race,

14   correct?

15       A.     It doesn't appear that that's in the

16   model.

17       Q.     But race is strongly correlated with

18   homicide rates, correct?

19       A.     It is.

20       Q.     All right.

21       A.     It's also associated with many of these

22   other things.
```

Daniel W. Webster, Sc.D., MPH                                September 21, 2011
                              Washington, D.C.

175

1        Q.    Now, it says on page 662 in the first full

2    paragraph, first sentence it says, "Our study does

3    not establish a causal relationship between guns and

4    homicide."  Do you agree with that statement?

5        A.    I agree that any one nonexperimental

6    study does not establish a causal relationship.

7        Q.    Now, if we go down further, it says in

8    that same paragraph in the last sentence -- it says,

9    "In addition, although several studies have

10   documented that individuals obtain firearms for

11   various reasons, including self-defense, almost

12   nothing is known about whether the specific

13   perceptions that motivate individuals to acquire

14   firearms for self-defense have any relationship to

15   actual homicide rates, overall or for any group."

16            And then it cites to a number of studies.

17   Do you agree with that statement?

18       A.    I'm trying to home in on the very

19   specifics of what they're saying.

20            Almost nothing is known about whether the

21   specific perceptions that motivate individuals to

22   acquire firearms for self-defense have any

Daniel W. Webster, Sc.D., MPH                                     September 21, 2011
                              Washington, D.C.

176

1    relationship to actual homicide rates -- I'm not

2    sure.

3         Q.    All right.  Now, if we look elsewhere in

4    this paragraph, it references reverse causation.  Can

5    you explain to me what the term reverse causation

6    means?

7         A.    Sure.  In this context they're talking

8    about the possibility that risk -- risk for being

9    victimized may be prompting gun ownership, and that

10   that's it risk that is causing the gun ownership

11   rather than the gun ownership causing the risk.

12             MR. THOMPSON:  All right.  I would like to

13   ask the court reporter to mark the next exhibit as

14   Webster 24.

15                  (Webster Deposition Exhibit No. 24

16                   was marked for identification.)

17   BY MR. THOMPSON:

18        Q.    And sir, would you please identify this

19   document for the record?

20        A.    It's an article entitled Rates of

21   Household Firearm Ownership and Homicide Across U.S.

22   Regions and States, 1988 to 1997, authors Matthew

177

1    Miller, Deborah Azrael and David Hemenway.  This is

2    published in American Journal of Public Health,

3    December of 2002.

4        Q.    Now, this study in the second paragraph in

5    the last sentence of that paragraph says, "Most, but

6    not all cross-sectional studies have found a positive

7    association between various measures of firearm

8    availability and overall rates of homicide, a trend

9    that holds across regions, states, cities and

10   counties."

11            It cites to two studies that reached a

12   different conclusion.  Did you consider those in

13   reaching your opinions in your report?

14       A.    Which studies are you referring to?

15       Q.    Well, it's footnotes 9 and 10, the first

16   is by Kleck and Patterson, and the second is by

17   Kaplan and Geling.  Have you read those studies?

18       A.    Yes.

19       Q.    And did you consider those studies in

20   connection with your report in this case?

21       A.    Did I consider them?  Say again.

22       Q.    Yes.  In preparing your report in this

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                         Washington, D.C.

                                                                          178

1      case, did you consider these studies?

2          A.    Yes, I knew of them.

3          Q.    They're not listed on your materials

4      considered, are they?

5          A.    No.

6          Q.    Okay.  And was it your understanding that

7      you just had to list the items you cited to in your

8      materials relied on?

9          A.    Yes.

10         Q.    Okay.  Now, do you think there -- do you

11     think those studies are flawed in some way?

12         A.    Yes.  So the Kleck and Patterson study

13     I'm a little more familiar with, right -- you know,

14     Kaplan and Geling, I would have to go back to review

15     again.  But the Kleck and Patterson.

16         Q.    What was your concern about that study?

17         A.    Well, one problem, as noted, is it's a

18     cross-sectional study.  But Kleck --

19         Q.    Wait.  You'll get to say everything, but I

20     didn't get that.  What did you say, one concern?

21         A.    One limitation is it is cross-sectional.

22         Q.    But that's what this is talking about, all

179

1    cross-sectional.  Okay.  Go ahead.

2        A.    Of greater concern in the Kleck and

3    Patterson study is the method by which they were

4    attempting to measure gun ownership and their use of

5    instrumental variables in that study.  And it's very

6    difficult to appropriately identify and specify

7    instruments for instrumental variable analysis.  And

8    Kleck and Patterson did not demonstrate that those

9    instruments were valid.

10       Q.    Do you have any reason to believe they're

11   invalid?

12       A.    There was a thorough analysis of that

13   published in the Journal of Quantitative Criminology

14   that details a lot of the specifics of that by Alba

15   and Messner that led me to be -- well, I was

16   concerned myself, but they sort of fleshed it out in

17   more full terms, that made me uncertain about

18   whether one can conclude anything from Kleck and

19   Patterson's data on the question of how gun

20   ownership --

21       Q.    Okay.  Now, if we look at this study and

22   we look at page 1989, the last full sentence on that

Daniel W. Webster, Sc.D., MPH                                          September 21, 2011
                                    Washington, D.C.

                                                                               180

1     page, under Results, it says, "Homicide victimization

2     rates for those age zero to four and aged 15 to 34

3     years were higher in regions with higher rates of gun

4     ownership, but the association did not reach

5     statistical significance."

6               When they say does not reach statistical

7     significance, they're reporting P values as high as

8     10 percent, correct?

9          A.    Yes.

10         Q.    Okay.  How do you explain why for those

11    aged 15 to 34 there was no statistically significant

12    correlation between higher gun ownership and

13    victimization rates?

14         A.    I would like a minute to just look at the

15    article.

16         Q.    Sure, please.

17         A.    So the statement that you read just a

18    minute ago at the bottom of 189 refers to the table

19    1 and accrued incident rate ratios.  These do not

20    adjust for the other factors associated with

21    homicide rates.

22               When -- if you look at the data in table

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                       181

1     2, you will see that, for example, in the 25 to 34

2     group, you do see positive associations between their

3     measure of gun availability and homicide risk, and as

4     well as for 15 to 24-year-olds and 5- to

5     14-year-olds.

6              So it's fairly broad across most age

7     groups.  You do see, in the analysis that make

8     appropriate adjustments for potential confounders,

9     the positive association for places with more guns

10    having higher rates of homicide.

11       Q.    All right.  Now, when you look at -- if

12    you'll turn your attention to page 1992, the middle

13    column, last paragraph, first sentence, "Our study

14    did not provide information about causation."  Do you

15    agree with that?

16             MR. HAKIM:  I object to the

17    characterization.

18             THE WITNESS:  It's sort of the same

19    question we've been getting back to, where any set of

20    authors or scientists who are reporting

21    nonexperimental data appropriately are cautious about

22    their one study proving causation.

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

182

```
 1    BY MR. THOMPSON:

 2         Q.    Well, this doesn't say it doesn't prove

 3    causation.  It says it does not provide information

 4    about causation.  Do you agree with that?

 5         A.    No.

 6         Q.    Okay.

 7         A.    Because association is one component to

 8    assessing causation.

 9         Q.    Do you have respect for the work of David

10    Hemenway?

11              MR. HAKIM:  Object to vagueness.

12              THE WITNESS:  Um-hm.

13    BY MR. THOMPSON:

14         Q.    Do you have respect for the work of

15    Matthew Miller?

16              MR. HAKIM:  Objection.

17              THE WITNESS:  Yeah, I respect their work.

18    BY MR. THOMPSON:

19         Q.    All right.  Now, later on in that same

20    paragraph, it says, "This result does not rule out

21    the possibility that reverse causation or a noncausal

22    explanation accounts for the association between
```

183

1    rates of firearm ownership and homicide.  It is

2    possible, for example, that locally elevated homicide

3    rates may have led to increased local gun

4    acquisition."  Do you agree with that?

5         A.    Yes.

6              MR. THOMPSON:  Could we take a five-minute

7    break?

8              THE VIDEOGRAPHER:  This concludes tape

9    number four in the video deposition of Dr. Daniel

10   Webster.  The time on the video is 2:45 p.m.  We are

11   off the record.

12             (Recess.)

13             THE VIDEOGRAPHER:  This begins tape number

14   five in the video deposition of Dr. Daniel Webster.

15   The time on the video is 2:56 p.m.  We are on the

16   record.

17                  (Webster Deposition Exhibit No. 25

18                  was marked for identification.)

19   BY MR. THOMPSON:

20        Q.    All right, sir, you've been handed a

21   document that's been marked Webster 25.  And I would

22   like you to identify this document for the record,

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
                   Washington, D.C.

184

1    please?

2        A.    It's an article entitled The Effect of

3    Gun Ownership Rates on Homicide Rates:  A

4    State-Level Analysis.  The author is Mark Gius, I'm

5    not sure if I'm pronouncing that correctly,

6    published in Applied Economic Letters in 2009.

7        Q.    All right.  And if we look at the page

8    1690, it says in that first sentence, "In addition,

9    gun ownership rates have rather small effects in

10   terms of magnitude on homicide rates."  Do you agree

11   with that statement?

12       A.    Small is a relative term, but in

13   comparison to some other factors examined in this

14   study and others, yes.

15       Q.    Okay.  What are those factors that would

16   have a larger magnitude on homicide rates than gun

17   ownership?

18       A.    Depending on the type of study, you know,

19   are we talking about a ecological study or an

20   individual level study.

21       Q.    Well, do those studies show different

22   things?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

185

1       A.      Well, they're able to measure sometimes

2    different things and you're able to infer slightly

3    different things from them.

4       Q.      Okay.  Well, I guess what I would ask you

5    is in your expert opinion, knowing the body of

6    literature as you do, what explanatory variables have

7    a larger impact on homicide rates than firearm

8    ownership?

9       A.      Things like what sociologists refer to as

10   concentrated disadvantage, places with high rates of

11   poverty, unemployment, disruption of homes, things

12   of that nature.

13      Q.      Drug utilization?

14      A.      Well, unfortunately that's not something

15   you can directly measure, so -- in the vast majority

16   of studies.  So --

17      Q.      Why is that so hard to measure?

18      A.      Because we don't have systematic data

19   collected to measure drug use over time and place as

20   we do some other things.  It's not something, for

21   example, that the Census will collect.  The Census

22   doesn't come in and ask you if you use illicit

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                            Washington, D.C.

                                                                         186

1    drugs.

2        Q.    And just because, though, we can't measure

3    drug utilization easy or well doesn't mean it might

4    not have a causal effect on homicides, correct?

5        A.    Correct.

6              MR. HAKIM:  Objection, it mischaracterizes

7    his testimony.

8    BY MR. THOMPSON:

9        Q.    Now, it says in the last sentence of this

10   quote, "The explanatory variables that have large

11   effects include white, rural and age, variables that

12   public policy makers have little control over."  Do

13   you agree with that?

14       A.    Yes.

15       Q.    Okay.  Now, let us turn to our next study.

16   Which will be marked as Webster 26, please.

17                   (Webster Deposition Exhibit No. 26

18                    was marked for identification.)

19   BY MR. THOMPSON:

20       Q.    And sir, would you please identify this

21   document for the record?

22       A.    It's an article entitled Firearm

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                                    Washington, D.C.

                                                                            187

1    Availability and Unintentional Firearm Deaths,

2    Suicide, and Homicide Among 5-14-Year-Olds,

3    published in the Journal of Trauma, Injury,

4    Infection and Critical Care.  Authors are Matthew

5    Miller, Deborah Azrael and David Hemenway; the

6    article was published in 2002.

7         Q.   All right.  Now, let's turn to page 273.

8    And it states in the right-hand column, second full

9    paragraph, "Another limitation of our study is that

10   our analyses may not account for some reasons that

11   states with higher household gun levels have higher

12   violent death rates.  Although we include some state

13   level confounders, poverty, urbanization and

14   education, these represent only a small number of the

15   characteristics likely to affect suicides, homicides

16   or unintentional firearms deaths."

17             Do you agree that those three confounders,

18   poverty, urbanization and education, are only a small

19   number of the characteristics likely to affect

20   homicide rates?

21             MR. HAKIM:  Objection, mischaracterizes

22   the evidence.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

188

1       A.      I agree that those factors measured in

2   this study and controlled for represent a small

3   number of things that might influence those

4   outcomes, but I do not necessarily infer that those

5   unmeasured things are confounders.

6       Q.      Now, it says in the next sentence, "We do

7   not, for example, account for parenting practices,

8   domestic abuse or firearms storage patterns."  Do you

9   think that parenting practices are correlated with

10  homicide rates?

11      A.      I don't know if they are.  I know that

12  parenting practices are associated with problem

13  behaviors in children.  I can't point to a study

14  that connects those parenting practices to homicide.

15      Q.      Do you know whether firearm storage

16  practices are correlated with homicide rates?

17      A.      Very broadly, no.  I think if I recall

18  correctly, I believe that there is some measure for

19  youth, have to go back and review -- if you want to

20  give me a minute, I can thumb through some material.

21      Q.      Well, I just want to make sure your

22  testimony is clear.  You said very broadly no.  Very

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

189

1    broadly no, you don't have an opinion?

2         A.    Very broadly meaning that for all ages,

3    for homicide risk and gun storage practices --

4    actually, as I think about it, in at least the

5    Kellermann study, it did examine storage practice

6    for homicide, and that did not appear to be

7    associated with difference in risk as opposed to

8    just general firearm availability.

9         Q.    Okay.  Any other analysis that you know of

10   that speaks to that issue?

11        A.    Give me just a moment here.  Yeah, so

12   there is a study that's referenced in my report,

13   citation number 47, that uses data from health and

14   safety practice -- practices of within households

15   conducted by CDC that included firearm ownership and

16   practices.  And where it was more common to store

17   firearms locked and unloaded, they had lower rates

18   of unintentional firearm deaths.

19        Q.    What about homicide rates?

20        A.    I don't believe that that was examined.

21        Q.    I just want the record to be clear.  Do

22   you have an opinion on whether there is a correlation

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                          190

```
 1     between storage practices of firearms and homicide

 2     rates?

 3          A.    Do I have an opinion whether there is an

 4     association between firearm storage practices and

 5     homicide rates?

 6          Q.    Yes.

 7          A.    I have an opinion that there is not a lot

 8     of data to know for certain about whether those

 9     practices are associated with homicide.

10          Q.    Well, even if you don't know for certain,

11     do you have an opinion as to whether it is associated

12     or not?

13          A.    I have an opinion about general

14     availability of firearms and the degree to which

15     storage practices limit that availability.  I would

16     believe my opinion is that it would reduce risk

17     within the home and perhaps outside the home with

18     respect to theft of guns.

19          Q.    Is there any empirical support for that,

20     that storage practices impact homicide rates?

