# Exhibit F

COPY

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS ASSOCIATION OF FIREARMS)
RETAILERS, KENNETH PACHOLSKI, )
KATHRYN TYLER, and MICHAEL HALL,)
    Plaintiffs, )
    -vs- ) No. 10 CV 04184
THE CITY OF CHICAGO and )
RICHARD M. DALEY, Mayor )
of the City of Chicago, )
    Defendants. )

The deposition of EUGENE WILLIAMS called
for examination pursuant to Notice and the Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before Jana E. Cox, a notary public within
and for the County of Cook and State of Illinois,
at 33 North Dearborn Street, Chicago, Illinois, on
the 29th day of April, 2011, at the hour of 9:03 a.m.

Reported By: Jana E. Cox, CSR
License No.: 084-004399

1

---

INDEX

| | WITNESS | EXAMINATION |
|---|---|---|
| 2 | | |
| 3 | EUGENE WILLIAMS | |
| 4 | By Mr. Patterson | 4, 58 |
| 5 | By Mr. Worseck | 44 |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | EXHIBITS | |
| 13 | NUMBER | MARKED FOR ID |
| 14 | Williams Deposition Exhibit | |
| 15 | No. 1 | 30 |

3

---

1 APPEARANCES:
2   COOPER & KIRK
3   BY: MR. PETER A. PATTERSON
4   1523 New Hampshire Avenue Northwest
5   Washington, D.C. 20036
6   (202) 220-9600
7     Representing the Plaintiffs;
8
9   ASSISTANT CORPORATION COUNSEL
10   DEPARTMENT OF LAW
11   BY: MR. ANDREW WORSECK
12   30 North LaSalle Street, Suite 1230
13   Chicago, Illinois 60602
14   (312) 744-7129
15     Representing the Defendants.
16
17
18
19
20
21
22
23
24

2

---

1         (Witness sworn.)
2         EUGENE WILLIAMS,
3 called as a witness herein, having been first duly
4 sworn, was examined and testified as follows:
5         EXAMINATION
6 BY MR. PATTERSON:
7   Q. Would you please state your name for the
8 record.
9   A. Eugene Williams.
10   Q. Chief Williams, have you been deposed
11 before?
12   A. Yes, I have.
13   Q. How many times have you been deposed?
14   A. Several.
15   Q. And do you recall what the cases were in
16 which you've been deposed?
17   A. No. They were quite some time ago.
18   Q. Were they in your capacity as a police
19 officer or in some other capacity?
20   A. Police officer.
21   Q. And since you have been deposed, you're
22 probably familiar, but let's go over a few ground
23 rules to start. There aren't many. First I will
24 ask questions, and I just ask that you wait until I

4

1  finish to answer. And I'll try to wait until you
2  finish answering to ask another one for benefit of
3  the court reporter. Also, you know, verbal answers
4  also for benefit of the court reporter are
5  necessary. And if you'd like a break at any time,
6  just let me know. I just request that if there is
7  a question pending, that you answer that question,
8  and then we can take a break after that.
9      A.  Understood.
10     Q.  I want to start with a little of your
11 background. Could you just tell me your
12 educational background I guess beginning with high
13 school and then continuing on through any other
14 education that you've completed?
15     A.  I went to South Shore High School in
16 Chicago, graduated there and went on to -- started
17 at Roosevelt University at that time in Chicago and
18 ultimately going to Aurora University where I
19 graduated with a BA in economic theory.
20     Q.  What year did you graduate from Aurora?
21     A.  1976.
22     Q.  Do you have any graduate education?
23     A.  No.
24     Q.  What employment have you held following

5

1  your graduation from Aurora?
2      MR. WORSECK: AS best as you can recall.
3  BY MR. PATTERSON:
4      Q.  As best as you can recall, yes.
5      A.  I worked in finance for at that time
6  Household Finance and shortly after that I joined
7  the police department.
8      Q.  What positions have you held in the police
9  department?
10     A.  I came out of the academy, and I joined
11 academy in 1980. Early in 1981 I went to the
12 Fourth District as a beat officer. A year or so
13 later I joined the tack team in the Fourth
14 District, stayed there to roughly 19 -- I'd say
15 '89, '90. I went to Area Two Detectives and worked
16 as a homicide detective there. I was promoted '91
17 or so to the rank of sergeant. As a sergeant, I
18 came back to the Fourth District working in
19 uniform. Then later on a tack team around about
20 '95 or '96. I went to the narcotics section and
21 worked as a sergeant in narcotics, stayed there
22 until I was promoted in 1998. And then I went to
23 the Third District as watch commander, watch
24 lieutenant commander. Stayed there a brief period

6

1  and then went to the 15th District as a watch
2  commander, stayed there for a while. And in 1999 I
3  went back to the narcotics section where I was a
4  lieutenant in narcotics. In 2000 I was promoted to
5  the commander of the narcotic section. Very end of
6  2001, just about January of 2002 I went to the
7  15th District as a commander of the 15th District.
8  And I stayed there until 2001 to roughly June --
9  May or June 2005 where I was appointed -- promoted
10 to assistant deputy superintendent. And in 2007,
11 roughly August, I was appointed -- not promoted,
12 but appointed interim chief of the organized crime
13 division. And we were in a period of transition
14 between superintendents. I had a position briefly
15 as interim assistant deputy superintendent for the
16 CAPS project office. And in March of 2008 I was
17 appointed to deputy chief of patrol in Area Two.
18 And November of 2008 I was promoted to chief of
19 patrol.
20     Q.  Okay. And what does the profession of
21 chief of patrol entail?
22     A.  Well, I supervise 25 district commanders
23 that cover the entire city. I supervise the
24 special functions group which has another -- the 25

7

1  districts are reporting to 6 deputy chiefs, and all
2  of them report to me. Then I also supervise a
3  special function group which has a deputy chief and
4  3 commanders, and they report to me as well. So
5  roughly total of 28 commanders and about 7 deputy
6  chiefs.
7      Q.  Then are there people who, in turn, report
8  to those commanders?
9      A.  Right. Officers, sergeants, lieutenants,
10 captains, and so forth.
11     Q.  How many officers would you say all
12 together either directly or indirectly underneath
13 your supervision?
14     A.  Over 7,000.
15     Q.  And what are the responsibilities of the
16 officers that you supervise?
17     MR. WORSECK: Objection, vague.
18 BY MR. PATTERSON:
19     Q.  You can answer if you understand the
20 question.
21     A.  Their job is to go out and to respond to
22 calls. Our primary goal is, you know, protection
23 of life and property. They respond to call on a
24 regular basis, take calls, answer reports, respond

8

2  (Pages 5 to 8)

**Page 9**

1  to calls for assistance.
2  Q.  And what role do you have in developing
3  policies and procedures for responding to calls in
4  the field?
5  MR. WORSECK:  Objection, vague.
6  THE WITNESS:  I'm not sure I understand.
7  BY MR. PATTERSON:
8  Q.  Do the officers you supervise have
9  policies and procedures that they follow when they
10  are, as you put it, responding to calls?
11  A.  Yes, they do.
12  Q.  And how are those policies and procedures
13  devised?
14  A.  There's several different ways that they
15  are devised and several different units within the
16  department that, you know, put together the
17  procedures.  One of them is the training academy,
18  of course.
19  Q.  And do you play any role in devising those
20  policies and procedures?
21  MR. WORSECK:  Objection vague, overbroad.
22  THE WITNESS:  No, I don't.
23  BY MR. PATTERSON:
24  Q.  On a day-to-day basis, what type of

**Page 10**

1  activities do you perform in your role as chief of
2  patrol?
3  A.  Primarily the deployment of resources to
4  troubled location or hot spots throughout the city,
5  making sure there is adequate resources brought to
6  bear on those locations, addressing any concerns of
7  my deputy chiefs or commanders so that they can
8  address the concerns of their subordinates.
9  Q.  And what types of things do you consider
10  when determining how to deploy resources?
11  A.  Primarily crime trends, crime stats,
12  what's occurred the night before or the day before.
13  Q.  What are your sources of information?
14  A.  Various sources, you know, from within
15  the department in terms of how many incidents took
16  place.
17  Q.  How do you learn about what incidents take
18  place?
19  A.  There is a report that is generated each
20  day that gives me indication of how many shootings
21  there was the night before, how many homicides
22  there were the night before.
23  Q.  And do you make any I would call those
24  shorter-term deployment of resources decisions

**Page 11**

1  based on, you know, reports of things that occurred
2  the night before?  Do you make any longer-term
3  decisions about how resources will be deployed
4  throughout the city?
5  MR. WORSECK:  Objection, vague.
6  THE WITNESS:  I'm not clear on that.
7  BY MR. PATTERSON:
8  Q.  Okay.  Well, you just described that
9  you -- when considering how to deploy resources,
10  you consider daily crime reports; is that correct?
11  A.  Correct.
12  Q.  Are there any reports that span more than
13  a day that you consider when deploying resources?
14  MR. WORSECK:  Objection, vague.  Do you
15  understand the question, Chief?
16  THE WITNESS:  Primarily we look at the
17  year-to-date numbers from the previous year and
18  compare them to where we are.  And essentially we
19  always want to be lower than where we were the year
20  before.
21  BY MR. PATTERSON:
22  Q.  You also mentioned that you respond to
23  concerns of your district commanders; is that
24  correct?

**Page 12**

1  A.  Yes.
2  Q.  What types of concerns would come to you?
3  A.  A myriad of concerns.  It could be
4  personnel issues.  It could be resource issues in
5  terms of availability of cars or equipment, the
6  conditions of cars, equipment.  It could be their
7  facilities might need repair or might need new
8  computers, might need various -- you know, a list
9  of things, and they would send a report through or
10  call me and say, you know, I need to get this done.
11  They have to send the report up through the chain.
12  Q.  And then once a concern comes to you, what
13  are the next steps for addressing that concern?
14  MR. WORSECK:  Objection, vague.
15  You can answer if you understand.
16  THE WITNESS:  I review it, give analysis of it.
17  If I think it's merited, then I'll send it forward
18  up the chain.
19  BY MR. PATTERSON:
20  Q.  Where is up the chain?
21  A.  Above me is the deputy superintendent of
22  patrol.
23  Q.  Who is that?
24  A.  Earnest Brown.

3  (Pages 9 to 12)

1    Q. He is the person that you report to?
2    A. That's correct.
3    Q. And when you make resource deployment
4  decisions, do you have the authority to implement
5  those decisions or do they need to get approved by
6  someone else?
7    A. It depends.
8    Q. It depends. Okay. Which types of
9  decisions could you implement and which types of
10  decisions would you need approval from someone
11  else?
12    A. Where officers are sent within the city,
13  who was sent on a specific detail from what area,
14  how many people are going to be working in a
15  particular violence zone. Some of the other issues
16  such as transferring of personnel, I would give a
17  recommendation. And some of those would require
18  approval from up the chain so to speak.
19    Q. And are you aware that you've been
20  identified as a person that has information
21  regarding the governmental justifications for or
22  governmental purposes or interests in several
23  provisions of Chicago's firearms ordinance?
24    A. I am.

13

1    Q. And I'm going to go through several of
2  those provisions and just ask you if you have any
3  information regarding that particular provision;
4  and then if you do, we'll follow up on that some.
5  Are you aware that Chicago's firearm ordinance
6  limits residents to the possession of one operable
7  firearm per person?
8    A. I am.
9    Q. Do you have any information regarding the
10  governmental justifications for governmental
11  purposes or interests in that limitation in the
12  ordinance?
13    A. If I could just back up and correct it.
14    Q. Sure.
15    A. In their home.
16    Q. In their home, yes. Anywhere including in
17  their -- okay.
18    A. Would you mind repeating?
19    Q. Yes. Do you have any information
20  regarding the governmental justifications for or
21  governmental purposes or interests in the
22  limitation of one operable firearm per person per
23  home?
24    MR. WORSECK: Objection, vague.

14

1    THE WITNESS: You know, based on my
2  understanding, my knowledge, and experience of, you
3  know, 30 plus years, you know, I look at things
4  such as the reduction of violence as being one of
5  the key reasons why we would want to limit the
6  number of handguns in the City of Chicago.
7  BY MR. PATTERSON:
8    Q. How does limiting persons to one operable
9  firearm in the home limit the number of handguns in
10  the City of Chicago?
11    A. You know, essentially from my knowledge
12  and experience, the more handguns there are, the
13  more likelihood there is for incidents of violence.
14  Also, you know, it endures itself in my opinion to
15  escalating situations which may have been as simple
16  as an assault to becoming aggravated assault and an
17  aggravated assault to become aggravated batter and
18  aggravated battery to become, you know, shooting or
19  homicide.
20    Q. I understand that. I guess my question is
21  how does the limitation of one operable firearm per
22  person in the home advance that interest when it is
23  my understanding that individuals can have as many
24  firearms as they would like, but only one of them

15

1  can be operable?
2    A. I think that goes to based on my
3  experience to the fact that the fewer guns there
4  are, again, the fewer guns there are in terms of
5  whether there are children in the home or whether
6  there's a domestic incident in the home or whether
7  there is a break-in in the home or using the weapon
8  against the resident, the fewer guns there are
9  available in the home, again, limit the amount of
10  violence that are associated with guns.
11    Q. So is it your position then that by
12  limiting individuals to one operable firearm per
13  home, it renders any additional inoperable firearms
14  unavailable for use?
15    MR. WORSECK: Objection, vague.
16    THE WITNESS: I didn't understand the question.
17  BY MR. PATTERSON:
18    Q. I understood your answer to be that by
19  limiting the number of firearms or handguns in the
20  home, it reduces the opportunity for, you know,
21  accidents with children, domestic violence, other
22  types of criminal situations; is that correct?
23    A. Yes, correct.
24    Q. So how does -- is your understanding of

16

4 (Pages 13 to 16)

1　the law that individuals can possess in the home as
2　many firearms as they would like so long as they
3　meet all the necessary registration requirements?
4　　MR. WORSECK: Objection to the extent it calls
5　for a legal opinion. The witness can give an
6　answer based on his understanding.
7　　THE WITNESS: My understanding is they can have
8　as many in the home as they can legally purchase.
9　Only one of them can be operable.
10　BY MR. PATTERSON:
11　　Q. So how does -- I'm still trying to get an
12　understanding of your answer of how that limitation
13　that only one of them can be operable advances the
14　interest in reducing violence?
15　　A. I thought I had -- apparently not well
16　enough. Let me add we also have a concern with our
17　first responders as well that are responding to
18　these homes. Along with that when other people are
19　your home, you can't control who's in your home.
20　So, again, having a limitation on the number of
21　operable guns, you know, I think goes a long ways
22　toward not only first responders' safety, but the
23　safety of other people, be it children or be it the
24　weapon being used against them if someone were to
17