21          A.    Again, I'm drawing upon my knowledge of

22     the broader literature about firearm availability
```

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                        Washington, D.C.

191

1   and stating my opinion that I believe that they are

2   associated.

3       Q.    Okay.  And I guess just to close out this

4   line of questioning, can you point to any study that

5   has examined that and found a positive association

6   between homicide rate and storage practices?

7             MR. HAKIM:  Object as vague.

8             THE WITNESS:  I can't point to a study

9   right now.

10  BY MR. THOMPSON:

11      Q.    Okay.  Now, let's go to our next study,

12  which is going to be Webster 27.

13                      (Webster Deposition Exhibit No. 27

14                      was marked for identification.)

15  BY MR. THOMPSON:

16      Q.    And would you please identify this

17  document for the record?

18      A.    It's an article entitled Firearm

19  Availability and Suicide, Homicide, Unintentional

20  Firearm Deaths Among Women, published in the Journal

21  of Urban Health in 2002, authors Matthew Miller,

22  Deborah Azrael and David Hemenway.

Daniel W. Webster, Sc.D., MPH                          September 21, 2011
                           Washington, D.C.

192

1        Q.    All right.  And did this study look at

2    women in different areas of the country?

3        A.    Yes.

4        Q.    Are there regional variations in terms of

5    patterns of violence?

6        A.    Yes.

7        Q.    And did this -- what are those regional

8    variations, if you know?

9        A.    The most strongest regional variation is

10   the higher rates of homicide in the South, in the

11   southern states.

12       Q.    Do you have an opinion as to why that

13   pattern persists?

14       A.    No.

15       Q.    Do you know whether this study held

16   constant for that regional variation?

17       A.    Give me a moment and I'll look.  No, they

18   did not control for southern region.  I believe that

19   was your question?

20       Q.    Yes, sir.

21             MR. THOMPSON:  Okay.  Let's move on to

22   Webster 28.

Daniel W. Webster, Sc.D., MPH
                  Washington, D.C.
          September 21, 2011

193

1             (Webster Deposition Exhibit No. 28

2             was marked for identification.)

3   BY MR. THOMPSON:

4     Q.   And please identify this document for the

5   record?

6     A.   It's an article entitled Firearm

7   Availability and Homicide Rates in Detroit, 1951 to

8   1986, author is David McDowall.  It's published in a

9   journal called Social Forces in June of 1991.

10     Q.   All right.  Was this a peer-reviewed

11  publication?

12     A.   I'm not one hundred percent sure.

13     Q.   Okay.  Now, let's look at page 1086.  I'm

14  sorry.  I lost my place here.  Instead, sorry, let's

15  skip to 1089.

16     A.   1089.

17     Q.   All right.  Now, let's look at the third

18  paragraph, the second sentence.  It says, "McDowall

19  and Loftin present evidence that violent crime rates

20  strongly influenced the demand for handguns in

21  Detroit."  Do you have any reason to doubt that

22  violent crime rates strongly influenced the demand

                                                              194

1     for handguns in Detroit?

2          A.     No.

3          Q.     Okay.  And it says, this finding suggests

4     that gun density and homicide rates affect each other

5     simultaneously forming a mutually reinforcing loop."

6     Do you agree with that?

7          A.     That it suggests that that could be

8     possible?  Sure.

9          Q.     Okay.  Now, this study looked at Detroit

10    from 1951 to 1986, is that right?

11         A.     Yes.

12         Q.     All right.  Do you think `Detroit from 1951

13    to 1986 is a good proxy for the City of Chicago

14    today?

15              MR. HAKIM:  Object to the vagueness of

16    what's the proxy for.

17              THE WITNESS:  If, you know, what you mean

18    is that the same as, no, it's not the same as.  There

19    will be some things that are similar and some things

20    not.

21    BY MR. THOMPSON:

22         Q.     Do you think it is valid to look at

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                        195

1    Detroit's experience from 1951 to 1986 and to draw

2    lessons from that experience with respect to the

3    provision of Chicago's firearm ordinance that you are

4    addressing in this case?

5         A.    Is it instructive?  Is that the question?

6         Q.    Yes, sir.

7         A.    Yes.

8         Q.    Okay.

9              MR. THOMPSON:  All right.  Let's turn to

10   Webster 29.

11              (Webster Deposition Exhibit No. 29

12               was marked for identification.)

13   BY MR. THOMPSON:

14        Q.    Would you please identify this document

15   for the record?

16        A.    It's an article entitled Handgun Sales,

17   Beer Sales and Youth Homicide, California 1972

18   through 1993, published in the Journal of Public

19   Health Policy in 2001 by Susan B. Sorenson and

20   Richard A. Berk.

21        Q.    Why do people look at beer sales rather

22   than alcohol sales?

196

1       A.      Because if you're interested in youth in

2    particular, beer tends to be the beverage of choice

3    for youth.

4       Q.      And how --

5       A.      Alcoholic beverage of choice, I should

6    say.

7       Q.      Is --

8       A.      My son likes Gatorade.

9       Q.      Mine, too.  Now how do you measure beer

10   sales?

11              MR. HAKIM:  Objection as to vagueness.

12              THE WITNESS:  How does anyone do it or how

13   is it --

14   BY MR. THOMPSON:

15      Q.      What's the best way to do it?  You've done

16   it, right?

17      A.      You can use records typically -- if

18   you're looking at -- you want information over time

19   for a place.  A common approach is to look at

20   alcohol tax receipts and that enables you to provide

21   estimates of alcohol sales.

22      Q.      All right.  Now, let's turn to page, say,

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
                    Washington, D.C.

197

1    192 of this.  Okay.  Study critique.  It says,

2    "Although the findings appear to be quite

3    provocative, several study limitations should be kept

4    in mind.  First, the measures used, for example,

5    number of handguns sold, were rather crude indicators

6    of the variables of interest."  Do you agree with

7    that?

8             MR. HAKIM:  Objection to the vagueness and

9    mischaracterizes the document.

10            THE WITNESS:  Whether the measures used

11   such as handguns sold were rather crude indicators of

12   variables of interest.  Crude in the sense that it

13   does not measure guns already possessed.

14   BY MR. THOMPSON:

15       Q.    Now, it says under -- in the next

16   paragraph, fourth, "the ecological fallacy should be

17   kept in mind."  What is the ecological fallacy, if

18   you know?

19       A.    The ecological fallacy is when you are

20   studying a phenomenon where the data available to

21   you are only available for aggregates of

22   individuals, populations, it could be neighborhood,

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                         Washington, D.C.

198

1    city, county, state, country -- that you attribute

2    causal connections to individual level determinants,

3    meaning that it cannot be determined with an

4    ecological study whether your measures apply at an

5    individual level or whether they only apply in

6    aggregate.

7        Q.    What does that mean, it doesn't apply at

8    the individual level?

9        A.    It may be the case that certain

10   conditions -- I'll give a good example: poverty.

11          So what the data on poverty tell us in

12   relation to crime and violence is that at an

13   individual level, your being poor only affects your

14   risk quite modestly, marginally.  What affects your

15   risk far greater is living in a neighborhood where

16   everybody is poor.

17          So there are certain phenomenon where the

18   risks are more applicable at different levels of

19   causation?  Is it conditions that change, conditions

20   in a community?  Or is it conditions that are

21   changing or relevant within an individual or a

22   household level?

199

1          So that's what the ecological fallacy

2    speaks to, is that you cannot determine with

3    certainty whether the association observed in the

4    aggregate applies exactly in the individual level.

5          Q.    And if you can't tell whether it applies

6    at an individual level, what is the significance for

7    policy makers?

8          A.    I still think it's quite significant for

9    policy makers.  There are many things that policy

10   makers are concerned about individuals, of course,

11   but they're also concerned about aggregates.  They

12   want safe communities, and there may be certain

13   things where they feel that certain policies may not

14   be good for every single individual, you know, in

15   their jurisdiction, but are a good thing in the

16   aggregate.

17         Q.    Sort of a Benthamite principle, the

18   greatest good for the greatest number; is that what

19   you're saying?

20              MR. HAKIM:  Objection, mischaracterizes

21   the witness's testimony.

22              THE WITNESS:  That's not exactly what I'm

Daniel W. Webster, Sc.D., MPH                                      September 21, 2011
                           Washington, D.C.

                                                                           200

1    saying, no.

2    BY MR. THOMPSON:

3         Q.    Okay.   Now it says in the next sentence of

4    this study, "The study is not intended or able to

5    either test or comment upon issues of controversy

6    regarding the individual level association between

7    firearms and violence or alcohol and violence."

8              Are you aware in your report in this case

9    drawing any inferences about individual level

10   associations between firearm storage and gun

11   violence?

12        A.    I'm going to ask you to restate it,

13   please.

14             MR. THOMPSON:   It's getting late enough;

15   if you'll read the question back.

16             THE REPORTER:   "Question:   It says in the

17   next sentence of this study, "The study is not

18   intended or able to either test or comment upon

19   issues of controversy regarding the individual level

20   association between firearms and violence or alcohol

21   and violence."

22             Are you aware in your report in this case

201

1    drawing any inferences about individual level

2    associations between firearm storage and gun

3    violence?"

4         THE WITNESS:  Yes.  So, the study I made

5    reference to before regarding the measures from the

6    CDC survey about firearms storage showing protective

7    effects of storing guns locked and unloaded was

8    gathered -- they were looking at aggregate measures.

9    And therefore, it is -- you cannot be sure that they

10   apply for any individual household.

11        What it says, what you can infer is that

12   generally in areas with safer storage practices of

13   firearms, you will see lower risk and rates for

14   unintentional firearm deaths.

15   BY MR. THOMPSON:

16        Q.    When you refer to safer storage practices,

17   will you include locking a gun in a gun safe as a

18   safer storage practice?

19        A.    It is --

20             MR. HAKIM:  Objection, mischaracterizes.

21             THE WITNESS:  Safer compared to what?

22   BY MR. THOMPSON:

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                    202

     1        Q.    You were the one who referenced safer

     2    storage practice.

     3        A.    Yes, safer than not storing it locked up,

     4    sure.

     5        Q.    Okay.  And is it in fact your opinion safe

     6    to take a gun and look it in a gun safe?

     7              MR. HAKIM:  Objection to the vagueness,

     8    safe for what purposes.

     9              THE WITNESS:  Yes, safe with respect to

    10    what?

    11    BY MR. THOMPSON:

    12        Q.    Accidental shootings.

    13        A.    Yes.

    14        Q.    Is it safe with respect to teen suicide if

    15    the children don't know the combination?

    16        A.    Yes.

    17        Q.    Is it safe with respect to homicide?

    18              MR. HAKIM:  Object.  These are

    19    hypotheticals, vague.

    20              THE WITNESS:  Again, just based on general

    21    information about what we know about firearm

    22    availability and risk for homicide, and I'm prepared

203

1    to believe that keeping a gun locked in a safe does

2    reduce gun availability within a household, then I

3    would expect that it would lead to lower risks for

4    homicides.

5         Q.    All right.  Now, let's move to Webster 30.

6                    (Webster Deposition Exhibit No. 30

7                    was marked for identification.)

8    BY MR. THOMPSON:

9         Q.    And would you please identify this

10   document for the record?

11        A.    This is an article entitled The Social

12   Cost of Gun Ownership by Philip J. Cook and Jens

13   Ludwig, published in the Journal of Public Economics

14   in 2006.

15        Q.    All right.  And let's turn to page 380.

16        A.    380.

17        Q.    Yes, sir.  Now, it references here on this

18   page -- if you need a moment to read it it's fine --

19   but a study by Duggan where for gun prevalence he

20   uses, or maybe it's a she, but Duggan uses

21   subscription rates to Guns and Ammo magazine.  Does

22   that ring a bell with you?

Daniel W. Webster, Sc.D., MPH                          September 21, 2011
                      Washington, D.C.

                                                              204

1      A.    Yes.

2      Q.    And so tell me how did this work?  How did

3  the authors -- let me ask.  Did Cook and Ludwig use a

4  subscription to Guns and Ammo magazine in this study?

5      A.    Yes, they compared it against the ratio

6  of firearm suicides to total suicides.

7      Q.    How would they get the subscription

8  information for Guns and Ammo magazine?

9      A.    I don't remember.

10     Q.    Do you know what level of detail, was it

11 state or zip code?

12     A.    I suspect it was zip code, but I'll have

13 to look.

14     Q.    Well, that's all right.  I don't have I

15 don't want to take your time.  I'm check later.

16          Do you think it was a valid methodology to

17 determine gun prevalence to utilize the subscription

18 rates to Guns and Ammo magazine?

19          MR. HAKIM:  Objection to vagueness.

20          THE WITNESS:  Do I think it was a valid

21 measure?

22 BY MR. THOMPSON:

205

1       Q.      Yes, sir.

2       A.      I'm not sure.  The study before us here

3  shows that the ratio of firearm suicides to total

4  suicides is a better measure.

5       Q.      Now, did Cook and Ludwig control for

6  southern culture in this paper?

7       A.      No.  But in many of their models, they

8  include variables for robbery rates, for example,

9  which are a measure of one form of violence, but

10  they do not control for southern -- southernness.

11       Q.      Robbery --

12       A.      -- directly.

13       Q.      Robbery doesn't have to be a crime of

14  violence, does it?

15       A.      I consider it a crime of violence, yes.

16       Q.      Well, don't sometimes people have their

17  property stolen from them and they're not even aware

18  of it?

19       A.      I think that's what, something I would

20  probably categorize as burglary.

21       Q.      Okay.  So you're drawing a distinction

22  between robbery, which stealing from property off of

Daniel W. Webster, Sc.D., MPH                                      September 21, 2011
Washington, D.C.

206

1    a person?

2         A.    Yes.

3               MR. HAKIM:   Object to characterization.

4    BY MR. THOMPSON:

5         Q.    Now, do they control for poverty rate?

6         A.    No.

7         Q.    Did they control for divorce rate?

8         A.    No.

9         Q.    Did they control for illegal drug use?

10        A.    No.

11        Q.    Did they control for residence in a

12   high-crime neighborhood?

13        A.    For residence in a high-crime

14   neighborhood.   No.

15        Q.    Did they control for ethnicity?

16        A.    No.   They controlled for race, but not

17   ethnicity.

18        Q.    Did they control for whether -- for

19   prevalence of gangs?

20        A.    No.   There is no good measures for that.

21        Q.    There is no good measure for gang

22   prevalence?

207

1             MR. HAKIM:  Objection.

2             THE WITNESS:  For each county over every

3    year, no.

4    BY MR. THOMPSON:

5        Q.    Couldn't you look at arrest rates?

6        A.    There is no standard methodology by which

7    law enforcement records that information and reports

8    it to anybody.

9        Q.    And they didn't control for how

10   individuals stored their firearms, did they?

11       A.    No.  Again, they didn't have a measure --

12   this study was tracking homicide over a long period

13   of time at both county and state level; there were

14   no measures of gun storage practices that they could

15   measure in the study.

16            MR. THOMPSON:  So now we're up to Webster

17   31.

18                  (Webster Deposition Exhibit No. 31

19                  was marked for identification.)

20   BY MR. THOMPSON:

21       Q.    And sir, would you please identify this

22   document?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                        208

1        A.      It's an article entitled Association

2    Between Youth-Focused Firearm Laws and Youth

3    Suicides, authors Daniel Webster, Jon Vernick, April

4    Zeolo and Jennifer Manganello, published in the

5    Journal of American Medical Association in 2004.

6        Q.      And since you published this, there have

7    been a number of states that have passed CAP laws, is

8    that right?

9        A.      Actually I don't believe so.  I think

10   many of them were adopted -- I don't think that many

11   additional states have passed child access

12   prevention laws, beyond this study date.  There

13   might be a couple, but not more than a couple.

14       Q.      Well, how many of them were there on -- as

15   of the date of this study?

16       A.      Hm -- I can refresh my memory -- one,

17   two, three, four --

18       Q.      I'm sorry, here it is, on the first page,

19   it says 18 states.

20       A.      Yes, 18.

21       Q.      Now, in this study, you took religious

22   affiliation into account, is that right?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

209

1        A.      Yes.

2        Q.      All right.  And why did you do that?

3        A.      Because some have theorized this

4   association between religiosity and suicide.

5        Q.      Okay.  And did you find in fact that there

6   were statistically significant relationships between

7   religious affiliation and some of the phenomenon you

8   were analyzing?

9        A.      What I found was that those set of

10  variables were often very highly colinear with what

11  I would refer to -- what researchers talk about as

12  fixed effects, for states.

13              So religious, proportion of a population

14  of a particular type of religion is something that

15  does not vary a lot over time, if you were studying

16  things over time.  And so in large part, it was not

17  so time-variant and very connected to the state

18  fixed effect.

19              So I don't believe that they

20  independently were associated, because again, of

21  disentangling them from a state fixed effects.

22       Q.      Well, let's look at table 2 on page 599.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                           Washington, D.C.

210

1       A.     Oh, I'm sorry.  Yes, they did make it.

2    Okay.

3       Q.     Right.  So explain the results here.

4       A.     Sure.  So for youth ages 14 to 17 years,

5    there was an elevated risk associated with Southern

6    Baptist and Mormon religion and lower risk for

7    Catholic affiliation.

8       Q.     And for the Mormon individuals and the

9    Catholic individuals, those were statistically

10   significant relationships, is that correct?

11      A.     Yes.

12             MR. HAKIM:  Objection as to vagueness.

13   BY MR. THOMPSON:

14      Q.     And the Southern Baptist was at a P value

15   of 10 percent?

16      A.     Yes.

17      Q.     Okay.

18             Wait a minute.  Is that 10 --

19      A.     No, I'm sorry, no.  It was .10.

20      Q.     .01.

21      A.     .01.  I'm sorry.

22      Q.     It's getting late in the day for both of

                                                                    211

1    us.  So that's statistically significant, too, right?

2        A.    That's correct.

3        Q.    It is just the other Protestant that

4    wasn't statistically significant?

5        A.    That's correct.

6        Q.    So you -- when I asked you why did you

7    look at this, you said some had theorized this

8    connection and your research shows that yes --

9        A.    Yes, there is an association.  Yeah.

10       Q.    Okay.  Of all the other studies referenced

11   in your report, did any others try to hold constant

12   for religious affiliation?

13       A.    I don't believe they did.

14       Q.    Now, let's -- and what was your overall

15   conclusion that you drew in this study?

16           MR. HAKIM:  Objection to vagueness.

17           THE WITNESS:  Conclusion about what?

18   BY MR. THOMPSON:

19       Q.    Well, the association between

20   youth-focused firearm laws and youth suicide.

21       A.    We found that child access prevention

22   laws were associated with reduced risk for suicide

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                        Washington, D.C.

212

1      among those ages 14 to 17, and that the other laws

2      of interest focused about reducing youth access,

3      including minimum purchase age and minimum

4      possession age laws, were not associated with youth

5      suicide risk.

6          Q.      Do you know whether Illinois currently has

7      a child access prevention law?

8          A.      It does.

9          Q.      Do you have an opinion as to what marginal

10     effect, if any, Chicago's law that you're opining on

11     in this case will have as compared to Illinois' law?

12                 MR. HAKIM:   Objection, beyond the scope of

13     his report.

14                 THE WITNESS:   I'm not sure.  You know, in

15     terms of being able to quantify.

16     BY MR. THOMPSON:

17         Q.      Well, apart from the quantification issue,

18     do you have an opinion on what the marginal --

19     whether there will be a marginal effect?

20                 MR. HAKIM:   The same objection, beyond the

21     scope of his report.

22                 THE WITNESS:   I'm not sure.  What I will

Daniel W. Webster, Sc.D., MPH                                      September 21, 2011
                        Washington, D.C.

213

1    say is that I believe that it will provide a

2    protective effect against suicides for young adults,

3    particularly those between 18 and 20.

4    BY MR. THOMPSON:

5         Q.    Well, I know you're not a lawyer, so if

6    you don't know the answer to this question, that's

7    fine.  But do you know how Chicago's law differs, if

8    at all, from Illinois' law with respect to child

9    access prevention?

10              MR. HAKIM:  Of course the objection is it

11   is calling for a legal conclusion.

12              THE WITNESS:  I don't know specifically

13   right now.

14   BY MR. THOMPSON:

15        Q.    Okay.

16        A.    I know that no child access prevention

17   law goes beyond protecting anyone that's older than

18   17.

19        Q.    Including Chicago's?

20        A.    To my knowledge, yes.

21        Q.    Now, you point to California and Florida

22   as jurisdictions in which there was a measurable

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
                    Washington, D.C.

                                                      214

1      impact of their child access prevention laws, is that

2      right?

3           A.    Yes.

4           Q.    Florida was the first in the country, is

5      that right?

6           A.    Right.

7           Q.    And there was a lot of publicity around

8      the passage of that law, is that right?

9           A.    That's correct.

10          Q.    Is it possible that some of the effect

11     that you're seeing in terms of the behavior that

12     changed after that law was passed is attributable to

13     the publicity?

14          A.    Maybe, yes.

15          Q.    Okay.  Have you tried to measure how much

16     of the behavior is attributable to the publicity as

17     opposed to the law?

18          A.    It's something you can't really

19     disentangle, so we observed this relationship and

20     noted how prominent Florida was in its effects,

21     particularly as it relates to -- this has to do with

22     a separate study that I published with Marc Starnes

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                        215

1    that looked at unintentional risk and child access

2    prevention laws, and there is where we saw the

3    greater effect, the most pronounced effects for

4    Florida in particular.

5              And there is a reason to believe that

6    publicity probably had an important role to play,

7    since the size of its effect stood out so much

8    compared to other states, it being first.

9        Q.    Now, you've also referenced the fact that

10   Florida and California make it a felony to violent

11   their child access prevention laws, is that right?

12       A.    Yes.

13       Q.    Isn't it true that Connecticut also makes

14   it a felony?

15       A.    I don't remember right now.

16       Q.    Okay.  Is it your opinion that as a

17   general matter, if you increase criminal penalties,

18   you will deter criminal conduct?

19             MR. HAKIM:  Objection, beyond the scope of

20   his report, it's vague, it's overbroad.

21             THE WITNESS:  Yeah.  I think that it's

22   very context-specific and needs to be studied sort of

Daniel W. Webster, Sc.D., MPH                                          September 21, 2011
                          Washington, D.C.

216

1       in sort of case by case.

2              You are talking about penalties for what

3       under what conditions?  So, you know, there is a very

4       broad deterrent literature.  Some studies show you

5       increase penalties and you get the behavioral

6       response that you get and some show that you don't.

7       So it's very context-specific, it's hard to

8       generalize.

9          Q.    Can you identify context in which when you

10      increase a criminal penalty you get the behavior you

11      want?

12             MR. HAKIM:  I think I'm objecting beyond

13      the scope of his report, it calls for speculation.

14             THE WITNESS:  I don't necessarily want to

15      say right now.

16      BY MR. THOMPSON:

17         Q.    I mean, if you don't know, that's fine.

18      If you do know, you need to say.  But you don't know?

19         A.    You mean -- I'm going to ask you to just

20      rephrase.

21         Q.    Sure.  I know.  So can you identify

22      certain contexts in which when you increase a

217

1    penalty, a criminal penalty, it deters that criminal

2    conduct?

3               MR. HAKIM:  And again, the same

4    objections.  It's beyond the scope of his report,

5    it's vague.

6               THE WITNESS:  There is some evidence about

7    elevating penalties for illegal possession of

8    firearms showing protective effects of that, of

9    crime-reducing effects.

10   BY MR. THOMPSON:

11      Q.    Do you recall what jurisdictions?  Do you

12   know about Project Exile in Richmond?

13      A.    Yes, I do.

14      Q.    Is that one of the ones that you are

15   thinking of?

16      A.    That is one of the ones that I'm thinking

17   of.  But there are others that sort of try to do

18   something very similar, but not exactly maybe what

19   Richmond did.  But it's the general idea of, for

20   particularly crimes associated with gun violence, to

21   increase the -- both the reality as well as the

22   perception that you may get federal prison time,

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                          218

1    which is most often longer than state prison time;

2    and initiatives that have taken that approach have

3    often found crime-reducing effects from such

4    approaches.

5         Q.    To your knowledge, is that the most

6    effective way a jurisdiction can limit gun-related

7    violence?

8               MR. HAKIM:  Again, it's beyond the scope

9    of his report, it calls for speculation, it's vague

10   as to most effective.

11              THE WITNESS:  I'm not sure.

12              MR. THOMPSON:  Let's move on to Webster

13   32.

14                   (Webster Deposition Exhibit No. 32

15                    was marked for identification.)

16   BY MR. THOMPSON:

17        Q.    And would you please identify this

18   document for the record?

19        A.    It's an article entitled State Gun Safe

20   Storage Laws and Child Mortality Due to Firearms.

21   Authors are Peter Cummings, David Grossman,

22   Frederick Rivara, Thomas Koepsell -- excuse me --

219

1    published in the Journal of the American Medical

2    Association in 1997.

3         Q.    All right.  And as of what date was the

4    data in this study collected?

5         A.    The data covered the years 1979 through

6    1994.

7         Q.    All right.  And if we look at -- can you

8    tell me what was controlled for in this study?

9         A.    I have to turn to methods.  So bear with

10   me.

11        Q.    Sure.  I think it may be in the second

12   sentence under Methods, but I wasn't sure.

13        A.    So they include, again, when I refer to a

14   state fixed effects, for each state's sort of unique

15   baseline rates for these outcomes that they're

16   studying as well as national trends over time for --

17   of the mortality rates being studied.

18             And the variables being controlled:  age,

19   sex, race; those appear to be the things controlled

20   for.  So baseline rates were controlled, national

21   trends were controlled and differences in age, sex

22   and race composition.

220

1      Q.    Is it true that only in California and

2   Florida have there been statistically significant

3   impacts of the CAP laws?

4           MR. HAKIM:  Object as to vagueness,

5   statistically significance.

6           THE WITNESS:  In a study that I conducted

7   with Marc Starnes, we found that when you looked at

8   state-specific measures and indicators, that the only

9   two states with certainty could you conclude that CAP

10  laws were associated with lower rates for

11  unintentional firearm deaths.

12  BY MR. THOMPSON:

13      Q.    The only two states were California and

14  Florida?

15      A.    That's correct.

16          MR. HAKIM:  Characterization.

17          THE WITNESS:  That's in part due to their

18  size as well.  It's harder to know with certainty for

19  certain states because there is more year-to-year

20  variability.  So whether something has statistical

21  significance, there's two components to that.  One

22  has to do with the size of the association, but the

221

1    other is relative to the variation in that measure.

2    And large states' rates for unintentional firearm

3    deaths have less variability than do small states'.

4         Q.    Do you know, have an opinion as to why

5    there is less variability in the big states?

6         A.    Oh, it's a very common phenomenon,

7    wherever -- there is basically an association

8    between the overall number and variation.  So the

9    larger the number, there tends to be lower

10   variability in a proportional sense.

11        Q.    Okay.

12             MR. THOMPSON:  I want to mark my last

13   exhibit, what I think is my last exhibit, Webster 33.

14             And I apologize -- I neglected to make a

15   copy for counsel.

16                  (Webster Deposition Exhibit No. 33

17                   was marked for identification.)

18   BY MR. THOMPSON:

19        Q.    And sir, would you please identify this

20   document for the record?

21        A.    It's an article entitled U.S. Gun Stock:

22   Results From the 2004 National Firearms Survey,

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
                    Washington, D.C.

222

1    authors Hepburn, Miller, Azrael and Hemenway

2    published in the journal Injury Prevention in 2007.

3         Q.    All right.  Now, let's turn to page 17.

4    And it says, under Number of Guns, "The actual number

5    of guns reported in our survey varied depending on

6    how the question was asked and who answered the

7    question."  Do you know what questions produced

8    different answers?

9              MR. HAKIM:  Objection as to overbroad and

10   vagueness.

11             THE WITNESS:  I don't know for certain.

12   BY MR. THOMPSON:

13        Q.    Well, let me ask it this way.  As a

14   general matter, are you familiar with the fact that

15   depending on how you ask a survey question, you'll

16   get a different answer?

17        A.    Of course, yes.

18        Q.    And with respect to firearm ownership in

19   particular, are you aware of any instances in which

20   asking a question one way has yielded one result and

21   asking it in a different way has yielded a different

22   result?

223

1      A.      Straight-up comparisons about the

2    differences?  Well, if you ask different questions,

3    you will get different responses, if that's the

4    question you're asking.

5      Q.      Well, I guess what I'm just asking about,

6    it seems like they're saying, look, there was a

7    sensitivity to the whether they asked somebody

8    whether they owned a firearm.  So I'm just wondering

9    if you know --

10              MR. HAKIM:  Object to characterization.

11              MR. THOMPSON:  I'm not even done with my

12   question.  Okay?

13   BY MR. THOMPSON:

14     Q.      I'm just asking as a general matter,

15   wholly apart from what this study says, whether you

16   are familiar with this being a sensitive issue with

17   respect to firearm ownership.

18              MR. HAKIM:  I'm going to object just to

19   the vagueness of sensitivity.

20              THE WITNESS:  Am I familiar that asking

21   gun owners about gun ownership is sensitive?  Yes.

22   I'm aware that that can be a sensitive topic.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                      224

1    BY MR. THOMPSON:

2        Q.    Are you familiar with any types of

3    questions about gun ownership that have been found to

4    produce inaccurately low levels of ownership?

5        A.    I'll try my best to be responsive to your

6    question.

7              The biggest concern really as it relates

8    to accurate reporting is in homes where there is

9    both a male and female adult and the female is asked

10   about guns broadly within the household.  There

11   tends to be less reporting of guns when women are

12   asked in such households compared to when men are

13   asked about whether there are guns and how many.

14       Q.    Would you also expect, too, that

15   individuals who possess their guns illegally would be

16   less likely to answer a survey like this honestly

17   than those who possess their firearms lawfully?

18       A.    That's a possibility.  I don't know of

19   like some direct empirical evidence that I could

20   point to, but that's a possibility.

21       Q.    And in fact, doesn't it make sense?

22             MR. HAKIM:  That's a characterization.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                        225

1              THE WITNESS:  It's -- I don't know.  It's

2     very speculative, I don't know.

3     BY MR. THOMPSON:

4         Q.    As a general matter, if the field of --

5     that you operate in, do people tend to confess to

6     crimes in response to surveys?

7              MR. HAKIM:  Objection as to vagueness.

8              THE WITNESS:  They answer affirmatively on

9     illegal drug use, a variety of illegal things that

10    people will report.

11    BY MR. THOMPSON:

12        Q.    But is there a sense that there is an

13    underreporting of illegal drug use, for example?

14        A.    That's a concern, yes.

15        Q.    Okay.  And that same concern would apply

16    to illegal possession of firearms, correct?

17        A.    It could.  I would also say that there is

18    the possibility of the reverse issue at play.  It's

19    certainly possible that some individuals who do not

20    possess firearms will report that they do, if they

21    believe -- if they're at least concerned that the

22    person asking the question is considering, you know,

Daniel W. Webster, Sc.D., MPH                                          September 21, 2011
                                Washington, D.C.

                                                                              226

1     is this someone I want to victimize.

2               It's possible.  I don't know.

3               THE VIDEOGRAPHER:  This concludes tape

4     number five in the video deposition of Dr. Daniel

5     Webster.  The time on the video is 3:39 p.m.  We're

6     off the record.

7               (Recess.)

8               THE VIDEOGRAPHER:  This begins tape number

9     six in the video deposition of Dr. Daniel Webster.

10    The time on the video is 4:12 p.m.  We are on the

11    record.

12    BY MR. THOMPSON:

13        Q.    Have any of the studies you've analyzed in

14    connection with this case addressed the effects of a

15    regime that allow only one operable gun for each

16    licensed individual in the house?

17        A.    No.

18        Q.    Have any of the studies you've analyzed in

19    connection with this case addressed the effects of a

20    regime in which there is only one operable gun

21    allowed in the house?

22              MR. HAKIM:  I'm going to make just an

227

1    objection of vagueness in terms of what you mean by

2    addressing.

3    BY MR. THOMPSON:

4         Q.    Go ahead.

5         A.    There are no studies that I can cite that

6    evaluate what happens when someone has a policy of

7    that nature that you describe.  The research that I

8    cite and describe and synthesize has relevance to

9    what I believe would be the outcome of such -- of

10   Chicago's policy.

11        Q.    Is it true that murder victims are almost

12   never killed with a gun belonging to themselves or to

13   some other member of their household?

14             MR. HAKIM:  I object to the vagueness of

15   almost never.  It's imprecise.

16             THE WITNESS:  Do you want to say that

17   again?

18   BY MR. THOMPSON:

19        Q.    Sure, I'll try to again.

20             Is it true that murder victims are rarely

21   killed with a gun belonging to themselves?

22             MR. HAKIM:  Again, I'm just going to

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                            Washington, D.C.

228

1      object to rarely being vague.

2                THE WITNESS:  Yeah, if you just -- you

3      want to be more specific about rarely?

4      BY MR. THOMPSON:

5         Q.    Well, is -- maybe I'll try -- is -- are

6      murder victims -- well, strike that.

7                Do you have any knowledge of the murder

8      rate for individuals being killed with their own gun?

9         A.    No.

10        Q.    Now, we talked a little bit about trying

11     to hold constant for religion in some context.  But

12     do you know whether religious affiliation is

13     negatively correlated with gun crimes?

14               MR. HAKIM:  Object to vagueness of gun

15     crimes.

16               THE WITNESS:  I don't know specifically

17     where that has been examined.  Religious -- how did

18     you say it again, religious --

19        Q.    Affiliation.

20        A.    -- affiliation and commission of gun

21     crimes.  I can't think of a study that has examined

22     that specifically.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

229

```
 1        Q.    Do you know whether religious affiliation

 2   is negatively correlated with murder rates?

 3        A.    I'm not aware that it is.

 4        Q.    Are you aware that it's not?

 5        A.    No, I'm not.

 6        Q.    Okay.  Now, is biological sex correlated

 7   with homicide rates?

 8        A.    Yes.

 9        Q.    Is Hispanic ethnicity correlated with

10   homicide rates?

11        A.    Weakly.

12        Q.    Is personal income correlated with

13   homicide rates?

14        A.    Yes, that's something we discussed

15   earlier.

16        Q.    Is marital status correlated with homicide

17   rates?

18        A.    Yes.

19        Q.    Is educational attainment correlated with

20   homicide rates?