1　break in the house or a domestic violence
2　situation.
3　　Q. You mentioned first responders. When
4　first responders are coming to a home, do they have
5　any means of knowing whether there are firearms
6　registered to residents of that home?
7　　MR. WORSECK: Objection, vague, calls for
8　speculation, but you can answer.
9　　THE WITNESS: You know, if the home has a
10　history, 911 system can, you know, notify the
11　officer if they've been to that location and
12　there's been a firearm recovered or if there's been
13　a call of a person with a gun or a previous call
14　has involved a firearm.
15　BY MR. PATTERSON:
16　　Q. And if you know, I mean, do officers have
17　access to the firearm registration information to
18　know if there are any firearms to that address?
19　　A. I don't know. I don't believe they do,
20　but I don't know.
21　　Q. And how are first responders, if you know,
22　how are they trained in terms of determining
23　whether there is potential that the home they're
24　responding to could have a firearm?
18

1　　MR. WORSECK: Objection, vague, calls for
2　speculation.
3　　THE WITNESS: I can answer in terms of -- I
4　can't speak for the training academy and curriculum
5　they put on, but I can speak to the fact that part
6　of the training is that we are trained to expect
7　that every place that we go would have a firearm.
8　BY MR. PATTERSON:
9　　Q. Okay. Are you trained to expect that
10　every place you would go would have just one
11　firearm or is any particular number of the number
12　of firearms specified?
13　　MR. WORSECK: Objection, vague, calls for
14　speculation.
15　　THE WITNESS: Any firearm is -- would be of
16　concern to us. Any amount of firearms would be of
17　concern to us.
18　BY MR. PATTERSON:
19　　Q. To your knowledge, has the training of
20　first responders changed at all in response to the
21　firearms ordinance that the City passed in July of
22　2010?
23　　MR. WORSECK: Objection, vague, calls for
24　speculation.
19

1　　THE WITNESS: Let me say again -- I'm not
2　speaking for the training academy and allowing
3　relief for them to inject themselves, but any time
4　any new legislation is enacted there is information
5　that's sent out to all department members.
6　BY MR. PATTERSON:
7　　Q. Okay. And in terms of the activities for
8　which you have authority, have you instituted any
9　changes based on the firearms ordinance that was
10　passed in July of 2010?
11　　A. Myself personally as chief of patrol?
12　　Q. Yes.
13　　A. No, I have not.
14　　Q. And is it your understanding that if there
15　are multiple persons in a household, each one of
16　them can possess an operable firearm so long as
17　they the meet requirements for possessing a
18　firearm?
19　　A. Living in that home?
20　　Q. Yes.
21　　MR. WORSECK: Objection, vague, and I'll object
22　to the extent it calls for a legal opinion.
23　　THE WITNESS: My understanding is only the
24　person who lives in that home who has all of the
20

5 (Pages 17 to 20)

1  certifications, the permit to have a weapon and
2  FOID card and so forth, only the people in that
3  house, and each one of them would have one weapon
4  that's operable.
5  BY MR. PATTERSON:
6      Q.  There is no limitation on the number of
7  people that could live in the home, is there?
8      A.  No.
9      MR. WORSECK:  Objection, calls for speculation
10  and a legal opinion.
11  BY MR. PATTERSON:
12      Q.  So do you have any objection that would
13  justify -- strike that.
14          So it Is the case then that there could be
15  several operable firearms lawfully possessed in a
16  single home if there are multiple people living in
17  the home; is that correct?
18      A.  That's correct.
19      Q.  So how does the limitation of one operable
20  firearm per person advance an interest in reducing
21  violence when there can be multiple firearms
22  operable in the home if there are several people
23  living in the home?
24      A.  The fact of the matter is, to my

21

1  to.
2  BY MR. PATTERSON:
3      Q.  Is it your understanding that the City's
4  firearm ordinance limits the possession of a
5  handgun on a person's property to that person's
6  home and does not include other parts of the
7  property such as the garage, porches, or yard
8  areas?
9      A.  That is my understanding.
10      Q.  And do you have any information regarding
11  the policy interests that this limitation can
12  serve?
13      MR. WORSECK:  Objection, vague.
14      THE WITNESS:  I can give my -- --
15      MR. WORSECK:  To the extent you understand.
16      THE WITNESS:  You know, I would be concerned
17  about any time a weapon is outside of the house.  I
18  would be concerned about the escalation.  I would
19  be concerned about the intimidation that that
20  presents and the potential for additional violence
21  once outside of the house.
22  BY MR. PATTERSON:
23      Q.  And why is that?
24      A.  Because in my experience and knowledge as

23

1  understanding and my knowledge, is that the law as
2  enacted allows a person to have a weapon, and
3  that's basically what, you know, I know.  I don't
4  have any independent knowledge of how or why there
5  would be multiple people in there and that would
6  move forward, but the fact they have a right to
7  have a weapon, that's what pretty much directs me.
8      Q.  You've given a general explanation about
9  why you think having fewer firearms in the arm
.10  could lead to reduction of violence.  Do you have
11  any evidence that would support that explanation
12  that you've given?
13      MR. WORSECK:  Objection, vague.
14      THE WITNESS:  I don't have any other than my
15  understanding, my knowledge, and my experience as a
16  police officer for 30 years plus.
17  BY MR. PATTERSON:
18      Q.  Are there any specific experiences that
19  you can recall that support your conclusion that
20  limiting the number of firearms to one operable
21  firearm in the home lead to a reduction of
22  violence?
23      MR. WORSECK:  Objection, vague.
24      THE WITNESS:  Nothing specific that I can refer

22

1  a police officer it's my understanding that when
2  people are involved in -- when they have firearms
3  and they would more likely be willing to take
4  measures that they would not have otherwise taken
5  if they didn't have a firearm.
6      Q.  Is it your opinion that the risks
7  associated with a person possessing a firearm are
8  greater when people have firearms on their own
9  property but outside of their home than when they
10  have firearms on their own property but inside of
11  their home?
12      MR. WORSECK:  Objection, vague, calls for
13  speculation.
14      THE WITNESS:  I'm not sure I understand that
15  question.
16  BY MR. PATTERSON:
17      Q.  I guess I'm trying to understand how the
18  City makes a distinction between and says you can
19  possess a handgun inside your home, but on other
20  areas of your property you cannot possess a
21  handgun.  So I guess I'm asking do you have any
22  information that the threats presented by
23  possession of a firearm are greater in areas on a
24  person's property outside of their home than they

24

6  (Pages 21 to 24)

**Page 25**

1   are inside of their home?
2      MR. WORSECK: Objection, vague.
3      THE WITNESS: Based on my knowledge if you're
4   in you're in your home, enclosed area, that's a
5   more secure area. And if someone were to force
6   their way in there, then I think that would be
7   quite a different situation than someone on the
8   outside of your home in terms of stepping outside
9   of the house with a firearm.
10   BY MR. PATTERSON:
11     Q. Do you have any evidence other than your
12   experience to support that view that you just
13   explained?
14      MR. WORSECK: Objection, vague.
15      THE WITNESS: I would rely on my experience.
16   BY MR. PATTERSON:
17     Q. Do you understand the City's firearms
18   ordinance to require individuals to fulfill a
19   firearms training requirement before they're
20   lawfully permitted to possess a firearm?
21     A. Yes.
22     Q. Do you have any information regarding the
23   governmental justifications for or governmental
24   interests or purposes in requiring individuals to

**Page 26**

1   train with firearms before they can lawfully
2   possess firearms?
3      MR. WORSECK: Objection, vague.
4      THE WITNESS: Firearms are deadly weapons.
5   Anyone who is willing to have them should have
6   proper training in the use of them.
7   BY MR. PATTERSON:
8     Q. Are you also aware that the City bans the
9   operation of firearm ranges within the City?
10     A. I am.
11     Q. In your view, what governmental interest
12   does this ban on firearms ranges serve, if you
13   know?
14     A. I look at it as availability acquisition,
15   access, transporting weapons to and from and at the
16   end of the day increased -- an increased number of
17   weapons within the City of Chicago.
18     Q. How would the operation of firearms ranges
19   within the City lead to an increase of weapons in
20   the City of Chicago?
21     A. Because additional people would be coming
22   in to practice at a range. It could be even
23   residents that are not -- people training who are
24   not residents of the City and bringing even more

**Page 27**

1   guns into the City.
2     Q. So is it your position that any increase
3   in the number in the City presents a risk of
4   increased gun violence in the City?
5      MR. WORSECK: Objection, vague.
6      THE WITNESS: In my experience, yes.
7   BY MR. PATTERSON:
8     Q. And are you aware that the City's firearms
9   ordinance bans the sale of firearms within the
10   city?
11     A. I am.
12     Q. What governmental interest does that ban
13   on firearm sales serve in your opinion, if you
14   know?
15     A. I would go back to what I just indicated.
16   In any situation that brings more weapons into the
17   City, the easy acquisition, the acquiring of
18   firearms, multiple people at the store purchasing
19   weapons, any time in my experience any time that
20   situation exists, there is greater increase for
21   potential for violence.
22     Q. What in your experience causes you to come
23   to that conclusion?
24     A. You know, I've seen -- strike that.

**Page 28**

1     I've known that there have been cases --
2   and I don't have the specific information -- where
3   gang members would go up and -- for lack of a
4   better word -- stake out gun stores and see who's
5   purchasing weapons and the potential for them to
6   follow them back to their home or whatever. I
7   think that's made much more easier for them to do
8   that when the store is located in the City.
9     Q. Those instances you described, did those
10   occur in the City of Chicago?
11     A. No, they didn't.
12     Q. Do you know where they occurred?
13     A. In -- I'm not sure if it's Riverdale, but
14   a south suburb of the City.
15     Q. Do you have any evidence that lawfully
16   possessed firearms present a risk of increased
17   violence in the City of Chicago?
18      MR. WORSECK: Objection, vague.
19      THE WITNESS: I don't have any evidence other
20   than personal experience.
21   BY MR. PATTERSON:
22     Q. I guess I'm trying to get at is
23   distinction between firearms that are possessed
24   lawfully and firearms that are possessed

7 (Pages 25 to 28)

1 unlawfully. Do you have any evidence that firearms
2 that are possessed lawfully as opposed to
3 unlawfully present a risk of increased violence in
4 the city?
5     MR. WORSECK: Objection, same objection.
6     THE WITNESS: No.
7 BY MR. PATTERSON:
8     Q. It's true, as you've said, that a regular
9 citizen of Chicago cannot go anywhere in the City
10 to buy a firearm; is that correct?
11     A. That's correct.
12     Q. Yet isn't it also true that the police
13 department has been recovering an average of 10,000
14 firearms a year for over a decade?
15     MR. WORSECK: Objection, calls for speculation.
16     THE WITNESS: I believe that's correct.
17 BY MR. PATTERSON:
18     Q. And isn't it that -- so even though over
19 that period of time there was a complete ban in
20 place on the possession of handguns?
21     MR. WORSECK: Objection to the extent it
22 mischaracterizes the prior law and calls for a
23 legal opinion.
24     You can answer if you understand.
29

1     THE WITNESS: I'm not clear when you say a
2 complete ban.
3 BY MR. PATTERSON:
4     Q. I'll move on. Isn't it true you can't
5 arrest your way out of the gun violence problem in
6 the Chicago?
7     MR. WORSECK: Objection, vague, calls for
8 speculation.
9     THE WITNESS: I agree.
10     MR. PATTERSON: Introduce an exhibit here. Can
11 we mark this as Williams Exhibit 1.
12         (Whereupon, Williams Deposition
13         Exhibit No. 1 was marked
14         for identification.)
15 BY MR. PATTERSON:
16     Q. I just handed you what the court reporter
17 has marked as Williams Exhibit 1. This is an
18 article that is entitled "Look Beyond the Handgun
19 Ban." Have you seen this article before?
20     MR. WORSECK: Take as much time as you need to
21 look it over.
22     THE WITNESS: (Reviewing document.) Yes, I do
23 recall.
24     MR. WORSECK: Have you had a chance to look at
30

1 the exhibit?
2     THE WITNESS: Yes.
3 BY MR. PATTERSON:
4     Q. Have you seen this article before?
5     A. Yes.
6     Q. And you were interviewed for this article;
7 is that correct?
8     A. Correct.
9     Q. Does this article accurately convey the
10 statements you made in that interview?
11     MR. WORSECK: Objection, vague, calls for
12 speculation.
13     To the extent you can remember exactly what you
14 said three years ago, you can answer the question.
15     THE WITNESS: To the extent I can remember, I
16 think it does.
17 BY MR. PATTERSON:
18     Q. If you look at the third paragraph, it is
19 a quote from you. It says "The regular citizen in
20 the Chicago cannot go anywhere and buy firearms,"
21 says Williams, eyebrows raised. And start the
22 quote again, "Yet in one year in the 1990s we had
23 more than 19,000 weapons recovered in one year.
24 We've been averaging 10,000 weapons every year for
31

1 the last 10 or 12 or 14 years, and that's with a
2 ban." What was the ban that you were referring to
3 in that quote?
4     A. The previous city ban on firearms that was
5 in place.
6     Q. In your experience with the police
7 department, was that ban on firearms effective in
8 reducing gun violence in the city?
9     MR. WORSECK: Objection, vague, calls for
10 speculation.
11 BY MR. PATTERSON:
12     Q. To the extent that you know.
13     MR. WORSECK: Calls for potentially expert
14 opinion and overbroad, but subject to those
15 objections.
16     THE WITNESS: Subject to those objections, I
17 think it has been effective. We're looking at the
18 number of guns that were recovered primarily a
19 large number, but also during that time was a large
20 number of homicides and we have been trending
21 continuously downward. So I think it has had a --
22 had an impact in -- I think it has been beneficial.
23 BY MR. PATTERSON:
24     Q. Do you have any evidence that other than
32

8 (Pages 29 to 32)

1  what you've just stated that decline in homicide
2  was caused by Chicago's prior firearms ban?
3      MR. WORSECK: Objection, vague.
4      THE WITNESS: Other than my personal experience
5  that the vast majority of the homicides and
6  shootings in Chicago are the result of a firearm,
7  you know, it's my opinion that the lesser amount of
8  guns that we have, the less amount of shootings and
9  homicides we'll have.
10 BY MR. PATTERSON:
11     Q.  If you turn to the next page, the fifth
12 paragraph of that page, the second sentence says "A
13 generation of rampant violence has shown," says
14 Deputy Chief Williams, "that we can't arrest
15 ourselves out of the situation. We have to be open
16 to different approaches." Do you see that?
17     A.  Second?
18     Q.  Right here.
19     A.  Okay.
20     Q.  I'll read that again. It says "A
21 generation of rampant violence has shown," says
22 Deputy Chief Williams, "that we can't arrest
23 ourselves out of the situation. We have to be open
24 to different approaches." What did you mean when