21        A.    Yes.

22        Q.    Is being a military veteran correlated
```

Daniel W. Webster, Sc.D., MPH                                        September 21, 2011

Washington, D.C.

230

1     with homicide rates?

2          A.    Yes.

3          Q.    Is having children under the age of 18

4     correlated with homicide rates?

5          A.    Yes.

6          Q.    Is living in a high-crime neighborhood

7     correlated with homicide rates?

8          A.    Yes.

9          Q.    Is associating with dangerous people

10    correlated with homicide rates?

11         MR. HAKIM:   I'm going to object to

12    vagueness in terms of what dangerous people are.

13         THE WITNESS:   I'm trying to think of a

14    study that directly measures affiliation with

15    dangerous people and I'm not coming up with anything

16    right now that examines homicide risk.

17    BY MR. THOMPSON:

18         Q.    Is associating with criminals correlated

19    with homicide rates?

20         A.    If you're asking if one's individual risk

21    for being a victim or a perpetrator of homicide is

22    related to your association with criminals, I would

Daniel W. Webster, Sc.D., MPH         September 21, 2011

Washington, D.C.

231

1    say yes.

2       Q.    Is percentage of the population in prison

3  correlated with homicide rates?

4       A.    Yes, in several studies.

5       Q.    Are divorce rates correlated with homicide

6  rates?

7       A.    Yes.

8       Q.    Is being a drug dealer correlated with

9  homicide rates?

10       MR. HAKIM:  Object to the vagueness of

11  what being a drug dealer is.

12       THE WITNESS:  I'm trying to think of a

13  study that has examined that specifically.  I'm not

14  coming up with one right now.  There might be one,

15  but --

16  BY MR. THOMPSON:

17       Q.    Would you agree that men are more likely

18  than women to purchase a firearm for hunting?

19       A.    Yes.

20       Q.    Would you agree that men are more likely

21  than women to purchase a firearm for target shooting?

22       A.    Yes.

Daniel W. Webster, Sc.D., MPH                                         September 21, 2011
                            Washington, D.C.

                                                                              232

1        Q.     Would you agree that women are more likely

2   than men to purchase a handgun for purposes of

3   self-defense?

4               Are men more likely to purchase a handgun

5   for self-defense than women?

6               MR. HAKIM:  Object.

7               THE WITNESS:  I want to be clear about

8   what it is you're asking and so that I can --

9   BY MR. THOMPSON:

10       Q.     Sure.

11       A.     -- accurately answer what it is.

12              So do men more commonly -- do more men

13   purchase a gun for self-defense than women, I would

14   say yes.  But when someone does purchase a gun,

15   women would be more inclined for self-protection

16   reasons than the men who own guns.  So I just want

17   to be clear about that.

18       Q.     That's a helpful clarification and I

19   appreciate that.

20       A.     Yes.

21       Q.     Do you own a firearm?

22       A.     I do not.

233

1      Q.    Have you ever owned a firearm?

2      A.    No.

3      Q.    Have you ever fired a firearm?

4      A.    Yes.

5      Q.    Would you agree that long guns are more

6  lethal than handguns?

7          MR. HAKIM:  Object to the vagueness.

8          THE WITNESS:  Some long guns can be more

9  lethal than some handguns.

10  BY MR. THOMPSON:

11      Q.    Is it harder to pull the trigger of a

12  handgun or a long gun?

13      A.    There is likely --

14          MR. HAKIM:  Objection.

15          THE WITNESS:  -- to be variability between

16  each depending on the kind.  So -- but generally

17  speaking, it's harder to handle a longer gun than a

18  smaller gun.

19  BY MR. THOMPSON:

20      Q.    How many guns do you need to commit

21  suicide?

22          MR. HAKIM:  Object to vagueness, again,

234

1    what conditions, incomplete hypothetical, it calls

2    for speculation.

3    BY MR. THOMPSON:

4        Q.    How many operable guns do you need to

5    commit suicide?

6            MR. HAKIM:  The same objections.

7            THE WITNESS:  One would do it.

8    BY MR. THOMPSON:

9        Q.    Do you have any idea how many CPD holders

10   live in the same residence in Chicago on average?

11           MR. HAKIM:  I object to

12   mischaracterization -- what is a CPU holder?

13   BY MR. THOMPSON:

14       Q.    Chicago permit holder, you know.

15       A.    Okay.

16       Q.    So let me ask it this way.  Do you have

17   any idea how many duly licensed handgun owners live

18   in residences in which there are handguns on average

19   in Chicago?

20       A.    Currently, no, I do not.

21       Q.    Is a willingness to take risk positively

22   correlated with experiencing accidents?

235

1          MR. HAKIM:  I object to the vagueness of

2   willingness to take risks leading to accidents.

3          THE WITNESS:  Yeah, accidents is very

4   broad.  So what --

5   BY MR. THOMPSON:

6      Q.    Well, don't you use that term in your

7   report?

8      A.    Actually, I probably don't.

9      Q.    Some of the literature you cite certainly

10  uses it, don't they?

11     A.    Most of the literature that examines what

12  I believe you're referring to refers to as

13  unintentional firearm deaths; is that what you mean?

14     Q.    That would be fine, we could use that.  So

15  why don't I ask the question again.

16          Is willingness to take risk positively

17  correlated with an unintentional firearm injuries?

18     A.    It might be, but I don't know of

19  empirical evidence that support that.

20     Q.    Would you agree that handgun owners are

21  more likely than the general public to be risk

22  takers?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                        236

1            MR. HAKIM:  I object to the vagueness of

2     risk takers, more likely.

3            THE WITNESS:  I don't know of empirical

4     evidence that compares risk taking for handgun

5     purchasers versus comparable others.

6     BY MR. THOMPSON:

7        Q.    Would you agree that criminals are more

8     likely than noncriminals to be risk takers?

9        A.    Yes.

10       Q.    Would you agree that criminals are more

11    likely than noncriminals to be involved in

12    unintentional firearm injuries?

13       A.    I don't know.  I don't know of data to

14    answer that question, so I'm not sure.

15       Q.    For most models and makes, is it true that

16    long guns have a lighter trigger pull than handguns?

17           MR. HAKIM:  Again, object to vagueness,

18    calls for speculation.

19           THE WITNESS:  I'm not sure.

20    BY MR. THOMPSON:

21       Q.    Is it true that burglary rates are lower

22    in rural areas than in metropolitan areas?

Daniel W. Webster, Sc.D., MPH
Washington, D.C.
September 21, 2011

237

1      A.      Generally, yes.

2      Q.      And is it reasonable to estimate the

3  number of firearms in the United States at 300

4  million?

5              MR. HAKIM:  I'm going to object.

6              THE WITNESS:  Yeah, there is a broad

7  range.  It would -- 300 million would be within the

8  broad range of our estimates.

9  BY MR. THOMPSON:

10     Q.      What is the broad range of the estimates?

11     A.      It's actually in one of the previous

12  exhibits, the Hepburn study.  I believe it was

13  something -- their point estimate was somewhere

14  around 285-86 million.

15     Q.      Okay.  That's fine.  We can check what the

16  report says.  Do you know what percentage of American

17  households own a firearm?

18     A.      The -- I consider the General Social

19  Survey to be the best measure of that.  I think most

20  social scientists believe that to be the case.  The

21  most recent survey estimates are about 35-36 percent

22  of households, if I recall, have at least one

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                        238

1     firearm.

2          Q.    ·How many crimes a year are committed in

3     the United States in which the criminal perpetrator

4     uses a firearm?

5          A.    Are you simply asking how many homicides

6     are committed with guns?

7          Q.    No, that's fine.  I'll try it again.

8               How many crimes, including but not limited

9     to homicide, are committed a year in the United

10    States in which the criminal utilizes a firearm in

11    connection with the commission of the crime?

12         A.    I don't remember that estimate right now.

13         Q.    Do you have a ballpark sense of it?

14         A.    I don't want to speculate right now.

15         Q.    If you were going to look that answer up,

16    where would you go to find it?

17         A.    I would go to the National Crime

18    Victimization Survey as one source of information.

19    If I was interested in individuals who were actually

20    wounded, I would go to the Centers for Disease

21    Control and Prevention's surveillance system,

22    hospital surveillance system.  But those would be

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                            Washington, D.C.

                                                                          239

1    the places I would look to.

2         Q.    Would you agree that most gunshot wound

3    victims are criminals?

4         A.    What do you mean by criminals?

5         Q.    People who have engaged in criminal

6    conduct.

7         A.    I would agree that most studies that have

8    examined the criminal history of victims of homicide

9    show that the majority have been arrested.  Most of

10   those studies, almost all of those studies, don't

11   really report convictions.

12        Q.    Do you have any reason to doubt that most

13   gunshot wound victims are people who have engaged in

14   criminal conduct?

15        MR. HAKIM:  Object, to overbreadth and

16   vagueness to the most.  It calls for a

17   characterization, speculation.

18        THE WITNESS:  So your question is whether

19   I think more than half of individuals who are killed

20   in homicides have engaged in criminal -- I'm just

21   trying to make sure I'm answering what you're asking.

22   BY MR. THOMPSON:

Daniel W. Webster, Sc.D., MPH                                September 21, 2011
                          Washington, D.C.

                                                                      240

1       Q.    Yeah.    Yeah.    Let me try it again.    Okay.

2             Are more than half of those who are

3    wounded and not killed by gunshots in the United

4    States individuals who have engaged in criminal

5    conduct?

6             MR. HAKIM:    Again, I object to vagueness

7    of criminal conduct, at the time of the shooting or

8    after the shooting or before the shooting.

9             THE WITNESS:    You're referring to previous

10   activities that they've engaged in?

11   BY MR. THOMPSON:

12      Q.    Let's say at the time, at or about the

13   time of the shooting.

14      A.    Okay.    I don't know that anyone has

15   examined what they were doing exactly at the time of

16   the shooting.    My awareness principally is that

17   these studies report, as I referred to a moment ago,

18   they report the proportion who had criminal

19   histories, and that includes arrest.    So that's what

20   I know and what, you know -- I don't know if I can

21   say much more beyond that.

22      Q.    If a gunshot wound victim goes to a

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

241

1    hospital for medical treatment, isn't it true that

2    the medical personnel are required to report

3    treatment of the gunshot wound victim to the police?

4         A.    That varies by state.

5         Q.    Is that true in most states?

6         A.    I've not examined all the laws, so I

7    don't know.

8         Q.    In those states where it is a requirement,

9    would gunshot wound victims who aren't bleeding to

10   death be understandably reluctant to go seek medical

11   treatment at a hospital if it was going to result in

12   a police investigation?

13             MR. HAKIM:   Object, incomplete

14   hypothetical, it calls for speculation.

15             THE WITNESS:   Yeah, I really don't know.

16   It would be something very difficult to study for

17   obvious reasons, so I'm not sure.

18   BY MR. THOMPSON:

19        Q.    Now, you've referenced the National Crime

20   Victimization Survey, both in your answers today and

21   in your report.  Has that survey ever asked a single

22   respondent directly about defensive gun use?

242

1              MR. HAKIM:  I object to the vagueness,

2    asking about gun use, asking directly.

3              THE WITNESS:  What that survey asked is if

4    someone reports a victimization, they ask did you do

5    anything in response?  And it's an open-ended

6    question in which a respondent could say I used a

7    gun.

8         Q.    And it is not an anonymous survey, is it?

9         A.    It is not an anonymous survey, because

10   they collect data on more than one time point with

11   an individual.

12        Q.    And it's conducted by the federal

13   government on behalf of the Department of Justice, is

14   that right?

15        A.    On behalf of -- I believe the individuals

16   collecting the data are part of the Census, but they

17   do provide the data to the Department of Justice.

18        Q.    And there are many surveys of defensive

19   gun use that estimate the number of defensive gun

20   uses at over a million a year, isn't that right?

21             MR. HAKIM:  Again, I object to vagueness,

22   many.

243

1      A.     There are some studies that report that,

2   yes.

3      Q.     Do you know what those studies are?

4      A.     Well, the one that probably gets the most

5   attention is the Kleck -- study.  Another similar

6   study has similar methodology done by Phil Cook and

7   Jens Ludwig.

8             THE REPORTER:  I didn't hear that.

9             THE WITNESS:  A similar study conducted by

10  Philip Cook and Jens Ludwig.

11  BY MR. THOMPSON:

12     Q.     Is it true that for victims who resist

13  force by utilizing a gun, they are less likely to

14  suffer serious injury than victims using any other

15  self-protection strategy?

16            MR. HAKIM:  I'm going to again object.

17  Undefined terms, less likely, serious injury.

18            THE WITNESS:  The studies that have been

19  done on this utilize the National Crime Victimization

20  Survey and attempt to answer that question.  That --

21  those data cannot obviously examine whether the use

22  of a firearm led to lethal consequences for the

Daniel W. Webster, Sc.D., MPH
Washington, D.C.
September 21, 2011

244

1    victim.

2          So I consider it an open question about

3    whether using a firearm in self-defense is the best

4    way to avoid serious injury when serious injury

5    includes death, and the studies that have examined

6    this don't consider those who may have died as a

7    result of using a gun.

8          Q.    Leaving aside those who may have died, and

9    dealing just with people who have -- you know,

10   injuries, and those who weren't injured at all, is it

11   true that those who resist force with a gun are less

12   likely to suffer injury, serious injury, than victims

13   using any other method of self-protection?

14         MR. HAKIM:  Again, the same objection as

15   to vagueness.

16         THE WITNESS:  I'm not aware how it

17   compares to the other ways of resistance.

18         MR. THOMPSON:  I have no further

19   questions.  And I thank you, sir, for your time.

20         THE WITNESS:  Sure.

21         MR. HAKIM:  Can we take five minutes.

22         MR. THOMPSON:  Sure, and I will vacate so

245

1    you --

2              THE VIDEOGRAPHER:  We're going off the

3    record.  The time on the video is 4:34 p.m.

4              (Recess taken.)

5              THE VIDEOGRAPHER:  We're back on the

6    record.  The time on the video is 4:49 p.m.

7         EXAMINATION BY COUNSEL FOR PLAINTIFFS

8              BY MR. HAKIM:

9         Q.    Dr. Webster, I'm going to direct you back

10   to Exhibit 1, your report.  Do you have that one

11   handy?

12        A.    I do.

13        Q.    And do you have the one that had all the

14   exhibits on it, or appendices to it?

15        A.    Yes.

16        Q.    Perfect.  I'm going to direct you to

17   Exhibit 2 of that, to the last couple pages here.

18        A.    Okay.

19        Q.    And I just wanted to ask whether or not in

20   the list of materials reviewed here, does it include

21   a list of studies cited by plaintiffs to support

22   their positions dated March 10th, 2011 and April

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                        246

1      29th, 2011?

2          A.    Yes.

3          Q.    And did you review those studies?

4          A.    I did.

5          Q.    Thank you.  I also want to direct you to

6      page 9 of your report.

7          A.    Okay.

8          Q.    And you'll see there is a footnote that

9      begins Kleck and Patterson analyzed cross-sectional

10     data from 170 U.S. cities with populations of 170,000

11     or more.

12         A.    Yes.  Yes.

13         Q.    Did you review that study?

14         A.    Yes.

15         Q.    And is that study -- is that study, Kleck

16     and Patterson, The Impact of Gun Control on Gun

17     Ownership, Levels of Violence Rates in the Journal of

18     Quantitative Criminology?

19         A.    Yes.  1993, is that correct?

20         Q.    That is correct.

21         A.    Yes.  Um-hm.

22         Q.    Dr. Webster, you were asked or I can

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

247

1    ask -- does your report include any studies that

2    directly examine safe storage practices where the

3    safe storage practice is the independent variable,

4    and the dependent variable is the homicide rate, so

5    directly examine the relationship between the safe

6    practices and the homicide rate?

7        A.    No.

8        Q.    Is it your opinion that studies showing

9    changes in the availability of guns in a home and

10   household would support a conclusion that such a

11   relationship nevertheless exists between safe storage

12   practices and the homicide rate?

13       A.    I believe safe storage practices that

14   make guns less available would -- I would believe

15   you would see the pattern of relationship similarly

16   more broadly as what one sees, whereas where you see

17   greater availability you see higher rates of

18   suicide.

19       Q.    So is it your expert opinion that research

20   supports your opinion that safe storage of firearms

21   reduced the risk of suicide, homicide and deaths from

22   unintentional shootings?

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
                    Washington, D.C.

                                                              248

1        A.    I believe that yes, that proper -- I'm

2    going to ask you to restate.  Sorry.

3        Q.    I apologize.  Your report states:

4    Research supports my opinion that safe storage of

5    firearms reduces the risk of suicide, homicide and

6    death from unintentional shootings.  I was just

7    asking, I'm assuming that is your expert opinion?

8        A.    Yes.

9        Q.    And for the reasons that are contained in

10   your expert report?

11       A.    Yes.

12       Q.    Thank you.  My last question is you were

13   asked a set of questions by Mr. Thompson relating to

14   survey data about there being approximately a million

15   defensive gun uses a year.  Do you recall that?

16       A.    Yes.

17       Q.    And you referenced a study by Philip Cook

18   and Jens Ludwig --

19       A.    Hm-hm.

20       Q.    -- in connection with your response.  Does

21   that study find that there were a million defensive

22   gun uses annually?

Daniel W. Webster, Sc.D., MPH                                                September 21, 2011
                              Washington, D.C.

                                                                                    249