                                                          33

1  you said that we can't arrest ourselves out of the
2  situation?
3      MR. WORSECK: Objection to the extent that
4  that's not an accurate quote or if the Chief can't
5  recall, but subject to that objection, the Chief
6  can give his best recollection.
7      THE WITNESS: My best recollection with respect
8  to that statement would be that there is other
9  things to be considered other than simply arresting
10 people in order to impact upon the violence.
11 BY MR. PATTERSON:
12     Q.  Do you still hold that view today?
13     A.  Yes.
14     Q.  What other types of approaches in your
15 view should be considered in addition to arrests?
16     A.  I think even in the article you'll see
17 where we put some pretty innovative strategies in
18 place in dealing with ex-offenders who were coming
19 back from being incarcerated, talking to them,
20 giving them training, giving them guidance, giving
21 them other options, telling them what would happen
22 if they were to be caught with a firearm again,
23 substance abuse training, job training. I think
24 those -- all of those things went a long way to

                                                          34

1  helping to reduce violence.
2      Q.  One thing that's mentioned in here is
3  Project Safe Neighborhoods. Could you describe a
4  little bit about what Project Safe Neighborhoods
5  is?
6      A.  Project Safe Neighborhoods is a federal
7  initiative by the -- initiated in '91, '92 by the
8  Bush administration to reduce handgun violence.
9      Q.  What sorts of activities does the police
10 department undertake under Project Safe
11 Neighborhoods?
12     A.  The pilot program started on the west side
13 of Chicago in 15th and 11th District at the time I
14 was a commander in 15th District. And we at that
15 time we were looking to reduce gun violence by
16 targeting people we knew had been offenders in gun
17 violence. We also wanted to get the information
18 out to the community and to other people before
19 they became offenders, gun offenders. A huge
20 initiative with a group of people from the federal,
21 state, and local authorities all together and also
22 with the community service providers went forth
23 with this initiative to get the message out that
24 guns kill and you should stay away from guns and

                                                          35

1  not pick up another gun especially if you've
2  already been arrested and sent away with it.
3      Q.  Is this project still ongoing?
4      A.  It is in one form or another. Not
5  necessarily in the same format when it started back
6  in '92. Sorry. I said '92. Correction. 2002.
7      Q.  2002. Okay. If you look about two-thirds
8  of the way down the page, there is just a one-line
9  paragraph that quotes you. It begins "We need" is
10 the first two words. Do you see that?
11     A.  Okay.
12     Q.  The quote is "We need to do here what we
13 did there, reduce the desire of young people to
14 pick up a gun." Do you agree that an important law
15 enforcement objective for the City of Chicago is to
16 reduce the desire of young people to pick up a gun?
17     A.  Absolutely. I think that's one of the
18 components.
19     Q.  Is that an important component?
20     A.  Absolutely. I think that the fewer guns
21 that are to pick up, then less young people have an
22 opportunity to pick up.
23     Q.  And do any of the provisions of Chicago's
24 firearms ordinance serve this interest in reducing

                                                          36

9 (Pages 33 to 36)

1 the desire of young people to pick up a gun?
2     MR. WORSECK: Objection, vague, calls for
3 speculation.
4     THE WITNESS: Given that it does call for
5 speculation, especially in the home where people
6 have guns and store weapons this way, I think it's
7 important that there's -- other than the one weapon
8 there, that other weapons are inoperable or have a
9 trigger lock on it. You know, people are known to
10 ramble and go through the house and find firearms.
11 And if they were find one, certainly would want it
12 to be one with the inoperable or trigger lock.
13 BY MR. PATTERSON:
14     Q. And other than those things that you just
15 mentioned, to the extent that you know, does
16 anything else in Chicago's firearms ordinance serve
17 the interest of reducing the desire of young people
18 to pick up a gun?
19     MR. WORSECK: Same objections.
20     THE WITNESS: Other than what I already
21 indicated, simply the lack of availability of guns
22 in general.
23 BY MR. PATTERSON:
24     Q. In your experience are you aware of any

37

1 situation in which a police officer has been
2 injured by a firearm that was lawfully possessed?
3     MR. WORSECK: Objection, calls for speculation.
4     THE WITNESS: Repeat -- could you repeat that?
5 BY MR. PATTERSON:
6     Q. In your experience are you aware of any
7 incident in which a police officer has been injured
8 by the use of a firearm that was lawfully possessed
9 by the person using the firearm?
10     MR. WORSECK: Same objection.
11     THE WITNESS: I'm not -- I'm not certain. I'm
12 not certain.
13 BY MR. PATTERSON:
14     Q. You don't recall any particular incident?
15     A. At this time, no.
16     Q. You're the president of the Chicago
17 Chapter of the National Organization of Black Law
18 Enforcement Executives; is that correct?
19     A. That's correct.
20     Q. How long have you held that position?
21     A. Since 2007 I want to say.
22     Q. What are your responsibilities as
23 president of that organization?
24     A. My job as president is to oversee the

38

1 chapter which consists of law enforcement officials
2 primarily African-American, but others as well from
3 federal, state, and local. A large part of what we
4 do is giving back to the communities, going out and
5 mentoring young people. We have a huge HIV and
6 Aids component of it. Primarily mentoring young
7 people and working in inner city communities to
8 give back and to show positive role model.
9     Q. Is one thing -- I'll refer to the
10 organization NOBLEE. Is that how it's generally
11 referred to?
12     A. Yes, Chicago Chapter.
13     Q. Chicago Chapter?
14     A. There's 50 plus chapters throughout. They
15 have a parent organization that's NOBLEE, and then
16 Chicago is the Chicago Chapter.
17     Q. Does the Chicago Chapter of NOBLEE, is one
18 thing that it does recommend legislation?
19     A. No.
20     Q. No?
21     A. No. No.
22     Q. Does it recommend solutions for combatting
23 gun violence in Chicago?
24     A. Yes.

39

1     Q. What solutions has the Chicago Chapter of
2 NOBLEE recommended for combatting gun violence in
3 Chicago?
4     A. The whole idea of getting our young people
5 in particular -- that's our target -- to not pick
6 up weapons, to not have -- use firearms for
7 conflict resolution. In large part so much of our
8 young -- so much what our young people do now used
9 to be resolved with a fist fight now is now
10 resolved with gun play. And to a greater extent
11 that's what we try to get out, get across.
12     Q. Has the Chicago Chapter of NOBLEE done any
13 research on the problem of gun violence in Chicago?
14     A. We are in the process right now. I think
15 there is a conference call later today. There is
16 an event coming up in the coming week where we are
17 partnering with Northwestern University to -- we're
18 embarking on that very topic with a group of --
19 with a think tank from Northwestern University and
20 Garrett Evangelical Theological Seminary which also
21 operates out of Northwestern university. So it's
22 several anthropologists and deep, deep thinkers to
23 go back to the root cause. So we're in the process
24 of that right now.

40

10 (Pages 37 to 40)

1    Q.  Can you describe a little more what that
2  research is going to entail?
3       MR. WORSECK:  Objection, calls for speculation.
4       THE WITNESS:  We're just embarking up on it
5  right now.
6  BY MR. PATTERSON:
7       Q.  So you don't have any specific plans or
8  understanding about what it is going to consist of?
9       A.  It's still in the works so to speak, work
10  in progress.
11      Q.  Other than that project, has NOBLEE
12  Chicago Chapter done any other research on the
13  problem of gun violence in Chicago?
14      A.  To the best of my recollection, no.
15      Q.  Do you have any more specific information
16  about the research project with Northwestern
17  University that you've described?
18      MR. WORSECK:  Objection, vague.
19      THE WITNESS:  I don't.  I'm not sure if that's
20  on the web site or on their web site as to what
21  we're embarking up on and what that's all going to
22  entail.
23  BY MR. PATTERSON:
24      Q.  But you personally don't have any more
                                                    41

1  specific?
2       A.  No.
3       Q.  Okay.  Are there any other organizations
4  that you're currently involved in?
5       MR. WORSECK:  Objection, vague and relevance.
6  BY MR. PATTERSON:
7       Q.  Are there any other organizations that
8  have as part of what they do anything related to
9  the problem of gun violence in Chicago that you're
10  currently a member of?
11      MR. WORSECK:  Objection, calls for speculation.
12      THE WITNESS:  I'm not aware of what all the
13  organizations that I'm involved with, you know,
14  what every component of what they're working on,
15  you know.  Some of the organizations I sit on I
16  have a very specific function, and I'm not familiar
17  with everything that the organization as a whole
18  might be working on.  So I'm sorry.
19  BY MR. PATTERSON:
20      Q.  Well, could you jus give me examples of
21  organizations that you do currently sit on?  Could
22  you describe?
23      MR. WORSECK:  Objection, vague, relevance.
24      THE WITNESS:  I'm the president of the St. Jude
                                                    42

1  Police League.  I'm a board member of the Illinois
2  Drug Enforcement Officers Association.  I'm a
3  member of International Chiefs of Police
4  Association.  I'm a member of the Police Executive
5  Research Form, PERF.  I know they have information
6  on that.  I'm not directly with that part.  I'm
7  sure there are others.  I just can't recall them
8  right now.
9  BY MR. PATTERSON:
10      Q.  That's fine.  To the extent that you know,
11  any of those organizations you just mentioned, have
12  they made any recommendations about solutions for
13  combatting gun violence in Chicago?
14      MR. WORSECK:  Objection, vague.
15      THE WITNESS:  To the best of my knowledge, I
16  don't think -- not aware of PERF having done that
17  in Chicago.  I know they've done it wherever you,
18  know, throughout, but I'm not certain as to whether
19  it was in Chicago.  I know they address that topic,
20  but I don't know if it was specifically about
21  Chicago.
22  BY MR. PATTERSON:
23      Q.  Have you been involved with the Interstate
24  Gun Trafficking Task Force?
                                                    43

1       A.  I think I've been to one meeting or so.  I
2  was representing my deputy superintendent who
3  chaired it.
4       Q.  What is the Interstate Gun Traffic Task
5  Force?
6       A.  To the -- that's a good question.  I went
7  there for one meeting, I think one meeting for the
8  Deputy Superintendent Brown who chairs it, and
9  there was discussion of gun traffic, how to address
10  gun trafficking throughout the state.
11      Q.  Okay.  During that meeting was there any
12  discussion about Chicago's firearms ordinance?
13      MR. WORSECK:  Objection, vague.
14      THE WITNESS:  To the best of my recollection,
15  no.
16      MR. PATTERSON:  Those are all the questions
17  that I have.
18          EXAMINATION
19  BY MR. WORSECK:
20      Q.  Chief Williams, I'd like to ask you a few
21  questions.
22      MR. WORSECK:  Actually, Pete, can I take
23  five minutes just to look over my notes.  I do have
24  a few questions, but just to streamline things.
                                                    44

11 (Pages 41 to 44)

1     (Off the record.)
2  BY MR. WORSECK:
3     Q.  Chief Williams, I want to direct your
4  attention back to Exhibit 1 which is the news
5  article.  And referring you to the second page, the
6  fifth paragraph which Mr. Patterson asked you about
7  earlier, do you remember that line of questioning?
8     A.  Yes, I do.
9     Q.  And there you indicate you were of the
10 view that, quote/unquote, we have to be open to
11 different approaches.  Do you see that?
12    A.  Yes, I do.
13    Q.  Is it fair to say that gun violence in
14 Chicago is a major problem?
15    A.  That's fair to say.
16    Q.  And it's been a problem for a number of
17 years --
18    MR. PATTERSON:  Objection, leading.
19 BY MR. WORSECK:
20    Q.  -- in Chicago?
21    A.  It has.
22    Q.  And it's been such a problem that the
23 police department has tried to do many different
24 things to try to address that problem?

45

1  to address the gun violence in problem in Chicago?
2     MR. PATTERSON:  Same objection.
3     THE WITNESS:  Yes.
4  BY MR. WORSECK:
5     Q.  Another tool on that table would be trying
6  to reduce the number of firearms that would be
7  available in public for people to misuse?
8     MR. PATTERSON:  Same objection.
9     THE WITNESS:  Absolutely.
10 BY MR. WORSECK:
11    Q.  Firearms that are in public could be
12 misused in various ways?
13    MR. PATTERSON:  Same objection.
14    THE WITNESS:  Yes.
15 BY MR. WORSECK:
16    Q.  One way of misuse would be the possessor
17 using it for an improper purpose --
18    A.  Correct.
19    Q.  -- such as to shoot somebody?
20    MR. PATTERSON:  Same objection.  Drew, I don't
21 want to -- can I have a standing objection to
22 leading?
23    MR. WORSECK:  I'll give you that standing
24 objection.

47

1     MR. PATTERSON:  Object to the question as
2  leading.
3     THE WITNESS:  That's correct.
4  BY MR. WORSECK:
5     Q.  And obviously arresting gun offenders is
6  one way of approaching the problem, correct?
7     MR. PATTERSON:  Objection, leading.
8     THE WITNESS:  It is.
9  BY MR. WORSECK:
10    Q.  Another approach is things along the lines
11 of intervention with gun offenders and other forms
12 of intervention within the community of the sort
13 that you talked about earlier?
14    MR. PATTERSON:  Objection, leading.
15    THE WITNESS:  That's correct.
16 BY MR. WORSECK:
17    Q.  And another approach is to reduce the
18 number of firearms that are available for misuse in
19 Chicago?
20    MR. PATTERSON:  Same objection.
21    THE WITNESS:  I agree.
22 BY MR. WORSECK:
23    Q.  And the police department would like to
24 have all of those tools on its table in attempting

46

1     MR. PATTERSON:  Okay.  Thanks.
2     THE WITNESS:  Yes.
3  BY MR. WORSECK:
4     Q.  Another way it could be used improperly
5  would be for purposes of intimidation?
6     A.  Yes.
7     Q.  Another way it could be used improperly is
8  if someone steals the gun from the possessor?
9     A.  Yes.
10    Q.  It also could be used to resist law
11 enforcement officers or other first responders who
12 might be called upon an incident occurring in
13 public?
14    A.  Yes.
15    Q.  Then directing you again to the second
16 page of Exhibit 1 about two-thirds down the page.
17 That one-line sentence Mr. Patterson asked you
18 about, quote/unquote, We need to do here what we
19 did there, reduce the desire of young people to
20 pick up a gun.  Do you remember that?
21    A.  Yes, I do.
22    Q.  And you would agree reducing the desire of
23 people to improperly acquire or use guns is one
24 tool that the police department would like to be

48

1 able to pursue to reduce gun violence?
2    A. Yes.
3    Q. Another tool would be to reduce the
4 availability of guns to be accessed by those people
5 who maintain the desire to acquire those guns?
6    A. Yes.
7    Q. Again, it's a multi-pronged approach, and
8 you would like all of the prongs to be available to
9 best address the gun violence problem in Chicago?
10    A. Correct.
11    Q. Earlier Mr. Patterson asked you about the
12 provision in the ordinance that states that
13 basically a homeowner is entitled to have one
14 operable firearm in the home and any additional
15 firearms need to be stored or rendered inoperable
16 in a certain way. Do you remember that line of
17 questioning in general?
18    A. I do.
19    Q. And one of the purposes served by that
20 provision is reducing the ability of a burglar or
21 intruder to use a gun they might come across in the
22 course of breaking into a house against the home
23 owner?
24    A. Yes.