1        A.     They specify a broad range that includes

2     a million.

3                     MR. HAKIM:   I think that is it.

4                     MR. THOMPSON:   I have no questions.

5                     THE VIDEOGRAPHER:   This concludes the

6     video deposition of Dr. Daniel Webster.   The time on

7     the video is 4:53 p.m.   We are off the record.

8                     (Thereupon at 4:53 p.m. the deposition was

9     concluded.)

10                    -      -     .-      -      -

11

12

13

14

15

16

17

18

19

20

21

22

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                          250

     1                    CERTIFICATE OF DEPONENT

     2     I hereby certify that I have read and examined the

     3     foregoing transcript, and the same is a true and

     4     accurate record of the testimony given by me.

     5     Any additions or corrections that I feel are

     6     necessary, I will attach on a separate sheet of

     7     paper to the original transcript.

     8

     9                         _____

    10                            Signature of Deponent

    11

    12     I hereby certify that the individual representing

    13     himself/herself to be the above-named individual,

    14     appeared before me this _____ day of _____,

    15     2011, and executed the above certificate in my

    16     presence.

    17                         _____

    18                            NOTARY PUBLIC IN AND FOR

    19

    20                         _____

    21                              County Name

    22     MY COMMISSION EXPIRES:

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

251

1                    CERTIFICATE OF NOTARY PUBLIC

2

3          I, Melissa Gilcrest, a Notary Public of the

4     District of Columbia, do hereby certify that the

5     within-named witness personally appeared before me at

6     the time and place herein set out, and after having

7     been duly sworn by me, was examined by counsel.

8          I further certify that the examination was

9     recorded stenographically by me and this transcript

10    is a true record of the proceedings.

11         I further certify that I am not of counsel to

12    any of the parties, nor related to any of the

13    parties, nor in any way interested in the outcome of

14    this action.

15

16                        _____

17                        Melissa J. Gilcrest

18                        Notary Public

19                        District of Columbia

20                        My commission expires: 10/14/2014

21

22

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011

Washington, D.C.

252

| A | | | | |
|---|---|---|---|---|
| **ability** 43:21 64:2 106:17 153:15 | 211:21 212:2,7 213:9,16 214:1 215:1,11 | 108:7 114:15 | 123:11 | **AFTERNOON** 4:8 129:1 |
| **able** 17:18 18:1 27:16 46:19 73:6 99:4 130:20 131:19 134:16 141:3 164:5 185:1,2 200:4,18 212:15 | **accessibility** 5:18 31:7,14,15 115:12 | **actual** 35:20 64:16 106:21 167:18 175:15 176:1 222:4 | **adolescents** 5:11 5:22 6:3 85:11 88:17 89:4 93:8 94:7,10 95:6 97:11 99:6 101:22 118:4 120:7 | **age** 45:17 110:18 111:10 174:6 180:2 181:6 186:11 212:3,4 219:18,21 230:3 |
|  | **Accident** 170:10 | **add** 56:2 68:8 |  |  |
|  | **accidental** 31:8 36:5,7 202:12 | **added** 79:9 |  | **aged** 180:2,11 |
|  | **accidents** 234:22 235:2,3 | **addicted** 133:6 |  | **agency** 63:16 |
|  |  | **addition** 112:20 175:9 184:8 | **adopted** 208:10 | **agent** 22:16 |
| **above-entitled** 1:20 128:20 | **accompany** 108:8 | **additional** 208:11 | **adult** 74:2,3 136:11 224:9 | **ages** 174:7 189:2 210:4 212:1 |
| **above-named** 250:13 | **account** 139:20 187:10 188:7 208:22 | **additions** 250:5 | **adulthood** 45:19 46:2 | **aggravated** 174:11 |
| **absence** 133:7 | **accounted** 153:6 | **address** 114:4 | **adults** 88:18 95:5 95:9,18 112:13 144:14 213:2 | **aggregate** 198:6 199:4,16 201:8 |
| **abuse** 37:22 38:3 38:9 39:6 65:5 127:10 128:4 140:21,22 149:16 159:3,4 159:10 165:10 166:6,9 188:8 | **accounting** 23:19 | **addressed** 226:14,19 |  |  |
|  | **accounts** 182:22 | **addressing** 75:8 104:16 195:4 227:2 | **advancements** 145:21 | **aggregates** 197:21 199:11 |
|  | **accrued** 180:19 |  | **advances** 146:5 | **ago** 133:19 180:18 240:17 |
|  | **accuracy** 41:17 | **adjourned** 128:20 | **advantage** 69:17 69:22 | **agreeing** 153:1 |
|  | **accurate** 47:8 78:12 224:8 250:4 | **adjust** 140:19 173:17,19 180:20 | **advocates** 136:22 137:16 | **ahead** 12:6 32:5 43:4 59:9 66:8 168:6 179:1 227:4 |
| **abused** 162:19 |  |  | **affect** 187:15,19 194:4 |  |
| **abuser** 163:15 163:19 165:2,4 | **accurately** 43:20 43:21 124:18 139:18 157:5 232:11 | **adjusted** 27:2,3 27:11,12 59:16 160:8,8 | **affective** 118:6 118:10,11,13 118:14 | **aiming** 17:13 |
| **abuser's** 163:12 165:10 |  |  |  | **Alaska** 88:19 |
|  | **acknowledgme...** 142:2 | **adjustments** 174:8 181:8 | **Affectively** 5:21 118:4 | **Alba** 179:14 |
| **abusive** 7:16 162:11 163:1,4 164:6 |  | **adjusts** 27:5 |  | **alcohol** 38:6 64:19,21 65:22 81:10 84:6 140:21 158:22 159:4,10 174:11 195:22 196:20,21 200:7,20 |
|  | **acquire** 155:10 175:13,22 | **administrative** 69:20 | **affiliated** 144:20 144:21 |  |
| **academic** 83:13 |  | **adolescence** 45:18 | **affiliation** 208:22 209:7 210:7 211:12 228:12 228:19,20 229:1 230:14 |  |
| **Academy** 28:11 28:13,14 120:9 | **acquired** 153:8 153:13 | **adolescent** 5:12 5:16,19 6:5 85:16 88:22 93:19 94:13,15 94:22 97:13 100:22 101:3 106:4,5 108:2 113:7 115:12 120:9 122:17 |  |  |
| **accept** 116:17 | **acquisition** 183:4 |  |  |  |
| **acceptable** 56:10 | **act** 61:11 77:15 88:3,4 161:13 |  | **affirmatively** 225:8 | **alcoholic** 65:1 155:2 157:15 196:5 |
| **access** 5:13 31:16 94:16 98:7 101:1 124:6,12,20 138:12 163:12 163:16,20 165:10 208:11 | **acting** 119:15 |  | **African-Ameri...** 74:7 |  |
|  | **action** 1:8 251:14 |  |  | **Alderson** 10:14 |
|  | **active** 59:22 |  | **African-Ameri...** 44:10,14 | **algebra** 23:16 |
|  | **activities** 240:10 |  |  | **allow** 33:7 34:13 |
|  | **activity** 114:10 |  |  |  |
|  | **acts** 104:4 108:3 |  |  |  |

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

253

226:15
allowed 226:21
allowing 32:9
allows 111:8
alluded 161:3
alluding 133:18
America 60:22
  139:7
American 115:15
  120:9 122:18
  162:14 177:2
  208:5 219:1
  237:16
Americans 17:22
  18:1,4
Ammo 203:21
  204:4,8,18
analyses 22:4,4
  53:12 66:9
  67:15 140:18
  168:2,7 187:10
analysis 8:14
  16:15 23:9,10
  27:5 36:19
  64:18 140:14
  140:19 142:4
  155:12 157:14
  158:9,18 160:7
  165:8 169:18
  170:10 173:18
  179:7,12 181:7
  184:4 189:9
analytic 23:10
analyze 21:18
analyzed 226:13
  226:18 246:9
analyzing 209:8
Andrew 3:12
  11:5
annually 136:11
  248:22
anonymous
  242:8,9

answer 12:6 15:9
  32:5 35:15
  46:10 52:5
  73:12 85:19
  93:17 123:3
  213:6 222:16
  224:16 225:8
  232:11 236:14
  238:15 243:20
answered 19:6
  43:2 83:9 222:6
answering
  239:21
answers 222:8
  241:20
anxiety 147:7,15
  147:20
anybody 207:8
apart 163:15,19
  212:17 223:15
apologize 30:6
  30:21 221:14
  248:3
apparent 6:4
  81:4 120:7
appear 174:15
  189:6 197:2
  219:19
APPEARANC...
  2:7 3:1
appeared 250:14
  251:5
appearing 82:8
  88:3 97:12
appendices
  245:14
applicable 90:13
  198:18
Applied 184:6
applies 149:18
  199:4,5
apply 18:13
  198:4,5,7

201:10 225:15
appreciate
  232:19
approach 196:19
  218:2
approaches
  218:4
appropriate
  171:14,17
  181:8
appropriately
  179:6 181:21
appropriateness
  171:16
approximately
  73:2 92:13
  248:14
April 208:3
  245:22
Archives 97:12
  106:7
area 55:2 58:16
  83:13 162:20
areas 18:3 47:4
  141:2 192:2
  201:12 236:22
  236:22
arithmetic 26:15
Arizona 5:7
  87:12 88:18
  89:3,15 90:5
  92:9 114:20
arm 28:15,16
arrest 207:5
  240:19
arrested 104:8
  155:7,8 159:22
  239:9
Arthur 57:7
  151:20
articles 51:10
  107:16
ascertain 41:20

aside 42:1 43:14
  43:16 64:5 95:6
  149:21 244:8
asked 43:1 211:6
  222:6 223:7
  224:9,12,13
  241:21 242:3
  246:22 248:13
asking 15:4 16:7
  35:19,19 43:7
  43:10 95:14
  110:21 135:10
  157:4 222:20
  222:21 223:4,5
  223:14,20
  225:22 230:20
  232:8 238:5
  239:21 242:2,2
  248:7
aspects 51:14
assault 174:11
assess 28:7 47:6
  47:15
assessing 22:7
  26:10 27:9
  101:21 182:8
assessment 76:6
  124:2 140:11
assigning 52:10
Assistant 3:13
associated 5:4
  20:8,12,22
  22:15 23:1,18
  23:20 40:17,20
  41:1,3,7,11,15
  48:15 60:5,7
  71:9,14 74:13
  77:7 82:6
  124:13 126:3
  128:5 141:5
  159:5 160:12
  166:3 174:21
  180:20 188:12

189:7 190:9,11
  191:2 209:20
  210:5 211:22
  212:4 217:20
  220:10
associating
  230:9,18
associations
  55:12,15 66:21
  181:2 200:10
  201:2
assume 79:12
  134:18
assuming 77:16
  248:7
assumption 63:7
  65:22 174:12
assumptions
  20:3
asterisk 149:1
attach 250:6
attack 63:16
  164:8
attacks 63:15
attainment
  156:11 229:19
attempt 22:4
  68:6 69:8 70:21
  84:15 89:21
  91:4,15 108:12
  108:18 127:11
  128:5 154:19
  243:20
attempted 116:7
attempters
  115:20
attempting 179:4
attempts 7:4
  90:2 91:5,6
  92:11,14 147:1
attend 13:1
attention 73:22
  101:9 127:2

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011

Washington, D.C.

254

130:2 155:5
181:12 243:5
**ATTORNEY**
2:10 3:3,4,12
attractive 75:17
attributable
23:17 214:12
214:16
attribute 151:6
198:1
August 97:13
author 101:4
106:6 115:13
120:8 122:18
184:4 193:8
authors 53:22
67:14,22 76:6
83:1 89:16
109:21 116:1,7
124:2 128:10
135:22 141:21
143:22 147:3
148:7,9 150:11
154:19 155:11
157:22 162:12
162:13 171:14
173:9 176:22
181:20 187:4
191:21 204:3
208:3 218:21
222:1
author's 79:22
availability 8:15
8:18,21 37:22
38:2 69:7 82:15
91:13 94:21
121:21 123:10
128:13 177:8
181:3 187:1
189:8 190:14
190:15,22
191:19 193:7
202:22 203:2

247:9,17
available 23:5
39:11 49:17
120:16 121:2
121:12,16
197:20,21
247:14
Avenue 2:1,11
10:11
average 26:15
46:6 122:3
156:7,10
234:10,18
avoid 244:4
awake 87:2
aware 61:2
107:16 110:2,6
118:21 200:8
200:22 205:17
222:19 223:22
229:3,4 244:16
awareness
240:16
aworseck@cit...
3:19
Azrael 89:17
136:1 141:22
144:1 147:4
173:10 177:1
187:5 191:22
222:1
a.m 2:2 10:17
56:13,18 85:2,5
100:7,12

**B**

B 20:8 21:8 54:1
195:19
bachelor's 13:3
back 14:22 54:14
58:1 62:3 64:15
73:20 80:11
83:17 85:4

104:12 129:3
129:15 140:13
144:12 170:14
178:14 181:19
188:19 200:15
245:5,9
background 16:2
77:18 133:4
134:19 138:2
bad 134:11
166:15
Baker 97:9
ballpark 18:17
32:16 34:8
238:13
ban 32:11
Baptist 210:6,14
Barber 89:18
147:3
bars 152:13
based 13:19 32:7
52:21 202:20
baseline 20:4
219:15,20
basically 20:7
42:18 221:7
basis 55:9
107:20 157:11
bear 70:10 145:2
161:21 219:9
bearing 71:11
bearings 62:7
Beck 106:10
116:5
beer 9:4 195:11
195:21 196:2,9
begins 10:3
29:21 30:12
55:14 56:16
100:10 145:10
183:13 226:8
246:9
behalf 2:9 3:2

242:13,15
behave 99:6
Behaving 103:17
behavior 103:12
214:11,16
216:10
behavioral 216:5
behaviors 88:6
89:14 108:8
188:13
belief 43:19
believe 12:22
14:2,7 20:21
33:18 34:14
40:2,3,21 44:3
46:11 52:16
78:3 87:20 99:5
100:2 121:10
133:18 140:2
158:2 161:2
165:17 179:10
188:18 189:20
190:16 191:1
192:18 203:1
208:9 209:19
211:13 213:1
215:5 225:21
227:9 235:12
237:12,20
242:15 247:13
247:14 248:1
bell 203:22
belonging 227:12
227:21
benchmark
25:15
benefit 75:20,21
benefits 75:9,12
104:17 118:22
Benthamite
199:17
Berk 195:20
best 130:12

196:15 224:5
237:19 244:3
Beth 147:4
better 95:2 205:4
beverage 196:2
196:5
beyond 46:8
208:12 212:12
212:20 213:17
215:19 216:12
217:4 218:8
240:21
bias 17:1 83:20
105:3,8,15
133:9,10,14
134:18
biased 63:12
76:5
big 221:5
biggest 37:16
224:7
biological 118:18
118:19 119:1
229:6
bipolar 112:2,4
bipolarity 112:9
112:10,12
bit 90:8 228:10
bivariant 173:14
blank 168:21
bleeding 241:9
Bloomberg
13:20,21,22,22
Bloomberg's
14:5,18,20 15:6
15:15
body 82:14 113:1
185:5
born 45:2,4,6,8
45:10
bottom 30:10
63:3 72:15 75:4
98:13,17

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

255

108:15 123:19
125:20 136:5,6
140:17 152:8
180:18
**boy** 133:9,10,14
134:17
**boys** 96:5
**brandishing**
164:6
**breadth** 113:4
137:2 146:3
**break** 12:4,5
55:7 56:10
84:21 127:17
127:18 183:7
**breakup** 93:11
**Brent** 106:6
115:14 118:5
120:8 122:18
**BRFSS** 136:9,10
**Bridge** 61:14
**bring** 16:13
**broad** 88:21
99:22 181:6
216:4 235:4
237:6,8,10
249:1
**broader** 53:13
83:6 190:22
**broadest** 168:11
**broadly** 31:16
36:15 83:3
139:1 166:4
188:17,22
189:1,2 224:10
247:16
**broke** 93:7
**Brooklyn** 61:13
**Brown** 3:5 11:1,3
**building** 52:22
**bunch** 22:6
130:17
**burglary** 205:20

236:21
**buy** 154:1
**buying** 34:5

**C**

**C** 4:1 10:1
**calculate** 125:10
**calculation** 19:12
**California** 9:5
195:17 213:21
215:10 220:1
220:13
**call** 35:14 151:4
166:20
**called** 1:18 11:11
16:22 24:7
67:19 103:18
127:3 170:9
193:9
**calling** 86:11
138:18 164:10
213:11
**calls** 90:22 108:9
216:13 218:9
234:1 236:18
239:16 241:14
**Campbell** 162:13
**cancer** 130:6
**CAP** 208:7 220:3
220:9
**carbon** 61:22
**care** 130:19
136:3 187:4
**carriage** 87:6
**carried** 86:8
169:2
**carries** 87:1
**carry** 86:17
**carryover** 63:12
75:4 101:12
**case** 10:8 11:21
12:9,10,20,21
36:20 42:10

43:12 64:20,22
65:9,16 66:10
68:19 71:13
75:5 76:4,13,15
78:1 88:14
97:16 101:14
104:13 108:2
110:3 120:13
155:7,14,18
157:15,20
162:17 164:1
168:1 177:20
178:1 195:4
198:9 200:8,22
212:11 216:1,1
226:14,19
237:20
**cases** 42:6 48:1,6
48:10 69:19
92:8,8 103:3
130:20 142:10
153:8 154:4
162:18 170:19
171:1,3
**case-control** 5:5
5:14,20,22 6:6
7:17 47:20,21
47:22 48:2,20
49:2,13,15 82:7
101:2 115:13
118:4 122:17
162:12
**cast** 162:13
**categories** 35:5
79:22 162:10
**categorize**
205:20
**categorizes**
174:5
**Catherine** 89:17
147:3
**Catholic** 39:22
40:8,9 210:7,9

**causal** 21:13,19
22:16 27:9
37:16 51:4,11
52:19,21 53:10
53:16,18 71:3,4
94:8,13,15
165:16 175:3,6
186:4 198:2
**causality** 21:16
**causation** 21:6
21:10 53:6 54:1
54:4,6,7,11
153:6,21
154:12 176:4,5
181:14,22
182:3,4,8,21
198:19
**cause** 51:15 52:2
54:8 161:5
166:10,14
**causes** 21:7 22:2
51:5,19 54:1
67:19 130:7
131:3,4 158:15
161:8,13
**causing** 176:10
176:11
**cautious** 165:18
181:21
**caveat** 83:1
165:14
**CDC** 136:12,14
189:15 201:6
**Census** 7:12
150:11 185:21
185:21 242:16
**Center** 13:17,18
14:11 144:10
**Centers** 136:15
238:20
**certain** 17:2 18:3
38:14 54:2,7
156:13 158:19

190:8,10 198:9
198:17 199:12
199:13 216:22
220:19 222:11
**certainly** 12:7
14:12 20:14
21:7 41:13
90:15 225:19
235:9
**certainty** 21:9
53:9 199:3
220:9,18
**certificate** 250:1
250:15 251:1
**certify** 250:2,12
251:4,8,11
**challenged** 37:7
37:8
**chance** 24:9,12
24:13 62:8
80:10,18
149:13
**change** 21:8 34:9
34:15 36:4
145:4 198:19
**changed** 33:7,13
34:13 214:12
**changes** 6:16
35:10 47:17
143:19 145:18
247:9
**changing** 198:21
**chapter** 50:12
**characteristics**
96:1,3 155:16
187:15,19
**characterization**
135:2 181:17
206:3 220:16
223:10 224:22
239:17
**charged** 104:8
**chart** 149:16

Daniel W. Webster, Sc.D., MPH
Washington, D.C.

September 21, 2011

256

**charts** 117:21
**check** 77:18
78:17 133:4
134:19 138:2
204:15 237:15
**Chicago's** 4:13
31:5 40:8 44:18
46:6,22 195:3
212:10 213:7
213:19 227:10
**chicken/egg**
75:15
**child** 5:7 9:11
88:22 89:16
120:9 208:11
211:21 212:7
213:8,16 214:1
215:1,11
218:20
**children** 5:10
97:11 104:14
104:15 110:18
111:10,12
122:19 188:13
202:15 230:3
**choice** 196:2,5
**choose** 44:6,7
**circumstances**
166:18
**citation** 189:13
**cite** 32:7 87:14
114:22 123:6
227:5,8 235:9
**cited** 87:17
133:16 178:7
245:21
**cites** 175:16
177:11
**cities** 177:9
246:10
**citing** 87:22
**citizens** 32:10
152:19

**city** 1:10,12 10:6
11:2,5 12:11
36:8 59:10
74:21 194:13
198:1
**civil** 1:8 10:8
**claim** 53:16,18
54:11
**claims** 53:5
**clarification**
232:18
**clarify** 88:11
**clear** 43:11 46:1
54:10 58:13
62:19 68:19
73:16 93:18
168:14 188:22
189:21 232:7
232:17
**clearly** 53:21
63:6 128:2
130:10
**cliff** 61:21
**close** 26:7 44:9
60:15 191:3
**closed** 62:1
80:16 101:17
**closely** 158:11
158:13,20
159:8 169:8
**code** 204:11,12
**codirect** 13:16
**cognizant** 132:13
**cohort** 133:3
**coincide** 20:20
**colinear** 209:10
**colinearity**
158:15 169:7,9
**colleagues** 57:8
69:18 71:16,22
115:14 129:21
151:20
**collect** 185:21

242:10
**collected** 70:4
144:13 185:19
219:4
**collecting** 242:16
**collection** 136:12
**college** 13:1
**Colorado** 5:14
13:3 101:2
102:16
**Columbia** 1:22
251:4,19
**column** 64:17
75:3,5 78:21
79:17 80:9
82:11 83:16
98:12 101:12
104:21 106:9
112:1,16
115:17 121:17
125:8 130:3
131:1 133:2
136:6 139:12
152:9 163:10
181:13 187:8
**combination**
202:15
**combined** 131:4
**come** 93:12
139:14,15
154:4 185:22
**comfortable** 26:1
44:2
**coming** 230:15
231:14
**comment** 152:2
200:5,18
**comments** 99:9
**Commercial** 3:15
**commission**
228:20 238:11
250:22 251:20
**commit** 42:4,15

44:11 45:4,14
72:2 85:11
101:15 102:12
113:12,13
161:8,13
166:11 233:20
234:5
**commitment**
107:12,14
**commits** 166:16
**committed** 42:5
55:8,17 60:21
68:13 79:8 92:1
92:14 96:3,4,18
101:6 128:8
141:4 238:2,6,9
**committee** 50:21
**committing** 40:6
54:19 73:9
94:14,16
**common** 19:2
26:7,30:15,17
47:5 77:22
158:17 189:16
196:19 221:6
**commonality**
32:4
**commonly** 20:15
20:16 64:19,21
114:13 158:14
232:12
**communicate**
42:19
**communication**
107:11,15,17
107:21
**communities**
152:21 155:21
199:12
**community** 6:6
37:15 121:2,13
121:18,22
122:6,17 128:8

198:20
**Comorbidity** 7:7
147:2
**comparability**
155:14
**comparable**
236:5
**compared** 44:19
66:20 67:7 74:2
76:16 126:20
127:8 132:8,11
132:14 135:5
201:21 204:5
212:11 215:8
224:12
**compares** 236:4
244:17
**comparing** 67:5
96:2,17 132:7
**comparison** 60:8
106:4 114:2,3
121:17 124:9
132:10,14
135:7 184:13
**comparisons**
48:8 64:18
223:1
**compensate**
17:10 18:4
**complete** 82:12
**completed** 74:5
91:8 92:13
112:6 113:19
119:10
**completely** 125:4
166:19
**completers**
112:19 115:20
118:11,20
119:5 127:8
**completing** 38:1
**completion** 92:10
**complex** 23:16

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

257

| | | | | |
|---|---|---|---|---|
| component 182:7 | 82:14 | connect 91:2 | 118:17 | 119:8 121:2,18 |
| components | condemn 40:4 | connected | **Constitutional** | 121:22 122:6 |
| 220:21 | condition 21:16 | 209:17 | 3:15 | 124:10 127:8 |
| composition | 76:13 114:5,7 | **Connecticut** | consumed 64:19 | 128:8 154:4 |
| 40:13 219:22 | 114:15 130:21 | 215:13 | 64:21 | 155:14,17 |
| concede 42:2 | conditions 95:13 | connecting 90:6 | consumption | 159:6 170:19 |
| concentrated | 128:3 130:17 | connection 21:20 | 65:1 155:2 | controversy |
| 185:10 | 168:12 198:10 | 51:11 53:16 | contact 87:6 | 200:5,19 |
| concept 20:5 | 198:19,19,20 | 61:6,10 94:8,13 | contain 61:1 | convey 54:10 |
| 21:4,5 23:22 | 216:3 234:1 | 94:15 177:20 | contained 248:9 | 108:4,5 |
| 26:9 | conduct 41:22 | 211:8 226:14 | context 62:18 | conviction 133:4 |
| concepts 15:19 | 103:2,3,4,6 | 226:19 238:11 | 80:12 87:17 | convictions |
| concern 64:3,6,7 | 127:10 128:4 | 248:20 | 88:9 95:12 | 239:11 |
| 77:2,5,10,12 | 215:18 217:2 | connections 27:9 | 113:4 122:22 | convinced 43:20 |
| 105:10 138:15 | 239:6,14 240:5 | 165:17 198:2 | 170:14 176:7 | 106:19 |
| 156:20 157:9 | 240:7 | connects 188:14 | 216:9 228:11 | **Cook** 141:22 |
| 178:16,20 | conducted 97:17 | consensus 37:15 | contexts 216:22 | 203:12 204:3 |
| 179:2 224:7 | 144:10 152:17 | 151:8 | context-specific | 205:5 243:6,10 |
| 225:14,15 | 189:15 220:6 | consequences | 98:4 215:22 | 248:17 |
| concerned 12:10 | 242:12 243:9 | 243:22 | 216:7 | **Cooper** 2:1 10:10 |
| 90:18 91:12,14 | confess 15:21 | consider 49:19 | **Continued** 3:1 | 10:21 11:5 |
| 143:8 179:16 | 225:5 | 68:11 105:7 | 5:1 6:1 7:1 8:2 | copy 221:15 |
| 199:10,11 | confidence 24:2 | 177:12,19,21 | 9:2 | corner 140:17 |
| 225:21 | 25:8,8 60:14 | 178:1 205:15 | continues 45:22 | **Corporation** 3:13 |
| concerns 138:12 | 79:12 80:15 | 237:18 244:2,6 | 168:16 | corrections |
| 169:6 | confident 70:2 | consideration | continuum | 250:5 |
| concert 139:3 | confined 36:19 | 76:20 100:3 | 172:11 | correctly 144:13 |
| conclude 173:20 | 61:3 | considered 105:3 | contribution 83:4 | 184:5 188:18 |
| 179:18 220:9 | confirm 78:17 | 178:4 | 117:6 | correlation 20:5 |
| concluded 75:20 | confound 21:3 | considering | contributor 71:3 | 20:17 94:5 |
| 169:13 249:9 | 22:1 | 105:1 225:22 | controlled 68:1 | 95:17 103:5,10 |
| concludes 50:22 | confounder | considers 40:1 | 83:21 133:7 | 103:14,19 |
| 56:11 100:5 | 22:11,14 | consistency 83:5 | 158:8 160:7 | 104:1,5,9 |
| 145:5 183:8 | confounders | consistent 72:20 | 168:9 173:22 | 112:11 126:6 |
| 226:3 249:5 | 22:14,20 23:6 | 94:3 96:12 | 188:2 206:16 | 127:12 172:6,6 |