49

1    Q. If that gun is broken down or secured with
2 a trigger lock, the intruder won't be able to use
3 it at all or at least quickly against the
4 homeowner?
5    A. Correct.
6    Q. And another purpose served by that
7 provision is reducing the number of firearms
8 accidents or suicides or domestic violence
9 shootings that would occur in the home by reducing
10 the number of operable firearms that could be
11 misused in those sorts of situations?
12    A. Correct.
13    Q. And do you remember a line of questioning
14 about first responders coming to homes that may
15 have guns in them?
16    A. Yes.
17    Q. And there was some questioning about the
18 assumptions that officers have regarding whether
19 firearms are in that home?
20    A. Yes.
21    Q. There were some questions about whether
22 first responders are made aware of whether that
23 home may or may not have guns in it?
24    A. Yes.

50

1    Q. And would you agree regardless of whatever
2 assumptions a responding officer brings to bear and
3 regardless of whether they have actual knowledge
4 regarding the presence of firearms in that home,
5 public safety is nonetheless enhanced by reducing
6 the number of firearms in that home that they be
7 misused as against a first responder?
8    A. I would agree.
9    Q. One way of serving that end is by reducing
10 the number of operable weapons that would be in
11 that home?
12    A. I agree.
13    Q. Have Chicago police officers ever been
14 harmed by guns in the course of responding to
15 emergency calls at residences in Chicago?
16    A. Yes. I don't have the specifics, but yes,
17 they have.
18    Q. That's something you're familiar with in
19 your 30 years of experience on the force?
20    A. Yes. And if I could -- I remember the
21 question that had to do with had a legally
22 possessed gun been used to hurt a police officer.
23 And just trying to remember, you know, things as
24 they come back. I remember a police officer's gun

51

1 was taken from him in the parking lot of a police
2 station. It was a legally possessed gun, and he
3 was shot to death -- Officer Thor Soderberg -- in
4 the parking lot of the Targeted Response Unit. You
5 know, that just goes to even police officers or
6 even people who have firearms, they can be taken
7 from them and they can be shot. So we had a
8 officer shot and killed because a weapon was taken.
9 I just wanted to correct that point.
10    Q. And CPD officers who have responded to
11 calls at residences have been harmed by guns being
12 possessed by people in those residences, correct?
13    A. Correct.
14    Q. And regular civilian citizens of Chicago
15 have been harmed by guns that are possessed by
16 people in their residences, correct?
17    A. Correct.
18    Q. That's something that you've become
19 familiar with in your 30 plus years on the force?
20    A. Yes.
21    Q. Do you remember a line of questioning
22 about the definition of home that's in the Chicago
23 gun ordinance?
24    A. Yes.

52

13 (Pages 49 to 52)

**Page 53**

1  Q.  And generally about the requirement that
2  while you're allowed to have an operable firearm
3  within the four corners of your home, you're not
4  permitted to bring that weapon out into your yard
5  or your porch, etc. —
6  A.  Yes.
7  Q.  — garage?
8  Those areas of one's property are
9  generally less secured than the home?
10  A.  Yes.
11  Q.  Those areas are easier to access by
12  criminals or other people with improper
13  motivations?
14  A.  Yes, they are.
15  Q.  It's easier for a criminal to steal a gun
16  from someone if they're standing out in their yard
17  as opposed to if they're in their home?
18  A.  I would say yes.
19  Q.  And garages are a feature of homes in
20  Chicago that in your experience on the force are
21  generally much less secure than the home and the
22  target of break-ins or other crime to a much
23  greater degree than is a home?
24  MR. PATTERSON:  Objection, speculation.

**Page 54**

1  THE WITNESS:  In my experience, yes.
2  BY MR. WORSECK:
3  Q.  In your experience on the force, are you
4  aware of instances in which a homeowner or other
5  citizen on private property, private residential
6  property, for instance standing out in a yard or
7  standing on a porch has used a firearm to
8  intimidate others or to shoot others?
9  A.  Yes.
10  Q.  That sort of intimidation and shooting is
11  very much the same as has and could occur on a
12  public street or public sidewalk?
13  A.  Yes.
14  Q.  You indicated earlier I believe that when
15  a person steps out of their home, whether into
16  their front yard, out into the public way, a
17  sidewalk or a street, they become a much greater
18  target of theft of that firearm being taken from
19  them?
20  A.  I would agree.
21  Q.  And would that concern also exist in the
22  context of people congregating at gun stores or at
23  shooting ranges, say, for instance, in the parking
24  lot of that kind of establishment?

**Page 55**

1  A.  Definitely possible.
2  Q.  And the kinds of intimidation, escalation
3  and other deadly gun use that you talked about
4  earlier, all of those concerns could exist in the
5  context of a parking lot or other gathering place
6  associated with a gun store or a gun range in
7  Chicago?
8  A.  Yes, it could.
9  Q.  And in your 30 years of experience on the
10  force, you've become aware of instances where
11  intimidation, escalation, and other deadly gun use
12  have occurred out on the public way in Chicago?
13  A.  Yes, I have.
14  Q.  Those same sorts of things could occur --
15  even though Chicago hasn't had gun stores or gun
16  ranges open to the public, those same sorts of
17  things could occur in public meeting spaces or
18  congregation spaces around those establishments?
19  A.  I believe they could.
20  Q.  Are you aware of any instances in which
21  the homes of Chicago police officers have been
22  targeted for the theft of the guns that are
23  expected to be in those homes?
24  A.  I am aware that in the briefing some gang

**Page 56**

1  members that it has been a part of their initiation
2  sometimes into gangs is to target police officer's
3  house and break into a police officer's house, get
4  a police officer's gun in order to be initiated
5  into a gang.
6  Q.  And would you agree that if criminals are
7  willing to break into the homes of a Chicago police
8  officer and steal their guns, that the same
9  criminals or other criminals would be willing to
10  break into the homes of the average citizen to
11  steal that citizen's guns?
12  A.  I agree with that and likewise on the
13  street which is what I just described earlier with
14  Officer Soderberg.  They're willing to break into
15  houses of police officers to get guns, and they're
16  willing to attack a police officer in full uniform
17  on the grounds of a police facility and take a gun
18  and shoot and kill a police officer.  I'm sure it
19  is my experience that would apply as well to a
20  common citizen.
21  Q.  Are you aware of a theft of guns from the
22  Harvey Police Department shooting range?
23  A.  I am.  Several of them were fully
24  automatic weapons.

14 (Pages 53 to 56)

1    Q.  Would you agree that if criminals are

2 willing to break into a law enforcement agent's

3 shooting range to steal guns belonging to a law

4 enforcement agency, criminals would be willing to

5 break into a civilian shooting range and steal

6 weapons that would be stored at that range?

7    A.  Yes.

8    Q.  They would be willing to break into a

9 civilian gun store and steal guns that are stored

10 within that store?

11    A.  Yes.

12    Q.  Chief Williams, the answers you've given

13 here, is it fair to say those are based on your

14 best recollection as you sit here today?

15    A.  Yes, they are.

16    Q.  It's possible that there could be other

17 instances or other evidence or other information

18 that would relate to and support the various

19 answers you've given today or the various subjects

20 you've talked about today that you can't recall or

21 that you're not aware of as you sit here today?

22    A.  That's correct.

23    MR. WORSECK:  I have nothing further.

24

57

---

1    A.  Correct.

2    Q.  And do you recall that you testified that

3 the limitation of one operable firearm per home

4 could reduce the number of suicides, reduce the

5 number of firearms that are used in domestic

6 violence situations and otherwise used for criminal

7 violence within the home?

8    A.  Yes.

9    Q.  Is an assumption of that -- of your

10 testimony that a person who otherwise would want to

11 commit suicide with a firearm or engage in domestic

12 violence or other criminal activity because of the

13 law limiting an individual to one operable firearm

14 per home would abide by that law and not use

15 another firearm that may be in the home?

16    MR. WORSECK:  Objection, vague.

17    THE WITNESS:  That wasn't my assumption.

18 BY MR. PATTERSON:

19    Q.  Okay.

20    A.  Simply the fact that there would be fewer

21 firearms available, and perhaps that person would

22 not know where the one firearm was and that was

23 operable and any other firearm that may have been

24 found would be inoperable which --

59

---

1    FURTHER EXAMINATION

2 BY MR. PATTERSON:

3    Q.  I'm going to have few questions here.  You

4 recall Mr. Worseck asked you a number of questions

5 about instances in which gun possession either in

6 the public or in the home could lead to negative

7 consequences including violence, intimidation,

8 escalation of situations.  Do you recall that --

9    A.  Yes.

10    Q.  -- general line of questioning?

11    A.  Yes, I do.

12    Q.  Are you aware of instances in your

13 experience in which -- other than the Chicago

14 police officer that had his gun taken from him that

15 you mentioned where lawfully possessed firearms led

16 to those negative consequences that you described?

17    A.  I cannot recall any others at this time.

18    Q.  And the officer who had his gun taken from

19 him and was unfortunately killed, the person that

20 shot him did not lawfully possess that firearm, did

21 he?

22    A.  No.

23    Q.  And after that situation police officers

24 still carried firearms; is that correct?

58

---

1    Q.  For a person --

2    MR. WORSECK:  I'm sorry.  Were you finished?

3    THE WITNESS:  -- which would prevent the person

4 from being shot or committing suicide.

5 BY MR. PATTERSON:

6    Q.  For a person that knows where the firearm

7 is and knows the method to render it operable, a

8 firearm that is rendered temporarily inoperable, in

9 your experience would the law limiting an

10 individual to one operable firearm per home deter

11 the person from using that inoperable firearm?

12    MR. WORSECK:  Objection, vague.

13    THE WITNESS:  In my experience and in my

14 training we talk about distance and time.  And so

15 to the extent that if a person was looking for a

16 weapon and trying to render it operable, that might

17 give an opportunity to call 911, give an

18 opportunity to get out of the house.  So, you know,

19 my position would be if those weapons are

20 inoperable, that's valuable time.  That's valuable

21 distance for them to, you know, exit themselves

22 from the situation potentially.  So that's where I

23 was going with that.

24

60

---

15 (Pages 57 to 60)

BY MR. PATTERSON:

Q. So by rendering a firearm inoperable, your testimony is that it extends the amount of time that would take place between a time would want to use that firearm and when a person could use that firearm?

A. If I'm not mistaken, I think you said the person who knows where the gun is?

Q. Yeah.

A. Okay. Right.

Q. Okay. You testified that Chicago police officers have been harmed by guns possessed by people in residences; is that correct?

A. Yes.

Q. I think the record is already clear on this. I just want to make sure. You're not aware of any instances in Chicago police officers have been harmed by guns that were lawfully possessed by people in residences, are you?

MR. WORSECK: Objection, vague, calls for speculation.

THE WITNESS: Not that I can recall.

BY MR. PATTERSON:

Q. You testified I believe that the risk of

61

theft of firearms is greater when a person is carrying a firearm outside the home versus when they are carrying it within their home; is that correct?

A. No, I don't think that's -- would you repeat that.

Q. Did you testify that the risk of a firearm being stolen or firearm theft is greater when the person carrying that firearm is outside their home than when they're inside of their home?

A. I believe that's correct.

Q. And what do you base that testimony on?

A. The availability of the firearm being outside of the house, being on the public way. And I don't want to keep harping on, you know, instances with police officers, you know, but when people are willing -- willing to take weapons from police officers and you're putting more weapons in the hands of people on the street, there is greater chance for intimidation, escalation, and there's nothing to keep bad guys from overcoming someone, targeting someone, stalking someone to the point they can get the drop on them just as they did with the police officer.

62

Q. Do you have any empirical evidence that the risk of theft of a firearm is greater outside of the home than it is inside of the home?

MR. WORSECK: Objection, vague.

THE WITNESS: No.

BY MR. PATTERSON:

Q. Have you ever studied that question about where the risk of theft of a firearm from a person carrying a firearm outside the home is greater than the risk of theft of a firearm from a person carrying a firearm inside their home?

A. I don't believe so.

Q. You mentioned in your testimony of theft of firearms from the Harvey Police Department shooting range; is that correct?

A. Correct.

Q. After that incident did the Chicago Police Department still operate shooting ranges?

A. Shooting ranges?

Q. Firearms training ranges?

A. Within the police department facilities?

Q. Yes.

A. Yes.

Q. Are you aware in your experience as a

63

Chicago police officer of any instance when a citizen has used a firearm to avert an attempted crime against that person's person or property?

MR. WORSECK: Objection, vague.

THE WITNESS: I believe so, yes.

BY MR. PATTERSON:

Q. So you are aware of such instances?

A. Yes.

Q. Isn't it true that police officers will not always be able to respond to a situation in order to prevent violence or injury to a person, person's person or property?

MR. WORSECK: Objection, vague.

THE WITNESS: A little bit more clarity?

BY MR. PATTERSON:

Q. Yeah. Isn't it true that the Chicago Police Department cannot always respond to a situation quickly enough to prevent injury to a person's person or property?

MR. WORSECK: Same objection.

THE WITNESS: Yes.

MR. PATTERSON: I think that's all I have. I did want to ask, Drew, is the City prepared to go forth with a 30(b)(6) deposition we have

64

16 (Pages 61 to 64)

1  noticed for today?
2      MR. WORSECK: We are not in a position to do
3  that as I indicated yesterday via my email to you.
4  We are not in a position to do that.
5      MR. PATTERSON: I just wanted to put on the
6  record that the City agreed to produce a witness on
7  that topic in January. The City proposed a date
8  for that topic to be today. We agreed, traveled
9  here in reliance on that proposal by the City,
10  issued a notice over ten days ago that is still
11  valid that the City is unilaterally informed us
12  that they're not going to fulfill. We have not
13  revoked that notice. I just wanted to put that on
14  the record.
15      MR. WORSECK: And as I indicated yesterday,
16  Pete, we were perfectly willing to produce
17  Chief Williams pursuant to his individual notice
18  which we did today. I assume that plaintiffs still
19  would want to have taken his deposition. So unless
20  you're saying you wouldn't have traveled here to
21  take his deposition at all, then I don't know that
22  the travel issue is germane.
23      MR. PATTERSON: Okay.
24      MR. WORSECK: We'll reserve signature.