| conclusion 55:10 | 84:2 181:8 | 113:17 126:4 | 219:8,18,19,20 | 180:12 189:22 |
| 110:22 177:12 | 187:13,17 | consistently 70:2 | 219:21 | **Cost** 9:7 203:12 |
| 211:15,17 | 188:5 | constant 22:5,21 | controlling 30:13 | council 28:2,3,4 |
| 213:11 247:10 | confounding | 75:19 94:19 | 123:11 162:20 | 28:19 50:13 |
| conclusions | 22:15 81:6,9 | 161:16,19 | controls 21:2 | 51:8 54:18 62:4 |
| 17:19 83:6 | 83:20 | 174:13 192:16 | 48:10 64:21,22 | counsel 1:19 |
| 143:1 | confused 167:8 | 211:11 228:11 | 65:10,17 103:4 | 3:13 4:2 10:18 |
| conclusively | confusing 167:7 | **constellation** | 104:15 118:19 | 10:20 11:13 |

Daniel W. Webster, Sc.D., MPH

September 21, 2011

Washington, D.C.

258

| | | | | |
|---|---|---|---|---|
| 58:2 129:12 | **CPD** 234:9 | **criticisms** 61:2 | **dates** 144:12 | 143:22 147:4 |
| 137:11 221:15 | **CPU** 234:12 | **critique** 197:1 | **David** 2:10 10:21 | 173:10 177:1 |
| 245:7 251:7,11 | **Craig** 3:4 11:3 | **cross-sectional** | 11:16 89:17 | 187:5 191:22 |
| **counties** 57:11 | **created** 159:9 | 139:14 177:6 | 97:8 106:6 | **decades** 144:11 |
| 57:16 58:8,17 | **creating** 19:5 | 178:18,21 | 115:13 117:19 | **decedent** 79:8 |
| 59:10 152:18 | **credibly** 51:4 | 179:1 246:9 | 118:5 120:8 | **December** 177:3 |
| 177:10 | **crime** 34:14,16 | **CRR** 1:21 2:4 | 122:18 136:11 | **decide** 16:11 |
| **countries** 38:11 | 35:4,5 36:3 | **crude** 63:5 197:5 | 144:1 147:4 | 26:1 64:9,10 |
| 38:15 39:1,5 | 40:16,20 104:8 | 197:11,12 | 150:11 173:9 | 137:14 |
| 89:1 | 110:7 193:19 | **cultural** 45:6 | 177:1 182:9 | **deciding** 18:20 |
| **country** 45:4,10 | 193:22 198:12 | **culture** 58:21 | 187:5 191:22 | **decision** 61:6 |
| 192:2 198:1 | 205:13,15 | 205:6 | 193:8 218:21 | **decision-making** |
| 214:4 | 238:11,17 | **Cummings** 69:15 | **day** 128:21 | 88:20 |
| **county** 62:10,11 | 241:19 243:19 | 71:22 72:14 | 210:22 250:14 | **decrease** 35:4 |
| 97:17,18,21 | **crimes** 34:17 | 73:21 78:5,6,16 | **days** 109:20 | 36:2,7 |
| 98:5 198:1 | 36:3 217:20 | 218:21 | **DC** 2:2,12 10:11 | **decreased** 131:3 |
| 207:2,13 | 225:6 228:13 | **current** 13:12 | **dead** 41:19 | 131:7,16 132:5 |
| 250:21 | 228:15,21 | 32:12 127:9 | **deal** 108:4,5 | **deemed** 39:18 |
| **couple** 29:15 | 238:2,8 | **currently** 212:6 | 124:1 158:17 | **defend** 164:5 |
| 56:9 63:2 65:6 | **crime-reducing** | 234:20 | **dealer** 12:10 | **defendants** 1:13 |
| 117:21 208:13 | 217:9 218:3 | **cut** 12:2 | 77:21 78:14 | 3:2 4:3 11:2,4,6 |
| 208:13 245:17 | **criminal** 51:6 | **cwoods@may...** | 100:1,4 231:8 | 129:13 |
| **course** 25:18 | 77:11,14 104:4 | 3:10 | 231:11 | **defensive** 241:22 |
| 91:16 109:19 | 134:20 215:17 | | **dealers** 76:21 | 242:18,19 |
| 117:8 199:10 | 215:18 216:10 | **D** | **dealing** 41:3 84:8 | 248:15,21 |
| 213:10 222:17 | 217:1,1 238:3 | **D** 4:12 10:1 | 244:9 | **defer** 148:8 |
| **court** 1:1 10:7,14 | 238:10 239:5,8 | **Dan** 3:22 10:13 | **death** 26:20 | **defined** 57:19 |
| 11:7 12:1 29:1 | 239:14,20 | **dangerous** 80:20 | 80:14 81:2 | **definite** 127:9 |
| 50:6 56:22 | 240:4,7,18 | 140:3 153:22 | 93:20 119:7,12 | **degree** 13:10 |
| 70:14 81:20 | **criminals** 230:18 | 230:9,12,15 | 131:3,7 132:7 | 19:17 20:1 48:9 |
| 97:1 100:15 | 230:22 236:7 | **dangers** 77:7 | 132:18 133:8 | 52:1,18 53:8 |
| 105:18 115:4 | 236:10 239:3,4 | **Daniel** 1:17 4:3 | 187:12 241:10 | 58:3 86:12 |
| 117:15 119:21 | **Criminology** | 10:4 11:10,18 | 244:5 248:6 | 109:3 134:13 |
| 122:9 129:15 | 141:21 179:13 | 56:12,17 100:6 | **deaths** 8:16,20 | 190:14 |
| 135:13 137:14 | 246:18 | 100:11 129:6 | 48:4 49:1 81:5 | **deleted** 138:3 |
| 143:11 146:14 | **crises** 93:8,8,10 | 145:6,11 | 98:19 130:5 | **delinquent** 104:4 |
| 150:1 151:11 | **crisis** 93:1,4,5,6 | 162:13 183:9 | 187:1,16 | **demand** 193:20 |
| 162:3 169:22 | 93:14,15,19 | 183:14 208:3 | 189:18 191:20 | 193:22 |
| 176:13 | 94:3,5,9,14,19 | 226:4,9 249:6 | 201:14 220:11 | **demographic** |
| **covered** 114:20 | 95:5,9,15,18 | **date** 10:16 | 221:3 235:13 | 68:2 95:22 96:2 |
| 219:5 | **criteria** 143:5 | 208:12,15 | 247:21 | 155:16 |
| **co-authors** 135:7 | **Critical** 136:3 | 219:3 | **Deborah** 89:16 | **demographically** |
| 169:13 | 187:4 | **dated** 245:22 | 136:1 141:22 | 132:8 134:1 |

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

259

| | | | | |
|---|---|---|---|---|
| demographics 44:18 58:19 59:7 67:13 | descriptive 51:1 design 16:17 18:2 48:5 162:17 165:16 | 121:11 134:2,6 134:14 148:1 149:11,19,20 189:7 | disagree 82:22 discern 23:16 disclaim 54:3,5 discovery 107:8 | dissimilar 92:4 distinction 205:21 distinguish 146:7 distinguishes 22:13 |
| demonstrate 51:4 69:10 113:22 114:1 179:8 | designed 55:4 94:20 95:1 designs 48:20 | differences 45:6 58:15,18,21 59:2,6,9 66:10 | discriminative 113:19 discussed 66:11 116:6 158:9 | District 1:1,2,22 10:6,7 251:4,19 divided 76:16 |
| demonstrating 53:16 88:1 | desire 43:22 desires 138:22 | 76:4 98:5 128:7 141:8 155:12 | 229:14 discussing 78:5 | Division 1:3 10:8 divorce 93:11 |
| denser 58:16 density 194:4 | detail 204:10 details 86:13 | 164:12 173:19 219:21 223:2 | 127:19 discussion 53:21 | 174:9 206:7 231:5 |
| Department 3:14 13:15 242:13 242:17 | 179:14 deter 215:18 determinants | different 15:12 17:8 21:2 49:9 64:8 79:9 89:3 | 60:17 82:11 disease 26:19 130:6 136:15 | divorced 93:6 doctor 13:9 documented 39:5 |
| depend 61:12 dependence 140:21,22 | 198:2 determine 19:16 34:7 141:3 | 90:4 93:7 105:11 132:4 152:5,14 154:8 | 238:20 Diseases 122:19 disentangle | 175:10 doing 32:4 43:8 109:7 240:15 |
| dependent 22:17 23:11 27:6 247:4 | 142:16 166:12 199:2 204:17 determined | 171:2 174:6 177:12 184:21 185:2,3 192:2 | 75:15 214:19 disentangling 209:21 | domestic 159:5 188:8 Donald 97:9 |
| depending 41:20 130:21 184:18 222:5,15 233:16 | 51:20 110:8 117:5 198:3 determining 51:14 | 198:18 222:8 222:16,21,21 223:2,3 differential 66:2 | dismiss 125:4 disorder 103:2,3 103:4,6 118:10 118:12,13,14 | donor 13:22 doubt 90:3,12 193:21 239:12 Douglas 82:9 170:9 |
| depends 18:18 20:1,3 34:3,16 45:5 53:11 109:18 | deterrent 40:5 216:4 deters 217:11 Detroit 8:22 | differently 18:2 differs 213:7 difficult 75:14 123:22 166:12 | 121:3,18,19 127:10 128:4 149:14 disorders 118:6 | dozen 78:3 Dr 56:12,17 83:12 145:6,11 183:9,14 226:4 |
| Deponent 250:1 250:10 | 193:7,21 194:1 194:9,12 | 179:6 241:16 difficulty 49:9 | 147:8,15,20 149:7,8 | 226:9 245:9 246:22 249:6 |
| deposed 11:19 depression 7:10 | Detroit's 195:1 development | diminution 33:6 direct 73:21 | disparities 167:22 | draw 17:18 22:22 23:3,4 34:21 |
| 65:15,17 66:1 66:12 114:12 | 88:22 developmentally | 101:9 224:19 245:9,16 246:5 | disparity 91:8 disposition 10:4 | 43:18 52:21 71:4 83:6 |
| 127:10,13 128:4 150:10 | 88:19 deviation 26:13 | directing 171:10 direction 2:5 | disqualified 135:8 | 110:21 195:1 drawing 190:21 |
| 150:17,19 151:2 | 120:21 Diagnoses 127:4 | directly 94:20 185:15 205:12 | disruption 185:11 | 200:9 201:1 205:21 |
| deprivation 174:9 | die 108:12,18 died 244:6,8 | 230:14 241:22 242:2 247:2,5 | disruptively 103:17 | drew 211:15 drinking 59:22 |
| descent 17:19 describe 227:7,8 describing 72:9 | difference 22:10 24:3,9,10 25:20 70:3 102:15,16 | director 13:18 disadvantage 185:10 | dissemination 137:1 | |

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

260

| | | | | |
|---|---|---|---|---|
| 155:2 157:15 157:19 | 161:3 169:2,6 229:15 | elevated 79:3,3 125:5 161:5 | 186:22 191:18 193:6 195:16 | everybody 198:16 |
| drinking-related 155:3 | early 144:12 Eastern 1:3 10:8 | 183:2 210:5 elevating 217:7 | 203:11 208:1 218:19 221:21 | evidence 21:12 34:21 68:17 |
| Drive 3:6 | easy 31:16 186:3 | EMANUEL 1:11 | entity 28:6 | 90:22 107:1,4 |
| drop 158:18 | ecological 141:6 | emotional | 144:19 | 108:22 137:21 |
| dropping 110:9 | 184:19 197:16 | 118:15 | environment | 187:22 193:19 |
| drug 41:3 65:8 | 197:17,19 | emphasized | 81:1 | 217:6 224:19 |
| 65:10,22 81:13 | 198:4 199:1 | 112:18 | equal 42:9 86:2 | 235:19 236:4 |
| 84:6,7 100:1,3 | Economic 184:6 | emphasizes | 86:20 | evident 128:2 |
| 155:4 159:1 | Economics | 41:11 | equally 90:13 | exactly 34:1,4,7 |
| 185:13,19 | 203:13 | empirical 21:12 | equals 79:22 | 53:8 61:15,17 |
| 186:3 206:9 | editor 117:9 | 137:21 190:19 | 80:16 | 61:18 91:10 |
| 225:9,13 231:8 | editors 116:21 | 224:19 235:19 | error 99:17 | 99:1 199:4,22 |
| 231:11 | 117:4 | 236:3 | 148:19 | 217:18 240:15 |
| drugs 38:9 60:1 | education 161:4 | employment | errors 148:18 | examination |
| 159:5 160:4 | 187:14,18 | 161:4 165:9,21 | escaped 124:15 | 1:19 4:2 11:11 |
| 186:1 | educational | enables 196:20 | essence 22:5 | 11:13 129:12 |
| dthompson@c... | 156:11 229:19 | endeavored | 77:20 108:9 | 245:7 251:8 |
| 2:14 | effect 8:12 22:5 | 47:15 | establish 21:16 | examine 47:10 |
| due 9:11 24:9 | 34:7,9 52:2 | enduring 42:16 | 51:11 175:3,6 | 52:17 55:4,5 |
| 27:15 59:22 | 164:15 184:2 | 94:9 95:9,18 | establishments | 94:21 123:22 |
| 70:3 81:5,8 | 186:4 209:18 | enforcement | 152:13 | 171:21 189:5 |
| 125:3 148:2 | 212:10,19 | 207:7 | estimate 25:9 | 243:21 247:2,5 |
| 149:13 164:15 | 213:2 214:10 | engaged 109:15 | 32:16,19 33:5 | examined 11:12 |
| 218:20 220:17 | 215:3,7 | 239:5,13,20 | 33:22 34:9 | 35:10 40:12 |
| Duggan 203:19 | effective 85:15 | 240:4,10 | 71:11 76:9,10 | 59:13 69:12 |
| 203:20 | 85:18,20 105:3 | England 57:10 | 92:17 139:6 | 120:12 121:10 |
| duly 1:20 11:11 | 218:6,10 | 129:21 151:21 | 237:2,13 | 123:9 129:8 |
| 31:11,20 33:2,8 | effects 105:8 | entirely 18:18 | 238:12 242:19 | 155:4 184:13 |
| 33:15 36:22 | 128:11 134:3 | 54:20 58:10 | estimates 60:14 | 189:20 191:5 |
| 129:8 234:17 | 184:9 186:11 | entitled 50:13 | 67:21 71:21 | 228:17,21 |
| 251:7 | 201:7 209:12 | 57:8 82:5 87:11 | 76:5 133:9 | 231:13 239:8 |
| dying 130:18 | 209:21 214:20 | 89:14 97:9 | 144:6 158:16 | 240:15 241:6 |
| dynamics 152:4 | 215:3 217:8,9 | 100:22 106:3 | 159:9 169:10 | 244:5 250:2 |
| 152:12 | 218:3 219:14 | 115:11 118:3 | 196:21 237:8 | 251:7 |
| D.C 1:15 | 226:14,19 | 120:6 122:16 | 237:10,21 | examines 230:16 |
| | Einstein's 27:20 | 129:19 135:20 | eternity 40:4 | 235:11 |
| ——————— | either 19:19 | 141:18 143:18 | ethnicity 206:15 | examining 48:21 |
| E | 130:19 153:14 | 146:21 150:8 | 206:17 229:9 | 141:7 |
| E 4:1 10:1,1 | 164:6 200:5,18 | 151:18 162:10 | evaluate 227:6 | example 17:18 |
| earlier 51:13 | elevate 45:22 | 170:7 173:6 | events 93:9 95:3 | 22:4 37:4 52:12 |
| 57:18 68:16 | 69:7 134:10 | 176:20 184:2 | 95:4 | 55:6 86:3 |
| 98:3 158:10 | | | | |

Daniel W. Webster, Sc.D., MPH

September 21, 2011

Washington, D.C.

261

| | | | | |
|---|---|---|---|---|
| 130:16 137:22 | experiencing | **F** | 223:16,20 | 209:5 238:16 |
| 158:22 181:1 | 234:22 | | 224:2 | 248:21 |
| 183:2 185:21 | experimental | **face** 12:16 | **family** 74:8 75:6 | **finding** 72:20 |
| 188:7 197:4 | 52:6,9 165:15 | **fact** 23:19 27:20 | 79:2,3 80:17 | 80:10,18 82:18 |
| 198:10 205:8 | **expert** 35:3 36:1 | 39:8 54:3 66:20 | 84:5,12 93:20 | 94:1 109:13 |
| 225:13 | 36:6,19 37:2,6 | 94:8 105:2 | 118:17 155:4 | 194:3 |
| **excerpt** 50:11 | 43:12 58:7 | 116:19 125:7 | 171:6,14 | **findings** 7:6 83:4 |
| **excuse** 58:6 | 60:10 73:17 | 149:4 202:5 | **far** 19:2,2 58:16 | 96:11 113:17 |
| 132:16 141:7 | 86:5 90:21 | 209:5 215:9 | 91:5,5,5,5 | 113:21 124:18 |
| 145:15 149:2 | 110:3,4 112:11 | 222:14 224:21 | 102:18,20 | 140:7 147:2 |
| 167:5 218:22 | 185:5 247:19 | **factor** 7:14,19 | 111:18 121:16 | 197:2 |
| **executed** 250:15 | 248:7,10 | 40:13 48:11,12 | 198:15 | **fine** 19:18 82:19 |
| **execution** 63:14 | **expert's** 109:9 | 60:16 66:19 | **fatalities** 98:16 | 111:5,6 137:8 |
| 64:12 | 161:11 | 71:6 151:19 | 172:3 | 137:13 152:10 |
| **executive** 4:15 | **expires** 250:22 | 170:8 | **Fatality** 5:7 7:20 | 203:18 213:7 |
| 50:12 | 251:20 | **factors** 5:16 7:15 | 170:9 | 216:17 235:14 |
| **exercise** 116:22 | **explain** 23:12 | 27:15 34:3 | **federal** 28:15,17 | 237:15 238:7 |
| **exhibited** 112:19 | 38:18,19 39:1 | 37:16,19 49:5 | 28:18 63:16 | **finer** 86:13 |
| **exhibits** 4:10,11 | 68:3 80:10,18 | 59:19 65:22 | 136:19 138:1 | **firearms-related** |
| 5:1,2 6:1,2 7:1 | 130:8 149:4 | 66:11 67:16,17 | 138:18 139:8 | 96:20 |
| 7:2 8:2,3 9:2,3 | 160:20 176:5 | 68:1 69:21 71:9 | 217:22 242:12 | **fired** 233:3 |
| 117:20 237:12 | 180:10 210:3 | 80:21 83:20 | **feel** 35:15 53:2 | **first** 31:1 49:12 |
| 245:14 | **explaining** 52:6 | 84:7 106:4 | 139:4 153:22 | 50:21 52:5 |
| **Exile** 217:12 | **explains** 66:2 | 123:12,22 | 199:13 250:5 | 60:18 64:17 |
| **existed** 46:5 | **explanation** | 128:12 133:8 | **felony** 133:5 | 65:14 69:14 |
| **existing** 50:22 | 80:19 164:17 | 135:9 141:4 | 215:10,14 | 73:22 79:17,18 |
| 51:3 | 182:22 | 154:20 155:9 | **felt** 19:21 | 80:9 85:9 95:22 |
| **exists** 247:11 | **explanatory** | 160:6 166:2 | **female** 74:4 | 105:1 115:17 |
| **expect** 32:8 35:1 | 22:11,13 23:14 | 168:5,11 | 224:9,9 | 118:9 124:17 |
| 36:4 67:9 71:19 | 53:3 158:10 | 180:20 184:13 | **femicide** 7:15 | 130:3,4,7 131:1 |
| 86:22 87:5 89:1 | 185:6 186:10 | 184:15 188:1 | 162:11,18 | 131:1 139:12 |
| 102:11 103:5,9 | **exposed** 76:14 | **failure** 71:20 | 163:13 165:5 | 140:18 150:15 |
| 103:14,18 | **exposure** 26:21 | **fair** 21:14 57:15 | 165:12,22 | 151:16 152:2 |
| 104:1,5,9 203:3 | 27:1 48:8 52:11 | 121:5 131:15 | 166:2 | 156:18 165:7 |
| 224:14 | 81:3 | 131:19 147:6 | **fewer** 130:5 | 167:3 175:1,2 |
| **expected** 127:7 | **exposures** 48:9 | 147:10 | 147:20 149:8 | 177:15 181:13 |
| 128:9 130:6 | **expressed** 93:1 | **fairly** 181:6 | **field** 225:4 | 184:8 197:4 |
| **Expelled** 103:22 | **expressly** 54:3 | **faith** 39:17,22 | **fight** 155:5,6 | 208:18 214:4 |
| **expense** 49:10 | **extent** 32:15 | **fallacy** 197:16,17 | 159:18 160:18 | 215:8 |
| **experience** | 35:13 36:10 | 197:19 199:1 | **filed** 10:6 | **five** 5:7 87:11 |
| 40:19 195:1,2 | 55:22 59:5,5 | **familiar** 50:14 | **final** 63:11 | 89:15 183:14 |
| **experienced** | 110:21 | 56:6 75:8 | **find** 29:15 71:20 | 226:4 244:21 |
| 48:7 93:1 | | 104:15 172:5 | 82:17 101:5 | **five-minute** |
| | | 178:13 222:14 | | |

Daniel W. Webster, Sc.D., MPH

September 21, 2011

Washington, D.C.

262

56:10 183:6
**fixed** 209:12,18
  209:21 219:14
**flag** 117:10
**flaw** 68:12
  125:12,15,17
**flawed** 178:11
**flaws** 123:16
**fleeting** 42:13
**fleshed** 179:16
**Florida** 213:21
  214:4,20 215:4
  215:10 220:2
  220:14
**focus** 34:20
  37:13 142:22
**focused** 9:9
  212:2
**focuses** 31:6
**focusing** 55:18
**following** 29:1
  50:6 56:22
  81:21 89:6
  100:16 105:19
  115:4 117:15
  119:22 122:9
  146:15 150:1
  151:11 162:3
  168:16 169:22
**follows** 11:12
  129:9
**footnote** 62:6,12
  62:16,19,22
  63:2 87:21
  246:8
**footnotes** 127:6
  177:15
**force** 243:13
  244:11
**Forces** 193:9
**foregoing** 250:3
**foreign** 45:2,6,8
**forgive** 54:9

**form** 66:4 205:9
**formal** 28:16
**formed** 28:6
**forming** 194:5
**forward** 26:5
  65:7
**found** 24:3,4
  55:15,18 71:22
  85:10 127:12
  151:1 165:4
  177:6 191:5
  209:9 211:21
  218:3 220:7
  224:3
**foundation** 87:16
  93:22 142:3
  157:1
**four** 55:15 60:4
  108:15 145:11
  152:1 180:2
  183:9 208:17
**fourth** 76:2
  197:16
**fraction** 55:16
  91:10
**Frederick**
  218:22
**free** 35:15 46:9
  85:18
**freely** 15:21
**frequent** 87:6
**frequently** 86:17
**friend** 85:13
  100:1
**friends** 99:21
**full** 31:2 50:20
  55:14 65:14
  69:14 76:2
  79:17 80:9
  83:16 85:9
  95:22 99:9
  104:21 130:4
  131:1,2 139:12

144:5 163:11
  165:7 170:13
  175:1 179:17
  179:22 187:8
**function** 28:7
**funded** 143:2
**funder** 143:9
**funding** 63:16
  142:5
**further** 129:8,9
  175:7 244:18
  251:8,11

---

**G**

**G** 10:1
**gang** 40:22 84:7
  161:17 206:21
**gangs** 206:19
**Garen** 129:20
**gather** 154:19
  157:4
**gathered** 139:17
  201:8
**gathering** 49:4
**Gatorade** 196:8
**Geling** 177:17
  178:14
**gender** 45:13
  92:6
**general** 17:12
  25:15 42:6 64:4
  86:11 93:15
  106:7 124:22
  126:5 134:11
  142:14 144:7
  153:14 167:1
  189:8 190:13
  202:20 215:17
  217:19 222:14
  223:14 225:4
  235:21 237:18
**generalizability**
  98:3

**generalizable**
  18:9,10,15 19:6
  57:16,17,19
  58:2,8 92:3
  97:21 98:1,11
  101:21 152:20
  163:3,4
**generalize** 216:8
**generally** 16:16
  17:12 21:21
  25:10,11 26:6
  34:2 36:13 47:3
  106:17 114:10
  130:13 133:21
  134:8 168:11
  201:12 233:16
  237:1
**generate** 18:14
**generated** 27:4
**getting** 138:12
  181:19 200:14
  210:22
**Gilcrest** 1:21 2:4
  10:14 251:3,17
**girlfriend** 93:6
**girls** 96:5
**Gius** 184:4
**give** 15:1 34:8
  35:9 46:19
  52:13 80:12
  86:13 99:18
  128:12 174:3
  188:20 189:11
  192:17 198:10
**given** 19:5 24:8
  25:9 53:12 71:2
  79:1 88:3
  165:18 250:4
**go** 12:6 13:6
  18:20 19:7,14
  20:9 30:1 32:4
  32:20 34:17
  43:4 45:21

54:14 58:1 59:9
  64:15 65:6 66:8
  73:20 77:19
  106:20,22
  113:15 128:16
  130:11 134:18
  140:5 145:3
  148:12 163:10
  164:7 168:6
  169:3 175:7
  178:14 179:1
  188:19 191:11
  227:4 238:16
  238:17,20
  241:10
**goes** 20:8 45:20
  159:4 213:17
  240:22
**good** 11:15 17:7
  133:9,10,14
  134:17 194:13
  198:10 199:14
  199:15,18
  206:20,21
**gotten** 127:16
**government**
  28:15,17,18
  136:19 138:12
  138:18 139:4,8
  144:20,21
  242:13
**Grace** 118:5
**graduated** 13:2
**graduating** 74:9
**grain** 86:13
**great** 11:19
  29:11 106:17
  108:4,5 124:1
  158:15
**greater** 77:13
  105:14 107:1,4
  107:7 108:22
  134:7,9 179:2

Daniel W. Webster, Sc.D., MPH                                      September 21, 2011

Washington, D.C.

263

| | | | | |
|---|---|---|---|---|
| 198:15 215:3 | 115:17 | hard 34:4,4 53:8 | 39:3,5 40:16 | 60:22 85:13 |
| 247:17 | HALL 1:7 | 148:2 149:12 | 42:15 45:19 | 115:12 140:9 |
| greatest 72:16 | Hampshire 2:1 | 185:17 216:7 | 74:6,9,9 113:13 | 155:19,21 |
| 83:19 140:6 | 2:11 10:11 | harder 41:19 | 180:7 185:10 | 156:4,7,8,10 |
| 199:18,18 | hand 159:4,4 | 220:18 233:11 | higher 59:19 | 156:12 157:16 |
| greatly 126:11 | handed 129:16 | 233:17 | 67:2,9 71:18 | 157:16 170:8 |
| Grossman 97:8 | 183:20 | harm 98:7 | 86:22 87:7 | 185:11 224:8 |
| 218:21 | handgun 4:19 7:9 | head 19:12 64:14 | 89:22 115:19 | homicides 30:2 |
| group 17:16 | 9:4 33:2,7,15 | 72:4 115:1 | 127:9 154:1 | 48:3,22 152:3,4 |
| 18:10 26:21,22 | 69:21 71:13,14 | heading 48:18 | 160:12 172:14 | 152:12 186:4 |
| 27:1 52:10,12 | 72:17,22 76:15 | 55:12 140:19 | 180:3,3,12 | 187:15 203:4 |
| 52:14 68:13 | 78:11,13,18,21 | health 13:8,11 | 181:10 187:11 | 238:5 239:20 |
| 69:4 74:4 96:16 | 79:2,19 80:7,17 | 13:15,16,20 | 187:11 192:10 | honest 27:22 |
| 114:2,3 125:8 | 80:19 81:3,4 | 14:1,4 25:6 | 247:17 | 172:1 |
| 125:13 133:22 | 121:21 122:5 | 74:4 75:13,16 | highly 47:4 60:11 | honestly 224:16 |
| 167:12 168:1,1 | 126:11,12,18 | 75:20 93:2 | 113:6 114:9 | hopefully 16:5 |
| 175:15 181:2 | 130:5,8,12,14 | 101:3 104:17 | 209:10 | Hopkins 13:10 |
| groups 70:3 | 130:19 131:6 | 130:9 162:14 | high-crime | 13:15,19 |
| 181:7 | 131:17 132:8 | 165:4 177:2 | 206:12,13 | hospital 238:22 |
| GSS 144:8,8 | 132:15 133:3 | 189:13 191:21 | 230:6 | 241:1,11 |
| guess 14:21 52:5 | 150:9 195:16 | 195:19 | high-gun 140:10 | hospitalization |
| 83:14 110:6 | 232:2,4 233:12 | healthier 133:21 | himself/herself | 59:22 |
| 123:4 130:12 | 234:17 235:20 | healthy 130:13 | 250:13 | hostile 41:7 |
| 143:3 185:4 | 236:4 | hear 243:8 | Hispanic 152:19 | hour 127:16 |
| 191:3 223:5 | handguns 6:8 | heard 110:4 | 152:21 229:9 | hours 109:20 |
| gunshot 7:20 | 32:10 34:5,14 | heart 130:6 | histories 84:5 | 119:17 |
| 170:8 172:3 | 46:18 76:18 | heck 25:20 | 240:19 | house 86:8 87:4 |
| 239:2,13 | 79:20 80:22 | held 10:9 192:15 | history 65:14,17 | 111:9 121:6 |
| 240:22 241:3,9 | 98:19 121:12 | hell 40:5 | 66:1 80:17 84:9 | 126:18 160:4 |
| gunshots 240:3 | 121:16 126:13 | help 103:13 | 239:8 | 160:20 161:1,8 |
| gun-related 81:2 | 129:20 132:11 | 108:9 | hit 159:18 160:18 | 161:13 226:16 |
| 82:15 218:6 | 132:19,20 | helpful 232:18 | Hm 208:16 | 226:21 |
| guys 127:16 | 133:20 193:20 | helps 27:14 | Hm-hm 163:17 | household 5:13 |
| | 194:1 197:5,11 | Hemenway | 248:19 | 6:9,16 7:9 8:7,9 |
| —————— | 233:6,9 234:18 | 71:16 89:17 | hold 22:5,20 | 48:18 78:11 |
| **H** | 236:16 | 136:1 144:1 | 75:19 94:19 | 87:8 101:1 |
| H 2:10 | handle 31:17 | 147:4 150:12 | 161:16,19 | 122:5 135:20 |
| Haitian 17:19,22 | 101:22 102:2 | 173:10 177:1 | 174:13 211:11 | 143:19 144:6 |
| 18:1,4 | 233:17 | 182:10 187:5 | 228:11 | 150:9 155:7 |
| half 60:22 98:18 | handy 245:11 | 191:22 222:1 | holder 234:12,14 | 159:17,22 |
| 101:6,13 | hanging 44:7 | Hepburn 144:1 | holders 234:9 | 160:18 173:8 |
| 102:11 239:19 | happens 227:6 | 222:1 237:12 | holds 177:9 | 173:15 176:21 |
| 240:2 | happy 127:15 | high 38:15,20,20 | homes 7:18 | 187:11 198:22 |