65

---

1          (Proceedings concluded at 10:34 a.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

66

---

1          IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4  ILLINOIS ASSOCIATION OF FIREARMS)
5  RETAILERS, et al.,          )
6      Plaintiffs,         )
7      -vs-                 ) No. 10 CV 04184
8  THE CITY OF CHICAGO, et al.,   )
9      Defendants.         )
10
11      This is to certify that I have read the
12  transcript of my deposition taken in the
13  above-entitled cause by Jana E. Cox, Certified
14  Shorthand Reporter, on April 29, 2011, and that the
15  foregoing transcript accurately states the
16  questions asked and the answers given by me as they
17  now appear.
18      _____
19          EUGENE WILLIAMS
20  SUBSCRIBED AND SWORN TO
21  before me this _____ day
22  of _ _____, 2011.
23      _____
24      Notary Public

67

---

1  STATE OF ILLINOIS  )
2              ) SS:
3  COUNTY OF C O O K  )
4      I, Jana E. Cox, a Notary Public within and
5  for the County of Cook and State of Illinois, do
6  hereby certify that heretofore, to-wit, on the
7  29th day of April, 2011, personally appeared before
8  me EUGENE WILLIAMS, a witness in a certain cause
9  now pending and undetermined in the United States
10  District Court, Northern District of Illinois,
11  Eastern Division, wherein ILLINOIS ASSOCIATION OF
12  FIREARMS is the Plaintiff and CITY OF CHICAGO is
13  the Defendant.
14      I further certify that the said EUGENE
15  WILLIAMS was by me first duly sworn to testify the
16  truth, the whole truth, and nothing but the truth
17  in the cause aforesaid; that the testimony then
18  given by said witness was reported stenographically
19  by me in the presence of said witness and
20  afterwards reduced to typewriting by Computer-Aided
21  Transcription, and the foregoing is a true and
22  correct transcript of the testimony so given by
23  said witness as aforesaid.
24      I further certify that the signature to

68

---

17 (Pages 65 to 68)



1  the foregoing deposition was not waived by counsel
2  for the respective parties.
3      I further certify that the taking of this
4  deposition was pursuant to Notice and that there
5  were present at the deposition the attorneys
6  hereinbefore mentioned.
7      I further certify that I am not counsel
8  for nor in any way related to the parties to this
9  suit, nor am I in any way interested in the outcome
10 thereof.
11     IN TESTIMONY WHEREOF:  I have hereunto set
12 my hand and affixed my notarial seal this 17th day
13 of May, 2011.
14
15
16
17 ___ *Jana E Cox* ___
18 NOTARY PUBLIC, COOK COUNTY, ILLINOIS
19
20
21
22
23
24
                                               69

1      McCorkle Court Reporters, Inc.
          200 N. LaSalle Street Suite 300
2          Chicago, Illinois 60601-1014
3
4  DATE:  May 17, 2011
   Andrew Worseck
5  30 N. LaSalle, Suite 1230
   Chicago, Illinois  60602
6
7  IN RE: IAFR vs. City of Chicago
   COURT NUMBER: 10 CV 04184
8  DATE TAKEN: April 29, 2011
   DEPONENT: Eugene Williams
9
   Dear Mr. Worseck:
10
   Enclosed is the deposition transcript for the
11 aforementioned deponent in the above-entitled
   cause. Also enclosed are additional signature
12 pages, if applicable, and errata sheets.
13 Per your agreement to secure signature, please
   submit the transcript to the deponent for review
14 and signature.  All changes or corrections must be
   made on the errata sheets, not on the transcript
15 itself.  All errata sheets should be signed and all
   signature pages need to be signed and notarized.
16
   After the deponent has completed the above, please
17 return all signature pages and errata sheets to me
   at the above address, and I will handle
18 distribution to the respective parties.
19 If you have any questions, please call me at the
   phone number below.
20
21 Sincerely,
22 Margaret Setina        Jana E. Cox
   Signature Department   Court Reporter
23
24 cc: Mr. Peter Patterson
                                               70

                                   18  (Pages 69 to 70)

**A**

abide
59:14
ability
49:20
able
49:1 50:2 64:10
above-entitled
67:13 70:11
Absolutely
36:17,20 47:9
abuse
34:23
academy
6:10,11 9:17 19:4
20:2
access
18:17 26:15 53:11
accessed
49:4
accidents
16:21 50:8
accurate
34:4
accurately
31:9 67:15
acquire
48:23 49:5
acquiring
27:17
acquisition
26:14 27:17
activities
10:1 20:7 35:9
activity
59:12
actual
51:3
add
17:16
addition
34:15
additional
16:13 23:20 26:21
49:14 70:11
address
10:8 18:18 43:19
44:9 45:24 47:1
49:9 70:17
addressing
10:6 12:13
adequate
10:5
administration
35:8
advance
15:22 21:20
advances
17:13
affixed
69:12
aforementioned
70:11
aforesaid
68:17,23
African-American
39:2
agency
57:4
agent's
57:2
aggravated
15:16,17,17,18
ago
4:17 31:14 65:10
agree
30:9 36:14 46:21
48:22 51:1,8,12
54:20 56:6,12 57:1
agreed
65:6,8
agreement

70:13
Aids
39:6
al
67:5,8
allowed
53:2
allowing
20:2
allows
22:2
amount
16:9 19:16 33:7,8
61:3
analysis
12:16
Andrew
2:11 70:4
answer
5:1,7 8:19,24 12:15
16:18 17:6,12 18:8
19:3 29:24 31:14
answering
5:2
answers
5:3 57:12,19 67:16
anthropologists
40:22
apparently
17:15
appear
67:17
APPEARANCES
2:1
appeared
68:7
applicable
70:12
apply
56:19
appointed
7:9,11,12,17
approach
46:10,17 49:7
approaches
33:16,24 34:14 45:11
approaching
46:6
approval
13:10,18
approved
13:5
April
1:21 67:14 68:7 70:8
area
6:15 7:17 13:13 25:4
25:5
areas
23:8 24:20,23 53:8
53:11
arm
22:9
arrest
30:5 33:14,22 34:1
arrested
36:2
arresting
34:9 46:5
arrests
34:15
article
30:18,19 31:4,6,9
34:16 45:5
asked
45:6 48:17 49:11
58:4 67:16
asking
24:21
assault
15:16,16,17
assistance
9:1
assistant

2:9 7:10,15
associated
16:10 24:7 55:6
Association
1:5 43:2,4 67:4 68:11
assume
65:18
assumption
59:9,17
assumptions
50:18 51:2
attack
56:16
attempted
64:2
attempting
46:24
attention
45:4
attorneys
69:5
August
7:11
Aurora
5:18,20 6:1
authorities
35:21
authority
13:4 20:8
automatic
56:24
availability
12:5 26:14 37:21
49:4 62:13
available
16:9 46:18 47:7 49:8
59:21
Avenue
2:4
average
29:13 56:10
averaging
31:24
avert
64:2
aware
13:19 14:5 26:8 27:8
37:24 38:6 42:12
43:16 50:22 54:4
55:10,20,24 56:21
57:21 58:12 61:16
63:24 64:7
a.m
1:21 66:1

**B**

B
3:12
BA
5:19
back
6:18 7:3 14:13 27:15
28:6 34:19 36:5
39:4,8 40:23 45:4
51:24
background
5:11,12
bad
62:21
ban
26:12 27:12 29:19
30:2,19 32:2,4,7
35:3 36:13
bans
26:8 27:9
base
62:12
based
11:1 15:1 16:2 17:6
20:9 25:3 57:13
basically
22:3 49:13

basis
8:24 9:24
batter
15:17
battery
15:18
bear
10:6 51:2
becoming
15:16
beginning
5:12
begins
36:9
believe
18:19 29:16 54:14
55:19 61:24 62:11
63:12 64:5
belonging
57:3
beneficial
32:22
benefit
5:2,4
best
6:2,4 34:6,7 41:14
43:15 44:14 49:9
57:14
better
28:4
Beyond
30:18
bit
35:4 64:14
Black
38:17
board
43:1
break
5:5,8 18:1 56:3,7,10
56:14 57:2,5,8
breaking
49:22
break-in
16:7
break-ins
53:22
brief
6:24
briefing
55:24
briefly
7:14
bring
53:4
bringing
26:24
brings
27:16 51:2
broken
50:1
brought
10:5
Brown
12:24 44:8
burglar
49:20
Bush
35:8
buy
29:10 31:20

**C**

C
68:3
call
8:23 10:23 12:10
18:13,13 37:4
40:15 60:17 70:19
called

1:14 4:3 48:12
calls
8:22,24 9:1,3,10 17:4
18:7 19:1,13,23
20:22 21:9 24:12
29:15,22 30:7
31:11 32:9,13 37:2
38:3 41:3 42:11
51:15 52:11 61:20
capacity
4:18,19
CAPS
7:16
captains
8:10
card
21:2
carried
58:24
carrying
62:2,3,9 63:9,11
cars
12:5,6
case
21:14
cases
4:15 28:1
catch
11:4 13:12 15:6,10
caught
34:22
cause
40:23 67:13 68:8,17
70:11
caused
33:2
causes
27:22
cc
70:23
certain
38:11,12 43:18 49:16
68:8
certainly
37:11
certifications
21:1
Certified
67:13
certify
67:11 68:6,14,24
69:3,7
chain
12:11,18,20 13:18
chaired
44:3
chairs
44:8
chance
30:24 62:20
changed
19:20
changes
20:9 70:14
chapter
38:17 39:1,12,13,16
39:17 40:1,12
41:12
chapters
39:14
Chicago
1:10,12,20 2:13 5:16
5:17 15:6,10 26:17
26:20 28:10,17
29:9 30:6 31:20
33:6 35:13 36:15
38:16 39:12,13,16
39:16,17,23 40:1,3
40:12,13 41:12,13
42:9 43:13,17,19
43:21 45:14,20
46:19 47:1 49:9
51:13,15 52:14,22
53:20 55:7,12,15

55:21 56:7 58:13
61:11,17 63:17
64:1,16 67:8 68:12
70:2,5,7
Chicago's
13:23 14:5 33:2
36:23 37:16 44:12
chief
4:10 7:12,17,18,21
8:3 10:1 11:15
20:11 33:14,22
34:4,5 44:20 45:3
57:12 65:17
chiefs
8:1,6 10:7 43:3
children
16:5,21 17:23
citizen
29:9 31:19 54:5
56:10,20 64:2
citizens
52:14
citizen's
56:11
city
1:10,12 7:23 10:4
11:4 13:12 15:6,10
19:21 24:18 26:8,9
26:17,19,20,24
27:1,3,4,10,17
28:8,10,14,17 29:4
29:9 32:4,8 36:15
39:7 64:23 65:6,7
65:9,11 67:8 68:12
City's
23:3 25:17 27:8
Civil
1:16
civilian
52:14 57:5,9
clarity
64:14
clear
11:6 30:1 61:15
combatting
39:22 40:2 43:13
come
12:2 27:22 49:21
51:24
comes
12:12
coming
18:4 26:21 34:18
40:16,16 50:14
commander
6:23,24 7:2,5,7 35:14
commanders
7:22 8:4,5,8 10:7
11:23
commit
59:11
committing
60:4
common
56:20
communities
39:4,7
community
35:18,22 46:12
compare
11:18
complete
29:19 30:2
completed
5:14 70:16
component
36:19 39:6 42:14
components
36:18
computers
12:8