| halfway 31:3 | | | | |

Daniel W. Webster, Sc.D., MPH

September 21, 2011

Washington, D.C.

264

| | | | | |
|---|---|---|---|---|
| 201:10 203:2 | 129:11 135:16 | illegally 134:4,8 | improperly 16:21 | 241:13 |
| 224:10 227:13 | 141:14 143:14 | 134:14 146:8 | impulsive 88:2,3 | inconsistent 14:5 |
| 247:10 | 146:17 150:4 | 224:15 | 88:20 108:3 | 14:17 15:6,14 |
| households 7:5 | 151:14 162:6 | illicit 60:1 65:8 | 114:16 | 109:5,16 151:7 |
| 19:4 64:20 | 170:3 173:2 | 65:10,22 81:13 | impulsively | increase 32:9,17 |
| 102:18 136:8 | 176:16 183:18 | 84:6 140:21 | 109:7,17 | 32:22 34:14 |
| 147:1 152:21 | 186:18 191:14 | 155:4 159:4 | 119:15 | 35:2,4 36:2,7 |
| 157:20,21 | 193:2 195:12 | 160:4 185:22 | impulsivity 89:2 | 37:9 121:6 |
| 161:6 189:14 | 203:7 207:19 | Illinois 1:2,5 3:7 | 89:3 | 126:17 165:9 |
| 224:12 237:17 | 218:15 221:17 | 3:17 10:7 212:6 | Inability 76:3 | 166:18 215:17 |
| 237:22 | identified 48:1 | 212:11 213:8 | inaccurately | 216:5,10,22 |
| houses 122:4 | 83:10 123:16 | illness 37:20,21 | 224:4 | 217:21 |
| hundred 32:18 | 162:19 164:18 | 59:11 65:15,18 | incidence 59:11 | increased 79:21 |
| 39:9 49:8 | identifies 48:6 | 66:1,13,21 67:6 | 157:15 | 81:1 126:2,11 |
| 126:22 133:13 | identify 14:3 | 67:8 70:9,22 | incident 180:19 | 163:13 183:3 |
| 135:11 193:12 | 21:22 22:19 | 71:2,18,21 84:4 | inclined 80:20 | increases 45:21 |
| hunting 102:20 | 29:6 57:5 82:3 | 84:12 93:21 | 155:9 232:15 | 51:19 |
| 231:18 | 89:11 97:6 | 134:21 140:21 | include 38:4,6 | increasing |
| hurt 159:16 | 100:20 106:1 | 145:1,16 | 51:1 100:1 | 165:20 |
| 160:18 | 115:9 118:1 | 156:15 161:20 | 122:20 123:21 | incremental |
| hypothesized | 120:4 122:14 | 165:2 | 158:12 186:11 | 126:17 |
| 34:10 48:15 | 129:17 135:18 | immediately | 187:12 201:17 | independent |
| hypothetical | 141:16 143:16 | 49:17 | 205:8 219:13 | 21:1 22:7 23:2 |
| 35:9,19 86:11 | 146:19 150:6 | impact 37:4,16 | 245:20 247:1 | 53:3 128:13 |
| 234:1 241:14 | 151:16 162:8 | 121:9 164:20 | included 63:4 | 136:6 144:5 |
| hypotheticals | 170:5 173:4 | 185:7 190:20 | 105:14 168:21 | 166:2 247:3 |
| 35:14 202:19 | 176:18 179:6 | 214:1 246:16 | 168:22 169:11 | independently |
| | 183:22 186:20 | impacts 220:3 | 189:15 | 23:18 68:3 |
| _____ I | 191:16 193:4 | implicitly 79:12 | includes 240:19 | 156:21 165:5 |
| idea 17:9,12 | 195:14 203:9 | important 16:14 | 244:5 249:1 | 209:20 |
| 21:12 23:15 | 207:21 216:9 | 16:16 17:5,6 | including 38:1 | indicate 53:22 |
| 46:17 53:22 | 216:21 218:17 | 19:21 23:7 | 67:18 68:2 | 75:12 119:14 |
| 72:1 73:2 99:18 | 221:19 | 26:10 43:18 | 69:21 91:12 | 166:6 |
| 114:10 217:19 | ignored 54:20 | 105:12 171:3 | 112:13 131:7 | indicated 60:21 |
| 234:9,17 | ILAFR 10:5 | 215:6 | 175:11 212:3 | indicates 116:20 |
| Ideally 99:7 | ill 5:21 72:3 | importantly 17:7 | 213:19 238:8 | 142:2 |
| identification | 118:4 130:17 | 31:17 | income 74:8 | indicating 118:21 |
| 10:12 29:4 50:9 | 133:6 145:19 | impossible 125:9 | 156:8 171:6,14 | 170:18 |
| 57:3 70:17 82:1 | 145:22 | 125:10 | 171:18,21 | indicators 197:5 |
| 89:9 97:4 | illegal 12:13 38:4 | imprecise 54:9 | 172:2,7,11 | 197:11 220:8 |
| 100:18 105:21 | 159:1 206:9 | 227:15 | 229:12 | individual 31:12 |
| 115:7 117:18 | 217:7 225:9,9 | imprecision | incomplete 35:14 | 33:3,8 36:22 |
| 120:2 122:12 | 225:13,16 | 158:15 169:10 | 86:11 234:1 | 42:2 86:7,16 |

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

265

87:6 134:10
184:20 198:2,5
198:8,13,21
199:4,6,14
200:6,9,19
201:1,10
226:16 230:20
242:11 250:12
250:13
**individuals** 31:20
33:14 34:13
42:12 48:6
52:10 72:21
86:2 91:11 95:2
96:17 99:5
105:13 111:8
111:15 112:13
113:9,10,11
114:4,14
120:12 125:8
132:9 133:20
134:1,7 136:8
138:17,21
155:9 175:10
175:13,21
197:22 199:10
207:10 210:8,9
224:15 225:19
228:8 238:19
239:19 240:4
242:15
**induced** 80:21
**inefficient** 17:17
**Infection** 136:2
187:4
**infer** 18:11 26:5
26:6 58:4 82:13
99:5 185:2
188:4 201:11
**inference** 19:18
71:4 117:3
**inferences** 17:16
52:19,21 200:9

201:1
**inferred** 125:5
**inferring** 51:14
52:2
**influence** 49:5
188:3
**influenced**
193:20,22
**information**
37:12 51:1
99:11 137:1,16
138:13 154:20
156:19 157:6
171:2,4 181:14
182:3 196:18
202:21 204:8
207:7 238:18
**initiatives** 218:2
**injured** 244:10
**injuries** 5:10
97:10 98:16,19
103:12 235:17
236:12 244:10
**injury** 26:20 82:8
130:7 136:2
143:22 147:5
150:12 187:3
222:2 243:14
243:17 244:4,4
244:12,12
**inoperable**
111:21
**inpatients** 106:5
112:10,19
114:6
**inside** 30:4
**Insights** 5:6
87:11 89:15
**insist** 138:11,16
**instance** 15:13
**instances** 23:4
79:6 222:19
**instructive** 195:5

**instrumental**
179:5,7
**instruments**
179:7,9
**intended** 200:4
200:18
**intensity** 43:21
**intent** 41:15,17
41:20 42:15,16
43:14 44:2 68:5
68:6,13 73:7
81:17 84:16
106:9,10,13,15
106:18,20
107:3,9,12,13
107:17,18,21
107:22 108:14
113:16,18
115:19 116:2,8
117:1
**intention** 42:13
**interest** 22:2,8
22:16 23:3
26:21 27:6 28:8
47:13 48:1,7,9
48:11,12 49:5
52:11 71:10,12
76:15 197:6,12
212:2
**interested** 17:4
95:2 196:1
238:19 251:13
**interject** 46:7
57:20
**interpose** 32:1
35:7 137:11
**interpretation**
131:22 132:4
138:8
**interpreting**
105:4
**interval** 78:10,13
79:12 80:15

**intervals** 25:8
60:14
**interview** 119:7
**intimate** 163:14
165:12
**introduce** 10:18
**invalid** 179:11
**inventory** 116:5
**investigation**
241:12
**involved** 104:4
155:6 236:11
**involvement**
77:11
**issue** 54:18
102:8 169:5
189:10 212:17
223:16 225:18
**issued** 14:9
**issues** 14:13
22:18 35:12
200:5,19
**italics** 91:3
**items** 148:22
178:7
**i.e** 101:15 153:7

_____
**J**
_____
**J** 3:3 170:9
203:12 251:17
**Jacqueline**
162:12
**Jennifer** 208:4
**Jens** 203:12
243:7,10
248:18
**Joe** 110:4
**Johns** 13:10,15
13:19
**Jon** 208:3
**Joshua** 118:5
**journal** 57:10
63:17 82:8

101:3 115:14
116:16,20,21
117:4 118:6
120:8 122:19
129:21 136:2
141:20 143:21
151:21 162:14
170:9 177:2
179:13 187:3
191:20 193:9
195:18 203:13
208:5 219:1
222:2 246:17
**Joyce** 142:3
**judged** 133:6
**July** 35:20 36:6
37:3 162:14
**jumping** 61:18
**June** 193:9
**jurisdiction**
31:18 199:15
218:6
**jurisdictions** 32:3
213:22 217:11
**Justice** 242:13
242:17
**Justification**
4:12

_____
**K**
_____
**Kaplan** 177:17
178:14
**KATHRYN** 1:7
**keep** 78:6 102:19
102:21 127:15
**keeping** 59:16
111:19 164:21
203:1
**keeps** 87:3
**Kellermann** 57:8
69:18 151:20
189:5
**KENNETH** 1:6

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

266

| | | | | |
|---|---|---|---|---|
| **Kentucky** 88:19 | **Koepsell** 218:22 | **law-abiding** | 198:8,13,22 | **linked** 82:15 |
| **kept** 86:7 111:21 | **L** | 32:10 | 199:4,6 200:6,9 | **Lippmann** 136:1 |
| 197:3,17 | **label** 157:10 | **lead** 101:4 106:6 | 200:19 201:1 | 144:2 |
| **key** 71:3 110:9 | **lack** 12:16 | 115:13 120:7 | 204:10 207:13 | **Lisa** 144:1 |
| 110:12 | 152:18 | 122:18 166:17 | **levels** 172:7,12 | **list** 49:22 178:7 |
| **kill** 42:3 43:22 | **language** 53:21 | 166:17 203:3 | 187:11 198:18 | 245:20,21 |
| 44:6,8 69:1 | 165:18 | **leading** 235:2 | 224:4 246:17 | **listed** 128:3 |
| 73:3 96:6 109:6 | **large** 37:3 92:22 | **leave** 52:1 95:6 | **licensed** 31:12 | 141:5 168:19 |
| 109:16 167:17 | 99:17 108:3 | 110:17 111:8 | 31:20 33:2,8,15 | 178:3 |
| **killed** 68:20 | 144:9 186:10 | **leaving** 42:1 | 36:22 76:21 | **lists** 84:2 |
| 109:2,14 | 209:16 221:2 | 43:14 64:5 | 77:21 78:14 | **literature** 38:13 |
| 120:12 163:14 | **larger** 99:7 | 159:9 244:8 | 226:16 234:17 | 54:21 75:8,11 |
| 163:21 167:19 | 184:16 185:7 | **led** 179:15 183:3 | **lies** 25:12 | 94:4 96:13,14 |
| 227:12,21 | 221:9 | 243:22 | **life** 93:1,4,5,6,10 | 104:16 113:2 |
| 228:8 239:19 | **largest** 97:17 | **left** 41:21 56:9 | 93:14,15,19 | 117:6 118:21 |
| 240:3 | 136:10 | 85:14 136:5 | 94:2,5,9,14,19 | 123:7 159:3 |
| **killing** 61:7,7,10 | **LaSalle** 3:16 | **left-hand** 83:16 | 95:5,9,15,18 | 185:6 190:22 |
| 72:22 73:5 | **lasting** 114:12 | 115:17 131:1 | 108:10 | 216:4 235:9,11 |
| 107:12 119:16 | **late** 200:14 | 136:5 139:12 | **lifestyle** 84:7 | **Litigation** 3:15 |
| 172:17 | 210:22 | **legal** 52:15 | **Lifetime** 7:10 | **little** 15:9 90:8 |
| **kind** 15:11 29:12 | **law** 2:10 3:3,4,12 | 110:21 132:11 | 150:9 | 178:13 186:12 |
| 50:20 75:15 | 3:14 10:10 33:6 | 132:16 138:7 | **Life-Threateni...** | 228:10 |
| 114:15 233:16 | 33:13 34:15 | 213:11 | 89:14 | **live** 88:18 153:22 |
| **kinds** 15:12 17:8 | 35:20 36:2 | **legally** 76:20 | **lighter** 236:16 | 234:10,17 |
| 93:7 | 110:16 111:7 | 78:17 133:20 | **likes** 196:8 | **lived** 80:20 |
| **King** 62:10 97:17 | 207:7 212:7,10 | 146:8 | **limit** 4:13 31:19 | 118:19 140:9,9 |
| 97:21 98:5 | 212:11 213:7,8 | **legislation** 32:20 | 33:1 36:21 | 155:19 163:15 |
| **Kirk** 2:1 10:10 | 213:17 214:8 | 138:1 | 99:14 190:15 | 163:19 |
| 10:22 | 214:12,17 | **lend** 58:13 | 218:6 | **lives** 118:18 |
| **Kleck** 177:16 | **lawfully** 46:17 | **lessons** 195:2 | **limitation** 99:10 | 154:2 |
| 178:12,15,18 | 134:3,15 | **lethal** 38:1 233:6 | 99:16 178:21 | **living** 18:15 |
| 179:2,8,18 | 224:17 | 233:9 243:22 | 187:9 | 44:11 45:3,9 |
| 243:5 246:9,15 | **laws** 9:9,11 32:4 | **lethality** 44:5 | **limitations** 51:3 | 60:2,3,11,15 |
| **knew** 164:7 | 34:13 46:5,22 | 91:4,6 | 76:6 104:22 | 74:12 110:18 |
| 178:2 | 47:4 208:2,7,12 | **letter** 120:17 | 123:20 152:1 | 111:10 136:8 |
| **knowing** 185:5 | 211:20,22 | **letters** 41:21 | 197:3 | 141:1 156:14 |
| **knowledge** 69:12 | 212:1,4 214:1 | 184:6 | **limited** 82:14 | 159:14 160:15 |
| 190:21 213:20 | 215:2,11 | **level** 38:20 79:13 | 153:8 238:8 | 198:15 230:6 |
| 218:5 228:7 | 218:20 220:3 | 80:4 109:15 | **line** 72:16 74:12 | **LLP** 3:5 |
| **known** 12:15,17 | 220:10 241:6 | 136:7 141:1 | 99:20 112:2,4 | **loaded** 87:3 |
| 31:6 60:15 | **lawsuit** 37:8 | 148:6,9 156:11 | 118:9,17 191:4 | 124:15 125:7,9 |
| 133:5 158:14 | **lawyer** 213:5 | 173:6 184:20 | **lines** 63:3 72:15 | **local** 6:12 85:10 |
| 175:12,20 | | 187:13 198:2,5 | 108:15 | 141:19 183:3 |

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

267

locally 183:2
location 61:7,11
62:1 63:8 99:12
locations 152:4
152:13
lock 90:19
110:10,11
locked 30:19
86:2,7 146:11
164:21 189:17
201:7 202:3
203:1
locking 85:15
121:9 201:17
locks 110:8
Loftin 193:19
logistic 27:4
67:15
long 47:1,4 70:6
101:7,15
102:12 124:6
124:12,21
126:3,7 158:20
207:12 233:5,8
233:12 236:16
longer 218:1
233:17
longitudinal
47:11,12,14
looked 36:19
38:10,13 57:11
80:7 171:5
194:9 215:1
220:7
looking 20:19
66:13 92:7,8
114:5 158:5
160:9 168:15
174:3 196:18
201:8
loop 194:5
lost 193:14
lot 15:11 18:20

25:20 34:3,6,6
39:4 45:5 86:15
93:7 130:11
161:5 179:14
190:7 209:15
214:7
lots 17:21,21,21
low 38:16 39:2
40:14 44:19
53:5 224:4
lower 39:14 47:2
85:21 86:1,6
87:8 132:19
133:22 135:9
156:8,11 161:4
163:15 189:17
201:13 203:3
210:6 220:10
221:9 236:21
Lowered 46:16
lowest 172:10
Ludwig 203:13
204:3 205:5
243:7,10
248:18
lunch 127:17

**M**

M 120:17
magazine 203:21
204:4,8,18
magical 24:19
magnitude 49:9
184:10,16
main 17:9 23:2
83:4
major 7:10 13:22
127:9,13 128:4
150:9,16,18
151:1
majority 90:1
91:9 92:22
101:16 185:15

239:9
makers 28:9
186:12 199:7,9
199:10
making 12:13,13
20:3 54:11
133:19 135:7
male 30:2 92:1
92:10 224:9
males 92:14
Management
13:16
Manganello
208:4
manifest 125:13
manifestations
134:20
manner 55:4
111:21
Marc 214:22
220:7
March 141:21
245:22
marginal 212:9
212:18,19
marginally
198:14
marital 229:16
mark 29:1 50:6
56:22 70:11,14
81:20 89:6 97:1
100:15 105:18
114:5 117:15
119:21 122:9
135:14 143:11
146:14 150:1
151:11 162:3
169:22 176:13
184:4 221:12
marked 29:4,7
50:9 57:3 70:17
82:1,4 89:9
97:4 100:18

105:21 115:7
117:18 120:2
122:12 129:11
135:16 141:12
141:14 143:14
146:17 150:4
151:14 162:6
170:3 173:2
176:16 183:18
183:21 186:16
186:18 191:14
193:2 195:12
203:7 207:19
218:15 221:17
marker 161:1
marketed 129:16
marriage 75:17
married 75:9,13
75:21
Mary 120:17
master's 13:8
matched 65:9
127:8 134:1
matching 64:22
material 36:4
188:20
materials 49:22
178:3,8 245:20
matrix 23:16
Matt 143:22
147:3
matter 1:20 10:5
12:8 64:4
119:17 126:5
127:19 128:20
215:17 222:14
223:14 225:4
matters 28:8
Matthew 89:17
135:22 141:22
150:12 173:9
176:22 182:15
187:4 191:21

**Mayer** 3:5 11:1
11:3
**Mayor** 1:11 11:2
13:21 14:5,18
14:20 15:6,14
**McDowall** 193:8
193:18
**mean** 17:14 20:6
24:1,12,19
26:15,16 31:15
32:11 34:5
36:18 37:11
42:15 52:4
53:20 57:17
60:4 61:17
68:14 76:10
85:20 93:20
99:2 107:14
109:1,22 114:3
114:10 116:12
120:18 123:14
131:5,16
133:17 138:17
142:10,15
148:20 161:4
186:3 194:17
198:7 216:17
216:19 227:1
235:13 239:4
**meaning** 46:2
125:18 133:14
189:2 198:3
**means** 20:16
21:1 26:2,11
38:1 52:9 54:19
80:14 96:5
108:11,16
116:14 133:8
137:8 168:22
176:6
**meant** 16:7 18:9
54:10 109:18
118:12

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

268

| | | | | |
|---|---|---|---|---|
| **measurable** 213:22 | 166:20 **medical** 63:16 103:13 115:15 145:22 155:5 208:5 219:1 241:1,2,10 | 84:4,12 93:2 104:17 134:21 140:21 145:1 145:16 156:15 161:20 165:1,3 | 143:22 147:3 150:12 173:9 177:1 182:15 187:5 191:21 222:1 | 159:10 168:4 169:2,3,3,12 169:19 205:7 236:15 |
| **measure** 19:3 21:22 22:9 27:10,16 43:21 47:9 68:6,12 69:20 70:1 73:7 76:3 80:1 81:16 84:15 106:13 106:15 116:8 116:22 126:16 171:14 179:4 181:3 185:1,15 185:17,19 186:2 188:18 196:9 197:13 204:21 205:4,9 206:21 207:11 207:15 214:15 221:1 237:19 | **medication** 59:21 66:14 **medicine** 57:10 66:17,18,22,22 67:1,3,7,8,10 97:13 129:22 151:21 173:11 **meets** 148:14 **Melissa** 1:21 2:4 10:14 251:3,17 **member** 78:11 79:2,4 155:4,7 159:18,21 160:3,18 227:13 | **mentally** 72:2 133:6 145:19 145:22 **mentioned** 13:21 20:2 64:1 68:3 93:10 105:9 **mentioning** 51:13 **Messner** 179:15 **met** 133:20 143:5 **method** 16:11 48:21 49:3 61:6 61:10,12,17 179:3 244:13 **methodological** 123:16 125:12 | **million** 237:4,7 237:14 242:20 248:14,21 249:2 **mind** 33:12 78:7 93:12 197:4,17 **Mine** 196:9 **minimum** 212:3,3 **minority** 90:2 **minute** 133:19 161:21 174:3 180:14,18 188:20 210:18 **minutes** 56:9 109:20 119:17 244:21 | **modestly** 198:14 **Molnar** 147:4 **moment** 42:14 62:3,7,12 140:14 189:11 192:17 203:18 240:17 **monoxide** 61:22 **mood** 149:6,8 **Moritz** 118:5 **Mormon** 210:6,8 **morning** 11:15 **mortality** 6:7 9:11 82:15 89:16 129:19 132:7 139:15 218:20 219:17 |
| **measured** 23:5 24:7 43:20 44:2 83:21 84:3 100:2 116:1 168:13 188:1 | **members** 74:4 75:6 84:5,12 **membership** 40:22 84:7 161:17 | **methodologica...** 158:3 **methodology** 25:19 116:15 123:13 204:16 207:6 243:6 | **mischaracteriz...** 234:12 **mischaracteriz...** 90:22 154:16 186:6 187:21 197:9 199:20 201:20 | **motivate** 175:13 175:21 **motivated** 138:16 **move** 156:4 168:11 192:21 203:5 218:12 |
| **measurement** 6:13 42:2 43:14 43:16 99:18 141:19 | **memory** 208:16 **men** 45:13 130:4 131:2,6,16 132:19 147:7,8 | **methods** 51:3 74:1 90:16 97:16 142:22 143:5 162:16 | **mischaracteriz...** 91:18 109:9 161:10 | **MPH** 1:18 4:4 11:10 129:6 **multi** 158:14 169:6,9 |
| **measures** 8:6 26:8 47:12 68:14 90:18 106:19 141:7 173:8 177:7 197:4,10 198:4 201:5,8 206:20 207:14 220:8 230:14 | 147:19 149:7 149:14,20 173:17,22 174:5,6 224:12 231:17,20 232:2,4,12,12 232:16 | 219:9,12 **metropolitan** 97:18 162:20 236:22 **MICHAEL** 1:7 **Michigan** 13:9 **mid** 45:20 46:2 | **misdemeanor** 133:5 **misreporting** 156:19 **missing** 170:13 170:17 171:2 **mistake** 30:6 **mistakes** 29:15 | **multiple** 86:7 126:20 **Multisite** 7:17 162:12 **Multivariate** 140:19 **multi-colinearity** 67:19 |
| **measuring** 25:16 41:17 71:14 **mechanism** 69:6 **median** 78:10,13 **mediating** | **mental** 37:20,21 59:11 65:15,18 66:1,13,21 67:6 67:8 70:9,22 71:2,18,20 75:12,16,20 | **middle** 29:20 163:10 181:12 **military** 229:22 **Miller** 89:17 135:22 141:22 | **model** 23:14 27:7 168:9,20 174:16 **models** 21:18 | **murder** 166:16 227:11,20 228:6,7 229:2 |

Daniel W. Webster, Sc.D., MPH

September 21, 2011

Washington, D.C.

murdered 167:11
murderer 167:18
mutually 194:5

**N**

N 4:1,1 10:1
98:19
name 10:12
11:16,18
250:21
narcotics 38:4
narrow 19:22
national 5:5 7:6
9:13 28:1,3,11
28:13,14,19
40:9 50:13 51:8
54:18 62:4 82:7
90:9,13 144:10
147:2 219:16
219:20 221:22
238:17 241:19
243:19
nationally 18:6
29:21 92:9
nature 68:15
95:3 185:12
227:7
nearly 40:9
49:12 63:5
necessarily
114:14 132:12
188:4 216:14
necessary 21:15
105:7 250:6
need 18:16 30:7
47:8,17 62:17
73:15 130:19
154:1 203:18
216:18 233:20
234:4
needed 116:17
needs 215:22
negative 172:6

negatively
228:13 229:2
neglected 221:14
negligent 12:12
neighborhood
40:16 154:2,5,8
154:9,13
197:22 198:15
206:12,14
230:6
neighborhoods
153:22
never 227:12,15
nevertheless
75:19 82:13
247:11
New 2:1,11
10:10 12:11
57:10 129:21
139:22 151:21
newly 139:22
nights 103:9
nomenclature
16:5
noncausal
182:21
noncriminals
236:8,11
nonexperimen...
51:22 52:4,7,17
52:21 165:18
175:5 181:21
nonfatal 98:16
nonlethal 108:7
nonwhite 96:8
non-firearm-re...
96:21
non-gun-owners
71:19
non-random 17:2
noon 127:16
North 3:16
northern 1:2 10:7

13:3
Northwest 10:11
notable 108:5
notably 39:13
89:3
Notary 1:21
250:18 251:1,3
251:18
note 25:13 26:6
29:14 125:6
148:14 149:11
noted 68:1,16
88:21 105:1
115:19 178:17
214:20
notes 88:2
noting 114:2
notion 72:21
109:16
NRA 138:11,16
139:3
NRA's 138:21
NRC 55:10
nuances 17:11
number 10:4,8
21:10 23:13,20
32:8 46:19
51:14 56:16
67:16 79:20
80:6 89:20
100:6,10
120:16 121:1
121:11,16
145:6,10
148:16 153:8
153:13 155:3
159:2 167:4,5
175:16 183:9
183:13 187:14
187:19 188:3
189:13 197:5
199:18 208:7
221:8,9 222:4,4

226:4,8 237:3
242:19
numbers 90:4,4
90:10,13
147:17
numerical
149:10,19
NW 2:1,11

**O**

O 4:1 10:1
objecting 153:1
216:12
objection 35:8
46:8 133:12
161:10 171:15
182:16 186:6
187:21 196:11
197:8 199:20
201:20 202:7
204:19 207:1
210:12 211:16
212:12,20
213:10 215:19
222:9 225:7
227:1 233:14
244:14
objections
137:11 217:4
234:6
objective 42:5
observed 24:9
88:6 89:2 153:7
199:3 214:19
obtain 134:8
175:10
obtained 85:12
134:4,15 136:9
146:8
obvious 241:17
obviously 32:2
35:8,11 41:19
138:7 166:15

243:21
occur 60:22
occurring 26:19
60:19 152:3,4
152:12
occurs 26:21
27:1
October 122:19
odds 26:17,18,22
27:2,3,10,11
27:12 59:16,19
63:5 76:12
125:2,10
126:10 160:9
160:12
offer 32:3
offered 12:19
offering 12:21
43:12
offices 1:22
10:10
oh 70:11 72:19
82:20 87:20
113:13 124:6
152:7 210:1
221:6
older 96:8
213:17
once 67:22
ones 39:21
114:12 217:14
217:16
oneself 43:22
61:7,7,10
107:12 161:2
one's 106:18
108:10 230:20
ongoing 136:12
open 244:2
open-ended
242:5
operable 4:13
31:11,19 33:2

Daniel W. Webster, Sc.D., MPH

September 21, 2011

Washington, D.C.

36:21 80:6 86:7
87:3 110:17
111:9 126:14
226:15,20
234:4
operate 225:5
operational
33:17
operator 10:13
opining 88:14
212:10
opinions 12:19
12:20 35:9
177:13
opportunities
165:9,21
opposed 24:5
49:8 86:8 87:2
94:14 126:18
189:7 214:17
opposite 38:22
order 47:6 96:19
128:12
ordering 90:16
orders 49:8
ordinance 31:5
35:6,10,11 36:7
36:12,13,16
37:3 195:3
original 78:17
250:7
outcome 22:9,17
23:1,11,18,21
26:19 27:8 48:7
48:15 49:6
71:10 134:11
158:20 168:13
227:9 251:13
outcomes 48:1,3
48:8,22 166:15
188:4 219:15
outside 30:4
36:10 90:21

155:6 167:4,10
167:15 190:17
overall 16:12
55:6,19 91:22
94:4 96:12
132:22 151:7
165:11,21
175:15 177:8
211:14 221:8
overbreadth
239:15
overbroad
215:20 222:9
overconsumpti...
65:5
oversample
17:10,14 18:3
oversight 12:15
owned 46:18
138:13 146:8
223:8 233:1
owner 140:1
owners 71:17
136:17 139:1,4
139:7 223:21
234:17 235:20
owning 60:12
160:13,22
owns 137:17

___P___

P 10:1 24:7,11,16
25:3,5,7,17
53:5 79:13,22
121:19 148:13
180:7 210:14
PACHOLSKI
1:6
pages 245:17
paid 142:17
panel 55:10
paper 68:7 205:6
250:7

paragraph 29:20
29:20 30:10
31:2 48:19
49:12 50:20
55:14 63:12
69:14 72:9,14
76:2 78:4 79:18
83:16,18 84:3
85:9 95:22 99:9
101:12 104:22
130:4 131:1
139:13 140:5
144:5 150:15
150:16 152:1
155:15 156:18
163:11 165:7
173:13 175:2,8
176:4 177:4,5
181:13 182:20
187:9 193:18
197:16
parent 103:18
parentheses
80:16 148:16
parenting 188:7
188:9,12,14
parents 90:19
93:5 118:18,19
119:1
part 12:11 28:12
48:5 164:14
209:16 220:17
242:16
partial 142:3
partially 83:21
participate 64:9
105:11,12
participating
136:13
particular 26:14
31:4 42:14
46:21 62:6 88:1
106:16 125:19

154:3 196:2
209:14 215:4
222:19
particularly
60:13 128:6
213:3 214:21
217:20
parties 251:12
251:13
partner 75:17
163:14 164:7
165:12 167:4,9
167:15,17
partners 110:7
passage 35:5
214:8
passed 35:20
133:4 208:7,11
214:12
pattern 134:9,12
192:13 247:15
patterns 188:8
192:5
Patterson 177:16
178:12,15
179:3,8 246:9
246:16
Patterson's
179:19
Pediatric 97:12
peer 27:18,21
116:12 117:8
peers 116:14
peer-reviewed
116:10,20
193:10
penalties 215:17
216:2,5 217:7
penalty 216:10
217:1,1
pending 12:5
penultimate