| | | | | | |
|---|---|---|---|---|---|
| **Computer-Aided**<br>68:20<br>**concern**<br>12:12,13 17:16 19:16<br>19:17 54:21<br>**concerned**<br>23:16,18,19<br>**concerns**<br>10:6,8 11:23 12:2,3<br>55:4<br>**concluded**<br>66:1<br>**conclusion**<br>22:19 27:23<br>**conditions**<br>12:6<br>**conference**<br>40:15<br>**conflict**<br>40:7<br>**congregating**<br>54:22<br>**congregation**<br>55:18<br>**consequences**<br>58:7,16<br>**consider**<br>10:9 11:10,13<br>**considered**<br>34:9,15<br>**considering**<br>11:9<br>**consist**<br>41:8<br>**consists**<br>39:1<br>**context**<br>54:22 55:5<br>**continuing**<br>5:13<br>**continuously**<br>32:21<br>**control**<br>17:19<br>**convey**<br>31:9<br>**Cook**<br>1:19 68:5 69:18<br>**COOPER**<br>2:2<br>**corners**<br>53:3<br>**CORPORATION**<br>2:9<br>**correct**<br>11:10,11,24 13:2<br>14:13 16:22,23<br>21:17,18 29:10,11<br>29:16 31:7,8 38:18<br>38:19 46:3,6,15<br>47:18 49:10 50:5<br>50:12 52:9,12,13<br>52:16,17 57:22<br>58:24 59:1 61:13<br>62:4,11 63:15,16<br>68:22<br>**Correction**<br>36:6<br>**corrections**<br>70:14<br>**counsel**<br>2:9 69:1,7<br>**County**<br>1:19 68:3,5 69:18<br>**course**<br>9:18 49:22 51:14<br>**court**<br>1:1 5:3,4 30:16 67:1<br>68:10 70:1,7,22<br>**Courts**<br>1:17<br>**cover** | **7:23**<br>**Cox**<br>1:18,23 67:13 68:4<br>70:22<br>**CPD**<br>52:10<br>**crime**<br>7:12 10:11,11 11:10<br>53:22 64:3<br>**criminal**<br>16:22 53:15 59:6,12<br>**criminals**<br>13:22 56:6,9,9 57:1,4<br>**CSR**<br>1:23<br>**currently**<br>42:4,10,21<br>**curriculum**<br>19:4<br>**CV**<br>1:9 67:7 70:7<br><br>**D**<br><br>**D**<br>3:1<br>**daily**<br>1:10<br>**DALEY**<br>1:11<br>**date**<br>65:7 70:4,8<br>**day**<br>1:21 10:12,20 11:13<br>26:16 67:21 68:7<br>69:12<br>**days**<br>65:10<br>**day-to-day**<br>9:24<br>**deadly**<br>26:4 55:3,11<br>**dealing**<br>34:18<br>**Dear**<br>70:9<br>**Dearborn**<br>1:20<br>**death**<br>52:3<br>**decade**<br>29:14<br>**decisions**<br>10:24 11:3 13:4,5,9<br>13:10<br>**decline**<br>33:1<br>**deep**<br>40:22,22<br>**Defendant**<br>68:13<br>**Defendants**<br>1:13 2:15 67:9<br>**Definitely**<br>55:1<br>**definition**<br>52:22<br>**degree**<br>53:23<br>**department**<br>2:10 6:7,9 9:16 10:15<br>20:5 29:13 32:7<br>35:10 45:23 46:23<br>48:24 56:22 63:14<br>63:18,21 64:17<br>70:22<br>**depends**<br>13:7,8<br>**deploy**<br>10:10 11:9<br>**deployed**<br>11:3<br>**deploying** | **11:13**<br>**deployment**<br>10:3,24 13:3<br>**deponent**<br>70:8,11,13,16<br>**deposed**<br>4:10,13,16,21<br>**deposition**<br>1:14 3:14 30:12<br>64:24 65:19,21<br>67:12 69:1,4,5<br>70:10<br>**depositions**<br>1:17<br>**deputy**<br>7:10,15,17 8:1,3,5<br>10:7 12:21 33:14<br>33:22 44:2,8<br>**describe**<br>35:3 41:1 42:22<br>**described**<br>11:8 28:9 41:17<br>56:13 58:16<br>**desire**<br>36:13,16 37:1,17<br>48:19,22 49:5<br>**detail**<br>13:13<br>**detective**<br>6:16<br>**Detectives**<br>6:15<br>**deter**<br>60:10<br>**determining**<br>10:10 18:22<br>**developing**<br>9:2<br>**devised**<br>9:13,15<br>**devising**<br>9:19<br>**different**<br>9:14,15 25:7 33:16<br>33:24 45:11,23<br>**direct**<br>45:3<br>**directing**<br>48:15<br>**directly**<br>8:12 43:6<br>**directs**<br>22:7<br>**discussion**<br>44:9,12<br>**distance**<br>60:14,21<br>**distinction**<br>24:18 28:23<br>**distribution**<br>70:18<br>**district**<br>1:1,2,16 6:12,14,18<br>6:23 7:1,7,7,22<br>11:23 35:13,14<br>67:1,2 68:10,10<br>**districts**<br>8:1<br>**division**<br>1:3 7:13 67:3 68:11<br>**document**<br>30:22<br>**domestic**<br>16:6,21 18:1 50:8<br>59:5,11<br>**downward**<br>32:21<br>**Drew**<br>47:20 64:23<br>**drop**<br>62:23<br>**Drug** | **43:2**<br>**duly**<br>4:3 68:15<br>**D.C**<br>2:5<br><br>**E**<br><br>**E**<br>1:18,23 3:1,12 67:13<br>68:4 70:22<br>**earlier**<br>45:7 46:13 49:11<br>54:14 55:4 56:13<br>**Early**<br>6:11<br>**Earnest**<br>12:24<br>**easier**<br>28:7 53:11,15<br>**Eastern**<br>1:3 67:3 68:11<br>**easy**<br>27:17<br>**economic**<br>5:19<br>**education**<br>5:14,22<br>**educational**<br>5:12<br>**effective**<br>32:7,17<br>**either**<br>8:12 58:5<br>**email**<br>65:3<br>**embarking**<br>40:18 41:4,21<br>**emergency**<br>51:15<br>**empirical**<br>63:1<br>**employment**<br>5:24<br>**enacted**<br>20:4 22:2<br>**enclosed**<br>25:4 70:10,11<br>**endures**<br>15:14<br>**enforcement**<br>36:15 38:18 39:1<br>43:2 48:11 57:2,4<br>**engage**<br>59:11<br>**enhanced**<br>51:5<br>**entail**<br>7:21 41:2,22<br>**entire**<br>7:23<br>**entitled**<br>30:18 49:13<br>**equipment**<br>12:5,6<br>**errata**<br>70:12,14,15,17<br>**escalating**<br>15:15<br>**escalation**<br>23:18 55:2,11 58:8<br>62:20<br>**especially**<br>36:1 37:5<br>**essentially**<br>11:18 15:11<br>**establishment**<br>54:24<br>**establishments**<br>55:18<br>**et**<br>67:5,8<br>**Eugene** | **1:14 3:3 4:2,9 67:19**<br>68:8,14 70:8<br>**Evangelical**<br>40:20<br>**event**<br>40:16<br>**evidence**<br>22:11 25:11 28:15,19<br>29:1 32:24 57:17<br>63:1<br>**exactly**<br>63:1<br>**examination**<br>1:15 3:2 4:5 44:18<br>58:1<br>**examined**<br>4:4<br>**examples**<br>42:20<br>**Executive**<br>43:4<br>**Executives**<br>38:18<br>**exhibit**<br>3:14 30:10,11,13,17<br>31:1 45:4 48:16<br>**exist**<br>54:21 55:4<br>**exists**<br>27:20<br>**exit**<br>60:21<br>**expect**<br>19:6,9<br>**expected**<br>55:23<br>**experience**<br>15:2,12 16:3 22:15<br>23:24 25:12,15<br>27:6,19,22 28:20<br>32:6 33:4 37:24<br>38:6 51:19 53:20<br>54:1,3 55:9 56:19<br>58:13 60:9,13<br>63:24<br>**experiences**<br>22:18<br>**expert**<br>32:13<br>**explained**<br>25:13<br>**explanation**<br>22:8,11<br>**extends**<br>61:3<br>**extent**<br>17:4 20:22 23:15<br>29:21 31:13,15<br>32:12 34:3 37:15<br>40:10 43:10 60:15<br>**ex-offenders**<br>34:18<br>**eyebrows**<br>31:21<br><br>**F**<br><br>**facilities**<br>12:7 63:21<br>**facility**<br>56:17<br>**fact**<br>16:3 19:5 21:24 22:6<br>59:20<br>**fair**<br>45:13,15 57:13<br>**familiar**<br>4:22 42:16 51:18<br>52:19<br>**feature**<br>53:19<br>**federal**<br>35:6,20 39:3 | **fewer**<br>16:3,4,8 22:9 36:20<br>59:20<br>**field**<br>9:4<br>**fifth**<br>33:11 45:6<br>**fight**<br>40:9<br>**finance**<br>6:5,6<br>**find**<br>37:10,11<br>**fine**<br>43:10<br>**finish**<br>5:1,2<br>**finished**<br>60:2<br>**firearm**<br>14:5,7,22 15:9,21<br>16:12 18:12,14,17<br>18:24 19:7,11,15<br>20:16,18 21:20<br>22:21 23:4 24:5,7<br>24:23 25:9,20 26:9<br>27:13 29:10 33:6<br>34:22 38:2,8,9<br>49:14 53:2 54:7,18<br>58:20 59:3,11,13<br>59:15,22,23 60:6,8<br>60:10,11 61:2,5,6<br>62:2,7,8,9,13 63:2<br>63:8,9,10,11 64:2<br>**firearms**<br>1:5 13:23 15:24<br>16:13,19 17:2 18:5<br>18:18 19:12,16,21<br>20:9 21:15,22 24:9<br>22:20 24:2,8,10<br>25:17,19 26:1,2,4<br>26:12,18 27:8,9,18<br>28:16,23,24 29:1<br>29:14 31:20 32:4,7<br>33:2 36:24 37:10<br>37:16 40:6 44:12<br>46:18 47:6,11<br>49:15 50:7,10,19<br>51:4,6 52:6 58:15<br>58:24 59:5,21 62:1<br>63:14,20 67:4<br>68:12<br>**first**<br>4:3,23 17:1,22 18:3<br>18:4,21 19:20<br>36:10 48:11 50:14<br>50:22 51:7 68:15<br>**fist**<br>40:9<br>**five**<br>44:23<br>**FOID**<br>21:2<br>**follow**<br>9:9 14:4 28:6<br>**following**<br>5:24<br>**follows**<br>4:4<br>**force**<br>25:5 43:24 44:5<br>51:19 52:19 53:20<br>54:3 55:10<br>**foregoing**<br>67:15 68:21 69:1<br>**form**<br>36:4 43:5<br>**format**<br>36:5<br>**forms**<br>46:11<br>**forth** |

8:10 21:2 35:22
64:24
**forward**
12:17 22:6
**found**
59:24
**four**
53:3
**Fourth**
6:12,13,18
**front**
54:16
**fulfill**
2S:18 65:12
**full**
56:16
**fully**
56:23
**function**
8:3 42:16
**functions**
7:24
**further**
57:23 58:1 68:14,24
69:3,7

**G**
**gang**
28:3 55:24 56:5
**gangs**
56:2
**garage**
23:7 53:7
**garages**
53:19
**Garrett**
40:20
**gathering**
55:5
**general**
22:8 37:22 49:17
58:10
**generally**
39:10 53:1,9,21
**generated**
10:19
**generation**
33:13,21
**germane**
65:22
**getting**
40:4
**give**
12:16 13:16 17:5
23:14 34:6 39:8
42:20 47:23 60:17
60:17
**given**
22:8,12 37:4 57:12
57:19 67:16 68:18
68:22
**gives**
10:20
**giving**
34:20,20,20 39:4
**go**
4:22 8:21 14:1 19:7
19:10 27:15 28:3
29:9 31:20 37:10
40:23 64:24
**goal**
8:22
**goes**
16:2 17:21 52:5
**going**
5:18 13:14 14:1 39:4
41:2,8,21 58:3
60:23 65:12
**good**
44:6
**governmental**
13:21,22 14:10,10,20

14:21 25:23,23
26:11 27:12
**graduate**
5:20,22
**graduated**
5:16,19
**graduation**
6:1
**greater**
24:8,23 27:20 40:10
53:23 54:17 62:1,8
62:19 63:2,9
**ground**
4:22
**grounds**
56:17
**group**
7:24 8:3 35:20 40:18
**guess**
5:12 15:20 24:17,21
28:22
**guidance**
34:20
**gun**
18:13 27:4 28:4 30:5
32:8 35:15,16,19
36:1,14,16 37:1,18
39:23 40:2,10,13
41:13 42:9 43:13
43:24 44:4,9,10
45:13 46:5,11 47:1
48:8,20 49:1,9,21
50:1 51:22,24 52:2
52:23 53:15 54:22
55:3,6,6,11,15,15
56:4,17 57:9 58:5
58:14,18 61:8
**guns**
16:3,4,8,10 17:21
27:1 32:18 33:8
35:24,24 36:20
37:6,21 48:23 49:4
49:5 50:15,23
51:14 52:11,15
55:22 56:8,11,15
56:21 57:3,9 61:12
61:18
**guys**
62:21

**H**
**H**
3:12
**HALL**
1:7
**Hampshire**
2:4
**hand**
69:12
**handed**
30:16
**handgun**
23:5 24:19,21 30:18
35:8
**handguns**
15:6,9,12 16:19
29:20
**handle**
70:17
**hands**
62:19
**happen**
34:21
**harmed**
51:14 52:11,15 61:12
61:18
**harping**
62:15
**Harvey**
56:22 63:14
**held**
5:24 6:8 38:20

**helping**
35:1
**hereinbefore**
69:6
**heretofore**
68:6
**hereunto**
69:11
**high**
5:12,15
**history**
18:10
**HIV**
39:5
**hold**
34:12
**home**
14:15,16,23 15:9,22
16:5,6,7,9,13,20
17:1,8,19,19 18:4
18:6,9,23 20:19,24
21:7,16,17,22,23
22:21 23:6 24:9,11
24:19,24 25:1,4,8
28:6 37:5 49:14,22
50:9,19,23 51:4,6
51:11 52:22 53:3,9
53:17,21,23 54:15
58:6 59:3,7,14,15
60:10 62:2,3,9,10
63:3,3,9,11
**homeowner**
49:13 50:4 54:4
**homes**
17:18 50:14 53:19
55:21,23 56:7,10
**homicide**
6:16 15:19 33:1
**homicides**
10:21 32:20 33:5,9
**hot**
10:4
**hour**
1:21
**house**
18:1 21:3 23:17,21
25:9 37:10 49:22
56:3,3 60:18 62:14
**household**
6:6 20:15
**houses**
56:15
**huge**
35:19 39:5
**hurt**
51:22

**I**
**IAFR**
70:7
**ID**
3:13
**idea**
40:4
**identification**
30:14
**identified**
13:20
**Illinois**
1:2,5,19,20 2:13 43:1
68:11 69:18 70:2,5
**impact**
32:22 34:10
**implement**
13:4,9
**important**
36:14,19 37:7
**improper**
47:17 53:12
**improperly**
48:4,7,23

**incarcerated**
34:19
**incident**
16:6 38:7,14 48:10
63:17
**incidents**
10:15,17 15:13
**include**
23:6
**including**
14:16 58:7
**increase**
26:19 27:2,20
**increased**
26:16,16 27:4 28:16
29:3
**independent**
22:4
**indicate**
45:9
**indicated**
27:15 37:21 54:14
65:3,15
**indication**
10:20
**indirectly**
8:12
**individual**
59:13 60:10 65:17
**individuals**
15:23 16:12 17:1
25:18,24
**information**
10:13 13:20 14:3,9
14:19 18:17 20:4
23:10 24:22 25:22
28:2 35:17 41:15
43:5 57:17
**informed**
65:11
**initiated**
35:7 56:4
**initiation**
56:1
**initiative**
35:7,20,23
**inject**
20:3
**injured**
38:2,7
**injury**
64:11,18
**inner**
39:7
**innovative**
34:17
**inoperable**
16:13 37:8,12 49:15
59:24 60:8,11,20
61:2
**inside**
24:10,19 25:1 62:10
63:3,11
**instance**
54:6,23 64:1
**instances**
28:9 54:4 55:10,20
57:17 58:5,12
61:17 62:16 64:7
**instituted**
20:8
**interest**
15:22 17:14 21:20
26:11 27:12 36:24
37:17
**interested**
69:9
**interests**
23:14 14:11,21 23:11
25:24
**interim**
7:12,15

**International**
43:3
**Interstate**
43:23 44:4
**intervention**
46:11,12
**interview**
31:10
**interviewed**
31:6
**intimidate**
54:8
**intimidation**
23:19 48:5 54:10
55:2,11 58:7 62:20
**Introduce**
30:10
**intruder**
49:21 50:2
**involved**
18:14 24:2 42:4,13
43:23
**issue**
65:22
**issued**
65:10
**issues**
12:4,4 13:15

**J**
**Jana**
1:18,23 67:13 68:4
70:22
**January**
7:5 65:7
**job**
8:21 34:23 38:24
**joined**
6:6,10,13
**Jude**
42:24
**July**
19:21 20:10
**June**
7:8,9
**jus**
42:20
**justifications**
13:21 14:10,20 25:23
**justify**
21:13

**K**
**K**
68:3
**KATHRYN**
1:7
**keep**
62:15,21
**KENNETH**
1:6
**key**
15:5
**kill**
35:24 56:18
**killed**
52:8 58:19
**kind**
54:24
**kinds**
55:2
**KIRK**
2:2
**knew**
35:16
**know**
5:3,6 8:22 9:16 10:14
11:1 12:8,10 15:1
15:3,3,11,14,18
16:20 17:21 18:9
18:10,16,18,19,20
18:21 22:3,3 23:16

26:13 27:14,24
28:12 32:12 33:7
37:9,15 42:13,15
43:5,10,17,18,19
43:20 51:23 52:5
62:2,15,16 65:21
**knowing**
18:5
**knowledge**
15:2,11 19:19 22:1,4
22:15 23:24 25:3
43:15 51:3
**known**
21:3 37:9
**knows**
60:6,7 61:8