48:19 78:9

163:11
people 17:2,19
17:22 18:15,16
19:1,8 25:5,6
26:5 34:5 44:6
49:7 68:20 69:1
72:2 76:21
109:2 124:4
137:20 139:20
141:4 153:8,13
153:21 154:12
155:20 156:4,7
156:8,10 157:4
166:11 172:14
195:21 205:16
225:5,10 230:9
230:12,15
239:5,13 244:9
perceived 154:8
percentage 19:4
19:19 72:2 73:3
92:18 118:17
136:7 139:7
140:20,22
152:19 231:2
237:16
percentages
90:14
perception 41:6
217:22
perceptions
175:13,21
Perfect 245:16
perform 67:15
period 45:18
207:12
permissible
110:17
permit 111:20
234:14
Perper 118:5
perpetrator
230:21 238:3

Daniel W. Webster, Sc.D., MPH
Washington, D.C.
September 21, 2011

271

persists 192:13
person 41:19
66:17 79:8 86:9
87:1 100:3
206:1 225:22
personal 79:2
229:12
personality
41:10 80:22
personally 251:5
personnel 241:2
persons 45:3,8
Peter 218:21
phenomenon
18:22 19:2
24:12 26:19,22
53:14 125:14
164:17 197:20
198:17 209:7
221:6
Phil 243:6
Philip 141:22
203:12 243:10
248:17
phrase 77:5
108:18
physical 155:6
pick 39:10
122:20 123:8
picked 123:7
piece 36:16
place 30:7 41:7
185:19 193:14
196:19 251:6
places 181:9
185:10 239:1
placing 83:1
Plaintiff 10:5
plaintiffs 1:8,19
2:9 4:3 10:19
10:22 11:13
245:7,21
plaintiff's 154:16

plan 109:19
planned 109:3
114:9,16
planning 107:2,4
108:6 109:1,15
109:19,22
114:13
plausible 51:16
play 44:18 45:1
215:6 225:18
played 46:5,11
46:15 47:1
plays 40:13
please 10:20
11:8,16 12:3
29:6 33:11 57:5
68:10 70:19
76:1 82:3 89:11
97:6 100:20
102:4 106:1
109:11 111:2
115:9 118:1
120:4 122:14
124:5 127:21
129:17 130:1
131:13 135:18
137:9 141:16
143:16 146:19
150:6 151:17
162:8 170:5
173:4 176:18
180:16 184:1
186:16,20
191:16 193:4
195:14 200:13
203:9 207:21
218:17 221:19
PLLC 2:1 10:10
PO 149:2
point 12:2 51:10
53:2,15 56:21
60:14 87:16
90:10 98:3

114:17 132:10
133:19 149:2,2
188:13 191:4,8
213:21 224:20
237:13 242:10
points 19:19
poison 90:19
poisonings 89:22
91:9
police 241:3,12
policies 15:12
199:13
policy 13:16,17
14:6,8,10,11
14:14,18 15:7
15:10,15 28:9
186:12 195:19
199:7,9,9 227:6
227:10
poor 172:13,15
198:13,16
populace 74:21
populated 58:16
population 16:12
18:11 40:9,10
44:18 58:4,15
74:2 124:22
140:20 174:10
209:13 231:2
populations
163:3 197:22
246:10
position 13:12
14:3,5,8,17,18
14:20 15:2,5,6
15:14 138:22
positions 13:13
15:7,17 245:22
positive 49:13,16
55:15 67:2
75:12 94:4
95:17 103:5,9
103:14,19

104:1,5,9,17
112:11 126:5
127:12 172:6
177:6 181:2,9
191:5
positively 65:1
65:10,18 84:9
84:13 95:6,10
107:2,8,13,22
108:19 124:21
150:18 156:14
159:12,15,16
159:19,22
160:4 234:21
235:16
possess 224:15
224:17 225:20
possessed
197:13
possession 212:4
217:7 225:16
possibility
105:10 169:14
176:8 182:21
224:18,20
225:18
possible 65:21
94:11 138:20
153:5 164:4,11
170:20 183:2
194:8 214:10
225:19 226:2
possibly 63:12
potent 113:18
potential 16:17
64:6 83:19
99:10,14
105:14 133:7
156:19 181:8
potentially 23:2
102:10 157:6
165:11,13
poverty 74:12

141:1 185:11
187:13,18
198:10,11
206:5
practical 48:21
49:2 52:15
practice 189:5
189:14 201:18
202:2 247:3
practices 12:12
188:7,9,12,14
188:16 189:3
189:14,16
190:1,4,9,15
190:20 191:6
201:12,16
207:14 247:2,6
247:12,13
precautions
107:8
precise 34:7
90:14 159:9
precision 19:17
20:2 67:21
124:1
predict 165:5
predictive
113:19
predictors
128:11
predominant
92:16
predominantly
92:1,9
preexisting
69:20
prefer 124:4
preferable
148:13
prepared 37:12
54:13 202:22
preparing 123:17
177:22

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

272

prescribed 59:21 67:1
prescription 38:9 66:13
presence 5:18 69:9 115:11 170:18 250:16
present 3:21 19:5 53:9 83:4 112:18 193:19
presented 91:3
presumably 106:12
pretty 60:15
prevalence 6:12 30:13 37:20 38:11 136:9 139:14 141:19 150:16,17,18 150:20 151:1 173:15,21 203:19 204:17 206:19,22
prevalent 113:6 113:6
preventing 165:9 166:5
prevention 13:18 51:6 82:9 143:22 147:5 150:13 170:10 208:12 211:21 212:7 213:9,16 214:1 215:2,11 222:2
Prevention's 238:21
previous 59:22 60:20 127:11 172:2 237:11 240:9
previously 12:9 105:9 115:19

129:8
primary 22:16 102:22
principal 34:19 87:22
principally 95:1 102:19 240:16
principle 199:17
prior 22:22 80:13 104:13 107:12 107:17,21 119:6,7,11 134:19
prison 217:22 218:1 231:2
private 144:19
probability 24:4 24:8
probable 127:9
probably 11:22 25:11 42:6 43:5 43:9 166:19 205:20 215:6 235:8 243:4
probative 27:10
problem 30:22 67:19 153:21 154:11 158:14 158:18 170:20 170:22 171:1 178:17 188:12
problems 43:14 43:17 63:13,21 63:22 64:12,13 66:16 75:16 93:3 118:15 155:2 157:19 158:22 169:9
proceedings 2:3 251:10
process 77:20
produce 224:4
produced 222:7

professional 130:9
professor 11:15 13:14 32:2 35:9 43:1 46:9 85:7 129:15 131:10 131:19
proffered 32:2 35:8
proffering 46:9
profile 92:4,6
program 136:12
progression 22:4
Project 217:12
prominent 214:20
prompt 69:9 95:4 95:4,15
prompting 176:9
prompts 91:11
pronounced 172:10,13 215:3
pronouncing 184:5
proof 54:7
proper 248:1
properly 131:5
property 205:17 205:22
proportion 108:3 113:14 209:13 240:18
proportional 221:10
protecting 213:17
protective 137:16 164:15 201:6 213:2 217:8
Protestant 211:3
prove 21:9 182:2

provide 95:1 136:18 181:14 182:3 196:20 213:1 242:17
provided 12:14 111:9 142:3
proving 181:22
provision 31:9 35:1 36:20 37:13 111:8 138:16 195:3
provisions 36:12 37:7,8 111:17
provocative 197:3
provoked 63:15
proxies 55:16 65:9
proximal 168:12 168:13
proxy 47:17 69:19 194:13 194:16
Psychiatric 127:4
Psychiatry 106:7 120:9
psychological 104:16
psychology 13:4
psychopatholo... 6:4 7:3 112:20 113:6 120:7 146:22
Psychotropic 59:21
public 1:21 13:8 13:11,14,20 14:4 25:6 130:9 162:14 177:2 186:12 195:18 203:13 235:21 250:18 251:1,3

251:18
publication 50:13 116:10 193:11
publications 24:21 25:2
publicity 214:7 214:13,16 215:6
published 24:21 57:9 63:17 83:7 89:13 101:3 106:6 107:16 115:14 116:20 118:6 120:8 122:18 129:21 136:1 141:20 143:21 147:5 150:12 151:20 162:14 170:10 173:10 177:2 179:13 184:6 187:3,6 191:20 193:8 195:18 203:13 208:4,6 214:22 219:1 222:2
pull 233:11 236:16
purchase 4:19 32:10 34:13 71:13 72:21 73:7 77:17,20 78:11,22 79:2,4 79:19 80:17,22 81:3,5 130:8,14 132:9,15 133:20 212:3 231:18,21 232:2,4,13,14
purchased 72:17 73:4,8 76:20 77:8,14 78:14 78:17 79:7,21

Daniel W. Webster, Sc.D., MPH

September 21, 2011

Washington, D.C.

273

130:5 131:6
132:6 134:3,15
139:21 140:3
**purchasers** 6:8
80:19 129:20
130:12 132:8
132:11 133:3
139:22 236:5
**purchases** 69:21
77:1,19 80:7
**purchasing**
130:18 131:17
**purpose** 72:22
73:5,8 102:22
108:12,18
123:1 135:3
153:2
**purposes** 10:12
98:1,22 102:2
102:20 113:4
202:8 232:2
**put** 25:6 26:4
43:16 49:20
84:18 86:13
110:3 128:1
149:21
**putting** 41:18
**puzzled** 90:8
**p.m** 128:18,19,21
129:2,4 145:7
145:12 183:10
183:15 226:5
226:10 245:3,6
249:7,8

___

**Q**

**qualifications**
133:21
**qualify** 93:10
**quantification**
212:17
**quantifies**
153:20

**quantify** 134:16
153:12,15
212:15
**Quantitative**
141:21 179:13
246:18
**questioning**
191:4
**questions** 16:2,7
42:1 106:19
157:4 165:3
222:7 223:2
224:3 244:19
248:13 249:4
**quick** 140:14
**quickly** 110:11
**quite** 67:20 94:11
130:17 142:10
147:22 152:5
152:14 197:2
198:14 199:8
**quote** 36:20 65:7
80:13 85:10
89:20 96:2
101:17 125:21
186:10

___

**R**

**R** 10:1
**race** 174:13,17
206:16 219:19
219:22
**racial** 44:18
58:18 67:13
92:4
**RAHM** 1:11
**raised** 118:22
169:6
**random** 17:5,6,8
17:12,17,20
18:14 19:6
20:10 24:5,13
74:3

**randomized**
51:21
**randomly** 52:10
52:13 162:18
**range** 19:22
25:14 26:7
88:21 237:7,8
237:10 249:1
**Ranjit** 3:3 11:1
**rape** 40:20
**rare** 18:21 48:22
**rarely** 227:20
228:1,3
**rate** 20:4 32:16
32:17,18,22
33:6 36:3 37:9
38:15,16,21
39:3,9,14 40:14
44:19 46:6,16
47:2 55:6 64:2
67:9 71:18
76:13,17 86:1,6
86:22 103:3,4
105:2 126:17
150:19,21
151:2 154:1
160:21 180:19
191:6 206:5,7
228:8 247:4,6
247:12
**ratio** 26:17,18
27:2,3,10,11
27:12 59:16,20
63:5 125:2,10
132:7 160:12
204:5 205:3
**rational** 21:11
**ratios** 160:9
180:19
**RDR** 1:21 2:4
**reach** 180:4,6
**reached** 177:11
**reaching** 177:13

**read** 50:17 62:18
62:20 96:12
131:15 145:4
150:22 170:16
177:17 180:17
200:15 203:18
250:2
**reader** 25:22
**reading** 119:9
121:20 131:5
131:11,20
**reads** 31:3 48:20
50:21 62:13
150:16 163:12
**ready** 62:21
**real** 47:5 66:16
99:19 138:22
**reality** 217:21
**really** 15:8 19:22
19:22 24:10,19
42:3,4,11 71:4
90:17 94:17
148:11 153:22
154:10 172:12
214:18 224:7
239:11 241:15
**reason** 71:8
87:22 90:3,12
169:11 179:10
193:21 215:5
239:12
**reasonable**
134:18 135:2
237:2
**reasonableness**
137:13
**reasons** 164:4
175:11 187:10
232:16 241:17
248:9
**Reay** 97:9
**recall** 63:18,20
64:13 87:12

144:13 188:17
217:11 237:22
248:15
**receipts** 196:20
**receives** 144:16
**recess** 56:15
85:3 100:9
129:7 145:9
183:12 226:7
245:4
**Reckless** 103:12
**recollection**
101:18
**recommendati...**
116:16
**recommended**
116:18
**recorded** 159:15
251:9
**records** 196:17
207:7
**record's** 93:17
**redefine** 58:2
**redo** 169:17
**reduce** 33:19
165:11,21
166:7 190:16
203:2
**reduced** 63:5
163:20 211:22
247:21
**reduces** 67:20
248:5
**reducing** 85:16
166:6 212:2
**refamiliarize**
101:8
**refer** 20:17 31:14
148:16,19
185:9 201:16
209:11 219:13
**referee** 117:9
**reference** 25:12

Daniel W. Webster, Sc.D., MPH
Washington, D.C.
September 21, 2011

274

39:8 47:20
69:14 87:10
106:10 135:6
201:5
**referenced** 48:2
56:7 63:21
116:4 136:14
189:12 202:1
211:10 215:9
241:19 248:17
**references** 64:11
176:4 203:17
**referencing** 31:9
**referred** 240:17
**referring** 36:15
56:1 114:8
154:4 177:14
235:12 240:9
**refers** 18:10
108:12 134:17
167:5 180:18
235:12
**reflect** 138:22
141:8 164:12
**reflects** 47:17
96:14 168:20
**refresh** 101:18
208:16
**refusal** 105:2
**refuse** 105:11
**regarding** 88:10
99:11 200:6,19
201:5
**regardless** 33:17
47:4 81:2
**regime** 32:12
226:15,20
**region** 174:12
192:18
**regional** 144:6
192:4,7,9,16
**regions** 7:12 8:11
150:11 176:22

177:9 180:3
**regression** 23:9
23:10 27:4,7
66:9 67:15
**regressions**
52:22
**regulated** 77:17
**regulation** 12:17
139:4
**regulations**
12:15
**Reidy** 3:22 10:13
**reinforcing** 194:5
**reject** 116:17
**relate** 14:10 21:5
**related** 17:3
20:14 27:6
28:17 230:22
251:12
**relates** 24:2
38:11 93:19
125:6 214:21
224:7
**relating** 14:14
22:18 47:1
62:19 248:13
**relation** 4:16 8:6
57:9 173:7
198:12
**relationship**
20:10 21:3 22:1
22:8 26:3 28:10
47:7 49:14,16
51:4 93:11
172:12 173:15
173:21 175:3,6
175:14 176:1
214:19 247:5
247:11,15
**relationships**
7:16 18:12 31:6
162:11 163:1,5
209:6 210:10

**relative** 76:5,9
76:10,12,16
79:1 80:15
85:13 96:20
99:21 126:12
184:12 221:1
**relatively** 19:20
40:14 44:19
45:19 48:22
172:14
**relativity** 27:21
**relevance** 52:12
88:6,9,10,13
142:8 143:2,4
227:8
**relevant** 12:14
12:20 22:19
34:22 61:18
98:6 102:7,9
125:16 128:6
142:4,10,18
147:22 154:21
155:8 172:2
198:21
**reliable** 44:3
**relied** 178:8
**religion** 209:14
210:6 228:11
**religiosity** 59:3,6
209:4
**religious** 40:13
208:21 209:7
209:13 211:12
228:12,17,18
229:1
**reluctant** 241:10
**rely** 15:18 51:22
52:16 55:1
69:18
**remained** 131:2
**remember** 11:22
204:9 215:15
238:12

**remembering**
144:12
**removed** 117:11
**rent** 155:20
156:4,7,10
**rented** 155:18
**renting** 159:11
160:11,20
161:1,8,13
**rephrase** 109:11
131:12 216:20
**Replication** 7:7
147:3
**reported** 65:8,15
96:11 158:9
168:3,7 222:5
**reporter** 11:7
12:1 29:1 50:6
56:22 70:14
81:20 97:1
100:15 105:18
115:4 117:15
119:21 122:9
129:16 135:14
143:11 146:14
150:1 151:11
162:3 169:22
176:13 200:16
243:8
**reporting** 10:15
25:12 63:14
180:7 181:20
224:8,11
**reports** 14:10
63:17 124:18
207:7 242:4
**represent** 10:19
187:14 188:2
**representative**
58:6 74:17,21
144:14
**represented**
29:21 159:6

**representing**
89:22 250:12
**represents** 21:19
**reproduced**
50:11
**require** 77:19
90:19
**required** 155:4
241:2
**requirement**
31:4 138:2
241:8
**requiring** 103:13
103:17
**research** 12:14
13:17 14:11
16:16,18,20
18:19 22:22
25:19 28:3,3,5
28:19 31:5
43:18,19 48:5
50:13,22 51:8
52:17 54:18
62:4 63:15
71:16 82:14
83:7 89:2 142:5
142:6 144:10
152:17 164:16
211:8 227:7
247:19 248:4
**researcher** 27:16
**researchers**
20:15 22:19
24:19 52:16
95:1 158:17
168:10 209:11
**researching**
22:18
**reservations**
139:7
**reside** 111:13
**residence** 206:11
206:13 234:10

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

275

residences 234:18
residency 40:16
residents 102:21
residing 162:19
resist 243:12 244:11
resistance 244:17
resource 28:1 174:9
resourcefulness 164:13,15
respect 66:11 140:7 182:9,14 182:17 190:18 195:2 202:9,14 202:17 213:8 222:18 223:17
respected 28:20
respond 12:17 15:2 138:17
respondent 241:22 242:6
respondents 69:19 136:11
respondent's 156:21
response 64:2,5 105:3,8 135:4 153:9,14 216:6 225:6 242:5 248:20
responses 223:3
responsible 134:21
responsive 224:5
rest 111:20
restate 123:4 137:9 200:12 248:2
restricted 60:19 152:2

restricting 165:10
result 24:13 32:9 32:20 34:15 80:2 101:20 161:5 166:21 182:20 222:20 222:22 241:11 244:7
resulting 49:1 103:12
results 5:14 7:16 9:12 63:6,15 75:3 83:5 88:5 91:21 101:2,11 102:7 105:4 133:11 134:9 134:12 152:19 162:11 163:10 173:12,14,17 180:1 210:3 221:22
resume 128:20
RESUMED 129:13
retail 12:16 152:13
RETAILERS 1:6
retrospective 97:16
reveal 64:18
reverse 91:11 92:11 153:5,21 154:11 176:4,5 182:21 225:18
review 5:8 54:14 89:16 117:8 178:14 188:19 246:3,13
reviewed 27:18 27:21 50:1 116:13,14

245:20
reviewer 142:20
reviewing 29:14
revisions 116:17
rhakim@maye... 3:9
Richard 195:20
Richmond 217:12,19
rifle 101:16
rights 136:22 137:16
right-hand 78:21 79:17 82:11 98:12 101:12 104:21 106:9 112:1,16 130:3 133:2 140:17 187:8
ring 203:22
risks 5:3 48:21 72:16 128:5 134:14 135:9 155:1 172:13 198:18 203:3 235:2
Rivara 218:22
robbery 174:11 205:8,11,13,22
Robert 89:18
role 44:19 45:1 46:5,11,14,21 47:1 215:6
rough 92:17
roughly 72:1 78:3
row 121:15
rule 27:14 182:20
run 138:2 158:14 169:9,18
Running 103:8
rural 152:20

186:11 236:22

**S**

S 4:1 10:1
safe 9:10 86:3,8 87:3 117:19 154:2 199:12 201:17 202:5,6 202:8,9,14,17 203:1 218:19 247:2,3,5,11 247:13,20 248:4
safely 111:14
safer 201:12,16 201:18,21 202:1,3
safety 189:14
sales 9:4,4 12:13 195:16,17,21 195:22 196:10 196:21
sample 17:1,5,6 17:17,20,21 18:2,9,15,17 19:6,19 58:3 63:4,13 74:3,16 92:2 98:20 99:4 99:7 123:21 124:14 125:3 144:14
sampling 16:8,9 16:14,20 17:11 148:3 151:4
samplings 17:8
satisfaction 153:20
satisfied 143:4
saw 215:2
saying 42:11,12 42:20 54:8 55:14 73:12,14 79:5,6 95:17

119:10 132:5 138:18 175:19 199:19 200:1 223:6
scale 106:10,12
Scandinavian 38:14 39:1
Schackner 89:18
scholarly 151:8
school 13:10,14 13:20,22 14:4,7 14:9 74:6,9,10 103:17,22
science 13:10 28:7,11 142:16 173:11
Sciences 28:13 28:15
scientific 27:17 28:7 37:15 75:8 75:11 116:14 142:5,19 143:5
scientifically 44:3 116:22 117:10 143:9
scientist 53:7 142:15
scientists 52:20 181:20 237:20
scope 36:10 46:8 90:21 212:12 212:21 215:19 216:13 217:4 218:8
Sc.D 1:18 4:4 11:10 129:6
SD 120:20
second 30:12 50:20 55:14 69:16 70:10 74:1 75:3 80:9 83:19 91:22 97:14 99:9,20

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

276

| | | | | |
|---|---|---|---|---|
| 104:21 112:17 | 232:3,5,13 | 83:6 166:18 | **sibling** 104:18 | 30:11 32:13 |
| 113:16 119:5 | 244:3 | 168:2,4 181:19 | **side** 41:18 84:19 | 43:18 46:12 |
| 125:22 139:13 | **self-inflicted** 5:9 | 209:9 248:13 | 128:1 | 48:13 50:11 |
| 140:6 144:4,5 | 97:10 98:19 | 251:6 | **sides** 172:18 | 53:19 57:5 62:9 |
| 145:2 152:17 | **self-protection** | **seven** 72:15 | **Signature** 250:10 | 76:11 82:3 |
| 155:15 163:9 | 232:15 243:15 | 120:11 169:12 | **significance** 24:1 | 89:11 97:6 |
| 163:11 165:7 | 244:13 | 169:19 | 24:6,16 25:14 | 100:20 102:17 |
| 173:13 177:4 | **self-reliance** | **sex** 219:19,21 | 25:16 26:8,10 | 106:1 115:9,21 |
| 177:16 187:8 | 41:11 | 229:6 | 79:13 80:1 | 120:5 122:14 |
| 193:18 219:11 | **self-reported** | **Shah** 101:4 | 124:16 125:16 | 135:18 140:17 |
| **seconds** 110:9 | 144:17 | **sheet** 250:6 | 125:18 148:10 | 143:16 144:3 |
| **section** 74:1 | **sense** 18:7 | **Shelby** 62:11 | 149:12 180:5,7 | 145:15 146:19 |
| 111:18 127:3 | 119:16 134:13 | **shooting** 31:8 | 199:6 220:5,21 | 150:6 153:17 |
| **see** 21:10 38:11 | 137:8 197:12 | 44:8 48:4 | **significant** 79:4 | 162:8 164:2 |
| 60:11 62:9 66:3 | 221:10 224:21 | 102:19 231:21 | 80:2,3 117:5 | 170:5 171:20 |
| 72:18 79:17 | 225:12 238:13 | 240:7,8,8,13 | 125:1,4,11,11 | 173:4 176:18 |
| 83:15 87:21 | **sensitive** 63:6 | 240:16 | 148:1,5 149:1 | 183:20 186:20 |
| 89:20 90:15 | 156:19 157:6 | **shootings** 36:5,8 | 149:20 169:2 | 192:20 195:6 |
| 91:8 97:19 | 223:16,21,22 | 49:1 202:12 | 173:14 174:7 | 203:17 205:1 |
| 115:20 116:3 | **sensitivity** | 247:22 248:6 | 180:11 199:8 | 207:21 221:19 |
| 120:16 121:14 | 136:22 137:3,8 | **shops** 12:16 | 209:6 210:10 | 244:19 |
| 132:16 134:9 | 223:7,19 | **short** 84:20 | 211:1,4 220:2 | **sit** 15:5,15 56:5 |
| 147:15 148:22 | **sentences** 65:7,7 | 120:18 | **similar** 58:4 | 123:15 |
| 158:8 162:16 | **sentiments** | **shotgun** 101:16 | 76:12 90:15 | **situation** 99:19 |
| 163:16 167:3,6 | 138:22 | **show** 45:12,16 | 132:9 155:17 | **six** 72:15 226:9 |
| 168:18 171:6 | **separate** 214:22 | 77:14,17 139:2 | 194:19 217:18 | **size** 123:21 125:3 |
| 174:2 181:1,2,7 | 250:6 | 147:19 148:12 | 243:5,6,9 | 215:7 220:18 |
| 201:13 246:8 | **September** 1:16 | 148:13 149:10 | **similarities** | 220:22 |
| 247:15,16,17 | 2:2 10:16 | 167:2 168:8 | 58:14 | **skepticism** |
| **seeing** 18:12 | **series** 97:17 | 184:21 216:4,6 | **similarly** 247:15 | 106:17 |
| 214:11 | 168:3 | 239:9 | **simple** 20:17 | **skip** 193:15 |
| **seek** 241:10 | **serious** 7:11 | **showed** 127:8 | **simply** 17:20 | **slight** 172:11 |
| **Seema** 101:4 | 112:19 114:11 | 173:14 | 25:5,7 26:4 | **slightly** 92:15 |
| **seen** 41:2,5 44:1 | 140:20 150:10 | **showing** 53:4 | 83:5 148:14 | 122:4 185:2 |
| 153:19 | 156:20 157:9 | 159:3 201:6 | 238:5 | **slow** 16:6 |
| **sees** 117:9 | 157:12 243:14 | 217:8 247:8 | **simultaneously** | **small** 19:22 90:1 |
| 247:16 | 243:17 244:4,4 | **shown** 49:13,15 | 194:5 | 98:20,21 99:2 |
| **select** 17:1 | 244:12 | 71:17 106:20 | **sin** 39:18 40:1,4 | 123:21 125:3 |
| **selected** 17:3 | **serves** 28:18 | 166:3 169:1 | **single** 14:3 52:3 | 184:9,12 |
| **selection** 16:22 | **SESSION** 4:8 | **shows** 77:2,8,19 | 117:3 199:14 | 187:14,18 |
| 23:6 63:13 | 129:1 | 104:13 118:10 | 241:21 | 188:2 221:3 |
| **self-defense** | **set** 48:9 49:5 | 121:1 174:7 | **sir** 14:15 16:10 | **smaller** 33:1 |
| 175:11,14,22 | 51:21 53:13 | 205:3 211:8 | 19:10 29:6,19 | 233:18 |

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

social 9:7 52:20
53:7 144:7
173:10 193:9
203:11 237:18
237:20
sociologists
185:9
sold 197:5,11
sole 73:8 163:16
163:20
solid 68:16
Solutions 110:7
somebody
142:17 223:7
somewhat 18:2
20:10 39:19
63:19 108:1
son 196:8
Sorenson 195:19
sorry 60:3 61:8
66:6 67:4 70:12
72:12,19 82:17
82:20 90:7 95:8
98:13 124:7,9
168:6 170:1
174:4 193:14
193:14 208:18
210:1,19,21
248:2
sort 14:22 20:9
20:16,20 28:17
35:13 68:8
75:15 93:21,22
98:2 164:12
179:16 181:18
199:17 215:22
216:1 217:17
219:14
sound 123:13
143:9 158:4
source 77:2
83:19 97:11
142:5 238:18

South 3:6 192:10
southern 174:12
192:11,18
205:6,10 210:5
210:14
southernness
205:10
speaking 47:3
59:7 233:17
speaks 162:22
189:10 199:2
special 77:7
specific 15:10
36:11,15 137:5
142:12 153:9
153:14 175:12
175:21 228:3
specifically 15:1
39:20 123:14
213:12 228:16
228:22 231:13
specifics 15:1
29:13 175:19
179:14
specify 179:6
249:1
speculate 34:20
43:8,11 86:16
238:14
speculation
35:14 43:9
86:12 88:9 91:1
130:11 164:10
216:13 218:9
234:2 236:18
239:17 241:14
speculative
39:19 225:2
spend 40:4
spent 84:6
sponsored
136:12
sports 102:19

spring 89:14
stable 161:4
standard 25:10
26:7,7,13
120:20 148:18
148:19 207:6
standardized
132:6
Starnes 214:22
220:7
start 125:22
168:10
starting 10:19
starts 45:21
49:12 72:14,16
76:2 144:6
state 6:12 9:10
11:16 57:12
85:10 97:18
110:17 111:1
136:7 141:18
173:6 187:12
198:1 204:11
207:13 209:17
209:21 218:1
218:19 219:14
241:4
stated 14:18
131:22
statement 51:7
54:21 55:20
63:9 81:7 82:16
83:10,22 90:7
91:2 112:22
147:12 152:22
153:10 156:22
157:2 175:4,17
180:17 184:11
statements 18:6
109:6 156:21
state's 140:20
219:14
State-Level 8:4

8:13 184:4
state-specific
220:8
stating 191:1
statistical 15:19
16:14 21:18
22:3,3 23:7,22
24:6,16 25:14
25:16 26:8,9
53:4,12 79:13
80:1 124:15
125:15 140:14
140:18 148:9
149:11 173:18
180:5,6 220:20
statistically 79:4
79:9 80:2,3
125:1,3 128:10
148:1,4 149:1
149:19 155:11
174:7 180:11
209:6 210:9
211:1,4 220:2,5
statistician 15:22
statistics 20:6
status 165:4
229:16
stealing 205:22
stenographer
10:13
stenographically
251:9
Stenotype 2:4
Stephanie 97:9
Steven 135:22
Stock 9:12
221:21
stolen 205:17
stood 215:7
storage 9:10
188:8,15 189:3
189:5 190:1,4