**L**
**lack**
28:3 37:21
**large**
32:19,19 39:3 40:7
**LaSalle**
2:12 70:1,5
**law**
2:10 17:1 22:1 29:22
36:14 38:17 39:1
48:10 57:2,3 59:13
59:14 60:9
**lawfully**
21:15 25:20 26:1
28:15,24 29:2 38:2
38:8 58:15,20
61:18
**lead**
22:10,21 26:19 58:6
**leading**
45:18 46:2,7,14
47:22
**League**
43:1
**learn**
10:17
**led**
58:15
**legal**
17:5 20:22 21:10
29:23
**legally**
17:8 51:21 52:2
**legislation**
20:4 39:18
**lesser**
33:7
**let's**
4:12
**License**
1:24
**lieutenant**
6:24 7:4
**lieutenants**
8:9
**life**
8:23
**likelihood**
15:13
**likewise**
56:12
**limitation**
14:11,22 15:21 17:12
17:20 21:6,19
23:11 59:3
**limiting**
15:8 16:12,19 22:20
59:13 60:9
**limits**
14:6 23:4
**line**
45:7 49:16 50:13

52:21 58:10
lines
46:10
list
12:8
little
5:10 35:4 41:1 64:14
live
21:7
lives
20:24
living
20:19 21:16,23
local
35:21 39:3
located
28:8
location
10:4 18:11
locations
10:6
lock
37:9,12 50:2
long
17:2,21 20:16 34:24
38:20
longer-term
11:2
look
11:16 15:3 26:14
30:18,21,24 31:18
36:7 44:23
looking
32:17 35:15 60:15
lot
52:1,4 54:24 55:5
lower
11:19

**M**
M
1:11
maintain
49:5
major
45:14
majority
33:5
making
10:5
March
7:16
Margaret
70:22
mark
30:11
marked
3:13 30:13,17
matter
21:24
Mayor
1:11
McCorkle
70:1
mean
18:16 33:24
means
18:5
measures
24:4
meet
17:3 20:17
meeting
44:1,7,7,11 55:17
member
42:10 43:1,3,4
members
20:5 28:3 56:1
mentioned
11:22 18:3 35:2
37:15 43:11 58:15
63:13 69:6

mentoring
39:5,6
merited
12:17
message
35:23
method
60:7
MICHAEL
1:7
mind
14:18
minutes
44:23
mischaracterizes
29:22
mistaken
61:7
misuse
46:18 47:7,16
misused
47:12 50:11 51:7
model
39:8
motivations
53:13
move
22:6 30:4
multiple
20:15 21:16,21 22:5
27:18
multi-pronged
49:7
myriad
12:3

**N**
N
3:1 70:1,5
name
4:7
narcotic
7:5
narcotics
6:20,21 7:3,4
National
38:17
necessarily
36:5
necessary
5:5 17:3
need
12:7,7,8,10 13:5,10
30:20 36:9,12
48:18 49:15 70:15
negative
58:6,16
Neighborhoods
35:3,4,6,11
new
2:4 12:7 20:4
news
45:4
night
10:12,21,22 11:2
NOBLEE
39:10,15,17 40:2,12
41:11
North
1:20 2:12
Northern
1:2 67:2 68:10
Northwest
2:4
Northwestern
40:17,19,21 41:16
notarial
69:12
notarized
70:15
notary
1:18 67:24 68:4

69:18
notes
44:23
notice
1:15 65:10,13,17
69:4
noticed
65:1
notify
18:10
November
7:18
number
3:13 15:6,9 16:19
17:20 19:11,11
21:6 22:20 26:16
27:3 32:18,19,20
45:16 46:18 47:6
50:7,10 51:6,10
58:4 59:4,5 70:7
70:19
numbers
11:17

**O**
O
68:3,3
object
20:21 46:1
objection
8:17 9:5,21 11:5,14
12:14 14:24 16:15
17:4 18:7 19:1,13
19:23 20:21 21:9
21:12 22:13,23
23:13 24:12 25:2
25:14 26:3 27:5
28:18 29:5,5,15,21
30:7 31:11 32:9
33:3 34:3,5 37:2
38:3,10 41:3,18
42:5,11,23 43:14
44:13 45:18 46:7
46:14,20 47:2,8,13
47:20,21,24 53:24
59:16 60:12 61:20
63:4 64:4,13,20
objections
32:15,16 37:19
objective
36:15
obviously
46:5
occur
28:10 50:9 54:11
55:14,17
occurred
10:12 11:11 28:12
55:12
occurring
48:12
offenders
35:16,19,19 46:5,11
office
7:16
officer
4:19,20 6:12 18:11
22:16 24:1 38:1,7
51:2,22 52:3,8
56:8,14,16,18
58:14,18 62:24
64:1
officers
8:9,11,16 9:8 13:12
18:16 43:2 48:11
50:18 51:13 52:5
52:10 55:21 56:15
58:23 61:12,17
62:16,18 64:9
officer's
51:24 56:2,3,4
officials

39:1
okay
7:20 11:8 13:8 14:17
19:9 20:7 33:19
36:7,11 42:3 44:11
48:1 59:19 61:10
61:11 65:23
once
12:12 23:21
one's
53:8
one-line
36:8 48:17
ongoing
36:3
open
33:15,23 45:10 55:16
operable
14:6,22 15:8,21 16:1
16:12 17:9,13,21
20:16 21:4,15,19
21:22 22:20 49:14
50:10 51:10 53:2
59:3,13,23 60:7,10
60:16
operate
63:18
operates
40:21
operation
26:9,18
opinion
15:14 17:5 20:22
21:10 24:6 27:13
29:23 32:14 33:7
opportunity
16:20 36:22 60:17,18
opposed
29:2 53:17
options
34:21
order
34:10 56:4 64:11
ordinance
13:23 14:5,12 19:21
20:9 23:4 25:18
27:9 36:24 37:16
44:12 49:12 52:23
organization
38:17,23 39:10,15
42:17
organizations
42:3,7,13,15,21
43:11
organized
7:12
outcome
69:9
outside
23:17,21 24:9,24
25:8,8 62:2,9,14
63:2,9
overbroad
9:21 32:14
overcoming
62:21
oversee
38:24
owner
49:23

**P**
PACHOLSKI
1:6
page
33:11,12 36:8 45:5
48:16,16
pages
70:12,15,17
paragraph
31:18 33:12 36:9
45:6

parent
39:15
parking
52:1,4 54:23 55:5
part
19:5 39:3 40:7 42:8
43:6 56:1
particular
13:15 14:3 19:11
38:14 40:5
parties
69:2,8 70:18
partnering
40:17
parts
23:6
passed
19:21 20:10
patrol
7:17,19,21 10:2
12:22 20:11
Patterson
2:3 3:4 4:6 6:3 8:18
6:7,23 11:7,21
12:19 15:7 16:17
17:10 18:15 19:8
19:18 20:6 21:5,11
22:17 23:2,22
24:16 25:10,16
26:7 27:7 28:21
29:7,17 30:3,10,15
31:3,17 32:1,17,23
33:10 34:11 37:13
37:23 38:5,13 41:6
41:23 42:6,19 43:9
43:22 44:16 45:6
45:18 46:1,7,14,20
47:2,8,13,20 48:1
48:17 49:11 53:24
58:2 59:18 60:5
61:1,23 63:6 64:6
64:15,22 65:5,23
70:23
pending
5:7 68:9
people
8:7 13:14 17:18,23
21:2,7,16,22 22:5
24:2,8 26:21,23
27:18 34:10 35:16
35:18,20 36:13,16
36:21 37:1,5,9,17
39:5,7 40:4,8 47:7
48:19,23 49:4 52:6
52:12,16 53:12
54:22 61:13,19
62:17,19
PERF
43:5,16
perfectly
65:16
perform
10:1
period
6:24 7:13 29:19
permit
21:1
permitted
25:20 53:4
person
13:1,20 14:7,22
15:22 18:13 20:24
21:20 22:22 24:7
59:10,21 60:1,3,6
60:11,15 61:5,8
62:1,9 63:8,10
64:3,11,12,19
personal
28:20 33:4
personally
20:11 41:24 68:7

personnel
12:4 13:16
persons
15:8 20:15
person's
23:5,5 24:24 64:3,12
64:19
pertaining
1:17
Pete
44:22 65:16
Peter
2:3 70:2,3
phone
70:19
pick
36:1,14,16,21,22
37:1,18 40:5 48:20
pilot
35:12
place
10:16,18 19:7,10
29:20 32:5 34:18
55:5 61:4
Plaintiff
68:12
plaintiffs
1:8 2:7 65:18 67:6
plans
41:7
play
4:7
please
4:7 70:3,16,19
plus
15:3 22:16 39:14
52:19
point
62:9 62:22
police
4:18,20 6:7,8 22:16
24:1 29:12 32:6
35:9 38:1,7 43:1,3
43:4 45:23 46:23
48:24 51:13,22,24
52:1,5 55:21 56:2
56:3,4,7,15,16,17
56:18,22 58:14,23
61:11,17 62:16,18
62:24 63:14,17,21
64:1,9,17
policies
9:3,9,12,20
policy
23:11
porch
53:5 54:7
porches
23:7
position
7:14 16:11 27:2
38:20 60:19 65:2,4
positions
6:8
positive
39:8
possess
17:1 20:16 24:19,20
25:20 26:2 58:20
possessed
21:15 28:16,23,24
29:2 38:2,8 51:22
52:2,12,15 58:15
61:12,18
possessing
20:17 24:7
possession
14:6 23:4 24:23
29:20 58:5
possessor
47:16 48:8
possible

55:1 57:16
**potential**
18:23 23:20 27:21
28:5
**potentially**
32:13 60:22
**practice**
26:22
**prepared**
64:23
**presence**
51:4 68:19
**present**
28:16 29:3 69:5
**presented**
24:22
**presents**
23:20 27:3
**president**
38:16,23,24 42:24
**pretty**
22:7 34:17
**prevent**
60:3 64:11,18
**previous**
11:17 18:13 32:4
**primarily**
10:3,11 11:16 32:18
39:2,6
**primary**
8:22
**prior**
29:22 33:2
**private**
54:5,5
**probably**
4:22
**problem**
30:5 40:13 41:13
42:9 45:14,16,22
45:24 46:6 47:1
49:9
**Procedure**
1:16
**procedures**
9:3,9,12,17,20
**Proceedings**
66:1
**process**
40:14,23
**produce**
65:6,16
**profession**
7:20
**program**
35:12
**progress**
41:10
**project**
7:16 35:3,4,6,10 36:3
41:11,16
**promoted**
6:16,22 7:4,9,11,18
**prongs**
49:8
**proper**
26:6
**property**
8:23 23:5,7 24:9,10
24:20,24 53:8 54:5
54:6 64:3,12,19
**proposal**
65:9
**proposed**
65:7
**protection**
8:22
**providers**
35:22
**provision**
14:3 49:12,20 50:7
**provisions**
13:23 14:2 36:23

**public**
1:18 47:7,11 48:13
51:5 54:12,12,16
55:12,16,17 58:6
62:14 67:24 68:4
69:18
**purchase**
17:8
**purchasing**
27:18 28:5
**purpose**
47:17 50:6
**purposes**
13:22 14:11,21 25:24
48:5 49:19
**pursuant**
1:15 65:17 69:4
**pursue**
49:1
**put**
9:10,16 19:5 34:17
65:5,13
**putting**
62:18

_____
**O**
_____

**question**
5:7,7 8:20 11:15
15:20 16:16 24:15
31:14 44:6 46:1
51:21 63:7
**questioning**
45:7 49:17 50:13,17
52:21 58:10
**questions**
4:24 44:16,21,24
50:21 58:3,4 67:16
70:19
**quickly**
50:3 64:18
**quite**
4:17 25:7
**quote**
31:19,22 32:3 34:4
36:12
**quotes**
36:9
**quote/unquote**
45:10 48:18

_____
**R**
_____

**raised**
31:21
**ramble**
37:10
**rampant**
33:13,21
**range**
26:22 55:6 56:22
57:3,5,6 63:15
**ranges**
26:9,12,18 54:23
55:16 63:18,19,20
**rank**
6:17
**read**
33:20 67:11
**reasons**
15:5
**recall**
4:15 6:2,4 22:19
30:23 34:5 38:14
43:7 57:20 58:4,8
58:17 59:2 61:22
**recollection**
34:6,7 41:14 44:14
57:14
**recommend**
39:18,22
**recommendation**
13:17
**recommendations**

43:12
**recommended**
40:2
**record**
4:8 45:1 61:15 65:6
65:14
**recovered**
18:12 31:23 32:18
**recovering**
29:13
**reduce**
35:1,8,15 36:13,16
46:17 47:6 48:19
49:1,3 59:4,4
**reduced**
68:20
**reduces**
16:20
**reducing**
17:14 21:20 32:8
36:24 37:17 48:22
49:20 50:7,9 51:5
51:9
**reduction**
15:4 22:10,21
**refer**
22:24 39:9
**referred**
39:11
**referring**
32:2 45:5
**regarding**
13:21 14:3,9,20
23:10 25:22 50:18
51:4
**regardless**
51:1,3
**registered**
18:6
**registration**
17:3 18:17
**regular**
8:24 29:8 31:19
52:14
**relate**
57:18
**related**
42:8 69:8
**relevance**
42:5,23
**reliance**
65:9
**relief**
20:3
**rely**
25:15
**remember**
31:13,15 45:7 48:20
49:16 50:13 51:20
51:23,24 52:21
**render**
60:7,16
**rendered**
49:15 60:8
**rendering**
61:2
**renders**
16:13
**repair**
12:7
**repeat**
38:4,4 62:6
**repeating**
14:18
**report**
8:2,4,7 10:19 12:9,11
13:1
**reported**
1:23 68:18
**reporter**
5:3,4 30:16 67:14
70:22

**Reporters**
70:1
**reporting**
8:1
**reports**
8:24 11:1,10,12
**representing**
2:7,15 44:2
**request**
5:6
**require**
13:17 25:18
**requirement**
25:19 53:1
**requirements**
17:3 20:17
**requiring**
25:24
**research**
40:13 41:2,12,16
43:5
**reserve**
65:24
**residences**
51:15 52:11,12,16
61:13,19
**resident**
16:8
**residential**
54:5
**residents**
14:6 18:6 26:23,24
**resist**
48:10
**resolution**
40:7
**resolved**
40:9,10
**resource**
12:4 13:3
**resources**
10:3,5,10,24 11:3,9
11:13
**respect**
34:7
**respective**
69:2 70:18
**respond**
8:21,23,24 11:22
64:10,17
**responded**
52:10
**responder**
51:7
**responders**
17:17,22 18:3,4,21
19:20 48:11 50:14
50:22
**responding**
9:3,10 17:17 18:24
51:2,14
**response**
19:20 52:4
**responsibilities**
8:15 38:22
**result**
33:6
**RETAILERS**
1:6 67:5
**return**
70:17
**review**
12:16 70:13
**Reviewing**
30:22
**revoked**
65:13
**RICHARD**
1:11
**right**
8:9 22:6 33:18 40:14
40:24 41:5 43:8
61:10