190:15,20

191:6 200:10
201:2,6,12,16
201:18 202:2
207:14 218:20
247:2,3,11,13
247:20 248:4
store 111:16
189:16
stored 101:17
111:14,21
207:10
storing 201:7
202:3
storm 63:15,18
Straight-up
223:1
strata 174:6
strategy 63:13
85:15,18
243:15
street 3:16
152:14
strength 41:14
stress 112:21
strike 132:17
149:5 228:6
strong 53:4 94:4
127:12
stronger 79:20
strongest 166:1
192:9
strongly 60:7
174:17 193:20
193:22
Structure 6:14
141:20
structures 61:19
students 25:19
studied 109:3
116:15 137:19
166:20 215:22
219:17
studying 18:19

Daniel W. Webster, Sc.D., MPH
Washington, D.C.
September 21, 2011

278

| | | | | |
|---|---|---|---|---|
| 19:1 48:16 49:7 | suffer 114:14 | support 52:18,19 | 185:18 | 63:22 76:13 |
| 98:4 197:20 | 243:14 244:12 | 53:22 114:18 | systemic 20:9 | 80:11 83:3 |
| 209:15 219:16 | sufficient 21:15 | 142:3 157:2 | 144:13 | 116:4 122:4 |
| subgroup 17:16 | suggest 42:22 | 190:19 235:19 | S.J 144:1 | 170:15 176:7 |
| subgroups | 107:17 125:18 | 245:21 247:10 | | 178:22 184:19 |
| 123:22 | 140:4 165:8,20 | supporting 51:16 | **T** | 216:2 |
| subject 12:8 | suggesting 161:7 | supports 21:12 | T 4:1,1 | talks 79:11 95:22 |
| 73:11,16,17 | 161:12 172:5 | 247:20 248:4 | table 59:16 68:1 | 111:18 |
| 133:9 155:7 | suggests 114:11 | supposed 111:14 | 79:10 98:14 | tall 61:18 |
| 157:20,21 | 194:3,7 | surprise 110:10 | 99:20 103:2 | tape 10:3 56:9,11 |
| subjects 64:3,20 | suicidal 7:4,11 | 127:11 150:22 | 112:1,3 118:8 | 56:16 100:5,10 |
| 64:22 65:16 | 41:14 43:13 | surprised 60:10 | 118:16 120:15 | 145:4,5,10 |
| 66:10 75:5,6 | 44:2 68:5,6 | surroundings | 121:15 147:6 | 183:8,13 226:3 |
| 76:4 84:5 97:16 | 81:16 84:16 | 80:21 | 148:22 157:13 | 226:8 |
| 101:14 155:14 | 93:2 106:5,9,10 | surveillance | 158:9 160:9 | target 231:21 |
| 155:18 | 106:15 107:2,9 | 238:21,22 | 166:22 168:7 | task 19:5 |
| subscription | 107:13,18,22 | survey 8:6 9:13 | 168:15,19,20 | tax 196:20 |
| 203:21 204:4,7 | 108:14 112:10 | 136:10 139:2 | 171:6 174:5 | teach 25:18 |
| 204:17 | 112:19 113:15 | 144:7,9 173:8 | 180:18,22 | team 5:8 63:16 |
| subsection | 113:18 114:5 | 201:6 221:22 | 209:22 | 89:16 |
| 124:10 | 115:19 116:2,8 | 222:5,15 | take 12:4,5 | technique 23:11 |
| subsequent | 117:1 119:6,11 | 224:16 237:19 | 52:13 56:10 | techniques 151:5 |
| 169:3 | 146:22 150:10 | 237:21 238:18 | 62:6,12 76:19 | teen 102:8,9 |
| subset 108:5 | 150:17,20 | 241:20,21 | 84:20 90:18 | 202:14 |
| substance 37:22 | suicidality 68:18 | 242:3,8,9 | 158:7 161:22 | teenagers |
| 38:3 39:6 | 77:10 119:4 | 243:20 248:14 | 183:6 202:6 | 102:11 |
| 127:10 128:4 | suicides 5:20 9:9 | surveys 225:6 | 204:15 234:21 | teens 109:6,14 |
| 140:22 149:14 | 32:8 37:14 48:3 | 242:18 | 235:2,16 | 109:16 |
| 165:10 166:6,9 | 48:22 49:14 | Susan 195:19 | 244:21 | telephone |
| substances | 55:17 60:19,21 | suspect 102:20 | taken 1:22 2:3 | 136:10 |
| 91:15 133:7 | 61:3 63:4 75:7 | 159:7 204:12 | 10:5 14:4,7 | tell 12:8 19:14 |
| 149:16 | 88:2 91:7 92:18 | suspended | 15:5,14 37:9 | 25:19 71:8 |
| substantial | 112:6 115:13 | 103:22 | 218:2 245:4 | 87:18 108:13 |
| 112:21 152:18 | 143:20 187:15 | swear 11:8 | takers 235:22 | 124:7 142:19 |
| substantially | 204:6,6 205:3,4 | sworn 1:20 11:12 | 236:2,8 | 157:14,18 |
| 67:20 71:21 | 208:3 213:2 | 129:8 251:7 | takes 14:17 | 198:11 199:5 |
| substation 54:19 | Suicide,a 6:6 | Symptoms 127:4 | talk 12:2 44:5 | 204:2 219:8 |
| substitution 55:2 | suicide-related | synonymous | 50:4 62:21 | telling 139:8 |
| 55:5 | 98:15 | 20:12 | 142:11 209:11 | tells 24:7 |
| successful 44:7 | Suite 3:16 | synthesize 227:8 | talked 39:8 | ten 19:18 110:8 |
| 69:2 | summarize 31:5 | system 238:21 | 57:18 228:10 | tend 26:4 88:19 |
| successive 168:9 | summary 4:15 | 238:22 | talking 36:11 | 225:5 |
| sued 12:11 | 50:12,21 | systematic | 56:6 62:10,20 | tended 79:20 |

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

279

| | | | | |
|---|---|---|---|---|
| tends 196:2 | 23:3 27:20 | 154:8 157:7 | 250:7 251:9 | 157:22 158:4 |
| 221:9 224:11 | 51:16 53:13 | threatened | Trauma 136:2 | 158:12 161:16 |
| Tennessee 57:12 | 81:3 | 167:17,20 | 187:3 | 161:19 164:16 |
| 62:11 | thereof 12:16 | threatens 93:22 | treatment 52:11 | 211:11 217:17 |
| tens 18:22 | thing 17:3 25:11 | threats 16:17,19 | 145:19,22 | 224:5 227:19 |
| term 16:7 18:9 | 39:6 54:8 71:13 | three 55:14 | 241:1,3,11 | 228:5 238:7 |
| 20:6,12,15,22 | 73:15 75:15 | 100:11 145:6 | trend 79:21 | 240:1 |
| 24:15 57:19 | 106:21 117:3 | 152:18 187:17 | 177:8 | trying 18:21 |
| 99:22 109:22 | 148:11 149:18 | 208:17 | trends 6:14 | 20:18 23:12 |
| 118:12 135:3 | 167:3 199:15 | threshold 148:15 | 141:20 219:16 | 42:18 43:17 |
| 176:5 184:12 | things 18:20 21:2 | throw 61:13 | 219:21 | 82:17 125:14 |
| 235:6 | 21:11,22 34:6 | thumb 53:20 | trial 51:21 | 175:18 228:10 |
| terms 27:9 49:9 | 39:4 42:9 58:12 | 188:20 | tried 66:12 69:1 | 230:13 231:12 |
| 59:11 92:10 | 68:15 86:2,20 | tied 159:8 | 75:18 214:15 | 239:21 |
| 93:14 101:21 | 95:3 102:20 | ties 155:21 | trigger 110:8,10 | turning 50:20 |
| 134:4 149:6,14 | 159:2 161:2,5 | tightly 60:5 | 110:11 233:11 | 64:17 112:16 |
| 179:17 184:10 | 174:22 184:22 | times 17:10 86:9 | 236:16 | twice 40:9 |
| 192:4 212:15 | 185:2,3,9,11 | 89:22 | true 18:6 22:7 | two 20:19 22:1 |
| 214:11 227:1 | 185:20 188:3,5 | time-variant | 24:5 38:14 | 36:11 56:17 |
| 230:12 243:17 | 194:19,19 | 209:17 | 40:19,22 41:3,6 | 57:11,16 58:8 |
| test 125:19 200:5 | 199:9,13 | tiny 91:9 | 41:10,14 44:6 | 65:7 70:3 87:3 |
| 200:18 | 209:16 219:19 | today 12:1,3 | 54:12 68:17 | 100:6 103:8,13 |
| testified 11:12 | 225:9 | 57:18 169:18 | 71:4 81:4 92:11 | 126:18,22 |
| 12:9 33:18 | thinking 19:15 | 194:14 241:20 | 136:17,20 | 174:5 177:11 |
| 129:9 | 107:20 217:15 | Today's 10:9,16 | 137:15,19 | 208:17 220:9 |
| testify 131:10,20 | 217:16 | tomorrow 33:14 | 149:6 151:8,9 | 220:13,21 |
| testifying 129:7 | third 22:5 31:2 | tons 159:3 | 155:20 160:11 | two-thirds 85:11 |
| testimony 12:14 | 78:22 89:19 | top 19:12 64:14 | 160:15,17 | 127:5 |
| 91:18 109:9 | 153:5 155:15 | 72:4 98:14 | 215:13 220:1 | TYLER 1:7 |
| 154:17 161:11 | 158:6 193:17 | 114:22 118:9 | 227:11,20 | type 51:20 88:3 |
| 186:7 188:22 | Thomas 218:22 | 133:2 | 236:15,21 | 168:11 171:18 |
| 199:21 250:4 | thorough 179:12 | topic 88:10 117:7 | 241:1,5 243:12 | 184:18 209:14 |
| tests 79:21 110:7 | thought 68:15 | 223:22 | 244:11 250:3 | types 58:12 93:9 |
| thank 18:8 | 116:21 | topics 88:14 | 251:10 | 106:19 154:20 |
| 128:15 244:19 | thoughts 7:4,11 | total 98:17 | truly 106:18 | 168:12 224:2 |
| 246:5 248:12 | 93:2 146:22 | 124:13 204:6 | 108:10 | typically 20:22 |
| theft 190:18 | 150:10,17,20 | 205:3 | trust 34:22 | 21:10 24:6,18 |
| Theoretically | thousand 32:19 | totality 37:10 | 139:18 | 25:4,21 27:4 |
| 27:19 | 39:10 | 117:4 | try 12:1 18:5 | 28:8 55:5 85:14 |
| theorized 41:13 | thousands 19:1 | tracking 207:12 | 21:18,21 22:20 | 139:3 196:17 |
| 137:20 209:3 | 49:7 | traditions 39:17 | 70:8 71:5 81:16 | typo 29:15 |
| 211:7 | threat 131:7 | transcribed 2:5 | 94:19 116:22 | |
| theory 21:11 | 140:6 153:9,14 | transcript 250:3 | 126:16 154:11 | **U** |

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

280

| | | | | |
|---|---|---|---|---|
| **Uh-huh** 30:16 | 130:6 170:8 | 191:21 | **vacate** 244:22 | 27:5 220:20 |
| **Um** 43:7 | 172:3 187:1,16 | **urbanization** | **vague** 59:5 | 221:3,5,10 |
| **Um-hm** 25:1 | 189:18 191:19 | 174:8 187:13 | 131:19 142:9 | 233:15 |
| 45:15 182:12 | 201:14 215:1 | 187:18 | 191:7 202:19 | **variable** 20:7,8 |
| 246:21 | 220:11 221:2 | **use** 20:15,22 | 215:20 217:5 | 21:7,8 22:6,11 |
| **unadjusted** | 235:13,17 | 21:5 24:15,19 | 218:9 228:1 | 22:15,16,17 |
| 173:14 174:4 | 236:12 247:22 | 24:20 25:15 | **vagueness** 55:22 | 23:1,2,12,17 |
| **uncertain** 179:17 | 248:6 | 31:17,17 52:11 | 77:5 85:18 | 23:18 26:14 |
| **uncertainties** | **unique** 219:14 | 59:22 61:20,22 | 93:14 95:12 | 27:6,7 71:12 |
| 165:16 | **uniquely** 64:8 | 65:8,10,22 | 133:12 135:3 | 76:14 103:10 |
| **uncertainty** 52:2 | **uniqueness** | 81:13 84:6,6 | 142:8 146:3 | 103:15,19 |
| **uncontrolled** | 96:20 | 91:15 96:6 | 147:10 156:2 | 104:2,6,10 |
| 81:6,8 | **unit** 26:16 148:20 | 102:12 109:21 | 171:15 182:11 | 158:21 168:21 |
| **Undefined** | **United** 1:1 6:11 | 134:21 149:14 | 194:15 196:11 | 170:13,18 |
| 243:17 | 6:17 17:20 | 155:4 159:1 | 197:8 202:7 | 179:7 247:3,4 |
| **underreporting** | 18:15 19:4 | 164:5 165:13 | 204:19 210:12 | **variables** 20:19 |
| 225:13 | 31:19 39:14 | 179:4 185:19 | 211:16 220:4 | 22:1,6,8,14 |
| **understand** 33:9 | 44:12,20 45:3,9 | 185:22 196:17 | 222:10 223:19 | 23:14,20 47:13 |
| 42:17,20 96:19 | 74:3,17 92:3,14 | 204:3 206:9 | 225:7 227:1,14 | 53:3,4 60:5 |
| 132:2 133:17 | 95:19 143:20 | 225:9,13 235:6 | 228:14 230:12 | 67:18 68:2,2 |
| 137:12 | 144:14 237:3 | 235:14 241:22 | 231:10 233:7 | 86:21 113:19 |
| **understandably** | 238:3,9 240:3 | 242:2,19 | 233:22 235:1 | 136:6 144:5 |
| 241:10 | **univariate** 64:17 | 243:21 | 236:1,17 | 155:3 158:11 |
| **understanding** | 64:18 157:14 | **uses** 69:19 | 239:16 240:6 | 158:13,19 |
| 28:12 43:19 | **University** 13:2 | 189:13 203:20 | 242:1,21 | 159:8 166:20 |
| 53:14 92:12 | 13:9,10 144:11 | 203:20 235:10 | 244:15 | 167:2 168:8,19 |
| 94:3 95:2 96:13 | **university-based** | 238:4 242:20 | **valid** 68:17 | 169:1,7,12,15 |
| 110:16 111:4 | 144:22 | 248:15,22 | 106:15 112:22 | 169:18 179:5 |
| 126:4 131:10 | **unloaded** 189:17 | **utilization** 66:14 | 116:22 142:16 | 185:6 186:10 |
| 139:16 163:18 | 201:7 | 81:11 185:13 | 179:9 194:22 | 186:11 197:6 |
| 163:22 178:6 | **unlock** 30:19 | 186:3 | 204:16,20 | 197:12 205:8 |
| **undo** 110:9,11 | **unlocked** 85:14 | **utilize** 15:19 | **validate** 99:11 | 209:10 219:18 |
| **unemployed** | 101:17 | 204:17 243:19 | **validity** 16:18,20 | **variation** 23:13 |
| 141:1 166:14 | **unmeasured** | **utilized** 151:5 | 23:7 27:17 | 23:16 24:5 |
| 166:16 | 188:5 | **utilizes** 238:10 | 140:7 | 148:3,20 192:9 |
| **unemployment** | **unsecured** 111:9 | **utilizing** 243:13 | **valuable** 25:22 | 192:16 221:1,8 |
| 166:1,10 174:9 | **unsound** 117:10 | **U.S** 7:12,18 8:5 | **value** 24:7,11,16 | **variations** 192:4 |
| 185:11 | **unthinkingly** | 8:10 9:12 10:6 | 25:3,7,17 53:5 | 192:8 |
| **unfortunately** | 119:16 | 150:11 170:7 | 79:13 121:19 | **varied** 222:5 |
| 185:14 | **unwanted** 82:13 | 173:7 176:21 | 148:13 210:14 | **varies** 26:15 |
| **unintentional** 5:9 | **unwilling** 136:18 | 221:21 246:10 | **values** 25:5 | 241:4 |
| 7:19 8:16,19 | **urban** 47:4 58:15 | | 180:7 | **variety** 28:8 |
| 48:4 49:1 97:10 | 141:2 152:18 | **V** | **variability** 26:16 | 166:15 225:9 |

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

281

various 175:11
177:7
vary 20:20 48:10
63:8 209:15
vast 90:1 91:9
185:15
verify 156:20
Vernick 208:3
versus 10:5
26:22 74:5,6,7
75:7 96:7,8,18
96:20 119:7,8
126:20 157:16
164:13 236:5
veteran 229:22
victim 40:19
152:3 230:21
240:22 241:3
244:1
victimization 8:5
172:18 173:7
173:16,22
180:1,13
238:18 241:20
242:4 243:19
victimize 226:1
victimized
166:17 176:9
victims 30:2
106:5 121:12
121:17 124:10
140:8 155:17
162:18 167:2
227:11,20
228:6 239:3,8
239:13 241:9
243:12,14
244:12
victim's 60:20
163:13
video 10:4,13,17
56:12,13,17,18
85:2,5 100:6,7

100:11,12
128:18 129:4
145:6,7,11,12
183:9,10,14,15
226:4,5,9,10
245:3,6 249:6,7
Videographer
3:22 10:3 11:7
56:11,16 85:1,4
100:5,10
128:17 129:3
145:5,10 183:8
183:13 226:3,8
245:2,5 249:5
Videotaped 1:17
view 93:8 113:17
Vince 110:3,4
violence 13:19
22:19 50:14
51:6 80:20 84:5
84:9 134:4
159:5 167:1
192:5 198:12
200:7,7,11,20
200:21 201:3
205:9,14,15
217:20 218:7
246:17
violent 80:22
133:5 167:4,10
167:15 187:12
193:19,22
215:10
virtually 55:3
vs 1:9

_____
W
_____
W 1:17 4:3 11:10
129:6
Wacker 3:6
Wait 178:19
210:18
want 12:4 16:12

17:15 18:22
19:11,17 20:1,2
21:10 26:4,5
36:14 43:16
49:6 58:4 61:20
61:22 62:13,17
76:17 87:16
99:7 108:13
125:6 127:17
142:11,12
188:19,21
189:21 196:18
199:12 204:15
216:11,14
221:12 226:1
227:16 228:3
232:7,16
238:14 246:5
wanted 17:18
18:14 19:3
62:18 245:19
wanting 108:10
wants 42:3 58:2
warranty 152:2
Washington 1:15
2:2,12 10:11
57:12 97:18
98:5
wasn't 27:21
167:19 211:4
219:12
way 12:20 14:17
17:1,2 19:19
20:10 44:3
54:12 70:3 80:5
127:5 131:22
144:20 153:12
154:11 156:20
157:10 158:17
165:14 168:12
178:11 196:15
218:6 222:13
222:20,21

234:16 244:4
251:13
ways 105:12
154:18 171:3
244:17
weaker 155:21
Weakly 229:11
wealth 51:1
123:7
weapons 98:18
Wednesday 1:16
2:2
week 119:6,7,11
weeks 109:20
weight 25:7
weighting 18:5
weights 17:11
welcome 11:15
129:15
well-respected
83:13
went 132:13
weren't 69:2
244:10
we'll 120:16
128:16 137:13
we're 46:8 62:20
73:14 76:13
85:1,4 92:7
127:19 128:17
129:3 207:16
226:5 245:2,5
we've 37:8 39:7
50:11 127:16
164:17 181:19
whatsoever
54:11 88:13
white 92:2
186:11
whites 44:11,15
96:7
wholly 223:15
Wiebe 82:9

83:12 170:9
Wiebe's 29:21
willingness
106:21 234:21
235:2,16
Wintemute
129:20 135:6
within-named
251:5
witness's 154:17
199:21
woman 167:11
167:17,19
women 8:20
45:14 149:7,15
162:19,22
163:4,19
164:13 173:16
191:20 192:2
224:11 231:18
231:21 232:1,5
232:13,15
wondering
142:15 223:8
Woods 3:4 11:3
11:3 84:20
word 30:15 137:7
165:13
work 25:16 182:9
182:14,17
204:2
world 41:7 89:1
world's 136:10
worry 157:5
Worseck 3:12
11:5 117:19
wouldn't 46:19
54:5 138:15
142:15 143:7
wound 239:2,13
240:22 241:3,9
wounded 238:20
240:3

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

282

| | | | | |
|---|---|---|---|---|
| **writ** 37:3 | 87:11 89:15,21 | **10** 5:18 25:3 | **122** 6:6 | 213:3 230:3 |
| **written** 14:13,16 | 90:2,18 91:13 | 115:4,6 177:15 | **1230** 3:16 | **183** 8:14 |
| **wrong** 99:18 | 93:22 95:15 | 180:8 210:15 | **129** 4:8 6:8 | **186** 8:17 |
| 152:9 | 96:3 98:6 | 210:18,19 | **13** 6:5 30:8 98:16 | **189** 180:18 |
| **wrote** 41:20 | 188:19 195:17 | **10th** 245:22 | 122:10,11 | **19** 7:8 150:1,3 |
| 62:13 | 196:1,3 208:2 | **10,000** 20:1 | **135** 6:11 | **19.2** 65:8 |
| | 210:4 211:20 | **10-cv-04184** 1:9 | **14** 6:7 129:10,17 | **191** 8:20 |
| ——————— | 212:2,4 | 10:8 | 210:4 212:1 | **192** 197:1 |
| **Y** | **youths** 92:1 96:8 | **10.7** 78:12 | **14-year-olds** | **193** 8:22 |
| **yeah** 33:20 37:11 | **youth-focused** | **10/14/2014** | 181:5 | **195** 9:6 |
| 63:19 69:3,6 | 208:2 211:20 | 251:20 | **14.6** 167:20 | **1951** 193:7 |
| 77:9 83:14 | | **10:04** 56:13 | **141** 6:14 | 194:10,12 |
| 87:20 88:11 | ——————— | **10:16** 56:18 | **143** 6:18 | 195:1 |
| 98:2 99:1 | **Z** | **10:59** 85:2 | **146** 7:7 | **1951-1986** 8:22 |
| 108:14 110:5 | **Zeolo** 208:4 | **100** 5:15 | **15** 6:9 135:14,15 | **196** 118:9 |
| 112:5,8 123:6 | **zero** 119:8 180:2 | **1030** 136:4 | 180:2,11 181:4 | **197** 119:3 |
| 124:8 131:15 | **zip** 204:11,12 | 140:14,16 | **150** 7:12 | **1972** 195:17 |
| 158:8 159:2 | | **1033** 139:11 | **151** 7:14 | **1972-1993** 9:6 |
| 168:16 172:20 | ——————— | **105** 5:17 | **1523** 2:1,11 | **1979** 219:5 |
| 182:17 189:11 | **$** | **1067** 127:2 | 10:10 | **1981** 143:21 |
| 211:9 215:21 | **$15,000** 74:8 | **1068** 124:5 | **1585** 130:2 | **1981-2002** 6:18 |
| 228:2 235:3 | | **1069** 123:20 | **1586** 130:22 | **1984** 74:2,4 |
| 237:6 240:1,1 | ——————— | **1086** 155:13 | **1587** 133:1 | **1986** 193:8 |
| 241:15 | **0** | 193:13 | **159** 101:9 104:13 | 194:10,13 |
| **year** 72:17 89:21 | **003** 121:19 | **1088** 156:17 | **16** 6:12 141:12 | 195:1 |
| 130:7 207:3 | **01** 210:20,21 | **1089** 151:22 | 141:13 | **1988** 106:7 |
| 238:2,9 242:20 | **05** 24:11,18,20 | 193:15,16 | **161** 104:20 | 176:22 |
| 248:15 | 25:10,13,17,20 | **1090** 163:8 | **162** 7:17 55:11 | **1988-1997** 8:11 |
| **years** 5:7 78:12 | 26:2,3 79:14 | **1092** 165:6 | **1690** 184:8 | **1989** 179:22 |
| 87:12 89:15 | 80:4 149:2 | **1093** 167:1 | **17** 6:15 141:22 | **1991** 115:15 |
| 103:13 145:19 | **06** 25:21 26:2,2 | **1095** 168:8,15 | 143:13 210:4 | 193:9 |
| 146:1 180:3 | 79:22 | **11** 4:5 5:21 74:7 | 212:1 213:18 | **1992** 181:12 |
| 210:4 219:5 | | 117:15,17 | 222:3 | **1993** 120:10 |
| **year-to-year** | ——————— | **11-city** 162:17 | **170** 7:20 246:10 | 122:19 151:21 |
| 220:19 | **1** | **11:04** 85:5 | **170,000** 246:10 | 195:18 246:19 |
| **Yep** 59:1 | **1** 4:12 24:20 | **11:26** 100:7 | **173** 8:8 | **1994** 118:7 138:1 |
| **yesterday** 29:15 | 25:13 29:2,3,7 | **11:29** 100:12 | **176** 8:11 | 219:6 |
| **yielded** 222:20 | 90:2 98:14 | **115** 5:20 | **178** 62:9 63:11 | **1997** 176:22 |
| 222:21 | 112:2,4 118:16 | **117** 5:22 | **179** 62:5 144:4 | 219:2 |
| **York** 12:12 | 147:6 169:3 | **12** 6:3 119:21 | **18** 7:3 110:18 | **1999** 97:13 |
| **young** 45:18 46:2 | 171:7 180:19 | 120:1 | 111:10 146:14 | 129:22 |
| 88:17 213:2 | 245:10 | **12:10** 128:18,19 | 146:16 174:10 | |
| **youth** 5:6 9:5,8,9 | **1,133** 74:3 | **120** 6:4 | 208:19,20 | ——————— |
| 13:19 55:18 | **1.8** 112:9 | | | **2** |
| | **1:26** 129:2,4 | | | |
| | **1:27** 128:21 | | | |
| | **1:48** 145:7 | | | |
| | **1:49** 145:12 | | | |

Daniel W. Webster, Sc.D., MPH

Washington, D.C.

September 21, 2011

283

| | | | | |
|---|---|---|---|---|
| **2** 4:15 29:11 31:1<br>50:7,8 62:4<br>79:10 99:20<br>112:2,4 118:8<br>167:1 169:4<br>174:5 181:1<br>209:22 245:17<br>**2.0** 80:15<br>**2.5** 125:2<br>**2:45** 183:10<br>**2:56** 183:15<br>**20** 7:13 24:12<br>63:5 145:19<br>146:1 151:11<br>151:13 213:3<br>**20s** 45:20 46:2<br>**200,000** 136:11<br>**2000** 36:6 101:3<br>139:15,21<br>**2001** 136:9<br>139:15 173:8<br>195:19<br>**2001-2003** 8:8<br>**2002** 139:16,21<br>143:21 150:13<br>177:3 187:6<br>191:21<br>**2003** 162:15<br>170:10 173:9<br>**20036** 2:12 10:11<br>**2004** 9:13 89:14<br>141:21 208:5<br>221:22<br>**2005** 32:19 39:9<br>39:10 46:5,18<br>47:1<br>**2006** 203:14<br>**2007** 136:3<br>173:11 222:2<br>**2009** 147:5 184:6<br>**2010** 35:6,21<br>37:3<br>**2011** 1:16 2:3 | **10:16** 245:22<br>246:1 250:15<br>**202** 2:13<br>**203** 9:7<br>**21** 1:16 2:3 7:15<br>127:6 162:3,5<br>170:19<br>**21st** 10:16<br>**210** 9:9<br>**218** 9:11<br>**22** 7:18 112:6<br>127:6 170:1,2<br>**220-9600** 2:13<br>**221** 9:13<br>**23** 8:4 172:22<br>173:1<br>**24** 8:9 101:13<br>176:14,15<br>**24-year-olds**<br>181:4<br>**245** 4:6<br>**25** 8:12 89:22<br>103:4 181:1<br>183:17,21<br>**25.4** 75:7<br>**26** 8:15 186:16<br>186:17<br>**27** 8:18 191:12<br>191:13<br>**273** 187:7<br>**28** 8:21 105:2<br>169:22 192:22<br>193:1<br>**285-86** 237:14<br>**29** 4:14 9:4 30:1<br>195:10,11<br>**29th** 246:1<br>**2992** 115:16<br>_____<br>**3**<br>**3** 4:16 48:17 57:1<br>57:2 74:7 103:2<br>112:1,3 157:14 | 168:7,15,19<br>169:4 170:18<br>**3.12** 65:9<br>**3:39** 226:5<br>**30** 3:16 9:7 89:22<br>99:5 203:5,6<br>**300** 237:3,7<br>**31** 9:8 104:14<br>207:17,18<br>**312** 3:8,18<br>**314** 150:14<br>**32** 9:10 218:13<br>218:14<br>**33** 9:12 98:20<br>221:13,16<br>**33.7** 75:6<br>**34** 121:22 174:10<br>180:2,11 181:1<br>**35** 167:14<br>**35-36** 237:21<br>**38** 91:20 92:21<br>118:19<br>**380** 203:15,16<br>**39** 95:21<br>_____<br>**4**<br>**4** 4:18 59:16 68:1<br>69:13 70:15,16<br>72:12 73:20<br>78:6 158:9<br>160:9<br>**4.5** 147:15<br>**4.6** 121:3 122:3<br>**4.7** 80:16<br>**4.8** 59:17<br>**4:12** 226:10<br>**4:34** 245:3<br>**4:49** 245:6<br>**4:53** 249:7,8<br>**44** 96:7<br>**46** 98:16<br>**469** 64:16<br>**47** 189:13 | **470** 59:15 65:13<br>**498** 120:16<br>_____<br>**5**<br>**5** 5:3 81:20,22<br>82:4 85:8 87:21<br>120:15 121:15<br>148:5 181:4<br>**5-14-Year-Olds**<br>8:17 187:2<br>**5.5** 147:16<br>**50** 4:15 6:10 72:5<br>135:21 136:13<br>**51** 93:2<br>**52** 74:5 118:18<br>**53** 96:8<br>**55** 74:5 167:9<br>**57** 4:17 117:20<br>142:2<br>**583** 106:8<br>**584** 111:22<br>**586** 112:15<br>**59** 98:17<br>**59.3** 109:1,1,14<br>**599** 209:22<br>_____<br>**6**<br>**6** 5:6 50:19 89:7<br>89:8 148:5<br>**6.4** 65:16<br>**6.6** 32:18,18 39:9<br>**60** 96:6<br>**60s** 45:21<br>**60606-2580** 3:17<br>**60606-4637** 3:7<br>**62** 24:21<br>**64** 103:3<br>**659** 173:13<br>**662** 175:1<br>_____<br>**7**<br>**7** 5:9 62:6,12,19<br>62:22 63:2 97:2<br>97:3 | **70** 4:20 74:6<br>**70s** 144:12<br>**70-75** 92:19<br>**71** 3:6<br>**712** 170:12<br>**713** 171:6<br>**73** 96:5 167:18<br>**744-7129** 3:18<br>**75** 92:22 94:1<br>**76** 96:8<br>**77** 96:7 119:8,10<br>119:14<br>**777** 82:10<br>**78** 62:14<br>**780** 83:15<br>**782-0600** 3:8<br>_____<br>**8**<br>**8** 5:12 29:18<br>100:15,17<br>**81** 5:5<br>**83.5** 65:15<br>**84** 92:2,2,13<br>**876** 97:15<br>**877** 99:8<br>**89** 5:8 90:1<br>_____<br>**9**<br>**9** 5:16 80:16<br>105:18,20<br>177:15 246:6<br>**9:04** 10:17<br>**9:06** 2:2<br>**91** 74:6<br>**95** 79:11 80:15<br>118:11<br>**97** 5:11<br>**974** 73:22<br>**975** 75:3 78:20<br>**976** 79:11<br>**977** 76:1 80:8 |