**risk**
27:3 28:16 29:3
61:24 62:7 63:2,8
63:10
**risks**
24:6
**Riverdale**
28:13
**role**
9:2,19 10:1 39:8
**Roosevelt**
5:17
**root**
40:23
**roughly**
6:14 7:8,11 8:5
**rules**
1:15 4:23

_____
**S**
_____

**S**
3:12
**Safe**
3:3,4,6,10
**safety**
17:22,23 51:5
**sale**
27:9
**sales**
27:13
**saying**
65:20
**says**
24:18 31:19,21 33:12
33:13,20,21
**school**
5:13,15
**seal**
69:12
**second**
33:12,17 45:5 48:15
**section**
6:20 7:3,5
**secure**
25:5 53:21 70:13
**secured**
50:1 53:9
**see**
28:4 33:16 34:16
36:10 45:11
**seen**
27:24 30:19 31:4
**Seminary**
40:20
**send**
12:9,11,17
**sent**
13:12,13 20:5 36:2
**sentence**
33:12 48:17
**sergeant**
6:17,17,21
**sergeants**
8:9
**serve**
23:12 26:12 27:13
36:24 37:16
**served**
49:19 50:6
**service**
35:22
**serving**
51:9
**set**
69:11
**Setina**
70:22
**sheets**
70:12,14,15,17
**shot**
47:19 54:8 56:18
**shooting**

15:18 54:10,23 56:22
57:3,5 63:15,18,19
**shootings**
10:20 33:6,8 50:9
**Shore**
5:15
**shorter-term**
10:24
**Shorthand**
67:14
**shortly**
6:6
**shot**
52:3,7,8 58:20 60:4
**show**
39:8
**shown**
33:13,21
**side**
35:12
**sidewalk**
54:12,17
**signature**
65:24 68:24 70:11,13
70:14,15,17,22
**signed**
70:15,15
**simple**
15:15
**simply**
34:9 37:21 59:20
**Sincerely**
70:21
**single**
21:16
**sit**
42:15,21 57:14,21
**site**
41:20,20
**situation**
18:2 25:7 27:16,20
33:15,23 34:2 38:1
58:23 60:22 64:10
64:18
**situations**
15:15 16:22 50:11
58:8 59:6
**Soderberg**
52:3 56:14
**solutions**
39:22 40:1 43:12
**somebody**
47:19
**sorry**
36:6 42:18 60:2
**sort**
46:12 54:10
**sorts**
35:9 50:11 55:14,16
**sources**
10:13,14
**south**
5:15 28:14
**spaces**
55:17,18
**span**
11:12
**speak**
13:18 19:4,5 41:9
**speaking**
20:2
**special**
7:24 8:3
**specific**
13:13 22:18,24 28:2
41:7,15 42:1,16
**specifically**
43:20
**specifics**
51:16
**specified**
19:12
**speculation**

18:8 19:2,14,24
21:9 24:13 29:15
30:8 31:12 32:10
37:3,5 38:3 41:3
42:11 53:24 61:21
**spots**
10:4
**SS**
68:2
**St**
42:24
**stake**
28:4
**stalking**
62:22
**standing**
47:21,23 53:16 54:6
54:7
**start**
4:23 5:10 31:21
**started**
5:16 35:12 36:5
**state**
1:19 4:7 35:21 39:3
44:10 68:1,5
**stated**
33:1
**statement**
34:8
**statements**
31:10
**states**
1:1,16 49:12 67:1,15
68:9
**station**
52:2
**stats**
10:11
**stay**
35:24
**stayed**
6:14,21,24 7:2,8
**steal**
53:15 56:8,11 57:3,5
57:9
**steals**
48:8
**stenographically**
68:18
**stepping**
25:8
**steps**
12:13 54:15
**stolen**
62:8
**store**
27:18 28:8 37:6 55:6
57:9,10
**stored**
49:15 57:6,9
**stores**
28:4 54:22 55:15
**strategies**
34:17
**streamline**
44:24
**street**
1:20 2:12 54:12,17
56:13 62:19 70:1
**strike**
21:13 27:24
**studied**
63:7
**subject**
32:14,16 34:5
**subjects**
57:19
**submit**
70:13
**subordinates**
10:8
**SUBSCRIBED**
67:20

**substance**
34:23
**suburb**
28:14
**suicide**
59:11 60:4
**suicides**
50:8 59:4
**suit**
69:9
**Suite**
2:12 70:1,5
**superintendent**
7:10,15 12:21 44:2,8
**superintendents**
7:14
**supervise**
7:22,23 8:2,16 9:8
**supervision**
8:13
**support**
22:11,19 25:12 57:18
**sure**
9:6 10:5 14:14 24:14
28:13 41:19 43:7
56:18 61:16
**sworn**
4:1,4 67:20 68:15
**system**
18:10

---
**T**
---
**T**
3:12
**table**
46:24 47:5
**tack**
6:13,19
**take**
5:8 8:24 10:17 24:3
30:20 44:22 56:17
61:4 62:17 65:21
**taken**
1:18 24:4 52:1,6,8
54:18 58:14,18
65:19 67:12 70:8
**talk**
60:14
**talked**
46:13 55:3 57:20
**talking**
34:19
**tank**
40:19
**target**
40:5 53:22 54:18
56:2
**targeted**
52:4 55:22
**targeting**
35:16 62:22
**Task**
43:24 44:4
**team**
6:13,19
**tell**
5:11
**telling**
34:21
**temporarily**
60:8
**ten**
65:10
**terms**
10:15 12:5 16:4
18:22 19:3 20:7
25:8
**testified**
4:4 59:2 61:11,24
**testify**
62:7 68:15
**testimony**

59:10 61:3 62:12
63:13 68:17,22
69:11
**Thanks**
48:1
**theft**
54:18 55:22 56:21
62:1,8 63:2,8,10
63:13
**Theological**
40:20
**theory**
5:19
**thereof**
69:10
**thing**
35:2 39:9,18
**things**
10:9 11:1 12:9 15:3
34:9,24 37:14
44:24 45:24 46:10
51:23 55:14,17
**think**
12:17 16:2 17:21
22:9 25:6 28:7
31:16 32:17,21,22
34:16,23 36:17,20
37:6 40:14,19
43:16 44:1,7 61:7
61:15 62:5 64:22
**thinkers**
40:22
**third**
6:23 31:18
**Thor**
52:3
**thought**
17:15
**threats**
24:22
**three**
31:14
**time**
4:17 5:5,17 6:5 20:3
23:17 27:19,19
29:19 30:20 32:19
35:13,15 38:15
58:17 60:14,20
61:3,4
**times**
4:13
**today**
34:12 40:15 57:14,19
57:20,21 65:1,8,18
**tool**
47:5 48:24 49:3
**tools**
46:24
**topic**
40:18 43:19 65:7,8
**total**
8:5
**to-wit**
6:8
**traffic**
44:4,9
**trafficking**
43:24 44:10
**train**
26:1
**trained**
18:22 19:6,9
**training**
9:17 19:4,6,19 20:2
25:19 26:6,23
34:20,23,23 60:14
63:20
**transcript**
67:12,15 68:22 70:10
70:13,14
**Transcription**
68:21

**transferring**
13:16
**transition**
7:13
**transporting**
26:15
**travel**
65:22
**traveled**
65:8,20
**trending**
32:20
**trends**
10:11
**tried**
45:23
**trigger**
37:9,12 50:2
**troubled**
10:4
**true**
29:8,12 30:4 64:9,16
68:21
**truth**
68:16,16,16
**try**
5:1 40:11 45:24
**trying**
41:8 24:17 28:22
47:5 51:23 60:16
**turn**
8:7 33:11
**two**
6:15 7:17 36:10
**two-thirds**
36:7 48:16
**TYLER**
1:7
**type**
9:24
**types**
10:9 12:2 13:8,9
16:22 34:14
**typewriting**
68:20

---
**U**
---
**ultimately**
5:18
**unavailable**
16:14
**underneath**
8:12
**understand**
8:19 9:6 11:15 12:15
15:20 16:16 23:15
24:14,17 25:17
29:24
**understanding**
15:2,23 16:24 17:6,7
17:12 20:14,23
22:1,15 23:3,9
24:1 41:8
**understood**
5:9 16:18
**undertake**
35:10
**undetermined**
68:9
**unfortunately**
58:19
**uniform**
6:19 56:16
**unilaterally**
65:11
**Unit**
52:4
**United**
1:1,16 67:1 68:9
**units**
9:15
**university**

5:17,18 40:17,19,21
41:17
**unlawfully**
29:1,3
**use**
16:14 26:6 38:8 40:6
48:23 49:21 50:2
55:3,11 59:14 61:5
61:5

---
**V**
---
**vague**
8:17 9:5,21 11:5,14
12:14 14:24 16:15
18:9 19:1,13,23
20:21 22:13,23
23:13 24:12 25:2
25:14 26:3 27:5
28:18 30:7 31:11
32:9 33:3 37:2
41:18 42:5,23
43:14 44:13 59:16
60:12 61:20 63:4
64:4,13
**valid**
65:11
**valuable**
60:20,20
**various**
10:14 12:8 47:12
57:18,19
**vast**
33:5
**verbal**
5:3
**versus**
62:2
**view**
25:12 26:11 34:12,15
45:10
**violence**
13:15 15:4,13 16:10
16:21 17:14 18:1
21:21 22:10,22
23:20 27:4,21
28:17 29:3 30:5
32:8 33:13,21
34:10 35:1,8,15,17
39:23 40:2,13
41:13 42:9 43:13
45:13 47:1 49:1,9
50:8 58:7 59:6,7
64:11
**vs**
1:9 67:7 70:7

---
**W**
---
**wait**
4:24 5:1
**waived**
69:1
**want**
5:10 11:19 15:5
37:11 38:21 45:3
47:21 59:10 61:4
61:16 62:15 64:23
65:19
**wanted**
35:17 52:9 65:5,13
**Washington**
2:5
**wasn't**
59:17
**watch**
6:23,23 7:1
**way**
25:6 30:5 34:24 36:8
37:6 46:6 47:16
48:4,7 49:16 51:9
54:16 55:12 62:14
69:8,9
**ways**

9:14 17:21 47:12
**weapon**
16:7 17:24 21:1,3
22:2,7 23:17 37:7
52:8 53:4 60:16
**weapons**
26:4,15,17,19 27:16
27:19 28:5 31:23
31:24 37:6,8 40:6
51:10 56:24 57:6
60:19 62:17,18
**web**
41:20,20
**week**
40:16
**went**
5:15,16 6:11,15,20
6:22 7:1,3,6 34:24
32:22 44:6
**west**
35:12
**we'll**
14:4 33:9 65:24
**we're**
32:17 40:17,23 41:4
41:21
**We've**
31:24
**WHEREOF**
69:11
**Williams**
1:14 3:3,14 4:2,9,10
30:11,12,17 31:21
33:14,22 44:20
45:3 57:12 65:17
67:19 68:8,15 70:8
**willing**
24:3 26:5 56:7,9,14
56:16 57:2,4,8
62:17,17 65:16
**witness**
3:2 4:1,3 9:6,22 11:6
11:16 12:16 15:1
16:16 17:5,17 18:9
19:3,15 20:1,23
22:14,24 23:14,16
24:14 25:3,15 26:4
27:6 28:19 29:6,16
30:1,9,22 31:2,15
32:16 33:4 34:7
37:4,20 38:4,11
41:4,19 42:12,24
43:15 44:14 46:3,8
46:15,21 47:3,9,14
48:2 54:1 59:17
60:3,13 61:22 63:5
64:5,14,21 65:6
67:8,18,19,23
**word**
28:4
**words**
36:10
**work**
41:9
**worked**
6:5,15,21
**working**
6:18 13:14 39:7
42:14,18
**works**
41:9
**Worseck**
2:11 3:5 6:2 8:17 9:5
9:21 11:5,14 12:14
14:24 16:15 17:4
18:9 19:1,13,23
20:21 21:9 22:13
22:23 23:13,15
24:12 25:2,14 26:3
27:5 28:18 29:5,15
29:21 30:7,20,24
31:11 32:9,13 33:3

34:3 37:2,19 38:3
38:10 41:3,18 42:5
42:11,23 43:14
44:13,19,22 45:2
45:19 46:4,9,16,22
47:4,10,15,23 48:3
54:2 57:23 58:4
59:16 60:2,12
61:20 63:4 64:4,13
64:20 65:2,15,24
70:4,9
**wouldn't**
65:20

——————— **X** ———————
**X**
3:1,12

——————— **Y** ———————
**yard**
23:7 53:4,16 54:6,16
**Yeah**
61:9 64:16
**year**
5:20 6:12 11:17,19
29:14 31:22,23,24
**years**
15:3 22:16 31:14
32:1 45:17 51:19
52:19 55:9
**year-to-date**
11:17
**yesterday**
65:3,15
**young**
36:13,16,21 37:1,17
39:5,6 40:4,8,8
48:19

——————— **Z** ———————
**zone**
13:15

——————— **0** ———————
**04184**
1:9 67:7 70:7
**084-004399**
1:24

——————— **1** ———————
**1**
3:15 30:11,13,17
45:4 48:16
**10**
1:9 32:1 67:7 70:7
**10,000**
29:13 31:24
**10:34**
66:1
**11th**
35:13
**12**
32:1
**1230**
2:12 70:5
**14**
32:1
**15th**
7:1,7,7 35:13,14
**1523**
2:4
**17**
70:4
**17th**
69:12
**19**
6:14
**19,000**
31:23
**1976**

5:21
**1980**
6:11
**1981**
6:11
**1990s**
31:22
**1998**
6:22
**1999**
7:2

——————— **2** ———————
**200**
70:1
**2000**
7:4
**2001**
7:6,8
**2002**
7:6 36:6,7
**20036**
2:5
**2005**
7:9
**2007**
7:10 38:21
**2008**
7:16,18
**2010**
19:22 20:10
**2011**
1:21 67:14,22 68:7
69:13 70:4,8
**202**
2:6
**220-9600**
2:6
**25**
7:22,24
**28**
8:5
**29**
67:14 70:8
**29th**
1:21 68:7

——————— **3** ———————
**3**
8:4
**30**
2:12 3:15 15:3 22:16
51:19 52:19 55:9
70:5
**30(b)(6)**
64:24
**300**
70:1
**312**
2:14
**33**
1:20

——————— **4** ———————
**4**
3:4
**44**
3:5

——————— **5** ———————
**50**
39:14
**58**
3:4

——————— **6** ———————
**6**
8:1
**60601-1014**
70:2

**60602**
2:13 70:5

——————— **7** ———————
**7**
8:5
**7,000**
8:14
**744-7129**
2:14

——————— **8** ———————
**89**
6:15

——————— **9** ———————
**9:03**
1:21
**90**
6:15
**91**
6:16 35:7
**911**
18:10 60:17
**92**
35:7 36:6,6
**95**
6:20
**96**
6:20